Lori Rifkin, Esq. (CA # 244081)
(*pro hac vice*)
HADSELL STORMER & RENICK LLP
4300 Horton Street, #15
Emeryville, CA 94608
Telephone: (415) 685-3591
Facsimile: (626) 577-7079
Email: lrifkin@hadsellstormer.com

Dan Stormer, Esq. (CA # 101967)
(*pro hac vice*)
Shaleen Shanbhag, Esq. (CA # 301047)
(*pro hac vice*)
HADSELL STORMER & RENICK LLP
128 N. Fair Oaks Avenue
Pasadena, California 91103
Telephone: (626) 585-9600
Facsimile:  (626) 577-7079
Emails: dstormer@hadsellstormer.com
         sshanbhag@hadsellstormer.com

Craig Durham (ISB # 6428)
Deborah Ferguson (ISB # 5333)
FERGUSON DURHAM, PLLC
223 N. 6th Street, Suite 325
Boise, ID 83702
Telephone: 208-345-5183
Facsimile: 208-908-8663
Emails: chd@fergusondurham.com
         DAF@fergusondurham.com

Amy Whelan, Esq. (CA # 215675)
(*pro hac vice*)
Julie Wilensky, Esq. (CA # 271765)
(*pro hac vice*)
NATIONAL CENTER FOR LESBIAN
RIGHTS
870 Market Street, Suite 370
San Francisco, CA 94102
Telephone: 415-365-1338
Facsimile: 415-392-8442
Email: AWhelan@NCLRights.org
         jwilensky@nclrights.org

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ADREE EDMO (a/k/a MASON EDMO),<br><br>Plaintiff,<br><br>v.<br><br>IDAHO DEPARTMENT OF CORRECTION; HENRY ATENCIO, in his official capacity; JEFF ZMUDA, in his official capacity; HOWARD KEITH YORDY, in his official and individual capacities; CORIZON, INC.; SCOTT ELIASON; MURRAY YOUNG; RICHARD CRAIG; RONA SIEGERT; CATHERINE WHINNERY; and DOES 1-15;<br><br>Defendants. | Case No.: 1:17-cv-00151-BLW<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Complaint Filed:         April 6, 2017<br>Discovery Cut-Off:       None Set<br>Motion Cut-Off:          None Set<br>Trial Date:              None Set |

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that Plaintiff, through her counsel of record, hereby moves the Court for the issuance of a preliminary injunction: 1) ordering Defendants to provide her immediate access to necessary medical treatment, including (a) sex-reassignment surgery; (b) reinstatement of spironolactone, or an equivalent type of care; (c) access to gender-appropriate underwear, clothing, and commissary items; (d) any other treatment a medical professional qualified to assess and treat gender dysphoria determines to be medically urgent; and 2) prohibiting Defendants from (a) implementing their policy and/or practice of blanket denial of access to such treatment for transgender persons incarcerated in the Idaho Department of Corrections; and (b) disciplining or retaliating against Plaintiff for expressing her gender identity, including wearing gender-appropriate underwear and clothing, and adhering to female grooming standards with regards to makeup and hair styling.

This motion is based on this Notice of Motion and Motion, the memorandum of points and authorities filed herewith, the Declarations of Adree Edmo, Dr. Randi Ettner, Dr. Nick Gorton, and Lori Rifkin filed in support of this Motion, and all pleadings and files on record in this action, as well as any oral argument and evidence that may be presented at any hearing on this motion.

Dated: June 1, 2018

                Respectfully Submitted,
                NATIONAL CENTER FOR LESBIAN RIGHTS
                FERGUSON DURHAM
                HADSELL STORMER & RENICK LLP

                By:    /s/ - Lori E. Rifkin           
                      Lori E. Rifkin
                Attorneys for Plaintiff

---

PLTF'S MTN FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION .............................................................................................................1

PROCEDURAL STATUS ..................................................................................................1

STATEMENT OF FACTS .................................................................................................2

    Plaintiff's History of Gender Dysphoria ...............................................................2

    Standards of Care for Treatment of Gender Dysphoria ......................................3

    Defendants' Inadequate Treatment of Plaintiff's Gender Dysphoria ..................4

    Plaintiff's Ongoing Substantial Risk of Serious Harm.........................................6

ARGUMENT .....................................................................................................................9

    I.     Legal Standard for Preliminary Injunction ................................................9

    II.    Plaintiff Will Succeed on the Merits of Her Claims ..................................9

          A.    Defendants Are Denying Plaintiff Medically Necessary
                Treatment in Violation of the Eighth Amendment ....................10

          B.    Defendants Are Discriminating Against Plaintiff on the
                Basis of Sex in Violation of the Fourteenth Amendment and
                the Affordable Care Act............................................................13

    III.   Plaintiff Is Now Suffering and Will Continue to Suffer Irreparable
          Harm in the Absence of Relief.................................................................16

    IV.   The Balance of Equities Weighs Strongly in Plaintiff's Favor ...............18

    V.    The Public Interest Requires an Injunction.............................................19

    VI.   Plaintiff's Requested Relief Complies with the Prison Litigation Reform Act .....19

CONCLUSION..................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*A.H. v Minersvile Area School District*
   2017 U.S. Dist. LEXIS 193622 (M.D. Pa. Nov. 22, 2017) ..............................15

*Adkins v. City of New York*
   143 F. Supp. 3d 134 (S.D.N.Y. 2015)................................................................15

*Alliance for the Wild Rockies v. Cottrell*
   632 F. 3d 1127 (9th Cir. 2011) ..........................................................................9

*Chalk v. U.S. Dist. Ct. Cent. Dist. of California*
   840 F. 2d 701 (9th Cir. 1988) ..........................................................................16

*De'lonta v. Johnson*
   708 F. 3d 520 (4th Cir. 2013) ............................................................................4

*Doe v. Harris*
   772 F. 3d 563 (9th Cir. 2014) ..........................................................................18

*Doe v. Trump*
   275 F. Supp. 3d 167 (D.D.C. 2017)..................................................................15

*Estelle v. Gamble*
   429 U.S. 97 (1976)............................................................................................10

*Evancho v. Pine-Richland Sch. Dist.*
   237 F. Supp. 3d 267 (W.D. Pa. 2017)...............................................................15

*Farmer v. Brennan*
   511 U.S. 825 (1994)....................................................................................10, 12

*Fields v. Smith*
   653 F. 3d 550 (7th Cir. 2011) ................................................................. *passim*

*Fyock v. City of Sunnyvale*
   25 F. Supp. 3d 1267 (N.D. Cal. 2014) .............................................................18

*Glenn v. Brumby*
   663 F. 3d 1312 (11th Cir. 2011) .......................................................................14

*Gomez v. Vernon*
   255 F. 3d 1118 (9th Cir. 2001) .........................................................................20

*Hernandez v. Cnty. of Monterey*
 110 F. Supp. 3d 929 (N.D. Cal. 2015) ...................................................................16, 19

*Hicklin v. Precynthe ("Hicklin 1")*
 2018 U.S. Dist. LEXIS 21516 (E.D. Mo. Feb. 9, 2018) .............................................17, 18

