LAWRENCE G. WASDEN
ATTORNEY GENERAL
STATE OF IDAHO

Brady J. Hall (ISB No. 7873)
brady@melawfirm.net
Marisa S. Crecelius (ISB No. 8011)
marisa@melawfirm.net
*Moore Elia Kraft & Hall, LLP*
Post Office Box 6756
Boise, Idaho 83707
Telephone: (208) 336-6900
Facsimile: (208) 336-7031

*Attorneys for Defendants Idaho Department of Corrections, Henry Atencio, Jeff Zmuda, Howard Keith Yordy, Richard Craig, and Rona Siegert*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ADREE EDMO,<br><br>          Plaintiffs,<br><br>vs.<br><br>IDAHO DEPARTMENT OF<br>CORRECTION; HENRY ATENCIO, in<br>his official capacity; JEFF ZMUDA, in<br>his official capacity; HOWARD KEITH<br>YORDY, in his official and individual<br>capacities; CORIZON, INC.; SCOTT<br>ELIASON; MURRAY YOUNG;<br>RICHARD CRAIG; RONA SIEGERT;<br>CATHERINE WHINNERY; AND<br>DOES 1-15;<br><br>          Defendants.<br>_____ | Case No. 1:17-cv-151-BLW<br><br>**IDOC DEFENDANTS' RESPONSE TO<br>PLAINTIFF'S MOTION FOR<br>PRELIMINARY INJUNCTION** |

**IDOC DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION – pg. 1**

COME NOW Defendants Idaho Department of Correction ("IDOC"), Henry Atencio, Jeff Zmuda, Howard Keith Yordy, Richard Craig, and Rona Siegert (collectively referred to as the "IDOC Defendants"), by and through their counsel of record, Moore Elia Kraft & Hall, LLP, and pursuant to District Local Rule Civ. 7.1(c), hereby submit this *Response to Plaintiff's Motion for Preliminary Injunction*.

## INTRODUCTION

On June 1, 2018, Plaintiff Adree Edmo filed *Plaintiff's Notice of Motion and Motion for Preliminary Injunction and Memorandum of Points and Authorities in Support Thereof* (hereinafter, "*Plaintiff's Motion for Preliminary Injunction*") (Dkt. 62). In the *Motion*, Plaintiff moved the Court for the issuance of a preliminary injunction 1) ordering the Defendants to provider with immediate access to sex reassignment surgery, female underwear and commissary items, and 2) prohibiting Defendants from implementing their policy and/or practice of blanket denial of access to treatment for transgendered inmates and discriminating and/or retaliating against Ms. Edmo for expressing her gender identity. (Dkt. 62, p. 2). For the reasons set forth in further detail below, the Plaintiff's *Motion* should be denied.

## STATEMENT OF FACTS

Plaintiff Adree Edmo entered IDOC custody on April 26, 2012, after pleading guilty to Sexual Abuse of a Child Under the Age of Sixteen Years. Within two months of her incarceration, Ms. Edmo requested and received an evaluation to be assessed for Gender Dysphoria ("GD")[1]. On June 25, 2012, Ms. Edmo underwent an evaluation with Corizon psychiatrist Dr. Scott Eliason, who diagnosed Ms. Edmo with GD. That diagnosis was confirmed less than one month later, on July 19, 2012, by Corizon psychologist Dr. Claudia Lake. By

---

[1] At the time of Ms. Edmo's diagnosis in 2012, GD was known as Gender Identity Disorder, or GID. When it was published in 2013, the DSM-V renamed GID to Gender Dysphoria, or GD. For ease of reference, this brief will refer to Ms. Edmo as having been diagnosed with GD.

September, 2012, Ms. Edmo had begun Hormone Replacement Therapy ("HRT") and to date has continued to receive female hormones. Soon after beginning HRT, Ms. Edmo was provided with a bra. She has also been permitted to feminize appropriately and since 2013, has maintained a demonstrably feminine appearance and presentation while housed in male facilities. *See Declaration of Walter Campbell* ("*Campbell Decl.*"), ¶ 21; *Declaration of Keith Yordy* ("*Yordy Decl.*"), ¶ 6.

After receiving her diagnosis of GD, Ms. Edmo was encouraged by IDOC mental health clinicians to attend group and individualized therapy specifically for inmates who have been diagnosed with GD. *Campbell Decl.*, ¶ 21; *Second Declaration of Krina Stewart*, ("*Stewart Decl.*,"), ¶ 8. In addition, Ms. Edmo has obtained female underwear and will be permitted to order makeup and female grooming items from the prison commissary, pursuant to the revised IDOC policy concerning GD inmates. *Declaration of Marisa S. Crecelius* ("*Crecelius Decl.*") Exh. B ("*Edmo Depo*"), pp.141-143; *Crecelius Decl.*, Exh. D ("*Dowell Depo*"), pp. 18-24, 93, Exh. 20, p. 8.

