| | |
|---|---|
| 1 | **UNITED STATES DISTRICT COURT** |
| 2 | **DISTRICT OF IDAHO** |
| 3 | |
| 4 | ADREE EDMO (a/k/a MASON EDMO), )  CASE NO. 1:17-cv-00151-BLW |
| 5 | Plaintiff,    )  **EVIDENTIARY HEARING DAY 1** |
| 6 | vs.     ) |
| 7 | IDAHO DEPARTMENT OF       ) |
| | CORRECTION; HENRY ATENCIO, in ) |
| 8 | his official capacity; JEFF  ) |
| | ZMUDA, in his official    ) |
| 9 | capacity; HOWARD KEITH YORDY, ) |
| | in his official and individual ) |
| 10 | capacities; CORIZON, INC.;   ) |
| | SCOTT ELIASON; MURRAY YOUNG;  ) |
| 11 | RICHARD CRAIG; RONA SIEGERT;  ) |
| | CATHERINE WHINNERY; and DOES  ) |
| 12 | 1-15,       ) |
| 13 | Defendants.   ) |
| | _____ ) |
| 14 | |
| 15 | |
| 16 | **TRANSCRIPT OF PROCEEDINGS – VOLUME 1** |
| 17 | **BEFORE THE HONORABLE B. LYNN WINMILL**<br>**WEDNESDAY, OCTOBER 10, 2018, 8:53 A.M.**<br>**BOISE, IDAHO** |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | Proceedings recorded by mechanical stenography, transcript produced by computer. |
| 23 | _____ |
| 24 | **TAMARA I. HOHENLEITNER, CSR 619, CRR** |
| 25 | FEDERAL OFFICIAL COURT REPORTER<br>550 WEST FORT STREET, BOISE, IDAHO  83724 |

**FOR PLAINTIFF**

    Lori Rifkin
    HADSELL STORMER & RENICK LLP
    4300 Horton Street, #15
    Emeryville, CA 94608

    Amy Whelan
    NATIONAL CENTER FOR LESBIAN RIGHTS
    870 Market Street, Suite 370
    San Francisco, CA 94102

    Shaleen Shanbhag
    HADSELL STORMER & RENICK LLP
    128 N. Fair Oaks Avenue
    Pasadena, California 91103

    Craig Durham
    Deborah Ferguson
    FERGUSON DURHAM, PLLC
    223 N. 6th Street, Suite 325
    Boise, ID 83702

**FOR DEFENDANTS IDAHO DEPARTMENT OF CORRECTIONS, HENRY ATENCIO, JEFF ZMUDA, HOWARD KEITH YORDY, RICHARD CRAIG, AND RONA SIEGERT**

    Brady J. Hall, Special Deputy Attorney General
    Marisa S. Crecelius
    MOORE ELIA KRAFT & HALL, LLP
    Post Office Box 6756
    Boise, Idaho 83707

**FOR DEFENDANTS CORIZON, INC., SCOTT ELIASON, MURRAY YOUNG, AND CATHERINE WHINNERY**

    Dylan A. Eaton
    J. Kevin West
    PARSONS, BEHLE & LATIMER
    800 W. Main Street, Suite 1300
    Boise, Idaho 83702

**I N D E X**

**OCTOBER 10, 2018 – VOLUME 1**

Date      Proceeding                                    Page

10/10/18  Hearing – Motion for Preliminary Injunction    1
          Opening Statement by Ms. Rifkin ................  9
          Opening Statement by Mr. Hall ................. 23


**P L A I N T I F F   W I T N E S S E S**

                                                     PAGE


**RANDI ETTNER, PH.D.**
     Direct Examination by Ms. Rifkin .................... 40
     Cross-Examination by Mr. Hall ....................... 106
     Cross-Examination by Mr. Eaton ...................... 153
     Examination by The Court ............................ 165
     Redirect Examination by Ms. Rifkin .................. 173
     Recross-Examination by Mr. Eaton .................... 184


**J O I N T   E X H I B I T S**

ADMITTED                                             PAGE

**1**    Medical records of Adree Edmo (CORIZON
       0001–1599)...................................... 85
**2**    Corizon Rule 35 Examination by Keelin Garvey,
       M.D. (Audio file)............................... 85
**3**    Idaho Department of Correction Rule 35
       Examination by Joel Andrade, PhD (Audio file).... 85
**4**    Idaho Department of Correction photographs of
       Adree Edmo (IDOC_A_pg. 4, 8, 11, 20, 24–26 and
       unbates stamped document)....................... 85
**5**    Idaho Department of Correction Disciplinary
       Offense Reports, various dates (IDOC_C_pgs.
       1–71)........................................... 85
**6**    Idaho Department of Correction Grievance Forms,
       various dates (IDOC_E_pg. 1–206)................ 85

4

**J O I N T   E X H I B I T S**

ADMITTED                                                              **PAGE**

7        Idaho Department of Correction Management
         Treatment Team Committee and Administrative
         Review Committee minutes, various dates
         2012-2018 (IDOC_L_pg. 1-110).................... 85

8        Idaho Department of Correction Standard
         Operating Procedure, version 3.2 re "Gender
         Identity Disorder: Healthcare for offenders
         with", adopted October 31, 2002, reviewed
         December 21, 2011 (IDOC_V_pg. 1-9)............. 85

9        Idaho Department of Correction Standard
         Operating Procedure, version 4.0 re "Gender
         Dysphoria: Healthcare for Inmates with",
         adopted October 31, 2002 (IDOC_KK_pg. 1-9)....... 85

10       Email from Ashley Dowell to Ross Castleton, et
         al. Re Gender Dysphoria Policy Update, dated
         September 26, 2018 and Idaho Department of
         Correction Memorandum, dated October 5, 2018
         (IDOC_KK_pg. 10-12)............................ 85

11       Email from Ashley Dowell to Walter Campbell re
         GD SOP change memo and Clinician Contact, dated
         October 5, 2018 (IDOC_KK_pg. 13)................ 85

12       Idaho Department of Correction Standard
         Operating Procedure, version 3.0 re "Prison
         Rape Elimination", adopted August 17, 2014,
         Reviewed May 20, 2009 (IDOC_W_29 -54)............ 85

13       Idaho Department of Correction Standard
         Operating Procedure, version 4.0 re "Prison
         Rape Elimination", adopted August 17, 2014
         (IDOC_W_27, 1 -26).............................. 85

14       Corizon Health, Clinical Pathway: Gender
         Dysphoria, issued March 2017
         (Pending Motion re Confidentiality)............. 85

15       WPATH Standards of Care for the Health of
         Transsexual, Transgender, and Gender
         Nonconforming People, 7th Version............... 85

16       Document entitled "Attendance for Lecture with
         Dr. Levine" (PBL 0047).......................... 85

17       Presentation entitled "Medical Necessity for
         Transgender Inmate: In Search of Clarity when
         Paradox, Complexity and Uncertainty Abound", by
         Stephen B. Levine, M.D. (PBL 1383-1445).......... 85

1                                    **J O I N T   E X H I B I T S**

2  **ADMITTED**                                                      **PAGE**

3   **18**      Presentation entitled "Gender Dysphoria: A
             Comprehensive Approach to Treatment and Policy
4            Management", by Mark Fleming, Ph.D., Scott
             Eliason, M.D., Mariann Atwell, Psy.D., Laura
5            McKinnon, MA, and Jessica Lee, MSN
             (PBL0399-0474)................................. 85
6   **19**      Article entitled "Male Prison Inmates with
             Gender Dysphoria: When is Sex Reassignment
7            Surgery Appropriate", by Cynthia Osborne and
             Anne Lawrence................................. 85
8

9

10                               **P L A I N T I F F   E X H I B I T S**

11  **ADMITTED**                                                     **PAGE**

12  **1001**     Excerpt from Diagnostic and Statistical Manual
             of Mental Disorders, Fifth Edition re "Gender
13           Dysphoria".................................... 48
    **1003**     Curriculum Vitae of Randi Ettner, PhD............ 41
14

15

16

17

18

19

20

21

22

23

24

25

6

P R O C E E D I N G S

October 10, 2018

1       THE CLERK:  The court will now hear Civil Case 17-151,

2

3       THE CLERK:  The court will now hear Civil Case 17-151,

4   Adree Edmo vs. Corizon, Incorporated, regarding a motion for

5   preliminary injunction.

6       THE COURT:  Good morning, Counsel.

7       Before we start, first, I will be taking a moment to log

8   in.  But while I'm doing that, I wanted to let you know a couple

9   things.

10       One is Ms. Hohenleitner had agreed that she should be able

11   to prepare the transcript within a week, I think, after the

12   trial is completed.  The challenge is that we had not

13   anticipated a case set for trial next week which we thought had

14   been resolved but was not.  So we will be in trial next week.

15   And I'm in trial the two weeks after that as well.  So I have

16   got back-to-back trials going from now through the next four

17   weeks.

18       And Ms. Hohenleitner, that puts quite a burden on her.  And

19   I think she was anticipating that she would be able to take care

20   of the transcript next week when we were not in trial.  And, of

21   course, that has now changed.

22       So I can't put undue pressure on her, and so this may

23   affect her ability to get the briefing -- the transcript to you

24   in preparation for the final briefing and submission of findings

25   of fact and conclusions of law.

1          The second issue has to do with the nature of the

2     proceeding.  We're here on a hearing for a temporary injunction,

3     but the request -- or the relief requested is in the form of a

4     mandatory injunction in terms of requiring IDOC and Corizon to

5     take certain affirmative steps, some of which are not

6     reversible.

7          So it's a -- it's hard for me to envision this hearing

8     being anything but a hearing on a final injunction at least as

9     to that part of the relief requested.

10          Does that make a difference?  I don't know.  But I think

11     it's something I will want to at least hear from counsel at some

12     point between now and Friday as to whether a different standard

13     applies, whether this should be treated as a hearing on a final

14     injunction for a final hearing on the request for injunctive

15     relief, realizing there may be other claims that will not be

16     resolved as part of this proceeding.  But I think we're just in

17     kind of an awkward procedural posture, and I will want counsel's

18     input on that.

19          Finally, we're starting late, unavoidable.  These things

20     happen, but we still need to keep the same amount of time

21     because counsel has been put on the clock.  I can't make up the

22     time today because I teach a class this afternoon, and I have to

23     be done at 2:30, as we originally planned.

24          But tomorrow and, if need be, Friday, we can find

25     additional time.  So we probably will go until 3:00, would be my

8

1      best guess; we'll go until 3:00 on Thursday.  At least I think

2      that's correct.

3           Ms. Bracke, is that correct, we don't have anything

4      scheduled in the afternoon?

5                THE CLERK:  Correct, Your Honor.

6                THE COURT:  All right.  So there we are.

7           All right.  With that, I think counsel requested the right

8      to present very brief opening statements or arguments.  So, with

9      that, I think from the plaintiffs, maybe we will just hear first

10     from you.

11               MR. EATON:  Your Honor, if I may, real fast.

12               THE COURT:  Yes.

13               MR. EATON:  Dr. Eliason is a party to this case.  I

14     was planning to have him sit in with us today.  He is ill today.

15     So I was hoping that if he can be excused, I anticipate he would

16     probably testify tomorrow.

17               THE COURT:  No, he doesn't need to be here.  That's

18     fine if you are not feeling well.

19          I should also point out, if you haven't noticed in the

20     courthouse, we had a major flood at the bottom of the building

21     on Thursday.  The heating system has still not been restored.

22     Fortunately, this courtroom maintains a fairly stable

23     temperature anyway, but it's going to be quite cool probably in

24     the public areas.

25          It's the best we can do.  The only alternative is to recess

1    the trial until they fix the system.  They promised to have it

2    done Friday, Monday, Tuesday, and they are still working on it.

3    So we don't know when it will be done.

4         All right.  And that's, in part -- if he is not feeling

5    well, that's an additional reason to have him find someplace

6    where he can be comfortable.

7         With that, then, we'll hear first from the plaintiffs in

8    terms of arguments of counsel.

9              MS. RIFKIN:  Thank you, Your Honor.  Lori Rifkin for

10   plaintiff, Adree Edmo.

11        Before I start with opening, just on the issue of delay,

12   Your Honor, we're informed that the IDOC transport with Ms. Edmo

13   was actually almost in the city with Ms. Edmo to be on time and

14   turned around and went back to the prison to pick somebody else

15   up.

16        And so I think that in terms of making sure that we start

17   on time in the next couple of days, it seems like there was a

18   communication problem and not a lag with the preparation of

19   Ms. Edmo.

20        We appreciate the chance to present a short opening simply

21   for framing the issues, because there will be a lot of facts and

22   opinions packed into the course of the next three days.  But

23   this is a straightforward constitutional case.

24        It is not disputed that gender dysphoria is a serious

25   medical condition within the ambit of the Eighth Amendment's

1    mandate that prisoners receive adequate treatment for their

2    serious medical needs.

3         Plaintiff's experts will explain that there is a medical

4    treatment for gender dysphoria that is routinely provided for

5    patients with Ms. Edmo's symptoms.  And this treatment does not

6    depend on where someone lives or whether they are thought to be

7    deserving or not.

8         While gender dysphoria is highly treatable, untrained and

9    inexperienced providers making treatment decisions place

10   patients at risk.  And the results of not adequately treating

11   gender dysphoria are predictable and dire.

12        The set of facts relevant for plaintiff's motion for

13   preliminary injunction are fairly narrow.  Ms. Edmo has been in

14   IDOC custody since 2012.  She was diagnosed with gender

15   dysphoria in the summer of 2012 and started cross-sex hormone

16   treatment in the fall of 2012.  She has been receiving

17   feminizing hormones for six years.

18        Our experts will explain that hormones essentially reach a

19   point where they have had the maximum feminizing impact they are

20   going to have and that Ms. Edmo is past that point.  While the

21   hormones alleviated some of her severe gender dysphoria, they

22   are only a partial treatment.

23        She continues to experience ongoing and acute distress from

24   gender dysphoria, twice culminating in attempts to perform

25   self-surgery by cutting off her testicles.

1          She has repeatedly and consistently requested gender

2     confirmation surgery since 2014 and filed this lawsuit pro se in

3     2017.

4          There is an internationally accepted standard of care for

5     gender dysphoria treatment.  It includes criteria for

6     determining when gender confirmation surgery is medically

7     necessary to treat severe and persistent gender dysphoria.

8          Gender confirmation surgery is not new, and it is not

9     experimental; it is the medical treatment for this medical

10    condition.  And whether surgery is appropriate is determined by

11    medical standards, not by someone's incarceration status.

12         The gender dysphoria treatment standards mirror the Eighth

13    Amendment's requirement that people in prison receive medically

14    necessary treatment, and the standard of care for what is

15    medically necessary does not change between the community and

16    prison.

17              THE COURT:  Well, but to be clear, the standard of

18    care, at least in Idaho, is a negligence-based standard.  And

19    the Eighth Amendment does not say that we treat this as a

20    medical malpractice claim.  There has to be a deliberate

21    indifference to the medical needs of the inmate.

22         So standard of care means something different in

23    imprisonment.  It means outside -- if we're talking about Eighth

24    Amendment, does it not?

25              MS. RIFKIN:  Well, the standard of care as referenced

1    to determining what is medically necessary is the same in the

2    community and in prison.

3         The standard for the Eighth Amendment for evaluating

4    liability requires the additional showing that refusal or

5    failure to provide medically necessary treatment was

6    deliberately indifferent rather than negligent.  But for

7    evaluating what is medically necessary treatment, that's the

8    same standard that's applied in the community and in prison.

9         THE COURT:  All right.  But medically necessary does

10   not mean -- in the Eighth Amendment context does not mean that

11   it is -- that a failure to act in a particular way gives rise to

12   liability unless it arises to a potential for either death or

13   wanton pain.  So the standard is different on that level.

14        Do you agree with that?

15        MS. RIFKIN:  I don't exactly agree with that,

16   Your Honor.  I think that the idea, deliberate indifference to a

17   serious medical need, the standard is a substantial risk of

18   serious harm.  And so the idea that it has to be -- I mean, it

19   has to be serious medical harm.

20        Everyone here, including defendants' experts, is going to

21   agree that gender dysphoria constitutes a serious medical need,

22   and failure to provide treatment results in serious medical harm

23   cognizable by the Eighth Amendment.  So that issue isn't really

24   in dispute.

25        The issue is whether surgery, gender confirmation surgery,

1    is the treatment that the medical standards of care require.

2    And I think the deliberate indifference analysis comes in in the

3    question of:  Do defendants know -- are they on notice that

4    Ms. Edmo has a serious medical need?  Are they on notice that

5    without the treatment at issue, which --

6              THE COURT:  You just said that they agree that this is

7    a serious medical need.  So regardless of what's happened in the

8    past, you are saying if they agree on that, then they are not

9    only on notice, but they are, in fact, accepting as true the

10   fact that Ms. Edmo has a serious medical need.

11             MS. RIFKIN:  That is correct, Your Honor.  That is

12   what defendants have stated in their briefing in opposition to

13   this motion for preliminary injunction.

14        And their experts will tell you that they, themselves, have

15   evaluated Ms. Edmo, and they, themselves, have agreed that she

16   has a diagnosis of gender dysphoria.

17        And their experts will also tell you that they agree that

18   she continues to experience ongoing clinically significant

19   distress or impairment of functioning, which is the definition

20   of the medical condition.

21        So this is not in dispute in this case that she has this

22   serious condition and she continues to experience clinically

23   significant and cognizable distress.

24             THE COURT:  Okay.  One of the things that we wrestle

25   with, you know, in Eighth Amendment cases all the time is when

1    an individual has a medical need and then there are, you know,

2    three or four different alternative possible treatments.  One

3    might be very conservative; the other might be quite radical;

4    and there might be a number of options in between.  As long as

5    all four -- all of these options are recognized as appropriate

6    responses to a medical need, the choice of one over another does

7    not constitute deliberate indifference.

8         Do you agree?

9         MS. RIFKIN:  I do agree with that when there are

10   options and one is not preferable over the other in terms of

11   from a reasonable medical provider's point of view.

12        THE COURT:  So that's kind of maybe the key issue in

13   the case.  Do you agree?

14        I mean, assuming that everyone is in agreement that there

15   is a serious medical need, there is a medical condition which

16   would satisfy the Eighth Amendment standard, the question is --

17   in terms of whether you're deliberately indifferent, is whether

18   the care provider has chosen a reasonable option or whether they

19   have closed their eyes to the most viable option in favor of one

20   that just simply saves them money.

21        MS. RIFKIN:  Well, Your Honor, that's why I think that

22   this case is actually a simple case because those issues that

23   you just said are not in dispute.

24        The defendants' experts are not going to say that gender

25   confirmation will not treat Ms. Edmo's gender dysphoria.  And

1       they are not even going to say that the hormone treatment she is

2       currently receiving is sufficient treatment to alleviate her

3       ongoing distress.

4           Instead, they are going to present you with a host of

5       rationales about why she is not ready for treatment or why she

6       doesn't deserve treatment that aren't part of the medical

7       considerations in this case.

8           Nobody is going to testify, except potentially defendants'

9       actual clinical providers, that the course of treatment Ms. Edmo

10      is currently receiving is sufficient for her gender dysphoria.

11      Their experts and her providers are going to tell you that she

12      is required to do other things to address other medical

13      conditions that they contend that she has or that she needs to

14      be better behaved in prison in order to get these treatments.

15          They are not going to present evidence that surgery that

16      she is requesting will not alleviate her gender dysphoria.  That

17      is uncontested in this case.

18              THE COURT:  Well, again, I want to ensure that my

19      layman's understanding or layperson's understanding doesn't get

20      in the way of the facts.

21          If you would have asked me whether or not there are some

22      potentially serious psychiatric consequences to this surgery,

23      some of which need to be prepared for, need to be encountered,

24      need to be wrestled with, and it's quite a long process because

25      of the change it will bring about in a person's personality --

1   that all of that takes time, and typically it is not just a snap

2   decision that is made, but, in fact, it requires consideration

3   of a lot of factors, including the defendant -- a patient's

4   mental health, underlying sources of problems in their life,

5   things of that sort, before you resort to reassignment surgery,

6   which is essentially irreversible.

7        Am I wrong about that?  And I'm not throwing that out as

8   that's my opinion.  I'm just saying that's kind of what I have

9   been led to believe by reading the things that people read in

10  our society.  And I want to make sure that doesn't get in the

11  way of the facts in this case.

12       So -- and that sounds a little bit like what the defendants

13  are arguing here, at least in part, certainly not -- that

14  doesn't reflect an argument that Ms. Edmo needs to behave better

15  in prison.  That's -- I agree.  Frankly, I would be shocked if

16  the defendants were going to argue that, at least not in that

17  fashion.

18       But this other concern I have is this is a very complex

19  decision with a lot of pieces that need to be considered and put

20  together before a final irreversible decision is made to engage

21  in the reassignment surgery.

22            MS. RIFKIN:  Your Honor, there are two responses to

23  that.

24       The first is:  This is a complex decision.  Surgeries, in

25  general, for medical conditions are complex.  And that's why we

1   look to governing standards of care that are developed by the

2   experts with medical authority.  And generally, when surgeons,

3   when doctors, when psychiatrists practice, they go to medical

4   school, and they are trained, and they follow the practices set

5   forth by their profession and the specialty in which they

6   practice.

7        And the treatment for gender dysphoria, the expert

8   association -- just like the American Medical Association, the

9   American Psychiatric Association -- is the World Professional

10  Association for Transgender Healthcare, or WPATH.  They have

11  been in existence since 1979.

12       And they look at and review all of the evidence, all of the

13  data, and they put forward the best practices.  And not just the

14  best practices, but they create the criteria for considering

15  whether surgery is appropriate and whether it's medically

16  necessary.

17       And so they have -- they create criteria that our experts

18  will talk about that does what you're talking about; that

19  consider all of the complex issues that need to be considered to

20  determine whether this is the right treatment for somebody.

21       And so those criteria are what enable us to make the

22  decision.  And you will hear that for those criteria, the answer

23  for Ms. Edmo is actually very clear.

24       And related to that is the idea that there needs to be a

25  certain amount of time to make sure this isn't a snap decision.

1       This isn't a snap decision.  Ms. Edmo has been on hormones for

2       six years.  And the criteria that you will hear about from our

3       experts require that somebody has had severe, persistent

4       dysphoria for at least six months and that they have been on

5       hormones for, I think, a year and that they have consistently

6       presented in their gender identity that they are transitioning

7       to for at least 12 months.

8           And so you're right, Your Honor, that it's not a snap

9       decision.  But in the community, the standards look at six

10      months and a year as time periods here, and we have extensive

11      documentation since at least 2012, when Ms. Edmo came into the

12      prison system, that she has consistently and persistently

13      presented as female and been on hormones for that long.

14          THE COURT:  Now, there was a suggestion I think in

15      your brief that Ms. Edmo had actually presented as a female even

16      before she came to prison.  But the defense disputed that.  And

17      at least from the statement you just made, I'm assuming that

18      you're not going to argue -- or if you are -- that perhaps it's

19      not necessary for the court to decide whether or not Ms. Edmo

20      had presented prior to being incarcerated.

21          MS. RIFKIN:  Your Honor, that is a disputed fact in

22      this case.  You will hear from Ms. Edmo, herself.  But what is

23      more important for the consideration in this case is the second

24      part of what you just said, which is you will hear from our

25      experts that the issue is not what happened more than six years

1    ago.  The issue is:  What is Ms. Edmo's medical condition now;

2    what is the harm she is experiencing; and what is the necessary

3    medical treatment now to make sure that her condition is

4    sufficiently addressed in medical terms.

5         THE COURT:  All right.  Just if I could -- again, I'm

6    taking up more of your time, but I think the purpose of the

7    opening statement is to make sure I understand the issues.  I

8    have read the briefs, so I pretty much know, I think, how the

9    evidence is going to play out.

10        So what it really comes down to is that the parties, in

11   your view, really don't dispute that Ms. Edmo has a serious

12   medical condition, the response to which is necessary to avoid

13   violating her rights under the Eighth Amendment.

14        So the question is:  What is the appropriate response?  And

15   your view is that if Ms. Edmo satisfies all of the criteria for

16   sex reassignment surgery, which is set forth by the body which

17   establishes the standard of care, then that is the choice that

18   is necessary to avoid an Eighth Amendment violation.

19        Is that roughly the argument?

20        MS. RIFKIN:  That's correct, Your Honor, with the

21   additional information that she has had all of the other

22   possible treatments.  Those other options --

23        THE COURT:  That's part of what's necessary to put her

24   in a position where she is -- the appropriate course of

25   treatment at this point -- and critical term is "at this point"

1      because she has been through these other processes -- is sex

2      reassignment surgery?

3              MS. RIFKIN:   That's precisely the case, Your Honor.

4      So I won't take up too much of your time but just try and

5      make points that we haven't already covered.

6              THE COURT:   Okay.

7              MS. RIFKIN:   I think, as Your Honor recognized,

8      bringing up behavior in prison is not necessarily relevant.

9      Defendants' experts and their witnesses are going to try to make

10     it relevant by suggesting that these behaviors or Ms. Edmo's

11     conviction offense or her experience of childhood sexual abuse

12     or whether she presented as feminine enough prior to her

13     incarceration, somehow affect and must be considered in terms of

14     what the medical treatment is for her now.

15             And our experts will explain that none of these factors are

16     relevant for determining what's medically necessary and whether

17     surgery is appropriate at this point and whether Ms. Edmo is

18     capable of making informed consent, of participating in medical

19     treatment, and of participating in the necessary follow-up to

20     medical treatment and surgery, as is often required with

21     surgery.

22             Defendants' experts will also claim that the symptoms and

23     manifestations of Ms. Edmo's gender dysphoria, that her attempts

24     at self-castration, now cutting on her arm to distract herself

25     from the distress somehow disqualify her from getting treatment,

1    from getting surgery for gender dysphoria.

2         They are going to argue that, despite her eligibility under

3    these criteria, that this makes her not ready, that this makes

4    it inappropriate for her.  And their answer is that she has to

5    engage in talk therapy to improve her coping mechanisms.

6         This is like telling a cancer patient they should be in

7    psychotherapy to stop anxiety about their tumor growing while at

8    the same time denying them chemotherapy and radiation to

9    actually treat the tumor.

10        Defendants will call their current -- her current clinical

11   providers to testify that she should not have the surgery -- not

12   that the surgery won't treat gender dysphoria, but they will say

13   that her current treatment is sufficient right now.  They will

14   acknowledge that surgery may be appropriate for her at some time

15   in the future, but they will suggest that before she can have

16   surgery, if she would only try harder and cooperate more with

17   them, she would do better, as if she could simply think away the

18   serious medical condition by focusing on other things rather

19   than it being the other way around, that this condition needs to

20   be treated so that she can move on with her life and focus on

21   the rest of what she needs to improve.

22        And the problem is that defendants' clinical providers are

23   not trained in the medical specialty of gender dysphoria.  Just

24   like defendants' experts, they have very little experience

25   treating people with gender dysphoria.  And critically, they

1    have absolutely no experience with gender confirmation surgery.

2         Not one of the witnesses that defendants will call in this

3    case has experience with gender confirmation surgery.  They have

4    never referred someone for gender confirmation surgery.  They

5    have never treated someone who has had gender confirmation

6    surgery.

7         So they characterize surgery as something unknown,

8    speculative, scary.  But that is simply reflective of a

9    philosophy that denies this treatment to people in prison and

10   suggests that different science and different medicine applies

11   to them.

12        The evidence and the legal arguments will show that

13   philosophy is not based in medicine, it's not based in science,

14   and it's not based in law.

15        Plaintiff's experts will tell you that the issue of whether

16   gender confirmation surgery for Ms. Edmo is medically necessary

17   is not even a close call.  The ongoing distress she experiences

18   is the predictable result of inadequately treated gender

19   dysphoria.  It is a medical condition with a medical treatment,

20   and this treatment has been established for decades.

21        We will also hear from Ms. Edmo, herself, who is with us in

22   the courtroom, who will get a chance to tell the court directly

23   why she has gone to such lengths to ask for treatment, why she

24   has persisted in presenting herself as who she is even in what

25   is perhaps the most challenging context to do so, being a woman

1    in a men's prison -- facing harassment, threats, discipline, and

2    abuse.

3         She knows that by bringing this lawsuit, by bringing this

4    motion, she is subjecting herself to even more scrutiny, to the

5    most personal of questions and challenges about her body, her

6    identity, her character, her shortcomings.

7         But as she will tell you, she is doing what she knows she

8    has to in order to be able to survive and keep moving forward in

9    prison and out.

10        And unless Your Honor has any additional questions --

11             THE COURT:  No.  That's fine.  Thank you.

12             MS. RIFKIN:  -- I'll sit down.

13             THE COURT:  Do either of the defendants wish to make

14   an opening statement?  Mr. Hall?

15             MR. HALL:  Yes, Your Honor.  In the interest of time,

16   the defendants have agreed to do a joint opening statement.

17             THE COURT:  Very good.

18             MR. HALL:  Your Honor, we have prepared a brief

19   PowerPoint presentation just to provide some context to what the

20   issues really are in this case.

21        Your Honor, as a preliminary matter, I would like to thank

22   the court for the opportunity to have the summer to perform some

23   discovery so that we could prepare a defense and that we could

24   tell the court the entire story here.

25        I also want to apologize on behalf of my clients, the Idaho

1    Department of Correction.  I do not know yet why Ms. Edmo was

2    not here prepared at 8:30, but I have talked to my clients, who

3    will make sure it does not happen again tomorrow.  But I

4    appreciate the court's understanding, and we will address that.

5         Your Honor, I think it's important to begin this proceeding

6    by understanding exactly what this case is about.  This is not

7    about defendants refusing to recognize that gender dysphoria is

8    a serious mental health disorder.

9         When Ms. Edmo came into the Idaho Department of Corrections

10   custody in 2012, she requested an evaluation for gender

11   dysphoria, which was known as "GID" at that time.  She was

12   provided one.  Within a month, she was diagnosed.

13        This is not a case about defendants' refusal to recognize

14   the accepted treatment options for gender dysphoria.  There are

15   four primary treatment options for gender dysphoria that are set

16   out by the WPATH, all of which the IDOC has recognized in policy

17   as appropriate on an individual case-by-case analysis.

18        Since 2012, Ms. Edmo has been placed on hormone therapy,

19   which has been followed closely and monitored.  There may be

20   some disagreement throughout this case as to whether or not this

21   lab showed a proper response, but that is not the limited

22   difference.

23        Ms. Edmo has been offered psychotherapy, group therapy, to

24   which she has denied or refused a lot of that, Your Honor.

25   Ms. Edmo has been allowed to feminize to the greatest extent

1    possible within the IDOC's prison policies.

2         There is striking difference -- we will see photographs of

3    Ms. Edmo in 2010, when she was initially in IDOC custody, again

4    in 2012 and then, of course, today.  And the progress is

5    astonishing.

6              THE COURT:  Mr. Hall, is the microphone -- would you

7    pull it -- yeah.

8              MR. HALL:  Can you hear me now?

9              THE COURT:  Much better.  It's much easier for the

10   court reporter as well.  Thank you.

11             MR. HALL:  I didn't want to bump into it.

12        So there is no -- there's no dispute there that IDOC, by

13   policy itself and by application, recognized the appropriate

14   treatment options for gender dysphoria.  And this is not a case

15   about the failure to provide those treatment options.

16        What this case is about is a difference in professional

17   opinion as to whether one treatment option, which is surgery, is

18   or has ever been appropriate for Ms. Edmo.

19        Now, we need to understand when surgery is appropriate.

20   There are no universal standards out there.  The area here is

21   rapidly evolving.

22        One of plaintiff's experts will testify -- excuse

23   me -- that this area has seen an explosion over the last several

24   years.  There has been a rapid change in the surgical

25   treatments, the techniques, the medicine involved, as well as

1      the terminology.

2             When we started this case, surgery was referred to as

3      "sexual reassignment surgery."  I learned recently that has now

4      changed.  It is now "gender confirmation surgery."  As we know,

5      "GID" is no longer; it is referred to as "GD."  A lot is

6      changing in this field.

7             Now, the defendants recognize the WPATH standards of care

8      in the seventh edition do provide the best guidance, but they

9      are also flexible clinical guidance that are subject to

10      modification based on individual case-by-case basis.

11             There is articles out there, few and far between, but one

12      which is one of the few that actually interprets those WPATH

13      policies and criteria within the prison system.  And that's the

14      article you will hear about this in case, Your Honor, from

15      Osborne and Lawrence, which is "Male Prison Inmates with Gender

16      Dysphoria:  When is Sex Reassignment Surgery Appropriate?"

17             And to deny or to ignore that there are key differences

18      in -- between a prison population and in the community is not

19      only ignorant but is dangerous for the population.

20             And that's not to say that the Department or the defendants

21      are saying, well, a certain treatment option is not available in

22      prison.  They have never said that.  They do not believe that.

23      You will not hear that from the defendants.

24             But one thing remains, Your Honor, is that there is a

25      critical need for more evidence-based research, especially how

1      these WPATH standards will apply or do apply or should apply in

2      a prison context.  The WPATH is aware of that, and they have

3      been working on it.

4           Ultimately, Your Honor --

5           THE COURT:  So you are saying that this association is

6      actually specifically considering whether the standard is

7      different in a prison setting than in a nonprison setting?

8           MR. HALL:  No, Your Honor.  They have -- they have two

9      pages of their standards that apply that reference how to apply

10     these in prisons, not a lot of data out there.  They relied on

11     maybe two articles.

12          So they do say they should be applied with reasonable

13     accommodations in a prison context.  However, what they are

14     looking at is, as a community wide -- whether it's out of prison

15     or in prison -- these standards lack a sufficient amount of

16     evidence-based research.  And that is needed.  That is critical.

17          And it goes towards the clinicians who are applying these

18     need to understand:  Is this based on sound science?  Is this

19     based on advocacy?  And there is a dispute out there.

20          Now, at the same time, Your Honor, the defendants have

21     recognized the WPATH.  The IDOC has had a member since 2014,

22     2015 of the WPATH.  And you will hear testimony from Mr. Clark.

23          And they look at it, they consider it, they find it

24     appropriate at times; but it must be applied on a case-by-case

25     analysis.  And all they are going to say --

1          THE COURT:  Let me just back up, though.

2          MR. HALL:  Yes.

3          THE COURT:  I want to make sure we are understanding

4     each other.

5          If -- there are a lot of areas in which our understanding

6     is expanding rapidly.  I have a daughter-in-law who is involved

7     in oncology.  And she is involved in immunotherapy, which is the

8     cutting edge, changing.  Probably every six months, there is

9     massive changes.

10          It doesn't mean, though, that in the course of treatment,

11     they stand still, waiting for that silver bullet to be

12     developed.  And I'm just a little concerned to say that we

13     should not be taking any action because this is an evolving

14     area.

15          And I'm not saying how this all cuts.  I just want to

16     be -- it kind of reminds me -- or it's the reason we don't use

17     what's called the *Fry* standard in terms of evaluating expert

18     witnesses.  Now we use *Daubert*, which allows us not to wait for

19     something to be generally accepted in the scientific community.

20     Instead, we look at, on a more dynamic basis, whether or not the

21     principles are sound, whether or not they are applicable and

22     relevant to the issue before the court.

23          And it seems to me -- I just -- you need to understand, I'm

24     much more of a *Daubert* guy than I am a *Frye* guy, no pun

25     intended, I guess.  But I just don't think generally, in this

1   day and age, we can wait for things -- to wait until they are

2   very stable and fixed, because they never are.

3            MR. HALL:  Right.

4            THE COURT:  And I assume you are not arguing that

5   that's the reason why we shouldn't order it here.

6        You are saying, as I suggested in my discussion with

7   Ms. Rifkin, that there is a variety of treatments that are

8   appropriate, medically indicated, and medically endorsed.  You

9   have chosen one, not the one plaintiffs want.  And that choice

10  should be ratified as long as it is a reasonable choice.

11           MR. HALL:  Right.

12       Well, Your Honor, a couple points.  First, defendants are

13  not saying that the court should overlook these standards.  That

14  is not it.  Defendants recognize these standards.  They apply

15  these standards.  They are the best standards out there.  And

16  they are relying on these standards in Ms. Edmo's case.  That

17  needs to be very clear.

18       No one is saying we need to wait for better evidence.  What

19  we're saying is that the evidence that we have, the concerns we

20  have do weigh against providing SRS gender confirmation surgery

21  at this time.

22       Now, ultimately, it's whether or not it's appropriate for

23  Ms. Edmo.  IDOC has provided and the defendants have provided

24  three of the four available treatment options.  And no one is

25  saying Ms. Edmo is never going to be appropriate or it's never

1      going to be appropriate for her to have surgery.  What they have

2      been saying is not at this time.

3          And that brings us to, really, understanding what the

4      criteria for surgery is.  And I want to look at the WPATH,

5      because that's what defendants are looking at, that's what

6      plaintiffs are looking at.

7          The plaintiff recognizes and has advanced the WPATH's

8      criteria, many of which it's undisputed that Ms. Edmo meets and

9      exceeds.  However, there are a couple that defendants have

10     concerns.

11         The primary one is highlighted and bolded there.  If

12     significant medical or mental health concerns are present, they

13     must be well controlled.  That is not language that the

14     defendants created.  That is the WPATH language.  That is the

15     standard, the criteria that is advanced by the plaintiffs in

16     this case.  And that is what the defendants are focused on in

17     making sure that they are doing and making the right decision

18     here before a permanent, irreversible, potentially harmful

19     procedure is provided.

20         Not saying never.  Not saying other GD offenders in the

21     prison system do not meet these criteria or may meet these

22     criteria at some point.  It's a case-by-case analysis.

23         The WPATH -- and we will see testimony on this -- requires

24     that clinicians and mental health providers look for these

25     coexisting mental health concerns, which include -- and the ones

1    highlighted in red there, the second bullet, are key.  Because

2    as we will see, Ms. Edmo has suffered from these, continues to

3    suffer from many of these -- anxiety, depression, self-harm, a

4    history of abuse and neglect, substance abuse, sexual concerns,

5    and personality disorders.

6        Again, these are not defendants' words or standards.  These

7    are the WPATH standards.  It's critical that we understand if

8    there are coexisting mental health concerns and how they are

9    affecting this individual.

10       And the WPATH recognizes that because these coexisting

11   mental health concerns can be, as captured in the third bullet,

12   a significant source of distress and, left untreated, can

13   actually complicate the process of gender identity exploration,

14   resolution of gender dysphoria.

15       The WPATH mandates that these must be well controlled --

16   not reasonably well controlled -- for surgery, well controlled.

17   And in that final bullet, they must be optimally managed.  And

18   that's ultimately the issue in this case, Your Honor.

19       Ms. Edmo has a number of coexisting mental health concerns.

20   Your Honor, it's important that the IDOC -- it is understood

21   that we are not bringing up all this prior history and behavior

22   in the prison to embarrass Ms. Edmo.  It is the job of the

23   mental health clinicians and the medical providers to understand

24   her entire clinical picture, what is she facing from a mental

25   health standpoint.  Because you can't treat gender dysphoria or

1        any one condition alone.  You can't treat it in a vacuum.  It's

2        not what the providers were trained to do, and it certainly

3        isn't what the WPATH, the standards advanced by plaintiffs,

4        actually require.

5              And what the testimony will show -- we believe the evidence

6        already on the record by way of declarations really establishes

7        this already -- Ms. Edmo has a number of coexisting mental

8        health concerns that are not well controlled.  And in part, no

9        fault to Ms. Edmo.  She has been a victim.

10             But also, Ms. Edmo has not participated in her treatment.

11        She has refused a number of treatment and therapy groups that

12        are aimed to identify the problems and address these coexisting

13        issues so that it will make her stable.  And if stable, gender

14        dysphoria can be potentially treated with surgery.

15             Your Honor, gender dysphoria, again, the defendants do not

16        dispute that it's a serious medical need.  They have provided

17        treatment.  They are hesitant and do not believe at this point

18        that it is appropriate, even under the WPATH standards, to

19        provide it in light of the mental health concerns that are

20        coexisting.

21             You will hear testimony that Ms. Edmo claims that she lived

22        full time as a woman prior to incarceration.  We dispute that.

23        It's relevant not only to her credibility but to her

24        understanding of what it means to identify as a woman and what

25        were her stressors at the time that she had a lot of prior

1    mental health issues preincarceration.

2         Depression, Your Honor, is one that has plagued Ms. Edmo

3    for her entire life.  We have records that go back to 2006 time

4    frame showing that Ms. Edmo has been depressed.  She identified

5    in 2012 that it runs in the family.  It's a component of her

6    genes, and she was diagnosed as early as 2009.

7         It continued through her incarceration, and she's --

8    preincarceration she has described her depression as extreme.

9    And in March of this year, plaintiff's own expert performed some

10   testing.  And one of those testing results was that Ms. Edmo

11   currently has severe depressive symptoms.  So, again, depression

12   is a significant factor that is not well controlled at this

13   time.

14        Anxiety is very much the same.  And that goes, really, part

15   and parcel with the depression.  Ms. Edmo identified

16   preincarceration as having high anxiety.  In March of this year,

17   plaintiff's expert also identified that Ms. Edmo had severe

18   anxiety symptoms.

19             THE COURT:  Mr. Hall, if, indeed, these

20   issues -- well, her mental health I don't think is --

21   concerns -- what's the terminology in the WPATH standard?

22             MR. HALL:  Coexisting mental health concerns.

23             THE COURT:  Is that the language used?

24             MR. HALL:  Yes.

25             THE COURT:  The mental health concerns?

34

1          MR. HALL:  Mental health concerns.

2          THE COURT:  Need to be well controlled --

3          MR. HALL:  Yes.

4          THE COURT:  -- or must be well controlled.

5          MR. HALL:  Must be well controlled.

6          THE COURT:  If the mental health concerns -- if a

7     mental health concern stems directly from gender dysphoria, is

8     that -- does the WPATH standard make clear that that also needs

9     to be well controlled before gender confirmation surgery is

10    ordered?

11         MR. HALL:  Your Honor, it --

12         THE COURT:  It's kind of the chicken and egg.

13         MR. HALL:  It can be.  And it's often left to

14    providers to sort that out, those who know the individual best.

15        What you will hear -- and I think it's no surprise to the

16    court -- is that mental health is complex.  You can have

17    anxiety, you can have depression, but you can't identify exactly

18    what's causing that; you can try.  And one of the best ways to

19    do it is to have talk therapy, to work through issues, to have

20    mood management therapy to address to see if it's a certain

21    component that is causing it.

22        And this is not a case that is -- that all of Ms. Edmo's

23    problems are related to gender dysphoria that can be cured with

24    this surgery.  No one is saying that.

25        Your Honor, Ms. Edmo has also been a victim of abuse.  I

don't want to get into that too much, but she has been the
victim of preincarceration sexual abuse from family members as
well as multiple relationships with significant others in the
years prior to, which is a contributing factor to a lot of her
other mental health concerns.

Her substance abuse is extreme prior to incarceration.  The
years before 2012, Ms. Edmo was engaged in a lot of drug use --
methamphetamines, heroin, but primarily alcohol -- to the point
of severe intoxication on a daily basis and a number of trips to
the hospital for that, which is also a contributing factor to
her significant history of self-harm.

We don't know the full extent.  We learn more -- we have
learned more as this case goes on.  Prior to incarceration,
Ms. Edmo attempted suicide anywhere from three to five times.
We are aware of a potential other one in Washington that we do
not have medical records for.

There was an event when she was 16 where she attempted to
overdose on medication or alcohol.  And more recently, in 2010
and 2011, Ms. Edmo attempted suicide after having some fights
with her significant other which were abusive and also due to
ongoing depression, anxiety, feelings of worthlessness,
unemployment, substance abuse.  A lot going on there,
Your Honor.

And she continues to have the urge to self-harm.  In
prison, she has attempted self-castration -- purported

1    self-castration attempts twice.  She has also been cutting

2    herself, Your Honor, in the last year, which is extremely

3    alarming.  It's not a good coping mechanism, but it shows

4    continued self-harm activities.

5        And in March of 2018, again, plaintiff's expert tested

6    Ms. Edmo, and she scored 100 out of 100, the highest score

7    possible on this test, that denotes the propensity for

8    suicidality.  So that is a very real and present concern,

9    Your Honor.

10       Sexual concerns are another one that may not seem relevant

11   at the forefront, but it goes towards a number of the other

12   issues.  Ms. Edmo has a long history of engaging in dangerous

13   sexual behavior, multiple partners preincarceration.  And then

14   after -- during -- during incarceration, Your Honor, there has

15   been a number of inappropriate sexual contacts that resulted in

16   disciplinary attention.

17       And Ms. Edmo identifies with sex as a coping mechanism.  It

18   provides for her attention from male offenders, which is a

19   significant component of this case.  And as you will see

20   testimony, may be -- until that's sorted out, that may be

21   influencing Ms. Edmo's desire to have this surgery.

22       And to date, Ms. Edmo has not focused on a lot of these

23   issues, Your Honor.  She has not completed the sex offender

24   treatment program that was mandated by the Department of

25   Corrections, and it is one reason why she has not been eligible

1     for parole.

2          Wrapped up in all of these is this concept of Ms. Edmo

3     having personality disorder traits.  There has been no formal

4     diagnosis, but none is needed in that the clinicians have been

5     attempting to treat all of the symptoms.  Personality disorder

6     traits -- many of them are listed on that in that bubble right

7     there -- pattern of unstable and intense personal relationships;

8     impulsivity, whether by sexual relationships or substance abuse;

9     recurring self-harm behavior, which is very present; unstable

10    mood and aggression.

11         Ms. Edmo has been the perpetrator of several assaults while

12    in incarceration, some over the last couple years, is defensive

13    to her treatment plan, is defensive and aggressive towards staff

14    as well as other offenders.

15         And, Your Honor, to the extent that her disciplinary

16    history is relevant, it is in some regards that it shows an

17    ongoing -- ongoing mental health concerns that do not excuse the

18    conduct.  But the clinicians look at it, and they determined

19    that, look, that is a sign or symptom of ongoing mental health

20    concerns.

21         So ultimately, Your Honor, in closing, it is not deliberate

22    indifference here for the defendants to have recognized the

23    gender dysphoria as a serious medical condition.  It is not

24    deliberate indifferent for the defendants to have recognized the

25    appropriate treatment, the treatment which has been provided.

1          To date, the only treatment that has not been provided as

2     contemplated by the WPATH for gender dysphoria is surgery.  And

3     the defendants have long maintained and continue to maintain

4     that Ms. Edmo does not meet the criteria.  And this is perhaps,

5     at most, a dispute by professionals, some of which who from the

6     Department of Corrections have known Ms. Edmo for a long time,

7     have had multiple conversations with her.

8          Plaintiff's experts have met with Ms. Edmo for two hours,

9     maybe three hours apiece.  And they certainly have not been

10    provided a complete history, and they weren't when they provided

11    their opinions.

12         Now, the defendants are not saying that surgery is not

13    appropriate in prison.  They are not saying that surgery is

14    never appropriate for a GD offender.  What they have been saying

15    and continue to maintain now is that surgery for Ms. Edmo is not

16    appropriate.  She does not meet -- even if we apply just the

17    WPATH standards, she does not meet those.  She has coexisting

18    mental health concerns which are complicating the situation.

19         IDOC has attempted to have Ms. Edmo address through mood

20    management training, social skills, healthy relationships

21    therapy, the sex offender treatment program, and the gender

22    dysphoria group.  They have attempted to have her engage to

23    address these other issues, these other coexisting mental health

24    concerns.

25         But Ms. Edmo's focus has primarily been on gender

1      dysphoria; I need the surgery.  And it's a difference of medical

2      opinion and professional opinion as to whether or not that's

3      appropriate.

4          And until these are well controlled, until her depression

5      is under control, until her anxiety, her sexual concerns, her

6      self-harm issues, and these personality traits can be managed,

7      it would not be appropriate or safe to provide this surgery.

8          A lot of this is speculative.  We don't have a lot of data.

9      And that's not why there would be any denial of that, but mental

10     health professionals need the discretion to be able to consider

11     the whole person and to consider whether or not she is mentally

12     stable at this time or was in 2016 when an evaluation for

13     surgery was performed.

14         Your Honor, unless there are any questions, I have nothing

15     further.

16             THE COURT:  No.  Thank you.

17         All right.  Plaintiffs may call their first witness.

18             MS. RIFKIN:  Thank you, Your Honor.

19         We would like to call Dr. Randi Ettner.

20             THE COURT:  Dr. Ettner, if you would step before the

21     clerk and be sworn.

22         RANDI ETTNER, PH.D., PLAINTIFF'S WITNESS, SWORN

23             THE CLERK:  Please take a seat in the witness stand.

24         Please state your complete name and spell your name for the

25     record.

40

1          THE WITNESS:  Dr. Randi, with an "I," Ettner,

2     E-T-T-N-E-R.

3          THE COURT:  You may inquire, Ms. Rifkin.

4                    DIRECT EXAMINATION

5     BY MS. RIFKIN:

6     Q.   Good morning, Dr. Ettner.

7     A.   Good morning.

8     Q.   Can you tell us your current positions, Doctor.

9     A.   I'm a clinical and forensic psychologist.  I'm the

10    secretary of the World Professional Association for Transgender

11    Health.  I am the president of the New Health Foundation

12    Worldwide.  I'm the psychologist at the Chicago Gender

13    Confirmation Surgery.

14         I perform research and write -- writing on gender-related

15    topics.  I supervise other psychologists, and I train people

16    about the care and the condition of gender dysphoria.

17    Q.   And you have a doctorate in psychology?

18    A.   Yes; correct.

19    Q.   How long have you been in practice as a psychologist?

20    A.   Since 1980.

21    Q.   And we have got a copy of your CV here.  It's marked as

22    Plaintiff's Exhibit 1003.  We can get that up on the screen.

23         Does the cover of this CV look accurate to you, Dr. Ettner?

24    A.   Yes, it does.

25              MS. RIFKIN:  Your Honor, I would like to move

1      Plaintiff's Exhibit 1003 into evidence as Dr. Ettner's CV.

2                  THE COURT:  Any objection?

3                  MR. HALL:  No objection, Your Honor.

4                  THE COURT:  Exhibit 1003 will be admitted.

5            (Plaintiff's Exhibit 1003 admitted.)

6      Q.   BY MS. RIFKIN:  Dr. Ettner, do you currently see patients?

7      A.   Yes.

8      Q.   And you listed a number of positions in addition to your

9      private practice.

10           Can you describe your other responsibilities besides being

11     a direct treater for patients?

12     A.   Well, as I mentioned, I supervise other psychologists.  I

13     train physicians, mental health professionals, and other people

14     who are interested in learning how to treat gender dysphoria

15     through the global education initiative of the World

16     Professional Association for Transgender Health.

17           I'm a member of the University of Minnesota's medical

18     foundation, the leadership council.  And I consult to

19     organizations, such as Walgreens, Tawani, and others as needed.

20     Q.   You have mentioned a couple times and we heard about in

21     opening statements the World Professional Association of

22     Transgender Healthcare, or WPATH.

23           What is this organization?

24     A.   Well, you stated that it started in 1979.  It actually

25     started in 1976.  In 1979, it promulgated the first version of

ETTNER - Direct

42

1       the standards of care.

2           It is now an organization consisting of 2,000 members,

3       professionals in various areas -- such as surgery,

4       endocrinology, primary care, mental health -- who work with

5       gender-variant individuals.

6       Q.   And you mentioned that the standards of care first

7       promulgated in 1979 -- thank you -- and we have heard about the

8       most recent version.

9           Can you explain what those standards of care are.

10      A.   The standards of care inform treatment for gender dysphoria

11      throughout the world.  They have been translated into, I

12      believe, 15 languages and are endorsed by almost all of the

13      scientific and professional organizations, including but not

14      limited to the World Health Organization, the American Medical

15      Association, the American Psychiatric Association, the American

16      Psychological Association, the American Family Practice

17      Association, the National Commission on Correctional Health, the

18      National Association of Social Workers, the American Academy of

19      Plastic Surgeons, the American College of Surgeons, and the

20      surgeons generals themselves.

21      Q.   Have you played any role with respect to promulgating the

22      standards of care?

23      A.   I am one of the authors of the seventh version of the

24      standards of care.

25      Q.   When was that seventh version promulgated?

43

1      A.    It was produced in 2011 and widely circulated by 2012.

2      Q.    And you also chair the WPATH Committee for

3      Institutionalization Persons; is that right?

4      A.    Yes.

5      Q.    What does this committee do?

6      A.    This committee actually looks at the care and the

7      assessment of individuals who are incarcerated and develops

8      standards for treatment for the standards of care for future

9      iterations and for the past iterations.

10           It looks at case law and different policies, how different

11     federal and state prisons handle the treatment, the placement,

12     and other policies regarding institutionalized people -- not

13     just in prisons but in other long-care facilities where people

14     really don't have agency to access care on their own.

15     Q.    How long have you been a member of WPATH?

16     A.    Since 1993.

17     Q.    And what is your experience treating patients with gender

18     dysphoria?

19     A.    I have personally treated 3,000 individuals with gender

20     dysphoria.

21     Q.    Have you, as part of that treatment, evaluated whether

22     gender confirmation surgery is necessary for patients?

23     A.    Yes.  For certain patients, it's medically indicated.

24     Q.    And have you referred any patients for gender confirmation

25     surgery?

44

1    A.    I have referred approximately 300 patients for surgery.

2    Q.    Do you have any experience interacting with or treating

3    patients after they have undergone gender confirmation surgery?

4    A.    Extensive experience.  Many of the patients that I have

5    treated will come back years after surgery not about gender

6    dysphoria, because that's been eliminated, but to discuss the

7    kinds of issues that other people have -- problems at work or

8    concerns with their children or other issues.

9    Q.    And what is your experience assessing incarcerated patients

10   with gender dysphoria?

11   A.    I have assessed approximately 30 individuals in 30

12   different prisons, federal and state, not just for surgery

13   necessarily but for care in general, medical care in general.

14   Q.    And you've also authored a number of books on the treatment

15   of gender dysphoria and transgender healthcare?

16   A.    That's correct.

17   Q.    And on your resume, it includes the "Principles of

18   Transgender Medicine and Surgery."

19         How would you describe this publication?

20   A.    That's a textbook that I edited for medical and surgical

21   care.  It's used in medical schools and for surgeons.  It was

22   revised in 2017.

23   Q.    And you have also authored a number of peer-reviewed

24   articles on treatment of gender dysphoria and transgender

25   healthcare?

ETTNER - Direct

1      A.    That's correct.

2      Q.    What does "peer-reviewed" mean when we talk about

3      scientific publications?

4      A.    A peer-reviewed article is when a manuscript is submitted

5      to a journal.  The editor will send it to typically three

6      experts in that area to review and to determine whether it is

7      rejected, accepted for publication, or accepted with revisions.

8      Q.    And why is peer review important from a scientific

9      perspective?

10     A.    Well, anyone can just write an article expressing their

11     opinion, but that may not be in concert with the standards of

12     the profession or the prevailing scientific knowledge.

13            So data, methodology, references, all of those are

14     rigorously checked by the editorial board in order to make sure

15     that the article that's submitted actually advances the body of

16     knowledge.

17     Q.    You mentioned earlier one of your responsibilities is that

18     you provide training on treating gender dysphoria.

19            Do you provide training specifically as to assessing

20     whether patients with gender dysphoria require surgery or

21     whether it's appropriate?

22     A.    I have in the past.  I do that at surgical presentations.

23     I present to the American College of Surgeons, the American

24     College of Plastic Surgeons, determining and explaining at these

25     conferences what the standard of care is and the importance of

1    the mental health professional in collaborating in

2    multidisciplinary teams that provide surgery.

3    Q.    Have you served as an expert consultant regarding policies

4    for treatment of gender dysphoria in prisons or jails?

5    A.    Yes.

6    Q.    Have you been invited by any federal or state agencies to

7    provide training about gender dysphoria?

8    A.    Yes.  I was an invited guest to the National Institutes of

9    Health to help develop a strategy for research on gender

10   dysphoria and sexual minorities.

11         I was invited to speak to the director of Health and Human

12   Services about the evidence-based care of gender dysphoria.  And

13   I was an invited guest of the World Health Organization as -- in

14   2013 as they contemplated where and how to place what was called

15   gender dysphoria, whether to change that name and where to place

16   and conceptualize that in ICD-11, the International

17   Classification of Diseases, which they have just completed in

18   June of this year.

19   Q.    And have you ever been appointed by a federal court as an

20   independent expert related to the treatment of gender dysphoria?

21   A.    Yes, I have, in relation to evaluation of an inmate for

22   surgery.

23   Q.    What did you do to form your opinions in this case,

24   Dr. Ettner?

25   A.    I reviewed all of the medical and mental health information

1    that was provided and all of the other documents that were

2    provided to me.  I met with Ms. Edmo at the prison where she

3    resides here in Idaho, and I conducted psychodiagnostic testing.

4    Q.   Have you -- as part of the records that you received and

5    reviewed, did you review plaintiff's -- Ms. Edmo's medical

6    records prior to her incarceration?

7    A.   Whatever was available, yes.

8              MS. RIFKIN:  At this point, Your Honor, I would like

9    to proffer Dr. Ettner as an expert psychology witness and an

10   expert witness regarding assessment and treatment of gender

11   dysphoria.

12             THE COURT:  I normally don't make a specific

13   determination at the request of counsel designating someone as

14   an expert.  You can go ahead and inquire.  If counsel feels that

15   your questions exceed her scope of expertise, they can object,

16   but typically they won't.

17        So let's just go ahead and proceed.

18   Q.   BY MS. RIFKIN:  All right.  Can you explain, Dr. Ettner,

19   what the "Diagnostic and Statistical Manual of Mental Disorders"

20   is?

21   A.   Yes.  It's a book used by mental health professionals that

22   identifies mental health issues and disorders, codes them, and

23   lists the diagnostic criteria and specifiers.

24   Q.   Is the diagnosis of gender dysphoria included in the DSM-5?

25   A.   Yes.

1    Q.   All right.  I would like to show you Plaintiff's Exhibit

2    1001.

3         All right.  If we can turn to the next page of the exhibit.

4         All right.  Is this the DSM-5 entry for gender dysphoria?

5    A.   Yes.

6         MS. RIFKIN:  Okay.  I would like to move Plaintiff's

7    Exhibit 1001 into evidence.

8         THE COURT:  Any objection?

9         MR. HALL:  No objection, Your Honor.

10        THE COURT:  All right.  1001 will be admitted.

11        MS. RIFKIN:  And can we put up the demonstrative for

12   this since this is a little hard to read.

13        (Plaintiff's Exhibit 1001 admitted.)

14   Q.   BY MS. RIFKIN:  Dr. Ettner, can you explain what a

15   diagnosis of gender dysphoria means?

16   A.   It means that an individual meets the criteria that are

17   listed here and, additionally, that the condition creates

18   significant distress that impairs some level of functioning.

19   Gender dysphoria is a serious but, fortunately, very treatable

20   medical condition.

21   Q.   The first part of this entry talks about a marked

22   incongruence between one's experienced and expressed gender and

23   assigned gender.

24        Can you explain in layperson terms what that means.

25   A.   It means that the person's body, their morphology does not

1       align with their sense of who they are, their gender identity.

2           So every individual has a gender identity, a sense of being

3       either male or female.

4       Q.   And how is that different from sex or assigned gender?

5       A.   I'm sorry.  Would you repeat that question.

6       Q.   Sure.  How is the gender identity different from sex?

7       A.   From sexual orientation, for example, or --

8       Q.   First, I would like you to talk about how it differs from

9       sex or the assigned gender.

10      A.   So the sex assigned at birth is based usually on a cursory

11      examination of the baby's genitals.  But as the child grows

12      older and has the ability to verbalize, they may, in rare cases,

13      say that they don't identify with the sex they were assigned at

14      birth.

15          So a little child who is assigned male at birth may say,

16      "They call me son, but I feel more like daughter."

17      Q.   And how is that different from sexual orientation?

18      A.   Completely different.  Sexual orientation is the gender,

19      the sex of someone who you're attracted to.  And gender identity

20      is your own sense of whether you're male or female.  So they are

21      unrelated.

22      Q.   And how does a -- how does gender identity relate to gender

23      presentation, or can you explain what gender presentation means?

24      A.   Gender presentation is merely the way one presents their

25      gender.  So a person can present the gender that matches their

ETTNER – Direct

50

1    identity by appearing, to the extent possible, with what is

2    traditionally the social signifiers of that gender.  So for a

3    female, it would be wearing makeup, hair length, feminine

4    clothing, and the accoutrements of womanhood.

5    Q.   Is every person who identifies as transgender also

6    diagnosed with gender dysphoria?

7    A.   No.

8    Q.   And can you explain what the difference is.

9    A.   "Transgender" is really an umbrella term for a person who

10   feels some sense that their assigned gender is not always in

11   concert with their gender identity.

12        But for the gender-dysphoric individual, that incongruity

13   is so severe, that it actually impairs their ability to

14   function.

15   Q.   What are typical symptoms that someone with gender

16   dysphoria may experience?

17   A.   Well, they would experience a desire to be rid of the

18   primary and secondary sex characteristics of the assigned

19   gender.  They would experience a desire to be -- to appear and

20   to be seen as the gender that is their affirmed gender.

21        They would most frequently have some degree of depression

22   or anxiety as a symptom of the gender dysphoria.  And depending

23   upon the severity of it, they may have some other psychological

24   attendant symptoms.

25   Q.   We can turn to the second -- the next.

1          You mentioned earlier this part of the DSM-5 entry for

2     gender dysphoria.

3          Can you explain what "clinically significant distress"

4     means.

5     A.   Yes.  So clinically significant distress is where the

6     distress reaches a threshold that the person will either require

7     medical or surgical or both interventions, and the distress will

8     impair or severely limit their ability to function in some way.

9          So when you talk about the distinction between transgender

10    and gender dysphoria, for instance, a child who is a tomboy,

11    assigned female at birth, may be displaying some

12    gender-nonconforming behaviors.  But that's not the same as

13    gender dysphoria.

14    Q.   Is gender dysphoria related to sexual abuse?

15    A.   No.

16    Q.   Is sexual abuse a contributing factor to gender dysphoria?

17    A.   No.

18    Q.   And does the condition of gender dysphoria require medical

19    treatment?

20    A.   Typically, gender dysphoria does require medical treatment,

21    yes.

22    Q.   Why?

23    A.   Because it's a medical condition.  And like other medical

24    conditions, it can intensify over time, and does.

25         So, for instance, if we compare it to the condition of

1      diabetes, some people may be prediabetic.  Perhaps they can

2      control their diabetes with nutrition and exercise; but in time,

3      they may actually require insulin.

4          So the same is true of gender dysphoria.  Some people may

5      initially be able to attenuate the gender dysphoria with a

6      social role transition.  But if the gender dysphoria is

7      persistent, they will require other treatments, medical and

8      surgical.

9      Q.   And what are the risks of not providing treatment to

10     someone with gender dysphoria?

11     A.   If the gender dysphoria is severe, the risks are serious.

12     Prison is actually a place where we see the long-term effects of

13     untreated gender dysphoria.  We see the natural progression of

14     the condition.  And typically the sequelae are either surgical

15     self-treatment where an individual attempts to remove their own

16     genitals, suicide, or severe emotional decompensation.

17     Q.   So I would like to talk about the WPATH standards of care

18     that we discussed a little earlier and we have heard some about

19     today.

20         Can we show the witness Joint Exhibit 15.

21         What version of the standards of care are in effect now?

22     A.   Version 7.

23     Q.   And I think you told us earlier that that came out in 2011.

24     A.   Correct.

25     Q.   How do the standards of care get decided?

53

1    A.    How are they produced?

2    Q.    Yeah.  How is it decided what goes into them and what

3    treatment is going to be recommended or put forward?

4    A.    So they begin with the previous iteration, and we

5    look -- and by "we," I mean not only the community of

6    professionals but sometimes stakeholders also will weigh in and

7    will determine what needs to be altered.

8         And if there have been new scientific research that needs

9    to be incorporated or if there have been changes in models of

10   care that need to be incorporated, individuals who have known

11   expertise, who have published or done research, are asked to

12   review the literature and do an evidence-based review of the

13   existing standards.

14        Those papers are then sent for review, just like in a

15   peer-reviewed journal.  And then the -- all of the authors

16   review the entire standards of care, and then they are published

17   with an evidence-based and expert consensus with the best

18   possible scientific information available at the time.

19   Q.    In opening statements, defendants' counsel stated that

20   WPATH is working on updated standards because there had been

21   insufficient evidence for the treatment of gender dysphoria for

22   the prior standards of care.

23        Is that accurate?

24   A.    No.

25   Q.    What are the treatment options for someone with a diagnosis

1      of gender dysphoria, under the standards of care?

2      A.   So the treatment options would include psychotherapy to

3      promote, for instance, resilience, work with families and

4      schools, help reduce stigma; social role transition, which was

5      previously called the real-life experience, where a person lives

6      in their affirmed gender, and that doesn't involve any medical

7      treatment, although it is considered medically necessary for the

8      treatment of gender dysphoria; cross-sex hormones is the medical

9      intervention; and then gender confirmation surgery to alter

10     secondary and/or primary sex characteristics.

11     Q.   Are those treatment options that you just described, are

12     those also the treatment options under the standards of care for

13     someone who is in prison?

14     A.   Yes.  The standards of care have been discussing treatments

15     for inmates since 1998.  And the seventh iteration, the one that

16     you have here, this platform, specifically state that the

17     treatments and assessment of inmates with gender dysphoria

18     should mirror that of the community.

19          So the condition whether or where a person is housed should

20     not determine what the protocol is.  The protocol is the same

21     regardless of where a person resides.

22     Q.   Are you involved at all, Dr. Ettner, with the update to the

23     standard of care that is currently being undertaken by WPATH?

24     A.   Yes.

25     Q.   In the next version, based on your involvement in that

55

1    process, do you know if the standards of care will be revised to

2    make distinctions between what treatment should be available for

3    incarcerated persons and what treatment should be available for

4    people in the community?

5    A.   There will be no distinction between treatment options.

6    The treatment will remain the same, regardless, as I said

7    previously, of where a person is housed, similar to other

8    medical conditions.

9         So, for instance, if a person has diabetes, whether they

10   reside in a nursing facility, in a prison, in an orphanage --

11   wherever they are housed, the standard of care, the treatments

12   remain the same.

13   Q.   All right.  And I would like to show you the portion of

14   this exhibit that describes what have been referred to as the

15   criteria for gender confirmation surgery, already discussed a

16   little here today.

17        Can we blow up the bottom half of that exhibit.

18        So are these the criteria set forth by WPATH for the gender

19   confirmation surgery that involves vaginoplasty?

20   A.   Yes.

21   Q.   So I would like to go through each of these criteria and

22   have you explain to us what they mean again, in layperson terms,

23   beginning with the first criterion, "persistent, well-documented

24   gender dysphoria."

25        What is meant by "persistent" and "well-documented"?

56

1    A.   What is meant is that the person has a well-established

2    diagnosis of gender dysphoria that has been persistent for

3    beyond six months.

4    Q.   And why is that important?

5    A.   To rule out any other potential diagnosis.

6    Q.   And typically when you, in your practice, are assessing a

7    patient with gender dysphoria or assessing a patient for gender

8    dysphoria, how far back in that person's history do you feel you

9    have to look in order to determine whether their gender

10   dysphoria is persistent?

11   A.   Some of the people that I see will tell me that they had

12   feelings of being different or unlike other boys as a child.

13   For some individuals, the condition has emerged around puberty.

14   And other people tell me that it's only been in recent years

15   that they have experienced gender dysphoria.

16        So I'm not on a fact-finding hunt for specific details

17   about their history.  The symptoms that they are presently

18   displaying, we know that gender dysphoria intensifies with age.

19   So it's not uncommon to see people who in midlife will come in

20   the community and say, "I didn't experience this as a child, but

21   now I'm experiencing severe gender dysphoria, and I think I need

22   to address it."

23   Q.   And are treatment options that we just discussed assessed

24   the same way for those people who present to you in midlife, for

25   example, as for people who come and tell you that they have

57

1      identified that way since they were a child?

2      A.   Treatment options are based on the severity of the

3      condition.

4      Q.   And what time period -- over what time period do you look

5      to assess the patient in order to determine the severity of the

6      condition?

7      A.   The patient's present clinical situation.  So just like

8      with any other medical condition, what is the patient's present

9      status?  What are their symptoms?  How severe are they?  How

10     much are they suffering?  What other options have been used and

11     exhausted?  What other options remain?  But mostly what their

12     present concerns and presentation is.

13     Q.   Looking to the second criterion, "capacity to make a fully

14     informed decision and to consent for treatment," what does that

15     mean from the medical point of view here?

16     A.   It means that the patient must be able to understand

17     informed decision and to be able to participate in decisions

18     about their healthcare.

19          So in the past, we have seen individuals who are retarded

20     or who are mentally -- have some level of developmental delays.

21     There are some people who may have autism.  And we want to make

22     sure that people who have conditions that may impact their

23     decision-making are able to understand and to participate in

24     decisions about treatment options.

25     Q.   All right.  We can skip No. 3 for the explanation.

ETTNER – Direct

1          For No. 4:  "If significant medical or mental health

2     concerns are present, they must be well controlled."

3          Can you explain what this criterion means in layperson

4     terms.

5     A.   Yes.  So significant medical conditions.  A recent example

6     from my practice would be an individual who has anal cancer and

7     is medically -- medically, it's indicated that they need gender

8     confirmation surgery.  So we would want to make sure that the

9     chemotherapy and radiation are over, that the cancer is

10    resolved, and that some modified vaginoplasty can be performed.

11         So it would involve consultation with the oncologist and

12    the surgeon to make sure that the person's medical condition was

13    well controlled before proceeding with surgery.

14         In terms of mental health concerns, we want to make sure

15    that the individual is not actively psychotic, that their

16    symptoms don't impair their ability to provide informed consent,

17    and that the benefits of surgery outweigh the risks.

18         So even individuals who have serious mental illnesses, like

19    schizophrenia or what we used to call multiple personality

20    disorder, have undergone successfully gender confirmation

21    surgery.  But we want to make sure that, at the time of surgery,

22    those conditions are controlled.

23    Q.   What does the phrase "well controlled" mean as applied to

24    the mental health concerns?

25    A.   Again, it means that these concerns don't impair reality

59

1      testing, that the person isn't, for instance, in a manic phase

2      where they're not fully understanding the postoperative care

3      involved or that they are unable to provide informed consent;

4      and that the benefit of doing the surgery outweighs the risk.

5           So in some instances, if a person is, for instance, having

6      a manic episode, that would have to be controlled medically, and

7      we would be in consultation with the surgeon, and we would

8      reevaluate the person just prior to surgery.

9      Q.   When you use the phrase "the benefit outweighs the risk,"

10     what kind of risk are you referring to?

11     A.   Well, the risk of untreated severe gender dysphoria, as

12     I've mentioned, is serious, severe risk.  And so many mental

13     health issues -- 50 percent of all Americans will have a mental

14     health diagnosis at some point in their lifetime.  So the

15     presence of mental health conditions does not negate or obviate

16     the ability to undergo surgery.

17          If a person has depression and they are taking

18     antidepressants, that may be considered well controlled.

19     Certain mental health concerns, such as personality disorders,

20     are lifelong and characterological, and they are not going to

21     change prior to surgery.

22          So we don't use those as reasons to deny surgery to people

23     for whom surgery is medically indicated.

24     Q.   Are there risks for surgery for persons with serious

25     uncontrolled mental health concerns?

**ETTNER – Direct**

60

1    A.   There can be, yes.

2    Q.   And what kinds of risks are those?

3    A.   Well, for instance, people who have schizophrenia, if they

4    don't understand the need to dilate after surgery or if they

5    don't have adequate housing or the ability to get food in their

6    homes after surgery, those people could be at risk for

7    complications.

8    Q.   Moving to the next criterion, No. 5, "12 continuous months

9    of hormone therapy as appropriate to the patient's gender

10   goals."

11        Why is this one of the criteria on for the surgery?

12   A.   Sex steroid hormones estrogen work primarily on the brain,

13   so -- and initially on the brain.  So when you provide cross-sex

14   hormone therapy to a gender dysphoric person, you will have not

15   only the development of secondary sex characteristics -- breast

16   growth, reduction of male pattern balding, redistribution of

17   body fat, et cetera -- but the person will experience an

18   improvement in their overall level of wellbeing.

19        So it's important to have those hormonal sex steroids

20   circulating, if there are no medical contraindications prior to

21   surgery, so the person will have had a good deal of feminization

22   prior to undergoing other surgical procedures.

23   Q.   And how long on average or is typical for the cross-sex

24   hormones to have the kind of feminization effect that you just

25   described?

1    A.   Well, after two years, people will typically get the

2    maximum amount of breast growth, for instance, that they are

3    going to attain with hormones, and they will have attained the

4    maximum amount of feminization usually at about the 24-month

5    mark.

6    Q.   Moving to the last criterion, criterion No. 6, "12

7    continuous months of living in a gender role that is congruent

8    with their gender identity."

9         First, what does it mean by "living in a gender role"?

10   A.   This is what we refer to as social role transition.  So

11   it's the person's ability to appear in the world in their

12   affirmed gender, which, if you think about it, is the

13   sine qua non of the condition: the idea that the way I appear

14   doesn't reflect who I am.

15        So this is an important component of the treatment, and it

16   attenuates gender dysphoria.

17   Q.   How does it accomplish that?  How does it attenuate gender

18   dysphoria?

19   A.   It helps to consolidate the identity, and it reduces some

20   of the dissonance of the incongruity of "I have this shell.

21   People think that this is who I am, but it isn't really who I

22   am."

23        So the person feels more congruent; they feel healthier;

24   they have a level of wellbeing; and they feel more authentic.

25   They describe it as just, "This is who I am."

ETTNER - Direct

62

1    Q.    And why is this criterion of 12 continuous months of living

2    in a gender role -- why is that one of the criteria for the

3    surgery?

4    A.    So that the person understands the limitations of living in

5    their affirmed gender; that some physical attributes will never

6    change, even with surgery and hormonal treatment; and that the

7    person is able to live in the world feeling safe and comfortable

8    and having been affirmed in their identity.

9          So, for instance, if a person is living in an isolated area

10   where there is no one else around -- let's say a forest

11   ranger -- and they were assigned male at birth but they are

12   experiencing gender dysphoria, they would choose to dress as a

13   female even though there is no one around to view them because

14   that is in consonance with how they view themselves, and that is

15   the psychological attenuation of the gender dysphoria.

16   Q.    Is it possible to undergo the social transition of living

17   in a gender role congruent with gender identity in a prison

18   environment?

19   A.    Yes.  Living in one's affirmed -- in one's affirmed role,

20   what we used to call the "real life experience," takes place

21   wherever your real life occurs.

22         And so it's not about where you live; it's about living in

23   role to the extent that one can.  And in a prison, that's

24   typically a very daunting task because one doesn't have often

25   the benefits of female clothing or some of the accoutrements

63

1    that one would have if they were living outside of prison.

2    Q.   And is it possible to achieve a social transition for

3    someone who was assigned the sex of male and identifies as

4    female while living in a men's prison?

5         MR. HALL:  Objection.  Foundation.

6    Your Honor, if I may.

7         THE COURT:  Let's lay a foundation as to the basis for

8    that opinion, whether she has had experience in working with

9    people in that setting and can actually cite from her own

10   experience or to studies she has evaluated in her role with

11   WPATH.  And I think she chaired the incarceration committee, so

12   I'm assuming she has that background.  It would be helpful to

13   know what background she has to offer that opinion.

14   Q.   BY MS. RIFKIN:  Dr. Ettner, I think you might have

15   mentioned some of this earlier, but can you describe your

16   experience assessing or treating individuals in a prison or jail

17   setting?

18        THE COURT:  She did indicate it was 30 individuals.

19        THE WITNESS:  Yes.

20        THE COURT:  So I did hear that.  But how that

21   translates into actual experience in the transition in a prison

22   setting is what I'm looking for.  So go ahead.

23        THE WITNESS:  So I have seen people in prisons who are

24   assigned male living in male prisons who, to the best of their

25   ability, attempt to appear female.

ETTNER – Direct

64

1          And that can mean growing their hair; in some cases,

2     tattooing makeup or actually making makeup if they are not

3     allowed to have it, if they are not allowed to purchase that or

4     if it's not given to them.

5          In some situations where people are not allowed any sort of

6     female accoutrements, they may still try, in one way or another,

7     to appear as female as possible, either piercing an ear or even,

8     in the case of someone I saw on death row who wasn't allowed to

9     feminize at all, attempting to make their fingernails shaped in

10    what they thought was a female shape so they could look at their

11    nails and remind themself of who they really were.

12          THE COURT:  Counsel, we're going to take a break

13    sometime in the next five minutes.  So I'll let you pick that

14    time.  You can do it now, or you can ask a few more questions.

15    But generally, sometime in the next five minutes, we will try to

16    take the first recess.

17          MS. RIFKIN:  I think a few more questions will be

18    good.  That will allow us to get to the end of this part.

19    Q.    BY MS. RIFKIN:  Dr. Ettner, is there a clinical reason why

20    someone with gender dysphoria would need to have the

21    undergarments typically associated with the affirmed gender, the

22    opposite sex?

23    A.    Yes.

24    Q.    What is that?

25    A.    If that individual is on hormones, they will have breast

65

1      growth, and they will need support for the breasts.

2          People who are assigned male at birth but are transitioning

3      will tuck their testicles and their penis, and that will require

4      a tighter undergarment than typically the undershorts that are

5      created for men.  And it can be painful without that support to

6      tuck the testicles.

7      Q.   And is there a clinical purpose for addressing someone with

8      gender dysphoria by their preferred gender pronoun?

9      A.   Yes.

10     Q.   What is that clinical purpose?

11     A.   Well, misgendering a person who identifies as female is

12     considered identity threat.  It's basically telling the person:

13     You aren't who you think you are.  We don't take you seriously.

14     And it's a -- it's a bad thing to do to a person.

15     Q.   From a psychological perspective, what effect can it have

16     on a patient to consistently be addressed using the wrong

17     pronoun?

18     A.   There are numerous studies about minority stress, these

19     sorts of stigmatization, the shame that occurs when people are

20     in situations where they are stigmatized, they are misgendered,

21     they are victimized.  And it has a very devastating effect.

22         Many, if not most, people with gender dysphoria have

23     experienced that at some point.  And it's -- it's very

24     demoralizing.

25         We have had -- I have seen clients where people have called

1    them "it" as a way of being discriminating and hostile.  And we

2    know that hate crimes take place against people who are

3    transgender.  So I think the marginalization and the

4    stigmatization is well documented.

5            MS. RIFKIN:  I think now would be a good time for a

6    break, Your Honor.

7            THE COURT:  All right.  Counsel, let's try to hold

8    this to about a 15-minute recess.  We'll be in recess for 15

9    minutes.

10           (Recess at 10:41 a.m. until 11:00 a.m.)

11           THE COURT:  We'll go ahead and proceed.

12       I'll remind the witness that you are still under oath,

13   Dr. Ettner.

14       Ms. Rifkin, you may resume your direct examination of the

15   witness.

16           MS. RIFKIN:  Thank you, Your Honor.

17   Q.  BY MS. RIFKIN:  Dr. Ettner, you told us earlier that you

18   did an evaluation of Ms. Edmo.

19       What was the purpose of your evaluation?

20   A.  To determine the adequacy of the treatment she was

21   receiving in the prison.

22   Q.  And was it specifically concerning any particular condition

23   or --

24   A.  Particularly, gender dysphoria, but I did address other

25   mental health concerns as well.

1    Q.    And what components did your evaluation of Ms. Edmo

2    consistent of?

3    A.    A clinical interview, the review of all the records that

4    were provided to me, and psychodiagnostic testing.

5    Q.    Can you explain what you mean by psychodiagnostic testing.

6    A.    Providing psychological tests to determine in a very

7    expeditious way a good deal of information about Ms. Edmo that I

8    couldn't otherwise obtain in the short period of time that I was

9    visiting with her.

10   Q.    What kinds of information did these tests look for?

11   A.    Psychological symptoms, aspects of trauma, and about 13

12   other domains of clinical issues, such as suicide, depression,

13   anxiety, hopelessness, ideas of self-reference, all sorts of

14   other behavioral tendencies, and different -- anxious arousal,

15   hyperarousal, a series of different psychological constructs.

16   Q.    And what do the results of the tests show?

17   A.    That in addition to severe gender dysphoria, Ms. Edmo has a

18   depressive disorder and anxiety features and suicidal ideation.

19   Q.    Did the tests provide you any particular information about

20   her depression and anxiety disorders?

21   A.    Yes.  The depression is primarily somatic and vegetative,

22   not cognitive.

23         And by that I mean that it's not subject to cognitive

24   reappraisal.  So it's not the sort of depression that someone

25   can talk through or process.  It actually affects bodily

1    systems.

2         So, for instance, in the area of anxiety, someone could

3    have a rapid heartbeat.  So it's not that they feel worried or

4    scared; it's more of a somatic symptom that arises that is

5    beyond their conscious control.

6         And you referenced the DSM-5 previously, and you will note

7    in the DSM-5 that depression and anxiety are very common, almost

8    universal, attendant issues with gender dysphoria.

9    Q.   And do you have an understanding of why that is, how

10   depression and anxiety relate, if at all, to gender dysphoria?

11   A.   Well, sure.  I mean, when a person understands that they

12   are entirely different than other people and that expressions of

13   that difference are taboo and can actually put them in harm's

14   way, that, in and of itself, can be a source of depression.

15        We know that depression can be lifelong.  And I believe

16   Ms. Edmo is taking the maximum amount of antidepressant

17   medication, Effexor, that's available.  And the fact that that

18   doesn't -- that does not stop the depression is another

19   indication that the depression is really part and parcel of

20   gender dysphoria and less of a comorbid or cooccurring disorder

21   on its own.

22   Q.   You mentioned -- I'll try to get the terms right, but

23   please correct me if I don't.

24        You said that the testing revealed that Ms. Edmo's

25   depression, you think, is more somatic than cognitive.  Did I

1    get that right?

2    A.    Yes.

3    Q.    What are the differences in the kinds of treatment that can

4    be provided for somatic depression versus cognitive depression?

5    A.    Well, in a person who doesn't have gender dysphoria, one

6    would attempt antidepressant medication for that.

7         For Ms. Edmo, I don't believe that attending a group or

8    processing her depression would impact the depression or

9    attenuate the symptoms.

10   Q.    And why not?

11   A.    Again, because it's not cognitive.

12        So if a person is, for instance, sad or depressed about a

13   particular issue and they can be taught to reframe that through

14   therapy or process it through therapy, that can be very helpful,

15   of course.  But if the depression is primarily noncognitive,

16   then talk therapy is not really the modality of choice.

17        The same is true of posttraumatic stress disorder, which I

18   did not diagnose.  I did not find that in Ms. Edmo in my

19   evaluation.

20   Q.    Did you form an opinion about whether Ms. Edmo was

21   appropriately diagnosed with gender dysphoria?

22   A.    Yes.  The diagnosis is appropriate.

23   Q.    And what is your opinion based on?

24   A.    It's based on my own assessment that she meets the

25   criteria, and everything I have read in the medical records, her

1    response to hormones, and her recognition that she require

2    treatment and her awareness that -- and repeated requests for

3    treatment.

4    Q.   And what is your understanding of what treatment Ms. Edmo

5    has received for gender dysphoria?

6    A.   She has received some feminine undergarments and some other

7    commissary items, and she has received cross-sex hormones

8    although they have fluctuated greatly and, in my opinion, are

9    not -- are not adequately being monitored.

10   Q.   How long has Ms. Edmo received cross-sex hormones?

11   A.   Approximately six years.

12   Q.   Given your testimony just now about your opinion that the

13   hormones are not appropriately being monitored, were you able to

14   evaluate whether -- to what extent Ms. Edmo has received as much

15   benefit from the hormones as she will receive?

16             MR. HALL:  Objection.

17             MR. EATON:  Foundation.

18             MR. HALL:  Join on the foundation.  Also goes beyond

19   the scope of the expert disclosure, Your Honor.

20             MR. EATON:  Join.

21             THE COURT:  Counsel, I am very strict that there has

22   to be a disclosure of any opinions that are going to be offered

23   through the witness.  So if you want to just show counsel where

24   this opinion is set forth in the expert disclosure, that will

25   solve the problem.  If not, you perhaps go into a different

1    area.

2         Now, the question -- well, go ahead if you have found

3    the --

4         Ms. Rifkin, I should have noted it.  I try to tell counsel

5    at the outset, the lectern is actually adjustable.  So you can

6    push -- there is a toggle that will bring it -- on the other

7    side, I believe.

8              MS. RIFKIN:  Great.  I think you told me that last

9    time I was here, and I forgot.

10             THE COURT:  It just makes it a little bit easier and

11   helps us get the microphone at a proper height as well.

12             MS. RIFKIN:  All right.  I think that the best way to

13   address this issue, Your Honor, would be to put up Dr. Ettner's

14   report that was part of -- both filed with the court and an

15   expert disclosure to lay the foundation.  And that way, there is

16   no dispute.

17             THE COURT:  All right.

18             MS. RIFKIN:  So can we put up -- it's -- for the

19   record reference, it's ECF 62-1.  It's page 24 of 100, page 20

20   internally, paragraph 61.

21             THE COURT:  Paragraph 61?

22             MS. RIFKIN:  Yes, Your Honor.

23   Q.   BY MS. RIFKIN:  Do you have that on your screen,

24   Dr. Ettner?

25   A.   Yes, I do.

1    Q.   Okay.  At the beginning of paragraph 61, you stated:

2              "Despite years of feminizing hormone therapy, Ms. Edmo

3              continues to suffer from severe gender dysphoria and

4              attendant depression.  The long-term hormonal

5              treatment she has undergone has served to intensify

6              Ms. Edmo's anatomical dysphoria."

7         Did you evaluate -- did you review and evaluate Ms. Edmo's

8    hormone treatment and its effects on her in order to render this

9    opinion?

10   A.   Yes.  I saw lay reports.

11   Q.   And did you discuss with Ms. Edmo the effects of hormone

12   treatment on her?

13   A.   I did.

14   Q.   And through that discussion, were you able to evaluate the

15   effects from a psychological perspective of hormone treatment on

16   Ms. Edmo?

17   A.   I'm not certain what you're asking.

18        I know that Ms. Edmo has been on hormones long enough to

19   have attained secondary sex characteristics and the sex steroids

20   that would be comparable to female peers.  In other words, she

21   has been hormonally reassigned.

22        However, it's important that those hormones be maintained

23   at appropriate levels.  And recently, from what I saw --

24              MR. HALL:  Objection.

25              THE COURT:  Just a moment.

1          MR. HALL:  Objection.  Nonresponsive.  Move to strike.

2          THE COURT:  Sustained.  I think we have gone beyond

3    counsel's question.  Let's put another question before the

4    witness.

5    Q.   BY MS. RIFKIN:  Based on your evaluation of Ms. Edmo,

6    Dr. Ettner, did you form an opinion about whether she requires

7    further treatment for gender dysphoria?

8    A.   Yes.

9    Q.   And what is the further treatment that she requires in your

10   opinion?

11   A.   She requires management of her hormonal medications with

12   follow-up laboratories, and she requires genital reconstruction

13   or gender confirmation surgery.

14          MR. HALL:  Objection, Your Honor.  Move to strike as

15   to the hormone therapy as nondisclosed opinions outside of the

16   witness's foundation.  I can ask some questions in aid of an

17   objection if the court would permit.

18          MR. EATON:  Join.

19          THE COURT:  Well, I need to, I think, first give

20   Ms. Rifkin a chance to point to a portion of the expert

21   disclosure which would set forth Dr. Ettner's opinion concerning

22   management of hormonal medications.

23          MS. RIFKIN:  Your Honor, that is actually in

24   Dr. Ettner's declaration, but I won't be pursuing that at the

25   moment.  So I think --

74

1          THE COURT:  All right.  Let's go ahead and strike that

2     and move on.  She has clearly offered the opinion that she

3     requires gender confirmation surgery, and we can go from there.

4     Q.   BY MS. RIFKIN:  Dr. Ettner, is the treatment of gender

5     confirmation surgery based in scientific evidence?

6     A.   Yes.

7     Q.   And can you briefly describe or summarize the basis for the

8     standard of care, including gender confirmation surgery as a

9     treatment?

10    A.   Decades of scientific research have validated the efficacy

11    of gender confirmation surgery for individuals who have severe

12    gender dysphoria.  And those studies have been done throughout

13    the world by different surgeons.

14         Some of that was collated in the Medicare decision when it

15    was determined that reassignment surgery is not experimental and

16    it has a relatively low rate of complications and there are

17    very -- has a very low rate of regrets and that, for some

18    people, it is the only treatment for gender dysphoria.

19    Q.   Did you come to a determination about whether gender

20    confirmation surgery is medically necessary for Ms. Edmo?

21    A.   Yes.

22    Q.   And what was your opinion?

23    A.   That gender confirmation surgery is medically indicated for

24    Ms. Edmo.

25    Q.   And you used the word "medically indicated."

75

1      Is there a distinction in your mind between medically
2  indicated and medically necessary?
3  A.   No.
4  Q.   Did you consider -- in evaluating the medical necessity of
5  gender confirmation surgery for Ms. Edmo, did you consider the
6  criteria by the WPATH standard of care that we were looking at
7  earlier today?
8  A.   Yes.
9  Q.   Can we bring those back up, please.  It's Joint Exhibit 15,
10 page 1566.  And can we blow up the bottom half again, please.
11      Did you evaluate whether Ms. Edmo meets the first criteria
12 under this category, "persistent, well-documented gender
13 dysphoria?"
14 A.   I did.
15 Q.   And what is that based on?
16 A.   Based on the review of records and my own assessment when I
17 met with Ms. Edmo.
18 Q.   What did you conclude with respect to criteria 1 for
19 Ms. Edmo?
20 A.   That she does, indeed, have persistent and well-documented
21 long-standing gender dysphoria.
22 Q.   Was there specific information from the medical records
23 that you relied on in coming to this conclusion?
24 A.   Other providers had made that diagnosis, and she meets the
25 criteria outlined in the DSM-5.

1    Q.   And did you evaluate whether Ms. Edmo meets the criterion

2    No. 2, "capacity to make a fully informed decision and to

3    consent for treatment"?

4    A.   Yes.  Ms. Edmo has no thought disorders and no impaired

5    reality testing.

6    Q.   And is Ms. Edmo above the age of majority for this country?

7    A.   She is.

8    Q.   Okay.  Looking at criterion 4, did you evaluate whether

9    Ms. Edmo meets this criterion for surgery?

10   A.   Yes.

11   Q.   And what's your opinion?

12   A.   My opinion is that she meets this criteria.

13   Q.   Are you aware -- I believe that you testified just a few

14   moments ago that you concluded that Ms. Edmo has depression and

15   anxiety disorder; is that right?

16   A.   Yes.

17   Q.   Did you form an opinion about whether that is well

18   controlled?

19   A.   It doesn't impair her ability to undergo surgery.  It's as

20   controlled as it can be, and my opinion is that it will be

21   attenuated post surgery.

22   Q.   When you say "it's as controlled as it can be," what do you

23   mean by that?

24   A.   She is taking the maximum amount of medication that

25   controls depression, major depression.

**ETTNER - Direct**

1    Q.   And based on your review of the records, are you aware of

2    whether Ms. Edmo is compliant with her prescribed medications

3    for depression or anxiety?

4    A.   She is compliant with her medical recommendations.

5    Q.   And looking at criterion No. 5, I think you testified that

6    Ms. Edmo has been on six years of hormone therapy; is that

7    accurate?

8    A.   Yes.

9    Q.   And looking at criterion 6, did you determine whether

10   Ms. Edmo has satisfied the -- I think you called it social

11   transition criterion of "12 continuous months of living in a

12   gender role that is congruent with her gender identity"?

13   A.   Yes, she has satisfied the condition of social role

14   transition.

15   Q.   And what was that conclusion of yours based on?

16   A.   Based on her living as a woman to the best of her ability

17   in a male prison.

18   Q.   Can you describe any factors or information that you

19   considered in arriving at the conclusion that Ms. Edmo has lived

20   as a woman to the best of her ability?

21   A.   Her appearance when I met with her, her disciplinary

22   records, which indicated that she had attempted to wear her hair

23   in a feminine hairstyle and to wear makeup even though that was

24   against the rules and she was -- received some sort of

25   disciplinary action for that, and her -- the way that she was

1    receiving female undergarments and had developed the stigma of

2    femininity, the secondary sex characteristics, breast

3    development, et cetera.

4    Q.  Did you evaluate whether Ms. Edmo's gender identity as

5    related to attention from male offenders?

6    A.  Would you repeat that question for me.  I'm sorry.

7    Q.  Sure.  Did you evaluate whether Ms. Edmo's gender identity

8    is related to attention from male offenders in prison?

9    A.  I don't regard gender identity which, as I said earlier, is

10   an innate sense of belonging to one gender or another, as being

11   related to who pays attention to you.

12            MR. HALL:  Objection.  Nonresponsive to the question

13   asked.

14            THE COURT:  The question is whether you evaluated

15   whether her gender identity is related to attention from male

16   offenders, not -- the question is:  Did you evaluate it?

17            THE WITNESS:  My opinion is that her gender identity

18   is not related to the attention that she may receive from other

19   inmates.

20            MR. HALL:  Objection.

21            THE COURT:  So you did evaluate it?

22            THE WITNESS:  Yes.  Thank you.

23            MR. HALL:  Objection.  Foundation and beyond the scope

24   of the disclosure.

25            MR. EATON:  Join that.

79

1          MS. RIFKIN:  Your Honor?

2          THE COURT:  Ms. Rifkin.

3          MS. RIFKIN:  Dr. Ettner has clearly testified that she

4    is an expert with respect to gender dysphoria and understanding

5    the condition of gender dysphoria.

6       Defendants have already made the argument here today about

7    the causes and contributing factors to gender dysphoria.

8    Dr. Ettner is an expert in gender dysphoria.  She has a 23-page

9    declaration on it.  Defendants deposed her for seven hours.

10         THE COURT:  I don't think the question is her

11   expertise on gender dysphoria.  It's a question of a -- well,

12   with her background in prison, I think chairing that committee

13   of the WPATH, I don't think that's an issue.  I think the only

14   issue is whether or not it was disclosed.

15         MS. RIFKIN:  Dr. Ettner was --

16         THE COURT:  Just a moment.  On further reflection, I'm

17   going to overrule the objection.  The question is did you

18   evaluate it.  She has not been asked to offer an opinion at this

19   point.  If there was no opinion given, you may want to renew the

20   objection.

21   Q.   BY MS. RIFKIN:  Dr. Ettner, as part of your study and

22   expertise in gender dysphoria, have you -- do you understand the

23   contributing factors or the factors that may contribute to a

24   person's gender identity?

25   A.   Gender identity, from all of the research and science to

1    date, appears to be a neurodevelopmental issue that occurs prior

2    to birth.

3    Q.   Are you aware that -- based on your review of records, that

4    Ms. Edmo attempted to cut off her testicles?

5    A.   Yes.

6    Q.   And what is the clinical significance of this?

7    A.   By definition, when an individual who is not psychotic or

8    delusional attempts what we call surgical self-treatment --

9    because we don't regard removal of the testicles or attempted

10   removal of the testicles as either mutilation or self-harm -- we

11   regard it as an intentional attempt to remove the target organ

12   that produces testosterone, which, in fact, is the cure for

13   gender dysphoria.

14        We typically see this in prisons when people are not

15   receiving adequate care for gender dysphoria.  They will attempt

16   to perform their own surgery.  Unfortunately, some people die

17   due to blood loss.  There is far more blood involved than people

18   realize, and the elasticity of the vas deferens nerve bundle can

19   cause that to retract into the body cavity.

20   Q.   Are you familiar with any other medical condition that is

21   associated with a person trying to cut off their testicles other

22   than gender dysphoria?

23   A.   I, personally, am not.

24   Q.   Did you form an opinion about what the risks are, if any,

25   to Ms. Edmo if she does not receive gender confirmation surgery?

81

1      A.   Yes.

2      Q.   And what is that opinion?  What is your opinion about the

3      risks to Ms. Edmo, if any?

4      A.   The risks would be, as typical in inadequately treated or

5      untreated gender dysphoria, either surgical self-treatment,

6      emotional decompensation, or suicide.  I think that in

7      Ms. Edmo's case, she is at particular risk for suicide given

8      that she has a high degree of suicide ideation.

9      Q.   And what -- what is that last statement that you made based

10     on?

11     A.   Based on the testing I did and the fact that she has had a

12     history of suicide attempts in the past.

13     Q.   Do you agree that gender confirmation surgery is

14     potentially harmful for Ms. Edmo?

15     A.   No.

16     Q.   Why not?

17     A.   Gender confirmation surgery is the cure for gender

18     dysphoria, so I don't know how the cure could be anything other

19     than therapeutic and beneficial.

20     Q.   I would like to show you the -- one of the slides that was

21     used in defendants' opening statement.

22          Is gender dysphoria a personality disorder trait,

23     Dr. Ettner?

24     A.   No.

25     Q.   Can you explain the difference between gender dysphoria and

1        a personality disorder trait?

2        A.   Two entirely different things.  Gender dysphoria is a

3        medical condition.  Personality disorder traits are -- there are

4        many different personality disorders, as you can see in the

5        DSM-5.  And traits are some aspects of those various disorders

6        which may or may not result in a diagnosis of a personality

7        disorder, and personality disorders are characterological and

8        typically lifelong.

9        Q.   What do you mean by characterological?

10       A.   It means that they are sort of baked into a person's

11       personality.  They don't change with time.  They don't usually

12       remit with medication.  They are sort of the way a person goes

13       through life.

14            So, for instance, you could have a personality disorder of,

15       let's say, a narcissistic personality disorder where a person

16       would have an overidealized view of themselves, a lack of

17       empathy, and some of the other criteria that are outlined in the

18       DSM-5.

19       Q.   Did you -- based on your review of Ms. Edmo's records and

20       your evaluation of Ms. Edmo, are you aware of whether Ms. Edmo

21       has been diagnosed with a personality disorder?

22       A.   I don't recall seeing that diagnosis in her medical

23       records.

24       Q.   And did you -- based on your review of Ms. Edmo's records

25       and your evaluation of Ms. Edmo, does she have a substance abuse

1    disorder that is currently uncontrolled?

2    A.   She has a history of substance abuse.  She has not had

3    substance abuse issues since her incarceration.

4    Q.   And based on your review of the medical records and your

5    evaluation of Ms. Edmo, does she have sexual concerns?

6    A.   She did not voice sexual concerns during our interview.

7    Q.   Do you know, is there -- is sexual concerns a medical term

8    you're familiar with?

9    A.   It's not a medical term, per se.  No.

10   Q.   Does any history of abuse that Ms. Edmo has result in an

11   uncontrolled mental health concern currently?

12             MR. HALL:  Objection.  Foundation, Your Honor.

13   Speculative, and it goes beyond the scope of disclosure.

14             MS. RIFKIN:  Your Honor, may I?

15             THE COURT:  Yes.

16             MS. RIFKIN:  Defendants in their opening statement

17   presented these as mental health concerns for Ms. Edmo that

18   interfere with her ability to receive gender -- satisfy the

19   criteria for surgery, which Dr. Ettner was disclosed to opine on

20   her meeting the criteria for surgery.  She is a psychologist.  I

21   don't see how this can possibly be beyond the scope.

22             MR. HALL:  Your Honor, they were not provided in the

23   disclosure.

24             THE COURT:  Well, I understand that.  This chart, I

25   assume, was not disclosed, either.  So there was no way to

84

1     really respond to it.

2          As long as you stay generally within the opinions already

3     offered, I'll allow you to ask specific questions tied just to

4     the chart which counsel used during the opening statement.  But,

5     again, the general things have to still be within the report,

6     but I'll allow some elaboration here to address the issues

7     raised during opening statements.

8          Go ahead and proceed.  The objection is overruled.

9     Q.   BY MS. RIFKIN:  Dr. Ettner, does any abuse history of

10    Ms. Edmo that you're aware of, from your review of records and

11    interview with her, create any mental health concerns that are

12    currently not controlled?

13    A.   No.  Many people, as we know, are victims of abuse, either

14    in childhood or beyond, but we don't deny medically necessary

15    treatment on that basis.

16    Q.   Dr. Ettner, as part of your review of Ms. Edmo's medical

17    records, did you review a progress note from Dr. Eliason

18    regarding Ms. Edmo's appropriateness for gender confirmation

19    surgery?

20    A.   I did.

21          MS. RIFKIN:  Can we show Joint Exhibit 1.

22    Your Honor, the parties have stipulated to the authenticity

23    of Joint Exhibit 1, which are Ms. Edmo's medical records from

24    her incarceration.  And I'd move to admit them into evidence.

25          THE COURT:  Well, Counsel, my notes indicate that

1    Exhibits 1 --

2         MS. RIFKIN:  I'm sorry.  Joint Exhibit 1.

3         THE COURT:  Right.  Joint Exhibit 1 through 19 have

4    all been stipulated as to their be admissibility.  So,

5    therefore, I'll admit all 19 of those exhibits without the need

6    for any further motions.

7         (Joint Exhibits 1 through 19 admitted.)

8    Q.   BY MS. RIFKIN:  All right, Dr. Ettner, if you can look at

9    the Joint Exhibit 1-538 that's in front of you.

10        Is this the progress note that you reviewed from

11   Dr. Eliason from April 20, 2016?

12   A.   Yes.

13   Q.   And what is your understanding of the purpose of

14   Dr. Eliason's assessment of Ms. Edmo on this date?

15   A.   To assess the necessity of gender confirmation surgery for

16   Ms. Edmo.

17   Q.   And did you form an opinion about the adequacy of

18   Dr. Eliason's assessment for whether gender confirmation surgery

19   was necessary for Ms. Edmo?

20        MR. EATON:  Object, Your Honor.  I don't believe

21   that's disclosed in the expert disclosures.

22        THE COURT:  Counsel, I apologize.  I was -- my

23   note-taking distracted me.  Give me just a moment to review the

24   question.

25        All right.  That is a pretty specific opinion that I would

1    expect to have been disclosed.  If you are going to use

2    Dr. Ettner to challenge Dr. Eliason's assessment and opinion, I

3    think that should have been disclosed.

4            MR. EATON:  I'd also object on foundation.  She is not

5    a psychiatrist.

6            MS. RIFKIN:  Your Honor --

7            THE COURT:  Well, from the point of view of a

8    psychologist, she, obviously, cannot offer the same opinion as a

9    psychiatrist, but they work in a related field.  So I think she

10   can assess, but I'm going to take into account the fact that she

11   is a psychologist, not a psychiatrist.

12           MS. RIFKIN:  I would like to show Dr. Ettner's expert

13   report, page 21, paragraph 64.

14       Can you zoom in, please, to paragraph 64.

15       Paragraph 64 reads:

16           "Despite the obvious severity of her gender dysphoria,

17           the Idaho" --

18           THE COURT:  Counsel, I can read it.

19           MS. RIFKIN:  Okay.

20           THE COURT:  I'm going to overrule the objection.  You

21   may go ahead and proceed.  But if you want to use that report to

22   indicate her opinion, you may, but that was clearly disclosed

23   that Dr. Ettner was going to call into question the adequacy of

24   the opinions rendered by IDOC using Dr. Eliason.

25           So go ahead.

1          MS. RIFKIN:  Okay.  Thank you.

2     Q.   BY MS. RIFKIN:  Let's go back to Dr. Eliason's note here.

3          All right.  So, Dr. Ettner, I believe the question was:

4     Did you form an opinion about the adequacy of Dr. Eliason's

5     assessment?

6               THE COURT:  Is it "Elison" or "Eliason"?

7               MR. EATON:  "Elison," Your Honor.

8               THE COURT:  It is "Elison."  My apologies.

9               MR. EATON:  He told me.  He is a psychiatrist, so you

10    listen.  That's how I remember it.

11              THE COURT:  Okay.  All right.  Go ahead.  But it is

12    spelled -- at least the spelling would support my pronunciation.

13    But he, in fact, pronounces it "Elison."

14              MR. EATON:  Correct, Your Honor.

15              THE COURT:  All right.  Thank you.  Because I actually

16    know some people with that spelling, and they say "Eliason."

17    So, obviously, there is a difference of opinion.

18         Go ahead.

19              MR. EATON:  Your Honor, with due respect, I do renew

20    my objection.  I think it simply says in that disclosure -- it

21    talks about not being qualified.  And it's a very, very vague

22    statement.  And I don't believe there is any -- any disclosures

23    about specifics about this document or opining about this

24    document in there.

25              MR. HALL:  Join.

```
1            MS. RIFKIN:  Your Honor, can we go back --

2            THE COURT:  Let's go back to that paragraph.

3            MS. RIFKIN:  Can we go back to that paragraph, please.

4       And in addition to this paragraph, Your Honor, defendants

5       deposed Dr. Ettner for seven hours.  And we'll look for the

6       relevant portions of her deposition transcript, but defendants

7       have this report.  In fact, they had it when we moved for

8       preliminary injunction.  And if they felt they needed to explore

9       the bases for her opinions clearly laid out in here, they had

10      seven hours to ask for further information about it.

11           THE COURT:  Let me just clarify.  The purpose under

12      the federal rules of requiring expert disclosures is to ensure

13      that there is not trial by ambush and that the opinions are

14      clearly spelled out and the basis for the opinions.

15      It is quite specific.  And the rules do not envision or put

16      a burden upon the opposing party to flesh out the opinions in

17      deposition.  However, if they do and if the subject matter is

18      covered during a deposition, then I think the matters covered in

19      the deposition are fair game.

20      So if, in fact, questions were asked by defense counsel of

21      Dr. Ettner, she can broach those subjects, offer the same

22      opinions that she did in response to questions during

23      deposition.  She can offer those opinions here.

24      So your sources will be either was the opinion stated

25      specifically or at least fairly in the opinion, or was it
```

1      covered by defense counsel during the deposition of Dr. Ettner.

2      And if the answer is no to either or to both of those, then we

3      don't get into it here.

4           MS. RIFKIN:  Your Honor, in this particular instance,

5      I don't think it's necessary to go to the transcript.  There is

6      clearly an error between April and May, but Dr. Ettner

7      specifically wrote -- referred to a note, Dr. Eliason's note,

8      that sex assignment surgery was not medically indicated.  And

9      she said at the end of this exact paragraph where it refers to

10     this exact note that these notes suggest that these providers

11     are not qualified to provide appropriate care to Ms. Edmo, and

12     they do not understand gender dysphoria generally or the

13     severity of Ms. Edmo's medical issues in particular.  And this

14     note is the exact one she referenced.

15          THE COURT:  Okay.  Then what you need to do is just

16     have her offer the opinion set forth in paragraph 64 and move

17     on.  Okay?

18          You know, it's -- you know, I take the Federal Rules of

19     Civil Procedure as being rules, not suggestions.  They say what

20     they mean, and they mean what they say.  And I think the rule is

21     quite clear that if you want to offer an expert opinion, you're

22     required to make a disclosure, and then the opinions offered

23     have to be tied to the opinions offered in that disclosure.

24          One additional matter is that I generally feel that if

25     defense counsel wants to take the deposition, they can expand

**ETTNER - Direct**

90

1    the scope through their questioning because they are the ones

2    that injected that into the case.

3            MR. EATON:  But, Your Honor, I did find appropriate

4    quotes from the deposition, and I specifically asked them that

5    you didn't opine about this note, and I believe she said

6    correct.  And I have that pulled up on my computer right now.

7            THE COURT:  Well, I have given -- again, Ms. Rifkin, I

8    think you can ask the question set forth in paragraph 64 or the

9    opinions set forth there in any other numbered paragraphs that

10   are in the report.  And if they -- an opinion was offered in

11   response to questions by Mr. Eaton or Mr. Hall during the

12   deposition of Dr. Ettner -- or I guess if they didn't take the

13   deposition, someone from their firms -- then you can ask.  But I

14   think we just need to move on at this point.  All right?

15       So the objection is sustained at this point, but I'll allow

16   you the leeway that I described, Ms. Rifkin.

17   Q.   BY MS. RIFKIN:  Based on your review of Ms. Edmo's medical

18   records, Dr. Ettner, did you form an opinion about whether

19   Ms. Edmo's treatment providers while she has been incarcerated

20   are qualified to provide appropriate care for gender dysphoria?

21   A.   Yes.

22   Q.   And what is the opinion that you came to about whether

23   Ms. Edmo's treatment providers are qualified to provide

24   appropriate treatment for gender dysphoria?

25   A.   My opinion is the providers are not qualified.

1          MR. HALL:  Objection, Your Honor, I had registered.

2     It's very vague, lacks foundation, and goes beyond the scope.

3     Paragraph 64 only talks about Dr. Eliason by name.

4          MR. EATON:  Join the objection.

5          MS. RIFKIN:  Your Honor, may I --

6          THE COURT:  The objection is overruled.  Go ahead.

7     Q.   BY MS. RIFKIN:  Do you need me to reask the question,

8     Doctor?

9          THE COURT:  I think she answered it.  No, she began.

10         Offer your opinion.  Go ahead.

11         THE WITNESS:  My opinion is that the providers who

12    were offering care and generating treatment plans were not

13    qualified to do so.

14    Q.   BY MS. RIFKIN:  And what is that opinion based on?

15    A.   It's based on the notes that I read in the medical reports

16    I was provided, and it was also based on the training that those

17    providers had received which I was able to review.

18         MS. RIFKIN:  Your Honor, I think for the sake of

19    avoiding some objection back and forth, I have a question if

20    Your Honor will permit --

21         THE COURT:  Yes.

22         MS. RIFKIN:  -- on proceeding.

23    Plaintiffs filed these expert reports with their motion for

24    preliminary injunction.  We agreed on a schedule of discovery

25    with defendants that included plaintiffs resubmitting their

1    expert reports and then discovery and then defendants' expert

2    reports.

3        And we received documents in discovery which were provided

4    to our experts.  Defendants then deposed them, but our experts

5    didn't produce new reports based on the documents that they were

6    then provided.

7        And so in discovery -- I mean in deposition, defendants

8    explored the bases for their opinions and asked whether they had

9    changed based on all this information.  So I would like to be

10   able to ask the witness about documents she doesn't reference in

11   her declaration because they weren't provided to plaintiff but

12   that she had reviewed and defendants knew that she had reviewed

13   and she talked about in her deposition.

14            THE COURT:  Mr. Eaton, Mr. Hall.

15            MR. EATON:  Your Honor, I think they need to stick

16   with the declarations and whatnot that they filed in support of

17   this.  I think this is the first time this issue has been

18   raised.  They could have filed a motion well before now if they

19   wanted to supplement expert disclosures, but to solicit new

20   opinions at the time of the hearing, we believe would be

21   inappropriate.

22            THE COURT:  All right.

23            MR. HALL:  Your Honor --

24            THE COURT:  Yes.

25            MR. HALL:  I will represent that at the time of

1      Dr. Ettner's deposition, it was asked if -- when she received

2      these documents.  The documents were received, many of them,

3      after her initial declaration.

4         I did ask if she has produced or has any other opinions

5      after the declaration, and the answer was no.  I believe that we

6      asked, as well, whether or not she intended to provide any new

7      opinions, and the answer was no, nor was she asked by counsel to

8      provide any new opinions that were not contained in the

9      declaration.

10            THE COURT:  All right.  Brief response.

11            MS. RIFKIN:  Well, Your Honor, I think to the extent

12      that Dr. Ettner did testify about -- as Your Honor said earlier,

13      to testify about these opinions during her deposition, that we

14      should be permitted to ask her about those opinions and provide

15      the court with any exhibits that are related to those that have

16      already been jointly stipulated to be admitted into evidence.

17            THE COURT:  At this point, I'll sustain the objection.

18      The ground rules will be just as I've described.  I would point

19      out that Rule 26(a)(2)(D) does provide for supplementation.  And

20      we often get into a fight about whether supplementation is

21      really supplementation or new opinions.

22         We don't allow new opinions, but you're allowed to

23      supplement prior opinions or move to amend the report if, in

24      fact, new information was provided that you did not have access

25      to.

94

1          Apparently, none of that happened.  So the ground rules are

2     roughly as I described.  It either has to be in the opinion that

3     she relied upon the documents; if not, the mere fact that it's

4     mentioned in Dr. Ettner's deposition is not enough to open the

5     door.

6          But if, in fact, she referred to the exhibits if questions

7     were asked about her -- or of her about the exhibits, then that

8     opens the door, and she is allowed to get into the same area

9     that she was asked about during her deposition -- but not just

10    the fact that it was mentioned.  She has to actually have been

11    asked questions about the exhibit, and she has to have offered

12    opinions or statements responsive to counsel's questions that's

13    relevant to the proceedings here.

14         All right?

15              MS. RIFKIN:  Yes, Your Honor.

16              THE COURT:  I understand -- you know, I'm sure

17    different courts approach it in different ways.  But this is --

18    you know, I have been here 23-plus years.  As long as I have

19    been on the federal bench, that's the way I have applied it.

20         And there is a lot of attorneys who are not particularly

21    happy when they got into court and found out.  In some

22    instances, they never filed any report and thought somehow that

23    they could just ignore Rule 26 completely.

24         Here, you did comply with Rule 26, but we're limited by the

25    rules just to the opinions offered here and as expanded by

ETTNER - Direct

95

1    counsel during the deposition.

2        So that's going to be -- and that applies also to what she

3    relied upon.  If there were documents disclosed afterwards, then

4    the process should have included filing a supplemental

5    declaration or disclosure.

6        But I certainly will allow some leeway.  If a particular

7    document was identified during the deposition and discussed, I'm

8    going to give some leeway in that regard.  Okay?

9            MS. RIFKIN:  Yes.  I understand, Your Honor.  And

10   thank you for that clarification.  I think it will hopefully

11   avoid future back-and-forth.

12           THE COURT:  And I should say I really don't think this

13   is a deal breaker.  I mean, the opinions are there that you

14   need, and a lot of this is kind of nibbling around the edges

15   anyway.

16       So go ahead and proceed.

17   Q.   BY MS. RIFKIN:  Dr. Ettner, at the time that you first

18   provided the expert declaration you have been looking at in this

19   case, you hadn't reviewed Ms. Edmo's medical records from before

20   she was incarcerated; is that right?

21       At the time that you first provided an expert declaration,

22   you had not yet reviewed the medical records from prior to her

23   incarceration; is that correct?

24   A.   Yes.

25   Q.   Did you think that those were important in assessing the

1     medical necessity of gender confirmation surgery?

2     A.   No.

3     Q.   Why not?

4     A.   Because I was concerned with the medical condition that

5     Ms. Edmo is presently suffering from.

6     Q.   And did you consider Ms. Edmo's disciplinary history in

7     IDOC in assessing the medical necessity of gender confirmation

8     surgery?

9     A.   No.  I considered that to be unrelated to whether or not

10    she requires a particular treatment at this time.

11    Q.   And why is that?

12    A.   Providers don't distinguish whether someone got a parking

13    ticket or committed a crime when providing medical care when

14    it's necessary.

15    Q.   Dr. Ettner, in your deposition, you were asked about

16    specific photographs of Ms. Edmo for when she first came into

17    custody in 2012 and prior to that in 2010.

18         Do you recall that?

19    A.   Yes.

20    Q.   Okay.  I would like to put Joint Exhibit 4 up.

21         THE COURT:  Are you having trouble switching over?

22    There we go.

23    Q.   BY MS. RIFKIN:  All right.  If you can turn to -- let's

24    see -- Joint Exhibit 4-4, page 4 of this exhibit.

25    A.   I'm looking at exhibit marked 4-1.

1    Q.   All right.  You were asked in deposition whether you have

2    reviewed this particular photograph of Ms. Edmo from 2010;

3    correct?

4    A.   Yes.

5    Q.   Did you think that this photograph of Ms. Edmo from 2010 --

6    did you need to evaluate this photograph in order to determine

7    whether gender confirmation surgery is presently medically

8    necessary for her?

9    A.   No.

10   Q.   And why not?

11   A.   Many patients that we see prior to hormone treatment or a

12   social role transition come in with full beards and looking very

13   distinctly male, and it doesn't have a bearing on their

14   diagnosis of gender dysphoria.

15   Q.   Does a patient's history of hair length or gender

16   presentation six or eight years prior to when you see them have

17   a bearing on the treatment that is necessary for gender

18   dysphoria?

19   A.   No.

20   Q.   If we can put up 4-6, please.

21        This is another photo you were asked about in deposition,

22   Dr. Ettner, from when Ms. Edmo entered IDOC custody in 2012.

23        Did you consider this photo relevant to determination of

24   whether gender confirmation surgery is medically necessary for

25   Ms. Edmo today?

1    A.   That's not a consideration that would enter into my present

2    decision-making; no.

3    Q.   In your opinion, does Ms. Edmo presently have unresolved

4    mental health issues that result in her not being appropriate

5    for gender confirmation surgery?

6    A.   No.

7    Q.   In your opinion, does Ms. Edmo have unresolved mental

8    health issues that result in her not being ready for gender

9    confirmation surgery?

10   A.   No.

11   Q.   Do you believe that Ms. Edmo's attempts to cut off her

12   testicles indicate that she has mental health concerns that are

13   not well controlled?

14   A.   No.  It indicates the need for treatment for gender

15   dysphoria.

16   Q.   And do you believe that Ms. Edmo's cutting of her arm in

17   recent months indicates that she has mental health concerns that

18   are not well controlled?

19   A.   No.  I think it's attention-reduction behavior that she

20   uses with the knowledge that she cannot cut her genitals because

21   she is aware that she needs to preserve that tissue if she is to

22   undergo gender confirmation surgery.

23   Q.   And do you believe that Ms. Edmo must participate in

24   psychotherapy to treat other mental health conditions before she

25   is ready to receive gender confirmation surgery?

99

1    A.   No.  Psychotherapy is neither a precondition for treatment

2    or a condition -- a precondition for surgery.

3    Q.   Does Ms. Edmo have the capacity to comply with postsurgical

4    treatment?  Earlier you gave an example of dilation, for

5    example.

6    A.   Yes.  Ms. Edmo is intelligent and has the capacity to

7    follow through with the postsurgical care that she would

8    require.

9    Q.   As far as you're aware, has Ms. Edmo been compliant with

10   the hormone therapy that she has been prescribed while she has

11   been in IDOC custody?

12   A.   Yes.

13   Q.   In deposition, Dr. Ettner, you were asked about an article

14   by the authors Osborne and Lawrence.

15        Do you recall that?

16   A.   Yes.

17   Q.   The article was entitled "Male Prison Inmates with Gender

18   Dysphoria:  When is Sex Reassignment Surgery Appropriate?"

19        Is that the article you were asked about in deposition?

20   A.   Yes.

21   Q.   And are you familiar with this article?

22   A.   Yes.

23   Q.   You were asked whether you're familiar with the authors

24   Osborne and Lawrence.  Are you?

25   A.   Yes.

ETTNER - Direct

1    Q.   And what is the -- in this article, what is sort of the

2    main point of this article that you were asked about?

3         MR. HALL:  Objection, Your Honor.  This goes beyond

4    the scope.  The witness testified at her deposition that she had

5    never read it -- read this article.  I object to the question

6    asking her to paraphrase now what the basis was or the point of

7    this article was and any opinions that may come out of it as to

8    what her thoughts are now or even the authors for lack of

9    relevance, because she has not reviewed the article or had not

10   prior to her deposition or prior to her expert report.

11        MS. RIFKIN:  Your Honor, I'll withdraw that question.

12        THE COURT:  Well, I'm not sure I was going to grant

13   it, but I'll -- let me just indicate the question is withdrawn.

14        Again, I wasn't at the deposition.  But if an expert

15   witness is being impeached by being shown some scholarly article

16   that he or she has not previously seen, you know, it's one thing

17   to say, well, this is something everybody who has expertise in

18   the field should know about.  But if the question is asked about

19   apart from that, it's just -- I'm sure there is hundreds of

20   articles that -- heaven knows there is a lot of Law Review

21   articles that I don't review.  But I think if I were to be asked

22   as an expert witness to offer an opinion and be challenged

23   because I didn't agree with what someone had said in an expert

24   opinion, I'm not sure it would be unfair for me to then go back

25   and review that and be prepared to respond to that at trial.

1          But the question is withdrawn.  Let's go ahead and proceed.

2     Q.   BY MS. RIFKIN:  Are you familiar with the work of Cynthia

3     Osborne and Anne Lawrence, the authors of that article,

4     Dr. Ettner?

5     A.   Yes.  I know both of those individuals.

6     Q.   And do you know if either of those individuals are members

7     of WPATH?

8     A.   They are not.  Anne Lawrence was at one time.

9     Q.   And are you familiar with the professional reputation of

10    these authors within the field of gender dysphoria treatment?

11    A.   Yes.

12    Q.   And what are their reputations?

13    A.   They are regarded as outliers in the field.  They don't

14    ascribe to the WPATH standards of care.

15    Q.   And are you familiar with the new standards of care that

16    Osborne and Lawrence propose for incarcerated people and whether

17    they should have surgery that they propose in this article?  Are

18    you familiar with that proposal by them?

19    A.   My understanding is that Cynthia Osborne thinks that

20    surgery may be appropriate in some cases but has suggested

21    additional conditions or hoops that individuals would have to

22    have gone through in order to be considered for surgery.

23    Q.   And are you aware of any scientific studies that support

24    those extra conditions or hoops that they propose that

25    incarcerated persons should have to go through in order to

1    receive gender confirmation surgery?

2    A.   I don't know --

3            MR. HALL:  Objection.  Beyond the scope.

4            MR. EATON:  Join.

5            THE COURT:  I'll sustain the objection.  If we're now

6    getting into the substance of that, and questioning what her

7    opinion was, I think -- I'm going to give you some leeway to

8    recall Dr. Ettner in rebuttal if, in fact, the defendants offer

9    opinions along those lines that you're getting into.  But as a

10   preemptive strike, I'll sustain the objection.

11           MS. RIFKIN:  Well, Your Honor, I mean, Dr. Ettner is

12   limited in her ability to -- we can't recall her on Friday

13   because she isn't able to still be here.  But I can offer the

14   deposition transcripts where counsel specifically asked

15   Dr. Ettner, as you suggested, about this article.  Why hadn't

16   she read it, whether she has opinion about it, et cetera.

17           THE COURT:  Well, you know, it's a court trial.  I'm

18   going to allow it.  Let's move on.

19       I'm worried we are wasting a lot of time here.  And I'm

20   worried that whether we can get done by Friday.  I mean, we will

21   be done by Friday because I start a trial in Pocatello on

22   Monday.

23       So I'll sustain the objection.  Counsel can raise this.

24   And if I end up feeling it's somehow critical, I'll notify

25   counsel and give them a chance to respond.  I may strike it at

1    that point.  But in order to get the evidence in, let's go ahead

2    and allow the inquiry.

3        Go ahead.

4    Q.   BY MS. RIFKIN:  So, Dr. Ettner, are you aware of any

5    scientific studies that support the new standards or

6    requirements for incarcerated persons to receive gender

7    confirmation surgery that are proposed by Osborne and Lawrence?

8    A.   No.

9    Q.   And have the standards proposed by Osborne and Lawrence for

10   incarcerated persons to receive gender confirmation surgery been

11   endorsed by any professional associations or organizations that

12   you're aware of?

13   A.   No.

14   Q.   And how do the standards that they have proposed relate to

15   the WPATH standard of care as far as how it considers treatment

16   of surgery for incarcerated persons?

17   A.   They get additional requirements.

18   Q.   And what is the relationship of that, if any, to the WPATH

19   standard of care?

20   A.   It's in opposition to the WPATH standards of care.

21   Q.   And, Dr. Ettner, earlier in your testimony, you were asked

22   about risks to Ms. Edmo, possible risks, if she undergoes gender

23   confirmation surgery.  You also testified about low -- about

24   regret rates.

25       Are you aware of what the regret rates are?  Are you aware

1      of whether there have been studies on regret rates for persons

2      who go through with gender confirmation surgery?

3      A.    Yes.

4      Q.    What does "regret rate" mean in a medical context?

5      A.    People who regret that they underwent surgery and wish that

6      they could reverse that decision.

7      Q.    And what is -- what are the regret rates?  Based on your

8      experience and knowledge of treatment of this condition, what

9      are the regret rates for gender confirmation surgery?

10     A.    Historically, they were approximately 1 percent.  As

11     surgical techniques have improved, the regret rate is now

12     somewhere between 0.23 and 0.4.  So I would say under 1 percent.

13     Q.    In your opinion, what is the likelihood that Ms. Edmo will

14     regret gender confirmation surgery if provided to her?

15                MR. EATON:  Objection.  Speculation.

16                MR. HALL:  Join.

17                THE COURT:  Counsel, I don't know how you can -- how

18     she can answer the question without just speculating.  I mean,

19     perhaps there is statistical studies showing that 99 percent of

20     the people do not regret the decision later.  But in terms of

21     tying it down specifically to Ms. Edmo, I think it just has to

22     involve speculation.

23           So I'll sustain the objection.

24     Q.    BY MS. RIFKIN:  In your opinion, Dr. Ettner, what effect

25     will gender confirmation surgery have on Ms. Edmo based on your

1    experience of treating, I believe you said, 3,000 patients with

2    gender dysphoria?

3    A.    It would eliminate the gender dysphoria.  It would provide

4    a level of wellbeing that she hasn't had previously.  It would

5    eliminate 80 percent of the testosterone in her body,

6    necessitating a lower dose of hormones going forward, which

7    would be particularly helpful given that she has elevated liver

8    enzymes.  And it would, I believe, eliminate much of the

9    depression and the attendant symptoms that she is experiencing.

10            MS. RIFKIN:  Thank you, Dr. Ettner.  No further

11   questions at this time.

12            THE COURT:  All right.  Cross.

13            MR. HALL:  Yes, Your Honor.

14            THE COURT:  Mr. Hall.

15            THE WITNESS:  Your Honor, could we take a short break?

16   I have to go to the restroom.

17            THE COURT:  Yes.  We'll take a short break.  Let's try

18   to keep this to five minutes because we have -- we'll probably

19   want to take another break before the end of the day.

20        We will be in recess for five minutes.

21        (Recess at 12:10 p.m. until 12:19 p.m.)

22            THE COURT:  Dr. Ettner, I'll again remind you you are

23   still under oath.

24        With that, Mr. Hall, you may cross-examine the witness.

25            MR. HALL:  Thank you, Your Honor.

1                        CROSS-EXAMINATION

2     BY MR. HALL:

3     Q.   Dr. Ettner, nice to see you again.

4          We had an opportunity to spend a few hours out in Chicago

5     recently, didn't we?

6     A.   Yes.

7     Q.   And I told you I wasn't wearing a tie then, but I would

8     wear a tie today.  And I did wear a tie, as I promised.

9     A.   Yes.  I recall your making that promise.

10    Q.   I keep my promises.

11         Doctor, I don't have a lot of time with you today.  So in

12    the interest of time, I'm going to ask some very pointed

13    questions.  It's really going to call for just a yes, no,

14    correct, incorrect.  And I would appreciate if you could answer

15    that way.

16         A lot of these you have already answered in your

17    deposition, but I have to get them on the record here today.

18         Is that fair?

19    A.   Yes.

20    Q.   Okay.  Thank you.

21         Now, Doctor, you are not a certified correctional health

22    professional, also known as CCHP, which is a designation from

23    the National Commission of Correctional Health; correct?

24    A.   That's correct.

25    Q.   And you have never been an employee of a prison; correct?

1    A.   Correct.

2    Q.   And you have no formal training on prison operations;

3    correct?

4    A.   That's correct.

5    Q.   Okay.  And you have no formal training on prison security

6    issues; correct?

7    A.   Correct.

8    Q.   And you have never been employed in a prison as a mental

9    health provider; correct?

10   A.   Correct.

11   Q.   And you have never treated a patient of yours who was, at

12   the time you provided treatment, incarcerated in a prison;

13   correct?

14   A.   Correct.

15   Q.   So with someone who is currently incarcerated, you have

16   never had a patient-psychologist relationship with them;

17   correct?

18   A.   Not as a provider.

19   Q.   As an expert?

20   A.   Correct.

21   Q.   And I believe from your deposition -- correct me if I'm

22   wrong -- you've had about 25 cases where you were retained as an

23   expert involving one of the parties who was a transgender

24   individual; is that correct?  Does that sound fair?

25   A.   I'm sorry.  Would you repeat that, please.

1   Q.   You have been retained on approximately 25 cases where you

2   were in a case involving a transgender individual; correct?

3   A.   Incarcerated or in general, are you asking?

4   Q.   In general.

5   A.   It may have been more than that.

6   Q.   And I believe you said at the time of your deposition that

7   about 20 lawsuits you were involved in were against a

8   correctional institution when it was involving a transgender

9   individual; correct?

10  A.   Yes.

11  Q.   And you have never been retained by lawyers representing a

12  correctional institution; correct?

13  A.   Correct.

14  Q.   Now, Doctor, you have never been published in a

15  peer-reviewed journal on a topic related to providing care to

16  transgender inmates in a correctional setting; correct?

17  A.   Correct.

18  Q.   Okay.  And you have never, then, of course, provided or

19  published any writings in a peer-reviewed journal on the topic

20  of providing treatment to transgender individuals who have

21  gender dysphoria in a prison; correct?

22  A.   Correct.

23  Q.   Now, Doctor, at the time of your deposition, I asked you if

24  you had read the article by Osborne and Lawrence which was just

25  discussed here briefly.

1          Do you recall that?

2     A.   Yes.

3     Q.   At the time of your deposition, you had not read it;

4     correct?

5     A.   Yes.

6               MR. HALL:  And for Your Honor, reference to this is

7     Joint Exhibit 19, which is stipulated admissible, admitted into

8     evidence.

9               THE COURT:  Yes.

10    Q.   BY MR. HALL:  You understand that was published in "The

11    Archives of Sexual Behavior" -- "The Archives of Sexual

12    Behavior"; correct?

13    A.   Yes.

14    Q.   And that's a peer-reviewed journal, is it not?

15    A.   It is.

16    Q.   And the WPATH actually cites and relies upon a number of

17    articles that are contained and been published by "The Archives

18    of Sexual Behavior"; correct?

19    A.   Yes.

20    Q.   You were involved in writing the WPATH; correct?

21    A.   Writing the WPATH?

22    Q.   The standards of care.

23    A.   Yes.

24    Q.   And just for reference, those were -- that was provided and

25    is admitted under Joint Exhibit 15.

1          Isn't it true that there is only two pages -- approximately

2     two pages of the WPATH that talk about how to apply the WPATH

3     standards of care in a correctional institution?

4     A.   Yes.

5     Q.   And that actually applies more generally to just

6     institutionalized persons from mental hospitals to corrections;

7     correct?

8     A.   It applies to all institutionalized persons.

9     Q.   Right.  Currently, you're aware of only one person in the

10    United States that has been provided sexual reassignment surgery

11    or gender confirming surgery while incarcerated; correct?

12    A.   Yes.

13    Q.   So there is not a lot of data, is there, in that regard;

14    correct?

15              MS. RIFKIN:  Objection.  Vague.

16              THE WITNESS:  Data regarding what?

17              THE COURT:  Just a second.  There is an objection?

18              MS. RIFKIN:  Objection.  Vague.

19              THE COURT:  Overruled.  The question is whether there

20    is a lot of data or not.  The witness can -- there either is or

21    is not.

22              THE WITNESS:  Data regarding?

23    Q.   BY MR. HALL:  Well, there is only one instance where an

24    inmate was provided sexual reassignment in a United States

25    prison; correct?

1    A.   Yes.

2    Q.   You're not aware of any other studies out there –– let me

3    rephrase it.

4       You're not aware of any studies that speak to the issue of

5    providing sexual reassignment to inmates in a correctional

6    facility; correct?

7    A.   I'm aware of studies discussing gender dysphoria in prison

8    environments.

9    Q.   Now, at the time of your deposition, you had not read the

10    Osborne and Lawrence article that's been admitted; correct?

11    A.   Correct.

12    Q.   And you did not rely upon that in drafting your declaration

13    which provided your opinions, which was provided in June of this

14    year; correct?

15    A.   Correct.

16    Q.   Now, let's talk about that declaration.  I think the date

17    was actually May 29, 2018.

18       Isn't it correct that prior to signing that declaration,

19    you had not talked with any of the defendants in this case?

20    A.   Correct.

21    Q.   And do you know or have any idea who the defendants are in

22    this case, the actual named individuals?

23    A.   You mean other than the Department of Correction and

24    Corizon?

25    Q.   Correct.

1    A.    No.  I didn't know any of the other individuals.

2    Q.    Okay.  And you have never interviewed any of Ms. Edmo's

3    medical or mental health providers who provided treatment to her

4    over the last six years at the prison; correct?

5    A.    I have not; correct.

6    Q.    And prior to signing your declaration, you never reviewed

7    any of IDOC's, Department of Corrections, standard operating

8    procedures regarding the treatment of gender dysphoria or gender

9    identity disorder; correct?

10   A.    Correct.

11   Q.    And you did not review any records from the prison

12   regarding Ms. Edmo other than her medical and mental health

13   records; correct?

14   A.    Just what was provided to me, yes.  Correct.

15   Q.    Well, the only thing that was provided to you prior to you

16   signing your declaration were medical and mental health records;

17   correct?

18   A.    Yes.

19   Q.    Okay.  And it's your understanding that those were not

20   complete at the time that you reviewed them and signed your

21   declaration; correct?

22   A.    Yes.

23   Q.    You did not review the disciplinary records?

24   A.    I did not --

25   Q.    Okay.

1    A.    -- at that time.

2    Q.    At that time, you didn't know Ms. Edmo had approximately 30

3    disciplinary offense reports; correct?

4    A.    I didn't know the number of disciplinary reports; correct.

5    Q.    At the time of signing your declaration, you did not know

6    that the IDOC had a management treatment committee; correct?

7    A.    I didn't know that's what it was called; correct.

8    Q.    Okay.  But you didn't see any records from the management

9    treatment committee regarding the discussions that they had

10   regarding Ms. Edmo and her treatment for gender dysphoria;

11   correct?

12   A.    Only what Ms. Edmo had related to me during our

13   discussions.

14   Q.    But you didn't see those records; correct?

15   A.    Correct.

16   Q.    And you did not review Ms. Edmo's offender history

17   statement, which was approximately 74 pages, that was

18   subsequently produced in discovery as Exhibit B; correct?

19   A.    Correct.

20   Q.    Now, you also, at the time of providing your declaration in

21   this case in May, May 29, you did not review any medical records

22   or mental health records regarding treatment provided to

23   Ms. Edmo preincarceration; correct?

24   A.    Correct.

25   Q.    So that would include the mental health records from the

114

1      Sho-Ban tribe; correct?

2      A.    Correct.

3      Q.    And mental and medical health records from Portneuf Medical

4      Center Behavioral Health Unit; correct?

5      A.    Correct.

6      Q.    And you had an interview with Ms. Edmo, at which time she

7      provided to you statements as to her preincarceration history;

8      correct?

9      A.    We talked briefly about some elements of her childhood and

10     early life; correct.

11     Q.    And she told you about her prior mental health treatment in

12     general; correct?

13     A.    Yes.

14     Q.    And she told you that she lived full time as a woman during

15     the years prior to her incarceration in 2012; correct?

16     A.    She had presented as female, yes.

17     Q.    Well, no.  She had told you that she had lived, quote,

18     "full time as a woman" in the years prior to her 2012

19     incarceration; isn't that correct?

20     A.    I'm not sure if it was all the years prior to her

21     incarceration.

22     Q.    But she used the word "full time," and you actually

23     included that in your report; correct?

24     A.    I did; yes.

25     Q.    Okay.  And your understanding was that she claimed she

1    lived full time as a woman for at least three to four years

2    prior to her incarceration in 2012; isn't that correct?

3    A.   For some time prior to her incarceration.

4    Q.   And she told you that she lived full time as a woman by

5    wearing female clothing; correct?

6    A.   I don't remember precisely if she said "female clothing."

7    I know nail polish and whatever I have written in my

8    declaration.

9    Q.   Right.  And she also told you that she styled her long hair

10   in a feminine fashion; correct?

11   A.   I don't recall her saying "long hair."

12   Q.   Now, prior to writing your declaration in May of 2018, did

13   you at any time seek out documents or information that would

14   corroborate Ms. Edmo's history that she gave you regarding her

15   time preincarceration?

16   A.   No.  Neither do I do that with my clients in the community.

17   Q.   You understood that Ms. Edmo had attempted suicide on

18   multiple prior occasions; correct?

19   A.   Yes.

20   Q.   And you didn't think that it was necessary or warranted to

21   go and seek out those medical records regarding those prior

22   suicide attempts?

23   A.   That's correct.

24   Q.   You're not saying that if a patient comes into your office

25   and wants treatment and they have multiple prior suicide

116

1    attempts, that you wouldn't consider those prior suicide

2    attempts in your evaluation?

3    A.   I would discuss it with them, as I did with Ms. Edmo.

4    Q.   You understand now, though, that Ms. Edmo's statement to

5    you that she lived full time as a woman is inconsistent with

6    other statements she has made; correct?

7    A.   I don't know.

8    Q.   Well, you understood at the time of your deposition that

9    Ms. Edmo had told a medical provider in 2012 -- namely,

10   Dr. Eliason -- that she only dressed as a woman on rare

11   occasions.  Are you aware of that?

12            MS. RIFKIN:  Objection, Your Honor.  Lacks foundation.

13            THE COURT:  The question is:  Were you aware?  Yes or

14   no.

15            THE WITNESS:  Would you repeat the question?  Was I

16   aware of?

17            MR. HALL:  Could I have the court reporter read the

18   question back, please.

19        (Question read by reporter.)

20            THE WITNESS:  I'm aware that that different providers

21   have had different -- different accounts of Ms. Edmo's dressing

22   prior to her incarceration than what I was told.

23   Q.   BY MR. HALL:  Than what you were told by Ms. Edmo; correct?

24   A.   Correct.

25   Q.   So you're aware of inconsistent statements that Ms. Edmo

**ETTNER – Cross**

117

1    had made to you and other providers about her history of living

2    full time as a woman?

3    A.    I'm aware that there are variations in the accounts.

4    Q.    And you're aware that those statements creating variations

5    or inconsistencies come from Ms. Edmo; correct?

6    A.    That's quite likely.

7    Q.    And have you reviewed or did you review the presentence

8    investigation report that was produced in discovery in this

9    case?

10   A.    If it was provided to me, I reviewed it.

11   Q.    Okay.  But did you review that presentence investigation

12   prior to you signing your declaration?

13   A.    No.

14   Q.    And you're aware that in that presentence investigation,

15   one document is a psychosexual examination; correct?

16   A.    Yes.

17   Q.    Okay.  And are you aware that in that psychosexual

18   examination, Ms. Edmo told the evaluator that she had never

19   cross-dressed?

20   A.    Yes.

21   Q.    Do you understand cross-dressing as dressing as the

22   opposite sex?

23   A.    That's my understanding of cross-dressing, yes.

24   Q.    Prior to you signing your declaration in May, did you reach

25   out to any of Ms. Edmo's family members to discuss her

1    preincarceration history?

2    A.    No.

3    Q.    So you didn't talk to her mother?

4    A.    No, I did not.

5    Q.    You didn't talk to her sisters?

6    A.    No.

7    Q.    I would like to refer you to the WPATH standards of care,

8    Joint Exhibit 15.  I'm going to spend some time on this with

9    you, Dr. Ettner.

10              MR. HALL:  Do I need to flip a switch to have this

11   iPad show up here?

12              THE COURT:  I don't -- what do you want?  You want the

13   input changed?

14              MR. HALL:  Yeah.  There it is right there.  It looks

15   like it's -- there we go.

16   Q.    BY MR. HALL:  Now, Dr. Ettner, what we're looking at here

17   is the portion of the WPATH standards of care under the heading

18   "The standards of care are flexible clinical guidelines";

19   correct?

20   A.    Yes.

21   Q.    Do you agree with that statement that's contained in the

22   WPATH, that the standards of care are, quote, "flexible clinical

23   guidelines"?

24   A.    I do.

25   Q.    And you interpret guidelines as recommendations; correct?

1      A.   As criteria, yes, clinical guidelines.

2      Q.   But guidelines are recommendations; standards are

3      mandatory; correct?

4      A.   Yes.

5      Q.   You agree with that.  And I believe that was your testimony

6      in your deposition; correct?

7      A.   Yes.

8      Q.   I'm having some technical difficulties here.

9           Down in the middle paragraph there on this page, it states

10     that:

11               "As for all previous versions of the standards of

12               care, SOC, the criteria put forth in this document for

13               hormone therapy and surgical treatments for gender

14               dysphoria are clinical guidelines."

15          Did I read that correctly?

16     A.   Yes.

17     Q.   And you agree with that; correct?

18     A.   I do.

19     Q.   Okay.  And then it continues:

20               "Individual health professionals and programs may

21               modify that."

22          Did I read that correctly?

23     A.   Yes.

24     Q.   And you agree with that; correct?

25     A.   I do.

1    Q.   I would like to turn your attention to page No. 22 of the

2    standards of care.

3         Do you see that there in front of you?

4    A.   I don't know what page I'm looking at, but it starts with

5    the sentence, "The competency of mental health professionals."

6    Q.   Right.  And I'll represent that it's page No. 22 of Joint

7    Exhibit 15-28.

8         And this is the section of WPATH which talks about the

9    minimum criteria that individuals who are mental health

10   providers should have if they are going to treat

11   gender-dysphoric offenders; correct?

12   A.   Yes.

13   Q.   To your knowledge, at the time that you wrote the

14   declaration in May of 2018, you didn't have any idea as to

15   whether or not any of the medical or mental health providers at

16   the prison met these standards; correct -- as for competency of

17   working with gender dysphoric?

18   A.   I deduced that from the medical records I reviewed.

19   Q.   But you didn't know the actual qualifications,

20   certifications, or trainings of any of the individuals who

21   provided treatment to Ms. Edmo at the prison; correct?

22   A.   I hadn't seen their individual qualifications.  I made a

23   judgment based on the notes that they wrote regarding Ms. Edmo

24   and her medical condition.

25   Q.   But you did not know the qualifications, certifications, or

1     training that those individuals had received; correct?

2     A.    No, I did not.

3     Q.    Okay.  And as you sit here today, can you name any of those

4     individuals?

5     A.    The individuals that treated her?

6     Q.    Correct.

7     A.    Yes.

8     Q.    And you did not include any of their names in the -- your

9     declaration, did you, other than a Dr. Eliason; correct?

10    A.    Correct.

11    Q.    I would like to turn your attention to page No. 24 of the

12    standards of care, which is Joint Exhibit 15-30.

13          Do you see that there in front of you?

14    A.    Yes.

15    Q.    In that section under subpart 3, "Assess, diagnose, and

16    discuss treatment options for coexisting mental health

17    concerns," this is a portion that is found in the WPATH;

18    correct?

19    A.    Yes.

20    Q.    And this is the WPATH's language; correct?

21    A.    Pardon me?

22    Q.    This is the WPATH -- their language; correct?

23    A.    Yes.

24    Q.    And you were -- you assisted in writing this version;

25    correct?

1        A.    Yes.

2        Q.    In this paragraph, Doctor, it states that:

3                    "Clients presenting with gender dysphoria may struggle

4                    with a range of mental health concerns, whether

5                    related or unrelated to what is often a long history

6                    of gender dysphoria and/or chronic minority stress."

7        Did I read that correctly?

8        A.    You did, yes.

9        Q.    And isn't it true that it then states that these possible

10       concerns that mental health providers should be looking for

11       include, quote, "anxiety, depression, self-harm, a history of

12       abuse and neglect, compulsivity, substance abuse, sexual

13       concerns, personality disorders," and then it names a few

14       others; correct?

15       A.    Yes.

16       Q.    And it's important that under the WPATH, mental health

17       providers treating someone with gender dysphoria, look and

18       address those coexisting mental health concerns; isn't that

19       true?

20       A.    That's true.

21       Q.    It continues on to the next page that these concerns that

22       were just listed previously can, quote:

23                    "Be significant sources of distress and, if left

24                    untreated, can complicate the process of gender

25                    identity exploration and resolution of gender

123

1     dysphoria."

2          Did I read that correctly?

3     A.   Yes.

4     Q.   And you agree with that, don't you?

5     A.   I do.

6     Q.   And then it continues:

7               "Addressing these concerns can greatly facilitate the

8               resolution of gender dysphoria, possible changes in

9               gender role, the making of informed decisions about

10              medical interventions, and improvements in quality of

11              life."

12         Correct?

13    A.   Yes.

14    Q.   Now, further down on the paragraph beginning with "Some

15    clients," it states that "The presence of coexisting mental

16    health concerns does not necessarily preclude possible changes

17    in gender role or access to feminizing/masculinizing hormones or

18    surgery"; correct?

19    A.   Correct.

20    Q.   Rather, it continues:

21              "These concerns need to be optimally managed prior to

22              or concurrent with treatment of gender dysphoria."

23         Did I read that correctly?

24    A.   Yes.

25    Q.   You agree with that statement, don't you?

1    A.    I do.

2    Q.    And how do you define "optimally"?

3    A.    In this context?

4    Q.    I believe I asked you that question in your deposition, and

5    how do you -- do you recall how you answered that question?

6    A.    Not precisely, no.

7    Q.    Would you agree that optimal is the -- how it's used here

8    and how you interpreted it is the maximum therapeutical point to

9    it that it has to be maximally controlled?

10   A.    With the best evidence-based treatment for that particular

11   mental health issue.

12   Q.    Right.  And you agree that under the WPATH, whether or not

13   a patient with gender dysphoria has coexisting mental health

14   concerns that need to be optimally managed prior to a certain

15   type of treatment, that that should be left to the sound

16   clinical judgment of the providers?

17   A.    Of a qualified mental health provider of which they

18   specified the criteria.

19   Q.    Thank you.

20         So if someone meets the qualifications that are found

21   within the WPATH that we discussed, you would agree that they

22   are competent to render sound clinical judgment?

23   A.    Yes.  One of those qualifications being the ability to

24   distinguish coexisting conditions that arise from gender

25   dysphoria or are distinct from the gender dysphoria.

1    Q.   Now, prior to your writing your declaration, were you aware

2    that Ms. Edmo had a long history of anxiety disorder?

3    A.   Depression predominantly with anxiety features.

4    Q.   It was not your understanding that she also had anxiety and

5    had complained of severe anxiety in the past?

6    A.   Yes.  But anxiety and depression usually are hand in hand.

7    Q.   Now, you performed testing of Ms. Edmo in 2018 in March;

8    correct?

9    A.   Yes.

10   Q.   The psychodiagnostic testing?

11   A.   Correct.

12   Q.   All right.  And the results of that testing was that

13   Ms. Edmo, at the time of the testing, was that she experiences

14   severe anxiety symptoms; correct?

15   A.   Yes.

16   Q.   And as for impression, that she also exhibited severe

17   depressive symptoms; correct?

18   A.   Yes.

19   Q.   And feelings of worthlessness; correct?

20   A.   Yes.

21   Q.   These tests that you perform, isn't it true that they do

22   not identify the cause or the source of that depression or

23   anxiety?

24   A.   Specifically, they cannot tell the cause of the anxiety or

25   depression.

1    Q.   Thank you.

2    A.   But one of the tests can determine if they are the result

3    of trauma.

4    Q.   Right.  And I believe you talked about that earlier.

5         But the point is that those tests do not identify the

6    source or the cause of someone's depression or anxiety; correct?

7    A.   Correct.

8    Q.   And one of the tests that you performed was the Beck

9    Hopelessness Scale; correct?

10   A.   Yes.

11   Q.   At the time of the testing, Ms. Edmo scored moderately

12   high, did she not?

13   A.   Yes.

14   Q.   And you're not aware of any records that you have seen from

15   her preincarceration days that would suggest to you that her

16   prior suicide attempts, history of depression and anxiety were

17   related to gender dysphoria; correct?

18   A.   I can't opine what was the basis of her previous suicidal

19   attempts other than what she has reported and what was written

20   in those documents.

21   Q.   The question was:  Have you seen any records that would

22   support that?

23        And that's no; correct?

24   A.   Support what?

25   Q.   Well, support or suggest that her prior anxiety, prior

1    depression, prior suicide attempts were caused at least in part

2    by gender dysphoria.

3    A.    My understanding is that she wasn't aware of gender

4    dysphoria as a diagnosis prior to entering the prison.

5    Q.    But to answer my question, you have seen no records;

6    correct?

7    A.    Correct.

8    Q.    Okay.  And you have seen records, though, where Ms. Edmo is

9    stating after suicide attempts prior to her incarceration, that

10   she was -- that she was suicidal and depressed due to loss of

11   employment and difficulty finding employment; correct?

12   A.    That was something she attributed her depression to.

13   Q.    And another one was that she attributed her depression to

14   unstable relationships with significant others; correct?

15   A.    Yes.

16   Q.    Right.  Who were abusive to her and for whom she claimed to

17   have an obsession over; correct?

18   A.    I don't remember obsession.  I do remember relationships

19   and abuse.

20   Q.    Right.  And substance abuse was also identified as one of

21   the causes of her suicide attempts, depression, and anxiety;

22   correct?

23   A.    Yes.

24   Q.    You understood that in the years prior to her

25   incarceration, she attempted to commit suicide several times by

1    overdose; correct?

2    A.   At least once that I was aware of.

3    Q.   And at one point, she made a very deep laceration to her

4    right forearm and required reconstructive surgery; correct?

5    A.   I think it was suturing.  I'm not -- I don't remember if it

6    was reconstructive surgery.

7    Q.   And at the time of your 2018 testing, Ms. Edmo scored a

8    100, which is the highest possible score on a scale that you

9    stated measures suicide ideation and suicide behavior; is that

10   correct?

11   A.   Suicide ideation, yes.

12   Q.   But not suicide behavior?

13   A.   Suicide behavior is less than suicide ideation, which is

14   the highest score.  Yes, she scored the highest possible score

15   on that.

16   Q.   So you understood at the time of your clinical interview

17   with Ms. Edmo that she had a long history of depression,

18   anxiety, and suicide attempts; correct?

19   A.   Yes.

20   Q.   And that at the time -- and that predated the incarceration

21   in 2012; correct?

22   A.   Yes.

23   Q.   Okay.  And it -- at the time of your testing, she still had

24   severe depression, anxiety, and suicide ideations; correct?

25   A.   Yes.

**ETTNER - Cross**

129

1    Q.   You also understand that Ms. Edmo had a history of sexual

2    abuse and neglect; correct?

3    A.   Yes.

4    Q.   Both by family members and then physical abuse by

5    significant others; correct?

6    A.   By a boyfriend, yes.

7    Q.   Okay.  And that you understood that that was a significant

8    factor in her preincarceration attempts to self-harm, kill

9    herself?

10   A.   That's what she related was the triggering event.

11   Q.   You also understand that prior to Ms. Edmo's incarceration,

12   she had a significant history of substance abuse; correct?

13   A.   Yes.

14   Q.   Including methamphetamines, heroin, and primarily alcohol;

15   correct?

16   A.   Yes.

17   Q.   And you understood that in the three to four years prior to

18   her incarceration in 2012, that she was on a daily basis

19   drinking to intoxication?

20   A.   Yes.

21   Q.   And that during those years where she was reportedly living

22   full time as a woman, she was under the influence that entire

23   time?

24   A.   I -- that I don't recall.  I don't -- can't say that she

25   was under the influence the entire time and that that coincided

1    with the period that she said she was living full time.

2    Q.   Now, you understand that prior to Ms. Edmo's incarceration,

3    she had a history of high-risk sexual behaviors?

4    A.   By "high-risk sexual behaviors," how are you defining that?

5    Q.   Well, did you review the psychosexual evaluation?

6    A.   Yes.

7    Q.   -- in the PSI?

8    A.   Yes.

9    Q.   Okay.  And that included statements about multiple prior

10   partners; correct?

11   A.   Multiple prior partners, I recall.

12   Q.   Right.  And unsafe sex?

13   A.   Okay.  Yes.

14   Q.   Right?

15   A.   I remember that.

16   Q.   You do remember that?

17   A.   Yes.

18   Q.   You agree that some of those can be high-risk sexual

19   behaviors?

20   A.   Possibly, yes.

21   Q.   And that since Ms. Edmo has been incarcerated, you

22   understand that she has had multiple prior -- multiple sexual

23   encounters with offenders, other inmates; correct?

24   A.   Encounters with other inmates, yes.

25   Q.   Which included sexual activity; correct?

1      A.    Yes.

2      Q.    And that she has been disciplined for that; correct?

3      A.    Yes.

4      Q.    Did you see records indicating that Ms. Edmo has admitted

5      that she -- she relies or she is dependent on male attention in

6      the prison?

7      A.    I don't recall that specifically in those words, no.

8      Q.    Now, you're also aware that from very early on in her

9      incarceration in 2012, Ms. Edmo exhibited traits of personality

10     disorder?

11     A.    No, I'm not aware of that.

12     Q.    You haven't seen the records upon her admission and intake

13     in 2012 where clinicians were indicating that she displays

14     personality trait disorders?

15     A.    I'm aware that some people suggested that she may have

16     personality disorder traits, but I don't recall her being

17     diagnosed with a specific personality disorder that meets the

18     DSM-5 criteria.

19     Q.    Right.  I didn't ask about a diagnosis, but just the

20     presence of personality disorder traits.

21           You were aware of that; correct?

22     A.    I recall someone suggesting that she had personality

23     disorder traits.

24     Q.    And you would agree that that is correct, that Ms. Edmo has

25     exhibited multiple traits or criteria of personality disorders;

1      correct?

2      A.   My evaluation of Ms. Edmo, I did not see evidence of a

3      personality disorder.

4      Q.   Okay.  But you did see that she had a pattern of unstable

5      and intense personal relationships?

6      A.   That does not necessarily equate with a personality

7      disorder.

8      Q.   I understand that.

9           But that is one of the criteria; correct?

10     A.   It is a criteria of some of the personality disorders.

11     Q.   And another criteria is impulsivity, is it not?

12     A.   It can be, yes.

13     Q.   Right.  And that can include impulsive sexual actions as

14     well as substance abuse; correct?

15     A.   It's possible, depending on what personality disorders

16     you're talking about.

17     Q.   But it is one of the criteria; correct?

18     A.   For some of the personality disorders.

19     Q.   And recurrent suicidal behavior, gestures, threats, or

20     self-mutilating behavior is another criteria of

21     personality -- borderline personality disorder; correct?

22     A.   You're asking about borderline personality disorder?

23     Q.   Yes, borderline.

24     A.   Yes.

25     Q.   Okay.  As is an unstable mood; correct?

133

1    A.    Yes.

2    Q.    And chronic feelings of emptiness; correct?

3    A.    Yes, can be.

4    Q.    And another trait or criteria is frequent displays of

5    temper and aggression; correct?

6    A.    Are you talking about borderline --

7    Q.    Borderline.

8    A.    -- disorder?

9    Q.    Yes.

10   A.    It can be a criteria.

11   Q.    Okay.  And you understand that while she was incarcerated

12   or has been incarcerated, Ms. Edmo has been a perpetrator of a

13   number of sex -- a number of physical assaults?

14   A.    I saw indications that there had been altercations that

15   Ms. Edmo had been involved in.

16   Q.    And you have seen records that indicate that she has

17   received disciplinary offense reports, punishment for fighting?

18   A.    Correct.

19   Q.    You understand that she attacked on more than one occasion

20   another transgender offender at the prison?

21   A.    Yes.  I saw that.

22   Q.    And you understand that preincarceration, she had a history

23   of fighting and abuse with her significant others?

24   A.    Yes.  There was abuse issues in a relationship.

25   Q.    You understand that she has also received a number of DORs

1      while incarcerated at the prison for disobedience to direct

2      orders?

3      A.   Yes.

4      Q.   And she has displayed aggression during her incarceration?

5      You would agree with that?

6      A.   I agree that she received a disciplinary report for

7      aggression.

8      Q.   Excuse me.  You understand that during her incarceration,

9      her mental health providers have recommended multiple times that

10     Ms. Edmo undergo a variety of treatments, including therapies;

11     correct?

12     A.   They've recommended that she join certain groups.

13     Q.   One was mood management; correct?

14     A.   Yes.

15     Q.   And Ms. Edmo refused repeatedly; correct?

16     A.   Correct.

17     Q.   And she still has not completed that; correct?

18     A.   Correct.

19     Q.   Another one is social skills.

20          That was referred to Ms. Edmo, and she refused again;

21     correct?

22     A.   I believe so.

23     Q.   And she has not completed it to date; correct?

24     A.   That, I'm not aware of, but I would presume no.

25     Q.   Another one is healthy relationships.

1          You're aware that she was referred to that therapy by her

2     mental health providers at the prison; correct?

3     A.    Yes.

4     Q.    And she has -- she refused; correct?

5     A.    That's my understanding.

6     Q.    She has not completed that group at this time; correct?

7     A.    That I don't know.

8     Q.    Now, you understand that Ms. Edmo was referred and required

9     to go to sex offender treatment programming.

10          Are you aware of that?

11    A.    Yes.

12    Q.    And are you aware that Ms. Edmo has, to this day, not

13    completed that?

14    A.    I believe I saw that, yes.

15    Q.    And you understand that one of the reasons why she was not

16    eligible for parole years ago is because she did not complete

17    the sex offender treatment program; correct?

18    A.    Yes.

19    Q.    And finally, gender dysphoria group, you understand that

20    the department and the mental health providers have recommended

21    and provided an opportunity for Ms. Edmo to go to a gender

22    dysphoria group; correct?

23    A.    Yes.

24    Q.    And that Ms. Edmo has been inconsistent with her commitment

25    to attend --

ETTNER - Cross

1    A.   Correct.

2    Q.   -- correct?

3         Sometimes she will go, sometimes she won't; correct?

4    A.   Yes.

5    Q.   There has been long periods of time where she hasn't gone

6    to that group; correct?

7    A.   I don't know about long periods of time.  I know her

8    participation has been intermittent.

9    Q.   Right.  And there has been periods where she hasn't gone

10   for up to six months; correct?

11   A.   I'm not aware of how many months she has not attended.

12   Q.   And you're also aware from the records that Ms. Edmo has

13   been provided primary clinicians who she can have clinical

14   contacts with on a regular basis; correct?

15   A.   Yes.

16   Q.   And it's your understanding that Ms. Edmo has frequent

17   no-shows or does not appear for those; correct?

18   A.   Yes.

19   Q.   Do you agree that -- well, do you know -- never mind.

20        We talked during your deposition about an explosion in the

21   social and medical understanding of gender dysphoria that was

22   very recent.

23        Do you remember that discussion?

24   A.   Yes.

25   Q.   And it really started after Caitlyn Jenner announced that

1    she was transitioning; correct?

2    A.    A tremendous amount of media attention.

3    Q.    Since that time, it's -- you have been required to update

4    some of your textbooks as well; correct?

5    A.    Since that time?

6    Q.    Yes.

7    A.    No.  Prior to that time.

8    Q.    And over the last 10 years, there has been this rapid

9    awareness in the public of gender dysphoria; correct?

10   A.    Public awareness has increased, yes.

11   Q.    Right.  At the time of your deposition, you stated that as

12   a result of that, research and science has mushroomed at the

13   same time that this public awareness of the condition has also

14   mushroomed.

15        Do you remember saying that?

16   A.    Yes.

17   Q.    And the terminology has changed, has it not?

18   A.    Some terms have changed.

19   Q.    Just today, I have heard multiple witnesses -- I believe

20   yourself -- use the word "sexual reassignment surgery"; correct?

21   A.    That's the old term.

22   Q.    Right.  And now it's "gender confirming surgery"; right?

23   A.    That's correct.

24   Q.    Now, you agree that in 2012, Ms. Edmo was provided an

25   evaluation for the purpose of determining if she had gender

1       dysphoria; correct?

2       A.   I agree that someone was asked to evaluate her.   I don't

3       agree that it was an evaluation in alignment with what WPATH

4       considers to be an evaluation.

5       Q.   Okay.   That's not what I asked.

6            You are aware that there was an evaluation done to

7       determine if Ms. Edmo had gender dysphoria; correct?

8       A.   An evaluation was requested and performed.

9       Q.   Okay.   And at the time you wrote your declaration, you did

10      not -- you did not have an opportunity to review that

11      evaluation; correct?

12      A.   I don't believe I did.

13      Q.   Okay.   Only after your declaration did you then receive and

14      read and consider the evaluation that was done in 2012; correct?

15      A.   Are you referring to the evaluation by Dr. Eliason?

16      Q.   No.   This is the 2012 evaluation for gender dysphoria --

17      A.   Okay.   Yes.

18      Q.   -- not surgery.

19      A.   Yes.

20      Q.   Okay.   You understand one was done?

21      A.   Yes.

22      Q.   And I think in your declaration, you determined that she

23      was appropriately diagnosed with gender dysphoria at that time.

24      A.   Correct.

25      Q.   You understand that within a month of asking for an

1    evaluation, she received one and then was diagnosed with gender

2    dysphoria; correct?

3    A.   Yes.

4    Q.   And then a short period of time after that, she was placed

5    on hormone therapy; correct?

6    A.   Correct.

7    Q.   And then she was provided access to clinical contacts with

8    mental health providers; correct?

9    A.   Yes.

10   Q.   Which she did not always attend; correct?

11   A.   Yes.

12   Q.   And she was permitted to attend groups, and it was

13   recommended that she attend various groups that could work on a

14   number of her coexisting mental health concerns; correct?

15   A.   Groups for various purposes, she was suggested to.  I

16   don't -- something like healthy relationships is not technically

17   a mental health concern.  She was recommended to attend several

18   different groups, yes.

19   Q.   But you agree that a healthy relationship class or mood

20   management class could be helpful to someone who has

21   personality -- borderline personality disorder traits; correct?

22   A.   I don't know that -- I don't agree that Ms. Edmo has

23   borderline personality disorder, nor is that group considered

24   the evidence-based care for personality disorder.

25   Q.   Okay.  Maybe I should have asked this:  You're not aware of

1    what they teach in those classes or groups; correct?

2    A.   Correct.

3    Q.   So you would be speculating as to whether or not it would

4    help either way; correct?

5    A.   Correct.

6    Q.   And you understand, though, that in addition to being

7    provided with an evaluation and diagnosis of GD, being placed on

8    hormone therapy, being given access to psychotherapy and groups

9    and clinical contacts with mental health providers, Ms. Edmo has

10   also been permitted to feminize in a manner that is appropriate

11   within the prison?

12           MS. RIFKIN:  Objection, Your Honor.  There has been no

13   foundation Ms. Edmo was provided psychotherapy.

14   Q.   BY MR. HALL:  Are you aware?

15           THE COURT:  Well, the question is:  Are you aware?

16   We're going to take a break here, Counsel.

17   What's your understanding in that regard?

18           THE WITNESS:  That she was able to contact certain

19   clinicians and that she was referred to groups and that she

20   could request individual psychotherapy.

21           MR. HALL:  Your Honor, would you like to take a break

22   now?

23           THE COURT:  Is this a good breaking point?

24           MR. HALL:  I think it would.

25           THE COURT:  We'll try to hold this to about 10 minutes

1      since we took a short break earlier.  We'll be in recess for

2      about 10 minutes.

3              (Recess at 1:08 p.m. until 1:25 p.m.)

4              THE COURT:  Dr. Ettner, I'll remind you you are still

5      under oath.

6          Mr. Hall, you may resume your cross-examination of the

7      witness.

8              MR. HALL:  Thank you, Your Honor.

9      Q.   BY MR. HALL:  Prior to going off the record, we were

10     talking about Ms. Edmo's feminizing in prison.

11         And after receiving the hormone therapy in 2012, Ms. Edmo

12     started to grow breasts; correct?

13     A.   I presume so.  I don't have any independent knowledge of

14     that, but she would at some point have begun to grow breasts.

15     Q.   And you're aware that it was determined for her to have a

16     bra was medically necessary; correct?

17     A.   Yes.

18     Q.   And it's your understanding that she was provided, then,

19     with a bra; correct?

20     A.   Yes.

21     Q.   And she has always had access since that time, with a bra;

22     correct?

23     A.   Yes.

24     Q.   Okay.  And you understand that she was permitted to grow

25     her hair out long; correct?

142

1    A.   As long as she wore it in a certain fashion, yes.

2    Q.   You saw that she was warned for having her hair in a high

3    ponytail which the records referenced; correct?

4    A.   Yes.

5    Q.   Okay.  And your understanding from those records is that

6    the security staff felt that this created a sexually charged

7    environment; correct?

8    A.   That's what I read, yes.

9    Q.   Okay.  And -- but, nonetheless, you haven't seen anything

10   where she has been forced to cut her hair short; correct?

11   A.   I have not.

12   Q.   Okay.  She has been also allowed to shape her eyebrows;

13   correct?

14   A.   Yes.

15   Q.   In fact, ever since you met her, she's shaved and styled

16   her eyebrows; correct?

17   A.   I have only met her on one occasion prior to today.

18   Q.   And she has been able to feminize in other ways, like

19   having female handwriting; correct?

20   A.   Excuse me?

21   Q.   She has been able to feminize in other ways, like

22   exhibiting female handwriting?

23   A.   I have never heard of female handwriting being a

24   gender-affirming exhibition.

25   Q.   But you're not aware of any -- any records that suggest

1    that IDOC's security staff were not permitting her to handwrite

2    in a more feminine fashion than a, say, masculine fashion;

3    correct?

4    A.    Personally, I don't know what the difference is between a

5    feminine handwriting and a masculine handwriting.

6    Q.    Okay.  You understand that she has been permitted and

7    assisted by the Department to change her gender marker with the

8    Idaho Department of Transportation?

9    A.    Yes.

10   Q.    You understand that Ms. Edmo has been permitted to feminize

11   in a manner of her speech, that she speaks effeminately;

12   correct?

13   A.    When I met with Ms. Edmo, her voice was in a female range.

14   I don't know what the Department of Corrections had to do with

15   that.

16   Q.    Well, you're not aware of the Department of Corrections

17   prohibiting her from doing that; correct?

18   A.    I didn't know that that wasn't her natural speaking voice.

19   I would have no way of knowing that.

20   Q.    Do you agree that the treatment options under the WPATH are

21   really fourfold, the first one being hormone therapy; correct?

22   A.    I don't know that they are in order with hormone therapy

23   being first, necessarily.

24   Q.    Right.  Not -- there is no order to what I'm trying to say

25   there.  There is just -- there is four real treatment options

1    for treating gender dysphoria; correct?

2    A.   There are three real options, and some people may opt for

3    psychotherapy as well.

4    Q.   Okay.  But those four are options are -- one, in no

5    particular order, is hormone therapy; correct?

6    A.   That's one of the options for treatment.

7    Q.   Right.  Another option is psychotherapy, which could

8    include group or individual counseling; correct?

9    A.   Yes.

10   Q.   Another option is allowing the individual to appear and

11   present in a manner that's congruent with their preferred

12   gender; correct?

13   A.   I wouldn't described it as "allowing" because the standards

14   of care emphasize shared decision-making.

15   Q.   But that is one of the treatment options?

16   A.   It's one of the options.

17   Q.   Okay.  And then the other option is surgery; correct?

18   A.   Correct.

19   Q.   Okay.  And the criteria for surgery you discussed earlier,

20   and I want to take a look at that.

21       Have I identified the correct section of the WPATH that

22   deals with surgery for adults, either female to male, or male to

23   female?

24   A.   I am looking at the criteria for genital reconstructive

25   surgery.

145

1    Q.   Okay.  Are those the criteria that you believe apply in

2    this instance?

3    A.   Yes.

4    Q.   Okay.  And the second one is "capacity to make a fully

5    informed decision and to consent for treatment"; correct?

6    A.   Yes.

7    Q.   Okay.  And then you agree there is a different one, No. 4,

8    which talks about "if significant medical or mental health

9    concerns are present, they must be well controlled"; correct?

10   A.   Yes.

11   Q.   And that's No. 4; correct?

12   A.   Yes.

13   Q.   And in No. 4, it says nothing about informed consent;

14   correct?

15   A.   In that sentence?

16   Q.   Yes.

17   A.   It does not.

18   Q.   Okay.  Informed consent is addressed in No. 2; correct?

19   A.   Yes.

20   Q.   Okay.  And nowhere in the criteria depicted on this page,

21   which is 68 of the WPATH standards of care marked Joint Exhibit

22   15-66, are the words "benefit outweighs the risk" found;

23   correct?

24   A.   The page I'm looking at is marked No. 60 -- page 60.

25   Q.   Right.  Joint Exhibit 15-66.  Do you see that?

1    A.    Yes.

2    Q.    And nowhere on that -- in those criteria captured on that

3    page can be found the words "benefit outweighs the risk";

4    correct?

5    A.    Correct.

6    Q.    Now, I believe earlier today and at the time of your

7    deposition, you testified that you're not aware of any members

8    of WPATH providing concerns to leadership at the WPATH that the

9    standards are not grounded in sufficient scientific evidence.

10        Do you remember that?

11   A.    Could you repeat that question.

12            MR. HALL:  Could I have the question read back,

13   please.

14        (Question read by reporter.)

15            THE WITNESS:  The standards which were created in 2011

16   were based on the best available scientific evidence at that

17   time.

18   Q.    BY MR. HALL:  Right.  And that doesn't answer my question.

19        Would you answer my question, please.

20   A.    I don't know that I can answer the question in a yes-or-no

21   fashion.

22   Q.    Do you recall your testimony when you stated that that has

23   not been an issue with the WPATH where members have not come

24   forward expressing concerns about the criteria in the WPATH's

25   standards of care being based on scientific evidence?

1    A.   That's correct.  Members are now suggesting changes for our

2    future iterations.

3    Q.   Right.  And you're familiar with a Gail Knudson; correct?

4    A.   Yes.

5    Q.   And she is the president of the WPATH; correct?

6    A.   Yes.

7    Q.   And you're aware of a letter or email that she wrote to

8    membership on May 23, 2017, where she discussed, did she not,

9    that membership had concerns with the lack of scientific

10    evidence to ground the standards of care; correct?

11    A.   Yes, which is why our SOC 8 are now being evidence-reviewed

12    by an outside authority as a result of not only Gail's concerns

13    but, as I mentioned in my deposition, new information about

14    children and adolescents that will be included in our next

15    iteration.

16    Q.   And isn't it true that in May of 2017, Dr. Knudson,

17    president, wrote in her letter to membership that one of the

18    primary concerns of membership was related to, quote, "the

19    increased need for scientific evidence to ground the standards

20    of care," end quote?

21    A.   Yes.

22    Q.   And isn't it true that as a result of that concern from the

23    membership, that Ms. Knudson and the WPATH leadership determined

24    to, quote, "endeavor to commission an evidence-based medicine

25    team to independently review the literature and grade the

1    evidence in select topic areas"; correct?

2    A.   Dr. Knudson, myself, and the other members of the executive

3    committee have hired Johns Hopkins, who we are working with to

4    do the evidence-based review of the literature for our next

5    iteration.

6    Q.   In prior iterations, including Version 7, WPATH didn't

7    reach out to Johns Hopkins to do evidence-based research;

8    correct?

9    A.   No, but we did have an evidence-based review of the

10   available literature at the time.

11   Q.   That was not determined to be sufficient, and that's why

12   WPATH has reached out to Johns Hopkins for support; correct?

13   A.   No.  I believe that what's happened is information about

14   children and adults, which is the majority of the new work in

15   the field, requires an evidence-based review since the

16   administration of hormone blockers to prepubertal children is a

17   relatively new phenomena that needs to be evidence based.

18             MR. HALL:  Your Honor, I would move to admit the

19   May 23, 2017, email and letter from Dr. Knudson as impeachment

20   testimony.

21             THE COURT:  Do you have it marked?

22             MR. HALL:  We -- I just received this last night,

23   Your Honor.  And I think that it was really a nonissue until I

24   heard the witness's testimony today saying that there were no

25   concerns, were no requests from membership.

1           And what I can do is we can have this marked and submitted.

2               THE COURT:  All right.  Ms. Rifkin.

3               MS. RIFKIN:  Yes, Your Honor.  We have never been

4       provided a copy of this.  It sounds like a hearsay statement

5       that could not be admitted even as impeachment evidence.

6               THE COURT:  Where did it come from?  If -- Mr. Hall,

7       if you didn't get that until last night, where did you get it?

8               MR. HALL:  I got it from counsel, Your Honor.

9               THE COURT:  Ms. Rifkin?

10              MS. RIFKIN:  Not from us.

11              MR. HALL:  Not from plaintiff's counsel, Your Honor.

12              THE COURT:  From who?

13              MR. HALL:  Defense counsel, Mr. Eaton, Your Honor.

14              MS. RIFKIN:  Who also had never provided it, even

15      though he's counsel in this case, to plaintiffs.

16              THE COURT:  Mr. Eaton, where did this come from?  And

17      why wasn't it disclosed until last night?

18              MR. EATON:  Your Honor, it came from our expert,

19      Dr. Garvey, who is a member of WPATH.  And when we deposed

20      Dr. Ettner and in the testimony today, this was the first time

21      it came up that she was denying that members were complaining

22      about --

23              THE COURT:  No.  That didn't answer my question.  Why

24      didn't you turn it -- you just got it --

25              MR. EATON:  I just got it this week, Your Honor, I

1       think a day or two ago.  And I wasn't planning to use it until

2       the testimony.

3              MS. RIFKIN:  Your Honor, we deposed Dr. Garvey.  We

4       sent requests for production specifically to Dr. Garvey at her

5       deposition, which was only two weeks ago.

6          This document has never been brought up.  I think, given

7       the beyond the scope objections by defendants' counsel -- they

8       didn't even make an effort to send it to us last night or this

9       week, whenever they got it.

10         And it's -- from all -- from all that's been represented

11      about it and testified to about it by counsel, it's hearsay.

12             THE COURT:  All right.  Let's lay the background.

13      Where did the letter -- who is the letter from?  Who is it to?

14      What is the date on it?

15             MR. HALL:  May 23, 2017, from the WPATH membership --

16      to the membership of WPATH signed by Gail Knudson, M.D.,

17      President WPATH.

18         And, Your Honor, we produced thousands of pages in

19      this -- throughout this case.  I never -- I never thought that

20      this was -- even if I received it earlier, was responsive to any

21      issue in this case or request.

22         I think it only became relevant when the witness provided

23      testimony that was inconsistent with this.  And that is

24      impeachment at that time, to be able to use this to show that

25      the witness testified inconsistently.

1          THE COURT:  But it's impeaching questions you asked on

2     cross-examination.

3          MR. HALL:  Well, no.  It's directly impeaching a

4     question that plaintiff counsel asked the doctor on direct,

5     Your Honor, that she was not --

6          THE COURT:  What question was that, and what response

7     was that?

8          MR. HALL:  I believe the question was:  Are you aware

9     that counsel -- me -- had represented that there was some

10    dispute or concern membership regarding whether or not the

11    standards of care were grounded in science-based research?

12         And that was asked in some way to Dr. Ettner, who testified

13    no.  And yet, now, this letter, when she --

14         THE COURT:  Ms. Rifkin asked that question?

15         MS. RIFKIN:  I don't believe so, Your Honor.

16         THE COURT:  I don't recall, but I thought it came up

17    just in your examination, but perhaps I'm mistaken.

18         MR. HALL:  I thought she opened the door to that and

19    asked the question.  I guess it's a matter for the court

20    reporter.

21         MS. RIFKIN:  Your Honor, I never asked a question

22    about membership concerns about WPATH standards.  That is simply

23    not accurate.

24         MR. HALL:  Your Honor, I don't want to misrepresent

25    anything.  I just remember that there was a question posed

1    regarding whether or not the WPATH standard --

2                 THE COURT:  Is Dr. Knudson going to be called?

3                 MR. HALL:  I'm sorry?

4                 THE COURT:  Is Dr. Knudson going to be a witness?

5                 MR. HALL:  No.

6                 THE COURT:  Are you aware of this letter?  Have you

7    seen it?

8                 THE WITNESS:  No.  Dr. Knudson and I -- I receive

9    emails from her every day because she's --

10                THE COURT:  Well, my question is:  Do you --

11                THE WITNESS:  I don't have any memory of this email or

12   of this discussion.

13                THE COURT:  Well, let's move on.  Because she has no

14   memory of it, it isn't really impeaching if she didn't know of

15   it.

16        So I'll sustain the objection.  Let's move on.

17                MR. HALL:  I think, Your Honor, I got the testimony in

18   that -- and I can ask the question of the witness again, but I

19   believe the witness testified that she is now aware of that

20   dialogue.  And I'll let her testimony regarding her knowledge of

21   the need for science-based research to stand.

22                THE COURT:  Well, if that's the end, there was no

23   objection to that.  Let's move on.

24                MR. HALL:  With that, Your Honor, I don't have any

25   further questions.  Thank you.

1          THE COURT:  All right.  Mr. Eaton.

2                    CROSS-EXAMINATION

3    BY MR. EATON:

4    Q.   Dr. Ettner, my name is Dylan Eaton.

5         Do you remember talking to me at your deposition?

6    A.   I do.

7    Q.   Mr. Hall did a good job, and he was thorough.  So I only

8    have a few questions for you.

9         One thing I wanted to clarify is:  Are you a

10   board-certified psychiatrist?

11   A.   No.

12   Q.   And are you a licensed psychiatrist?

13   A.   No.

14   Q.   And I know Mr. Hall was asking you, and I think generally

15   you indicated that providers -- you were not aware of the

16   providers you referred to in your declaration qualifications;

17   correct?

18   A.   I didn't see their CVs, no.

19   Q.   You also weren't aware of their qualifications; correct?

20   A.   Correct.

21   Q.   And specifically, you didn't know Dr. Eliason's

22   qualifications; correct?

23   A.   No.

24   Q.   Now, did I understand you to testify that SRS, sex

25   reassignment surgery, is not harmful?  Did I understand that

**ETTNER – Cross**

154

1    testimony to be correct?

2    A.   It's not harmful if it is done for medical purposes in --

3    in cases where it's indicated, yes.

4    Q.   But you would acknowledge there is risks with that surgery;

5    correct?

6    A.   As with any surgery, yes.

7    Q.   Okay.  So there is risks of infection, for instance?

8    A.   Infection, dehiscence, urinary retention, yes -- and

9    other -- other complications, yes.

10   Q.   Up to and including death; correct?  That's a potential

11   risk of SRS?

12   A.   Of any surgical operation where there is anesthesia used,

13   yes.

14   Q.   So death is a risk of SRS?

15   A.   Potentially, yes.

16   Q.   I believe you indicated that SRS has low rates of

17   complications.

18        Did you testify to that?

19   A.   Yes.

20   Q.   And what did you mean by that?

21   A.   Similar to the complication rate of genitourinary

22   reconstructive surgery for congenital or carcinogenic cancer

23   related vaginal procedures.

24   Q.   Okay.  But you're not a medical doctor; correct?

25   A.   I am not.

**ETTNER – Cross**

155

1   Q.   Okay.  Are there -- you're not relying on any specific

2   study to make that statement, are you?

3   A.   There are specific studies, yes.

4   Q.   What study is that?

5   A.   There are several studies.  There is one recent one by an

6   author named Poh, P-O-H.  And I can't remember the second

7   author.

8        There are several studies on the complications of

9   vaginoplasty, and they differ depending on the technique.  So

10  there is more than one technique of doing vaginoplasty.

11       The simple inversion technique carries less rate of

12  complications.  Most of the complications are easily managed.

13  Few, but occasionally, require surgical revision but not often.

14  Q.   I believe you testified that you're aware of some concerns

15  by clinicians and/or medical providers regarding personality

16  disorder traits; is that right?

17  A.   Would you say that again.

18  Q.   I thought you had testified that you were aware that some

19  clinicians and/or medical providers for Ms. Edmo had indicated

20  there were personality disorder traits.

21  A.   I recall seeing that in the medical records.

22  Q.   But then I believe you testified you don't have -- you

23  haven't seen any diagnosis of a personality disorder; is that

24  correct?

25  A.   I have not seen a specific diagnosis of borderline

**ETTNER – Cross**

156

1    personality disorder or another specific personality disorder.

2    Q.    What is cyclothymia?

3    A.    Cyclothymia is a disorder where a person has manic

4    behaviors.

5    Q.    Is that a personality disorder?

6    A.    It can be a personality disorder, or it can be an aspect of

7    a bipolar disorder.

8    Q.    Have you seen that diagnosis in the medical records for

9    Ms. Edmo?

10   A.    Not that I recall.

11   Q.    It was a while ago, but if I remember your testimony, I

12   believe you indicated that you treated about 3,000 gender

13   dysphoria patients.

14        Is that correct?

15   A.    That's correct.

16   Q.    And if I understood you correctly, you've referred about

17   300 of them for surgery?

18   A.    Not 300 of the patients that I have seen, that I followed

19   personally.  In some cases, I have written a second opinion

20   referral letter for individuals, which is something that occurs

21   on a one-time basis.

22        If you refer to the standards of care, a person who

23   undergoes genital surgery requires two referral letters, one by

24   someone who has followed them and one which is a onetime

25   second-opinion letter.

1          So I have written second-opinion letters, and I have

2    written letters for my own patients that I follow.

3    Q.   Well, I just want to be clear.  If I understood, you said

4    the 300-patient number, which I thought I understood to be

5    related to referrals to surgery.

6          And if that's incorrect, what was that reference for?

7    A.   I have written approximately 300 letters, referral letters,

8    for surgery for gender dysphoria individuals.

9    Q.   Okay.  So that's 10 percent?

10   A.   That's 10 percent of my practice, but that's not what it

11   refers to.

12         300 is 10 percent of 3,000, but I'm not saying that 10

13   percent of my patients have gone on for surgery.  I'm saying I

14   have written 300 referral letters.

15   Q.   I understand.

16   A.   Do you understand?

17   Q.   Thank you for clarifying.

18         So would the percentage be less than of your own patients

19   that have gone on for surgery?

20   A.   Yes.  Likely, it would be.  Yes.

21   Q.   Okay.  And what percentage would that be?

22   A.   That I can't calculate because some of the clients that I

23   have seen are children who wouldn't be eligible for surgery or

24   young adolescents.

25   Q.   But less than 10 percent?

1     A.    Likely less than 10 percent, yes.

2     Q.    Okay.  Thank you.

3           I believe you talked with Mr. Hall about regret rates.

4           Do you recall that?

5     A.    Yes.

6     Q.    And you seem pretty certain about the 1 percent or less of

7     folks that have gender confirmation surgery have regrets; is

8     that correct?

9     A.    That's according to the literature, yes.

10    Q.    According to all literature?

11    A.    According to, yes, the majority of the literature, yes.

12    Yes, including Anne Lawrence's articles.  You referenced Anne

13    Lawrence earlier, and she has also documented those rates.

14    Q.    But there is no studies about regret rates for incarcerated

15    gender dysphoria patients; correct?

16    A.    Regret rates for incarcerated persons who have had surgery?

17    Q.    Yes.

18    A.    While they were incarcerated?

19    Q.    Yes.

20    A.    No, there are not.

21    Q.    And haven't there been challenges to the studies for

22    regrets being not robust enough?

23    A.    Not that I'm aware of.

24          MR. EATON:  Your Honor, if I may, I just have to

25    toggle on my computer over here.

1       THE COURT:  Yes.

2   Q.   BY MR. EATON:  I believe in our -- excuse me.  I believe in

3   our deposition, we discussed the CMS decision.

4       Do you recall discussing that?

5   A.   Yes.

6   Q.   And what does "CMS" refer to?  Do you know what that means?

7   A.   Yes.  It was the challenge to the Medicare decision of

8   2014.

9   Q.   Okay.  And it was a national-coverage decision that was

10  being made by CMS about gender reassignment surgery; correct?

11  A.   Yes.

12  Q.   I'm not sure if I hit the right button here.  We'll see.

13      THE CLERK:  Are you attempting to display from your

14  computer?

15      MR. EATON:  I am, yes.  Thank you.

16      THE CLERK:  Are you using an HDMI or VGA connection?

17      MR. EATON:  I believe it's an HDMI.

18      And is that Plaintiff 1 or 2?

19      THE CLERK:  That's 1.

20      THE COURT:  So you're trying to plug in at your table?

21      MR. EATON:  Yes.  I thought I was connected with an

22  HDMI over there and I could just pull it up on my computer, is

23  what I was trying -- it's already up on my computer, and I was

24  just trying to display it for the court.

25      THE COURT:  Have you changed the input?

**ETTNER – Cross**

1          THE CLERK:  I have.  May I look?

2          THE COURT:  Yes.  Go ahead.

3          THE CLERK:  Thank you.

4     So oftentimes they recommend connecting before you turn on

5     your computer, and that usually solves the problem.  I don't

6     know if we have time to restart.

7          MR. EATON:  I'll just try it through questions.  I

8     apologize.

9     Q.   BY MR. EATON:  We looked at that document at the

10    deposition; correct?

11    A.   Yes.

12    Q.   Okay.  And CMS did a thorough review of many studies.

13         Would you agree with that?

14    A.   Yes.  A review of the studies, yes.

15    Q.   And these were reviews on regret rates after sex

16    reassignment surgery, among other things; correct?

17    A.   Yes.

18    Q.   All right.  And the final decision was issued in 2016;

19    right?  Is that your understanding?

20    A.   Yes.

21    Q.   And one thing they were considering, as well, is whether

22    they were going to recognize WPATH standards of care.

23         Do you understand that?

24    A.   Yes.

25    Q.   And they decided not to recognize the WPATH standards of

1      care as the exclusive standard.

2          You understand that; correct?

3      A.   Yes.

4      Q.   And since I'm not able to pull this up, I'm just going to

5      quote.

6          And for the court, it's Defendants' Exhibit 2034, 0065.

7          This is the summary at the end of this document.  And it

8      says, quote:

9              "Based on extensive assessment of the clinical

10             evidence as described above, there is not enough

11             high-quality evidence to determine whether gender

12             reassignment surgery improves health outcomes for

13             Medicare beneficiaries with gender dysphoria and

14             whether patients most likely to benefit from these

15             types of surgical interventions can be identified

16             prospectively."

17             That's a quote from that.  Do you recall that?

18             THE COURT:  Just a moment.

19             MS. RIFKIN:  Your Honor, may I provide a copy of this

20     exhibit to the witness?

21             THE COURT:  Can we put it on the screen on the

22     evidence presenter so that she can see it?

23             MS. RIFKIN:  I think defendants have a paper copy.

24     They quoted at length.

25             THE COURT:  If you have a paper copy, you can show it

**ETTNER – Cross**

162

1    to the witness using the evidence presenter.

2         While Mr. Eaton is getting that, so I understand -- did I

3    understand this is some kind of a Medicare determination for

4    Medicare patients that these -- this treatment will not be

5    funded?  Is that --

6              THE WITNESS:  What it was, it was questioning the

7    efficacy of surgery for Medicare beneficiaries, which is a group

8    of individuals over age 65, as you well know.

9              THE COURT:  That was going to be the point I was going

10   to ask.

11             THE WITNESS:  And that was what the response was, that

12   that's not really an adequate control with the body of

13   literature that we typically look at.

14             THE COURT:  You saved Ms. Rifkin 15 minutes of

15   redirect on that topic.

16        So go ahead, Mr. Eaton.

17             MR. EATON:  Thank you.  I apologize for the technical

18   difficulties.  There we go.

19   Q.   BY MR. EATON:  Are you able to see this summary now?

20   A.   Yes.

21   Q.   Good deal.

22        And I was quoting that first paragraph.  You see that

23   there?

24   A.   Yes.

25   Q.   Essentially what they decided is that -- is it your

1   understanding that CMS decided that there was not enough

2   high-quality evidence to determine whether gender reassignment

3   surgery improves health outcomes for Medicare beneficiaries with

4   gender dysphoria?

5   A.   For Medicare beneficiaries, yes.

6   Q.   That's your understanding.

7        And WPATH disagreed with that; correct?

8   A.   WPATH offered a response to that.

9        And again, the studies of people over 65 have not been well

10  documented because it was only in 2014 -- it was actually

11  May 31st of 2014 -- that the Medicare began to provide surgeries

12  based on the evidence that they were not experimental, there

13  were few complications, and that they were efficacious.

14            MR. EATON:  Your Honor, I would move to admit

15  Defendants' Exhibit 2034.

16            THE COURT:  Any objection?

17            MS. RIFKIN:  We object, Your Honor, based on both

18  relevancy and I believe this is a draft decision memo by

19  Medicare rather than their final decision memo that represents

20  the actual opinion of Medicare.

21            THE COURT:  Mr. Eaton.

22            MR. EATON:  Your Honor, this is on their website

23  currently.  You can take judicial notice of it.

24            THE COURT:  I can't take judicial notice of what's on

25  a website.  That would open the door to lots of mischief.

1          MR. EATON:  And it's a government entity.

2          MS. RIFKIN:  As Your Honor has pointed out, Ms. Edmo

3     was not in the Medicare population, so we do not -- we object

4     based on relevancy.

5          THE COURT:  Without more, I'm going to have to sustain

6     the objection.  I mean, I don't know if it was based upon the

7     age of and the -- I mean, I think performing that surgery on

8     someone who is over 65 compared to someone who is in their 20s

9     or 30s is so radically different, that I just can't imagine it

10    really has much relevance.

11         Plus, there is hearsay issues, a number of other concerns.

12    So I'm going to sustain the objection.

13         MR. EATON:  That's fine, Your Honor.  We can address

14    it later.

15    Q.   BY MR. EATON:  And we also talked about in your deposition

16    about then Endocrine Society guidelines; correct?

17    A.   Yes.

18    Q.   And there is a 2009 version, and there's a 2017 version;

19    correct?

20    A.   Yes.

21    Q.   And you understand that the Endocrine Society in its 2017

22    version had indicated that there could be more robust studies

23    regarding regret rates.

24         We talked about that in the deposition; correct?

25    A.   Yes.

1      We have just published a new study on regret rates,

2      actually, coming out of the University of Oregon.

3           MR. EATON:  I'd move to strike.  This is un -- not

4      responsive.

5           THE COURT:  Sustained.

6      Yeah.  Don't just volunteer statements.  Just answer

7      counsel's questions.

8           Go ahead, Mr. Eaton.

9           MR. EATON:  Your Honor, I don't believe I have any

10     further questions at this time.

11          THE COURT:  All right.  I am going to have just one or

12     two questions, Ms. Rifkin.  This is the way I normally -- I wait

13     until counsel has all had one bite at the apple, and then...

14                          EXAMINATION

15     BY THE COURT:

16     Q.   You indicated that there was -- statistically, that studies

17     indicate that 1 percent or so of the individuals who have had

18     gender confirmation surgery later regretted that.

19          Has any analysis been done as to what the common features

20     were which led those individuals to regret the surgery?

21     A.   Yes.

22          The most common cause is when the people went to

23     inexperienced surgeons and had poor surgical outcomes.  So if

24     someone had surgery, Your Honor, and their urinary stream was

25     hitting the ceiling, they would be regretful.  That was the most

1    typical reason for regret.

2    Q.   But you've analyzed that.  And is this something you work

3    with?  I mean, it's not -- you're reporting to me --

4    A.   What the studies have reported.

5    Q.   Okay.  All right.  That's what I want to be clear about.

6         You indicated -- and I kind of got lost in the shuffle

7    there.  But I understand that, although you have written

8    referrals for 300, a lot of those are kind of like second

9    opinions.

10   A.   Correct.

11   Q.   And so of the 3,000 patients with gender dysphoria that you

12   have either treated or evaluated, something less than 10 percent

13   you have recommended for gender confirmation surgery; is that

14   correct?

15   A.   Yes.

16   Q.   I mean, less than 10 percent, all the way from zero to 10

17   percent.

18        Can you pin it down a little more closely?  Is 10 percent a

19   pretty good number, or is it something less than that?

20   A.   I would say it's something more than that.

21   Q.   More than 10 percent?

22   A.   Yes.

23   Q.   Okay.

24   A.   10 percent of -- I would say of the 300 referral letters I

25   have written, probably 200 were from patients that I, myself,

1    had followed preoperatively and was the primary provider.

2    Q.   So 200 out of 3,000 patients, then, which is less than 10

3    percent?

4    A.   Correct.

5         And then about 100 were people who came for a onetime

6    second opinion.

7    Q.   All right.  I'm really focusing more on the patients you

8    actually treated.

9         And so you're saying, roughly, 7 or 8 percent you

10   recommended for surgery.  The remaining 92 or -3 percent, you

11   did not recommend, but they continued to receive some kind of

12   treatment, presumably hormone replacement or something of that

13   sort or --

14   A.   Or sometimes they just are -- in the early days, they

15   couldn't afford surgery, before insurance covered it.

16   Q.   Okay.  What -- what I'm trying to get at is that

17   you -- there are some people who suffer from gender dysphoria

18   that you do not recommend surgery for; is that correct?

19   A.   That's correct.  There have been some cases where I have

20   actually refused surgery when people requested it or wanted it.

21   Q.   Okay.  I'm going to quit beating around the bush.

22        What I want to know is:  Is it your opinion that

23   essentially every person who truly suffers from gender dysphoria

24   should be treated or at least be considered for treatment with

25   gender confirmation surgery?

**ETTNER – Examination by The Court**

168

1  A.   No.  For some people, hormones are sufficient treatment.

2  Q.   Okay.  And roughly, how do you break that group down?

3       I mean, just -- what I'm trying to get at is:  What

4  percentage of the people you see should have been treated with

5  gender confirmation surgery?

6  A.   A far smaller number than the people that are treated with

7  hormones.

8  Q.   Okay.  So less than half?

9  A.   Yes.

10  Q.   Okay.  That's probably enough for my purposes.

11       And generally, is the distinguishing characteristics that

12  one or more of those criteria that we have discussed from the

13  WPATH organization were not met?

14  A.   Typically, it's based on the severity of the gender

15  dysphoria.

16  Q.   Okay.  Now, you recommend here that Ms. Edmo should be

17  given gender confirmation surgery.  So she is in that smaller

18  group that you feel that is the appropriate treatment.

19       And I assume, based on what you just said, primarily it's

20  because of the severity of the gender dysphoria that she suffers

21  from?

22  A.   That's correct; that's my opinion.

23  Q.   And that -- can you -- is there anything else you want to

24  elaborate as to what sets her case apart from the majority of

25  cases where you don't recommend gender confirmation surgery?

1    A.    Yes.  It's the inadequacy of the hormone therapy to

2    eliminate the gender dysphoria, and it's the desire to actually

3    perform the surgery herself, to remove the testicles.

4          So in the prisons, we see the natural progression of the

5    condition, and we see many people who attempt to remove their

6    own testicles to rid themself of the testosterone, because it is

7    the testosterone that causes the gender dysphoria.  So if you

8    remove that target organ, you eliminate the gender dysphoria.

9          And taking pills is a different path of physiology.  It

10   doesn't eliminate it entirely.  But once you remove that organ

11   or, like, with a female, if you remove the uterus and the organs

12   that excrete estrogen in a person who is born female but wants

13   to be male, you have to actually remove the target organs to

14   eliminate the sex -- the nascent, the natural sex-circulating

15   hormones.

16   Q.    Let me turn to one other question.  I think it was the

17   fourth element on the -- maybe it was the third of the six

18   standards that you used.

19         As I recall -- and I don't have it in front of me.  But as

20   I recall, it indicated that if there are serious mental health

21   concerns, then those need -- those must be -- what was the word?

22   A.    Well controlled.

23   Q.    -- well controlled.

24         While serious concerns almost pull a different direction.

25   "Serious" suggests something of significance, whereas a concern

1    suggests something short of a diagnosis.

2         So, as I thought about that, it struck me that perhaps

3    serious has to do with what the impact of that mental health

4    problem is on the individual.

5         In other words, everybody has some depression, everybody or

6    many of us do, I assume.  Obviously, we all can suffer from

7    anxiety at times.  But unless it is at a clinical level, it's

8    not something that would be -- that would trigger this

9    requirement or raise this concern that would require that it be

10   well regulated or well controlled; correct?

11        Can you --

12   A.   I think that's correct.

13        What we're more concerned with are the thought disorders,

14   schizophrenia, the disorders that impair reality testing.  So if

15   a person has, say, what we used to call multiple personality

16   disorder or bipolar disorder, those kinds of issues may impair

17   not only a person's ability to provide informed consent but to

18   comply with postoperative care or to even be reality based to

19   understand the risks involved with the surgery.

20        But depression and anxiety, if they are on medication and

21   their reality testing isn't impaired, as is the case with

22   Ms. Edmo, she can participate in decisions about her healthcare.

23        And what we find is that those issues actually decrease

24   after surgery.  People are less depressed because they are not

25   feeling gender dysphoric any longer; they are cured of that.

1      Q.    And there is no way to eliminate -- I mean, that's one of

2      the challenges.  You assume, perhaps, as a clinician, that if

3      you remove stressors, you can resolve at least some of the more

4      minor, nonchemical-based mental issues.  And so you're left

5      somewhat to guess.

6            But the thought would be if I -- again, I don't have the --

7      what Mr. Hall used during his closing *[sic]*, but those various

8      mental health concerns may -- perhaps all of those might well be

9      the result of gender dysphoria, so that the depression, the

10     anxiety, the self-medication through drugs and alcohol, sexual

11     acting out -- I can't recall the others -- but all of those may

12     be tied to the gender dysphoria, but there is no way to know;

13     correct?

14     A.    There is no way to know.

15           But for certain individuals, particularly if they grow up

16     in a culture where they are not -- they don't have information

17     about gender dysphoria, they don't understand why they feel the

18     way they do, they may self-medicate as a way of suppressing

19     those feelings.

20           Many individuals join the army or do hypermasculine

21     activities to try to cure themself of the condition.  They have

22     children, they marry, thinking that this will finally end this.

23     But it doesn't, and it does intensify with age.

24     Q.    But my question is:  There is no real way to know, in

25     advance of the surgery, whether that is going to have that

1     effect and resolve some of those mental health concerns.

2     A.   If we can distinguish that the depression and anxiety are

3     largely or partially part and parcel of the gender dysphoria,

4     then we can determine that they will be attenuated or

5     eliminated.

6     Q.   Okay.

7     A.   Many clients give up antidepressants after surgery because

8     they no longer need them -- not all but many.

9     Q.   Okay.  Is the gender dysphoria more severe, typically,

10    among those who are in prison than those who are not for any

11    reason?

12         That's kind of an awkward question.  But is incarceration,

13    itself, a factor that may actually make the gender dysphoria

14    more disruptive of your normal thought processes?

15         I guess what I'm getting at is:  Is being confined in an

16    all-male environment and then suffering from this, whether that

17    actually may --

18    A.   That's an excellent question.  I would say no.

19    Q.   Well, if you don't have an opinion, then you probably

20    haven't offered it.  Let's move on.

21    A.   My opinion is no because it's a medical condition.

22    Q.   Okay.

23    A.   And we believe that it's brain based.  There are functional

24    magnetic resonance imagery shows differences in the brains of

25    people who have severe gender dysphoria and people who don't,

1       primarily in the right hemisphere of the brain.  I won't get

2       into all of the nerdy --

3       Q.   Well, we don't have that --

4       A.   -- science.  Right.

5       Q.   We don't have that testing done in this case in any event.

6       A.   No, we do not.

7            THE COURT:  Counsel, I went on longer than I intended.

8       So let me -- we only have 20 minutes.

9            Ms. Rifkin.

10           MS. RIFKIN:  Thank you, Your Honor.

11                        REDIRECT EXAMINATION

12      BY MS. RIFKIN:

13      Q.   Just to pick up on the court's question, Dr. Ettner.  You

14      had referred before to the fact that your opinion that, in

15      prison, we see the natural progression of untreated gender

16      dysphoria.

17           What do you mean by that?  Why in prison would we see --

18      or, in your opinion, do we see symptoms of gender dysphoria that

19      aren't as common to see on the outside?

20      A.   Because people don't --

21           MR. HALL:  Objection.

22           THE COURT:  Just a moment.

23           MR. HALL:  Objection.  Foundation, Your Honor.

24           MR. EATON:  Join.

25           THE COURT:  Well, I opened the door to that.  I don't

1    know -- counsel should have objected to my question, perhaps,

2    and see how far you get.

3              MR. HALL:  Noted for the future, Judge.

4              THE COURT:  Yeah.  Let me --

5              MR. HALL:  Judge, the objection is based on just a

6    lack of experience in a correctional institution and treating

7    anybody who has ever had gender dysphoria.

8              THE COURT:  I think you noted on your CV that was on

9    the screen earlier that you had chaired sort of a subcommittee

10   of WPATH that focuses on incarceration of gender dysphoric

11   individuals.

12             THE WITNESS:  I chaired the institutionalized

13   committee, yes.

14             THE COURT:  And I have given you some leeway to talk

15   about that.

16        But is that more than just chairing a committee?  Is that a

17   subpart or subfeature of your own expertise?

18             THE WITNESS:  Yes.  Yes.

19             THE COURT:  You've worked specifically with inmates

20   suffering from gender dysphoria?

21             THE WITNESS:  Not exclusively, but yes.

22             THE COURT:  Well, I'm going to give some leeway here.

23   When we get into posttrial submissions, if it becomes important

24   to consider this, I'll kind of review whether or not there has

25   been enough foundation to establish expertise.

1          Go ahead and answer the question.  I'm more concerned about

2     time right now than anything.  Go ahead.  Can you answer?

3          THE WITNESS:  The question -- I think the answer is

4     that if people don't have access to healthcare treatments, to

5     medical treatments or surgical treatments, the disease will

6     unfold as would any disease.

7          So if a person had, for instance, pneumonia and they didn't

8     have access to the appropriate therapies, you would see the

9     disease progress.  You would see damage to the lungs, possibly,

10    and possibly ultimate systemic bacterial infection.

11    Q.   BY MS. RIFKIN:  I would like to show you what has been

12    admitted Joint Exhibit 15, page 15 -- let's see -- I believe

13    that's page 22 of the exhibit that Mr. Hall showed you.

14         Mr. Hall asked you whether you had considered whether any

15    of Ms. Edmo's providers met these standards for WPATH mental

16    health professionals working with adults who present with gender

17    dysphoria.

18         Did you -- and you considered these standards; is that

19    right?

20    A.   Yes.  These are the WPATH criteria for competency for

21    qualified mental health professionals.

22    Q.   And he asked you, when you rendered the opinion that her

23    providers did not -- are not competent under these standards --

24    whether you had been able to review their qualifications and

25    training.

1        Since you provided your report in this case, have you had

2        the opportunity to review the training provided to Ms. Edmo's

3        clinical providers?

4        A.    Yes.

5        Q.    I would like to show you what is Joint Exhibit 17.

6             This PDF, "Medical Necessity for Transgender Inmates in

7        Search of Clarity When Paradox, Complexity and Uncertainty

8        Abound" by Dr. Stephen Levine, is this one of the training

9        materials you reviewed that you understand was provided to

10       Ms. Edmo's treaters?

11       A.    Yes.

12       Q.    Are you familiar with Dr. Stephen Levine, Dr. Ettner?

13       A.    Yes.

14       Q.    What is Dr. Levine's reputation in the field of treating

15       gender dysphoria?

16       A.    Dr. Levine is considered to be an outlier in the field.  He

17       is anti WPATH.  And Dr. Levine has his own personal theory about

18       gender dysphoria and its treatment and about the types of people

19       that complain about gender dysphoria in prisons.

20       Q.    Is Dr. Levine part of WPATH?

21       A.    No.  He left WPATH after Standards of Care 5.

22       Q.    And I would like to show you what is page 43 of this

23       exhibit and call your attention -- maybe we can blow it up to

24       the second main bullet point, "SRS is not conceived as

25       lifesaving."  There we go.

1    Part of Dr. Levine's presentation to the –– Ms. Edmo's

2    providers, he said:

3         "SRS is not conceived as lifesaving, as is repairing a

4         potentially leaking aortic aneurysm, but is

5         life-enhancing, as is providing augmentation for women

6         distressed about their small breasts."

7    Is this an opinion about surgery to treat gender dysphoria

8    that's generally accepted in the field?

9    A.   It is not.

10   Q.   Let's show page 44 of this same exhibit.  And let's blow up

11   the last bullet point here.

12        Dr. Levine's presentation training says:

13        "To date, most GD inmates in American prisons have not

14        had any major complications other than frustration and

15        the sense that the DOC does not care about their

16        suffering."

17   Do you –– is that statement consistent with your experience

18   and expertise, Dr. Ettner?

19   A.   It is not.

20   Q.   Are you aware of any literature, peer-reviewed studies,

21   data that supports this conclusion by Dr. Levine?

22   A.   No.

23        Dr. Levine's personal theory about gender dysphoria doesn't

24   have any scientific documentation to accompany it.  It appears

25   to be his own –– his own theory that is at odds with WPATH but

1    is not based in any scientific documentation.

2    Q.   And turning to the next page, page 45 of this exhibit,

3    looking at the third bullet point down, Dr. Levine's training

4    stated that:

5                "Most preoperative trans females have learned to

6                ignore their penis most of the time even though its

7                functions remind them of their maleness."

8        Is this consistent with your experience and expertise,

9    Dr. Ettner?

10   A.   No, it's not.

11   Q.   Are you aware of any evidence, data, research, or

12   literature that supports this statement by Dr. Levine?

13   A.   No.

14       I think one of the problems is that these statements paint

15   people all with the same brush rather than considering

16   individuals on case-by-case basis.  And all of medicine, best

17   practice medicine, is based on an individualized basis.

18   Q.   And if we can turn to page 58 of this exhibit.  And go to

19   the last, No. 6.

20       Dr. Levine's training provided to Ms. Edmo's providers

21   under 6A states:

22               "This may explain their motivation to exaggerate their

23               distress, gender dysphoria."

24       Do you believe this statement is an accurate reflection of

25   all patients with gender dysphoria in prison?

1    A.   I don't, no.

2    Q.   So if we can return back to Joint Exhibit 15, page 22.

3              THE COURT:  Counsel, what was the exhibit you were

4    just referencing here?

5              MS. RIFKIN:  Joint Exhibit 17.  And I'm sorry,

6    Your Honor.  It's one of the ones already been admitted.

7              THE COURT:  No.  I'm not faulting you.  I just didn't

8    catch the exhibit number.  So thank you.

9    Q.   BY MS. RIFKIN:  All right.  So if we can kind of blow up

10   the No. 6 under the WPATH standards here.

11       Based on your now opportunity to review the training

12   materials and the training that was provided to Ms. Edmo's IDOC

13   and Corizon treaters, do you believe that Dr. Levine's training

14   satisfies the requirement that they have continuing education in

15   the assessment and treatment of gender dysphoria such that they

16   become qualified providers?

17             MR. HALL:  Objection.  Foundation, relevance.  This

18   goes beyond the scope of the report.

19             MR. EATON:  Join.

20             THE COURT:  Just a moment.

21             MS. RIFKIN:  Your Honor, if I may?

22             THE COURT:  Yes.

23             MS. RIFKIN:  Your Honor, defense counsel, both of

24   them, actually asked Dr. Ettner about reviewing the

25   qualifications of the providers.  And this is the exhibit that

**ETTNER – Redirect**

180

1    Mr. Hall showed Dr. Ettner.  So they opened the door.

2              MR. HALL:  That's not my objection.

3              THE COURT:  Just -- what is -- do you want to restate

4    the objection, Mr. Hall?

5              MR. HALL:  Foundation, Your Honor, and relevance

6    talking about Levine.  Levine is not here.  He is not an expert

7    in this case.

8              THE COURT:  And he is not going to testify?

9              MR. HALL:  He is not going to testify.

10             THE COURT:  But he did provide a presentation to at

11   least Corizon, if not IDOC as well, on this issue of what

12   policies should be followed in Ms. Edmo's case and other

13   inmates; is that accurate?

14             MR. HALL:  Well, I think it's one training,

15   Your Honor.  But she is drawing the conclusion -- she doesn't

16   even know who was at this training, let alone what provider --

17             THE COURT:  I think counsel's question was whether or

18   not the training as reflected in those PowerPoint slides

19   satisfies this continuing education requirement.

20        What exhibit number is this?

21             MS. RIFKIN:  This particular exhibit is Joint Exhibit

22   15, Your Honor.

23             THE COURT:  All right.  Thank you.

24        Whether or not -- in terms of compliance with the WPATH

25   standards; correct?

1            MS. RIFKIN:  Correct.

2            THE COURT:  I'll overrule the objection.

3       You may answer.

4            THE WITNESS:  Dr. Levine's training does not align

5       with the WPATH standards, and it is not -- in my opinion, it

6       does not provide an appropriate knowledge base for providers to

7       learn about gender dysphoria, how to assess it, how to generate

8       treatment plans.  And it is not considered relevant because he

9       is an outlier and has a different philosophical approach than

10      all of the organizations that I mentioned previously.

11      Q.   BY MS. RIFKIN:  And just a couple of more questions,

12      Dr. Ettner.

13           During Mr. Hall's cross-examination, he identified -- he

14      asked you about a number of traits that might be associated with

15      borderline personality disorder, such as impulsivity or a

16      history of abusive relationships.

17           In your experience and based on your expertise, are some of

18      these traits that Mr. Hall talked about -- are they uncommon in

19      individuals with untreated gender dysphoria?

20      A.   No.  And they are also not uncommon in other disorders.

21      Impulsivity is a characteristic of attention deficit disorder,

22      for example.

23      Q.   In your opinion, are Ms. Edmo's current treatment providers

24      experienced and able to distinguish between symptoms of gender

25      dysphoria and other mental health conditions?

1          MR. HALL:  Objection.  Beyond the scope, foundation.

2          MR. EATON:  Join.

3          THE COURT:  I'm going to sustain the objection,

4    Counsel.  I think we're getting beyond the scope of cross, and I

5    don't know whether or not there was any disclosure of these

6    opinions as well.

7          MS. RIFKIN:  Your Honor, defense counsel asked

8    Dr. Ettner many questions representing that these traits had

9    been identified by Ms. Edmo's treating providers and -- as

10   borderline personality or personality traits.  He didn't present

11   the records, but asked Dr. Ettner about this.

12         THE COURT:  Has she evaluated -- I thought I

13   understood from her earlier testimony that she had not, at least

14   as of the time she prepared the report, reviewed the underlying

15   documents.

16      How can she offer an opinion as to the ability and

17   experience of the current treatment providers.

18         MS. RIFKIN:  Your Honor, on July 10, 2018, the expert

19   disclosures in this case, Dr. Ettner offered a second

20   declaration that contained her first declaration and was largely

21   the same, but it states that she had then received the entire

22   medical file.

23         THE COURT:  Okay.  But was the opinion that you are

24   now asking her as to whether or not treatment providers were or

25   were not experienced and skilled enough to distinguish between

1  general mental health conditions and gender dysphoria?

2          MS. RIFKIN:  Yes.  I would like to --

3          THE COURT:  You can ask the same question that's in

4  the disclosure, and then let's move on.

5          MS. RIFKIN:  All right.  Can we show the July 10,

6  2018, expert report, paragraph 11.

7          THE COURT:  And I can see it as long as you stay

8  within the bounds of that report --

9          MS. RIFKIN:  Our only copy is electronic.

10         I'm sorry.  Paragraph 12.

11  Q.  BY MS. RIFKIN:  Was it your opinion, Dr. Ettner, that

12  Ms. Edmo's medical providers demonstrate -- that their notes

13  demonstrate that they do not have the training or expertise to

14  understand gender dysphoria as a serious medical condition

15  requiring treatment?

16  A.  That wasn't, is my opinion.

17         MS. RIFKIN:  Thank you.  No further questions.

18         THE COURT:  Mr. Hall.

19         Counsel, I can stay five minutes.  It's almost 2:30, but I

20  have a class coming in fairly soon.  And so I don't know -- do

21  you have just a few questions, or are we -- how much time do you

22  need?

23         I'm not saying I'm going to cut you off.  We'll come back

24  tomorrow morning if we need to, but I hate to hold Dr. Ettner

25  here.

1          MR. HALL:  I agree, Your Honor.  Can we have three

2     minutes just to confer?

3          THE COURT:  Well, if I take a recess, three minutes

4     will become ten.  So why don't you just -- we'll stay in the

5     courtroom, and you can visit.

6          MR. EATON:  I just have one follow-up question,

7     Your Honor.

8          THE COURT:  Yes.

9                    RECROSS-EXAMINATION

10    BY MR. EATON:

11    Q.   Dr. Ettner, you don't purport to know all of the trainings

12    that the medical providers at the Idaho Department of

13    Corrections and Corizon have received; correct -- on gender

14    dysphoria?

15    A.   Only what I read in their declarations and in their

16    depositions when questioned about their training in gender

17    dysphoria.

18    Q.   Have you seen any other PowerPoint slides that have been

19    presented to Corizon or IDOC other than the Levine slides that

20    you have seen?

21    A.   I believe I saw some slides by Mr. Clark.

22    Q.   Any others that you're aware of?

23    A.   Not that I recall.

24         MR. EATON:  Nothing further, Your Honor.

25         THE COURT:  Anything else?

1          MR. HALL:  No further questions.

2          THE COURT:  Anything else, Ms. Rifkin?

3          MS. RIFKIN:  No, Your Honor.

4          THE COURT:  All right.  We'll get you off the stand.

5      Counsel, we'll reconvene at 8:30 again tomorrow morning.

6  Same -- we will probably go until 3:00, just to catch up on the

7  time that we lost this morning.

8      Is there anything else we need to take up this afternoon?

9          MS. RIFKIN:  Not from plaintiff, Your Honor.

10          MS. FERGUSON:  Thank you, Your Honor.

11      Just our concern was Ms. Edmo did not -- she left the

12  prison this morning at 6:30; it was called out for

13  transportation.  She wasn't given any breakfast.  She arrived

14  here at almost 9:00 and without -- you know, in a rush to

15  change.  So we're just hoping that the prison could please

16  remedy that.

17          THE COURT:  Mr. Hall, I'm sure can make sure that

18  doesn't happen tomorrow morning.  And that was both a question

19  and kind of a suggestion.

20          MR. HALL:  Your Honor, I will not be driving the van

21  or doing the call-out, but I will do my best to talk to my

22  client and make sure that she is here earlier.

23          THE COURT:  All right.

24          MR. HALL:  Your Honor, I do believe there was a little

25  bit of confusion because the initial transport order was for

1      7:30; that was moved to 8:30.

2           What time can Ms. Edmo be here in the morning in regards to

3      the marshals?  Are they able to accept her at 7:30?

4           THE COURT:  Why don't I let you work -- Mr. Severson

5      will perhaps put you in touch with the marshal, if need be, so

6      you can work that out.

7           MR. HALL:  Thank you.

8           THE COURT:  Maybe all three parties -- three attorneys

9      can get together with Mr. Severson and work out the details.

10     And I think perhaps allowing her to change clothes before she

11     comes might be an answer, as well, just to make it easier on

12     everyone.  But however you work that out is fine with me.

13          Okay.  Mr. Eaton, anything else?

14          MR. EATON:  Not at this time, Your Honor.  Thank you.

15          THE COURT:  We will be in recess until 8:30 tomorrow

16     morning.

17          Sorry.  I would like to see Exhibits -- either hard or

18     electronic copies of Exhibits 15 and 19 so I can look at them.

19     If you can submit them by email if they are electronic.  If you

20     have hard copies and they are not terribly long, give them to

21     Mr. Severson.

22          All right.  We will be in recess.

23          (Court recessed at 2:35 p.m.)

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5

6             I, Tamara Hohenleitner, Federal Official Realtime

7    Court Reporter, in and for the United States District Court for

8    the District of Idaho, do hereby certify that pursuant to

9    Section 753, Title 28, United States Code, that the foregoing

10   is a true and correct transcript of the stenographically

11   reported proceedings held in the above-entitled matter and that

12   the transcript page format is in conformance with the

13   regulations of the Judicial Conference of the United States.

14

15                         Dated this 19th day of October, 2018.

16

17

18                         /S/ TAMARA I. HOHENLEITNER
                           _____
19                         TAMARA I. HOHENLEITNER, CSR NO. 619, CRR
                           FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25

**0**

**0.23** [1] - 104:12
**0.4** [1] - 104:12
**0065** [1] - 161:6

**1**

**1** [13] - 75:18, 84:21,
84:23, 85:1, 85:2,
85:3, 85:7, 104:10,
104:12, 158:6,
159:18, 159:19,
165:17
**1-538** [1] - 85:9
**10** [19] - 6:2, 137:8,
140:25, 141:2, 157:9,
157:10, 157:12,
157:25, 158:1,
166:12, 166:16,
166:18, 166:21,
166:24, 167:2,
182:18, 183:5
**100** [5] - 36:6, 71:19,
128:8, 167:5
**1001** [4] - 48:2, 48:7,
48:10, 48:13
**1003** [4] - 40:22,
41:1, 41:4, 41:5
**10:41** [1] - 66:10
**11** [1] - 183:6
**11:00** [1] - 66:10
**12** [6] - 18:7, 60:8,
61:6, 62:1, 77:11,
183:10
**12:10** [1] - 105:21
**12:19** [1] - 105:21
**13** [1] - 67:11
**15** [12] - 42:12,
52:20, 66:8, 75:9,
109:25, 118:8,
162:14, 175:12,
179:2, 180:22, 186:18
**15-28** [1] - 120:7
**15-30** [1] - 121:12
**15-66** [2] - 145:22,
145:25
**15-minute** [1] - 66:8
**1566** [1] - 75:10
**16** [1] - 35:17
**17** [2] - 176:5, 179:5
**17-151** [1] - 6:3
**19** [5] - 85:3, 85:5,
85:7, 109:7, 186:18
**1976** [1] - 41:25
**1979** [4] - 17:11,
41:24, 41:25, 42:7
**1980** [1] - 40:20
**1993** [1] - 43:16
**1998** [1] - 54:15

**1:08** [1] - 141:3
**1:25** [1] - 141:3

**2**

**2** [3] - 76:2, 145:18,
159:18
**2,000** [1] - 42:2
**20** [4] - 71:19, 85:11,
108:7, 173:8
**200** [2] - 166:25,
167:2
**2006** [1] - 33:3
**2009** [2] - 33:6,
164:18
**2010** [5] - 25:3,
35:18, 96:17, 97:2,
97:5
**2011** [4] - 35:19,
43:1, 52:23, 146:15
**2012** [24] - 10:14,
10:15, 10:16, 18:11,
24:10, 24:18, 25:4,
33:5, 35:7, 43:1,
96:17, 97:22, 114:15,
114:18, 115:2, 116:9,
128:21, 129:18,
131:9, 131:13,
137:24, 138:14,
138:16, 141:11
**2013** [1] - 46:14
**2014** [5] - 11:2,
27:21, 159:8, 163:10,
163:11
**2015** [1] - 27:22
**2016** [3] - 39:12,
85:11, 160:18
**2017** [8] - 1:3,
44:22, 147:8, 147:16,
148:19, 150:15,
164:18, 164:21
**2018** [9] - 6:2, 36:5,
111:17, 115:12,
120:14, 125:7, 128:7,
182:18, 183:6
**2034** [2] - 161:6,
163:15
**20s** [1] - 164:8
**21** [1] - 86:13
**22** [4] - 120:1, 120:6,
175:13, 179:2
**23** [3] - 147:8,
148:19, 150:15
**23-page** [1] - 79:8
**23-plus** [1] - 94:18
**24** [2] - 71:19, 121:11
**24-month** [1] - 61:4
**25** [2] - 107:22, 108:1
**26** [2] - 94:23, 94:24
**26(a)(2)(D** [1] - 93:19

**29** [2] - 111:17,
113:21
**2:30** [2] - 7:23,
183:19
**2:35** [1] - 186:23

**3**

**3** [3] - 57:25, 121:15,
167:10
**3,000** [6] - 43:19,
105:1, 156:12,
157:12, 166:11, 167:2
**30** [4] - 44:11, 63:18,
113:2
**300** [8] - 44:1,
156:17, 156:18,
157:7, 157:12,
157:14, 166:8, 166:24
**300-patient** [1] -
157:4
**30s** [1] - 164:9
**31st** [1] - 163:11
**3:00** [3] - 7:25, 8:1,
185:6

**4**

**4** [7] - 58:1, 76:8,
96:20, 96:24, 145:7,
145:11, 145:13
**4-1** [1] - 96:25
**4-4** [1] - 96:24
**4-6** [1] - 97:20
**43** [1] - 176:22
**44** [1] - 177:10
**45** [1] - 178:2

**5**

**5** [3] - 60:8, 77:5,
176:21
**50** [1] - 59:13
**58** [1] - 178:18

**6**

**6** [4] - 61:6, 77:9,
178:19, 179:10
**60** [2] - 145:24
**61** [3] - 71:20, 71:21,
72:1
**62-1** [1] - 71:19
**64** [6] - 86:13, 86:14,
86:15, 89:16, 90:8,
91:3
**65** [3] - 162:8, 163:9,
164:8
**68** [1] - 145:21
**6:30** [1] - 185:12

**6A** [1] - 178:21

**7**

**7** [3] - 52:22, 148:6,
167:9
**74** [1] - 113:17
**7:30** [2] - 186:1,
186:3

**8**

**8** [2] - 147:11, 167:9
**80** [1] - 105:5
**8:30** [4] - 24:2, 185:5,
186:1, 186:15

**9**

**92** [1] - 167:10
**99** [1] - 104:19
**9:00** [1] - 185:14

**A**

**a.m** [2] - 66:10
**ability** [17] - 6:23,
49:12, 50:13, 51:8,
58:16, 59:16, 60:5,
61:11, 63:25, 76:19,
77:16, 77:20, 83:18,
102:12, 124:23,
170:17, 182:16
**able** [23] - 6:10, 6:19,
23:8, 39:10, 52:5,
57:16, 57:17, 57:23,
62:7, 70:13, 72:14,
91:17, 92:10, 102:13,
140:18, 142:18,
142:21, 150:24,
161:4, 162:19,
175:24, 181:24, 186:3
**Abound** [1] - 176:8
**absolutely** [1] - 22:1
**abuse** [27] - 20:11,
23:2, 31:4, 34:25,
35:2, 35:6, 35:22,
37:8, 51:14, 51:16,
82:25, 83:2, 83:3,
83:10, 84:9, 84:13,
122:12, 127:19,
127:20, 129:2, 129:4,
129:12, 132:14,
133:23, 133:24
**abusive** [3] - 35:20,
127:16, 181:16
**Academy** [1] - 42:18
**accept** [1] - 186:3
**accepted** [6] - 11:4,
24:14, 28:19, 45:7,

177:8
**accepting** [1] - 13:9
**access** [8] - 43:14,
93:24, 123:17, 139:7,
140:8, 141:21, 175:4,
175:8
**accommodations**
[1] - 27:13
**accompany** [1] -
177:24
**accomplish** [1] -
61:17
**according** [3] -
158:9, 158:10, 158:11
**account** [1] - 86:10
**accounts** [2] -
116:21, 117:3
**accoutrements** [3] -
50:4, 62:25, 64:6
**accurate** [6] - 40:23,
53:23, 77:7, 151:23,
178:24, 180:13
**achieve** [1] - 63:2
**acknowledge** [2] -
21:14, 154:4
**act** [1] - 12:11
**acting** [1] - 171:11
**action** [2] - 28:13,
77:25
**actions** [1] - 132:13
**actively** [1] - 58:15
**activities** [2] - 36:4,
171:21
**activity** [1] - 130:25
**actual** [2] - 15:9,
63:21, 111:22,
120:19, 163:20
**acute** [1] - 10:23
**addition** [4] - 41:8,
67:17, 88:4, 140:6
**additional** [8] - 7:25,
9:5, 12:4, 19:21,
23:10, 89:24, 101:21,
103:17
**additionally** [1] -
48:17
**address** [12] - 15:12,
24:4, 32:12, 34:20,
38:19, 38:23, 56:22,
66:24, 71:13, 84:6,
122:18, 164:13
**addressed** [3] - 19:4,
65:16, 145:18
**addressing** [2] -
65:7, 123:7
**adequacy** [4] -
66:20, 85:17, 86:23,
87:4
**adequate** [4] - 10:1,
60:5, 80:15, 162:12

**adequately** [2] - 10:10, 70:9
**adjustable** [1] - 71:5
**administration** [1] - 148:16
**admissibility** [1] - 85:4
**admissible** [1] - 109:7
**admission** [1] - 131:12
**admit** [4] - 84:24, 85:5, 148:18, 163:14
**admitted** [13] - 41:4, 41:5, 48:10, 48:13, 85:7, 93:16, 109:7, 109:25, 111:10, 131:4, 149:5, 175:12, 179:6
**adolescents** [2] - 147:14, 157:24
**Adree** [2] - 6:4, 9:10
**adults** [3] - 144:22, 148:14, 175:16
**advance** [1] - 171:25
**advanced** [3] - 30:7, 30:15, 32:3
**advances** [1] - 45:15
**advocacy** [1] - 27:19
**affect** [2] - 6:23, 20:13
**affecting** [1] - 31:9
**affects** [1] - 67:25
**affirmed** [8] - 50:20, 54:6, 61:12, 62:5, 62:8, 62:19, 64:21
**affirming** [1] - 142:24
**afford** [1] - 167:15
**afternoon** [3] - 7:22, 8:4, 185:8
**afterwards** [1] - 95:3
**age** [6] - 29:1, 56:18, 76:6, 162:8, 164:7, 171:23
**agencies** [1] - 46:6
**agency** [1] - 43:14
**aggression** [4] - 37:10, 133:5, 134:4, 134:7
**aggressive** [1] - 37:13
**ago** [6] - 19:1, 76:14, 135:16, 150:1, 150:5, 156:11
**agree** [35] - 12:14, 12:15, 12:21, 13:6, 13:8, 13:17, 14:8, 14:9, 14:13, 16:15, 81:13, 100:23,

118:21, 119:5, 119:17, 119:24, 123:4, 123:25, 124:7, 124:12, 124:21, 130:18, 131:24, 134:5, 134:6, 136:19, 137:24, 138:2, 138:3, 139:19, 139:22, 143:20, 145:7, 160:13, 184:1
**agreed** [4] - 6:10, 13:15, 23:16, 91:24
**agreement** [1] - 14:14
**ahead** [22] - 47:14, 47:17, 63:22, 66:11, 71:2, 74:1, 84:8, 86:21, 86:25, 87:11, 87:18, 91:6, 91:10, 95:16, 101:1, 103:1, 103:3, 160:2, 162:16, 165:8, 175:1, 175:2
**aid** [1] - 73:16
**aimed** [1] - 32:12
**alarming** [1] - 36:3
**alcohol** [4] - 35:8, 35:18, 129:14, 171:10
**align** [1] - 49:1, 181:4
**alignment** [1] - 138:3
**all-male** [1] - 172:16
**alleviate** [2] - 15:2, 15:16
**alleviated** [1] - 10:21
**allow** [8] - 64:18, 84:3, 84:6, 90:15, 93:22, 95:6, 102:18, 103:2
**allowed** [8] - 24:25, 64:3, 64:5, 64:8, 93:22, 94:8, 142:12
**allowing** [3] - 144:10, 144:13, 186:10
**allows** [1] - 28:18
**almost** [6] - 9:13, 42:12, 68:7, 169:24, 183:19, 185:14
**alone** [2] - 32:1, 180:16
**alter** [1] - 54:9
**altercations** [1] - 133:14
**altered** [1] - 53:7
**alternative** [2] - 8:25, 14:2
**ambit** [1] - 9:25
**ambush** [1] - 88:13
**amend** [1] - 93:23
**Amendment** [9] -

11:19, 11:24, 12:3, 12:10, 12:23, 13:25, 14:16, 19:13, 19:18
**Amendment's** [2] - 9:25, 11:13
**American** [11] - 17:8, 17:9, 42:14, 42:15, 42:16, 42:18, 42:19, 45:23, 177:13
**Americans** [1] - 59:13
**amount** [8] - 7:20, 17:25, 27:15, 61:2, 61:4, 68:16, 76:24, 137:2
**anal** [1] - 58:6
**analysis** [5] - 13:2, 24:17, 27:25, 30:22, 165:19
**analyzed** [1] - 166:2
**anatomical** [1] - 72:6
**anesthesia** [1] - 154:12
**aneurysm** [1] - 177:4
**Anne** [4] - 101:3, 101:8, 158:12
**announced** [1] - 136:25
**answer** [18] - 17:22, 21:4, 89:2, 93:5, 93:7, 104:18, 106:14, 127:5, 146:18, 146:19, 146:20, 149:23, 165:6, 175:1, 175:2, 175:3, 181:3, 186:11
**answered** [3] - 91:9, 106:16, 124:5
**anti** [1] - 176:17
**anticipate** [1] - 8:15
**anticipated** [1] - 6:13
**anticipating** [1] - 6:19
**antidepressant** [2] - 68:16, 69:6
**antidepressants** [2] - 59:18, 172:7
**anxiety** [36] - 21:7, 31:3, 33:14, 33:16, 33:18, 34:17, 35:21, 39:5, 50:22, 67:13, 67:18, 67:20, 68:2, 68:7, 68:10, 76:15, 77:3, 122:11, 125:2, 125:3, 125:4, 125:5, 125:6, 125:14, 125:23, 125:24, 126:6, 126:16, 126:25, 127:21, 128:18, 128:24,

170:7, 170:20, 171:10, 172:2
**anxious** [1] - 67:14
**anyway** [2] - 8:23, 95:15
**aortic** [1] - 177:4
**apart** [2] - 100:19, 168:24
**apiece** [1] - 38:9
**apologies** [1] - 87:8
**apologize** [4] - 23:25, 85:22, 160:8, 162:17
**appear** [7] - 50:19, 61:11, 61:13, 63:25, 64:7, 136:17, 144:10
**appearance** [1] - 77:21
**appearing** [1] - 50:1
**apple** [1] - 165:13
**applicable** [1] - 28:21
**application** [1] - 25:13
**applied** [5] - 12:8, 27:12, 27:24, 58:23, 94:19
**applies** [5] - 7:13, 22:10, 95:2, 110:5, 110:8
**apply** [9] - 27:1, 27:9, 29:14, 38:16, 110:2, 145:1
**applying** [1] - 27:17
**appointed** [1] - 46:19
**appreciate** [3] - 9:20, 24:4, 106:14
**approach** [2] - 94:17, 181:9
**Appropriate** [2] - 26:16, 99:18
**appropriate** [37] - 11:10, 14:5, 17:15, 19:14, 19:24, 20:17, 21:14, 24:17, 25:13, 25:18, 25:19, 27:24, 29:8, 29:22, 29:25, 30:1, 32:18, 37:25, 38:13, 38:14, 38:16, 39:3, 39:7, 45:21, 60:9, 69:22, 72:23, 89:11, 90:3, 90:20, 90:24, 98:4, 101:20, 140:10, 168:18, 175:8, 181:6
**appropriately** [3] - 69:21, 70:13, 138:23
**appropriateness** [1] - 84:18
**April** [2] - 85:11, 89:6

**Archives** [3] - 109:11, 109:17
**area** [8] - 25:20, 25:23, 28:14, 45:6, 62:9, 68:2, 71:1, 94:8
**areas** [4] - 8:24, 28:5, 42:3, 148:1
**argue** [3] - 16:16, 18:18, 21:2
**arguing** [2] - 16:13, 29:4
**argument** [3] - 16:14, 19:19, 79:6
**arguments** [2] - 8:8, 9:8, 22:12
**arise** [1] - 124:24
**arises** [2] - 12:12, 68:4
**arm** [2] - 20:24, 98:16
**army** [1] - 171:20
**arousal** [1] - 67:14
**arrived** [1] - 185:13
**arriving** [1] - 77:19
**article** [19] - 26:14, 45:4, 45:10, 45:15, 99:13, 99:17, 99:19, 99:21, 100:1, 100:2, 100:5, 100:7, 100:9, 100:15, 101:3, 101:17, 102:15, 108:24, 111:10
**articles** [7] - 26:11, 27:11, 44:24, 100:20, 100:21, 109:17, 158:12
**ascribe** [1] - 101:14
**aspect** [1] - 156:6
**aspects** [2] - 67:11, 82:5
**assaults** [2] - 37:11, 133:13
**assess** [4] - 57:5, 85:15, 86:10, 181:7
**Assess** [1] - 121:15
**assessed** [2] - 44:11, 56:23
**assessing** [7] - 44:9, 45:19, 56:6, 56:7, 63:16, 95:25, 96:7
**assessment** [11] - 43:7, 47:10, 54:17, 69:24, 75:16, 85:14, 85:18, 86:2, 87:5, 161:9, 179:15
**assigned** [13] - 48:23, 49:4, 49:9, 49:10, 49:13, 49:15, 50:10, 50:18, 51:11, 62:11, 63:3, 63:24,

65:2
**assignment** [1] - 89:8
**assisted** [2] - 121:24, 143:7
**associated** [3] - 64:21, 80:21, 181:14
**association** [2] - 17:8, 27:5
**Association** [11] - 17:8, 17:9, 17:10, 40:10, 41:16, 41:21, 42:15, 42:16, 42:17, 42:18
**associations** [1] - 103:11
**assume** [5] - 29:4, 83:25, 168:19, 170:6, 171:2
**assuming** [3] - 14:14, 18:17, 63:12
**astonishing** [1] - 25:5
**attacked** [1] - 133:19
**attain** [1] - 61:3
**attained** [2] - 61:3, 72:19
**attempt** [5] - 63:25, 69:6, 80:11, 80:15, 169:5
**attempted** [11] - 35:14, 35:17, 35:19, 35:25, 38:19, 38:22, 77:22, 80:4, 80:9, 115:17, 127:25
**attempting** [3] - 37:5, 64:9, 159:13
**attempts** [17] - 10:24, 20:23, 36:1, 52:15, 80:8, 81:12, 98:11, 115:22, 116:1, 116:2, 126:16, 126:19, 127:1, 127:9, 127:21, 128:18, 129:8
**attend** [5] - 135:25, 139:10, 139:12, 139:13, 139:17
**attendant** [4] - 50:24, 68:8, 72:4, 105:9
**attended** [1] - 136:11
**attending** [1] - 69:7
**attention** [14] - 36:16, 36:18, 78:5, 78:8, 78:11, 78:15, 78:18, 98:19, 120:1, 121:11, 131:5, 137:2, 176:23, 181:21
**attention-reduction** [1] - 98:19
**attenuate** [3] - 52:5,

61:17, 69:9
**attenuated** [2] - 76:21, 172:4
**attenuates** [1] - 61:16
**attenuation** [1] - 62:15
**attorneys** [2] - 94:20, 186:8
**attracted** [1] - 49:19
**attributed** [2] - 127:12, 127:13
**attributes** [1] - 62:5
**augmentation** [1] - 177:5
**authentic** [1] - 61:24
**authenticity** [1] - 84:22
**author** [2] - 155:6, 155:7
**authored** [2] - 44:14, 44:23
**authority** [2] - 17:2, 147:12
**authors** [7] - 42:23, 53:15, 99:14, 99:23, 100:8, 101:3, 101:10
**autism** [1] - 57:21
**available** [9] - 26:21, 29:24, 47:7, 53:18, 55:2, 55:3, 68:17, 146:16, 148:10
**average** [1] - 60:23
**avoid** [3] - 19:12, 19:18, 95:11
**avoiding** [1] - 91:19
**aware** [61] - 27:2, 35:15, 76:13, 77:1, 80:3, 82:20, 84:10, 98:21, 99:9, 101:23, 103:4, 103:12, 103:25, 110:9, 111:2, 111:4, 111:7, 116:11, 116:13, 116:16, 116:20, 116:25, 117:3, 117:4, 117:14, 117:17, 125:1, 126:14, 127:3, 128:2, 131:8, 131:11, 131:15, 131:21, 134:24, 135:1, 135:10, 135:12, 136:11, 136:12, 138:6, 139:25, 140:14, 140:15, 141:15, 142:25, 143:16, 146:7, 147:7, 151:8, 152:6, 152:19, 153:15, 153:19, 155:14, 155:18,

158:23, 177:20, 178:11, 184:22
**awareness** [4] - 70:2, 137:9, 137:10, 137:13
**awkward** [2] - 7:17, 172:12

## B

**baby's** [1] - 49:11
**back-and-forth** [1] - 95:11
**back-to-back** [1] - 6:16
**background** [4] - 63:12, 63:13, 79:12, 150:12
**bacterial** [1] - 175:10
**bad** [1] - 65:14
**baked** [1] - 82:10
**balding** [1] - 60:16
**Ban** [1] - 114:1
**base** [1] - 181:6
**based** [66] - 11:18, 22:13, 22:14, 26:10, 26:25, 27:16, 27:18, 27:19, 46:12, 49:10, 53:12, 53:17, 54:25, 57:2, 69:23, 69:24, 73:5, 74:5, 75:15, 75:16, 77:1, 77:15, 77:16, 80:3, 81:9, 81:11, 82:19, 82:24, 83:4, 90:17, 91:14, 91:15, 91:16, 92:5, 92:9, 104:7, 104:25, 120:23, 124:10, 139:24, 146:16, 146:25, 147:24, 148:4, 148:7, 148:9, 148:15, 148:17, 151:11, 152:21, 161:9, 163:12, 163:17, 164:4, 164:6, 168:14, 168:19, 170:18, 171:4, 172:23, 174:5, 178:1, 178:17, 179:11, 181:17
**bases** [2] - 88:9, 92:8
**basis** [14] - 26:10, 28:20, 35:9, 63:7, 74:7, 84:15, 88:14, 100:6, 126:18, 129:18, 136:14, 156:21, 178:16, 178:17
**beards** [1] - 97:12
**bearing** [2] - 97:13,

97:17
**beating** [1] - 167:21
**became** [1] - 150:22
**Beck** [1] - 126:8
**become** [2] - 179:16, 184:4
**becomes** [1] - 174:23
**began** [2] - 91:9, 163:11
**begin** [2] - 24:5, 53:4
**beginning** [3] - 55:23, 72:1, 123:14
**begun** [1] - 141:14
**behalf** [1] - 23:25
**behave** [1] - 16:14
**behaved** [1] - 15:14
**Behavior** [3] - 109:11, 109:12, 109:18
**behavior** [10] - 20:8, 31:21, 36:13, 37:9, 98:19, 128:9, 128:12, 128:13, 132:19, 132:20
**behavioral** [1] - 67:14
**Behavioral** [1] - 114:4
**behaviors** [6] - 20:10, 51:12, 130:3, 130:4, 130:19, 156:4
**belonging** [1] - 78:10
**bench** [1] - 94:19
**beneficial** [1] - 81:19
**beneficiaries** [4] - 161:13, 162:7, 163:3, 163:5
**benefit** [6] - 59:4, 59:9, 70:15, 145:22, 146:3, 161:14
**benefits** [2] - 58:17, 62:25
**best** [17] - 8:1, 8:25, 17:13, 17:14, 26:8, 29:15, 34:14, 34:18, 53:17, 63:24, 71:12, 77:16, 77:20, 124:10, 146:16, 178:16, 185:21
**better** [5] - 15:14, 16:14, 21:17, 25:9, 29:18
**between** [16] - 7:12, 11:15, 14:4, 26:11, 26:18, 48:22, 51:9, 55:2, 55:5, 75:1, 81:25, 89:6, 104:12, 143:4, 181:24, 182:25
**beyond** [15] - 56:3,

68:5, 70:18, 73:2, 78:23, 83:13, 83:21, 84:14, 91:2, 100:3, 102:3, 150:7, 179:18, 182:1, 182:4
**bipolar** [2] - 156:7, 170:16
**birth** [7] - 49:10, 49:14, 49:15, 51:11, 62:11, 65:2, 80:2
**bit** [3] - 16:12, 71:10, 185:25
**bite** [1] - 165:13
**blockers** [1] - 148:16
**blood** [2] - 80:17
**blow** [5] - 55:17, 75:10, 176:23, 177:10, 179:9
**board** [2] - 45:14, 153:10
**board-certified** [1] - 153:10
**bodily** [1] - 67:25
**body** [8] - 19:16, 23:5, 45:15, 48:25, 60:17, 80:19, 105:5, 162:12
**bolded** [1] - 30:11
**book** [1] - 47:21
**books** [1] - 44:14
**borderline** [10] - 132:21, 132:22, 132:23, 133:6, 133:7, 139:21, 139:23, 155:25, 181:15, 182:10
**born** [1] - 169:12
**bottom** [3] - 8:20, 55:17, 75:10
**bounds** [1] - 183:8
**boyfriend** [1] - 129:6
**boys** [1] - 56:12
**bra** [3] - 141:16, 141:19, 141:21
**Bracke** [1] - 8:3
**brain** [4] - 60:12, 60:13, 172:23, 173:1
**brains** [1] - 172:24
**break** [9] - 64:12, 66:6, 105:15, 105:17, 105:19, 140:16, 140:21, 141:1, 168:2
**breaker** [1] - 95:13
**breakfast** [1] - 185:13
**breaking** [1] - 140:23
**breast** [4] - 60:15, 61:2, 64:25, 78:2
**breasts** [4] - 65:1, 141:12, 141:14, 177:6

**brief** [4] - 8:8, 18:15, 23:18, 93:10
**briefing** [3] - 6:23, 6:24, 13:12
**briefly** [3] - 74:7, 108:25, 114:9
**briefs** [1] - 19:8
**bring** [3] - 15:25, 71:6, 75:9
**bringing** [4] - 20:8, 23:3, 31:21
**brings** [1] - 30:3
**broach** [1] - 88:21
**brought** [1] - 150:6
**brush** [1] - 178:15
**bubble** [1] - 37:6
**building** [1] - 8:20
**bullet** [7] - 28:11, 31:1, 31:11, 31:17, 176:24, 177:11, 178:3
**bump** [1] - 25:11
**bundle** [1] - 80:18
**burden** [2] - 6:18, 88:16
**bush** [1] - 167:21
**button** [1] - 159:12
**BY** [42] - 40:5, 41:6, 47:18, 48:14, 63:14, 64:19, 66:17, 71:23, 73:5, 74:4, 79:21, 84:9, 85:8, 87:2, 90:17, 91:7, 91:14, 95:17, 96:23, 101:2, 103:4, 104:24, 106:2, 109:10, 110:23, 116:23, 118:16, 140:14, 141:9, 146:18, 153:3, 159:2, 160:9, 162:19, 164:15, 165:15, 173:12, 175:11, 179:9, 181:11, 183:11, 184:10

## C

**Caitlyn** [1] - 136:25
**calculate** [1] - 157:22
**call-out** [1] - 185:21
**cancer** [4] - 21:6, 58:6, 58:9, 154:22
**cannot** [3] - 86:8, 98:20, 125:24
**capable** [1] - 20:18
**capacity** [5] - 57:12, 76:2, 99:3, 99:6, 145:4
**captured** [2] - 31:11, 146:2

**carcinogenic** [1] - 154:22
**Care** [1] - 176:21
**care** [76] - 6:19, 11:4, 11:14, 11:18, 11:22, 11:25, 13:1, 14:18, 17:1, 19:17, 26:7, 40:16, 42:1, 42:4, 42:6, 42:9, 42:10, 42:22, 42:24, 43:6, 43:8, 43:13, 43:14, 44:13, 44:21, 45:25, 46:12, 52:17, 52:21, 52:25, 53:10, 53:16, 53:22, 54:1, 54:12, 54:14, 54:23, 55:1, 55:11, 59:2, 74:8, 75:6, 80:15, 89:11, 90:20, 91:12, 96:13, 99:7, 101:14, 101:15, 103:15, 103:19, 103:20, 108:15, 109:22, 110:3, 118:7, 118:17, 118:18, 118:22, 119:12, 120:2, 121:12, 139:24, 144:14, 145:21, 146:25, 147:10, 147:20, 151:11, 156:22, 160:22, 161:1, 170:18, 177:15
**carries** [1] - 155:11
**Case** [1] - 6:3
**case** [59] - 6:13, 8:13, 9:23, 13:21, 14:13, 14:22, 15:7, 15:17, 16:11, 18:22, 18:23, 20:3, 22:3, 23:20, 24:6, 24:13, 24:17, 24:20, 25:14, 25:16, 26:2, 26:10, 26:14, 27:24, 29:16, 30:16, 30:22, 31:18, 34:22, 35:13, 36:19, 43:10, 46:23, 64:8, 81:7, 90:2, 95:19, 108:2, 111:19, 111:22, 113:21, 117:9, 149:15, 150:19, 150:21, 168:24, 170:21, 173:5, 176:1, 178:16, 180:7, 180:12, 182:19
**case-by-case** [5] - 24:17, 26:10, 27:24, 30:22, 178:16
**cases** [10] - 13:25, 49:12, 64:1, 101:20, 107:22, 108:1, 154:3,

156:19, 167:19, 168:25
**castration** [3] - 20:24, 35:25, 36:1
**catch** [2] - 179:8, 185:6
**category** [1] - 75:12
**caused** [1] - 127:1
**causes** [3] - 79:7, 127:21, 169:7
**causing** [2] - 34:18, 34:21
**cavity** [1] - 80:19
**CCHP** [1] - 106:22
**ceiling** [1] - 165:25
**Center** [1] - 114:4
**certain** [13] - 7:5, 17:25, 26:21, 34:20, 43:23, 59:19, 72:17, 124:14, 134:12, 140:18, 142:1, 158:6, 171:15
**certainly** [4] - 16:13, 32:2, 38:9, 95:6
**certifications** [2] - 120:20, 120:25
**certified** [2] - 106:21, 153:10
**cetera** [3] - 60:17, 78:3, 102:16
**chair** [1] - 43:2
**chaired** [3] - 63:11, 174:9, 174:12
**chairing** [2] - 79:12, 174:16
**challenge** [3] - 6:12, 86:2, 159:7
**challenged** [1] - 100:22
**challenges** [3] - 23:5, 158:21, 171:2
**challenging** [1] - 22:25
**chance** [4] - 9:20, 22:22, 73:20, 102:25
**change** [10] - 11:15, 15:25, 25:24, 46:15, 59:21, 62:6, 82:11, 143:7, 185:15, 186:10
**changed** [7] - 6:21, 26:4, 92:9, 118:13, 137:17, 137:18, 159:25
**changes** [5] - 28:9, 53:9, 123:8, 123:16, 147:1
**changing** [2] - 26:6, 28:8
**character** [1] - 23:6
**characteristic** [1] -

181:21
**characteristics** [6] - 50:18, 54:10, 60:15, 72:19, 78:2, 168:11
**characterize** [1] - 22:7
**characterological** [3] - 59:20, 82:7, 82:9
**charged** [1] - 142:6
**chart** [2] - 83:24, 84:4
**checked** [1] - 45:14
**chemotherapy** [2] - 21:8, 58:9
**Chicago** [2] - 40:12, 106:4
**chicken** [1] - 34:12
**child** [6] - 49:11, 49:15, 51:10, 56:12, 56:20, 57:1
**childhood** [3] - 20:11, 84:14, 114:9
**children** [4] - 44:8, 147:14, 148:14, 148:16, 157:23, 171:22
**choice** [5] - 14:6, 19:17, 29:9, 29:10, 69:16
**choose** [1] - 62:12
**chosen** [2] - 14:18, 29:9
**chronic** [2] - 122:6, 133:2
**circulated** [1] - 43:1
**circulating** [2] - 60:20, 169:14
**cite** [1] - 63:9
**cites** [1] - 109:16
**city** [1] - 9:13
**Civil** [2] - 6:3, 89:19
**claim** [2] - 11:20, 20:22
**claimed** [2] - 114:25, 127:16
**claims** [2] - 7:15, 32:21
**clarification** [1] - 95:10
**clarify** [2] - 88:11, 153:9
**clarifying** [1] - 157:17
**Clarity** [1] - 176:7
**Clark** [2] - 27:22, 184:21
**class** [4] - 7:22, 139:19, 139:20, 183:20
**classes** [1] - 140:1

**Classification** [1] - 46:17
**clear** [7] - 11:17, 17:23, 29:17, 34:8, 89:21, 157:3, 166:5
**clearly** [6] - 74:2, 79:3, 86:22, 88:9, 88:14, 89:6
**clerk** [1] - 39:21
**CLERK** [8] - 6:3, 8:5, 39:23, 159:13, 159:16, 159:19, 160:1, 160:3
**client** [1] - 185:22
**clients** [8] - 23:25, 24:2, 65:25, 115:16, 122:3, 123:15, 157:22, 172:7
**clinical** [26] - 15:9, 21:10, 21:22, 26:9, 31:24, 40:9, 57:7, 64:19, 65:7, 65:10, 67:3, 67:12, 80:6, 118:18, 118:22, 119:1, 119:14, 124:16, 124:22, 128:16, 136:13, 139:7, 140:9, 161:9, 170:7, 176:3
**clinically** [4] - 13:18, 13:22, 51:3, 51:5
**clinician** [1] - 171:2
**clinicians** [10] - 27:17, 30:24, 31:23, 37:4, 37:18, 131:13, 136:13, 140:19, 155:15, 155:19
**clock** [1] - 7:21
**close** [1] - 22:17
**closed** [1] - 14:19
**closely** [2] - 24:19, 166:18
**closing** [2] - 37:21, 171:7
**clothes** [1] - 186:10
**clothing** [4] - 50:4, 62:25, 115:5, 115:6
**CMS** [5] - 159:3, 159:6, 159:10, 160:12, 163:1
**codes** [1] - 47:22
**coexisting** [16] - 30:25, 31:8, 31:10, 31:19, 32:7, 32:12, 32:20, 33:22, 38:17, 38:23, 121:16, 122:18, 123:15, 124:13, 124:24, 139:14
**cognitive** [5] - 67:22,

67:23, 68:25, 69:4, 69:11

**cognizable** [2] - 12:23, 13:23

**coincided** [1] - 129:25

**collaborating** [1] - 46:1

**collated** [1] - 74:14

**College** [3] - 42:19, 45:23, 45:24

**comfortable** [2] - 9:6, 62:7

**coming** [3] - 75:23, 165:2, 183:20

**commissary** [1] - 70:7

**commission** [1] - 147:24

**Commission** [2] - 42:17, 106:23

**commit** [1] - 127:25

**commitment** [1] - 135:24

**committed** [1] - 96:13

**Committee** [1] - 43:2

**committee** [9] - 43:5, 43:6, 63:11, 79:12, 113:6, 113:9, 148:3, 174:13, 174:16

**common** [4] - 68:7, 165:19, 165:22, 173:19

**communication** [1] - 9:18

**community** [12] - 11:15, 12:2, 12:8, 18:9, 26:18, 27:14, 28:19, 53:5, 54:18, 55:4, 56:20, 115:16

**comorbid** [1] - 68:20

**comparable** [1] - 72:20

**compare** [1] - 51:25

**compared** [1] - 164:8

**competency** [3] - 120:5, 120:16, 175:20

**competent** [2] - 124:22, 175:23

**complain** [1] - 176:19

**complained** [1] - 125:5

**complaining** [1] - 149:21

**complete** [4] - 38:10, 39:24, 112:20, 135:16

**completed** [7] - 6:12, 36:23, 46:17, 134:17,

134:23, 135:6, 135:13

**completely** [2] - 49:18, 94:23

**complex** [5] - 16:18, 16:24, 16:25, 17:19, 34:16

**Complexity** [1] - 176:7

**compliance** [1] - 180:24

**compliant** [3] - 77:2, 77:4, 99:9

**complicate** [2] - 31:13, 122:24

**complicating** [1] - 38:18

**complication** [1] - 154:21

**complications** [9] - 60:7, 74:16, 154:9, 154:17, 155:8, 155:12, 163:13, 177:14

**comply** [3] - 94:24, 99:3, 170:18

**component** [4] - 33:5, 34:21, 36:19, 61:15

**components** [1] - 67:1

**compulsivity** [1] - 122:12

**computer** [6] - 90:6, 158:25, 159:14, 159:22, 159:23, 160:5

**conceived** [2] - 176:24, 177:3

**concept** [1] - 37:2

**conceptualize** [1] - 46:16

**concern** [10] - 16:18, 34:7, 36:8, 83:11, 139:17, 147:22, 151:10, 169:25, 170:9, 185:11

**concerned** [4] - 28:12, 96:4, 170:13, 175:1

**concerning** [2] - 66:22, 73:21

**concerns** [63] - 29:19, 30:10, 30:12, 30:25, 31:4, 31:8, 31:11, 31:19, 32:8, 32:19, 33:21, 33:22, 33:25, 34:1, 34:6, 35:5, 36:10, 37:17, 37:20, 38:18, 38:24, 39:5, 44:8, 57:12, 58:2, 58:14, 58:24,

58:25, 59:19, 59:25, 66:25, 83:5, 83:6, 83:7, 83:17, 84:11, 98:12, 98:17, 121:17, 122:4, 122:10, 122:13, 122:18, 122:21, 123:7, 123:16, 123:21, 124:14, 139:14, 145:9, 146:8, 146:24, 147:9, 147:12, 147:18, 148:25, 151:22, 155:14, 164:11, 169:21, 169:24, 171:8, 172:1

**concert** [2] - 45:11, 50:11

**conclude** [1] - 75:18

**concluded** [1] - 76:14

**conclusion** [5] - 75:23, 77:15, 77:19, 177:21, 180:15

**conclusions** [1] - 6:25

**concurrent** [1] - 123:22

**condition** [41] - 9:25, 11:10, 13:20, 13:22, 14:15, 19:1, 19:3, 19:12, 21:18, 21:19, 22:19, 32:1, 37:23, 40:16, 48:17, 48:20, 51:18, 51:23, 51:25, 52:14, 54:19, 56:13, 57:3, 57:6, 57:8, 58:12, 61:13, 66:22, 77:13, 79:5, 80:20, 82:3, 96:4, 99:2, 104:8, 120:24, 137:13, 169:5, 171:21, 172:21, 183:14

**conditions** [14] - 15:13, 16:25, 51:24, 55:8, 57:22, 58:5, 58:22, 59:15, 98:24, 101:21, 101:24, 124:24, 181:25, 183:1

**conduct** [1] - 37:18

**conducted** [1] - 47:3

**confer** [1] - 184:2

**conferences** [1] - 45:25

**confined** [1] - 172:15

**Confirmation** [1] - 40:13

**confirmation** [58] - 11:2, 11:6, 11:8, 12:25, 14:25, 22:1,

22:3, 22:4, 22:5, 22:16, 26:4, 29:20, 34:9, 43:22, 43:24, 44:3, 54:9, 55:15, 55:19, 58:8, 58:20, 73:13, 74:3, 74:5, 74:8, 74:11, 74:20, 74:23, 75:5, 80:25, 81:13, 81:17, 84:18, 85:15, 85:18, 96:1, 96:7, 97:7, 97:24, 98:5, 98:9, 98:22, 98:25, 102:1, 103:7, 103:10, 103:23, 104:2, 104:9, 104:14, 104:25, 158:7, 165:18, 166:13, 167:25, 168:5, 168:17, 168:25

**confirming** [2] - 110:11, 137:22

**confusion** [1] - 185:25

**congenital** [1] - 154:22

**congruent** [5] - 61:7, 61:23, 62:17, 77:12, 144:11

**connected** [1] - 159:21

**connecting** [1] - 160:4

**connection** [1] - 159:16

**conscious** [1] - 68:5

**consensus** [1] - 53:17

**consent** [9] - 20:18, 57:14, 58:16, 59:3, 76:3, 145:5, 145:13, 145:18, 170:17

**consequences** [1] - 15:22

**conservative** [1] - 14:3

**consider** [11] - 17:19, 27:23, 39:10, 39:11, 75:4, 75:5, 96:6, 97:23, 116:1, 138:14, 174:24

**consideration** [3] - 16:2, 18:23, 98:1

**considerations** [1] - 15:7

**considered** [15] - 16:19, 17:19, 20:13, 54:7, 59:18, 65:12, 77:19, 96:9, 101:22, 139:23, 167:24, 175:14, 175:18,

176:16, 181:8

**considering** [4] - 17:14, 27:6, 160:21, 178:15

**considers** [2] - 103:15, 138:4

**consistent** [3] - 67:2, 177:17, 178:8

**consistently** [4] - 11:1, 18:5, 18:12, 65:16

**consisting** [1] - 42:2

**consolidate** [1] - 61:19

**consonance** [1] - 62:14

**constitute** [1] - 14:7

**constitutes** [1] - 12:21

**constitutional** [1] - 9:23

**constructs** [1] - 67:15

**consult** [1] - 41:18

**consultant** [1] - 46:3

**consultation** [2] - 58:11, 59:7

**contact** [1] - 140:18

**contacts** [4] - 36:15, 136:14, 139:7, 140:9

**contained** [4] - 93:8, 109:17, 118:21, 182:20

**contemplated** [2] - 38:2, 46:14

**contend** [1] - 15:13

**context** [7] - 12:10, 22:25, 23:19, 27:2, 27:13, 104:4, 124:3

**continue** [2] - 38:3, 38:15

**continued** [3] - 33:7, 36:4, 167:11

**continues** [10] - 10:23, 13:18, 13:22, 31:2, 35:24, 72:3, 119:19, 122:21, 123:6, 123:20

**continuing** [2] - 179:14, 180:19

**continuous** [4] - 60:8, 61:7, 62:1, 77:11

**contraindications** [1] - 60:20

**contribute** [1] - 79:23

**contributing** [5] - 35:4, 35:10, 51:16, 79:7, 79:23

**control** [4] - 39:5, 52:2, 68:5, 162:12
**controlled** [28] - 30:13, 31:15, 31:16, 32:8, 33:12, 34:2, 34:4, 34:5, 34:9, 39:4, 58:2, 58:13, 58:22, 58:23, 59:6, 59:18, 76:18, 76:20, 76:22, 84:12, 98:13, 98:18, 124:9, 145:9, 169:22, 169:23, 170:10
**controls** [1] - 76:25
**conversations** [1] - 38:7
**conviction** [1] - 20:11
**cooccurring** [1] - 68:20
**cool** [1] - 8:23
**cooperate** [1] - 21:16
**copies** [2] - 186:18, 186:20
**coping** [3] - 21:5, 36:3, 36:17
**copy** [6] - 40:21, 149:4, 161:19, 161:23, 161:25, 183:9
**Corizon** [7] - 6:4, 7:4, 111:24, 179:13, 180:11, 184:13, 184:19
**Correct** [14] - 107:20, 108:13, 111:11, 111:15, 114:2, 116:24, 121:10, 126:7, 127:7, 133:18, 134:16, 140:5, 146:5, 166:10
**correct** [253] - 8:2, 8:3, 8:5, 13:11, 19:20, 40:18, 44:16, 45:1, 52:24, 68:23, 87:14, 90:6, 95:23, 97:3, 106:14, 106:23, 106:24, 106:25, 107:1, 107:3, 107:4, 107:6, 107:7, 107:9, 107:10, 107:13, 107:14, 107:17, 107:21, 107:24, 108:2, 108:9, 108:12, 108:16, 108:17, 108:21, 108:22, 109:4, 109:12, 109:18, 109:20, 110:7, 110:11, 110:14, 110:25, 111:6, 111:10, 111:14, 111:18,

111:20, 111:25, 112:4, 112:5, 112:9, 112:10, 112:13, 112:14, 112:17, 112:21, 113:3, 113:4, 113:6, 113:7, 113:11, 113:14, 113:15, 113:18, 113:19, 113:23, 113:24, 114:1, 114:4, 114:5, 114:8, 114:10, 114:12, 114:15, 114:19, 114:23, 115:2, 115:5, 115:10, 115:18, 115:23, 116:6, 116:23, 117:5, 117:15, 118:19, 118:25, 119:3, 119:6, 119:17, 119:24, 120:11, 120:16, 120:21, 121:1, 121:6, 121:9, 121:18, 121:20, 121:22, 121:25, 122:14, 123:12, 123:18, 123:19, 125:8, 125:11, 125:14, 125:17, 125:19, 126:6, 126:9, 126:17, 126:23, 127:6, 127:11, 127:14, 127:17, 127:22, 128:1, 128:4, 128:10, 128:18, 128:21, 128:24, 129:2, 129:5, 129:12, 129:15, 130:10, 130:23, 130:25, 131:2, 131:21, 131:24, 132:1, 132:9, 132:14, 132:17, 132:21, 132:25, 133:2, 133:5, 134:11, 134:13, 134:15, 134:17, 134:18, 134:21, 134:23, 135:2, 135:4, 135:6, 135:17, 135:22, 136:1, 136:2, 136:3, 136:6, 136:10, 136:14, 136:17, 137:1, 137:4, 137:9, 137:20, 137:23, 138:1, 138:7, 138:11, 138:14, 138:24, 139:2, 139:5, 139:6, 139:8, 139:10, 139:14, 139:21, 140:1, 140:2, 140:4, 141:12, 141:16, 141:19, 141:22, 141:25, 142:3, 142:7,

142:10, 142:13, 142:16, 142:19, 143:3, 143:12, 143:17, 143:21, 144:1, 144:5, 144:8, 144:12, 144:17, 144:18, 144:21, 145:5, 145:9, 145:11, 145:14, 145:18, 145:23, 146:4, 147:1, 147:3, 147:5, 147:10, 148:1, 148:8, 148:12, 153:17, 153:19, 153:20, 153:22, 154:1, 154:5, 154:10, 154:24, 155:24, 156:14, 156:15, 158:8, 158:15, 159:10, 160:10, 160:16, 161:2, 163:7, 164:16, 164:19, 164:24, 166:14, 167:4, 167:18, 167:19, 168:22, 170:10, 170:12, 171:13, 180:25, 181:1, 184:13
**Correction** [2] - 24:1, 111:23
**correctional** [7] - 106:21, 108:8, 108:12, 108:16, 110:3, 111:5, 174:6
**Correctional** [2] - 42:17, 106:23
**corrections** [1] - 110:6
**Corrections** [7] - 24:9, 36:25, 38:6, 112:7, 143:14, 143:16, 184:13
**correctly** [6] - 119:15, 119:22, 122:7, 123:2, 123:23, 156:16
**corroborate** [1] - 115:14
**council** [1] - 41:18
**Counsel** [5] - 6:6, 84:25, 102:23, 140:16, 182:4
**counsel** [39] - 7:11, 7:21, 8:7, 9:8, 47:13, 47:14, 53:19, 64:12, 66:7, 70:21, 70:23, 71:4, 84:4, 85:22, 86:18, 88:20, 89:1, 89:25, 93:7, 95:1, 102:14, 102:25, 104:17, 149:8,

149:11, 149:13, 149:15, 150:7, 150:11, 151:4, 151:9, 165:13, 173:7, 174:1, 179:3, 179:23, 182:7, 183:19, 185:5
**counsel's** [5] - 7:17, 73:3, 94:12, 165:7, 180:17
**counseling** [1] - 144:8
**country** [1] - 76:6
**couple** [6] - 6:8, 9:17, 29:12, 30:9, 37:12, 41:20, 181:11
**course** [8] - 6:21, 9:22, 15:9, 19:24, 25:4, 28:10, 69:15, 108:18
**Court** [1] - 186:23
**court** [19] - 6:3, 18:19, 22:22, 23:22, 23:24, 25:10, 28:22, 29:13, 34:16, 46:19, 71:14, 73:17, 93:15, 94:21, 102:17, 116:17, 151:19, 159:24, 161:6
**court's** [2] - 24:4, 173:13
**courthouse** [1] - 8:20
**courtroom** [3] - 8:22, 22:22, 184:5
**courts** [1] - 94:17
**cover** [1] - 40:23
**coverage** [1] - 159:9
**covered** [5] - 20:5, 88:18, 89:1, 167:15
**create** [3] - 17:14, 17:17, 84:11
**created** [4] - 30:14, 65:5, 142:6, 146:15
**creates** [1] - 48:17
**creating** [1] - 117:4
**credibility** [1] - 32:23
**crime** [1] - 96:13
**crimes** [1] - 66:2
**criteria** [52] - 11:5, 17:14, 17:17, 17:21, 17:22, 18:2, 19:15, 21:3, 26:13, 30:4, 30:8, 30:15, 30:21, 30:22, 38:4, 47:23, 48:16, 55:15, 55:18, 55:21, 60:11, 62:2, 69:25, 75:6, 75:11, 75:18, 75:25, 76:12, 82:17, 83:19, 83:20, 119:1, 119:12, 120:9,

124:18, 131:18, 131:25, 132:9, 132:10, 132:11, 132:17, 132:20, 133:4, 133:10, 144:19, 144:24, 145:1, 145:20, 146:2, 146:24, 168:12, 175:20
**criterion** [13] - 55:23, 57:13, 58:3, 60:8, 61:6, 62:1, 76:1, 76:8, 76:9, 77:5, 77:9, 77:11
**critical** [5] - 19:25, 26:25, 27:16, 31:7, 102:24
**critically** [1] - 21:25
**cross** [15] - 10:15, 54:8, 60:13, 60:23, 70:7, 70:10, 105:12, 105:24, 117:19, 117:21, 117:23, 141:6, 151:2, 181:13, 182:4
**CROSS** [2] - 106:1, 153:2
**cross-dressed** [1] - 117:19
**cross-dressing** [2] - 117:21, 117:23
**cross-examination** [3] - 141:6, 151:2, 181:13
**CROSS-EXAMINATION** [2] - 106:1, 153:2
**cross-examine** [1] - 105:24
**cross-sex** [6] - 10:15, 54:8, 60:13, 60:23, 70:7, 70:10
**culminating** [1] - 10:24
**culture** [1] - 171:16
**cure** [4] - 80:12, 81:17, 81:18, 171:21
**cured** [2] - 34:23, 170:25
**current** [6] - 21:10, 21:13, 40:8, 181:23, 182:17
**cursory** [1] - 49:10
**custody** [6] - 10:14, 24:10, 25:3, 96:17, 97:22, 99:11
**cut** [6] - 80:4, 80:21, 98:11, 98:20, 142:10, 183:23
**cuts** [1] - 28:15

**cutting** [5] - 10:25, 20:24, 28:8, 36:1, 98:16

**CV** [4] - 40:21, 40:23, 41:1, 174:8

**CVs** [1] - 153:18

**cyclothymia** [2] - 156:2, 156:3

**Cynthia** [2] - 101:2, 101:19

# D

**daily** [2] - 35:9, 129:18

**damage** [1] - 175:9

**dangerous** [2] - 26:19, 36:12

**data** [10] - 17:13, 27:10, 39:8, 45:13, 110:13, 110:16, 110:20, 110:22, 177:21, 178:11

**date** [8] - 36:22, 38:1, 80:1, 85:14, 111:16, 134:23, 150:14, 177:13

**Daubert** [2] - 28:18, 28:24

**daughter** [2] - 28:6, 49:16

**daughter-in-law** [1] - 28:6

**daunting** [1] - 62:24

**days** [4] - 9:17, 9:22, 126:15, 167:14

**deal** [4] - 60:21, 67:7, 95:13, 162:21

**deals** [1] - 144:22

**death** [4] - 12:12, 64:8, 154:10, 154:14

**decades** [2] - 22:20, 74:10

**decide** [1] - 18:19

**decided** [5] - 52:25, 53:2, 160:25, 162:25, 163:1

**decision** [25] - 16:2, 16:19, 16:20, 16:24, 17:22, 17:25, 18:1, 18:9, 30:17, 57:14, 57:17, 57:23, 74:14, 76:2, 98:2, 104:6, 104:20, 144:14, 145:5, 159:3, 159:7, 159:9, 160:18, 163:18, 163:19

**decision-making** [3] - 57:23, 98:2, 144:14

**decisions** [5] - 10:9,

---

57:17, 57:24, 123:9, 170:22

**declaration** [30] - 73:24, 79:9, 92:11, 93:3, 93:5, 93:9, 95:5, 95:18, 95:21, 111:12, 111:16, 111:18, 112:6, 112:16, 112:21, 113:5, 113:20, 115:8, 115:12, 117:12, 117:24, 120:14, 121:9, 125:1, 138:9, 138:13, 138:22, 153:16, 182:20

**declarations** [3] - 32:6, 92:16, 184:15

**decompensation** [2] - 52:16, 81:6

**decrease** [1] - 170:23

**deduced** [1] - 120:18

**deep** [1] - 128:3

**defendant** [1] - 16:3

**defendants** [38] - 13:3, 13:12, 16:12, 16:16, 21:10, 22:2, 23:13, 23:16, 24:7, 26:7, 26:20, 26:23, 27:20, 29:12, 29:14, 29:23, 30:5, 30:9, 30:14, 30:16, 32:15, 37:22, 37:24, 38:3, 38:12, 79:6, 79:9, 83:16, 88:4, 88:6, 91:25, 92:4, 92:7, 92:12, 102:8, 111:19, 111:21, 161:23

**Defendants'** [2] - 161:6, 163:15

**defendants'** [13] - 12:20, 14:24, 15:8, 20:9, 20:22, 21:22, 21:24, 24:13, 31:6, 53:19, 81:21, 92:1, 150:7

**defense** [8] - 18:16, 23:23, 88:20, 89:1, 89:25, 149:13, 179:23, 182:7

**defensive** [2] - 37:12, 37:13

**deferens** [1] - 80:18

**deficit** [1] - 181:21

**define** [1] - 124:2

**defining** [1] - 130:4

**definition** [2] - 13:19, 80:7

**degree** [2] - 50:21, 81:8

---

**dehiscence** [1] - 154:8

**delay** [1] - 9:11

**delays** [1] - 57:20

**deliberate** [6] - 11:20, 12:16, 13:2, 14:7, 37:21, 37:24

**deliberately** [2] - 12:6, 14:17

**delusional** [1] - 80:8

**demonstrate** [2] - 183:12, 183:13

**demonstrative** [1] - 48:11

**demoralizing** [1] - 65:24

**denial** [1] - 39:9

**denied** [1] - 24:24

**denies** [1] - 22:9

**denotes** [1] - 36:7

**deny** [3] - 26:17, 59:22, 84:14

**denying** [2] - 21:8, 149:21

**department** [1] - 135:20

**Department** [12] - 24:1, 24:9, 26:20, 36:24, 38:6, 111:23, 112:7, 143:7, 143:8, 143:14, 143:16, 184:12

**dependent** [1] - 131:5

**depicted** [1] - 145:20

**deposed** [5] - 79:9, 88:5, 92:4, 149:19, 150:3

**deposition** [46] - 88:6, 88:17, 88:18, 88:19, 88:23, 89:1, 89:25, 90:4, 90:12, 90:13, 92:7, 92:13, 93:1, 93:13, 94:4, 94:9, 95:1, 95:7, 96:15, 97:1, 97:21, 99:13, 99:19, 100:4, 100:10, 100:14, 102:14, 106:17, 107:21, 108:6, 108:23, 109:3, 111:9, 116:8, 119:6, 124:4, 136:20, 137:11, 146:7, 147:13, 150:5, 153:5, 159:3, 160:10, 164:15, 164:24

**depositions** [1] - 184:16

**depressed** [4] - 33:4, 69:12, 127:10, 170:24

---

**depression** [49] - 31:3, 33:2, 33:8, 33:11, 33:15, 34:17, 35:21, 39:4, 50:21, 59:17, 67:12, 67:20, 67:21, 67:24, 68:7, 68:10, 68:14, 68:15, 68:18, 68:19, 68:25, 69:4, 69:8, 69:15, 72:4, 76:14, 76:25, 77:3, 105:9, 122:11, 125:3, 125:6, 125:22, 125:25, 126:6, 126:16, 127:1, 127:12, 127:13, 127:21, 128:17, 128:24, 170:5, 170:20, 171:9, 172:2

**depressive** [3] - 33:11, 67:18, 125:17

**describe** [6] - 41:10, 44:19, 61:25, 63:15, 74:7, 71:18

**described** [8] - 33:8, 54:11, 60:25, 90:16, 93:18, 94:2, 144:13, 161:10

**describes** [1] - 55:14

**deserve** [1] - 15:6

**deserving** [1] - 10:7

**designating** [1] - 47:13

**designation** [1] - 106:22

**desire** [4] - 36:21, 50:17, 50:19, 169:2

**despite** [3] - 21:2, 72:2, 86:16

**details** [2] - 56:16, 186:9

**determination** [4] - 47:13, 74:19, 97:23, 162:3

**determine** [15] - 17:20, 45:6, 53:7, 54:20, 56:9, 57:5, 66:20, 67:6, 77:9, 97:6, 126:2, 138:7, 161:11, 163:2, 172:4

**determined** [7] - 11:10, 37:18, 74:15, 138:22, 141:15, 147:23, 148:11

**determining** [5] - 11:6, 12:1, 20:16, 45:24, 137:25

**devastating** [1] - 65:21

**develop** [1] - 46:9

**developed** [3] - 17:1,

---

28:12, 78:1

**development** [2] - 60:15, 78:3

**developmental** [1] - 57:20

**develops** [1] - 43:7

**diabetes** [3] - 52:1, 52:2, 55:9

**diagnose** [2] - 69:18, 121:15

**diagnosed** [9] - 10:14, 24:12, 33:6, 50:6, 69:21, 82:21, 131:17, 138:23, 139:1

**diagnosis** [20] - 13:16, 37:4, 47:24, 48:15, 53:25, 56:2, 56:5, 59:14, 69:22, 75:24, 82:6, 82:22, 97:14, 127:4, 131:19, 140:7, 155:23, 155:25, 156:8, 170:1

**Diagnostic** [1] - 47:19

**diagnostic** [1] - 47:23

**dialogue** [1] - 152:20

**die** [1] - 80:16

**differ** [1] - 155:9

**difference** [10] - 7:10, 24:22, 25:2, 25:16, 39:1, 50:8, 68:13, 81:25, 87:17, 143:4

**differences** [3] - 26:17, 69:3, 172:24

**different** [33] - 7:12, 11:22, 12:13, 14:2, 22:10, 27:7, 43:10, 44:12, 49:4, 49:6, 49:17, 49:18, 56:12, 67:14, 67:15, 68:12, 70:25, 74:13, 82:2, 82:4, 94:17, 116:20, 116:21, 139:18, 145:7, 164:9, 169:9, 169:24, 181:9

**differs** [1] - 49:8

**difficulties** [2] - 119:8, 162:18

**difficulty** [1] - 127:11

**dilate** [1] - 60:4

**dilation** [1] - 99:4

**dire** [1] - 10:11

**DIRECT** [1] - 40:4

**direct** [4] - 41:11, 66:14, 134:1, 151:4

**direction** [1] - 169:24

**directly** [3] - 22:22, 34:7, 151:3

**director** [1] - 46:11
**disagreed** [1] - 163:7
**disagreement** [1] - 24:20
**disciplinary** [10] - 36:16, 37:15, 77:21, 77:25, 96:6, 112:23, 113:3, 113:4, 133:17, 134:6
**discipline** [1] - 23:1
**disciplined** [1] - 131:2
**disclosed** [9] - 79:14, 83:19, 83:25, 85:21, 86:1, 86:3, 86:22, 95:3, 149:17
**disclosure** [14] - 70:19, 70:22, 70:24, 71:15, 73:21, 78:24, 83:13, 83:23, 87:20, 89:22, 89:23, 95:5, 182:5, 183:4
**disclosures** [5] - 85:21, 87:22, 88:12, 92:19, 182:19
**discovery** [7] - 23:23, 91:24, 92:1, 92:3, 92:7, 113:18, 117:8
**discretion** [1] - 39:10
**discriminating** [1] - 66:1
**discuss** [5] - 44:6, 72:11, 116:3, 117:25, 121:16
**discussed** [10] - 52:18, 55:15, 56:23, 95:7, 108:25, 124:21, 144:19, 147:8, 159:3, 168:12
**discussing** [3] - 54:14, 111:7, 159:4
**discussion** [4] - 29:6, 72:14, 136:23, 152:12
**discussions** [2] - 113:9, 113:13
**disease** [3] - 175:5, 175:6, 175:9
**Diseases** [1] - 46:17
**disobedience** [1] - 134:1
**disorder** [44] - 24:8, 37:3, 37:5, 58:20, 67:18, 68:20, 69:17, 76:15, 81:22, 82:1, 82:3, 82:7, 82:14, 82:15, 82:21, 83:1, 112:9, 125:2, 131:10, 131:16, 131:17,

131:20, 131:23, 132:3, 132:7, 132:21, 132:22, 133:8, 139:21, 139:23, 139:24, 155:16, 155:20, 155:23, 156:1, 156:3, 156:5, 156:6, 156:7, 170:16, 181:15, 181:21
**Disorders** [1] - 47:19
**disorders** [17] - 31:5, 47:22, 59:19, 67:20, 76:4, 82:4, 82:5, 82:7, 122:13, 131:14, 131:25, 132:10, 132:15, 132:18, 170:13, 170:14, 181:20
**display** [2] - 159:13, 159:24
**displayed** [1] - 134:4
**displaying** [2] - 51:11, 56:18
**displays** [2] - 131:13, 133:4
**dispute** [11] - 12:24, 13:21, 14:23, 19:11, 25:12, 27:19, 32:16, 32:22, 38:5, 71:16, 151:10
**disputed** [3] - 9:24, 18:16, 18:21
**disqualify** [1] - 20:25
**disruptive** [1] - 172:14
**dissonance** [1] - 61:20
**distinct** [1] - 124:25
**distinction** [3] - 51:9, 55:5, 75:1
**distinctions** [1] - 55:2
**distinctly** [1] - 97:13
**distinguish** [5] - 96:12, 124:24, 172:2, 181:24, 182:25
**distinguishing** [1] - 168:11
**distract** [1] - 20:24
**distracted** [1] - 85:23
**distress** [14] - 10:23, 13:19, 13:23, 15:3, 20:25, 22:17, 31:12, 48:18, 51:3, 51:5, 51:6, 51:7, 122:23, 178:23
**distressed** [1] - 177:6
**DOC** [1] - 177:15
**doctor** [2] - 151:4,

154:24
**Doctor** [7] - 40:8, 91:8, 106:11, 106:21, 108:14, 108:23, 122:2
**doctorate** [1] - 40:17
**doctors** [1] - 17:3
**document** [8] - 87:23, 87:24, 95:7, 117:15, 119:12, 150:6, 160:9, 161:7
**documentation** [3] - 18:11, 177:24, 178:1
**documented** [7] - 55:23, 55:25, 66:4, 75:12, 75:20, 158:13, 163:10
**documents** [11] - 47:1, 92:3, 92:5, 92:10, 93:2, 94:3, 95:3, 115:13, 126:20, 182:15
**domains** [1] - 67:12
**done** [13] - 7:23, 9:2, 9:3, 53:11, 74:12, 102:20, 102:21, 138:6, 138:14, 138:20, 154:2, 165:19, 173:5
**door** [6] - 94:5, 94:8, 151:18, 163:25, 173:25, 180:1
**DORs** [1] - 133:25
**dose** [1] - 105:6
**down** [8] - 19:10, 23:12, 104:21, 119:9, 123:14, 166:18, 168:2, 178:3
**Dr** [116] - 8:13, 39:19, 39:20, 40:1, 40:6, 40:23, 41:1, 41:6, 46:24, 47:9, 47:18, 48:14, 54:22, 63:14, 64:19, 66:13, 66:17, 71:13, 71:24, 73:6, 73:21, 73:24, 74:4, 79:3, 79:8, 79:15, 79:21, 81:23, 83:19, 84:9, 84:16, 84:17, 85:8, 85:11, 85:14, 85:18, 86:2, 86:12, 86:23, 86:24, 87:2, 87:3, 87:4, 88:5, 88:21, 89:1, 89:6, 89:7, 90:12, 90:18, 91:3, 93:1, 93:12, 94:4, 95:17, 96:15, 97:22, 99:13, 101:4, 102:8, 102:11, 102:15, 103:4, 103:21, 104:24,

105:10, 105:22, 106:3, 116:10, 118:9, 118:16, 121:9, 138:15, 141:4, 147:16, 148:2, 148:19, 149:19, 149:20, 150:3, 150:4, 151:12, 152:2, 152:4, 152:8, 153:4, 153:21, 173:13, 176:8, 176:12, 176:14, 176:16, 176:17, 176:20, 177:1, 177:12, 177:18, 177:21, 177:23, 178:3, 178:9, 178:12, 178:20, 179:13, 179:24, 180:1, 181:4, 181:12, 182:8, 182:11, 182:19, 183:11, 183:24, 184:11
**draft** [1] - 163:18
**drafting** [1] - 111:12
**drawing** [1] - 180:15
**dress** [1] - 62:12
**dressed** [2] - 116:10, 117:19
**dressing** [4] - 116:21, 117:21, 117:23
**drinking** [1] - 129:19
**driving** [1] - 185:20
**drug** [1] - 35:7
**drugs** [1] - 171:10
**DSM-5** [9] - 47:24, 48:4, 51:1, 68:6, 68:7, 75:25, 82:5, 82:18, 131:18
**due** [4] - 35:20, 80:17, 87:19, 127:10
**during** [21] - 36:14, 83:6, 84:4, 84:7, 88:18, 88:22, 89:1, 90:11, 93:13, 94:9, 95:1, 95:7, 113:12, 114:14, 129:21, 134:4, 134:8, 136:20, 171:7, 181:13
**Dylan** [1] - 153:4
**dynamic** [1] - 28:20
**dysphoria** [202] - 9:24, 10:4, 10:8, 10:11, 10:15, 10:21, 10:24, 11:5, 11:7, 11:12, 12:21, 13:16, 14:25, 15:10, 15:16, 17:7, 18:4, 20:23, 21:1, 21:12, 21:23, 21:25, 22:19, 24:7,

24:11, 24:14, 24:15, 25:14, 31:14, 31:25, 32:14, 32:15, 34:7, 34:23, 37:23, 38:2, 38:22, 39:1, 40:16, 41:14, 42:10, 43:18, 43:20, 44:6, 44:10, 44:15, 44:24, 45:18, 45:20, 46:4, 46:7, 46:10, 46:12, 46:15, 46:20, 47:11, 47:24, 48:4, 48:15, 48:19, 50:6, 50:16, 50:22, 51:2, 51:10, 51:13, 51:14, 51:16, 51:18, 51:20, 52:4, 52:5, 52:6, 52:10, 52:11, 52:13, 53:21, 54:1, 54:8, 54:17, 55:24, 56:2, 56:7, 56:8, 56:10, 56:15, 56:18, 56:21, 59:11, 61:16, 61:18, 62:12, 62:15, 64:20, 65:8, 65:22, 66:24, 67:17, 68:8, 68:10, 68:20, 69:5, 69:21, 70:5, 72:3, 72:6, 73:7, 74:12, 74:18, 75:13, 75:21, 79:4, 79:5, 79:7, 79:8, 79:11, 79:22, 80:13, 80:15, 80:22, 81:5, 81:18, 81:22, 81:25, 82:2, 86:16, 89:12, 90:20, 90:24, 97:14, 97:18, 98:15, 101:10, 105:2, 105:3, 108:21, 111:7, 112:8, 113:10, 119:14, 122:3, 122:6, 122:17, 123:1, 123:8, 123:22, 124:13, 124:25, 126:17, 127:2, 127:4, 135:19, 135:22, 136:21, 137:9, 138:1, 138:7, 138:16, 138:23, 139:2, 144:1, 156:13, 157:8, 158:15, 161:13, 163:4, 166:11, 167:17, 167:23, 168:15, 168:20, 169:2, 169:7, 169:8, 171:9, 171:12, 171:17, 172:3, 172:9, 172:13, 172:25, 173:16, 173:18, 174:7, 174:20, 175:17, 176:15, 176:18, 176:19, 177:7, 177:23, 178:23, 178:25,

179:15, 181:7,
181:19, 181:25,
183:1, 183:14,
184:14, 184:17
**Dysphoria** [2] -
26:16, 99:18
**dysphoric** [6] -
50:12, 60:14, 120:11,
120:17, 170:25,
174:10

## E

**E-T-T-N-E-R** [1] -
40:2
**ear** [1] - 64:7
**early** [4] - 33:6,
114:10, 131:8, 167:14
**easier** [3] - 25:9,
71:10, 186:11
**easily** [1] - 155:12
**EATON** [43] - 8:11,
8:13, 70:17, 70:20,
73:18, 78:25, 85:20,
86:4, 87:7, 87:9,
87:14, 87:19, 90:3,
91:4, 92:15, 102:4,
104:15, 149:18,
149:25, 153:3,
158:24, 159:2,
159:15, 159:17,
159:21, 160:7, 160:9,
162:17, 162:19,
163:14, 163:22,
164:1, 164:13,
164:15, 165:3, 165:9,
173:24, 179:19,
182:2, 184:6, 184:10,
184:24, 186:14
**eaton** [1] - 90:11
**Eaton** [10] - 92:14,
149:13, 149:16,
153:1, 153:4, 162:2,
162:16, 163:21,
165:8, 186:13
**ECF** [1] - 71:19
**edge** [1] - 28:8
**edges** [1] - 95:14
**edited** [1] - 44:20
**edition** [1] - 26:8
**editor** [1] - 45:5
**editorial** [1] - 45:14
**Edmo** [177] - 6:4,
9:10, 9:12, 9:13, 9:19,
10:13, 10:20, 13:4,
13:10, 13:15, 15:9,
16:14, 17:23, 18:1,
18:11, 18:15, 18:19,
18:22, 19:11, 19:15,
20:17, 22:16, 22:21,

24:1, 24:9, 24:18,
24:23, 24:25, 25:3,
25:18, 29:23, 29:25,
30:8, 31:2, 31:19,
31:22, 32:7, 32:9,
32:10, 32:21, 33:2,
33:4, 33:10, 33:15,
33:17, 34:25, 35:7,
35:14, 35:19, 36:6,
36:12, 36:17, 36:22,
37:2, 37:11, 38:4,
38:6, 38:8, 38:15,
38:19, 47:2, 66:18,
67:1, 67:7, 67:17,
68:16, 69:7, 69:18,
69:20, 70:4, 70:10,
70:14, 72:2, 72:11,
72:16, 72:18, 73:5,
74:20, 74:24, 75:5,
75:11, 75:17, 75:19,
76:1, 76:4, 76:6, 76:9,
76:14, 77:2, 77:6,
77:10, 77:19, 80:4,
80:25, 81:3, 81:14,
82:20, 82:25, 83:5,
83:10, 83:17, 84:10,
85:14, 85:16, 85:19,
89:11, 96:5, 96:16,
97:2, 97:5, 97:22,
97:25, 98:3, 98:7,
98:23, 99:3, 99:6,
99:9, 103:22, 104:13,
104:21, 104:25,
112:12, 113:2,
113:10, 113:12,
113:23, 114:6,
115:17, 116:3, 116:9,
116:23, 116:25,
117:5, 117:18,
120:21, 120:23,
125:2, 125:7, 125:13,
126:11, 127:8, 128:7,
128:17, 129:1,
130:21, 131:4, 131:9,
131:24, 132:2,
133:12, 133:15,
134:10, 134:15,
134:20, 135:8,
135:12, 135:21,
135:24, 136:12,
136:16, 137:24,
138:7, 139:22, 140:9,
140:13, 141:11,
143:10, 143:13,
155:19, 156:9, 164:2,
168:16, 170:22,
185:11, 186:2
**Edmo's** [48] - 10:5,
14:25, 19:1, 20:10,
20:23, 29:16, 34:22,
36:21, 38:25, 47:5,

68:24, 72:6, 72:7,
78:4, 78:7, 81:7,
82:19, 82:24, 84:16,
84:18, 84:23, 89:13,
90:17, 90:19, 90:23,
95:19, 96:6, 98:11,
98:16, 112:2, 113:16,
115:14, 116:4,
116:21, 117:25,
129:11, 130:2,
141:10, 175:15,
176:2, 176:10, 177:1,
178:20, 179:12,
180:12, 181:23,
182:9, 183:12
**education** [3] -
41:15, 179:14, 180:19
**effect** [6] - 52:21,
60:24, 65:15, 65:21,
104:24, 172:1
**effects** [4] - 52:12,
72:8, 72:11, 72:15
**effeminately** [1] -
143:11
**Effexor** [1] - 68:17
**efficacious** [1] -
163:13
**efficacy** [1] - 74:10,
162:7
**effort** [1] - 150:8
**egg** [1] - 34:12
**eight** [1] - 97:16
**Eighth** [11] - 9:25,
11:12, 11:19, 11:23,
12:3, 12:10, 12:23,
13:25, 14:16, 19:13,
19:18
**either** [19] - 12:12,
23:13, 49:3, 51:6,
52:14, 64:7, 80:10,
81:5, 83:25, 84:13,
88:24, 89:2, 94:2,
101:6, 110:20, 140:4,
144:22, 166:12,
186:17
**elaborate** [1] -
168:24
**elaboration** [1] -
84:6
**elasticity** [1] - 80:18
**electronic** [3] -
183:9, 186:18, 186:19
**element** [1] - 169:17
**elements** [1] - 114:9
**elevated** [1] - 105:7
**Eliason** [10] - 8:13,
84:17, 85:11, 86:24,
87:6, 87:16, 91:3,
116:10, 121:9, 138:15
**Eliason's** [7] - 85:14,

85:18, 86:2, 87:2,
87:4, 89:7, 153:21
**eligibility** [1] - 21:2
**eligible** [3] - 36:25,
135:16, 157:23
**eliminate** [8] - 105:3,
105:5, 105:8, 169:2,
169:8, 169:10,
169:14, 171:1
**eliminated** [2] - 44:6,
172:5
**Elison** [4] - 87:6,
87:7, 87:8, 87:13
**email** [4] - 147:7,
148:19, 152:11,
186:19
**emails** [1] - 152:9
**embarrass** [1] -
31:22
**emerged** [1] - 56:13
**emotional** [2] -
52:16, 81:6
**empathy** [1] - 82:17
**emphasize** [1] -
144:14
**employed** [1] - 107:8
**employee** [1] -
106:25
**employment** [2] -
127:11
**emptiness** [1] -
133:2
**enable** [1] - 17:21
**encountered** [1] -
15:23
**encounters** [2] -
130:23, 130:24
**end** [6] - 64:18, 89:9,
102:24, 105:19,
147:20, 152:22,
161:7, 171:22
**endeavor** [1] -
147:24
**Endocrine** [2] -
164:16, 164:21
**endocrinology** [1] -
42:4
**endorsed** [2] - 29:8,
42:12, 103:11
**engage** [3] - 16:20,
21:5, 38:22
**engaged** [1] - 35:7
**engaging** [1] - 36:12
**enhancing** [1] -
177:5
**ensure** [2] - 15:18,
88:12
**enter** [1] - 98:1
**entered** [1] - 97:22
**entering** [1] - 127:4

**entire** [7] - 23:24,
31:24, 33:3, 53:16,
129:22, 129:25,
182:21
**entirely** [3] - 68:12,
82:2, 169:10
**entitled** [1] - 99:17
**entity** [1] - 164:1
**entry** [3] - 48:4,
48:21, 51:1
**environment** [3] -
62:18, 142:7, 172:16
**environments** [1] -
111:8
**envision** [2] - 7:7,
88:15
**enzymes** [1] - 105:8
**episode** [1] - 59:6
**equate** [1] - 132:6
**error** [1] - 89:6
**especially** [1] - 26:25
**essentially** [4] -
10:18, 16:6, 162:25,
167:23
**establish** [1] -
174:25
**established** [2] -
22:20, 56:1
**establishes** [2] -
19:17, 32:6
**estrogen** [2] - 60:12,
169:12
**et** [3] - 60:17, 78:3,
102:16
**Ettner** [70] - 39:19,
39:20, 40:1, 40:6,
40:23, 41:6, 46:24,
47:9, 47:18, 48:14,
54:22, 63:14, 64:19,
66:13, 66:17, 71:24,
73:6, 74:4, 79:3, 79:8,
79:15, 79:21, 81:23,
83:19, 84:9, 84:16,
85:8, 86:2, 86:23,
87:3, 88:5, 88:21,
89:1, 89:6, 90:12,
90:18, 93:12, 95:17,
96:15, 97:22, 99:13,
101:4, 102:8, 102:11,
102:15, 103:4,
103:21, 104:24,
105:10, 105:22,
106:3, 118:9, 118:16,
141:4, 149:20,
151:12, 153:4,
173:13, 176:12,
177:18, 178:9,
179:24, 180:1,
181:12, 182:8,
182:11, 182:19,

183:11, 183:24,
184:11
**ETTNER** [1] - 39:22
**Ettner's** [7] - 41:1,
71:13, 73:21, 73:24,
86:12, 93:1, 94:4
**evaluate** [14] - 70:14,
72:7, 72:14, 75:11,
76:1, 76:8, 78:4, 78:7,
78:16, 78:21, 79:18,
97:6, 138:2
**evaluated** [6] -
13:15, 43:21, 63:10,
78:14, 166:12, 182:12
**evaluating** [4] - 12:3,
12:7, 28:17, 75:4
**evaluation** [25] -
24:10, 39:12, 46:21,
66:18, 66:19, 67:1,
69:19, 73:5, 82:20,
82:25, 83:5, 116:2,
130:5, 132:2, 137:25,
138:3, 138:4, 138:6,
138:8, 138:11,
138:14, 138:15,
138:16, 139:1, 140:7
**evaluator** [1] -
117:18
**event** [3] - 35:17,
129:10, 173:5
**evidence** [44] -
15:15, 17:12, 19:9,
22:12, 26:25, 27:16,
29:18, 29:19, 32:5,
41:1, 46:12, 48:7,
53:12, 53:17, 53:21,
74:5, 84:24, 93:16,
103:1, 109:8, 124:10,
132:2, 139:24, 146:9,
146:16, 146:25,
147:10, 147:11,
147:19, 147:24,
148:1, 148:4, 148:7,
148:9, 148:15,
148:17, 149:5,
161:10, 161:11,
161:22, 162:1, 163:2,
163:12, 178:11
**evidence-based** [12]
- 26:25, 27:16, 46:12,
53:12, 53:17, 124:10,
139:24, 147:24,
148:4, 148:7, 148:9,
148:15
**evidence-reviewed**
[1] - 147:11
**evolving** [2] - 25:21,
28:13
**exact** [3] - 89:9,
89:10, 89:14

**exactly** [3] - 12:15,
24:6, 34:17
**exaggerate** [1] -
178:22
**EXAMINATION** [6] -
40:4, 106:1, 153:2,
165:14, 173:11, 184:9
**examination** [8] -
49:11, 66:14, 117:15,
117:18, 141:6, 151:2,
151:17, 181:13
**examine** [1] - 105:24
**example** [6] - 49:7,
96:25, 58:5, 99:4,
99:5, 181:22
**exceed** [1] - 47:15
**exceeds** [1] - 30:9
**excellent** [1] -
172:18
**except** [1] - 15:8
**exclusive** [1] - 161:1
**exclusively** [1] -
174:21
**excrete** [1] - 169:12
**excuse** [5] - 25:22,
37:17, 134:8, 142:20,
159:2
**excused** [1] - 8:15
**executive** [1] - 148:2
**exercise** [1] - 52:2
**exhausted** [1] -
57:11
**exhibited** [3] -
125:16, 131:9, 131:25
**exhibiting** [1] -
142:22
**exhibition** [1] -
142:24
**Exhibits** [4] - 85:1,
85:7, 186:17, 186:18
**exhibits** [4] - 85:5,
93:15, 94:6, 94:7
**existence** [1] - 17:11
**existing** [1] - 53:13
**expand** [1] - 89:25
**expanded** [1] - 94:25
**expanding** [1] - 28:6
**expect** [1] - 86:1
**expeditious** [1] -
67:7
**experience** [29] -
10:23, 13:18, 13:22,
20:11, 21:24, 22:1,
22:3, 43:17, 44:2,
44:4, 44:9, 50:16,
50:17, 50:19, 54:5,
56:20, 60:17, 62:20,
63:8, 63:10, 63:16,
63:21, 104:8, 105:1,
174:6, 177:17, 178:8,

181:17, 182:17
**experienced** [5] -
48:22, 56:15, 65:23,
181:24, 182:25
**experiences** [2] -
22:17, 125:13
**experiencing** [4] -
19:2, 56:21, 62:12,
105:9
**experimental** [3] -
11:9, 74:15, 163:12
**expert** [37] - 17:7,
28:17, 33:9, 33:17,
36:5, 46:3, 46:20,
47:9, 47:10, 47:14,
53:17, 70:19, 70:24,
71:15, 73:20, 79:4,
79:8, 85:21, 86:12,
88:12, 89:21, 91:23,
92:1, 92:19, 95:18,
95:21, 100:10,
100:14, 100:22,
100:23, 107:19,
107:23, 149:18,
180:6, 182:18, 183:6
**expertise** [1] -
47:15, 53:11, 79:11,
79:22, 100:17,
174:17, 174:25,
177:18, 178:8,
181:17, 183:13
**experts** [21] - 10:3,
10:18, 12:20, 13:14,
13:17, 14:24, 15:11,
17:2, 17:17, 18:3,
18:25, 20:9, 20:15,
20:22, 21:24, 22:15,
25:22, 38:8, 45:6,
92:4
**explain** [15] - 10:3,
10:18, 20:15, 42:9,
47:18, 48:14, 48:24,
49:23, 50:8, 51:3,
55:22, 58:3, 67:5,
81:25, 178:22
**explaining** [1] -
45:24
**explanation** [1] -
57:25
**exploration** [2] -
31:13, 122:25
**explore** [1] - 88:8
**explored** [1] - 92:8
**explosion** [2] -
25:23, 136:20
**expressed** [1] -
48:22
**expressing** [2] -
45:10, 146:24
**expressions** [1] -

68:12
**extensive** [3] -
18:10, 44:4, 161:9
**extent** [7] - 24:25,
35:12, 37:15, 50:1,
62:23, 70:14, 93:11
**extra** [1] - 101:24
**extreme** [2] - 33:8,
35:6
**extremely** [1] - 36:2
**eyebrows** [2] -
142:12, 142:16
**eyes** [1] - 14:19

---

# F

**facilitate** [1] - 123:7
**facilities** [1] - 43:13
**facility** [2] - 55:10,
111:6
**facing** [2] - 23:1,
31:24
**fact** [20] - 6:25, 13:9,
13:10, 16:2, 18:21,
56:16, 68:17, 80:12,
81:11, 86:10, 87:13,
88:7, 88:20, 93:24,
94:3, 94:6, 94:10,
102:8, 142:15, 173:14
**fact-finding** [1] -
56:16
**factor** [6] - 33:12,
35:4, 35:10, 51:16,
129:8, 172:13
**factors** [6] - 16:3,
20:15, 77:18, 79:7,
79:23
**facts** [4] - 9:21,
10:12, 15:20, 16:11
**failure** [4] - 12:5,
12:11, 12:22, 25:15
**fair** [3] - 88:19,
106:18, 107:24
**fairly** [4] - 8:22,
10:13, 88:25, 183:20
**fall** [1] - 10:16
**familiar** [10] - 80:20,
83:8, 99:21, 99:23,
101:2, 101:9, 101:15,
101:18, 147:3, 176:12
**families** [1] - 54:3
**family** [4] - 33:5,
35:2, 117:25, 129:4
**Family** [1] - 42:16
**far** [7] - 26:11, 56:8,
80:17, 99:9, 103:15,
168:6, 174:2
**fashion** [6] - 16:17,
115:10, 142:1, 143:2,
146:21

**fast** [1] - 8:11
**fat** [1] - 60:17
**fault** [1] - 32:9
**faulting** [1] - 179:7
**favor** [1] - 14:19
**features** [3] - 67:18,
125:3, 165:19
**Federal** [1] - 89:18
**federal** [4] - 43:11,
44:12, 46:6, 46:19,
88:12, 94:19
**feelings** [5] - 35:21,
56:12, 125:19, 133:2,
171:19
**felt** [2] - 88:8, 142:6
**female** [27] - 18:13,
18:15, 49:3, 49:20,
50:3, 51:11, 62:13,
62:25, 63:4, 63:25,
64:6, 64:7, 64:10,
65:11, 72:20, 78:1,
114:16, 115:5, 115:6,
142:19, 142:22,
142:23, 143:13,
144:22, 144:23,
169:11, 169:12
**females** [1] - 178:5
**feminine** [7] - 20:12,
50:3, 70:6, 77:23,
115:10, 143:2, 143:5
**femininity** [1] - 78:2
**feminization** [3] -
60:21, 60:24, 61:4
**feminize** [6] - 24:25,
64:9, 140:10, 142:18,
142:21, 143:10
**feminizing** [4] -
10:17, 10:19, 72:2,
141:10
**feminizing/**
**masculinizing** [1] -
123:17
**FERGUSON** [1] -
185:10
**few** [11] - 26:11,
26:12, 64:14, 64:17,
76:13, 106:4, 122:13,
153:8, 155:13,
163:13, 183:21
**field** [9] - 26:6, 86:9,
100:18, 101:10,
101:13, 148:15,
176:14, 176:16, 177:8
**fight** [1] - 93:20
**fighting** [2] - 133:17,
133:23
**fights** [1] - 35:19
**file** [1] - 182:22
**filed** [6] - 11:2,
71:14, 91:23, 92:16,

92:18, 94:22
**filing** [1] - 95:4
**final** [8] - 6:24, 7:8, 7:13, 7:14, 16:20, 31:17, 160:18, 163:19
**finally** [3] - 7:19, 135:19, 171:22
**findings** [1] - 6:24
**fine** [4] - 8:18, 23:11, 164:13, 186:12
**fingernails** [1] - 64:9
**firms** [1] - 90:13
**first** [24] - 6:7, 8:9, 9:7, 16:24, 29:12, 39:17, 41:25, 42:6, 48:21, 49:8, 55:23, 61:9, 64:16, 73:19, 75:11, 92:17, 95:17, 95:21, 96:16, 143:21, 143:23, 149:20, 162:22, 182:20
**five** [6] - 35:14, 64:13, 64:15, 105:18, 105:20, 183:19
**fix** [1] - 9:1
**fixed** [1] - 29:2
**flesh** [1] - 88:16
**flexible** [3] - 26:9, 118:18, 118:22
**flip** [1] - 118:10
**flood** [1] - 8:20
**fluctuated** [1] - 70:8
**focus** [2] - 21:20, 38:25
**focused** [2] - 30:16, 36:22
**focuses** [1] - 174:10
**focusing** [2] - 21:18, 167:7
**folks** [1] - 158:7
**follow** [6] - 17:4, 20:19, 73:12, 99:7, 157:2, 184:6
**follow-up** [3] - 20:19, 73:12, 184:6
**followed** [5] - 24:19, 156:18, 156:24, 167:1, 180:12
**food** [1] - 60:5
**forced** [1] - 142:10
**forearm** [1] - 128:4
**forefront** [1] - 36:11
**forensic** [1] - 40:9
**forest** [1] - 62:10
**forgot** [1] - 71:9
**form** [9] - 7:3, 46:23, 69:20, 73:6, 76:17, 80:24, 85:17, 87:4, 90:18
**formal** [3] - 37:3,

107:2, 107:5
**forth** [11] - 17:5, 19:16, 55:18, 70:24, 73:21, 89:16, 90:8, 90:9, 91:19, 95:11, 119:12
**fortunately** [2] - 8:22, 48:19
**forward** [5] - 17:13, 23:8, 53:3, 105:6, 146:24
**Foundation** [1] - 40:11
**foundation** [18] - 41:18, 63:5, 63:7, 70:17, 70:18, 71:15, 73:16, 78:23, 83:12, 86:4, 91:2, 116:12, 140:13, 173:23, 174:25, 179:17, 180:5, 182:1
**four** [9] - 6:16, 14:2, 14:5, 24:15, 29:24, 115:1, 129:17, 143:25, 144:4
**fourfold** [1] - 143:21
**fourth** [1] - 169:17
**frame** [1] - 33:4
**framing** [1] - 9:21
**Frankly** [1] - 16:15
**frequent** [2] - 133:4, 136:16
**frequently** [1] - 50:21
**Friday** [6] - 7:12, 7:24, 9:2, 102:12, 102:20, 102:21
**front** [4] - 85:9, 120:3, 121:13, 169:19
**frustration** [1] - 177:14
**Fry** [1] - 28:17
**Frye** [1] - 28:24
**full** [12] - 32:22, 35:12, 97:12, 114:14, 114:18, 114:22, 115:1, 115:4, 116:5, 117:2, 129:22, 130:1
**fully** [4] - 57:13, 59:2, 76:2, 145:4
**function** [2] - 50:14, 51:8
**functional** [1] - 172:23
**functioning** [2] - 13:19, 48:18
**functions** [1] - 178:7
**funded** [1] - 162:5
**future** [5] - 21:15, 43:8, 95:11, 147:2,

174:3

# G

**Gail** [2] - 147:3, 150:16
**Gail's** [1] - 147:12
**game** [1] - 88:19
**Garvey** [3] - 149:19, 150:3, 150:4
**GD** [5] - 26:5, 30:20, 38:14, 140:7, 177:13
**gender** [326] - 9:24, 10:4, 10:8, 10:11, 10:14, 10:21, 10:24, 11:1, 11:5, 11:6, 11:7, 11:8, 11:12, 12:21, 12:25, 13:16, 14:24, 14:25, 15:10, 15:16, 17:7, 18:6, 20:23, 21:1, 21:12, 21:23, 22:4, 22:5, 22:16, 22:18, 24:7, 24:10, 24:14, 24:15, 25:14, 26:4, 29:20, 31:13, 31:14, 31:25, 32:13, 32:15, 34:7, 34:9, 34:23, 37:23, 38:2, 38:21, 38:25, 40:14, 40:16, 41:14, 42:5, 42:10, 43:17, 43:19, 43:22, 43:24, 44:3, 44:5, 44:10, 44:15, 44:24, 45:18, 45:20, 46:4, 46:7, 46:9, 46:12, 46:15, 46:20, 47:10, 47:24, 48:4, 48:15, 48:19, 48:22, 48:23, 49:1, 49:2, 49:4, 49:6, 49:9, 49:18, 49:19, 49:22, 49:23, 49:24, 49:25, 50:2, 50:6, 50:10, 50:11, 50:12, 50:15, 50:19, 50:20, 50:22, 51:2, 51:10, 51:12, 51:13, 51:14, 51:16, 51:18, 51:20, 52:4, 52:5, 52:6, 52:10, 52:11, 52:13, 53:21, 54:1, 54:6, 54:8, 54:9, 54:17, 55:15, 55:18, 55:24, 56:2, 56:7, 56:9, 56:15, 56:18, 56:21, 58:7, 58:20, 59:11, 60:9, 60:14, 61:7, 61:8, 61:9, 61:12, 61:16, 61:17, 62:2, 62:5, 62:12, 62:15, 62:17, 64:20,

64:21, 65:8, 65:22, 66:24, 67:17, 68:8, 68:10, 68:20, 69:5, 69:21, 70:5, 72:3, 73:7, 73:13, 74:3, 74:4, 74:8, 74:11, 74:12, 74:18, 74:19, 74:23, 75:5, 75:12, 75:21, 77:12, 78:4, 78:7, 78:9, 78:10, 78:15, 78:17, 79:4, 79:5, 79:7, 79:8, 79:11, 79:22, 79:24, 79:25, 80:13, 80:15, 80:22, 80:25, 81:5, 81:13, 81:17, 81:22, 81:25, 82:2, 83:18, 84:18, 85:15, 85:18, 86:16, 89:12, 90:20, 90:24, 96:1, 96:7, 97:7, 97:14, 97:15, 97:17, 97:24, 98:5, 98:8, 98:14, 98:22, 98:25, 101:10, 102:1, 103:6, 103:10, 103:22, 104:2, 104:9, 104:14, 104:25, 105:2, 105:3, 108:21, 110:11, 111:7, 112:8, 113:10, 119:13, 120:11, 120:17, 122:3, 122:6, 122:17, 122:24, 122:25, 123:8, 123:9, 123:17, 123:22, 124:13, 124:24, 124:25, 126:17, 127:2, 127:3, 135:19, 135:21, 136:21, 137:9, 137:22, 137:25, 138:7, 138:16, 138:23, 139:1, 142:24, 143:7, 144:1, 144:12, 156:12, 157:8, 158:7, 158:15, 159:10, 161:11, 161:13, 163:2, 163:4, 165:18, 166:11, 166:13, 167:17, 167:23, 167:25, 168:5, 168:14, 168:17, 168:20, 168:25, 169:2, 169:7, 169:8, 170:25, 171:9, 171:12, 171:17, 172:3, 172:9, 172:13, 172:25, 173:15, 173:18, 174:7, 174:10, 174:20, 175:16, 176:15, 176:18, 176:19,

177:7, 177:23, 178:23, 178:25, 179:15, 181:7, 181:19, 181:24, 183:1, 183:14, 184:13, 184:16
**Gender** [3] - 26:15, 40:12, 99:17
**gender-affirming** [1] - 142:24
**gender-dysphoric** [2] - 50:12, 120:11
**gender-nonconforming** [1] - 51:12
**gender-related** [1] - 40:14
**gender-variant** [1] - 42:5
**general** [8] - 16:25, 44:13, 84:5, 108:3, 108:4, 114:12, 183:1
**generally** [11] - 17:2, 28:19, 28:25, 64:15, 84:2, 89:12, 89:24, 110:5, 153:14, 168:11, 177:8
**generals** [1] - 42:20
**generate** [1] - 181:7
**generating** [1] - 91:12
**genes** [1] - 33:6
**genital** [3] - 73:12, 144:24, 156:23
**genitals** [3] - 49:11, 52:16, 98:20
**genitourinary** [1] - 154:21
**gestures** [1] - 132:19
**GID** [2] - 24:11, 26:5
**given** [11] - 64:4, 70:12, 79:19, 81:7, 90:7, 105:7, 140:8, 150:6, 168:17, 174:14, 185:13
**global** [1] - 41:15
**goals** [1] - 60:10
**governing** [1] - 17:1
**government** [1] - 164:1
**grade** [1] - 147:25
**grant** [1] - 100:12
**great** [1] - 71:8
**greatest** [1] - 24:25
**greatly** [2] - 70:8, 123:7
**ground** [4] - 93:18, 94:1, 147:10, 147:19
**grounded** [2] - 146:9, 151:11

**group** [12] - 24:23, 38:22, 69:7, 135:6, 135:19, 135:22, 136:6, 139:23, 144:8, 162:7, 168:2, 168:18
**groups** [9] - 32:11, 134:12, 139:12, 139:13, 139:15, 139:18, 140:1, 140:8, 140:19
**grow** [4] - 141:12, 141:14, 141:24, 171:15
**growing** [2] - 21:7, 64:1
**grows** [1] - 49:11
**growth** [3] - 60:16, 61:2, 65:1
**guess** [6] - 8:1, 28:25, 90:12, 151:19, 171:5, 172:15
**guest** [2] - 46:8, 46:13
**guidance** [2] - 26:8, 26:9
**guidelines** [7] - 118:18, 118:23, 118:25, 119:1, 119:2, 119:14, 164:16
**guy** [2] - 28:24

### H

**hair** [9] - 50:3, 64:1, 77:22, 97:15, 115:9, 115:11, 141:25, 142:2, 142:10
**hairstyle** [1] - 77:23
**half** [3] - 55:17, 75:10, 168:8
**Hall** [20] - 23:14, 25:6, 33:19, 90:11, 92:14, 105:14, 105:24, 141:6, 149:6, 153:7, 153:14, 158:3, 171:7, 175:13, 175:14, 180:1, 180:4, 181:18, 183:18, 185:17
**HALL** [82] - 23:15, 23:18, 25:8, 25:11, 27:8, 28:2, 29:3, 29:11, 33:22, 33:24, 34:1, 34:3, 34:5, 34:11, 34:13, 41:3, 48:9, 63:5, 70:16, 70:18, 72:24, 73:1, 73:14, 78:12, 78:20, 78:23, 83:12, 83:22, 87:25, 91:1, 92:23,

92:25, 100:3, 102:3, 104:16, 105:13, 105:25, 106:2, 109:6, 109:10, 110:23, 116:17, 116:23, 118:10, 118:14, 118:16, 140:14, 140:21, 140:24, 141:8, 141:9, 146:12, 146:18, 148:18, 148:22, 149:8, 149:11, 149:13, 150:15, 151:3, 151:8, 151:18, 151:24, 152:3, 152:5, 152:17, 152:24, 173:21, 173:23, 174:3, 174:5, 179:17, 180:2, 180:5, 180:9, 180:14, 182:1, 184:1, 185:1, 185:20, 185:24, 186:7
**Hall's** [1] - 181:13
**hand** [2] - 125:6
**handle** [1] - 43:11
**handwrite** [1] - 143:1
**handwriting** [5] - 142:19, 142:22, 142:23, 143:5
**happy** [1] - 94:21
**harassment** [1] - 23:1
**hard** [4] - 7:7, 48:12, 186:17, 186:20
**harder** [1] - 21:16
**harm** [3] - 12:18, 12:19, 12:22, 19:2, 31:3, 35:11, 35:24, 36:4, 37:9, 39:6, 80:10, 122:11, 129:8
**harm's** [1] - 68:13
**harmful** [4] - 30:18, 81:14, 153:25, 154:2
**hate** [2] - 66:2, 183:24
**HDMI** [3] - 159:16, 159:17, 159:22
**heading** [1] - 118:17
**health** [89] - 16:4, 24:8, 30:12, 30:24, 30:25, 31:8, 31:11, 31:19, 31:23, 31:25, 32:8, 32:19, 33:1, 33:20, 33:22, 33:25, 34:1, 34:6, 34:7, 34:16, 35:5, 37:17, 37:19, 38:18, 38:23, 39:10, 41:13, 42:4, 46:1, 46:25, 47:21, 47:22, 58:1, 58:14, 58:24, 59:13, 59:14,

59:15, 59:19, 59:25, 66:25, 83:11, 83:17, 84:11, 98:4, 98:8, 98:12, 98:17, 98:24, 106:21, 107:9, 112:3, 112:12, 112:16, 113:22, 113:25, 114:3, 114:11, 119:20, 120:5, 120:9, 120:15, 121:16, 122:4, 122:10, 122:16, 122:18, 123:16, 124:11, 124:13, 124:17, 134:9, 135:2, 135:20, 139:8, 139:14, 139:17, 140:9, 145:8, 161:12, 163:3, 169:20, 170:3, 171:8, 172:1, 175:16, 175:21, 181:25, 183:1
**Health** [10] - 40:11, 41:16, 42:14, 42:17, 46:9, 46:11, 46:13, 106:23, 114:4
**Healthcare** [1] - 17:10, 41:22
**Healthcare** [5] - 44:15, 44:25, 57:18, 170:22, 175:4
**healthier** [1] - 61:23
**healthy** [4] - 38:20, 134:25, 139:16, 139:19
**hear** [16] - 6:3, 7:11, 8:9, 9:7, 17:22, 18:2, 18:22, 18:24, 22:21, 25:8, 26:14, 26:23, 27:22, 32:21, 34:15, 63:20
**heard** [6] - 41:20, 42:7, 52:18, 137:19, 142:23, 148:24
**hearing** [6] - 7:2, 7:7, 7:8, 7:13, 7:14, 92:20
**hearsay** [3] - 149:4, 150:11, 164:11
**heartbeat** [1] - 68:3
**heating** [1] - 8:21
**heaven** [1] - 100:20
**height** [1] - 71:11
**help** [3] - 46:9, 54:4, 140:4
**helpful** [4] - 63:12, 69:14, 105:7, 139:20
**helps** [2] - 61:19, 71:11
**hemisphere** [1] - 173:1
**heroin** [2] - 35:8,

129:14
**herself** [8] - 18:22, 20:24, 22:21, 22:24, 23:4, 36:2, 129:9, 169:3
**hesitant** [1] - 32:17
**high** [9] - 33:16, 81:8, 126:12, 130:3, 130:4, 130:18, 142:2, 161:11, 163:2
**high-quality** [2] - 161:11, 163:2
**high-risk** [3] - 130:3, 130:4, 130:18
**highest** [4] - 36:6, 128:8, 128:14
**highlighted** [2] - 30:11, 31:1
**highly** [1] - 10:8
**hired** [1] - 148:3
**historically** [1] - 104:10
**history** [29] - 31:4, 31:21, 35:11, 36:12, 37:16, 38:10, 56:8, 56:17, 81:12, 83:2, 83:10, 84:9, 96:6, 97:15, 113:16, 114:7, 115:14, 117:1, 118:1, 122:5, 122:11, 125:2, 126:16, 128:17, 129:1, 129:12, 130:3, 133:22, 181:16
**hit** [1] - 159:12
**hitting** [1] - 165:25
**Hohenleitner** [2] - 6:10, 6:18
**hold** [3] - 66:7, 140:25, 183:24
**homes** [1] - 60:6
**hoops** [2] - 101:21, 101:24
**hopefully** [1] - 95:10
**Hopelessness** [1] - 126:9
**hopelessness** [1] - 67:13
**hoping** [2] - 8:15, 185:15
**Hopkins** [3] - 148:3, 148:7, 148:12
**hormonal** [5] - 60:19, 62:6, 72:4, 73:11, 73:22
**hormonally** [1] - 72:21
**hormone** [23] - 10:15, 15:1, 24:18, 60:9, 60:14, 72:2, 72:8, 72:11, 72:15,

73:15, 77:6, 97:11, 99:10, 119:13, 139:5, 140:8, 141:11, 143:21, 143:22, 144:5, 148:16, 167:12, 169:1
**hormones** [23] - 10:17, 10:18, 10:21, 18:1, 18:5, 18:13, 54:8, 60:12, 60:24, 61:3, 64:25, 70:1, 70:7, 70:10, 70:13, 70:15, 72:18, 72:22, 105:6, 123:17, 168:1, 168:7, 169:15
**hospital** [1] - 35:10
**hospitals** [1] - 110:6
**host** [1] - 15:4
**hostile** [1] - 66:1
**hours** [6] - 38:8, 38:9, 79:9, 88:5, 88:10, 106:4
**housed** [2] - 54:19, 55:7, 55:11
**housing** [1] - 60:5
**Human** [1] - 46:11
**hundreds** [1] - 100:19
**hunt** [1] - 56:16
**hyperarousal** [1] - 67:15
**hypermasculine** [1] - 171:20

### I

**ICD-11** [1] - 46:16
**Idaho** [7] - 11:18, 23:25, 24:9, 47:3, 86:17, 143:8, 184:12
**idea** [6] - 12:16, 12:18, 17:24, 61:13, 111:21, 120:14
**ideas** [1] - 67:13
**ideation** [5] - 67:18, 81:8, 128:9, 128:11, 128:13
**ideations** [1] - 128:24
**identified** [10] - 33:4, 33:15, 33:17, 57:1, 95:7, 127:20, 144:21, 161:15, 181:13, 182:9
**identifies** [5] - 36:17, 47:22, 50:5, 63:3, 65:11
**identify** [6] - 32:12, 32:24, 34:17, 49:13, 125:22, 126:5
**identity** [25] - 18:6,

23:6, 31:13, 49:1,
49:2, 49:6, 49:19,
49:22, 50:1, 50:11,
61:8, 61:19, 62:8,
62:17, 65:12, 77:12,
78:4, 78:7, 78:9,
78:15, 78:17, 79:24,
79:25, 112:9, 122:25
**IDOC** [18] - 7:4, 9:12,
10:14, 24:16, 25:3,
25:12, 27:21, 29:23,
31:20, 38:19, 86:24,
96:7, 97:22, 99:11,
113:6, 179:12,
180:11, 184:19
**IDOC's** [3] - 25:1,
112:7, 143:1
**ignorant** [1] - 26:19
**ignore** [3] - 26:17,
94:23, 178:6
**ill** [1] - 8:14
**illnesses** [1] - 58:18
**imagery** [1] - 172:24
**imagine** [1] - 164:9
**immunotherapy** [1] -
28:7
**impact** [4] - 10:19,
57:22, 69:8, 170:3
**impair** [6] - 51:8,
58:16, 58:25, 76:19,
170:14, 170:16
**impaired** [2] - 76:4,
170:21
**impairment** [1] -
13:19
**impairs** [2] - 48:18,
50:13
**impeached** [1] -
100:15
**impeaching** [3] -
151:1, 151:3, 152:14
**impeachment** [3] -
148:19, 149:5, 150:24
**importance** [1] -
45:25
**important** [11] -
18:23, 24:5, 31:20,
45:8, 56:4, 60:19,
61:15, 72:22, 95:25,
122:16, 174:23
**impression** [1] -
125:16
**imprisonment** [1] -
11:23
**improve** [2] - 21:5,
21:21
**improved** [1] -
104:11
**improvement** [1] -
60:18

**improvements** [1] -
123:10
**improves** [2] -
161:12, 163:3
**impulsive** [1] -
132:13
**impulsivity** [4] -
37:8, 132:11, 181:15,
181:21
**inadequacy** [1] -
169:1
**inadequately** [2] -
22:18, 81:4
**inappropriate** [3] -
21:4, 36:15, 92:21
**incarcerated** [22] -
18:20, 43:7, 44:9,
55:3, 90:19, 95:20,
101:16, 101:25,
103:6, 103:10,
103:16, 107:12,
107:15, 108:3,
110:11, 130:21,
133:11, 133:12,
134:1, 158:14,
158:16, 158:18
**incarceration** [30] -
10:11, 20:13, 32:22,
33:7, 35:6, 35:13,
36:14, 37:12, 47:6,
63:11, 83:3, 84:24,
95:23, 114:15,
114:19, 114:21,
115:2, 115:3, 116:22,
127:9, 127:25,
128:20, 129:11,
129:18, 130:2, 131:9,
134:4, 134:8, 172:12,
174:10
**include** [7] - 30:25,
54:2, 113:25, 121:8,
122:11, 132:13, 144:8
**included** [7] - 47:24,
91:25, 95:4, 114:23,
130:9, 130:25, 147:14
**includes** [2] - 11:5,
44:17
**including** [9] - 12:20,
16:3, 42:13, 74:8,
129:14, 134:10,
148:6, 154:10, 158:12
**incongruence** [1] -
48:22
**incongruity** [2] -
50:12, 61:20
**inconsistencies** [1] -
117:5
**inconsistent** [4] -
116:5, 116:25,
135:24, 150:23

**inconsistently** [1] -
150:25
**incorporated** [2] -
53:9, 53:10
**Incorporated** [1] -
6:4
**incorrect** [2] -
106:14, 157:6
**increased** [2] -
137:10, 147:19
**indeed** [2] - 33:19,
75:20
**independent** [2] -
46:20, 141:13
**independently** [1] -
147:25
**indicate** [7] - 63:18,
84:25, 86:22, 98:12,
100:13, 133:16,
165:17
**indicated** [18] - 29:8,
43:23, 58:7, 59:23,
74:23, 74:25, 75:2,
77:22, 89:8, 153:15,
154:3, 154:16,
155:19, 156:12,
164:22, 165:16,
166:6, 169:20
**indicates** [2] - 98:14,
98:17
**indicating** [2] -
131:4, 131:13
**indication** [1] - 68:19
**indications** [1] -
133:14
**indifference** [5] -
11:21, 12:16, 13:2,
14:7, 37:22
**indifferent** [3] - 12:6,
14:17, 37:24
**individual** [22] -
14:1, 24:17, 26:10,
31:9, 34:14, 48:16,
49:2, 50:12, 52:15,
58:6, 58:15, 64:25,
80:7, 107:24, 108:2,
108:9, 119:20,
120:22, 140:20,
144:8, 144:10, 170:4
**individualized** [1] -
178:17
**individuals** [32] -
42:5, 43:7, 43:19,
44:11, 53:10, 56:13,
57:19, 58:18, 63:16,
63:18, 74:11, 101:5,
101:6, 101:21,
108:20, 111:22,
112:1, 120:9, 120:20,
121:1, 121:4, 121:5,

156:20, 157:8, 162:8,
165:17, 165:20,
171:15, 171:20,
174:11, 178:16,
181:19
**inexperienced** [2] -
10:9, 165:23
**infection** [3] - 154:7,
154:8, 175:10
**influence** [2] -
129:22, 129:25
**influencing** [1] -
36:21
**inform** [1] - 42:10
**information** [15] -
19:21, 46:25, 53:18,
67:7, 67:10, 67:19,
75:22, 77:18, 88:10,
92:9, 93:24, 115:13,
147:13, 148:13,
171:16
**informed** [12] - 9:12,
20:18, 57:14, 57:17,
58:16, 59:3, 76:2,
123:9, 145:5, 145:13,
145:18, 170:17
**initial** [2] - 93:3,
185:25
**initiative** [1] - 41:15
**injected** [1] - 90:2
**injunction** [9] - 6:5,
7:2, 7:4, 7:8, 7:14,
10:13, 13:13, 88:8,
91:24
**injunctive** [1] - 7:14
**inmate** [3] - 11:21,
46:21, 110:24
**Inmates** [3] - 26:15,
99:17, 176:6
**inmates** [10] - 54:15,
54:17, 78:19, 108:16,
111:5, 130:23,
130:24, 174:19,
177:13, 180:13
**innate** [1] - 78:10
**input** [3] - 7:18,
118:13, 159:25
**inquire** [2] - 40:3,
47:14
**inquiry** [1] - 103:2
**instance** [17] - 51:10,
51:25, 54:3, 55:9,
59:1, 59:5, 60:3, 61:2,
62:9, 68:2, 69:12,
82:14, 89:4, 110:23,
145:2, 154:7, 175:7
**instances** [2] - 59:5,
94:22
**instead** [2] - 15:4,
28:20

**Institutes** [1] - 46:8
**institution** [4] -
108:8, 108:12, 110:3,
174:6
**Institutionalization**
[1] - 43:3
**institutionalized** [4]
- 43:12, 110:6, 110:8,
174:12
**insufficient** [1] -
53:21
**insulin** [1] - 52:3
**insurance** [1] -
167:15
**intake** [1] - 131:12
**intelligent** [1] - 99:6
**intended** [3] - 28:25,
93:6, 173:7
**intense** [2] - 37:7,
132:5
**intensifies** [1] -
56:18
**intensify** [3] - 51:24,
72:5, 171:23
**intentional** [1] -
80:11
**interacting** [1] - 44:2
**interest** [2] - 23:15,
106:12
**interested** [1] - 41:14
**interfere** [1] - 83:18
**intermittent** [1] -
136:8
**internally** [1] - 71:20
**International** [1] -
46:16
**internationally** [1] -
11:4
**interpret** [1] - 118:25
**interpreted** [1] -
124:8
**interprets** [1] - 26:12
**intervention** [1] -
54:9
**interventions** [3] -
51:7, 123:10, 161:15
**interview** [5] - 67:3,
83:6, 84:11, 114:6,
128:16
**interviewed** [1] -
112:2
**intoxication** [2] -
35:9, 129:19
**inversion** [1] -
155:11
**investigation** [3] -
117:8, 117:11, 117:14
**invited** [4] - 46:6,
46:8, 46:11, 46:13
**involve** [3] - 54:6,

58:11, 104:22
**involved** [10] - 25:25, 28:6, 28:7, 54:22, 59:3, 80:17, 108:7, 109:20, 133:15, 170:19
**involvement** [1] - 54:25
**involves** [1] - 55:19
**involving** [3] - 107:23, 108:2, 108:8
**iPad** [1] - 118:11
**irreversible** [3] - 16:6, 16:20, 30:18
**isolated** [1] - 62:9
**issue** [22] - 7:1, 9:11, 12:23, 12:25, 13:5, 14:12, 18:25, 19:1, 22:15, 28:22, 31:18, 69:13, 71:13, 79:13, 79:14, 80:1, 92:17, 111:4, 124:11, 146:23, 150:21, 180:11
**issued** [1] - 160:18
**issues** [30] - 9:21, 14:22, 17:19, 19:7, 23:20, 32:13, 33:1, 33:20, 34:19, 36:12, 36:23, 38:23, 39:6, 44:7, 44:8, 47:22, 59:13, 67:12, 68:8, 83:3, 84:6, 89:13, 98:4, 98:8, 107:6, 133:24, 164:11, 170:16, 170:23, 171:4
**items** [1] - 70:7
**iteration** [4] - 53:4, 54:15, 147:15, 148:5
**iterations** [4] - 43:9, 147:2, 148:6
**itself** [3] - 25:13, 68:14, 172:13

## J

**jail** [1] - 63:16
**jails** [1] - 46:4
**Jenner** [1] - 136:25
**job** [2] - 31:22, 153:7
**Johns** [3] - 148:3, 148:7, 148:12
**join** [13] - 70:18, 70:20, 73:18, 78:25, 87:25, 91:4, 102:4, 104:16, 134:12, 171:20, 173:24, 179:19, 182:2
**joint** [1] - 23:16
**Joint** [22] - 52:20,

75:9, 84:21, 84:23, 85:2, 85:3, 85:7, 85:9, 96:20, 96:24, 109:7, 109:25, 118:8, 120:6, 121:12, 145:21, 145:25, 175:12, 176:5, 179:2, 179:5, 180:21
**jointly** [1] - 93:16
**journal** [5] - 45:5, 53:15, 108:15, 108:19, 109:14
**Judge** [2] - 174:3, 174:5
**judgment** [3] - 120:23, 124:16, 124:22
**judicial** [2] - 163:23, 163:24
**July** [2] - 182:18, 183:5
**June** [2] - 46:18, 111:13

## K

**keep** [4] - 7:20, 23:8, 105:18, 106:10
**key** [3] - 14:12, 26:17, 31:1
**kill** [1] - 129:8
**kind** [16] - 7:17, 14:12, 16:8, 28:16, 34:12, 59:10, 60:24, 95:14, 162:3, 166:6, 166:8, 167:11, 172:12, 174:24, 179:9, 185:19
**kinds** [5] - 44:7, 60:2, 67:10, 69:3, 70:16
**knowing** [1] - 143:19
**knowledge** [8] - 45:12, 45:16, 98:20, 104:8, 120:13, 141:13, 152:20, 181:6
**known** [4] - 24:11, 38:6, 53:10, 106:22
**knows** [3] - 23:3, 23:7, 100:20
**Knudson** [9] - 147:3, 147:16, 147:23, 148:2, 148:19, 150:16, 152:2, 152:4, 152:8

## L

**lab** [1] - 24:21
**laboratories** [1] -

73:12
**laceration** [1] - 128:3
**lack** [5] - 27:15, 82:16, 100:8, 147:9, 174:6
**lacks** [2] - 91:2, 116:12
**lag** [1] - 9:18
**laid** [1] - 88:9
**language** [5] - 30:13, 30:14, 33:23, 121:20, 121:22
**languages** [1] - 42:12
**largely** [2] - 172:3, 182:20
**last** [14] - 25:23, 36:2, 37:12, 61:6, 71:8, 81:9, 112:4, 137:8, 148:22, 149:7, 149:17, 150:8, 177:11, 178:19
**late** [1] - 7:19
**Law** [1] - 100:20
**law** [4] - 6:25, 22:14, 28:6, 43:10
**Lawrence** [11] - 26:15, 99:14, 99:24, 101:3, 101:8, 101:16, 103:7, 103:9, 108:24, 111:10, 158:13
**Lawrence's** [1] - 158:12
**lawsuit** [2] - 11:2, 23:3
**lawsuits** [1] - 108:7
**lawyers** [1] - 108:11
**lay** [4] - 63:7, 71:15, 72:10, 150:12
**layman's** [1] - 15:19
**layperson** [3] - 48:24, 55:22, 58:3
**layperson's** [1] - 15:19
**leadership** [3] - 41:18, 146:8, 147:23
**leaking** [1] - 177:4
**learn** [2] - 35:12, 181:7
**learned** [3] - 26:3, 35:13, 178:5
**learning** [1] - 41:14
**least** [19] - 7:8, 7:11, 8:1, 11:18, 16:13, 16:16, 18:4, 18:7, 18:11, 18:17, 87:12, 88:25, 115:1, 127:1, 128:2, 167:24, 171:3, 180:11, 182:13
**lectern** [1] - 71:5

**led** [2] - 16:9, 165:20
**leeway** [6] - 90:16, 95:6, 95:8, 102:7, 174:14, 174:22
**left** [7] - 31:12, 34:13, 122:23, 124:15, 171:4, 176:21, 185:11
**legal** [1] - 22:12
**length** [3] - 50:3, 97:15, 161:24
**lengths** [1] - 22:23
**less** [8] - 68:20, 128:13, 155:11, 157:18, 157:25, 158:1, 158:6, 166:12, 166:16, 166:19, 167:2, 168:8, 170:24
**letter** [9] - 147:7, 147:17, 148:19, 150:13, 151:13, 152:6, 156:20, 156:25
**letters** [7] - 156:23, 157:1, 157:2, 157:7, 157:14, 166:24
**level** [7] - 12:13, 48:18, 57:20, 60:18, 61:24, 105:4, 170:7
**levels** [1] - 72:23
**Levine** [10] - 176:8, 176:12, 176:16, 176:17, 176:20, 177:21, 178:12, 180:6, 184:19
**Levine's** [8] - 176:14, 177:1, 177:12, 177:23, 178:3, 178:20, 179:13, 181:4
**liability** [2] - 12:4, 12:12
**licensed** [1] - 153:12
**life** [10] - 16:4, 21:20, 33:3, 54:5, 62:20, 62:21, 82:13, 114:10, 123:11, 177:5
**life-enhancing** [1] - 177:5
**lifelong** [1] - 59:20, 68:15, 82:8
**lifesaving** [2] - 176:25, 177:3
**lifetime** [1] - 59:14
**light** [1] - 32:19
**likelihood** [1] - 104:13
**likely** [4] - 117:6, 157:20, 158:1, 161:14
**limit** [1] - 51:8
**limitations** [1] - 62:4
**limited** [4] - 24:21,

42:14, 94:24, 102:12
**lines** [1] - 102:9
**listed** [4] - 37:6, 41:8, 48:17, 122:22
**listen** [1] - 87:10
**lists** [1] - 47:23
**literature** [10] - 53:12, 147:25, 148:4, 148:10, 158:9, 158:10, 158:11, 162:13, 177:20, 178:12
**live** [2] - 62:7, 62:22
**lived** [7] - 32:21, 77:19, 114:14, 114:17, 115:1, 115:4, 116:5
**liver** [1] - 105:7
**lives** [2] - 10:6, 54:5
**living** [16] - 61:7, 61:9, 62:1, 62:4, 62:9, 62:16, 62:19, 62:22, 63:1, 63:4, 63:24, 77:11, 77:16, 117:1, 129:21, 130:1
**log** [1] - 6:7
**long-care** [1] - 43:13
**long-standing** [1] - 75:21
**long-term** [2] - 52:12, 72:4
**look** [22] - 17:1, 17:12, 18:9, 27:23, 28:20, 30:4, 30:24, 37:18, 37:19, 40:23, 53:5, 56:9, 57:4, 64:10, 67:10, 85:8, 88:5, 122:17, 144:20, 160:1, 162:13, 186:18
**looked** [1] - 160:9
**looking** [18] - 27:14, 30:5, 30:6, 57:13, 63:22, 75:6, 76:8, 77:5, 77:9, 95:18, 96:25, 97:12, 118:16, 120:4, 122:10, 144:24, 145:24, 178:3
**looks** [3] - 43:6, 43:10, 118:14
**Lori** [1] - 9:9
**loss** [2] - 80:17, 127:10
**lost** [2] - 166:6, 185:7
**low** [4] - 74:16, 74:17, 103:23, 154:16
**lower** [1] - 105:6
**lungs** [1] - 175:9

# M

**M.D** [1] - 150:16
**magnetic** [1] - 172:24
**main** [2] - 100:2, 176:24
**maintain** [2] - 38:3, 38:15
**maintained** [2] - 38:3, 72:22
**maintains** [1] - 8:22
**major** [3] - 8:20, 76:25, 177:14
**majority** [4] - 76:6, 148:14, 158:11, 168:24
**makeup** [1] - 50:3, 64:2, 77:23
**Male** [2] - 26:15, 99:17
**male** [20] - 36:18, 49:3, 49:15, 49:20, 60:16, 62:11, 63:3, 63:24, 65:2, 77:17, 78:5, 78:8, 78:15, 97:13, 131:5, 144:22, 169:13, 172:16
**maleness** [1] - 178:7
**malpractice** [1] - 11:20
**managed** [5] - 31:17, 39:6, 123:21, 124:14, 155:12
**management** [8] - 34:20, 38:20, 73:11, 73:22, 113:6, 113:8, 134:13, 139:20
**mandate** [1] - 10:1
**mandated** [1] - 36:24
**mandates** [1] - 31:15
**mandatory** [2] - 7:4, 119:3
**manic** [3] - 59:1, 59:6, 156:3
**manifestations** [1] - 20:23
**manner** [3] - 140:10, 143:11, 144:11
**Manual** [1] - 47:19
**manuscript** [1] - 45:4
**March** [4] - 33:9, 33:16, 36:5, 125:7
**marginalization** [1] - 66:3
**mark** [1] - 61:5
**marked** [7] - 40:21, 48:21, 96:25, 145:21, 145:24, 148:21, 149:1

**marker** [1] - 143:7
**marry** [1] - 171:22
**marshal** [1] - 186:5
**marshals** [1] - 186:3
**masculine** [2] - 143:2, 143:5
**massive** [1] - 28:9
**matches** [1] - 49:25
**materials** [2] - 176:9, 179:12
**matter** [4] - 23:21, 88:17, 89:24, 151:19
**matters** [1] - 88:18
**maximally** [1] - 124:9
**maximum** [6] - 10:19, 61:2, 61:4, 68:16, 76:24, 124:8
**mean** [34] - 12:10, 12:18, 14:14, 28:10, 45:2, 53:5, 55:22, 57:15, 58:23, 61:9, 64:1, 67:5, 67:23, 68:11, 76:23, 82:9, 89:20, 92:7, 95:13, 102:11, 102:20, 104:4, 104:18, 111:23, 154:20, 164:6, 164:7, 166:3, 166:16, 168:3, 171:1, 173:17
**means** [14] - 11:22, 11:23, 32:24, 48:15, 48:16, 48:24, 48:25, 49:23, 51:4, 57:16, 58:3, 58:25, 82:10, 159:6
**meant** [2] - 55:25, 56:1
**measures** [1] - 128:9
**mechanism** [2] - 36:3, 36:17
**mechanisms** [1] - 21:5
**media** [1] - 137:2
**medical** [113] - 9:25, 10:2, 10:3, 11:9, 11:11, 11:20, 11:21, 12:17, 12:19, 12:21, 12:22, 13:1, 13:4, 13:7, 13:10, 13:20, 14:1, 14:6, 14:11, 14:15, 15:6, 15:12, 16:25, 17:2, 17:3, 19:1, 19:3, 19:4, 19:12, 20:14, 20:18, 20:20, 21:18, 21:23, 22:19, 30:12, 31:23, 32:16, 35:16, 37:23, 39:1, 41:17, 44:13, 44:20, 44:21, 46:25,

47:5, 48:20, 51:7, 51:18, 51:20, 51:23, 52:7, 54:6, 54:8, 55:8, 57:8, 57:15, 58:1, 58:5, 58:12, 60:20, 69:25, 75:4, 75:22, 77:4, 80:20, 82:3, 82:22, 83:4, 83:7, 83:9, 84:16, 84:23, 89:13, 90:17, 91:15, 95:19, 95:22, 96:1, 96:4, 96:7, 96:13, 104:4, 112:3, 112:12, 112:16, 113:21, 114:3, 115:21, 116:9, 120:15, 120:18, 120:24, 123:10, 136:21, 145:8, 154:2, 154:24, 155:15, 155:19, 155:21, 156:8, 172:21, 175:5, 182:22, 183:12, 183:14, 184:12
**Medical** [4] - 17:8, 42:14, 114:3, 176:6
**medically** [28] - 11:6, 11:13, 11:15, 12:1, 12:5, 12:7, 12:9, 17:15, 20:16, 22:16, 29:8, 43:23, 54:7, 58:7, 59:6, 59:23, 74:20, 74:23, 74:25, 75:1, 75:2, 84:14, 89:8, 97:7, 97:24, 141:16
**Medicare** [12] - 74:14, 159:7, 161:13, 162:3, 162:4, 162:7, 163:3, 163:5, 163:11, 163:19, 163:20, 164:3
**medicate** [1] - 171:18
**medication** [7] - 35:18, 68:17, 69:6, 76:24, 82:12, 170:20, 171:10
**medications** [3] - 73:11, 73:22, 77:2
**Medicine** [1] - 44:18
**medicine** [6] - 22:10, 22:13, 25:25, 147:24, 178:16, 178:17
**meet** [5] - 30:21, 38:4, 38:16, 38:17
**meeting** [1] - 83:20
**meets** [10] - 30:8, 48:16, 69:24, 75:11, 75:24, 76:1, 76:9, 76:12, 124:20, 131:17
**member** [4] - 27:21,

41:17, 43:15, 149:19
**members** [10] - 35:2, 42:2, 101:6, 117:25, 129:4, 146:7, 146:23, 147:1, 148:2, 149:21
**membership** [10] - 147:8, 147:9, 147:17, 147:18, 147:23, 148:25, 150:15, 150:16, 151:10, 151:22
**memo** [2] - 163:18, 163:19
**memory** [2] - 152:11, 152:14
**men** [1] - 65:5
**men's** [2] - 23:1, 63:4
**mental** [48] - 16:4, 24:8, 30:12, 30:24, 30:25, 31:8, 31:11, 31:19, 31:23, 31:24, 32:7, 32:19, 33:1, 33:20, 33:22, 33:25, 34:1, 34:6, 34:7, 34:16, 35:5, 37:17, 37:19, 38:18, 38:23, 39:9, 41:13, 42:4, 46:1, 46:25, 47:21, 47:22, 58:1, 58:14, 58:18, 58:24, 59:12, 59:13, 59:15, 59:19, 59:25, 66:25, 83:11, 83:17, 84:11, 98:4, 98:7, 98:12, 98:17, 98:24, 107:8, 110:6, 112:3, 112:12, 112:16, 113:22, 113:25, 114:3, 114:11, 120:5, 120:9, 120:15, 121:16, 122:4, 122:10, 122:16, 122:18, 123:15, 124:11, 124:13, 124:17, 134:9, 135:2, 135:20, 139:8, 139:14, 139:17, 140:9, 145:8, 169:20, 170:3, 171:4, 171:8, 172:1, 175:15, 175:21, 181:25, 183:1
**Mental** [1] - 47:19
**mentally** [2] - 39:11, 57:20
**mentioned** [12] - 41:12, 41:20, 42:6, 45:17, 51:1, 59:12, 63:15, 68:22, 94:4, 94:10, 147:13, 181:10
**mere** [1] - 94:3
**merely** [1] - 49:24

**met** [10] - 38:8, 47:2, 75:17, 77:21, 120:16, 142:15, 142:17, 143:13, 168:13, 175:15
**methamphetamines** [2] - 35:8, 129:14
**methodology** [1] - 45:13
**microphone** [2] - 25:6, 71:11
**middle** [1] - 119:9
**midlife** [2] - 56:19, 56:24
**might** [7] - 14:3, 14:4, 63:14, 171:8, 181:14, 186:11
**mind** [2] - 75:1, 136:19
**minimum** [1] - 120:9
**Minnesota's** [1] - 41:17
**minor** [1] - 171:4
**minorities** [1] - 46:10
**minority** [2] - 65:18, 122:6
**minutes** [12] - 64:13, 64:15, 66:9, 105:18, 105:20, 140:25, 141:2, 162:14, 173:8, 183:19, 184:2, 184:3
**mirror** [2] - 11:12, 54:18
**mischief** [1] - 163:25
**misgendered** [1] - 65:20
**misgendering** [1] - 65:11
**misrepresent** [1] - 151:24
**mistaken** [1] - 151:17
**modality** [1] - 69:16
**models** [1] - 53:9
**moderately** [1] - 126:11
**modification** [1] - 26:10
**modified** [1] - 58:10
**modify** [1] - 119:21
**moment** [8] - 6:7, 72:25, 73:25, 79:16, 85:23, 161:18, 173:22, 179:20
**moments** [1] - 76:14
**Monday** [2] - 9:2, 102:22
**money** [1] - 14:20
**monitored** [3] - 24:19, 70:9, 70:13

**month** [2] - 24:12, 138:25

**months** [12] - 18:4, 18:7, 18:10, 28:8, 56:3, 60:8, 61:7, 62:1, 77:11, 98:17, 136:10, 136:11

**mood** [6] - 34:20, 37:10, 38:19, 132:25, 134:13, 139:19

**morning** [10] - 6:6, 40:6, 40:7, 183:24, 185:5, 185:7, 185:12, 185:18, 186:2, 186:16

**morphology** [1] - 48:25

**most** [14] - 14:19, 22:25, 23:5, 38:5, 42:8, 50:21, 65:22, 155:12, 161:14, 165:22, 165:25, 177:13, 178:5, 178:6

**mostly** [1] - 57:11

**mother** [1] - 118:3

**motion** [6] - 6:4, 10:12, 13:13, 23:4, 91:23, 92:18

**motions** [1] - 85:6

**motivation** [1] - 178:22

**move** [19] - 21:20, 40:25, 48:6, 73:1, 73:14, 74:2, 84:24, 89:16, 90:14, 93:23, 102:18, 148:18, 152:13, 152:16, 152:23, 163:14, 165:3, 172:20, 183:4

**moved** [2] - 88:7, 186:1

**moving** [3] - 23:8, 60:8, 61:6

**MR** [125] - 8:11, 8:13, 23:15, 23:18, 25:8, 25:11, 27:8, 28:2, 29:3, 29:11, 33:22, 33:24, 34:1, 34:3, 34:5, 34:11, 34:13, 41:3, 48:9, 63:5, 70:16, 70:17, 70:18, 70:20, 72:24, 73:1, 73:14, 73:18, 78:12, 78:20, 78:23, 79:25, 83:12, 83:22, 85:20, 86:4, 87:7, 87:9, 87:14, 87:19, 87:25, 90:3, 91:1, 91:4, 92:15, 92:23, 92:25, 100:3, 102:3, 102:4, 104:15, 104:16,

105:13, 105:25, 106:2, 109:6, 109:10, 110:23, 116:17, 116:23, 118:10, 118:14, 118:16, 140:14, 140:21, 140:24, 141:8, 141:9, 146:12, 146:18, 148:18, 148:22, 149:8, 149:11, 149:13, 149:18, 149:25, 150:15, 151:3, 151:8, 151:18, 151:24, 152:3, 152:5, 152:17, 152:24, 153:3, 158:24, 159:2, 159:15, 159:17, 159:21, 160:7, 160:9, 162:17, 162:19, 163:14, 163:22, 164:1, 164:13, 164:15, 165:3, 165:9, 173:21, 173:23, 173:24, 174:3, 174:5, 179:17, 179:19, 180:2, 180:5, 180:9, 180:14, 182:1, 182:2, 184:1, 184:6, 184:10, 184:24, 185:1, 185:20, 185:24, 186:7, 186:14

**MS** [104] - 9:9, 11:25, 12:15, 13:11, 14:9, 14:21, 16:22, 18:21, 19:20, 20:3, 20:7, 23:12, 39:18, 40:5, 40:25, 41:6, 47:8, 47:18, 48:6, 48:11, 48:14, 63:14, 64:17, 64:19, 66:5, 66:16, 66:17, 71:8, 71:12, 71:18, 71:22, 71:23, 73:5, 73:23, 74:4, 79:1, 79:3, 79:15, 79:21, 83:14, 83:16, 84:9, 84:21, 85:2, 85:8, 86:6, 86:12, 86:19, 87:1, 87:2, 88:1, 88:3, 89:4, 90:17, 91:5, 91:7, 91:14, 91:18, 91:22, 93:11, 94:15, 95:9, 95:17, 96:23, 100:11, 101:2, 102:11, 103:4, 104:24, 105:10, 110:15, 110:18, 116:12, 140:12, 149:3, 149:10, 149:14, 150:3, 151:15, 151:21, 161:19, 161:23,

163:17, 164:2, 173:10, 173:12, 175:11, 179:5, 179:9, 179:21, 179:23, 180:21, 181:1, 181:11, 182:7, 182:18, 183:2, 183:5, 183:9, 183:11, 183:17, 185:3, 185:9, 185:10

**multidisciplinary** [1] - 46:2

**multiple** [14] - 35:3, 36:13, 38:7, 58:19, 115:18, 115:25, 130:9, 130:11, 130:22, 131:25, 134:9, 137:19, 170:15

**mushroomed** [2] - 137:12, 137:14

**must** [12] - 20:13, 27:24, 30:13, 31:15, 31:17, 34:4, 34:5, 57:16, 58:2, 98:23, 145:9, 169:21

**mutilating** [1] - 132:20

**mutilation** [1] - 80:10

---

# N

**nail** [1] - 115:7

**nails** [1] - 64:11

**name** [6] - 39:24, 46:15, 91:3, 121:3, 153:4

**named** [2] - 111:22, 155:6

**namely** [1] - 116:9

**names** [2] - 121:8, 122:13

**narcissistic** [1] - 82:15

**narrow** [1] - 10:13

**nascent** [1] - 169:14

**National** [4] - 42:17, 42:18, 46:8, 106:23

**national** [1] - 159:9

**national-coverage** [1] - 159:9

**natural** [5] - 52:13, 143:18, 169:4, 169:14, 173:15

**nature** [1] - 7:1

**necessarily** [5] - 20:8, 44:13, 123:16, 132:6, 143:23

**necessary** [29] - 11:7, 11:14, 11:15, 12:1, 12:5, 12:7, 12:9,

17:16, 18:19, 19:2, 19:12, 19:18, 19:23, 20:16, 20:19, 22:16, 43:22, 54:7, 74:20, 75:2, 84:14, 85:19, 89:5, 96:14, 97:8, 97:17, 97:24, 115:20, 141:16

**necessitating** [1] - 105:6

**necessity** [4] - 75:4, 85:15, 96:1, 96:7

**Necessity** [1] - 176:6

**need** [51] - 7:20, 7:24, 8:17, 12:17, 12:21, 13:4, 13:7, 13:10, 14:1, 14:6, 14:15, 15:23, 15:24, 16:19, 17:19, 25:19, 26:25, 27:18, 28:23, 29:18, 32:16, 34:2, 39:1, 39:10, 53:10, 56:21, 58:7, 60:4, 64:20, 65:1, 73:19, 85:5, 89:15, 90:14, 91:7, 92:15, 95:14, 97:6, 98:14, 118:10, 123:21, 124:14, 147:19, 152:21, 169:21, 172:8, 183:22, 183:24, 185:8, 186:5

**needed** [4] - 27:16, 37:4, 41:19, 88:8

**needs** [13] - 10:2, 11:21, 15:13, 16:14, 17:24, 21:19, 21:21, 29:17, 34:8, 53:7, 53:8, 98:21, 148:17

**negate** [1] - 59:15

**neglect** [3] - 31:4, 122:12, 129:2

**negligence** [1] - 11:18

**negligence-based** [1] - 11:18

**negligent** [1] - 12:6

**nerdy** [1] - 173:2

**nerve** [1] - 80:18

**neurodevelopment al** [1] - 80:1

**never** [29] - 22:4, 22:5, 26:22, 29:2, 29:25, 30:20, 38:14, 62:5, 94:22, 100:5, 106:25, 107:8, 107:11, 107:16, 108:11, 108:14, 108:18, 112:2, 112:6, 117:18, 136:19,

142:23, 149:3, 149:14, 150:6, 150:19, 151:21

**new** [15] - 11:8, 53:8, 92:5, 92:19, 93:6, 93:8, 93:21, 93:22, 93:24, 101:15, 103:5, 147:13, 148:14, 148:17, 165:1

**New** [1] - 40:11

**next** [16] - 6:13, 6:14, 6:16, 6:20, 9:17, 9:22, 48:3, 50:25, 54:25, 60:8, 64:13, 64:15, 122:21, 147:14, 148:4, 178:2

**nibbling** [1] - 95:14

**nice** [1] - 106:3

**night** [4] - 148:22, 149:7, 149:17, 150:8

**no-shows** [1] - 136:17

**nobody** [1] - 15:8

**non** [1] - 61:13

**nonchemical** [1] - 171:4

**nonchemical-based** [1] - 171:4

**noncognitive** [1] - 69:15

**nonconforming** [1] - 51:12

**nondisclosed** [1] - 73:15

**none** [3] - 20:15, 37:4, 94:1

**nonetheless** [1] - 142:9

**nonissue** [1] - 148:23

**nonprison** [1] - 27:7

**nonresponsive** [2] - 73:1, 78:12

**normal** [1] - 172:14

**normally** [2] - 47:12, 165:12

**note** [10] - 68:6, 84:17, 85:10, 85:23, 87:2, 89:7, 89:10, 89:14, 90:5

**note-taking** [1] - 85:23

**noted** [3] - 71:4, 174:3, 174:8

**notes** [5] - 84:25, 89:10, 91:15, 120:23, 183:12

**nothing** [3] - 39:14, 145:13, 184:24

**notice** [5] - 13:3,

13:4, 13:9, 163:23, 163:24
**noticed** [1] - 8:19
**notify** [1] - 102:24
**nowhere** [2] - 145:20, 146:2
**number** [23] - 14:4, 31:19, 32:7, 32:11, 35:9, 36:11, 36:15, 41:8, 44:14, 44:23, 109:16, 113:4, 133:13, 133:25, 139:14, 157:4, 164:11, 166:19, 168:6, 179:8, 180:20, 181:14
**numbered** [1] - 90:9
**numerous** [1] - 65:18
**nursing** [1] - 55:10
**nutrition** [1] - 52:2

## O

**oath** [3] - 66:12, 105:23, 141:5
**object** [6] - 47:15, 85:20, 86:4, 100:5, 163:17, 164:3
**objected** [1] - 174:1
**objection** [51] - 41:2, 41:3, 48:8, 48:9, 63:5, 70:16, 72:24, 73:1, 73:14, 73:17, 78:12, 78:20, 78:23, 79:17, 79:20, 83:12, 84:8, 86:20, 87:20, 90:15, 91:1, 91:4, 91:6, 91:19, 93:17, 100:3, 102:3, 102:5, 102:10, 102:23, 104:15, 104:23, 110:15, 110:17, 110:18, 116:12, 140:12, 152:16, 152:23, 163:16, 164:6, 164:12, 173:21, 173:23, 174:5, 179:17, 180:2, 180:4, 181:2, 182:1, 182:3
**objections** [1] - 150:7
**obsession** [2] - 127:17, 127:18
**obtain** [1] - 67:8
**obviate** [1] - 59:15
**obvious** [1] - 86:16
**obviously** [3] - 86:8, 87:17, 170:6
**occasion** [2] -

133:19, 142:17
**occasionally** [1] - 155:13
**occasions** [2] - 115:18, 116:11
**occurs** [4] - 62:21, 65:19, 80:1, 156:20
**October** [1] - 6:2
**odds** [1] - 177:25
**offender** [7] - 36:23, 38:14, 38:21, 113:16, 133:20, 135:9, 135:17
**offenders** [8] - 30:20, 36:18, 37:14, 78:5, 78:8, 78:16, 121:11, 130:23
**offense** [3] - 20:11, 113:3, 133:17
**offer** [12] - 63:13, 79:18, 86:8, 88:21, 88:23, 89:16, 89:21, 91:10, 100:22, 102:8, 102:13, 182:16
**offered** [12] - 24:23, 70:22, 74:2, 84:3, 89:22, 89:23, 90:10, 94:11, 94:25, 163:8, 172:20, 182:19
**offering** [1] - 91:12
**office** [1] - 115:24
**often** [6] - 20:20, 34:13, 62:24, 93:20, 122:5, 155:13
**oftentimes** [1] - 160:4
**old** [1] - 137:21
**older** [1] - 49:12
**once** [2] - 128:2, 169:10
**oncologist** [1] - 58:11
**oncology** [1] - 28:7
**one** [91] - 6:10, 13:24, 14:2, 14:6, 14:10, 14:19, 22:2, 24:12, 25:17, 25:22, 26:11, 26:12, 26:24, 29:9, 29:18, 29:24, 30:11, 32:1, 33:2, 33:10, 34:18, 34:24, 35:15, 36:10, 36:25, 42:23, 45:17, 49:24, 54:15, 60:11, 62:2, 62:10, 62:13, 62:23, 62:24, 63:1, 64:6, 69:5, 78:10, 81:20, 89:14, 89:24, 100:16, 101:8, 107:23, 110:9, 110:23, 117:15, 124:23, 126:2, 126:8,

127:13, 127:20, 128:3, 132:9, 132:17, 133:19, 134:13, 134:19, 134:25, 135:15, 138:20, 139:1, 142:17, 143:21, 144:4, 144:6, 144:15, 144:16, 145:4, 145:7, 147:17, 153:9, 155:5, 155:10, 156:21, 156:23, 156:24, 160:21, 165:11, 165:13, 168:12, 169:16, 171:1, 176:8, 178:14, 179:6, 180:14, 184:6
**one's** [3] - 48:22, 62:19
**one-time** [1] - 156:21
**ones** [3] - 30:25, 90:1, 179:6
**onetime** [2] - 156:24, 167:5
**ongoing** [8] - 10:23, 13:18, 15:3, 22:17, 35:21, 37:17, 37:19
**open** [2] - 94:4, 163:25
**opened** [3] - 151:18, 173:25, 180:1
**opening** [12] - 8:8, 9:11, 9:20, 19:7, 23:14, 23:16, 41:21, 53:19, 81:21, 83:16, 84:4, 84:7
**opens** [1] - 94:8
**operating** [1] - 112:7
**operation** [1] - 154:12
**operations** [1] - 107:2
**opine** [3] - 83:19, 90:5, 126:18
**opining** [1] - 87:23
**opinion** [74] - 16:8, 25:17, 39:2, 45:11, 63:8, 63:13, 69:20, 69:23, 70:8, 70:12, 70:24, 72:9, 73:6, 73:10, 73:21, 74:2, 74:22, 76:11, 76:12, 76:17, 76:20, 78:17, 79:18, 79:19, 80:24, 81:2, 85:17, 85:25, 86:2, 86:8, 86:22, 87:4, 87:17, 88:24, 88:25, 89:16, 89:21, 90:10, 90:18, 90:22, 90:25, 91:10, 91:11, 91:14, 94:2, 98:3,

98:7, 100:22, 100:24, 102:7, 102:16, 104:13, 104:24, 156:19, 156:25, 157:1, 163:20, 167:6, 167:22, 168:22, 172:19, 172:21, 173:14, 173:18, 175:22, 177:7, 181:5, 181:23, 182:16, 182:23, 183:11, 183:16
**opinions** [34] - 9:22, 38:11, 46:23, 70:22, 73:15, 84:2, 86:24, 88:9, 88:13, 88:14, 88:16, 88:22, 88:23, 89:22, 89:23, 90:9, 92:8, 92:20, 93:4, 93:7, 93:8, 93:13, 93:14, 93:21, 93:22, 93:23, 94:12, 94:25, 95:13, 100:7, 102:9, 111:13, 166:9, 182:6
**opportunity** [6] - 23:22, 106:4, 135:21, 138:10, 176:2, 179:11
**opposing** [1] - 88:16
**opposite** [2] - 64:22, 117:22
**opposition** [2] - 13:12, 103:20
**opt** [1] - 144:2
**optimal** [1] - 124:7
**optimally** [4] - 31:17, 123:21, 124:2, 124:14
**option** [7] - 14:18, 14:19, 25:17, 26:21, 144:7, 144:10, 144:17
**options** [27] - 14:4, 14:5, 14:10, 19:22, 24:14, 24:15, 25:14, 25:15, 29:24, 53:25, 54:2, 54:11, 54:12, 55:5, 56:23, 57:2, 57:10, 57:11, 57:24, 121:16, 143:20, 143:25, 144:2, 144:4, 144:6, 144:15, 144:16
**order** [15] - 15:14, 23:8, 29:5, 45:14, 56:9, 57:5, 72:8, 97:6, 101:22, 101:25, 103:1, 143:22, 143:24, 144:5, 185:25
**ordered** [1] - 34:10
**orders** [1] - 134:2
**Oregon** [1] - 165:2
**organ** [3] - 80:11, 169:8, 169:10

**organization** [3] - 41:23, 42:2, 168:13
**Organization** [2] - 42:14, 46:13
**organizations** [4] - 41:19, 42:13, 103:11, 181:10
**organs** [2] - 169:11, 169:13
**orientation** [3] - 49:7, 49:17, 49:18
**originally** [1] - 7:23
**orphanage** [1] - 55:10
**Osborne** [10] - 26:15, 99:14, 99:24, 101:3, 101:16, 101:19, 103:7, 103:9, 108:24, 111:10
**otherwise** [1] - 67:8
**outcomes** [3] - 161:12, 163:3, 165:23
**outlier** [2] - 176:16, 181:9
**outliers** [1] - 101:13
**outlined** [2] - 75:25, 82:17
**outset** [1] - 71:5
**outside** [5] - 11:23, 63:1, 73:15, 147:12, 173:19
**outweigh** [1] - 58:17
**outweighs** [4] - 59:4, 59:9, 145:22, 146:3
**overall** [1] - 60:18
**overdose** [2] - 35:18, 128:1
**overidealized** [1] - 82:16
**overlook** [1] - 29:13
**overrule** [3] - 79:17, 86:20, 181:2
**overruled** [3] - 84:8, 91:6, 110:19
**own** [16] - 33:9, 43:14, 49:20, 52:15, 63:9, 68:21, 69:24, 75:16, 80:16, 157:2, 157:18, 169:6, 174:17, 176:17, 177:25

## P

**P-O-H** [1] - 155:6
**p.m** [5] - 105:21, 141:3, 186:23
**packed** [1] - 9:22
**page** [24] - 48:3, 71:19, 75:10, 86:13,

96:24, 119:9, 120:1, 120:4, 120:6, 121:11, 122:21, 145:20, 145:24, 146:3, 175:12, 175:13, 176:22, 177:10, 178:2, 178:18, 179:2

**pages** [5] - 27:9, 110:1, 110:2, 113:17, 150:18

**pain** [1] - 12:13

**painful** [1] - 65:5

**paint** [1] - 178:14

**paper** [2] - 161:23, 161:25

**papers** [1] - 53:14

**Paradox** [1] - 176:7

**paragraph** [19] - 71:20, 71:21, 72:1, 86:13, 86:14, 86:15, 88:2, 88:3, 88:4, 89:9, 89:16, 90:8, 91:3, 119:9, 122:2, 123:14, 162:22, 183:6, 183:10

**paragraphs** [1] - 90:9

**paraphrase** [1] - 100:6

**parcel** [3] - 33:15, 68:19, 172:3

**pardon** [1] - 121:21

**parking** [1] - 96:12

**parole** [2] - 37:1, 135:16

**part** [22] - 7:9, 7:16, 9:4, 15:6, 16:13, 18:24, 19:23, 32:8, 33:14, 43:21, 47:4, 48:21, 51:1, 64:18, 68:19, 71:14, 79:21, 84:16, 127:1, 172:3, 176:20, 177:1

**partial** [1] - 10:22

**partially** [1] - 172:3

**participate** [4] - 57:17, 57:23, 98:23, 170:22

**participated** [1] - 32:10

**participating** [2] - 20:18, 20:19

**participation** [1] - 136:8

**particular** [13] - 12:11, 66:22, 67:19, 69:13, 81:7, 89:4, 89:13, 95:6, 96:10, 97:2, 124:10, 144:5, 180:21

**particularly** [4] -

66:24, 94:20, 105:7, 171:15

**parties** [4] - 19:10, 84:22, 107:23, 186:8

**partners** [3] - 36:13, 130:10, 130:11

**party** [2] - 8:13, 88:16

**past** [7] - 10:20, 13:8, 43:9, 45:22, 57:19, 81:12, 125:5

**path** [1] - 169:9

**patient** [1] - 21:6, 56:7, 57:5, 57:16, 65:16, 107:11, 107:16, 115:24, 124:13

**patient's** [5] - 16:3, 57:7, 57:8, 60:9, 97:15

**patient-psychologist** [1] - 107:16

**patients** [28] - 10:5, 10:10, 41:6, 41:11, 43:17, 43:22, 43:23, 43:24, 44:1, 44:3, 44:4, 44:9, 45:20, 97:11, 105:1, 156:13, 156:18, 157:2, 157:13, 157:18, 158:15, 161:14, 162:4, 166:11, 166:25, 167:2, 167:7, 178:25

**pattern** [3] - 37:7, 60:16, 132:4

**pays** [1] - 78:11

**PDF** [1] - 176:6

**peer** [9] - 44:23, 45:2, 45:4, 45:8, 53:15, 108:15, 108:19, 109:14, 177:20

**peer-reviewed** [8] - 44:23, 45:2, 45:4, 53:15, 108:15, 108:19, 109:14, 177:20

**peers** [1] - 72:20

**penis** [2] - 65:3, 178:6

**people** [60] - 11:13, 16:9, 21:25, 22:9, 40:15, 41:13, 43:12, 43:13, 44:7, 52:1, 52:4, 55:4, 56:11, 56:14, 56:19, 56:24, 56:25, 57:21, 57:22, 59:22, 60:3, 60:6,

61:1, 61:21, 63:9, 63:23, 64:5, 65:2, 65:19, 65:22, 65:25, 66:2, 68:12, 74:18, 80:14, 80:16, 80:17, 84:13, 87:16, 101:16, 104:5, 104:20, 131:15, 144:2, 163:9, 165:22, 167:5, 167:17, 167:20, 168:1, 168:4, 168:6, 169:5, 170:24, 172:25, 173:20, 175:4, 176:18, 178:15

**per** [1] - 83:9

**percent** [22] - 59:13, 104:10, 104:12, 104:19, 105:5, 157:9, 157:10, 157:12, 157:13, 157:25, 158:1, 158:6, 165:17, 166:12, 166:16, 166:17, 166:18, 166:21, 166:24, 167:3, 167:9, 167:10

**percentage** [3] - 157:18, 157:21, 168:4

**perform** [6] - 10:24, 23:22, 40:14, 80:16, 125:21, 169:3

**performed** [6] - 33:9, 39:13, 58:10, 125:7, 126:8, 138:8

**performing** [1] - 164:7

**perhaps** [13] - 18:18, 22:25, 38:4, 52:1, 70:25, 104:19, 151:17, 170:2, 171:2, 171:8, 174:1, 186:5, 186:10

**period** [5] - 57:4, 67:8, 130:1, 139:4

**periods** [4] - 18:10, 136:5, 136:7, 136:9

**permanent** [1] - 30:18

**permit** [2] - 73:17, 91:20

**permitted** [6] - 93:14, 139:12, 140:10, 141:24, 143:6, 143:10

**permitting** [1] - 143:1

**perpetrator** [2] - 37:11, 133:12

**persisted** [1] - 22:24

**persistent** [9] - 11:7, 18:3, 52:7, 55:23,

55:25, 56:2, 56:10, 75:12, 75:20

**persistently** [1] - 18:12

**person** [38] - 39:11, 49:25, 50:5, 50:9, 51:6, 54:5, 54:19, 54:21, 55:7, 55:9, 56:1, 59:1, 59:5, 59:8, 59:17, 60:14, 60:17, 60:21, 61:23, 62:4, 62:7, 62:9, 65:11, 65:12, 65:14, 68:11, 69:5, 69:12, 80:21, 82:12, 82:15, 110:9, 156:3, 156:22, 167:23, 169:12, 170:15, 175:7

**person's** [8] - 15:25, 48:25, 56:8, 58:12, 61:11, 79:24, 82:10, 170:17

**personal** [2] - 23:5, 37:7, 132:5, 176:17, 177:23

**personality** [48] - 15:25, 31:5, 37:3, 37:5, 39:6, 58:19, 59:19, 81:22, 82:1, 82:3, 82:4, 82:6, 82:7, 82:11, 82:14, 82:15, 82:21, 122:13, 131:9, 131:14, 131:16, 131:17, 131:20, 131:22, 131:25, 132:3, 132:6, 132:10, 132:15, 132:18, 132:21, 132:22, 139:21, 139:23, 139:24, 155:15, 155:20, 155:23, 156:1, 156:5, 156:6, 170:15, 181:15, 182:10

**personally** [4] - 43:19, 80:23, 143:4, 156:19

**persons** [10] - 55:3, 59:24, 101:25, 103:6, 103:10, 103:16, 104:1, 110:6, 110:8, 158:16

**Persons** [1] - 43:3

**perspective** [3] - 45:9, 65:15, 72:15

**PH.D** [1] - 39:22

**phase** [1] - 59:1

**phenomena** [1] - 148:17

**philosophical** [1] -

181:9

**philosophy** [2] - 22:9, 22:13

**photo** [2] - 97:21, 97:23

**photograph** [3] - 97:2, 97:5, 97:6

**photographs** [2] - 25:2, 96:16

**phrase** [2] - 58:23, 59:9

**physical** [3] - 62:5, 129:4, 133:13

**physicians** [1] - 41:13

**physiology** [1] - 169:9

**pick** [3] - 9:14, 64:13, 173:13

**picture** [1] - 31:24

**pieces** [1] - 16:19

**piercing** [1] - 64:7

**pills** [1] - 169:9

**pin** [1] - 166:18

**place** [6] - 10:9, 46:14, 46:15, 52:12, 62:20, 66:2

**placed** [3] - 24:18, 139:4, 140:7

**placement** [1] - 43:11

**plagued** [1] - 33:2

**plaintiff** [5] - 9:10, 30:7, 92:11, 151:4, 185:9

**Plaintiff** [1] - 159:18

**Plaintiff's** [6] - 40:22, 41:1, 41:5, 48:1, 48:6, 48:13

**PLAINTIFF'S** [1] - 39:22

**plaintiff's** [10] - 10:3, 10:12, 22:15, 25:22, 33:9, 33:17, 36:5, 38:8, 47:5, 149:11

**plaintiffs** [10] - 8:9, 9:7, 29:9, 30:6, 30:15, 32:3, 39:17, 91:23, 91:25, 149:15

**plan** [1] - 37:13

**planned** [1] - 7:23

**planning** [2] - 8:14, 150:1

**plans** [2] - 91:12, 181:8

**Plastic** [2] - 42:19, 45:24

**platform** [1] - 54:16

**play** [1] - 19:9

**played** [1] - 42:21

**plug** [1] - 159:20
**plus** [1] - 164:11
**pneumonia** [1] - 175:7
**Pocatello** [1] - 102:21
**Poh** [1] - 155:6
**point** [34] - 7:12, 8:19, 10:19, 10:20, 14:11, 19:25, 20:17, 30:22, 32:17, 35:8, 47:8, 57:15, 59:14, 65:23, 73:20, 79:19, 86:7, 90:14, 90:15, 93:17, 93:18, 100:2, 100:6, 103:1, 124:8, 126:5, 128:3, 140:23, 141:14, 162:9, 176:24, 177:11, 178:3
**pointed** [2] - 106:12, 164:2
**points** [2] - 20:5, 29:12
**policies** [6] - 25:1, 26:13, 43:10, 43:12, 46:3, 180:12
**policy** [2] - 24:16, 25:13
**polish** [1] - 115:7
**ponytail** [1] - 142:3
**poor** [1] - 165:23
**population** [3] - 26:18, 26:19, 164:3
**portion** [4] - 55:13, 73:20, 118:17, 121:17
**portions** [1] - 88:6
**Portneuf** [1] - 114:3
**posed** [1] - 151:25
**position** [1] - 19:24
**positions** [2] - 40:8, 41:8
**possible** [16] - 14:2, 19:22, 25:1, 36:7, 50:1, 53:18, 62:16, 63:2, 64:7, 103:22, 122:9, 123:8, 123:16, 128:8, 128:14, 132:15
**possibly** [4] - 83:21, 130:20, 175:9, 175:10
**post** [1] - 76:21
**postoperative** [2] - 59:2, 170:18
**postsurgical** [2] - 99:3, 99:7
**posttraumatic** [1] - 69:17
**posttrial** [1] - 174:23
**posture** [1] - 7:17
**potential** [4] - 12:12, 35:15, 56:5, 154:10

**potentially** [7] - 15:8, 15:22, 30:18, 32:14, 81:14, 154:15, 177:4
**PowerPoint** [3] - 23:19, 180:18, 184:18
**Practice** [1] - 42:16
**practice** [8] - 17:3, 17:6, 40:19, 41:9, 56:6, 58:6, 157:10, 178:17
**practices** [3] - 17:4, 17:13, 17:14
**precisely** [1] - 20:3, 115:6, 124:6
**preclude** [1] - 123:16
**precondition** [2] - 99:1, 99:2
**predated** [1] - 128:20
**prediabetic** [1] - 52:1
**predictable** [2] - 10:11, 22:18
**predominantly** [1] - 125:3
**preemptive** [1] - 102:10
**preferable** [1] - 14:10
**preferred** [2] - 65:8, 144:11
**preincarceration** [12] - 33:1, 33:8, 33:16, 35:2, 36:13, 113:23, 114:7, 115:15, 118:1, 126:15, 129:8, 133:22
**preliminary** [6] - 6:5, 10:13, 13:13, 23:21, 88:8, 91:24
**preoperative** [1] - 178:5
**preoperatively** [1] - 167:1
**preparation** [2] - 6:24, 9:18
**prepare** [2] - 6:11, 23:23
**prepared** [5] - 15:23, 23:18, 24:2, 100:25, 182:14
**prepubertal** [1] - 148:16
**prescribed** [2] - 77:2, 99:10
**presence** [3] - 59:15, 123:15, 131:20
**present** [19] - 8:8, 9:20, 15:4, 15:15, 10:12, 36:8, 37:9, 45:23, 49:25, 56:24, 57:7, 57:8, 57:12,

58:2, 98:1, 144:11, 145:9, 175:16, 182:10
**presentation** [9] - 23:19, 49:23, 49:24, 57:12, 97:16, 177:1, 177:12, 180:10
**presentations** [1] - 45:22
**presented** [8] - 18:6, 18:13, 18:15, 18:20, 20:12, 83:17, 114:16, 184:19
**presentence** [3] - 117:7, 117:11, 117:14
**presenter** [2] - 161:22, 162:1
**presenting** [2] - 22:24, 122:3
**presently** [4] - 56:17, 96:5, 97:7, 98:3
**presents** [1] - 49:24
**preserve** [1] - 98:21
**president** [3] - 40:11, 147:5, 147:17
**President** [1] - 150:17
**pressure** [1] - 6:22
**presumably** [1] - 167:12
**presume** [2] - 134:24, 141:13
**pretty** [4] - 19:8, 85:25, 158:6, 166:19
**prevailing** [1] - 45:12
**previous** [1] - 53:4, 119:11, 126:18
**previously** [7] - 54:5, 55:7, 68:6, 100:16, 105:4, 122:22, 181:10
**primarily** [8] - 35:8, 38:25, 60:12, 67:21, 69:15, 129:14, 168:19, 173:1
**primary** [8] - 24:15, 30:11, 42:4, 50:18, 54:10, 136:13, 147:18, 167:1
**Principles** [1] - 44:17
**principles** [1] - 28:21
**prison** [65] - 9:14, 11:13, 11:16, 12:2, 12:8, 15:14, 16:15, 18:12, 18:16, 20:8, 22:9, 23:1, 23:9, 25:1, 26:13, 26:18, 26:22, 27:2, 27:7, 27:13, 27:14, 27:15, 30:21, 31:22, 35:25, 38:13, 47:2, 52:12, 54:13, 55:10, 62:17, 62:23,

63:1, 63:4, 63:16, 63:21, 66:21, 77:17, 78:8, 79:12, 106:25, 107:2, 107:5, 107:8, 107:12, 108:21, 110:25, 111:7, 112:4, 112:11, 120:16, 120:21, 127:4, 131:6, 133:20, 134:1, 135:2, 140:11, 141:10, 172:10, 173:15, 173:17, 178:25, 185:12, 185:15
**Prison** [2] - 26:15, 99:17
**prisoners** [1] - 10:1
**prisons** [11] - 27:10, 43:11, 43:13, 44:12, 46:4, 63:23, 63:24, 80:14, 169:4, 176:19, 177:13
**private** [1] - 41:9
**pro** [1] - 11:2
**problem** [5] - 9:18, 21:22, 70:25, 160:5, 170:4
**problems** [5] - 16:4, 32:12, 34:23, 44:7, 178:14
**procedural** [1] - 7:17
**Procedure** [1] - 89:19
**procedure** [1] - 30:19
**procedures** [3] - 60:22, 112:8, 154:23
**proceed** [6] - 47:17, 66:11, 84:8, 86:21, 95:16, 101:1
**proceeding** [5] - 7:2, 7:16, 24:5, 58:13, 91:22
**proceedings** [1] - 94:13
**process** [7] - 15:24, 31:13, 55:1, 67:25, 69:14, 95:4, 122:24
**processes** [2] - 20:1, 172:14
**processing** [1] - 69:8
**produce** [1] - 92:5
**produced** [6] - 43:1, 53:1, 93:4, 113:18, 117:8, 150:18
**produces** [1] - 80:12
**production** [1] - 150:4
**profession** [2] - 17:5, 45:12
**Professional** [4] -

17:9, 40:10, 41:16, 41:21
**professional** [7] - 25:16, 39:2, 42:13, 46:1, 101:9, 103:11, 106:22
**professionals** [10] - 38:5, 39:10, 41:13, 42:3, 47:21, 53:6, 119:20, 120:5, 175:16, 175:21
**proffer** [1] - 47:9
**program** [3] - 36:24, 38:21, 135:17
**programming** [1] - 135:9
**programs** [1] - 119:20
**progress** [4] - 25:4, 84:17, 85:10, 175:9
**progression** [3] - 52:13, 169:4, 173:15
**prohibiting** [1] - 143:17
**promise** [1] - 106:9
**promised** [2] - 9:1, 106:8
**promises** [1] - 106:10
**promote** [1] - 54:3
**promulgated** [3] - 41:25, 42:7, 42:25
**promulgating** [1] - 42:21
**pronoun** [2] - 65:8, 65:17
**pronounces** [1] - 87:13
**pronunciation** [1] - 87:12
**propensity** [1] - 36:7
**proper** [2] - 24:21, 71:11
**proposal** [1] - 101:18
**propose** [3] - 101:16, 101:17, 101:24
**proposed** [3] - 103:7, 103:9, 103:14
**prospectively** [1] - 161:16
**protocol** [2] - 54:20
**provide** [28] - 12:5, 12:22, 23:19, 25:15, 26:8, 32:19, 39:7, 45:18, 45:19, 46:2, 46:7, 58:16, 59:3, 60:13, 67:19, 89:11, 90:20, 90:23, 93:6, 93:8, 93:14, 93:19, 105:3, 161:19,

163:11, 170:17, 180:10, 181:6
**provided** [52] - 10:4, 24:12, 29:23, 30:19, 32:16, 37:25, 38:1, 38:10, 47:1, 47:2, 67:4, 69:4, 83:22, 91:16, 92:3, 92:6, 92:11, 93:24, 95:18, 95:21, 104:14, 107:12, 108:18, 109:24, 110:10, 110:24, 111:13, 112:3, 112:14, 112:15, 113:22, 114:7, 117:10, 120:21, 135:21, 136:13, 137:24, 139:7, 140:7, 140:13, 141:18, 149:4, 149:14, 150:22, 176:1, 176:2, 176:9, 178:20, 179:12
**provider** [7] - 14:18, 107:9, 107:18, 116:9, 124:17, 167:1, 180:16
**provider's** [1] - 14:11
**providers** [48] - 10:9, 15:9, 15:11, 21:11, 21:22, 30:24, 31:23, 32:2, 34:14, 75:24, 89:10, 90:19, 90:23, 90:25, 91:11, 91:17, 96:12, 112:3, 116:20, 117:1, 120:10, 120:15, 122:10, 122:17, 124:16, 134:9, 135:2, 135:20, 139:8, 140:9, 153:15, 153:16, 155:15, 155:19, 175:15, 175:23, 176:3, 177:2, 178:20, 179:16, 179:25, 181:6, 181:23, 182:9, 182:17, 182:24, 183:12, 184:12
**provides** [1] - 36:18
**providing** [10] - 29:20, 52:9, 67:6, 96:13, 108:15, 108:20, 111:5, 113:20, 146:8, 177:5
**PSI** [1] - 130:7
**Psychiatric** [2] - 17:9, 42:15
**psychiatric** [1] - 15:22
**psychiatrist** [6] - 86:5, 86:9, 86:11,

87:9, 153:10, 153:12
**psychiatrists** [1] - 17:3
**psychodiagnostic** [4] - 47:3, 67:4, 67:5, 125:10
**Psychological** [1] - 42:16
**psychological** [7] - 50:23, 62:15, 65:15, 67:6, 67:11, 67:15, 72:15
**psychologist** [7] - 40:9, 40:12, 40:19, 83:20, 86:8, 86:11, 107:16
**psychologists** [2] - 40:15, 41:12
**psychology** [2] - 40:17, 47:9
**psychosexual** [3] - 117:15, 117:17, 130:5
**psychotherapy** [10] - 21:7, 24:23, 54:2, 98:24, 99:1, 140:8, 140:13, 140:20, 144:3, 144:7
**psychotic** [2] - 58:15, 80:7
**puberty** [1] - 56:13
**public** [4] - 8:24, 137:9, 137:10, 137:13
**publication** [2] - 44:19, 45:7
**publications** [1] - 45:3
**published** [7] - 53:11, 53:16, 108:14, 108:19, 109:10, 109:17, 165:1
**pull** [4] - 25:7, 159:22, 161:4, 169:24
**pulled** [1] - 90:6
**pun** [1] - 28:24
**punishment** [1] - 133:17
**purchase** [1] - 64:3
**purport** [1] - 184:11
**purported** [1] - 35:25
**purpose** [7] - 19:6, 65:7, 65:10, 66:19, 85:13, 88:11, 137:25
**purposes** [3] - 139:15, 154:2, 168:10
**pursuing** [1] - 73:24
**push** [1] - 71:6
**put** [17] - 6:22, 7:21, 16:19, 17:13, 19:23, 48:11, 53:3, 68:13, 71:13, 71:18, 73:3,

88:15, 96:20, 97:20, 119:12, 161:21, 186:5
**puts** [1] - 6:18

## Q

**qua** [1] - 61:13
**qualifications** [10] - 120:19, 120:22, 120:25, 124:20, 124:23, 153:16, 153:19, 153:22, 175:24, 179:25
**qualified** [9] - 87:21, 89:11, 90:20, 90:23, 90:25, 91:13, 124:17, 175:21, 179:16
**quality** [3] - 123:10, 161:11, 163:2
**questioned** [1] - 184:16
**questioning** [3] - 90:1, 102:6, 162:6
**questions** [28] - 23:5, 23:10, 39:14, 47:15, 64:14, 64:17, 73:16, 84:3, 88:20, 88:22, 90:11, 94:6, 94:11, 94:12, 105:11, 106:13, 151:1, 152:25, 153:8, 160:7, 165:7, 165:10, 165:12, 181:11, 182:8, 183:17, 183:21, 185:1
**quit** [1] - 167:21
**quite** [7] - 6:18, 8:23, 14:3, 15:24, 88:15, 89:21, 117:6
**quote** [10] - 114:17, 118:22, 122:11, 122:22, 147:18, 147:20, 147:24, 161:5, 161:8, 161:17
**quoted** [1] - 161:24
**quotes** [1] - 90:4
**quoting** [1] - 162:22

## R

**radiation** [2] - 21:8, 58:9
**radical** [1] - 14:3
**radically** [1] - 164:9
**raise** [2] - 102:23, 170:9
**raised** [2] - 84:7, 92:18
**Randi** [2] - 39:19, 40:1

**RANDI** [1] - 39:22
**range** [2] - 122:4, 143:13
**ranger** [1] - 62:11
**rapid** [3] - 25:24, 68:3, 137:8
**rapidly** [2] - 25:21, 28:6
**rare** [2] - 49:12, 116:10
**rate** [6] - 74:16, 74:17, 104:4, 104:11, 154:21, 155:1
**rates** [13] - 103:24, 103:25, 104:1, 104:7, 104:9, 154:16, 158:3, 158:13, 158:14, 158:16, 160:15, 164:23, 165:1
**rather** [5] - 12:6, 21:18, 123:20, 163:19, 178:15
**ratified** [1] - 29:10
**rationales** [1] - 15:5
**reach** [3] - 10:18, 117:24, 148:7
**reached** [1] - 148:12
**reaches** [1] - 51:6
**read** [24] - 16:9, 19:8, 48:12, 69:25, 86:18, 91:15, 100:5, 102:16, 108:24, 109:3, 111:9, 116:17, 116:19, 119:15, 119:22, 122:7, 123:2, 123:23, 138:14, 142:8, 146:12, 146:14, 184:15
**reading** [1] - 16:9
**reads** [1] - 86:15
**ready** [4] - 15:5, 21:3, 98:8, 98:25
**real** [8] - 8:11, 36:8, 54:5, 62:20, 62:21, 143:25, 144:2, 171:24
**real-life** [1] - 54:5
**reality** [5] - 58:25, 76:5, 170:14, 170:18, 170:21
**realize** [1] - 80:18
**realizing** [1] - 7:15
**really** [24] - 12:23, 19:10, 19:11, 23:20, 30:3, 32:6, 33:14, 43:14, 50:9, 61:21, 64:11, 68:19, 69:16, 84:1, 93:21, 95:12, 106:13, 136:25, 143:21, 148:23, 152:14, 162:12,

164:10, 167:7
**reappraisal** [1] - 67:24
**reask** [1] - 91:7
**reason** [7] - 9:5, 28:16, 29:5, 36:25, 64:19, 166:1, 172:11
**reasonable** [4] - 14:11, 14:18, 27:12, 29:10
**reasonably** [1] - 31:16
**reasons** [2] - 59:22, 135:15
**reassigned** [1] - 72:21
**Reassignment** [2] - 26:16, 99:18
**reassignment** [15] - 16:5, 16:21, 19:16, 20:2, 26:3, 74:15, 110:10, 110:24, 111:5, 137:20, 153:25, 159:10, 160:16, 161:12, 163:2
**rebuttal** [1] - 102:8
**receive** [13] - 10:1, 11:13, 70:15, 78:18, 80:25, 83:18, 98:25, 102:1, 103:6, 103:10, 138:13, 152:8, 167:11
**received** [20] - 47:4, 70:5, 70:6, 70:7, 70:10, 70:14, 77:24, 91:17, 92:3, 93:1, 93:2, 121:1, 133:17, 133:25, 134:6, 139:1, 148:22, 150:20, 182:21, 184:13
**receiving** [7] - 10:16, 15:2, 15:10, 66:21, 78:1, 80:15, 141:11
**recent** [6] - 42:8, 56:14, 58:5, 98:17, 136:22, 155:5
**recently** [4] - 26:3, 35:18, 72:23, 106:5
**recess** [9] - 8:25, 64:16, 66:8, 105:20, 141:1, 184:3, 186:15, 186:22
**Recess** [3] - 66:10, 105:21, 141:3
**recessed** [1] - 186:23
**recognition** [1] - 70:1
**recognize** [6] - 24:7, 24:13, 26:7, 29:14, 160:22, 160:25

**recognized** [7] - 14:5, 20:7, 24:16, 25:13, 27:21, 37:22, 37:24

**recognizes** [2] - 30:7, 31:10

**recommend** [5] - 160:4, 167:11, 167:18, 168:16, 168:25

**recommendations** [3] - 77:4, 118:25, 119:2

**recommended** [8] - 53:3, 134:9, 134:12, 135:20, 139:13, 139:17, 166:13, 167:10

**reconstruction** [1] - 73:12

**reconstructive** [4] - 128:4, 128:6, 144:24, 154:22

**reconvene** [1] - 185:5

**record** [5] - 32:6, 39:25, 71:19, 106:17, 141:9

**records** [47] - 33:3, 35:16, 47:4, 47:6, 67:3, 69:25, 75:16, 75:22, 77:1, 77:22, 80:3, 82:19, 82:23, 82:24, 83:4, 84:10, 84:17, 84:23, 90:18, 95:19, 95:22, 112:11, 112:13, 112:16, 112:23, 113:8, 113:14, 113:21, 113:22, 113:25, 114:3, 115:21, 120:18, 126:14, 126:21, 127:5, 127:8, 131:4, 131:12, 133:16, 136:12, 142:3, 142:5, 142:25, 155:21, 156:8, 182:11

**RECROSS** [1] - 184:9

**RECROSS-EXAMINATION** [1] - 184:9

**recurrent** [1] - 132:19

**recurring** [1] - 37:9

**red** [1] - 31:1

**redirect** [1] - 162:15

**REDIRECT** [1] - 173:11

**redistribution** [1] -

60:16

**reduce** [1] - 54:4

**reduces** [1] - 61:19

**reduction** [2] - 60:16, 98:19

**reevaluate** [1] - 59:8

**refer** [4] - 61:10, 118:7, 156:22, 159:6

**reference** [7] - 27:9, 67:13, 71:19, 92:10, 109:6, 109:24, 157:6

**referenced** [5] - 11:25, 68:6, 89:14, 142:3, 158:12

**references** [1] - 45:13

**referencing** [1] - 179:4

**referral** [5] - 156:20, 156:23, 157:7, 157:14, 166:24

**referrals** [2] - 157:5, 166:8

**referred** [15] - 22:4, 26:2, 26:5, 43:24, 44:1, 55:14, 89:7, 94:6, 134:20, 135:1, 135:8, 140:19, 153:16, 156:16, 173:14

**referring** [2] - 59:10, 138:15

**refers** [2] - 89:9, 157:11

**reflect** [2] - 16:14, 61:14

**reflected** [1] - 180:18

**reflection** [2] - 79:16, 178:24

**reflective** [1] - 22:8

**reframe** [1] - 69:13

**refusal** [2] - 12:4, 24:13

**refused** [6] - 24:24, 32:11, 134:15, 134:20, 135:4, 167:20

**refusing** [1] - 24:7

**regard** [6] - 78:9, 80:9, 80:11, 95:8, 110:13, 140:17

**regarded** [1] - 101:13

**regarding** [20] - 6:4, 43:12, 46:3, 47:10, 84:18, 110:16, 110:22, 112:8, 112:12, 113:9, 113:10, 113:22, 115:14, 115:21, 120:23, 151:10,

152:1, 152:20, 155:15, 164:23

**regardless** [3] - 13:7, 54:21, 55:6

**regards** [2] - 37:16, 186:2

**registered** [1] - 91:1

**regret** [18] - 103:24, 103:25, 104:1, 104:4, 104:5, 104:7, 104:9, 104:11, 104:14, 104:20, 158:3, 158:14, 158:16, 160:15, 164:23, 165:1, 165:20, 166:1

**regretful** [1] - 165:25

**regrets** [3] - 74:17, 158:7, 158:22

**regretted** [1] - 165:18

**regular** [1] - 136:14

**regulated** [1] - 170:10

**rejected** [1] - 45:7

**relate** [3] - 49:22, 68:10, 103:14

**related** [20] - 17:24, 34:23, 40:14, 46:20, 51:14, 78:5, 78:8, 78:11, 78:15, 78:18, 86:9, 93:15, 108:15, 113:12, 122:5, 126:17, 129:10, 147:18, 154:23, 157:5

**relation** [1] - 46:21

**relationship** [4] - 103:18, 107:16, 133:24, 139:19

**relationships** [10] - 35:3, 37:7, 37:8, 38:20, 127:14, 127:18, 132:5, 134:25, 139:16, 181:16

**relatively** [2] - 74:16, 148:17

**relevance** [4] - 100:9, 164:10, 179:17, 180:5

**relevancy** [2] - 163:18, 164:4

**relevant** [13] - 10:12, 20:8, 20:10, 20:16, 28:22, 32:23, 36:10, 37:16, 88:6, 94:13, 97:23, 150:22, 181:8

**relied** [4] - 27:10, 75:23, 94:3, 95:3

**relief** [3] - 7:3, 7:9, 7:15

**relies** [2] - 109:16, 131:5

**rely** [1] - 111:12

**relying** [2] - 29:16, 155:1

**remain** [3] - 55:6, 55:12, 57:11

**remaining** [1] - 167:10

**remains** [1] - 26:24

**remedy** [1] - 185:16

**remember** [14] - 87:10, 115:6, 127:18, 128:5, 130:15, 130:16, 136:23, 137:15, 146:10, 151:25, 153:5, 155:6, 156:11

**remind** [4] - 64:11, 66:12, 105:22, 141:4, 178:7

**reminds** [1] - 28:16

**remit** [1] - 82:12

**removal** [2] - 80:9, 80:10

**remove** [9] - 52:15, 80:11, 169:3, 169:5, 169:8, 169:10, 169:11, 169:13, 171:3

**render** [2] - 72:8, 124:22

**rendered** [2] - 86:24, 175:22

**renew** [2] - 79:19, 87:19

**repairing** [1] - 177:3

**repeat** [5] - 49:5, 78:6, 107:25, 116:15, 146:11

**repeated** [1] - 70:2

**repeatedly** [2] - 11:1, 134:15

**rephrase** [1] - 111:3

**replacement** [1] - 167:12

**report** [17] - 71:14, 84:5, 86:13, 86:21, 88:7, 90:10, 93:23, 94:22, 100:10, 114:23, 117:8, 134:6, 176:1, 179:18, 182:14, 183:6, 183:8

**reported** [2] - 126:19, 166:4

**reportedly** [1] - 129:21

**reporter** [5] - 25:10, 116:17, 116:19, 146:14, 151:20

**reporting** [1] - 166:3

**reports** [9] - 72:10, 91:15, 91:23, 92:1, 92:2, 92:5, 113:3, 113:4, 133:17

**represent** [2] - 92:25, 120:6

**represented** [2] - 150:10, 151:9

**representing** [2] - 108:11, 182:8

**represents** [1] - 163:19

**reputation** [2] - 101:9, 176:14

**reputations** [1] - 101:12

**request** [5] - 7:3, 7:14, 47:13, 140:20, 150:21

**requested** [7] - 7:3, 7:9, 8:7, 11:1, 24:10, 138:8, 167:20

**requesting** [1] - 15:16

**requests** [3] - 70:2, 148:25, 150:4

**require** [14] - 13:1, 18:3, 32:4, 45:20, 51:6, 51:18, 51:20, 52:3, 52:7, 65:3, 70:1, 99:8, 155:13, 170:9

**required** [6] - 15:12, 20:20, 89:22, 128:4, 135:8, 137:3

**requirement** [4] - 11:13, 170:9, 179:14, 180:19

**requirements** [2] - 103:6, 103:17

**requires** [11] - 12:4, 16:2, 30:23, 73:6, 73:9, 73:11, 73:12, 74:3, 96:10, 148:15, 156:23

**requiring** [3] - 7:4, 88:12, 183:15

**research** [13] - 26:25, 27:16, 40:14, 46:9, 53:8, 53:11, 74:10, 79:25, 137:12, 148:7, 151:11, 152:21, 178:11

**reside** [1] - 55:10

**resides** [2] - 47:3, 54:21

**resilience** [1] - 54:3

**resolution** [3] - 31:14, 122:25, 123:8

**resolve** [2] - 171:3, 172:1

**resolved** [3] - 6:14, 7:16, 58:10
**resonance** [1] - 172:24
**resort** [1] - 16:5
**respect** [4] - 42:21, 75:18, 79:4, 87:19
**respond** [3] - 84:1, 100:25, 102:25
**response** [10] - 19:12, 19:14, 24:21, 70:1, 88:22, 90:11, 93:10, 151:6, 162:11, 163:8
**responses** [2] - 14:6, 16:22
**responsibilities** [2] - 41:10, 45:17
**responsive** [3] - 94:12, 150:20, 165:4
**rest** [1] - 21:21
**restart** [1] - 160:6
**restate** [1] - 180:3
**restored** [1] - 8:21
**restroom** [1] - 105:16
**resubmitting** [1] - 91:25
**result** [10] - 22:18, 82:6, 83:10, 98:4, 98:8, 126:2, 137:12, 147:12, 147:22, 171:9
**resulted** [1] - 36:15
**results** [5] - 10:10, 12:22, 33:10, 67:16, 125:12
**resume** [3] - 44:17, 66:14, 141:6
**retained** [3] - 107:22, 108:1, 108:11
**retarded** [1] - 57:19
**retention** [1] - 154:8
**retract** [1] - 80:19
**return** [1] - 179:2
**revealed** [1] - 68:24
**reverse** [1] - 104:6
**reversible** [1] - 7:6
**review** [42] - 17:12, 45:6, 45:8, 47:5, 53:12, 53:14, 53:16, 67:3, 72:7, 75:16, 77:1, 80:3, 82:19, 82:24, 83:4, 84:10, 84:16, 84:17, 85:23, 90:17, 91:17, 100:21, 100:25, 112:11, 112:23, 113:16, 113:21, 117:7, 117:11, 130:5, 138:10, 147:25,

148:4, 148:9, 148:15, 160:12, 160:14, 174:24, 175:24, 176:2, 179:11
**Review** [1] - 100:20
**reviewed** [25] - 44:23, 45:2, 45:4, 46:25, 47:5, 53:15, 85:10, 92:12, 95:19, 95:22, 97:2, 100:9, 108:15, 108:19, 109:14, 112:6, 112:20, 117:7, 117:10, 120:18, 147:11, 176:9, 177:20, 182:14
**reviewing** [1] - 179:24
**reviews** [1] - 160:15
**revised** [2] - 44:22, 55:1
**revision** [1] - 155:13
**revisions** [1] - 45:7
**rid** [2] - 50:17, 169:6
**RIFKIN** [103] - 9:9, 11:25, 12:15, 13:11, 14:9, 14:21, 16:22, 18:21, 19:20, 20:3, 20:7, 23:12, 39:18, 40:5, 40:25, 41:6, 47:8, 47:18, 48:6, 48:11, 48:14, 63:14, 64:17, 64:19, 66:5, 66:16, 66:17, 71:8, 71:12, 71:18, 71:22, 71:23, 73:5, 73:23, 74:4, 79:1, 79:3, 79:15, 79:21, 83:14, 83:16, 84:9, 84:21, 85:2, 85:8, 86:6, 86:12, 86:19, 87:1, 87:2, 88:1, 88:3, 89:4, 90:17, 91:5, 91:7, 91:14, 91:18, 91:22, 93:11, 94:15, 95:9, 95:17, 96:23, 100:11, 101:2, 102:11, 103:4, 104:24, 105:10, 110:15, 110:18, 116:12, 140:12, 149:3, 149:10, 149:14, 150:3, 151:15, 151:21, 161:19, 161:23, 163:17, 164:2, 173:10, 173:12, 175:11, 179:5, 179:9, 179:21, 179:23, 180:21, 181:1, 181:11, 182:7,

182:18, 183:2, 183:5, 183:9, 183:11, 183:17, 185:3, 185:9
**Rifkin** [16] - 9:9, 29:7, 40:3, 66:14, 71:4, 73:20, 79:2, 90:7, 90:16, 149:2, 149:9, 151:14, 162:14, 165:12, 173:9, 185:2
**rights** [1] - 19:13
**rigorously** [1] - 45:14
**rise** [1] - 12:11
**risk** [16] - 10:10, 12:17, 59:4, 59:9, 59:10, 59:11, 59:12, 60:6, 81:7, 130:3, 130:4, 130:18, 145:22, 146:3, 154:11, 154:14
**risks** [13] - 52:9, 52:11, 58:17, 59:24, 60:2, 80:24, 81:3, 81:4, 103:22, 154:4, 154:7, 170:19
**robust** [2] - 158:22, 164:22
**role** [16] - 42:21, 52:6, 54:4, 61:7, 61:9, 61:10, 62:2, 62:17, 62:19, 62:23, 63:10, 77:12, 77:13, 97:12, 123:9, 123:17
**roughly** [4] - 19:19, 94:2, 167:9, 168:2
**routinely** [1] - 10:4
**row** [1] - 64:8
**rule** [2] - 56:5, 89:20
**Rule** [3] - 93:19, 94:23, 94:24
**rules** [7] - 77:24, 88:12, 88:15, 89:19, 93:18, 94:1, 94:25
**Rules** [1] - 89:18
**runs** [1] - 33:5
**rush** [1] - 185:14

**S**

**sad** [1] - 69:12
**safe** [2] - 39:7, 62:7
**sake** [1] - 91:18
**satisfied** [2] - 77:10, 77:13
**satisfies** [3] - 19:15, 179:14, 180:19
**satisfy** [2] - 14:16, 83:18
**saved** [1] - 162:14

**saves** [1] - 14:20
**saw** [8] - 64:8, 72:10, 72:23, 133:14, 133:21, 135:14, 142:2, 184:21
**scale** [1] - 128:8
**Scale** [1] - 126:9
**scared** [1] - 68:4
**scary** [1] - 22:8
**schedule** [1] - 91:24
**scheduled** [1] - 8:4
**schizophrenia** [3] - 58:19, 60:3, 170:14
**scholarly** [1] - 100:15
**school** [1] - 17:4
**schools** [2] - 44:21, 54:4
**science** [8] - 22:10, 22:13, 27:18, 79:25, 137:12, 151:11, 152:21, 173:4
**science-based** [2] - 151:11, 152:21
**scientific** [18] - 28:19, 42:13, 45:3, 45:8, 45:12, 53:8, 53:18, 74:5, 74:10, 101:23, 103:5, 146:9, 146:16, 146:25, 147:9, 147:19, 177:24, 178:1
**scope** [13] - 47:15, 70:19, 78:23, 83:13, 83:21, 90:1, 91:2, 100:4, 102:3, 150:7, 179:18, 182:1, 182:4
**score** [3] - 36:6, 128:8, 128:14
**scored** [4] - 36:6, 126:11, 128:7, 128:14
**screen** [4] - 40:22, 71:23, 161:21, 174:9
**scrutiny** [1] - 23:4
**se** [2] - 11:2, 83:9
**Search** [1] - 176:7
**seat** [1] - 39:23
**second** [15] - 7:1, 18:23, 31:1, 50:25, 57:13, 110:17, 145:4, 155:6, 156:19, 156:25, 157:1, 166:8, 167:6, 176:24, 182:19
**second-opinion** [2] - 156:25, 157:1
**secondary** [5] - 50:18, 54:10, 60:15, 72:19, 78:2
**secretary** [1] - 40:10
**section** [3] - 120:8,

121:15, 144:21
**security** [3] - 107:5, 142:6, 143:1
**see** [43] - 25:2, 30:23, 31:2, 34:20, 36:19, 41:6, 52:12, 52:13, 56:11, 56:19, 80:14, 82:4, 83:21, 96:24, 97:11, 97:16, 106:3, 113:8, 113:14, 120:3, 121:13, 131:4, 132:2, 132:4, 145:25, 153:18, 159:12, 161:22, 162:19, 162:22, 168:4, 169:4, 169:5, 173:15, 173:17, 173:18, 173:19, 174:2, 175:8, 175:9, 175:12, 183:7, 186:17
**seeing** [2] - 82:22, 155:21
**seek** [2] - 115:13, 115:21
**seem** [2] - 36:10, 158:6
**select** [1] - 148:1
**self** [20] - 10:25, 20:24, 31:3, 35:11, 35:24, 35:25, 36:1, 36:4, 37:9, 39:6, 52:15, 67:13, 80:8, 80:10, 81:5, 122:11, 129:8, 132:20, 171:10, 171:18
**self-castration** [3] - 20:24, 35:25, 36:1
**self-harm** [9] - 31:3, 35:11, 35:24, 36:4, 37:9, 39:6, 80:10, 122:11, 129:8
**self-medicate** [1] - 171:18
**self-medication** [1] - 171:10
**self-mutilating** [1] - 132:20
**self-reference** [1] - 67:13
**self-surgery** [1] - 10:25
**self-treatment** [3] - 52:15, 80:8, 81:5
**send** [2] - 45:5, 150:8
**sense** [6] - 49:1, 49:2, 49:20, 50:10, 78:10, 177:15
**sent** [2] - 53:14, 150:4

**sentence** [2] - 120:5, 145:15

**sequelae** [1] - 52:14

**series** [1] - 67:15

**serious** [28] - 9:24, 10:2, 12:17, 12:18, 12:19, 12:21, 12:22, 13:4, 13:7, 13:10, 13:22, 14:15, 15:22, 19:11, 21:18, 24:8, 32:16, 37:23, 48:19, 52:11, 58:18, 59:12, 59:24, 169:20, 169:24, 169:25, 170:3, 183:14

**seriously** [1] - 65:13

**served** [2] - 46:3, 72:5

**Services** [1] - 46:12

**set** [11] - 6:13, 10:12, 17:4, 19:16, 24:15, 55:18, 70:24, 73:21, 89:16, 90:8, 90:9

**sets** [1] - 168:24

**setting** [6] - 27:7, 63:9, 63:17, 63:22, 108:16

**seven** [2] - 79:9, 88:5, 88:10

**seventh** [4] - 26:8, 42:23, 42:25, 54:15

**several** [6] - 25:23, 37:11, 127:25, 139:17, 155:5, 155:8

**severe** [22] - 10:21, 11:7, 18:3, 33:11, 33:17, 35:9, 50:13, 52:11, 52:16, 56:21, 57:9, 59:11, 59:12, 67:17, 72:3, 74:11, 125:5, 125:14, 125:16, 128:24, 172:9, 172:25

**severely** [1] - 51:8

**severity** [7] - 50:23, 57:2, 57:5, 86:16, 89:13, 168:14, 168:20

**Severson** [3] - 186:4, 186:9, 186:21

**Sex** [2] - 26:16, 99:18

**sex** [37] - 10:15, 19:16, 20:1, 36:17, 36:23, 38:21, 49:4, 49:6, 49:9, 49:10, 49:13, 49:19, 50:18, 54:8, 54:10, 60:12, 60:13, 60:15, 60:19, 60:23, 63:3, 64:22, 70:7, 70:10, 72:19,

78:2, 89:8, 117:22, 130:12, 133:13, 135:9, 135:17, 153:24, 160:15, 169:14

**sex-circulating** [1] - 169:14

**sexual** [31] - 20:11, 26:3, 31:4, 35:2, 36:10, 36:13, 36:15, 37:8, 39:5, 46:10, 49:7, 49:17, 49:18, 51:14, 51:16, 83:5, 83:6, 83:7, 110:10, 110:24, 111:5, 122:12, 129:1, 130:3, 130:4, 130:18, 130:22, 130:25, 132:13, 137:20, 171:10

**Sexual** [3] - 109:11, 109:18

**sexually** [1] - 142:6

**shame** [1] - 65:19

**shape** [2] - 64:10, 142:12

**shaped** [1] - 64:9

**shared** [1] - 144:14

**shaved** [1] - 142:15

**shell** [1] - 61:20

**Sho** [1] - 114:1

**Sho-Ban** [1] - 114:1

**shocked** [1] - 16:15

**short** [8] - 9:20, 67:8, 105:15, 105:17, 139:4, 141:1, 142:10, 170:1

**shortcomings** [1] - 23:6

**show** [18] - 22:12, 32:5, 48:1, 52:20, 55:13, 67:16, 70:23, 81:20, 84:21, 86:12, 118:11, 150:24, 161:25, 175:11, 176:5, 176:22, 177:10, 183:5

**showed** [3] - 24:21, 175:13, 180:1

**showing** [3] - 12:4, 33:4, 104:19

**shown** [1] - 100:15

**shows** [4] - 36:3, 37:16, 136:17, 172:24

**shuffle** [1] - 166:6

**sic** [1] - 171:7

**side** [1] - 71:7

**sign** [1] - 37:19

**signed** [2] - 112:20, 150:16

**significance** [2] - 80:6, 169:25

**significant** [21] - 13:18, 13:23, 30:12, 31:12, 33:12, 35:3, 35:11, 35:20, 36:19, 48:18, 51:3, 51:5, 58:1, 58:5, 122:23, 127:14, 129:5, 129:7, 129:12, 133:23, 145:8

**signifiers** [1] - 50:2

**signing** [6] - 111:18, 112:6, 112:16, 113:5, 117:12, 117:24

**silver** [1] - 28:11

**similar** [2] - 55:7, 154:21

**simple** [2] - 14:22, 155:11

**simply** [6] - 9:20, 14:20, 21:17, 22:8, 87:20, 151:22

**sine** [1] - 61:13

**sisters** [1] - 118:5

**sit** [3] - 8:14, 23:12, 121:3

**situation** [2] - 38:18, 57:7

**situations** [2] - 64:5, 65:20

**six** [13] - 10:17, 18:2, 18:4, 18:9, 18:25, 28:8, 56:3, 70:11, 77:6, 97:16, 112:4, 136:10, 169:17

**skilled** [1] - 182:25

**skills** [2] - 38:20, 134:19

**skip** [1] - 57:25

**slides** [5] - 81:20, 180:18, 184:18, 184:19, 184:21

**small** [1] - 177:6

**smaller** [2] - 168:6, 168:17

**snap** [4] - 16:1, 17:25, 18:1, 18:8

**SOC** [2] - 119:12, 147:11

**Social** [1] - 42:18

**social** [12] - 38:20, 50:2, 52:6, 54:4, 61:10, 62:16, 63:2, 77:10, 77:13, 97:12, 134:19, 136:21

**Society** [2] - 164:16, 164:21

**society** [1] - 16:10

**solicit** [1] - 92:19

**solve** [1] - 70:25

**solves** [1] - 160:5

**somatic** [4] - 67:21, 68:4, 68:25, 69:4

**someone** [28] - 10:6, 22:4, 22:5, 47:13, 49:19, 50:15, 52:10, 53:25, 54:13, 63:3, 64:8, 64:20, 65:7, 67:24, 68:2, 90:13, 96:12, 100:23, 107:15, 122:17, 124:20, 131:22, 138:2, 139:20, 156:24, 164:8, 165:24

**someplace** [1] - 9:5

**sometime** [2] - 64:13, 64:15

**sometimes** [4] - 53:6, 136:3, 167:14

**somewhat** [1] - 171:5

**somewhere** [1] - 104:12

**son** [1] - 49:16

**soon** [1] - 183:20

**sorry** [8] - 49:5, 78:6, 85:2, 107:25, 152:3, 179:5, 183:10, 186:17

**sort** [10] - 16:5, 34:14, 64:5, 67:24, 77:24, 82:10, 82:12, 100:1, 167:13, 174:9

**sorted** [1] - 36:20

**sorts** [2] - 65:19, 67:13

**sound** [5] - 27:18, 28:21, 107:24, 124:15, 124:22

**sounds** [2] - 16:12, 149:4

**source** [4] - 31:12, 68:14, 125:22, 126:6

**sources** [3] - 16:4, 88:24, 122:23

**speaking** [1] - 143:18

**speaks** [1] - 143:11

**specialty** [2] - 17:5, 21:23

**specific** [12] - 47:12, 56:16, 75:22, 84:3, 85:25, 88:15, 96:16, 131:17, 155:1, 155:3, 155:25, 156:1

**specifically** [14] - 27:6, 45:19, 54:16, 66:22, 88:25, 89:7, 90:4, 102:14, 104:21, 125:24, 131:7, 150:4, 153:21, 174:19

**specifics** [1] - 87:23

**specified** [1] - 124:18

**specifiers** [1] - 47:23

**speculating** [2] - 104:18, 140:3

**speculation** [2] - 104:15, 104:22

**speculative** [3] - 22:8, 39:8, 83:13

**speech** [1] - 143:11

**spell** [1] - 39:24

**spelled** [2] - 87:12, 88:14

**spelling** [2] - 87:12, 87:16

**spend** [2] - 106:4, 118:8

**SRS** [7] - 29:20, 153:24, 154:11, 154:14, 154:16, 176:24, 177:3

**stable** [5] - 8:22, 29:2, 32:13, 39:12

**staff** [3] - 37:13, 142:6, 143:1

**stakeholders** [1] - 53:6

**stand** [4] - 28:11, 39:23, 152:21, 185:4

**standard** [28] - 7:12, 11:4, 11:14, 11:17, 11:18, 11:22, 11:25, 12:3, 12:8, 12:13, 12:17, 14:16, 19:17, 27:6, 28:17, 30:15, 33:21, 34:8, 45:25, 54:23, 55:11, 74:8, 75:6, 103:15, 103:19, 112:7, 152:1, 161:1

**standards** [76] - 11:11, 11:12, 13:1, 17:1, 18:9, 25:20, 26:7, 27:1, 27:9, 27:15, 29:13, 29:14, 29:15, 29:16, 31:6, 31:7, 32:3, 32:18, 38:17, 42:1, 42:6, 42:9, 42:10, 42:22, 42:24, 43:8, 45:11, 52:17, 52:21, 52:25, 53:13, 53:16, 53:20, 53:22, 54:1, 54:12, 54:14, 55:1, 101:14, 101:15, 103:5, 103:9, 103:14, 103:20, 109:22, 110:3, 118:7, 118:17, 118:18, 118:22, 119:2, 119:11, 120:2,

120:16, 121:12, 144:13, 145:21, 146:9, 146:15, 146:25, 147:10, 147:19, 151:11, 151:22, 156:22, 160:22, 160:25, 169:18, 175:15, 175:18, 175:23, 179:10, 180:25, 181:5
**Standards** [1] - 176:21
**standing** [1] - 75:21
**standpoint** [1] - 31:25
**start** [4] - 6:7, 9:11, 9:16, 102:21
**started** [6] - 10:15, 26:2, 41:24, 41:25, 136:25, 141:12
**starting** [1] - 7:19
**starts** [1] - 120:4
**state** [5] - 39:24, 43:11, 44:12, 46:6, 54:16
**statement** [18] - 18:17, 19:7, 23:14, 23:16, 81:9, 81:21, 83:16, 84:4, 87:22, 113:17, 116:4, 118:21, 123:25, 149:4, 155:2, 177:17, 178:12, 178:24
**statements** [12] - 8:8, 41:21, 53:19, 84:7, 94:12, 114:7, 116:6, 116:25, 117:4, 130:9, 165:6, 178:14
**States** [2] - 110:10, 110:24
**states** [6] - 119:9, 122:2, 122:9, 123:15, 178:21, 182:21
**stating** [1] - 127:9
**Statistical** [1] - 47:19
**statistical** [1] - 104:19
**statistically** [1] - 165:16
**status** [2] - 11:11, 57:9
**stay** [4] - 84:2, 183:7, 183:19, 184:4
**stems** [1] - 34:7
**step** [1] - 39:20
**Stephen** [2] - 176:8, 176:12
**steps** [1] - 7:5
**steroid** [1] - 60:12
**steroids** [2] - 60:19,

72:19
**stick** [1] - 92:15
**stigma** [2] - 54:4, 78:1
**stigmatization** [1] - 65:19, 66:4
**stigmatized** [1] - 65:20
**still** [12] - 7:20, 8:21, 9:2, 28:11, 64:6, 66:12, 84:5, 102:13, 105:23, 128:23, 134:17, 141:4
**stipulated** [4] - 84:22, 85:4, 93:16, 109:7
**stop** [2] - 21:7, 68:18
**story** [1] - 23:24
**straightforward** [1] - 9:23
**strategy** [1] - 46:9
**stream** [1] - 165:24
**stress** [3] - 65:18, 69:17, 122:6
**stressors** [2] - 32:25, 171:3
**strict** [1] - 70:21
**strike** [5] - 73:1, 73:14, 74:1, 102:10, 102:25, 165:3
**striking** [1] - 25:2
**struck** [1] - 170:2
**struggle** [1] - 122:3
**studies** [22] - 63:10, 65:18, 74:12, 101:23, 103:5, 104:1, 104:19, 111:2, 111:4, 111:7, 155:3, 155:5, 155:8, 158:14, 158:21, 160:12, 160:14, 163:9, 164:22, 165:16, 166:4, 177:20
**study** [4] - 79:21, 155:2, 155:4, 165:1
**styled** [2] - 115:9, 142:15
**subcommittee** [1] - 174:9
**subfeature** [1] - 174:17
**subject** [3] - 26:9, 67:23, 88:17
**subjecting** [1] - 23:4
**subjects** [1] - 88:21
**submission** [1] - 6:24
**submissions** [1] - 174:23
**submit** [1] - 186:19
**submitted** [3] - 45:4,

45:15, 149:1
**subpart** [1] - 121:15, 174:17
**subsequently** [1] - 113:18
**substance** [12] - 31:4, 35:6, 35:22, 37:8, 82:25, 83:2, 83:3, 102:6, 122:12, 127:20, 129:12, 132:14
**substantial** [1] - 12:17
**successfully** [1] - 58:20
**suffer** [4] - 31:3, 72:3, 167:17, 170:6
**suffered** [1] - 31:2
**suffering** [5] - 57:10, 96:5, 172:16, 174:20, 177:16
**suffers** [2] - 167:23, 168:20
**sufficient** [7] - 15:2, 15:10, 21:13, 27:15, 146:9, 148:11, 168:1
**sufficiently** [1] - 19:4
**suggest** [5] - 21:15, 89:10, 126:15, 126:25, 142:25
**suggested** [5] - 29:6, 101:20, 102:15, 131:15, 139:15
**suggesting** [3] - 20:10, 131:22, 147:1
**suggestion** [2] - 18:14, 185:19
**suggestions** [1] - 89:19
**suggests** [3] - 22:10, 169:25, 170:1
**suicidal** [4] - 67:18, 126:18, 127:10, 132:19
**suicidality** [1] - 36:8
**suicide** [25] - 35:14, 35:19, 52:16, 67:12, 81:6, 81:7, 81:8, 81:12, 115:17, 115:22, 115:25, 116:1, 126:16, 127:1, 127:9, 127:21, 127:25, 128:9, 128:11, 128:12, 128:13, 128:18, 128:24
**summarize** [1] - 74:7
**summary** [2] - 161:7, 162:19
**summer** [2] - 10:15,

23:22
**supervise** [2] - 40:15, 41:12
**supplement** [2] - 92:19, 93:23
**supplemental** [1] - 95:4
**supplementation** [3] - 93:19, 93:20, 93:21
**support** [10] - 65:1, 65:5, 87:12, 92:16, 101:23, 103:5, 126:22, 126:24, 126:25, 148:12
**supports** [2] - 177:21, 178:12
**suppressing** [1] - 171:18
**surgeon** [2] - 58:12, 59:7
**surgeons** [5] - 17:2, 42:20, 44:21, 74:13, 165:23
**Surgeons** [4] - 42:19, 45:23, 45:24
**surgeries** [2] - 16:24, 163:11
**Surgery** [4] - 26:16, 40:13, 44:18, 99:18
**surgery** [172] - 10:25, 11:2, 11:6, 11:8, 11:10, 12:25, 15:15, 15:22, 16:5, 16:21, 17:15, 19:16, 20:2, 20:17, 20:20, 20:21, 21:1, 21:11, 21:12, 21:14, 21:16, 22:1, 22:3, 22:4, 22:6, 22:7, 22:16, 25:17, 25:19, 26:2, 26:3, 26:4, 29:20, 30:1, 30:4, 31:16, 32:14, 34:9, 34:24, 36:21, 38:2, 38:12, 38:13, 38:15, 39:1, 39:7, 39:13, 42:3, 43:22, 43:25, 44:1, 44:3, 44:5, 44:12, 45:20, 46:2, 46:22, 54:9, 55:15, 55:19, 58:8, 58:13, 58:17, 58:21, 59:4, 59:8, 59:16, 59:21, 59:22, 59:23, 59:24, 60:4, 60:6, 60:11, 60:21, 62:3, 62:6, 73:13, 74:3, 74:5, 74:8, 74:11, 74:15, 74:20, 74:23, 75:5, 76:9, 76:19, 76:21, 80:16, 80:25, 81:13,

81:17, 83:19, 83:20, 84:19, 85:15, 85:18, 89:8, 96:1, 96:8, 97:7, 97:24, 98:5, 98:9, 98:22, 98:25, 99:2, 101:17, 101:20, 101:22, 102:1, 103:7, 103:10, 103:16, 103:23, 104:2, 104:5, 104:9, 104:14, 104:25, 110:10, 110:11, 123:18, 128:4, 128:6, 137:20, 137:22, 138:18, 144:17, 144:19, 144:22, 144:25, 153:25, 154:4, 154:6, 154:22, 156:17, 156:23, 157:5, 157:8, 157:13, 157:19, 157:23, 158:7, 158:16, 159:10, 160:16, 161:12, 162:7, 163:3, 164:7, 165:18, 165:20, 165:24, 166:13, 167:10, 167:15, 167:18, 167:20, 167:25, 168:5, 168:17, 168:25, 169:3, 170:19, 170:24, 171:25, 172:7, 177:7
**surgical** [16] - 25:24, 44:20, 45:22, 51:7, 52:8, 52:14, 60:22, 80:8, 81:5, 104:11, 119:13, 154:12, 155:13, 161:15, 165:23, 175:5
**surprise** [1] - 34:15
**survive** [1] - 23:8
**sustain** [3] - 93:17, 102:5, 102:10, 102:23, 104:23, 152:16, 164:5, 164:12, 182:3
**sustained** [3] - 73:2, 90:15, 165:5
**suturing** [1] - 128:5
**switch** [1] - 118:10
**switching** [1] - 96:21
**sworn** [1] - 39:21
**SWORN** [1] - 39:22
**symptom** [3] - 37:19, 50:22, 68:4
**symptoms** [17] - 10:5, 20:22, 33:11, 33:18, 37:5, 50:15, 50:24, 56:17, 57:9,

58:16, 67:11, 69:9, 105:9, 125:14, 125:17, 173:18, 181:24
**system** [5] - 8:21, 9:1, 18:12, 26:13, 30:21
**systemic** [1] - 175:10
**systems** [1] - 68:1

# T

**table** [1] - 159:20
**taboo** [1] - 68:13
**talks** [5] - 48:21, 87:21, 91:3, 120:8, 145:8
**target** [3] - 80:11, 169:8, 169:13
**task** [1] - 62:24
**tattooing** [1] - 64:2
**taught** [1] - 69:13
**Tawani** [1] - 41:19
**teach** [2] - 7:22, 140:1
**team** [1] - 147:25
**teams** [1] - 46:2
**technical** [2] - 119:8, 162:17
**technically** [1] - 139:16
**technique** [3] - 155:9, 155:10, 155:11
**techniques** [2] - 25:25, 104:11
**temper** [1] - 133:5
**temperature** [1] - 8:23
**temporary** [1] - 7:2
**ten** [1] - 184:4
**tendencies** [1] - 67:14
**term** [7] - 19:25, 50:9, 52:12, 72:4, 83:7, 83:9, 137:21
**terminology** [3] - 26:1, 33:21, 137:17
**terms** [16] - 7:4, 9:8, 9:16, 14:10, 14:17, 19:4, 20:13, 28:17, 48:24, 55:22, 58:4, 58:14, 68:22, 104:20, 137:18, 180:24
**terribly** [1] - 186:20
**test** [1] - 36:7
**tested** [1] - 36:5
**testicles** [10] - 10:25, 65:3, 65:6, 80:4, 80:9, 80:10, 80:21, 98:12, 169:3, 169:6

**testified** [13] - 76:13, 77:5, 79:3, 100:4, 103:23, 146:7, 150:11, 150:25, 151:12, 152:19, 155:14, 155:18, 155:22
**testify** [10] - 8:16, 15:8, 21:11, 25:22, 93:12, 93:13, 153:24, 154:18, 180:8, 180:9
**testimony** [19] - 27:22, 30:23, 32:5, 32:21, 36:20, 70:12, 103:21, 119:5, 146:22, 148:20, 148:24, 149:20, 150:2, 150:23, 152:17, 152:20, 154:1, 156:11, 182:13
**testing** [13] - 33:10, 47:3, 59:1, 67:4, 67:5, 68:24, 76:5, 81:11, 125:7, 125:10, 125:12, 125:13, 126:11, 128:7, 128:23, 170:14, 170:21, 173:5
**testosterone** [4] - 80:12, 105:5, 169:6, 169:7
**tests** [8] - 67:6, 67:10, 67:16, 67:19, 125:21, 126:2, 126:5, 126:8
**textbook** [1] - 44:20
**textbooks** [1] - 137:4
**THE** [200] - 6:3, 6:6, 8:5, 8:6, 8:12, 8:17, 11:17, 12:9, 13:6, 13:24, 14:12, 15:18, 18:14, 19:5, 19:23, 20:6, 23:11, 23:13, 23:17, 25:6, 25:9, 27:5, 28:1, 28:3, 29:4, 33:19, 33:23, 33:25, 34:2, 34:4, 34:6, 34:12, 39:16, 39:20, 39:23, 40:1, 40:3, 41:2, 41:4, 47:12, 48:8, 48:10, 63:7, 63:18, 63:19, 63:20, 63:23, 64:12, 66:7, 66:11, 70:21, 71:10, 71:17, 71:21, 72:25, 73:2, 73:19, 74:1, 78:14, 78:17, 78:21, 78:22, 79:2, 79:10, 79:16, 83:15, 83:24, 84:25, 85:3, 85:22,

86:7, 86:18, 86:20, 87:6, 87:8, 87:11, 87:15, 88:2, 88:11, 89:15, 90:7, 91:6, 91:9, 91:11, 91:21, 92:14, 92:22, 92:24, 93:10, 93:17, 94:16, 95:12, 96:21, 100:12, 102:5, 102:17, 104:17, 105:12, 105:14, 105:15, 105:17, 105:22, 109:9, 110:16, 110:17, 110:19, 110:22, 116:13, 116:15, 116:20, 118:12, 140:15, 140:18, 140:23, 140:25, 141:4, 146:15, 148:21, 149:2, 149:6, 149:9, 149:12, 149:16, 149:23, 150:12, 151:1, 151:6, 151:14, 151:16, 152:2, 152:4, 152:6, 152:8, 152:10, 152:11, 152:13, 152:22, 153:1, 159:1, 159:13, 159:16, 159:19, 159:20, 159:25, 160:1, 160:2, 160:3, 161:18, 161:21, 161:25, 162:6, 162:9, 162:11, 162:14, 163:16, 163:21, 163:24, 164:5, 165:5, 165:11, 165:15, 173:7, 173:22, 173:25, 174:4, 174:8, 174:12, 174:14, 174:18, 174:19, 174:21, 174:22, 175:3, 179:3, 179:7, 179:20, 179:22, 180:3, 180:8, 180:10, 180:17, 180:23, 181:2, 181:4, 182:3, 182:12, 182:23, 183:3, 183:7, 183:18, 184:3, 184:8, 184:25, 185:2, 185:4, 185:17, 185:23, 186:4, 186:8, 186:15
**themself** [3] - 64:11, 169:6, 171:21
**themselves** [5] - 13:14, 13:15, 42:20, 62:14, 82:16
**then..** [1] - 165:13
**theory** [3] - 176:17, 177:23, 177:25

**therapeutic** [1] - 81:19
**therapeutical** [1] - 124:8
**therapies** [2] - 134:10, 175:8
**therapy** [25] - 21:5, 24:18, 24:23, 32:11, 34:19, 34:20, 38:21, 60:9, 60:14, 69:14, 69:16, 72:2, 73:15, 77:6, 99:10, 119:13, 135:1, 139:5, 140:8, 141:11, 143:21, 143:22, 144:5, 169:1
**therefore** [1] - 85:5
**they've** [1] - 134:12
**thinking** [1] - 171:22
**thinks** [1] - 101:19
**third** [3] - 31:11, 169:17, 178:3
**thorough** [2] - 153:7, 160:12
**thoughts** [1] - 100:8
**thousands** [1] - 150:18
**threat** [1] - 65:12
**threats** [2] - 23:1, 132:19
**three** [13] - 9:22, 14:2, 29:24, 35:14, 38:9, 45:5, 115:1, 129:17, 144:2, 184:1, 184:3, 186:8
**threshold** [1] - 51:6
**throughout** [4] - 24:20, 42:11, 74:12, 150:19
**throwing** [1] - 16:7
**Thursday** [2] - 8:1, 8:21
**ticket** [1] - 96:13
**tie** [3] - 106:7, 106:8
**tied** [3] - 84:3, 89:23, 171:12
**tighter** [1] - 65:4
**tissue** [1] - 98:21
**today** [7] - 7:22, 8:14, 25:4, 52:19, 55:16, 75:7, 79:6, 97:25, 106:8, 106:11, 106:17, 121:3, 137:19, 142:17, 146:6, 148:24, 149:20
**together** [2] - 16:20, 186:9
**toggle** [2] - 71:6, 158:25
**tomboy** [1] - 51:10
**tomorrow** [7] - 7:24,

8:16, 24:3, 183:24, 185:5, 185:18, 186:15
**took** [1] - 141:1
**topic** [4] - 108:15, 108:19, 148:1, 162:15
**topics** [1] - 40:15
**touch** [1] - 186:5
**towards** [2] - 27:17, 36:11, 37:13
**traditionally** [1] - 50:2
**train** [2] - 40:15, 41:13
**trained** [3] - 17:4, 21:23, 32:2
**training** [23] - 38:20, 45:18, 45:19, 46:7, 91:16, 107:2, 107:5, 121:1, 175:25, 176:2, 176:8, 177:12, 178:3, 178:20, 179:11, 179:12, 179:13, 180:14, 180:16, 180:18, 181:4, 183:13, 184:16
**trainings** [2] - 120:20, 184:11
**trait** [4] - 81:22, 82:1, 131:14, 133:4
**traits** [17] - 37:3, 37:6, 39:6, 82:3, 82:5, 131:9, 131:16, 131:20, 131:23, 131:25, 139:21, 155:16, 155:20, 181:14, 181:18, 182:8, 182:10
**trans** [1] - 178:5
**transcript** [5] - 6:11, 6:20, 6:23, 88:6, 89:5
**transcripts** [1] - 102:14
**transgender** [12] - 44:15, 44:24, 50:5, 50:9, 51:9, 66:3, 107:23, 108:2, 108:8, 108:16, 108:20, 133:20
**Transgender** [6] - 17:10, 40:10, 41:16, 41:22, 44:18, 176:6
**transition** [9] - 52:6, 54:4, 61:10, 62:16, 63:2, 63:21, 77:11, 77:14, 97:12
**transitioning** [3] - 18:6, 65:2, 137:1
**translated** [1] - 42:11
**translates** [1] - 63:21
**transport** [2] - 9:12,

185:25
  **transportation** [1] -
185:13
  **Transportation** [1] -
143:8
  **trauma** [2] - 67:11,
126:3
  **treat** [12] - 11:7,
11:19, 14:25, 21:9,
21:12, 31:25, 32:1,
37:5, 41:14, 98:24,
120:10, 177:7
  **treatable** [2] - 10:8,
48:19
  **treated** [16] - 7:13,
21:20, 22:5, 22:18,
32:14, 43:19, 44:5,
81:4, 107:11, 121:5,
156:12, 166:12,
167:8, 167:24, 168:4,
168:6
  **treater** [1] - 41:11
  **treaters** [2] - 176:10,
179:13
  **treating** [12] - 10:10,
21:25, 43:17, 44:2,
45:18, 63:16, 105:1,
122:17, 144:1, 174:6,
176:14, 182:9
  **treatment** [146] -
10:1, 10:4, 10:5, 10:9,
10:16, 10:22, 11:5,
11:9, 11:12, 11:14,
12:5, 12:7, 12:22,
13:1, 13:5, 15:1, 15:2,
15:5, 15:6, 15:9, 17:7,
17:20, 19:3, 19:25,
20:14, 20:19, 20:20,
20:25, 21:13, 22:9,
22:19, 22:20, 22:23,
24:14, 24:15, 25:14,
25:15, 25:17, 26:21,
28:10, 29:24, 32:10,
32:11, 32:17, 36:24,
37:13, 37:25, 38:1,
38:21, 42:10, 43:8,
43:11, 43:21, 44:14,
44:24, 46:4, 46:20,
47:10, 51:19, 51:20,
52:9, 52:15, 53:3,
53:21, 53:25, 54:2,
54:7, 54:8, 54:11,
54:12, 55:2, 55:3,
55:5, 55:6, 56:23,
57:2, 57:14, 57:24,
61:15, 62:6, 66:20,
69:3, 70:2, 70:3, 70:4,
72:5, 72:8, 72:12,
72:15, 73:7, 73:9,
74:4, 74:9, 74:18,

76:3, 80:8, 81:5,
84:15, 90:19, 90:23,
90:24, 91:12, 96:10,
97:11, 97:17, 98:14,
99:1, 99:4, 101:10,
103:15, 104:8,
107:12, 108:20,
112:3, 112:8, 113:6,
113:9, 113:10,
113:22, 114:11,
115:25, 120:21,
121:16, 123:22,
124:10, 124:15,
135:9, 135:17,
143:20, 143:25,
144:6, 144:15, 145:5,
162:4, 167:12,
167:24, 168:1,
168:18, 176:18,
179:15, 181:8,
181:23, 182:17,
182:24, 183:15
  **treatments** [14] -
14:2, 15:14, 19:22,
25:25, 29:7, 52:7,
54:14, 54:17, 55:11,
119:13, 134:10,
175:4, 175:5
  **tremendous** [1] -
137:2
  **trial** [10] - 6:12, 6:13,
6:14, 6:15, 6:20, 9:1,
88:13, 100:25,
102:17, 102:21
  **trials** [1] - 6:16
  **tribe** [1] - 114:1
  **trigger** [1] - 170:8
  **triggering** [1] -
129:10
  **trips** [1] - 35:9
  **trouble** [1] - 96:21
  **true** [10] - 13:9, 52:4,
69:17, 110:1, 122:9,
122:19, 122:20,
125:21, 147:16,
147:22
  **truly** [1] - 167:23
  **try** [13] - 20:4, 20:9,
21:16, 34:18, 64:6,
64:15, 66:7, 68:22,
71:4, 105:17, 140:25,
160:7, 171:21
  **trying** [7] - 80:21,
143:24, 159:20,
159:23, 159:24,
167:16, 168:3
  **tuck** [2] - 65:3, 65:6
  **Tuesday** [1] - 9:2
  **tumor** [2] - 21:7, 21:9
  **turn** [9] - 48:3, 50:25,

96:23, 120:1, 121:11,
149:24, 160:4,
169:16, 178:18
  **turned** [1] - 9:14
  **turning** [1] - 178:2
  **twice** [2] - 10:24,
36:1
  **two** [13] - 6:15,
16:22, 27:8, 27:11,
38:8, 61:1, 82:2,
110:1, 110:2, 150:1,
150:5, 156:23, 165:12
  **tying** [1] - 104:21
  **type** [1] - 124:15
  **types** [2] - 161:15,
176:18
  **typical** [4] - 50:15,
60:23, 81:4, 166:1
  **typically** [15] - 16:1,
45:5, 47:16, 51:20,
52:14, 56:6, 61:1,
62:24, 64:21, 65:4,
80:14, 82:8, 162:13,
168:14, 172:9

## U

  **ultimate** [1] - 175:10
  **ultimately** [4] - 27:4,
29:22, 31:18, 37:21
  **umbrella** [1] - 50:9
  **unable** [1] - 59:3
  **unavoidable** [1] -
7:19
  **Uncertainty** [1] -
176:7
  **uncommon** [3] -
56:19, 181:18, 181:20
  **uncontested** [1] -
15:17
  **uncontrolled** [3] -
59:25, 83:1, 83:11
  **under** [23] - 19:13,
21:2, 32:18, 39:5,
54:1, 54:12, 66:12,
75:12, 88:11, 104:12,
105:23, 109:25,
118:17, 121:15,
122:16, 124:12,
129:22, 129:25,
141:5, 143:20,
175:23, 178:21,
179:10
  **undergarment** [1] -
65:4
  **undergarments** [3] -
64:21, 70:6, 78:1
  **undergo** [5] - 59:16,
62:16, 76:19, 98:22,
134:10

  **undergoes** [2] -
103:22, 156:23
  **undergoing** [1] -
60:22
  **undergone** [3] -
44:3, 58:20, 72:5
  **underlying** [2] -
16:4, 182:14
  **undershorts** [1] -
65:4
  **understood** [11] -
31:20, 115:17, 116:8,
127:24, 128:16,
129:7, 129:17,
156:16, 157:3, 157:4,
182:13
  **undertaken** [1] -
54:23
  **underwent** [1] -
104:5
  **undisputed** [1] -
30:8
  **undue** [1] - 6:22
  **unemployment** [1] -
35:22
  **unfair** [1] - 100:24
  **unfold** [1] - 175:6
  **unfortunately** [1] -
80:16
  **Unit** [1] - 114:4
  **United** [2] - 110:10,
110:24
  **universal** [2] - 25:20,
68:8
  **University** [2] -
41:17, 165:2
  **unknown** [1] - 22:7
  **unless** [4] - 12:12,
23:10, 39:14, 170:7
  **unlike** [1] - 56:12
  **unrelated** [3] - 49:21,
96:9, 122:5
  **unresolved** [2] -
98:3, 98:7
  **unsafe** [1] - 130:12
  **unstable** [5] - 37:7,
37:9, 127:14, 132:4,
132:25
  **untrained** [1] - 10:8
  **untreated** [7] -
31:12, 52:13, 59:11,
81:5, 122:24, 173:15,
181:19
  **up** [39] - 7:21, 9:15,
19:6, 20:4, 20:8,
20:19, 28:1, 31:21,
37:2, 40:22, 48:11,
55:17, 71:13, 71:18,
73:12, 75:9, 75:10,
90:6, 96:20, 97:20,

102:24, 118:11,
136:10, 149:21,
150:6, 151:16,
154:10, 159:22,
159:23, 161:4,
171:15, 172:7,
173:13, 176:23,
177:10, 179:9, 184:6,
185:6, 185:8
  **update** [2] - 54:22,
137:3
  **updated** [1] - 53:20
  **urge** [1] - 35:24
  **urinary** [2] - 154:8,
165:24
  **uses** [1] - 98:20
  **uterus** [1] - 169:11

## V

  **vacuum** [1] - 32:1
  **vaginal** [1] - 154:23
  **vaginoplasty** [4] -
55:19, 58:10, 155:9,
155:10
  **vague** [4] - 87:21,
91:2, 110:15, 110:18
  **validated** [1] - 74:10
  **van** [1] - 185:20
  **variant** [1] - 42:5
  **variations** [2] -
117:3, 117:4
  **variety** [2] - 29:7,
134:10
  **various** [5] - 42:3,
82:5, 139:13, 139:15,
171:7
  **vas** [1] - 80:18
  **vegetative** [1] -
67:21
  **verbalize** [1] - 49:12
  **Version** [1] - 148:6
  **version** [11] - 41:25,
42:8, 42:23, 42:25,
52:21, 52:22, 54:25,
121:24, 164:18,
164:22
  **versions** [1] - 119:11
  **versus** [1] - 69:4
  **VGA** [1] - 159:16
  **viable** [1] - 14:19
  **victim** [3] - 32:9,
34:25, 35:2
  **victimized** [1] -
65:21
  **victims** [1] - 84:13
  **view** [8] - 14:11,
19:11, 19:15, 57:15,
62:13, 62:14, 82:16,
86:7

**violating** [1] - 19:13
**violation** [1] - 19:18
**visit** [1] - 184:5
**visiting** [1] - 67:9
**voice** [3] - 83:6, 143:13, 143:18
**volunteer** [1] - 165:6
**vs** [1] - 6:4

## W

**wait** [5] - 28:18, 29:1, 29:18, 165:12
**waiting** [1] - 28:11
**Walgreens** [1] - 41:19
**wanton** [1] - 12:13
**wants** [3] - 89:25, 115:25, 169:12
**warned** [1] - 142:2
**warranted** [1] - 115:20
**Washington** [1] - 35:15
**wasting** [1] - 102:19
**ways** [4] - 34:18, 94:17, 142:18, 142:21
**wear** [4] - 77:22, 77:23, 106:8
**wearing** [3] - 50:3, 106:7, 115:5
**website** [2] - 163:22, 163:25
**week** [6] - 6:11, 6:13, 6:14, 6:20, 149:25, 150:9
**weeks** [3] - 6:15, 6:17, 150:5
**weigh** [2] - 29:20, 53:6
**well-documented** [4] - 55:23, 55:25, 75:12, 75:20
**well-established** [1] - 56:1
**wellbeing** [3] - 60:18, 61:24, 105:4
**whatnot** [1] - 92:16
**whereas** [1] - 169:25
**whole** [1] - 39:11
**wide** [1] - 27:14
**widely** [1] - 43:1
**wish** [2] - 23:13, 104:5
**withdraw** [1] - 100:11
**withdrawn** [2] - 100:13, 101:1
**witness** [23] - 39:17, 39:23, 47:9, 47:10,

52:20, 66:12, 66:15, 70:23, 73:4, 92:10, 100:4, 100:15, 100:22, 105:24, 110:20, 141:7, 150:22, 150:25, 152:4, 152:18, 152:19, 161:20, 162:1
**WITNESS** [23] - 39:22, 40:1, 63:19, 63:23, 78:17, 78:22, 91:11, 105:15, 110:16, 110:22, 116:15, 116:20, 140:18, 146:15, 152:8, 152:11, 162:6, 162:11, 174:12, 174:18, 174:21, 175:3, 181:4
**witness's** [2] - 73:16, 148:24
**witnesses** [4] - 20:9, 22:2, 28:18, 137:19
**woman** [13] - 22:25, 32:22, 32:24, 77:16, 77:20, 114:14, 114:18, 115:1, 115:4, 116:5, 116:10, 117:2, 129:22
**womanhood** [1] - 50:4
**women** [1] - 177:5
**word** [4] - 74:25, 114:22, 137:20, 169:21
**words** [6] - 31:6, 72:20, 131:7, 145:22, 146:3, 170:5
**wore** [1] - 142:1
**Workers** [1] - 42:18
**World** [6] - 17:9, 40:10, 41:15, 41:21, 42:14, 46:13
**world** [4] - 42:11, 61:11, 62:7, 74:13
**Worldwide** [1] - 40:12
**worried** [3] - 68:3, 102:19, 102:20
**worthlessness** [2] - 35:21, 125:19
**WPATH** [81] - 17:10, 24:16, 26:7, 26:12, 27:1, 27:2, 27:21, 27:22, 30:4, 30:14, 30:23, 31:7, 31:10, 31:15, 32:3, 32:18, 33:21, 34:8, 38:2, 38:17, 41:22, 43:2, 43:15, 52:17, 53:20,

54:23, 55:18, 63:11, 75:6, 79:13, 101:7, 101:14, 103:15, 103:18, 103:20, 109:16, 109:20, 109:21, 110:2, 118:7, 118:17, 118:22, 120:8, 121:17, 121:22, 122:16, 124:12, 124:21, 138:3, 143:20, 144:21, 145:21, 146:8, 146:23, 147:5, 147:23, 148:6, 148:12, 149:19, 150:15, 150:16, 150:17, 151:22, 152:1, 160:22, 160:25, 163:7, 163:8, 168:13, 174:10, 175:15, 175:20, 176:17, 176:20, 176:21, 177:25, 179:10, 180:24, 181:5
**WPATH's** [3] - 30:7, 121:20, 146:24
**wrapped** [1] - 37:2
**wrestle** [1] - 13:24
**wrestled** [1] - 15:24
**write** [2] - 40:14, 45:10
**writing** [6] - 40:14, 109:20, 109:21, 115:12, 121:24, 125:1
**writings** [1] - 108:19
**written** [9] - 115:7, 126:19, 156:19, 157:1, 157:2, 157:7, 157:14, 166:7, 166:25
**wrote** [6] - 89:7, 120:13, 120:23, 138:9, 147:7, 147:17

## Y

**year** [7] - 18:5, 18:10, 33:9, 33:16, 36:2, 46:18, 111:14
**years** [25] - 10:17, 18:2, 18:25, 25:24, 35:4, 35:7, 37:12, 44:5, 56:14, 61:1, 70:11, 72:2, 77:6, 94:18, 97:16, 112:4, 114:15, 114:18, 114:20, 115:1, 127:24, 129:17, 129:21, 135:16, 137:8
**yes-or-no** [1] - 146:20

**young** [1] - 157:24
**yourself** [1] - 137:20

## Z

**zero** [1] - 166:16
**zoom** [1] - 86:14