1                  **UNITED STATES DISTRICT COURT**

2                      **DISTRICT OF IDAHO**

3

4    ADREE EDMO (a/k/a MASON EDMO), )  CASE NO. 1:17-cv-00151-BLW
                                    )
5                  Plaintiff,       )  **EVIDENTIARY HEARING DAY 2**
                                    )
6              vs.                  )
                                    )
7    IDAHO DEPARTMENT OF            )
     CORRECTION; HENRY ATENCIO, in  )
8    his official capacity; JEFF    )
     ZMUDA, in his official         )
9    capacity; HOWARD KEITH YORDY,  )
     in his official and individual )
10   capacities; CORIZON, INC.;     )
     SCOTT ELIASON; MURRAY YOUNG;   )
11   RICHARD CRAIG; RONA SIEGERT;   )
     CATHERINE WHINNERY; and DOES   )
12   1-15,                          )
                                    )
13                 Defendants.      )
     _____)

14

15

16          **TRANSCRIPT OF PROCEEDINGS - VOLUME 2**
            **BEFORE THE HONORABLE B. LYNN WINMILL**
17          **THURSDAY, OCTOBER 11, 2018, 8:33 A.M.**
                      **BOISE, IDAHO**

18

19

20

21

22   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
23   _____

24          **TAMARA I. HOHENLEITNER, CSR 619, CRR**
             FEDERAL OFFICIAL COURT REPORTER
25      550 WEST FORT STREET, BOISE, IDAHO  83724

1     **FOR PLAINTIFF**

2        Lori Rifkin
        HADSELL STORMER & RENICK LLP
3        4300 Horton Street, #15
        Emeryville, CA 94608

4

5        Amy Whelan
        NATIONAL CENTER FOR LESBIAN RIGHTS
        870 Market Street, Suite 370
6        San Francisco, CA 94102

7        Shaleen Shanbhag
        HADSELL STORMER & RENICK LLP
8        128 N. Fair Oaks Avenue
        Pasadena, California 91103

9

10       Craig Durham
        Deborah Ferguson
        FERGUSON DURHAM, PLLC
11       223 N. 6th Street, Suite 325
        Boise, ID 83702

12

13   **FOR DEFENDANTS IDAHO DEPARTMENT OF CORRECTIONS, HENRY ATENCIO, JEFF ZMUDA, HOWARD KEITH YORDY, RICHARD CRAIG, AND RONA SIEGERT**

14       Brady J. Hall, Special Deputy Attorney General
        Marisa S. Crecelius
15       MOORE ELIA KRAFT & HALL, LLP
        Post Office Box 6756
16       Boise, Idaho 83707

17   **FOR DEFENDANTS CORIZON, INC., SCOTT ELIASON, MURRAY YOUNG, AND CATHERINE WHINNERY**

18

19       Dylan A. Eaton
        J. Kevin West
        PARSONS, BEHLE & LATIMER
20       800 W. Main Street, Suite 1300
        Boise, Idaho 83702

21

22

23

24

25

**I N D E X**

**OCTOBER 11, 2018 – VOLUME 2**

Date        Proceeding                                          Page

10/11/18  Hearing – Motion for Preliminary Injunction      187

**P L A I N T I F F   W I T N E S S E S**

**PAGE**

**ADREE EDMO**
    Direct Examination by Ms. Rifkin ..................... 191
    Cross-Examination by Mr. Hall ........................ 204
    Cross-Examination by Mr. Eaton ....................... 221
    Examination by The Court ............................. 227
    Redirect Examination by Ms. Rifkin ................... 229
    Further Examination by The Court ..................... 230

**RYAN NICHOLAS GORTON, M.D.**
    Direct Examination by Ms. Whelan ..................... 231
    Cross-Examination by Mr. Eaton ....................... 268
    Redirect Examination by Ms. Rifkin ................... 318
    Recross-Examination by Mr. Eaton ..................... 320

**D E F E N D A N T S'   W I T N E S S E S**

**PAGE**

**JEREMY JUNIOR CLARK**
    Direct Examination By Mr. Hall........................ 321
    Cross-Examination By Ms. Rifkin....................... 349
    Redirect Examination By Mr. Hall..................... 377
    Examination By The Court............................. 384
    Recross-Examination By Ms. Rifkin.................... 388
    Further Redirect Examination By Mr. Hall............. 397

**SCOTT ELIASON, M.D.**
    Direct Examination By Mr. Eaton...................... 400

1                    **P L A I N T I F F   E X H I B I T S**

2  **ADMITTED**                                          **PAGE**

3   **1002**    Certificate of Live Birth, date issued August
              7, 2018........................................ 204
4   **1004**    Curriculum Vitae of Ryan Nicholas Gorton, M.D.... 232
    **1025**    Presentation entitled "Gender Dysphoria
5             Assessment", by Walter Campbell, PhD and Jeremy
              Clark, LCPC..................................... 371


7                    **D E F E N D A N T S' E X H I B I T S**

8  **ADMITTED**                                          **PAGE**

    **2007**    Medical records from Sho-Ban Tribe
10            (IDOC_Q_9-15;  IDOC_Q_32-40)..................... 206
    **2009**    Medical records from Portneuf
11            (IDOC_S_ 12-14;  IDOC_S_ 32-34;  IDOC_S_ 60-64;
              IDOC_S_ 315-316;  IDOC_S_ 337-341;  IDOC_S_
12            353-354)........................................ 206
    **2016**    GID group assignment (IDOC_HH_1-3).............. 207
13  **2019**    Jeremy Clark CV and Qualifications
              (IDOC_Clark_1-63)............................... 325
14  **2022**    CV Scott Eliason (PBL 1304-1308)................ 404
    **2038**    Endocrine Treatment of Gender-Dysphoric/
15            Gender-Incongruent Persons: An Endocrine
              Society Clinical Practice Guideline
16            (Hembree, et al., Endocrine Society, September
              13, 2017) (Produced at Garvey Depo)............. 312

1              P R O C E E D I N G S

2                  October 11, 2018

3         THE CLERK:  The court will now hear Civil Case

4    17-151, Adree Edmo vs. Corizon, Incorporated, et al., regarding

5    a motion for preliminary injunction.

6         THE COURT:  Good morning.  I believe we were ready for

7    the plaintiffs to call their next witness.

8       With that, Ms. Rifkin.

9         MS. RIFKIN:  Yes, Your Honor.  We would like to call

10   plaintiff, Adree Edmo, Your Honor.

11        THE COURT:  Ms. Edmo, would you please step before the

12   clerk and be sworn.

13              ADREE EDMO, PLAINTIFF, SWORN

14        THE COURT:  We got started off on the wrong --

15   typically you walk in front of the clerk's space.  But that's

16   all right.  We started that yesterday with Dr. Ettner.

17        THE CLERK:  Please state your complete name and spell

18   your name for the record.

19        THE WITNESS:  My name is Adree Edmo.  My first name is

20   Adree, A-D-R-E-E.  My last name is Edmo, E-D-M-O.

21        THE COURT:  You may inquire.

22        MS. RIFKIN:  Thank you.

23                  DIRECT EXAMINATION

24   BY MS. RIFKIN:

25   Q.   Good morning, Ms. Edmo.

1   A.   Good morning.

2   Q.   Is Adree Edmo your legal name?

3   A.   Yes, it is.

4   Q.   And has it always been your legal name?

5   A.   No, it has not.

6   Q.   When did you start using the name "Adree"?

7   A.   Approximately in 2013.

8   Q.   And when did you legally change your name?

9   A.   In September of 2013.

10  Q.   How did you pick the name "Adree"?

11  A.   My older brother was having a daughter, his first daughter,

12  and he had been asking a name for his daughter.  And I proposed

13  the name "Adriana."

14       Shortly after she was born, I found out that he had

15  actually chosen Adriana, and I really enjoyed the name Adriana.

16  So I shortened it to "Adree," which is my legal name now.

17  Q.   And how old are you, Ms. Edmo?

18  A.   30 years old.

19  Q.   How long have you been incarcerated?

20  A.   Since 2012.

21  Q.   What is your education?

22  A.   I have some college education.  I completed a paralegal

23  certificate program through Adams State University of Colorado.

24  It's an extended college program specifically for prisoners.

25  Q.   And prior to incarceration, where did you primarily live?

1    A.    In Fort Hall, Idaho, on the Fort Hall Indian Reservation.

2    Q.    What tribe are you enrolled with?

3    A.    I am enrolled into the Shoshone-Bannock tribes.

4    Q.    Ms. Edmo, what is your gender identity?

5    A.    Female.

6    Q.    And how do you know that you are female?

7    A.    The best way to explain it is my brain typically operates

8    female, even though my body hasn't corresponded with my brain.

9    My brain operates, I guess, in a way similar to as a female, is

10   the best way I can explain it.

11   Q.    When do you first remember feeling that way?

12   A.    About the age of around 5 or 6.

13   Q.    Did you have a name at that time for what you were feeling?

14   A.    No, I did not.

15   Q.    And what is your sexual orientation?

16   A.    I'm attracted to heterosexual men.  So I guess my sexual

17   orientation would be heterosexual.

18   Q.    Was there a time that you identified as any other sexual

19   orientation?

20   A.    Before learning about gender identity and transgender, a

21   lot of people around me had identified me as being gay, even

22   though, to me, that wasn't necessarily the right word that I

23   would choose, but I accepted it.

24   Q.    And what is your understanding of what gender dysphoria

25   means?

1    A.   My understanding of gender dysphoria is it means it's an

2    incongruence between a person's -- a feeling of who they are,

3    whether they are male or female.  And it's a difference between

4    a person's innate sense of female or male as compared to what

5    they were assigned at birth.

6    Q.   When did you learn what gender dysphoria or gender identity

7    disorder is?

8    A.   Approximately, I would say for sure in 2012.

9    Q.   And was that while you were incarcerated or prior?

10   A.   While I was incarcerated.

11   Q.   What is the experience of having gender dysphoria like for

12   you?

13   A.   The typical feelings that I feel with gender dysphoria are

14   I feel depressed; I feel -- sometimes, when it's extreme, I feel

15   disgusting; I feel tormented; I feel hopeless; and I feel like,

16   with no hope, I have no, like, reason to keep on going.  It's

17   pretty extreme.

18   Q.   Are there times that it gets better, times that it gets

19   worse?

20   A.   I would have to say it's there all the time, but there are

21   times where it is worse, like extremely worse.  And there are

22   times where it's not as bad, but it's still there in the

23   foreground.

24   Q.   And you said that you identify as female.

25        How do you express yourself as female?

1    A.    So, with me, I have always identified as female, I guess,

2    in a sense.  I do wear makeup.  I have grown my hair out.  I

3    have similar gestures as females.  I walk, my voice is feminine.

4    I just have, I guess, general mannerisms that you would see in a

5    typical female.

6    Q.    And why -- why is wearing makeup something that's important

7    to you?

8    A.    It helps create, like, an egosyntonic state of mind.  It

9    helps me express on the outside about what I feel on the inside.

10   It helps me give people an idea of who I truly am on the inside.

11   Q.    Have you been disciplined for presenting as feminine in

12   prison?

13   A.    Yes, I have.

14   Q.    Why keep presenting as feminine even though you have been

15   punished for it?

16   A.    It's -- it's -- honestly, it's all I ever know.  I mean, I

17   don't know what it means to have male or to be a man, as they

18   say.  I don't know -- that doesn't -- I can't comprehend that.

19   I just act this way that I am now.  It's the only way that I

20   know.

21   Q.    Do you think it would be easier to stop presenting

22   outwardly as feminine, to cut your hair and not wear makeup?

23   A.    It would not be easy.

24   Q.    And why?

25   A.    Because it would be -- it would be making me feel like I

1    had to conform to something or somebody that I'm not.  And that

2    is not who I am.  I mean, it would -- it's embarrassing.  It's

3    difficult and it's depressing.

4    Q.   Besides gender dysphoria, do you have any other mental

5    health diagnoses that you're aware of?

6    A.   The only one that I am sure that I'm aware of is major

7    depressive disorder.

8    Q.   Have you received treatment for gender dysphoria?

9    A.   I have received hormonal therapy.  I received some pretty

10   much process groups of gender dysphoria, and that's about the

11   extent of what I have received.

12   Q.   How long have you been receiving hormones for gender

13   dysphoria?

14   A.   Since 2012.

15   Q.   And how have these hormones affected you?

16   A.   Mentally, they have -- I guess a better word is they

17   cleared my mind; whereas before, it was like a -- I guess a

18   cloud over my mental state.  It felt like a blurriness.  And

19   when I finally started taking hormones, it kind of felt like all

20   that fogginess and kind of -- became clear.

21        Physically, I have grown breasts.  I have had body fat

22   redistribution from my waist to more so my hips.  It's allowed

23   my skin consistency to change, meaning I have, like, softer

24   skin.  I don't produce as much oil in my skin, so my skin is a

25   lot smoother.

1    Q.   What kind of treatment are you seeking for gender dysphoria

2    in this lawsuit?

3    A.   Sex reassignment surgery or gender confirmation surgery.

4    Q.   Why are you seeking surgery?

5    A.   Ultimately, I feel the gender confirmation surgery will

6    help me affirm my gender identity as female.

7    Q.   Do you continue to experience distress related to gender

8    incongruence?

9    A.   Yes.

10   Q.   How do you feel about your genitals now?

11   A.   They are disgusting.  They feel like it's alien to my body.

12   It's embarrassing.  Sometimes it's hard to comprehend that I

13   still have male genitalia.  And it's even more so embarrassing

14   because I know that other people know that, especially being in

15   prison, and they capitalize on that.  And it makes me feel even

16   more depressed, embarrassed, disgusted.

17       I feel -- I don't feel appreciated as who I feel I am, and

18   I feel just like a complete outcast.

19   Q.   How often do you think about the kinds of things you just

20   described?

21   A.   Every day.  It's an everyday reoccurring thought.  Every

22   day I wake up, and I have to remind myself that some day, at

23   some point, I will be okay enough, and I will have surgery, and

24   I can continue on in life.

25   Q.   Have you taken any steps to try to treat yourself on your

1     own?

2     A.   Yes.  In 2015, I attempted to castrate my testicles.  I

3     used a razor blade that we get at the prison.  And I broke open

4     the disposable razor blade, and I attempted to cut the testicle

5     sac open.

6          I did leave a note before I did it, letting the officers

7     know that I in no way -- I was not trying to commit suicide.  I

8     was only trying to help myself.

9          And in December of 2016, again, I tried to castrate my

10    testicles; this time I got further.  I used a disposable blade

11    again.  I broke it out of the razor.  And this time, I actually

12    got into the testicle sac and got out the testicle.

13         But I wasn't able to actually sever the testicle because

14    there was too much blood.  I didn't know there would be that

15    much blood in that area, and I couldn't see anymore what I was

16    cutting.  So I abandoned it and got medical help.

17    Q.   Can you describe how you were feeling at the time that you

18    attempted to cut your testicle off?

19    A.   I can remember right before it, I had a sense of urgency.

20    I felt like this was -- this was -- like I had to do this.  I

21    felt like it was going to benefit me in the long run, and I felt

22    like it was a decision that I had to make.  I felt ready.  I had

23    adrenaline pumping through my body, and I felt like it

24    was -- like it was going to happen.

25    Q.   And you said that after the second -- your second attempt,

1    you sought medical help.

2         What happened?

3    A.    The emergency personnel that we have at the prison arrived.

4    They assessed me as best they could right there and took me to

5    the medical building at the prison.  And then from there, they

6    called the ambulance, and I went to Saint Alphonsus hospital.

7    Q.    And what happened at the hospital?

8    A.    They gave me some more pain medication, and they -- I

9    waited for a while for a urologist, I think it is.  And once the

10   urologist arrived, she kind of assessed the situation.

11        But due to, like, the adrenaline wearing off, I was in so

12   much pain that she had said I would need anesthesia to go under,

13   and then she repaired my testicle.

14   Q.    Were you offered a choice as to whether your testicle would

15   be repaired?

16   A.    No.

17   Q.    And how did you feel after -- after it was repaired and you

18   came out of the anesthesia?

19   A.    After I came to and they brought me back to the prison, I

20   was pretty disappointed in myself.  Because I felt like I made

21   it that far, and I was kind of upset because I was, like, I was

22   so close, and I should have finished it.  I was just pretty

23   disappointed in myself, ultimately.

24   Q.    Do you worry that you will try to castrate yourself again?

25   A.    Given the extreme episodes that I go through in gender

**EDMO – Direct**

200

1    dysphoria, I -- I don't doubt that I would actually try it

2    again.  I don't -- I can't tell you when I will have another

3    extreme episode of gender dysphoria.  I don't know when it's

4    going to happen.  I just know that it's always there, and

5    sometimes it's worse than others.

6    Q.   And what do you do when -- at the times when it's worse

7    than others now?

8    A.   Well, I have been self-medicating by using a razor to cut

9    my arm.  Because while I'm in a gender dysphoric episode, the

10   mental anguish and torment I go through about who I feel I am

11   versus my physical body, I need to feel actual pain to actually

12   bring me out of that episode, to realize, you know, I need to

13   keep as much tissue down there for surgery to be successful.

14   But at the time, cutting my arm and feeling that physical pain

15   releases that emotional torment that I feel at that time.

16   Q.   What do you expect the results of gender confirmation

17   surgery to be for you?

18   A.   Ultimately, I expect to have the complete production of

19   testosterone stopped and ultimately my genitals turned into a

20   vagina.

21   Q.   What kinds of challenges in your life do you think you

22   might have after gender confirmation surgery?

23   A.   I know that gender confirmation surgery is not a fix-all.

24   It's not a magic operation.  It's not going to make my life

25   completely fantastic or blissful afterwards.

1        I'm still going to face the same stressors that we all face

2    in everyday life, you know, medical, family, relationship

3    issues.  I just know that after having gotten the surgery, it's

4    going to put me at a level a lot better to handle those types of

5    situations than I am now.

6    Q.    Do you expect gender confirmation surgery to affect your

7    mental health condition of depression one way or the other?

8    A.    Definitely.  I feel like I won't have as much depression

9    about myself and about my physical body.  I don't think I will

10   be so anxious that people are always knowing that I'm different,

11   and I feel like in -- you know, not only that, I feel like I can

12   actually express who I truly am more visibly and just more

13   adequately.

14   Q.    When do you expect to be released from prison?

15   A.    In 2021.

16   Q.    Do you feel prepared to live in the community as a woman?

17   A.    I don't think that there is a major difference to whether

18   or not you step outside the prison and automatically it's like a

19   dramatic change.  I mean, I have been living myself since 2012

20   and even before that.  So it's not a major difference.

21        I'm about as ready as any person getting out of prison.  I

22   will continue to wear makeup.  I will continue to wear female

23   clothing.

24   Q.    Have you had a job while you have been in prison?

25   A.    Yes, I have.  I have had two, actually.

1     Q.   And at the jobs, have you presented feminine in terms of

2     hair and makeup, as you've described?

3     A.   Yes, I have.  I've -- actually, as of yesterday, I just

4     barely got my employment back at the Idaho Correctional

5     Industries, which they call "CI."  I work out there.

6           Before -- before yesterday, I was working as a production

7     clerk in the production office at Correctional Industries.  I

8     went to an interview yesterday, and I was able to get my

9     position back.  And I will continue to work as a -- basically an

10    office clerk.

11    Q.   If you were in the community right now and had the freedom

12    to dress however you chose and present yourself however you

13    wanted, do you think you would still seek gender confirmation

14    surgery?

15    A.   Absolutely.

16    Q.   How do correctional officers in the prison address you?

17    A.   They address me as "him" or "Mr. Edmo."  There are very few

18    and far between that actually address me as just "Edmo."  But a

19    lot of them use the pronoun of "he," "him," "his."

20    Q.   And what about medical and mental health staff?  What

21    pronouns do they use?

22    A.   The same.  They are mostly -- they use "him," "his."

23    Multiple occasions, they use "Mr. Edmo."  Very few medical

24    providers ever call me "Edmo."  Very rarely do I ever hear any

25    of them call me "Ms. Edmo."

203

1    Q.   How does that make you feel?

2    A.   Since it's been happening since 2012, it irritates me, it

3    embarrasses me.  But at the same time, I just kind of have to go

4    with it besides trying to argue with them.  I mean, it's really

5    frustrating.

6    Q.   And I would like to show you what's been marked as

7    Plaintiff's Exhibit 2.

8                THE COURT:  Is that a joint exhibit?

9                MS. RIFKIN:  No, Your Honor.

10               THE COURT:  Then it's 1002?

11               MS. RIFKIN:  I'm sorry.  Yes.  I'm sorry.  Plaintiff's

12   Exhibit 1002.

13   Q.   BY MS. RIFKIN:  Do you recognize this document, Ms. Edmo?

14   A.   Yes.  It's my birth certificate.

15   Q.   And what sex does it list?

16   A.   Female.

17   Q.   Has your birth certificate always listed female?

18   A.   No, it has not.

19   Q.   Did you have it changed?

20   A.   Yes.

21   Q.   Why did you want it changed?

22   A.   Because it helps affirm my identity as a female.

23               MS. RIFKIN:  I would like to move Plaintiff's Exhibit

24   1002 into evidence.

25               THE COURT:  Any objection?

1              MR. HALL:  No objection.

2              MR. EATON:  No objection.

3              THE COURT:  1002 will be admitted.

4         (Plaintiff's Exhibit 1002 admitted.)

5              MS. RIFKIN:  I have no further questions at this time.

6              THE COURT:  Cross.

7              MR. HALL:  Yes, Your Honor.

8              THE COURT:  Mr. Hall.

9                        CROSS-EXAMINATION

10   BY MR. HALL:

11   Q.   Good morning, Ms. Edmo.

12   A.   Good morning.

13   Q.   It's nice to see you again.  If you don't remember me, I'm

14   one of the attorneys for the Department of Corrections.  We had

15   an opportunity to spend a good seven hours together this summer

16   at a deposition.

17        Do you recall that?

18   A.   Yes, I do.

19   Q.   And I asked you a number of questions that certainly we're

20   not going to go through today.

21        But were you truthful in the responses you gave at the

22   time?

23   A.   Yes, I was.

24   Q.   Okay.  And you also had a clinical interview with a

25   Dr. Andrade.

205

1          Do you recall that --

2     A.    Yes.

3     Q.    -- this summer?

4          And he asked you a number of questions about your history.

5          Were you truthful with that?

6     A.    Yes.

7     Q.    Is it your habit to be truthful when talking with medical

8     providers?

9     A.    Yes.  To the best of my ability, yes.

10    Q.    And is it your habit to be truthful when talking to mental

11    health providers?

12    A.    Yes.

13    Q.    Thank you.

14         Ms. Edmo, can you see the record that has been marked as

15    Defendant's Exhibit 2007?

16    A.    Yes, I see it.

17    Q.    Okay.  Did you have an opportunity to receive treatment

18    from the Shoshone-Bannock Tribes Counseling and Family Services

19    in 2011?

20    A.    I believe so.

21    Q.    And do you recall that this followed a suicide attempt that

22    you had made on yourself in that time?

23    A.    I don't remember the -- I don't remember having an intake

24    assessment, but --

25    Q.    Do you recall --

1    A.    -- I remember a suicide attempt in that year, yes.

2    Q.   Do you recall -- and you had treatment with a Dr. Palmer in

3    this time period; correct?

4    A.   I don't remember his name.

5    Q.   I think you referenced it earlier.

6              MR. HALL:  I would like to move to admit Exhibit

7    No. 2007, Your Honor.  It's been stipulated.

8              THE COURT:  Any objection?

9              MS. RIFKIN:  No objection.

10             THE COURT:  2007 will be admitted.

11        (Defendants' Exhibit 2007 admitted.)

12   Q.   BY MR. HALL:  Ms. Edmo, I have had placed here Exhibit

13   No. 2009.

14        Isn't it true that you received emergency medical treatment

15   in 2011 as well as in 2010 for two separate suicide attempts?

16   A.   Yeah, I believe so.

17             MR. HALL:  Okay.  I would like to move to admit

18   Exhibit No. 2009.

19             THE COURT:  Any objection?

20             MS. RIFKIN:  No, Your Honor.

21             THE COURT:  2009 will be admitted.

22        (Defendants' Exhibit 2009 admitted.)

23   Q.   BY MR. HALL:  While we're on this housekeeping, do you

24   recognize the document that's been marked as 2016?

25   A.   I -- yes, I can roughly remember it.  I don't absolutely

1    remember the absolute context of it.

2    Q.   Right.  Do you recall having a gender dysphoria group with

3    a Clinician Watson?

4    A.   Yes.  That would have to be in 2012, 2013.

5    Q.   Okay.  And this is a document that you produced as part of

6    a homework assignment; correct?

7    A.   I believe so.  I can't really exactly remember.

8    Q.   On the third page of Exhibit No. 2016, there is a signature

9    down there.

10       Is that your signature, Ms. Edmo?

11   A.   Yes.

12           MR. HALL:  I would like to move to admit Exhibit

13   No. 2016.

14           THE COURT:  Any objection?

15           MS. RIFKIN:  No.

16           THE COURT:  2016 is admitted.

17   (Defendants' Exhibit 2016 admitted.)

18   Q.   BY MR. HALL:  And we had talked about your preincarceration

19   history of suicide attempts.  There were a couple in the

20   2010-2011 time frame; correct?

21   A.   Yes.

22   Q.   Okay.  And in this document, you discuss living in

23   Washington and dating a man named Casey, sometime prior to

24   moving to Idaho in 2009.

25       Do you recall that?

208

1     A.    Yes, in 20- -- prior, yes.

2     Q.    Okay.  You had a fight with Casey.  And as a result of

3     that, you took it hard, and you attempted suicide; is that

4     correct?

5     A.    I believe so.

6     Q.    Okay.  And then you moved back to Idaho; correct?

7     A.    I don't think I ever moved to Washington, but I was in

8     Washington, and I came back to Idaho.

9     Q.    Okay.  This suicide that's referenced here, that occurred

10    in Washington; correct?

11    A.    No, it did not.

12    Q.    Okay.  So you're saying that suicide that's referenced here

13    occurred in Idaho?

14    A.    Yes.

15    Q.    Do you recall either way?

16    A.    I have never committed -- tried to commit suicide in

17    Washington.

18    Q.    Okay.  Do you recall trying to commit suicide when you were

19    16 years old?

20    A.    No.

21    Q.    Before you is Defendant's Exhibit 2007.  Let's see if we

22    can zoom in on this a little bit more.  And this is the record

23    from Shoshone-Bannock Tribes Counseling & Family Services.

24          Isn't it true that in November of 2003, you were

25    transported to Portneuf via ambulance after an apparent

1     overdose?  Do you recall that?

2     A.    Yeah.  I kind of remember something like that.

3     Q.    And do you recall that being related to a suicide attempt?

4     A.    No.

5     Q.    Now, just for the record, I want to make sure that it's

6     clear.

7          Prior to the incarceration in 2012, there has been multiple

8     suicide attempts that you've taken directly on your own life;

9     correct?

10    A.    Two of them, in 2010 and '11, I believe.

11    Q.    And is it your testimony that there has been no others?

12    A.    No, there hasn't.

13    Q.    In your deposition, you recall there were two serious

14    suicide attempts, but there may have been more?  Do you recall

15    that?

16    A.    I recall letting you know that, yeah, there were two

17    serious ones that I actually had the intent to commit suicide.

18    Q.    Okay.  There were others that you did not have the intent

19    to commit suicide; is that your testimony?

20    A.    Yes.

21    Q.    Okay.  And during those time period where you were

22    attempting suicide, you were heavily abusing alcohol; correct?

23    A.    Yes.

24    Q.    And in the three, four years prior to incarceration, you

25    were using alcohol and other drugs at a very high rate; correct?

1    A.    Yes.

2    Q.    Okay.  And I believe that you agreed that your substance

3    abuse was its most extreme in the years -- three or four years

4    prior to your incarceration in 2012; correct?

5    A.    Yes.

6    Q.    Okay.  And isn't it true that your more serious suicide

7    attempts followed relationship problems with one of your

8    partners; correct?

9    A.    Yes.

10   Q.    And at this time, you were also unemployed; correct?

11   A.    Yes.

12   Q.    You were -- that was a big stressor for you, was it not?

13   A.    It was a stressor.

14   Q.    Okay.  And you were having self-worth problems, were you

15   not?

16   A.    Yes.

17   Q.    You didn't feel like your life was worth much at that time;

18   correct?

19   A.    I felt worthless, yes.

20   Q.    And you had a lot of legal problems at that time with some

21   felony check fraud charges; correct?

22   A.    In 2010, yes.

23   Q.    And in '11 and '12, you were still dealing with probation

24   and probation violations; correct?

25   A.    Yes.

EDMO - Cross

211

1    Q.   Now, in your declaration that you provided, on page 7, you

2    stated that:

3              "I began living full time as a woman around the age of

4              20 or 21.  I wore makeup, women's outerwear, underwear

5              and bras, and styled my long hair."

6    Isn't that correct?

7    A.   Yes.

8    Q.   That's what you stated --

9    A.   Yes.

10   Q.   -- correct?

11   A.   I did.

12   Q.   And isn't it true that prior to your incarceration, you

13   never had hair longer than your ears; correct -- about longer

14   than the top of your ears?

15   A.   It's been about in the middle.

16   Q.   About in the middle?

17   A.   Yeah, or about the bottom to the middle of my ears.

18   Q.   Okay.  So the longest your hair was ever prior to your

19   incarceration was about the middle of your ear; correct?

20   A.   Bottom or middle.  I don't know the exact, if it was middle

21   or bottom, but I would say to the bottom of my ear.

22   Q.   Right.  So after your incarceration, you grew your -- in

23   2012, you grew your hair out longer than it's ever been in your

24   life; correct?

25   A.   Yes.

EDMO - Cross

212

1    Q.   And you've had, let's say, counseling or verbal warnings

2    from correctional staff about your hair from time to time;

3    correct?

4    A.   Yes.

5    Q.   And a lot of those have been directed at when you have a

6    ponytail or a bun; correct?

7    A.   Yes.

8    Q.   And you have a high ponytail; right?  Which I imagine is a

9    ponytail up on top, coming off the top of the head; correct?

10   A.   No.

11   Q.   No?  Describe for me a high ponytail, then.

12   A.   If I were to wear my hair in a ponytail, it would be about

13   this length (indicating).

14   Q.   And you have been counseled by correctional officers since

15   2012 on multiple occasions, about maybe toning down your

16   feminine hairstyle; correct?

17   A.   Yes.

18   Q.   And the rationale that was given to you on multiple times

19   is along the lines of:  "Ms. Edmo, we need to protect you from

20   sexual assault.  And we can't have you appearing in a feminine

21   matter that may cause a, quote, 'sexually charged environment.'"

22        Isn't that correct?

23   A.   No, that's not correct.

24   Q.   No officer has ever told that to you?

25   A.   No.  Actually, they have told me to take my hair down.

1   Q.   You have never been told by a correctional officer that

2   your hair creates a sexually charged environment?

3   A.   Only after if I have been given a disciplinary offense

4   report was it explained that it -- the reason why.

5   Q.   Right.  And isn't it true, Ms. Edmo, that you have never

6   actually been given a disciplinary offense report for wearing

7   makeup or wearing your hair in a feminine style?  The

8   disciplinary offense reports have been for disobedience to a

9   direct order; isn't that correct?

10  A.   Yes.

11  Q.   There is a difference there; right?  And you do recognize

12  that?

13  A.   I think -- I believe it's covert.  The disciplinary process

14  has the officer pick the best offense that describes the

15  behavior.  So they would use disobedience to orders.

16  Q.   Right.  And on all of those disobedience to orders DORs

17  relating to your makeup or your hair, you were warned in

18  advance, like, "Ms. Edmo, you need to take down your hair," or

19  "You need to remove your makeup"; correct?

20  A.   Yes.

21  Q.   Okay.  And your response was no; correct?

22  A.   On multiple occasions, yes.

23  Q.   Right.  You refused that direct order; correct?

24  A.   At the time, I didn't think it was a direct order.  But

25  they gave me instructions to remove my makeup or take my hair

1    down.

2    Q.   Okay.  So then after you refused to follow direct order, it

3    was then that you were given a DOR; correct?

4    A.   Yes.

5    Q.   Okay.  And you've understood since your incarceration that,

6    as a transgender female, that you feel that you're at a higher

7    risk of sexual assault in a male facility; isn't that correct?

8    A.   No prison is safe.

9    Q.   No prison is safe.  But you have actually written in your

10   declaration that, because you are a transgender female in a male

11   prison, you feel like you are at a higher risk of sexual assault

12   from the male population; correct?

13   A.   Yes.

14   Q.   And isn't it true that there are individuals incarcerated

15   with you that are in jail on convictions for sexual assault?

16   A.   I don't know what their exact convictions are, but I would

17   believe so.

18   Q.   Right.  Do you understand that the Department of Correction

19   has an obligation to protect you from sexual assault?

20   A.   Yes.

21   Q.   And isn't it true that in this lawsuit, which is not a real

22   claim on this motion, that you are making a claim that one of

23   the defendants -- namely, Defendant Keith Yordy -- failed to

24   protect you from sexual assault due to your transgender status

25   and femininity?

**EDMO — Cross**

215

1    A.    Yes.

2    Q.    Do you see there that there is kind of this conflict?  You

3    want to feminize in prison, and the IDOC has allowed you to do

4    that in a number of ways.  But there are limits to that placed

5    by security, and it's due to the goal of protecting you from

6    sexual assault.

7         Do you understand that?

8              MS. RIFKIN:  I'm going to move to strike the testimony

9    of counsel prior to the question.

10             THE COURT:  Just a moment.

11        Counsel, I think -- let's rephrase the question.

12             MR. HALL:  That's fine.

13             THE COURT:  There was a lot of testimony in the

14   question that's probably not necessary.

15   Q.    BY MR. HALL:  You understand that one of the rationales for

16   limiting your ability to wear your hair pre today in a feminine

17   fashion was to protect you from sexual assault; correct?

18   A.    I don't know what their reasons are.

19   Q.    But those were the justifications that were provided to

20   you?

21   A.    In the DORs, yes.

22   Q.    Okay.  And, Ms. Edmo, you're aware that there has been some

23   recent policy changes; correct?

24   A.    I think so.

25   Q.    As of last Friday, the policy has been changed regarding

1    gender dysphoria treatment; correct?

2    A.    I received a memo from Ashley Dowell.

3    Q.    Okay.  That memo said that now all GD offenders, including

4    yourself, will have access to female commissary items that are

5    available to female offenders at other institutions; correct?

6    A.    Yes.

7    Q.    So makeup?

8    A.    Yes.

9    Q.    And even female underwear?

10   A.    Yes.

11   Q.    Now, it's true you've had female underwear from time to

12   time since your incarceration in 2012; correct?

13   A.    Yes.

14   Q.    And you're also -- it's your understanding of this new

15   policy that IDOC has mandated that its mental health and medical

16   staff are to refer to you and other gender dysphoric inmates by

17   your preferred gender?

18   A.    That's what it states.

19   Q.    Okay.  Are you happy with that?  Does that -- does that

20   please you in any way?

21   A.    It's a very slight relief.

22   Q.    You understand that since 2011, IDOC has had a policy to

23   provide gender dysphoric inmates with treatment for GD?

24   A.    I think so.

25   Q.    Okay.  And that included sex reassignment surgery or gender

1      confirming surgery if it was determined to be medically

2      necessary by a qualified GD evaluator; correct?

3      A.   Yes.  That's what the policy states.

4      Q.   Okay.  The policy did not have a prohibition against sex

5      reassignment surgery, per se; correct?

6      A.   Per se.

7      Q.   Yes, though; correct?

8      A.   Yes, per se.

9      Q.   Okay.  And isn't it true that prior to June 1 of this year,

10     when this motion for preliminary injunction was filed, no

11     medical provider or mental health provider had determined that

12     sexual reassignment was medically necessary for you?

13     A.   Yes, that's correct.

14     Q.   And those that have determined it purportedly are the

15     experts that have been retained by your counsel; correct?

16          MS. RIFKIN:  I would like to move to strike

17     "purportedly."

18          MR. HALL:  It's in debate, Your Honor.  I think the

19     record will show what Dr. Ettner had testified.

20          THE COURT:  Overruled.

21     Q.   BY MR. HALL:  Would you answer the question, please.

22     A.   What was the question again?

23          MR. HALL:  Would you read the question back, Madam

24     Court Reporter.

25          (Question read by reporter.)

1          THE WITNESS:  Yes.

2     Q.   BY MR. HALL:  Now, you understand that as part of some

3     procedures for sex reassignment surgery, including a

4     vaginoplasty, that your male anatomy would be used to create a

5     vagina?

6     A.   I think that's correct.

7     Q.   So you understand that it's important to preserve your male

8     anatomy so that in the future, if it's appropriate for you to

9     have sex reassignment surgery, that tissue is available to

10    create female anatomy; correct?

11    A.   As what I have been told, yes.

12    Q.   Okay.  And you're committed to preserving your male anatomy

13    to be used in the future; correct?

14    A.   Yes.

15    Q.   Now, you've had -- you've had a number of contacts

16    throughout your incarceration with clinical staff; correct?

17    A.   Yes.

18    Q.   Including Clinician Watson; correct?

19    A.   Yes.

20    Q.   And Clinician Stewart; correct?

21    A.   Yes.

22    Q.   Okay.  And throughout those years, both Clinician Watson

23    and Clinician Stewart have repeatedly referred you to and

24    recommended that you undergo a number of different group

25    therapies; correct?

1    A.   I wouldn't say "group therapy," but groups.

2    Q.   Mood management would be one; correct?

3    A.   Yeah.  Mood management class, yes.

4    Q.   Social skills?

5    A.   Social skills class, yes.

6    Q.   Healthy relationships; yes?

7    A.   Yes.

8    Q.   And you've also been recommended and required to complete

9    the sex offender treatment programming; correct?

10   A.   Yes.

11   Q.   And despite multiple recommendations to undergo those

12   classes, you have repeatedly refused to take those classes;

13   correct?

14   A.   Yes.

15   Q.   Okay.  And however, though, I have noticed throughout the

16   records that there have been periods of time where you expressed

17   to the clinicians, whether it's Watson or Stewart, that you have

18   a moment of clarity that maybe you should take those classes.

19        Do you agree with that?

20   A.   I think at some point, yes.

21   Q.   Yeah.  Where you stated, "You know, I do need to take those

22   classes because it will help me work on my other issues, not

23   just GD."

24        Do you agree with that?

25   A.   I would say yes.

220

1    Q.   And as recently as May or April of this year, you told

2    Clinician Watson in a concern form that you were ready to get on

3    top of your mental health issues and take these classes.

4         Do you remember that?

5    A.   Because she had recommended them.

6    Q.   Right.  But you had agreed, which was something rare for

7    you.  You had agreed that:  Yes, I do need to do that.  I need

8    to focus on these other mental health issues.  I'm ready to take

9    those classes.

10        Correct?

11             MS. RIFKIN:  I'm going to move to object to counsel's

12   characterization as "something rare for you" and move to strike

13   that part of the question.  Also lacks foundation.

14             THE COURT:  Counsel, I'm going to sustain the

15   objection.  It assumes a fact not in evidence.  And because of

16   that, it becomes compound and confusing.

17   Q.   BY MR. HALL:  You agree that you've repeatedly -- and you

18   testified earlier that you repeatedly refused to take these

19   classes; correct?

20   A.   Yes.

21   Q.   Okay.  Yet you have, on only a couple of occasions, had a

22   moment of clarity where you have agreed that, yes, I do need to

23   work on these mental health issues; correct?

24             MS. RIFKIN:  I'm objecting as lacks foundation,

25   misstates the evidence as to "only a couple of occasions."

**EDMO - Cross**

1    Assumes facts not in evidence.

2            THE COURT:  Overruled.  The witness can respond if she

3    feels she has done it on more than on a couple of occasions, if

4    she wishes.

5    Q.  BY MR. HALL:  Go ahead.  And If I'm mischaracterizing

6    anything, please let me know.

7            THE COURT:  Typically -- don't be reluctant to explain

8    a response if you disagree with counsel's characterization.

9        Go ahead.

10           THE WITNESS:  Can you repeat the question, please.

11           MR. HALL:  Madam Court Reporter, would you read the

12   question back for the witness, please.

13       (Question read by reporter.)

14           THE WITNESS:  I'm not sure what you mean by "moment of

15   clarity," but I have agreed to it on a couple of occasions.

16   Q.  BY MR. HALL:  But as of today, you have not completed mood

17   management, social skills, healthy relationships, or the sex

18   offender treatment program; correct?

19   A.  Correct.

20           MR. HALL:  I have no further questions.  Thank you.

21           THE COURT:  Mr. Eaton.

22                      CROSS-EXAMINATION

23   BY MR. EATON:

24   Q.  Hello, Ms. Edmo.

25       As you probably recall, my name is Dylan Eaton.  I

222

1    represent the Corizon providers.

2         Do you remember me?

3    A.    Yes, I do.

4    Q.    Okay.  Just a couple questions for you.

5         First of all, I believe you indicated that you acknowledge

6    you were diagnosed with gender identity disorder in 2012; is

7    that correct?

8    A.    Yes.

9    Q.    Okay.  And that was by a Dr. Eliason; is that correct?

10   A.    I don't know exactly who diagnosed me initially.  I know

11   that I had an evaluation by Dr. Lake.

12   Q.    Okay.  You had an evaluation by Dr. Lake.

13        You recall that?

14   A.    Yes.

15   Q.    And did the -- and you understand that you actually

16   received that diagnosis in 2012; right?

17   A.    Yes, I did.

18   Q.    And that made you feel better, didn't it?

19   A.    It was exciting.

20   Q.    And why is that?

21   A.    Because I felt like this was the start of getting my life

22   back together.

23   Q.    And you were seeking a GID, gender identity disorder,

24   designation at that time because you wanted to be put on

25   hormones; isn't that right?

1    A.   I didn't really know necessarily what the treatment was,

2    but I did ask for an evaluation of a gender identity disorder.

3    Q.   And after you received that designation, did you want to be

4    put on hormones?

5    A.   They had asked me if that was my -- if I would be willing

6    to go on hormone replacement therapy.

7    Q.   And you agreed to that?

8    A.   Yes.

9    Q.   Okay.  And I believe you testified that once you started

10   taking the hormones, that a cloud was lifted, and you started

11   feeling better; is that correct?

12   A.   Yes.

13   Q.   Okay.  So the hormones helped you; right?

14   A.   In the beginning, yes.

15   Q.   Okay.  And you acknowledge that you've been on hormones

16   since 2012; right?

17   A.   Yes.

18   Q.   And you have been managed by medical providers, including a

19   Dr. Whinnery, on those hormones?

20   A.   I have seen Dr. Whinnery for hormones.

21   Q.   And you understand that your medications, your hormones

22   have been adjusted periodically, sometimes because of your

23   requests over the years?

24   A.   Yes.

25   Q.   When we talked at your deposition, I brought up a record by

1       Dr. Stoddart, who had indicated that -- in that record that you

2       had been sad because Dr. Whinnery had left, and she was an

3       advocate for you.

4           Do you remember discussing that with me?

5       A.   I remember you referring to that conversation.

6       Q.   And I believe you -- we got into a discussion as to you're

7       not sure what "advocate" means, but you indicated that you

8       believed Dr. Whinnery was helping you; correct?

9       A.   She was the doctor that initially prescribed me hormones.

10      Q.   But she was helping you; right?

11      A.   She prescribed the hormones that was helping me, yeah.

12      Q.   I'm not just asking about the hormones.

13          But she was helping you with your gender identity disorder

14      and your gender dysphoria treatment; correct?

15      A.   Yes.

16      Q.   She helped you, for instance, with the prescription to get

17      a bra -- a memo to get a bra; correct?

18      A.   Yeah.  She wrote the medical memo.

19      Q.   Okay.  And she tried to work with you to help you get some

20      type of underwear that would work for you; correct?

21      A.   On multiple occasions, I asked her, and she attempted to, I

22      believe.  I'm not sure if she did actually, but she had told me

23      that she had tried.

24      Q.   And she tried to work with you and helped you, for

25      instance, get a jockstrap and pads to help you try to tuck;

1    correct?

2    A.   I had asked her for a medical memo for panties, actually.

3    And she said the best she can give me is a jockstrap with some

4    medical pads.

5    Q.   So you understand she gave you that and was trying to help

6    you there; correct?

7    A.   That's what she prescribed me, yes.

8    Q.   And you acknowledge that you have been seeing a

9    psychiatrist, Dr. Eliason, since 2012; correct?

10   A.   I have seen him, yes.

11   Q.   Okay.  And you saw him initially when you were diagnosed

12   for GID; correct?

13   A.   I don't know if he was the initial person.  I seen him one

14   time prior to seeing Dr. Lake.

15   Q.   Okay.  So you do recall seeing -- an appointment at least

16   with Dr. Eliason prior to seeing Dr. Lake?

17   A.   Yes.

18   Q.   And then afterwards, you would acknowledge that you have

19   seen him periodically for mental health conditions --

20   A.   Yes.

21   Q.   -- since 2012?

22   A.   Excuse me.  Yes.

23   Q.   At some of those appointments, you have received

24   medications, such as Zoloft; correct?

25   A.   I believe so.

1    Q.    Okay.  But you acknowledge that Dr. Eliason and other

2    medical providers have given you medications to help you with

3    your depression, for instance; correct?

4    A.    Dr. Eliason has.  Yes, Dr. Eliason has.

5    Q.    Okay.  And you have been in chronic care and seen a medical

6    provider every approximately 90 days; is that correct?

7    A.    I don't know if I'm in that program or not.  They don't

8    give me that information.

9    Q.    So you're not aware of whether you're in chronic care?

10   A.    Like I said, I don't know if that's what they designated me

11   into the program.  They don't let me know that information.

12   Q.    Okay.

13   A.    But I assume that I am in chronic care, I think.  I can't

14   give you an answer as to if that's absolutely sure or not.

15   Q.    And you continue to see a psychiatrist at the ISCI today;

16   correct?

17   A.    Yes.

18   Q.    And sometimes you will see a mental health nurse

19   practitioner?

20   A.    I have seen a mental health nurse practitioner, yes.

21   Q.    This year?

22   A.    Not this year.

23   Q.    Okay.  But you do see a psychiatrist?  You have seen a

24   psychiatrist this year?

25   A.    Yes.

1    Q.   On more than one occasion; correct?

2    A.   Yes.

3            MR. EATON:  I don't believe I have any further

4    questions.  Thank you.

5            THE COURT:  Before redirect, I'm going to ask just one

6    or two questions.

7                          EXAMINATION

8    BY THE COURT:

9    Q.   Ms. Edmo, I'm a little confused about the extent of the

10   hormone treatment you've had since you have been incarcerated.

11          Has that been an on-again, off-again?  I mean, have you

12   generally had access to hormone treatment while incarcerated or

13   not?

14   A.   Yes.  As to the dosages, they have been never consistent.

15   Q.   Okay.  But I assume the doctors have tried to work with you

16   in terms of adjusting that, or they just unilaterally make

17   changes?

18   A.   They just unilaterally make changes.

19   Q.   I had understood that there was some -- something cropped

20   up in your blood work which suggested that they either

21   substantially reduce or even eliminate the hormone treatment.

22          Did I understand that correctly?

23   A.   Yes, you did.

24          So part of my hormone therapy, I receive estrogen and

25   spironolactone, which is a testosterone suppressant.  Just as of

228

1    recently, beginning in December of last year into February of

2    this year, they gave me a blood test, and my liver enzymes had

3    elevated.

4        And they didn't know -- we didn't know exactly what that

5    was attributed to.  So they kind of did a, you know, elimination

6    process.  And they determined or felt that it was probably due

7    to the spironolactone.

8        So they took me off of it completely.  And as a result, I

9    started getting more testosterone in my body.  And I can feel

10   that because it's -- prior to hormone therapy, I know what it

11   feels like to be hormonally just testosterone.

12       So I felt that testosterone building up, and I sent in

13   concern forms to the providers asking:  Please, is there any

14   other testosterone suppressant that you can find for me or

15   anything, because I can feel it building, and it's not good for

16   me.  It feels disgusting.  It's gross.

17       So just recently, as of I believe June of this year, they

18   put me back on spironolactone after I continually and repeatedly

19   requested it.

20   Q.   All right.  I'm going to ask another question.  It's a

21   little sensitive, but I think I need to ask.

22       Were you -- I assume, then, that you were on hormone

23   therapy at the time you attempted to self-castrate on both

24   occasions; is that correct?

25   A.   Yes, it is.

1       THE COURT:  All right.  Questions, Ms. Rifkin?

2                 REDIRECT EXAMINATION

3    BY MS. RIFKIN:

4    Q.   Ms. Edmo, at the time that you stopped sex offender

5    programming, was it your understanding that you were required to

6    attend?

7    A.   Before I stopped?

8    Q.   At the time that you stopped the programming.

9    A.   No.  I didn't -- they didn't say it was required that I had

10   to -- I had to finish -- I was required to finish it in order to

11   have a chance at parole.

12   Q.   And at what point did you stop attending sex offender

13   programming?

14   A.   Right after the Commission had decided that I needed to

15   complete my full sentence.  And right after that, they -- my

16   case manager had told me:  Since you don't have a date for

17   parole anymore, you're going to full-term release, there is no

18   need for you to be in this program.  We need to give that slot

19   to somebody who has parole.

20             MS. RIFKIN:  No further questions.

21             THE COURT:  Mr. Hall.

22             MR. HALL:  No recross, Your Honor.

23             THE COURT:  Mr. Eaton.

24             MR. EATON:  Nothing further, Your Honor.

25                 FURTHER EXAMINATION

230

1      BY THE COURT:

2      Q.    I can find this out in some other form.

3            What is your parole status, then?  Based on what you have

4      just said, are you indicating that the parole commission has

5      said that you will not be considered for parole?

6      A.    Yes, that's correct.

7      Q.    That's your understanding?

8      A.    Yes.

9      Q.    What is your top-out date?

10     A.    2021.

11           THE COURT:  Okay.  All right.  I assume that was --

12     any follow-up to that?

13           MS. RIFKIN:  No, Your Honor.

14           MR. HALL:  No follow-up, Your Honor.

15           MR. EATON:  No, Your Honor.

16           THE COURT:  All right.  Ms. Edmo, you may step down.

17     Thank you.

18           Call your next witness.

19           MS. WHELAN:  Good morning, Your Honor.  I'm Amy

20     Whelan, one of Ms. Edmo's counsel.  And we're going to call

21     Dr. Nick Gorton.

22           THE COURT:  Dr. Gorton, please step before the clerk

23     and be sworn.

24       RYAN NICHOLAS GORTON, M.D., PLAINTIFF'S WITNESS, SWORN

25           THE CLERK:  Please take a seat in the witness stand.

231

1          Please state your complete name and spell your name for the

2     record.

3              THE WITNESS:  Ryan Nicholas Gorton.  It's R-Y-A-N,

4     N-I-C-H-O-L-A-S, G-O-R-T-O-N.

5              THE COURT:  Is it Ms. "Whalen" or Whelan?

6              MS. WHELAN:  "Whalen."

7              THE COURT:  There is an Assistant U.S. Attorney in

8     North Idaho that I think pronounces it the same way.  So I

9     wanted to make sure I had it right.

10         Ms. Whelan, you may inquire of the witness.

11              MS. WHELAN:  Thank you.

12                        DIRECT EXAMINATION

13     BY MS. WHELAN:

14     Q.   Good morning, Dr. Gorton.

15     A.   Good morning.

16     Q.   Dr. Gorton, could you just make sure that that microphone

17     is set up for you.  I'm having a little bit of trouble hearing

18     you.

19     A.   Is this better?

20     Q.   That's better.

21              MS. WHELAN:  Dr. Gorton's qualifications are set forth

22     in paragraphs 3 through 6 of his first report and his CV.  We

23     offer his CV into evidence at this time, which is marked as

24     Plaintiff's Exhibit 1004.

25              THE COURT:  Any objection?

232

1          MR. HALL:  No objection, Your Honor.

2          MR. EATON:  No objection.

3          THE COURT:  1004 will be admitted.

4      (Plaintiff's Exhibit 1004 admitted.)

5          MS. WHELAN:  Could we bring that up for him.

6   Q.   BY MS. WHELAN:  Dr. Gorton, do you recognize this document?

7   A.   I do.

8   Q.   And what is it?

9   A.   It's my curriculum vitae.

10  Q.   You don't have to read your entire CV.  But does it look

11  accurate?

12  A.   It does.

13  Q.   And this CV details your experience, but could you briefly

14  describe your education.

15  A.   Yes.  I got a bachelor of science in biochemistry at

16  North Carolina State University.  And I got my M.D. at the

17  University of North Carolina Chapel Hill.  And then I did a

18  residency and chief residency in emergency medicine at Kings

19  County Hospital in Brooklyn.

20         THE COURT:  Dr. Gorton, you are a little soft-spoken.

21  If you could bring the microphone just a little closer and don't

22  wander too much from that.  Some of us are blessed with a

23  booming voice and some don't, such as myself.  So please keep

24  the microphone close so that we can hear you.

25         Go ahead, Ms. Whelan.

233

1    Q.    BY MS. WHELAN:  And during your residency and your chief

2    residency, can you explain what you were doing at that time.

3    A.    So I had finished medical school.  And so, as a physician,

4    I was doing specialty training in emergency medicine.

5    Q.    And from 2008 to the present, you have also worked with

6    Project Health.

7          Can you explain what that organization is and what you do

8    for them.

9    A.    So Project Health was a collaboration between Lyon-Martin

10   Health Services, which is the clinic where I work, and the

11   Transgender Law Center.

12         And the initial goal of the project was that in California

13   at the time, if you were transgender, there were really only two

14   places you could get care, which is San Francisco and

15   Los Angeles, which is not an ideal situation.

16         So the project was to identify community clinics throughout

17   California and provide them some intensive clinic technical

18   assistance so that they would be able to provide that care in a

19   clinically appropriate way.

20         And the -- we probably trained about eight or nine clinics

21   throughout California.

22   Q.    You have also been a consultant with TransLine since

23   January 2011.

24         Can you explain what that organization is and what you do

25   for them.

234

1      A.    So TransLine was actually a project that came out of

2      Project Health in that we would go out to these clinics, and

3      we'd provide them with a bunch of educational training.  But

4      then as they started practicing and seeing patients, things came

5      up, and they weren't necessarily sure what to do in all

6      circumstances.  So they needed sort of this consultation that

7      was ongoing.

8           And so it was very successful, and the clinics that we

9      worked with said it was absolutely probably one of the most

10     important things we did.  So we actually opened it up, and it

11     became a national consultation line.

12          So that if you're healthcare provider and taking care of a

13     transgender patient, and you might not have the experience you

14     need or you might just have a very unusual question, you submit

15     it to TransLine, and one of a number of providers who are

16     experienced in transgender care from Lyon-Martin Clinic but also

17     from some other LGBT clinics throughout the U.S. will answer the

18     question.

19     Q.    And are there any restrictions on who can use that hotline?

20     A.    Well, it's for healthcare providers.  And most of the

21     questions are from physicians or nurse practitioners or P.A.s,

22     but we occasionally get a nurse or mental health provider who

23     has a question.

24     Q.    And where are you currently employed?

25     A.    I'm employed as an emergency physician at Sutter Davis

235

1     Hospital in Davis, California.  And I also practice pro bono at

2     Lyon-Martin Health Services in San Francisco.

3     Q.   Can you explain what Lyon-Martin Health Services is.

4     A.   Yes.  It was originally a sort of for-us, by-us clinic for

5     lesbian and bisexual women started in the 1980s.  And then in

6     the 1990s, the clinic expanded its treatment model to include

7     transgender patients.

8          And it's a -- it's a -- like a safety-net clinic.  It's a

9     federally qualified healthcare center.

10    Q.   Can you explain what a federally qualified healthcare

11    center is.

12    A.   So FQHCs are clinics that enter into an agreement with the

13    government that they will treat anybody who shows up, whether

14    they are insured or not insured.  So if you're uninsured, you

15    have a sliding scale payment system.  And in return for that,

16    the government reimburses you more for those patients that do

17    have government-sponsored insurance, particularly Medicaid and

18    Medicare.

19    Q.   And are the patients you treat at a federally qualified

20    healthcare center different from patients at other primary care

21    clinics?

22    A.   Yes.  In that, you know, because the majority of our

23    patients are uninsured -- or if they are insured, they have

24    Medicare or Medicaid -- they tend to be a lot more

25    disenfranchised.

236

1          So, for example, in my clinic, about 20 percent of our

2     patients are homeless or marginally housed.  We have higher

3     rates of substance abuse, higher rates of cooccurring mental

4     health conditions.  They are people who aren't doing quite as

5     good as you would see in a regular primary care clinic.

6          And we also have a significant portion of our patients who

7     are involved in the criminal justice system.  Either they were

8     in prison or they're on parole or some of my patients have gone

9     to prison.

10    Q.   You described it as a primary care clinic.

11         Can you describe what your duties and responsibilities are

12    at Lyon-Martin as a primary care doctor.

13    A.   So I carry my own panel of patients that I see, and I'm

14    their regular doctor.  But I also supervise midlevel providers,

15    like nurse practitioners and physician assistants.

16         I do a lot of training with the clinic.  So we have medical

17    students, nurse practitioners, P.A. students, residents, fellows

18    who come and will spend a month or so with us to get training in

19    transgender healthcare.

20    Q.   And where do those students come from who you train?

21    A.   The majority is, you know, just because of location, they

22    are from the Bay Area and California area, but we have had

23    students from across the country and even a couple of

24    international students.

25    Q.   How many students would you estimate that you have trained

1    since 2005, when you began working there?

2    A.    That's a hard number, but probably about 10 a year or so.

3    At least 100.

4    Q.    How many people with gender dysphoria have you treated in

5    the course of your career?

6    A.    That have been my primary patients?  About 400 or more than

7    400.

8    Q.    And how many people with gender dysphoria are you currently

9    treating?

10   A.    Again, that are my primary care patients, about 100.

11   Q.    I'm sorry.  Did you say 100?

12   A.    Yeah, 100.

13   Q.    Thank you.

14         Are you familiar with the World Professional Association

15   for Transgender Health, or WPATH?

16   A.    I am.

17   Q.    And what is that organization?

18   A.    It's a professional organization for those who provide care

19   to transgender patients.

20   Q.    And what activities does WPATH engage in?

21   A.    They release the standards of care and revise it

22   periodically, which is guidance on who should be treated with

23   what particular types of treatments, medical, surgical.

24         They hold a conference every two years that's sort of a

25   research and education conference.  So people will present their

1      data from more recent research.

2          They, you know, will periodically make statements or

3      address things that are relating to transgender health.

4      Q.   And do you have a role in the association of WPATH?

5      A.   I'm a member of WPATH.  I'm also on the Medicine Research

6      and the Incarcerated Persons committees.

7      Q.   Your CV also lists several publications related to

8      transgender healthcare.  We don't need to go over those

9      individually.

10         But does your -- if you could pull up his CV again.  Sorry.

11         Does your CV accurately list those publications?

12     A.   Can I scroll through it?

13     Q.   There is a way.  I don't know that you can.

14     A.   Like one more page.

15         Yeah, it does.

16     Q.   Are there any newer publications that are not listed?

17     A.   Could you back up one page?

18         Oh, that are not listed?  No.  I mean, I have one project

19     I'm working on but not in publication.

20     Q.   Your CV also lists numerous presentations related to

21     transgender healthcare.  Again, we don't need to go over those

22     individually.

23         But does your CV accurately list those presentations?

24     A.   The most important ones.  I don't put every presentation

25     that I do on my CV.  It would be 30 pages long.  So these are

1      the most important ones.

2      Q.    Okay.  We often hear about peer-reviewed journals.

3            Can you explain what that means.

4      A.    Those are medical or, more broadly, scientific journals

5      where you submit a paper, and then peers of yours -- so people

6      who are knowledgeable in that field of study -- will review the

7      paper.

8            And you then have the opportunity to make corrections or

9      they might suggest, you know, you should expand on this or

10     explain this or maybe include this data that you didn't include.

11     And then you make corrections, and you resubmit it.

12           It's published.  And then there is a process afterwards and

13     the sometimes vigorous discussion in the editorial pages in

14     subsequent months where people discuss the paper if it's --

15     especially if it's something controversial.

16     Q.    And do you have peer-reviewed journal publications listed

17     on your CV?

18     A.    I do.

19     Q.    Have you ever been retained as an expert in other cases

20     involving transgender healthcare?

21     A.    Yes.

22     Q.    Can you give some examples of those cases in the past five

23     years.

24     A.    Yes.  So I was an expert in a case in New York State that

25     was *Cruz v. Zucker*, where the question was whether or not the

240

1       state Medicaid agency would cover certain treatments for

2       transgender recipients of New York State Medicaid.  And that

3       was -- the plaintiffs won, and so New York State now provides

4       that.

5              There was a case in Florida.  Reiyn Keohana was the

6       plaintiff.  I don't know what the -- it was the prison system

7       was the defendant.  And the issue was whether or not she would

8       have female grooming requirements.  And ultimately, they agreed

9       to give her those.

10             I was an expert in Michelle Norsworthy's case in

11      California.  And at issue was whether or not she needed sex

12      reassignment surgery.  And she won, but then they paroled her

13      very soon afterwards, so she didn't get surgery while she was in

14      prison.

15             And I had two similar cases to that in California that were

16      the same issue, a trans woman in prison who was wanting to get

17      sex reassignment surgery.  They are not completed yet, but I

18      actually found out one of them yesterday was -- we're not doing

19      it anymore because the state decided to parole that person.

20      Q.   You testified earlier about the WPATH standards of care.

21             Do you use those when you treat patients who have gender

22      dysphoria?

23      A.   I do.

24      Q.   Can we bring up the WPATH standards, which is Joint Exhibit

25      15, please.

1      Dr. Gorton, do these look like the standards of care that
2   we're talking about?
3   A.   Yes.
4   Q.   During your deposition in this case, defense counsel asked
5   you about your understanding of the standards of care as,
6   quote/unquote, "flexible guidelines."
7      Do you recall that?
8   A.   I believe so.
9   Q.   Can we go to page 2 of this document -- sorry.  Page 2 of
10  the actual document, not the 15-2.
11     Do you see the heading here called "The Standards of Care
12  are Flexible Clinical Guidelines"?
13  A.   I do.
14  Q.   What is your understanding of what that means?
15  A.   What that means is that for most patients in most
16  situations, the guidelines that WPATH sets forth to determine
17  who should be given certain types of treatment are appropriate
18  to follow; but that in some situations, experienced providers
19  can provide treatment even to a patient who hasn't completely
20  met all those criteria, if there is a good reason.
21     And so, like, the examples they give are unique anatomic,
22  social, or psychological situations.  So, like, I have a patient
23  who is a transgender woman whose mother has dementia, and her
24  mother was actually accepting her transition but now doesn't
25  remember that her child transitioned.

242

1          And so when my -- if my patient shows up to provide care

2     for her, she doesn't recognize her.  And so when she provides

3     care for her mother, she dresses in men's clothes, and she

4     presents as a man, you know, to make it -- to make her

5     essentially able to care for her mother.

6          And this patient was wanting to be referred for surgery.

7     And typically, you would say:  Well, gee, you have to have 12

8     months of living full time in the target gender role.

9          And, you know, if somebody, say, at work, they don't, you

10    know, present as that gender, you would say:  Well, gee, maybe I

11    haven't met the 12-month requirement.

12         And in her case, there is a situation where she presents as

13    male, but it has nothing to do with her gender dysphoria, and it

14    wouldn't be appropriate for me to say, well, since you have to

15    provide care for your mother, we are not going to give you this

16    treatment that you otherwise need.

17    Q.   And the standards of care give another example of that on

18    page 35.

19         Can we switch to that page, please.  The second part.

20    There you go.

21         Do you see the heading on this page that says, quote,

22    "Relationship between the standards of care and informed consent

23    models," end quote?

24    A.   I do.

25    Q.   Can you explain what informed consent models are.

243

1    A.    So that's something that came out of the United States,

2    historically LGBT community health centers who treated a lot of

3    trans patients in that the criteria for starting hormone therapy

4    was that you had to be diagnosed by a mental health provider

5    before you could start hormone therapy.

6         And in many cases, patients weren't able to access that

7    psychological care because their insurance wouldn't cover it and

8    because they couldn't afford to pay out of pocket.

9         So providers in those clinics said, you know, we have to

10   provide care to this person.  You know, not providing care

11   because they don't have the resources to see a psychologist for

12   10 visits is not appropriate.

13        And so they, you know, essentially went -- you know, used

14   the concept that the standards are flexible and made sure that

15   patients understood that we're not -- we're not doing the thing

16   that WPATH says, but there is a good reason we are not doing it

17   and made sure they were okay with that departure from the

18   standard.

19        And you know, that's what the informed consent part of it

20   is about, that the patient understands you are departing from

21   the standard, and they consent to treatment.

22   Q.    And those health centers that are listed here -- Callen

23   Lorde Community Health Center, Fenway Community Health

24   Transgender Health Program, and the Tom Waddell Health Center --

25   what are those centers?

244

1    A.   They are all community health centers.  Tom Waddell is

2    actually a San Francisco Department of Public Health Clinic, but

3    they are historically clinics that treat and care for the LGBT

4    community.

5    Q.   So the first part of that first paragraph references what

6    you just described, the informed consent model.  And then the

7    last sentence of that first paragraph says:

8              "The SOC are flexible clinical guidelines; they allow

9              for tailoring of interventions to the needs of the

10             individual receiving services and for tailoring of

11             protocols to the approach and setting in which these

12             services are provided."

13        And then there is a cite to a study there by Ehrbar and

14   Gorton from 2010.

15        Is that right?

16   A.   Yes.

17   Q.   And that's a cite to a study that you did; correct?

18   A.   To a paper that I did, yes.

19   Q.   Can you explain how that paper addresses the topic of

20   tailoring the standards of care to particular patients.

21   A.   Yes.  So, basically, the idea was -- it was a discussion

22   paper for providers of care for transgender patients to sort of

23   examine their own model for providing care; that is, how much

24   and when is appropriate for them to deviate from the standard of

25   care.

1        So, for example, one of the examples we used in that was a

2    patient who also is wanting to get surgery and so needs to meet

3    the requirement of living in the target gender for 12 months.

4    And that's usually expected to be in either school or work or a

5    volunteer context, so something you do in the community.  And,

6    say, you had a patient who had such a profound disability that

7    they couldn't participate in schoolwork or volunteer activity.

8    It wouldn't be appropriate to say for this patient that, well,

9    because you can't do those things, we're not going to treat your

10   other condition.

11       So it was just sort of a way for providers to examine their

12   own model and their own comfort level in providing that care.

13   Q.   So it sounds like this concept of flexibility is intended

14   to address situations where experienced providers may need to

15   loosen the criteria due to individual patient circumstances; is

16   that fair?

17           MR. EATON:  Objection.  She is testifying.

18           THE COURT:  I'm sorry.

19           MR. EATON:  And leading.

20           THE COURT:  Well, I -- I think counsel is trying to

21   just paraphrase what the witness has already said.  I generally

22   give a fair amount of leeway as long as counsel is not putting

23   words in the witness's mouth, particularly in a court trial.

24       So I'll overrule the objection.  But, Counsel, be careful

25   not to testify from the lectern.

1          Go ahead.  You may answer.

2               THE WITNESS:  Can you ask the question again.

3               MS. WHELAN:  Could you read back that question, Court

4      Reporter.

5          (Question read by reporter.)

6               THE WITNESS:  Yes, that's correct.

7      Q.   BY MS. WHELAN:  Yesterday the parties heard testimony about

8      hormone treatments for transgender women.

9          Can you describe the physical effects a transgender woman

10     would experience from hormone medication.

11     A.   Sure.  So she will develop breasts.  Her facial hair is not

12     going to stop growing in, but it -- it will grow slower, and the

13     hairs might be a little thinner.

14         There is some changes in the skin.  You know, you produce

15     less sweat.  Sometimes people find they smell different.

16         Your distribution of fat and muscle in your body changes,

17     so you have a more feminine figure.

18         Those are some of the physical changes.  Also, to your --

19     in some patients -- not in all, but in some patients, the sex

20     drive diminishes, and also there's shrinkage of the testicles.

21     Q.   Typically, how long would it take for those physical

22     changes that you described to occur?

23     A.   You might notice the first beginnings of those changes

24     within the first month of treatment.  But it usually takes two

25     to three years to get the maximum effect that you're going to

1    get.

2    Q.   Can you describe what genital surgeries are used to treat

3    transgender women.

4    A.   The most typical surgery is the vaginoplasty, which is the

5    construction of a vagina.  And there is some different

6    techniques that you can use to do that, but probably the lion's

7    share of it is what's called a penile inversion vaginoplasty.

8         And what you do is you take the head of the penis and its

9    neurovascular pedicle that the nerves and the blood vessels that

10   run to it, and you preserve those, and that actually becomes the

11   clitoris.

12             MR. EATON:  Sorry, Your Honor.  I'm going to object to

13   the foundation.

14             THE COURT:  In what respect?

15             MR. EATON:  Well, I don't think he has been qualified

16   or has been established that he is able to testify as to SRS

17   surgeries and how those go.

18             THE COURT:  Overruled.  The witness clearly was

19   treating as a primary care physician transgender individuals.

20   And I think that's sufficient to -- since he would be making

21   referrals, presumably, for that surgery, I think that's

22   sufficient to establish that he would know what's involved in

23   the process.

24        The objection is overruled.  You may answer -- or continue

25   with your answer.

1          THE WITNESS:  So I think I was saying you preserve the

2     head of the penis.  The head of the penis is the clitoris.  And

3     then the shaft of the penis, essentially the tissue inside of

4     it, is removed; and it's inverted, and that's used to create the

5     vagina.  A space is created in the perineum, and that's

6     inserted.  The testicles are removed, and the scrotum is used to

7     create the labia majora.

8     Q.   And what are the goals of genital surgery for transgender

9     women?

10    A.   Well, the primary goal is to treat their gender dysphoria.

11    I mean, you know, when you treat gender dysphoria, it also will

12    sometimes diminish other mental health diagnoses.

13         You also get the benefit of removing the testicles, so

14    there is no more testosterone production.  And so it simplifies

15    hormone treatments in that you don't usually have to be on any

16    antiandrogen.  So if somebody is on --

17              THE REPORTER:  Could you slow down.

18              THE WITNESS:  Sorry.

19         It simplifies hormone treatment in that if people are on

20    any antiandrogen, that can be stopped usually.

21         And, for example, spironolactone, which is the antiandrogen

22    we use in the vast majority of transgender women, you can

23    discontinue that.

24    Q.   BY MS. WHELAN:  In your clinical experience, have you had

25    patients who had trouble accessing surgeries to treat their

1    gender dysphoria?

2    A.   Yes.

3    Q.   And what consequences have you observed in patients who had

4    trouble accessing that surgical care?

5    A.   So in -- so I started practicing with trans patients in

6    about 2005.  And in 2011 -- around 2011, things changed pretty

7    dramatically in that instead of most of my patients not having

8    access to surgery, most of them did.

9        Private insurers were covering it a lot more, and the state

10   Medicaid agency started covering it.

11       So in comparing those two times, I mean, before we were

12   able to get patient surgery, their dysphoria was inadequately

13   controlled, oftentimes causing severe suffering, sometimes with

14   disastrous consequences.

15       I have had patients -- I haven't had a patient since 2011

16   who committed suicide, but I had some patients who committed

17   suicide.  And I think that was a big contributing factor.

18       It's just -- there is a tremendous amount of suffering that

19   people experience if they can't get the surgery that they need.

20   Q.   Have you also provided follow-up care to patients who have

21   had genital surgery?

22   A.   I provide follow-up care to all my patients who have

23   genital surgery.

24   Q.   Approximately how many patients are you currently treating

25   who have had vaginoplasty?

1     A.   So I have about 100 trans patients on my panel.  So about

2     50 trans women, say.  And I would say probably 30 of them have

3     had vaginoplasty.

4     Q.   What therapeutic effects have you seen for patients who

5     have had genital surgery?

6     A.   The biggest one is that their dysphoria diminishes.  You

7     know, like I said, that's -- that's a huge thing, and that's

8     what we are treating with this.

9          But, I mean, there is secondary effects.  Like I said,

10    depression, anxiety can get better.  I have had patients who no

11    longer needed to take antidepressants.

12         The other thing, too, is when people are able to sort of

13    take care of this huge issue that they have, they can often then

14    focus on other things in life -- going back to school, getting a

15    job, you know, focusing on their relationships.

16         And certainly not in every situation, but, like, I had a

17    patient who was at times homeless, at times marginally housed

18    and had a really bad substance abuse problem who wanted surgery

19    and had to get clean for surgery; so he did and then stayed

20    clean after surgery.

21         And he has been clean and sober for several years, and he

22    actually works as a peer, a substance abuse counselor.  And he

23    does that, but then he is also going to school to get therapy

24    credentials to be an MSW.

25    Q.   Let's talk about Ms. Edmo in particular.

1      Can you explain what you were retained to do in this case.

2   A.   I was retained to evaluate whether or not she was getting

3   appropriate medical treatment for her gender dysphoria and, in

4   specific, whether or not she needed genital sex reassignment

5   surgery.

6   Q.   Can you explain what you did prior to writing your first

7   report in this case to form those opinions.

8   A.   So I reviewed some of her medical records from prison, and

9   I went to see her and evaluated her.

10  Q.   And when you say you reviewed some of her prison medical

11  records, did you later receive a full set?

12  A.   I did.

13  Q.   And the first set that you reviewed, what percentage would

14  you say is that of her full set that you later received?

15  A.   Maybe 80 to 90 percent.

16  Q.   Can you say a little bit more about the clinical interview

17  that you did of her at prison.  Can you describe that.

18  A.   So we were in a visiting room, and I essentially got her

19  history with regards to her gender dysphoria but also with

20  regards to other mental health issues she has, medical issues,

21  how she had been living as a woman in prison, what treatment she

22  had received, what benefits she'd received from those.

23  Q.   And after that evaluation and your review of her medical

24  records, did you come to a conclusion as to whether or not

25  Ms. Edmo has gender dysphoria?

1    A.    Yes.

2    Q.    And what was that conclusion?

3    A.    That, yes, she does have gender dysphoria.

4    Q.    Did you also determine whether Ms. Edmo needs surgery?

5    A.    Yes, she does.

6    Q.    When you assessed her need for surgery, did you use the

7    standards of care?

8    A.    I did.

9    Q.    Can we bring up again Joint Exhibit 15 at page -- I believe

10   it's 15-66.

11         Do you see that on the screen, Dr. Gorton?

12   A.    I do.

13   Q.    You used these criteria to assess surgery for Ms. -- the

14   need for surgery for Ms. Edmo; is that correct?

15   A.    Correct.

16   Q.    Can you go through those six factors and describe what you

17   found with respect to Ms. Edmo.

18   A.    Sure.  So the first one is a persistent well-documented

19   gender dysphoria.  And, you know, in my interview with her, this

20   has been a persistent symptom for her, and also her records that

21   I reviewed from prison, document that.  So I think she meets

22   that criteria.

23         The capacity to make a fully informed decision and to

24   consent for treatment, she didn't seem at all impaired in her

25   decision-making capacity.  So I think that's met.

253

1        She is obviously over the age of 18, so she meets criteria

2    3.

3        4 is if significant medical or mental health concerns are

4    present, they must be well controlled.  So from the medical

5    perspective, there is nothing that is a contraindication for her

6    to have surgery.  From the mental health perspective, other than

7    her gender dysphoria, she has depression, anxiety.  And those

8    are present, but they are not to a level that would preclude her

9    getting sex reassignment surgery.

10              MR. HALL:  Objection.  Foundation, move to strike.

11              MR. EATON:  Join.

12              MR. HALL:  The doctor is not a mental health provider.

13              THE COURT:  Well, the question, I think, is not --

14    well, I will overrule the objection.

15        The question is phrased in a way as to characterize the

16    extent or how the mental health problems would impact the

17    decision as to gender confirmation surgery.  Even though there

18    is a mental health component, it's primarily driven by the

19    doctor's expertise in this other area.

20        So I'll overrule the objection.  Go ahead and answer --

21    well, your answer stands.  Let's go ahead and put another

22    question before the witness.

23              MS. WHELAN:  Sure.

24    Q.   BY MS. WHELAN:  Could you just continue with the next two

25    prongs, Dr. Gorton.

1    A.    Sure.  So No. 5 is 12 continuous months of hormone therapy

2    appropriate to the patient's gender goals.  And she has that, as

3    documented in her medical record.

4          And then the final is 12 continuous months of living in a

5    gender role that is congruent with her gender identity.  I think

6    she exceeds this; right?  Because the idea is that you have to

7    live in the -- your target gender role, and she had been doing

8    that despite an environment that's very hostile to that and some

9    negative consequences that she has experienced because of that.

10   So, I mean, she is doing it despite that.  So she more than

11   meets that criteria.

12   Q.    Are you also aware that Ms. Edmo has attempted

13   self-surgeries?

14   A.    Yes.

15   Q.    What is the clinical significance of her self-surgery

16   attempts?

17   A.    Primarily that she has severe genital-focused gender

18   dysphoria and that she is not getting the medically necessary

19   treatment to alleviate that.

20   Q.    Do you think that Ms. Edmo engaged in self-surgery because

21   her depression or her anxiety are not well controlled?

22              MR. EATON:  Objection.  Speculation.

23              MR. HALL:  Join.

24              THE COURT:  Overruled.

25              THE WITNESS:  Even if she had no anxiety and no

1  depression, she still might have done this because it's -- the

2  depression and anxiety aren't driving it.  I mean, there is a

3  lot of people with depression and anxiety who don't remove their

4  testicles.  The dysphoria was driving this.

5          And the -- you know, essentially, it's a function of not

6  having access to medically necessary care.  And this isn't

7  unique to her situation or even unique to people with gender

8  dysphoria.

9          I mean, there is a case reported in the literature of a

10  Russian surgeon who was Antarctica and got appendicitis, and

11  there was nobody else to do it, so he took his own appendix out.

12          There was a woman, completely untrained, a Mexican woman

13  who performed a Cesarean section on herself, and she and her

14  child both survived -- in her kitchen.

15          And it's because these people are presented with extreme

16  circumstances where that's the only option.  And the only

17  difference between those is the diagnosis.  So in the Russian

18  surgeon, it was appendicitis; and in the Mexican woman, it was

19  failure to progress in labor.  And in Ms. Edmo's case, it's

20  gender dysphoria.

21  Q.  After you wrote your report in this case, you reviewed

22  additional documents; is that correct?

23  A.  Yes.

24  Q.  Do you recall what those documents were?

25  A.  Yes.  There were a lot of them.

256

1          So I got a more complete set of her medical records from

2     prison.  I got some -- not very much but some records from

3     before she was in prison, some medical records.  I got more

4     information about the DORs that were mentioned in the original

5     set that I got.  So I got more complete information about that.

6          There was a slide deck for a lecture that I think providers

7     had received about transgender care.  There were multiple

8     depositions.  There was Dr. Garvey and Dr. Andrade's reports.

9          I don't know if I'm missing anything, but that's what I can

10    think of now.

11    Q.   Have you seen anything in the documents you reviewed after

12    writing your report, that would change your opinion as to

13    whether Ms. Edmo's mental health issues are well controlled?

14    A.   No.

15    Q.   Have you seen anything in the documents you reviewed that

16    would change your opinion that Ms. Edmo needs genital surgery?

17    A.   No.

18    Q.   Do you think that a prisoner should be discipline-free for

19    some period of time before receiving surgery?

20    A.   Not at all.

21               MR. HALL:  Objection.  Foundation.

22               MR. EATON:  Join.

23               MR. HALL:  There has been no testimony that he has any

24    experience in prison or corrections.

25               THE COURT:  Rephrase the question as to whether that

1    would be an indicator that she would not be a good candidate.

2    It's roughly the same question, but I think rephrased, it would

3    probably resolve the objection of counsel.

4    Q.   BY MS. WHELAN:  Dr. Gorton, in your professional opinion,

5    would you ever consider disciplinary actions or even criminal

6    actions of a patient as precluding their medical need for

7    surgery?

8              MR. HALL:  Objection.  Foundation and it goes

9    towards -- well, Your Honor, it is compound.

10             THE COURT:  I'm going to overrule the objection.  Go

11   ahead.

12             THE WITNESS:  No.  And I couldn't do my job as an ER

13   doctor if I thought that, because we get a lot of prisoners that

14   are brought in for care.  And there have even been a few cases

15   where I was assaulted by somebody and pressed charges against

16   them, but I still had to treat them because I was the only

17   doctor there.

18        And in those cases, you have to make a bright line between,

19   you know, what the person did -- even if what the person did was

20   punch you in the face -- and the care that you treat.  You know,

21   somebody's medical care shouldn't be dependent on whether or not

22   they have committed a crime, and it would be supremely unethical

23   to even consider that.

24   Q.   BY MS. WHELAN:  Are you familiar with the term

25   "evidence-based medicine"?

1    A.    Yes.

2    Q.    Can you describe what that term means.

3    A.    So, basically, it's taking the sum of all medical

4    literature, all the evidence that we have about treating

5    patients and taking that data and applying it to the individual

6    patient that's in front of you to try and optimize the treatment

7    that you provide to optimize their ultimate outcome.

8    Q.    Do you believe that the WPATH standards of care are

9    supported by evidence-based medicine?

10   A.    I do.

11   Q.    Are you aware that some people have suggested that genital

12   surgery should not be provided because there is insufficient

13   high-quality evidence to support those surgeries?

14   A.    Yes.

15   Q.    How are you aware of that?

16   A.    I have come up with that argument -- or come up against

17   that argument before.  That was in the New York State Medicaid

18   case that I worked with.  I mean, that was their whole

19   contention, that this isn't supported by the medical literature.

20         And I mean, in this particular case, I think Dr. Garvey's

21   report says that.

22   Q.    Can you explain what high-quality evidence is in this

23   context.

24   A.    Well, the highest quality evidence is, you know,

25   meta-analysis.  So we bring a bunch of studies together, and

259

1       then each of those studies is a large, well-performed

2       double-blinded randomized controlled clinical trial that runs

3       for a very long period of follow-up.

4       Q.   And are those types of studies that you just described --

5       sorry.  Strike that.

6            Does that quality of evidence that you just described exist

7       for genital surgeries for transgender people?

8       A.   No.

9       Q.   Why doesn't that evidence exist?

10      A.   There is a lot of reasons.  You know, just going through

11      the type of studies, so it's not going to be a large study

12      because it's a rare disease.  So, I mean, nobody expects of that

13      a rare disease.

14           You can't do a double-blinded study, because in a

15      double-blinded study, neither the patient nor the provider knows

16      what treatment they received.  And this is, obviously, apparent

17      surgery, so patients are going to know what procedure they had.

18           You can't do a placebo-controlled trial because if you have

19      a treatment that you know is effective -- and we do; I mean, we

20      have been doing this for decades, and there is an adequate

21      evidence base to realize that this is effective -- you can't

22      say, well, I'm going to take 100 people, and 50 I'm going to

23      provide them the care that we know that works, and these other

24      50, I'm just going to watch them and see what happens, because

25      that's not ethical, you know.  Especially in a disease where

1    suicide is a significant complication, that's not okay.

2        I mean, we even do that -- like, if you're doing a study or

3    if you're in the middle of a study, like, if you're studying a

4    new cancer drug and you give -- half the people get the drug and

5    half get placebo, and then partway through the study, you

6    realize, wow, the patients that are getting the drug have a much

7    greater survival and their cancer is shrinking, you stop the

8    study.  You don't say, well, let's keep going with the study so

9    that we get good data and, in doing so, endanger the lives of

10   the people who got the placebo.

11       I mean, that's not medically ethical.  I mean, there is no

12   way you could get a placebo-controlled trial of trans surgery

13   study past an IRB.  You can't do it.

14   Q.   And what is an IRB?

15   A.   It's an institutional review board.  So if you're doing

16   research, you make a proposal and say, hey, this is the study

17   that I want to do this, and this is how I want to treat the

18   human subjects.  And they decide whether or not that's okay.

19   Q.   Your report in this case discusses a surgical evaluation

20   for Ms. Edmo that was done by Dr. Eliason.

21       Do you recall that?

22   A.   I do.

23   Q.   Can we bring up the Eliason assessment, which is Joint

24   Exhibit 1-538.

25            THE COURT:  Counsel, so we're clear, we have been

1    referring to this as, I think, 1-538.  That's really Exhibit 1,

2    page 538; is that correct?

3              MS. WHELAN:  That's correct.  I'm sorry.

4              THE COURT:  That's fine.  I just need to make sure the

5    record is clear for any appellate review.

6              MS. WHELAN:  Yes.  Thank you, Your Honor.

7              THE COURT:  I always have to cover my bets.  So go

8    ahead.

9    Q.   BY MS. WHELAN:  Dr. Gorton, is that up on your screen?

10   A.   Yes, it is.

11   Q.   Is this the assessment that you reviewed?

12   A.   Yes, it is.

13   Q.   Did you agree with this assessment?

14   A.   No.

15   Q.   Can you explain why you didn't agree with this assessment.

16   A.   Well, one, I didn't agree with the conclusion that he made

17   that she doesn't need surgery.  But, two, his reasoning I also

18   didn't agree with.

19   Q.   Can you explain why you didn't agree with his reasoning.

20   A.   So if you look at the thing that starts "A" with a colon

21   after it, that stands for "assessment," he talks about

22   situations where sex reassignment surgery might be medically

23   necessary, and he gives three examples.

24        And the first example isn't even germane to transgender

25   people.  That talks about people with intersex conditions.  I

1      mean, you can have coexisting intersex conditions and gender

2      dysphoria, but that's -- that's actually referring to problems

3      that intersex people have.

4          The third one is -- it says, "Some type of medical problem

5      in which endogenous sexual hormones were causing severe

6      physiologic damage."  And so that's the hormones that your body

7      makes itself, not ones that we give you.

8          So, I mean, I can't even -- that's -- it's almost kind of

9      bizarre.  I can't even think of a clinical circumstance where

10     that would be the case that your hormones that your body

11     produces are attacking you, so we have to give you sex

12     reassignment surgery.  I just don't understand what he is

13     talking about there.

14         And then the second one is it was -- he is talking about

15     how severe the dysphoria is, and that's legitimate.  But he

16     says, "Severe and devastating dysphoria that is primarily due to

17     genitals could potentially meet criteria."

18         And the criteria isn't severe and devastating dysphoria;

19     it's clear and significant dysphoria.  And that's the criteria

20     that I use and my colleagues use for assessing patients; right?

21     If I required my patients to have severe and devastating

22     dysphoria, over two-thirds of the people I refer for surgery

23     wouldn't get it.

24         You know, and the thing is even if you use his extremely

25     high bar, I think Ms. Edmo meets it.  Because, I mean, she tried

263

1    to cut her testicles off, twice.  If that's not something that

2    speaks to severe genital-focused dysphoria, I'm not sure what

3    is.

4    Q.   Do you agree with Dr. Eliason's statement that, quote,

5    "Medical necessity for sex reassignment surgery is not very well

6    defined and is constantly shifting"?

7    A.   Not at all.

8    Q.   Why don't you agree with that statement?

9    A.   I mean, this is something that we have been doing this for

10   decades.  You know, the first sex reassignment surgery that we

11   know of happened 101 years ago at the University of Oregon.  And

12   so we have been doing this for a long time.

13        We know it's effective.  And medical necessity is the

14   patient has a disease, and you have a treatment that we know to

15   be effective.  And that disease is to a clinically significant

16   level; that's medically necessary.  There is no argument about

17   the medical necessity of it.

18   Q.   What is your opinion about what might happen to Ms. Edmo if

19   she isn't provided surgery?

20             MR. EATON:  Objection.  Speculation.

21             MR. HALL:  Join.

22             MS. WHELAN:  May I, Your Honor?

23             THE COURT:  Just a moment.  I'm going to overrule the

24   objection.  I think this question goes to the very heart of the

25   issue before the court.

264

1          There, undoubtedly, is some measure of speculation.  But on

2     the other hand, the doctor has been involved in treating

3     hundreds of individuals suffering from gender dysphoria.  And I

4     think based on that, clearly, there would have to be an

5     understanding of what the consequences are if certain treatment

6     is or is not provided.

7          So I'm going to overrule the objection.  Counsel will be

8     allowed to explore the speculative nature, if there is one, of

9     the doctor's testimony during cross.

10         You may go ahead and answer.

11              THE WITNESS:  Can I have the question again.

12              THE COURT:  I was afraid of that.  Go ahead.

13    Q.   BY MS. WHELAN:  What is your opinion about what might

14    happen to Ms. Edmo if she isn't provided surgery?

15    A.   If she is not provided surgery, there is a very substantial

16    chance that she will try to attempt self-surgery again.  And

17    that's especially worrisome given her attempts have been

18    progressive.  Like her first attempt, she didn't make as much

19    progress as the second attempt.  So I think she might be

20    successful if she repeats that.

21         There is also a real chance that she will attempt or commit

22    suicide.

23    Q.   Why did you say in your report that surgery should be

24    provided to Ms. Edmo within six months?

25    A.   In my -- in the patients that I have treated, there is

1        something that I just kind of noticed that when people who have

2        been needing surgery for a long time finally realize they are

3        going to get it, even before they have surgery, their gender

4        dysphoria improves.

5            They -- you know, it's sort of like there is this -- you

6        know, a relief that comes that's, you know, they know they are

7        going to get the treatment that they want.

8            And so what happens is if there is a delay -- and that

9        could be because the patient gets appendicitis and can't have

10       surgery for a number of months, or, you know, there is a longer

11       wait for the surgeon to be able to get them in -- if it goes

12       more than about six months, that sort of anticipatory benefit

13       that you get with regards to their gender dysphoria starts to

14       fade away.

15           And so if I have patients who, for some reason, there is

16       going to be a delay past that, I actually bring them in and talk

17       with them about it and make sure things aren't getting worse.

18               THE COURT:  Counsel, we are past where we would take

19       the break, but I'll let you go for a few more minutes.  I don't

20       want to interrupt your line of questioning, either.

21               MS. WHELAN:  I'm about done, so I think that will work

22       if it works for you.

23               THE COURT:  Just a few more minutes?

24               MS. WHELAN:  Just a couple more minutes.

25               THE COURT:  All right.

1      Q.   BY MS. WHELAN:  How likely do you think that it is that

2      Ms. Edmo will regret surgery?

3      A.   Very, very low.

4      Q.   And on what do you base that opinion?

5      A.   One, my evaluation of her.  She has -- her gender dysphoria

6      is very genital-focused.  And so that makes her less likely to

7      regret it.

8           Also, if you look in the medical literature, regret rates

9      sort of overall generically for transgender patients are on the

10     order of 1 to 2 percent, which sounds like that's a big amount,

11     but it's actually -- like, if you compare it to, say, you know,

12     like prostate surgery or gastric bypass surgery, those have

13     regret rates in the 10 to 20 percent range.

14          And by "regret," I mean you're asking the patient

15     afterwards, "If you could go back in time and make this decision

16     again, would you still choose to do it?"  And that's -- you

17     know, so 1 to 2 percent for surgical procedures is actually not

18     bad.

19          And the other thing, too, is there is -- there have been a

20     few studies that have looked at predictors for which patients

21     are more likely to regret.  And the one that probably has the

22     strongest effect -- and I could not tell you why this is the

23     case -- but it's the sexual orientation of the transgender woman

24     in that trans women who are straight -- so their sexual

25     preference is for men -- tend to have much lower regret rates

1       than transgender women who are lesbians.

2       Q.   Are you also familiar with complications that can result

3       from genital surgeries for transgender women?

4       A.   Yes.

5       Q.   What are some of those complications?

6       A.   I mean, it's a major genitourinary surgery.  So you can

7       have infections; you can have complications with urine flow; you

8       can have dehiscence, where the wound doesn't perfectly heal.

9            You -- if patients don't, subsequent to surgery, dilate

10      their vaginas as they are supposed to, you can actually have the

11      vaginal depth decrease and the width decrease.  Those are things

12      that you can treat if they come up.

13           I mean, there is the -- in order to have surgery, you have

14      to have anesthesia, and anesthesia carries its own risks, which,

15      you know, you have a one-in-a-million shot that you're going to

16      die under anesthesia.  So there is that.

17           Though it's not -- the risks aren't particularly greater

18      than other similar genitourinary surgeries.

19      Q.   Based on your clinical experience, what is the likelihood

20      that Ms. Edmo's severe gender dysphoria will significantly

21      improve without surgery?

22      A.   Very low to none.

23                MS. WHELAN:  Thank you, Dr. Gorton.  I have no further

24      questions at this time.

25                THE COURT:  Counsel, let's just start cross after we

1          take a 15-minute break.  Try to hold it to 15 minutes, Counsel.

2          So, again, try to reconvene at 20 minutes to the hour.

3                   Court will be in recess.

4              (Recess at 10:28 a.m. until 10:44 a.m.)

5                   THE COURT:  I'll remind the witness that you're still

6          under oath.

7              I think we were ready for cross-examination, Mr. Hall -- or

8          Mr. Eaton.  Yes, Mr. Eaton.

9                              CROSS-EXAMINATION

10         BY MR. EATON:

11         Q.   Good morning, Dr. Gorton.  How are you today?

12         A.   Good.

13         Q.   Good.  As you know, my name is Dylan Eaton.  I represent

14         Corizon as providers in this lawsuit.  I talked with you at your

15         deposition.

16             Do you remember that?

17         A.   Yes.

18         Q.   That deposition was on September 25th?

19         A.   That sounds about right.

20         Q.   Sounds about right?

21             And so I have the privilege of asking you a few more

22         questions today.

23             First, have you -- you have never worked in a prison;

24         right?

25         A.   No, I haven't.

269

1    Q.   Okay.  And you have never been a part of a treatment group

2    or committee at a prison; correct?

3    A.   No.

4    Q.   And you have never provided treatment and care to an inmate

5    who had gender dysphoria or gender identity disorder while they

6    were incarcerated; correct?

7    A.   My patients have become incarcerated, but I was their

8    provider before but not during.  And I have treated patients

9    after prison if they are on parole, but not while they were in

10   prison.

11   Q.   Right.  And I understand when we talked at your deposition

12   that you told me you had some pre and post experience with

13   people that have been in prison.  But that wasn't my question.

14        My question is:  Have you -- you have never provided

15   treatment and care to an inmate who has gender dysphoria or

16   gender identity disorder while they were incarcerated; correct?

17   A.   Yeah, I haven't.

18   Q.   So that's a correct?

19   A.   Yes; correct.  Sorry.

20   Q.   And you are not a board-certified psychiatrist; correct?

21   A.   No, I'm not.

22   Q.   Correct?

23   A.   Correct.  Sorry.

24   Q.   Sorry.  I just need to watch the double negatives.

25        You are not a licensed psychiatrist; right?

1    A.    Correct.

2    Q.    And you're not a licensed clinician; right -- mental health

3    clinician?

4    A.    Correct.

5    Q.    All right.  And you are not a licensed therapist; correct?

6    A.    Correct.

7    Q.    And you are not a psychologist; correct?

8    A.    Correct.

9    Q.    Do you know what a certified correctional

10   healthcare -- health professional is?

11   A.    You mentioned it at the deposition, so that's about it.

12   Q.    So you don't know about that term?

13   A.    No.

14   Q.    Okay.  So safe to say that you're not a certified

15   correctional health professional?

16   A.    Correct.

17   Q.    And you do not perform gender confirmation surgery;

18   correct?

19   A.    No, I don't.  Correct.  Sorry.

20   Q.    Correct?  That's okay.

21         And just so I understand -- there has been confusion

22   sometimes about terminology -- is "sex reassignment surgery" an

23   okay term as well?

24   A.    Yes, that's fine.

25   Q.    And I just used the term "gender confirmation surgery."

1      Is that an appropriate term?

2   A.   They are used interchangeably.

3   Q.   Is that a newer term?

4   A.   Yes, it's more new.

5   Q.   What about "gender affirming surgery"?

6   A.   Those -- "gender affirming surgery" is a newer term as

7   well.

8   Q.   Is "gender affirming surgery" even newer than "gender

9   confirmation surgery"?

10  A.   They are both relatively new.  I don't know which one was

11  first, so...

12  Q.   Okay.  And you're not licensed to practice medicine in any

13  state other than California; right?

14  A.   Correct.

15  Q.   If there is a patient with complex mental health problems,

16  say, with several mental health comorbidities, you would refer

17  such a patient to a psychiatrist; correct?

18  A.   There is different contexts to answer that question.  Are

19  you talking about overall?  Are you talking about gender

20  dysphoria patients' referral for surgery?

21  Q.   No.  I'm talking about if a gender dysphoria patient has

22  complex mental health problems, you would refer them to a

23  psychiatrist, right, to address their mental health issues?

24  A.   It depends.  I mean, I have patients who come to me, who

25  have complex mental health problems who have previously seen a

1    psychiatrist, and they are very stable on their medicines.  And

2    so if they are stable, I just continue those medicines.

3        Certainly, if they became symptomatic or had problems, I

4    refer them back to psychiatry.

5    Q.   So you utilize psychiatrists in your practice, correct,

6    even for gender dysphoria patients?

7    A.   I do.  My clinic actually has psychiatrists there.

8    Q.   Okay.  You will refer your gender dysphoria patients often

9    to psychiatrists?

10   A.   My practice at my clinic is that -- so we have access to

11   psychiatrists; we also have access to therapists.  And so the

12   most common thing is I would refer a patient to a therapist.

13   Really, for psychiatry, it's more there is some meds management

14   issue that needs to be addressed.

15   Q.   So bottom line, at your Lyon-Martins clinic, you have

16   mental health professionals that you utilize; correct?

17   A.   Yes, absolutely.

18   Q.   And that includes clinicians?  Yes?

19   A.   Yes.

20   Q.   And that includes therapists?

21   A.   I think of those as the same things.  But, yes.

22   Q.   Okay.  And you utilize psychiatrists sometimes?

23   A.   Yes.

24   Q.   And that situation could be when there is complex mental

25   health issues and comorbidities, that would be an example of

1    when you might refer somebody to a psychiatrist; correct?

2    A.   As I answered before, sometimes, yes.

3    Q.   Now, you did not charge an expert fee for this case;

4    correct?

5    A.   That's correct.  They paid my expenses but no expert fee.

6    Q.   I think this is the first time I've had an expert not ask

7    for a fee at a deposition.  So thank you.

8         So you don't charge at all for fees for being here today or

9    for your testimony at deposition or any of the work you have

10   done on this case; correct?

11   A.   Correct.

12   Q.   And you don't charge a fee because it's a transgender case;

13   correct?

14   A.   No.  I actually did have one transgender case that I

15   charged a fee for.

16   Q.   Have you had transgender cases where you didn't charge a

17   fee other than this one?

18   A.   Correct, yes.

19   Q.   Most of them; right?

20   A.   Yes.

21   Q.   And then I believe you told me that you have charged a fee

22   when you were an expert witness in a Florida licensing case

23   involving a gynecologist; right?

24   A.   That's correct.

25   Q.   Okay.  There was some discussion with Ms. Whelan about some

1    of your involvement with groups when we were looking at your CV.

2        So you do legal -- you're a legal consultant and do

3    specific projects for the Sylvia Rivera Law Project, which is an

4    organization to assist transgender people, especially who are

5    poor or people of color; right?

6    A.    That's correct.

7    Q.    Right.  And you do legal consulting and projects for Lambda

8    Legal Defense and Education Fund, which handles LGBT cases?

9    A.    I mean, I think of it as medical consulting because I'm not

10   a lawyer, so -- I mean, to legal organizations, yeah.

11   Q.    So you do medical consulting for them?

12   A.    Yes.

13   Q.    Okay.  And Transgender Law Center, which works on

14   transgender precedent-setting cases, I believe is what you told

15   me?

16   A.    They do -- they do now.  They were a more direct service

17   organization years ago.

18   Q.    And you provided consulting and specific projects for them

19   as well; correct?

20   A.    Yes.

21   Q.    All right.  And National Center for Lesbian Rights, which

22   focuses on lesbian rights and, more broadly, LGBT issues, such

23   as transgender issues, you provide consulting and do specific

24   projects for them; right?

25   A.    That's correct.

1    Q.    And then the National Center for Transgender Equality,

2    you're involved with them as well; correct?

3    A.    To a small extent.

4    Q.    And you donate to some of these groups; correct?

5    A.    Yes.

6    Q.    Okay.  And I believe you mentioned you also get quite a few

7    calls from attorneys at the National Center for Lesbian Rights,

8    such as Ms. Whelan, who is one of Ms. Edmo's attorneys,

9    regarding various issues and questions on other matters; right?

10                MS. WHELAN:  Objection.  Misstates the evidence.

11                THE COURT:  Well, if you disagree, you can.  I'll

12   overrule the objection.

13                THE WITNESS:  I mean, I have worked on a handful of

14   projects with them, maybe less than six over 8 to 10 years.

15   But, you know, I'll get questions from people, you know, "Can

16   you work on this project?"  And if I have the bandwidth at that

17   time, I do.

18   Q.    BY MR. EATON:  So I remember discussing this at your

19   deposition.  And you indicated that you get calls fairly

20   frequently from Ms. Whelan or other attorneys, right, for other

21   projects?

22   A.    Are you speaking --

23                MS. WHELAN:  Objection.

24                THE COURT:  Just a moment.  What is the objection,

25   Ms. Whelan?

276

1          MS. WHELAN:  I'm sorry.  It just misstates the

2    deposition testimony, Your Honor.

3          THE COURT:  Well, let's put a question --

4          MS. WHELAN:  I mean, if he wants to show it to him --

5          THE COURT:  I'm going to sustain the objection and ask

6    counsel to put a question before the witness rather than just

7    make an observation.

8       Go ahead and proceed.

9    Q.   BY MR. EATON:  Do you remember discussing -- do you recall

10   when we were discussing that you would get phone calls from

11   Ms. Whelan on other cases during the deposition?

12   A.   I believe what I said is that, overall, I will not

13   infrequently get calls from the organizations you just

14   mentioned; there is a big list of them.

15      And so, overall, yeah.  But from Ms. Whelan, I think we

16   worked on two things, this and one other.

17   Q.   So she has contacted you occasionally, then, on other

18   matters?

19   A.   These two times, yes -- or this time and one other time.

20   Q.   All right.  Now, you mentioned in your deposition that you

21   realize that getting documentation of a person's prior mental

22   health treatment is important in assessing that person for SRS;

23   correct?

24   A.   Ideally, yes.

25   Q.   I'm sorry.  I didn't hear the first word.

1    A.    Ideally, yes.

2    Q.    You indicated that that is important; correct?

3    A.    You can't always get that information, but you should try,

4    yes.

5    Q.    Okay.  And after your clinical interview with Ms. Edmo, did

6    you request to receive or obtain any of her prior mental health

7    treatment records?

8    A.    I actually got more of her treatment records while she was

9    in prison, from the attorneys.  And like I said, I got some more

10   records from -- like, a very little bit -- from her previous

11   treatment before prison.

12   Q.    But did you ask for her preincarceration mental health

13   records at the time of your declaration in May of 2018?

14   A.    Honestly, I didn't know I could.  I mean, usually people

15   just hand you the stuff and say, "This is the data that you

16   have."  So, no, I didn't.

17   Q.    Did you ask Ms. Edmo if you could obtain any of her

18   preincarceration records?

19   A.    The thing is I didn't establish a physician-patient

20   relationship with her, and I made that very clear at the

21   beginning.  That's part of my boilerplate I explain to people.

22         So, you know, if I was seeing somebody and they are my

23   patient and I'm providing them care, I -- that's something I

24   typically do; I request their old medical records, if there

25   are -- if they exist and if they are germane.  But I didn't

1    think that that was something that I was supposed to do,

2    honestly.

3    Q.   So you did not ask Ms. Edmo --

4    A.   No.

5    Q.   -- for her preincarceration records; is that correct?

6    A.   No, I didn't.

7    Q.   Correct?

8    A.   Correct.  Sorry.

9    Q.   You did not obtain or review plaintiff's presentence

10   investigation or related documents regarding her convictions

11   prior to your declaration in May of 2018; correct?

12   A.   Correct.

13   Q.   So I want to be clear.  At the time of your May 29, 2018,

14   declaration in this case, you only reviewed medical

15   records -- the prison chart notes that you said you received

16   were about 80 or 90 percent of those records -- and had a

17   clinical interview with Ms. Edmo; correct?

18   A.   Correct.

19   Q.   And at the time you executed your declaration in May 2018,

20   you hadn't reviewed incident reports regarding Ms. Edmo;

21   correct?

22   A.   In her -- are you talking about DORs?

23   Q.   No.  Incident reports.

24        Do you know what those are?

25   A.   Can you give me a description.

1    Q.   I'm just wondering:  Do you know what they are?

2    A.   Well, I'll tell you what I saw in her chart, and you can

3    tell me if this is correct.

4         So there were notes that were written by clinicians in

5    regarding -- or in regards to disciplinary problems that she had

6    that, you know, answer questions like was her mental health a

7    mitigating factor or involved in this.

8         So that's what I had.  I don't know if that's what you're

9    talking about.

10   Q.   So you saw in the chart some references by clinicians

11   related to DORs that she had received?

12   A.   That's correct; yes.

13   Q.   But you hadn't actually seen the actual DORs at the time of

14   your May 2018 declaration; correct?

15   A.   That's correct.

16   Q.   When I say "DORs," you understand I'm talking about

17   disciplinary offense reports?

18   A.   Yes.

19   Q.   Okay.  At the time of your declaration in May of 2018, you

20   hadn't reviewed any of the Management and Treatment Committee

21   meeting minutes regarding Ms. Edmo; correct?

22   A.   That's correct.

23   Q.   At the time of your May 2018 declaration, you hadn't

24   reviewed sex offender treatment program records regarding

25   Ms. Edmo; correct?

1    A.   Correct.

2    Q.   At the time of your May 2018 declaration, you hadn't

3    reviewed preincarceration Sho-Ban Tribe medical records

4    regarding Ms. Edmo; correct?

5    A.   Correct.

6    Q.   At the time of your May 2018 declaration, you hadn't

7    reviewed any preincarceration records from Indian Health

8    Services regarding Ms. Edmo; correct?

9    A.   Correct.

10   Q.   At the time of your May 2018 declaration, you hadn't

11   reviewed any preincarceration records from Portneuf Hospital

12   regarding Ms. Edmo; correct?

13   A.   Correct.

14   Q.   At the time of your May 2018 declaration, you hadn't

15   reviewed any presentencing investigation; correct -- documents?

16   A.   Correct.

17   Q.   And at the time of your May 2018 declaration, you hadn't

18   reviewed any Bannock County Jail records; correct?

19   A.   I'm pretty sure not.

20   Q.   And at the time of your May 2018 declaration, you hadn't

21   reviewed any Idaho Department of Corrections gender dysphoria

22   policies or procedures; correct?

23   A.   Correct.

24   Q.   And at the time of your May 2018 declaration, you hadn't

25   reviewed any prior versions of the Idaho Department of

281

1        Corrections PREA policy; correct?

2        A.   Correct.

3        Q.   And just so we're clear, then, you executed another shorter

4        declaration again in this case on June 11th of 2018; right?

5        A.   I did.  And I believe that date is correct.

6        Q.   Okay.  And for that declaration, the only additional

7        information you reviewed was the complete prison medical chart;

8        correct?

9        A.   Partially correct.

10           There was -- what happened was I got a new set of records.

11       And I mean, she has massively long records.  So the attorneys

12       that I was working with actually gave me a one-page document

13       that said:  These are the pages that you didn't have.  So it

14       sort of highlighted the pages that I didn't have.

15           And so I read through those pages.  But, as it turned out

16       subsequently, there was -- I mean, they made an error in writing

17       down which pages were -- that hadn't been reviewed yet.  So

18       there was actually a small portion of her mental health records

19       that I didn't realize was added to that.  And then subsequent to

20       that second declaration, I became aware of that.

21           Sorry.  That's complex.

22       Q.   So if I understand you correctly, you received the complete

23       medical chart by the time you executed your declaration in June

24       of 2018?

25       A.   Yes.

282

1    Q.   Okay.  But you're saying that there were a few mental

2    health records that you didn't realize that were in that new

3    packet that were new; correct?

4    A.   Correct.

5    Q.   But other than that, all of the list of other documents I

6    just went through that you did not review for your May 2018

7    declaration, you also had not reviewed those for your June 2018

8    declaration; correct?

9    A.   I'm actually not entirely sure.  I mean, I -- what I recall

10   is that I got the subsequent set of records that were her

11   medical records.  And then after that, things kind of dribbled

12   in.  Like I would get, "Here is a report to read," "Here is a

13   deposition to read."

14        And I can't tell you for certain that none of those came

15   before the second declaration.  I just don't know the exact

16   dates.

17   Q.   Okay.

18   A.   I don't think it was the majority -- I mean, it certainly

19   was not the majority.

20   Q.   Well, at your deposition, we went through all of those, and

21   you indicated that all those that we just discussed, had come in

22   within the last few weeks of the deposition, at the end of

23   September; right?

24   A.   That certainly may be the case.  I mean, it was a little

25   bit fresher in my mind then.  So if I said that, that's probably

1    true.

2    Q.   And you certainly didn't have her preincarceration medical

3    and mental health records at the time of your June 2018

4    declaration; right?

5    A.   No, I don't believe I had those.

6    Q.   Now, in your deposition, we discussed paragraph 32 of your

7    May declaration.  And I can pull it up if you want me to, but we

8    discussed that the -- that Ms. Edmo reported that she saw a

9    psychiatrist through Indian Health Services who mentioned the

10   possibility of getting a diagnosis related to gender dysphoria;

11   and that if she wanted treatment, they would have to send her to

12   a specialist.

13        Do you recall discussing that with me?

14   A.   I recall discussing it, not the exact discussion.  But,

15   yeah, we talked about it.

16   Q.   Why don't we pull up that declaration, the May declaration,

17   paragraph 32.

18        So are you seeing this on your screen?

19             THE COURT:  Counsel, just for the record, is this part

20   of the court record?  And if so, can you give us a docket

21   number?  Or is it an exhibit?

22             MR. EATON:  This is a docket number.  It was filed

23   with the court.  So I believe the parties indicated they would

24   refer to the docket number for purposes of --

25             THE COURT:  Docket No. 62-1, the page is page 59.

284

1        MR. EATON:  Correct, Your Honor.

2        THE COURT:  Paragraph 32; is that what you said?

3        MR. EATON:  Yes, Your Honor.

4        THE COURT:  All right.

5   Q.    BY MR. EATON:  Are you seeing that, Doctor?

6   A.    Yes.  Sorry.  Yes.

7   Q.    And here, this is part of your declaration where you are

8   summarizing what she reported to you; is that correct?

9   A.    Correct.

10  Q.    And the last sentence says:

11           "She does report that a psychiatrist she had seen

12           through the Indian Health Service mentioned the

13           possibility of getting a diagnosis related to gender

14           dysphoria and said that if she wanted treatment, she

15           would have to send her to a specialist."

16  Do you see that there?

17  A.    I do.

18  Q.    I read that correctly?

19  A.    Yes.

20  Q.    And that was per Ms. Edmo's report; correct?

21  A.    That's correct.

22  Q.    And did you ever confirm this statement with any documents

23  or records?

24  A.    Again, all I had were the records from her -- the

25  incomplete prison records.

285

1    Q.   Well, you did not confirm that this statement with any

2    documents in this case; correct?

3    A.   No.

4    Q.   Correct?

5    A.   I'm sorry.  Correct.

6    Q.   And you mentioned that you interviewed Ms. Edmo for this

7    case; correct?

8    A.   Correct.

9    Q.   All right.  And you did not record that interview, either

10   audio or video; correct?

11   A.   Correct.

12   Q.   All right.  So the only documentation we have regarding

13   your clinical interview with Ms. Edmo is what you put in your

14   declaration; right?

15   A.   Correct.

16   Q.   And that lasted about two hours?

17   A.   Two, two-and-a-half hours, something like that.

18   Q.   And you -- the purpose of that was pretty much to get her

19   subjective history; correct?

20   A.   It was to get her subjective history, but I also did a

21   limited examination.

22   Q.   That was a no-touch medical examination; is that right?

23   A.   Correct.

24   Q.   So just observation?

25   A.   Observation and assessing her -- you know, like, it's part

1      of the physical exam, the psychiatry portion of a physical exam,

2      to assess level of depression.

3            So it would be in the objective section, but it's an

4      objective thing that you ask the patient about and your

5      observations.

6      Q.   You didn't ask the patient to disrobe; right?

7      A.   No, I did not.

8      Q.   And you didn't examine her breasts or her anatomy or

9      anything; correct?

10     A.   Not beyond what I could see through her clothes, like her

11     body habitus.

12     Q.   Now, your counsel talked to you about the WPATH standards

13     of care.

14           You're a member of WPATH; correct?

15     A.   Correct.

16     Q.   And I believe you mentioned you served on the

17     Institutionalized Persons Committee for WPATH; is that right?

18     A.   Correct.

19     Q.   And do you recall telling me in your deposition that you

20     could not recall any person on that committee that worked in a

21     prison; right?

22     A.   Correct.

23     Q.   All right.  So could you pull up Plaintiff's Joint

24     Exhibit 15.  That's the WPATH standards.  Let's go to the next

25     page.  One more.  One more.  Keep going.  I'm trying to get to

1    the first page.  Let's go to the second page.

2        You see this is the document you were talking with your

3    counsel about, "The standards of care are flexible clinical

4    guidelines"; right?

5    A.   Correct.

6    Q.   So you admit that one of the main -- first of all -- sorry.

7    Could we go back one page.

8        If you could look at the second paragraph, this is purposes

9    and use of standards of care just generally; right, Doctor?

10            THE COURT:  Can you zoom in on that.

11            MR. EATON:  Can we zoom in on the -- there we go.

12   Second paragraph.

13   Q.   BY MR. EATON:  So you can see the start of this first --

14   second paragraph, it says:

15            "One of the main functions of WPATH is to promote the

16            highest standards of healthcare for individuals

17            through the articulation of standards of care for

18            health of transsexual, transgender, and gender

19            nonconforming people."

20       Do you see that?

21   A.   I do.

22   Q.   You agree with that; right?

23   A.   Yes.

24   Q.   Isn't it the purpose of WPATH to set a higher standard of

25   care than the bare minimum?

288

1    A.   I don't know what you're specifically talking about.

2    Q.   Well, it's trying to set a high bar for treatment and care

3    of gender dysphoria cases; correct?

4    A.   As far as the quality of care, yes.

5    Q.   Let's go to the next page, please.  Zoom out and go to the

6    next page.  We went one too far.  Page 2.  Go back up one.

7         And again, now we're on the section, "The standards of care

8    are flexible clinical guidelines," that you were talking with

9    your counsel about; correct?

10   A.   Yes.

11   Q.   And so you admit that WPATH standards of care are intended

12   to be flexible in order to meet the diverse healthcare needs of

13   transsexual, transgender, and gender nonconforming people;

14   right?

15   A.   Yes.

16   Q.   Indeed, the section says its standards of care are flexible

17   guidelines; correct?

18   A.   Correct.

19   Q.   Clinical guidelines.

20        And you admit that the WPATH criteria put forth in this

21   document for hormone therapy and surgical treatments for gender

22   dysphoria are clinical guidelines; right?

23   A.   Yes.

24   Q.   And that's what it says right there on the first

25   paragraph -- or the second paragraph, first sentence; right?

1          Second paragraph, first sentence:

2               "As for all previous versions of the standard of care,

3               the criteria put forth in this document for hormone

4               therapy and surgical treatments for gender dysphoria

5               are clinical guidelines."

6          Right?

7     A.    Yes.

8     Q.    And then you agree that individual healthcare professionals

9     and programs may modify them, as it says there; correct?

10    A.    Yes.

11    Q.    And I believe you talked with your counsel about some

12    examples of what it means to be flexible; correct?

13    A.    Correct.

14    Q.    All right.  But those are just examples; right?

15    A.    Yeah, they are examples.

16    Q.    So there is nothing in WPATH that provides an exhaustive

17    list of when you can be flexible; right?

18    A.    They provide a pretty broad list there in the second

19    sentence.  You know, anatomic, social, psychological situations;

20    an experienced health professional's evolving method of handling

21    a common situation; research, a little-researched area, or harm

22    reduction.  So, I mean, that's --

23    Q.    Where are you looking?

24    A.    That's the sentence following the one that you said.  They

25    give examples.  I mean, that's a pretty broad list.  I mean, my

1      examples were much more specific, you know.  But they are giving

2      the broad sort of groups of departures.  They are not giving

3      specific examples like this patient with this clinical

4      situation.  They are saying social situations and anatomic

5      situations and an experienced provider's evolving method of

6      treating patients.

7          So these are kind of global groups, not really so much

8      examples.

9      Q.   But it says "may come about."

10         So these are examples; right?  Examples of categories?

11     A.   Yeah, categories.

12     Q.   Now, you would agree that treatment and care of gender

13     dysphoria patients has been evolving over the last 10 years;

14     right?

15     A.   Yes.

16     Q.   We discussed some of those.  But terminology has changed,

17     for instance, SRS versus gender confirmation surgery?

18     A.   Correct.

19     Q.   And the diagnosis of gender identity disorder was changed

20     to gender dysphoria; right?

21     A.   That's correct.

22     Q.   All right.  And over the last 10 years, hormone dose range

23     recommendations have changed over the years, too; right?

24     A.   Not a lot but some, yes.

25     Q.   Now, I believe in our -- in your deposition, you indicated

1    that you liberally refer your gender dysphoria patients to

2    mental health therapy; right?

3    A.    If they need specific issues addressed, yeah.

4    Q.    But you do that often with your patients; right?

5    A.    Always with patients who are being referred to surgery.

6    And not always -- I would say not in the majority of the

7    patients who it's not specifically related to surgery.

8    Q.    Well, it's a helpful tool that you utilize with your

9    patients; right?

10    A.    Absolutely, in some patients, yes.

11    Q.    All right.  And you believe, don't you, that psychotherapy

12    is important for Ms. Edmo; right?

13    A.    I do.

14    Q.    You believe that it's important that she goes to mental

15    health groups; correct?

16    A.    If they are good-quality mental health groups, yes.

17    Q.    Now, you acknowledge that Ms. Edmo was properly diagnosed

18    with gender identity disorder in 2012 by Dr. Eliason; correct?

19    A.    Correct.

20    Q.    And you also acknowledge that Ms. Edmo was properly

21    diagnosed with gender identity disorder in 2012 by Dr. Lake;

22    correct?

23    A.    Correct.

24    Q.    Now, I wanted to talk to you briefly about elevated liver

25    enzymes.

1    You mentioned that that's a concern in your declaration in

2    this case; correct?

3    A.   Correct.

4    Q.   All right.  So now, another issue you mention in your May

5    2018 declaration relates to management of medications or

6    hormones when plaintiff had elevated liver enzymes in 2018;

7    right?

8    A.   It was the end of 2017, like late December into 2018.

9    Q.   And into January of 2018?

10   A.   Correct.

11   Q.   Now, as I understand it, you take issue with plaintiff

12   being taken off spironolactone hormone in late February 2018

13   when she likely still had elevated liver enzymes; right?

14   A.   I think she may have been taken off in January.  But, yes,

15   I do.

16   Q.   Well, let's pull up the June declaration.  Let's go to the

17   last paragraph in this declaration.  Actually, it's the last

18   page, top there.

19       So on page 3, we're looking at your June declaration;

20   correct, Doctor?

21   A.   Correct.

22   Q.   All right.  At the very bottom of page 3, it starts with

23   the word "it."  Do you see that?

24       Like a sentence start with "it" and then carries onto

25   page 4.

1    A.    Yes, I see that.

2    Q.    All right.  That says:

3              "It appears from the records that Ms. Edmo has not

4              been taking any spironolactone or any other adequate

5              antiandrogen since February 19, 2018."

6    Correct?

7    A.    It does.

8          Though she was taken off in January, I think they restarted

9    it.  That's probably why I remember January.

10   Q.    What I'm getting at is that then she was stopped for a

11   while on February 19, 2018; correct?

12   A.    Well, I think she was briefly started and then stopped

13   again on the 19th.

14   Q.    Right.  It was stopped for sure on the 19th?

15   A.    Correct.

16   Q.    And in your May 2018 declaration, you opine that the

17   spironolactone is likely not causing elevated enzyme -- liver

18   enzymes; right?

19   A.    Correct.

20   Q.    In fact, you go so far as to say that there was virtually

21   no chance that spironolactone caused Ms. Edmo's elevated liver

22   function tests; correct?

23   A.    I don't know if those are the exact words.  But, yes.

24   Q.    Would you please pull up the June 11th declaration,

25   paragraph 14.  I'm sorry.  I have been saying "June."  I think

294

1       it's July.

2           You understand that that's the one I'm referring to; right,

3       Doctor?

4       A.   Yeah.  You have got the dates better than I do, so...

5       Q.   So the last sentence in paragraph 14, you say:

6               "As I opined in my May 2018 declaration, there is

7               virtually no chance that spironolactone caused

8               Ms. Edmo's elevated liver function tests."

9           Right?

10      A.   Correct.

11      Q.   And you also opine that the Effexor, also called

12      venlafaxine, is the most likely cause of her elevated liver

13      enzymes; correct?

14      A.   No.  What I said is, of the medicines she is on, if one of

15      those medicines caused it, venlafaxine is the most likely

16      culprit.

17      Q.   Okay.  Let's look at the May declaration, paragraph 59,

18      last line.

19          So in this declaration paragraph, last line at the top of

20      page 24 of your declaration, page 72 of document 62-1, it says:

21              "The medication change is extremely concerning since

22              venlafaxine is the most likely medication prescribed

23              to Ms. Edmo that would cause elevations in LFTs."

24          Correct?

25      A.   Yes.  Again, I was talking about, of the medications she is

1    taking, that's the most likely culprit.  But that's not my

2    opinion that that was the most likely cause of the elevated

3    liver function test; just that if you're going to blame the

4    medicine, the venlafaxine is the more likely culprit.

5    Q.   Okay.  But you don't disagree with that sentence in your

6    declaration?

7    A.   No.  Because I was talking about the most likely medicine

8    prescribed to her.

9              THE COURT REPORTER:  Would you -- "No, because"?

10             THE WITNESS:  No.  Because -- I totally lost what I

11   said.

12   Q.   BY MR. EATON:  I was just asking if you agreed with that

13   sentence.  I wasn't really asking for anything more.

14   A.   Sorry.  Yes.

15   Q.   Okay.  And you take issue with her being left on a high

16   dose of Effexor during this time frame in February and March

17   2018; right?

18   A.   I believe what I was saying in paragraph 59 was that she

19   was on a high dose of Effexor, and then they increased her

20   Effexor, and the mental health provider hadn't looked at her RA

21   result of liver function tests.

22        And we know that in about 1 percent of people who take

23   Effexor -- at the max dose, about 1 percent will have elevated

24   liver function tests.

25        So if you're going to go over that max dose, and she

1    recently had LFTs that were elevated, I would not do that.

2    Q.   Right.  In fact, you said you would cut the Effexor in half

3    if you were her provider; right?

4    A.   I would cut the dose by some.  I probably said "half"

5    there.  That sounds reasonable.

6    Q.   Okay.  So her spironolactone was discontinued in February

7    19 of 2018, and she was still on the Effexor going into March;

8    correct?

9    A.   Correct.

10   Q.   All right.  And so could we pull up the lab from March.  If

11   you would scroll down a little bit.

12        So this is a lab from March 6 of 2018.  And we have been

13   talking about elevated liver enzymes.

14        What in the lab do you look at to make those

15   determinations?

16   A.   So there is several tests that look at liver inflammation,

17   liver function.  So the two that are highlighted there, AST and

18   ALT, those are proteins that are found in liver cells.  And so

19   if the cells get damaged, those get released in the circulation

20   and will go out.  So that's a marker for inflammation or damage

21   to liver.  But there is also markers of the function of the

22   liver.

23        For example, the two top tests, albumin and bilirubin -- so

24   albumin is a protein made by the liver.  So if your liver is not

25   functioning well, that may go down.

297

1           Bilirubin is actually a waste product of red blood cells

2       being destroyed eventually, and that can go up if your liver's

3       metabolic function is not able to break down all the waste

4       products your body is -- your body is producing.

5       Q.   So, in any event, the March 6th, 2018, lab here for

6       Ms. Edmo shows that her liver function was normal; correct?

7       A.   Correct.

8       Q.   After being taken off spironolactone; correct?

9       A.   Yes, but I don't think those are related.

10      Q.   And she is still on Effexor at this point?

11      A.   I believe so, yes.

12      Q.   Let's pull up the May declaration, paragraph 84.  I'm not

13      sure if it's paragraph or page 37.  I think it's paragraph 37.

14           Let's try page 37 -- oh, I'm sorry.  Paragraph 84.

15           So just to help the doctor, why don't you scroll up to the

16      prior page.

17           Just to orient you, Doctor, this is your section where you

18      are talking about surgery, in your opinion, is medically

19      necessary to treat Ms. Edmo's gender dysphoria; right?

20      A.   Correct.

21      Q.   All right.  And then let's scroll down.

22           And you list the criteria in WPATH there; right?

23      A.   Correct.

24      Q.   And then scroll down to page 48.

25           And you're talking about in part -- you're going through

1        the criteria in this section, correct, for Ms. Edmo?

2        A.   My computer screen didn't move.  Did you move to a

3        different place?

4        Q.   I'm still on page 84.

5        A.   I'm on page 37.

6        Q.   I'm sorry.  It's paragraph 84.

7        A.   Oh, sorry.  Okay.  Yes.

8        Q.   Are we on the same page now?

9        A.   Yes.

10       Q.   Are we on the same paragraph now?

11       A.   Yes.  Got it.

12       Q.   So in this paragraph, you are going through the WPATH

13       criteria as you believe they apply to Ms. Edmo; right?

14       A.   Yes.

15       Q.   Okay.  And where I highlighted there, you are talking about

16       the criteria for whether her mental health issues are well

17       controlled; right?

18       A.   Yes.

19       Q.   You say her mental health issues are also reasonably well

20       controlled; right?

21       A.   Correct.

22       Q.   You don't analyze any of her mental health issues in this

23       declaration; right?

24       A.   In this particular paragraph, no.  I mean, but I think I

25       mentioned them elsewhere.

1          This is my bigger declaration; right?  The first one?

2     Q.   This is your -- yes, your longer declaration.

3     A.   I mentioned her anxiety and depression and assessed those.

4     Q.   But you don't address those here when you're talking about

5     the criteria for SRS; correct?

6     A.   In this paragraph 84, no.  I just am talking about what I

7     have already seen or what I have already stated.

8     Q.   Now, WPATH, the final standard for SRS is 12 continuous

9     months living in a gender role that is congruent with their

10    gender identity; right?

11    A.   Correct.

12    Q.   All right.  And you determined that she has fulfilled that?

13    A.   I did.

14    Q.   The WPATH doesn't further elaborate on how to apply this

15    criteria in a prison setting; right?

16    A.   Correct.  I mean, they say it's applicable in a prison

17    setting, but they don't give specific guidance.

18    Q.   Well, that's in the one-and-a-half-page section that in

19    WPATH that just applies to institutions generally that includes

20    prisons but other institutions as well; correct?

21    A.   Correct.

22    Q.   Right.  And that's not -- the prison setting is not

23    addressed in the specific criteria in WPATH for SRS; right?

24    A.   Well, it's like the -- you know, the Institutionalized

25    Persons Committee.  Yes, it's applicable to people in nursing

1       homes, but 95 percent of the issues are about prisons.  And the

2       same thing with the institutionalized persons comment in WPATH.

3       Yes, it's about all the circumstances, because you shouldn't

4       ignore those.  But the vast majority of times this comes up,

5       it's related to prisons.

6       Q.   But the section on SRS criteria in the WPATH, that section

7       doesn't address prison settings and how it applies; correct --

8       how the criteria applies?

9       A.   Well, those criteria apply broadly across the board to

10      anybody who is transgender.

11      Q.   Well, again, it doesn't elaborate on how to apply the 12

12      months living in gender role as a congruent person with their

13      gender identity in a prison setting?  It doesn't address that

14      any further, correct, in a prison setting?

15      A.   It doesn't do it in any setting.  So, no.  I mean, they are

16      not specific about where they are applied.  They are just

17      applicable to the disease.

18      Q.   That might be where the flexibility comes in in the

19      guidelines; right?

20      A.   I don't understand what you're asking.

21      Q.   It doesn't define where the -- how to apply the section in

22      different settings.

23           So there could be some flexibility there; correct?

24      A.   Yes.

25      Q.   Now, you did not recommend SRS be performed immediately at

1    the time of your declarations in this case; correct?

2    A.   Well, I said within six months, but immediately would have

3    been great, too.  I gave a range because I didn't think the day

4    after I evaluated her that they were going to come in and give

5    her surgery, so...

6    Q.   Well, if you thought there was a medical need for her to

7    get it immediately and within a month, you would have said that;

8    right?

9    A.   I would have specifically -- I mean, I set the range based

10   on my clinical experience with patients.  So I think within six

11   months is a reasonable range.

12              MR. EATON:  Okay.  Could you read my question back to

13   the witness, please.

14          (Question read by reporter.)

15              THE WITNESS:  I mean, it's not like your appendix is

16   going to rupture and you have to get surgery tonight.  So all

17   patients who are treated for this, they are seen, they are

18   evaluated, there is a process you have to go through.  It's not

19   something that happens overnight.  So that's not -- I mean,

20   that's not what you do clinically.

21        So, I mean, I would never say this person needs emergency

22   sex reassignment surgery.  Let's send them in an ambulance to

23   the hospital.  That's kind of absurd.

24   Q.   So it's a process for dealing with when SRS is appropriate;

25   right?

1    A.   That's correct.

2    Q.   And you thought -- it was a guesstimate that within six

3    months, SRS would be appropriate; right?

4    A.   Well, it's based on my clinical experience with my

5    patients, what I have observed.

6    Q.   So you tell them, your patients, that you should get SRS

7    within six months?

8    A.   No.  I tell my patients that we're going to refer you for

9    SRS.  And in most cases, that actually happens within six

10   months.  From the time that I see them, we pretty quickly get

11   them in to see a mental health provider and get them referred.

12        But occasionally there are things that come up that make

13   that process longer.  And so I don't tell patients, "Hey, we're

14   going to get this by six months."  I'm like, "We are referring

15   you for this.  Most of them go in under those windows."  And the

16   ones that don't, there ends up being an issue.

17   Q.   And I believe in your deposition, you indicated that it's

18   not uncommon for a surgeon to schedule a vaginoplasty out five

19   months or more; right?

20   A.   It depends on the surgeon.  You know, there are some

21   surgeons that are backed up.  And if a patient wants a specific

22   surgeon, like I want Dr. Marci Bowers, she is going to have to

23   wait for it.  But if she is willing to go to another surgeon,

24   she can get it sooner.

25   Q.   But you don't recall talking to me in your deposition about

1       that's approximately -- it takes a surgeon approximately

2       five -- excuse me -- five months to get the sex reassignment

3       surgery scheduled?

4       A.   I may.  I mean, you know, it's a range.  It depends on the

5       surgeon.

6            But, sure.  If you can point me to what I said, I can tell

7       you if it's accurate.  But I don't know -- this is a better way

8       of saying it:  I don't know if I said specifically five months.

9       But there is a range that providers do; and some of the more

10      popular ones, you have to wait longer.

11      Q.   Five months wouldn't be unreasonable, for instance, to wait

12      for an SRS; right?

13      A.   No.  Five months wouldn't be unreasonable.

14      Q.   And you're critical of Dr. Eliason's SRS assessment; right?

15      A.   Correct.

16      Q.   Now, you understand that Dr. Eliason had mostly been Edmo's

17      treating psychiatrist since 2012; right?

18      A.   I saw a couple of notes from Dr. Eliason, but most of the

19      mental health notes that I saw in her chart weren't from him.

20      Q.   You didn't see periodic treatment notes from Dr. Eliason

21      over the years?

22      A.   I did, but there were a lot of other mental health notes,

23      so I didn't know if he was her primary.

24      Q.   Okay.  But you understand he was one of her treaters, her

25      treating psychiatrists, over the years since 2012; right?

1   A.   Sure.  On the mental health treatment team, that's

2   legitimate to say.

3   Q.   And you realize that Dr. Eliason diagnosed Ms. Edmo with

4   GID in 2012; right?

5   A.   Correct.

6   Q.   And you understand that Dr. Eliason had been seeing

7   Ms. Edmo periodically to discuss her mental health care issues

8   and manage her medications, such as Zoloft, over the years since

9   2012; right?

10   A.   I remember there were at least a couple of notes.

11   Q.   Where he was managing her mental health care; correct?

12   A.   Correct.

13   Q.   And you acknowledge that Dr. Eliason spoke with Ms. Edmo at

14   the time of the April 2016 SRS evaluation and documented her

15   subjective reporting in that note; right?

16   A.   Correct.

17   Q.   All right.  And you acknowledge that Dr. Eliason documented

18   his objective observations at the time; correct?

19   A.   Correct.

20   Q.   And you acknowledge that Dr. Eliason did an assessment on

21   plaintiff; right?

22   A.   Correct.

23   Q.   And you acknowledge that Dr. Eliason's plan was that a

24   combination of hormonal treatment and supportive counseling was

25   sufficient at that time for her gender dysphoria; right?

1    A.   That he -- that he said that, yes.

2    Q.   And you acknowledge that he says that he will -- would

3    continue to monitor and assess the inmate throughout her stay at

4    the facility where he worked?

5    A.   Correct.

6    Q.   Do you know where he worked?

7    A.   The same facility where she was at, possibly others.

8    Q.   Do you have an understanding of whether there is a

9    behavioral health unit at that facility that's separate from the

10   general population?  Do you understand that?

11   A.   Do you mean are prisoners at a behavioral health level at

12   that institution?  Yeah.

13   Q.   Do you have an understanding of whether there is a separate

14   behavioral health facility or section separate from general

15   population?

16   A.   Like, to house the prisoners?  Yes.

17   Q.   Okay.  And you acknowledge that Dr. Eliason staffed the

18   SR -- his note says he staffed the SRS decision with other

19   medical and mental health providers; right?

20   A.   Other mental health providers, yes.  But I don't remember

21   their exact credentials, so I'm not sure if one of them was a

22   medical provider other than Dr. Eliason.

23   Q.   Okay.  Why don't we pull up that note.  It's probably in

24   the Dr. Eliason folder, Corizon records.

25        So this is the document you were talking with your counsel

1    about, the SRS assessment by Dr. Eliason?

2    A.   Correct.

3    Q.   All right.  If you scroll down or if we could highlight the

4    first paragraph where it says, "A," there is -- "27-year-old

5    male," is what that paragraph starts with --

6    A.   Correct.

7    Q.   -- in the middle.

8    A.   I see that.

9    Q.   I'm just asking her if she can zoom in on that a little

10   bit.

11        So the note indicates, in the middle there:

12             "I staffed this case with Dr. Jeremy Stoddart,

13             Dr. Murray Young, Jeremy Clark, LCPC, clinical

14             supervisor and WPATH member, and they agreed with my

15             assessment."

16        Do you see that there?

17   A.   I do.

18   Q.   So he staffed this with others; right?

19   A.   Yeah.  But, like I said, I still didn't know if

20   Dr. Stoddart or Dr. Young are psychologists or other medical

21   providers, so...

22   Q.   Well, you see the reference to Jeremy Clark, a clinician

23   who indicates has WPATH training; right?

24   A.   Well, it says he is a WPATH member.  There is no training

25   required to be a member.

1    Q.   Well, you would agree that it's appropriate for Dr. Eliason

2    to staff the SRS decision with other providers, including a

3    clinician who was associated with WPATH; right?

4    A.   You can be a member of WPATH by sending them a check and

5    filling out a form.  So, I mean, I don't know Dr. Clark's

6    credentials.

7         I mean, it should be staffed with people who are

8    experienced in taking care of transgender individuals because

9    that's the issue at question.

10   Q.   You wouldn't fault someone for consulting with someone that

11   has an understanding of WPATH standards; right?

12   A.   No, but I don't know if Mr. Clark has that.

13   Q.   And you acknowledge that his note states he considered

14   criteria and determined he did not meet the criteria for SRS;

15   right?

16        He mentioned --

17   A.   He said -- yeah.  He says "does not meet criteria for

18   medical necessity for sex reassignment surgery."

19   Q.   Okay.  And if we could scroll down just a little bit.

20        And Dr. Eliason documented Ms. Edmo's other mental health

21   disorders, including major depressive disorder and alcohol use

22   disorder, on the bottom there; correct?

23   A.   Correct.

24   Q.   Now, I want to switch gears a little bit and talk to you

25   about regret and suicide.

1          At least one of your --

2          We can clear out of that and maybe pull up another one here

3      in a second.

4          So you told me at your deposition at least one of your

5      patients who had SRS -- and I'm talking about sex reassignment

6      surgery -- was successful at committing suicide after the

7      surgery; correct?

8      A.   I had a patient -- I think we talked about a patient of

9      mine who tried to do self-surgery who committed suicide after

10     surgery.

11     Q.   You don't recall telling me that one of your patients who

12     had SRS was successful at committing suicide after surgery?

13     A.   I mean, when you say "SRS," you mean a surgeon performed

14     it --

15     Q.   Right.

16     A.   -- not a patient?

17     Q.   Right.

18     A.   I can't recall someone right now, not that I referred to

19     get SRS.

20     Q.   Okay.  Could we pull up his deposition, page 246, line 22.

21         So you see at the bottom there, it says, question:  "And of

22     those that have had SRS, there was one that was successful at

23     committing suicide; correct?"

24         And you responded "yes"?

25     A.   The one I'm referring to is somebody who had SRS who had

1       SRS -- like, I didn't refer them for it; they got that back in

2       the day.

3       Q.   I'm sorry.  I'm not following you.

4       A.   So it was somebody who had SRS, but it was not my referral

5       for SRS.  They came to me having -- being status postsurgery.

6       Q.   So it wasn't your patient, but you're aware of somebody

7       that had SRS that then committed suicide after; is that what

8       you're telling me?

9       A.   Yeah, it was my patient.  But, like, it wasn't like they

10      came to me, I diagnosed them with gender dysphoria, and then

11      they had surgery and then --

12                   THE REPORTER:  Would you slow down.

13                   THE WITNESS:  I'm sorry.  It wasn't a patient that I

14      saw diagnosed, referred for, and they had surgery and then

15      committed suicide.  It is somebody who previously had had

16      surgery before I saw them, before they became my patient; and

17      then, subsequently, they committed suicide.

18      Q.   BY MR. EATON:  Okay.  And at your deposition, we talked

19      about three other of your patients have attempted suicide after

20      a vaginoplasty; correct?

21      A.   Yes, but not completed.

22      Q.   And you estimated a handful of your patients have attempted

23      suicide after their surgeries; right?

24      A.   We're talking about the three and the one.  So four, "a

25      handful"?

310

1    Q.   Well, of all the patients that have had SRS to some degree,

2    you estimate that a handful of your patients have attempted

3    suicide after those surgeries; right?

4    A.   I'm sure that's correct.  That's fair.

5    Q.   And you had one patient who expressed regret after an

6    orchiectomy --

7         Am I saying that right?

8    A.   Correct.

9    Q.   -- an orchiectomy, which is surgery to remove the

10   testicles, and then sued you and your clinic; correct?

11   A.   Sued several people in my clinic, yes.

12   Q.   Including you?

13   A.   Yes.

14   Q.   Could we please pull up the Defendants' Exhibit 2038, page

15   27.  Let's look at this first page.

16        Doctor, do you remember discussing the Endocrine Society

17   guidelines with me?

18   A.   Correct, yes.

19   Q.   And if you scroll down just to the bottom of that page, it

20   will show that that's the 2017 guidelines; correct?

21   A.   Correct.

22   Q.   All right.  Let's go to page 27.

23        Is the Endocrine Society -- that's a good guide; correct?

24   It's a helpful guide and resource for you and other doctors?

25   A.   This particular guideline?  Yes.

1    Q.   Yes.

2    A.   Yes.

3    Q.   Okay.  So I put a little highlight there next to the

4    paragraph.  There is a sentence that says:

5              "Further insight into the characteristics of persons

6              who regret their decision postoperatively would

7              facilitate better future selection of applicants

8              eligible for sexual reassignment surgery."

9    Do you see that?

10   A.   I do.

11   Q.   You agree with that?

12   A.   Yes.

13   Q.   And then the next sentence says:

14             "We need more studies with appropriate controls that

15             examine long-term quality of life, psychosocial

16             outcomes, and psychiatric outcomes to determine the

17             long-term benefits of surgical treatment."  And it's

18             referring to SRS.

19   Do you see that?

20   A.   I do.

21   Q.   And you agree with that?

22   A.   Yes.

23   Q.   Now, you acknowledge that Ms. Edmo -- you can take that

24   exhibit down.

25             MR. EATON:  Your Honor, I would move to admit that.

312

1           THE COURT:  What was the exhibit number again?

2           MR. EATON:  Sorry.  The exhibit is Defendant's Exhibit

3   2038.  It's the Endocrine Society guidelines.

4           THE COURT:  Any objection?

5           MS. WHELAN:  No objection.

6           THE COURT:  2038 will be admitted.

7      (Defendants' Exhibit 2038 admitted.)

8   Q.   BY MR. EATON:  Do you knowledge that she -- Ms. Edmo

9   received a bra at the prison from early on, soon after she

10  received her hormones; correct?

11  A.   I don't know the exact timing, but yes.

12  Q.   She has had it for a long time, since soon after --

13  A.   For years, yeah.

14  Q.   -- sex -- or soon after the hormone therapy, correct,

15  started?

16  A.   For years.  I mean, soon -- I don't know what you mean by

17  "soon."  So -- but, yes, she has it for quite some time.

18  Q.   Sorry.  We were talking over one another there.  Let me try

19  it again.

20       So since 2012, Ms. Edmo has had access to a bra; correct?

21  A.   I don't know if it was 2012, but that certainly sounds

22  reasonable.

23  Q.   You're aware that she currently has access to panties;

24  correct?

25  A.   Currently, yes.

1    Q.   And she has had panties in the past at times; correct?

2    A.   She has had panties that she has obtained or created for

3    herself but not that were given to her to treat her gender

4    dysphoria.

5    Q.   And what is a gaff?

6    A.   A gaff is an undergarment that is used by transgender women

7    to tuck the penis and the testicles against the perineum so

8    that, one, they don't sort of feel the penis and the testicles

9    as much and, two, so it makes it so that they don't appear to

10   have a penis and testicles.

11   Q.   Are you aware of any record showing that Ms. Edmo requested

12   a gaff?

13   A.   I think she may have.  I'm not entirely sure, but that

14   sounds familiar.  There were a lot of records.

15   Q.   You don't know?

16   A.   I'm not sure, yeah.

17   Q.   Now, in your declaration, you indicated Ms. Edmo reports

18   wearing women's underwear almost exclusively and wearing either

19   women's clothes and feminine men clothes; she would dress

20   feminine and go out with her friends to parties.  And that was

21   referring to preincarceration.

22        Do you recall that?

23   A.   I do.

24   Q.   Okay.  That's accurate, from what she told you?

25   A.   Correct.

1     Q.   And she reported to you that she used extensive -- she

2     had -- she used makeup extensively before prison; correct?

3     A.   Yes.

4     Q.   Let's pull up the May 2018 declaration, paragraph 47.  Can

5     you scroll up just a tiny bit.

6          Are you seeing this paragraph 47, Doctor?

7     A.   Yes.

8     Q.   Okay.  That's your paragraph in one of your declarations;

9     right?

10    A.   The first declaration, yes.

11    Q.   Okay.  And this first sentence says, quote:

12               "Prior to Ms. Edmo's first appointment with Dr. Alviso

13               in 2016, her medical records contain no real

14               transgender history," end quote.

15         Right?

16    A.   That's correct.

17    Q.   Is that a correct statement, Doctor?

18    A.   No.  As we talked about in my deposition, I didn't have the

19    Dr. Alviso and Dr. Lake records when I initially saw her.  And

20    then I got the complete set of her medical records before the

21    second declaration I made, but the pages that were indicated

22    that these are the records that you didn't get initially,

23    actually didn't include Dr. Eliason's and Dr. Lake's notes.

24         So when I wrote this, I hadn't read those.  So that's not

25    correct.

GORTON - Cross

315

1    Q.   Nevertheless, you made conclusions about Corizon and

2    IDOC --

3         Actually, scroll down, please, a little bit more.

4         You made assumptions, nevertheless, that -- this is the

5    last sentence:

6              "It is also possible, however, that the prison

7              officials failed to access this history because even

8              if they had it, they are precluded by prison policy

9              from providing adequate care, such as surgery and

10             access to female commissary items."

11        You came to that conclusion; right?

12   A.   I said it was possible, yes.

13   Q.   And that was -- and that sentence is referring to her not

14   having a transgender history; right?

15   A.   Well, it is also true that even with those histories done,

16   the -- that statement actually still stands that it's possible

17   that you could change it to "Even though they assessed her

18   history, they were precluded by prison policy from providing

19   adequate care."

20   Q.   So you are wanting to change your declaration; is that

21   right?

22   A.   This particular -- well, what I'm saying is the first part

23   of that paragraph was incorrect because I didn't have those

24   records at the time.

25        The second part of the paragraph, that it's possible that

1      she was not -- that she was not provided that care because it

2      was precluded by prison policy.

3      Q.   But that sentence is based on her not having a transgender

4      history; correct?

5      A.   That -- yeah, I was particularly talking about it there,

6      but, yes.

7      Q.   And again, you hadn't reviewed any prison policies at the

8      time of this declaration; right?

9      A.   Well, what I read were responses in her medical record that

10     said, "No, you can't have this; that's against policy."

11         You know, so did I read the policy?  No, when she was told,

12     you can't have this because of the policy.

13         So I assume the people who were responding to her -- I

14     don't even know what they are called -- the requests for

15     treatment that she puts in -- know the policy enough to be able

16     to state it.

17              MR. EATON:  I'm going to move to strike that response

18     as narrative and nonresponsive.  And I would ask the court if we

19     could get an answer to the question, please.

20              MR. HALL:  Join.

21              THE COURT:  Restate the question.

22     Q.   BY MR. EATON:  My question was:  At the time you executed

23     the declaration, this document 62-1 -- I believe we talked about

24     this earlier -- you had not read any Idaho Department of

25     Correction policies or procedures; correct?

1    A.   Policies or procedures, no.

2    Q.   Correct?

3    A.   Correct.

4    Q.   And why is it important to have transgender history?

5    A.   It's important in every clinical situation where you're

6    treating a patient to have a history so that you can base their

7    care on that.

8    Q.   And you acknowledge now that Dr. Eliason and Dr. Lake both

9    provided a transgender history in their documents in 2012 when

10   they were assessing her for GID; correct?

11   A.   Correct.

12   Q.   Doctor, you don't know one way or another the

13   qualifications of Jeremy Clark, the clinician that we were

14   talking about that was referenced in Dr. Eliason's record;

15   right?

16   A.   From his record, I mean, it has his educational -- I mean

17   the letters after his name.  I mean --

18   Q.   It shows he's --

19   A.   -- I don't know what training he had or what school he went

20   to, no.

21   Q.   Right.  So you don't know, one way or another, his

22   qualifications -- Jeremy Clark's; correct?

23   A.   Well, I know some of his qualifications in that he is

24   licensed --

25   Q.   You just know --

1     A.    -- as a clinician.

2     Q.    Sorry.  You just know his label after his name; correct?

3     A.    Yes, that he is licensed as a clinician.

4           MR. EATON:  Your Honor, I don't believe I have any

5     further questions at this time.

6           THE WITNESS:  Your Honor, could I get a bathroom

7     break?

8           THE COURT:  Yes.

9        Counsel, why don't we -- we will probably end up taking two

10    breaks since we're going to go I think until 3:00 or

11    thereabouts.  Why don't we take a 15-minute break now, and then

12    we'll see how that plays out.

13       We will be in recess for 15 minutes.

14       (Recess at 11:59 a.m. until 12:20 p.m.)

15          THE COURT:  Dr. Gorton, I'll remind you you are still

16    under oath.  And I will ask you to speak a little more slowly, a

17    little more clearly to make it easy on the court reporter.

18       I think -- Mr. Hall, I think we are ready for your cross.

19          MR. HALL:  No additional cross for defendants.

20          THE COURT:  All right.  You made it easy.

21       Ms. Whelan, redirect.

22          MS. WHELAN:  Thank you.

23                         REDIRECT EXAMINATION

24    BY MS. WHELAN:

25    Q.   Dr. Gorton, there was a question about why you are working

1       pro bono on this case and just being compensated for expenses.

2           Do you remember that?

3       A.   I do.

4       Q.   Can you explain why you're doing that.

5       A.   I'm very well compensated as an ER doctor, and I think it's

6       an ethical requirement as a professional, as a healthcare

7       provider that, if you're able to, you should do some pro bono

8       work.

9           So all the work that I have done at Lyon-Martin is pro

10      bono.  And because of my experience working at the clinic, I

11      have a set of -- you know, a knowledge and skill set that is

12      sometimes useful in other situations.

13          And so I, you know, use that in situations like this.  And

14      it's the same reason.  I mean, I think if you're -- you know,

15      being a doctor has certain responsibilities, and I think one of

16      them is that you have to do some pro bono work in a society

17      where not everybody has access to care.

18      Q.   Now, defense counsel asked you about a number of categories

19      of documents that you've now reviewed.

20          Do you recall that?

21      A.   Yes.

22      Q.   And since you have reviewed all of those documents, have

23      they changed your opinion about whether Ms. Edmo needs surgery?

24      A.   No.

25      Q.   And what is that opinion?

320

1      A.   That she needs genital sex reassignment surgery.

2           MS. WHELAN:  Thank you.  I have no further questions.

3           THE COURT:  All right.  Give me just a moment,

4      Counsel.

5           All right.  I guess I have none.

6           Any recross?

7           MR. EATON:  Just one question, Your Honor.

8           THE COURT:  Yes.

9                         RECROSS-EXAMINATION

10     BY MR. EATON:

11     Q.   Are you aware that Dr. Ettner, the other expert in this

12     case, charges a fee?

13     A.   I know Dr. Ettner charges a fee.  I don't know if she is

14     charging it in this case, but I assume so.

15          THE COURT:  All right.  You may step down.  Thank you

16     very much, Dr. Gorton.

17          Plaintiffs may call their next witness.

18          MS. RIFKIN:  That completes plaintiff's witnesses,

19     Your Honor.

20          THE COURT:  I'm not sure who is going to go first from

21     the defense.

22          Mr. Hall.

23          MR. HALL:  Your Honor, in the interest of time, we are

24     going to kind of mix up witnesses as to who is going to call

25     who.

```
1              THE COURT:  All right.

2              MR. HALL:  IDOC is going to call witness Jeremy Clark

3       at this time.

4              THE COURT:  Mr. Clark, would you step before the clerk

5       and be sworn.  Just come forward, sir.  Ms. Bracke will place

6       you under oath.  Step a little closer.

7              JEREMY JUNIOR CLARK, DEFENDANT'S WITNESS, SWORN

8              THE CLERK:  Please take a seat in the witness stand.

9         Please state your complete name and spell your name for the

10      record.

11             THE WITNESS:  Jeremy Junior Clark.  J-E-R-E-M-Y,

12      J-U-N-I-O-R, C-L-A-R-K.

13             THE COURT:  You may inquire, Mr. Hall.

14             MR. HALL:  Thank you, Your Honor.

15                          DIRECT EXAMINATION

16      BY MR. HALL:

17      Q.   Good afternoon, Mr. Clark.

18      A.   Good afternoon.

19      Q.   How are you employed?

20      A.   I'm employed with Idaho Department of Corrections.

21      Q.   And in what position?

22      A.   I'm a clinical supervisor.

23      Q.   And how long have you had that position?

24      A.   It will be six years this November.

25      Q.   And what are your duties in that position?
```

1    A.   I have supervised -- direct supervisors over our clinical

2    staff.  I have supervised our behavioral health unit, our acute

3    mental health unit, provide consultation, clinical consultation.

4    I have also done sex offender treatment consultation.

5         I believe that's it.

6    Q.   How long have you been employed with the Idaho Department

7    of Corrections?

8    A.   Six years this November.

9    Q.   And in that time period, have you held other positions?

10   A.   I have been a member of our Management and Treatment

11   Committee.  I have also -- shoot.  That would be it.

12   Q.   You mentioned a Management Treatment Committee.  Can you

13   tell the court what that is, please.

14   A.   It's a multiple-disciplinary team that the Department has

15   to address treatment and planning and security issues associated

16   with our transgender population, our inmates that have gender

17   dysphoria.

18   Q.   Is that a specific committee set up to address the mental

19   health needs and housing of the gender dysphoric inmates?

20   A.   Yes, that's correct.

21   Q.   Okay.  And when you started on that, approximately how many

22   inmates had a diagnosis of GD or GID?

23   A.   Say, approximately 10.

24   Q.   And has that since expanded?

25   A.   Yes, it has.  We're just over 30 currently incarcerated.

CLARK – Direct

323

1    Q.   So over the last six years, approximately, it's gone from

2    10 diagnosed to 30 now?

3    A.   Yes, that is correct.

4    Q.   And what is the role of the MTC?

5    A.   We review when an appropriate assessor does an assessment

6    on somebody for gender dysphoria.  The Management and Treatment

7    Committee reviews that assessment, determines if it's

8    appropriate, develops a treatment plan that would include mental

9    health services, medical services, and we recommend housing

10   placement.

11   Q.   And does the MTC review the treatment and situations of all

12   of the GD offenders?

13   A.   Yes, that is correct.

14   Q.   And is that throughout the entire state in all

15   institutions?

16   A.   Yes, that is correct.

17            THE COURT:  Just so I'm clear, the 30 inmates you

18   refer to, is that throughout all the institutions or just at the

19   medium-security facility?  Or does IDOC try to have all of the

20   gender dysphoric inmates housed at one facility?

21        There are a lot of questions in that, but I think you

22   understand.

23            THE WITNESS:  Early on, we tended to keep them in one

24   facility, but now they are throughout all the facilities, even

25   in our current female facilities.

1          THE COURT:  So the 30 includes inmates at all

2     facilities?

3          THE WITNESS:  Yes, that is correct.

4          THE COURT:  But the same Management and Treatment

5     Committee oversees treatment for all of them?

6          THE WITNESS:  Yes.

7          THE COURT:  All right.  So I just wanted to get that

8     clarified before we moved on.

9     Q.   BY MR. HALL:  Does the Management Treatment Committee make

10    medical decisions?

11    A.   No.

12    Q.   Okay.  And who makes those medical decisions?

13    A.   They are referred to a medical provider to determine those

14    needs.

15    Q.   I want to talk about your qualifications, Mr. Clark.

16    Placed in front of you is a copy of your CV marked as

17    Defendant's Exhibit 2019, page 1.

18         Do you recognize this document?

19    A.   Yes, I do.

20    Q.   Does that set forth accurately your qualifications?

21    A.   Yes, it does.

22    Q.   Okay.  Did you create this document?

23    A.   Yes, I did.

24    Q.   And is this document current?

25    A.   Yes.

1          MR. HALL:  Your Honor, move to admit Defendant's

2     Exhibit 2019.

3          THE COURT:  Any objection?

4          MS. RIFKIN:  No.

5          THE COURT:  The exhibit will be admitted.

6     (Defendants' Exhibit 2019 admitted.)

7     Q.   BY MR. HALL:  Are you familiar with the World Professional

8     Association for Transgender Health?

9     A.   Yes, I am.

10    Q.   And what is that organization, to your knowledge?

11    A.   It's an international organization that addresses the needs

12    for transgender population and gender-nonconforming population

13    and individuals who have gender dysphoria.

14    Q.   Now, there has been some testimony about membership.

15         Are you a member of the WPATH?

16    A.   Yes, I am.

17    Q.   What does that mean?

18    A.   Essentially, I -- you pay a fee every month, but you have

19    all the resources available to you from that association;

20    articles.  I receive periodic emails about updates about what's

21    going on within the association.  You're notified about

22    conferences throughout the world that address transgender

23    health.

24    Q.   And how long have you been a member?

25    A.   Since late 2013.

**CLARK - Direct**

326

1    Q.   And are you aware that the WPATH provides some competency

2    requirements or criteria for individuals who are going to be

3    working with gender dysphoric patients?

4    A.   Yes.

5    Q.   Okay.  Do you recognize the document --

6    A.   I do.

7    Q.   -- placed here in front of you marked Joint Exhibit 15,

8    page No. 28?

9    A.   Yes, I do.

10   Q.   Okay.  And do you recognize that as the criteria that's set

11   forth by the WPATH?

12   A.   Yes.  It's in their Standards of Care Version 7.

13   Q.   I would like to go through some of these.  The first one is

14   a master's degree or its equivalent in a clinical behavioral

15   science field.

16        Do you meet that requirement?

17   A.   Yes, I do.

18   Q.   In what way?

19   A.   I have a master's degree in counseling and guidance.

20   Q.   And what is your -- what is your certification?

21   A.   Do you mean my licensure?

22   Q.   Your licensure.

23   A.   I'm a licensed clinical professional counselor here in the

24   State of Idaho.

25   Q.   LCPC; correct?

1    A.    Yes, that is correct.

2    Q.    Okay.  Tell the court about that position or that

3    licensure.

4          Are you permitted to diagnose?

5    A.    Yes, I am permitted to diagnose.

6    Q.    And is it within your scope of practice to provide

7    psychotherapy?

8    A.    Yes.

9    Q.    And does that include individual therapy, group therapy?

10   A.    And I have had training in family therapy as well.

11   Q.    Okay.  Let's take a look at the second criteria.

12         Do you have competence in using the Diagnostic Statistical

13   Manual of Mental Disorders?

14   A.    Yes, I do have training.

15   Q.    Is that the DSM?

16   A.    Yes.

17   Q.    And you've had training in that?

18   A.    Yes.

19   Q.    And where have you obtained training in that?

20   A.    It started in my graduate school.  I have had other

21   trainings because it changed to a different version about four

22   or five years ago, I believe.  And I had training to update with

23   that.  And I actually did some training at a lower level on

24   this; undergraduate level.

25   Q.    And other than training, have you used the DSM in your

1    professional experience?

2    A.   Yes, for the past 11 years as a licensed professional in

3    Idaho.

4    Q.   Is that a document that you consult frequently in your

5    profession?

6    A.   Yes.

7    Q.   The third criteria is the ability to recognize and diagnose

8    coexisting mental health concerns and to distinguish these from

9    gender dysphoria.

10        Do you have competency in that?

11   A.   Yes, I do.

12            MS. RIFKIN:  Objection, Your Honor.  Lacks foundation.

13   Mr. Clark has been named as a nonretained expert witness by

14   defendants.

15            THE COURT:  Well, the witness -- okay.  My

16   understanding is that counsel is trying to establish that the

17   witness has the credentials to meet the requirements for the

18   WPATH criteria to be a gender dysphoria treatment provider.  And

19   I think that's all we're testifying to, not offering opinions,

20   per se.

21            MS. RIFKIN:  Mr. Clark hasn't testified to any

22   experience with gender dysphoria at this point, which is a

23   prerequisite to answering a question, his opinion about No. 3

24   here, the ability to recognize and distinguish --

25            THE COURT:  Well, he can have him explain what -- I'll

1    overrule the objection.

2              MR. HALL:  Right.  Right.

3    Q.   BY MR. HALL:  Mr. Clark, do you have familiarity in

4    recognizing and distinguishing coexisting mental health concerns

5    from gender dysphoria?

6    A.   Yes, I do.

7    Q.   Okay.  And can you explain that.

8    A.   Through my experience treating and talking with both

9    inmates, I have dealt with multiple mental health issues, and I

10   have also worked with the inmates that do have gender dysphoria

11   along with those other issues, such as schizophrenia and other

12   mood disorders.

13   Q.   And have you reviewed the DSM's criteria for diagnosis of

14   gender dysphoria?

15   A.   Yes.

16   Q.   And have you applied that to patients who have diagnosis of

17   gender dysphoria?

18   A.   Yes.

19   Q.   So you would say you're familiar with gender dysphoria as

20   it's defined under the DSM?

21   A.   Yes, I am.

22   Q.   Okay.  And what is your understanding as to coexisting

23   mental health concerns?

24   A.   If someone has a diagnosis of gender dysphoria, it is

25   possible to have other identified mental health disorders, such

1    as mood disorders, possible personality disorders, psychosis,

2    and other identified mental health disorders.  Substance abuse

3    would be another example.

4    Q.    And is it your understanding that the WPATH is only

5    concerned with diagnoses or mental health concerns?

6    A.    Mental health concerns.

7    Q.    Okay.  How do those differ from a diagnosis of a mental

8    health disorder?

9    A.    From my standpoint, the diagnosis is a label, a name to put

10   on a set of behaviors.  When you're talking about mental health

11   behaviors, you take all the issues that the person is having --

12   whether it's depression, anxiety, gender dysphoria -- and you

13   need to take that into consideration in your treatment.

14   Q.    The fifth criteria is knowledge about gender-nonconforming

15   identities and expression in the assessment and treatment of

16   gender dysphoria.

17         Do you have knowledge about gender-nonconforming identities

18   and expressions?

19   A.    Yes.

20   Q.    Would you tell the court what your knowledge is.

21   A.    When I was asked to become a WPATH member, at that time I

22   have attended four -- I believe it was four conferences, some

23   presented by WPATH, where I was able to get training in that

24   what is constituted as someone who is cisgender, gender

25   nonconforming, transgender.  And I have also read several

1    articles that also talks about those distinctions.

2    Q.   Can you name some of those articles?  I think there is --

3    A.   I presented a few.  Osborne and Lawrence comes into play.

4    I can't think of the exact titles of the articles at this time.

5    Q.   Mr. Clark, I have placed in front of you here Exhibit

6    No. 19 -- Joint Exhibit 19-1.

7         Do you recognize this article?

8    A.   Yes.  That's the article I was referring to, Osborne --

9    written by Osborne and Lawrence.

10   Q.   And you have read this article; is that what your testimony

11   was?

12   A.   Yes.

13   Q.   Okay.  And have you relied upon that article in your

14   profession?

15   A.   I have.

16   Q.   Mr. Clark, the sixth criteria speaks about continuing

17   education in the assessment and treatment of gender dysphoria.

18        Have you obtained continuing education in the assessment

19   and treatment of gender dysphoria?

20   A.   I have, through those conferences presented by WPATH.  I

21   have also started their global training -- I can't think of the

22   word, but their program where they are starting to provide more

23   specific training to professionals such as myself, to help us

24   better treat folks with gender dysphoria.

25   Q.   And you mentioned WPATH trainings.

CLARK - Direct

332

1       Describe for me those.  What are those?

2   A.   There have been several conferences.  I have been to

3   Oakland.  I've been to Chicago.  I've been to Los Angeles where

4   they put on two- to three-day trainings where they provide

5   classes that address transgender, gender nonconforming, and

6   training for folks with gender dysphoria.

7   Q.   And these trainings that were in Oakland, Chicago, and

8   Los Angeles, were those trainings put on by WPATH?

9   A.   The one in Oakland was not, but it was sponsored.  But the

10  others were sponsored by WPATH, yes.

11  Q.   So the one in Oakland was sponsored by WPATH, but it wasn't

12  hosted by WPATH?

13  A.   That's correct.

14  Q.   Have you been to any other trainings over the last, say,

15  five years where you received experience in -- continuing

16  education in the assessment and treatment of gender dysphoria?

17  A.   During this year, early this spring, we had our all

18  clinical staff training, and we had some people from the

19  Washington State DOC come and talk to us about their program for

20  assisting the transgender population of people with gender

21  dysphoria.

22       And I have provided some training for our staff, based on

23  the trainings I have been to, to help educate them as well.

24  Q.   And have you provided training to mental health clinicians

25  at IDOC on gender dysphoria topics?

1    A.   Yes, at least twice.

2    Q.   And have you been involved in any trainings at IDOC that --

3    where outside speakers have come?

4    A.   That one that happened this year, we brought people from

5    Washington State DOC.

6    Q.   Okay.  And do you remember who those people were from

7    Washington State DOC?

8    A.   I cannot remember at this time.

9    Q.   And what was the subject matter that those individuals

10   spoke on?

11   A.   Mainly the management, how they were managing the inmates

12   with gender dysphoria, how they looked at it, how they assessed

13   it.  They also had a multiple disciplinary team that was very

14   similar to our Management and Treatment Committee and how they

15   used that.  And so we did a lot of comparison.

16        They also gave some basic stuff, like what -- definitions

17   of what gender nonconforming, transgender, and other topics like

18   that.

19   Q.   And were you present during a presentation provided by a

20   Dr. Levine?

21   A.   I was.

22   Q.   Do you remember when that was?

23   A.   It was in the summer of 2016.

24   Q.   And do you recall what the subject matter of Dr. Levine's

25   presentation was?

334

1   A.   It was his opinion on different paradigms associated with

2   people with transgender issues and gender dysphoria.  And he

3   gave some suggestions on how to manage the inmates in prison.

4   And he quoted a lot from the Osborne and Lawrence article that

5   you had up earlier because that had just come out as well.  And

6   so he used those topics.

7   Q.   At part of that presentation, did you get the understanding

8   that Dr. Levine's opinion was that SRS surgery for a gender

9   dysphoric inmate is never appropriate?

10                MS. RIFKIN:  Objection.  Leading.

11                THE COURT:  Sustained.  Rephrase that question.

12   Q.   BY MR. HALL:  What were the -- did you arrive at any

13   conclusions as to the opinions that Dr. Levine had presented

14   during his presentation?

15   A.   In general, it was talking about the different paradigms,

16   what might explain why a person experiences gender dysphoria.

17   In the end, it was suggestions that caution should be taken when

18   talking about things such as sexual affirming surgery, talked

19   about medical necessity and his opinions about that and also

20   time frames, making sure that you can address all the issues a

21   person may have in prison because it's a different environment

22   compared to the community.

23   Q.   Do you recall Dr. Levine making any opinions as to the

24   appropriateness of surgery for a gender dysphoric inmate?

25   A.   I felt he emphasized, actually, that it was appropriate and

1    that it needed to happen when it was appropriate.

2    Q.   Did you ever hear Dr. Levine espouse an opinion at that

3    presentation that SRS is never appropriate for a gender

4    dysphoric inmate?

5    A.   I did not.

6    Q.   What is your understanding as to the criteria under the

7    WPATH for sexual reassignment surgery or gender confirmation

8    surgery?

9    A.   Documented persistent gender dysphoria.  They have to be of

10   the age of consent.  They have to be able to give informed

11   consent.

12          MS. RIFKIN:  Objection, Your Honor.  Counsel has put a

13   document on in order to coach the witness about how to answer.

14          THE COURT:  Well, isn't this --

15          MR. HALL:  It's an admitted exhibit, Your Honor.

16          THE COURT:  It's an admitted exhibit.  I --

17          MS. RIFKIN:  He asked his understanding and then put

18   the document in front of the witness.

19          MR. HALL:  Well, I can ask it this way.

20          MS. RIFKIN:  Between asking the question --

21          THE COURT:  Well, Counsel -- Counsel, he has already

22   indicated his familiarity with the WPATH criteria.  That's what

23   this is.

24          I suspect you did the same thing with all of the other

25   witnesses, as well, to give them a chance to go through item by

1      item.

2          I'm going to overrule the objection.  I don't think

3      it's -- unless the test here is whether or not the witness has

4      an encyclopedic memory as to each of the WPATH standards, I

5      don't think it's an issue.

6          If that's what we're trying to get at -- but I suspect

7      that's not, and it's more just a discussion about his view of

8      what those criteria are.  So I don't think showing it to him is

9      in any way improper.

10         Go ahead and proceed.

11     Q.   BY MR. HALL:  Mr. Clark, are you familiar with the document

12     that's been placed in front of you and marked as Joint Exhibit

13     15, page 66?

14     A.   I am.

15     Q.   And what is this document?

16     A.   This is the criteria set up for a phalloplasty associated

17     by the WPATH standards in their Version 7.

18     Q.   And are you familiar with the standards -- the six

19     standards or criteria presented there?

20     A.   I am.

21     Q.   Okay.  Have you ever had an opportunity to apply those

22     standards to a gender dysphoric patient?

23     A.   Yes, several times.

24     Q.   Are you familiar with the plaintiff, Adree Edmo?

25     A.   I am.

1    Q.   Okay.  And explain for me your familiarity with Ms. Edmo.

2    A.   I have had occasional bump-ins, so to say, run-ins with

3    Ms. Edmo throughout the time.  I have attended a couple of

4    groups where Ms. Edmo has attended.

5         But much of my information has come secondary through the

6    Management Treatment Committee and when I supervised the

7    clinicians who were providing treatment for Ms. Edmo.

8    Q.   And has Ms. Edmo and her gender dysphoria been topics of

9    discussion at the MTC meetings?

10   A.   Yes.

11   Q.   And approximately how many times during those meetings

12   have -- where you have been present that Ms. Edmo was addressed?

13   A.   Say, about a dozen.

14   Q.   And is there a time range there?  Is it beginning ever

15   since you were on the MTC committee?

16   A.   Yes.  From my best knowledge, yes.

17   Q.   Over the last five years?

18   A.   I would say that is correct, yes.

19   Q.   Okay.  And have you gained a familiarity with Ms. Edmo's

20   gender dysphoria and the treatment she has received at IDOC?

21   A.   Yes.

22   Q.   And what is your understanding as to Ms. Edmo's treatment

23   that she has received for her gender dysphoria?

24   A.   Been attending groups for most of that five years that are

25   associated with gender -- other inmates that have gender

1    dysphoria; been provided hormone replacement therapy to

2    associate -- that was prescribed by a medical provider -- and

3    also, there has been individual contacts with clinicians over

4    the years with Ms. Edmo.

5    Q.   You've had conversations with clinicians that have provided

6    direct contact with Ms. Edmo; is that what you're saying?

7    A.   Yes.

8    Q.   And have you reviewed any medical records or mental health

9    records for Ms. Edmo?

10   A.   Periodically, yes.

11   Q.   And have you reviewed the clinical notes from the mental

12   health contact she has had during her incarceration?

13   A.   Not all of them, but some of them, yes.

14   Q.   And have you reviewed or had an opportunity to review the

15   presentence investigation?

16   A.   Yes, I have.

17   Q.   And is it your understanding that that document was

18   produced prior to Ms. Edmo's incarceration?

19   A.   Yes.

20   Q.   Are there any other documents that you've reviewed

21   regarding Ms. Edmo and her gender dysphoria?

22   A.   I looked at her assessments when she requested to be

23   assessed for gender dysphoria.  That happened before my time on

24   the MTC.  I have reviewed those records as well.

25   Q.   And do you know who did that assessment?

1    A.    I know -- I believe Dr. Eliason was one, and I can't

2    remember the other person.

3    Q.    Does Claudia Lake ring a bell?

4    A.    Yes.

5              MS. RIFKIN:  Objection.  Leading, Your Honor.

6              MR. HALL:  Your Honor, I'm merely trying to get an

7    answer as to whether or not the witness --

8              THE COURT:  Overruled.  Generally, counsel is allowed

9    to ask leading questions on foundational matters.  And, frankly,

10   in a proceeding before the court, as long as you're not putting

11   words in the witness's mouth, I'm going to give counsel some

12   leeway.  I have tried to do it on both sides, do the same.

13             So proceed.

14   Q.    BY MR. HALL:  And from your review of Ms. Edmo's medical

15   records and your involvement on the MTC, have you gained a

16   familiarity with Ms. Edmo's coexisting mental health concerns?

17   A.    I feel that I have, yes.

18   Q.    And what are those, to your knowledge?

19   A.    The main thing that's always stuck out is major depressive

20   order or her struggles with depression and anxiety.  That was

21   noted in the PSI, the presentence investigation.  And it appears

22   to be a constant issue for Ms. Edmo.

23         And there has also been addressed some personality trait

24   struggles, such as borderline traits, antisocial traits.

25   Q.    Right.  Can you name some of those borderline personality

CLARK – Direct

340

1     trait disorders that you have noticed?

2     A.    Interpersonal issues, self-harming behavior, sexual

3     offending, you know -- inappropriate sexual behaviors, and

4     manipulation.

5     Q.    Are you familiar with Ms. Edmo's disciplinary history?

6     A.    Yes.

7     Q.    And do you find that Ms. Edmo's disciplinary history is

8     relevant in any way to your -- your profession as a mental

9     health clinician?

10    A.    I feel that it is.

11    Q.    In what way?

12    A.    Much of any inmate's disciplinary issue, we have to look at

13    and see if mental health is a contributing factor into those

14    behaviors to help address that, such as interpersonal issues;

15    psychosis may play a role.  And so we have to look into those

16    issues to ensure we're doing our part to help treat the mental

17    health side that might be associated with those misbehaviors.

18    Q.    Are you aware of any DORs or disciplinary history that

19    Ms. Edmo has received that would indicate or suggest or be

20    consistent with borderline personality disorder traits?

21    A.    Yes.  There have been several DORs for sexually acting out,

22    assaulting other inmates, not following orders of the officers,

23    and struggling with other inmates within the facility.

24    Q.    Did you have an opportunity to assess whether or not

25    Ms. Edmo has ever met the criteria of the WPATH for surgery?

1    A.   Yes.  That was looked at back in 2016.

2    Q.   And describe for me how that -- how that occurred.  How

3    were you involved in that?

4    A.   I believe Ms. Edmo made the request, and Dr. Scott Eliason

5    said he would do the assessment.  And once he completed the

6    assessment, he brought it before the MTC.

7    Q.   And did you have an opportunity to apply Mrs. Edmo's mental

8    health conditions to the criteria of the WPATH at that time?

9    A.   I did.

10   Q.   Okay.  And did you make a -- did you have an opinion at

11   that time as to whether or not Ms. Edmo met the criteria for

12   surgery?

13   A.   I did.

14   Q.   What was that opinion?

15   A.   That surgery was not appropriate.

16   Q.   And what is the basis for that opinion?

17   A.   I personally felt and clinically felt that Ms. Edmo's

18   mental health issues were not well controlled.

19   Q.   And what mental health conditions did you believe were not

20   well controlled?

21   A.   The depression, the anxiety, along with the borderline

22   personality traits.

23   Q.   Were there any particular traits of borderline personality

24   disorder that you felt were not well controlled at that time in

25   2016?

1    A.   Within six months, there were several DORs; one was for

2    assaulting another inmate.

3         Also, at that time, Ms. Edmo had gone on suicide watch for

4    self-harming behaviors and was continuing to engage in

5    self-harming behaviors at that time.

6    Q.   Do you know if -- around that time, in 2016, whether

7    Ms. Edmo had exhibited sexual acting-out in the prison?

8    A.   Yes.  There had been a -- there had been a DOR for sexual

9    activity within that six-month frame as well.

10   Q.   Six months prior to the evaluation?

11   A.   Yes.

12   Q.   And were you aware of other DORs where Ms. Edmo was cited

13   for inappropriate sexual contact in a prison?

14   A.   I believe there was two or three throughout her time in

15   incarceration.

16   Q.   And why -- well, do you believe that prior to someone

17   meeting the criteria for surgery under the WPATH, that it's

18   important that their coexisting mental health concerns be well

19   controlled?

20   A.   In my opinion, I really -- what really stood out for me

21   with the Osborne and Lawrence article was surgery is an

22   identified treatment for gender dysphoria, but there is no

23   evidence to indicate that surgery would alleviate major

24   depressive disorder, eliminate self-harming behaviors.

25        And so, in my opinion, I feel like that's why the WPATH

1    said the other cooccurring issues need to be well controlled

2    because the surgery is there to alleviate the gender dysphoria.

3    Q.   And do you believe that it's important also to have these

4    coexisting mental health concerns well controlled prior to a

5    surgery because of the stressors that may come after a surgery?

6    A.   I do feel that is accurate.

7    Q.   Okay.  And explain that to me.

8    A.   I would say this really plays a big role in prison.

9    Because, based on current policy throughout the United States,

10   inmates are housed based on their primary genitalia.

11       So this would mean, naturally, a person would automatically

12   move to female facility, which has different dynamics, different

13   social transitioning issues that would come into play.

14       And also -- so needing to have that well controlled at that

15   time would be significant because I believe, especially in

16   prison, new stressors are going to arise even after prison --

17   after surgery.

18   Q.   Is it your understanding that, for Ms. Edmo, sex

19   reassignment surgery will be an irreversible procedure?

20   A.   Yes.

21   Q.   Is it your understanding that it will be a significant

22   medical procedure for Ms. Edmo?

23   A.   Based on the trainings I have seen and attended, yes.

24   Q.   And do you feel that -- or did you feel in 2016 that

25   Ms. Edmo's mental health conditions -- coexisting mental health

1      conditions were well controlled such that she could cope with

2      the stressors postsurgery?

3      A.   I did not feel that.

4      Q.   Okay.  Have you made any opinions or -- let me strike that.

5           Do you feel that Ms. Edmo has been compliant with her

6      treatment plan?

7      A.   No.

8      Q.   Do you feel that Ms. Edmo has been compliant with the

9      recommendations that her mental health conditions have made to

10     her over the years?

11     A.   Not consistently.

12     Q.   And in what ways?

13     A.   Often will attend group for a while and then will quit.

14     Has often rejected our recommendations for other things to

15     address the interpersonal issues and the mood management issues.

16          And I believe Ms. Edmo feels this is all part of her gender

17     dysphoria, and we haven't been offered an opportunity to make

18     sure that if there is cooccurring stuff, that that's actually

19     affecting the behaviors as well.

20     Q.   And you're familiar that in 2016, Dr. Eliason provided

21     a -- an assessment to Ms. Edmo as to whether or not she met the

22     criteria for sex reassignment surgery?

23     A.   Yes.

24     Q.   And did you have a conversation with Dr. Eliason at that

25     time?

1    A.   I did, shortly after he did the assessment.

2    Q.   And did he reach out to you to ask your opinion on

3    Ms. Edmo's mental health condition?

4    A.   He did.  He consulted with me.

5    Q.   And did he consult with you as to whether or not you felt

6    it was appropriate for Ms. Edmo to have sex reassignment

7    surgery?

8    A.   Yes.  That was the topic of the conversation.

9    Q.   And did you provide him with your thoughts at that time?

10   A.   I did.

11   Q.   And what did you -- what did you explain to Dr. Eliason at

12   that time?

13   A.   Essentially what you -- we have been just talking about.

14   At that time, Ms. Edmo was engaging in a lot of misbehavior,

15   sexually acting out, self-harming behavior, wasn't attending

16   groups consistently.

17        In my opinion, at that time, her mental health was not well

18   controlled based on those factors.

19   Q.   And is it your understanding that, after speaking with you

20   and with others, other medical or mental health providers, that

21   Dr. Eliason concluded that surgery for Ms. Edmo in 2016 was not

22   medically necessary or appropriate?

23   A.   That is what I recall, yes.

24   Q.   Are you familiar or are you aware that Ms. Edmo has been

25   engaging in some cutting behaviors over the last year?

1   A.   I was informed of that by her treating clinician, yes.

2   Q.   And who is that?

3   A.   Ms. Krina Stewart.

4   Q.   And have you had conversations with Ms. Stewart about

5   Ms. Edmo?

6   A.   Throughout the past couple years, yes.

7   Q.   And what was your understanding after speaking with

8   Ms. Stewart as to Ms. Edmo's cutting?

9   A.   That a lot of times -- and probably in particular with

10  Ms. Edmo -- cutting is a form of coping with stress.  And so our

11  conversations, we were talking about what other coping skills we

12  can encourage Ms. Edmo to engage in and how to address that

13  issue.

14  Q.   And that Ms. Edmo was engaging in cutting, did that -- does

15  that affect your opinion either way at this point as to whether

16  or not Ms. Edmo's coexisting mental health concerns are well

17  controlled?

18  A.   I feel that it supports my idea that it's not well

19  controlled.

20  Q.   Do you believe that cutting is a helpful and safe coping

21  mechanism?

22  A.   No, I do not.

23  Q.   Do you think that cutting to someone's body is contrary to

24  a claim that their mental health conditions are well controlled?

25  A.   Yes, I would consider that contrary.

1    Q.    Okay.  At this point, do you believe that Ms. Edmo's

2    coexisting mental health concerns are well controlled?

3    A.    At this time, based on the information I have been given,

4    no, I do not feel that it's currently well controlled.

5    Q.    Do you have any concerns for Ms. Edmo if she undergoes

6    surgery at this time when her mental health concerns are not

7    well controlled?

8    A.    Yes.  I believe the behaviors would continue even if the

9    surgery were to happen.

10   Q.    And which behaviors in particular?

11   A.    The cutting.  I do feel that some of the mood disorder

12   stuff, the depression and anxiety, would be lessened, but I

13   don't think it would be alleviated as it hasn't been completely

14   addressed.

15   Q.    Are you familiar with the policies and standard operating

16   procedures of the Department of Corrections?

17   A.    Yes.

18   Q.    And when you started at the Idaho Department of

19   Corrections, was there a policy dealing with gender identity

20   disorder, gender dysphoria?

21   A.    Yes, there was.

22   Q.    And were you familiar with that policy?

23   A.    Yes, I was.

24   Q.    Okay.  And what is your understanding as to what that

25   policy said as to whether or not surgery, sexual reassignment

1    surgery, would be provided or made available to offenders with

2    gender dysphoria?

3    A.    That it would require it to be medically necessary, and it

4    would be looked at on a case-by-case basis.

5    Q.    Was there anything in that policy that you were aware of

6    that stated that IDOC would not provide sex reassignment surgery

7    under any circumstances?

8    A.    To the best of my recollection, there was no language in

9    there that said that.

10   Q.    And has that policy since been revised, the gender

11   dysphoria policy?

12   A.    Yes.

13   Q.    And when was that revised?

14   A.    It was officially released October 5th, just last week.

15   Q.    And are there any major differences between the 2011 policy

16   and the policy that was enacted last week?

17   A.    Yes.  In particular, in the areas of social transitioning,

18   needing to allow the inmates with gender dysphoria to have the

19   commissary -- all commissary.

20         So for our trans females, they can access makeup.  They can

21   have traditional feminine hairstyles.  They would be given

22   female undergarments.  And then it would be vice versa for our

23   trans male population.

24   Q.    And does this current policy, to your knowledge, still

25   provide that sex reassignment surgery will be provided to a

**CLARK — Direct/Cross**

349

1      gender dysphoric inmate on a case-by-case basis?

2      A.   Yes, also based on medical necessity.

3      Q.   Okay.  Thank you.

4            MR. HALL:  No further questions.  Thank you.

5            THE WITNESS:  You're welcome.

6            THE COURT:  Mr. Eaton, do you have any questions you

7      want to ask before I ask for cross?

8            MR. EATON:  No, Your Honor.  Thank you.

9            THE COURT:  All right.  Ms. Rifkin.

10                         CROSS-EXAMINATION

11     BY MS. RIFKIN:

12     Q.   Good afternoon, Mr. Clark.

13     A.   Good afternoon.

14     Q.   You have never provided direct treatment for any patients

15     with gender dysphoria or gender identity disorder; correct?

16     A.   That is correct.

17     Q.   In direct exam a few moments ago, you testified that you

18     were able to distinguish mental health concerns from gender

19     dysphoria; correct?

20     A.   Yes.

21     Q.   And you testified that you can do that based on your

22     experience treating patients; correct?

23     A.   And also based on the diagnosis in the DSM.

24     Q.   But you haven't actually treated any patients with gender

25     dysphoria; correct?

A.   No, but I have given assessments where I have given a

diagnosis of gender dysphoria as well as other cooccurring

mental health disorders.

Q.   You have never personally provided any assessments for sex

reassignment surgery; correct?

A.   That is correct.

Q.   You have never consulted with other providers regarding

assessments for sex reassignment surgery; correct?

A.   I have consulted with Dr. Eliason when he did the

assessment for Ms. Edmo.

        MS. RIFKIN:  Your Honor, I would like to use the

deposition of Mr. Clark.

        THE COURT:  Yes.  Let's have it published.  Do you

have the original?

        MS. RIFKIN:  I do.

        THE COURT:  Perhaps Mr. Severson can get that, and

I'll direct Ms. Bracke to publish the deposition.

        LAW CLERK:  We don't have the sealed original.  It's

in the office that's close.

        THE COURT:  Well, I assume there is no serious

objection.

        MR. HALL:  Your Honor, I don't -- I don't believe so.

This was a deposition that actually took place last week, and

currently we have not had an opportunity to have a

read-and-sign.  So there may be some transcription errors that

1      the witness has not had an opportunity to review.

2                  THE COURT:  All right.

3                  MS. RIFKIN:  Your Honor, the dates being after the

4      cutoff were proposed by defendants for this witness.  So we got

5      the deposition transcript processed.

6                  THE COURT:  I understand.

7                  MR. HALL:  That's not my issue.  I just --

8                  THE COURT:  Yeah.  Let's just solve the problem.  We

9      don't need to say who is at fault.  Let's just solve the

10     problem.

11         What I would suggest -- again, we have a court trial.

12     Let's go ahead and use the unsigned copy of the deposition.

13         I would indicate to the witness that if you have some

14     concern over how the question and answer -- whether it's

15     different from what you recall, you can so indicate, and then

16     we'll give you a chance to kind of correct the deposition on the

17     fly.

18                 Do you understand?

19                 THE WITNESS:  Yes.

20                 THE COURT:  In other words, a court reporter like

21     Ms. Hohenleitner is taking it down, doing the best job they can.

22     Sometimes mistakes are made for that reason.  A copy is given to

23     the person being deposed, given a chance to read it and then

24     make corrections.  They can't change answers, but they can

25     indicate that when they said "the," they really meant "that," or

1    they thought they said "that," but the court reporter perhaps

2    didn't pick it up.  So we can correct those kinds of things.

3         If you see a problem, let's note it.  I may allow you to

4    confer with your attorney to go over that change as we proceed

5    along.  My guess is there won't be any of those problems.  That

6    would be quite rare, but I think we need to protect the

7    witness's right to review and correct the deposition.

8         And then when it is available, we need to publish it and

9    make it part of the court record.  All right?

10             MS. RIFKIN:  Yes.  We can publish it to the court now

11   and the witness.

12             THE COURT:  Well, typically, "publish" means we are

13   taking the final approved and signed deposition and now

14   publishing it as part of the court record.  I don't know that we

15   can do that until we have been through that process.

16        So we are just going to use this copy.  But at some point,

17   you will need to submit the final signed version of the

18   deposition to complete the court record.  And if there is any

19   variation, we will need to note that for the record as well.

20   All right?

21             MS. RIFKIN:  Understood, Your Honor.

22             THE COURT:  Yes, let's go ahead and hand it to him.

23   We won't formally publish it since we don't have the original.

24             MS. RIFKIN:  Can we display, please, Mr. Clark's

25   deposition, page 29.

1          THE COURT:  It would be helpful if you zoom in

2     on -- that's a little hard to read.

3          MS. RIFKIN:  Can we zoom in on lines 2 through 8,

4     please.

5          THE COURT:  Okay.  Now you should be able to read that

6     easily.

7     Q.   BY MS. RIFKIN:  Do you see those lines, Mr. Clark?

8     A.   I do.

9          MS. RIFKIN:  May I read them, Your Honor?

10         THE COURT:  Well, you can ask him whether these

11    questions were asked and ask him whether he gave those answers.

12    Q.   BY MS. RIFKIN:  Do you see the question on line 2, "Have

13    you personally provided any assessments for sex reassignment

14    surgery or gender reaffirmation surgery?"

15    A.   Yes, I do see it.

16    Q.   And your answer was no?

17    A.   That is correct.

18    Q.   Is that -- is that accurate?

19    A.   That is accurate.

20    Q.   And the next line, line 6, question:  "Have you consulted

21    with other providers regarding assessments for surgery?"

22         Answer:  "No.  I haven't had the opportunity."

23         Was that your answer?

24    A.   It was.  I believe in the context at the time, I was

25    thinking outside providers, not within the Department.

1      Q.   Your experience providing supervision to clinicians who are

2      directly treating patients with gender dysphoria was mainly

3      while you were at ISCI, where Ms. Edmo is housed; correct?

4      A.   Yes, at the time, because that's where most of them were

5      housed when I was a clinical supervisor.

6      Q.   Okay.  And I'm just going to ask you to make sure to answer

7      the question I ask and not give additional narrative unless it's

8      directly responsive to my question.

9           You were the clinical supervisor at ISCI for eight months;

10     correct?

11     A.   Yes.

12     Q.   Prior to that time, your experience with patients with

13     gender dysphoria was limited to supervising a clinician who had

14     a single patient with gender dysphoria; correct?

15     A.   Yes.

16     Q.   And you do not currently provide clinical supervision to

17     any clinicians who provide direct treatment to inmates with

18     gender dysphoria; correct?

19     A.   Not at this time.

20     Q.   You testified a moment ago in direct that Dr. Eliason --

21     that you provided consultation with -- to Dr. Eliason regarding

22     his assessment of Ms. Edmo for gender confirmation surgery;

23     correct?

24     A.   Yes, that's correct.

25     Q.   And you testified that you relied on the WPATH criteria for

1    medical necessity in consulting with Dr. Eliason; correct?

2    A.   Yes.

3    Q.   That consultation -- you have testified that that

4    consultation with Dr. Eliason was actually an informal consult;

5    correct?

6    A.   Yes.

7    Q.   It occurred when you ran into each other in passing at

8    ISCI; correct?

9    A.   Yes.

10   Q.   And it lasted no more than 15 to 20 minutes; correct?

11   A.   From my best recollection, yes.

12   Q.   And you didn't document this informal consultation

13   anywhere; correct?

14   A.   I did not.

15   Q.   And in your discussion with him about what medically

16   necessary entailed, you specifically recall telling Dr. Eliason,

17   "I don't know.  That's kind of doctor things"; correct?

18   A.   In particular to the topic of medically necessary, yes.

19   Q.   And you didn't provide him an opinion about what medically

20   necessary means; correct?

21   A.   No, I did not.

22   Q.   You testified a moment ago that the MTC doesn't decide

23   whether surgery is medically necessary; correct?

24   A.   From my -- I don't know what I testified to or said before,

25   but the MTC would be the multiple disciplinary team that would

CLARK – Cross

1       take that assessment, address and assess where it's appropriate,

2       and then possibly refer surgery if it was felt it was

3       appropriate.

4       Q.   Didn't you testify a moment ago that the MTC doesn't

5       consider -- doesn't decide whether surgery is appropriate; the

6       medical provider does that separately?

7       A.   I thought that was about diagnosis, but I could be wrong.

8       Q.   Is it your testimony that the MTC considered Ms. Edmo and

9       assessed her for surgery separate from what Dr. Eliason did?

10      A.   No.  At that time, we relied on Dr. Eliason's assessment.

11      Q.   Did the MTC discuss and review Dr. Eliason's assessment for

12      Ms. Edmo?

13      A.   Yes, that was done.

14      Q.   If that had occurred, it would be in the minutes of the

15      MTC, wouldn't it?

16              MR. HALL:  Objection.  Foundation.

17              THE COURT:  Just a moment.

18              MR. EATON:  Join.

19              THE COURT:  Overruled.

20      You may answer.  You presided over the MTC; did I

21      understand that?

22              THE WITNESS:  At that time, I was just a member.

23              THE COURT:  Would you be familiar with the method by

24      which its meetings and transactions within the meetings are

25      memorialized?

1          THE WITNESS:  I was not part of the minutes.

2          THE COURT:  Well, that wasn't my question.

3          THE WITNESS:  I'm sorry.

4          THE COURT:  The question was:  Are you familiar with

5     the way in which those meetings are documented?

6          THE WITNESS:  Yes.

7          THE COURT:  Okay.  The objection is overruled.  You

8     may inquire.

9          THE WITNESS:  It should have been, is my response.

10    Q.   BY MS. RIFKIN:  Mr. Clark, I'm going to show you -- can you

11    read this document okay from your computer, Mr. Clark?

12    A.   Yes.

13    Q.   Okay.  This is Joint Exhibit 7, page 78.  It reads,

14    "Management and Treatment Team Committee Minutes," and it is

15    dated June 1, 2016.

16         Do you see that?

17    A.   I do.

18    Q.   Have you seen this kind of document before?

19    A.   Yes, I have.

20    Q.   And I would like to show you the third page of this

21    particular document.  I'll show you the second page first so you

22    see the whole document.  That's page 79 of Joint Exhibit 7.

23         And now I would like to show you the third page of Joint

24    Exhibit 7, page 80.

25         Do you see that "approved by"?

1    A.    Yes, I do.

2    Q.    And is that your name underneath?

3    A.    It is.

4    Q.    So you were involved in the minutes; isn't that right,

5    Mr. Clark?

6    A.    I did not write them.  I reviewed them and then should have

7    signed off on them.

8    Q.    That was your responsibility, to review the minutes to make

9    sure that they are accurate and reflect the discussion of the

10   MTC; correct?

11   A.    Yes.

12   Q.    So I'm going to show you again the second page of this

13   document.

14         Do you see where it says "Edmo"?

15   A.    Yes.

16   Q.    Is there any documented consideration of Ms. Edmo --

17   Dr. Eliason's evaluation of Ms. Edmo for surgery?

18   A.    No, there is not.

19   Q.    These are the June 1, 2016, minutes for the MTC committee.

20         Do you think that that discussion would be documented in

21   another set of minutes for the MTC?

22   A.    Possibly.  I don't know.

23   Q.    What month do you think?  So Dr. Eliason's assessment was

24   in April 2016.  What month do you think when the MTC met they

25   would have been discussing Dr. Eliason's assessment of Ms. Edmo

1    for surgery?

2    A.   Possibly this one or the next one.  I don't know.

3    Q.   I'm going to show you what's been marked as Joint

4    Exhibit 7, page 81.

5        Do you see that these are the Management and Treatment Team

6    Committee minutes for September 7, 2016?

7    A.   I do.

8    Q.   Would that have been the next time the MTC met after June

9    2016?

10   A.   More than likely.

11   Q.   At this time, the MTC met every three months; is that

12   correct?

13   A.   Yes.

14   Q.   So I'm going to show you page 79 of Joint Exhibit 7.

15       Do you see the section where it says "Additional

16   discussion" and Ms. Edmo's name appears?

17   A.   Yes.

18   Q.   Is there any discussion documented of Dr. Eliason's

19   assessment of Ms. Edmo for surgery?

20   A.   No, but it looks exactly like the one from the previous

21   minutes.

22           MR. HALL:  I believe the witness has already been

23   shown this.

24           THE COURT:  What's the concern, Mr. Hall?

25           MR. HALL:  I think counsel might have a couple of

CLARK – Cross

360

1    these pages just mixed up.

2              MS. RIFKIN:  Oh, you're right.  I'm sorry.  Thank you

3    for the clarification.

4    Q.   BY MS. RIFKIN:  All right.  I'm showing you page 84, which

5    is part of the September minutes.  I apologize for that

6    confusion.

7         Do you see the additional discussion for Ms. Edmo there?

8    A.   I do.

9    Q.   Okay.  That's the first bullet point.

10        Have you had a chance to review that?

11   A.   Yes.

12   Q.   I'm going to show you the next page, page 85.

13        Do you see the top, the continuation of the discussion for

14   Ms. Edmo?

15   A.   I do.

16   Q.   Is there a discussion of Dr. Eliason's assessment of

17   Ms. Edmo for surgery?

18   A.   There is not.

19   Q.   I'm going to show you the last page of these minutes, Joint

20   Exhibit 7, page 86.

21        That, again, has your name; correct?

22   A.   Yes.

23   Q.   At this time, you were responsible for reviewing the

24   minutes to make sure that they were accurate; correct?

25   A.   Yes, I was.

1    Q.   And neither of these minutes reflect any discussion by the

2    MTC of Dr. Eliason's assessment of Ms. Edmo for surgery;

3    correct?

4    A.   That is correct.

5    Q.   You have never provided direct treatment to Ms. Edmo;

6    correct?

7    A.   That is correct.

8    Q.   And you have never reviewed Ms. Edmo's preincarceration

9    medical records other than what was in the PSI report counsel

10   referenced; correct?

11   A.   That is correct.

12   Q.   You agree that Ms. Edmo continues to experience gender

13   dysphoria; correct?

14   A.   Yes.

15   Q.   And in your opinion, Ms. Edmo is not exaggerating her

16   gender dysphoria; correct?

17   A.   I don't think so.

18   Q.   You have never diagnosed Ms. Edmo as having borderline

19   personality disorder; correct?

20   A.   That is correct.

21   Q.   To your knowledge, no other IDOC or Corizon providers have

22   diagnosed Ms. Edmo with borderline personality disorder;

23   correct?

24   A.   That is true.

25   Q.   Over the six years that she has been in IDOC custody, none

 1    of them have diagnosed her with borderline personality disorder;

 2    correct?

 3    A.   Yes.

 4    Q.   You agree that Ms. Edmo is not psychotic; correct?

 5    A.   I do.

 6    Q.   To your knowledge, she has never been psychotic or

 7    demonstrating psychosis; correct?

 8    A.   Not since I have known her.

 9    Q.   You believe Ms. Edmo is capable of forming informed consent

10    for medical procedures; correct?

11              MR. HALL:  Object to form and foundation.  It goes

12    beyond the scope of direct.

13              MS. RIFKIN:  Mr. Clark testified --

14              THE COURT:  Overruled.  Overruled.  The testimony was

15    as to WPATH standards, and this is directly relevant to that, I

16    think.  So I'll overrule the objection -- or at least directly

17    relevant based upon Dr. Ettner's interpretation of the WPATH

18    standards, which counsel is free to dispute, but I think it's

19    within the scope.

20    Go ahead.

21              MR. HALL:  You mentioned Dr. Ettner, Judge, just a

22    second ago.

23              THE COURT:  Yes.

24              MR. HALL:  I'm sorry.  What did you mean by that?

25              THE COURT:  I said that Dr. Ettner had indicated what

1          her understanding of that fourth requirement of serious mental

2          health concerns being well controlled, that that focused upon

3          competency to consent to treatment and a number of other

4          factors.

5                    MR. HALL:  Right.  Mr. Clark, though.

6                    THE COURT:  I understand that.  But I think it's

7          still -- counsel is simply using that understanding to

8          cross-examine the witness, which I think is appropriate.

9               I'm not in any way suggesting that Mr. Clark agrees with

10         that, but I think it's fair to ask questions using the standard

11         as another expert understands them.

12                   MR. HALL:  May I clarify my objection, Your Honor, on

13         one particular issue?

14                   THE COURT:  Yes.

15                   MR. HALL:  Ms. Rifkin is asking him to go through all

16         the criteria.  He did not say that he believes Ms. Edmo meets

17         all those criteria.  So he was actually never asked in direct

18         nor has he testified that she has informed consent.

19                   THE COURT:  But he has very specifically testified

20         that the one criteria that was not met was that she had serious

21         mental health concerns that were not well controlled.  And

22         therefore, since that's what this question pertains to, based

23         upon Dr. Ettner's reading of that standard, the objection is

24         overruled.

25                   MR. HALL:  All right.  Thank you, Your Honor.

1      THE COURT:  Proceed.

2      Q.   BY MS. RIFKIN:  Mr. Clark, you believe Ms. Edmo is oriented

3      as to reality; correct?

4      A.   Yes.

5      Q.   And at ISCI, the institution where Ms. Edmo resides, there

6      are special mental health units for inmates who are not able to

7      function in the general population because of their mental

8      illness; correct?

9      A.   Yes.

10     Q.   And Ms. Edmo is housed in general population, not in one of

11     the mental health units; correct?

12     A.   She has been housed in the BHU, yes.

13     Q.   When was the last time she was housed in the behavioral

14     health unit?

15     A.   Approximately two years.

16     Q.   So for the last two years, Ms. Edmo has been housed in

17     general population; isn't that correct?

18     A.   To my best recollection, yes.

19     Q.   You testified that you relied in part on Ms. Edmo's

20     disciplinary record in opining she is not appropriate for

21     surgery; correct?

22     A.   Yes.

23     Q.   You believe her disciplinary record demonstrates

24     uncontrolled mental health concerns?

25     A.   I do.

**CLARK — Cross**

365

Q.   And you testified that Ms. Edmo's DORs for sexual activity and assault were related to mental health concerns and borderline personality disorder; correct?

A.   Border personality traits.

Q.   And mental health --

THE COURT:  Just a moment.  Did you mean "borderline personality traits?

THE WITNESS:  Excuse me.  Borderline.

THE COURT:  I have been guilty of the same.  Sometimes when people saying "borderline personality disorder," I wish they would change that term, because I initially thought that meant you were on the edge of having a personality disorder instead of a defined specific personality disorder.  So I'm kind of acutely sensitive to that.

So you are referring to borderline personality disorder?

THE WITNESS:  Traits, yes.

THE COURT:  Traits, as recognized in the DSM-5?

THE WITNESS:  Yes.

THE COURT:  All right.  Go ahead.  I apologize for that little rant.

MS. RIFKIN:  That's perfectly fine, Your Honor.

THE COURT:  I have always wondered why they chose that term.  There has to be a better term.

MS. RIFKIN:  So if we could show the witness what's been marked as Joint Exhibit 1, page 524, please.

1  Q.  BY MS. RIFKIN:  Mr. Clark, you're familiar with this mental

2  health DOR recommendation form used by IDOC; correct?

3  A.  Yes, I am.

4  Q.  They have to be filled out for inmates with mental health

5  diagnoses when there is a DOR charged against them; is that

6  correct?

7  A.  Yes.

8  Q.  You supervise and train IDOC clinicians about how to fill

9  these out; correct?

10  A.  I do.

11  Q.  And one of the questions on this form asks whether mental

12  illness was a contributing factor in the incident leading to a

13  DOR; correct?

14  A.  Yes.

15  Q.  And there is also a box to check mental illness is not a

16  factor in the incident; correct?

17  A.  That is correct.

18  Q.  And you instruct IDOC clinicians that you supervise that if

19  any mental health issue played a role in the behavior, they have

20  to mark the "yes" box; right?

21  A.  Yes, if they feel that's appropriate.

22  Q.  So looking at the DOR recommendation right here, the

23  offense date is December 30, 2015; correct?

24  A.  Yes.

25  Q.  And the offense description is "sexual activity"?

367

1    A.    Yes.

2    Q.    This is one of the DORs you said shows that Ms. Edmo's

3    mental health concerns are uncontrolled; correct?

4    A.    That's one of the behaviors, yes.

5    Q.    Which box is checked for whether mental illness

6    contributed -- was a contributing factor in the incident?

7    A.    This clinician felt that -- excuse me.  Mental illness was

8    not a factor.

9    Q.    So the box "no" for mental illness a contributing factor in

10   incident is checked; correct?

11   A.    Yes.

12   Q.    And also, the box "Mental illness is not a factor in

13   incident," that one is also checked; right?

14   A.    That is correct.

15   Q.    Can we show the witness Joint Exhibit 1, page 610.  Zoom in

16   a little bit.  Thank you.

17         This is another mental health DOR recommendation for

18   Ms. Edmo; correct?

19   A.    Yes.

20   Q.    This is dated March 30, 2017; correct?

21   A.    Yes.

22   Q.    This is for assault?

23   A.    Yes.

24   Q.    And this is another one of the DORs that you said shows

25   that her mental health concerns are not well controlled; right?

1    A.   That's one of the behaviors.

2    Q.   This DOR documents behavior that shows to you her mental

3    health concerns are not well controlled; right?

4    A.   Can you rephrase that a little bit.  Are you saying this

5    DOR or the behavior?

6    Q.   The behavior.

7         You referenced that Ms. Edmo received DORs for assault;

8    correct?

9    A.   Yes.

10   Q.   And you said that that shows -- the fact that she got a DOR

11   for assaultive behavior shows that her mental health concerns

12   are not well controlled; correct?

13   A.   The fact she assaulted somebody, yes.

14   Q.   And you train a clinician that if the behavior for which

15   Ms. Edmo got a DOR is related to mental health, they have to

16   check the "yes" box on this form, Mental Health DOR

17   Recommendation; correct?

18   A.   Yes.

19              MR. HALL:  Objection.  Foundation.

20              THE COURT:  Overruled.

21              THE WITNESS:  If it's found in each case.

22   Q.   BY MS. RIFKIN:  Can you answer the question, Mr. Clark?

23        You train IDOC clinicians that if they believe the behavior

24   for which a person receives a DOR is related to mental health

25   concerns, they have to check the "yes" box on this form;

CLARK – Cross

1    correct?

2    A.   Yes.

3    Q.   And for this DOR for assault, which box is checked?

4    A.   Mental illness was not a factor in the incident.

5    Q.   It's checked, for "Mental illness contributing factor in

6    incident," "no"; correct?

7    A.   Yes.

8    Q.   And the next box, "Mental illness not a factor in

9    incident," that's checked "yes"; right?

10   A.   Yes.

11   Q.   So it wasn't a mistake on the clinician's part, accidently

12   checking the box; right?

13   A.   Not that I'm aware of.

14   Q.   You agree that Ms. Edmo has been compliant with her hormone

15   treatments since they started in September 2012; correct?

16   A.   To the best of my knowledge, yes.

17   Q.   And you agree that Ms. Edmo has been compliant with her

18   medication for depression; correct?

19   A.   Yes.

20   Q.   And you testified that when you learned that Ms. Edmo had

21   attempted to cut her testicle, you didn't know whether this was

22   related to her gender dysphoria; correct?

23   A.   That is correct, because I didn't do the assessment on

24   Ms. Edmo to know that.

25   Q.   You told counsel on direct that you attended a training by

1    Dr. Levine in 2016; correct?

2    A.   Yes.

3    Q.   And after that training, you created a training to train

4    other IDOC clinicians on gender dysphoria; correct?

5    A.   Yes, I did.

6    Q.   And for this training, you borrowed quite a bit from

7    Dr. Levine, didn't you?

8    A.   Yes.

9    Q.   You felt that using Dr. Levine's material was a good way to

10   talk about identities and different identity possibilities;

11   correct?

12   A.   Yes.

13   Q.   Can we show Plaintiff's Exhibit 1025, please.

14        Is this the training that you and your supervisor created

15   to give to IDOC clinicians in September 2017?

16   A.   Yes.

17             THE COURT:  Are you offering the exhibit before we

18   discuss it further?

19             MS. RIFKIN:  Yes, Your Honor, I'm offering this.

20             THE COURT:  Any objection?

21             MR. HALL:  No, Your Honor.

22             THE COURT:  Mr. Eaton?

23             MR. HALL:  Sorry.  We have stipulated to authenticity;

24   however, these are hearsay statements.  So to that extent, I'll

25   object.

1          THE COURT:  Mr. Eaton?

2          MR. EATON:  I'll join that.

3          THE COURT:  Well, as I understand it, this is

4     a -- some slide -- PowerPoint slides prepared for a presentation

5     to IDOC staff prepared at least in part by Mr. Clark with regard

6     to how to assess gender dysphoria.

7          Is that correct?  Is that correct, Ms. Rifkin?

8          MS. RIFKIN:  Yes, Your Honor.

9          THE COURT:  And what is the date?  I don't see a date

10     on the exhibit list.

11          MS. RIFKIN:  Mr. Clark produced this at his deposition

12     and handwrote the date September 2017, Your Honor, which he

13     testified was the date of the presentation.

14          THE COURT:  All right.  I'll overrule the objection.

15     The exhibit will be admitted.

16          (Plaintiff's Exhibit 1025 admitted.)

17          THE COURT:  I might note that it potentially could be

18     used for impeachment even if not offered to prove the truth of

19     the matter asserted, and it is proper impeachment based -- based

20     upon his prior testimony.

21          So go ahead and proceed.

22          MS. RIFKIN:  All right.  Can we show, please, page 5

23     of this exhibit.  And I would like to zoom in on the lower

24     left-hand corner slide.

25          THE COURT:  While you're doing that, I should note, as

1    well, that how the staff is actually trained is probably also an

2    issue in the case.  So it has direct relevance as to proper

3    training.  Even if not offered to prove the truth of the matter

4    asserted, it can be offered to show what training was actually

5    provided to staff concerning gender dysphoria assessments.

6         So I'd just state that as another grounds for the court's

7    decision.

8              MS. RIFKIN:  I'm sorry, Your Honor.  Just one minute.

9              THE COURT:  I was just clarifying the record.  Go

10   ahead.

11   Q.   BY MS. RIFKIN:  All right.  This is one of the slides from

12   Dr. Levine that you took and put in your own training to IDOC

13   clinicians; correct?

14   A.   Yes.

15   Q.   And you took No. 2 from Dr. Levine.

16        The SOC, that refers to the WPATH standards of care;

17   correct?

18   A.   That is correct.

19   Q.        "SOC, which claims to be a scientific and minority

20             rights document, ignores the profound differences

21             between science and advocacy."

22        That's part of the training you presented to the IDOC

23   clinicians; correct?

24   A.   Yes.

25   Q.   And if we can go over to the slide directly next to that

1    one, bottom right-hand corner.

2              THE COURT:  Could you back up?  I apologize.  Could I

3    see that prior blow-up that you had?

4         So the statement is that -- "SOC" is standard of care?  Is

5    that what that means?

6              THE WITNESS:  Yes, it does.

7              THE COURT:  Standard of care which claims to be a

8    scientific and minority rights document ignores the difference

9    between science and advocacy.

10        So what you're saying is that the standard of care, rather

11   than to be neutral, is, in fact, an advocacy position taken by

12   someone with expertise in the field?  Is that, in essence, what

13   you're saying there?

14             THE WITNESS:  That's what Dr. Levine said.

15             MR. HALL:  Objection.

16             THE COURT:  Okay.  But it's what you were then

17   presenting to the staff?

18             THE WITNESS:  Yes.

19             THE COURT:  All right.  Okay.  Go ahead.

20   Q.   BY MS. RIFKIN:  All right.  If we can move over to the

21   bottom right-hand corner slide, please.

22        No. 5:

23             "Judges, who are schooled in civil rights, look to

24             professional societies like WPATH for guidance.  It is

25             an uphill battle to convince them that a professional

1                    society is wrong and a dissenting expert in the

2                    courtroom is right."

3          That's another one of Dr. Levine's theories that you

4     trained IDOC clinicians on, isn't it?

5     A.   Yes.

6     Q.   If we can turn to page 6 of this exhibit.

7          Before I go to those, prior to providing this training, in

8     addition to attending Dr. Levine's training to IDOC, you also

9     had a direct conversation with him; correct?

10    A.   No.

11    Q.   You communicated directly with Dr. Levine after that

12    training; correct?

13    A.   Oh, after training.  Yes.

14    Q.   And based on the conversation you and he had, he sent you

15    some additional slides to use for your own presentation to IDOC

16    clinicians; correct?

17    A.   Not specifically for me to use them, but I chose to use

18    them.

19    Q.   So he sent you some additional slides based on your

20    conversation, and you chose to include those slides in this

21    training that we're looking at; correct?

22    A.   Yes.

23    Q.   Okay.  If we can zoom in on the upper right-hand corner

24    slide.  Thank you.  I think that's good.

25         Can you read -- can you read the words on that, Doctor --

1      Mr. Clark?

2      A.   Yes.

3      Q.   Okay.  This is one of the slides that you testified

4      Dr. Levine sent you after the training that you chose to

5      include?

6      A.   Yes.

7      Q.   And the slide starts:

8              "The justice paradigm reminds us that the inmate is in

9              prison as a punishment for a crime, for the protection

10             of citizens, and for an opportunity for civic

11             rehabilitation."

12         Correct?

13     A.   Yes.

14     Q.   And No. 3 on this slide, bullet point 3, says:

15             "This paradigm might be alternatively labeled common

16             sense paradigm or a citizens paradigm."

17         Correct?

18     A.   Yes.

19     Q.   And under No. 2, this slide says:

20             "Most individuals -- professional, government

21             officials and laypersons -- do not support the surgery

22             and express bafflement and outrage when they learn of

23             court decisions to mandate it for inmates at public

24             expense."

25         Correct?

1    A.   That's what it says, yes.

2    Q.   And this is information you included when training IDOC

3    clinicians about gender dysphoria; correct?

4    A.   Yes.

5    Q.   And treatment for gender dysphoria?

6    A.   Yes.

7    Q.   And how to treat people within their care for gender

8    dysphoria; correct?

9    A.   It was part of the training, yes.

10   Q.   You became familiar with the Osborne and Lawrence article

11   and proposed extra requirements for prisoners who want gender

12   confirmation surgery through Dr. Levine's training; correct?

13   A.   No.  I had the article prior to that.

14   Q.   Didn't you testify a few moments ago on direct that

15   Dr. Levine's training to you included the Osborne and Levine

16   [sic] standards and, based on that, you rely upon them?

17   A.   It wasn't based on that.  I had the article prior to that

18   training.

19   Q.   Okay.  Are you aware of any professional associations that

20   had endorsed or accepted the standards proposed by Osborne and

21   Lawrence for treating patients with gender dysphoria?

22   A.   I'm not aware of any, no.

23   Q.   And IDOC has never provided gender confirmation surgery to

24   a prisoner; correct?

25   A.   Not to my knowledge.

1   Q.   And out of the 30 patients with gender dysphoria at IDOC,

2   not one has been referred for gender confirmation surgery;

3   correct?

4   A.   That is correct.

5             MS. RIFKIN:  No more questions at this time.

6             THE COURT:  Redirect.

7             MR. HALL:  Yes, Your Honor.

8        Excuse me, Madam Clerk.  Is there a magic button I need to

9   press here?  Thank you.

10            THE CLERK:  You're welcome.

11                        REDIRECT EXAMINATION

12  BY MR. HALL:

13  Q.   Mr. Clark, I want to refer you back to the competency of

14  mental health professionals under the WPATH.  We discussed this

15  previously.  It is Joint Exhibit 15, page 28.

16       Do you see that there in front of you?

17  A.   Yes, I do.

18  Q.   Do you see anywhere where it says in order to be competent,

19  you must have provided an assessment for sex reassignment

20  surgery?

21  A.   I do not see that.

22  Q.   I have placed before you Joint Exhibit 15, page 66.

23       Do you see that in front of you there?

24  A.   Yes, I do.

25  Q.   Looking at the criteria for surgery, do you see anywhere

1     there where it says the words "medical necessity"?

2     A.   I do not.

3     Q.   Let's talk a little bit about these mental health DOR

4     recommendations, in particular, this one, Joint Exhibit 1, page

5     524.

6          Do you see that in front of you?

7     A.   Yes, I do.

8     Q.   Now, these aren't done for every offender who gets a -- let

9     me rephrase that.

10         Are these mental health recommendation for DORs done for

11    every offender in the Idaho Department of Corrections who

12    receives a DOR?

13    A.   No.

14    Q.   Who are they done for?

15    A.   For folks that -- the inmates that have a certain level of

16    care associated with their mental health.

17    Q.   What does that mean, the level of care for their health?

18    A.   We have several levels of medical care that we provide.

19    For example, we have some that are just med management only;

20    like your neighbor on Zoloft, for example.  But others attend

21    groups, have to be put in a mental health unit.  And these

22    recommendations are associated for people that are at that

23    higher level of mental health need.

24    Q.   Okay.  And was Ms. Edmo at that higher level of mental

25    health need?

1    A.    Yes.

2    Q.    Okay.  Does it say anywhere on here that Ms. Edmo does not

3    have a mental health illness?  And I'm referring to Joint

4    Exhibit 1, page 525.

5    A.    It does not say that.

6    Q.    Is there any conclusion here that -- well, let me talk to

7    you about this.

8          At the top here, it says, "Documented history, mental

9    illness that could impair decision-making."

10         Do you see that?

11   A.    Yes.

12   Q.    What does that mean?

13   A.    Meaning there is a history that the particular inmate has

14   demonstrated issues of mental health.

15   Q.    And that box was marked "yes" for Ms. Edmo; correct?

16   A.    Yes.

17   Q.    Okay.  Who reviews these forms?

18   A.    I don't know who -- the clinicians complete those, and then

19   they are given to a duty officer.

20   Q.    Okay.  That's my question.

21         A clinician is going to complete these forms after

22   reviewing the DOR; is that correct?

23   A.    Reviews the DOR.  They are supposed to review the medical

24   file and any other history.

25   Q.    And then they complete it, and they pass it off to

1      security?

2      A.    That is accurate, yes.

3      Q.    And then does someone review that in the process as to

4      determining whether or not to affirm or overrule the DOR?

5      A.    That's on the responsibility of the security staff.

6      Q.    Okay.  Is it your understanding that the security staff

7      uses this form not to determine if mental illness was involved

8      but whether or not mental illness should be a mitigating factor

9      in either affirming or overruling the DOR?

10     A.    Yes.  That's the intention.

11     Q.    Okay.  So the intention is not to make a statement that the

12     person is not suffering from any mental health concerns at the

13     time; is that fair?

14     A.    That is accurate.

15     Q.    And you didn't complete this form; correct?

16     A.    I did not.

17     Q.    Sorry.  Marked as Joint Exhibit 1-524.

18     A.    I did not.

19     Q.    Now, have you provided more training to IDOC staff other

20     than the slides that were discussed with you by Ms. Rifkin

21     marked as Plaintiff's Exhibit 1025?

22     A.    I believe that was the last one that I did, but we have

23     future ones planned.

24     Q.    Right.  And do you believe that when you present training,

25     that you present only one side of a debate or an issue?

1    A.    Absolutely not.

2    Q.    And was it your intention in including information from

3    Dr. Levine to present the WPATH and another side of the debate?

4    A.    No.

5    Q.    Do you think it's good training to provide staff with a

6    balanced look at both sides of a debate?

7              MS. RIFKIN:  I'm sorry, Your Honor.  I'm going to

8    object as leading the witness here.

9              THE COURT:  I'm sorry.  You're objecting to leading?

10             MS. RIFKIN:  Leading the witness, yes, as this is

11   direct.

12             THE COURT:  Rephrase the question.

13   Q.    BY MR. HALL:  Do you find it important to present both

14   sides of a debate?

15   A.    Yes, I do.

16   Q.    Why?

17   A.    I feel like all of the things need to be on the table to

18   empower my staff to make the best decisions possible based on

19   all the information.

20   Q.    Do you feel that the WPATH has adequately addressed how to

21   apply the standards in a prison context?

22             MS. RIFKIN:  Objection as beyond the scope of cross.

23             MR. HALL:  I think it goes directly to cross and the

24   basis and foundation for the presentations and the training that

25   he has provided to IDOC clinicians.

**CLARK − Redirect**

382

1          THE COURT:  Overruled.  You may answer.

2          THE WITNESS:  I feel it covers a lot of what we can do

3     in prison for this population, but I do feel it is missing areas

4     on how to deal with specific issues associated with prisons.

5     Q.   BY MR. HALL:  And do you believe that Levine and Osborne

6     and Lawrence have attempted to try and comment on how to apply

7     the WPATH in the context of a prison?

8     A.   That was how I interpreted it, yes.

9     Q.   And you've -- you have reviewed Osborne and Lawrence's

10    article; correct?

11    A.   Yes.

12    Q.   And have you ever presented any opinions to IDOC staff that

13    the IDOC should not ever provide sex reassignment surgery to a

14    gender dysphoric inmate?

15    A.   I have never said that, no.

16    Q.   Do you believe that?

17    A.   I do not.

18    Q.   Okay.  Did you present in this slide, this presentation,

19    Plaintiff's Exhibit 1025-1, that it's actually Dr. Levine's

20    opinion that SRS should never be provided in a prison?

21    A.   No, I never presented that to them.

22    Q.   Do you believe that there may be gender dysphoric inmates

23    at the Idaho Department of Corrections who may one day meet the

24    criteria for sex reassignment surgery?

25          MS. RIFKIN:  Objection.  Calls for speculation, beyond

1      the scope.

2              THE COURT:  Well, I'm going to allow it because I was

3      going to ask that question myself.  So I guess that defines

4      relevance.

5              So you can answer.

6              THE WITNESS:  I do believe there will come a time

7      where we will have a person incarcerated that will meet the

8      criteria for surgery.

9      Q.   BY MR. HALL:  And is it your opinion that if someone meets

10     the criteria under the WPATH, that it would be appropriate to

11     provide sex reassignment surgery or refer to a physician who

12     could make that determination?

13     A.   Yes, I do feel that would be appropriate.

14     Q.   But going back to your opinion, while that may be possible

15     for some offender someday, you don't believe that Ms. Edmo meets

16     the criteria for sex reassignment surgery; correct?

17     A.   That is correct.

18     Q.   And in 2016, that was your opinion at that time; correct?

19     A.   Yes, that was my opinion.

20     Q.   And you weren't lying when you said that you considered the

21     WPATH in 2016 and in assessing whether or not Ms. Edmo had

22     mental health concerns that made SRS inappropriate, were you?

23     A.   No, I was not.

24     Q.   You had a conversation with Dr. Eliason?

25     A.   Yes, I did.

384

1    Q.   And have you seen Dr. Eliason's note from that assessment?

2    A.   Yes, I have.

3    Q.   And did you see where he referenced you in there as a WPATH

4    member and that he had specifically staffed it with you?

5    A.   Yes, I did.

6             MR. HALL:  Okay.  No further questions.

7             THE COURT:  All right.  I was going to ask some

8    questions, and I should have asked them after Ms. Rifkin's

9    questions.  But I'll do it now and give both sides a chance to

10   follow up if I ask anything that raises a concern.

11                          EXAMINATION

12   BY THE COURT:

13   Q.   Just to be clear, the training that you provided to the

14   IDOC staff, it was not training to assist the staff in making a

15   gender dysphoria assessment, because that's not their role;

16   correct?

17   A.   No.  That particular one for September 2017 was for a group

18   of clinicians that we were training to do assessments.

19   Q.   So it was to do assessments?

20   A.   Yes.

21   Q.   And was the upshot of the training that you use the WPATH

22   criteria to determine whether or not a person should, in fact,

23   receive gender-conforming surgery?

24   A.   I don't recall if I covered surgery in the further slides

25   or not.  I think I was focusing mainly on the assessments.

1    Q.   In other words, to assess whether or not a person suffers

2    from gender dysphoria?

3    A.   Yes.

4    Q.   Is that all you're doing?

5    A.   Yes.

6    Q.   You're not recommending a particular treatment program?

7    That's not the role of the assessment?

8    A.   For that training, no, that was not the purpose of it.

9    Q.   Okay.  Well, the second question, I think I understood

10   that -- just earlier today, that apparently as of the last

11   Friday, there was a change in IDOC policy allowing female

12   underwear, makeup, and hairstyles according to an inmate's

13   desired gender and directing correctional officers to address

14   them according to that desired gender.

15        First of all, did I get that right?  And secondly, were you

16   involved in that change in policy?  Or do you know?  Maybe you

17   don't even know.

18   A.   Yes.  First of all -- okay.  Remind me your first question.

19   I apologize.

20   Q.   Well, it was basically, there has been a change in IDOC

21   policy.  You were aware of that?

22   A.   Yes.

23   Q.   And were you involved in creating that change in policy?

24   A.   Yes, I was involved in that process.

25   Q.   So was that your recommendation?

CLARK – Examination by The Court

386

1    A.   To offer those?

2    Q.   Make those changes.

3    A.   Yes, it was.

4    Q.   Okay.  Was that a -- well, let me just leave it at that.

5    Maybe I don't need to go any further because it's not directly

6    relevant to the issue before the court.

7         Let me ask now just a couple questions about, I guess, the

8    WPATH standards.

9         In the last few questions asked by Mr. Hall, you talked

10   about whether there would be someone at some point who IDOC

11   might well approve for gender confirmation surgery.  And I'm

12   assuming that that person would need to qualify under the WPATH

13   standards; that would be maybe the or at least a criteria for

14   making that determination.

15        Is that --

16   A.   I would rely on those standards heavily, yes.

17   Q.   WPATH standards?

18   A.   Yes, the WPATH standards.

19   Q.   All right.  And you agree that, as I understand your

20   testimony, that other than that fourth requirement that any

21   serious existing or serious mental health concerns be well

22   controlled, that the plaintiff, Ms. Edmo, qualifies under the

23   WPATH standards?

24   A.   From my opinion, yes.

25   Q.   Okay.  So let me ask -- and I have no idea what the answer

**CLARK – Examination by The Court**

387

1       to this is.  First of all, gender dysphoria -- and I want to be

2       careful on terminology.  I know that DSM-5 at least provides the

3       standard for diagnosing gender dysphoria, but would gender

4       dysphoria by itself constitute a serious mental health concern?

5       A.   I think it can, yes.

6       Q.   But you would agree that if that is the only uncontrolled

7       serious mental health concern, that should not be a

8       disqualifying factor under the WPATH standards; or, otherwise,

9       you have complete circular reasoning?

10      A.   Yes, that is correct.

11      Q.   All right.  Then, if all of Ms. Edmo or any inmate's

12      existing mental health concerns are either gender dysphoria or

13      other recognized mental health issues which were a direct

14      consequence of gender dysphoria or greatly exacerbated by gender

15      dysphoria, would that, in your view, be disqualifying under that

16      fourth requirement of the WPATH standards?

17      A.   I think that would have to be taken in great consideration

18      if you can really establish the gender dysphoria as the basis of

19      it.

20      Q.   Well, that's my next question, is that you, presumably, as

21      a licensed mental health professional but not having a Ph.D. or

22      not being a psychiatrist, I'm assuming that you don't know how

23      we would ever differentiate between those mental health issues

24      which are directly tied to gender dysphoria and those which are

25      not?

CLARK – Examination by The Court/Recross

388

1    A.   I think it can be difficult with some people, yes.

2    Q.   Okay.  But you would agree that, at least potentially, if

3    they are, in fact, directly tied to gender dysphoria, those also

4    should not be considered in making that assessment under that

5    fourth requirement of the WPATH?

6    A.   Yeah.

7         THE COURT:  All right.  Counsel, go ahead.

8         Again, Mr. Hall and Mr. Eaton, I assume you will follow up

9    on my questions.  That's one of the great advantages of being up

10   here; I have a question, I get to ask it.

11        Go ahead.

12        MS. RIFKIN:  Thank you, Your Honor.  If we can show

13   Mr. Clark Joint Exhibit 8, please.

14                          RECROSS-EXAMINATION

15   BY MS. RIFKIN:

16   Q.   Mr. Clark, this is the IDOC policy relating to GD -- folks

17   in prison with GD that was operative until last Friday; correct?

18   A.   Yes.

19   Q.   Okay.  And if we can turn to what is I believe page 3 of

20   this exhibit.  And can we zoom in on "Qualified gender identity

21   disorder evaluator," please.

22        In this policy which has been operative right up until

23   Friday and was operative in 2016 when Ms. Edmo was assessed for

24   surgery, this was the definition of qualified gender identity

25   disorder evaluator employed under IDOC policy; correct?

CLARK – Recross

389

1    A.   Yes.

2              MR. HALL:  Your Honor, I'm going to object.  This line

3    of questioning goes well beyond the scope of the initial cross

4    or the court's questions.

5              THE COURT:  It seems like it does.  I don't know --

6    can you tie it back in?

7              MS. RIFKIN:  I can, Your Honor.  Mr. Hall put the six

8    criteria in front of Mr. Clark and stated that he -- that he had

9    been able to assess Ms. Edmo.  The questions are about his

10   assessment of Ms. Edmo for surgery and his qualifications to do

11   that, and this directly addresses that.

12             THE COURT:  Your objection is -- oh, go ahead,

13   Mr. Hall.

14             MR. HALL:  Your Honor, the line of questioning was

15   dealing solely with the WPATH criteria, whether he was competent

16   under the WPATH, not this policy.

17         I think this takes it well beyond the WPATH and to a policy

18   which is no longer in effect.  And I have offered nothing to

19   suggest that Mr. Clark -- well, really, no analysis as to

20   whether he qualifies under that definition.

21             MS. RIFKIN:  Your Honor, if counsel will stipulate

22   that Mr. Clark was not qualified as of prior to last Friday

23   under IDOC policy to assess patients with gender dysphoria as to

24   appropriateness or medical necessity for sex reassignment

25   surgery -- if they will stipulate that he was not qualified

1      under their own policy, I'll withdraw the questions.

2              THE COURT:  Mr. Eaton -- or are you willing to concede

3      that you are not arguing that, in any event?  You're not arguing

4      that he, in fact, was qualified to do assessments?

5              MR. HALL:  Well, that takes it out of context.  But we

6      never -- we have never presented any testimony that, under this

7      definition, that Mr. Clark meets that.  He is not a doctor of

8      philosophy, so I don't see what the point is.

9          But there are other physicians that may qualify in that --

10     Claudia Lake, Dr. Eliason.

11             THE COURT:  All that is being asked here is whether or

12     not IDOC is arguing that Mr. Clark was, in fact, a qualified

13     gender dysphoria evaluator.

14         And you're not arguing that he is; correct?

15             MR. HALL:  Under that definition, no.

16             THE COURT:  You're trying to qualify it.  So let's

17     flesh out why -- under what definition.  Today, he is.

18     Apparently, there was a change made on Friday.  And are you

19     saying now that he is qualified?

20             MR. HALL:  Under this policy, it describes qualified

21     gender identity disorder evaluator as a doctor of philosophy or

22     a psychiatrist -- sorry -- a medical doctor, a physician

23     licensed by a state board of medicine.

24         I think Mr. Clark has not testified that he is a doctor of

25     philosophy nor has he testified that he is a medical doctor.

1          THE COURT:  The question, though, is whether or not

2     you are going to argue Mr. Clark is, in fact, a -- I'll use the

3     word, well, gender identity disorder evaluator.  And you're not

4     offering him as such or suggesting, in fact, he has made that

5     evaluation in a way that was operative in this proceeding?

6          MR. HALL:  Correct, Your Honor.

7          THE COURT:  Okay.  I don't know what more we can do.

8     Frankly, I now know what the IDOC policy is, so let's just move

9     on.

10         MS. RIFKIN:  That's fine.

11    Q.   BY MS. RIFKIN:  Mr. Clark, you testified about the policy

12    change and that you were involved in the policy change.

13    You -- based on your own experience, IDOC started the process to

14    revise its GD policy in 2016; correct?

15    A.   That was the approximate time, yes.

16    Q.   And so after two-and-a-half or more years in the process of

17    revising its policy, it happened to adopt a new policy last

18    Friday; correct?

19    A.   Officially, yes.

20         MR. HALL:  Objection, Your Honor.  This is also going

21    beyond the scope of cross and the court's questioning.  She had

22    the opportunity to cross about the policy.

23         THE COURT:  I understand.  And I injected some of that

24    into the case by asking about the change in policy.

25         I'm going to allow some leeway, Counsel, but my questions

1       were tied to changes regarding how the correctional officers

2       were to refer to the inmate and the physical aspects of this.

3       So I think we need to limit it to that.

4                    MS. RIFKIN:  I'll move on, Your Honor.

5                    THE COURT:  All right.

6                    MS. RIFKIN:  May I have -- I would like to be able to

7       show Mr. Clark the exhibit, Plaintiff's Exhibit 1025, that we

8       have been talking about.  I would like him to be able to look

9       through that entire document to be able to answer questions.

10              May I approach the witness?

11                   THE COURT:  Yes.  Mr. Severson will -- if you have a

12      hard copy, we'll provide that to him so he can review it.

13              Counsel, we need to take one more short break, and we'll

14      probably limit it to just five minutes, and then we'll go

15      through until 3:00, a little after 3:00 maybe.  Will that work?

16                   MS. RIFKIN:  Take a break in five minutes or now?

17                   THE COURT:  Well, the reason I'm suggesting that, too,

18      is if you want Mr. Clark to review the entire thing, he can do

19      that on the break.

20                   MS. RIFKIN:  Sure.

21                   THE COURT:  Then you can come back and ask questions

22      about it.

23                   MS. RIFKIN:  That works, Your Honor.

24                   THE COURT:  All right.  Let's take a 10-minute break.

25      And we'll probably run until 3:00 or 3:10 to try to catch up the

1    time we lost yesterday.

2            THE WITNESS:  I have a question.  I'm supposed to

3    review this whole thing?

4            THE COURT:  I'm assuming you're only talking about one

5    exhibit, which is Exhibit 1025.

6            THE WITNESS:  Okay.  Thank you.

7            MS. RIFKIN:  I mean, I'm tempted to say yes.  But, no,

8    just 1025.

9            THE COURT:  Ms. Rifkin, you're so generous.

10          Yeah, just Exhibit 1025, which I think is the PowerPoint

11   slides you looked at earlier, but she wants you to look at all

12   of them.

13          Right?  Okay.

14           MR. HALL:  Your Honor, just one question --

15           THE COURT:  Yes.

16           MR. HALL:  -- so I don't run afoul of anything.  Would

17   it be permissible if Mr. Clark leaves the witness stand during

18   this?

19           THE COURT:  Oh, yes.  No.  We are going to take a

20   10-minute break.  So he can -- we'll take a break and, yes, he

21   can --

22           MR. HALL:  You're not sequestering him there?

23           THE COURT:  No, not at all.

24           MR. HALL:  He's able to talk to his attorneys?

25           THE COURT:  No, not at all.

1          MR. HALL:  Thank you.

2          THE COURT:  All right.  We'll be in recess for 10

3     minutes.

4          (Recess at 2:02 p.m. until 2:17 p.m.)

5          THE COURT:  Mr. Clark, I'll remind you you are still

6     under oath.

7          Ms. Rifkin, you may resume your examination.

8          MS. RIFKIN:  Thank you, Your Honor.

9     Q.   BY MS. RIFKIN:  Mr. Clark, have you had a chance to review

10    Plaintiff's Exhibit 1025?

11    A.   Yes.

12    Q.   Okay.  And it's there in front of you?

13    A.   Yes.

14    Q.   Okay.  You told the court before the break that this

15    training was about assessment and not surgery; correct?

16    A.   Yes.

17    Q.   Can you please turn to what's labeled page 6 of

18    Exhibit 1025.

19    A.   I'm there.

20    Q.   So looking at the slide in the upper left-hand corner, this

21    slide discusses surgery; right?

22    A.   Yes.

23    Q.        "Assumes that genital surgery will cure the problem

24             and withholding SRS constitutes a gross violation of

25             the Eighth Amendment."

1        That's the top part of this slide?

2    A.   Yes.

3    Q.   And it ends with:

4            "This paradigm assumes that SRS is a cure that if

5            withheld constitutes a gross violation of the Eighth

6            Amendment."

7    A.   Yes.

8    Q.   And the next slide, "Is there a fifth hidden paradigm,"

9    this is one of the ones we talked about earlier.  This also

10   talks about surgery; correct?

11   A.   Yes.

12   Q.   And the next slide, "Is there a fifth hidden paradigm -- a

13   justice paradigm?" this slide also talks about surgery; correct?

14   A.   Yes.

15   Q.   So you chose to include these slides from Dr. Levine with

16   perceptions -- his perceptions about providing surgery for

17   inmates with gender dysphoria in a training about assessment of

18   gender dysphoria; correct?

19   A.   Yes.

20   Q.   I'm going to represent to you that, besides the cover

21   slide, there are 38 slides in this PowerPoint.

22        Do you know how many of those slides you took from

23   Dr. Levine's presentation?

24   A.   The majority.

25   Q.   Does 32 out of the 38 slides sound like the right number?

CLARK – Recross

1    A.   Yes.

2    Q.   And it's the only slides you didn't take from Dr. Levine

3    were the ones where you presented the WPATH standards of care

4    for medical professionals, the DSM-5 criteria, and what the MTC

5    does; is that accurate?

6    A.   That's accurate.

7    Q.   You and Mr. Hall suggested that you included Dr. Levine's

8    slides in here to present both sides of the debate; isn't that

9    accurate?

10   A.   Yes.

11   Q.   Where is the other side of the debate in this presentation,

12   Mr. Clark?

13   A.   If you look at the slides, he presents what the -- what

14   each one is presenting and what the limitations or possibilities

15   would be.

16        I put them in there specifically for talking points, so we

17   could address the issue, not to take a side anywhere.

18   Q.   Isn't it true, Mr. Clark, that you testified in your

19   deposition that you don't recall expressing disagreement with

20   any of Dr. Levine's opinions in these slides?

21             MR. HALL:  Objection.

22             THE WITNESS:  I don't recall that.

23             THE COURT:  Just a moment.  Just a moment.

24             MR. HALL:  I think that misstates the deposition

25   testimony.  If we could see --

397

1          THE COURT:  Well, let's ask the question whether he

2     disagrees or not.  And then if he gives an answer contrary to

3     his deposition, you can impeach.

4          Go ahead.

5     Q.   BY MS. RIFKIN:  Do you recall testifying at your deposition

6     that you didn't discuss your disagreement with any of

7     Dr. Levine's slides during the training?

8     A.   I don't recall that, no.

9          MS. RIFKIN:  No further questions, Your Honor.

10          THE COURT:  Mr. Hall.

11          MR. HALL:  Your Honor, a couple brief questions.

12     Madam Clerk, could I have this converted over.  Thank you.

13                    FURTHER REDIRECT EXAMINATION

14     BY MR. HALL:

15     Q.   I want to show you again Joint Exhibit 15, page No. 28.

16          Again, these are the competencies under the WPATH of being

17     able to work with someone who is gender dysphoric; correct?

18     A.   Yes.

19          MS. RIFKIN:  Objection.  This is beyond the scope of

20     the recross.

21          MR. HALL:  Can I have a little leeway, Your Honor?

22          THE COURT:  I'm going to give you some leeway.  Go

23     ahead and proceed.

24     Q.   BY MR. HALL:  The court asked you some questions about

25     whether or not the roles of a psychologist versus a clinician,

1      the role of a medical doctor, psychiatrist versus a clinician.

2           Under Joint Exhibit 15, page No. 28, does it say in there

3      anywhere that to be competent under the WPATH, you have to be a

4      medical doctor?

5      A.   No.

6      Q.   Does it say you have to be a Ph.D.-level provider or

7      professional?

8      A.   No, it doesn't.

9      Q.   Okay.  And do you -- to your knowledge, can only a

10     psychiatrist or a psychologist determine the relationship

11     between gender dysphoria and other coexisting mental health

12     concerns?

13     A.   No.

14     Q.   And in your profession, within your scope of care, can you

15     determine the difference between a gender dysphoric -- gender

16     dysphoria and other coexisting mental health concerns?

17     A.   Yes.  I have that experience.

18     Q.   Okay.  And the WPATH expects you to do that, doesn't it?

19     A.   Yes.

20     Q.   And I just want to ask one more question, maybe two, about

21     the slides under Plaintiff's Exhibit 1025.

22           This is the title right here of the presentation, "Gender

23     Dysphoria Assessment"; correct?

24     A.   Yeah.

25     Q.   And just to make it very clear, because I don't think it's

1    been very clear -- I just want to make it very clear -- this

2    presentation was not about treatment options, including surgery;

3    right?

4    A.    That is correct.

5    Q.    It was about training for diagnosis of gender dysphoria; is

6    that correct?

7    A.    Yes.

8              MR. HALL:  Thank you.  No further questions.

9              THE COURT:  Anything else?

10             MS. RIFKIN:  No, Your Honor, not from plaintiff.

11             THE COURT:  All right.  Mr. Clark, you may step down.

12   Thank you.

13             THE WITNESS:  Am I free?

14             THE COURT:  You are.

15        I assume he is released from any subpoena, not subject to

16   recall.

17             MR. HALL:  Right, Your Honor.

18             THE COURT:  Well, presumably you know where to find

19   him if need be.  So you are released.

20             MR. HALL:  I think he is taking off.  He will be in

21   the mountains.

22             THE COURT:  That's right.  It is that time of the

23   year.

24             THE WITNESS:  Thank you.

25             THE COURT:  Call your next witness, Mr. Eaton.

1          MR. EATON:  Yes, Your Honor.  The defendants call

2     Dr. Eliason.

3          THE COURT:  Sir, would you step before the clerk and

4     be sworn.

5          SCOTT ELIASON, M.D., DEFENDANTS' WITNESS, SWORN

6          THE CLERK:  Please take a seat in the witness stand.

7      Please state your complete name and spell your name for the

8     record.

9          THE WITNESS:  Scott Eliason, S-C-O-T-T, E-L-I-A-S-O-N.

10          THE COURT:  You may inquire.

11          MR. EATON:  Thank you, Your Honor.

12                    DIRECT EXAMINATION

13     BY MR. EATON:

14     Q.   So I have been saying it right.  It's Eliason; right?

15     A.   Yes.

16     Q.   I told everybody the first time I met you, you said, "I'm a

17     psychiatrist.  I listen."

18          It's Eliason; is that right?

19     A.   That's right.

20     Q.   Okay.  Well, I know you have been ill this week, so I'm

21     glad you can be here, and I hope you're feeling better.

22     A.   Thanks.

23     Q.   How are you employed?

24     A.   I'm employed by Corizon full time, but also I -- I work at

25     Ada County Jail.  And then I have a small consulting business

**ELIASON – Direct**

401

1    called Boise Forensic Psychiatry where I consult with lawyers on

2    cases.

3    Q.   Okay.  And what is your job title with Corizon?

4    A.   I'm the regional psychiatric director.

5    Q.   Okay.  And is that a full-time job?

6    A.   Yes.

7    Q.   Okay.  And how long have you been employed with Corizon?

8    A.   I have been with Corizon before it was Corizon, but it used

9    to be called Correctional Medical Services.  And I joined them

10   the end of 2009.

11   Q.   Okay.  And then that was a name change eventually?

12   A.   Yeah.  Then it became -- it merged with some other company

13   and changed to Corizon.

14   Q.   Okay.  And have you been the psychiatric director

15   since -- since 2009?

16   A.   It was really -- it was the spring of 2010 that I became

17   the director.

18   Q.   Okay.  And what did you do before that for Corizon?

19   A.   I just -- I just saw patients as a psychiatrist.

20   Q.   Okay.  And the official title, again, is?

21   A.   Regional psychiatric director.

22   Q.   Okay.  So as the regional psychiatric director, what are

23   your duties?

24   A.   Primarily, I see patients for 90 percent of the time.  And

25   then I oversee the psychiatric providers throughout the state.

402

1    So that includes psychiatrists and nurse practitioners and

2    physician's assistants throughout the state.

3    Q.   When you say "throughout the state," is that at state

4    prisons?

5    A.   Yes, throughout the state prison system.  That's right.

6    Q.   And so you have a supervisory role over those

7    psychiatrists.  And do you call them "mid-levels"?

8    A.   Yeah, that's right.

9    Q.   Okay.  And do you have administrative roles?

10   A.   Yes.  I do peer reviews, read credentialing interviews.

11   I'm involved with the hiring process and interviewing, things

12   like that.

13   Q.   And then if I understood you, the majority of your time is

14   spent treating and caring for patients?

15   A.   Yes.

16   Q.   And what does that entail?

17   A.   The treating patients?  Sitting down, talking with

18   patients, reviewing their records, and prescribing treatments.

19   Q.   And at what facilities do you do that?

20   A.   I give direct care on a regular basis at Idaho State

21   Correctional Institution and Idaho Maximum Security Institution.

22   Q.   And is there a specific unit that you provide the direct

23   care at ISCI?

24   A.   There is two units.  I work at the behavioral health unit

25   at ISCI, and I also work at the receptions and diagnostic unit.

1    Q.   And is that separate from the general population?

2    A.   Yes.  That's the arrival area.

3    Q.   And the behavioral health unit is separate from the general

4    population as well?

5    A.   Yes.

6    Q.   And what do you do for Ada County?

7    A.   For Ada County, I provide some direct patient care, and

8    then I oversee a nurse practitioner who works there, too.

9    Q.   Okay.  Could we pull up Dr. Eliason's CV.  This is -- can

10   you scroll down a little bit.  This is Defendant's Exhibit 2022.

11        Dr. Eliason, do you see this?

12   A.   Yes.

13   Q.   Okay.  Is this your CV?

14   A.   Yeah, this is my CV.

15   Q.   Do you want us to scroll through it?

16        Why don't you scroll through it just briefly so he can see

17   it.

18        Is that your CV?

19   A.   Yes.

20   Q.   Did you write that?

21   A.   Yes.

22   Q.   Okay.  And is it accurate?

23   A.   Yes.

24        MR. EATON:  All right.  We would move to admit the CV,

25   Your Honor.

**ELIASON – Direct**

404

```
1              THE COURT:  Any objection?

2              MS. SHANBHAG:  No objection, Your Honor.

3              THE COURT:  What's the exhibit number again?

4              MR. EATON:  2022 of Defendants' exhibits.

5              THE COURT:  2022 is admitted.

6              MR. EATON:  Thank you, Your Honor.

7         (Defendant's Exhibit 2022 admitted.)

8    Q.    BY MR. EATON:  The court has your CV now, but I would still

9    like to talk to you and highlight a little bit of your

10   background.  So let's talk about your education first.

11        Did you graduate from medical school?

12   A.    Yes.

13   Q.    Where was that?

14   A.    Medical College of Wisconsin.

15   Q.    Okay.  And when was that?

16   A.    In 2003.

17   Q.    Okay.  And then why don't you walk me through your formal

18   training -- excuse me -- formal education.

19   A.    I did a psychiatric residency at the University of

20   Washington, where I did my first two years in Seattle and then

21   my last two years in Spokane.

22        And then I did a forensic psychiatry fellowship at the

23   University of California, San Francisco, where I trained at

24   several facilities, but I primarily worked at San Quentin

25   Prison.
```

**ELIASON – Direct**

405

1          And then –- and then I graduated from training.  I worked

2     at the Department of Health and Welfare for the first

3     year-and-a-half out of training, and then I got the job at the

4     prison.

5     Q.   Which prison?

6     A.   With Corizon here in Idaho.

7     Q.   And when was that?  That was in 2009?

8     A.   2009.

9     Q.   And you mentioned a fellowship.

10         In any of that education, did you encounter any gender

11    dysphoria or, I guess, it may have been gender identity disorder

12    patients at that time?

13    A.   Yes.  At San Quentin, I didn't directly treat patients, but

14    I shadowed my attending, who did have patients that were

15    transgender.

16    Q.   Can you scroll down one page.

17         On this page, you mention NCCHC.

18         Do you see that in the middle?

19    A.   The recent CME?

20    Q.   Yes.

21    A.   Yes.

22    Q.   What is that?

23    A.   NCCHC stands for National Commission, I think, of

24    Correctional Health Care.

25    Q.   Can you just explain what you're referencing there?

1    A.   I reference a conference that specializes in correctional

2    healthcare that I had attended.

3    Q.   Okay.  And are you board certified?

4    A.   Yes.

5    Q.   In what?

6    A.   In forensic psychiatry and general psychiatry.

7    Q.   Okay.  What's the difference?

8    A.   General psychiatry is the psychiatric treatment of adults

9    and also children but doesn't specialize in children.

10        And then forensic psychiatry is really the interface of

11   mental health and the legal system.  And so you're trained in

12   all sorts of different aspects of psychiatry when it has to do

13   with the law.  And as an offshoot of that forensic psychiatry is

14   considered the fellowship training for correctional

15   psychiatrists.

16   Q.   And do you have any certifications or credentialing related

17   to providing treatment and care to prisoners?

18   A.   Yes.  Through the NCCHC, I am what's called a "CCHP," which

19   stands for a Certified Correctional Healthcare Provider.  And I

20   both have the physician certification and the mental health

21   certification for that.

22   Q.   And I assume, through your training and education and

23   experience, you are familiar with the DSM?

24   A.   Yes.

25   Q.   And what is that?

ELIASON – Direct

407

1    A.    That's the Diagnostic and Statistics Manual, which is the

2    textbook full of psychiatric disorders and their diagnostic

3    criteria.

4    Q.    And what version are we on now?

5    A.    Version 5.

6    Q.    Of the DSM?

7    A.    Yes.

8    Q.    Okay.  And so through your training, education, and

9    experience, are you familiar with the disorders and criteria of

10   mental health disorders in the DSM?

11   A.    Yes.

12   Q.    Does that include previously gender identity disorder?

13   A.    Yes.

14   Q.    And has that changed, that diagnosis?

15   A.    Yes.  It's now called gender dysphoria.

16   Q.    Okay.  And do you have an appreciation as to why that

17   changed?

18   A.    You know, there is -- mental health disorders are somewhat

19   difficult to define and often have a lot to do with society.

20   Like, if you look back at the earlier editions of the DSM, you

21   might find things like homosexuality in there, but now we know

22   that to just be a normal variant of human behavior.

23        And so over time, some things that have in the past been

24   considered mental disorders become not mental disorders.

25        And there has been some movement, I think, with the

1      transgender population to destigmatize or depathologize

2      transgender behavior.

3           And I think that the change from gender identity disorder

4      to gender dysphoria was to kind of support that and to help

5      de-stigmatize the transgender population.

6      Q.   But is gender dysphoria still a -- do you call it a

7      diagnosis?

8      A.   Yeah.  It is still a diagnosis that you can find in the

9      DSM.

10     Q.   Okay.  I would like to pull up his records.  I think it's

11     the second page.

12          So do you know Ms. Edmo, who is the plaintiff in this case?

13     A.   Yes.

14     Q.   And how did it come about that you know Ms. Edmo

15     originally?

16     A.   Originally, I was asked to evaluate Ms. Edmo for gender

17     identity disorder.

18     Q.   And how did that process work at that time?

19     A.   Usually the inmate would bring to the attention of the

20     Department of Corrections that they wanted to be evaluated for

21     gender identity disorder, and that usually had to go through the

22     chief psychologist, who was Dr. Craig at that time.  And then

23     Dr. Craig would assign people to do the evaluations.

24     Q.   Actually, can we scroll up one record.

25          So here we have a Health Services Request form; correct?

409

1    A.    Yes.

2    Q.    And this is Joint Exhibit 1-12.

3          And what -- is that Ms. Edmo asking for something --

4    A.    Yes.

5    Q.    -- can you tell?

6          What is she asking for?

7    A.    She said, "I would like to speak to Dr. Eliason about

8    hormone therapy.  Thank you."

9    Q.    And what's the date on that?

10   A.    It looks like -- oh, 6 -- June 13, 2012.

11   Q.    And to your knowledge, is that how it came about that you

12   were assessing Ms. Edmo?

13   A.    Well, I'm not sure if there were prior communications about

14   this as well.  I think this could have led to it.  But if you go

15   to my note below that you just had --

16   Q.    Yeah, let's go to that.

17   A.    -- the date is June 25th.  And so it could have been that,

18   but it could have also been some prior communications.

19   Q.    In any event, was Ms. Edmo referred to you for an

20   assessment?

21   A.    Yes.

22   Q.    An assessment of what?

23   A.    An assessment of her gender identity disorder.

24   Q.    Okay.  And so what -- the court has this note, so I don't

25   want you to read it all.

ELIASON - Direct

410

1        But can you walk us through generally what the subjective

2    section and what she was saying to you at that time that was

3    significant to your assessment.

4    A.   Just that, primarily, she had always felt feminine and felt

5    that she was supposed to have been born a female and not a male

6    and that she used to think that that meant that she was supposed

7    to be a homosexual, but that now that she thought that she

8    wasn't a gay man but really a woman.

9        Do you want me to go further?

10   Q.   Yeah.  What else was significant to you in that

11   conversation?

12   A.   And so then we talked about her sexual orientation some and

13   then about how she interacted and felt about being a man versus

14   being a woman and the kinds of things she felt comfortable

15   doing.

16       And then we also talked about some about her mental health

17   medications.

18   Q.   So what mental health medications was she on at that time?

19   A.   She was taking a medicine called Lamictal.

20   Q.   What's that for?

21   A.   Lamictal is a mood stabilizer that's primarily indicated

22   for bipolar disorder but used in depression as well.

23   Q.   Anything else in the subjective section that you found

24   significant?

25   A.   Not really.

411

1    Q.   And then you have an objective section.

2         What did you do there and document?

3    A.   So objective is basically like my physical exam or, in

4    psychiatry, we call it our mental status exam, which is when we

5    describe what we see related to their mental health.

6         So I noted that she appeared feminine in demeanor and

7    interaction style.

8    Q.   And you also indicate in there --

9         Can you stop moving it, please.  Thank you.

10        And then in there, you also indicate "mood depressed";

11   right?

12   A.   Yes.

13   Q.   All right.  And so did you have an assessment?

14   A.   Yes.

15   Q.   And what was your assessment?

16   A.   Well, first I commented about her mood disorder and that

17   she reported that she had done better on Zoloft.  Then I said

18   that I thought that she met criteria for gender identity

19   disorder and that it was consistent with presentation and his

20   reported -- her reported history.

21   Q.   And then did you make an assessment?

22   A.   Yes.

23   Q.   What was that?

24   A.   Well, that was my assessment.  Then I made a diagnosis down

25   here.

1    Q.    Okay.

2    A.    And under diagnosis for axis 1, which is where we would put

3    major mental illnesses at the time, I put "alcohol dependence,

4    mood disorder not otherwise specified."

5    Q.    Let's stop there for a second.

6          So what was the basis for that assessment or that

7    diagnosis?

8    A.    The alcohol dependence?  That was based on previous records

9    that I was provided.

10   Q.    And then did you have another diagnosis as well?

11   A.    Yes.  Mood disorder not otherwise specified.

12   Q.    What was the reason for that diagnosis?

13   A.    That was partially based on what we talked about, but also

14   prior records as well.

15   Q.    Okay.  What about any other diagnosis?

16   A.    And then I put here "GID," which stands for gender identity

17   disorder.

18   Q.    Why did you make that assessment?

19   A.    I made that assessment based on my objective evaluation and

20   then her report.

21   Q.    And then you -- did you prescribe any medications?

22   A.    Yes.  I stopped her Lamictal and started Zoloft.

23   Q.    And why did you do that?

24   A.    Basically because she felt like she had done better on

25   Zoloft.

1    Q.   Okay.  And so now that Ms. Edmo had a diagnosis from you of

2    gender identity disorder, what were the next steps, if any, in

3    the process?

4    A.   So in the process in the Department of Corrections, you

5    would get two evaluations, one by -- it was usually by me and

6    then one by a psychologist.

7         And then the two evaluations would be brought to the MTC,

8    the management and treatment team, and we would discuss the

9    evaluations.  And then if -- the Department of Corrections

10   oftentimes would also have more information based on outside

11   records or outside interviews with collateral people.  And then

12   we would use that information to determine whether or not the

13   diagnosis of gender identity disorder was appropriate.

14   Q.   And so do you have any understanding as to whether Ms. Edmo

15   received another assessment by a psychologist?

16   A.   Yes.

17   Q.   And who was that?

18   A.   That was Claudia Lake.

19   Q.   Have you reviewed that?

20   A.   Not recently, but I have.

21   Q.   Okay.  And you mentioned the MTC, the Management Treatment

22   Committee.  I believe the court heard Mr. Clark testify about

23   that committee.

24        But, generally, what was the makeup of that committee?

25   A.   It was a multidisciplinary committee, meaning that we had

1    people from security, usually a deputy or warden; but we also

2    had people from mental health, which was the primary clinicians

3    who interact on a daily or weekly basis with their patients; and

4    then we also had medical representation.

5        And I was on that committee as kind of a combination since

6    I was a psychiatrist; but I worked for Corizon, so I was from

7    the medical portion and the mental health portion.

8    Q.   What did you understand your role was on the MTC?

9    A.   My role was to provide assistance and some expertise and

10   commentary and insight into the different patients.

11   Q.   Okay.  And do you know whether the MTC met after your

12   diagnosis and Dr. Lake's diagnosis of GID?

13   A.   Yes, it did meet.

14   Q.   And what happened at that point, at that meeting regarding

15   the GID assessment?

16   A.   I believe it was agreed by the committee that Ms. Edmo did

17   have gender identity disorder.

18   Q.   Okay.  And do you have any appreciation as to whether

19   hormones were started after that?

20   A.   They were started after that.  I can't remember how

21   quickly, but they were.

22   Q.   Okay.  Were you involved in providing the hormone therapy?

23   A.   No.  The committee would basically decide whether or not

24   the patient should be put into the medical clinic to then be

25   seen if it was appropriate to be put on hormones.  The medical

415

1    provider would then sit down with them and determine if there

2    was any contraindications or reasons why they shouldn't be on

3    them.

4    Q.   Now, did you see Ms. Edmo after the GID diagnosis?

5    A.   Yes.

6    Q.   Okay.  Did you see her continuously in the months following

7    or the years following?

8    A.   Yeah, fairly regularly.

9    Q.   Can you explain, elaborate on that.

10   A.   So as long as she was housed in the behavioral health unit,

11   I saw her at a minimum of every three months, and provided her

12   psychiatric care.

13        There was a little bit of a difference with the care and

14   treatment of gender identity disorder and gender dysphoria.

15   Q.   How is that?

16   A.   And that was in my ongoing interactions with her, although

17   I may assess some of the gender dysphoria components or

18   symptoms, the treatment for gender dysphoria was primarily

19   driven through the MTC.  And the treatment for the other mental

20   health conditions, the medication, the prescriptions was done in

21   those monthly -- every-three-month visits.

22   Q.   Okay.  So in the month -- in the year after your GID

23   diagnosis -- so 2012 to 2013 -- did Ms. Edmo have other mental

24   health disorders?

25   A.   I don't recall without looking at my notes, but I think so.

416

1    Q.   Well, I guess what I'm asking is:  Did you have any

2    diagnosis -- and I think we have talked about this some

3    already from your first note -- other than GID?

4    A.   Yes.

5    Q.   And so what were those?

6    A.   I think the diagnosis was called "mood disorder not

7    otherwise specified," but the primary symptom that we were

8    treating was depression.

9    Q.   And, in fact, you periodically would meet with Ms. Edmo

10   over the years after GID to treat her underlying mental health

11   issues; right?

12   A.   Yes.

13   Q.   Can we scroll down to Joint Exhibit 1-370.

14        So I'm showing you now what is marked, I believe, as

15   Joint Exhibit 1-370.

16        Can you scroll up, please.  Thank you.

17        Do you recognize this?

18   A.   Yes.

19   Q.   What is it?

20   A.   It's a letter to the Department of Transportation.

21   Q.   And how did this letter come about?

22   A.   I remember Ms. Edmo was trying to get her driver's license

23   changed so, when she got released, it would reflect that she was

24   a female.  And I guess part of that procedure was you had to

25   have a letter from a doctor.

1    Q.   And so you were willing to do that?

2    A.   Yes.

3    Q.   Okay.  Is this that letter?

4    A.   Yes.

5    Q.   Is that your signature?

6    A.   It is.

7    Q.   What did you indicate in that letter?

8    A.   I indicated that Ms. Edmo was -- now considered herself

9    mentally a female and that she was on hormone replacement

10   therapy, which was equivalent to a change of gender.

11   Q.   Okay.  Can we go down to Joint Exhibit 1-438.

12        So I noticed in some of your earlier records, that you

13   reference in your notes and referred to plaintiff Edmo as "he";

14   is that right?

15   A.   Yes.

16   Q.   Okay.  And then in this note dated September 17 of 2014,

17   did you reference her by a different pronoun?

18   A.   Yes.

19   Q.   And what were you using there?

20   A.   I -- most of the time in this note, I used the female

21   pronoun.

22   Q.   Okay.  And so why is it that you started using that

23   pronoun?

24   A.   Well, through, you know, some continuing training and

25   education about treating patients with gender dysphoria, one

418

1      thing I learned was the importance and power of words.  And, you

2      know, at this point, I felt it was warranted to call Ms. Edmo a

3      "she" in there.

4      Q.   Were you always consistent with that in your records?

5      A.   No.  I mean, you can see here, you know, I clearly have

6      changed at the top.  But in the objective portion, I said

7      "appears feminine in his demeanor," you know.  So it wasn't

8      100 percent consistent, but --

9      Q.   Did you mean any ill intent by referring to Ms. Edmo as

10     "he"?

11     A.   No.

12     Q.   In fact, you were trying to recognize the she pronoun, and

13     you transitioned with that; right?

14     A.   Yes.

15          THE COURT:  Counsel, could I just inquire?  You

16     indicate "return of depressive symptoms with decrease of dose."

17          That's decrease of Zoloft; correct?

18          THE WITNESS:  Yes; that's right.

19          THE COURT:  All right.

20     Q.   BY MR. EATON:  And I'm not going to walk through each one

21     of your notes when you're addressing her depression and other

22     mental health records, but this was an example that I wanted to

23     talk to you about.

24          Could we bring up Joint Exhibit 1-538.  This is the

25     April 20, 2016 note.  There we go.

419

1              So you're now being shown Joint Exhibit 1-538.

2              Do you see that?

3         A.   Yes.

4         Q.   Okay.  And what is this note?

5         A.   Well, this is basically my assessment of Ms. Edmo for the

6    medical necessity of gender reassignment surgery.

7         Q.   And how did that come about?

8         A.   Ms. Edmo requested to be evaluated for sexual reassignment

9    surgery and had sent several concern forms to several people.

10   And then so in the MTC, we discussed it.

11             And as part of the Idaho Department of Corrections standard

12   operating procedures, it says something to the effect of gender

13   reassignment surgery would not be provided unless deemed

14   medically necessary.

15             And so the committee felt like I was the best

16   representative to determine whether or not it was medically

17   necessary, since I was the one with medical training.

18        Q.   And did you understand that the Idaho Department of

19   Corrections required -- their standard operating procedure

20   required a qualified GID evaluator?

21        A.   Yes.

22        Q.   Okay.  And do you know what that required, what it meant to

23   be a qualified GID provider?

24        A.   At least what I remember from the earlier testimony, it

25   said "physician" but that also had the expertise and familiarity

1    with gender identity disorder, I think it was.

2    Q.   Did you consider yourself a qualified GID evaluator --

3    A.   Yes.

4    Q.   -- to assess Ms. Edmo?

5    A.   Yes.

6    Q.   Why is that?

7    A.   Because, you know, I have extensive training in all sorts

8    of mental health disorders, but I have also treated patients

9    with gender identity disorder prior to working in the Department

10   of Corrections.

11       And I don't know how many I had assessed prior to Ms. Edmo

12   at this time, but I'm sure I had assessed at least a handful of

13   inmates with gender identity disorder.

14   Q.   Okay.  And so let's talk about the subjective section in

15   this note.

16       What -- what did you discuss with Ms. Edmo that was

17   significant to you regarding your assessment for SRS?

18   A.   We talked about several things.

19       Can we zoom in on that a little bit?

20   Q.   Yeah.  Let's zoom in.

21       First, before we talk about that, I believe you indicated

22   this was an SRS assessment; right?

23   A.   Yes.

24   Q.   Can you elaborate and explain what that means.

25   A.   So this is an assessment to determine whether or not

1      surgery was needed to treat her gender dysphoria.

2      Q.   Okay.  What kind of surgery?

3      A.   By "surgery," it's a very blanket term.  At this point, we

4      were primarily talking about a surgery to remove the penis and

5      put in a vagina and –– but there are several other surgeries

6      that gender reassignment surgery could entail.

7      Q.   Is that a vaginoplasty?  Is that what you're referring to?

8      A.   Yeah, that's the term for it.

9      Q.   I have been learning.

10          So I was asking you about your subjective section.

11          So what was significant in that regarding your conversation

12     with Ms. Edmo?

13     A.   Well, what was important?  I felt like it was all important

14     because I put it there.

15     Q.   Why don't you just go through that with us.

16     A.   You know, I felt like –– so she said she was doing all

17     right.  And so, subjectively, she felt like things were going

18     well.  She was eligible for parole, but this had not been

19     granted because there were multiple DORs.  And she had mentioned

20     that she had received DORs for makeup and feminine appearance.

21          And she was really frustrated by this because, I mean, how

22     do you determine if somebody appears too feminine?  You know,

23     which makes sense.  It's kind of a blurry line; right?  But she

24     found that frustrating.

25          And she wanted to discuss sex reassignment surgery.  She

1    had been on hormone replacement for the last year-and-a-half but

2    felt that she needed more than just the hormones.  And she said

3    that the hormones had helped her gender dysphoria but was still

4    frustrated by her current anatomy, which meant her genitals.

5          And then she said that she had made several attempts to

6    mutilate her genitals the past fall, which means cutting on

7    them, because of that distress that she felt.

8    Q.   She reported that to you?

9    A.   Yes.

10   Q.   Do you have any understanding as to when that may have

11   happened in relation to your meeting here, your appointment?

12   A.   I think it was the preceding September or something around

13   there.

14   Q.   And what specifically are you referring to?

15   A.   Her cutting on her genitals.

16   Q.   Okay.  So that was several months before?

17   A.   Yes.

18         And then she also requested to be assigned to a different

19   housing unit and didn't want to be in the behavioral health unit

20   anymore.

21         And then we both talked about the importance of having

22   intact genitals for a successful sexual reassignment surgery.

23   And I kind of brought that up and talked to her about it, hoping

24   it would be kind of a deterrent to the self-mutilation.

25         And then I also consulted with the prison staff about the

1    inmate's behavior.  And they had noted that she seemed pleasant

2    and didn't see any, like, overt depressive symptoms.

3         And I had also seen Ms. Edmo in several different settings

4    and appear her looking -- I say here "did not observe

5    significant dysphoria."  In layman's terms, that would mean that

6    she looked pleasant and had a good mood.

7    Q.   Okay.  And she was on medications at the time of this

8    assessment?

9    A.   Yes.

10   Q.   And what was she on?

11   A.   She was on Effexor and Remeron, which are two different

12   antidepressants.

13   Q.   Why was she on those?

14   A.   Because of her history of depression.

15   Q.   All right.  Let's scroll down a little bit.

16        You made some observations; is that right?

17   A.   That's right.

18   Q.   What observations did you make?

19   A.   That she had eyebrows colored in with black pencil.  Her

20   hygiene was good.  She was wearing foundation.  She appeared

21   feminine in demeanor and interaction style.  And her thoughts

22   were logical and linear.  And she denied any suicidal or

23   homicidal thoughts.  And she had no overt delusions, which means

24   she wasn't discussing openly that she was paranoid or...

25        Her affect, which means like her expressed emotions, had a

424

full range, so a healthy range, what were generally euthymic,

which means generally pleasant but, yet, frustrated with the

whole process, which is what I mean by that, frustrated.

And then her speech was regular in rate, rhythm, and

volume, which means she had a regular quality of speech and that

her mood was, quote, "doing all right."

Q.   Okay.  And then did you make an assessment?

A.   Yes.

Q.   And how did you go about making that assessment?

A.   So I incorporated what I had available to me, which was

prior history, my interaction with the patient, her clinicians,

and so her regular treating counselors and therapists.

Q.   Let me stop you there.

So you have access to the clinicians' records at that time?

A.   Oh, yes.  I mean, I rely on those heavily.

If you look at my notes, they are fairly brief compared to

if you looked at some community evaluations or some of the

evaluations like in this case, some of the experts who have

written.  They will have really long evaluations.

But in correctional medicine, it's a little bit different

because we have access to a wide variety of information right in

our system.  And the therapist and the clinicians and all of

their information is all available to us.

Q.   And did you review that at this time?

A.   Yes.  And so I incorporated all of that.

1    Q.   Okay.

2    A.   And then I also staffed this case with multiple people.

3    And what I tried to do is I tried to staff it with people that I

4    thought would come from differing backgrounds and different

5    viewpoints.  So I --

6    Q.   Why don't we walk through those that you staffed with.

7    A.   I staffed it first with Dr. Jeremy Stoddart.  I chose him

8    because he was a psychiatrist who wasn't the person doing the

9    evaluation, so it wasn't me.

10         Then I chose Dr. Murray Young, because he was the regional

11   medical director, so he had the medical expertise.

12         And then I chose Jeremy Clark because Jeremy Clark was a

13   WPATH member and had been to several WPATH conferences and was

14   somebody who I felt knew a lot about WPATH and their standards.

15   Q.   Okay.  And when did you staff this?

16   A.   With all those people?

17   Q.   Yes.

18   A.   Oh, right after I did the -- that day.

19   Q.   Okay.  And what did -- and you say, "and they agreed with

20   my assessment"; is that right?

21   A.   Yes; that's right.

22   Q.   And "they" is referring to the various folks that you

23   staffed it with?

24   A.   Yes.

25   Q.   All right.  And you heard Jeremy Clark testify today;

1    correct?

2    A.    Yes.

3    Q.    And he testified about your conversation with him?

4    A.    Uh-huh.

5    Q.    Is that a "yes"?

6    A.    Yes.  Sorry.

7    Q.    Okay.  What do you recall -- did that refresh your

8    recollection as to your conversation with Mr. Clark?

9    A.    Yes, a little bit.

10   Q.    And what do you remember about it, if anything?

11   A.    This is a couple years ago, so it's a little bit foggy.

12   But I remember beforehand deciding who I wanted to staff it

13   with.  And then if my -- if my memory is correct, I was walking

14   out of the prison and walked past Jeremy.  And I was like, "Oh,

15   my gosh.  I need to talk to you about something."  And then we

16   discussed this case.

17   Q.    Okay.  And do you remember what he --

18   A.    And then the other two I called on the phone.

19   Q.    Okay.  Do you remember what Jeremy Clark said to you at

20   that time?

21   A.    Well, the way that medical consultations and staffings like

22   this happen is the person asking for help presents the case;

23   right?

24         So to these three people, I presented Ms. Edmo's case,

25   discussed what I knew about it and discussed, you know, my

1    observations, interactions and then what I thought would be the

2    right choice.  And then they would ask questions if they wanted

3    to and then tell me if they agree or disagree or what points

4    they disagree.

5    Q.    Okay.  What else, if anything, did you do for your

6    assessment?

7    A.    You know, I also did research, and I reached out to staff

8    throughout the country.

9         You know, I'm a regional psychiatric director, so that

10   means I'm involved in meetings with psychiatric directors of

11   other states.  And I have been to several different NCCHC, which

12   is the national commission on health care for correctional

13   providers.

14        And in those meetings, I've both presented and been to

15   different presentations of people who have struggled with how to

16   treat the transgender population in the prison setting.  And

17   it's something that the correctional profession is really trying

18   to grapple with how to do appropriately.

19        And so, you know, I acquired a certain level of expertise

20   about it through all of that.  And then I went online, and I

21   searched also for healthcare insurances and looked up Medicare

22   and Medicaid and what they were doing with sex reassignment

23   surgeries and just trying to basically figure out how do you

24   decide this.

25        And, you know, if you read -- there is a second paragraph

428

1     in my assessment.

2     Q.   Why don't you talk to us about that.

3     A.   And where I basically talk about how to define medical

4     necessity for sexual reassignment surgery.  And I know this is

5     very contested -- this is probably, you know, the whole crux of

6     this --

7     Q.   Well, just talk about the facts.

8     A.   -- case.

9          But, to me and to many of my colleagues in the correctional

10    healthcare, we don't feel as if the medical necessity for sexual

11    reassignment surgery in the inmate population has been very well

12    defined.

13    Q.   Why is that?

14    A.   Well, because, you know, in the community, you have the

15    WPATH standards that are fairly clear.  And then you have

16    insurance companies and different groups who lay out this

17    criteria for what they think is appropriate for somebody before

18    they can get a sexual reassignment surgery.

19         But the inmate population is a very different population,

20    and it's a very strange environment.  And to try to just squeeze

21    every person in the inmate population and say it's exactly the

22    same, it's not; it's very different.

23         And so it's not very well defined.  And I think that in

24    each case, you have multiple things you can rely on, but you

25    also -- you rely on these things, and then you also rely on your

429

1    clinical judgment with the patient sitting in front of you in

2    the correctional environment, and you try to determine if it's

3    well defined -- if it's medically necessary.

4        And here I listed several cases where I thought this would

5    be an example of something which may meet medical criteria for

6    necessity.  And I say in here that there was some sort of birth

7    defect or ambiguous genitalia that required some sort of

8    reconstructive or reparative surgery.  Or I list in here "severe

9    and devastating dysphoria primarily due to genitals," and say

10   that that could also potentially meet criteria, which is

11   somewhat similar to one of the WPATH standards.

12            THE COURT:  Just so I'm clear, Doctor, are you

13   suggesting those three criteria that you point out here would be

14   the things that you think maybe should be added onto the WPATH

15   criteria in the inmate population?

16            THE WITNESS:  No, I don't think that's what I was

17   doing.  I think primarily what I was doing is I was trying to

18   say:  Are there cases when I think it would meet medical

19   necessity?  And I am saying, yes, there are cases; and here are

20   a few examples of some cases.

21            THE COURT:  So you are suggesting this in lieu of the

22   WPATH criteria for noninmate populations?

23            THE WITNESS:  No.  I was just -- I was basically

24   trying to come up with a couple examples of cases where I would

25   say there are cases that would meet medical necessity; here are

**ELIASON - Direct**

430

1       some examples.

2              THE COURT:  Did I understand you to say, though, that

3       you felt that the WPATH criteria just doesn't fit comfortably

4       with the inmate population?

5              THE WITNESS:  Yeah, depending on how you look at the

6       WPATH standards.  Because in the WPATH standards themselves --

7              THE COURT:  Let me tell you, to avoid -- I am going to

8       ask you at some point to tell me what you think needs to be

9       changed in the WPATH standards to fit the inmate population.  So

10      be thinking about that, or counsel can cover that.  Because it's

11      certainly something that's nagging at me a bit.

12             So go ahead, Mr. Eaton.

13             MR. EATON:  Maybe one way to at least partially

14      address that is --

15             THE COURT:  And we are going to take a break for the

16      evening in about seven minutes.  So I don't want to cut -- go

17      ahead.  I didn't mean for that question to get you off your

18      stride.  We can cover that at a later point.  So go ahead.

19      Q.   BY MR. EATON:  So maybe one way to address that, or at

20      least in part, is:  So what ultimately did you conclude with

21      this assessment?

22      A.   Ultimately, I concluded that Ms. Edmo did not meet criteria

23      for medical necessity at that time.

24      Q.   And why?

25      A.   Primarily for two reasons.  It was my opinion, number one,

1      that Ms. Edmo's mental health concerns were not fully in

2      adequate control.

3             And then, number two -- and this, to me, was even the more

4      important of the two -- is that I didn't feel like it was doing

5      Ms. Edmo any service to rush through getting gender reassignment

6      surgery in that current social situation.

7             The WPATH standards talk about a 12-month period of living

8      in your identified gender role.  And in my knowledge of

9      Ms. Edmo, she had not really done that yet.

10            And although it's -- you know, gender reassignment surgery

11     can be very helpful for people who are transgender and have

12     gender dysphoria, there is a real important study that was done

13     that showed that even in postoperative transgender population,

14     those patients are still very likely -- much more likely than

15     the general population -- to kill themselves.

16            And the author of that paper goes on to say that it's

17     important to note that it's not because gender reassignment

18     surgery is bad; right?  She is not saying that in this paper.

19     But what she was saying was that society and people's social

20     networks aren't supporting people enough through their

21     transitions; and that if people are better supported through

22     their transitions, then this huge increase in suicide over the

23     general population could be decreased.

24            And my main goal for my patients -- and primarily in this

25     case, Ms. Edmo -- is to have a happy, healthy life.  And I think

**ELIASON – Direct**

432

1    that Ms. Edmo at this time was parole eligible.  She could very

2    soon have been getting out and, at worst-case scenario, I

3    believe, tops out in 2021.

4         And it's my opinion that at this time, that I thought that

5    it would be most helpful to, number one, spend time getting her

6    mental health under better control; and then, number two, to get

7    her to have the experience around her real social network -- her

8    family and friends on the outside -- living as a woman to

9    determine whether or not she felt like that was her real

10   identity and to not make that determination in prison when I

11   felt like she could get out and would get out.

12   Q.   And you also in the top -- this first paragraph under

13   assessment, the last couple of lines, you talk about the plan;

14   is that right?

15   A.   Okay.  Wait.  Where are we looking here?

16   Q.   The first paragraph with assessment, last couple of lines.

17   A.   Okay. Yeah.  Where I said --

18   Q.   You say, "That being said..."  If you could go over that.

19   A.   "That being said."  Yeah.

20            "That being said, I will continue to monitor and

21            assess this inmate for the medical necessity of SRS

22            throughout their stay here.  For the time being, it is

23            my opinion that the combination of hormone treatment

24            and supportive counseling is sufficient for her gender

25            dysphoria."

1    Q.   And in this note, did you identify other mental health

2    disorders?

3    A.   Yes.

4    Q.   And what did you identify?

5    A.   Down below, you can see it says "MDD," which stands for

6    major depressive disorder, and also alcohol use disorder.

7    Q.   And so what happened after you completed this assessment?

8    Do you know?

9    A.   So after I completed this assessment, it was -- it weighed

10   heavily on my mind.  And I -- I met with Ms. Edmo again soon

11   thereafter.  And I had decided that I didn't want to, like, be

12   the lone person saying no for something that was this

13   potentially important and something that was very political and

14   something that I thought I needed some help.

15        And so I decided to form a committee of physicians who

16   could be trained on how to decide whether or not sexual

17   reassignment surgery was necessary.

18        So I met with Ms. Edmo, and I said, "Hey, so we're going to

19   do this differently.  We're going to form a committee."  And I

20   told her about the committee.

21        And then I put together a training with Dr. Stephen

22   Levine -- Levine.

23   Q.   How did that training come about?

24   A.   Well, he had been identified to me as someone who was an

25   expert in the field and also had some correctional experience,

1    and that it was in an NCCHC training and from the Department of

2    Corrections from Massachusetts who had been, you know, recently

3    sued about the same kind of issue and that they consulted

4    frequently with Dr. Levine, from Case Western.

5         And so I reached out to Dr. Levine on my own and said,

6    "Hey, how would you like to come out and do a day-long training

7    to me and some fellow physicians?"  And he agreed to do it.

8         And then we opened that up to also the Department of

9    Corrections, and the MTC committee members also attended that.

10        And so the plan was to make this committee to help me

11   determine medical necessity for sexual reassignment surgery.

12   And I had identified several different physicians that were

13   going to be on it.  They all came.  They got trained.

14   Q.   And I have a note for that.  So let's pull up the --

15            THE COURT:  Counsel, we're right at where we take the

16   break.  I'll let you follow up with these questions, and then

17   we'll have to take the break.

18            MR. EATON:  Okay.  Thank you.

19   Q.   BY MR. EATON:  So there is a Levine list of attendees.

20        Is this what you're talking about?

21   A.   Yes.

22   Q.   And are those people that you understand attended the

23   Levine presentation?

24   A.   Yes, that's right.

25   Q.   And there has been some testimony in this case by experts

1      that Levine was an outlier, maybe didn't, like, follow or was

2      not a member of the WPATH.

3           Did you appreciate that at the time?

4      A.   You know, I think probably determining if someone is an

5      outlier depends on where you start from.  But Dr. Levine, at

6      least from my experience, is not at all someone who is opposed

7      to gender reassignment surgery.

8           And he has, I think, 35 or more years in running a

9      transgender health clinic and is very successful and very well

10     liked by his patients and frequently recommends gender

11     reassignment surgery.

12          And so in the presentation that he gave that day, I never

13     once felt like he was saying don't give inmates gender

14     reassignment surgery.  I do feel like he might have posed some

15     questions to say, like, here are some --

16               MS. SHANBHAG:  Objection.  Hearsay.

17               THE COURT:  Just a moment.  I'm sorry.  I was not

18     thinking along those lines.

19          Well, the witness is characterizing what his understanding

20     of the message, not necessarily what was actually said.  The

21     witness can be cross-examined on that assessment, I think,

22     without getting into the substance.  So I'll allow it.

23          The objection is overruled, but it is a close question.

24          Is it Ms. Shanbhag?

25               MS. SHANBHAG:  Shanbhag, yes.

**ELIASON - Direct**

436

1          THE COURT:  Shanbhag.  Okay.  I apologize.  I wanted

2     to make sure I had that right.

3          Go ahead.  But, again, you have got about one or two more

4     questions, and then we'll have to call it a day.

5          MR. EATON:  Okay.

6     Q.   BY MR. EATON:  You were talking about --

7     A.   I'm going to say --

8     Q.   Hold on.  You were talking about your impressions with --

9     A.   -- that I never once felt like he didn't want inmates to

10    receive gender reassignment surgery, and would oftentimes pose

11    some opposing arguments to why it might not be a safe option or

12    might not be a good option but would also talk about how it was

13    necessary.

14    Q.   Are you aware of whether Corizon received other trainings

15    from other people regarding gender dysphoria?

16    A.   Yes.  After that, one of the attendees, Dr. Stoddart, said

17    he worked with the local physician who treated the majority of

18    the transgender population in Boise and offered to get him to

19    come and present education.

20         MS. SHANBHAG:  Objection.

21         THE COURT:  Just a moment.

22         MS. SHANBHAG:  Hearsay.

23         THE COURT:  Sustained.

24         The witness can testify as to what he did or didn't do.

25    But what someone said, I mean, unless it has independent

1    relevance, would be hearsay.

2    Q.   BY MR. EATON:  Did you attend any other trainings regarding

3    gender dysphoria through Corizon other than the Levine

4    presentation?

5    A.   Yes.  There was a presentation by a Dr. Alviso from here in

6    town.

7    Q.   And what was your understanding of that presentation?

8    A.   Dr. Alviso talked about his experience in the treatment of

9    the transgender population and how he treated them.

10   Q.   Okay.  And did you appear for that?

11   A.   I attended by phone.

12            MR. EATON:  Okay.  Your Honor, I know you're wanting

13   to call it.  So I can --

14            THE COURT:  I think we can't get Dr. Eliason done

15   today, unfortunately.  And I hope you are feeling better,

16   Dr. Eliason.

17        Counsel, let's take a break.  We'll recess [*sic*] at 8:30.

18   I think I kind of messed up the clock by asking questions that

19   can't be charged to anyone.  So I'll have Mr. Severson visit

20   with counsel and see how much time we need to spend tomorrow to

21   give you the allotted time.  But we do need to wrap up tomorrow

22   because, as I said, I'm going to be in trial for the next three

23   week on different matters.  So if we can't wrap it up tomorrow,

24   we would have to come back more than a month from now.

25        All right.  We will be in recess, then, until 8:30 tomorrow

438

1     morning.

2          (Court recessed at 3:22 p.m.)

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5

6              I, Tamara Hohenleitner, Federal Official Realtime

7       Court Reporter, in and for the United States District Court for

8       the District of Idaho, do hereby certify that pursuant to

9       Section 753, Title 28, United States Code, that the foregoing

10      is a true and correct transcript of the stenographically

11      reported proceedings held in the above-entitled matter and that

12      the transcript page format is in conformance with the

13      regulations of the Judicial Conference of the United States.

14

15                              Dated this 19th day of October, 2018.

16

17

18                              /S/ TAMARA I. HOHENLEITNER
                                _____
19                              TAMARA I. HOHENLEITNER, CSR NO. 619, CRR
                                FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25

**'**

**'11** [2] - 209:10, 210:23
**'12** [1] - 210:23
**'sexually** [1] - 212:21

**1**

**1** [14] - 217:9, 261:1, 266:10, 266:17, 295:22, 295:23, 324:17, 357:15, 358:19, 365:25, 367:15, 378:4, 379:4, 412:2
**1-12** [1] - 409:2
**1-370** [1] - 416:13, 416:15
**1-438** [1] - 417:11
**1-524** [1] - 380:17
**1-538** [4] - 260:24, 261:1, 418:24, 419:1
**10** [9] - 237:2, 243:12, 266:13, 275:14, 290:13, 290:22, 322:23, 323:2, 394:2
**10-minute** [2] - 392:24, 393:20
**100** [7] - 237:3, 237:10, 237:11, 237:12, 250:1, 259:22, 418:8
**1002** [5] - 203:10, 203:12, 203:24, 204:3, 204:4
**1004** [3] - 231:24, 232:3, 232:4
**101** [1] - 263:11
**1025** [10] - 370:13, 371:16, 380:21, 392:7, 393:5, 393:8, 393:10, 394:10, 394:18, 398:21
**1025-1** [1] - 382:19
**10:28** [1] - 268:4
**10:44** [1] - 268:4
**11** [2] - 191:2, 328:2
**11:59** [1] - 318:14
**11th** [2] - 281:4, 293:24
**12** [6] - 242:7, 245:3, 254:1, 254:4, 299:8, 300:11
**12-month** [2] - 242:11, 431:7
**12:20** [1] - 318:14
**13** [1] - 409:10
**14** [2] - 293:25, 294:5

**15** [12] - 240:25, 252:9, 268:1, 286:24, 318:13, 326:7, 336:13, 355:10, 377:15, 377:22, 397:15, 398:2
**15-2** [1] - 241:10
**15-66** [1] - 252:10
**15-minute** [2] - 268:1, 318:11
**16** [1] - 293:19
**17** [1] - 417:16
**17-151** [1] - 191:4
**18** [1] - 253:1
**19** [4] - 293:5, 293:11, 296:7, 331:6
**19-1** [1] - 331:6
**1980s** [1] - 235:5
**1990s** [1] - 235:6
**19th** [2] - 293:13, 293:14

**2**

**2** [10] - 203:7, 241:9, 266:10, 266:17, 288:6, 353:3, 353:12, 372:15, 375:19
**20** [7] - 208:1, 211:4, 236:1, 266:13, 268:2, 355:10, 418:25
**2003** [2] - 208:24, 404:16
**2005** [2] - 237:1, 249:6
**2007** [5] - 205:15, 206:7, 206:10, 206:11, 208:21
**2008** [1] - 233:5
**2009** [9] - 206:13, 206:18, 206:21, 206:22, 207:24, 401:10, 401:15, 405:7, 405:8
**2010** [5] - 206:15, 209:10, 210:22, 244:14, 401:16
**2010-2011** [1] - 207:20
**2011** [8] - 205:19, 206:15, 216:22, 233:23, 249:6, 249:15, 348:15
**2012** [28] - 192:20, 194:8, 196:14, 201:19, 203:2, 207:4, 209:7, 210:4, 211:23, 212:15, 216:12, 222:6, 222:16, 223:16, 225:9,

225:21, 291:18, 291:21, 303:17, 303:25, 304:4, 304:9, 312:20, 312:21, 317:9, 369:15, 409:10, 415:23
**2013** [5] - 192:7, 192:9, 207:4, 325:25, 415:23
**2014** [2] - 417:16
**2015** [2] - 198:2, 366:23
**2016** [26] - 198:9, 206:24, 207:8, 207:13, 207:16, 207:17, 304:14, 314:13, 333:23, 341:1, 341:25, 342:6, 343:24, 344:20, 345:21, 357:15, 358:19, 358:24, 359:6, 359:9, 370:1, 383:18, 383:21, 388:23, 391:14, 418:25
**2017** [6] - 292:8, 310:20, 367:20, 370:15, 371:12, 384:17
**2018** [34] - 191:2, 277:13, 278:11, 278:13, 278:19, 279:14, 279:19, 279:23, 280:2, 280:6, 280:10, 280:14, 280:17, 280:20, 280:24, 281:4, 281:24, 282:6, 282:7, 283:3, 292:5, 292:6, 292:8, 292:9, 292:12, 293:5, 293:11, 293:16, 294:6, 295:17, 296:7, 296:12, 297:5, 314:4
**2019** [3] - 324:17, 325:2, 325:6
**2021** [3] - 201:15, 230:10, 432:3
**2022** [4] - 403:10, 404:4, 404:5, 404:7
**2038** [4] - 310:14, 312:3, 312:6, 312:7
**21** [1] - 211:4
**22** [1] - 308:20
**24** [1] - 294:20
**246** [1] - 308:20
**25th** [2] - 268:18, 409:17
**27** [2] - 310:15, 310:22

**27-year-old** [1] - 306:4
**28** [4] - 326:8, 377:15, 397:15, 398:2
**29** [2] - 278:13, 352:25
**2:02** [1] - 394:4
**2:17** [1] - 394:4

**3**

**3** [8] - 231:22, 253:2, 292:19, 292:22, 328:23, 375:14, 388:19
**30** [10] - 192:18, 238:25, 250:2, 322:25, 323:2, 323:17, 324:1, 366:23, 367:20, 377:1
**32** [4] - 283:6, 283:17, 284:2, 395:25
**35** [2] - 242:18, 435:8
**37** [4] - 297:13, 297:14, 298:5
**38** [2] - 395:21, 395:25
**3:00** [4] - 318:10, 392:15, 392:25
**3:10** [1] - 392:25
**3:22** [1] - 438:2

**4**

**4** [2] - 253:3, 292:25
**400** [2] - 237:6, 237:7
**47** [2] - 314:4, 314:6
**48** [1] - 297:24

**5**

**5** [5] - 193:12, 254:1, 371:22, 373:22, 407:5
**50** [3] - 250:2, 259:22, 259:24
**524** [2] - 365:25, 378:5
**525** [1] - 379:4
**538** [1] - 261:2
**59** [3] - 283:25, 294:17, 295:18
**5th** [1] - 348:14

**6**

**6** [7] - 193:12, 231:22, 296:12, 353:20, 374:6, 394:17, 409:10
**610** [1] - 367:15

**62-1** [3] - 283:25, 294:20, 316:23
**66** [2] - 336:13, 377:22
**6th** [1] - 297:5

**7**

**7** [10] - 211:1, 326:12, 336:17, 357:13, 357:22, 357:24, 359:4, 359:6, 359:14, 360:20
**72** [1] - 294:20
**78** [1] - 357:13
**79** [2] - 357:22, 359:14

**8**

**8** [3] - 275:14, 353:3, 388:13
**80** [3] - 251:15, 278:16, 357:24
**81** [1] - 359:4
**84** [6] - 297:12, 297:14, 298:4, 298:6, 299:6, 360:4
**85** [1] - 360:12
**86** [1] - 360:20
**8:30** [2] - 437:17, 437:25

**9**

**90** [4] - 226:6, 251:15, 278:16, 401:24
**95** [1] - 300:1

**A**

**A-D-R-E-E** [1] - 191:20
**a.m** [3] - 268:4, 318:14
**abandoned** [1] - 198:16
**ability** [4] - 205:9, 215:16, 328:7, 328:24
**able** [23] - 198:13, 202:8, 233:18, 242:5, 243:6, 247:16, 249:12, 250:12, 265:11, 297:3, 316:15, 319:7, 330:23, 335:10, 349:18, 353:5, 364:6, 389:9, 392:6, 392:8, 392:9, 393:24, 397:17

**absolute** [1] - 207:1
**absolutely** [7] -
202:15, 206:25,
226:14, 234:9,
272:17, 291:10, 381:1
**absurd** [1] - 301:23
**abuse** [5] - 210:3,
236:3, 250:18,
250:22, 330:2
**abusing** [1] - 209:22
**accepted** [2] -
193:23, 376:20
**accepting** [1] -
241:24
**access** [15] - 216:4,
227:12, 243:6, 249:8,
255:6, 272:10,
272:11, 312:20,
312:23, 315:7,
315:10, 319:17,
348:20, 424:14,
424:21
**accessing** [2] -
248:25, 249:4
**accidently** [1] -
369:11
**according** [2] -
385:12, 385:14
**accurate** [14] -
232:11, 303:7,
313:24, 343:6,
353:18, 353:19,
358:9, 360:24, 380:2,
380:14, 396:5, 396:6,
396:9, 403:22
**accurately** [4] -
238:11, 238:23,
324:20
**acknowledge** [16] -
222:5, 223:15, 225:8,
225:18, 226:1,
291:17, 291:20,
304:13, 304:17,
304:20, 304:23,
305:2, 305:17,
307:13, 311:23, 317:8
**acquired** [1] - 427:19
**act** [1] - 195:19
**acting** [3] - 340:21,
342:7, 345:15
**acting-out** [1] -
342:7
**actions** [2] - 257:5,
257:6
**activities** [1] -
237:20
**activity** [4] - 245:7,
342:9, 365:1, 366:25
**actual** [3] - 200:11,
241:10, 279:13

**acute** [1] - 322:2
**acutely** [1] - 365:14
**Ada** [3] - 400:25,
403:6, 403:7
**Adams** [1] - 192:23
**added** [2] - 281:19,
429:14
**addition** [1] - 374:8
**Additional** [1] -
359:15
**additional** [7] -
255:22, 281:6,
318:19, 354:7, 360:7,
374:15, 374:19
**address** [22] -
202:16, 202:17,
202:18, 238:3,
245:14, 271:23,
299:4, 300:7, 300:13,
322:15, 322:18,
325:22, 332:5,
334:20, 340:14,
344:15, 346:12,
356:1, 385:13,
396:17, 430:14,
430:19
**addressed** [7] -
272:14, 291:3,
299:23, 337:12,
339:23, 347:14,
381:20
**addresses** [3] -
244:19, 325:11,
389:11
**addressing** [1] -
418:21
**adequate** [5] -
259:20, 293:4, 315:9,
315:19, 431:2
**adequately** [2] -
201:13, 381:20
**adjusted** [1] - 223:22
**adjusting** [1] -
227:16
**administrative** [1] -
402:9
**admit** [9] - 206:6,
206:17, 207:12,
287:6, 288:11,
288:20, 311:25,
325:1, 403:24
**admitted** [20] -
204:3, 204:4, 206:10,
206:11, 206:21,
206:22, 207:16,
207:17, 232:3, 232:4,
312:6, 312:7, 325:5,
325:6, 335:15,
335:16, 371:15,
371:16, 404:5, 404:7

**adopt** [1] - 391:17
**Adree** [9] - 191:4,
191:10, 191:19,
191:20, 192:2, 192:6,
192:10, 192:16,
336:24
**ADREE** [1] - 191:13
**adrenaline** [2] -
198:23, 199:11
**Adriana** [3] - 192:13,
192:15
**adults** [1] - 406:8
**advance** [1] - 213:18
**advantages** [1] -
388:9
**advocacy** [3] -
372:21, 373:9, 373:11
**advocate** [2] - 224:3,
224:7
**affect** [3] - 201:6,
346:15, 423:25
**affected** [1] - 196:15
**affecting** [1] - 344:19
**affirm** [3] - 197:6,
203:22, 380:4
**affirming** [5] - 271:5,
271:6, 271:8, 334:18,
380:9
**afford** [1] - 243:8
**afoul** [1] - 393:16
**afraid** [1] - 264:12
**afternoon** [4] -
321:17, 321:18,
349:12, 349:13
**afterwards** [5] -
200:25, 225:18,
239:12, 240:13,
266:15
**age** [4] - 193:12,
211:3, 253:1, 335:10
**agency** [2] - 240:1,
249:10
**ago** [10] - 263:11,
274:17, 327:22,
349:17, 354:20,
355:22, 356:4,
362:22, 376:14,
426:11
**agree** [24] - 219:19,
219:24, 220:17,
261:13, 261:15,
261:16, 261:18,
261:19, 263:4, 263:8,
287:22, 289:8,
290:12, 307:1,
311:11, 311:21,
361:12, 362:4,
369:14, 369:17,
386:19, 387:6, 388:2,
427:3

**agreed** [12] - 210:2,
220:6, 220:7, 220:22,
221:15, 223:7, 240:8,
295:12, 306:14,
414:16, 425:19, 434:7
**agreement** [1] -
235:12
**agrees** [1] - 363:9
**ahead** [28] - 221:5,
221:9, 232:25, 246:1,
253:20, 253:21,
257:11, 261:8,
264:10, 264:12,
276:8, 336:10,
351:12, 352:22,
362:20, 365:19,
371:21, 372:10,
373:19, 388:7,
388:11, 389:12,
397:4, 397:23,
430:12, 430:17,
430:18, 436:3
**al** [1] - 191:4
**albumin** [2] - 296:23,
296:24
**alcohol** [6] - 209:22,
209:25, 307:21,
412:3, 412:8, 433:6
**alien** [1] - 197:11
**alleviate** [3] - 254:19,
342:23, 343:2
**alleviated** [1] -
347:13
**allotted** [1] - 437:21
**allow** [6] - 244:8,
348:18, 352:3, 383:2,
391:25, 435:22
**allowed** [4] - 196:22,
215:3, 264:8, 339:8
**allowing** [1] - 385:11
**almost** [2] - 262:8,
313:18
**Alphonsus** [1] -
199:6
**ALT** [1] - 296:18
**alternatively** [1] -
375:15
**Alviso** [4] - 314:12,
314:19, 437:5, 437:8
**ambiguous** [1] -
429:7
**ambulance** [3] -
199:6, 208:25, 301:22
**Amendment** [2] -
394:25, 395:6
**amount** [2] - 245:22,
249:18, 266:10
**Amy** [1] - 230:19
**analysis** [2] - 258:25,
389:19

**analyze** [1] - 298:22
**anatomic** [3] -
241:21, 289:19, 290:4
**anatomy** [6] - 218:4,
218:8, 218:10,
218:12, 286:8, 422:4
**Andrade** [1] - 204:25
**Andrade's** [1] -
256:8
**anesthesia** [5] -
199:12, 199:18,
267:14, 267:16
**Angeles** [3] - 233:15,
332:3, 332:8
**anguish** [1] - 200:10
**answer** [26] - 217:21,
226:14, 234:17,
246:1, 247:24,
247:25, 253:20,
253:21, 264:10,
271:18, 279:6,
316:19, 335:13,
339:7, 351:14,
353:16, 353:22,
353:23, 354:6,
356:20, 368:22,
382:1, 383:5, 386:25,
392:9, 397:2
**answered** [1] - 273:2
**answering** [1] -
328:23
**answers** [2] -
351:24, 353:11
**Antarctica** [1] -
255:10
**antiandrogen** [4] -
248:16, 248:20,
248:21, 293:5
**anticipatory** [1] -
265:12
**antidepressants** [2]
- 250:11, 423:12
**antisocial** [1] -
339:24
**anxiety** [11] - 250:10,
253:7, 254:21,
254:25, 255:2, 255:3,
299:3, 330:12,
339:20, 341:21,
347:12
**anxious** [1] - 201:10
**apologize** [5] -
360:5, 365:19, 373:2,
385:19, 436:1
**apparent** [2] -
208:25, 259:16
**appear** [3] - 313:9,
423:4, 437:10
**appearance** [1] -
421:20

**appeared** [2] - 411:6, 423:20

**appearing** [1] - 212:20

**appellate** [1] - 261:5

**appendicitis** [3] - 255:10, 255:18, 265:9

**appendix** [2] - 255:11, 301:15

**applicable** [3] - 299:16, 299:25, 300:17

**applicants** [1] - 311:7

**applied** [2] - 300:16, 329:16

**applies** [3] - 299:19, 300:7, 300:8

**apply** [9] - 298:13, 299:14, 300:9, 300:11, 300:21, 336:21, 341:7, 381:21, 382:6

**applying** [1] - 258:5

**appointment** [3] - 225:15, 314:12, 422:11

**appointments** [1] - 225:23

**appreciate** [1] - 435:3

**appreciated** [1] - 197:17

**appreciation** [2] - 407:16, 414:18

**approach** [2] - 244:11, 392:10

**appropriate** [34] - 218:8, 233:19, 241:17, 242:14, 243:12, 244:24, 245:8, 251:3, 254:2, 271:1, 301:24, 302:3, 307:1, 311:14, 323:5, 323:8, 334:9, 334:25, 335:1, 335:3, 341:15, 345:6, 345:22, 356:1, 356:3, 356:5, 363:8, 364:20, 366:21, 383:10, 383:13, 413:13, 414:25, 428:17

**appropriately** [1] - 427:18

**appropriateness** [2] - 334:24, 389:24

**approve** [1] - 386:11

**approved** [2] - 352:13, 357:25

**approximate** [1] -

391:15

**April** [4] - 220:1, 304:14, 358:24, 418:25

**Area** [1] - 236:22

**area** [5] - 198:15, 236:22, 253:19, 289:21, 403:2

**areas** [2] - 348:17, 382:3

**argue** [2] - 203:4, 391:2

**arguing** [4] - 390:3, 390:12, 390:14

**argument** [3] - 258:16, 258:17, 263:16

**arguments** [1] - 436:11

**arise** [1] - 343:16

**arm** [2] - 200:9, 200:14

**arrival** [1] - 403:2

**arrive** [1] - 334:12

**arrived** [2] - 199:3, 199:10

**article** [10] - 331:7, 331:8, 331:10, 331:13, 334:4, 342:21, 376:10, 376:13, 376:17, 382:10

**articles** [4] - 325:20, 331:1, 331:2, 331:4

**articulation** [1] - 287:17

**Ashley** [1] - 216:2

**aspects** [2] - 392:2, 406:12

**assault** [12] - 212:20, 214:7, 214:11, 214:15, 214:19, 214:24, 215:6, 215:17, 365:2, 367:22, 368:7, 369:3

**assaulted** [2] - 257:15, 368:13

**assaulting** [2] - 340:22, 342:2

**assaultive** [1] - 368:11

**asserted** [2] - 371:19, 372:4

**assess** [12] - 252:13, 286:2, 305:3, 340:24, 356:1, 371:6, 385:1, 389:9, 389:23, 415:17, 420:4, 432:21

**assessed** [11] - 199:4, 199:10, 252:6,

299:3, 315:17, 333:12, 338:23, 356:9, 388:23, 420:11, 420:12

**assessing** [6] - 262:20, 276:22, 285:25, 317:10, 383:21, 409:12

**assessment** [69] - 205:24, 260:23, 261:11, 261:13, 261:15, 261:21, 303:14, 304:20, 306:1, 306:15, 323:5, 323:7, 330:15, 331:17, 331:18, 332:16, 338:25, 341:5, 341:6, 344:21, 345:1, 350:10, 354:22, 356:1, 356:10, 356:11, 358:23, 358:25, 359:19, 360:16, 361:2, 369:23, 377:19, 384:1, 384:15, 385:7, 388:4, 389:10, 394:15, 395:17, 409:20, 409:22, 409:23, 410:3, 411:13, 411:15, 411:21, 411:24, 412:6, 412:18, 412:19, 413:15, 414:15, 419:5, 420:17, 420:22, 420:25, 423:8, 424:7, 424:9, 425:20, 427:6, 428:1, 430:21, 432:13, 432:16, 433:7, 433:9, 435:21

**Assessment** [1] - 398:23

**assessments** [11] - 338:22, 350:1, 350:4, 350:8, 353:13, 353:21, 372:5, 384:18, 384:19, 384:25, 390:4

**assessor** [1] - 323:5

**assign** [1] - 408:23

**assigned** [2] - 194:5, 422:18

**assignment** [1] - 207:6

**assist** [2] - 274:4, 384:14

**assistance** [2] - 233:18, 414:9

**Assistant** [1] - 231:7

**assistants** [2] - 236:15, 402:2

**assisting** [1] - 332:20

**associate** [1] - 338:2

**associated** [9] - 307:3, 322:15, 334:1, 336:16, 337:25, 340:17, 378:16, 378:22, 382:4

**Association** [2] - 237:14, 325:8

**association** [3] - 238:4, 325:19, 325:21

**associations** [1] - 376:19

**assume** [10] - 226:13, 227:15, 228:22, 230:11, 316:13, 320:14, 350:20, 388:8, 399:15, 406:22

**assumes** [4] - 220:15, 221:1, 394:23, 395:4

**assuming** [3] - 386:12, 387:22, 393:4

**assumptions** [1] - 315:4

**AST** [1] - 296:17

**attacking** [1] - 262:11

**attempt** [8] - 198:25, 205:21, 206:1, 209:3, 264:16, 264:18, 264:19, 264:21

**attempted** [12] - 198:2, 198:4, 198:18, 208:3, 224:21, 228:23, 254:12, 309:19, 309:22, 310:2, 369:21, 382:6

**attempting** [1] - 209:22

**attempts** [8] - 206:15, 207:19, 209:8, 209:14, 210:7, 254:16, 264:17, 422:5

**attend** [4] - 229:6, 344:13, 378:20, 437:2

**attended** [9] - 330:22, 337:3, 337:4, 343:23, 369:25, 406:2, 434:9, 434:22, 437:11

**attendees** [2] - 434:19, 436:16

**attending** [5] - 229:12, 337:24, 345:15, 374:8, 405:14

**assistants** [2] -

**assistants** [2] -

**attention** [1] - 408:19

**Attorney** [1] - 231:7

**attorney** [1] - 352:4

**attorneys** [7] - 204:14, 275:7, 275:8, 275:20, 277:9, 281:11, 393:24

**attracted** [1] - 193:16

**attributed** [1] - 228:5

**audio** [1] - 285:10

**authenticity** [1] - 370:23

**author** [1] - 431:16

**automatically** [2] - 201:18, 343:11

**available** [7] - 216:5, 218:9, 325:19, 348:1, 352:8, 424:10, 424:23

**avoid** [1] - 430:7

**aware** [22] - 196:5, 196:6, 215:22, 226:9, 254:12, 258:11, 258:15, 281:20, 309:6, 312:23, 313:11, 320:11, 326:1, 340:18, 342:12, 345:24, 348:5, 369:13, 376:19, 376:22, 385:21, 436:14

**axis** [1] - 412:2

### B

**bachelor** [1] - 232:15

**backed** [1] - 302:21

**background** [1] - 404:10

**backgrounds** [1] - 425:4

**bad** [4] - 194:22, 250:18, 266:18, 431:18

**bafflement** [1] - 375:22

**balanced** [1] - 381:6

**Ban** [1] - 280:3

**bandwidth** [1] - 275:16

**Bannock** [4] - 193:3, 205:18, 208:23, 280:18

**bar** [2] - 262:25, 288:2

**bare** [1] - 287:25

**barely** [1] - 202:4

**base** [3] - 259:21, 266:4, 317:6

**based** [31] - 230:3, 257:25, 258:9, 264:4,

267:19, 301:9, 302:4, 316:3, 332:22, 343:9, 343:10, 343:23, 345:18, 347:3, 349:2, 349:21, 349:23, 362:17, 363:22, 371:19, 374:14, 374:19, 376:16, 376:17, 381:18, 391:13, 412:8, 412:13, 412:19, 413:10

**basic** [1] - 333:16

**basis** [8] - 341:16, 348:4, 349:1, 381:24, 387:18, 402:20, 412:6, 414:3

**bathroom** [1] - 318:6

**battle** [1] - 373:25

**Bay** [1] - 236:22

**became** [8] - 196:20, 234:11, 272:3, 281:20, 309:16, 376:10, 401:12, 401:16

**become** [3] - 269:7, 330:21, 407:24

**becomes** [2] - 220:16, 247:10

**beforehand** [1] - 426:12

**began** [2] - 211:3, 237:1

**beginning** [4] - 223:14, 228:1, 277:21, 337:14

**beginnings** [1] - 246:23

**behavior** [13] - 213:15, 340:2, 345:15, 366:19, 368:2, 368:5, 368:6, 368:11, 368:14, 368:23, 407:22, 408:2, 423:1

**behavioral** [10] - 305:9, 305:11, 305:14, 322:2, 326:14, 364:13, 402:24, 403:3, 415:10, 422:19

**behaviors** [13] - 330:10, 330:11, 340:3, 340:14, 342:4, 342:5, 342:24, 344:19, 345:25, 347:8, 347:10, 367:4, 368:1

**believes** [1] - 363:16

**bell** [1] - 339:3

**below** [2] - 409:15, 433:5

**benefit** [1] - 198:21, 248:13, 265:12

**benefits** [2] - 251:22, 311:17

**best** [14] - 193:7, 193:10, 199:4, 205:9, 213:14, 225:3, 337:16, 348:8, 351:21, 355:11, 364:18, 369:16, 381:18, 419:15

**bets** [1] - 261:7

**better** [19] - 194:18, 196:16, 201:4, 222:18, 223:11, 231:19, 231:20, 250:10, 294:4, 303:7, 311:7, 331:24, 365:23, 400:21, 411:17, 412:24, 431:21, 432:6, 437:15

**between** [14] - 194:2, 194:3, 202:18, 233:9, 242:22, 255:17, 257:18, 335:20, 348:15, 372:21, 373:9, 387:23, 398:11, 398:15

**beyond** [8] - 286:10, 362:12, 381:22, 382:25, 389:3, 389:17, 391:21, 397:19

**BHU** [1] - 364:12

**big** [5] - 210:12, 249:17, 266:10, 276:14, 343:8

**bigger** [1] - 299:1

**biggest** [1] - 250:6

**bilirubin** [2] - 296:23, 297:1

**biochemistry** [1] - 232:15

**bipolar** [1] - 410:22

**birth** [4] - 194:5, 203:14, 203:17, 429:6

**bisexual** [1] - 235:5

**bit** [24] - 208:22, 231:17, 251:16, 277:10, 282:25, 296:11, 306:10, 307:19, 307:24, 314:5, 315:3, 367:16, 368:4, 370:6, 378:3, 403:10, 404:9, 415:13, 420:19, 423:15, 424:20, 426:9, 426:11, 430:11

**bizarre** [1] - 262:9

**black** [1] - 423:19

**blade** [3] - 198:3, 198:4, 198:10

**blame** [1] - 295:3

**blanket** [1] - 421:3

**blessed** [1] - 232:22

**blinded** [3] - 259:2, 259:14, 259:15

**blissful** [1] - 200:25

**blood** [6] - 198:14, 198:15, 227:20, 228:2, 247:9, 297:1

**blow** [1] - 373:3

**blow-up** [1] - 373:3

**blurriness** [1] - 196:18

**blurry** [1] - 421:23

**board** [5] - 260:15, 269:20, 300:9, 390:23, 406:3

**board-certified** [1] - 269:20

**body** [14] - 193:8, 196:21, 197:11, 198:23, 200:11, 201:9, 228:9, 246:16, 262:6, 262:10, 286:11, 297:4, 346:23

**boilerplate** [1] - 277:21

**Boise** [2] - 401:1, 436:18

**bono** [5] - 235:1, 319:1, 319:7, 319:10, 319:16

**booming** [1] - 232:23

**border** [1] - 365:4

**borderline** [13] - 339:24, 339:25, 340:20, 341:21, 341:23, 361:18, 361:22, 362:1, 365:3, 365:6, 365:8, 365:10, 365:15

**born** [2] - 192:14, 410:5

**borrowed** [1] - 370:6

**bottom** [11] - 211:17, 211:20, 211:21, 272:15, 292:22, 307:22, 308:21, 310:19, 373:1, 373:21

**Bowers** [1] - 302:22

**box** [11] - 366:15, 366:20, 367:5, 367:9, 367:12, 368:16, 368:25, 369:3, 369:8, 369:12, 379:15

**bra** [4] - 224:17,

312:9, 312:20

**Bracke** [2] - 321:5, 350:17

**brain** [3] - 193:7, 193:8, 193:9

**bras** [1] - 211:5

**break** [16] - 265:19, 268:1, 297:3, 318:7, 318:11, 392:13, 392:16, 392:19, 392:24, 393:20, 394:14, 430:15, 434:16, 434:17, 437:17

**breaks** [1] - 318:10

**breasts** [3] - 196:21, 246:11, 286:8

**brief** [2] - 397:11, 424:16

**briefly** [4] - 232:13, 291:24, 293:12, 403:16

**bright** [1] - 257:18

**bring** [10] - 200:12, 232:5, 232:21, 240:24, 252:9, 258:25, 260:23, 265:16, 408:19, 418:24

**broad** [3] - 289:18, 289:25, 290:2

**broadly** [3] - 239:4, 274:22, 300:9

**broke** [2] - 198:3, 198:11

**Brooklyn** [1] - 232:19

**brother** [1] - 192:11

**brought** [7] - 199:19, 223:25, 257:14, 333:4, 341:6, 413:7, 422:23

**building** [3] - 199:5, 228:12, 228:15

**bullet** [2] - 360:9, 375:14

**bump** [1] - 337:2

**bump-ins** [1] - 337:2

**bun** [1] - 212:6

**bunch** [2] - 234:3, 258:25

**business** [1] - 400:25

**button** [1] - 377:8

**BY** [73] - 191:24, 203:13, 204:10, 206:12, 206:23, 207:18, 215:15, 217:21, 218:2, 220:17, 221:5,

221:16, 221:23, 227:8, 229:3, 230:1, 231:13, 232:6, 233:1, 246:7, 248:24, 253:24, 257:4, 257:24, 261:9, 264:13, 266:1, 268:10, 275:18, 276:9, 284:5, 287:13, 295:12, 309:18, 312:8, 316:22, 318:24, 320:10, 321:16, 324:9, 325:7, 329:3, 334:12, 336:11, 339:14, 349:11, 353:7, 353:12, 357:10, 360:4, 364:2, 366:1, 368:22, 372:11, 373:20, 377:12, 381:13, 382:5, 383:9, 384:12, 388:15, 391:11, 394:9, 397:5, 397:14, 397:24, 400:13, 404:8, 418:20, 430:19, 434:19, 436:6, 437:2

**by-us** [1] - 235:4

**bypass** [1] - 266:12

# C

**C-L-A-R-K** [1] - 321:12

**California** [9] - 233:12, 233:17, 233:21, 235:1, 236:22, 240:11, 240:15, 271:13, 404:23

**Callen** [1] - 243:22

**cancer** [2] - 260:4, 260:7

**candidate** [1] - 257:1

**cannot** [1] - 333:8

**capable** [1] - 362:9

**capacity** [2] - 252:23, 252:25

**capitalize** [1] - 197:15

**care** [85] - 226:5, 226:9, 226:13, 233:14, 233:18, 234:12, 234:16, 235:20, 236:5, 236:10, 236:12, 237:10, 237:18, 237:21, 240:20, 241:1, 241:5, 242:1, 242:3, 242:5, 242:15,

242:17, 242:22, 243:7, 243:10, 244:3, 244:20, 244:22, 244:23, 244:25, 245:12, 247:19, 249:4, 249:20, 249:22, 250:13, 252:7, 255:6, 256:7, 257:14, 257:20, 257:21, 258:8, 259:23, 269:4, 269:15, 277:23, 286:13, 287:3, 287:9, 287:17, 287:25, 288:2, 288:4, 288:7, 288:11, 288:16, 289:2, 290:12, 304:7, 304:11, 307:8, 315:9, 315:19, 316:1, 317:7, 319:17, 372:16, 373:4, 373:7, 373:10, 376:7, 378:16, 378:17, 378:18, 396:3, 398:14, 402:20, 402:23, 403:7, 406:17, 415:12, 415:13, 427:12

**Care** [3] - 241:11, 326:12, 405:24

**career** [1] - 237:5

**careful** [2] - 245:24, 387:2

**caring** [1] - 402:14

**Carolina** [2] - 232:16, 232:17

**carries** [2] - 267:14, 292:24

**carry** [1] - 236:13

**Case** [2] - 191:3, 434:4

**case** [50] - 229:16, 239:24, 240:5, 240:10, 241:4, 242:12, 251:1, 251:7, 255:9, 255:19, 255:21, 258:18, 258:20, 260:19, 262:10, 266:23, 273:3, 273:10, 273:12, 273:14, 273:22, 278:14, 281:4, 282:24, 285:2, 285:7, 292:2, 301:1, 306:12, 319:1, 320:12, 320:14, 348:4, 349:1, 368:21, 372:2, 391:24, 408:12, 424:18, 425:2, 426:16,

426:22, 426:24, 428:8, 428:24, 431:25, 432:2, 434:25

**case-by-case** [2] - 348:4, 349:1

**cases** [19] - 239:19, 239:22, 240:15, 243:6, 257:14, 257:18, 273:16, 274:8, 274:14, 276:11, 288:3, 302:9, 401:2, 429:4, 429:18, 429:19, 429:20, 429:24, 429:25

**Casey** [2] - 207:23, 208:2

**castrate** [4] - 198:2, 198:9, 199:24, 228:23

**catch** [1] - 392:25

**categories** [3] - 290:10, 290:11, 319:18

**caused** [3] - 293:21, 294:7, 294:15

**causing** [3] - 249:13, 262:5, 293:17

**caution** [1] - 334:17

**CCHP** [1] - 406:18

**cells** [3] - 296:18, 296:19, 297:1

**center** [3] - 235:9, 235:11, 235:20

**Center** [7] - 233:11, 243:23, 243:24, 274:13, 274:21, 275:1, 275:7

**centers** [4] - 243:2, 243:22, 243:25, 244:1

**certain** [7] - 240:1, 241:17, 264:5, 282:14, 319:15, 378:15, 427:19

**certainly** [8] - 204:19, 250:16, 272:3, 282:18, 282:24, 283:2, 312:21, 430:11

**certificate** [3] - 192:23, 203:14, 203:17

**certification** [3] - 326:20, 406:20, 406:21

**certifications** [1] - 406:16

**certified** [4] - 269:20, 270:9, 270:14, 406:3

**Certified** [1] - 406:19

**Cesarean** [1] - 255:13

**challenges** [1] - 200:21

**chance** [11] - 229:11, 264:16, 264:21, 293:21, 294:7, 335:25, 351:16, 351:23, 360:10, 384:9, 394:9

**change** [22] - 192:8, 196:23, 201:19, 256:12, 256:16, 294:21, 315:17, 315:20, 351:24, 352:4, 365:11, 385:11, 385:16, 385:20, 385:23, 390:18, 391:12, 391:24, 401:11, 408:3, 417:10

**changed** [15] - 203:19, 203:21, 215:25, 249:6, 290:16, 290:19, 290:23, 319:23, 327:21, 401:13, 407:14, 407:17, 416:23, 418:6, 430:9

**changes** [10] - 215:23, 227:17, 227:18, 246:14, 246:16, 246:18, 246:22, 246:23, 386:2, 392:1

**Chapel** [1] - 232:17

**characteristics** [1] - 311:5

**characterization** [2] - 220:12, 221:8

**characterize** [1] - 253:15

**characterizing** [1] - 435:19

**charge** [4] - 273:3, 273:8, 273:12, 273:16

**charged** [6] - 212:21, 213:2, 273:15, 273:21, 366:5, 437:19

**charges** [4] - 210:21, 257:15, 320:12, 320:13

**charging** [1] - 320:14

**chart** [6] - 278:15, 279:2, 279:10, 281:7, 281:23, 303:19

**check** [5] - 210:21, 307:4, 366:15, 368:16, 368:25

**checked** [6] - 367:5, 367:10, 367:13, 369:3, 369:5, 369:9

**checking** [1] - 369:12

**Chicago** [2] - 332:3, 332:7

**chief** [3] - 232:18, 233:1, 408:22

**child** [2] - 241:25, 255:14

**children** [2] - 406:9

**choice** [2] - 199:14, 427:2

**choose** [2] - 193:23, 266:16

**chose** [9] - 202:12, 365:22, 374:17, 374:20, 375:4, 395:15, 425:7, 425:10, 425:12

**chosen** [1] - 192:15

**chronic** [3] - 226:5, 226:9, 226:13

**CI** [1] - 202:5

**circular** [1] - 387:9

**circulation** [1] - 296:19

**circumstance** [1] - 262:9

**circumstances** [5] - 234:6, 245:15, 255:16, 300:3, 348:7

**cisgender** [1] - 330:24

**cite** [2] - 244:13, 244:17

**cited** [1] - 342:12

**citizens** [2] - 375:10, 375:16

**civic** [1] - 375:10

**Civil** [1] - 191:3

**civil** [1] - 373:23

**claim** [3] - 214:22, 346:24

**claims** [2] - 372:19, 373:7

**clarification** [1] - 360:3

**clarified** [1] - 324:8

**clarify** [1] - 363:12

**clarifying** [1] - 372:9

**clarity** [3] - 219:18, 220:22, 221:15

**CLARK** [1] - 321:7

**clark** [1] - 371:11

**Clark** [54] - 306:13, 306:22, 307:12, 317:13, 321:2, 321:4, 321:11, 321:17, 324:15, 328:13, 328:21, 329:3, 331:5, 331:16, 336:11,

349:12, 350:12, 353:7, 357:10, 357:11, 358:5, 362:13, 363:5, 363:9, 364:2, 366:1, 368:22, 371:5, 375:1, 377:13, 388:13, 388:16, 389:8, 389:19, 389:22, 390:7, 390:12, 390:24, 391:2, 391:11, 392:7, 392:18, 393:17, 394:5, 394:9, 396:12, 396:18, 399:11, 413:22, 425:12, 425:25, 426:8, 426:19

**Clark's** [3] - 307:5, 317:22, 352:24

**class** [2] - 219:3, 219:5

**classes** [8] - 219:12, 219:18, 219:22, 220:3, 220:9, 220:19, 332:5

**Claudia** [3] - 339:3, 390:10, 413:18

**clean** [3] - 250:19, 250:20, 250:21

**clear** [16] - 196:20, 209:6, 260:25, 261:5, 262:19, 277:20, 278:13, 281:3, 308:2, 323:17, 384:13, 398:25, 399:1, 428:15, 429:12

**cleared** [1] - 196:17

**clearly** [4] - 247:18, 264:4, 318:17, 418:5

**Clerk** [2] - 377:8, 397:12

**CLERK** [7] - 191:3, 191:17, 230:25, 321:8, 350:18, 377:10, 400:6

**clerk** [6] - 191:12, 202:7, 202:10, 230:22, 321:4, 400:3

**clerk's** [1] - 191:15

**clinic** [17] - 233:10, 233:17, 235:4, 235:6, 235:8, 236:1, 236:5, 236:10, 236:16, 272:7, 272:10, 272:15, 310:10, 310:11, 319:10, 414:24, 435:9

**Clinic** [2] - 234:16, 244:2

**clinical** [33] - 204:24, 218:16, 244:8,

248:24, 251:16, 254:15, 259:2, 262:9, 267:19, 277:5, 278:17, 285:13, 287:3, 288:8, 288:19, 288:22, 289:5, 290:3, 301:10, 302:4, 306:13, 317:5, 321:22, 322:1, 322:3, 326:14, 326:23, 332:18, 338:11, 354:5, 354:9, 354:16, 429:1

**Clinical** [1] - 241:12
**clinically** [4] - 233:19, 263:15, 301:20, 341:17
**clinician** [15] - 270:2, 270:3, 306:22, 307:3, 317:13, 318:1, 318:3, 340:9, 346:1, 354:13, 367:7, 368:14, 379:21, 397:25, 398:1
**Clinician** [6] - 207:3, 218:18, 218:20, 218:22, 218:23, 220:2
**clinician's** [1] - 369:11
**clinicians** [26] - 219:17, 272:18, 279:4, 279:10, 332:24, 337:7, 338:3, 338:5, 354:1, 354:17, 366:8, 366:18, 368:23, 370:4, 370:15, 372:13, 372:23, 374:4, 374:16, 376:3, 379:18, 381:25, 384:18, 414:2, 424:11, 424:22
**clinicians'** [1] - 424:14
**clinics** [9] - 233:16, 233:20, 234:2, 234:8, 234:17, 235:12, 235:21, 243:9, 244:3
**clitoris** [2] - 247:11, 248:2
**clock** [1] - 437:18
**close** [4] - 199:22, 232:24, 350:19, 435:23
**closer** [2] - 232:21, 321:6
**clothes** [4] - 242:3, 286:10, 313:19
**clothing** [1] - 201:23, 223:10

**CME** [1] - 405:19
**coach** [1] - 335:13
**coexisting** [12] - 262:1, 328:8, 329:4, 329:22, 339:16, 342:18, 343:4, 343:25, 346:16, 347:2, 398:11, 398:16
**collaboration** [1] - 233:9
**collateral** [1] - 413:11
**colleagues** [2] - 262:20, 428:9
**College** [1] - 404:14
**college** [2] - 192:22, 192:24
**colon** [1] - 261:20
**color** [1] - 274:5
**Colorado** [1] - 192:23
**colored** [1] - 423:19
**combination** [3] - 304:24, 414:5, 432:23
**comfort** [1] - 245:12
**comfortable** [1] - 410:14
**comfortably** [1] - 430:3
**coming** [1] - 212:9
**comment** [2] - 300:2, 382:6
**commentary** [1] - 414:10
**commented** [1] - 411:16
**commissary** [4] - 216:4, 315:10, 348:19
**Commission** [3] - 229:14, 405:23
**commission** [2] - 230:4, 427:12
**commit** [6] - 198:7, 208:16, 208:18, 209:17, 209:19, 264:21
**committed** [9] - 208:16, 218:12, 249:16, 257:22, 308:9, 309:7, 309:15, 309:17
**committee** [17] - 269:2, 286:20, 322:18, 337:15, 358:19, 413:23, 413:24, 413:25, 414:5, 414:16, 414:23, 419:15, 433:15, 433:19, 433:20, 434:9, 434:10

**Committee** [13] - 279:20, 286:17, 299:25, 322:11, 322:12, 323:7, 324:5, 324:9, 333:14, 337:6, 357:14, 359:6, 413:22
**committees** [1] - 238:6
**committing** [3] - 308:6, 308:12, 308:23
**common** [3] - 272:12, 289:21, 375:15
**communicated** [1] - 374:11
**communications** [2] - 409:13, 409:18
**Community** [2] - 243:23
**community** [10] - 201:16, 202:11, 233:16, 243:2, 244:1, 244:4, 245:5, 334:22, 424:17, 428:14
**comorbidities** [2] - 271:16, 272:25
**companies** [1] - 428:16
**company** [1] - 401:12
**compare** [1] - 266:11
**compared** [3] - 194:4, 334:22, 424:16
**comparing** [1] - 249:11
**comparison** [1] - 333:15
**compensated** [2] - 319:1, 319:5
**competence** [1] - 327:12
**competencies** [1] - 397:16
**competency** [4] - 326:1, 328:10, 363:3, 377:13
**competent** [3] - 377:18, 389:15, 398:3
**complete** [19] - 191:17, 197:18, 200:18, 219:8, 229:15, 231:1, 256:1, 256:5, 281:7, 281:22, 314:20, 321:9, 352:18, 379:18, 379:21, 379:25, 380:15, 387:9, 400:7
**completed** [7] - 192:22, 221:16, 240:17, 309:21,

341:5, 433:7, 433:9
**completely** [5] - 200:25, 228:8, 241:19, 255:12, 347:13
**completes** [1] - 320:18
**complex** [5] - 271:15, 271:22, 271:25, 272:24, 281:21
**compliant** [4] - 344:5, 344:8, 369:14, 369:17
**complication** [1] - 260:1
**complications** [3] - 267:2, 267:5, 267:7
**component** [1] - 253:18
**components** [1] - 415:17
**compound** [2] - 220:16, 257:9
**comprehend** [2] - 195:18, 197:12
**computer** [2] - 298:2, 357:11
**concede** [1] - 390:2
**concept** [2] - 243:14, 245:13
**concern** [9] - 220:2, 228:13, 292:1, 351:14, 359:24, 384:10, 387:4, 387:7, 419:9
**concerned** [1] - 330:5
**concerning** [2] - 294:21, 372:5
**concerns** [30] - 253:3, 328:8, 329:4, 329:23, 330:5, 330:6, 339:16, 342:18, 343:4, 346:16, 347:2, 347:5, 347:6, 349:18, 363:2, 363:21, 364:24, 365:2, 367:3, 367:25, 368:3, 368:15, 368:25, 380:12, 383:22, 386:21, 387:12, 398:12, 398:16, 431:1
**conclude** [1] - 430:20
**concluded** [2] - 345:21, 430:22
**conclusion** [5] - 251:24, 252:2, 261:16, 315:11, 379:6

**conclusions** [2] - 315:1, 334:13
**condition** [3] - 201:7, 245:10, 345:3
**conditions** [11] - 225:19, 236:4, 261:25, 262:1, 341:8, 341:19, 343:25, 344:1, 344:9, 346:24, 415:20
**confer** [1] - 352:4
**conference** [3] - 237:24, 237:25, 406:1
**conferences** [5] - 325:22, 330:22, 331:20, 332:2, 425:13
**confirm** [2] - 284:22, 285:1
**confirmation** [18] - 197:3, 197:5, 200:16, 200:22, 200:23, 201:6, 202:13, 253:17, 270:17, 270:25, 271:9, 290:17, 335:7, 354:22, 376:12, 376:23, 377:2, 386:11
**confirming** [1] - 217:1
**conflict** [1] - 215:2
**conform** [1] - 196:1
**conforming** [1] - 384:23
**confused** [1] - 227:9
**confusing** [1] - 220:16
**confusion** [2] - 270:21, 360:6
**congruent** [1] - 254:5, 299:9, 300:12
**consent** [11] - 242:22, 242:25, 243:19, 243:21, 244:6, 252:24, 335:10, 335:11, 362:9, 363:3, 363:18
**consequence** [1] - 387:14
**consequences** [4] - 249:3, 249:14, 254:9, 264:5
**consider** [5] - 257:5, 257:23, 346:25, 356:5, 420:2
**consideration** [3] - 330:13, 358:16, 387:17
**considered** [8] - 230:5, 307:13, 356:8, 383:20, 388:4,

406:14, 407:24, 417:8
**consistency** [1] -
196:23
**consistent** [5] -
227:14, 340:20,
411:19, 418:4, 418:8
**consistently** [2] -
344:11, 345:16
**constant** [1] - 339:22
**constantly** [1] -
263:6
**constitute** [1] - 387:4
**constituted** [1] -
330:24
**constitutes** [2] -
394:24, 395:5
**construction** [1] -
247:5
**consult** [4] - 328:4,
345:5, 355:4, 401:1
**consultant** [2] -
233:22, 274:2
**consultation** [9] -
234:6, 234:11, 322:3,
322:4, 354:21, 355:3,
355:4, 355:12
**consultations** [1] -
426:21
**consulted** [6] -
345:4, 350:7, 350:9,
353:20, 422:25, 434:3
**consulting** [8] -
274:7, 274:9, 274:11,
274:18, 274:23,
307:10, 355:1, 400:25
**contact** [3] - 338:6,
338:12, 342:13
**contacted** [1] -
276:17
**contacts** [2] -
218:15, 338:3
**contain** [1] - 314:13
**contention** [1] -
258:19
**contested** [1] - 428:5
**context** [7] - 207:1,
245:5, 258:23,
353:24, 381:21,
382:7, 390:5
**contexts** [1] - 271:18
**continually** [1] -
228:18
**continuation** [1] -
360:13
**continue** [12] -
197:7, 197:24,
201:22, 202:9,
226:15, 247:24,
253:24, 272:2, 305:3,
347:8, 432:20

**continues** [1] -
361:12
**continuing** [5] -
331:16, 331:18,
332:15, 342:4, 417:24
**continuous** [3] -
254:1, 254:4, 299:8
**continuously** [1] -
415:6
**contraindication** [1]
- 253:5
**contraindications**
[1] - 415:2
**contrary** [3] - 346:23,
346:25, 397:2
**contributed** [1] -
367:6
**contributing** [6] -
249:17, 340:13,
366:12, 367:6, 367:9,
369:5
**control** [2] - 431:2,
432:6
**controlled** [30] -
249:13, 253:4,
254:21, 256:13,
259:2, 259:18,
260:12, 298:17,
298:20, 341:18,
341:20, 341:24,
342:19, 343:1, 343:4,
343:14, 344:1,
345:18, 346:17,
346:19, 346:24,
347:2, 347:4, 347:7,
363:2, 363:21,
367:25, 368:3,
368:12, 386:22
**controls** [1] - 311:14
**controversial** [1] -
239:15
**conversation** [11] -
224:5, 344:24, 345:8,
374:9, 374:14,
374:20, 383:24,
410:11, 421:11,
426:3, 426:8
**conversations** [3] -
338:5, 346:4, 346:11
**converted** [1] -
397:12
**convictions** [3] -
214:15, 214:16,
278:10
**convince** [1] -
373:25
**cooccurring** [4] -
236:3, 343:1, 344:18,
350:2
**cope** [1] - 344:1

**coping** [3] - 346:10,
346:11, 346:20
**copy** [5] - 324:16,
351:12, 351:22,
352:16, 392:12
**Corizon** [17] - 191:4,
222:1, 268:14,
305:24, 315:1,
361:21, 400:24,
401:3, 401:7, 401:8,
401:13, 401:18,
405:6, 414:6, 436:14,
437:3
**corner** [5] - 371:24,
373:1, 373:21,
374:23, 394:20
**correct** [348] - 206:3,
207:6, 207:20, 208:4,
208:6, 208:10, 209:9,
209:22, 209:25,
210:4, 210:8, 210:10,
210:18, 210:21,
210:24, 211:6,
211:10, 211:13,
211:19, 211:24,
212:3, 212:6, 212:9,
212:16, 212:22,
212:23, 213:9,
213:19, 213:21,
213:23, 214:3, 214:7,
214:12, 215:17,
215:23, 216:1, 216:5,
216:12, 217:2, 217:5,
217:7, 217:13,
217:15, 218:6,
218:10, 218:13,
218:16, 218:18,
218:20, 218:25,
219:2, 219:9, 219:13,
220:10, 220:19,
220:23, 221:18,
221:19, 222:7, 222:9,
223:11, 224:8,
224:14, 224:17,
224:20, 225:1, 225:6,
225:9, 225:12,
225:24, 226:3, 226:6,
226:16, 227:1,
228:24, 230:6,
244:17, 246:6,
252:14, 252:15,
255:22, 261:2, 261:3,
269:2, 269:6, 269:16,
269:18, 269:19,
269:20, 269:22,
269:23, 270:5, 270:7,
270:18, 270:19,
270:20, 271:17,
272:5, 272:16, 273:1,
273:4, 273:5, 273:10,

273:13, 273:24,
274:6, 274:19,
274:25, 275:2, 275:4,
276:23, 277:2, 278:5,
278:7, 278:11,
278:12, 278:17,
278:21, 279:3,
279:12, 279:14,
279:15, 279:21,
279:22, 279:25,
280:1, 280:4, 280:5,
280:8, 280:12,
280:15, 280:16,
280:18, 280:22,
281:1, 281:5, 281:8,
281:9, 282:3, 282:8,
284:1, 284:8, 284:9,
284:20, 284:21,
285:2, 285:4, 285:5,
285:7, 285:10,
285:19, 286:9,
286:14, 286:15,
286:18, 288:3, 288:9,
288:17, 288:18,
289:9, 289:12,
290:18, 290:21,
291:15, 291:18,
291:22, 292:2,
292:10, 292:20,
292:21, 293:6,
293:11, 293:22,
294:13, 294:24,
296:8, 297:6, 297:7,
297:8, 298:1, 299:5,
299:16, 299:20,
300:7, 300:14,
300:23, 301:1, 302:1,
304:5, 304:11,
304:18, 304:19,
306:2, 307:22, 308:7,
308:23, 309:20,
310:4, 310:8, 310:10,
310:20, 310:23,
312:10, 312:14,
312:20, 312:24,
313:1, 314:2, 314:16,
314:17, 314:25,
316:4, 316:25, 317:2,
317:10, 317:11,
317:22, 318:2,
322:20, 323:3,
323:13, 323:16,
324:3, 326:25, 327:1,
332:13, 337:18,
349:15, 349:16,
349:19, 349:22,
349:25, 350:5, 350:6,
350:8, 351:16, 352:2,
352:7, 353:17, 354:3,
354:10, 354:14,
354:18, 354:23,

354:24, 355:1, 355:5,
355:8, 355:10,
355:13, 355:17,
355:20, 355:23,
358:10, 359:12,
360:21, 360:24,
361:3, 361:4, 361:6,
361:7, 361:10,
361:11, 361:13,
361:16, 361:19,
361:20, 361:23,
362:2, 362:4, 362:7,
362:10, 364:3, 364:8,
364:11, 364:17,
364:21, 365:3, 366:2,
366:6, 366:9, 366:13,
366:16, 366:17,
366:23, 367:3,
367:10, 367:14,
367:18, 367:20,
368:8, 368:12,
368:17, 369:1, 369:6,
369:15, 369:18,
369:22, 369:23,
370:1, 370:4, 370:11,
371:7, 372:13,
372:17, 372:18,
372:23, 374:9,
374:12, 374:16,
374:21, 375:12,
375:17, 375:25,
376:3, 376:8, 376:12,
376:24, 377:3, 377:4,
379:15, 379:22,
380:15, 382:10,
383:16, 383:17,
383:18, 384:16,
387:10, 388:17,
388:25, 390:14,
391:6, 391:14,
391:18, 394:15,
395:10, 395:13,
395:18, 397:17,
398:23, 399:4, 399:6,
408:25, 418:17,
426:1, 426:13
**Correct** [45] - 270:1,
270:4, 270:6, 270:8,
270:16, 271:14,
273:11, 273:18,
278:8, 278:18, 280:9,
280:13, 280:23,
281:2, 282:4, 285:8,
285:11, 285:15,
285:23, 286:22,
287:5, 289:13,
291:19, 291:23,
292:3, 293:15,
293:19, 294:10,
296:9, 297:20,
297:23, 298:21,

299:11, 299:21,
303:15, 304:12,
304:16, 304:22,
305:5, 306:6, 307:23,
310:18, 310:21,
313:25, 317:3
**Correction** [2] -
214:18, 316:25
**Correctional** [6] -
202:4, 202:7, 401:9,
402:21, 405:24,
406:19
**correctional** [16] -
202:16, 212:2,
212:14, 213:1, 270:9,
270:15, 385:13,
392:1, 406:1, 406:14,
424:20, 427:12,
427:17, 428:9, 429:2,
433:25
**corrections** [4] -
239:8, 239:11,
256:24, 351:24
**Corrections** [17] -
204:14, 280:21,
281:1, 321:20, 322:7,
347:16, 347:19,
378:11, 382:23,
408:20, 413:4, 413:9,
419:11, 419:19,
420:10, 434:2, 434:9
**correctly** [3] -
227:22, 281:22,
284:18
**corresponded** [1] -
193:8
**counsel** [39] - 215:9,
215:11, 217:15,
220:14, 230:20,
241:4, 245:20,
245:22, 257:3,
260:25, 264:7,
265:18, 267:25,
276:6, 283:19,
286:12, 287:3, 288:9,
289:11, 305:25,
318:9, 319:18,
328:16, 335:12,
339:8, 339:11,
359:25, 361:9,
362:18, 363:7,
369:25, 388:7,
389:21, 392:13,
418:15, 430:10,
434:15, 437:17,
437:20
**Counsel** [6] - 245:24,
268:1, 320:4, 335:21,
391:25
**counsel's** [2] -

220:11, 221:8
**counseled** [1] -
212:14
**counseling** [4] -
212:1, 304:24,
326:19, 432:24
**Counseling** [2] -
205:18, 208:23
**counselor** [2] -
250:22, 326:23
**counselors** [1] -
424:12
**country** [2] - 236:23,
427:8
**County** [5] - 232:19,
280:18, 400:25,
403:6, 403:7
**couple** [19] - 207:19,
220:21, 220:25,
221:3, 221:15, 222:4,
236:23, 265:24,
303:18, 304:10,
337:3, 346:6, 359:25,
386:7, 397:11,
426:11, 429:24,
432:13, 432:16
**course** [1] - 237:5
**Court** [4] - 217:24,
221:11, 246:3, 438:2
**court** [26] - 191:3,
245:23, 263:25,
268:3, 283:20,
283:23, 316:18,
318:17, 322:13,
327:2, 330:20,
339:10, 351:11,
351:20, 352:1, 352:9,
352:10, 352:14,
352:18, 375:23,
386:6, 394:14,
397:24, 404:8,
409:24, 413:22
**court's** [3] - 372:6,
389:4, 391:21
**courtroom** [1] -
374:2
**cover** [6] - 240:1,
243:7, 261:7, 395:20,
430:10, 430:18
**covered** [1] - 384:24
**covering** [2] - 249:9,
249:10
**covers** [1] - 382:2
**covert** [1] - 213:13
**Craig** [2] - 408:22,
408:23
**create** [6] - 195:8,
218:4, 218:10, 248:4,
248:7, 324:22
**created** [4] - 248:5,

313:2, 370:3, 370:14
**creates** [1] - 213:2
**creating** [1] - 385:23
**credentialing** [2] -
402:10, 406:16
**credentials** [4] -
250:24, 305:21,
307:6, 328:17
**crime** [1] - 257:22,
375:9
**criminal** [2] - 236:7,
257:5
**criteria** [68] - 241:20,
243:3, 245:15,
252:13, 252:22,
253:1, 254:11,
262:17, 262:18,
262:19, 288:20,
289:3, 297:22, 298:1,
298:13, 298:16,
299:5, 299:15,
299:23, 300:6, 300:8,
300:9, 307:14,
307:17, 326:2,
326:10, 327:11,
328:7, 328:18,
329:13, 330:14,
331:16, 335:6,
335:22, 336:8,
336:16, 336:19,
340:25, 341:8,
341:11, 342:17,
344:22, 354:25,
363:16, 363:17,
363:20, 377:25,
382:24, 383:8,
383:10, 383:16,
384:22, 386:13,
389:8, 389:15, 396:4,
407:3, 407:9, 411:18,
428:17, 429:5,
429:10, 429:13,
429:15, 429:22,
430:3, 430:22
**critical** [1] - 303:14
**cropped** [1] - 227:19
**cross** [14] - 204:6,
264:9, 267:25, 268:7,
318:18, 318:19,
349:7, 363:8, 381:22,
381:23, 389:3,
391:21, 391:22,
435:21
**CROSS** [4] - 204:9,
221:22, 268:9, 349:10
**cross-examination**
[1] - 268:7
**CROSS-
EXAMINATION** [4] -
204:9, 221:22, 268:9,

349:10
**cross-examine** [1] -
363:8
**cross-examined** [1]
- 435:21
**crux** [1] - 428:5
**Cruz** [1] - 239:25
**culprit** [3] - 294:16,
295:1, 295:4
**cure** [2] - 394:23,
395:4
**current** [6] - 323:25,
324:24, 343:9,
348:24, 422:4, 431:6
**curriculum** [1] -
232:9
**custody** [1] - 361:25
**cut** [9] - 195:22,
198:4, 198:18, 200:8,
263:1, 296:2, 296:4,
369:21, 430:16
**cutoff** [1] - 351:4
**cutting** [1] - 198:16,
200:14, 345:25,
346:8, 346:10,
346:14, 346:20,
346:23, 347:11,
422:6, 422:15
**CV** [19] - 231:22,
231:23, 232:10,
232:13, 238:7,
238:10, 238:11,
238:20, 238:23,
238:25, 239:17,
274:1, 324:16, 403:9,
403:13, 403:14,
403:18, 403:24, 404:8

---

## D

**daily** [1] - 414:3
**damage** [2] - 262:6,
296:20
**damaged** [1] -
296:19
**data** [5] - 238:1,
239:10, 258:5, 260:9,
277:15
**date** [10] - 229:16,
230:9, 281:5, 366:23,
371:9, 371:12,
371:13, 409:9, 409:17
**dated** [3] - 357:15,
367:20, 417:16
**dates** [3] - 282:16,
294:4, 351:3
**dating** [1] - 207:23
**daughter** [3] -
192:11, 192:12
**Davis** [2] - 234:25,

349:10
235:1
**day-long** [1] - 434:6
**days** [1] - 226:6
**de** [1] - 408:5
**de-stigmatize** [1] -
408:5
**deal** [1] - 382:4
**dealing** [4] - 210:23,
301:24, 347:19,
389:15
**dealt** [1] - 329:9
**debate** [7] - 217:18,
380:25, 381:3, 381:6,
381:14, 396:8, 396:11
**decades** [2] -
259:20, 263:10
**December** [4] -
198:9, 228:1, 292:8,
366:23
**decide** [6] - 260:18,
355:22, 356:5,
414:23, 427:24,
433:16
**decided** [4] - 229:14,
240:19, 433:11,
433:15
**deciding** [1] - 426:12
**decision** [10] -
198:22, 252:23,
252:25, 253:17,
266:15, 305:18,
307:2, 311:6, 372:7,
379:9
**decision-making** [2]
- 252:25, 379:9
**decisions** [4] -
324:10, 324:12,
375:23, 381:18
**deck** [1] - 256:6
**declaration** [52] -
211:1, 214:10,
277:13, 278:11,
278:14, 278:19,
279:14, 279:19,
279:23, 280:2, 280:6,
280:10, 280:14,
280:17, 280:20,
280:24, 281:4, 281:6,
281:20, 281:23,
282:7, 282:8, 282:15,
283:4, 283:7, 283:16,
284:7, 285:14, 292:1,
292:5, 292:16,
292:17, 292:19,
293:16, 293:24,
294:6, 294:17,
294:19, 294:20,
295:6, 297:12,
298:23, 299:1, 299:2,
313:17, 314:4,

314:10, 314:21, 315:20, 316:8, 316:23
**declarations** [2] - 301:1, 314:8
**decrease** [4] - 267:11, 418:16, 418:17
**decreased** [1] - 431:23
**deemed** [1] - 419:13
**defect** [1] - 429:7
**defendant** [1] - 240:7
**Defendant** [1] - 214:23
**Defendant's** [7] - 205:15, 208:21, 312:2, 324:17, 325:1, 403:10, 404:7
**DEFENDANT'S** [1] - 321:7
**defendants** [5] - 214:23, 318:19, 328:14, 351:4, 400:1
**Defendants'** [7] - 206:11, 206:22, 207:17, 310:14, 312:7, 325:6, 404:4
**DEFENDANTS'** [1] - 400:5
**defense** [3] - 241:4, 319:18, 320:21
**Defense** [1] - 274:8
**define** [3] - 300:21, 407:19, 428:3
**defined** [6] - 263:6, 329:20, 365:13, 428:12, 428:23, 429:3
**defines** [1] - 383:3
**definitely** [1] - 201:8
**definition** [5] - 388:24, 389:20, 390:7, 390:15, 390:17
**definitions** [1] - 333:16
**degree** [3] - 310:1, 326:14, 326:19
**dehiscence** [1] - 267:8
**delay** [2] - 265:8, 265:16
**delusions** [1] - 423:23
**demeanor** [3] - 411:6, 418:7, 423:21
**dementia** [1] - 241:23
**demonstrated** [1] - 379:14
**demonstrates** [1] - 364:23

**demonstrating** [1] - 362:7
**denied** [1] - 423:22
**departing** [1] - 243:20
**Department** [24] - 204:14, 214:18, 244:2, 280:21, 280:25, 316:24, 321:20, 322:6, 322:14, 347:16, 347:18, 353:25, 378:11, 382:23, 405:2, 408:20, 413:4, 413:9, 416:20, 419:11, 419:18, 420:9, 434:1, 434:8
**departure** [1] - 243:17
**departures** [1] - 290:2
**depathologize** [1] - 408:1
**dependence** [2] - 412:3, 412:8
**dependent** [1] - 257:21
**deposed** [1] - 351:23
**deposition** [41] - 204:16, 209:13, 223:25, 241:4, 268:15, 268:18, 269:11, 270:11, 273:7, 273:9, 275:19, 276:2, 276:11, 276:20, 282:13, 282:20, 282:22, 283:6, 286:19, 290:25, 302:17, 302:25, 308:4, 308:20, 309:18, 314:18, 350:12, 350:17, 350:23, 351:5, 351:12, 351:16, 352:7, 352:13, 352:18, 352:25, 371:11, 396:19, 396:24, 397:3, 397:5
**depositions** [1] - 256:8
**depressed** [3] - 194:14, 197:16, 411:10
**depressing** [1] - 196:3
**depression** [20] - 201:7, 201:8, 226:3, 250:10, 253:7, 254:21, 255:1, 255:2,

255:3, 286:2, 299:3, 330:12, 339:20, 341:21, 347:12, 369:18, 410:22, 416:8, 418:21, 423:14
**depressive** [7] - 196:7, 307:21, 339:19, 342:24, 418:16, 423:2, 433:6
**depth** [1] - 267:11
**deputy** [1] - 414:1
**describe** [12] - 198:17, 212:11, 232:14, 236:11, 246:9, 247:2, 251:17, 252:16, 258:2, 332:1, 341:2, 411:5
**described** [7] - 197:20, 202:2, 236:10, 244:6, 246:22, 259:4, 259:6
**describes** [2] - 213:14, 390:20
**description** [2] - 278:25, 366:25
**designated** [1] - 226:10
**designation** [2] - 222:24, 223:3
**desired** [2] - 385:13, 385:14
**despite** [3] - 219:11, 254:8, 254:10
**destigmatize** [1] - 408:1
**destroyed** [1] - 297:2
**details** [1] - 232:13
**determination** [3] - 383:12, 386:14, 432:10
**determinations** [1] - 296:15
**determine** [16] - 241:16, 252:4, 311:16, 324:13, 380:7, 384:22, 398:10, 398:15, 413:12, 415:1, 419:16, 420:25, 421:22, 429:2, 432:9, 434:11
**determined** [6] - 217:1, 217:11, 217:14, 228:6, 299:12, 307:14
**determines** [1] - 323:7
**determining** [2] - 380:4, 435:4
**deterrent** [1] -

422:24
**devastating** [4] - 262:16, 262:18, 262:21, 429:9
**develop** [1] - 246:11
**develops** [1] - 323:8
**deviate** [1] - 244:24
**diagnose** [3] - 327:4, 327:5, 328:7
**diagnosed** [13] - 222:6, 222:10, 225:11, 243:4, 291:17, 291:21, 304:3, 309:10, 309:14, 323:2, 361:18, 361:22, 362:1
**diagnoses** [4] - 196:5, 248:12, 330:5, 366:5
**diagnosing** [1] - 387:3
**diagnosis** [32] - 222:16, 255:17, 283:10, 284:13, 290:19, 322:22, 329:13, 329:16, 329:24, 330:7, 330:9, 349:23, 350:2, 356:7, 399:5, 407:14, 408:7, 408:8, 411:24, 412:2, 412:7, 412:10, 412:12, 412:15, 413:1, 413:13, 414:12, 415:4, 415:23, 416:2, 416:6
**diagnostic** [2] - 402:25, 407:2
**Diagnostic** [2] - 327:12, 407:1
**die** [1] - 267:16
**differ** [1] - 330:7
**difference** [9] - 194:3, 201:17, 201:20, 213:11, 255:17, 373:8, 398:15, 406:7, 415:13
**differences** [2] - 348:15, 372:20
**different** [31] - 201:10, 218:24, 235:20, 246:15, 247:5, 271:18, 298:3, 300:22, 327:21, 334:1, 334:15, 334:21, 343:12, 351:15, 370:10, 406:12, 414:10, 417:17, 422:18, 423:3, 423:11, 424:20, 425:4,

427:11, 427:15, 428:16, 428:19, 428:22, 434:12, 437:23
**differentiate** [1] - 387:23
**differently** [1] - 433:19
**differing** [1] - 425:4
**difficult** [3] - 196:3, 388:1, 407:19
**dilate** [1] - 267:9
**diminish** [1] - 248:12
**diminishes** [2] - 246:20, 250:6
**direct** [24] - 213:9, 213:23, 213:24, 214:2, 274:16, 322:1, 338:6, 349:14, 349:17, 350:17, 354:17, 354:20, 361:5, 362:12, 363:17, 369:25, 372:2, 374:9, 376:14, 381:11, 387:13, 402:20, 402:22, 403:7
**DIRECT** [4] - 191:23, 231:12, 321:15, 400:12
**directed** [1] - 212:5
**directing** [1] - 385:13
**directly** [13] - 209:8, 354:2, 354:8, 362:15, 362:16, 372:25, 374:11, 381:23, 386:5, 387:24, 388:3, 389:11, 405:13
**director** [7] - 401:4, 401:14, 401:17, 401:21, 401:22, 425:11, 427:9
**directors** [1] - 427:10
**disability** [1] - 245:6
**disagree** [5] - 221:8, 275:11, 295:5, 427:3, 427:4
**disagreement** [2] - 396:19, 397:6
**disagrees** [1] - 397:2
**disappointed** [2] - 199:20, 199:23
**disastrous** [1] - 249:14
**disciplinary** [16] - 213:3, 213:6, 213:8, 213:13, 257:5, 279:5, 279:17, 322:14, 333:13, 340:5, 340:7, 340:12, 340:18,

355:25, 364:20,
364:23

**discipline** [1] -
256:18

**discipline-free** [1] -
256:18

**disciplined** [1] -
195:11

**discontinue** [1] -
248:23

**discontinued** [1] -
296:6

**discuss** [9] - 207:22,
239:14, 304:7,
356:11, 370:18,
397:6, 413:8, 420:16,
421:25

**discussed** [10] -
282:21, 283:6, 283:8,
290:16, 377:14,
380:20, 419:10,
426:16, 426:25

**discusses** [2] -
260:19, 394:21

**discussing** [9] -
224:4, 275:18, 276:9,
276:10, 283:13,
283:14, 310:16,
358:25, 423:24

**discussion** [16] -
224:6, 239:13,
244:21, 273:25,
283:14, 336:7, 337:9,
355:15, 358:9,
358:20, 359:16,
359:18, 360:7,
360:13, 360:16, 361:1

**disease** [6] - 259:12,
259:13, 259:25,
263:14, 263:15,
300:17

**disenfranchised** [1]
- 235:25

**disgusted** [1] -
197:16

**disgusting** [3] -
194:15, 197:11,
228:16

**disobedience** [3] -
213:8, 213:15, 213:16

**disorder** [54] - 194:7,
196:7, 222:6, 222:23,
223:2, 224:13, 269:5,
269:16, 290:19,
291:18, 291:21,
307:21, 307:22,
330:8, 340:20,
341:24, 342:24,
347:11, 347:20,
349:15, 361:19,

361:22, 362:1, 365:3,
365:10, 365:12,
365:13, 365:15,
388:21, 388:25,
390:21, 391:3,
405:11, 407:12,
408:3, 408:17,
408:21, 409:23,
410:22, 411:16,
411:19, 412:4,
412:11, 412:17,
413:2, 413:13,
414:14, 415:14,
416:6, 420:1, 420:9,
420:13, 433:6

**Disorders** [1] -
327:13

**disorders** [17] -
307:21, 329:12,
329:25, 330:1, 330:2,
340:1, 350:3, 407:2,
407:9, 407:10,
407:18, 407:24,
415:24, 420:8, 433:2

**display** [1] - 352:24

**disposable** [2] -
198:4, 198:10

**dispute** [1] - 362:18

**disqualifying** [2] -
387:8, 387:15

**disrobe** [1] - 286:6

**dissenting** [1] -
374:1

**distinctions** [1] -
331:1

**distinguish** [3] -
328:8, 328:24, 349:18

**distinguishing** [1] -
329:4

**distress** [2] - 197:7,
422:7

**distribution** [1] -
246:16

**diverse** [1] - 288:12

**DOC** [3] - 332:19,
333:5, 333:7

**docket** [4] - 283:20,
283:22, 283:24,
283:25

**doctor** [20] - 224:9,
236:12, 236:14,
253:12, 257:13,
257:17, 264:2,
297:15, 310:16,
319:5, 319:15,
355:17, 390:7,
390:21, 390:22,
390:24, 390:25,
398:1, 398:4, 416:25

**Doctor** [10] - 284:5,

287:9, 292:20, 294:3,
297:17, 314:6,
314:17, 317:12,
374:25, 429:12

**doctor's** [2] - 253:19,
264:9

**doctors** [2] - 227:15,
310:24

**document** [35] -
203:13, 206:24,
207:5, 207:22, 232:6,
241:9, 241:10,
252:21, 281:12,
287:2, 288:21, 289:3,
294:20, 305:25,
316:23, 324:18,
324:22, 324:24,
326:5, 328:4, 335:13,
335:18, 336:11,
336:15, 338:17,
355:12, 357:11,
357:18, 357:21,
357:22, 358:13,
372:20, 373:8, 392:9,
411:2

**documentation** [2] -
276:21, 285:12

**Documented** [1] -
379:8

**documented** [10] -
252:18, 254:3,
304:14, 304:17,
307:20, 335:9, 357:5,
358:16, 358:20,
359:18

**documents** [14] -
255:22, 255:24,
256:11, 256:15,
278:10, 280:15,
282:5, 284:22, 285:2,
317:9, 319:19,
319:22, 338:20, 368:2

**donate** [1] - 275:4

**done** [18] - 221:3,
255:1, 260:20,
265:21, 273:10,
315:15, 319:9, 322:4,
356:13, 378:8,
378:10, 378:14,
411:17, 412:24,
415:20, 431:9,
431:12, 437:14

**DOR** [20] - 214:3,
342:8, 366:2, 366:5,
366:13, 366:22,
367:17, 368:2, 368:5,
368:10, 368:15,
368:16, 368:24,
369:3, 378:3, 378:12,
379:22, 379:23,

380:4, 380:9

**DORs** [18] - 213:16,
215:21, 256:4,
278:22, 279:11,
279:13, 279:16,
340:18, 340:21,
342:1, 342:12, 365:1,
367:2, 367:24, 368:7,
378:10, 421:19,
421:20

**dosages** [1] - 227:14

**dose** [7] - 290:22,
295:16, 295:19,
295:23, 295:25,
296:4, 418:16

**double** [4] - 259:2,
259:14, 259:15,
269:24

**double-blinded** [3] -
259:2, 259:14, 259:15

**doubt** [1] - 200:1

**Dowell** [1] - 216:2

**down** [32] - 200:13,
207:9, 212:15,
212:25, 213:18,
214:1, 230:16,
248:17, 281:17,
296:11, 296:25,
297:3, 297:21,
297:24, 306:3,
307:19, 309:12,
310:19, 311:24,
315:3, 320:15,
351:21, 399:11,
402:17, 403:10,
405:16, 411:24,
415:1, 416:13,
417:11, 423:15, 433:5

**dozen** [1] - 337:13

**Dr** [147] - 191:16,
204:25, 206:2,
217:19, 222:9,
222:11, 222:12,
223:19, 223:20,
224:1, 224:2, 224:8,
225:9, 225:14,
225:16, 226:1, 226:4,
230:21, 230:22,
231:14, 231:16,
231:21, 232:6,
232:20, 241:1,
252:11, 253:25,
256:8, 257:4, 258:20,
260:20, 261:9, 263:4,
267:23, 268:11,
291:18, 291:21,
302:22, 303:14,
303:16, 303:18,
303:20, 304:3, 304:6,
304:13, 304:17,

304:20, 304:23,
305:17, 305:22,
305:24, 306:1,
306:12, 306:13,
306:20, 307:1, 307:5,
307:20, 314:12,
314:19, 314:23,
317:8, 317:14,
318:15, 318:25,
320:11, 320:13,
320:16, 333:20,
333:24, 334:8,
334:13, 334:23,
335:2, 339:1, 341:4,
344:20, 344:24,
345:11, 345:21,
350:9, 354:20,
354:21, 355:1, 355:4,
355:16, 356:9,
356:10, 356:11,
358:17, 358:23,
358:25, 359:18,
360:16, 361:2,
362:17, 362:21,
362:25, 363:23,
370:1, 370:7, 370:9,
372:12, 372:15,
373:14, 374:3, 374:8,
374:11, 375:4,
376:12, 376:15,
381:3, 382:19,
383:24, 384:1,
390:10, 395:15,
395:23, 396:2, 396:7,
396:20, 397:7, 400:2,
403:9, 403:11,
408:22, 408:23,
409:7, 414:12, 425:7,
425:10, 433:21,
434:4, 434:5, 435:5,
436:16, 437:5, 437:8,
437:14, 437:16

**dramatic** [1] - 201:19

**dramatically** [1] -
249:7

**dress** [2] - 202:12,
313:19

**dresses** [1] - 242:3

**dribbled** [1] - 282:11

**drive** [1] - 246:20

**driven** [2] - 253:18,
415:19

**driver's** [1] - 416:22

**driving** [2] - 255:2,
255:4

**drug** [3] - 260:4,
260:6

**drugs** [1] - 209:25

**DSM** [3] - 327:15,
327:25, 329:20,

349:23, 406:23,
407:6, 407:10,
407:20, 408:9
   **DSM's** [1] - 329:13
   **DSM-5** [3] - 365:17,
387:2, 396:4
   **due** [7] - 199:11,
214:24, 215:5, 228:6,
245:15, 262:16, 429:9
   **during** [14] - 209:21,
233:1, 241:4, 264:9,
269:8, 276:11,
295:16, 332:17,
333:19, 334:14,
337:11, 338:12,
393:17, 397:7
   **duties** [3] - 236:11,
321:25, 401:23
   **duty** [1] - 379:19
   **Dylan** [2] - 221:25,
268:13
   **dynamics** [1] -
343:12
   **Dysphoria** [1] -
398:23
   **dysphoria** [156] -
193:24, 194:1, 194:6,
194:11, 194:13,
196:4, 196:8, 196:10,
196:13, 197:1, 200:1,
200:3, 207:2, 216:1,
224:14, 237:4, 237:8,
240:22, 242:13,
248:10, 248:11,
249:1, 249:12, 250:6,
251:3, 251:19,
251:25, 252:3,
252:19, 253:7,
254:18, 255:4, 255:8,
255:20, 262:2,
262:15, 262:16,
262:18, 262:19,
262:22, 263:2, 264:3,
265:4, 265:13, 266:5,
267:20, 269:5,
269:15, 271:20,
271:21, 272:6, 272:8,
280:21, 283:10,
284:14, 288:3,
288:22, 289:4,
290:13, 290:20,
291:1, 297:19,
304:25, 309:10,
313:4, 322:17, 323:6,
325:13, 328:9,
328:18, 328:22,
329:5, 329:10,
329:14, 329:17,
329:19, 329:24,
330:12, 330:16,

331:17, 331:19,
331:24, 332:6,
332:16, 332:21,
332:25, 333:12,
334:2, 334:16, 335:9,
337:8, 337:20,
337:23, 338:1,
338:21, 338:23,
342:22, 343:2,
344:17, 347:20,
348:2, 348:11,
348:18, 349:15,
349:19, 349:25,
350:2, 354:2, 354:13,
354:14, 354:18,
361:13, 361:16,
369:22, 370:4, 371:6,
372:5, 376:3, 376:5,
376:8, 376:21, 377:1,
384:15, 385:2, 387:1,
387:3, 387:4, 387:12,
387:14, 387:15,
387:18, 387:24,
388:3, 389:23,
390:13, 395:17,
395:18, 398:11,
398:16, 399:5,
405:11, 407:15,
408:4, 408:6, 415:14,
415:17, 415:18,
417:25, 421:1, 422:3,
423:5, 429:9, 431:12,
432:25, 436:15, 437:3
   **dysphoric** [15] -
200:9, 216:16,
216:23, 322:19,
323:20, 326:3, 334:9,
334:24, 335:4,
336:22, 349:1,
382:14, 382:22,
397:17, 398:15

**E**

   **E-D-M-O** [1] - 191:20
   **E-L-I-A-S-O-N** [1] -
400:9
   **ear** [2] - 211:19,
211:21
   **early** [3] - 312:9,
323:23, 332:17
   **ears** [3] - 211:13,
211:14, 211:17
   **easier** [1] - 195:21
   **easily** [1] - 353:6
   **easy** [3] - 195:23,
318:17, 318:20
   **Eaton** [13] - 221:21,
221:25, 229:23,
268:8, 268:13, 349:6,

370:22, 371:1, 388:8,
390:2, 399:25, 430:12
   **EATON** [53] - 204:2,
221:23, 227:3,
229:24, 230:15,
232:2, 245:17,
245:19, 247:12,
247:15, 253:11,
254:22, 256:22,
263:20, 268:10,
275:18, 276:9,
283:22, 284:1, 284:3,
284:5, 287:11,
287:13, 295:12,
301:12, 309:18,
311:25, 312:2, 312:8,
316:17, 316:22,
318:4, 320:7, 320:10,
349:8, 356:18, 371:2,
400:1, 400:11,
400:13, 403:24,
404:4, 404:6, 404:8,
418:20, 430:13,
430:19, 434:18,
434:19, 436:5, 436:6,
437:2, 437:12
   **edge** [1] - 365:12
   **editions** [1] - 407:20
   **editorial** [1] - 239:13
   **Edmo** [179] - 191:4,
191:10, 191:11,
191:19, 191:20,
191:25, 192:2,
192:17, 193:4,
202:17, 202:18,
202:23, 202:24,
202:25, 203:13,
204:11, 205:14,
206:12, 207:10,
212:19, 213:5,
213:18, 215:22,
221:24, 227:9, 229:4,
230:16, 250:25,
251:25, 252:4,
252:14, 252:17,
254:12, 254:20,
256:16, 260:20,
262:25, 263:18,
264:14, 264:24,
266:2, 277:5, 277:17,
278:3, 278:17,
278:20, 279:21,
279:25, 280:4, 280:8,
280:12, 283:8, 285:6,
285:13, 291:12,
291:17, 291:20,
293:3, 294:23, 297:6,
298:1, 298:13, 304:3,
304:7, 304:13,
311:23, 312:8,

312:20, 313:11,
313:17, 319:23,
336:24, 337:1, 337:3,
337:4, 337:7, 337:8,
337:12, 338:4, 338:6,
338:9, 338:21,
339:22, 340:19,
340:25, 341:4,
341:11, 342:3, 342:7,
342:12, 343:18,
343:22, 344:5, 344:8,
344:16, 344:21,
345:6, 345:14,
345:21, 345:24,
346:5, 346:10,
346:12, 346:14,
347:5, 350:10, 354:3,
354:22, 356:8,
356:12, 358:14,
358:16, 358:17,
358:25, 359:19,
360:7, 360:14,
360:17, 361:2, 361:5,
361:12, 361:15,
361:18, 361:22,
362:4, 362:9, 363:16,
364:2, 364:5, 364:10,
364:16, 367:18,
368:7, 368:15,
369:14, 369:17,
369:20, 369:24,
378:24, 379:2,
379:15, 383:15,
383:21, 386:22,
387:11, 388:23,
389:9, 389:10,
408:12, 408:14,
408:16, 409:3,
409:12, 409:19,
413:1, 413:14,
414:16, 415:4,
415:23, 416:9,
416:22, 417:8,
417:13, 418:2, 418:9,
419:5, 419:8, 420:4,
420:11, 420:16,
421:12, 423:3,
430:22, 431:5, 431:9,
431:25, 432:1,
433:10, 433:18
   **EDMO** [1] - 191:13
   **Edmo's** [33] -
230:20, 255:19,
256:13, 267:20,
275:8, 284:20,
293:21, 294:8,
297:19, 303:16,
307:20, 314:12,
337:19, 337:22,
338:18, 339:14,
339:16, 340:5, 340:7,

341:7, 341:17,
343:25, 345:3, 346:8,
346:16, 347:1,
359:16, 361:8,
364:19, 365:1, 367:2,
426:24, 431:1
   **educate** [1] - 332:23
   **Education** [1] -
274:8
   **education** [14] -
192:21, 192:22,
232:14, 237:25,
331:17, 331:18,
332:16, 404:10,
404:18, 405:10,
406:22, 407:8,
417:25, 436:19
   **educational** [2] -
234:3, 317:16
   **effect** [4] - 246:25,
266:22, 389:18,
419:12
   **effective** [4] -
259:19, 259:21,
263:13, 263:15
   **effects** [3] - 246:9,
250:4, 250:9
   **Effexor** [9] - 294:11,
295:16, 295:19,
295:20, 295:23,
296:2, 296:7, 297:10,
423:11
   **egosyntonic** [1] -
195:8
   **Ehrbar** [1] - 244:13
   **eight** [2] - 233:20,
354:9
   **Eighth** [2] - 394:25,
395:5
   **either** [10] - 208:15,
227:20, 236:7, 245:4,
265:20, 285:9,
313:18, 346:15,
380:9, 387:12
   **elaborate** [4] -
299:14, 300:11,
415:9, 420:24
   **elevated** [12] - 228:3,
291:24, 292:6,
292:13, 293:17,
293:21, 294:8,
294:12, 295:2,
295:23, 296:1, 296:13
   **elevations** [1] -
294:23
   **ELIASON** [1] - 400:5
   **Eliason** [47] - 222:9,
225:9, 225:16, 226:1,
226:4, 260:20,
260:23, 291:18,

303:16, 303:18,
303:20, 304:3, 304:6,
304:13, 304:17,
304:20, 305:17,
305:22, 305:24,
306:1, 307:1, 307:20,
317:8, 339:1, 341:4,
344:20, 344:24,
345:11, 345:21,
350:9, 354:20,
354:21, 355:1, 355:4,
355:16, 356:9,
383:24, 390:10,
400:2, 400:9, 400:14,
400:18, 403:11,
409:7, 437:14, 437:16
   **Eliason's** [15] -
263:4, 303:14,
304:23, 314:23,
317:14, 356:10,
356:11, 358:17,
358:23, 358:25,
359:18, 360:16,
361:2, 384:1, 403:9
   **eligible** [3] - 311:8,
421:18, 432:1
   **eliminate** [2] -
227:21, 342:24
   **elimination** [1] -
228:5
   **elsewhere** [1] -
298:25
   **emails** [1] - 325:20
   **embarrassed** [1] -
197:16
   **embarrasses** [1] -
203:3
   **embarrassing** [3] -
196:2, 197:12, 197:13
   **emergency** [6] -
199:3, 206:14,
232:18, 233:4,
234:25, 301:21
   **emotional** [1] -
200:15
   **emotions** [1] -
423:25
   **emphasized** [1] -
334:25
   **employed** [9] -
234:24, 234:25,
321:19, 321:20,
322:6, 388:25,
400:23, 400:24, 401:7
   **employment** [1] -
202:4
   **empower** [1] -
381:18
   **enacted** [1] - 348:16
   **encounter** [1] -

405:10
   **encourage** [1] -
346:12
   **encyclopedic** [1] -
336:4
   **end** [7] - 242:23,
282:22, 292:8,
314:14, 318:9,
334:17, 401:10
   **endanger** [1] - 260:9
   **Endocrine** [3] -
310:16, 310:23, 312:3
   **endogenous** [1] -
262:5
   **endorsed** [1] -
376:20
   **ends** [2] - 302:16,
395:3
   **engage** [3] - 237:20,
342:4, 346:12
   **engaged** [1] - 254:20
   **engaging** [3] -
345:14, 345:25,
346:14
   **enjoyed** [1] - 192:15
   **enrolled** [2] - 193:2,
193:3
   **ensure** [1] - 340:16
   **entail** [2] - 402:16,
421:6
   **entailed** [1] - 355:16
   **enter** [1] - 235:12
   **entire** [4] - 232:10,
323:14, 392:9, 392:18
   **entirely** [2] - 282:9,
313:13
   **environment** [6] -
212:21, 213:2, 254:8,
334:21, 428:20, 429:2
   **enzyme** [1] - 293:17
   **enzymes** [7] - 228:2,
291:25, 292:6,
292:13, 293:18,
294:13, 296:13
   **episode** [3] - 200:3,
200:9, 200:12
   **episodes** [1] -
199:25
   **Equality** [1] - 275:1
   **equivalent** [2] -
326:14, 417:10
   **ER** [2] - 257:12,
319:5
   **error** [1] - 281:16
   **errors** [1] - 350:25
   **especially** [6] -
197:14, 239:15,
259:25, 264:17,
274:4, 343:15
   **espouse** [1] - 335:2

   **essence** [1] - 373:12
   **essentially** [7] -
242:5, 243:13, 248:3,
251:18, 255:5,
325:18, 345:13
   **establish** [4] -
247:22, 277:19,
328:16, 387:18
   **established** [1] -
247:16
   **estimate** [2] -
236:25, 310:2
   **estimated** [1] -
309:22
   **estrogen** [1] - 227:24
   **et** [1] - 191:4
   **ethical** [3] - 259:25,
260:11, 319:6
   **Ettner** [6] - 191:16,
217:19, 320:11,
320:13, 362:21,
362:25
   **Ettner's** [2] - 362:17,
363:23
   **euthymic** [1] - 424:1
   **evaluate** [2] - 251:2,
408:16
   **evaluated** [5] -
251:9, 301:4, 301:18,
408:20, 419:8
   **evaluation** [12] -
222:11, 222:12,
223:2, 251:23,
260:19, 266:5,
304:14, 342:10,
358:17, 391:5,
412:19, 425:9
   **evaluations** [7] -
408:23, 413:5, 413:7,
413:9, 424:17,
424:18, 424:19
   **evaluator** [8] - 217:2,
388:21, 388:25,
390:13, 390:21,
391:3, 419:20, 420:2
   **evening** [1] - 430:16
   **event** [3] - 297:5,
390:3, 409:19
   **eventually** [2] -
297:2, 401:11
   **every-three-month**
[1] - 415:21
   **everyday** [2] -
197:21, 201:2
   **evidence** [16] -
203:24, 220:15,
220:25, 221:1,
231:23, 257:25,
258:4, 258:9, 258:13,
258:22, 258:24,

259:6, 259:9, 259:21,
275:10, 342:23
   **evidence-based** [2] -
257:25, 258:9
   **evolving** [3] -
289:20, 290:5, 290:13
   **exacerbated** [1] -
387:14
   **exact** [8] - 211:20,
214:16, 282:15,
283:14, 293:23,
305:21, 312:11, 331:4
   **exactly** [5] - 207:7,
222:10, 228:4,
359:20, 428:21
   **exaggerating** [1] -
361:15
   **exam** [5] - 286:1,
349:17, 411:3, 411:4
   **examination** [4] -
268:7, 285:21,
285:22, 394:7
   **EXAMINATION** [17] -
191:23, 204:9,
221:22, 227:7, 229:2,
229:25, 231:12,
268:9, 318:23, 320:9,
321:15, 349:10,
377:11, 384:11,
388:14, 397:13,
400:12
   **examine** [5] -
244:23, 245:11,
286:8, 311:15, 363:8
   **examined** [1] -
435:21
   **example** [12] - 236:1,
242:17, 245:1,
248:21, 261:24,
272:25, 296:23,
330:3, 378:19,
378:20, 418:22, 429:5
   **examples** [16] -
239:22, 241:21,
245:1, 261:23,
289:12, 289:14,
289:15, 289:25,
290:1, 290:3, 290:8,
290:10, 429:20,
429:24, 430:1
   **exceeds** [1] - 254:6
   **exciting** [1] - 222:19
   **exclusively** [1] -
313:18
   **excuse** [6] - 225:22,
303:2, 365:8, 367:7,
377:8, 404:18
   **executed** [4] -
278:19, 281:3,
281:23, 316:22

   **exhaustive** [1] -
289:16
   **exhibited** [1] - 342:7
   **exhibits** [1] - 404:4
   **exist** [3] - 259:6,
259:9, 277:25
   **existing** [2] - 386:21,
387:12
   **expand** [1] - 239:9
   **expanded** [2] -
235:6, 322:24
   **expect** [4] - 200:16,
200:18, 201:6, 201:14
   **expected** [1] - 245:4
   **expects** [2] - 259:12,
398:18
   **expense** [1] - 375:24
   **expenses** [2] -
273:5, 319:1
   **experience** [29] -
194:11, 197:7,
232:13, 234:13,
246:10, 248:24,
249:19, 256:24,
267:19, 269:12,
301:10, 302:4,
319:10, 328:1,
328:22, 329:8,
332:15, 349:22,
354:1, 354:12,
361:12, 391:13,
398:17, 406:23,
407:9, 432:7, 433:25,
435:6, 437:8
   **experienced** [7] -
234:16, 241:18,
245:14, 254:9,
289:20, 290:5, 307:8
   **experiences** [1] -
334:16
   **expert** [12] - 239:19,
239:24, 240:10,
273:3, 273:5, 273:6,
273:22, 320:11,
328:13, 363:11,
374:1, 433:25
   **expertise** [6] -
253:19, 373:12,
414:9, 419:25,
425:11, 427:19
   **experts** [3] - 217:15,
424:18, 434:25
   **explain** [28] - 193:7,
193:10, 221:7, 233:2,
233:7, 233:24, 235:3,
235:10, 239:3,
239:10, 242:25,
244:19, 251:1, 251:6,
258:22, 261:15,
261:19, 277:21,

319:4, 328:25, 329:7,
334:16, 337:1, 343:7,
345:11, 405:25,
415:9, 420:24
   **explained** [1] - 213:4
   **explore** [1] - 264:8
   **express** [4] - 194:25,
195:9, 201:12, 375:22
   **expressed** [3] -
219:16, 310:5, 423:25
   **expressing** [1] -
396:19
   **expression** [1] -
330:15
   **expressions** [1] -
330:18
   **extended** [1] -
192:24
   **extensive** [2] -
314:1, 420:7
   **extensively** [1] -
314:2
   **extent** [5] - 196:11,
227:9, 253:16, 275:3,
370:24
   **extra** [1] - 376:11
   **extreme** [6] - 194:14,
194:17, 199:25,
200:3, 210:3, 255:15
   **extremely** [3] -
194:21, 262:24,
294:21
   **eyebrows** [1] -
423:19

## F

   **face** [3] - 201:1,
257:20
   **facial** [1] - 246:11
   **facilitate** [1] - 311:7
   **facilities** [5] -
323:24, 323:25,
324:2, 402:19, 404:24
   **facility** [10] - 214:7,
305:4, 305:7, 305:9,
305:14, 323:19,
323:20, 323:24,
340:23, 343:12
   **fact** [14] - 220:15,
293:20, 296:2,
368:10, 368:13,
373:11, 384:22,
388:3, 390:4, 390:12,
391:2, 391:4, 416:9,
418:12
   **factor** [14] - 249:17,
279:7, 340:13,
366:12, 366:16,
367:6, 367:8, 367:9,

367:12, 369:4, 369:5,
369:8, 380:8, 387:8
   **factors** [3] - 252:16,
345:18, 363:4
   **facts** [2] - 221:1,
428:7
   **fade** [1] - 265:14
   **failed** [2] - 214:23,
315:7
   **failure** [1] - 255:19
   **fair** [5] - 245:16,
245:22, 310:4,
363:10, 380:13
   **fairly** [4] - 275:19,
415:8, 424:16, 428:15
   **fall** [1] - 422:6
   **familiar** [20] - 237:14,
257:24, 267:2,
313:14, 325:7,
329:19, 336:11,
336:18, 336:24,
340:5, 344:20,
345:24, 347:15,
347:22, 356:23,
357:4, 366:1, 376:10,
406:23, 407:9
   **familiarity** [6] -
329:3, 335:22, 337:1,
337:19, 339:16,
419:25
   **family** [3] - 201:2,
327:10, 432:8
   **Family** [2] - 205:18,
208:23
   **fantastic** [1] - 200:25
   **far** [5] - 199:21,
202:18, 288:4, 288:6,
293:20
   **fashion** [1] - 215:17
   **fat** [2] - 196:21,
246:16
   **fault** [2] - 307:10,
351:9
   **February** [4] - 228:1,
292:12, 293:5,
293:11, 295:16, 296:6
   **federally** [3] - 235:9,
235:10, 235:19
   **fee** [10] - 273:3,
273:5, 273:7, 273:12,
273:15, 273:17,
273:21, 320:12,
320:13, 325:18
   **feelings** [1] - 194:13
   **fees** [1] - 273:8
   **fellow** [1] - 434:7
   **fellows** [1] - 236:17
   **fellowship** [3] -
404:22, 405:9, 406:14
   **felony** [1] - 210:21

**felt** [38] - 196:18,
196:19, 198:20,
198:21, 198:22,
198:23, 199:20,
210:19, 222:21,
228:6, 228:12,
334:25, 341:17,
341:24, 345:5, 356:2,
367:7, 370:9, 410:4,
410:13, 410:14,
412:24, 418:2,
419:15, 421:13,
421:16, 421:17,
422:2, 422:7, 425:14,
430:3, 432:9, 432:11,
435:13, 436:9
   **female** [32] - 193:5,
193:6, 193:8, 193:9,
194:3, 194:4, 194:24,
194:25, 195:1, 195:5,
197:6, 201:22,
203:16, 203:17,
203:22, 214:6,
214:10, 216:4, 216:5,
216:9, 216:11,
218:10, 240:8,
315:10, 323:25,
343:12, 348:22,
385:11, 410:5,
416:24, 417:9, 417:20
   **females** [2] - 195:3,
348:20
   **feminine** [19] -
195:3, 195:11,
195:14, 195:22,
202:1, 212:16,
212:20, 213:7,
216:16, 246:17,
313:19, 313:20,
348:21, 410:4, 411:6,
418:7, 421:20,
421:22, 423:21
   **femininity** [1] -
214:25
   **feminize** [1] - 215:3
   **Fenway** [1] - 243:23
   **few** [15] - 202:17,
202:23, 257:14,
265:19, 265:23,
266:20, 268:21,
275:6, 282:1, 282:22,
331:3, 349:17,
376:14, 386:9, 429:20
   **field** [4] - 239:6,
326:15, 373:12,
433:25
   **fifth** [3] - 330:14,
395:8, 395:12
   **fight** [1] - 208:2
   **figure** [2] - 246:17,

427:23
   **file** [1] - 379:24
   **filed** [2] - 217:10,
283:22
   **fill** [1] - 366:8
   **filled** [1] - 366:4
   **filling** [1] - 307:5
   **final** [4] - 254:4,
299:8, 352:13, 352:17
   **finally** [2] - 196:19,
265:2
   **fine** [5] - 215:12,
261:4, 270:24,
365:21, 391:10
   **finish** [2] - 229:10
   **finished** [2] - 199:22,
233:3
   **first** [51] - 191:19,
192:11, 193:11,
222:5, 231:22, 244:5,
244:7, 246:23,
246:24, 251:6,
251:13, 252:18,
261:24, 263:10,
264:18, 268:23,
271:11, 273:6,
276:25, 287:1, 287:6,
287:13, 288:24,
288:25, 289:1, 299:1,
306:4, 310:15,
314:10, 314:11,
314:12, 315:22,
320:20, 326:13,
357:21, 360:9,
385:15, 385:18,
387:1, 400:16,
404:10, 404:20,
405:2, 411:16, 416:3,
420:21, 425:7,
432:12, 432:16
   **fit** [2] - 430:3, 430:9
   **five** [13] - 239:22,
302:18, 303:2, 303:8,
303:11, 303:13,
327:22, 332:15,
337:17, 337:24,
392:14, 392:16
   **fix** [1] - 200:23
   **fix-all** [1] - 200:23
   **flesh** [1] - 390:17
   **flexibility** [3] -
245:13, 300:18,
300:23
   **flexible** [9] - 241:6,
243:14, 244:8, 287:3,
288:8, 288:12,
288:16, 289:12,
289:17
   **Flexible** [1] - 241:12
   **Florida** [2] - 240:5,

273:22
   **flow** [1] - 267:7
   **fly** [1] - 351:17
   **focus** [2] - 220:8,
250:14
   **focused** [4] - 254:17,
263:2, 266:6, 363:2
   **focuses** [1] - 274:22
   **focusing** [2] -
250:15, 384:25
   **fogginess** [1] -
196:20
   **foggy** [1] - 426:11
   **folder** [1] - 305:24
   **folks** [5] - 331:24,
332:6, 378:15,
388:16, 425:22
   **follow** [11] - 214:2,
230:12, 230:14,
241:18, 249:20,
249:22, 259:3,
384:10, 388:8,
434:16, 435:1
   **follow-up** [5] -
230:12, 230:14,
249:20, 249:22, 259:3
   **followed** [2] -
205:21, 210:7
   **following** [5] -
289:24, 309:3,
340:22, 415:6, 415:7
   **for-us** [1] - 235:4
   **foreground** [1] -
194:23
   **Forensic** [1] - 401:1
   **forensic** [4] - 404:22,
406:6, 406:10, 406:13
   **form** [15] - 220:2,
230:2, 251:7, 307:5,
346:10, 362:11,
366:2, 366:11,
368:16, 368:25,
380:7, 380:15,
408:25, 433:15,
433:19
   **formal** [2] - 404:17,
404:18
   **formally** [1] - 352:23
   **forming** [1] - 362:9
   **forms** [4] - 228:13,
379:17, 379:21, 419:9
   **Fort** [2] - 193:1
   **forth** [6] - 231:21,
241:16, 288:20,
289:3, 324:20, 326:11
   **forward** [1] - 321:5
   **foundation** [12] -
220:13, 220:24,
247:13, 253:10,
256:21, 257:8,

328:12, 356:16, 362:11, 368:19, 381:24, 423:20
**foundational** [1] - 339:9
**four** [6] - 209:24, 210:3, 309:24, 327:21, 330:22
**fourth** [4] - 363:1, 386:20, 387:16, 388:5
**FQHCs** [1] - 235:12
**frame** [3] - 207:20, 295:16, 342:9
**frames** [1] - 334:20
**Francisco** [4] - 233:14, 235:2, 244:2, 404:23
**Frankly** [1] - 391:8
**frankly** [1] - 339:9
**fraud** [1] - 210:21
**free** [3] - 256:18, 362:18, 399:13
**freedom** [1] - 202:11
**frequently** [4] - 275:20, 328:4, 434:4, 435:10
**fresher** [1] - 282:25
**Friday** [7] - 215:25, 385:11, 388:17, 388:23, 389:22, 390:18, 391:18
**friends** [2] - 313:20, 432:8
**front** [13] - 191:15, 258:6, 324:16, 326:7, 331:5, 335:18, 336:12, 377:16, 377:23, 378:6, 389:8, 394:12, 429:1
**frustrated** [4] - 421:21, 422:4, 424:2, 424:3
**frustrating** [2] - 203:5, 421:24
**fulfilled** [1] - 299:12
**full** [10] - 211:3, 229:15, 229:17, 242:8, 251:11, 251:14, 400:24, 401:5, 407:2, 424:1
**full-term** [1] - 229:17
**full-time** [1] - 401:5
**fully** [2] - 252:23, 431:1
**function** [11] - 255:5, 293:22, 294:8, 295:3, 295:21, 295:24, 296:17, 296:21, 297:3, 297:6, 364:7
**functioning** [1] -

296:25
**functions** [1] - 287:15
**Fund** [1] - 274:8
**FURTHER** [2] - 229:25, 397:13
**future** [4] - 218:8, 218:13, 311:7, 380:23

## G

**G-O-R-T-O-N** [1] - 231:4
**gaff** [3] - 313:5, 313:6, 313:12
**gained** [2] - 337:19, 339:15
**Garvey** [1] - 256:8
**Garvey's** [1] - 258:20
**gastric** [1] - 266:12
**gay** [2] - 193:21, 410:8
**GD** [9] - 216:3, 216:23, 217:2, 219:23, 322:22, 323:12, 388:16, 388:17, 391:14
**gears** [1] - 307:24
**gee** [2] - 242:7, 242:10
**gender** [254] - 193:4, 193:20, 193:24, 194:1, 194:6, 194:11, 194:13, 196:4, 196:8, 196:10, 196:12, 197:1, 197:3, 197:5, 197:6, 197:7, 199:25, 200:3, 200:9, 200:16, 200:22, 200:23, 201:6, 202:13, 207:2, 216:1, 216:16, 216:17, 216:23, 216:25, 222:6, 222:23, 223:2, 224:13, 224:14, 237:4, 237:8, 240:21, 242:8, 242:10, 242:13, 245:3, 248:10, 248:11, 249:1, 251:3, 251:19, 251:25, 252:3, 252:19, 253:7, 253:17, 254:2, 254:5, 254:7, 254:17, 255:7, 255:20, 262:1, 264:3, 265:3, 265:13, 266:5, 267:20, 269:5, 269:15, 269:16, 270:17, 270:25, 271:5, 271:6, 271:8,

271:19, 271:21, 272:6, 272:8, 280:21, 283:10, 284:13, 287:18, 288:3, 288:13, 288:21, 289:4, 290:12, 290:17, 290:19, 290:20, 291:1, 291:18, 291:21, 297:19, 299:9, 299:10, 300:12, 300:13, 304:25, 309:10, 313:3, 322:16, 322:19, 323:6, 323:20, 325:12, 325:13, 326:3, 328:9, 328:18, 328:22, 329:5, 329:10, 329:14, 329:17, 329:19, 329:24, 330:12, 330:14, 330:16, 330:17, 330:24, 331:17, 331:19, 331:24, 332:5, 332:6, 332:16, 332:20, 332:25, 333:12, 333:17, 334:2, 334:8, 334:16, 334:24, 335:3, 335:7, 335:9, 336:22, 337:8, 337:20, 337:23, 337:25, 338:21, 338:23, 342:22, 343:2, 344:16, 347:19, 347:20, 348:2, 348:10, 348:18, 349:1, 349:15, 349:18, 349:24, 350:2, 353:14, 354:2, 354:13, 354:14, 354:18, 354:22, 361:12, 361:16, 369:22, 370:4, 371:6, 372:5, 376:3, 376:5, 376:7, 376:14, 376:11, 376:21, 376:23, 377:1, 377:2, 382:14, 382:22, 384:15, 384:23, 385:2, 385:13, 385:14, 386:11, 387:1, 387:3, 387:12, 387:14, 387:18, 387:24, 388:3, 388:20, 388:24, 389:23, 390:13, 390:21, 391:3, 395:17, 395:18, 397:17, 398:11, 398:15,

399:5, 405:10, 405:11, 407:12, 407:15, 408:3, 408:4, 408:6, 408:16, 408:21, 409:23, 411:18, 412:16, 413:2, 413:13, 414:17, 415:14, 415:17, 415:18, 417:10, 417:25, 419:6, 419:12, 420:1, 420:9, 420:13, 421:1, 421:6, 422:3, 431:5, 431:8, 431:10, 431:12, 431:17, 432:24, 435:7, 435:10, 435:13, 436:10, 436:15, 437:3
**Gender** [1] - 398:22
**gender-conforming** [1] - 384:23
**gender-nonconforming** [3] - 325:12, 330:14, 330:17
**general** [13] - 195:4, 305:10, 305:14, 334:15, 364:7, 364:10, 364:17, 403:1, 403:3, 406:6, 406:8, 431:15, 431:23
**generally** [9] - 227:12, 245:21, 287:9, 299:19, 339:8, 410:1, 413:24, 424:1, 424:2
**generically** [1] - 266:9
**generous** [1] - 393:9
**genital** [15] - 247:2, 248:8, 249:21, 249:23, 250:5, 251:4, 254:17, 256:16, 258:11, 259:7, 263:2, 266:6, 267:3, 320:1, 394:23
**genital-focused** [3] - 254:17, 263:2, 266:6
**genitalia** [3] - 197:13, 343:10, 429:7
**genitals** [8] - 197:10, 200:19, 262:17, 422:4, 422:6, 422:15, 422:22, 429:9
**genitourinary** [2] - 267:6, 267:18
**germane** [2] - 261:24, 277:25
**gestures** [1] - 195:3
**GID** [15] - 222:23,

225:12, 304:4, 317:10, 322:22, 412:16, 414:12, 414:15, 415:4, 415:22, 416:3, 416:10, 419:20, 419:23, 420:2
**given** [16] - 199:25, 212:18, 213:3, 213:6, 214:3, 226:2, 241:17, 264:17, 313:3, 347:3, 348:21, 350:1, 351:22, 351:23, 379:19
**glad** [1] - 400:21
**global** [2] - 290:7, 331:21
**goal** [4] - 215:5, 233:12, 248:10, 431:24
**goals** [2] - 248:8, 254:2
**good-quality** [1] - 291:16
**Gorton** [18] - 230:21, 230:22, 231:3, 231:14, 231:16, 232:6, 232:20, 241:1, 244:14, 252:11, 253:25, 257:4, 261:9, 267:23, 268:11, 318:15, 318:25, 320:16
**GORTON** [1] - 230:24
**Gorton's** [1] - 231:21
**gosh** [1] - 426:15
**government** [4] - 235:13, 235:16, 235:17, 375:20
**government-sponsored** [1] - 235:17
**graduate** [2] - 327:20, 404:11
**graduated** [1] - 405:1
**granted** [1] - 421:19
**grapple** [1] - 427:18
**great** [3] - 301:3, 387:17, 388:9
**greater** [2] - 260:7, 267:17
**greatly** [1] - 387:14
**grew** [2] - 211:22, 211:23
**grooming** [1] - 240:8
**gross** [3] - 228:16, 394:24, 395:5
**grounds** [1] - 372:6

**group** [7] - 207:2, 218:24, 219:1, 269:1, 327:9, 344:13, 384:17

**groups** [13] - 196:10, 219:1, 274:1, 275:4, 290:2, 290:7, 291:15, 291:16, 337:4, 337:24, 345:16, 378:21, 428:16

**grow** [1] - 246:12

**growing** [1] - 246:12

**grown** [2] - 195:2, 196:21

**guess** [13] - 193:9, 193:16, 195:1, 195:4, 196:16, 196:17, 320:5, 352:5, 383:3, 386:7, 405:11, 416:1, 416:24

**guesstimate** [1] - 302:2

**guidance** [4] - 237:22, 299:17, 326:19, 373:24

**guide** [2] - 310:23, 310:24

**guideline** [1] - 310:25

**guidelines** [13] - 241:6, 241:16, 244:8, 287:4, 288:8, 288:17, 288:19, 288:22, 289:5, 300:19, 310:17, 310:20, 312:3

**Guidelines** [1] - 241:12

**guilty** [1] - 365:9

**gynecologist** [1] - 273:23

# H

**habit** [2] - 205:7, 205:10

**habitus** [1] - 286:11

**hair** [17] - 195:2, 195:22, 202:2, 211:5, 211:13, 211:18, 211:23, 212:2, 212:12, 212:25, 213:2, 213:7, 213:17, 213:18, 213:25, 215:16, 246:11

**hairs** [1] - 246:13

**hairstyle** [1] - 212:16

**hairstyles** [2] - 348:21, 385:12

**half** [9] - 260:4, 260:5, 285:17, 296:2, 296:4, 299:18,

**391**:16, 405:3, 422:1

**Hall** [15] - 193:1, 204:8, 229:21, 268:7, 318:18, 320:22, 321:13, 359:24, 386:9, 388:8, 389:7, 389:13, 396:7, 397:10

**HALL** [92] - 204:1, 204:7, 204:10, 206:6, 206:12, 206:17, 206:23, 207:12, 207:18, 215:12, 215:15, 217:18, 217:21, 217:23, 218:2, 220:17, 221:5, 221:11, 221:16, 221:20, 229:22, 230:14, 232:1, 253:10, 253:12, 254:23, 256:21, 256:23, 257:8, 263:21, 316:20, 318:19, 320:23, 321:2, 321:14, 321:16, 324:9, 325:1, 325:7, 329:2, 329:3, 334:12, 335:15, 335:19, 336:11, 339:6, 339:14, 349:4, 350:22, 351:7, 356:16, 359:22, 359:25, 362:11, 362:21, 362:24, 363:5, 363:12, 363:15, 363:25, 368:19, 370:21, 370:23, 373:15, 377:7, 377:12, 381:13, 381:23, 382:5, 383:9, 384:6, 389:2, 389:14, 390:5, 390:15, 390:20, 391:6, 391:20, 393:14, 393:16, 393:22, 393:24, 394:1, 396:21, 396:24, 397:11, 397:14, 397:21, 397:24, 399:8, 399:17, 399:20

**hand** [8] - 264:2, 277:15, 352:22, 371:24, 373:1, 373:21, 374:23, 394:20

**handful** [5] - 275:13, 309:22, 309:25, 310:2, 420:12

**handle** [1] - 201:4

**handles** [1] - 274:8

**handling** [1] - 289:20

**handwrote** [1] - 371:12

**happy** [2] - 216:19, 431:25

**hard** [5] - 197:12, 208:3, 237:2, 353:2, 392:12

**harm** [1] - 289:21

**harming** [5] - 340:2, 342:4, 342:5, 342:24, 345:15

**head** [4] - 212:9, 247:8, 248:2

**heading** [2] - 241:11, 242:21

**heal** [1] - 267:8

**Health** [20] - 233:6, 233:9, 233:10, 234:2, 235:2, 235:3, 237:15, 243:23, 243:24, 244:2, 280:7, 283:9, 284:12, 325:8, 368:16, 405:2, 405:24, 408:25

**health** [166] - 196:5, 201:7, 202:20, 205:11, 216:15, 217:11, 220:3, 220:8, 220:23, 225:19, 226:18, 226:20, 234:22, 236:4, 238:3, 243:2, 243:4, 243:22, 244:1, 248:12, 251:20, 253:3, 253:6, 253:12, 253:16, 253:18, 256:13, 270:2, 270:10, 270:15, 271:15, 271:16, 271:22, 271:23, 271:25, 272:16, 272:25, 276:22, 277:6, 277:12, 279:6, 281:18, 282:2, 283:3, 287:18, 289:20, 291:2, 291:15, 291:16, 295:20, 298:16, 298:19, 298:22, 302:11, 303:19, 303:22, 304:1, 304:7, 304:11, 305:9, 305:11, 305:14, 305:19, 305:20, 307:20, 322:2, 322:3, 322:19, 323:9, 323:23, 328:8, 329:4, 329:9, 329:23, 329:25, 330:2, 330:5, 330:6, 330:8, 330:10,

**332**:24, 338:8, 338:12, 339:16, 340:9, 340:13, 340:17, 341:8, 341:18, 341:19, 342:18, 343:4, 343:25, 344:9, 345:3, 345:17, 345:20, 346:16, 346:24, 347:2, 347:6, 349:18, 350:3, 363:2, 363:21, 364:6, 364:11, 364:14, 364:24, 365:2, 365:5, 366:2, 366:4, 366:19, 367:3, 367:17, 367:25, 368:3, 368:11, 368:15, 368:24, 377:14, 378:3, 378:10, 378:16, 378:17, 378:21, 378:23, 378:25, 379:3, 379:14, 380:12, 383:22, 386:21, 387:4, 387:7, 387:12, 387:13, 387:21, 387:23, 398:11, 398:16, 402:24, 403:3, 406:11, 406:20, 407:10, 407:18, 410:16, 410:18, 411:5, 414:2, 414:7, 415:10, 415:20, 415:24, 416:10, 418:22, 420:8, 422:19, 427:12, 431:1, 432:6, 433:1, 435:9

**Healthcare** [1] - 406:19

**healthcare** [17] - 234:12, 234:20, 235:9, 235:10, 235:20, 236:19, 238:8, 238:21, 239:20, 270:10, 287:16, 288:12, 289:8, 319:6, 406:2, 427:21, 428:10

**healthy** [4] - 219:6, 221:17, 424:1, 431:25

**hear** [6] - 191:3, 202:24, 232:24, 239:2, 276:25, 335:2

**heard** [3] - 246:7, 413:22, 425:25

**hearing** [1] - 231:17

**hearsay** [4] - 370:24, 435:16, 436:22, 437:1

**heart** [1] - 263:24

**heavily** [4] - 209:22, 386:16, 424:15, 433:10

**held** [1] - 322:9

**hello** [1] - 221:24

**help** [18] - 197:6, 198:8, 198:16, 199:1, 219:22, 224:19, 224:25, 225:5, 226:2, 297:15, 331:23, 332:23, 340:14, 340:16, 408:4, 426:22, 433:14, 434:10

**helped** [4] - 223:13, 224:16, 224:24, 422:3

**helpful** [6] - 291:8, 310:24, 346:20, 353:1, 431:11, 432:5

**helping** [4] - 224:8, 224:10, 224:11, 224:13

**helps** [4] - 195:8, 195:9, 195:10, 203:22

**herself** [3] - 255:13, 313:3, 417:8

**heterosexual** [2] - 193:16, 193:17

**hidden** [2] - 395:8, 395:12

**high** [9] - 209:25, 212:8, 212:11, 258:13, 258:22, 262:25, 288:2, 295:15, 295:19

**high-quality** [2] - 258:13, 258:22

**higher** [7] - 214:6, 214:11, 236:2, 236:3, 287:24, 378:23, 378:24

**highest** [2] - 258:24, 287:16

**highlight** [1] - 306:3, 311:3, 404:9

**highlighted** [3] - 281:14, 296:17, 298:15

**Hill** [1] - 232:17

**hips** [1] - 196:22

**hiring** [1] - 402:11

**historically** [1] - 243:2, 244:3

**histories** [1] - 315:15

**history** [22] - 205:4, 207:19, 251:19, 285:19, 285:20, 314:14, 315:7, 315:14, 315:18,

316:4, 317:4, 317:6, 317:9, 340:5, 340:7, 340:18, 379:8, 379:13, 379:24, 411:20, 423:14, 424:11

**Hohenleitner** [1] - 351:21

**hold** [3] - 237:24, 268:1, 436:8

**homeless** [2] - 236:2, 250:17

**homes** [1] - 300:1

**homework** [1] - 207:6

**homicidal** [1] - 423:23

**homosexual** [1] - 410:7

**homosexuality** [1] - 407:21

**honestly** [3] - 195:16, 277:14, 278:2

**hope** [3] - 194:16, 400:21, 437:15

**hopeless** [1] - 194:15

**hoping** [1] - 422:23

**hormonal** [2] - 196:9, 304:24

**hormonally** [1] - 228:11

**hormone** [26] - 223:6, 227:10, 227:12, 227:21, 227:24, 228:10, 228:22, 243:3, 243:5, 246:8, 246:10, 248:15, 248:19, 254:1, 288:21, 289:3, 290:22, 292:12, 312:14, 338:1, 369:14, 409:8, 414:22, 417:9, 422:1, 432:23

**hormones** [23] - 196:12, 196:15, 196:19, 222:25, 223:4, 223:10, 223:13, 223:15, 223:19, 223:20, 223:21, 224:9, 224:11, 224:12, 262:5, 262:6, 262:10, 292:6, 312:10, 414:19, 414:25, 422:2, 422:3

**hospital** [3] - 199:6, 199:7, 301:23

**Hospital** [3] - 232:19,

235:1, 280:11

**hosted** [1] - 332:12

**hostile** [1] - 254:8

**hotline** [1] - 234:19

**hour** [1] - 268:2

**hours** [3] - 204:15, 285:16, 285:17

**house** [1] - 305:16

**housed** [11] - 236:2, 250:17, 323:20, 343:10, 354:3, 354:5, 364:10, 364:12, 364:13, 364:16, 415:10

**housekeeping** [1] - 206:23

**housing** [3] - 322:19, 323:9, 422:19

**huge** [3] - 250:7, 250:13, 431:22

**human** [2] - 260:18, 407:22

**hundreds** [1] - 264:3

**hygiene** [1] - 423:20

## I

**Idaho** [22] - 193:1, 202:4, 207:24, 208:6, 208:8, 208:13, 231:8, 280:21, 280:25, 316:24, 321:20, 322:6, 326:24, 328:3, 347:18, 378:11, 382:23, 402:20, 402:21, 405:6, 419:11, 419:18

**idea** [5] - 195:10, 244:21, 254:6, 346:18, 386:25

**ideal** [1] - 233:15

**ideally** [2] - 276:24, 277:1

**identified** [9] - 193:18, 193:21, 195:1, 329:25, 330:2, 342:22, 431:8, 433:24, 434:12

**identify** [4] - 194:24, 233:16, 433:1, 433:4

**identities** [3] - 330:15, 330:17, 370:10

**identity** [40] - 193:4, 193:20, 194:6, 197:6, 203:22, 222:6, 222:23, 223:2, 224:13, 254:5, 269:5, 269:16, 290:19, 291:18, 291:21,

299:10, 300:13, 347:19, 349:15, 370:10, 388:20, 388:24, 390:21, 391:3, 405:11, 407:12, 408:3, 408:17, 408:21, 409:23, 411:18, 412:16, 413:2, 413:13, 414:17, 415:14, 420:1, 420:9, 420:13, 432:10

**IDOC** [41] - 215:3, 216:15, 216:22, 315:2, 321:2, 323:19, 332:25, 333:2, 337:20, 348:6, 361:21, 361:25, 366:2, 366:8, 366:18, 368:23, 370:4, 370:15, 371:5, 372:12, 372:22, 374:4, 374:8, 374:15, 376:2, 376:23, 377:1, 380:19, 381:25, 382:12, 382:13, 384:14, 385:11, 385:20, 386:10, 388:16, 388:25, 389:23, 390:12, 391:8, 391:13

**ignore** [1] - 300:4

**ignores** [2] - 372:20, 373:8

**ill** [2] - 400:20, 418:9

**illness** [14] - 364:8, 366:12, 366:15, 367:5, 367:7, 367:9, 367:12, 369:4, 369:5, 369:8, 379:3, 379:9, 380:7, 380:8

**illnesses** [1] - 412:3

**imagine** [1] - 212:8

**immediately** [3] - 300:25, 301:2, 301:7

**impact** [1] - 253:16

**impair** [1] - 379:9

**impaired** [1] - 252:24

**impeach** [1] - 397:3

**impeachment** [2] - 371:18, 371:19

**importance** [2] - 418:1, 422:21

**important** [20] - 195:6, 218:7, 234:10, 238:24, 239:1, 276:22, 277:2, 312:1, 291:14, 317:4, 317:5, 342:18, 343:3, 381:13,

421:13, 431:4, 431:12, 431:17, 433:13

**impressions** [1] - 436:8

**improper** [1] - 336:9

**improve** [1] - 267:21

**improves** [1] - 265:4

**inadequately** [1] - 249:12

**inappropriate** [3] - 340:3, 342:13, 383:22

**Incarcerated** [1] - 238:6

**incarcerated** [11] - 192:19, 194:9, 194:10, 214:14, 227:10, 227:12, 269:6, 269:7, 269:16, 322:25, 383:7

**incarceration** [13] - 192:25, 209:7, 209:24, 210:4, 211:12, 211:19, 211:22, 214:5, 216:12, 218:16, 338:12, 338:18, 342:15

**incident** [10] - 278:20, 278:23, 366:12, 366:16, 367:6, 367:10, 367:13, 369:4, 369:6, 369:9

**include** [10] - 235:6, 239:10, 314:23, 323:8, 327:9, 374:20, 375:5, 395:15, 407:12

**included** [4] - 216:25, 376:2, 376:15, 396:7

**includes** [5] - 272:18, 272:20, 299:19, 324:1, 402:1

**including** [9] - 216:3, 218:3, 218:18, 223:18, 307:2, 307:21, 310:12, 381:2, 399:2

**incomplete** [1] - 284:25

**incongruence** [2] - 194:2, 197:8

**incorporated** [2] - 424:10, 424:25

**Incorporated** [1] - 191:4

**incorrect** [1] - 315:23

**increase** [1] - 431:22

**increased** [1] - 295:19

**indeed** [1] - 288:16

**independent** [1] - 436:25

**Indian** [4] - 193:1, 280:7, 283:9, 284:12

**indicate** [9] - 340:19, 342:23, 351:13, 351:15, 351:25, 411:8, 411:10, 417:7, 418:16

**indicated** [16] - 222:5, 224:1, 224:7, 275:19, 277:2, 282:21, 283:23, 290:25, 302:17, 313:17, 314:21, 335:22, 362:25, 410:21, 417:8, 420:21

**indicates** [2] - 306:11, 306:23

**indicating** [1] - 230:4

**indicating)** [1] - 212:13

**indicator** [1] - 257:1

**individual** [6] - 244:10, 245:15, 258:5, 289:8, 327:9, 338:3

**individually** [2] - 238:9, 238:22

**individuals** [9] - 214:14, 247:19, 264:3, 287:16, 307:8, 325:13, 326:2, 333:9, 375:20

**Industries** [2] - 202:5, 202:7

**infections** [1] - 267:7

**inflammation** [2] - 296:16, 296:20

**informal** [2] - 355:4, 355:12

**information** [15] - 226:8, 226:11, 256:4, 256:5, 277:3, 281:7, 337:5, 347:3, 376:2, 381:2, 381:19, 413:10, 413:12, 424:21, 424:23

**informed** [9] - 242:22, 242:25, 243:19, 244:6, 252:23, 335:10, 346:1, 362:9, 363:18

**infrequently** [1] - 276:13

**initial** [3] - 225:13, 233:12, 389:3

injected [1] - 391:23
injunction [2] -
191:5, 217:10
inmate [20] - 269:4,
269:15, 305:3, 334:9,
334:24, 335:4, 342:2,
349:1, 375:8, 379:13,
382:14, 392:2,
408:19, 428:11,
428:19, 428:21,
429:15, 430:4, 430:9,
432:21
inmate's [4] -
340:12, 385:12,
387:11, 423:1
inmates [27] -
216:16, 216:23,
322:16, 322:19,
322:22, 323:17,
323:20, 324:1, 329:9,
329:10, 333:11,
334:3, 337:25,
340:22, 340:23,
343:10, 348:18,
354:17, 364:6, 366:4,
375:23, 378:15,
382:22, 395:17,
420:13, 435:13, 436:9
innate [1] - 194:4
inquire [6] - 191:21,
231:10, 321:13,
357:8, 400:10, 418:15
inserted [1] - 248:6
inside [3] - 195:9,
195:10, 248:3
insight [2] - 311:5,
414:10
instance [5] -
224:16, 224:25,
226:3, 290:17, 303:11
instead [2] - 249:7,
365:13
institution [2] -
305:12, 364:5
Institution [1] -
402:21
institutional [1] -
260:15
institutionalized [1]
- 300:2
Institutionalized [2]
- 286:17, 299:24
institutions [5] -
216:5, 299:19,
299:20, 323:15,
323:18
instruct [1] - 366:18
instructions [1] -
213:25
insufficient [1] -

258:12
insurance [3] -
235:17, 243:7, 428:16
insurances [1] -
427:21
insured [3] - 235:14,
235:23
insurers [1] - 249:9
intact [1] - 422:22
intake [1] - 205:23
intended [2] -
245:13, 288:11
intensive [1] -
233:17
intent [3] - 209:17,
209:18, 418:9
intention [3] -
380:10, 380:11, 381:2
interact [1] - 414:3
interacted [1] -
410:13
interaction [3] -
411:7, 423:21, 424:11
interactions [2] -
415:16, 427:1
interchangeably [1]
- 271:2
interest [1] - 320:23
interface [1] - 406:10
international [2] -
236:24, 325:11
interpersonal [3] -
340:2, 340:14, 344:15
interpretation [1] -
362:17
interpreted [1] -
382:8
interrupt [1] - 265:20
intersex [3] - 261:25,
262:1, 262:3
interventions [1] -
244:9
interview [8] - 202:8,
204:24, 251:16,
252:19, 277:5,
278:17, 285:9, 285:13
interviewed [1] -
285:6
interviewing [1] -
402:11
interviews [2] -
402:10, 413:11
inversion [1] - 247:7
inverted [1] - 248:4
investigation [4] -
278:10, 280:15,
338:15, 339:21
involved [16] - 236:7,
247:22, 264:2, 275:2,
279:7, 333:2, 341:3,

358:4, 380:7, 385:16,
385:23, 385:24,
391:12, 402:11,
414:22, 427:10
involvement [2] -
274:1, 339:15
involving [2] -
239:20, 273:23
IRB [2] - 260:13,
260:14
irreversible [1] -
343:19
irritates [1] - 203:2
ISCI [7] - 226:15,
354:3, 354:9, 355:8,
364:5, 402:23, 402:25
issue [23] - 240:7,
240:11, 240:16,
250:13, 263:25,
272:14, 292:4,
292:11, 295:15,
302:16, 307:9, 336:5,
339:22, 340:12,
346:13, 351:7,
363:13, 366:19,
372:2, 380:25, 386:6,
396:17, 434:3
issues [38] - 201:3,
219:22, 220:3, 220:8,
220:23, 251:20,
256:13, 271:23,
272:25, 274:22,
274:23, 275:9, 291:3,
298:16, 298:19,
298:22, 300:1, 304:7,
322:15, 329:9,
329:11, 330:11,
334:2, 334:20, 340:2,
340:14, 340:16,
341:18, 343:1,
343:13, 344:15,
379:14, 382:4,
387:13, 387:23,
416:11
item [2] - 335:25,
336:1
items [2] - 216:4,
315:10
itself [2] - 262:7,
387:4

J

Jail [2] - 280:18,
400:25
jail [1] - 214:15
January [5] - 233:23,
292:9, 292:14, 293:8,
293:9
Jeremy [13] - 306:12,

306:13, 306:22,
317:13, 317:22,
321:2, 321:11, 425:7,
425:12, 425:25,
426:14, 426:19
JEREMY [2] - 321:7,
321:11
job [7] - 201:24,
250:15, 257:12,
351:21, 401:3, 401:5,
405:3
jobs [1] - 202:1
jockstrap [2] -
224:25, 225:3
join [7] - 253:11,
254:23, 256:22,
263:21, 316:20,
356:18, 371:2
joined [1] - 401:9
Joint [29] - 240:24,
252:9, 260:23,
286:23, 326:7, 331:6,
336:12, 357:13,
357:22, 357:23,
359:3, 359:14,
360:19, 365:25,
367:15, 377:15,
377:22, 378:4, 379:3,
380:17, 388:13,
397:15, 398:2, 409:2,
416:13, 416:15,
417:11, 418:24, 419:1
joint [1] - 203:8
journal [1] - 239:16
journals [2] - 239:2,
239:4
Judge [1] - 362:21
Judges [1] - 373:23
judgment [1] - 429:1
July [1] - 294:1
June [15] - 217:9,
228:17, 281:4,
281:23, 282:7, 283:3,
292:16, 292:19,
293:24, 293:25,
357:15, 358:19,
359:8, 409:10, 409:17
JUNIOR [2] - 321:7,
321:12
Junior [1] - 321:11
justice [3] - 236:7,
375:8, 395:13
justifications [1] -
215:19

K

keep [7] - 194:16,
195:14, 200:13,
232:23, 260:8,

286:25, 323:23
Keith [1] - 214:23
Keohana [1] - 240:5
kill [1] - 431:15
kind [27] - 196:19,
196:20, 197:1,
199:10, 199:21,
203:3, 209:2, 215:2,
228:5, 262:8, 265:1,
282:11, 290:7,
301:23, 320:24,
351:16, 355:17,
357:18, 365:13,
408:4, 414:5, 421:2,
421:23, 422:23,
422:24, 434:3, 437:18
kinds [4] - 197:19,
200:21, 352:2, 410:14
Kings [1] - 232:18
kitchen [1] - 255:14
knowing [1] - 201:10
knowledge [16] -
312:8, 319:11,
325:10, 330:14,
330:17, 330:20,
337:16, 339:18,
348:24, 361:21,
362:6, 369:16,
376:25, 398:9,
409:11, 431:8
knowledgeable [1] -
239:6
known [1] - 362:8
knows [1] - 259:15
Krina [1] - 346:3

L

lab [4] - 296:10,
296:12, 296:14, 297:5
label [2] - 318:2,
330:9
labeled [2] - 375:15,
394:17
labia [1] - 248:7
labor [1] - 255:19
lacks [3] - 220:13,
220:24, 328:12
Lake [10] - 222:11,
222:12, 225:14,
225:16, 291:21,
314:19, 317:8, 339:3,
390:10, 413:18
Lake's [2] - 314:23,
414:12
Lambda [1] - 274:7
Lamictal [3] -
410:19, 410:21,
412:22
language [1] - 348:8

**large** [2] - 259:1, 259:11
**last** [34] - 191:20, 215:25, 228:1, 244:7, 282:22, 284:10, 290:13, 290:22, 292:17, 294:5, 294:18, 294:19, 315:5, 323:1, 332:14, 337:17, 345:25, 348:14, 348:16, 350:23, 360:19, 364:13, 364:16, 380:22, 385:10, 386:9, 388:17, 389:22, 391:17, 404:21, 422:1, 432:13, 432:16
**lasted** [2] - 285:16, 355:10
**late** [3] - 292:8, 292:12, 325:25
**LAW** [1] - 350:18
**law** [1] - 406:13
**Law** [3] - 233:11, 274:3, 274:13
**Lawrence** [7] - 331:3, 331:9, 334:4, 342:21, 376:10, 376:21, 382:6
**Lawrence's** [1] - 382:9
**lawsuit** [3] - 197:2, 214:21, 268:14
**lawyer** [1] - 274:10
**lawyers** [1] - 401:1
**lay** [1] - 428:16
**layman's** [1] - 423:5
**laypersons** [1] - 375:21
**LCPC** [2] - 306:13, 326:25
**leading** [8] - 245:19, 334:10, 339:5, 339:9, 366:12, 381:8, 381:9, 381:10
**learn** [1] - 194:6, 375:22
**learned** [2] - 369:20, 418:1
**learning** [2] - 193:20, 421:9
**least** [16] - 225:15, 237:3, 304:10, 308:1, 308:4, 333:1, 362:16, 371:5, 386:13, 387:2, 388:2, 419:24, 420:12, 430:13, 430:20, 435:6
**leave** [2] - 198:6,

386:4
**leaves** [1] - 393:17
**lectern** [1] - 245:25
**lecture** [1] - 256:6
**led** [1] - 409:14
**leeway** [5] - 245:22, 339:12, 391:25, 397:21, 397:22
**left** [4] - 224:2, 295:15, 371:24, 394:20
**left-hand** [2] - 371:24, 394:20
**Legal** [1] - 274:8
**legal** [9] - 192:2, 192:4, 192:16, 210:20, 274:2, 274:7, 274:10, 406:11
**legally** [1] - 192:8
**legitimate** [2] - 262:15, 304:2
**length** [1] - 212:13
**lesbian** [2] - 235:5, 274:22
**Lesbian** [2] - 274:21, 275:7
**lesbians** [1] - 267:1
**less** [3] - 246:15, 266:6, 275:14
**lessened** [1] - 347:12
**letter** [5] - 416:20, 416:21, 416:25, 417:3, 417:7
**letters** [1] - 317:17
**letting** [2] - 198:6, 209:16
**level** [13] - 201:4, 245:12, 253:8, 263:16, 286:2, 305:11, 327:23, 327:24, 378:15, 378:17, 378:23, 378:24, 427:19
**levels** [2] - 378:18, 402:7
**Levine** [25] - 333:20, 334:13, 334:23, 335:2, 370:1, 370:7, 372:12, 372:15, 373:14, 374:11, 375:4, 376:15, 381:3, 382:5, 395:15, 396:2, 433:22, 434:4, 434:5, 434:19, 434:23, 435:1, 435:5, 437:3
**Levine's** [12] - 333:24, 334:8, 370:9, 374:3, 374:8, 376:12, 376:15, 382:19,

395:23, 396:7, 396:20, 397:7
**LFTs** [2] - 294:23, 296:1
**LGBT** [5] - 234:17, 243:2, 244:3, 274:8, 274:22
**liberally** [1] - 291:1
**license** [1] - 416:22
**licensed** [10] - 269:25, 270:2, 270:5, 271:12, 317:24, 318:3, 326:23, 328:2, 387:21, 390:23
**licensing** [1] - 273:22
**licensure** [3] - 326:21, 326:22, 327:3
**lieu** [1] - 429:21
**life** [11] - 197:24, 200:21, 200:24, 201:2, 209:8, 210:17, 211:24, 222:21, 250:14, 311:15, 431:25
**lifted** [1] - 223:10
**likelihood** [1] - 267:19
**likely** [15] - 266:1, 266:6, 266:21, 292:13, 293:17, 294:12, 294:15, 294:22, 295:1, 295:2, 295:4, 295:7, 359:10, 431:14
**limit** [2] - 392:3, 392:14
**limitations** [1] - 396:14
**limited** [2] - 285:21, 354:13
**limiting** [1] - 215:16
**limits** [1] - 215:4
**line** [13] - 234:11, 257:18, 265:20, 272:15, 294:18, 294:19, 308:20, 353:12, 353:20, 389:2, 389:14, 421:23
**linear** [1] - 423:22
**lines** [6] - 212:19, 353:3, 353:7, 432:13, 432:16, 435:18
**lion's** [1] - 247:6
**list** [12] - 203:15, 238:11, 238:23, 276:14, 282:5, 289:17, 289:18, 289:25, 297:22, 371:10, 429:8, 434:19

**listed** [6] - 203:17, 238:16, 238:18, 239:16, 243:22, 429:4
**listen** [1] - 400:17
**lists** [2] - 238:7, 238:20
**literature** [4] - 255:9, 258:4, 258:19, 266:8
**little-researched** [1] - 289:21
**live** [3] - 192:25, 201:16, 254:7
**liver** [20] - 228:2, 291:24, 292:6, 292:13, 293:17, 293:21, 294:8, 294:12, 295:3, 295:21, 295:24, 296:13, 296:16, 296:17, 296:18, 296:21, 296:22, 296:24, 297:6
**liver's** [1] - 297:2
**lives** [1] - 260:9
**living** [11] - 201:19, 207:22, 211:3, 242:8, 245:3, 251:21, 254:4, 299:9, 300:12, 431:7, 432:8
**local** [1] - 436:17
**location** [1] - 236:21
**logical** [1] - 423:22
**lone** [1] - 433:12
**long-term** [2] - 311:15, 311:17
**longest** [1] - 211:18
**look** [20] - 232:10, 241:1, 261:20, 266:8, 287:8, 294:17, 296:14, 296:16, 310:15, 327:11, 340:12, 340:15, 373:23, 381:6, 392:8, 393:11, 396:13, 407:20, 424:16, 430:5
**looked** [10] - 266:20, 295:20, 333:12, 338:22, 341:1, 348:4, 393:11, 423:6, 424:17, 427:21
**looking** [10] - 274:1, 289:23, 292:19, 366:22, 374:21, 377:25, 394:20, 415:25, 423:4, 432:15
**looks** [2] - 359:20, 409:10
**loosen** [1] - 245:15
**Lorde** [1] - 243:23
**Los** [3] - 233:15,

332:3, 332:8
**lost** [2] - 295:10, 393:1
**low** [2] - 266:3, 267:22
**lower** [3] - 266:25, 327:23, 371:23
**lying** [1] - 383:20
**Lyon** [7] - 233:9, 234:16, 235:2, 235:3, 236:12, 272:15, 319:9
**Lyon-Martin** [6] - 233:9, 234:16, 235:2, 235:3, 236:12, 319:9
**Lyon-Martins** [1] - 272:15

**M**

**M.D** [3] - 230:24, 232:16, 400:5
**madam** [1] - 221:11
**Madam** [3] - 217:23, 377:8, 397:12
**magic** [2] - 200:24, 377:8
**main** [4] - 287:6, 287:15, 339:19, 431:24
**major** [10] - 196:6, 201:17, 201:20, 267:6, 307:21, 339:19, 342:23, 348:15, 412:3, 433:6
**majora** [1] - 248:7
**majority** [10] - 235:22, 236:21, 248:22, 282:18, 282:19, 291:6, 300:4, 395:24, 402:13, 436:17
**makeup** [16] - 195:2, 195:6, 195:22, 201:22, 202:2, 211:4, 213:7, 213:17, 213:19, 213:25, 216:7, 314:2, 348:20, 385:12, 413:24, 421:20
**male** [14] - 194:3, 194:4, 195:17, 197:13, 214:7, 214:10, 214:12, 218:4, 218:7, 218:12, 242:13, 306:5, 348:23, 410:5
**man** [5] - 195:17, 207:23, 242:4, 410:8, 410:13
**manage** [2] - 304:8,

334:3
  **managed** [1] -
223:18
  **Management** [11] -
279:20, 322:10,
322:12, 323:6, 324:4,
324:9, 333:14, 337:6,
357:14, 359:5, 413:21
  **management** [9] -
219:2, 219:3, 221:17,
272:13, 292:5,
333:11, 344:15,
378:19, 413:8
  **manager** [1] - 229:16
  **managing** [2] -
304:11, 333:11
  **mandate** [1] - 375:23
  **mandated** [1] -
216:15
  **manipulation** [1] -
340:4
  **mannerisms** [1] -
195:4
  **Manual** [2] - 327:13,
407:1
  **March** [6] - 295:16,
296:7, 296:10,
296:12, 297:5, 367:20
  **Marci** [1] - 302:22
  **marginally** [2] -
236:2, 250:17
  **mark** [1] - 366:20
  **marked** [13] - 203:6,
205:14, 206:24,
231:23, 324:16,
326:7, 336:12, 359:3,
365:25, 379:15,
380:17, 380:21,
416:14
  **marker** [1] - 296:20
  **markers** [1] - 296:21
  **Martin** [6] - 233:9,
234:16, 235:2, 235:3,
236:12, 319:9
  **Martins** [1] - 272:15
  **Massachusetts** [1] -
434:2
  **massively** [1] -
281:11
  **master's** [2] -
326:14, 326:19
  **material** [1] - 370:9
  **matter** [5] - 212:21,
333:9, 333:24,
371:19, 372:3
  **matters** [4] - 275:9,
276:18, 339:9, 437:23
  **max** [2] - 295:23,
295:25
  **Maximum** [1] -

402:21
  **maximum** [1] -
246:25
  **MDD** [1] - 433:5
  **mean** [76] - 195:16,
196:2, 201:19, 203:4,
221:14, 227:11,
238:18, 248:11,
249:11, 250:9,
254:10, 255:2, 255:9,
258:18, 258:20,
259:12, 259:19,
260:2, 260:11, 262:1,
262:8, 262:25, 263:9,
266:14, 267:6,
267:13, 271:24,
274:9, 274:10,
275:13, 276:4,
277:14, 281:11,
281:16, 282:9,
282:18, 282:24,
289:22, 289:25,
298:24, 299:16,
300:15, 301:9,
301:15, 301:19,
301:21, 303:4,
305:11, 307:5, 307:7,
308:13, 312:16,
317:16, 317:17,
319:14, 325:17,
326:21, 343:11,
362:24, 365:6,
378:17, 379:12,
393:7, 418:5, 418:9,
421:21, 423:5, 424:3,
424:15, 430:17,
436:25
  **meaning** [3] -
196:23, 379:13,
413:25
  **means** [19] - 193:25,
194:1, 195:17, 224:7,
239:3, 241:14,
241:15, 258:2,
289:12, 352:12,
355:20, 373:5,
420:24, 422:6,
423:23, 423:25,
424:2, 424:5, 427:10
  **meant** [5] - 351:25,
365:12, 410:6,
419:22, 422:4
  **measure** [1] - 264:1
  **mechanism** [1] -
346:21
  **med** [1] - 378:19
  **Medicaid** [7] -
235:17, 235:24,
240:1, 240:2, 249:10,
258:17, 427:22

**Medical** [2] - 263:5,
401:9
  **medical** [99] -
198:16, 199:1, 199:5,
201:2, 202:20,
202:23, 205:7,
206:14, 216:15,
217:11, 223:18,
224:18, 225:2, 225:4,
226:2, 226:5, 233:3,
236:16, 237:23,
239:4, 251:3, 251:8,
251:10, 251:20,
251:23, 253:3, 253:4,
254:3, 256:1, 256:3,
257:6, 257:21, 258:3,
258:19, 262:4,
263:13, 263:17,
266:8, 274:9, 274:11,
277:24, 278:14,
280:3, 281:7, 281:23,
282:11, 283:2,
285:22, 301:6,
305:19, 305:22,
306:20, 307:18,
314:13, 314:20,
316:9, 323:9, 324:10,
324:12, 324:13,
334:19, 338:2, 338:8,
339:14, 343:22,
345:20, 349:2, 355:1,
356:6, 361:9, 362:10,
378:1, 378:18,
379:23, 389:24,
390:22, 390:25,
396:4, 398:1, 398:4,
404:11, 404:14,
414:4, 414:7, 414:24,
414:25, 419:6,
419:17, 425:11,
426:21, 428:3,
428:10, 429:5,
429:18, 429:25,
430:23, 432:21,
434:11
  **medically** [17] -
217:1, 217:12,
254:18, 255:6,
260:11, 261:22,
263:16, 297:18,
345:22, 348:3,
355:15, 355:18,
355:19, 355:23,
419:14, 419:16, 429:3
  **Medicare** [3] -
235:18, 235:24,
427:21
  **medicating** [1] -
200:8
  **medication** [6] -

199:8, 246:10,
294:21, 294:22,
369:18, 415:20
  **medications** [10] -
223:21, 225:24,
226:2, 292:5, 294:25,
304:8, 410:17,
410:18, 412:21, 423:7
  **Medicine** [1] - 238:5
  **medicine** [10] -
232:18, 233:4,
257:25, 258:9,
271:12, 295:4, 295:7,
390:23, 410:19,
424:20
  **medicines** [4] -
272:1, 272:2, 294:14,
294:15
  **medium** [1] - 323:19
  **medium-security** [1]
- 323:19
  **meds** [1] - 272:13
  **meet** [16] - 245:2,
262:17, 288:12,
307:14, 307:17,
326:16, 328:17,
382:23, 383:7,
414:13, 416:9, 429:5,
429:10, 429:18,
429:25, 430:22
  **meeting** [4] - 279:21,
342:17, 414:14,
422:11
  **meetings** [7] - 337:9,
337:11, 356:24,
357:5, 427:10, 427:14
  **meets** [8] - 252:21,
253:1, 254:11,
262:25, 363:16,
383:9, 383:15, 390:7
  **member** [14] - 238:5,
286:14, 306:14,
306:24, 306:25,
307:4, 322:10,
325:15, 325:24,
330:21, 356:22,
384:4, 425:13, 435:2
  **members** [1] - 434:9
  **membership** [1] -
325:14
  **memo** [5] - 216:2,
216:3, 224:17,
224:18, 225:2
  **memorialized** [1] -
356:25
  **memory** [2] - 336:4,
426:13
  **men** [3] - 193:16,
266:25, 313:19
  **men's** [1] - 242:3

**Mental** [5] - 327:13,
367:12, 368:16,
369:5, 369:8
  **mental** [161] - 196:4,
196:18, 200:10,
201:7, 202:20,
205:10, 216:15,
217:11, 220:3, 220:8,
220:23, 225:19,
226:18, 226:20,
234:22, 236:3, 243:4,
248:12, 251:20,
253:3, 253:6, 253:12,
253:16, 253:18,
256:13, 270:2,
271:15, 271:16,
271:22, 271:23,
272:24, 276:21,
277:6, 277:12, 279:6,
281:18, 282:1, 283:3,
291:2, 291:14,
291:16, 295:20,
298:16, 298:19,
298:22, 302:11,
303:19, 303:22,
304:1, 304:7, 304:11,
305:19, 305:20,
307:20, 322:3,
322:18, 323:8, 328:8,
329:4, 329:9, 329:23,
329:25, 330:2, 330:5,
330:6, 330:7, 330:10,
332:24, 338:8,
338:11, 339:16,
340:8, 340:13,
340:16, 341:7,
341:18, 341:19,
342:18, 343:4,
343:25, 344:9, 345:3,
345:17, 345:20,
346:16, 346:24,
347:2, 347:6, 349:18,
350:3, 363:1, 363:21,
364:6, 364:7, 364:11,
364:24, 365:2, 365:5,
366:1, 366:4, 366:11,
366:15, 366:19,
367:3, 367:5, 367:7,
367:9, 367:17,
367:25, 368:2,
368:11, 368:15,
368:24, 369:4,
377:14, 378:3,
378:10, 378:16,
378:21, 378:23,
378:24, 379:3, 379:8,
379:14, 380:7, 380:8,
380:12, 383:22,
386:21, 387:4, 387:7,
387:12, 387:13,

387:21, 387:23,
398:11, 398:16,
406:11, 406:20,
407:10, 407:18,
407:24, 410:16,
410:18, 411:4, 411:5,
412:3, 414:2, 414:7,
415:19, 415:23,
416:10, 418:22,
420:8, 431:1, 432:6,
433:1
  **mentally** [2] -
196:16, 417:9
  **mention** [2] - 292:4,
405:17
  **mentioned** [19] -
256:4, 270:11, 275:6,
276:14, 276:20,
283:9, 284:12, 285:6,
286:16, 292:1,
298:25, 299:3,
307:16, 322:12,
331:25, 362:21,
405:9, 413:21, 421:19
  **merely** [1] - 339:6
  **merged** [1] - 401:12
  **message** [1] -
435:20
  **messed** [1] - 437:18
  **met** [15] - 241:20,
242:11, 252:25,
340:25, 341:11,
344:21, 358:24,
359:8, 359:11,
363:20, 400:16,
411:18, 414:11,
433:10, 433:18
  **meta** [1] - 258:25
  **meta-analysis** [1] -
258:25
  **metabolic** [1] - 297:3
  **method** [3] - 289:20,
290:5, 356:23
  **Mexican** [2] - 255:12,
255:18
  **Michelle** [1] - 240:10
  **microphone** [3] -
231:16, 232:21,
232:24
  **mid** [1] - 402:7
  **mid-levels** [1] -
402:7
  **middle** [10] - 211:15,
211:16, 211:17,
211:19, 211:20,
260:3, 306:7, 306:11,
405:18
  **midlevel** [1] - 236:14
  **might** [23] - 200:22,
234:13, 234:14,

239:9, 246:13,
246:23, 255:1,
261:22, 263:18,
264:13, 264:19,
273:1, 300:18,
334:16, 340:17,
359:25, 371:17,
375:15, 386:11,
407:21, 435:14,
436:11, 436:12
  **million** [1] - 267:15
  **mind** [4] - 195:8,
196:17, 282:25,
433:10
  **mine** [1] - 308:9
  **minimum** [2] -
287:25, 415:11
  **minority** [2] - 372:19,
373:8
  **minute** [1] - 372:8
  **Minutes** [1] - 357:14
  **minutes** [24] -
265:19, 265:23,
265:24, 268:1, 268:2,
279:21, 318:13,
355:10, 356:14,
357:1, 358:4, 358:8,
358:19, 358:21,
359:6, 359:21, 360:5,
360:19, 360:24,
361:1, 392:14,
392:16, 394:3, 430:16
  **misbehavior** [1] -
345:14
  **misbehaviors** [1] -
340:17
  **mischaracterizing**
[1] - 221:5
  **missing** [2] - 256:9,
382:3
  **misstates** [4] -
220:25, 275:10,
276:1, 396:24
  **mistake** [1] - 369:11
  **mistakes** [1] -
351:22
  **mitigating** [2] -
279:7, 380:8
  **mix** [1] - 320:24
  **mixed** [1] - 360:1
  **model** [4] - 235:6,
244:6, 244:23, 245:12
  **models** [2] - 242:23,
242:25
  **modify** [1] - 289:9
  **moment** [16] -
215:10, 219:18,
220:22, 221:14,
263:23, 275:24,
320:3, 354:20,

355:22, 356:4,
356:17, 365:6,
396:23, 435:17,
436:21
  **moments** [2] -
349:17, 376:14
  **monitor** [2] - 305:3,
432:20
  **month** [10] - 236:18,
246:24, 301:7,
325:18, 342:9,
358:23, 358:24,
415:21, 415:22,
437:24
  **monthly** [1] - 415:21
  **months** [28] -
239:14, 242:8, 245:3,
254:1, 254:4, 264:24,
265:10, 265:12,
299:9, 300:12, 301:2,
301:11, 302:3, 302:7,
302:10, 302:14,
302:19, 303:2, 303:8,
303:11, 303:13,
342:1, 342:10, 354:9,
359:11, 415:6,
415:11, 422:16
  **mood** [15] - 219:2,
219:3, 221:16,
329:12, 330:1,
344:15, 347:11,
410:21, 411:10,
411:16, 412:4,
412:11, 416:6, 423:6,
424:6
  **morning** [10] - 191:6,
191:25, 192:1,
204:11, 204:12,
220:19, 231:14,
231:15, 268:11, 438:1
  **most** [26] - 210:3,
234:9, 234:20,
238:24, 239:1,
241:15, 247:4, 249:7,
249:8, 272:12,
273:19, 294:12,
294:15, 294:22,
295:1, 295:2, 295:7,
302:9, 302:15,
303:18, 337:24,
354:4, 375:20,
417:20, 432:5
  **mostly** [2] - 202:22,
303:16
  **mother** [5] - 241:23,
241:24, 242:3, 242:5,
242:15
  **motion** [3] - 191:5,
214:22, 217:10
  **mountains** [1] -

399:21
  **mouth** [2] - 245:23,
339:11
  **move** [19] - 203:23,
206:6, 206:17,
207:12, 215:8,
217:16, 220:11,
220:12, 253:10,
298:2, 311:25,
316:17, 325:1,
343:12, 373:20,
391:8, 392:4, 403:24
  **moved** [2] - 208:6,
208:7, 324:8
  **movement** [1] -
407:25
  **moving** [2] - 207:24,
411:9
  **MR** [145] - 204:1,
204:2, 204:7, 204:10,
206:6, 206:12,
206:17, 206:23,
207:12, 207:18,
215:12, 215:15,
217:18, 217:21,
217:23, 218:2,
220:17, 221:5,
221:11, 221:16,
221:20, 221:23,
227:3, 229:22,
229:24, 230:14,
230:15, 232:1, 232:2,
245:17, 245:19,
247:12, 247:15,
253:10, 253:11,
253:12, 254:22,
254:23, 256:21,
256:22, 256:23,
257:8, 263:20,
263:21, 268:10,
275:18, 276:9,
283:22, 284:1, 284:3,
284:5, 287:11,
287:13, 295:12,
301:12, 309:18,
311:25, 312:2, 312:8,
316:17, 316:20,
316:22, 318:4,
318:19, 320:7,
320:10, 320:23,
321:2, 321:14,
321:16, 324:9, 325:1,
325:7, 329:2, 329:3,
334:12, 335:15,
335:19, 336:11,
339:6, 339:14, 349:4,
349:8, 350:22, 351:7,
356:16, 356:18,
359:22, 359:25,
362:11, 362:21,

362:24, 363:5,
363:12, 363:15,
363:25, 368:19,
370:21, 370:23,
371:2, 373:15, 377:7,
377:12, 381:13,
381:23, 382:5, 383:9,
384:6, 389:2, 389:14,
390:5, 390:15,
390:20, 391:6,
391:20, 393:14,
393:16, 393:22,
393:24, 394:1,
396:21, 396:24,
397:11, 397:14,
397:21, 397:24,
399:8, 399:17,
399:20, 400:1,
400:11, 400:13,
403:24, 404:4, 404:6,
404:8, 418:20,
430:13, 430:19,
434:18, 434:19,
436:5, 436:6, 437:2,
437:12
  **MS** [114] - 191:9,
191:22, 191:24,
203:9, 203:11,
203:13, 203:23,
204:5, 206:9, 206:20,
207:15, 215:8,
217:16, 220:11,
220:24, 229:3,
229:20, 230:13,
230:19, 231:6,
231:11, 231:13,
231:21, 232:5, 232:6,
233:1, 246:3, 246:7,
248:24, 253:23,
253:24, 257:4,
257:24, 261:3, 261:6,
261:9, 263:22,
264:13, 265:21,
265:24, 266:1,
267:23, 275:10,
275:23, 276:1, 276:4,
312:5, 318:22,
318:24, 320:2,
320:18, 325:4,
328:12, 328:21,
334:10, 335:12,
335:17, 335:20,
339:5, 349:11,
350:11, 350:15,
351:3, 352:10,
352:21, 352:24,
353:3, 353:7, 353:9,
353:12, 357:10,
360:2, 360:4, 362:13,
364:2, 365:21,
365:24, 366:1,

368:22, 370:19, 371:8, 371:11, 371:22, 372:8, 372:11, 373:20, 377:5, 381:7, 381:10, 381:22, 382:25, 388:12, 388:15, 389:7, 389:21, 391:10, 391:11, 392:4, 392:6, 392:16, 392:20, 392:23, 393:7, 394:8, 394:9, 397:5, 397:9, 397:19, 399:10, 404:2, 435:16, 435:25, 436:20, 436:22
**MSW** [1] - 250:24
**MTC** [29] - 323:4, 323:11, 337:9, 337:15, 338:24, 339:15, 341:6, 355:22, 355:25, 356:4, 356:8, 356:11, 356:15, 356:20, 358:10, 358:19, 358:21, 358:24, 359:8, 359:11, 361:2, 396:4, 413:7, 413:21, 414:8, 414:11, 415:19, 419:10, 434:9
**multidisciplinary** [1] - 413:25
**multiple** [15] - 202:23, 209:7, 212:15, 212:18, 213:22, 219:11, 224:21, 256:7, 322:14, 329:9, 333:13, 355:25, 421:19, 425:2, 428:24
**multiple-disciplinary** [1] - 322:14
**Murray** [2] - 306:13, 425:10
**muscle** [1] - 246:16
**must** [2] - 253:4, 377:19
**mutilate** [1] - 422:6
**mutilation** [1] - 422:24

### N

**nagging** [1] - 430:11
**name** [33] - 191:17, 191:18, 191:19, 191:20, 192:2, 192:4, 192:6, 192:8, 192:10, 192:12, 192:13,

192:15, 192:16, 193:13, 206:4, 221:25, 231:1, 268:13, 317:17, 318:2, 321:9, 330:9, 331:2, 339:25, 358:2, 359:16, 360:21, 400:7, 401:11
**named** [1] - 207:23, 328:13
**namely** [1] - 214:23
**narrative** [2] - 316:18, 354:7
**National** [4] - 274:21, 275:1, 275:7, 405:23
**national** [2] - 234:11, 427:12
**naturally** [1] - 343:11
**nature** [1] - 264:8
**NCCHC** [5] - 405:17, 405:23, 406:18, 427:11, 434:1
**necessarily** [4] - 193:22, 223:1, 234:5, 435:20
**necessary** [19] - 215:14, 217:2, 217:12, 254:18, 255:6, 261:23, 263:16, 297:19, 345:22, 348:3, 355:16, 355:18, 355:20, 355:23, 419:14, 419:17, 429:3, 433:17, 436:13
**necessity** [1] - 263:5, 263:13, 263:17, 307:18, 334:19, 349:2, 355:1, 378:1, 389:24, 419:6, 428:4, 428:10, 429:6, 429:19, 429:25, 430:23, 432:21, 434:11
**need** [47] - 199:12, 200:11, 200:12, 212:19, 213:18, 213:19, 219:21, 220:7, 220:22, 228:21, 229:18, 234:14, 238:8, 238:21, 242:16, 245:14, 249:19, 252:6, 252:14, 257:6, 261:4, 261:17, 269:24, 291:3, 301:6, 311:14, 330:13, 343:1, 351:9, 352:6, 352:8, 352:17, 352:19, 377:8,

378:23, 378:25, 381:17, 386:5, 386:12, 392:3, 392:13, 399:19, 426:15, 437:20, 437:21
**needed** [9] - 229:14, 234:6, 240:11, 250:11, 251:4, 335:1, 421:1, 422:2, 433:14
**needing** [3] - 265:2, 343:14, 348:18
**needs** [13] - 244:9, 245:2, 252:4, 256:16, 272:14, 288:12, 301:21, 319:23, 320:1, 322:19, 324:14, 325:11, 430:8
**negative** [1] - 254:9
**negatives** [1] - 269:24
**neighbor** [1] - 378:20
**nerves** [1] - 247:9
**net** [1] - 235:8
**network** [1] - 432:7
**networks** [1] - 431:20
**neurovascular** [1] - 247:9
**neutral** [1] - 373:11
**never** [28] - 208:16, 211:13, 213:1, 213:5, 227:14, 268:23, 269:1, 269:4, 269:14, 301:21, 334:9, 335:3, 349:14, 350:4, 350:7, 361:5, 361:8, 361:18, 362:6, 363:17, 376:23, 382:15, 382:20, 382:21, 390:6, 435:12, 436:9
**nevertheless** [2] - 315:1, 315:4
**new** [9] - 216:14, 260:4, 271:4, 271:10, 281:10, 282:2, 282:3, 343:16, 391:17
**New** [4] - 239:24, 240:2, 240:3, 258:17
**newer** [4] - 238:16, 271:3, 271:6, 271:8
**next** [21] - 191:7, 230:18, 253:24, 286:24, 288:5, 288:6, 311:3, 311:13, 320:17, 353:20, 359:2, 359:8, 360:12, 369:8, 372:25, 387:20, 395:8,

395:12, 399:25, 413:2, 437:22
**nice** [1] - 204:13
**NICHOLAS** [2] - 230:24, 231:4
**Nicholas** [1] - 231:3
**Nick** [1] - 230:21
**nine** [1] - 233:20
**no-touch** [1] - 285:22
**nobody** [2] - 255:11, 259:12
**nonconforming** [8] - 287:19, 288:13, 325:12, 330:14, 330:17, 330:25, 332:5, 333:17
**none** [4] - 267:22, 282:14, 320:5, 361:25
**noninmate** [1] - 429:22
**nonresponsive** [1] - 316:18
**nonretained** [1] - 328:13
**normal** [2] - 297:6, 407:22
**Norsworthy's** [1] - 240:10
**North** [3] - 231:8, 232:16, 232:17
**note** [22] - 198:6, 304:15, 305:18, 305:23, 306:11, 307:13, 352:3, 352:19, 371:17, 371:25, 384:1, 409:15, 409:24, 416:3, 417:16, 417:20, 418:25, 419:4, 420:15, 431:17, 433:1, 434:14
**noted** [3] - 339:21, 411:6, 423:1
**notes** [13] - 278:15, 279:4, 303:18, 303:19, 303:20, 303:22, 304:10, 314:23, 338:11, 415:25, 417:13, 418:21, 424:16
**nothing** [5] - 229:24, 242:13, 253:5, 289:16, 389:18
**notice** [1] - 246:23
**noticed** [4] - 219:15, 265:1, 340:1, 417:12
**notified** [1] - 325:21
**November** [3] - 208:24, 321:24, 322:8

**number** [20] - 204:19, 205:4, 215:4, 218:15, 218:24, 234:15, 237:2, 265:10, 283:21, 283:22, 283:24, 312:1, 319:18, 363:3, 395:25, 404:3, 430:25, 431:3, 432:5, 432:6
**numerous** [1] - 238:20
**nurse** [8] - 226:18, 226:20, 234:21, 234:22, 236:15, 236:17, 402:1, 403:8
**nursing** [1] - 299:25

### O

**Oakland** [4] - 332:3, 332:7, 332:9, 332:11
**oath** [4] - 268:6, 318:16, 321:6, 394:6
**object** [6] - 220:11, 247:12, 362:11, 370:25, 381:8, 389:2
**objecting** [2] - 220:24, 381:9
**objection** [60] - 203:25, 204:1, 204:2, 206:8, 206:9, 206:19, 207:14, 220:15, 231:25, 232:1, 232:2, 245:17, 245:24, 247:24, 253:10, 253:14, 253:20, 254:22, 256:21, 257:3, 257:8, 257:10, 263:20, 263:24, 264:7, 275:10, 275:12, 275:23, 275:24, 276:5, 312:4, 312:5, 325:3, 328:12, 329:1, 334:10, 335:12, 336:2, 339:5, 350:21, 356:16, 357:7, 362:16, 363:12, 363:23, 368:19, 370:20, 371:14, 373:15, 381:22, 382:25, 389:12, 391:20, 396:21, 397:19, 404:1, 404:2, 435:16, 435:23, 436:20
**objective** [7] - 286:3, 286:4, 304:18, 411:1, 411:3, 412:19, 418:6
**obligation** [1] -

214:19
**observation** [3] -
276:7, 285:24, 285:25
**observations** [5] -
286:5, 304:18,
423:16, 423:18, 427:1
**observe** [1] - 423:4
**observed** [2] - 249:3,
302:5
**obtain** [3] - 277:6,
277:17, 278:9
**obtained** [3] - 313:2,
327:19, 331:18
**obviously** [2] -
253:1, 259:16
**occasion** [1] - 227:1
**occasional** [1] -
337:2
**occasionally** [3] -
234:22, 276:17,
302:12
**occasions** [9] -
202:23, 212:15,
213:22, 220:21,
220:25, 221:3,
221:15, 224:21,
228:24
**occur** [1] - 246:22
**occurred** [5] - 208:9,
208:13, 341:2, 355:7,
356:14
**October** [2] - 191:2,
348:14
**off-again** [1] - 227:11
**offender** [9] - 219:9,
221:18, 229:4,
229:12, 279:24,
322:4, 378:8, 378:11,
383:15
**offenders** [4] -
216:3, 216:5, 323:12,
348:1
**offending** [1] - 340:3
**offense** [7] - 213:3,
213:6, 213:8, 213:14,
279:17, 366:23,
366:25
**offer** [2] - 231:23,
386:1
**offered** [7] - 199:14,
344:17, 371:18,
372:3, 372:4, 389:18,
436:18
**offering** [4] - 328:19,
370:17, 370:19, 391:4
**office** [3] - 202:7,
202:10, 350:19
**officer** [4] - 212:24,
213:1, 213:14, 379:19
**officers** [6] - 198:6,

202:16, 212:14,
340:22, 385:13, 392:1
**official** [1] - 401:20
**officially** [2] -
348:14, 391:19
**officials** [2] - 315:7,
375:21
**offshoot** [1] - 406:13
**often** [8] - 197:19,
239:2, 250:13, 272:8,
291:4, 344:13,
344:14, 407:19
**oftentimes** [3] -
249:13, 413:10,
436:10
**oil** [1] - 196:24
**old** [4] - 192:17,
192:18, 208:19,
277:24
**older** [1] - 192:11
**on-again** [1] - 227:11
**once** [5] - 199:9,
223:9, 341:5, 435:13,
436:9
**one** [115] - 196:6,
201:7, 204:14, 210:7,
214:22, 215:15,
219:2, 225:13, 227:1,
227:5, 230:20, 234:9,
234:15, 238:14,
238:17, 238:18,
240:18, 245:1, 250:6,
252:18, 261:16,
262:4, 262:14, 264:8,
266:5, 266:21,
267:15, 271:10,
273:14, 273:17,
275:8, 276:16,
276:19, 281:12,
286:25, 287:6, 287:7,
287:15, 288:6,
289:24, 294:2,
299:14, 299:1,
299:18, 303:24,
305:21, 308:1, 308:2,
308:4, 308:11,
308:22, 308:25,
309:24, 310:5,
312:18, 313:8, 314:8,
317:12, 317:21,
319:15, 320:7,
323:20, 323:23,
326:13, 332:9,
332:11, 333:4, 339:1,
342:1, 359:2, 359:20,
363:13, 363:20,
364:10, 366:11,
367:2, 367:4, 367:13,
367:24, 368:1, 372:8,
372:11, 373:1, 374:3,

375:3, 377:2, 378:4,
380:22, 380:25,
382:23, 384:17,
388:9, 392:13, 393:4,
393:14, 395:9,
396:14, 398:20,
405:16, 408:24,
413:5, 413:6, 417:25,
418:20, 419:17,
429:11, 430:13,
430:19, 430:25,
432:5, 436:3, 436:16
**one-and-a-half-
page** [1] - 299:18
**one-in-a-million** [1] -
267:15
**one-page** [1] -
281:12
**ones** [9] - 209:17,
238:24, 239:1, 262:7,
302:16, 303:10,
380:23, 395:9, 396:3
**ongoing** [2] - 234:7,
415:16
**online** [1] - 427:20
**open** [2] - 198:3,
198:5
**opened** [2] - 234:10,
434:8
**openly** [1] - 423:24
**operates** [2] - 193:7,
193:9
**operating** [3] -
347:15, 419:12,
419:19
**operation** [1] -
200:24
**operative** [4] -
388:17, 388:22,
388:23, 391:5
**opine** [2] - 293:16,
294:11
**opined** [1] - 294:6
**opining** [1] - 364:20
**opinion** [33] -
256:12, 256:16,
257:4, 263:18,
264:13, 266:4, 295:2,
297:18, 319:23,
319:25, 328:23,
334:1, 334:8, 335:2,
341:10, 341:14,
341:16, 342:20,
342:25, 345:2,
345:17, 346:15,
355:19, 361:15,
382:20, 383:9,
383:14, 383:18,
383:19, 386:24,
430:25, 432:4, 432:23

**opinions** [8] - 251:7,
328:19, 334:13,
334:19, 334:23,
344:4, 382:12, 396:20
**opportunity** [13] -
204:15, 205:17,
239:8, 336:21,
338:14, 340:24,
341:7, 344:17,
350:24, 351:1,
353:22, 375:10,
391:22
**opposed** [1] - 435:6
**opposing** [1] -
436:11
**optimize** [2] - 258:6,
258:7
**option** [3] - 255:16,
436:11, 436:12
**options** [1] - 399:2
**or..** [1] - 423:24
**orchiectomy** [2] -
310:6, 310:9
**order** [11] - 213:9,
213:23, 213:24,
214:2, 229:10,
266:10, 267:13,
288:12, 335:13,
339:20, 377:18
**orders** [3] - 213:15,
213:16, 340:22
**Oregon** [1] - 263:11
**organization** [8] -
233:7, 233:24,
237:17, 237:18,
274:4, 274:17,
325:10, 325:11
**organizations** [2] -
274:10, 276:13
**orient** [1] - 297:17
**orientation** [5] -
193:15, 193:17,
193:19, 266:23,
410:12
**oriented** [1] - 364:2
**original** [4] - 256:4,
350:14, 350:18,
352:23
**originally** [3] - 235:4,
408:15, 408:16
**osborne** [1] - 331:3
**Osborne** [9] - 331:8,
331:9, 334:4, 342:21,
376:10, 376:15,
376:20, 382:5, 382:9
**otherwise** [5] -
242:16, 387:8, 412:4,
412:11, 416:7
**outcast** [1] - 197:18
**outcome** [1] - 258:7

**outcomes** [2] -
311:16
**outerwear** [1] - 211:4
**outlier** [2] - 435:1,
435:5
**outrage** [1] - 375:22
**outside** [7] - 195:9,
201:18, 333:3,
353:25, 413:10,
413:11, 432:8
**outwardly** [1] -
195:22
**overall** [4] - 266:9,
271:19, 276:12,
276:15
**overdose** [1] - 209:1
**overnight** [1] -
301:19
**overrule** [12] -
245:24, 253:14,
253:20, 257:10,
263:23, 264:7,
275:12, 329:1, 336:2,
362:16, 371:14, 380:4
**overruled** [14] -
217:20, 221:2,
247:18, 247:24,
254:24, 339:8,
356:19, 357:7,
362:14, 363:24,
368:20, 382:1, 435:23
**overruling** [1] -
380:9
**oversee** [2] - 401:25,
403:8
**oversees** [1] - 324:5
**overt** [2] - 423:2,
423:23
**own** [13] - 198:1,
209:8, 236:13,
244:23, 245:12,
255:11, 267:14,
372:12, 374:15,
390:1, 391:13, 434:5

## P

**P.A** [1] - 236:17
**P.A.s** [1] - 234:21
**p.m** [4] - 318:14,
394:4, 438:2
**packet** [1] - 282:3
**pads** [2] - 224:25,
225:4
**page** [73] - 207:8,
211:1, 238:14,
238:17, 241:9,
242:18, 242:19,
242:21, 252:9, 261:2,
281:12, 283:25,

286:25, 287:1, 287:7, 288:5, 288:6, 292:18, 292:19, 292:22, 292:25, 294:20, 297:13, 297:14, 297:16, 297:24, 298:4, 298:5, 298:8, 299:18, 308:20, 310:14, 310:15, 310:19, 310:22, 324:17, 326:8, 336:13, 352:25, 357:13, 357:20, 357:21, 357:22, 357:23, 357:24, 358:12, 359:4, 359:14, 360:4, 360:12, 360:19, 360:20, 365:25, 367:15, 371:22, 374:6, 377:15, 377:22, 378:4, 379:4, 388:19, 394:17, 397:15, 398:2, 405:16, 405:17, 408:11

**pages** [8] - 238:25, 239:13, 281:13, 281:14, 281:15, 281:17, 314:21, 360:1
**paid** [1] - 273:5
**pain** [4] - 199:8, 199:12, 200:11, 200:14
**Palmer** [1] - 206:2
**panel** [2] - 236:13, 250:1
**panties** [4] - 225:2, 312:23, 313:1, 313:2
**paper** [8] - 239:5, 239:7, 239:14, 244:18, 244:19, 244:22, 431:16, 431:18
**paradigm** [8] - 375:8, 375:15, 375:16, 395:4, 395:8, 395:12, 395:13
**paradigms** [2] - 334:1, 334:15
**paragraph** [37] - 244:5, 244:7, 283:6, 283:17, 284:2, 287:8, 287:12, 287:14, 288:25, 289:1, 292:17, 293:25, 294:5, 294:17, 294:19, 295:18, 297:12, 297:13, 297:14, 298:6,

298:10, 298:12, 298:24, 299:6, 306:4, 306:5, 311:4, 314:4, 314:6, 314:8, 315:23, 315:25, 427:25, 432:12, 432:16
**paragraphs** [1] - 231:22
**paralegal** [1] - 192:22
**paranoid** [1] - 423:24
**paraphrase** [1] - 245:21
**parole** [11] - 229:11, 229:17, 229:19, 230:3, 230:4, 230:5, 236:8, 240:19, 269:9, 421:18, 432:1
**paroled** [1] - 240:12
**part** [31] - 207:5, 218:2, 220:13, 227:24, 242:19, 243:19, 244:5, 269:1, 277:21, 283:19, 284:7, 285:25, 297:25, 315:22, 315:25, 334:7, 340:16, 344:16, 352:9, 352:14, 357:1, 360:5, 364:19, 369:11, 371:5, 372:22, 376:9, 395:1, 416:24, 419:11, 430:20
**partially** [3] - 281:9, 412:13, 430:13
**participate** [1] - 245:7
**particular** [18] - 237:23, 244:20, 250:25, 258:20, 298:24, 310:25, 315:22, 341:23, 346:9, 347:10, 348:17, 355:18, 357:21, 363:13, 378:4, 379:13, 384:17, 385:6
**particularly** [4] - 235:17, 245:23, 267:17, 316:5
**parties** [3] - 246:7, 283:23, 313:20
**partners** [1] - 210:8
**partway** [1] - 260:5
**pass** [1] - 379:25
**passing** [1] - 355:7
**past** [10] - 239:22, 260:13, 265:16, 265:18, 313:1, 328:2,

346:6, 407:23, 422:6, 426:14
**patient** [44] - 234:13, 241:19, 241:22, 242:1, 242:6, 243:20, 245:2, 245:6, 245:8, 245:15, 249:12, 249:15, 250:17, 257:6, 258:6, 259:15, 263:14, 265:9, 266:14, 271:15, 271:17, 271:21, 272:12, 277:19, 277:23, 286:4, 286:6, 290:3, 302:21, 308:8, 308:16, 309:6, 309:9, 309:13, 309:16, 310:5, 317:6, 336:22, 354:14, 403:7, 414:24, 424:11, 429:1
**patient's** [1] - 254:2
**patients** [94] - 234:4, 235:7, 235:16, 235:19, 235:20, 235:23, 236:2, 236:6, 236:8, 236:13, 237:6, 237:10, 237:19, 240:21, 241:15, 243:3, 243:6, 243:15, 244:20, 244:22, 246:19, 248:25, 249:3, 249:5, 249:7, 249:15, 249:16, 249:20, 249:22, 249:24, 250:1, 250:4, 250:10, 258:5, 259:17, 260:6, 262:20, 262:21, 264:25, 265:15, 266:9, 266:20, 267:9, 269:7, 269:8, 271:24, 272:6, 272:8, 290:6, 290:13, 291:1, 291:4, 291:5, 291:7, 291:9, 291:10, 301:10, 301:17, 302:5, 302:6, 302:8, 302:13, 308:5, 308:11, 309:19, 309:22, 310:1, 310:2, 326:3, 329:16, 349:14, 349:22, 349:24, 354:2, 354:12, 376:21, 377:1, 389:23, 401:19, 401:24, 402:14, 402:17, 402:18, 405:12, 405:13, 405:14, 414:3, 414:10, 417:25, 420:8, 431:14, 431:24,

435:10
**patients'** [1] - 271:20
**pay** [2] - 243:8, 325:18
**payment** [1] - 235:15
**pedicle** [1] - 247:9
**peer** [4] - 239:2, 239:16, 250:22, 402:10
**peer-reviewed** [2] - 239:2, 239:16
**peers** [1] - 239:5
**pencil** [1] - 423:19
**penile** [1] - 247:7
**penis** [8] - 247:8, 248:2, 248:3, 313:7, 313:8, 313:10, 421:4
**people** [64] - 193:21, 195:10, 197:14, 201:10, 236:4, 237:4, 237:8, 237:25, 239:5, 239:14, 246:15, 248:19, 249:19, 250:12, 255:3, 255:7, 255:15, 258:11, 259:7, 259:22, 260:4, 260:10, 261:25, 262:3, 262:22, 265:1, 269:13, 274:4, 274:5, 275:15, 277:14, 277:21, 287:19, 288:13, 295:22, 299:25, 307:7, 310:11, 316:13, 332:18, 332:20, 333:4, 333:6, 334:2, 365:10, 376:7, 378:22, 388:1, 408:23, 413:11, 414:1, 414:2, 419:9, 425:2, 425:3, 425:16, 426:24, 427:15, 431:11, 431:20, 431:21, 434:22, 436:15
**people's** [1] - 431:19
**per** [5] - 217:5, 217:6, 217:8, 284:20, 328:20
**percent** [11] - 236:1, 251:15, 266:10, 266:13, 266:17, 278:16, 295:22, 295:23, 300:1, 401:24, 418:8
**percentage** [1] - 251:13
**perceptions** [1] - 395:16
**perfectly** [1] - 267:8,

365:21
**perform** [1] - 270:17
**performed** [4] - 255:13, 259:1, 300:25, 308:13
**perhaps** [2] - 350:16, 352:1
**perineum** [2] - 248:5, 313:7
**period** [6] - 206:3, 209:21, 256:19, 259:3, 322:9, 431:7
**periodic** [2] - 303:20, 325:20
**periodically** [7] - 223:22, 225:19, 237:22, 238:2, 304:7, 338:10, 416:9
**periods** [1] - 219:16
**permissible** [1] - 393:17
**permitted** [2] - 327:4, 327:5
**persistent** [3] - 252:18, 252:20, 335:9
**person** [26] - 201:21, 225:13, 240:19, 243:10, 257:19, 276:22, 286:20, 300:12, 301:21, 330:11, 334:16, 334:21, 339:2, 343:11, 351:23, 368:24, 380:12, 383:7, 384:22, 385:1, 386:12, 425:8, 426:22, 428:21, 433:12
**person's** [3] - 194:2, 194:4, 276:21
**personality** [16] - 330:1, 339:23, 339:25, 340:20, 341:22, 341:23, 361:19, 361:22, 362:1, 365:3, 365:4, 365:7, 365:10, 365:12, 365:13, 365:15
**personally** [3] - 341:17, 350:4, 353:13
**personnel** [1] - 199:3
**Persons** [2] - 238:6, 286:17, 299:25
**persons** [2] - 300:2, 311:5
**perspective** [2] - 253:5, 253:6
**pertains** [1] - 363:22
**Ph.D** [1] - 387:21

**Ph.D.-level** [1] - 398:6

**phalloplasty** [1] - 336:16

**philosophy** [3] - 390:8, 390:21, 390:25

**phone** [3] - 276:10, 426:18, 437:11

**phrased** [1] - 253:15

**physical** [10] - 200:11, 200:14, 201:9, 246:9, 246:18, 246:21, 286:1, 392:2, 411:3

**physically** [1] - 196:21

**physician** [10] - 233:3, 234:25, 236:15, 247:19, 277:19, 383:11, 390:22, 406:20, 419:25, 436:17

**physician's** [1] - 402:2

**physician-patient** [1] - 277:19

**physicians** [5] - 234:21, 390:9, 433:15, 434:7, 434:12

**physiologic** [1] - 262:6

**pick** [3] - 192:10, 213:14, 352:2

**place** [3] - 298:3, 321:5, 350:23

**placebo** [4] - 259:18, 260:5, 260:10, 260:12

**placebo-controlled** [2] - 259:18, 260:12

**placed** [7] - 206:12, 215:4, 324:16, 326:7, 331:5, 336:12, 377:22

**placement** [1] - 323:10

**places** [1] - 233:14

**plaintiff** [10] - 191:10, 240:6, 292:6, 292:11, 304:21, 336:24, 386:22, 399:10, 408:12, 417:13

**PLAINTIFF** [1] - 191:13

**Plaintiff's** [14] - 203:7, 203:11, 203:23, 204:4, 231:24, 232:4, 286:23, 370:13, 371:16, 380:21, 382:19, 392:7,

394:10, 398:21

**plaintiff's** [2] - 278:9, 320:18

**PLAINTIFF'S** [1] - 230:24

**plaintiffs** [3] - 191:7, 240:3, 320:17

**plan** [5] - 304:23, 323:8, 344:6, 432:13, 434:10

**planned** [1] - 380:23

**planning** [1] - 322:15

**play** [3] - 331:3, 340:15, 343:13

**played** [1] - 366:19

**plays** [2] - 318:12, 343:8

**pleasant** [3] - 423:1, 423:6, 424:2

**pocket** [1] - 243:8

**point** [9] - 197:23, 219:20, 229:12, 297:10, 303:6, 328:22, 346:15, 347:1, 352:16, 360:9, 375:14, 386:10, 390:8, 414:14, 418:2, 421:3, 429:13, 430:8, 430:18

**points** [2] - 396:16, 427:3

**policies** [5] - 280:22, 316:7, 316:25, 317:1, 347:15

**policy** [44] - 215:23, 215:25, 216:15, 216:22, 217:3, 217:4, 281:1, 315:8, 315:18, 316:2, 316:10, 316:11, 316:12, 316:15, 343:9, 347:19, 347:22, 347:25, 348:5, 348:10, 348:11, 348:15, 348:16, 348:24, 385:11, 385:16, 385:21, 385:23, 388:16, 388:22, 388:25, 389:16, 389:17, 389:23, 390:1, 390:20, 391:8, 391:11, 391:12, 391:14, 391:17, 391:22, 391:24

**political** [1] - 433:13

**ponytail** [5] - 212:6, 212:8, 212:9, 212:11, 212:12

**poor** [1] - 274:5

**popular** [1] - 303:10

**population** [29] - 214:12, 305:10, 305:15, 322:16, 325:12, 332:20, 348:23, 364:7, 364:10, 364:17, 382:3, 403:1, 403:4, 408:1, 408:5, 427:16, 428:11, 428:19, 428:21, 429:15, 430:4, 430:9, 431:13, 431:15, 431:23, 436:18, 437:9

**populations** [1] - 429:22

**portion** [6] - 236:6, 281:18, 286:1, 414:7, 418:6

**Portneuf** [2] - 208:25, 280:11

**pose** [1] - 436:10

**posed** [1] - 435:14

**position** [6] - 202:9, 321:21, 321:23, 321:25, 327:2, 373:11

**positions** [1] - 322:9

**possibilities** [2] - 370:10, 396:14

**possibility** [2] - 283:10, 284:13

**possible** [8] - 315:6, 315:12, 315:16, 315:25, 329:25, 330:1, 381:18, 383:14

**possibly** [4] - 305:7, 356:2, 358:22, 359:2

**post** [1] - 269:12

**postoperative** [1] - 431:13

**postoperatively** [1] - 311:6

**postsurgery** [2] - 309:5, 344:2

**potentially** [5] - 262:17, 371:17, 388:2, 429:10, 433:13

**power** [1] - 418:1

**PowerPoint** [3] - 371:4, 393:10, 395:21

**practice** [5] - 235:1, 271:12, 272:5, 272:10, 327:6

**practicing** [2] - 234:4, 249:5

**practitioner** [3] - 226:19, 226:20, 403:8

**practitioners** [4] - 234:21, 236:15, 236:17, 402:1

**pre** [2] - 215:16, 269:12

**PREA** [1] - 281:1

**precedent** [1] - 274:14

**precedent-setting** [1] - 274:14

**preceding** [1] - 422:12

**preclude** [1] - 253:8

**precluded** [3] - 315:8, 315:18, 316:2

**precluding** [1] - 257:6

**predictors** [1] - 266:20

**preference** [1] - 266:25

**preferred** [1] - 216:17

**preincarceration** [10] - 207:18, 277:12, 277:18, 278:5, 280:3, 280:7, 280:11, 283:2, 313:21, 361:8

**preliminary** [2] - 191:5, 217:10

**prepared** [3] - 201:16, 371:4, 371:5

**prerequisite** [1] - 328:23

**prescribe** [1] - 412:21

**prescribed** [6] - 224:9, 224:11, 225:7, 294:22, 295:8, 338:2

**prescribing** [1] - 402:18

**prescription** [1] - 224:16

**prescriptions** [1] - 415:20

**present** [15] - 202:12, 233:5, 237:25, 242:10, 253:4, 253:8, 333:19, 337:12, 380:24, 380:25, 381:3, 381:13, 382:18, 396:8, 436:19

**presentation** [20] - 238:24, 333:19, 333:25, 334:7, 334:14, 335:3, 371:4, 371:13, 374:15, 382:18, 395:23, 396:11, 398:22, 399:2, 411:19, 434:23, 435:12, 437:4, 437:5, 437:7

**presentations** [4] - 238:20, 238:23, 381:24, 427:15

**presented** [14] - 202:1, 255:15, 330:23, 331:3, 331:20, 334:13, 336:19, 372:22, 382:12, 382:21, 390:6, 396:3, 426:24, 427:14

**presentence** [3] - 278:9, 338:15, 339:21

**presentencing** [1] - 280:15

**presenting** [5] - 195:11, 195:14, 195:21, 373:17, 396:14

**presents** [4] - 242:4, 242:12, 396:13, 426:22

**preserve** [3] - 218:7, 247:10, 248:1

**preserving** [1] - 218:12

**presided** [1] - 356:20

**press** [1] - 377:9

**pressed** [1] - 257:15

**presumably** [3] - 247:21, 387:20, 399:18

**pretty** [10] - 194:17, 196:9, 199:20, 199:22, 249:6, 280:19, 285:18, 289:18, 289:25, 302:10

**previous** [4] - 277:10, 289:2, 359:20, 412:8

**previously** [4] - 271:25, 309:15, 377:15, 407:12

**primarily** [14] - 192:25, 253:18, 254:17, 262:16, 401:24, 404:24, 410:4, 410:21, 415:18, 421:4, 429:9, 429:17, 430:25, 431:24

**primary** [12] - 235:20, 236:5, 236:10, 236:12, 237:6, 237:10, 247:19, 248:10, 303:23, 343:10, 414:2, 416:7

**prison** [72] - 195:12,

197:15, 198:3, 199:3,
199:5, 199:19,
201:14, 201:18,
201:21, 201:24,
202:16, 214:8, 214:9,
214:11, 215:3, 236:8,
236:9, 240:6, 240:14,
240:16, 251:8,
251:10, 251:17,
251:21, 252:21,
256:2, 256:3, 256:24,
268:23, 269:2, 269:9,
269:10, 269:13,
277:9, 277:11,
278:15, 281:7,
284:25, 286:21,
299:15, 299:16,
299:22, 300:7,
300:13, 300:14,
312:9, 314:2, 315:6,
315:8, 315:18, 316:2,
316:7, 334:3, 334:21,
342:7, 342:13, 343:8,
343:16, 375:9,
381:21, 382:3, 382:7,
382:20, 388:17,
402:5, 405:4, 405:5,
422:25, 426:14,
427:16, 432:10
  **Prison** [1] - 404:25
  **prisoner** [2] -
256:18, 376:24
  **prisoners** [6] -
192:24, 257:13,
305:11, 305:16,
376:11, 406:17
  **prisons** [5] - 299:20,
300:1, 300:5, 382:4,
402:4
  **private** [1] - 249:9
  **privilege** [1] - 268:21
  **pro** [5] - 235:1,
319:1, 319:7, 319:9,
319:16
  **probation** [2] -
210:23, 210:24
  **problem** [6] - 250:18,
262:4, 351:8, 351:10,
352:3, 394:23
  **problems** [11] -
210:7, 210:14,
210:20, 253:16,
262:2, 271:15,
271:22, 271:25,
272:3, 279:5, 352:5
  **procedure** [5] -
259:17, 343:19,
343:22, 416:24,
419:19
  **procedures** [8] -

218:3, 266:17,
280:22, 316:25,
317:1, 347:16,
362:10, 419:12
  **proceed** [7] - 276:8,
336:10, 339:13,
352:4, 364:1, 371:21,
397:23
  **proceeding** [2] -
339:10, 391:5
  **process** [6] -
196:10, 213:13,
228:6, 239:12,
247:23, 301:18,
301:24, 302:13,
352:15, 380:3,
385:24, 391:13,
391:16, 402:11,
408:18, 413:3, 413:4,
424:3
  **processed** [1] -
351:5
  **produce** [2] - 196:24,
246:14
  **produced** [3] -
207:5, 338:18, 371:11
  **produces** [1] -
262:11
  **producing** [1] -
297:4
  **product** [1] - 297:1
  **production** [4] -
200:18, 202:6, 202:7,
248:14
  **products** [1] - 297:4
  **profession** [5] -
328:5, 331:14, 340:8,
398:14, 427:17
  **Professional** [2] -
237:14, 325:7
  **professional** [14] -
237:18, 257:4,
270:10, 270:15,
319:6, 326:23, 328:1,
328:2, 373:24,
373:25, 375:20,
376:19, 387:21, 398:7
  **professional's** [1] -
289:20
  **professionals** [5] -
272:16, 289:8,
331:23, 377:14, 396:4
  **profound** [2] - 245:6,
372:20
  **program** [10] -
192:23, 192:24,
221:18, 226:7,
226:11, 229:18,
279:24, 331:22,
332:19, 385:6

**Program** [1] - 243:24
  **programming** [4] -
219:9, 229:5, 229:8,
229:13
  **programs** [1] - 289:9
  **progress** [2] -
255:19, 264:19
  **progressive** [1] -
264:18
  **prohibition** [1] -
217:4
  **Project** [4] - 233:6,
233:9, 234:2, 274:3
  **project** [5] - 233:12,
233:16, 234:1,
238:18, 275:16
  **projects** [6] - 274:3,
274:7, 274:8, 274:18,
274:24, 275:14,
275:21
  **promote** [1] - 287:15
  **prongs** [1] - 253:25
  **pronoun** [5] -
202:19, 417:17,
417:21, 417:23,
418:12
  **pronounces** [1] -
231:8
  **pronouns** [1] -
202:21
  **proper** [2] - 371:19,
372:2
  **properly** [2] -
291:17, 291:20
  **proposal** [1] - 260:16
  **proposed** [4] -
192:12, 351:4,
376:11, 376:20
  **prostate** [1] - 266:12
  **protect** [5] - 212:19,
214:19, 214:24,
215:17, 352:6
  **protecting** [1] -
215:5
  **protection** [1] -
375:9
  **protein** [1] - 296:24
  **proteins** [1] - 296:18
  **protocols** [1] -
244:11
  **prove** [1] - 371:18,
372:3
  **provide** [32] -
216:23, 233:17,
233:18, 234:3,
237:18, 241:19,
242:1, 242:15,
243:10, 249:22,
258:7, 259:23,
274:23, 289:18,

322:3, 327:6, 331:22,
332:4, 345:9, 348:6,
348:25, 354:16,
354:17, 355:19,
378:18, 381:5,
382:13, 383:11,
392:12, 402:22,
403:7, 414:9
  **provided** [38] -
211:1, 215:19,
244:12, 249:20,
258:12, 263:19,
264:6, 264:14,
264:15, 264:24,
269:4, 269:14,
274:18, 316:1, 317:9,
332:22, 332:24,
333:19, 338:1, 338:5,
344:20, 348:1,
348:25, 349:14,
350:4, 353:13,
354:21, 361:5, 372:5,
376:23, 377:19,
380:19, 381:25,
382:20, 384:13,
412:9, 415:11, 419:13
  **Provider** [1] - 406:19
  **provider** [21] -
217:11, 226:6,
234:12, 234:22,
243:4, 253:12,
259:15, 269:8,
295:20, 296:3,
302:11, 305:22,
319:7, 324:13,
328:18, 338:2, 356:6,
398:6, 415:1, 419:23
  **provider's** [1] - 290:5
  **providers** [29] -
202:24, 205:8,
205:11, 222:1,
223:18, 226:2,
228:13, 234:15,
234:20, 236:14,
241:18, 243:9,
244:22, 245:11,
245:14, 256:6,
268:14, 303:9,
305:19, 305:20,
306:21, 307:2,
345:20, 350:7,
353:21, 353:25,
361:21, 401:25,
427:13
  **provides** [5] - 240:3,
242:2, 289:16, 326:1,
387:2
  **providing** [12] -
243:10, 244:23,
245:12, 277:23,

315:9, 315:18, 337:7,
354:1, 374:7, 395:16,
406:17, 414:22
  **PSI** [2] - 339:21,
361:9
  **psychiatric** [12] -
311:16, 401:4,
401:14, 401:21,
401:22, 401:25,
404:19, 406:8, 407:2,
415:12, 427:9, 427:10
  **psychiatrist** [21] -
225:9, 226:15,
226:23, 226:24,
269:20, 269:25,
271:17, 271:23,
272:1, 273:1, 283:9,
284:11, 303:17,
387:22, 390:22,
398:1, 398:10,
400:17, 401:19,
414:6, 425:8
  **psychiatrists** [9] -
272:5, 272:7, 272:9,
272:11, 272:22,
303:25, 402:1, 402:7,
406:15
  **Psychiatry** [1] -
401:1
  **psychiatry** [11] -
272:4, 272:13, 286:1,
404:22, 406:6, 406:8,
406:10, 406:12,
406:13, 411:4
  **psychological** [3] -
241:22, 243:7, 289:19
  **psychologist** [7] -
243:11, 270:7,
397:25, 398:10,
408:22, 413:6, 413:15
  **psychologists** [1] -
306:20
  **psychosis** [3] -
330:1, 340:15, 362:7
  **psychosocial** [1] -
311:15
  **psychotherapy** [2] -
291:11, 327:7
  **psychotic** [2] -
362:4, 362:6
  **public** [1] - 375:23
  **Public** [1] - 244:2
  **publication** [1] -
238:19
  **publications** [4] -
238:7, 238:11,
238:16, 239:16
  **publish** [5] - 350:17,
352:8, 352:10,
352:12, 352:23

**published** [2] - 239:12, 350:13
**publishing** [1] - 352:14
**pull** [16] - 238:10, 283:7, 283:16, 286:23, 292:16, 293:24, 296:10, 297:12, 305:23, 308:2, 308:20, 310:14, 314:4, 403:9, 408:10, 434:14
**pumping** [1] - 198:23
**punch** [1] - 257:20
**punished** [1] - 195:15
**punishment** [1] - 375:9
**purportedly** [2] - 217:14, 217:17
**purpose** [3] - 285:18, 287:24, 385:8
**purposes** [2] - 283:24, 287:8
**put** [29] - 201:4, 222:24, 223:4, 228:18, 238:24, 253:21, 276:3, 276:6, 285:13, 288:20, 289:3, 311:3, 330:9, 332:4, 332:8, 335:12, 335:17, 372:12, 378:21, 389:7, 396:16, 412:2, 412:3, 412:16, 414:24, 414:25, 421:5, 421:14, 433:21
**puts** [1] - 316:15
**putting** [2] - 245:22, 339:10

## Q

**qualifications** [7] - 231:21, 317:13, 317:22, 317:23, 324:15, 324:20, 389:10
**qualified** [15] - 217:2, 235:9, 235:10, 235:19, 247:15, 388:24, 389:22, 389:25, 390:4, 390:12, 390:19, 390:20, 419:20, 419:23, 420:2
**Qualified** [1] - 388:20
**qualifies** [2] - 386:22, 389:20

**qualify** [3] - 386:12, 390:9, 390:16
**quality** [8] - 258:13, 258:22, 258:24, 259:6, 288:4, 291:16, 311:15, 424:5
**Quentin** [2] - 404:24, 405:13
**questioning** [4] - 265:20, 389:3, 389:14, 391:21
**questions** [46] - 204:5, 204:19, 205:4, 221:20, 222:4, 227:4, 227:6, 229:1, 229:20, 234:21, 267:24, 268:22, 275:9, 275:15, 279:6, 318:5, 320:2, 323:21, 339:9, 349:4, 349:6, 353:11, 363:10, 366:11, 377:5, 384:6, 384:8, 384:9, 386:7, 386:9, 388:9, 389:4, 389:9, 390:1, 391:25, 392:9, 392:21, 397:9, 397:11, 397:24, 399:8, 427:2, 434:16, 435:15, 436:4, 437:18
**quickly** [2] - 302:10, 414:21
**quit** [1] - 344:13
**quite** [5] - 236:4, 275:6, 312:17, 352:6, 370:6
**quote** [7] - 212:21, 242:21, 242:23, 263:4, 314:11, 314:14, 424:6
**quote/unquote** [1] - 241:6
**quoted** [1] - 334:4

## R

**RA** [1] - 295:20
**raises** [1] - 384:10
**ran** [1] - 355:7
**randomized** [1] - 259:2
**range** [10] - 266:13, 290:22, 301:3, 301:9, 301:11, 303:4, 303:9, 337:14, 424:1
**rant** [1] - 365:20
**rare** [5] - 220:6, 220:12, 259:12, 259:13, 352:6
**rarely** [1] - 202:24
**rate** [2] - 209:25,

424:4
**rates** [5] - 236:3, 266:8, 266:13, 266:25
**rather** [2] - 276:6, 373:10
**rationale** [1] - 212:18
**rationales** [1] - 215:15
**razor** [4] - 198:3, 198:4, 198:11, 200:8
**reach** [1] - 345:2
**reached** [2] - 427:7, 434:5
**read** [30] - 217:23, 217:25, 221:11, 221:13, 232:10, 246:3, 246:5, 281:15, 282:12, 282:13, 284:18, 301:12, 301:14, 314:24, 316:9, 316:11, 316:24, 330:25, 331:10, 350:25, 351:23, 353:2, 353:5, 353:9, 357:11, 374:25, 402:10, 409:25, 427:25
**read-and-sign** [1] - 350:25
**reading** [1] - 363:23
**reads** [1] - 357:13
**ready** [7] - 191:6, 198:22, 201:21, 220:2, 220:8, 268:7, 318:18
**reaffirmation** [1] - 353:14
**real** [6] - 214:21, 264:21, 314:13, 431:12, 432:7, 432:9
**reality** [1] - 364:3
**realize** [8] - 200:12, 259:21, 260:6, 265:2, 276:21, 281:19, 282:2, 304:3
**really** [24] - 192:15, 203:4, 207:7, 223:1, 233:13, 250:18, 261:1, 272:13, 290:7, 295:13, 342:20, 343:8, 351:25, 387:18, 389:19, 401:16, 406:10, 410:8, 410:25, 421:21, 424:19, 427:17, 431:9
**reason** [9] - 194:16, 213:4, 241:20, 243:16, 265:15, 319:14, 351:22,

392:17, 412:12
**reasonable** [3] - 296:5, 301:11, 312:22
**reasonably** [1] - 298:19
**reasoning** [3] - 261:17, 261:19, 387:9
**reasons** [4] - 215:18, 259:10, 415:2, 430:25
**reassignment** [56] - 197:3, 216:25, 217:5, 217:12, 218:3, 218:9, 240:12, 240:17, 251:4, 253:9, 261:22, 262:12, 263:5, 263:10, 270:22, 301:22, 303:2, 307:18, 308:5, 311:8, 320:1, 335:7, 343:19, 344:22, 345:6, 347:25, 348:6, 348:25, 350:5, 350:8, 353:13, 377:19, 382:13, 382:24, 383:11, 383:16, 389:24, 419:6, 419:8, 419:13, 421:6, 421:25, 422:22, 427:22, 428:4, 428:11, 428:18, 431:5, 431:10, 431:17, 433:17, 434:11, 435:7, 435:11, 435:14, 436:10
**receive** [7] - 205:17, 227:24, 251:11, 277:6, 325:20, 384:23, 436:10
**received** [27] - 196:8, 196:9, 196:11, 206:14, 216:2, 222:16, 223:3, 225:23, 251:14, 251:22, 256:7, 259:16, 278:15, 279:11, 281:22, 312:9, 312:10, 332:15, 337:20, 337:23, 340:19, 368:7, 413:15, 421:20, 436:14
**receives** [2] - 368:24, 378:12
**receiving** [3] - 196:12, 244:10, 256:19
**recent** [3] - 215:23, 238:1, 405:19
**recently** [6] - 220:1,

228:1, 228:17, 296:1, 413:20, 434:2
**receptions** [1] - 402:25
**recess** [5] - 268:3, 318:13, 394:2, 437:17, 437:25
**Recess** [3] - 268:4, 318:14, 394:4
**recessed** [1] - 438:2
**recipients** [1] - 240:2
**recognize** [13] - 203:13, 206:24, 213:11, 232:6, 242:2, 324:18, 326:5, 326:10, 328:7, 328:24, 331:7, 416:17, 418:12
**recognized** [2] - 365:17, 387:13
**recognizing** [1] - 329:4
**recollection** [4] - 348:8, 355:11, 364:18, 426:8
**recommend** [2] - 300:25, 323:9
**recommendation** [5] - 366:2, 366:22, 367:17, 378:10, 385:25
**Recommendation** [1] - 368:17
**recommendations** [6] - 219:11, 290:23, 344:9, 344:14, 378:4, 378:22
**recommended** [3] - 218:24, 219:8, 220:5
**recommending** [1] - 385:6
**recommends** [1] - 435:10
**reconstructive** [1] - 429:8
**reconvene** [1] - 268:2
**record** [27] - 191:18, 205:14, 208:22, 209:5, 217:19, 223:25, 224:1, 231:2, 254:3, 261:5, 283:19, 283:20, 285:9, 313:11, 316:9, 317:14, 317:16, 321:10, 352:9, 352:14, 352:18, 352:19, 364:20, 364:23, 372:9, 400:8, 408:24

**records** [54] - 219:16, 251:8, 251:11, 251:24, 252:20, 256:1, 256:2, 256:3, 277:7, 277:8, 277:10, 277:13, 277:18, 277:24, 278:5, 278:15, 278:16, 279:24, 280:3, 280:7, 280:11, 280:18, 281:10, 281:11, 281:18, 282:2, 282:10, 282:11, 283:3, 284:23, 284:24, 284:25, 293:3, 305:24, 313:14, 314:13, 314:19, 314:20, 314:22, 315:24, 338:8, 338:9, 338:24, 339:15, 361:9, 402:18, 408:10, 412:8, 412:14, 413:11, 417:12, 418:4, 418:22, 424:14

**recross** [3] - 229:22, 320:6, 397:20

**RECROSS** [2] - 320:9, 388:14

**RECROSS-EXAMINATION** [2] - 320:9, 388:14

**red** [1] - 297:1

**redirect** [3] - 227:5, 318:21, 377:6

**REDIRECT** [4] - 229:2, 318:23, 377:11, 397:13

**redistribution** [1] - 196:22

**reduce** [1] - 227:21

**reduction** [1] - 289:22

**refer** [17] - 216:16, 262:22, 271:16, 271:22, 272:4, 272:8, 272:12, 273:1, 283:24, 291:1, 302:8, 309:1, 323:18, 356:2, 377:13, 383:11, 392:2

**reference** [4] - 306:22, 406:1, 417:13, 417:17

**referenced** [7] - 206:5, 208:9, 208:12, 317:14, 361:10, 368:7, 384:3

**references** [2] - 244:5, 279:10

**referencing** [1] - 405:25

**referral** [2] - 271:20, 309:4

**referrals** [1] - 247:21

**referred** [10] - 218:23, 242:6, 291:5, 302:11, 308:18, 309:14, 324:13, 377:2, 409:19, 417:13

**referring** [16] - 224:5, 261:1, 262:2, 294:2, 302:14, 308:25, 311:18, 313:21, 315:13, 331:8, 365:15, 379:3, 418:9, 421:7, 422:14, 425:22

**refers** [1] - 372:16

**reflect** [3] - 358:9, 361:1, 416:23

**refresh** [1] - 426:7

**refused** [4] - 213:23, 214:2, 219:12, 220:18

**regard** [1] - 371:5

**regarding** [22] - 191:4, 215:25, 275:9, 278:10, 278:20, 279:5, 279:21, 279:24, 280:4, 280:8, 280:12, 285:12, 338:21, 350:7, 353:21, 354:21, 392:1, 414:14, 420:17, 421:11, 436:15, 437:2

**regards** [4] - 251:19, 251:20, 265:13, 279:5

**regional** [5] - 401:4, 401:21, 401:22, 425:10, 427:9

**regret** [10] - 266:2, 266:7, 266:8, 266:13, 266:14, 266:21, 266:25, 307:25, 310:5, 311:6

**regular** [6] - 236:5, 236:14, 402:20, 424:4, 424:5, 424:12

**regularly** [1] - 415:8

**rehabilitation** [1] - 375:11

**reimburses** [1] - 235:16

**Reiyn** [1] - 240:5

**rejected** [1] - 344:14

**related** [17] - 197:7, 209:3, 238:7, 238:20, 278:10, 279:11, 283:10, 284:13, 291:7, 297:9, 300:5,

365:2, 368:15, 368:24, 369:22, 406:16, 411:5

**relates** [1] - 292:5

**relating** [3] - 213:17, 238:3, 388:16

**relation** [1] - 422:11

**relationship** [4] - 201:2, 210:7, 277:20, 398:10

**Relationship** [1] - 242:22

**relationships** [3] - 219:6, 221:17, 250:15

**relatively** [1] - 271:10

**release** [2] - 229:17, 237:21

**released** [6] - 201:14, 296:19, 348:14, 399:15, 399:19, 416:23

**releases** [1] - 200:15

**relevance** [3] - 372:2, 383:4, 437:1

**relevant** [4] - 340:8, 362:15, 362:17, 386:6

**relied** [4] - 331:13, 354:25, 356:10, 364:19

**relief** [2] - 216:21, 265:6

**reluctant** [1] - 221:7

**rely** [6] - 376:16, 386:16, 424:15, 428:24, 428:25

**remember** [35] - 193:11, 198:19, 204:13, 205:23, 206:1, 206:4, 206:25, 207:1, 207:7, 209:2, 220:4, 222:2, 224:4, 224:5, 241:25, 268:16, 275:18, 276:9, 293:9, 304:10, 305:20, 310:16, 319:2, 333:6, 333:8, 333:22, 339:2, 414:20, 416:22, 419:24, 426:10, 426:12, 426:17, 426:19

**Remeron** [1] - 423:11

**remind** [5] - 197:22, 268:5, 318:15, 385:18, 394:5

**reminds** [1] - 375:8

**remove** [5] - 213:19, 213:25, 255:3, 310:9,

421:4

**removed** [2] - 248:4, 248:6

**removing** [1] - 248:13

**reoccurring** [1] - 197:21

**repaired** [3] - 199:13, 199:15, 199:17

**reparative** [1] - 429:8

**repeat** [1] - 221:10

**repeatedly** [5] - 218:23, 219:12, 220:17, 220:18, 228:18

**repeats** [1] - 264:20

**rephrase** [6] - 215:11, 256:25, 334:11, 368:4, 378:9, 381:12

**rephrased** [1] - 257:2

**replacement** [4] - 223:6, 338:1, 417:9, 422:1

**report** [14] - 213:4, 213:6, 231:22, 251:7, 255:21, 256:12, 258:21, 260:19, 264:23, 282:12, 284:11, 284:20, 361:9, 412:20

**reported** [8] - 255:9, 283:8, 284:8, 314:1, 411:17, 411:20, 422:8

**Reporter** [3] - 217:24, 221:11, 246:4

**REPORTER** [3] - 248:17, 295:9, 309:12

**reporter** [7] - 217:25, 221:13, 246:5, 301:14, 318:17, 351:20, 352:1

**reporting** [1] - 304:15

**reports** [6] - 213:8, 256:8, 278:20, 278:23, 279:17, 313:17

**represent** [3] - 222:1, 268:13, 395:20

**representation** [1] - 414:4

**representative** [1] - 419:16

**request** [3] - 277:6, 277:24, 341:4

**Request** [1] - 408:25

**requested** [5] - 228:19, 313:11,

338:22, 419:8, 422:18

**requests** [2] - 223:23, 316:14

**require** [1] - 348:3

**required** [10] - 219:8, 229:5, 229:9, 229:10, 262:21, 306:25, 419:19, 419:20, 419:22, 429:7

**requirement** [8] - 242:11, 245:3, 319:6, 326:16, 363:1, 386:20, 387:16, 388:5

**requirements** [4] - 240:8, 326:2, 328:17, 376:11

**research** [5] - 237:25, 238:1, 260:16, 289:21, 427:7

**Research** [1] - 238:5

**researched** [1] - 289:21

**Reservation** [1] - 193:1

**residency** [5] - 232:18, 233:1, 233:2, 404:19

**residents** [1] - 236:17

**resides** [1] - 364:5

**resolve** [1] - 257:3

**resource** [1] - 310:24

**resources** [2] - 243:11, 325:19

**respect** [2] - 247:14, 252:17

**respond** [1] - 221:2

**responded** [1] - 308:24

**responding** [1] - 316:13

**response** [4] - 213:21, 221:8, 316:17, 357:9

**responses** [2] - 204:21, 316:9

**responsibilities** [2] - 236:11, 319:15

**responsibility** [2] - 358:8, 380:5

**responsible** [1] - 360:23

**responsive** [1] - 354:8

**restarted** [1] - 293:8

**restate** [1] - 316:21

**restrictions** [1] - 234:19

**resubmit** [1] - 239:11

**result** [4] - 208:2,

228:8, 267:2, 295:21
**results** [1] - 200:16
**resume** [1] - 394:7
**retained** [4] - 217:15, 239:19, 251:1, 251:2
**return** [2] - 235:15, 418:16
**review** [22] - 239:6, 251:23, 260:15, 261:5, 278:9, 282:6, 323:5, 323:11, 338:14, 339:14, 351:1, 352:7, 356:11, 358:8, 360:10, 379:23, 380:3, 392:12, 392:18, 393:3, 394:9, 424:24
**reviewed** [37] - 239:2, 239:16, 251:8, 251:10, 251:13, 252:21, 255:21, 256:11, 256:15, 261:11, 278:14, 278:20, 279:20, 279:24, 280:3, 280:7, 280:11, 280:15, 280:18, 280:21, 280:25, 281:7, 281:17, 282:7, 316:7, 319:19, 319:22, 329:13, 338:8, 338:11, 338:14, 338:20, 338:24, 358:6, 361:8, 382:9, 413:19
**reviewing** [3] - 360:23, 379:22, 402:18
**reviews** [4] - 323:7, 379:17, 379:23, 402:10
**revise** [2] - 237:21, 391:14
**revised** [2] - 348:10, 348:13
**revising** [1] - 391:17
**rhythm** [1] - 424:4
**Rifkin** [8] - 191:8, 229:1, 349:9, 363:15, 371:7, 380:20, 393:9, 394:7
**RIFKIN** [77] - 191:9, 191:22, 191:24, 203:9, 203:11, 203:13, 203:23, 204:5, 206:9, 206:20, 207:15, 215:8, 217:16, 220:11, 220:24, 229:3, 229:20, 230:13,

320:18, 325:4, 328:12, 328:21, 334:10, 335:12, 335:17, 335:20, 339:5, 349:11, 350:11, 350:15, 351:3, 352:10, 352:21, 352:24, 353:3, 353:7, 353:9, 353:12, 357:10, 360:2, 360:4, 362:13, 364:2, 365:21, 365:24, 366:1, 368:22, 370:19, 371:8, 371:11, 371:22, 372:8, 372:11, 373:20, 377:5, 381:7, 381:10, 381:22, 382:25, 388:12, 388:15, 389:7, 389:21, 391:10, 391:11, 392:4, 392:6, 392:16, 392:20, 392:23, 393:7, 394:8, 394:9, 397:5, 397:9, 397:19, 399:10
**Rifkin's** [1] - 384:8
**right-hand** [3] - 373:1, 373:21, 374:23
**Rights** [2] - 274:21, 275:7
**rights** [4] - 274:22, 372:20, 373:8, 373:23
**ring** [1] - 339:3
**risk** [2] - 214:7, 214:11
**risks** [2] - 267:14, 267:17
**Rivera** [1] - 274:3
**role** [17] - 238:4, 242:8, 254:5, 254:7, 299:9, 300:12, 323:4, 340:15, 343:8, 366:19, 384:15, 385:7, 398:1, 402:6, 414:8, 414:9, 431:8
**roles** [2] - 397:25, 402:9
**room** [1] - 251:18
**roughly** [2] - 206:25, 257:2
**run** [5] - 198:21, 247:10, 337:2, 392:25, 393:16
**run-ins** [1] - 337:2
**running** [1] - 435:8
**runs** [1] - 259:2
**rupture** [1] - 301:16
**rush** [1] - 431:5

**Russian** [2] - 255:10, 255:17
**RYAN** [2] - 230:24, 231:3
**Ryan** [1] - 231:3

## S

**sac** [2] - 198:5, 198:12
**sad** [1] - 224:2
**safe** [5] - 214:8, 214:9, 270:14, 346:20, 436:11
**safety** [1] - 235:8
**safety-net** [1] - 235:8
**said..** [1] - 432:18
**Saint** [1] - 199:6
**San** [6] - 233:14, 235:2, 244:2, 404:23, 404:24, 405:13
**saw** [11] - 225:11, 279:2, 279:10, 283:8, 303:18, 303:19, 309:14, 309:16, 314:19, 401:19, 415:11
**scale** [1] - 235:15
**scenario** [1] - 432:2
**schedule** [1] - 302:18
**scheduled** [1] - 303:3
**schizophrenia** [1] - 329:11
**school** [7] - 233:3, 245:4, 250:14, 250:23, 317:19, 327:20, 404:11
**schooled** [1] - 373:23
**schoolwork** [1] - 245:7
**science** [4] - 232:15, 326:15, 372:21, 373:9
**scientific** [3] - 239:4, 372:19, 373:8
**scope** [9] - 327:6, 362:12, 362:19, 381:22, 383:1, 389:3, 391:21, 397:19, 398:14
**SCOTT** [2] - 400:5, 400:9
**Scott** [2] - 341:4, 400:9
**screen** [4] - 252:11, 261:9, 283:18, 298:2
**scroll** [18] - 238:12, 296:11, 297:15,

297:21, 297:24, 306:3, 307:19, 310:19, 314:5, 315:3, 403:10, 403:15, 403:16, 405:16, 408:24, 416:13, 416:16, 423:15
**scrotum** [1] - 248:6
**se** [4] - 217:5, 217:6, 217:8, 328:20
**sealed** [1] - 350:18
**searched** [1] - 427:21
**seat** [3] - 230:25, 321:8, 400:6
**Seattle** [1] - 404:20
**second** [25] - 198:25, 242:19, 262:14, 264:19, 281:20, 282:15, 287:1, 287:8, 287:12, 287:14, 288:25, 289:1, 289:18, 308:3, 314:21, 315:25, 327:11, 357:21, 358:12, 362:22, 385:9, 408:11, 412:5, 427:25
**secondary** [2] - 250:9, 337:5
**secondly** [1] - 385:15
**section** [17] - 255:13, 286:3, 288:7, 288:16, 297:17, 298:1, 299:18, 300:6, 300:21, 305:14, 359:15, 410:2, 410:23, 411:1, 420:14, 421:10
**Security** [1] - 402:21
**security** [7] - 215:5, 322:15, 323:19, 380:1, 380:5, 380:6, 414:1
**see** [72] - 195:4, 198:15, 204:13, 205:14, 205:16, 208:21, 215:2, 216:15, 226:18, 226:23, 236:5, 236:13, 241:11, 242:21, 243:11, 251:9, 252:11, 259:24, 284:16, 286:10, 287:2, 287:13, 287:20, 292:23, 293:1, 302:10, 302:11, 303:20, 306:8,

306:16, 306:22, 308:21, 311:9, 311:19, 318:12, 340:13, 352:3, 353:7, 353:12, 353:15, 357:16, 357:22, 357:25, 358:14, 359:5, 359:15, 360:7, 360:13, 371:9, 373:3, 377:16, 377:18, 377:21, 377:23, 377:25, 378:6, 379:10, 384:3, 390:8, 396:25, 401:24, 403:11, 403:16, 405:18, 411:5, 415:4, 415:6, 418:5, 419:2, 423:2, 433:5, 437:20
**seeing** [10] - 225:8, 225:14, 225:15, 225:16, 234:4, 277:22, 283:18, 284:5, 304:6, 314:6
**seek** [1] - 202:13
**seeking** [3] - 197:1, 197:4, 222:23
**seem** [1] - 252:24
**selection** [1] - 311:7
**self** [14] - 200:8, 210:14, 228:23, 254:13, 254:15, 254:20, 264:16, 308:9, 340:2, 342:4, 342:5, 342:24, 345:15, 437:20
**self-castrate** [1] - 228:23
**self-harming** [5] - 340:2, 342:4, 342:5, 342:24, 345:15
**self-medicating** [1] - 200:8
**self-mutilation** [1] - 422:24
**self-surgeries** [1] - 254:13
**self-surgery** [4] - 254:15, 254:20, 264:16, 308:9
**self-worth** [1] - 210:14
**send** [3] - 283:11, 284:15, 301:22
**sending** [1] - 307:4
**sense** [5] - 194:4, 195:2, 198:19, 375:16, 421:23
**sensitive** [2] - 228:21, 365:14
**sent** [5] - 228:12,

374:14, 374:19, 375:4, 419:9

**sentence** [17] - 229:15, 244:7, 284:10, 288:25, 289:1, 289:19, 289:24, 292:24, 294:5, 295:5, 295:13, 311:4, 311:13, 314:11, 315:5, 315:13, 316:3

**separate** [7] - 206:15, 305:9, 305:13, 305:14, 356:9, 403:1, 403:3

**separately** [1] - 356:6

**September** [11] - 192:9, 268:18, 282:23, 359:6, 360:5, 369:15, 370:15, 371:12, 384:17, 417:16, 422:12

**sequestering** [1] - 393:22

**serious** [10] - 209:13, 209:17, 210:6, 350:20, 363:1, 363:20, 386:21, 387:4, 387:7

**served** [1] - 286:16

**service** [2] - 274:16, 431:5

**Service** [1] - 284:12

**services** [4] - 244:10, 244:12, 323:9

**Services** [9] - 205:18, 208:23, 233:10, 235:2, 235:3, 280:8, 283:9, 401:9, 408:25

**set** [21] - 231:17, 231:21, 251:11, 251:13, 251:14, 256:1, 256:5, 281:10, 282:10, 287:24, 288:2, 301:9, 314:20, 319:11, 322:18, 324:20, 326:10, 330:10, 336:16, 358:21

**sets** [1] - 241:16

**setting** [9] - 244:11, 274:14, 299:15, 299:17, 299:22, 300:13, 300:14, 300:15, 427:16

**settings** [3] - 300:7, 300:22, 423:3

**seven** [2] - 204:15,

430:16

**sever** [1] - 198:13

**several** [23] - 238:7, 250:21, 271:16, 296:16, 310:11, 330:25, 332:2, 336:23, 340:21, 342:1, 378:18, 404:24, 419:9, 420:18, 421:5, 422:5, 422:16, 423:3, 425:13, 427:11, 429:4, 434:12

**Severe** [1] - 262:16

**severe** [9] - 249:13, 254:17, 262:5, 262:15, 262:18, 262:21, 263:2, 267:20, 429:8

**Severson** [3] - 350:16, 392:11, 437:19

**sex** [44] - 197:3, 203:15, 216:25, 217:4, 218:3, 218:9, 219:9, 221:17, 229:4, 229:12, 240:11, 240:17, 246:19, 251:4, 253:9, 261:22, 262:11, 263:5, 263:10, 270:22, 279:24, 301:22, 303:2, 307:18, 308:5, 312:14, 320:1, 322:4, 343:18, 344:22, 345:6, 348:6, 348:25, 350:4, 350:8, 353:13, 377:19, 382:13, 382:24, 383:11, 383:16, 389:24, 421:25, 427:22

**sexual** [34] - 193:15, 193:16, 193:18, 212:20, 214:7, 214:11, 214:15, 214:19, 214:24, 215:6, 215:17, 217:12, 262:5, 266:23, 266:24, 311:8, 334:18, 335:7, 340:2, 340:3, 342:7, 342:8, 342:13, 347:25, 365:1, 366:25, 410:12, 419:8, 422:22, 428:4, 428:10, 428:18, 433:16, 434:11

**sexually** [3] - 213:2, 340:21, 345:15

**shadowed** [1] -

405:14

**shaft** [1] - 248:3

**SHANBHAG** [5] - 404:2, 435:16, 435:25, 436:20, 436:22

**Shanbhag** [3] - 435:24, 435:25, 436:1

**share** [1] - 247:7

**shifting** [1] - 263:6

**Sho** [1] - 280:3

**Sho-Ban** [1] - 280:3

**shoot** [1] - 322:11

**short** [1] - 392:13

**shortened** [1] - 192:16

**shorter** [1] - 281:3

**shortly** [2] - 192:14, 345:1

**Shoshone** [3] - 193:3, 205:18, 208:23

**Shoshone-Bannock** [3] - 193:3, 205:18, 208:23

**shot** [1] - 267:15

**show** [21] - 203:6, 217:19, 276:4, 310:20, 357:10, 357:20, 357:21, 357:23, 358:12, 359:3, 359:14, 360:12, 360:19, 365:24, 367:15, 370:13, 371:22, 372:4, 388:12, 392:7, 397:15

**showed** [1] - 431:13

**showing** [4] - 313:11, 336:8, 360:4, 416:14

**shown** [2] - 359:23, 419:1

**shows** [9] - 235:13, 242:1, 297:6, 317:18, 367:2, 367:24, 368:2, 368:10, 368:11

**shrinkage** [1] - 246:20

**shrinking** [1] - 260:7

**sic** [2] - 376:16, 437:17

**side** [5] - 340:17, 380:25, 381:3, 396:11, 396:17

**sides** [5] - 339:12, 381:6, 381:14, 384:9, 396:8

**sign** [1] - 350:25

**signature** [3] - 207:8, 207:10, 417:5

**signed** [3] - 352:13, 352:17, 358:7

**significance** [1] - 254:15

**significant** [13] - 236:6, 253:3, 260:1, 262:19, 263:15, 343:15, 343:21, 410:3, 410:10, 410:24, 420:17, 421:11, 423:5

**significantly** [1] - 267:20

**similar** [6] - 193:9, 195:3, 240:15, 267:18, 333:14, 429:11

**simplifies** [2] - 248:14, 248:19

**simply** [1] - 363:7

**single** [1] - 354:14

**sit** [1] - 415:1

**sitting** [2] - 402:17, 429:1

**situation** [10] - 199:10, 233:15, 242:12, 250:16, 255:7, 272:24, 289:21, 290:4, 317:5, 431:6

**situations** [12] - 201:5, 241:16, 241:18, 241:22, 245:14, 261:22, 289:19, 290:4, 290:5, 319:12, 319:13, 323:11

**six** [19] - 252:16, 264:24, 265:12, 275:14, 301:2, 301:10, 302:2, 302:7, 302:9, 302:14, 321:24, 322:8, 323:1, 336:18, 342:1, 342:9, 342:10, 361:25, 389:7

**six-month** [1] - 342:9

**sixth** [1] - 331:16

**skill** [1] - 319:11

**skills** [4] - 219:4, 219:5, 221:17, 346:11

**skin** [5] - 196:23, 196:24, 246:14

**slide** [17] - 256:6, 371:4, 371:24, 372:25, 373:21, 374:24, 375:7, 375:14, 375:19, 382:18, 394:20, 394:21, 395:1, 395:8, 395:12, 395:13,

395:21

**slides** [19] - 371:4, 372:11, 374:15, 374:19, 374:20, 375:3, 380:20, 384:24, 393:11, 395:15, 395:21, 395:22, 395:25, 396:2, 396:8, 396:13, 396:20, 397:7, 398:21

**sliding** [1] - 235:15

**slight** [1] - 216:21

**slot** [1] - 229:18

**slow** [2] - 248:17, 309:12

**slower** [1] - 246:12

**slowly** [1] - 318:16

**small** [3] - 275:3, 281:18, 400:25

**smell** [1] - 246:15

**smoother** [1] - 196:25

**so..** [4] - 271:11, 294:4, 301:5, 306:21

**sober** [1] - 250:21

**SOC** [4] - 244:8, 372:16, 372:19, 373:4

**social** [11] - 219:4, 219:5, 221:17, 241:22, 289:19, 290:4, 343:13, 348:17, 431:6, 431:19, 432:7

**societies** [1] - 373:24

**Society** [3] - 310:16, 310:23, 312:3

**society** [4] - 319:16, 374:1, 407:19, 431:19

**soft** [1] - 232:20

**soft-spoken** [1] - 232:20

**softer** [1] - 196:23

**solely** [1] - 389:15

**solve** [2] - 351:8, 351:9

**someday** [1] - 383:15

**someone** [15] - 307:10, 308:18, 329:24, 330:24, 342:16, 373:12, 380:3, 383:9, 386:10, 397:17, 433:24, 435:4, 435:6, 436:25

**sometime** [1] - 207:23

**sometimes** [15] - 194:14, 197:12, 200:5, 223:22,

226:18, 239:13,
246:15, 248:12,
249:13, 270:22,
272:22, 273:2,
319:12, 351:22, 365:9
**somewhat** [2] -
407:18, 429:11
**soon** [8] - 240:13,
312:9, 312:12,
312:14, 312:16,
312:17, 432:2, 433:10
**sooner** [1] - 302:24
**sorry** [42] - 203:11,
237:11, 238:10,
241:9, 245:18,
247:12, 248:18,
259:5, 261:3, 269:19,
269:23, 269:24,
270:19, 276:1,
276:25, 278:8,
281:21, 284:6, 285:5,
287:6, 293:25,
295:14, 297:14,
298:6, 298:7, 309:3,
309:13, 312:2,
312:18, 318:2, 357:3,
360:2, 362:24,
370:23, 372:8,
380:17, 381:7, 381:9,
390:22, 426:6, 435:17
**sort** [14] - 234:6,
235:4, 237:24,
244:22, 245:11,
250:12, 265:5,
265:12, 266:9,
281:14, 290:2, 313:8,
429:6, 429:7
**sorts** [2] - 406:12,
420:7
**sought** [1] - 199:1
**sound** [1] - 395:25
**sounds** [7] - 245:13,
266:10, 268:19,
268:20, 296:5,
312:21, 313:14
**space** [2] - 191:15,
248:5
**speakers** [1] - 333:3
**speaking** [3] -
275:22, 345:19, 346:7
**speaks** [2] - 263:2,
331:16
**special** [1] - 364:6
**specialist** [2] -
283:12, 284:15
**specialize** [1] - 406:9
**specializes** [1] -
406:1
**specialty** [1] - 233:4
**specific** [16] - 251:4,

410:21
**stable** [2] - 272:1,
272:2
**staff** [25] - 202:20,
212:2, 216:16,
218:16, 307:2, 322:2,
332:18, 332:22,
371:5, 372:1, 372:5,
373:17, 380:5, 380:6,
380:19, 381:5,
381:18, 382:12,
384:14, 422:25,
425:3, 425:15,
426:12, 427:7
**staffed** [10] - 305:17,
305:18, 306:12,
306:18, 307:7, 384:4,
425:2, 425:6, 425:7,
425:23
**staffings** [1] - 426:21
**stand** [4] - 230:25,
321:8, 393:17, 400:6
**standard** [15] -
243:18, 243:21,
244:24, 287:24,
289:2, 299:8, 347:15,
363:10, 363:23,
373:4, 373:7, 373:10,
387:3, 419:11, 419:19
**standards** [48] -
237:21, 240:20,
240:24, 241:1, 241:5,
242:17, 242:22,
243:14, 244:20,
252:7, 258:8, 286:12,
286:24, 287:3, 287:9,
287:16, 287:17,
288:7, 288:11,
288:16, 307:11,
336:4, 336:17,
336:18, 336:19,
336:22, 362:15,
362:18, 372:16,
376:16, 376:20,
381:21, 386:8,
386:13, 386:16,
386:17, 386:18,
386:23, 387:8,
387:16, 396:3,
425:14, 428:15,
429:11, 430:6, 430:9,
431:7
**Standards** [2] -
241:11, 326:12
**standpoint** [1] -
330:9
**stands** [7] - 253:21,
261:21, 315:16,
405:23, 406:19,
412:16, 433:5

**start** [7] - 192:6,
222:21, 243:5,
267:25, 287:13,
292:24, 435:5
**started** [22] - 191:14,
191:16, 196:19,
223:9, 223:10, 228:9,
234:4, 235:5, 249:5,
249:10, 293:12,
312:15, 322:21,
327:20, 331:21,
347:18, 369:15,
391:13, 412:22,
414:19, 414:20,
417:22
**starting** [2] - 243:3,
331:22
**starts** [5] - 261:20,
265:13, 292:22,
306:5, 375:7
**State** [11] - 192:23,
232:16, 239:24,
240:2, 240:3, 258:17,
326:24, 332:19,
333:5, 333:7, 402:20
**state** [19] - 191:17,
195:8, 196:18, 231:1,
240:1, 240:19, 249:9,
271:13, 316:16,
321:9, 323:14, 372:6,
390:23, 400:7,
401:25, 402:2, 402:3,
402:5
**statement** [8] -
263:4, 263:8, 284:22,
285:1, 314:17,
315:16, 373:4, 380:11
**statements** [2] -
238:2, 370:24
**states** [4] - 216:18,
217:3, 307:13, 427:11
**States** [2] - 243:1,
343:9
**Statistical** [1] -
327:12
**Statistics** [1] - 407:1
**status** [4] - 214:24,
230:3, 309:5, 411:4
**stay** [2] - 305:3,
432:22
**stayed** [1] - 250:19
**step** [9] - 191:11,
201:18, 230:16,
230:22, 320:15,
321:4, 321:6, 399:11,
400:3
**Stephen** [1] - 433:21
**steps** [2] - 197:25,
413:2
**Stewart** [6] - 218:20,

218:23, 219:17,
346:3, 346:4, 346:8
**stigmatize** [1] -
408:5
**still** [24] - 194:22,
197:13, 201:1,
202:13, 210:23,
255:1, 257:16,
266:16, 268:5,
292:13, 296:7,
297:10, 298:4,
306:19, 315:16,
318:15, 348:24,
363:7, 394:5, 404:8,
408:6, 408:8, 422:3,
431:14
**stipulate** [2] -
389:21, 389:25
**stipulated** [2] -
206:7, 370:23
**Stoddart** [5] - 224:1,
306:12, 306:20,
425:7, 436:16
**stood** [1] - 342:20
**stop** [7] - 195:21,
229:12, 246:12,
260:7, 411:9, 412:5,
424:13
**stopped** [9] - 200:19,
229:4, 229:7, 229:8,
248:20, 293:10,
293:12, 293:14,
412:22
**straight** [1] - 266:24
**strange** [1] - 428:20
**stress** [1] - 346:10
**stressor** [2] - 210:12,
210:13
**stressors** [4] - 201:1,
343:5, 343:16, 344:2
**stride** [1] - 430:18
**strike** [7] - 215:8,
217:16, 220:12,
253:10, 259:5,
316:17, 344:4
**strongest** [1] -
266:22
**struggled** [1] -
427:15
**struggles** [2] -
339:20, 339:24
**struggling** [1] -
340:23
**stuck** [1] - 339:19
**students** [6] -
236:17, 236:20,
236:23, 236:24,
236:25
**studies** [6] - 258:25,
259:1, 259:4, 259:11,

274:3, 274:18,
274:23, 290:1, 290:3,
291:3, 299:17,
299:23, 300:16,
302:21, 322:18,
331:23, 365:13,
382:4, 402:22
**specifically** [11] -
192:24, 288:1, 291:7,
301:9, 303:8, 355:16,
363:19, 374:17,
384:4, 396:16, 422:14
**specified** [3] - 412:4,
412:11, 416:7
**speculation** [4] -
254:22, 263:20,
264:1, 382:25
**speculative** [1] -
264:8
**speech** [2] - 424:4,
424:5
**spell** [4] - 191:17,
231:1, 321:9, 400:7
**spend** [4] - 204:15,
236:18, 432:5, 437:20
**spent** [1] - 402:14
**spironolactone** [11]
- 227:25, 228:7,
228:18, 248:21,
292:12, 293:4,
293:17, 293:21,
294:7, 296:6, 297:8
**Spokane** [1] - 404:21
**spoken** [1] - 232:20
**sponsored** [4] -
235:17, 332:9,
332:10, 332:11
**spring** [2] - 332:17,
401:16
**squeeze** [1] - 428:20
**SR** [1] - 305:18
**SRS** [40] - 247:16,
276:22, 290:17,
299:5, 299:8, 299:23,
300:6, 300:25,
301:24, 302:3, 302:6,
302:9, 303:12,
303:14, 304:14,
305:18, 306:1, 307:2,
307:14, 308:5,
308:12, 308:13,
308:19, 308:22,
308:25, 309:1, 309:4,
309:5, 309:7, 310:1,
311:18, 334:8, 335:3,
382:20, 383:22,
394:24, 395:4,
420:17, 420:22,
432:21
**stabilizer** [1] -

266:20, 311:14
**study** [14] - 239:6,
244:13, 244:17,
259:11, 259:14,
259:15, 260:2, 260:3,
260:5, 260:8, 260:13,
260:16, 431:12
**studying** [1] - 260:3
**stuff** [4] - 277:15,
333:16, 344:18,
347:12
**style** [3] - 213:7,
411:7, 423:21
**styled** [1] - 211:5
**subject** [3] - 333:9,
333:24, 399:15
**subjective** [7] -
285:19, 285:20,
304:15, 410:1,
410:23, 420:14,
421:10
**subjectively** [1] -
421:17
**subjects** [1] - 260:18
**submit** [3] - 234:14,
239:5, 352:17
**subpoena** [1] -
399:15
**subsequent** [4] -
239:14, 267:9,
281:19, 282:10
**subsequently** [2] -
281:16, 309:17
**substance** [6] -
210:2, 236:3, 250:18,
250:22, 330:2, 435:22
**substantial** [1] -
264:15
**substantially** [1] -
227:21
**successful** [8] -
200:13, 234:8,
264:20, 308:6,
308:12, 308:22,
422:22, 435:9
**sued** [3] - 310:10,
310:11, 434:3
**suffering** [4] -
249:13, 249:18,
264:3, 380:12
**suffers** [1] - 385:1
**sufficient** [4] -
247:20, 247:22,
304:25, 432:24
**suggest** [4] - 239:9,
340:19, 351:11,
389:19
**suggested** [3] -
227:20, 258:11, 396:7
**suggesting** [5] -

363:9, 391:4, 392:17,
429:13, 429:21
**suggestions** [2] -
334:3, 334:17
**suicidal** [1] - 423:22
**suicide** [34] - 198:7,
205:21, 206:1,
206:15, 207:19,
208:3, 208:9, 208:12,
208:16, 208:18,
209:3, 209:8, 209:14,
209:17, 209:19,
209:22, 210:6,
249:16, 249:17,
260:1, 264:22,
307:25, 308:6, 308:9,
308:12, 308:23,
309:7, 309:15,
309:17, 309:19,
309:23, 310:3, 342:3,
431:22
**sum** [1] - 258:3
**summarizing** [1] -
284:8
**summer** [3] - 204:15,
205:3, 333:23
**supervise** [3] -
236:14, 366:8, 366:18
**supervised** [3] -
322:1, 322:2, 337:6
**supervising** [1] -
354:13
**supervision** [2] -
354:1, 354:16
**supervisor** [5] -
306:14, 321:22,
354:5, 354:9, 370:14
**supervisors** [1] -
322:1
**supervisory** [1] -
402:6
**support** [3] - 258:13,
375:21, 408:4
**supported** [3] -
258:9, 258:19, 431:21
**supporting** [1] -
431:20
**supportive** [2] -
304:24, 432:24
**supports** [1] -
346:18
**supposed** [6] -
267:10, 278:1,
379:23, 393:2, 410:5,
410:6
**suppressant** [2] -
227:25, 228:14
**supremely** [1] -
257:22
**surgeon** [10] -

255:10, 255:18,
265:11, 302:18,
302:20, 302:22,
302:23, 303:1, 303:5,
308:13
**surgeons** [1] -
302:21
**surgeries** [12] -
247:2, 247:17,
248:25, 254:13,
258:13, 259:7, 267:3,
267:18, 309:23,
310:3, 421:5, 427:23
**surgery** [189] - 197:3,
197:4, 197:5, 197:23,
200:13, 200:17,
200:22, 200:23,
201:3, 201:6, 202:14,
216:25, 217:1, 217:5,
218:3, 218:9, 240:12,
240:13, 240:17,
242:6, 245:2, 247:4,
247:21, 248:8, 249:8,
249:12, 249:19,
249:21, 249:23,
250:5, 250:18,
250:19, 250:20,
251:5, 252:4, 252:6,
252:13, 252:14,
253:6, 253:9, 253:17,
254:15, 254:20,
256:16, 256:19,
257:7, 258:12,
259:17, 260:12,
261:17, 261:22,
262:12, 262:22,
263:5, 263:10,
263:19, 264:14,
264:15, 264:16,
264:23, 265:2, 265:3,
265:10, 266:2,
266:12, 267:6, 267:9,
267:13, 267:21,
270:17, 270:22,
270:25, 271:5, 271:6,
271:8, 271:9, 271:20,
290:17, 291:5, 291:7,
297:18, 301:5,
301:16, 301:22,
303:3, 307:18, 308:6,
308:7, 308:9, 308:10,
308:12, 309:11,
309:14, 309:16,
310:9, 311:8, 315:9,
319:23, 320:1, 334:8,
334:18, 334:24,
335:7, 335:8, 340:25,
341:12, 341:15,
342:17, 342:21,
342:23, 343:2, 343:5,
343:17, 343:19,

344:22, 345:7,
345:21, 346:14, 347:9,
347:25, 348:1, 348:6,
348:25, 350:5, 350:8,
353:14, 353:21,
354:22, 355:23,
356:2, 356:5, 356:9,
358:17, 359:1,
359:19, 360:17,
361:2, 364:21,
375:21, 376:12,
376:23, 377:2,
377:20, 377:25,
382:13, 382:24,
383:8, 383:11,
383:16, 384:23,
384:24, 386:11,
388:24, 389:10,
389:25, 394:15,
394:21, 394:23,
395:10, 395:13,
395:16, 399:2, 419:6,
419:9, 419:13, 421:1,
421:2, 421:3, 421:4,
421:6, 421:25,
422:22, 428:4,
428:11, 428:18,
429:8, 431:6, 431:10,
431:18, 433:17,
434:11, 435:7,
435:11, 435:14,
436:10
**surgical** [7] - 237:23,
249:4, 260:19,
266:17, 288:21,
289:4, 311:17
**survival** [1] - 260:7
**survived** [1] - 255:14
**suspect** [2] - 335:24,
336:6
**sustain** [2] - 220:14,
276:5
**sustained** [2] -
334:11, 436:23
**Sutter** [1] - 234:25
**sweat** [1] - 246:15
**switch** [2] - 242:19,
307:24
**sworn** [4] - 191:12,
230:23, 321:5, 400:4
**SWORN** [4] - 191:13,
230:24, 321:7, 400:5
**Sylvia** [1] - 274:3
**symptom** [2] -
252:20, 416:7
**symptomatic** [1] -
272:3
**symptoms** [3] -
415:18, 418:16, 423:2
**system** [6] - 235:15,

236:7, 240:6, 402:5,
406:11, 424:22

---

**T**

---

**table** [1] - 381:17
**tailoring** [3] - 244:9,
244:10, 244:20
**talks** [5] - 261:21,
261:25, 331:1,
395:10, 395:13
**target** [3] - 242:8,
245:3, 254:7
**Team** [1] - 357:14,
359:5
**team** [5] - 304:1,
322:14, 333:13,
355:25, 413:8
**technical** [1] -
233:17
**techniques** [1] -
247:6
**tempted** [1] - 393:7
**tend** [2] - 235:24,
266:25
**tended** [1] - 323:23
**term** [16] - 229:17,
257:24, 258:2,
270:12, 270:23,
270:25, 271:1, 271:3,
271:6, 311:15,
311:17, 365:11,
365:23, 421:3, 421:8
**terminology** [3] -
270:22, 290:16, 387:2
**terms** [3] - 202:1,
227:16, 423:5
**test** [3] - 228:2,
295:3, 336:3
**testicle** [8] - 198:4,
198:12, 198:13,
198:18, 199:13,
199:14, 369:21
**testicles** [11] - 198:2,
198:10, 246:20,
248:6, 248:13, 255:4,
263:1, 310:10, 313:7,
313:8, 313:10
**testified** [25] -
217:19, 220:18,
223:9, 240:20,
328:21, 349:17,
349:21, 354:20,
354:25, 355:3,
355:22, 355:24,
362:13, 363:18,
363:19, 364:19,
365:1, 369:20,
371:13, 375:3,
390:24, 390:25,

391:11, 396:18, 426:3
**testify** [7] - 245:25,
247:16, 356:4,
376:14, 413:22,
425:25, 436:24
**testifying** [3] -
245:17, 328:19, 397:5
**testimony** [19] -
209:11, 209:19,
215:8, 215:13, 246:7,
256:23, 264:9, 273:9,
276:2, 325:14,
331:10, 356:8,
362:14, 371:20,
386:20, 390:6,
396:25, 419:24,
434:25
**testosterone** [7] -
200:19, 227:25,
228:9, 228:11,
228:12, 228:14,
248:14
**tests** [6] - 293:22,
294:8, 295:21,
295:24, 296:16,
296:23
**textbook** [1] - 407:2
**THE** [252] - 191:3,
191:6, 191:11,
191:14, 191:17,
191:19, 191:21,
203:8, 203:10,
203:25, 204:3, 204:6,
204:8, 206:8, 206:10,
206:19, 206:21,
207:14, 207:16,
215:10, 215:13,
217:20, 218:1,
220:14, 221:2, 221:7,
221:10, 221:14,
221:21, 227:5, 227:8,
229:1, 229:21,
229:23, 230:1,
230:11, 230:16,
230:22, 230:25,
231:3, 231:5, 231:7,
231:25, 232:3,
232:20, 245:18,
245:20, 246:2, 246:6,
247:14, 247:18,
248:1, 248:17,
248:18, 253:13,
254:24, 254:25,
256:25, 257:10,
257:12, 260:25,
261:4, 261:7, 263:23,
264:11, 264:12,
265:18, 265:23,
265:25, 267:25,
268:5, 275:11,

275:13, 275:24,
276:3, 276:5, 283:19,
283:25, 284:2, 284:4,
287:10, 295:9,
295:10, 301:15,
309:12, 309:13,
312:1, 312:4, 312:6,
316:21, 318:6, 318:8,
318:15, 318:20,
320:3, 320:8, 320:15,
320:20, 321:1, 321:4,
321:8, 321:11,
321:13, 323:17,
323:23, 324:1, 324:3,
324:4, 324:6, 324:7,
325:3, 325:5, 328:15,
328:25, 334:11,
335:14, 335:16,
335:21, 339:8, 349:5,
349:6, 349:9, 350:13,
350:16, 350:20,
351:2, 351:6, 351:8,
351:19, 351:20,
352:12, 352:22,
353:1, 353:5, 353:10,
356:17, 356:19,
356:22, 356:23,
357:1, 357:2, 357:3,
357:4, 357:6, 357:7,
357:9, 359:24,
362:14, 362:23,
362:25, 363:6,
363:14, 363:19,
364:1, 365:6, 365:8,
365:9, 365:16,
365:17, 365:18,
365:19, 365:22,
368:20, 368:21,
370:17, 370:20,
370:22, 371:1, 371:3,
371:9, 371:14,
371:17, 371:25,
372:9, 373:2, 373:6,
373:7, 373:14,
373:16, 373:18,
373:19, 377:6,
377:10, 381:9,
381:12, 382:1, 382:2,
383:2, 383:6, 384:7,
384:12, 388:7, 389:5,
389:12, 390:2,
390:11, 390:16,
391:1, 391:7, 391:23,
392:5, 392:11,
392:17, 392:21,
392:24, 393:2, 393:4,
393:6, 393:9, 393:15,
393:19, 393:23,
393:25, 394:2, 394:5,
396:22, 396:23,
397:1, 397:10,

397:22, 399:9,
399:11, 399:13,
399:14, 399:18,
399:22, 399:24,
399:25, 400:3, 400:6,
400:9, 400:10, 404:1,
404:3, 404:5, 418:15,
418:18, 418:19,
429:12, 429:16,
429:21, 429:23,
430:2, 430:5, 430:7,
430:15, 434:15,
435:17, 436:1,
436:21, 436:23,
437:14
**themselves** [2] -
430:6, 431:15
**theories** [1] - 374:3
**therapeutic** [1] -
250:4
**therapies** [1] -
218:25
**therapist** [3] - 270:5,
272:12, 424:22
**therapists** [3] -
272:11, 272:20,
424:12
**therapy** [21] - 196:9,
219:1, 223:6, 227:24,
228:10, 228:23,
243:3, 243:5, 250:23,
254:1, 288:21, 289:4,
291:2, 312:14, 327:9,
327:10, 338:1, 409:8,
414:22, 417:10
**thereabouts** [1] -
318:11
**thereafter** [1] -
433:11
**therefore** [1] -
363:22
**thinking** [3] - 353:25,
430:10, 435:18
**thinner** [1] - 246:13
**third** [5] - 207:8,
262:4, 328:7, 357:20,
357:23
**thirds** [1] - 262:22
**thoughts** [3] - 345:9,
423:21, 423:23
**three** [14] - 209:24,
210:3, 246:25,
261:23, 309:19,
309:24, 332:4,
342:14, 359:11,
415:11, 415:21,
426:24, 429:13,
437:22
**three-day** [1] - 332:4
**throughout** [21] -

218:16, 218:22,
219:15, 233:16,
233:21, 234:17,
305:3, 323:14,
323:18, 323:24,
325:22, 337:3,
342:14, 343:9, 346:6,
401:25, 402:2, 402:3,
402:5, 427:8, 432:22
**tie** [1] - 389:6
**tied** [3] - 387:24,
388:3, 392:1
**timing** [1] - 312:11
**tiny** [1] - 314:5
**tissue** [3] - 200:13,
218:9, 248:3
**title** [3] - 398:22,
401:3, 401:20
**titles** [1] - 331:4
**today** [11] - 204:20,
215:16, 221:16,
226:15, 268:11,
268:22, 273:8,
385:10, 390:17,
425:25, 437:15
**together** [4] -
204:15, 222:22,
258:25, 433:21
**Tom** [2] - 243:24,
244:1
**tomorrow** [4] -
437:20, 437:21,
437:23, 437:25
**tonight** [1] - 301:16
**toning** [1] - 212:15
**took** [8] - 199:4,
208:3, 228:8, 255:11,
350:23, 372:12,
372:15, 395:22
**tool** [1] - 291:8
**top** [13] - 211:14,
212:9, 220:3, 230:9,
292:18, 294:19,
296:23, 360:13,
379:8, 395:1, 418:6,
432:12
**top-out** [1] - 230:9
**topic** [3] - 244:19,
345:8, 355:18
**topics** [4] - 332:25,
333:17, 334:6, 337:8
**tops** [1] - 432:3
**torment** [2] - 200:10,
200:15
**tormented** [1] -
194:15
**totally** [1] - 295:10
**touch** [1] - 285:22
**towards** [1] - 257:9
**town** [1] - 437:6

**traditional** [1] -
348:21
**train** [5] - 236:20,
366:8, 368:14,
368:23, 370:3
**trained** [8] - 233:20,
236:25, 372:1, 374:4,
404:23, 406:11,
433:16, 434:13
**training** [67] - 233:4,
234:3, 236:16,
236:18, 306:23,
306:24, 317:19,
327:10, 327:14,
327:17, 327:19,
327:22, 327:23,
327:25, 330:23,
331:21, 331:23,
332:6, 332:18,
332:22, 332:24,
369:25, 370:3, 370:6,
370:14, 372:3, 372:4,
372:12, 372:22,
374:7, 374:8, 374:12,
374:13, 374:21,
375:4, 376:2, 376:9,
376:12, 376:15,
376:18, 380:19,
380:24, 381:5,
381:24, 384:13,
384:14, 384:18,
384:21, 385:8,
394:15, 395:17,
397:7, 399:5, 404:18,
405:1, 405:3, 406:14,
406:22, 407:8,
417:24, 419:17,
420:7, 433:21,
433:23, 434:1, 434:6
**trainings** [11] -
327:21, 331:25,
332:4, 332:7, 332:8,
332:14, 332:23,
333:2, 343:23,
436:14, 437:2
**trait** [2] - 339:23,
340:1
**traits** [9] - 339:24,
340:20, 341:22,
341:23, 365:4, 365:7,
365:16, 365:17
**trans** [9] - 240:16,
243:3, 249:5, 250:1,
250:2, 260:12,
266:24, 348:20,
348:23
**transactions** [1] -
356:24
**transcript** [1] - 351:5
**transcription** [1] -

350:25
**Transgender** [6] -
233:11, 237:15,
243:24, 274:13,
275:1, 325:8
**transgender** [64] -
193:20, 214:6,
214:10, 214:24,
233:13, 234:13,
234:16, 235:7,
236:19, 237:19,
238:3, 238:8, 238:21,
239:20, 240:2,
241:23, 244:22,
246:8, 246:9, 247:3,
247:19, 248:8,
248:22, 256:7, 259:7,
261:24, 266:9,
266:23, 267:1, 267:3,
273:12, 273:14,
273:16, 274:4,
274:14, 274:23,
287:18, 288:13,
300:10, 307:8, 313:6,
314:14, 315:14,
316:3, 317:4, 317:9,
322:16, 325:12,
325:22, 330:25,
332:5, 332:20,
333:17, 334:2,
405:15, 408:1, 408:2,
408:5, 427:16,
431:11, 431:13,
435:9, 436:18, 437:9
**transition** [1] -
241:24
**transitioned** [2] -
241:25, 418:13
**transitioning** [2] -
343:13, 348:17
**transitions** [2] -
431:21, 431:22
**TransLine** [3] -
233:22, 234:1, 234:15
**Transportation** [1] -
416:20
**transported** [1] -
208:25
**transsexual** [2] -
287:18, 288:13
**treat** [23] - 197:25,
235:13, 235:19,
240:21, 244:3, 245:9,
247:2, 248:10,
248:11, 248:25,
257:16, 257:20,
260:17, 267:12,
297:19, 313:3,
331:24, 340:16,
376:7, 405:13,

416:10, 421:1, 427:16
**treated** [10] - 237:4,
237:22, 243:2,
264:25, 269:8,
301:17, 349:24,
420:8, 436:17, 437:9
**treaters** [1] - 303:24
**treating** [20] - 237:9,
247:19, 249:24,
250:8, 258:4, 264:2,
290:6, 303:17,
303:25, 317:6, 329:8,
346:1, 349:22, 354:2,
376:21, 402:14,
402:17, 416:8,
417:25, 424:12
**Treatment** [11] -
279:20, 322:10,
322:12, 323:6, 324:4,
324:9, 333:14, 337:6,
357:14, 359:5, 413:21
**treatment** [79] -
196:8, 197:1, 205:17,
206:2, 206:14, 216:1,
216:23, 219:9,
221:18, 223:1,
224:14, 227:10,
227:12, 227:21,
235:6, 241:17,
241:19, 242:16,
243:21, 246:24,
248:19, 251:3,
251:21, 252:24,
254:19, 258:6,
259:16, 259:19,
263:14, 264:5, 265:7,
269:1, 269:4, 269:15,
276:22, 277:7, 277:8,
277:11, 279:24,
283:11, 284:14,
288:2, 290:12,
303:20, 304:1,
304:24, 311:17,
316:15, 322:4,
322:15, 323:8,
323:11, 324:5,
328:18, 330:13,
330:15, 331:17,
331:19, 332:16,
337:7, 337:20,
337:22, 342:22,
344:6, 349:14,
354:17, 361:5, 363:3,
376:5, 385:6, 399:2,
406:8, 406:17, 413:8,
415:14, 415:18,
415:19, 432:23, 437:8
**treatments** [8] -
237:23, 240:1, 246:8,
248:15, 288:21,

289:4, 369:15, 402:18
**tremendous** [1] -
249:18
**trial** [6] - 245:23,
259:2, 259:18,
260:12, 351:11,
437:22
**Tribe** [1] - 280:3
**tribe** [1] - 193:2
**Tribes** [2] - 205:18,
208:23
**tribes** [1] - 193:3
**tried** [11] - 198:9,
208:16, 224:19,
224:23, 224:24,
227:15, 262:25,
308:9, 339:12, 425:3
**trouble** [3] - 231:17,
248:25, 249:4
**true** [13] - 206:14,
208:24, 210:6,
211:12, 213:5,
214:14, 214:21,
216:11, 217:9, 283:1,
315:15, 361:24,
396:18
**truly** [2] - 195:10,
201:12
**truth** [2] - 371:18,
372:3
**truthful** [4] - 204:21,
205:5, 205:7, 205:10
**try** [16] - 197:25,
199:24, 200:1,
224:25, 258:6,
264:16, 268:1, 268:2,
277:3, 297:14,
312:18, 323:19,
382:6, 392:25,
428:20, 429:2
**trying** [18] - 198:7,
198:8, 203:4, 208:18,
225:5, 245:20,
286:25, 288:2,
328:16, 336:6, 339:6,
390:16, 416:22,
418:12, 427:17,
427:23, 429:17,
429:24
**tuck** [2] - 224:25,
313:7
**turn** [3] - 374:6,
388:19, 394:17
**turned** [2] - 200:19,
281:15
**twice** [2] - 263:1,
333:1
**two** [41] - 201:25,
206:15, 209:10,
209:13, 209:16,

227:6, 233:13,
237:24, 240:15,
246:24, 249:11,
253:24, 261:17,
262:22, 276:16,
276:19, 285:16,
285:17, 296:17,
296:23, 313:9, 318:9,
332:4, 342:14,
364:15, 364:16,
391:16, 398:20,
402:24, 404:20,
404:21, 413:5, 413:7,
423:11, 426:18,
430:25, 431:3, 431:4,
432:6, 436:3
**two-and-a-half** [2] -
285:17, 391:16
**two-thirds** [1] -
262:22
**type** [3] - 224:20,
259:11, 262:4
**types** [4] - 201:4,
237:23, 241:17, 259:4
**typical** [2] - 194:13,
195:5, 247:4
**typically** [7] - 191:15,
193:7, 221:7, 242:7,
246:21, 277:24,
352:12

## U

**U.S** [2] - 231:7,
234:17
**ultimate** [1] - 258:7
**ultimately** [7] -
197:5, 199:23,
200:18, 200:19,
240:8, 430:20, 430:22
**uncommon** [1] -
302:18
**uncontrolled** [3] -
364:24, 367:3, 387:6
**under** [35] - 199:12,
267:16, 268:6,
302:15, 318:16,
321:6, 329:20, 335:6,
342:17, 348:7,
375:19, 377:14,
383:10, 386:12,
386:22, 387:8,
387:15, 388:4,
388:25, 389:16,
389:20, 389:23,
390:1, 390:6, 390:15,
390:17, 390:20,
394:6, 397:16, 398:2,
398:3, 398:21, 412:2,
432:6, 432:12

**undergarment** [1] -
313:6
**undergarments** [1] -
348:22
**undergo** [2] -
218:24, 219:11
**undergoes** [1] -
347:5
**undergraduate** [1] -
327:24
**underlying** [1] -
416:10
**underneath** [1] -
358:2
**understood** [6] -
214:5, 227:19,
243:15, 352:21,
385:9, 402:13
**underwear** [6] -
211:4, 216:9, 216:11,
224:20, 313:18,
385:12
**undoubtedly** [1] -
264:1
**unemployed** [1] -
210:10
**unethical** [1] -
257:22
**unfortunately** [1] -
437:15
**unilaterally** [2] -
227:16, 227:18
**uninsured** [2] -
235:14, 235:23
**unique** [3] - 241:21,
255:7
**unit** [12] - 305:9,
322:2, 322:3, 364:14,
378:21, 402:22,
402:24, 402:25,
403:3, 415:10, 422:19
**United** [2] - 243:1,
343:9
**units** [3] - 364:6,
364:11, 402:24
**University** [6] -
192:23, 232:16,
232:17, 263:11,
404:19, 404:23
**unless** [4] - 336:3,
354:7, 419:13, 436:25
**unreasonable** [2] -
303:11, 303:13
**unsigned** [1] -
351:12
**untrained** [1] -
255:12
**unusual** [1] - 234:14
**up** [73] - 197:22,
212:9, 223:25,

227:20, 228:12, 230:12, 230:14, 231:17, 232:5, 234:5, 234:10, 235:13, 238:10, 238:17, 240:24, 242:1, 249:20, 249:22, 252:9, 258:16, 259:3, 260:23, 261:9, 267:12, 283:7, 283:16, 286:23, 288:6, 292:16, 293:24, 296:10, 297:2, 297:12, 297:15, 300:4, 302:12, 302:16, 302:21, 305:23, 308:2, 308:20, 310:14, 314:4, 314:5, 318:9, 320:24, 322:18, 334:5, 336:16, 352:2, 360:1, 373:2, 373:3, 384:10, 388:8, 388:9, 388:22, 392:25, 403:9, 408:10, 408:24, 416:16, 418:24, 422:23, 427:21, 429:24, 434:8, 434:14, 434:16, 437:18, 437:21, 437:23
**update** [1] - 327:22
**updates** [1] - 325:20
**uphill** [1] - 373:25
**upper** [2] - 374:23, 394:20
**upset** [1] - 199:21
**upshot** [1] - 384:21
**urgency** [1] - 198:19
**urine** [1] - 267:7
**urologist** [2] - 199:9, 199:10
**useful** [1] - 319:12
**uses** [1] - 380:7
**utilize** [4] - 272:5, 272:16, 272:22, 291:8

## V

**vagina** [5] - 200:20, 218:5, 247:5, 248:5, 421:5
**vaginal** [1] - 267:11
**vaginas** [1] - 267:10
**vaginoplasty** [8] - 218:4, 247:4, 247:7, 249:25, 250:3, 302:18, 309:20, 421:7
**variant** [1] - 407:22

**variation** [1] - 352:19
**variety** [1] - 424:21
**various** [2] - 275:9, 425:22
**vast** [2] - 248:22, 300:4
**venlafaxine** [4] - 294:12, 294:15, 294:22, 295:4
**verbal** [1] - 212:1
**versa** [1] - 348:22
**Version** [2] - 326:12, 336:17
**version** [4] - 327:21, 352:17, 407:4, 407:5
**versions** [2] - 280:25, 289:2
**versus** [5] - 200:11, 290:17, 397:25, 398:1, 410:13
**vessels** [1] - 247:9
**via** [1] - 208:25
**vice** [1] - 348:22
**video** [1] - 285:10
**view** [2] - 336:7, 387:15
**viewpoints** [1] - 425:5
**vigorous** [1] - 239:13
**violation** [2] - 394:24, 395:5
**violations** [1] - 210:24
**virtually** [2] - 293:20, 294:7
**visibly** [1] - 201:12
**visit** [1] - 437:19
**visiting** [1] - 251:18
**visits** [2] - 243:12, 415:21
**vitae** [1] - 232:9
**voice** [2] - 195:3, 232:23
**volume** [1] - 424:5
**volunteer** [2] - 245:5, 245:7
**vs** [1] - 191:4

## W

**Waddell** [2] - 243:24, 244:1
**waist** [1] - 196:22
**wait** [5] - 265:11, 302:23, 303:10, 303:11, 432:15
**waited** [1] - 199:9
**wake** [1] - 197:22
**walk** [6] - 191:15, 195:3, 404:17, 410:1,

418:20, 425:6
**walked** [1] - 426:14
**walking** [1] - 426:13
**wander** [1] - 232:22
**wants** [3] - 276:4, 302:21, 393:11
**warden** [1] - 414:1
**warned** [1] - 213:17
**warnings** [1] - 212:1
**warranted** [1] - 418:2
**Washington** [9] - 207:23, 208:7, 208:8, 208:10, 208:17, 332:19, 333:5, 333:7, 404:20
**waste** [2] - 297:1, 297:3
**watch** [3] - 259:24, 269:24, 342:3
**Watson** [5] - 207:3, 218:18, 218:22, 219:17, 220:2
**ways** [2] - 215:4, 344:12
**wear** [6] - 195:2, 195:22, 201:22, 212:12, 215:16
**wearing** [7] - 195:6, 199:11, 213:6, 213:7, 313:18, 423:20
**week** [5] - 348:14, 348:16, 350:23, 400:20, 437:23
**weekly** [1] - 414:3
**weeks** [1] - 282:22
**weighed** [1] - 433:9
**welcome** [2] - 349:5, 377:10
**Welfare** [1] - 405:2
**well-documented** [1] - 252:18
**well-performed** [1] - 259:1
**Western** [1] - 434:4
**Whalen** [2] - 231:5, 231:6
**Whelan** [11] - 230:20, 231:5, 231:10, 232:25, 273:25, 275:8, 275:20, 275:25, 276:11, 276:15, 318:21
**whereas** [1] - 196:17
**Whinnery** [4] - 223:19, 223:20, 224:2, 224:8
**whole** [5] - 258:18, 357:22, 393:3, 424:3, 428:5

**wide** [1] - 424:21
**width** [1] - 267:11
**willing** [4] - 223:5, 302:23, 390:2, 417:1
**windows** [1] - 302:15
**Wisconsin** [1] - 404:14
**wish** [1] - 365:10
**wishes** [1] - 221:4
**withdraw** [1] - 390:1
**withheld** [1] - 395:5
**withholding** [1] - 394:24
**witness** [40] - 191:7, 221:2, 221:12, 230:18, 230:25, 231:10, 245:21, 247:18, 253:22, 268:5, 273:22, 276:6, 301:13, 320:17, 321:2, 321:8, 328:13, 328:15, 328:17, 335:13, 335:18, 336:3, 339:7, 351:1, 351:4, 351:13, 352:11, 359:22, 363:8, 365:24, 367:15, 381:8, 381:10, 392:10, 393:17, 399:25, 400:6, 435:19, 435:21, 436:24
**WITNESS** [50] - 191:19, 218:1, 221:10, 221:14, 230:24, 231:3, 246:2, 246:6, 248:1, 248:18, 254:25, 257:12, 264:11, 275:13, 295:10, 301:15, 309:13, 318:6, 321:7, 321:11, 323:23, 324:3, 324:6, 349:5, 351:19, 356:22, 357:1, 357:3, 357:6, 357:9, 365:8, 365:16, 365:18, 368:21, 373:6, 373:14, 373:18, 382:2, 383:6, 393:2, 393:6, 396:22, 399:13, 399:24, 400:5, 400:9, 418:18, 429:16, 429:23, 430:5
**witness's** [3] - 245:23, 339:11, 352:7
**witnesses** [3] - 320:18, 320:24, 335:25
**woman** [13] - 201:16,

211:3, 240:16, 241:23, 246:9, 251:21, 255:12, 255:18, 266:23, 410:8, 410:14, 432:8
**women** [10] - 235:5, 246:8, 247:3, 248:9, 248:22, 250:2, 266:24, 267:1, 267:3, 313:6
**women's** [3] - 211:4, 313:18, 313:19
**won** [2] - 240:3, 240:12
**wondered** [1] - 365:22
**wondering** [1] - 279:1
**word** [6] - 193:22, 196:16, 276:25, 292:23, 331:22, 391:3
**words** [8] - 245:23, 293:23, 339:11, 351:20, 374:25, 378:1, 385:1, 418:1
**wore** [1] - 211:4
**works** [6] - 250:22, 259:23, 265:22, 274:13, 392:23, 403:8
**World** [2] - 237:14, 325:7
**world** [1] - 325:22
**worrisome** [1] - 264:17
**worry** [1] - 199:24
**worse** [6] - 194:19, 194:21, 200:5, 200:6, 265:17
**worst** [1] - 432:2
**worst-case** [1] - 432:2
**worth** [2] - 210:14, 210:17
**worthless** [1] - 210:19
**wound** [1] - 267:8
**wow** [1] - 260:6
**WPATH** [94] - 237:15, 237:20, 238:4, 238:5, 240:20, 240:24, 241:16, 243:16, 258:8, 286:12, 286:14, 286:17, 286:24, 287:15, 287:24, 288:11, 288:20, 289:16, 297:22, 298:12, 299:8, 299:14, 299:19, 299:23, 300:2, 300:6,

306:14, 306:23, 306:24, 307:3, 307:4, 307:11, 325:15, 326:1, 326:11, 328:18, 330:4, 330:21, 330:23, 331:20, 331:25, 332:8, 332:10, 332:11, 332:12, 335:7, 335:22, 336:4, 336:17, 340:25, 341:8, 342:17, 342:25, 354:25, 362:15, 362:17, 372:16, 373:24, 377:14, 381:3, 381:20, 382:7, 383:10, 383:21, 384:3, 384:21, 386:8, 386:12, 386:17, 386:18, 386:23, 387:8, 387:16, 388:5, 389:15, 389:16, 389:17, 396:3, 397:16, 398:3, 398:18, 425:13, 425:14, 428:15, 429:11, 429:14, 429:22, 430:3, 430:6, 430:9, 431:7, 435:2

**wrap** [2] - 437:21, 437:23

**write** [2] - 358:6, 403:20

**writing** [3] - 251:6, 256:12, 281:16

**written** [4] - 214:9, 279:4, 331:9, 424:19

**wrote** [3] - 224:18, 255:21, 314:24

## Y

**year** [17] - 206:1, 217:9, 220:1, 226:21, 226:22, 226:24, 228:1, 228:2, 228:17, 237:2, 332:17, 333:4, 345:25, 399:23, 405:3, 415:22, 422:1

**year-and-a-half** [2] - 405:3, 422:1

**years** [43] - 192:18, 208:19, 209:24, 210:3, 218:22, 223:23, 237:24, 239:23, 246:25, 250:21, 263:11, 274:17, 275:14, 290:13, 290:22, 290:23, 303:21,

303:25, 304:8, 312:13, 312:16, 321:24, 322:8, 323:1, 327:22, 328:2, 332:15, 337:17, 337:24, 338:4, 344:10, 346:6, 361:25, 364:15, 364:16, 391:16, 404:20, 404:21, 415:7, 416:10, 426:11, 435:8

**yesterday** [7] - 191:16, 202:3, 202:6, 202:8, 240:18, 246:7, 393:1

**Yordy** [1] - 214:23

**York** [4] - 239:24, 240:2, 240:3, 258:17

**Young** [3] - 306:13, 306:20, 425:10

**yourself** [7] - 194:25, 197:25, 199:24, 202:12, 205:22, 216:4, 420:2

## Z

**Zoloft** [7] - 225:24, 304:8, 378:20, 411:17, 412:22, 412:25, 418:17

**zoom** [13] - 208:22, 287:10, 287:11, 288:5, 306:9, 353:1, 353:3, 367:15, 371:23, 374:23, 388:20, 420:19, 420:20

**Zucker** [1] - 239:25