*Hicklin v. Precynthe*
 No. 4:16-cv-02357-NCC, Dkt. No. 176 (E.D. Mo. May 22, 2018) .......................... *passim*

*Jett v. Penner*
 439 F. 3d 1091 (9th Cir. 2006) ...............................................................................10

*Karnoski v. Trump*
 No. C17-1297-MJP, 2017 WL 6311305 (W.D. Wash. Dec. 11, 2017) .....................14, 15

*Lolli v. Cnty. of Orange*
 351 F. 3d 410 (9th Cir. 2003) ..................................................................................12

*Mandala v. Coughlin*
 920 F. Supp. 342 (E.D.N.Y. 1996) ...........................................................................10

*Marlett v. Harrington*
 No. 1:15-cv-01382, 2015 WL 6123613 (E.D. Cal. Oct. 16, 2015)..................................14

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*
 571 F. 3d 873 (9th Cir. 2009) ....................................................................................9

*Martin v. Barron*
 286 F. Supp. 3d 1131 (D. Idaho 2018) .............................................................13, 14, 15

*McNearney v. Wash. Dep't of Corr.*
 2012 U.S. Dist. LEXIS 115802 (W.D. Wash. June 15, 2012).........................................19

*Melendres v. Arpaio*
 695 F. 3d 990 (9th Cir. 2012) .............................................................................18, 19

*Norsworthy v. Beard*
 87 F. Supp. 3d 1164 (N.D. Cal. 2015) ................................................................. *passim*

*O'Donnabhain v. Comm'r of Internal Revenue*
 134 T.C. 34 (U.S. Tax Ct. 2010)...............................................................................4

*Olive v. Harrington*
 No. 1:15-cv-01276, 2016 WL 4899177 (E.D. Cal. Sept. 14, 2016) .................................14

*Ortiz v. City of Imperial*
 884 F. 2d 1312 (9th Cir. 1989) ................................................................................13

*Pimentel v. Dreyfus*
    670 F. 3d 1096 (9th Cir. 2012) ........................................9

*Prescott v. Rady Children's Hospital-San Diego*
    265 F. Supp. 3d 1090 (S.D. Cal. 2017)........................16

*Rhea v. Wash. Dep't of Corr.*
    2010 U.S. Dist. LEXIS 97705 (W.D. Wash. July 2, 2010) ............................18

*Rodde v. Bonta*
    357 F. 3d 988 (9th Cir. 2004) ........................................19

*Schwenk v. Hartford*
    204 F. 3d 1187 (9th Cir. 2000) ........................................13, 14

*Smith v. City of Salem*
    378 F. 3d 566 (6th Cir. 2004) ........................................14

*Soneeya v. Spencer*
    851 F. Supp. 2d 228 (D. Mass. 2012) ..............................4

*Stockman v. Trump*
    No. 5:17-cv-01799-JGB-KK, Dkt. No. 79 (C.D. Cal. Dec. 22, 2017) ................14, 15, 18

*Stone v. Trump*
    280 F. Supp. 3d 747 (D. Md. 2017) ..............................15

*Thomas v. Cnty. of Los Angeles*
    978 F. 2d 504 (9th Cir. 1992) ........................................16

*United States v. Raines*
    362 U.S. 17 (1960)........................................19

*United States v. Virginia*
    518 U.S. 515 (1996)........................................15

*Whitaker v. Kenosha Unified Sch. Dist No. 1*
    858 F. 3d 1034 (7th Cir. 2017) ........................................14

*Winter v. Natural Res. Def. Council, Inc.*
    555 U.S. 7 (2009)........................................9, 18

*Wood v. Cnty. of Alameda*
    1995 U.S. Dist. LEXIS 17514 (N.D. Cal. Nov. 17, 1995)................16

*Zepeda v. U.S. I.N.S.*
    753 F.2d 719 (9th Cir. 1983) ........................................19

**STATUTES**

18 U.S.C. § 3626(a)(2) (Prison Litigation Reform Act) ...................................................20

42 U.S.C. § 18116 (Section 1557 of the Affordable Care Act) .....................................15

## INTRODUCTION

Plaintiff Adree Edmo moves for a preliminary injunction to address Defendants' failure to appropriately treat her serious medical condition of gender dysphoria.  Two of the preeminent experts in the treatment of gender dysphoria have now evaluated Ms. Edmo and determined that Defendants' denial of necessary treatment causes her to suffer life-threatening physical and psychological harm.  Ms. Edmo has already attempted to self-castrate twice in the absence of necessary treatment, and she will suffer irreparable harm in the absence of preliminary relief.

## PROCEDURAL STATUS

Ms. Edmo filed her original complaint in this case in *pro per* on April 6, 2017 seeking injunctive relief as well as damages for, *inter alia*, Defendants' failure to provide her timely access to necessary medical treatment for her gender dysphoria.  On April 14, 2017, the Court issued an Initial Screening Order permitting Ms. Edmo to move forward on many of her claims. In the fall of 2017, Ms. Edmo obtained counsel to represent her and filed a Second Amended Complaint on September 1, 2017.  Defendants then filed a Motion for Dispositive Relief on November 1, 2017, for which the Court heard oral arguments on April 4, 2018.

Since filing the Second Amended Complaint, Ms. Edmo's counsel sought access from Defendants to her medical records in order to assess the urgency of Ms. Edmo's medical needs. Defendants refused to produce these records until the end of May 2018.  Declaration of Lori Rifkin in Support of Plaintiff's Motion for a Preliminary Injunction ("Rifkin Decl.") ¶ 2. However, because of the gravity of Ms. Edmo's medical condition, Ms. Edmo's counsel retained two highly qualified medical experts to evaluate Ms. Edmo and review the incomplete medical records accessible by Ms. Edmo.  *Id.* ¶ 3.  Based on the assessments of these experts,[1] Plaintiff now moves the Court for a preliminary injunction 1) ordering Defendants to provide her immediate access to necessary medical treatment, including sex-reassignment surgery; and 2) prohibiting Defendants from enforcing their policy and/or practice of blanket denial of such

---

[1] The expert declarations of Dr. Randi Ettner ("Ettner Decl.") and Dr. Nicholas Gorton ("Gorton Decl.") are attached as Exhibits 1 and 2, respectively, to the Declaration of Lori Rifkin, submitted concurrently.  Rifkin Decl. ¶¶ 4-5 & Exhs. 1-2.

PLTF'S MTN FOR PRELIMINARY INJUNCTION          -1-

treatment for transgender persons incarcerated in the Idaho Department of Corrections.

## STATEMENT OF FACTS

Plaintiff's History of Gender Dysphoria

Ms. Edmo is a transgender woman—an individual whose female gender identity differs from the male sex assigned to her at birth.  SAC ¶ 1.  Prior to being incarcerated, Ms. Edmo lived full-time as a woman.  *Id.* ¶¶ 3, 39.  Ms. Edmo has been incarcerated since April 2012.  *Id.* ¶ 1. In July 2012, Defendants diagnosed Ms. Edmo with gender dysphoria, a serious medical condition characterized by marked incongruence between the sex assigned at birth and a person's gender identity, strong cross-gender identification, and clinically significant distress or impairment of functioning.  Ettner Decl. ¶¶ 17, 35-36; SAC ¶¶ 1, 40.