Despite several recommendations from her treating clinicians, Ms. Edmo has not regularly attended therapy to help her work through her serious underlying mental health issues and pre-incarceration history of trauma, abuse, and suicide attempts. *Campbell Decl.*, ¶¶ 24, 29; *Stewart Decl.*, ¶ 12. *Declaration of Laura Watson* ("*Watson Decl.*"), ¶18. Ms. Edmo continues to suffer from depression and anxiety and she currently exhibits maladaptive behaviors, such as cutting, co-dependency, disobedient behaviors, and sexually acting-out. *Campbell Decl.*, ¶ 25, *Stewart Decl.*, ¶¶ 9-13; *Watson Decl.*, ¶ 10, 17-19. Ms. Edmo also demonstrates symptoms of PTSD and borderline personality disorder. *Crecelius Decl.*, Exh A. ("*Andrade Report*"), Exh. 1, p. 6; *Campbell Decl.*, ¶ 25, *Stewart Decl.*, ¶ 10; *Watson Decl.*, ¶ 17. In addition, Ms. Edmo has also not completed her mandated sex offender treatment programming, making her ineligible for

**IDOC DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION – pg. 3**

parole. *Watson Decl.*, ¶ 18; *Declaration of Sandy Jones* ("*Jones Decl.*"), ¶ 13.

On April 20, 2016, Ms. Edmo received an evaluation for sex reassignment surgery ("SRS") by qualified GD evaluator, Dr. Eliason. *Crecelius Decl.*, Exh. C ("*Eliason Depo*"), p. 106-114. As part of that evaluation, Dr. Eliason consulted with IDOC Lead Clinician Jeremy Clark, who is a member of the World Professional Association for Transgender Health ("WPATH"), regarding whether Ms. Edmo met the criteria for SRS. *Eliason Depo.*, p. 106-114; *Declaration of Jeremy Clark* ("*Clark Decl.*,) ¶¶ 3, 10. After an in-person visit with Ms. Edmo and consultation with mental health staff, Dr. Eliason determined that Ms. Edmo did not meet the criteria for SRS and it was therefore not medically necessary. *Eliason Depo.*, p. 110.

## LEGAL STANDARD

The IDOC Defendants incorporate the legal standard for deciding a preliminary injunction that is set forth in *Plaintiff's Motion for Preliminary Injunction* (Dkt, p.16), with the following additions. First, the standard for granting a preliminary injunction requires Plaintiff "to demonstrate that irreparable injury is <u>likely</u> in the absence of an injunction (not just a possibility of harm)." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 22, 129 S. Ct. 365, 375 (2008) (emphasis added). To issue a preliminary injunction based only on a possibility of irreparable harm would be "inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (per curiam).

Furthermore, mandatory injunctions ordering a party to take action—such as the type sought by Ms. Edmo in this case—are particularly disfavored and are generally not granted unless extreme or very serious damage will result. *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1185 (N.D. Cal.), *appeal dismissed and remanded*, 802 F.3d 1090 (9th Cir. 2015). Mandatory

injunctions are not issued in doubtful cases "or where the injury complained of is capable of compensation in damages." *Id.* Finally, the Prison Litigation Reform Act ("PLRA") provides that, in any civil action regarding prison conditions, preliminary injunctive relief must be "narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct the harm…" 18 U.S.C.A. § 3626(a)(2). The PLRA further requires the Court to give "substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief." *Id.*

## ANALYSIS

Plaintiff moves for preliminary injunctive relief on the basis of her Eighth Amendment Claims alleging that the IDOC Defendants were deliberately indifferent to Ms. Edmo's medical needs and on the basis of her sex discrimination claims under the Fourteenth Amendment and the Affordable Care Act. For the reasons argued below, Plaintiff's *Motion for Preliminary Injunction* should be denied.

### I.      Plaintiff Cannot Establish That She Will Succeed on Her Claims

#### A.      Eighth Amendment claims

Plaintiff asserts that the IDOC Defendants were deliberately indifferent to her medical needs in violation of the Eighth Amendment. Mere negligence alone does not establish a valid Eighth Amendment claim. *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 291 (1976). Rather, in order to succeed on such a claim, a plaintiff must first establish that a prison official was "deliberately indifferent" to a prisoner's serious medical need. *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014). A prison official is deliberately indifferent <u>only</u> if the official "knows of and disregards an excessive risk to inmate health and safety." *Id.* (quoting *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004)) (emphasis added). "[T]he official must both be

**IDOC DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION –
pg. 5**

aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

This Court has very recently articulated the deliberate indifference standard as it applies to cases involving mental health care as follows:

> In the context of mental health care, courts have recognized that it is particularly difficult to establish deliberate indifference to a serious need for numerous reasons. "First, there is considerable room for disagreement and debate among psychiatrists and other mental health professionals as to what is a serious mental illness for which the denial of adequate treatment causes constitutionally cognizable pain." *Capps v. Atiyeh*, 559 F. Supp. 894, 917 (D. Or. 1982). For instance, mere anxiety may not be a serious medical need, as opposed to a part of the "routine discomfort" that is an inevitable consequence of the penalty of imprisonment. See, e.g., *Long v. Nix*, 877 F. Supp. 1358,1366 (S.D. Iowa 1995), aff'd, 86 F.3d 761 (8th Cir. 1996). Second, "[t]he diagnosis of mental illnesses is made tougher still because it is easy for inmates tired of their boring, restrictive and even harsh routines to feign the symptoms of mental illness to effect a change in their environment." *Id*. (internal quotation marks omitted). Third, "psychiatrists themselves differ on the underlying theories and thus on the methods of treatment." *Id*. "[T]he Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." *Id*. (internal quotation marks omitted) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 314 (1982)).