From the time Ms. Edmo was a very young child, she understood herself to be a girl. Declaration of Adree Edmo in Support of Plaintiff's Motion for a Preliminary Injunction ("Edmo Decl.") ¶ 3.  She describes her female gender identity as something she "never questioned . . . it's always been this way as long as I can remember."  Ettner Decl. ¶ 15.  Ms. Edmo assumed she would grow up to be as feminine as her older sisters, and her body would develop as theirs did rather than like that of her older brothers.  Ettner Decl. ¶ 15; Edmo Decl. ¶ 3; Gorton Decl. ¶ 29. She had mostly female friends during her school years and "felt like one of them," and would even sometimes use the girls' restroom in grade school and high school.  Gorton Decl. ¶¶ 26, 30. Ms. Edmo experienced mostly positive support for her gender identity as female from her immediate family, which she attributes in part to being Native American and growing up on the Shoshone Bannock reservation, because there is a history in Native American communities of accepting gender nonconforming people.  *Id.* ¶ 27.

Ms. Edmo attended public elementary, middle, and high school, and one year of college at Idaho State University.  Ettner Decl. ¶ 13.  At around age 11 or 12, Ms. Edmo understood herself as "a girl in a boy's body," although she did not have a word to describe this at the time. Gorton Decl. ¶ 29.  Her transition through puberty was "shocking and very depressing" to her,

and caused a dramatic increase in her gender dysphoria.  Edmo Decl. ¶ 4; Gorton Decl. ¶ 29.  As she moved into her teenage years, however, Ms. Edmo began to feel more confident about expressing her female identity and began wearing girls' clothing and makeup to school.  Edmo Decl. ¶ 5.  Ms. Edmo's immediate family and friends remained supportive, although she experienced some harassment and sexual assault as a result of her gender identity.  Gorton Decl. ¶¶ 27-28; Edmo Decl. ¶ 6.  By age 21, Ms. Edmo began to live as a woman full-time, using female pronouns and dressing in women's clothing.  Edmo Decl. ¶ 7; Ettner Decl. ¶ 16; Gorton Decl. ¶ 33.  Living as a woman, Ms. Edmo felt for the first time in her life "like others saw me as the real person that I am—as the woman I am."  Edmo Decl. ¶ 8.

Although Ms. Edmo's incarceration beginning in 2011 impeded her ability to continue fully living as female, she has continually sought to do so even in the face of repeated disciplinary consequences, which, in turn, have affected her eligibility for parole.  Edmo Decl. ¶¶ 19-20; Gorton Decl. ¶¶ 37-38.  This has included altering the prison-issued male underwear to allow her to tuck her penis, wearing her hair long and in a traditionally feminine style, and making or obtaining her own facial make-up, despite IDOC's refusal to permit her access to women's underwear and female commissary items. Edmo Decl. ¶ 19; Gorton Decl. ¶¶ 36-41.  In 2012, Ms. Edmo changed her name socially and in 2013, she legally changed her name.  Edmo Decl. ¶ 11.

Standards of Care for Treatment of Gender Dysphoria

Gender dysphoria is a diagnosable and highly treatable condition recognized by the American Psychiatric Association and included in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5"), as well as the World Health Organization's International Classification of Diseases-10.  SAC ¶ 26; Ettner Decl. ¶ 34; Gorton Decl. ¶ 8.  Like many other medical conditions, gender dysphoria can be ameliorated or cured through medical treatment.  SAC ¶¶ 27-28; Gorton Decl. ¶ 10.  The World Professional Association for Transgender Health ("WPATH"), the leading international organization focused on transgender health care, has established internationally accepted Standards of Care for the treatment of gender dysphoria.  SAC ¶ 28; Gorton Decl. ¶ 11.  The current version of the WPATH Standards

of Care, Version 7, was published in September 2011, and constitutes the prevailing standard of care used by medical and mental health professionals treating gender dysphoria.  SAC ¶ 28; *Hicklin v. Precynthe*, No. 4:16-cv-02357-NCC, Dkt. No. 176, at 5-6 (E.D. Mo. May 22, 2018); *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1186 (N.D. Cal. 2015) (WPATH Standards of Care are the accepted standards of treatment for transgender patients); *see also De'lonta v. Johnson*, 708 F. 3d 520, 522-23 (4th Cir. 2013); *Soneeya v. Spencer*, 851 F. Supp. 2d 228, 231 (D. Mass. 2012); *O'Donnabhain v. Comm'r of Internal Revenue*, 134 T.C. 34, 65 (U.S. Tax Ct. 2010).

The WPATH Standards of Care set forth medical treatment options for gender dysphoria and require that a competent medical professional with knowledge and expertise in gender dysphoria evaluate a patient for appropriate and necessary treatment options, which, in addition to living in accord with the person's gender identity, may include hormone therapy, surgery to change primary and/or secondary characteristics, and/or psychotherapy addressing the negative impact of gender dysphoria and stigma on mental health.  SAC ¶¶ 33-36, Ettner Decl. ¶¶ 40-41; Gorton Decl. ¶¶ 12-16.  The Standards "explain that some individuals are unable to obtain relief from gender dysphoria without surgical intervention, and describe sex-reassignment surgery (or "SRS") as 'essential and medically necessary' for this group of patients."  *Norsworthy*, 87 F. Supp. 3d at 1186 (quoting WPATH Standards of Care at 36); Ettner Decl. ¶¶ 55-56.  The WPATH Standards of Care apply to incarcerated as well as non-incarcerated people.  SAC ¶ 36; Ettner Decl. ¶ 43; Gorton Decl. ¶ 17.

<u>Defendants' Inadequate Treatment of Plaintiff's Gender Dysphoria</u>

Since Defendants diagnosed Ms. Edmo with gender identity disorder—now recognized as gender dysphoria—in 2012, she has continually sought appropriate treatment, including access to feminizing hormones, evaluation for and access to sex-reassignment surgery (also referred to as gender confirmation surgery), and the ability to live as a woman while incarcerated.  SAC ¶ 4; Ettner Decl. ¶ 60; Edmo Decl. ¶¶ 27-28.  However, Defendants have refused to provide Ms. Edmo with sex-reassignment surgery, have not adequately monitored and adjusted her feminizing hormones, and have denied her access to other medically necessary

treatments for reducing her gender dysphoria, including being called by her legal name and the appropriate pronouns and the ability to access and wear appropriate undergarments.  SAC ¶¶ 4, 41-44, 49-51, 54; SAC Ex. B, at 39-40, 45; Ettner Decl. ¶¶ 60, 64-70; Gorton Decl. ¶¶ 36-41, 49-52, 55-65; Edmo Decl. ¶¶ 14, 17, 23, 27-28.  Ms. Edmo is harassed by both correctional officers and other inmates for her appearance, mannerisms, and transitioning body.[2]  Edmo Decl. ¶¶ 15-16.  Defendants' refusal to treat Ms. Edmo as a woman is "a constant reminder that my body does not match my feeling of being a woman and female" and "torture above and beyond my prison sentence."  Edmo Decl. ¶¶ 13, 16.