*Mintun v. Corizon Med. Servs.*, No. 1:16-CV-00367-DCN, 2018 WL 1040088, at *5 (D. Idaho Feb. 22, 2018)(emphasis added).

Here, the IDOC Defendants recognize that Ms. Edmo's GD is a "serious medical need" for purposes of her Eighth Amendment claim. Indeed, Ms. Edmo was first diagnosed with GD while in IDOC custody in 2012, less than three months after being incarcerated at ISCI. Her diagnosis has been treated with HRT and counseling and she has been provided the ability to feminize in prison, and is followed closely by a multi-disciplinary team. However, for the following reasons, Ms. Edmo cannot establish that the IDOC Defendants deliberately disregarded an excessive risk to Ms. Edmo's health and safety.

First, with the exception of SRS, IDOC has provided Ms. Edmo with every type of treatment recommended by the WPATH, including changes in gender expression and role, hormone therapy, and psychotherapy. *See Declaration of Lori Rifkin,* Exh. 1 ("*Ettner Decl.*"), ¶ 41 (Dkt. 62-1).[2] Furthermore, IDOC policy expressly recognizes that SRS is an available treatment option for prisoners, so long as SRS is deemed medically necessary by a qualified GD evaluator. *Crecelius Decl.*, Exh. E, p. 3. In addition, Ms. Edmo's needs related to her GD are regularly assessed by the IDOC's Management and Treatment Committee ("MTC"). The MTC is a multi-disciplinary committee made up of treatment providers and other IDOC staff, who regularly address and make recommendations regarding GD inmates' housing, discipline, and treatment, taking into consideration each inmate's individualized GD needs. *Campbell Decl.*, ¶¶ 13-19 ; *Clark Decl.*, ¶¶ 7-8; *Stewart Decl.*, ¶ 5; *Watson Decl.*, ¶¶ 6-8.

As part of its assessment concerning Ms. Edmo's GD, the MTC recommended that Ms. Edmo be provided with an assessment for SRS in 2016. *Campbell Decl.*, ¶ 26. That assessment was conducted by psychiatrist Dr. Eliason, in consultation with IDOC clinicians, including WPATH member and clinical supervisor Jeremy Clark. *Clark Decl.*, ¶¶ 10-15; *Eliason Depo.*, p. 108-114. Dr. Eliason had previously diagnosed Ms. Edmo with GD and was familiar with her mental health treatment and condition prior to her evaluation. *Eliason Depo.*, pp. 56, 57, 62, 63, 108, 113. After visiting with her and consulting with the MTC and other mental health staff, Dr. Eliason concluded that SRS was neither medically necessary nor appropriate for Ms. Edmo. *Eliason Depo.*, p. 108-114.

Dr. Eliason's decision was based on his professional judgment, his understanding of Ms.

---

[2] In making treatment decisions for inmates diagnosed with GD, IDOC clinicians and other mental health care professionals rely on their education, experience, and training in their areas of expertise, along with various other resources. One of those resources includes the WPATH's "Standards of Care," Version 7. By citing and referring to the WPATH, the IDOC Defendants do not acknowledge that it is the legal standard of care for the treatment of GD offenders, nor is the WPATH the only reference which provides guidance regarding the treatment of GD inmates.

**IDOC DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION – pg. 7**

Edmo's mental health history, and in consultation with IDOC clinicians. *Eliason Depo*., p. 108-114.  Dr. Eliason did not base his decision on a "blanket" IDOC policy prohibiting SRS. Rather, Dr. Eliason performed an individual assessment of Ms. Edmo, and as a qualified evaluator, determined that SRS was not medically necessary. *Eliason Depo*., p. 108-114.

Dr. Eliason's determination is consistent with the opinions held by Ms. Edmo's treating clinicians, IDOC's Chief Psychologist, members of the MTC, along with IDOC's retained expert witness, Dr. Joel Andrade, Ph.D. LISCW CCHP-MH, and the Corizon Defendants' retained expert witness, psychiatrist Dr. Keelin Garvey, all of whom agree that SRS is not appropriate for Ms. Edmo at this time, due to her significant uncontrolled mental health concerns. *See Clark Decl.*; *Campbell Decl.*; *Stewart Decl.*; *Watson Decl.*; *Andrade Report*, Exh. 1; *Crecelius Decl.*, Exh. F ("*Garvey Report*").