Although Defendants have provided Ms. Edmo with some feminizing hormones, they have failed to provide appropriate treatment for her continued severe gender dysphoria and attendant depression.  Ettner Decl. ¶¶ 59-70.  Ms. Edmo meets and exceeds the criteria for medically necessary sex-reassignment surgery as a result of her persistent, well-documented gender dysphoria and severe distress.  Ettner Decl. ¶¶ 65-66; Gorton Decl. ¶¶ 84, 87-88.  However, Defendants' medical providers are not qualified to assess and treat gender dysphoria and, even if they were qualified, IDOC policies and/or practices prohibit them from providing medically necessary and likely life-saving care through a categorical ban on sex-reassignment surgery.  Ettner Decl. ¶ 64; Gorton Decl. ¶¶ 44, 47, 50-54, 73.  The notes of several providers who purportedly treated Ms. Edmo for gender dysphoria show no attempts to assess Ms. Edmo's history as a transgender person.  Gorton Decl. ¶ 47.  The only record in the six years since Defendants diagnosed Ms. Edmo's gender dysphoria that could conceivably resemble an evaluation of Ms. Edmo's transgender history is a single note by one doctor dated December 14, 2016.  *Id.*

Defendants are also failing to adequately monitor Ms. Edmo's hormone regimen and have inappropriately removed her from one hormone, spironolactone, as a result of elevated enzyme levels found during Ms. Edmo's liver function test, even though this hormone is unlikely

---

[2] Correctional officers also recently threatened Ms. Edmo that she will not be permitted to attend attorney-client visits if she is wearing makeup and styles her hair in a feminine manner. Rifkin Decl. ¶ 6.

to be responsible for Ms. Edmo's elevated enzyme levels.  Ettner Decl. ¶ 70; Gorton Decl. ¶¶ 49-63.  While the proper course in response to abnormal labs is to immediately perform an adequate history and physical examination, Ms. Edmo's records contain no evidence of any evaluation to determine the actual cause of Ms. Edmo's abnormal liver function test results.  Gorton Decl. ¶¶ 56, 65.

In the meantime, the unnecessary withdrawal of Ms. Edmo's spironolactone means that she is not receiving the appropriate dosage of feminizing hormones and is therefore experiencing recurring masculinization.  Gorton Decl. ¶ 64.  These unexpected and unwanted physical changes, including rapid facial hair growth and, in particular, the painful enlargement of her testicles, have considerably worsened Ms. Edmo's dysphoria and place her at significant risk of self-surgery or suicide if she does not get the medical treatment she needs.  Gorton Decl. ¶ 39, 64; Edmo Decl. ¶ 26.

Defendants are also violating the Standards of Care by refusing to allow Ms. Edmo access to female underwear and a gaff (an undergarment commonly worn by transgender women to minimize the appearance of male genitals), canteen items available to female prisoners, and safe and effective means of hair removal.  Gorton Decl. ¶ 36.  These are medically necessary treatments to ameliorate her gender dysphoria.  Ettner Decl. ¶ 69; Gorton Decl. ¶ 92.  Moreover, Defendants have disciplined Ms. Edmo numerous times for actions and behaviors that are medically necessary for transgender patients, which has exacerbated Ms. Edmo's gender dysphoria.  Ettner Decl. ¶ 60; Gorton Decl. ¶ 40, 93.  For example, Defendants disciplined her for altering her prison-issued male underwear to resemble women's underwear or a gaff.  Gorton Decl. ¶ 37.  Ms. Edmo reports that her makeshift gaff, which she wears because she is denied access to both a proper gaff and women's clothing, has caused redness, swelling, and extreme pain on several occasions.  *Id.* ¶ 39.

Plaintiff's Ongoing Substantial Risk of Serious Harm

As a result of Defendants' failure to treat her, Ms. Edmo has twice resorted to attempting auto-castration (removal of the testicles).  SAC ¶ 45.  This is not an act of self-mutilation or

intended self-harm, but rather "surgical self-treatment."  Ettner Decl. ¶ 62; Gorton Decl. ¶ 18;
Edmo Decl. ¶ 34.  Transgender women without access to appropriate care, particularly those who
are imprisoned, are often so desperate for relief that they resort to life-threatening attempts at
auto-castration in the hopes of eliminating the major source of testosterone that kindles the
distress.  Ettner Decl. ¶ 38.  However, such self-surgery attempts are extremely dangerous, and
can result in major loss of blood leading to death unless an individual is sent to a hospital in time,
as Ms. Edmo was during her second attempt.  Ettner Decl. ¶ 62; Gorton Decl. ¶ 74.

It is also common for patients like Ms. Edmo, who are in desperate need of medical
treatment, to become more sophisticated in subsequent self-surgery attempts, placing them at
substantial and increasing risk of serious and irreparable harm.  Gorton Decl. ¶ 74.  After her first
attempt, Ms. Edmo resolved to be successful if she decided to attempt self-surgery again.  Edmo
Decl. ¶ 32.  To this end, Ms. Edmo prepared for weeks before her second auto-castration
attempt—she studied the anatomy of the scrotum, chose an incision site with a better chance of
success, obtained gauze and alcohol swabs, boiled the razor blade to reduce chances of infection,
and enlisted another inmate to call for help in the event she lost too much blood because she did
not want to die.  Gorton Decl. ¶ 74; Edmo Decl. ¶ 33.  During her second attempt, Ms. Edmo
made further surgical progress, but abandoned her efforts because the high blood loss prevented
her from being able to see what she was doing.  Gorton Decl. ¶ 74.  She was taken to the
hospital, where her testicle was repaired without any discussion of possibly removing the nearly-
severed testicle.  *Id.*; Edmo Decl. ¶ 33.

Dr. Gorton opines that it is medically necessary for Ms. Edmo to be referred to a surgeon
for sex-reassignment surgery immediately, but at minimum within the next six months.  Gorton
Decl. ¶ 88.  Dr. Gorton explains that Ms. Edmo has "well established and persistent gender
dysphoria, a substantial portion of which is related to her male genitalia," placing her at high risk
of re-attempting self-surgery or suicide if she is denied this medically necessary care.  *Id.*

Similarly, Dr. Ettner opines that because having male genitalia generates profound
distress for Ms. Edmo, this anguish is very likely to result in further emotional deterioration and

self-harm.  Ettner Decl. ¶ 61.  Dr. Ettner further opines that Ms. Edmo is at great risk for succumbing to feelings of hopelessness and despair, leading to emotional destabilization and suicide.  *Id.* ¶ 67.  Dr. Ettner also explains that gender dysphoria intensifies with age, which is consistent with Ms. Edmo's description of her experience.  *Id.*; Edmo Decl. ¶ 36.  Ms. Edmo scored 11 on the Beck Hopelessness Scale (BHS), relative to a study finding that of outpatients who ultimately committed suicide, 93.8% had BHS scores of 9 or higher.  Ettner Decl. ¶ 30.  Ms. Edmo also scored a 100—the highest score possible—on the Traumatic Symptom Inventory-2 scale that measures suicide ideation and suicide behavior.  *Id.* ¶ 33.  Dr. Ettner found this result "alarming" considering Ms. Edmo's previous history of suicide attempts and the fact that she is currently receiving the maximum dose of her anti-depressant medication.  *Id.*

Indeed, the most significant suicidality Ms. Edmo has experienced while incarcerated occurred because she felt hopeless after she requested sex-reassignment surgery and was told that she would "never" get the surgery.  Gorton Decl. ¶ 77; Edmo Decl. ¶ 29.  Defendants then placed her on suicide watch, where she was stripped of all her clothes and thus forced to see her body unclothed—a significant trigger for patients with gender dysphoria, which increased both her dysphoria and suicidal thoughts.  Gorton Decl. ¶ 77; Edmo Decl. ¶ 30.