For example, prior to her incarceration, Ms. Edmo demonstrated a significant history of mental health issues and was diagnosed with Major Depressive Disorder, Anxiety, and Alcohol Dependence. *Andrade Report*, Exh. 1 pp. 1, 5-9; *Garvey Report*, pp. 5-10. Ms. Edmo was sexually abused repeatedly as a child and was a victim of domestic violence and emotional abuse by a domestic partner in her early twenties. *Edmo Depo*., pp. 264-265; *Andrade Report*, Exh. 1 pp. 1, 5-9; *Garvey Report*, pp. 5-10. Also prior to her incarceration, Ms. Edmo attempted suicide several times. *Edmo Depo*., pp. 79-86. On one occasion, Ms. Edmo cut her right arm in a suicide attempt after a dispute with a boyfriend and was hospitalized afterward in the Behavioral Health Unit at Porneuf Medical Center in Pocatello, Idaho. *Id*. In at least one other attempt, Ms. Edmo overdosed on pills and alcohol. *Id*.

Since entering prison, Ms. Edmo's serious underlying mental health conditions have remained uncontrolled. *See Clark Decl.*; *Campbell Decl.*; *Stewart Decl.*; *Watson Decl.*; *Andrade Report*, Exh. 1; *Garvey Report*. Ms. Edmo continues to experience depression and anxiety, and

she exhibits maladaptive behaviors, such as cutting and co-dependency *Campbell Decl.*, ¶ 25, *Stewart Decl.*, ¶ 10; *Watson Decl.*, ¶¶ 10, 17-19. Ms. Edmo also currently exhibits symptoms of PTSD and borderline personality disorder. *Andrade Report*, Exh. 1, p. 6; *Campbell Decl.*, ¶ 25, *Stewart Decl.*, ¶ 10; *Watson Decl.*, ¶ 17. Ms. Edmo's mental health issues remain of grave concern to IDOC clinicians and mental health staff. Ms. Edmo persistently demonstrates poor self-worth, poor self-esteem, dependency issues, sexually-charged behaviors, and unhealthy relationships while incarcerated. *Campbell Decl.*, ¶¶ 28-33, *Stewart Decl.*, ¶¶ 19-14; *Watson Decl.*, ¶¶ 10-19. These underlying mental health issues have complicated Ms. Edmo's resolution of her GD and must be well-controlled before any surgical intervention is appropriate. *Ettner Decl.*, ¶ 63 (Dkt. 62-1); *Watson Decl.*, ¶ 19.

IDOC's retained expert, Dr. Joel Andrade, has over a decade of experience in providing and supervising the provision of correctional mental health care, including directing and overseeing the treatment of all inmates diagnosed with GD in the custody of the Massachusetts Department of Corrections. *See Andrade Report*, Exh. 3. Dr. Andrade conducted a clinical interview with Ms. Edmo on July 31, 2018, and has also reviewed Ms. Edmo's complete mental health treatment record, including her pre-incarceration records. *Andrade Report*, Exh. 1, p. 1. Based on his review of the relevant documents in this case, and his interview with Ms. Edmo in July, Dr. Andrade has concluded that Ms. Edmo is not clinically ready for SRS for several reasons. *Andrade Report*, Exh. 1.

First, while Ms. Edmo claims that she lived full-time as woman and was well accepted as such in her community for years prior to entering prison, Dr. Andrade could find no support for that claim in Ms. Edmo's pre-incarceration medical records and PSI Reports. *Andrade Report*, Exh. 1., p 7. *See also Declaration of Cliff Cummings*. Accordingly, Dr. Andrade is concerned that Ms. Edmo may not appreciate and understand what it means to fully live in the gender role

consistent with her identity prior to being released from prison in 2021. *Id*. In other words, Dr. Andrade believes that Ms. Edmo is at risk for increased harm if she enters the community after having received SRS without a real opportunity to assimilate to life full-time as a female outside of prison. *Id*.

Dr. Andrade also believes that, due to Ms. Edmo's unresolved mental health issues related to her early-life trauma and substance abuse, pursuing SRS at this time increases Ms. Edmo's risk for suicide post-surgery. *Id*., p. 9. For instance, Ms. Edmo made representations to Dr. Andrade during the clinical interview that her feminine appearance enticed her abuser or led to her sexual abuse. *Id*., pp. 4-5. It is apparent to Dr. Andrade that Ms. Edmo has not fully addressed in psychotherapy the relationship between her early childhood trauma and her mental health conditions; in particular, Ms. Edmo's GD. *Id*. Working through those issues with a mental health provider is something that Ms. Edmo must do before she can fully and meaningfully elect to proceed with SRS. *Id*., pp. 7-10. Otherwise, Ms. Edmo will not be able to successfully cope with the stressors of surgery, which may increase her risk of harm. *Id*. At this time, Ms. Edmo had not developed healthy coping strategies and instead deals with her depression and gender dysphoria by cutting herself. *Id*.; *See also Campbell Decl*., ¶ 25; *Stewart Decl*., ¶¶ 9-10; *Edmo Depo*., pp. 300-304. Ms. Edmo must develop healthy tools to manage her depression, anxiety, and GD that do not involve maladaptive behaviors such as cutting, sexual acting out, and codependency. *See Campbell Decl*.; *Stewart Decl*.; *Watson Decl*.; *Andrade Report*, Exh. 1; *Garvey Report*.