Further, Defendants' mental health providers do not understand the difference between suicidality, non-suicidal self injury, and self-surgery, and have incorrectly assessed Ms. Edmo's self-surgery attempts as either non-suicidal self-injury or suicidality.  Gorton Decl. ¶¶ 66-67.  Rather than intended self-harm, Ms. Edmo's self-surgery is "health-seeking" behavior intended to remove testosterone from the body, thereby alleviating gender dysphoria.  *Id.* ¶ 67.  Ms. Edmo attempted self-surgery because she was "at a point beyond mental anguish . . . thinking: 'If I don't do this, I won't be able to keep going.'" Edmo Decl. ¶ 34.  Thus, questions routinely asked by Defendants' mental health staff, such as whether Ms. Edmo wants to harm or kill herself, are insufficient to address her high risk for self-surgery.  Gorton Decl. ¶ 71; Ettner Decl. ¶¶ 44, 68.

//

//

---

PLTF'S MTN FOR PRELIMINARY INJUNCTION

## ARGUMENT

### I.    Legal Standard for Preliminary Injunction

"A plaintiff seeking a preliminary injunction must establish that [s]he is likely to succeed on the merits, that [s]he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [her] favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2009); *Pimentel v. Dreyfus*, 670 F. 3d 1096, 1105 (9th Cir. 2012) (applying *Winter* to claim under 42 U.S.C. § 1983). "[S]erious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F. 3d 1127, 1135 (9th Cir. 2011) (internal quotation marks omitted).

While preliminary injunctions that order a party to take affirmative action are generally not granted "unless extreme or very serious damage will result," *see Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co*., 571 F. 3d 873, 879 (9th Cir. 2009), this is exactly such a case. Defendants' ongoing refusal to provide necessary medical treatment to Ms. Edmo places her at imminent risk of serious harm.  Ms. Edmo has a history of suicide attempts and twice risked her life in attempts to remove her testicles herself.  As set forth in detail *infra*, and in the concurrently-submitted declarations, two of the preeminent experts in the field of medical treatment for patients with gender dysphoria have assessed Ms. Edmo and found Defendants' failure to appropriately treat her—including their denial of access to sex-reassignment surgery— to be life-threatening.

### II.    Plaintiff Will Succeed on the Merits of Her Claims

Ms. Edmo moves for preliminary injunctive relief on the basis of her Eighth Amendment claim for failure to provide adequate and necessary medical treatment for the serious medical condition of gender dysphoria, and on the basis of her sex discrimination claims under the

Fourteenth Amendment and the Affordable Care Act.[3]  Even at this early procedural stage in the case, the evidence decisively establishes that Ms. Edmo will succeed on the merits of these claims.

> **A.**     **Defendants Are Denying Plaintiff Medically Necessary Treatment in Violation of the Eighth Amendment**

It is well-established that "[d]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal citation omitted).  Deliberate indifference may be "manifested by prison doctors in their response to the prisoner's needs or by prison [officials or] guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.*  A plaintiff establishes deliberate indifference by showing a serious medical need such that failure to treat the condition could result in further significant injury or the unnecessary and wanton infliction of pain, and showing that a defendant engaged in a purposeful act or failure to respond to this medical need such that the plaintiff was harmed.  *Jett v. Penner*, 439 F. 3d 1091, 1096 (9th Cir. 2006).  Deliberate indifference may be demonstrated "when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison officials provide medical care."  *Id.*  (internal quotations and citations omitted).

Prison officials are liable for violations under the Eighth Amendment when they are deliberately indifferent to a substantial risk of serious harm to a prisoner, which the Supreme Court has described as "the equivalent of recklessly disregarding that risk."  *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).  As the United States Supreme Court explained in *Farmer*, "[d]eliberate indifference lies somewhere between the poles of negligence at one end and purpose or knowledge at the other." 511 U.S. at 836; *see also Mandala v. Coughlin*, 920 F. Supp. 342, 353 (E.D.N.Y. 1996) (while a showing of medical malpractice or mere negligence does not

---

[3] Ms. Edmo is also likely to succeed on the merits of her other claims, including her Americans with Disabilities Act claim.  *See* Pl.'s Response to Defs.' Mot. for Dispositive Relief, ECF No. 44 at 18-23.  However, given that the law on those claims is less clearly established, Plaintiff's motion for a preliminary injunction focuses more narrowly on her Eighth Amendment, Fourteenth Amendment, and ACA claims.

suffice, neither must a defendant's act or omission be "for the very purpose of causing harm or with knowledge that harm will result" (internal quotations and citations omitted)).

The evidence overwhelmingly shows that Ms. Edmo has a serious medical need cognizable under the Eighth Amendment.  Defendants' own doctors diagnosed Ms. Edmo with gender dysphoria, which is recognized by the medical field as a serious medical condition. Ettner Decl. ¶ 34; Gorton Decl. ¶ 8.  Courts have consistently considered gender dysphoria to be a serious medical condition for the purposes of the Eighth Amendment.  *E.g.*, *Fields v. Smith*, 653 F. 3d 550, 555 (7th Cir. 2011) (discussing cases finding that Gender Identity Disorder is a "serious medical need" for purposes of the Eighth Amendment); *Hicklin v. Precynthe*, No. 4:16-cv-02357-NCC, Dkt. No. 176, at 5 (E.D. Mo. May 22, 2018) ("Gender dysphoria is an objectively serious medical need."); *Norsthworthy*, 87 F. Supp. 3d at 1170.  In support of this motion, Ms. Edmo submits evidence from Dr. Ettner and Dr. Gorton as well as her own declaration and medical records demonstrating "that, notwithstanding years of treatment in the form of hormone therapy and counseling, she continues to experience severe symptoms of gender dysphoria."  *Norsworthy*, 87 F. Supp. 3d at 1186.  These symptoms include severe "[p]sychological and emotional pain [she] experiences as a result of her gender dysphoria," that place her mental and physical health in serious jeopardy and "means that she is unable to complete her existence or complete who she is."  *Id.*  (internal alterations and quotations omitted).

Defendants' failures to appropriately monitor and adjust Ms. Edmo's feminizing hormones, assess and provide her access to sex-reassignment surgery, and provide other medically necessary treatments that allow her to live in accord with her female gender identity— as well as Defendants' punishment of Ms. Edmo for expressing her gender identity—put Ms. Edmo at life-threatening risk.  This includes heightened risk of re-attempting self-surgery, and of emotional destabilization that may lead to other self-harm, including suicide.  Ettner Decl. ¶¶ 61, 67; Gorton Decl. ¶ 88.