Based on the foregoing, Ms. Edmo is not likely to succeed on her claim that the IDOC Defendants were deliberately indifferent to her gender dysphoria by not recommending SRS. IDOC does <u>not</u> have a blanket practice or policy prohibiting SRS. Rather, each GD inmate is individually assessed and evaluation of their need for treatment is ongoing, through review by

**IDOC DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION – pg. 10**

the MTC and in group and individual therapy with the inmate's individual treatment providers. Here, Ms. Edmo was evaluated for surgery by a qualified evaluator, who in his professional judgment determined that SRS was not medically necessary. The Defendants' retained experts, along with Ms. Edmo's treating clinicians and members of the MTC, believe that Ms. Edmo's other serious mental health concerns are not well-controlled, as required by the WPATH standards. *See Ettner Decl.*, ¶ 63 (Dkt. 62-1). Those well-documented uncontrolled mental health conditions should not be overlooked or ignored in any assessment of whether SRS is appropriate for Ms. Edmo.

While Ms. Edmo's retained experts may believe that her mental health concerns are well-controlled, a difference in professional opinion does not constitute deliberate indifference. As this Court has stated, "psychiatrists themselves differ on the underlying theories and thus on the methods of treatment" of mental health conditions. *Mintun*, No. 1:16-CV-00367-DCN, 2018 WL 1040088, at *5. The decision not to recommend SRS for Ms. Edmo was an exercise of professional judgment, supported by Ms. Edmo's current treatment providers, the MTC, at least two members of WPATH, and experts with years of experience treating and supervising inmates with GD. Accordingly, the IDOC Defendants have not been deliberately indifferent to Ms. Edmo's medical needs in concluding that SRS is inappropriate at this time. To the contrary, the IDOC Defendants and Ms. Edmo's IDOC treatment providers want to ensure that they do no harm to Ms. Edmo by authorizing such an invasive and permanent procedure prematurely and without consideration of her entire clinical picture.

The same is true for Ms. Edmo's claims that the IDOC Defendants have been deliberately indifferent by limiting Ms. Edmo's ability to wear makeup and female undergarments. First, prior to the time of the filing of Ms. Edmo's *Motion for Preliminary Injunction*, no medical

provider for Ms. Edmo had determined that makeup, a "gaff,"[3] laser hair removal, or female underwear were medically necessary for the treatment of Ms. Edmo's GD. *Declaration of Rona Siegert* ("*Siegert Decl.*,"), ¶¶ 10-17; *Declaration of Yordy*, ¶ 7. Ms. Edmo has been allowed to appropriately feminize in many other ways. Second, as of June 6, 2017, female transgender inmates who had been diagnosed with GD were allowed to possess female underwear. *See Dowell Depo.*, Exh. 19, p. 16. In other words, IDOC does not have a policy prohibiting Ms. Edmo from possessing female underwear and she has done so at various times during her incarceration.

Still, Ms. Edmo's inappropriate use of makeup and feminine hairstyles and her alteration of female undergarments raises serious security and safety concerns. *See Yordy Decl.*, ¶¶ 7-9, Exh. 5. Allowing offenders to appear or act sexual in prison increases the risk of inappropriate prisoner relationships, sexual harassment and assaults, and various other serious security concerns. *Id.* "The duty of prison officials to protect the safety of inmates and prison personnel is a factor that may properly be considered in prescribing medical care for a serious medical need." *Kosilek v. Maloney*, 221 F. Supp. 2d 156, 161 (D. Mass. 2002).

Here, IDOC prohibits all offenders – regardless of their sex, gender, or housing – from appearing or behaving sexually while incarcerated under the custody of the IDOC. *Yordy Decl.*, ¶¶ 7-9. Accordingly, the IDOC has prohibited Ms. Edmo from sexualizing her feminine appearance and behavior in a manner that may create a sexually-charged environment. *Id.* The IDOC's focus has not been with precluding Ms. Edmo from feminizing, but rather with her repeated attempts to sexualize her appearance in a male facility. There are also security concerns with providing offenders with access to underwear traditionally worn by the opposite gender,

---

[3] Ms. Edmo has conceded that she has never actually requested a "gaff," let alone exhausted the IDOC's grievance process in regards to the need for such an item.

**IDOC DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION – pg. 12**

especially in regards to offenders with sexual fetishes. *Id.* It is also against IDOC policy to destroy or alter property, as Ms. Edmo did when she altered her underwear into thongs. *See Yordy Decl.*, Exh. 5, pp. IDOC_C_pg.62-65. In making such considerations to prohibit inmates, including Ms. Edmo, from appearing or acting sexual in prison, IDOC officials acted reasonably and in good faith to protect the safety and security of all inmates, including Ms. Edmo, and were thus not deliberately indifferent to her medical needs.