The evidence also overwhelmingly establishes that Defendants' actions and omissions in denying Plaintiff necessary treatment for her serious medical need are deliberate.  Plaintiff has

repeatedly and exhaustively requested appropriate medical treatment including assessment for sex-reassignment surgery through every avenue available to her in the prison system, including filing grievances through IDOC's administrative grievance process, as well as repeatedly asking Corizon medical providers for assessments and referrals.  Edmo Decl. ¶¶ 27-28; *see Norsworthy*, 87 F. Supp. 3d at 1189 ("Despite access to the relevant Standards of Care and evidence that SRS was medically necessary for Norsworthy, Defendants failed to provide her SRS, or to refer her to a specialist for further evaluation.") (citing *Hoptowit v. Ray*, 682 F. 2d 1237, 1253 (9th Cir. 1982)).  Defendant IDOC officials and supervisors have not only denied her individual appeals, Defendants have also adopted and enforced a blanket policy and/or practice prohibiting provision of sex-reassignment surgery to people incarcerated in IDOC facilities, regardless of whether such treatment is medically necessary.  *See Norsworthy*, 87 F. Supp. 3d  at 1191 (blanket policy barring sex-reassignment surgery conflicts with requirement that medical care be individualized based on a particular patient's needs).  Defendants are also actively contesting this lawsuit, while still refusing to provide Ms. Edmo adequate and necessary medical treatment, further evidencing the deliberateness of their decisions.

Defendants have been repeatedly placed on notice of the substantial risk of serious harm resulting from their ongoing denial of necessary treatment to Ms. Edmo: refusal of such treatment has resulted in Ms. Edmo twice attempting to perform self-castration and separately attempting suicide, as well as ongoing serious psychological, emotional, and physical distress.  *Farmer*, 511 U.S. at 837; *see also Lolli v. Cnty. of Orange*, 351 F. 3d 410, 421 (9th Cir. 2003) ("Much like recklessness in criminal law, deliberate indifference to medical needs may be shown by circumstantial evidence when the facts are sufficient to demonstrate that a defendant actually knew of a risk of harm.").

Defendants' provision of Ms. Edmo with some treatment for gender dysphoria further supports her deliberate indifference claim.  This partial treatment shows that Defendants recognize that she has a serious medical condition warranting treatment while also refusing to provide the medically necessary care her condition requires.  *See Hicklin*, No. 4-16-cv-01357-

NCC, Dkt. No. 176, at 6 ("providing [only] counseling and/or psychotropic medication to a severely gender dysphoric patient whose condition warrants medical intervention is a departure from the [WPATH] standards of care . . . [and] puts a person at serious risk of psychological and physical harm" in violation of the Eighth Amendment); *Norsworthy*, F. Supp. 3d at 1187 ("Just because defendants have provided a prisoner with some treatment consistent with the Standards of Care, it does not follow that they have necessarily provided her with *constitutionally adequate* treatment.") (internal alterations omitted) (quoting *De'lonta v. Johnson*, 708 F. 3d 520, 526 (4th Cir. 2013)); *see also Ortiz v. City of Imperial*, 884 F. 2d 1312, 1314 (9th Cir. 1989) (a plaintiff alleging deliberate medical indifference "need not prove complete failure to treat"). Just as Defendants would be deliberately indifferent if they denied surgery to a patient requiring an operation and instead simply prescribed the patient painkillers, Defendants' refusal to provide Ms. Edmo with access to a crucial medical intervention required to treat her condition constitutes deliberate indifference to a serious medical need. *See* Ettner Decl. ¶ 68; *Fields*, 653 F. 3d at 556 (holding statute barring Wisconsin corrections officials from providing transgender inmates hormone therapy and sex-reassignment surgery unconstitutional under the Eighth Amendment, and recognizing that "[r]efusing to provide effective treatment for a serious medical condition serves no valid penological purpose and amounts to torture").

## B.     Defendants Are Discriminating Against Plaintiff on the Basis of Sex in Violation of the Fourteenth Amendment and the Affordable Care Act

Defendants' refusal to provide Ms. Edmo with medically necessary care because she is transgender discriminates based on sex. Defendants are withholding care from Ms. Edmo based on their belief that a transgender person should not receive certain medical treatment such as sex-reassignment surgery and access to traditionally female underwear, despite this treatment being the accepted standard of care for treating gender dysphoria.

Discrimination against transgender people constitutes discrimination based on sex. *Schwenk v. Hartford*, 204 F. 3d 1187, 1201-02 (9th Cir. 2000); *see also Martin v. Barron*, 286 F. Supp. 3d 1131, 1144 (D. Idaho 2018) ("[T]o conclude discrimination based on gender identity or

transsexual status is not discrimination based on sex is to depart from advanced medical understanding in favor of archaic reasoning.").  Such discrimination is subject to heightened scrutiny when evaluating whether it violates the Equal Protection Clause.  *Whitaker v. Kenosha Unified Sch. Dist  No. 1*, 858 F. 3d 1034, 1051 (7th Cir. 2017) (holding that discrimination against a transgender student is "inherently based upon a sex-classification and heightened review applies"); *Glenn v. Brumby*, 663 F. 3d 1312, 1317 (11th Cir. 2011) ("[D]iscrimination against a transgender individual because her gender-nonconformity is sex discrimination," under the Equal Protection Clause, "whether it's described as being on the basis of sex or gender"); *Smith v. City of Salem*, 378 F. 3d 566, 572-73 (6th Cir. 2004) (same); *Stockman v. Trump*, No. 5:17-cv-01799-JGB-KK, Dkt. No. 79, at 19 (C.D. Cal. Dec. 22, 2017) (applying intermediate scrutiny to claims of transgender servicemembers as sex-based discrimination); *Karnoski v. Trump*, No. C17-1297-MJP, 2017 WL 6311305, at *7 (W.D. Wash. Dec. 11, 2017) (same); *Olive v. Harrington*, No. 1:15-cv-01276, 2016 WL 4899177, at *5 (E.D. Cal. Sept. 14, 2016) ("Discrimination on the basis of transgender status is subject to intermediate scrutiny."); *Marlett v. Harrington*, No. 1:15-cv-01382, 2015 WL 6123613, at *4 (E.D. Cal. Oct. 16, 2015) (same); *Norsworthy*, 87 F. Supp. 3d at 1119 ("[D]iscrimination against transgender individuals is a form of gender-based discrimination subject to intermediate scrutiny under the Equal Protection Clause").