The IDOC policy concerning healthcare for GD inmates has recently been updated, as part of a two-year process involving the Chief of Prisons, the Chief Psychologist, and mental health staff at IDOC. *Dowell Depo.*, pp. 19-23. The updated policy specifically allows inmates with GD to wear appropriate makeup, style their hair in traditionally female hairstyles, and present as female. *Dowell Depo.*, Exh. 20, p. 8. Furthermore, the updated policy allows inmates who have been diagnosed with GD to access commissary items, such as bras, underwear, female makeup, and grooming items. *Id.* This updated policy does not relieve IDOC of its obligation to maintain a safe and secure environment. Rather, the updated policy specifically sets forth guidelines to avoid a sexually charged atmosphere in IDOC facilities, prohibiting provocative or sexually charged clothing and behavior, such as the type for which Ms. Edmo has previously received DORs. *Id. See also Yordy Decl.*, Exhs. 5 and 6.

The U.S. Supreme Court has held that prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their  judgment are needed to preserve internal order and discipline and to maintain institutional security. *See Whitley v. Albers*, 475 U.S. 312, 321–22, 106 S. Ct. 1078, 1085, 89 L. Ed. 2d 251 (1986). Such deference extends to "prophylactic or preventive measures" intended to reduce the incidence of breaches of prison discipline. *Id.* "It does not insulate from review actions taken in bad faith and for no legitimate purpose, but it requires that neither judge nor jury freely substitute their

**IDOC DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION – pg. 13**

judgment for that of officials who have made a considered choice." Here, the IDOC Defendants have not been deliberately indifferent to Ms. Edmo's needs by limiting her access to items that have not been deemed medically necessary by her medical providers. Furthermore, the IDOC Defendants have not been deliberately indifferent to Ms. Edmo's GD by limited her from from appearing or acting sexual in prison. *See, for e.g.*, *Yordy Decl.*, ¶ 11, Exh. 5. Accordingly, Ms. Edmo cannot establish that she will be successful on her claim that the IDOC Defendants were deliberately indifferent to any treatment aspect of her GD.

## B.      Fourteenth Amendment claims

Plaintiff asserts that the IDOC Defendants have refused to provide Ms. Edmo with SRS and access to female undergarments on the basis of her status as a transgender female, in violation of the Fourteenth Amendment to the United States Constitution. Specifically, Plaintiff argues that IDOC has a policy "denying sex-assignment surgery and other medically necessary care to transgender people…" *Plaintiff's Motion for Preliminary Injunction*, p. 22. As an initial matter, the standard regarding the validity of a prison regulation that allegedly impinges on an inmate's Constitutional rights is whether such a regulation is "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89, 107 S. Ct. 2254, 2261–62. However, in this case, the Court need not reach the question of whether the denial of SRS and access to female underwear serves some penological interest because IDOC simply does not have a policy, practice, or regulation that denies medically necessary care to Ms. Edmo based on her status as a transgender person.

To the contrary, since 2011, IDOC policy has specifically allowed for SRS when deemed medically necessary. *Crecelius Decl.*, Exh. E, p. 3. Pursuant to such policy, Ms. Edmo has received an evaluation in 2016 for SRS by psychiatrist Dr. Eliason, after which he determined that the surgery was <u>not</u> medically necessary. This determination was made in consultation with

a member of WPATH and is supported by Ms. Edmo's current and former IDOC treating clinicians, the Chief Psychologist of IDOC, members of the MTC, and the Defendants' expert witnesses. In addition, despite the fact that no medical provider has deemed female underwear medically necessary, Ms. Edmo has access to female underwear and will soon have additional access to female commissary items, including female underwear, pursuant to the updated GD policy.

Ms. Edmo's claim that there is a policy prohibiting medically necessary care for transgender persons is further belied by the fact that Ms. Edmo has been provided with care for her GD that <u>has</u> been deemed medically necessary, including HRT, supportive undergarments, and bras. In addition, her individual care, housing, and disciplinary issues as they relate to Ms. Edmo's GD are regularly assessed by the MTC. Accordingly, there is no evidence that Ms. Edmo has been denied medical care on the basis of being a transgender person.

Despite the fact that no policy prohibiting SRS exists, IDOC has legitimate penological interests for not providing SRS to Ms. Edmo at this time. First, the IDOC Defendants have a legitimate interest in providing for the safety and well-being of all of the inmates in custody, including Ms. Edmo. Providing treatment that is neither medically necessary nor appropriate could cause significant harm to Ms. Edmo. IDOC administrators cannot overrule the valid treatment decisions of its medical providers and the recommendations of its clinical and mental health staff, particularly when there are serious concerns about the negative effects that SRS may have on Ms. Edmo's physical and mental well-being. For those reasons, Ms. Edmo cannot succeed on her Fourteenth Amendment claims.