Numerous district courts, including in the District of Idaho and others in the Ninth Circuit, have also held that "government discrimination based on transgender status is also discrimination based on a quasi-suspect class and thus is subject to intermediate scrutiny." *Martin*, 286 F. Supp. 3d at 1144; *see id.* at 1145 ("[I]n  Idaho . . . transgender people have no state constitutional protections from discrimination based on their transgender status in relation to employment decisions, housing, and other services.  Therefore, transgender people bear all of the characteristics of a quasi-suspect class."); *Norsworthy*, 87 F. Supp. 3d at 1119 ("Applying *Schwenk*, . . . discrimination based on transgender status independently qualifies as a suspect classification because transgender people meet the indicia of a 'suspect' or 'quasi-suspect

classification.'""); *Stockman*, No. 5:17-cv-01799-JGB-KK, Dkt. No. 79, at 19 (same); *Karnoski*, No. C17-1297-MJP, 2017 WL 6311305, at *7 ("The Court concludes that the policy distinguishes on the basis of transgender status, a quasi-suspect classification, and is therefore subject to intermediate scrutiny."); *see also Stone v. Trump*, 280 F. Supp. 3d 747, 768 (D. Md. 2017); *Doe v. Trump*, 275 F. Supp. 3d 167, 208 (D.D.C. 2017); *A.H. v Minersville Area School District*, 2017 U.S. Dist. LEXIS 193622 (M.D. Pa. Nov. 22, 2017); *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017); *Adkins v. City of New York*, 143 F. Supp. 3d 134, 140 (S.D.N.Y. 2015).  Thus, heightened scrutiny applies to Plaintiff's Equal Protection claim, whether regarded as a claim based on sex, or also directly based on transgender status.

Under heightened scrutiny, Defendants have the burden to show that their policy of denying sex-reassignment surgery and other medically necessary care to transgender people is substantially related to an important government interest.  *See, e.g.*, *Martin*, 286 F. Supp. 3d at 1142.  The asserted governmental justification must be "exceedingly persuasive" and it must be "genuine, not hypothesized or invented *post hoc* in response to litigation."  *United States v. Virginia*, 518 U.S. 515, 533 (1996).  Defendants cannot meet that burden here.  There is no legitimate, much less important, governmental purpose served by denying medically necessary care to a socially disfavored group of people.  *See Fields*, 653 F. 3d at 556; *Norsworthy*, 87 F. Supp. 3d at 1120 (recognizing that Defendants "articulate[d] no important governmental interest" served by denying access to sex-reassignment surgery).  Gender dysphoria is a serious medical condition; when left untreated, it can result in debilitating harms, including severe depression and suicidality.  Ettner Decl. ¶¶ 34, 37; Gorton Decl. ¶ 10. The treatments for gender dysphoria are well-established and effective.  Ettner Decl. ¶¶ 40-58; Gorton Decl. ¶¶ 11-17.  There is no legitimate government interest in denying transgender prisons access to this life-saving care.

Defendants' policy also violates Section 1557 of the Affordable Care Act, which prohibits covered entities from discriminating based on sex in the provision of health care services.  42 U.S.C. § 18116.  As a health program or activity that receives federal financial assistance, IDOC is a covered entity subject to the Affordable Care Act's nondiscrimination

requirement.  The anti-discrimination provisions of the ACA are construed consistently with those of other federal sex discrimination laws; accordingly, the ACA's prohibition of discrimination based on sex prevents differential treatment of transgender patients.  *See, e.g.*, *Prescott v. Rady Children's Hospital-San Diego*, 265 F. Supp. 3d 1090, 1099 (S.D. Cal. 2017).

### III.   Plaintiff Is Now Suffering and Will Continue to Suffer Irreparable Harm in the Absence of Relief

Defendants' refusal to provide Ms. Edmo with medically necessary care is causing her irreparable harm.  As a result of Defendants' denial of care, Ms. Edmo has attempted suicide and twice risked her life in attempts to self-castrate.  While a plaintiff seeking a preliminary injunction ordering treatment for gender dysphoria "is not required to demonstrate that she is at risk of death or imminent self-harm," *Norsworthy*, F. Supp. 3d at 1188, Ms. Edmo is at risk of these outcomes here.  Ettner Decl. ¶¶ 30-33, 67; Gorton Decl. ¶ 88.

In addition to being at risk of death due to suicide or attempts to perform her own surgical care, Ms. Edmo is also suffering serious psychological harm, which the Ninth Circuit has repeatedly held constitutes irreparable injury.  *See, e.g.*, *Chalk v. U.S. Dist. Ct. Cent. Dist. of California*, 840 F. 2d 701, 709 (9th Cir. 1988) (plaintiff's "emotional stress, depression and reduced sense of well-being" constituted irreparable harm); *Thomas v. Cnty. of Los Angeles*, 978 F. 2d 504, 512 (9th Cir. 1992) ("Plaintiffs have also established irreparable harm, based on this Court's finding that the deputies' actions have resulted in irreparable physical and emotional injuries to plaintiffs and the violation of plaintiffs' civil rights."); *see also Hernandez v. Cnty. of Monterey*, 110 F. Supp. 3d 929, 956 (N.D. Cal. 2015) ("[P]ain, suffering and the risk of death constitute irreparable harm sufficient to support a preliminary injunction in prison cases.") (internal quotations omitted); *Wood v. Cnty. of Alameda*, 1995 U.S. Dist. LEXIS 17514, at *46 (N.D. Cal. Nov. 17, 1995) (finding irreparable injury where plaintiff's "declaration ma[de] clear that she has suffered feelings of guilt, depression, anxiety, and loss of self-esteem . . .").

District courts have specifically recognized that emotional pain and suffering, anxiety, and depression caused by prison officials' failure to provide adequate treatment for gender

dysphoria constitute irreparable harm warranting a preliminary injunction.  *See, e.g.*, *Hicklin*, No. 4:16-cv-02357-NCC, Dkt. No. 176 (granting permanent injunction); *Hicklin v. Precynthe*, 2018 U.S. Dist. LEXIS 21516, at *29 (concluding that plaintiff would suffer "irreparable harm in the absence of a preliminary injunction because she suffers from depression, anxiety, and intrusive thoughts of self-castration as a result of Defendants' conduct") (E.D. Mo. Feb. 9, 2018) ("*Hicklin I*"); *Norsworthy*, 87 F. Supp. 3d at 1192 (irreparable injury where plaintiff testified that "she suffers continued and 'excruciating' 'psychological and emotional pain' as a result of her gender dysphoria").  Evidence that an incarcerated person is at "severe risk of self-harm" through self-castration also supports a finding of irreparable injury.  *Hicklin I*, 2018 U.S. Dist.  LEXIS 21516, at *31 (irreparable injury where plaintiff was at "severe risk of self-harm" in light of evidence that "she has a history of suicide ideation and has indicated on more than one occasion the inclination to remove her own testicles").

Here, the irreparable harm Ms. Edmo continues to suffer in the absence of necessary medical treatment is clear.  Defendants' refusal to provide Ms. Edmo access to qualified medical providers knowledgeable about gender dysphoria, including those who can appropriately evaluate her for and perform sex-reassignment surgery, causes Ms. Edmo extreme anguish, anxiety, depression, and stress, and places her at high risk for attempting to castrate herself again.  Gorton Decl. ¶¶ 67, 69, 73, 76, 85-87; Edmo Decl. ¶¶ 27-29, 35-36.  This risk is substantially heightened by the recent enlargement of Ms. Edmo's testicles, which is a result of medically unwarranted cessation of her spironolactone.  Gorton Decl. ¶ 64; Ettner Decl. ¶ 70. Ms. Edmo describes "[t]he thought of never being able to have sex-reassignment surgery" as "too stressful to imagine.  I would compare it to telling a cancer patient: 'This treatment will cure you, but you can't have it.' Without surgery, I feel like I am living, but dying inside." Edmo Decl. ¶ 37.  Drs. Ettner and Gordon both opine that without sex-reassignment surgery, Ms. Edmo's symptoms of gender dysphoria will continue to worsen and the risk that she may resort to life-threatening self-castration, or another suicide attempt, is significant and "dire."  Ettner Decl. ¶¶ 67, 71; Gorton Decl. ¶ 88.