### C.      Claims under the Affordable Care Act

Ms. Edmo also argues that the IDOC Defendants' "policy" discriminates against Ms. Edmo based on sex and therefore violates Section 1557 of the Affordable Care Act 42 U.S.C. §

18116(a) ("ACA"). For the same reasons that Ms. Edmo cannot succeed on her Fourteenth Amendment discrimination claims (outlined in section **II D** above), Ms. Edmo is also not likely to succeed on her ACA claims. In her *Motion for Preliminary Injunction*, Ms. Edmo asserts that the ACA is applicable to the IDOC Defendants because the IDOC receives "federal financial assistance" and is therefore a covered entity subject to the ACA's nondiscrimination requirement. However, the ACA is not applicable to Ms. Edmo, as she and IDOC do not meet the requirements for applicability, including Section 1557.

The ACA applies to an individual through either engaging with insurance companies on the free exchange or as an employee receiving insurance from an employer. The Federal Code specifically notes that incarceration is an eligibility disqualifier for a person to participate on the free exchange. 45 C.F.R. 155.305. Ms. Edmo is not employed by IDOC, nor does she receive health insurance from IDOC. Therefore, the ACA does not apply to Ms. Edmo as an individual.

Similarly, the ACA does not apply to IDOC as an entity. For the ACA to apply, IDOC would need to participate in a "health program or activity." 42 USC §§ 18032(2)(A)&(B). According to the Department of Health and Human Services, an entity qualifies as participating in a "health program or activity" if it is principally engaged in the provision or administration of health-related services, health-related insurance coverage, or other health-related coverage, "such as a hospital, health clinic, community health center, group health plan, health insurance issuer, physician's practice, nursing facility, or residential or community-based treatment facility." 81 Fed. Reg. 31375, 31385. IDOC is not "principally engaged" in providing or administering health services. Rather, IDOC is principally engaged in managing felony offenders housed in prisons and supervised on probation and parole. Accordingly, Section 1557 of the ACA does not apply to the IDOC Defendants and Ms. Edmo's claims on that basis are not likely to succeed.

## II.   Plaintiff is Not Likely to Suffer Irreparable Harm Absent Injunctive Relief

Ms. Edmo claims that her failure to receive SRS caused her to contemplate suicide on one occasion and risk her life in attempts to self-castrate. Ms. Edmo further claims that she is at risk of irreparable harm in the form of death, suicide, attempts to perform her own surgical care, extreme anguish, depression, and stress if she does not receive SRS and other "medically necessary care." The evidence in this case tells a different story. Regarding Ms. Edmo's current mental health condition, during her exam with her retained expert Dr. Gorton, she denied active suicidal ideations with "vague thoughts" of non-suicidal self-injury. *Declaration of Ryan Nicholas Gorton* ("*Gorton Decl.*"), ¶¶ 21, 77, 78 (Dkt. 62-1). She had similar reports in her clinical interviews with Drs. Andrade and Garvey. *See Andrade Report*, p. 9; *Garvey Report*, pp. 10, 16. Ms. Edmo also testified at her deposition that she has no plans to commit suicide. *Edmo Depo.*, p. 209.

In addition, Ms. Edmo is goal-oriented and functional and is not exhibiting symptoms of a person whose condition is so extreme that a mandatory injunction is required. *Stewart Decl.*, Ms. Edmo recently got married, has plans for her future after she is released from custody, and aims to finish her bachelor's degree. *Stewart Decl.*, ¶¶ 15-17; *Edmo Depo.*, pp. 209-212; *Andrade Report*, pp. 3-4; *Garvey Report*, pp. 17. Ms. Edmo has not made any actual attempts at suicide since prior to her incarceration. *Edmo Depo.*, pp. 182-184.

Furthermore, the medical and mental health professionals in this case do not agree that Ms. Edmo is likely to suffer irreparable harm should she not have immediate access to SRS. First, Dr. Gorton opines that Ms. Edmo must be referred to an "appropriate surgeon" for sex reassignment surgery "as soon as possible but at a minimum within the next 6 months." *Gorton Decl.*"), ¶ 88 (Dkt. 62-1) (emphasis added). Second, the Defendants' retained experts and Ms. Edmo's current and former treating clinicians have concerns that such a surgery will actually put

**IDOC DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION – pg. 17**

Ms. Edmo at a greater risk for suicide because she has not yet developed the tools to cope with her serious uncontrolled mental health conditions, which are likely to be exacerbated or complicated should surgery not meet with Ms. Edmo's high expectations. *See Campbell Decl*.; *Stewart Decl*.; *Watson Decl*.; *Andrade Report*, Exh. 1; *Garvey Report*.

Finally, Ms. Edmo's underlying mental health conditions are contributing to her current mental state, including the anguish, anxiety, and depression that Ms. Edmo claims are solely caused by her failure to receive SRS. As described above, Ms. Edmo has not regularly attended the recommenced individualized and group therapy for treating her other mental health conditions, including the Mood Management and Social Skills groups. *Campbell Decl.*, ¶¶ 24, 29; *Stewart Decl*., ¶ 12. *Watson Decl*., ¶18. Furthermore, Ms. Edmo has not completed her sex offender treatment programming. *Jones Decl*., ¶ 13. Importantly, Ms. Edmo does not acknowledge and has not adequately addressed the existence of her other serious mental health conditions that contribute to her current feelings of anxiety and depression, such as her childhood trauma and prior abusive relationships. *See Campbell Decl*.; *Stewart Decl*.; *Watson Decl*.; *Andrade Report*, Exh. 1; *Garvey Report*. As a result, those feelings will remain and may in fact worsen should Ms. Edmo receive SRS before those issues are well-controlled. *See Ettner Decl*., ¶ 63 (Dkt. 62-1).