In addition to these severe emotional, psychological, and physical harms, the deprivation of Ms. Edmo's Eighth and Fourteenth Amendment rights alone also establishes irreparable injury.  "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'"  *Melendres v. Arpaio*, 695 F. 3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Doe v. Harris*, 772 F. 3d 563, 583 (9th Cir. 2014); *Norsworthy*, 87 F. Supp. 3d at 1193 ("[T]he deprivation of [Plaintiff's] constitutional rights under the Eighth Amendment is itself sufficient to establish irreparable harm."); *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1282 (N.D. Cal. 2014) ("[D]eprivation of constitutional rights always constitutes irreparable harm."); *accord Stockman*, No. 5:17-cv-01799-JGB-KK, Dkt. No. 79, at 20 (finding that the stigmatic harm of transgender people being seen as "less-than" as a result of the transgender military ban constituted irreparable harm sufficient to warrant the grant of a preliminary injunction).

## IV.     The Balance of Equities Weighs Strongly in Plaintiff's Favor

The balance of equities heavily favors Ms. Edmo's requested relief.  "Courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'"  *Winter*, 555 U.S. at 24 (quoting *Amoco Production Co.*, 480 U.S. 531, 542 (1987)).

Plaintiff has established that she suffers irreparable harm, including unnecessary physical and emotional suffering and denial of her constitutional rights, as a result of Defendants' refusal to provide her with medically necessary treatment for gender dysphoria, including sex-reassignment surgery.  This is more than sufficient to tip the balance of equities in Ms. Edmo's favor.  *See, e. g.*, *Hicklin I*, 2018 U.S. Dist. LEXIS 21516, at *44 (finding the "balance of harms substantially weighs in favor of granting injunctive relief" because plaintiff demonstrated "she continues to face irreparable injury absent relief . . . including the denial of her constitutional rights"); *Norsworthy*, 87 F. Supp. 3d at 1193 ( "The balance of the equities favors [plaintiff's] requested relief.  She has established that she is suffering and is likely to continue to suffer unnecessary pain if she is denied SRS."); *Rhea v. Wash. Dep't of Corr.*, 2010 U.S. Dist. LEXIS

97705, at *37 (W.D. Wash. July 2, 2010) ("In light of the medical findings of these physicians that [plaintiff] is suffering and will continue to suffer unnecessary pain, the undersigned finds that the balance of hardships is greater for Ms. Rhea if the injunction were not granted.").

Defendants cannot cite any legitimate concerns that would outweigh the irreparable harm Ms. Edmo is suffering. *Rodde v. Bonta*, 357 F. 3d 988, 999 (9th Cir. 2004) (balance of hardships favored disabled plaintiffs, who would be deprived of necessary treatment and suffer increased pain and medical complications without relief); *Zepeda v. U.S. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983) (defendant "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations"); *Hernandez*, 110 F. Supp. 3d at 957 (balance of equities favored inmates given Ninth Circuit law holding "that the interest in protecting individuals from physical harm outweighs monetary costs to government entities").

## V.    The Public Interest Requires an Injunction

Finally, the public interest requires that Defendants be ordered to provide medically necessary treatment to Ms. Edmo, including sex-reassignment surgery. *See Melendres*, 695 F. 3d at 1002 ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights." (citations and internal quotations omitted)); *see also United States v. Raines*, 362 U.S. 17, 27 (1960) ("[T]here is the highest public interest in the due observance of all constitutional guarantees.").  "In addition, 'the public has a strong interest in the provision of constitutionally-adequate health care to prisoners.'" *McNearney v. Wash. Dep't of Corr.*, 2012 U.S. Dist. LEXIS 115802, at *44 (W.D. Wash. June 15, 2012) (quoting *Flynn v. Doyle*, 630 F. Supp. 2d 987, 993 (E.D. Wis. 2009)).  Conversely, there is no public interest in forcing Ms. Edmo to continue to suffer unnecessary and life-threatening harms during this litigation. *See Fields*, 653 F. 3d at 556; *Norsworthy*, 87 F. Supp. 3d at 1194.

## VI.   Plaintiff's Requested Relief Complies with the Prison Litigation Reform Act

The scope of Plaintiff's proposed injunction conforms to the Prison Litigation Reform Act's requirement that a court "shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation

of the Federal right, and is the least intrusive means necessary to correct the violation of the

Federal right." 18 U.S.C. § 3626(a)(2).  "The Court shall give substantial weight to any adverse

impact on public safety or the operation of a criminal justice system." *Id*.  The Ninth Circuit has

clarified that the PLRA "has not substantially changed the threshold findings and standards

required to justify an injunction."  *Gomez v. Vernon*, 255 F. 3d 1118, 1129 (9th Cir. 2001).

Here, an injunction granting Ms. Edmo "access to adequate medical care, including

referral to a qualified surgeon for sex-reassignment surgery, is narrowly drawn, extends no

further than necessary to correct the constitutional violation, and is the least intrusive means

necessary to correct the violation. "  *Norsworthy*, F. Supp. 3d at 1194-95.  Further, "[t]here is no

evidence that granting this relief will have any adverse impact on public safety or the operation

of the criminal justice system."  *Id*. at 1195; *see Fields*, 653 F. 3d at 556.

## CONCLUSION

For the foregoing reasons, Plaintiff requests the Court issue a preliminary injunction: 1)

ordering Defendants to provide her immediate access to necessary medical treatment, including

(a) sex-reassignment surgery; (b) reinstatement of spironolactone, or an equivalent type of care;

(c) access to gender-appropriate underwear, clothing, and commissary items; (d) any other

treatment a medical professional qualified to assess and treat gender dysphoria determines to be

medically urgent; and 2) prohibiting Defendants from (a) implementing their policy and/or

practice of blanket denial of access to such treatment for transgender persons incarcerated in the

Idaho Department of Corrections; and (b) disciplining or retaliating against Plaintiff for

expressing her gender identity, including wearing gender-appropriate underwear and clothing,

and adhering to female grooming standards with regards to makeup and hair styling.

Dated: June 1, 2018

Respectfully Submitted,
NATIONAL CENTER FOR LESBIAN RIGHTS
FERGUSON DURHAM
HADSELL STORMER & RENICK LLP

By:      /s/ - Lori E. Rifkin
         Lori E. Rifkin
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 1st day of June, 2018, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Dylan Eaton
deaton@parsonsbehle. com

J.  Kevin West
kwest@parsonsbehle. com

Attorneys for Corizon Defendants

Brady James Hall
brady@melawfirm. net

Attorney for IDOC Defendants

_____/s/ - Lori E.  Rifkin_____
Lori E.  Rifkin