Therefore, based on Ms. Edmo's current clinical condition and the professional judgment of several medical and mental health professionals regarding Ms. Edmo's uncontrolled depression, anxiety, and substance abuse problems, along with her symptoms of borderline personality disorder, PTSD, and her current cutting behaviors, whether Ms. Edmo will suffer irreparable harm as a result of not receiving immediate access to SRS is speculative. Therefore injunctive relief is not appropriate. To the contrary, injunctive relief ordering SRS presents a meaningful risk of future harm to Ms. Edmo, by increasing her risk of suicide, depression, and

**IDOC DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION –**
**pg. 18**

dysphoria, particularly if the outcome of the surgery does not meet Ms. Edmo's expectations as the solution to her severe depression, anxiety, and self-esteem issues.

### III.   The Balance of Equities Does Not Tip in Plaintiff's Favor and Granting Plaintiff Injunctive Relief is Not in the Public Interest

In deciding a motion for preliminary injunction, Courts must balance the competing claims of injury and consider the effect on each party, paying particular regard to the public consequences in employing the extraordinary remedy of an injunction. *Winter*, 555 U.S. at 24, 129 S. Ct. at 376–77 (2008). Here, in order to obtain the extraordinary relief that she seeks, Ms. Edmo must demonstrate that this balance tips in her favor and that such relief is in the public interest. For the following reasons, she cannot do so.

As mentioned in section **II B** above, the IDOC Defendants have an obligation to provide for the safety and well-being of all of the inmates in custody, including Ms. Edmo. This obligation includes providing medically necessary mental health care to treat all of Ms. Edmo's mental health concerns. To do so, the IDOC Defendants must have the discretion, autonomy, and authority to provide medically necessary treatment to prisoners in IDOC custody based on their individual needs and the individual professional judgment of the treatment providers. To order treatment that is not appropriate or medically necessary would inevitably interfere with IDOC's ability to provide medically necessary care. Furthermore, Ms. Edmo is an inmate with a complicated clinical picture and many mental health needs that must be addressed. To sacrifice the treatment of Ms. Edmo as a whole person to provide a potentially harmful procedure to treat her GD would impede IDOC's ability to provide medically necessary care to Ms. Edmo and other prisoners with GD.

Similarly, awarding injunctive relief to Ms. Edmo is not in the public interest. Running a prison system requires "expertise, planning, and the commitment of resources" that have been

committed to the responsibility of prison administrators in the executive branch of government. *Oakleaf v. Martinez*, 297 F. Supp. 3d 1221, 1233 (D.N.M. 2018).Ordering the IDOC Defendants to provide medical care that is not medically necessary and runs counter to the treatment prescribed by Ms. Edmo's mental health and medical treatment providers after exercising their professional judgment weighs against the public interest. *See id*. Ms. Edmo's medical and mental treatment must be viewed, as her Corizon and IDOC providers have done, in the context of her entire mental health and personal history. To address her needs in a vacuum, based on incomplete information and without evaluating her entire clinical picture, does not serve the public's interest, and it certainly does not serve Ms. Edmo.

## CONCLUSION

For the foregoing reasons, the IDOC Defendants respectfully request that this Court deny the *Plaintiff's Motion for Preliminary Injunction*.

DATED this 14th day of September, 2018.

Moore Elia Kraft & Hall, LLP

*/s/Brady J. Hall*
**Attorneys for Defendants Idaho Department of Correction, Henry Atencio, Jeff Zmuda, Howard Keith Yordy, Richard Craig, and Rona Siegert**

**IDOC DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION –
pg. 20**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of September, 2018, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Dan Stormer
dstormer@hadsellstormer.com
Lori Rifkin
lrifkin@hadsellstormer.com
Shaleen Shanbhag
sshanbhag@hadsellstormer.com
HADSELL STORMER & RENICK, LLP
*(Counsel for Plaintiff)*

Craig Durham
chd@fergusondurham.com
Deborah Ferguson
daf@fergusondurham.com
FERGUSON DURHAM, PLLC
*(Counsel for Plaintiff)*

Amy Whelan
awhelan@nclrights.org
Julie Wilensky
jwilensky@nclrights.org
NATIONAL CENTER FOR LESBIAN RIGHTS
*(Counsel for Plaintiffs)*

Dylan Eaton
deaton@parsonsbehle.com
J. Kevin West
kwest@parsonsbehle.com
PARSONS, BEHLE & LATIMER
(Counsel for

*/s/Krista Zimmerman*
Krista Zimmerman