1                    **UNITED STATES DISTRICT COURT**

2                         **DISTRICT OF IDAHO**

3

4     ADREE EDMO (a/k/a MASON EDMO), ) CASE NO. 1:17-cv-00151-BLW
                                     )
5                     Plaintiff,     ) **EVIDENTIARY HEARING DAY 3**
                                     )
6               vs.                  )
                                     )
7     IDAHO DEPARTMENT OF            )
      CORRECTION; HENRY ATENCIO, in  )
8     his official capacity; JEFF    )
      ZMUDA, in his official         )
9     capacity; HOWARD KEITH YORDY,  )
      in his official and individual )
10    capacities; CORIZON, INC.;     )
      SCOTT ELIASON; MURRAY YOUNG;   )
11    RICHARD CRAIG; RONA SIEGERT;   )
      CATHERINE WHINNERY; and DOES   )
12    1-15,                          )
                                     )
13                    Defendants.    )
      _____ )

14

15

16            **TRANSCRIPT OF PROCEEDINGS - VOLUME 3**
           **BEFORE THE HONORABLE B. LYNN WINMILL**
17          **FRIDAY, OCTOBER 12, 2018, 8:37 A.M.**
                      **BOISE, IDAHO**

18

19

20

21

22    Proceedings recorded by mechanical stenography, transcript
      produced by computer.

23    _____

24            **TAMARA I. HOHENLEITNER, CSR 619, CRR**
                FEDERAL OFFICIAL COURT REPORTER
25         550 WEST FORT STREET, BOISE, IDAHO  83724

**FOR PLAINTIFF**

      Lori Rifkin
      HADSELL STORMER & RENICK LLP
      4300 Horton Street, #15
      Emeryville, CA 94608

      Amy Whelan
      NATIONAL CENTER FOR LESBIAN RIGHTS
      870 Market Street, Suite 370
      San Francisco, CA 94102

      Shaleen Shanbhag
      HADSELL STORMER & RENICK LLP
      128 N. Fair Oaks Avenue
      Pasadena, California 91103

      Craig Durham
      Deborah Ferguson
      FERGUSON DURHAM, PLLC
      223 N. 6th Street, Suite 325
      Boise, ID 83702

**FOR DEFENDANTS IDAHO DEPARTMENT OF CORRECTIONS, HENRY ATENCIO, JEFF ZMUDA, HOWARD KEITH YORDY, RICHARD CRAIG, AND RONA SIEGERT**

      Brady J. Hall, Special Deputy Attorney General
      Marisa S. Crecelius
      MOORE ELIA KRAFT & HALL, LLP
      Post Office Box 6756
      Boise, Idaho 83707

**FOR DEFENDANTS CORIZON, INC., SCOTT ELIASON, MURRAY YOUNG, AND CATHERINE WHINNERY**

      Dylan A. Eaton
      J. Kevin West
      PARSONS, BEHLE & LATIMER
      800 W. Main Street, Suite 1300
      Boise, Idaho 83702

**I N D E X**

**OCTOBER 12, 2018 – VOLUME 3**

| Date | Proceeding | Page |
|------|-----------|------|
| 10/12/18 | Hearing – Motion for Preliminary Injunction | 439 |
| | Closing argument by Ms. Rifkin ................. | 674 |
| | Closing argument by Mr. Eaton ................. | 686 |
| | Closing argument by Mr. Hall ................... | 696 |

**D E F E N D A N T S' W I T N E S S E S**

**PAGE**

**JOEL ANDRADE, Ph.D.**
Direct Examination By Mr. Hall......................... 623
Cross-Examination By Ms. Rifkin....................... 644
Redirect Examination By Mr. Hall...................... 660
Recross-Examination By Ms. Rifkin..................... 668

**KEELIN GARVEY, M.D.**
Direct Examination By Mr. Eaton....................... 502
Cross-Examination By Ms. Rifkin....................... 549
Redirect Examination By Mr. Eaton..................... 617
Recross-ExaminationBy Ms. Rifkin...................... 621

**SCOTT ELIASON, M.D.**
Continued Direct Examination By Mr. Eaton............. 449
Cross-Examination By Ms. Shanbhag..................... 457
Examination By The Court.............................. 484
Redirect Examination By Mr. Eaton..................... 490
Recross-Examination By Ms. Shanbhag.................. 497
Further Examination By The Court...................... 498

**J O I N T   E X H I B I T S**

**ADMITTED**                                              **PAGE**

**20**       Presentation entitled "Gender Dysphoria: A
             Comprehensive Approach to Treatment and Policy
             Management", by Mark Fleming, Ph.D., Scott
             Eliason, M.D., Mariann Atwell, Psy.D., Laura
             McKinnon, MA, and Jessica Lee, MSN
             (PBL0399-0474)................................... 473

1          <u>P L A I N T I F F   E X H I B I T S</u>

2   **ADMITTED**                                                    **PAGE**

3   **1029**     Summary of presentation entitled "Tax Dollars
              at Work Treating Inmates with Gender
4             Dysphoria", by Keelin A. Garvey, M.D. and Joel
              Andrade, Ph.D., excerpted from American Academy
5             of Psychiatry and the Law, 48th Annual Meeting,
              dated October 2017............................. 576
6   **1030**     Presentation entitled "Tax Dollars at Work
              Treating Inmates with Gender Dysphoria", by
7             Keelin A. Garvey, M.D. and Joel Andrade, Ph.D.... 565
    **1041**     National Commission on Correctional Health Care
8             Position Statement Re: Transgender,
              Transsexual, and Gender Nonconforming Health
9             Care in Correctional Settings.................... 476

10

11          <u>D E F E N D A N T S '   E X H I B I T S</u>

12  **ADMITTED**                                                    **PAGE**

13  **2010**     Confidential PSI Documents
              (IDOC_T_1-147) Filed under seal.................. 633
14  **2021**     Dr. Joel Andrade CV and Qualifications (Exhibit
              A to IDOC Defendant's Expert Witness
15            Disclosure)...................................... 624
    **2032**     CV of Dr. Garvey, September 2018 (Produced at
16            Garvey Depo)..................................... 503
    **2033**     Byne et al – Report of the APA Task Force on
17            Treatment of GID (Arch Sex Behav (2012) 41:759-
              796; June 27, 2012) (Produced at Garvey Depo).... 620

18

19

20

21

22

23

24

25

P R O C E E D I N G S

October 12, 2018

1   THE CLERK:  The court will now hear Civil Case

17-151, Adree Edmo vs. Corizon, Incorporated, et al., for day

three of a motion for preliminary injunction.

6   THE COURT:  Good morning, Counsel.

7   Before we continue with the examination of Dr. Eliason,

Mr. Severson advised me that there was an issue.  I'm going to

lay out what I understand to be the situation and then have

counsel confirm that I have got it right or wrong, correct me

where I am wrong, and then I'll indicate how we're going to

resolve this.  I don't really want to waste a lot of time

arguing or getting hung up on that.

14   My understanding is the defendants have now chosen not to

call certain witnesses that were previously identified on their

witness list.  The defendants had anticipated -- and that the

defendants are going to rely upon the declarations that were

filed under oath in this proceeding for those same witnesses.

19   The defendant -- the plaintiffs are concerned that there

have been depositions taken of those individuals, and they feel

that the untested affidavits, without being able to impeach

those individuals, really does not give the court a full sense

of what the record is or should be.  And apparently you can't

reach an agreement as to how to resolve it.

25   If I have got it right, you can just confirm; if I have got

1        it wrong, let me know where I have got it wrong.

2              MS. RIFKIN:  Your Honor, that's correct.  We had

3        suggested that, given that defendants are no longer calling

4        certain witnesses that were on their witness list they had

5        intended to call, that we be able to submit written impeachment

6        through submitting their deposition testimony following the

7        hearing.  We could lodge the full original deposition

8        transcripts in the same manner that we discussed yesterday with

9        the court and submit the written excerpts as impeachment

10       testimony, but defendants have declined to agree to that

11       proposal.

12             THE COURT:  All right.  Mr. Hall, Mr. Eaton.

13             MR. HALL:  Your Honor, I mean, in all candor, I

14       haven't had a lot of time to think about this, because it's not

15       something we ever contemplated when we put together our

16       stipulation in June of this year where we agreed that in lieu

17       of, or in addition to, live testimony, parties could submit --

18       all parties could submit declarations.  And the parties would

19       then have time to depose fact nonretained expert witnesses or

20       retained expert witnesses.

21             We filed a lot of declarations because we knew, with this

22       not being a full trial and having only three days, there was no

23       way to possibly get to all of them.  So we submitted those on

24       the record, provided those to plaintiff's counsel in August.

25       And a lot of those, there was no request from the plaintiff to

445

1        take the depositions of those individuals.  They let them lie.

2            They scheduled three depositions of three witnesses we

3        identified as nonretained expert witnesses and fact witnesses,

4        and they decided to take those depositions before we ever

5        included them in our final witness list.

6            My concern right now of allowing them to use the deposition

7        transcript is there was no opportunity or real need at that time

8        to rehabilitate witnesses on the record.  They were not

9        identified as witnesses to be called for sure at the trial at

10       that time -- or the hearing.

11           And they weren't trial depositions.  They were just

12       discovery depositions.  If plaintiffs wanted to rebut the

13       assertions in the declarations, they could have gone about it a

14       different way.  They could have scheduled their depositions

15       earlier after receiving them in August.  They could have filed

16       motions to strike.  They could have filed, you know,

17       contradictory declarations.

18           I just -- I do have a concern about now allowing plaintiffs

19       to submit impeachment testimony by way of a deposition where we

20       have no opportunity to rehabilitate the witness.

21           That's it, Your Honor.

22               THE COURT:  Okay.  Mr. Eaton.

23               MR. EATON:  Your Honor, I don't believe this issue

24       applies to us.

25               THE COURT:  All right.

```
1            MR. EATON:  We don't have any declarations other than

2       our expert who will be on the stand.

3            MS. RIFKIN:  That's not quite true, Your Honor.

4            THE COURT:  Ms. Rifkin, I don't think I need to hear

5       any more.  I'm going to allow the -- here is how we're going to

6       resolve it.

7            The plaintiffs -- or the defendants will be put to their

8       choice to either call the witness live or they submit the

9       affidavit.  If they submit the affidavit, plaintiffs will be

10      allowed to indicate designations from the -- I don't want to

11      read the entire deposition.  Although you can submit it, I'm not

12      going to read it all.  I want you to designate those portions --

13      only those portions that you think are impeaching or otherwise

14      contradictory.

15           And then, Mr. Hall, you'll have a chance to cross-designate

16      any items in the depositions that you think are necessary to

17      provide context for what the witness said in the designation --

18      the excerpts designated by the plaintiffs.

19           That's why I'm giving you the choice.  If you are going to

20      rely upon the affidavit, then you have to accept the fact that

21      there may be some impeachment that's going to occur from the

22      depositions, but you will have the opportunity to provide

23      context but only context by cross-designation of additional

24      excerpts.

25           I want a complete record.  I want to let the parties -- I
```

1    need to know -- I want information, and I'm not going to stand

2    on formality in the, I guess, search for truth.

3        And so, from that point of view, this thing was put

4    together hurriedly for the hearing.  It was not perfect, but I'm

5    going to make it as perfect as I can to make sure both parties

6    have a fair opportunity, the defendant first by being able to

7    choose now.

8        You can call them live, or you can rely upon the

9    declarations.  But if you rely on the declarations, the

10   plaintiffs will have a chance to designate portions of the

11   excerpts that they think are impeaching, with the defendant,

12   IDOC, having the opportunity to cross-designate to ensure that

13   the court has a full context.

14       So I think that's the best way we can approach it.  I can't

15   resolve it any better than that, but that's how we're going to

16   go forward.  All right?

17            MR. HALL:  That's fine, Your Honor.

18            MS. RIFKIN:  Yes, Your Honor.

19            THE COURT:  Mr. Eaton, I believe we had Dr. Eliason on

20   the stand under your examination, as I recall.

21            MR. EATON:  Thank you, Your Honor.

22       I believe there is a dispute as to whether our expert,

23   Dr. Garvey, can sit in here during the testimony.  I was

24   planning to have her in here.  Their experts weren't excluded,

25   and I don't think anyone has been excluded.

1          THE COURT:  Well, generally, I'll allow opposing

2     counsel's expert to be in the room just to avoid delay in

3     having -- so they can know what it is they're being called to

4     rebut.  But your own expert, your other expert, I'm not sure I

5     feel the same rule would apply.

6          But no one has asked to exclude witnesses, anyway, under

7     Rule 615.  So it's all fair game, I guess, until witnesses have

8     been excluded.  Nobody made the motion up to this point in time,

9     and I'm not sure it's fair to do it in the middle of the

10    hearing.

11         I guess my inclination is to let everybody in because

12    nobody has been excluded up to this point.

13         MS. RIFKIN:  Your Honor, we did not have our experts

14    in the courtroom for testimony.  I believe our expert,

15    Dr. Gorton, accidentally came in for the space of a minute.  But

16    we did not have our experts sit in on the testimony.

17         Also, Dr. Eliason testified extensively yesterday, and

18    Dr. Garvey was not in the courtroom.  And so to the extent that

19    Dr. Garvey is in the courtroom now for a portion of his

20    testimony, I think that --

21         THE COURT:  Well, I think under those circumstances,

22    Mr. Eaton -- you know, typically, counsel agree that experts can

23    stay in during the opposing side's expert testimony, but I have

24    never heard anyone argue they should be allowed to do it during

25    their own expert.

449

1           MR. EATON:  Your Honor, I'll defer to the court.  We

2     don't need to take any more time on this.

3           THE COURT:  All right.  No.  Let's -- let's have them

4     stay outside the courtroom.  Okay?

5        All right.  Is Dr. -- oh, you're, here.  Sorry.  You snuck

6     up on me there, although you were there the whole time.  My

7     brain is not connected yet this morning.

8        All right.  With that, I'll remind you, Dr. Eliason, that

9     you are still under oath.

10       Mr. Eaton, you may resume your examination.

11       The one thing I would suggest to all counsel is that we

12    kind of cut to the chase as much as you can.  I think it's

13    always good early in a hearing or trial to take a little more

14    time with the first few witnesses to make sure I have a general

15    sense of what's going on.  I think I have got that.

16       So I think now we should be right and direct to the point

17    both on direct and cross-examination, particularly mindful of

18    the fact that we don't have a lot of time left.

19       So, with that, go ahead and inquire.

20          MR. EATON:  Yes.  I plan to be quick with this

21    witness, Your Honor.

22       Madam Clerk, could we pull up the computer on the far side.

23       Could you zoom in on the top paragraph.

24    SCOTT ELIASON, M.D., DEFENDANTS' WITNESS, PREVIOUSLY SWORN

25                 CONTINUED DIRECT EXAMINATION

450

1    BY MR. EATON:

2    Q.   Dr. Eliason, yesterday we talked about this note.

3         Do you remember that?

4    A.   Yes.

5    Q.   And this note was regarding your original assessment of

6    gender identity disorder?

7    A.   Yes.

8    Q.   Okay.  I just wanted to bring one thing up quickly.

9         Right next to where I put the line, there is a quote,

10   "Actually, a woman," quote, and then there is another sentence.

11        I was just wondering if you could tell us what Ms. Edmo

12   told you in that regard.

13   A.   After where it says "woman"?

14   Q.   Yes.

15   A.   It says that "He reported only dressing as a female during

16   rare occasions."

17   Q.   Okay.  Thank you.

18        Now, it's been suggested that all of plaintiff's mental

19   illness issues stem from her gender dysphoria, by plaintiffs.

20        When you assessed Ms. Edmo for SRS in 2016 --

21             MS. SHANBHAG:  Objection.  I'd move to strike the

22   testimony by counsel as to the characterization.

23             THE COURT:  Overruled.  I think it's a

24   characterization, frankly, of the questions I have asked the

25   witnesses.

451

1        So go ahead and proceed.

2            MR. EATON:  Thank you.

3    Q.    BY MR. EATON:  Again, it's been suggested by plaintiffs

4    that all of plaintiff's mental health issues stem from her

5    gender dysphoria.

6        When you assessed Ms. Edmo for sex reassignment surgery in

7    April of 2016, did you agree with such a characterization?

8    A.    No.

9    Q.    And why is that?

10   A.    Because Ms. Edmo also had other mental health disorders.

11   Q.    Such as?

12   A.    Major depression and alcohol use disorder.

13   Q.    Okay.  And then I believe yesterday at the end of the day

14   when we left off, you mentioned you appeared by phone for a

15   presentation by Dr. Alviso; is that right?

16   A.    That's right.

17   Q.    Okay.  And who is Dr. Alviso?

18   A.    Dr. Alviso is a local doctor.  I'm not sure if he is a

19   family doctor or an internist, but he works at the Family

20   Medicine Clinic or Family Medicine Residency of Idaho clinic.

21   And he treats a lot of the transgender population in town,

22   mostly prescribing hormones.

23   Q.    Okay.  And is he an employee of Corizon?

24   A.    No.  He is a consultant that Corizon works with sometimes.

25   Q.    Okay.  And do you know when Corizon started working with

452

1    Dr. Alviso?

2    A.   I think it was in the fall of 2016.

3    Q.   Okay.  And then I believe we were talking that you

4    mentioned you were going to set up a committee to further

5    address sex reassignment surgeries, and then you talked about

6    some presentations that you had lined up.

7        Do you remember that testimony?

8    A.   Yes.  Yeah.

9    Q.   Okay.  And then what happened after that with regard to the

10   committee?

11   A.   Yeah.  So it was my idea to form this committee of

12   physicians who could determine this.  And I set up these

13   trainings.  And I had identified multiple physicians.

14       If you pull up the attendance sheet of the Dr. Levine

15   training, I had several physicians that attended that with me.

16       And then the problem is, since that time, they all quit.

17   And, you know, it's a classic correctional medical problem is

18   that retaining staff is really hard to do.  Turnover happens a

19   lot.  But every single one of those physicians that I have

20   identified all left the company, and so my committee evaporated,

21   basically.

22   Q.   And were there some Idaho Department of Correction folks at

23   that presentation?

24   A.   Yes.  Almost everybody who was on the Management and

25   Treatment Committee attended that training.

**ELIASON – Direct**

453

1    Q.   And so was it your understanding that the Management

2    Treatment Committee then would consider SRS?

3    A.   Yes.  From there on, that was a consideration that we did

4    in the committee.

5    Q.   Okay.  And as a Corizon regional psychiatric director, are

6    you familiar with Corizon policies and procedures and practices

7    related to the treatment and care of gender dysphoric inmates?

8    A.   Yes.

9    Q.   Is sex reassignment surgery as a treatment for gender

10   dysphoria prohibited by Corizon?

11   A.   Absolutely not.

12   Q.   What treatment options are available for treating a gender

13   dysphoria patient through Corizon?

14   A.   All -- all treatment options that are seen as medically

15   necessary.

16   Q.   And what would that include?

17   A.   So it would include -- I mean, it's not limited to this,

18   but it would include psychotherapy, hormone treatment, surgical

19   procedures.

20   Q.   Okay.  And are there any Corizon written policies or

21   procedures regarding sex reassignment surgery?

22   A.   No.

23   Q.   And if there are no policies and procedures, then what's

24   the practice related to sex reassignment assessments?

25   A.   It's really left to the clinical judgment of the providers.

**ELIASON - Direct**

454

1   Q.   And do you follow the Idaho Department of Corrections

2   standard operating procedure as well Corizon?

3   A.   Yes.

4   Q.   There has been some discussion regarding the gender

5   dysphoria Management Treatment Committee at Idaho Department of

6   Corrections.

7        Did the Management Treatment Committee ever deny anything

8   you deemed medically necessary?

9   A.   I can't -- I can't think of a single incidence.

10  Q.   Okay.  And further, is it your understanding that sex

11  reassignment surgery --

12  A.   Well, let me -- let me answer that last question in a

13  different way.

14       I mean, there may have been times when a committee member

15  of some sort disagreed, and then the committee would discuss

16  things.  But it was never something where somebody didn't either

17  change their mind because of input from the committee.  And that

18  was the same case with me.

19       So I never felt like, after discussing something, I felt

20  like it was still medically necessary and they denied it.

21  Q.   Fair enough.

22       And is it your understanding that sex reassignment surgery

23  would be available to a patient in the Idaho Department of

24  Corrections' custody if you recommended it was medically

25  necessary?

ELIASON - Direct

455

1    A.    Yes.

2    Q.    And what's that understanding based on?

3    A.    Well, I have had that specific conversation several times

4    with the department where if we felt it was medically necessary,

5    you know, would it be provided.  And the answer was yes.

6         And I've had a long relationship with the Idaho Department

7    of Corrections, and I have worked with the department of

8    corrections in other states, too.

9         And what has always been remarkable to me about Idaho is

10   the care that they provide for the people that they house in

11   their prisons.  And I think that they are highly professional.

12   And I think if a provider came to them and thought something was

13   medically necessary, they would follow that advice.

14             MR. EATON:  I don't want to preempt the court,

15   Your Honor, but I believe you were asking the witness a question

16   the other day, and so I was going to pose that to the witness.

17   Q.    BY MR. EATON:  And I believe that question, if I understood

18   it correctly, was:  What would you change to WPATH to make it

19   work in a correctional setting?  Do you have some thoughts on

20   that?

21   A.    I do have some thoughts.  I'll try to keep them concise.

22        I think even in WPATH, it does allow for flexibility in

23   different housing situations.  And so I think you need to apply

24   that flexibility to their standards.

25        And the first thing I would look at is they have a

1       real-life -- a 12-month real-life test of living as your chosen

2       gender identity.  And that's, I think, a really crucial step;

3       and I think that prison is not the optimal place for that step.

4            And so there would need to be some sort of prolonged period

5       of incarceration where it had to be really long to say that

6       we're going to do this real-life test in prison.  And I don't --

7       I don't have a real number to give you, but I would imagine it

8       would be longer than five years.

9            And it also -- it would need to allow for the level of

10      cooperation with mental and medical staff.  Because if the

11      patient is always at odds with medical and mental health staff,

12      frequently engaging in self-harm, frequently getting

13      disciplinary write-ups and things like this, then they wouldn't

14      be a good candidate to go through such a stressful procedure.

15           You know, getting the procedure, there is a lot of medical

16      follow-ups, a lot of bad outcomes that can happen.  And you need

17      to have that cooperation to work through those.  And if you

18      don't have that, I think that that -- the level of

19      cooperativeness would have to be another criteria that would be

20      in there.

21           And I think those two would really help.

22           And then, lastly, one glaring problem that we have is there

23      is just no clinical evidence that sex reassignment surgery in

24      the inmate population is a safe and effective treatment.

25           You know, in the United States, I think we have had one --

457

1     a case of one person who has had a sex reassignment surgery as

2     an inmate.  And I think this is kind of a unique population that

3     needs to be studied more before we really can say whether it's

4     safe and effective.

5              MR. EATON:  Thank you.  No further questions.

6              THE COURT:  Mr. Hall, do you have any?

7              MR. HALL:  No, Your Honor.

8              THE COURT:  Ms. Shanbhag.

9              MR. EATON:  Madam Clerk, could we take this down.

10    Thank you.

11                         CROSS-EXAMINATION

12    BY MS. SHANBHAG:

13    Q.   Good morning, Dr. Eliason.

14    A.   Good morning.

15    Q.   I would like to begin with your April 20, 2016, assessment

16    of Ms. Edmo's request for surgery.

17             Can we pull up Joint Exhibit 1-538.  I think we are having

18    a little -- Exhibit 1, page 538.  Thank you.

19             And you testified yesterday that when you met with Ms. Edmo

20    on April 20, 2016, that you knew she had attempted to cut off

21    her testicles in September of 2015; is that correct?

22    A.   I don't think I worded it that way, but I did know -- like

23    if you see in the note, it says -- in the middle of that top

24    paragraph, it cites that she made attempts to mutilate her

25    genitals this past fall.

ELIASON - Cross

458

1    Q.   Right.  And at your deposition, you testified that you had

2    seen Ms. Edmo not long after this self-castration attempt;

3    correct?

4    A.   In my deposition, I said that I -- say that one more time.

5    Q.   At your deposition, you testified that you had seen

6    Ms. Edmo not long after she attempted to castrate her testicles.

7    A.   You know, I don't -- I don't remember how soon after I saw

8    her.

9    Q.   That's fine.  We discussed a January 2016 visit.

10   A.   Okay.

11   Q.   And during that visit, she reported to you that it was

12   difficult to stop her mind from thinking at night because she

13   had thoughts about castration; correct?  Do you remember that?

14   A.   Do you have -- do you have that note?

15   Q.   I can show you the deposition testimony.

16   A.   Yeah.  That would be helpful.

17           MS. SHANBHAG:  Your Honor, we only have a certified

18   copy for the court, but this deposition was taken over 30 days

19   ago, and I don't believe we received any corrections.

20           MR. EATON:  Your Honor, I object.  I don't think this

21   is proper impeachment at this point.

22           THE COURT:  Well, the witness is just asking to have

23   his memory refreshed as to what --

24           MR. EATON:  With the document?

25           THE COURT:  Ell, I think what we should do is ask him

1    whether that's his current recollection.  If he -- if he says

2    something contrary to the deposition, then you can show him the

3    deposition.

4        So rather than ask him about what he testified to, let's

5    ask him what his current memory is, and we'll proceed from

6    there.

7    Q.   BY MS. SHANBHAG:  Do you remember Ms. Edmo reporting to you

8    that it was difficult to stop her mind from thinking at night

9    because she had thoughts about castration?

10   A.   I don't remember that off the top of my head.

11              THE COURT:  What was the date of that interaction?

12              MS. SHANBHAG:  January 27, 2016, I believe.

13              THE WITNESS:  But we have that note.

14              THE COURT:  You're talking about the medical note?

15              THE WITNESS:  Yeah.  Because if the medical note says

16   that, then it would refresh my memory.

17   Q.   BY MS. SHANBHAG:  Right.  I'm asking about what you

18   testified to.

19   A.   Oh, in the deposition?

20   Q.   Yes.

21   A.   I can't remember.  I mean, it was a nine-hour deposition,

22   so...

23              MS. SHANBHAG:  May I approach, Your Honor?

24              THE COURT:  Yeah.

25        Mr. Severson?

460

1    Q.   BY MS. SHANBHAG:  This is the cover of your deposition

2    transcript; correct?

3    A.   Correct.

4    Q.   And can we go to page 104, please.

5    A.   Yes.  Okay.  I'm there.

6    Q.   I would like to direct you to line 12.

7    A.   Okay.  Line 12?  Is that what you said?

8    Q.   Yes.

9    A.   Okay.

10   Q.   Do you mind if I read it to you?

11   A.   Sure.

12   Q.   Question:  "And is there a reason you didn't see her until

13   January of 2016?"

14        Answer:  "Well, it sounds like she wasn't in.  From my

15   note, it says the inmate reported she had been in Unit 8, which

16   is a different unit, and so there is a different provider

17   there."

18        Question:  "And she also -- or you wrote that she noted it

19   is difficult to stop her mind from thinking at night and, quote,

20   'I just have all these thoughts about castrating myself,' end

21   quote; correct?"

22        Answer:  "Yes."

23        Do you remember this discussion with Ms. Edmo now?

24   A.   Yes.

25   Q.   And in response to Ms. Edmo's report --

**ELIASON - Cross**

461

1          MR. EATON:  Your Honor, I'm going to object to

2     foundation.  I'm not sure I understand where we're going here.

3          THE COURT:  Well, I don't -- I think we are

4     back -- it's really not impeaching.  We are just putting in the

5     deposition testimony because the witness has never had an

6     opportunity to say something contrary to what was in the

7     deposition.

8          So I think the better approach is to just go through the

9     same line of inquiry.  And if the witness gives you a contrary

10    response from what he provided during the deposition, then it's

11    proper to impeach.

12         So I think, in this instance, simply doing the same thing,

13    showing him the treatment notes and then asking him the same

14    questions, would be the proper way to proceed.

15         So I don't -- I'll sustain the objection.  I don't think

16    this is a proper form of impeachment.

17         Let's go ahead and proceed.

18    Q.   BY MS. SHANBHAG:  And in response to Ms. Edmo's reports

19    that she -- it was difficult to stop thinking about

20    self-castration at night, you prescribed her medication to help

21    her sleep; is that correct?

22    A.   Yes.

23    Q.   And that prescription was Remeron; right?

24    A.   Correct.

25    Q.   I would like to go back to the April 20, 2016, note.

462

1          THE COURT:  Is this part of Exhibit 1?

2          MS. SHANBHAG:  Exhibit 1, page 538, yes.

3     Q.   BY MS. SHANBHAG:  You testified yesterday that there were

4     two bases for your conclusion that Ms. Edmo did not meet medical

5     necessity for surgery.

6          Do you remember that?

7     A.   Yes.

8     Q.   And the first basis you stated was that her mental health

9     concerns were not controlled; correct?

10    A.   Yes, correct.

11    Q.   And I'm looking at your progress note dated April 20, 2016.

12    And nowhere in this note do you cite mental health concerns as a

13    basis for denying Ms. Edmo's surgery; correct?

14    A.   Correct.

15    Q.   In fact, at your deposition just two months ago, you

16    testified that you could not remember if your decision to deny

17    Ms. Edmo's surgery was based upon her mental health stability;

18    right?

19    A.   I guess I can't remember, but -- I don't remember.

20    Q.   But yesterday you said for the very first time that your

21    decision to deny Ms. Edmo's surgery was because of uncontrolled

22    mental health concerns; correct?

23    A.   I did say that was one of the two reasons.

24    Q.   And you also testified yesterday that the second basis for

25    denying Ms. Edmo's surgery was your belief that she did not meet

**ELIASON – Cross**

463

1    the criterion regarding 12 continuous months of living in a

2    gender role congruent with a gender identity; correct?

3    A.   Yes, in a way.

4    Q.   Again looking at the April 20, 2016, note, nowhere in this

5    note do you cite her failure to live in a congruent gender role

6    as a basis for denying her surgery; correct?

7    A.   Correct.

8    Q.   And at your deposition, you did not mention this reason at

9    all; correct?

10   A.   I don't remember.

11   Q.   In fact, you admitted yesterday that Ms. Edmo presented as

12   feminine in demeanor and interaction style when you first met

13   with her in June 2012; right?

14   A.   Yes.  Correct.

15   Q.   And I would like to now show Joint Exhibit 1-347.

16        This is one of your progress notes dated April 10, 2013; am

17   I right?

18   A.   Yes.  Correct.

19   Q.   And in this note, in the second part, you note that

20   Ms. Edmo has groomed eyebrows and appears feminine in demeanor

21   and interaction style; right?

22   A.   Correct.

23   Q.   I would like to show another progress note, Exhibit 1,

24   page 425.

25        And this is a progress note dated April 9, 2014; correct?

1    A.   Correct.

2    Q.   And in this note, you also write that Ms. Edmo had groomed

3    eyebrows and appears feminine in demeanor and interaction style;

4    correct?

5    A.   Correct.

6    Q.   I would like to show Joint Exhibit 1, page 452, please.

7         And this is a progress note dated January 28, 2015;

8    correct?

9    A.   Correct.

10   Q.   And in this note, you again note that Ms. Edmo had groomed

11   eyebrows and appears feminine in demeanor and interaction style;

12   right?

13   A.   That is correct.

14   Q.   And if we could go back to the April 20, 2016 note which is

15   page 1 -- Exhibit 1-538.

16        You testified yesterday that on April 20, the date you

17   assessed Ms. Edmo for surgery, you documented that her eyebrows

18   were colored in with black pencil, she was wearing foundation

19   and, again, appeared feminine in demeanor and interaction style;

20   correct?

21   A.   Correct.

22   Q.   And you were also aware that Ms. Edmo had been disciplined

23   multiple times for looking too feminine; correct?

24   A.   I was aware that that's what Ms. Edmo told me.

25   Q.   So is it your opinion that now, two-and-a-half years after

**ELIASON - Cross**

465

1   you had documented Ms. Edmo appearing and acting in a feminine

2   demeanor, that she has met the criteria regarding 12 continuous

3   months of living in a gender role congruent with a gender

4   identity?

5   A.   I still --

6   Q.   That's a yes-or-no answer, please.

7        MR. EATON:  I ask that he be able to answer the

8   question, Your Honor.

9        THE COURT:  Well, is it your opinion or not?

10       THE WITNESS:  It's -- I can't really give a yes or no

11  because I disagree with the criteria in general the way it's

12  kind of presented; right?  That's the problem, is that I --

13       MR. EATON:  I object to foundation and also --

14       THE WITNESS:  I could explain how --

15       THE COURT:  No.  No.

16       MS. SHANBHAG:  I would move to strike counsel's

17  comments.

18       THE COURT:  What's the objection?

19       MR. EATON:  It misstatements testimony, and it also

20  lacks foundation.

21       THE COURT:  Are you objecting to the question --

22       MR. EATON:  Yes.

23       THE COURT:  -- or the continuing response?

24       MR. EATON:  No.  The question.

25       THE COURT:  Overruled.  You know, again, my sense is

466

1    you would acknowledge that, construed according to the actual

2    WPATH standards, she was living for at least 12 months or

3    attempting to live for at least 12 months as a woman.

4        Your disagreement is that it's not 12 months in the real

5    world.  And that's the point you're making?

6              THE WITNESS:  That's exactly it, yes.

7              THE COURT:  All right.  Go ahead, Counsel.

8              THE WITNESS:  That's it.

9    Q.   BY MS. SHANBHAG:  And during your deposition, you did

10   testify that an individual could meet the WPATH criteria even

11   though that person is incarcerated; correct?

12   A.   Correct.

13             THE COURT:  And as I understand your testimony, it is,

14   for example, someone who is incarcerated for 20 years with no

15   opportunity for parole or a fixed life sentence, that's their

16   real world at that point.

17       But where someone is parole eligible within a number of

18   years, you're saying it's simply not appropriate to do it

19   because they will live in a different world within a number of

20   years; and, therefore, the standard -- WPATH standards need to

21   take that into account?

22             THE WITNESS:  Exactly.

23             THE COURT:  Counsel, I'm just -- you know, I get a

24   pretty clear sense of what the testimony is.  And we can object

25   to foundation, and we can ask questions all we want, but I need

1       to know what the witness is saying.

2               That's my understanding of what he has already testified

3       to.  So go ahead.  I'm trying to help counsel out here.

4               MS. SHANBHAG:  Thank you, Your Honor.

5       Q.   BY MS. SHANBHAG:  And you testified yesterday that you

6       denied Ms. Edmo's request for surgery in part because you noted

7       she was eligible for parole as of April 20, 2016; is that

8       correct?

9       A.   That is correct.

10              MR. EATON:  Sorry to keep objecting, Your Honor.  But

11      the use of the word "deny" I take exception to.  There is

12      nothing -- there is no specific deny --

13              THE COURT:  I'm going to overrule the objection.  If

14      you feel you never denied it, then you can so indicate.

15              So go ahead.  Restate the question, though, if you would,

16      Ms. Shanbhag.

17      Q.   BY MS. SHANBHAG:  You testified yesterday that you found

18      Ms. Edmo's -- Ms. Edmo did not meet medical necessity for

19      surgery, in part because she was eligible for parole as of

20      April 20, 2016; correct?

21      A.   Correct.

22      Q.   But you did not reevaluate Ms. Edmo for surgery after she

23      was no longer eligible for parole, did you?

24      A.   I didn't.

25      Q.   And at your deposition, you testified that your

1    determination that surgery was not medically necessary was not

2    based on any of Ms. Edmo's prior criminal record; right?

3    A.   Could you say that again.

4    Q.   Sure.  Your determination that surgery was not medically

5    necessary for Ms. Edmo was not based on her prior criminal

6    record?

7    A.   Correct.

8    Q.   And you also testified that your determination that surgery

9    was not medically necessary was not based on her disciplinary

10   history or DORs; correct?

11   A.   I -- at my deposition, what did I testify about?

12   Q.   That you did not base your decision on Ms. Edmo's

13   disciplinary history.

14   A.   Correct.

15   Q.   And you also testified that your determination that surgery

16   was not medically necessary, it was not based on a review of her

17   presentence investigation reports; correct?

18   A.   Correct.

19   Q.   But you did testify that information you relied upon in

20   reaching your decision was the medical record, staff

21   observations, Ms. Edmo's therapist, and her therapist's notes;

22   correct?

23            MR. EATON:  Objection.  Misstates testimony.

24            THE COURT:  Just a moment.  Just a moment.

25       Did you testify that way or not?  If you disagree, you can

469

1    so indicate.

2              THE WITNESS:  And some other things, but those things

3    were included as well.

4              MS. SHANBHAG:  Your Honor, I would like to use

5    Dr. Eliason's deposition testimony.

6              THE COURT:  All right.  Do we have -- do you have

7    that?  All right.  So you can show --

8              MS. SHANBHAG:  Can we go to page 113, please.

9              THE COURT:  Counsel, for the record, again, we are not

10   doing this in the normal course, but I'm publishing the

11   deposition of Dr. Eliason.  I'm assuming you either have or will

12   submit the final sealed copy to the court.

13             MS. SHANBHAG:  Yes, Your Honor.

14   Q.   BY MS. SHANBHAG:  Referring to line 6, page 113.

15   A.   Okay.

16   Q.   Question:  "And you also mentioned obtaining collateral

17   sources of information as another factor in determining whether

18   a patient needs sex reassignment surgery.

19        "What collateral sources of information did you rely upon

20   here?"

21        Answer:  "I relied upon the previous medical record, staff

22   observations, her therapist, and their notes.  And that's it."

23   A.   Okay.

24   Q.   Is that accurate?

25   A.   Yes, that is accurate.

470

1    Q.   And, Dr. Eliason, you also testified at your deposition

2    that gender dysphoria and depression can be related; correct?

3    A.   Yes.

4    Q.   And you have never diagnosed Ms. Edmo with borderline

5    personality disorder; right?

6    A.   Correct.

7    Q.   You have also never diagnosed her with PTSD; correct?

8    A.   Correct.

9    Q.   Can we pull up Joint Exhibit 1, page 538 again.

10        Yesterday you testified about the three specific situations

11   that you believed could meet medical necessity; correct?

12   A.   Correct.

13   Q.   And in this note here in the assessment portion, you

14   concluded that this inmate does not meet any of those above

15   criteria; right?

16   A.   I don't see where I said that.

17        Okay.  There we go.  Yes.

18   Q.   These three examples of what you call medical necessity are

19   not the WPATH criteria for surgery; correct?

20   A.   Correct.

21        One of them is very similar --

22   Q.   I just asked for a --

23   A.   Sorry.  Correct.

24   Q.   And in fact, you testified at your deposition that you

25   don't know where you got these three examples of medical

1    necessity from; correct?

2    A.   Correct.

3    Q.   And you did agree at your deposition that attempted

4    self-castration could meet your own example of medical

5    necessity; correct?

6    A.   Correct.

7    Q.   You also testified that you believed Ms. Edmo's gender

8    dysphoria had risen to another level when you assessed her for

9    surgery; correct?

10   A.   Correct.

11   Q.   But you made no change to Ms. Edmo's current treatment plan

12   at this visit; correct?

13   A.   At this visit, I was -- correct.

14   Q.   Can you zoom out a little bit on the note.

15        Your treatment plan for Ms. Edmo on April 20, 2016 -- which

16   is reflected, I believe, in the "P" portion at the bottom; is

17   that right?

18   A.   That is correct.

19   Q.   Your treatment plan was to continue her sleep and

20   antidepressant medications and for her to return to clinic in

21   three months; right?

22   A.   Correct.

23   Q.   And you knew that Ms. Edmo attempted to castrate herself

24   again a few months after you determined surgery was not

25   medically necessary; correct?

1    A.   Correct.

2    Q.   And you have never found gender confirmation surgery

3    medically necessary for any patient diagnosed with gender

4    dysphoria; correct?

5    A.   Correct.

6    Q.   There was some testimony yesterday from you about

7    contacting Dr. Stephen Levine to lead a day-long training for

8    IDOC and Corizon staff; correct?

9    A.   Correct.

10   Q.   And you also testified that you knew Dr. Levine was a

11   defense expert for the Massachusetts Department of Correction;

12   correct?

13   A.   No.

14           MR. EATON:  Objection.

15           THE WITNESS:  That is not correct.

16           THE COURT:  I'm sorry?

17           MR. EATON:  Misstates testimony.

18           THE COURT:  Overruled.  I mean, the question was asked

19   whether that is what he testified to, and he can either confirm

20   or not.

21           THE WITNESS:  Should I answer?

22           THE COURT:  Yes.

23           THE WITNESS:  So not correct.

24   Q.   BY MS. SHANBHAG:  I would like to show Dr. Levine's

25   PowerPoint from the training, Joint Exhibit 17, please.

1          Is this Dr. Levine's PowerPoint from the training that you

2     organized, Dr. Eliason?

3     A.    Yes, I believe so.

4     Q.    Can we please show page 43 of this exhibit.

5          And this is a slide from Dr. Levine's presentation;

6     correct?

7     A.    Correct.

8     Q.    And after organizing and attending Dr. Levine's training,

9     you then presented a training on gender dysphoria with other

10    Corizon health providers; correct?

11    A.    Correct.

12              MS. SHANBHAG:  I would like to show Joint Exhibit 20.

13          And, Your Honor, this is an exhibit that it was not

14    included on the parties' original list.  It's simply a clearer

15    version of Exhibit 18.

16              THE COURT:  I assume there is no objection to using

17    this in lieu of Exhibit 18?

18              MR. EATON:  No, Your Honor.

19              THE COURT:  All right.  Exhibit 20 will be admitted.

20    And I guess we'll keep 18 as part of the record, as well, with

21    the understanding that it's an exact copy of the same exhibit.

22              MS. SHANBHAG:  Thank you, Your Honor.

23          (Joint Exhibit 20 admitted.)

24    Q.    BY MS. SHANBHAG:  And is this the PowerPoint from the

25    training that you presented?

474

1    A.   Yes.

2    Q.   Can we move to page 7, please.

3         Did you present the portion titled "Gender Dysphoria: A

4    Psychiatric Perspective"?

5    A.   Yes.

6    Q.   And that presentation was comprised of seven slides;

7    correct?

8    A.   I don't remember.

9    Q.   And three of your slides were attributed to Dr. Levine;

10    correct?

11    A.   I assume.

12    Q.   But you didn't select all of Dr. Levine's slides for this

13    training, did you?

14    A.   No.  He -- oh, no.

15    Q.   I would like to show one of the slides of Dr. Levine's that

16    you chose.

17         Can you show Exhibit 20, page 28, please.

18         This slide is titled "SRS and Suicidal Threats"; correct?

19    A.   Correct.

20    Q.   And at the bottom or very close to the title, you see

21    Dr. Stephen Levine's name; is that correct?

22    A.   Yes.

23    Q.   So you trained other providers, in looking at the second

24    bullet point, that "SRS is not conceived as lifesaving, as is

25    repairing a potentially leaking aortic aneurysm, but as

1      life-enhancing, as is providing augmentation for women

2      distressed about their small breasts."

3          Is that correct?

4      A.   That's correct.

5      Q.   And this is a direct quote from Dr. Levine's presentation;

6      correct?

7      A.   Correct.

8      Q.   And you never reevaluated Ms. Edmo for surgery after

9      April 20, 2016; correct?

10     A.   Correct.

11     Q.   Even though you testified that you had hoped to

12     reconvene -- or reassess and convene a committee, you never

13     actually reevaluated her; correct?

14     A.    Incorrect.  In person, I never reevaluated her.  But on the

15     Management and Treatment Committee, I did.

16     Q.   Dr. Eliason, you testified at your deposition that you

17     never reevaluated Ms. Edmo for surgery; correct?

18     A.   Well, that is true that I never said --

19     Q.   I'm asking for a yes-or-no answer.

20     A.   True.

21     Q.   Thank you.

22          And you are unaware of any patient in IDOC custody who has

23     been provided gender confirmation surgery; correct?

24     A.   That is correct.

25     Q.   Yesterday you testified that you're a certified

**ELIASON – Cross**

476

 1    correctional healthcare professional through the National

 2    Commission on Correctional Health Care?

 3    A.    Correct.

 4    Q.    Can I call that NCCHC?

 5    A.    Yes.

 6    Q.    And that means you're familiar with NCCHC policies and

 7    recommendations for providing treatment in prison; right?

 8    A.    Yes.

 9    Q.    I would like to show Plaintiff's Exhibit 1041.

10          And this is an NCCHC position statement on Transgender,

11    Transsexual, and Gender Nonconforming Health Care in

12    Correctional Settings; right?

13    A.    Yes.

14    Q.    Are you familiar with this document?

15    A.    Yes.

16          MS. SHANBHAG:  Your Honor, I would like to move to

17    admit Plaintiff's Exhibit 1041 into evidence.

18          THE COURT:  Any objection?

19          MR. EATON:  No objection.

20          THE COURT:  Exhibit 1041 will be admitted.

21    (Plaintiff's Exhibit 1041 admitted.)

22          MS. SHANBHAG:  If we can move to page 2, please.

23    Q.    BY MS. SHANBHAG:  The last sentence under the position

24    statement, that reads:

25          "The National Commission on Correctional" --

ELIASON - Cross

477

1          THE COURT:  Is it possible you could blow that up or

2     call out -- thank you.

3     Q.   BY MS. SHANBHAG:   The last sentence reads:

4              "The National Commission on Correctional Health Care

5              recommends that the following principles guide

6              correctional health professionals in addressing the

7              needs of transgender patients."

8          Right?

9     A.   Correct.

10    Q.   And you're familiar with the principles below?

11    A.   Yes.

12    Q.   And you agree with them; right?

13    A.   Yes.

14    Q.   As a certified correctional healthcare provider under

15    NCCHC, you follow the NCCHC guidelines for treating patients;

16    right?

17    A.   Yes.

18    Q.   I would like to direct you to No. 5 of that page.

19         If we could blow that up, please.

20         No. 5 reads:

21              "The management of medical or surgical transgender

22              care should follow accepted standards developed by

23              professionals with expertise in transgender health."

24              Right?

25    A.   Correct.

1    Q.   Do you see the footnote 1 there after the word "standards"?

2    A.   Yes.

3    Q.   Will you please turn to the last page of the exhibit, which

4    I believe is page 4.  Blow that up on the notes part.

5         Can you read footnote 1, Dr. Eliason.

6    A.   Yes.  It says:

7              "'Standards of Care for the Health of Transsexual,

8              Transgender, and Gender Nonconforming People, Version

9              7,' available from the World Professional Association

10             for Transgender Health."

11   Q.   So these are the WPATH standards of care; correct?

12   A.   Correct.

13   Q.   And this reflects that NCCHC's specific endorsement of the

14   WPATH standards of care as accepted standards developed by

15   professionals with expertise in transgender health; correct?

16             MR. EATON:  Objection.  Foundation.

17             MR. HALL:  Join.

18             MR. EATON:  I don't think there is any testimony that

19   he can speak on behalf of WPATH or NCCHC.

20             MR. SHANBHAG:  Your Honor, I asked if he agreed.

21             THE COURT:  Overruled.  You may answer.

22             THE WITNESS:  Correct.

23   Q.   BY MS. SHANBHAG:  I would like to go to page 3 of this

24   exhibit.  Can we zoom in on No. 16.

25             And this reads:

**ELIASON – Cross**

479

1           "Treatment for genital self-harm or for complications

2           arising from self-treatment should be provided when

3           medically necessary."

4      Right?

5           THE COURT:  This is item No. 16, and we're again on

6      Exhibit 1041?

7           MS. SHANBHAG:  Page 3, yes, Your Honor.

8           THE COURT:  Page 3.  Thank you.

9  Q.   BY MS. SHANBHAG:  And this No. 16 discusses genital

10     self-harm arising from self-treatment; correct?

11 A.   Correct.

12 Q.   So this document recognizes that patients with gender

13     dysphoria may attempt self-treatment by trying to remove their

14     genitals; correct?

15 A.   Correct.

16 Q.   So the NCCHC recognizes that patients with gender dysphoria

17     may engage in genital self-harm in attempt to self-treat;

18     correct?

19          MR. EATON:  Objection.  Foundation.  It hasn't been

20     established that he speaks on behalf of the NCCHC.

21          THE COURT:  Well, he said that he is a member.  If you

22     feel that -- you can indicate whether you think they have

23     indicated as much or not.

24          The objection is overruled.

25          THE WITNESS:  That's correct.

**ELIASON – Cross**

480

1    Q.   BY MS. SHANBHAG:  And as a certified provider for NCCHC,

2    you're not aware whether the NCCHC has adopted the extra

3    criteria for medical necessity advocated by people such as

4    Osborne and Lawrence; correct?

5    A.   That's incorrect.  They have -- in the lectures that you

6    attend at NCCHC, they do go into detail specifically talking

7    about the flexibility of the criteria.

8    Q.   I'm asking if they have adopted the specific criteria for

9    medical necessity.

10   A.   Can you rephrase that one more time?

11   Q.   Sure.

12        Has the NCCHC adopted the criteria proposed by Osborne and

13   Lawrence?

14   A.   I would say --

15   Q.   Yes or no.

16   A.   No.  No.

17        THE COURT:  Could you bring that up again, item 16 on

18   that page.  Thank you.

19   Q.   BY MS. SHANBHAG:  You testified earlier about your proposed

20   new criteria for evaluating gender confirmation surgery;

21   correct?

22   A.   Correct.

23   Q.   Have you ever proposed these criteria in any publication?

24   A.   No.  Honestly --

25   Q.   Just yes or no.

ELIASON - Cross

481

1    A.   No.  No.

2    Q.   Have you ever proposed your new criteria in any peer-review

3    context?

4    A.   No.

5    Q.   And you have never published anything regarding gender

6    dysphoria; correct?

7    A.   Correct.

8    Q.   And Mr. Eaton mentioned Corizon policy regarding gender

9    dysphoria earlier.

10       And you are aware of a Corizon guideline document regarding

11   gender dysphoria; correct?

12   A.   I'm not sure which one you're talking about.

13            MR. EATON:  Your Honor, I just -- objection to the

14   extent we're getting into a document that has been sealed.  I'm

15   concerned that the clinical pathways is where we're going here,

16   and I have concern about discussing that in detail.  I don't

17   mind it being mentioned.

18            THE COURT:  Well, I can't preclude counsel -- even if

19   it's been sealed, I can't preclude counsel from examining a

20   witness about it.  I can clear the courtroom.  That's the only

21   thing I can do.

22       In sealing documents, I didn't mean that they would be

23   precluded from the court's consideration or for examination but

24   only that they would not be available for general dissemination

25   or available to the public.

1      So I can't -- if we're going to get into it, we will need

2   to clear the courtroom.

3          MS. SHANBHAG:  Your Honor, I will be very vague.  I

4   will not get into the specifics.

5          THE COURT:  Go ahead.

6   Q.   BY MS. SHANBHAG:  And this guideline document regarding

7   gender dysphoria does not mention gender confirmation surgery;

8   correct?

9   A.   I'm not sure.

10          MS. SHANBHAG:  Your Honor, I would like to show the

11   document now, so if we could clear the courtroom.

12          THE COURT:  If you are just showing it, I can turn off

13   this projector.  How much are you going to -- I mean, are you

14   going to --

15          MR. EATON:  Your Honor, I don't think -- if she is

16   just going to show it to the witness, I have no objection if

17   nobody else is going to see it at this point.

18          THE COURT:  All right.  The projector is off, so you

19   can go ahead and put it on for just the witness.

20          MS. SHANBHAG:  One second, Your Honor.

21      Your Honor, may we give the witness the exhibit directly?

22          THE COURT:  Yes.

23   Q.   BY MS. SHANBHAG:  Dr. Eliason?

24   A.   Yes.

25   Q.   You're looking at Joint Exhibit 14; is that correct?

483

1    A.   That is correct.

2    Q.   And this document regarding gender dysphoria, it's a

3    Corizon guideline document; correct?

4    A.   Yes.

5    Q.   And this document does not mention gender confirmation

6    surgery at all; correct?

7    A.   I would have to review it.

8    Q.   Please review it.

9    A.   That is correct.

10   Q.   And do you agree that individuals with gender dysphoria

11   should have access to all necessary types of treatment

12   regardless of whether they are incarcerated; correct?

13   A.   Yes.

14   Q.   And that one type of treatment for individuals with gender

15   dysphoria is gender confirmation surgery; correct?

16   A.   Correct.

17            MS. SHANBHAG:  No further questions.

18            THE COURT:  Can you put that up on the screen?  The

19   jury can't -- do you have it where -- I mean, I guess I have it

20   here.  I can look at it.  Give me a moment.  I may --

21            MS. SHANBHAG:  One minute, Your Honor.  I can publish

22   it.

23            THE COURT:  Well, that's all right.  It's 14,

24   Exhibit 14?

25            MS. SHANBHAG:  Yes.  Yes, Joint Exhibit 14.

1          THE COURT:  And just from the page --

2          MS. SHANBHAG:  It's a two-page document, I believe.

3          THE COURT:  All right.  Let me look at it.

4      The question asked was that gender confirmation surgery was

5   not listed as a treatment option?

6          MS. SHANBHAG:  Correct.

7          MS. RIFKIN:  Your Honor, we can put it up now so that

8   it appears on the screen.

9          THE COURT:  I have got it on the screen here.

10     Okay.  All right.  You're done with your cross?

11         MS. SHANBHAG:  Yes.

12         THE COURT:  I'm going to ask a few questions.  I try

13  to do it -- I sometimes do it at the right time, but this will

14  give both sides a chance on redirect and recross to follow up.

15  And some of these have been covered on cross, and so let me --

16                       EXAMINATION

17  BY THE COURT:

18  Q.    In the -- I have that exhibit number.  I want to say Joint

19  Exhibit 1.

20     On Exhibit No. 1, page 538, you list those three

21  circumstances in which gender confirmation surgery would appear

22  to be justified; at least I think that's what it said.

23     Have I got that right?

24  A.    Yeah.  Well, what I was trying to do is list some examples.

25  Q.    Examples?

1    A.   Yeah.

2    Q.   All right.  The second one was you referred to a severe and

3    devastating gender dysphoria primarily due to genitals.

4         I assume -- again, obviously, I'm not no psychologist or

5    psychiatrist, but I'm assuming that gender dysphoria comes in

6    different forms, and at least form is where one has a strong

7    concern for their genitalia and views it as kind of the enemy of

8    sorts?

9    A.   Yes.

10   Q.   That lends itself or results in self-castration attempts.

11        Is that what you were referring to?

12   A.   Yes.  That and just like the pervasiveness of it, you know,

13   where it's just constantly on the mind.

14        In gender dysphoria, oftentimes other interventions take

15   away the dysphoria, such as taking a female haircut or dressing

16   as a female or being called a female name.  A lot of times, that

17   decreases the dysphoria to a level where it's sustainable.

18   Q.   Does it also reduce the focus on genitalia?

19   A.   So sometimes the focus isn't as extreme, you know.  And so

20   anytime you make those gender-affirming moves, sometimes that

21   takes away that pain from the genital focus or --

22   Q.   So is the thought -- the recent change in policy last

23   Friday, was the thought that that might reduce the pain, as you

24   refer to it, and, therefore, perhaps make gender confirmation

25   surgery unnecessary?

486

1           MR. HALL:  Objection.  Foundation.  It doesn't speak

2    for IDOC policy.

3           THE COURT:  Well, good point, good point.  All right.

4    I'll not ask that question.

5    Q.   BY THE COURT:  Well, then, just -- you know, my real

6    question was:  What keeps the plaintiff from falling within that

7    description, that example you gave of when gender conforming

8    surgery would be --

9    A.   I do think that that one, No. 2, is where the plaintiff,

10   Ms. Edmo, does primarily meet that criteria.  But then, like,

11   when you focus on that, then you have to look at the details.

12   And that's where I believe that doing it on the outside would

13   best suit Ms. Edmo.

14   Q.   Okay.  So, well, that kind of leads me to another question

15   I had.

16          You indicated that there was the need to have an inmate

17   living 12 months as a -- in a gender-conforming role or a

18   gender -- I'm not sure I'm going to get hung up in the

19   terminology here -- but living as a woman in Ms. Edmo's case in

20   a real-life setting, not in an incarcerated setting.  But, of

21   course, that would change if there is long-term incarceration.

22          Now, but does that dynamic or that calculation change when

23   the inmate engages in dangerous behavior while incarcerated,

24   such as self-castration or suicidal ideation?

25   A.   I think it could.

487

1      Q.    Okay.  But it didn't in Ms. Edmo's case?

2      A.    Yeah.  In this specific case, I didn't think that it did.

3            The self-castration and those incidences, primarily

4      Ms. Edmo's cases usually happened when Ms. Edmo was going

5      through stress from other reasons; like she was getting a

6      disciplinary infraction and gets sent to Unit 8.  And then while

7      there and in a state of being upset, she would engage in this

8      self-harm.

9            And if you look past through her history, she has these

10     different episodes of cutting and suicide attempts, which were

11     her ways to deal with stress.

12     Q.    Okay.  A prison, particularly for a transgender individual,

13     is going to be a very stressful environment?

14     A.    True; yes.

15     Q.    That's going to be true today, yesterday, tomorrow, and as

16     long as they are incarcerated?

17     A.    Yes.

18     Q.    Do you agree?

19     A.    Totally.

20     Q.    Okay.  The last and I think I asked -- I think it was

21     Dr. Ettner -- I'm not sure who all I asked this question of.

22     But one of the challenges is that the defendant clearly has

23     gender dysphoria -- I don't think anyone is disputing that --

24     and then there are a number of other mental health concerns.

25     The ones that are pretty clearly recognized would be depression

1    and anxiety, perhaps substance abuse, which may be a form of

2    self-medication.

3         But there is no way to tell whether those are a function

4    of -- kind of manifestations of -- what's the word -- gender

5    dysphoria impacting her in adverse ways, or is there?

6    A.   No.  You know, I mean, I honestly think it's disingenuous

7    to say you know specifically where painful symptoms come from,

8    because oftentimes we don't know why we're upset ourselves.

9    Q.   But -- okay.  I guess my concern is whether or not the

10   requirement -- I think it was the fourth requirement under the

11   WPATH standards -- if, indeed, the mental health concerns are

12   either caused or seriously exacerbated by gender dysphoria, that

13   kind of creates a classic catch-22.  She is in need of

14   something, but she can only have it by not being in need of it,

15   which is the catch-22.

16   A.   Yeah.  It is a little bit of a --

17   Q.   How do you get out of that?  As a clinician, what's the way

18   you address that?

19   A.   You know, it's a challenging thing that we deal with a lot

20   as mental health professionals.  Because, you know, you want to

21   try to help them through these different impulses, but

22   oftentimes the thing that they want is the thing that will end

23   up actually maybe being harmful to them.

24        I mean, this is the hardest part of my job, really, is that

25   patients oftentimes want something now that I know in the long

1        run is not a good idea for them.

2               For example, they want to get into the hospital; they want

3        to get sedative medications; they want things that really would

4        help their immediate pain right now, it would make it feel

5        better right now.  But in the long run, I know these things are

6        going to be bad for them.

7               So I have to advocate and try to help the patient not do

8        that thing because I know that in the long run, it won't be good

9        for them.

10              And like in Ms. Edmo's case, I feel like Ms. Edmo really

11       wants to have the gender reaffirming surgery right now, but I

12       feel like that would be doing her a disservice.

13       Q.   Okay.  And I -- a lot of questions about how many inmates

14       have been treated with gender confirmation surgery.  My

15       understanding is there has been one in the state of California.

16              Does Corizon provide that contract for the State of

17       California?

18       A.   No.  At least I don't think Corizon has any prison

19       contracts in California.

20       Q.   So there are no inmates in any facility in which Corizon is

21       providing healthcare in which gender confirmation surgery has

22       been selected as a treatment option?

23       A.   Yeah.  I would be fairly confident in saying yes.

24              THE COURT:  All right.  Okay.  Maybe I'll just leave

25       it at that.  All right.  I'm sorry.

490

1          Mr. Eaton, redirect.

2              MR. EATON:  Thank you, Your Honor.

3                    REDIRECT EXAMINATION

4     BY MR. EATON:

5     Q.   You never denied SRS forever for Ms. Edmo; correct?

6     A.   Correct.

7     Q.   All right.  At the time you made your assessment, you

8     indicated it would be continued to be monitored; right?

9     A.   That is correct.

10    Q.   All right.  And is doing SRS, sex reassignment surgery,

11    going to eliminate plaintiff's other mental health issues?

12    A.   No.

13             THE COURT:  Could I -- I'm going to jump in.

14        You're pretty emphatic on that "no."  I asked earlier

15    whether it's possible to sort out what's caused by gender

16    dysphoria, what's not.

17        And you indicated reluctance to be able to say emphatically

18    how you could ever rule that out, but you seem to be ruling it

19    out now.

20        Am I misreading your testimony?

21             THE WITNESS:  No.

22        I think you're reading an important nuance in that there

23    are numerous studies that show that in the transgender

24    population, there is a significant amount of comorbid mental

25    health disorders and that that those comorbid disorders tend to

1    continue and not be cured by the --

2              THE COURT:  Okay.  All right.

3              MR. HALL:  I'm sorry.  By the what?

4              THE WITNESS:  By getting the surgery.

5              MR. HALL:  Thank you.

6    Q.   BY MR. EATON:  And I believe we were talking about

7    Exhibit 14, the clinical pathways for Corizon; right?

8    A.   Yes.

9    Q.   Counsel talked to you about that?

10   A.   Yes.

11   Q.   That's -- those are just guidelines; right?

12   A.   Yes.

13   Q.   Okay.  And they are not mandatory?

14   A.   I think they are meant to be helpful and help guide through

15   specifically the details of the hormone treatments but by no

16   means limits what you can do.

17   Q.   Okay.  So it doesn't preclude SRS surgery?

18   A.   No.

19        You know, I'm in a leadership role with Corizon as a

20   regional psychiatric director, and I'm in meetings with this.

21   And they take this issue very seriously, and I have never once

22   felt that Corizon was trying to guide us away from recommending

23   surgery.

24   Q.   And plaintiff's counsel talked to you about the NCCHC

25   manual or document; right?

492

1    A.   Yes.

2    Q.   And I believe they reference a position statement.

3    A.   Yes.

4    Q.   Is a position statement mandatory guidelines?

5    A.   No.

6    Q.   And that's where it was referencing WPATH; right?

7    A.   Yes.

8    Q.   And NCCHC may reference WPATH, but are these -- but those

9    are guidelines that are flexible; right?

10   A.   Exactly.

11   Q.   Does WPATH have specific guidelines for the correctional

12   setting?

13   A.   Well, it does -- in their standards of care, it does

14   include all different types of housing situations.  So you could

15   say that that includes correctional environments.  But it leaves

16   room for clinical judgment, and it leaves room for flexibility.

17   Q.   And the guidelines, say, for vaginoplasty don't

18   specifically address how to apply those in a correctional

19   setting in the WPATH; right?

20   A.   Yes.

21   Q.   Counsel asked you if you've ever reevaluated plaintiff, and

22   I believe you were trying to elaborate on your answer.  Could do

23   that now.

24   A.   Yes.  So Ms. Edmo did move out of the unit in which I

25   treated, and so I didn't continue to see him, but Ms. Edmo

1    continued to see other providers and then continued to see her

2    therapists, who are on the Management and Treatment Committee,

3    and we reviewed her case at our meetings.

4    Q.   And did Ms. Edmo ever send you a concern form after you

5    assessed her in April of 2016 regarding her reevaluation?

6    A.   No.

7    Q.   Have you ever been asked to do -- by anyone to do a

8    reevaluation of Ms. Edmo?

9    A.   No.

10   Q.   You were asked about your slides with some other presenters

11   where you included some of Dr. Levine's slides.

12   A.   Yes.

13   Q.   Are those adopted -- are the Levine slides and what's in

14   them adopted Corizon policy?

15   A.   No.

16   Q.   And what was your purpose of including those slides?

17   A.   You know, Dr. Levine had some really great talking points.

18   And if you look at that one point where it talks about basically

19   equating gender reassignment surgery to the same thing as

20   getting a breast enhancement, Dr. Levine put that in there as

21   kind of a talking point to get the audience thinking about the

22   differences between these things.

23            MS. SHANBHAG:  Objection.  Lacks foundation.

24            THE COURT:  Just a moment.  I'm sorry?

25            MS. SHANBHAG:  Lacks foundation.  He is testifying as

494

1       to --

2                   THE COURT:  Just a moment.  I'm sorry.

3              Okay.  Sustained.

4              You can't speculate as to what Dr. Levine intended when he

5       put something in or didn't.  You can obviously testify about

6       what he did put in and your take on it but not what Dr. Levine

7       intended.

8                   THE WITNESS:  Gotcha.

9       Q.   BY MR. EATON:  We are talking about your slides, and you

10      incorporated those into your --

11      A.   So I was seeing --

12      Q.   Hold on.  Hold on.

13      A.   Sorry.

14      Q.   And we are talking about your slides and your presentation.

15      And I'm trying to ask why you incorporated those in there and

16      your understanding about those talking points.

17      A.   So I understood that those talking points were meant to be

18      a discussion point and not to equate it as the same as a breast

19      enhancement.

20      Q.   And so that was just to present a -- to get people talking?

21      A.   It was a --

22                  MS. SHANBHAG:  Objection.  Leading.

23                  THE COURT:  Sustained.  Rephrase.

24      Q.   BY MR. EATON:  And so why was it presented as a talking

25      point?

1    A.    To help the audience participate and to understand.

2    Q.    Were you specifically adopting those points?

3    A.    No.

4    Q.    And with respect to Corizon, there were other trainings

5    besides Levine on gender dysphoria and treatment and care;

6    right?

7    A.    Yes.

8    Q.    Such as Dr. Alviso's presentation?

9    A.    Yes.

10   Q.    Does attempted self-castration, in and of itself, qualify

11   you for SRS?

12   A.    No.

13   Q.    You were asked if you had ever diagnosed Ms. Edmo with PTSD

14   or borderline personality disorder.

15         Do you have any thoughts on whether she has borderline

16   personality disorder traits?

17   A.    Yes.  I think that that probably does fit Ms. Edmo very

18   well.

19   Q.    You were asked about your April 2016 note regarding your

20   SRS assessment by counsel, and they indicated that there were

21   some things that weren't in that note.

22         Do you remember that conversation?

23   A.    Okay.  Can you say that again.

24   Q.    I'm talking about your SRS assessment note that counsel was

25   asking you about.

496

1    A.    Uh-huh.  Okay.

2    Q.    And I believe they indicated that your specific mention of

3    mental health concerns that you had as why she may not

4    qualify -- one of the reasons that she may not qualify for SRS

5    was not in that note?

6    A.    Yes.

7    Q.    Okay.  But you do, in that note, document her other mental

8    health conditions, including major depressive disorder; right?

9    A.    Yes.

10   Q.    And as to the living 12 months as a female criteria, you

11   testified in your deposition that you talked over that with

12   Ms. Edmo, didn't you?

13   A.    Yes.

14            MS. SHANBHAG:  Objection.  Leading.

15            THE COURT:  Sustained.

16   Q.    BY MR. EATON:  Did you talk to Ms. Edmo about the 12-month

17   living requirement as a female in the prison setting?

18   A.    I don't know if I phrased it exactly like that.

19   Q.    Generally, did you --

20   A.    Yes.

21   Q.    -- talk to her about that?

22   A.    Yes.

23   Q.    What was that discussion?

24   A.    Just the importance of having the real-life test not be in

25   the prison.

1    Q.   So the April 2016 note regarding the SRS assessment, does

2    that capture all of your thinking regarding that assessment?

3    A.   No.

4         MR. EATON:  I don't believe I have any further

5    questions, Your Honor.

6         THE COURT:  Any further questions, Ms. Shanbhag?

7         MS. SHANBHAG:  Yes.  I'll be brief, Your Honor.

8                         RECROSS-EXAMINATION

9    BY MS. SHANBHAG:

10   Q.   Dr. Eliason, you're taught in medical school that it's

11   important to document treatment of a patient; correct?

12   A.   Correct.

13   Q.   And do you agree that the purpose of a physician's progress

14   note is to document treatment of a patient?

15   A.   Yes.

16   Q.   And you agree it's important for a physician to document

17   diagnoses of a patient in the medical record; correct?

18   A.   Yes.

19   Q.   And you did diagnose Ms. Edmo with major depressive

20   disorder; correct?

21   A.   Correct.

22   Q.   And that diagnosis was reflected in your progress notes;

23   correct?

24   A.   Correct.

25   Q.   But you never documented diagnosing her with borderline

1    personality disorder or exhibiting borderline personality

2    disorder traits; correct?

3    A.   That is correct.

4    Q.   And earlier you told the court that Ms. Edmo's castration

5    attempts were related to being placed in segregation.

6         Do you know whether Ms. Edmo was, in fact, in segregation,

7    or what you called "Unit 8," when she attempted self-castration?

8    A.   I believe --

9              MR. HALL:  Object to the form, vague.  There were

10   multiple times -- there were twice; correct?

11             THE COURT:  Overruled.  The question was:  Do you know

12   whether Ms. Edmo was, in fact, in segregation, or Unit 8, when

13   she attempted self-castration?  The question is:  Do you know?

14             THE WITNESS:  That was my understanding, yes.

15   Q.   BY MS. SHANBHAG:  But, in fact, she wasn't in Unit 8, was

16   she?

17   A.   Well, it was my understanding that she was.

18             MS. SHANBHAG:  No further questions.

19             THE COURT:  All right.  I have a couple follow-up, and

20   I'll --

21                      FURTHER EXAMINATION

22   BY THE COURT:

23   Q.   Doctor, it's -- I guess I have been around psychologists

24   and psychiatrists long enough that my sense is that when you're

25   dealing with mental health, it's pretty dicey to say that

1      someone is cured of a mental health problem.

2           That's the word you used, though, when I asked you about,

3      you know, this concern about chicken and egg, that if the gender

4      dysphoria is actually contributing, exacerbating, or even

5      causing other mental health issues.  You indicated that studies

6      indicate that after sex reassignment surgery or gender

7      confirmation surgery, that no one is cured.

8           The other question -- the more pointed question is whether

9      there is any studies done indicating whether those mental health

10     concerns have been improved -- not cured, but improved.

11          So is that what you meant, that there is no indication --

12     any studies done to show whether there is any improvement in the

13     mental health?

14     A.   I would say that the evidence is just very poor.

15     Q.   Okay.  All right.  That's fair, certainly.

16          Do you have any opinion as to whether sex reassignment

17     surgery would minimize, exacerbate, or have no change on

18     Ms. Edmo's mental health if the procedure were performed

19     tomorrow?

20          In other words, what would her status be in six months, a

21     year, two years from now?

22     A.   You know, I guess I couldn't predict.  If I had to just

23     leap in one direction and have that done, one thing that I see

24     is I see a problem cooperating with staff very well.  And if

25     there were complications, I think it would be a poor outcome.

1    Q.    I understand that.

2    A.    But if it went smoothly, it could maybe be better.

3    Q.    Okay.  Of course, why I'm asking that question is to try to

4    get back to my original question, is the catch-22 thing.

5          There is no way we can sort that out, is what you're

6    saying?

7    A.    Yeah.  Yeah.

8    Q.    The other question I was going to ask, I think you or

9    someone indicated that there are 30 inmates under the -- in the

10   custody of the Idaho Department of Corrections who are currently

11   either being treated for or been diagnosed with gender

12   dysphoria.

13         Is that --

14   A.    That's my understanding.  About there, yeah.

15   Q.    So, systemwide, of all the facilities managed by Corizon,

16   do you have any idea what the numbers are?

17   A.    Oh, gosh.  I don't have any idea, but I think our numbers

18   are going to be fairly --

19   Q.    Representative?

20   A.    Yeah.  And we only have 7,000 inmates in Idaho.  So some of

21   Corizon's other states will be a lot bigger.

22   Q.    Okay.  So there is probably hundreds, maybe even thousands?

23   A.    Yeah, very well could be.

24         THE COURT:  Okay.  All right.  Any further follow-up,

25   Counsel, with the questions I have asked?

1           Plaintiff, anything?

2                MS. SHANBHAG:  Nothing, Your Honor.

3                THE COURT:  Mr. Eaton?

4                MR. EATON:  No, Your Honor.

5                THE COURT:  Mr. Hall?

6                MR. HALL:  No, Your Honor.  Thank you.

7                THE COURT:  All right.  You may step down.

8         Call your next witness.

9                MR. HALL:  We were just going to sneak out real quick

10    and use the restroom, if that's okay, Your Honor.

11               THE COURT:  We would take -- you know, today is going

12    to be a little different because we are going a little longer to

13    make sure you get all your hours.  So we can take a 10-minute

14    break now.  We were going to take one in about 20 minutes, but

15    we can do it now.

16        I don't see anybody objecting, so we'll take a 10-minute

17    recess.  We'll be in recess.

18        (Recess at 10:02 a.m. until 10:20 a.m.)

19               THE COURT:  Call your next witness.

20               MR. EATON:  Your Honor, defense calls Dr. Keelin

21    Garvey.

22               THE COURT:  Dr. Garvey, please step before the clerk

23    and be sworn.

24         KEELIN GARVEY, M.D., DEFENDANTS' WITNESS, SWORN

25               THE CLERK:  Please take a seat in the witness stand.

502

1            Please state your complete name and spell your name for the

2      record.

3                 THE WITNESS:  My name is Dr. Keelin Garvey.

4      K-E-E-L-I-N, G-A-R-V-E-Y, M.D.

5                 THE COURT:  You may inquire.

6                 MR. EATON:  Thank you, Your Honor.

7                        DIRECT EXAMINATION

8      BY MR. EATON:

9      Q.    Dr. Garvey, thank you for being here.  I understand you

10     flew in from the Boston area.

11     A.    Yes, that's correct.

12     Q.    All right.  Well, I wanted to get into some of your

13     qualifications and experience.

14            Madam Clerk, could we pull up the computer for our table,

15     please.

16            And, Jen, could you pull up the CV for Dr. Garvey.

17            Do you see a document in front of you, Dr. Garvey?

18     A.    Yes, I do.

19     Q.    What is this document?

20     A.    It appears to be my CV.

21     Q.    Okay.  Why don't we just scroll through it real fast.

22                 THE COURT:  I don't know what the purpose is of

23     scrolling through it fast, because nobody can read it at that

24     rate, so --

25     Q.    BY MR. EATON:  I just wanted to -- is it a complete copy of

503

1    your CV?

2    A.   It appears to be, yes.

3    Q.   Okay.  And this is a document you created?

4    A.   Yes.

5         MR. EATON:  All right.  We would move to admit this

6    into evidence, Your Honor.

7         THE COURT:  Any objection?

8         MR. HALL:  No objection.

9         THE COURT:  The exhibit will be admitted into

10   evidence.  I don't know that I have the exhibit number.  I'm not

11   sure it was identified.

12        MR. EATON:  Exhibit 2032.

13        THE COURT:  All right.  2032 is admitted.

14   (Defendants' Exhibit 2032 admitted.)

15        MS. RIFKIN:  And, Your Honor, I was just going to ask

16   that we make sure that it's being published or shown when

17   they're talking about exhibits so we have a chance to look at it

18   and object.

19        MR. EATON:  It's up right now, Your Honor.

20        THE COURT:  There is an -- I'm sorry.  I thought there

21   was no objection.

22        MS. RIFKIN:  I just -- I expected it to be on the

23   screen where I could see it, Your Honor.

24        THE COURT:  Well, don't you have your own monitors

25   there?

504

1          MS. RIFKIN:  Now I do, yes.  Thank you.

2          THE COURT:  Okay.  I will turn it back on, but you

3    should have it on your own monitors.

4          MS. RIFKIN:  Thank you.

5          MR. EATON:  Are we good?

6          MS. RIFKIN:  Yes.  I'm sorry.

7    Q.   BY MR. EATON:  All right.  So the court now has your CV,

8    and they can read it and consider it, but I want to just

9    highlight a few of your experiences.

10         Can you briefly tell us your formal education.

11   A.   Sure.  I received my undergraduate bachelor degree from

12   Yale University.  I attended the University of Massachusetts

13   Medical School, where I received my medical doctorate degree.

14   And then I attended Brown University for my general psychiatry

15   residency, followed by a one-year forensic psychiatry fellowship

16   at UC Davis in California.

17   Q.   And are you board certified in general adult psychiatry?

18   A.   Yes, I am.

19   Q.   And are you board certified in forensic psychiatry?

20   A.   Yes, I am.

21   Q.   And are you a licensed psychiatrist?

22   A.   Yes, that's correct.  I'm licensed in eight states.

23   Q.   Including -- can you list them?

24   A.   Massachusetts, Rhode Island, Pennsylvania, Minnesota,

25   Arizona, Florida, Texas, and California.

1    Q.   And you mentioned residencies.

2         Did you have experience in the correctional setting during

3    your residency?

4    A.   Yes, I did.  I was interested in correctional healthcare

5    very early in my career, my training.  So I did several

6    electives in correctional healthcare during residency and did a

7    two-month elective in the prison system in Rhode Island.

8         And I also did a two-month elective that involved doing

9    competency to stand trial evaluations, which was not a treatment

10   role; it was an evaluation role, but it also involved going into

11   the correctional system.

12   Q.   And did you have a forensic fellowship?

13   A.   Yes, I did.

14   Q.   Where was that?

15   A.   That was at the University of California Davis.

16   Q.   And was that in a correctional setting?

17   A.   It involved correctional work.

18        Because I was interested in correctional healthcare, I

19   looked at programs specifically that involved more extensive

20   exposure to correctional healthcare.  So at University of

21   California at Davis, at that time, we had two about

22   two-and-a-half days per week of correctional treatment work,

23   which was more than a lot of the other fellowships had.

24   Q.   And as a psychiatrist, I assume you have a lot of training

25   and education and experience with the DSM-5.

1    A.    Yes, I do.

2    Q.    And briefly explain what that is.

3    A.    Sure.  When I was a resident, we were still using the

4    DSM-4 -- you mean explain my experience or explain the DSM-5?

5    Q.    Yeah, and what the DSM-5 is.

6              THE COURT:  I pretty much know what the DSM-5 is.

7              MR. EATON:  All right.  Just your experience, then.

8              THE COURT:  I'm just concerned about time.  Go ahead.

9              MR. EATON:  I appreciate it, Your Honor.

10             THE WITNESS:  So I trained under the DSM-4.  But when

11   the DSM-5 was drafted, I actually was responsible for doing the

12   training on the DSM-5 for my company, MHM, at the time.  So I

13   trained all the mental health staff in the Massachusetts system

14   and then also did some national trainings on the DSM-5.

15   Q.    BY MR. EATON:  And the gender dysphoria is one of the

16   diagnoses in the DSM-5?

17   A.    That's correct.

18   Q.    Now let's talk a little bit about your experience, your

19   work experience.

20        Can you tell the court briefly what that is.

21   A.    Sure.  Following my forensic fellowship in California, I

22   took a job in the Massachusetts Department of Correction.  I was

23   a staff psychiatrist initially, so that meant that I had a

24   caseload of patients that I followed and provided psychiatric

25   treatment for.

GARVEY – Direct

507

1          About a year into that role, I was promoted to deputy

2     medical director for psychiatry.  So I took on some

3     administrative responsibilities, as well, but also maintained my

4     clinical work.

5          And then in August of 2015, I became the chief psychiatrist

6     in the system, still maintaining -- so I had more administrative

7     responsibility, but I still maintained my caseload of patients

8     as well.

9          By that point, it had gotten a little bit smaller, but I

10    had some patients that I had followed the whole seven years of

11    my career in Massachusetts.

12    Q.   And as a deputy medical director, what were your duties?

13    A.   Primarily still clinical.  So most of my time was spent

14    providing clinical treatment to inmates, but I also oversaw the

15    work of other providers.

16         We had about -- anywhere from 11 to 16 or so psychiatrists

17    and nurse practitioners.  So they would come to me if they had

18    questions about particular cases.  I coordinated peer review and

19    the supervisory review process and just kind of had some general

20    oversight over the system.

21    Q.   And did you treat patients with gender dysphoria in that

22    role?

23    A.   I did, yes.

24    Q.   Okay.  And what was your role in that respect?

25    A.   At that point, it was as a treating provider.  So somewhere

GARVEY - Direct

508

1    around when I started in 2010 -- I don't remember the exact

2    date, but somewhere around 2010 or 2011, I had a couple of

3    patients that were under my treatment who had gender dysphoria.

4    Q.   And then as a statewide -- statewide psychiatric director,

5    did you have -- did you encounter gender dysphoria patients?

6    A.   Yes, I did.

7        So in the Massachusetts system at that time, the chief

8    psychiatrist was also the chair of the Gender Dysphoria

9    Treatment Committee.  We had a pretty established policy and

10   procedure at that point.  So when I took on the role of chief

11   psychiatrist, I became the chair of the Gender Dysphoria

12   Treatment Committee.

13   Q.   And about how many inmates had a GD diagnosis around the

14   time you were working in the Massachusetts correctional system?

15   A.   I don't remember the exact numbers.  I know when I started

16   in that role, we had a smaller group, probably somewhere like 12

17   to 15 or so.

18       In the two years that I was responsible for that treatment

19   committee, it grew fairly rapidly.  So we had anywhere, I would

20   say, from 30 to 40 at any given time.

21       The numbers fluctuated because in the Massachusetts system,

22   the Department of Correction also houses what we consider jail

23   detainees for the women's side.  So we had a number of trans men

24   that were in and out of the system and not there longer term.

25   So the number tended to vary, but it was about 30 to 40, I would

509

1     say.

2     Q.   And in your role at the Massachusetts state prison system,

3     were treatment options available for inmates diagnosed with

4     gender dysphoria?

5     A.   Yes, they were.

6     Q.   And what were they?

7     A.   They involved every -- every patient in our system,

8     regardless of gender dysphoria or other diagnosis, has a

9     treating clinician if they have any kind of mental health

10    diagnosis.

11        So our gender dysphoria population did each have an

12    individual assigned clinician to address stressors and other

13    kinds of issues therapeutically.

14        We also had -- did hormone -- cross-gender hormone therapy

15    for gender-dysphoric individuals.

16        We set up a system for getting hair removal.  So we had

17    both an electrologist that would come into the system and also a

18    dermatologist that we referred to for laser hair removal.  And

19    she was the one that made the recommendations for which form of

20    hair removal.

21        We had -- we discussed gender confirmation surgery on

22    case-by-case basis, so it was available as an option.

23    Q.   And in your role in this Massachusetts prison setting, were

24    you involved in all aspects of the treatment for gender

25    dysphoria patients?

510

A.   I was.

So each patient also had an assigned psychiatrist, so I wasn't the one that was individually treating each patient.

If the assigned psychiatrist or the assigned clinician had recommendations for the person's treatment, including their gender dysphoria treatment, that those recommendations would come to the committee, and we would discuss them.  And then I, along with the other members of the treatment committee, would make decisions about those recommendations.

Q.   And then as a deputy medical director, you also had some gender dysphoria patients that you were directly working with; correct?

A.   I did while I was the deputy medical director.

When I became the chief psychiatrist, the department of correction had said that I could no longer be the individual treater for those patients because of my role on the treatment committee.  But I did have at least a couple at a time up until I became the chief psychiatrist.

Q.   And very briefly, why is it that you work in a correctional setting or have worked in a correctional setting?

A.   Well, I think I went into it for reasons that are different from the reasons that kept me in.

I initially knew that I was going to go into forensic psychiatry and envisioned a career doing more criminal competency, not guilty by reason of insanity, those types of

1    evaluations.

2         I was always interested in corrections, because I think

3    there is so many seriously mentally ill people that end up in

4    the system.  But also, there is a lot of -- there's a lot of

5    depth to working in that environment, that I really enjoyed.

6    But I didn't anticipate staying in corrections for so long.  I

7    thought I would kind of do that for a few years.

8         As I got into it, both because of my administrative

9    responsibilities and sort of greater involvement in the whole

10   system -- and also I think largely because of my caseload -- I

11   developed more of an interest in the actual treatment of

12   inmates.

13        I always had an interest, but I had kind of the luxury of

14   working with some people for seven years during my whole time in

15   Massachusetts, so it became more like a calling for me.  I

16   really enjoyed working with that population.

17        It's obviously challenging at times, but I had an

18   opportunity to see people really improve their lives while they

19   were incarcerated.  Ideally, that would happen without

20   incarceration, but it was very rewarding to see some of the work

21   that we could do in the correctional system.

22   Q.   Thank you.

23        And then what's your current work?

24   A.   Currently, I'm working for a company called InnovaTel.

25   It's a telepsychiatry company.  And we primarily do community

512

1    mental health, but I was hired to expand into reentry programs

2    and also a smaller correctional systems.

3        So right now, I am the director of forensic psychiatry and

4    correctional psychiatry for InnovaTel.  I do clinical work

5    typically four days a week, and that currently involves working

6    with the forensic population of people that are coming out of

7    jail.

8    Q.   And when you say "reentry program," what do you mean?

9    A.   So it's a program -- so reentry is usually referring to the

10   period of time when individuals are close to getting out of

11   prison or jail and then entering the community.

12       So we focus on a lot of the practical aspects of that.

13   They have case managers that help them get licensure and their

14   driver's license and housing and medical care and all that

15   stuff.

16       And then I'm the treating psychiatrist for them, so I will

17   make changes or continue their psychiatric medication if they

18   are satisfied with it.

19   Q.   Okay.  And please tell the court about your experience with

20   patient requests for sex reassignment surgery.

21   A.   Sure.  So in our system, we had a policy that governed --

22   it was a department of correction policy that was written by the

23   Massachusetts Department of Correction.  And that governed the

24   process for requesting and evaluating gender confirmation

25   surgery.

1          So in our system, for me to formally evaluate the medical

2     necessity of gender confirmation surgery, it would come in the

3     form of a recommendation from that person's clinician and/or

4     psychiatrist.

5          But part of the -- besides the treatment committee, we also

6     had a supervision group that met also once a month before the

7     treatment committee.  And that was where all the clinicians

8     would come and they would talk about their patients, and we

9     would review treatment plans and talk about changes that needed

10    to be made.

11         So, technically, one of the clinicians would have had to

12    make a formal recommendation for gender confirmation surgery for

13    me to formally evaluate.  But as of when I left, we had several

14    patients that it was really discussed every time we met because

15    we -- their clinicians felt like they were probably approaching

16    medical necessity and that, at some point in the near future,

17    they would recommend that.

18         So it was an ongoing discussion for -- for several people.

19    Q.   And what training and experience do you have with regard to

20    sex reassignment surgery?

21    A.   So I had a little bit of training on gender dysphoria in my

22    residency.  My training since then has been primarily through

23    conferences.

24         I did attend a WPATH training in Atlanta in January of

25    2016.  That was, I believe, a four-day program that was pretty

514

1    comprehensive.

2         I have read a lot of the primary literature on gender

3    confirmation surgery.

4         And as part of my role in Massachusetts, we had a

5    consultant who joined for an hour of the supervision committee

6    each month and an hour of the treatment committee each month.

7    And he would also provide annual training once a year but did

8    that two hours of supervision every month during our meetings.

9    Q.   And how many inmates have received SRS surgery while

10   incarcerated in the United States, if you know?

11   A.   There is one that I am aware of.

12   Q.   And did you author an expert report in this case?

13   A.   In this case, yes, I did.

14   Q.   Okay.  Could you pull up her expert report, please.

15        MS. RIFKIN:  Your Honor, prior to the expert report,

16   we do not believe counsel has laid foundation for the expert

17   opinions that Dr. Garvey has given in this case in her report.

18        THE COURT:  Okay.  We could have taken that up before

19   the hearing.

20        But have you notified counsel of the specifics?

21        So you're going to object to the report itself?

22        MS. RIFKIN:  Well, depending on the opinions that

23   counsel is about to ask, we don't believe he has laid the

24   foundation during this examination yet.

25        THE COURT:  Well, are you offering the exhibit at this

515

1     point?  Because it might be better just to go through and get

2     the opinions out, and then we can address any *Daubert* issue or

3     702 issue concerning the opinions.

4            MR. EATON:  Your Honor, I was going to ask her to

5     confirm that she wrote the report and that it was accurate and

6     she signed it.

7            THE COURT:  Well, I think we can stipulate to that.

8     So let's --

9            MS. RIFKIN:  So stipulated.

10           THE COURT:  Yeah.  And for that matter, I mean, I can

11    receive the opinion or the disclosure but may decline to rely on

12    it or use it depending upon what we hear at this point.

13        So I'm going to give you leeway to use the report, go

14    through and have Dr. Garvey indicate what the opinions are that

15    she wants to offer to the court, and then at that point in time

16    we get an objection from Ms. Rifkin and proceed in that fashion.

17    All right?

18           MR. EATON:  Thank you, Your Honor.  I was going to ask

19    if the witness would like to have a copy of the report in front

20    of her so that she could reference it.

21           THE COURT:  Do you have a copy?

22           THE WITNESS:  I don't have one here; so, yes, that

23    would be helpful.

24           MR. EATON:  This is Docket 100-2, which is her report.

25    Q.   BY MR. EATON:  And what records did you review in

516

1    preparation for preparing your expert report in this case?

2    A.   I reviewed Corizon medical and mental health records zero

3    to 1599.  I reviewed the second amended complaint and the

4    associated discovery.  I reviewed the reports of the plaintiff's

5    experts, Dr. Ettner and Dr. Gorton.

6         I reviewed, as part of the discovery, additional past

7    records of Ms. Edmo, including records from Portneuf Medical

8    Center, Sho-Ban records, Indian Health Service records.

9         There were several reports that had been authored,

10   including a presentence investigation report in 2009 and 2011; I

11   reviewed those.  I reviewed a psychosexual evaluation that was

12   done in 2011.  And I reviewed a PowerPoint and a document that

13   had been provided by Dr. Alviso as well.

14   Q.   Okay.  And that was -- those are the documents you reviewed

15   for your report?

16   A.   That's correct.

17   Q.   And then did you review any documents subsequent to that

18   report?

19   A.   I did.  I reviewed several depositions, including the

20   deposition of Ms. Edmo; the plaintiff's experts, Dr. Gorton and

21   Dr. Ettner; the deposition and report of Dr. Andrade; the

22   deposition of Dr. Eliason, Dr. Menard, Dr. Alviso.

23        And I believe that was it, that I can recall.

24   Q.   And with the additional information that you reviewed, did

25   that change your opinions in this case?

```
1    A.   No, it did not.

2    Q.   Did you do a clinical interview with Ms. Edmo?

3    A.   I did, yes.

4    Q.   And was that audio-recorded?

5    A.   It was audio-recorded, yes.

6    Q.   And how long did that clinical interview last?

7    A.   About 2 hours and 35 minutes.

8    Q.   Anything else you have reviewed related to your expert

9    reports and opinions in this case?

10   A.   There were a number of articles that I had read previously

11   and reviewed prior to this as well.  I think that covers all of

12   the records that I can recall reading.

13        I also read -- there are some declarations that came out

14   recently.  So I read those more recently, after I wrote my

15   report also.

16   Q.   Okay.  In what general areas were you asked to opine in

17   this case?

18   A.   I was asked to opine about the treatment that Ms. Edmo

19   received from medical providers that are -- work for Corizon as

20   well as psychiatric providers with Corizon and also to form an

21   opinion about the medical necessity of gender confirmation

22   surgery.

23   Q.   And also the gender dysphoria assessment?

24   A.   Yes.  That was part of the clinical interview.

25   Q.   Did you assess whether Ms. Edmo has gender dysphoria?
```

518

1    A.    Yes, I did.

2    Q.    And how did you go about doing that?

3    A.    Through my interview, I asked Ms. Edmo about her history

4    and about her current experience.  And I –– at that point, I did

5    not have –– at the point that I saw Ms. Edmo for the interview,

6    I did not have the prior pre-prison records, but I talked about

7    her experience and her –– the history that she reported to me.

8    Q.    And you have familiarity with diagnosing a person with

9    gender dysphoria?

10   A.    Yes, I do.

11         As part of my role in Massachusetts, I was responsible for

12   evaluating every person in the system that reported symptoms of

13   gender dysphoria, whether they were new and entering the system

14   or had been there for a long time, but newly reported symptoms.

15   So I did those evaluations regularly.

16   Q.    What determination did you make, if any, about Ms. Edmo?

17   A.    At that point, I did diagnose Ms. Edmo with gender

18   dysphoria.

19   Q.    And what was the basis for that?

20   A.    The basis was Ms. Edmo's report to me of her symptoms

21   currently and her experience of living as a female in prison

22   since 2012.

23         I did include in my report the pieces of information that

24   Ms. Edmo had shared with me from her childhood.  I did –– at

25   that point, again, I didn't have the prior records to rely on,

1    but I did have those prior to writing my report.

2    Q.   And did you make any determination as to whether she has

3    other mental health disorders?

4    A.   I did.   I diagnosed Ms. Edmo with major depressive

5    disorder, alcohol use disorder, opioid use disorder, and

6    stimulant use disorder.

7    Q.   And are any of those relevant in your determination of

8    gender dysphoria and treatment, therefore, for Ms. Edmo?

9    A.   They are -- they are comorbidities, meaning that they're

10   illnesses that are occurring simultaneous with her gender

11   dysphoria.   So it is all relevant.

12        It doesn't mean that she doesn't have gender dysphoria, but

13   it is all relevant to her treatment plan.

14             MS. RIFKIN:   I'm going to object, Your Honor, to the

15   extent Dr. Garvey is testifying about treatment for gender

16   dysphoria as distinct from her assessment of the diagnosis of

17   gender dysphoria, because she does not have the requisite

18   expertise to opine about treatment.

19             THE COURT:   About treatment options?

20             MS. RIFKIN:   Yes, Your Honor, about -- about actually

21   assessing what treatment is appropriate for actual patients with

22   gender dysphoria.   Rather, she can -- she can testify about what

23   treatment options are discussed in literature that she has

24   reviewed.   But as far as how to assess what treatment is

25   necessary for patients, we object to her offering an expert

520

1      opinion.

2              MR. EATON:  May I, Your Honor?

3              THE COURT:  Yes.

4              MR. EATON:  I mean, she testified about her

5      experience.  You can have qualifications through education,

6      training, and experience.  And she has testified that she has

7      treated gender dysphoria patients in the Massachusetts

8      correctional setting as a deputy, and then she oversaw and was

9      involved in the treatment decisions at --

10             THE COURT:  I'm going to overrule the objection.

11     Certainly, you can get into that on cross, but I don't

12     think -- I'll just overrule the objection at this point.

13         Go ahead and proceed.

14             MR. EATON:  Thank you, Your Honor.

15     Q.    BY MR. EATON:  In your expert opinion, are there treatment

16     options available for a gender dysphoria patient?

17     A.    In general?

18     Q.    Yes.

19     A.    Yes.  Treatment --

20     Q.    What are those?

21     A.    What was that?  I'm sorry.

22     Q.    What are those options?

23     A.    Those options include cross-gender hormone therapy,

24     surgeries, hair removal.  Psychotherapy is often recommended to

25     help individuals process some of the stress associated with

521

1   transition.

2   Q.   And did you consider Ms. Edmo's psychiatric treatment?

3   A.   Yes, I did.

4   Q.   And did you consider the time it took to evaluate gender

5   dysphoria?

6   A.   Yes, I did.

7        So I looked at the medical records, the mental health

8   records.  And from what I saw in the records, it appeared that

9   Ms. Edmo's first request for an evaluation was around June 1st

10  of 2012.

11       She had her first evaluation for the diagnosis with

12  Dr. Eliason around -- I think it was June 25th, so it was less

13  than a month later.  And then was subsequently transferred for a

14  follow up and more extensive evaluation with Dr. Claudia Lake in

15  July of 2012.

16       And then I also reviewed a committee meeting record from

17  the Management Treatment Committee that also reviewed her

18  history as provided during those evaluations and --

19  Q.   And what was your determination?

20  A.   My determination was that relative to cases that I have

21  seen, that was a fairly quick time to do the evaluation and then

22  approving the hormone therapy and then initiating hormones.

23  Q.   And was the diagnostic process for determining GID

24  appropriate?

25  A.   Yes, it was.

1      Dr. Eliason did cover what WPATH recommended as part of the

2    evaluation.  And then when Claudia Lake saw Ms. Edmo the

3    following month, she went into a lot more depth about the

4    history.

5    Q.   And what about the time it took for treatment, including

6    hormones, after the GID evaluation?  Do you have an opinion on

7    that?

8    A.   Yes.  Based on my experience, that was also fairly rapid.

9      At the time that this was happening -- this was 2012 --

10   WPATH standards of care had been updated and had removed some of

11   the criteria that they previously required for hormone

12   treatment.

13     The endocrine guidelines at the time were from 2009 and had

14   not been updated yet.  So it was kind of a period of transition

15   where some were still using the older criteria to determine

16   eligibility for hormones, but the standards of care, the WPATH

17   document, had removed some of those criteria.

18     So based on my experience with patients, even now, I think

19   that's a pretty quick turnaround time.  I think it was in late

20   August or September that the hormones were first ordered.

21   Q.   And with regard to hormones, do you have experience with

22   treatment with hormones?

23   A.   Yes.

24     So in our system, we reviewed the treatment plans every

25   month of every individual that was diagnosed with gender

1    dysphoria.

2        We used an outside consultant for our hormone

3    recommendations, so we would -- the initial initiation of

4    hormones would happen per his recommendations.  His name is

5    Dr. Joshua Safer.  So I would approve the referral to Dr. Safer,

6    who would provide recommendations.

7        The medical provider responsible for each patient would be

8    responsible for ordering the medication, but we reviewed

9    everyone's treatment regimen at almost every month's meeting in

10   a supervision group.  Some were on a fairly stable regimen, so

11   there wasn't a lot of discussion.

12   Q.   And do you have education, training, and experience in

13   hormone treatment?

14   A.   I do.

15       I have attended the WPATH conference in January of

16   2017 -- I might have said 2016 before.  It was January -- I

17   think it was 2017.

18       And I have also read a lot of the literature about

19   hormones.  I have read the Endocrine Society guidelines and the

20   Center for Excellence guidelines and, again, reviewed all of the

21   treatment plans for the individuals in the Massachusetts system

22   and looked at their hormone regimen.

23   Q.   And do you have an opinion as to whether the hormone

24   therapy provided to Ms. Edmo was appropriate?

25   A.    I do.  Yes, I think that the hormone therapy was

524

1    appropriate.

2        The general method of providing hormone treatment involves

3    an estrogen and then an antiandrogen to block testosterone.  So

4    she was started on both.

5        They appear to have been titrated, according to her report.

6    And the medical records that I saw did address what kind of

7    symptoms she was having or what kind of response she was having

8    to the hormone therapy.

9        But the regimen she was started on and then the continued

10   adjustments were consistent with what I have seen in other cases

11   of people with hormone therapy.

12   Q.   Okay.  I would like to turn to your SRS evaluation for sex

13   reassignment surgery.

14       At the outset, do you believe sex reassignment surgery can

15   be appropriate treatment for inmates under certain

16   circumstances?

17       MS. RIFKIN:  I would like to renew my objection

18   specifically as to Dr. Garvey's opinion on gender confirmation

19   surgery on the basis that she has never treated a patient,

20   evaluated a patient, recommended a patient for gender

21   confirmation surgery.

22       THE COURT:  Mr. Eaton?

23       MR. EATON:  Your Honor, again, it can be qualified by

24   education, training, and experience.  She indicated that she has

25   some education, I believe her testimony was, regarding treatment

1     options for gender dysphoria including sex reassignment surgery.

2     She has indicated that she has gone to WPATH trainings regarding

3     sex reassignment surgery.  She has indicated that she, as a

4     deputy and as the chief psychiatrist, also had experience with

5     sex reassignment surgery options.

6              THE COURT:  I'm going to overrule the objection.  It

7     goes to the weight of the witness's testimony and opinion.

8     Obviously, someone who has done all the things that Ms. Rifkin

9     pointed to, presumably their opinion has more weight.  But I

10    think by training and by some of the roles that she has played

11    in the various prison settings, I think she is qualified to

12    offer an opinion.  And through cross-examination, you can test

13    that as well.

14             So the objection is overruled.

15    Q.   BY MR. EATON:  Also, do you have any certifications in a

16    correctional setting?

17    A.   I do.  I'm a certified correctional health professional by

18    the National Commission on Correctional Health Care.

19    Q.   And what does that mean?

20    A.   It's a certification that involves taking a test, studying

21    policies and procedures in correctional systems.  And you

22    maintain it on an annual basis, attend their conferences

23    typically as well.

24    Q.   And would WPATH and sex reassignment surgery come up in

25    those conferences?

526

1    A.   It typically does.  I presented at several conferences

2    myself, so I did present at the National Commission on

3    Correctional Health Care on gender dysphoria treatment in

4    correctional settings.

5         I have also presented at the American Correctional

6    Association conference and the American Academy of Psychiatry

7    and the Law on gender dysphoria treatment in correctional

8    settings.

9    Q.   And that would include sex reassignment surgery?

10   A.   Yes.  That's often the -- we talk about all the treatment

11   forms and the evaluation process, but that's often what people

12   want to hear about the most, because there are a lot of

13   questions about it.  So I do talk about that in my training.

14        And every training that I have done involves pretty

15   significant discussion with the audience, so everyone sort of

16   shares their experience and their methods of assessing this.

17   Q.   Okay.  We need to move quickly here.  But there has been

18   discussion by plaintiff's experts that the regret loss

19   after -- the regret after sex reassignment surgery is 1 to 2

20   percent.

21        I guess -- sorry.  We are just cramped for time here, so

22   I'm monitoring time.

23        First of all, what is your opinion as to whether the

24   evaluation by Dr. Eliason on sex reassignment surgery was

25   appropriate or not?

527

1    A.   I believe that it was appropriate.  I have read his

2    evaluation from that time and then also his deposition and the

3    declaration of the person that he had consulted with, I think

4    Mr. Clark.

5         So I do -- I believe that he was using his clinical

6    judgment to apply decision-making and making that decision for

7    Ms. Edmo.

8    Q.   Can you elaborate on that a little bit.

9    A.   Sure.

10        So he did consider Ms. Edmo's self-castration attempts and

11   that, and he sought consultation with additional medical

12   professionals with Corizon and also with Jeremy Clark, who I

13   believe is a WPATH member.

14        He -- and from reading the deposition, too, he appeared to

15   be considering her current clinical status and made the

16   determination that he didn't think it was medically necessary at

17   that time.

18   Q.   I will ask you in a second whether you -- about whether you

19   think she is qualified for a sex reassignment surgery now.

20        But before we discuss that, as I was mentioning a minute

21   ago, plaintiff's experts have been talking about this 1 to 2

22   percent regret rate.

23        Very briefly, do you -- after sex reassignment surgery,

24   very briefly, what are your opinions on that?

25   A.   I believe that those numbers are quoted commonly, but they

528

1      don't reflect the totality of the literature.  I have read the

2      1 to 2 percent regret rate in the literature as well.  However,

3      there are significant problems with the quality of the data,

4      primarily involving a significant number of people that are lost

5      to follow-up.

6          So many of the studies are quoted, that 1 to 2 percent

7      comes from the people that they were able to follow up.  But in

8      many cases, up to half or even more of the sample had been lost,

9      and their results are not counted in this 1 to 2 percent.  We

10     don't have any data on the people that were not followed up.

11         So I believe that those numbers don't represent the full

12     picture.

13     Q.   All right.  And so where did you -- did you come to an

14     opinion about whether Ms. Edmo is -- currently satisfies the

15     criteria for sex reassignment surgery now?

16     A.   I -- my opinion was that gender confirmation surgery is not

17     medically necessary at this time for Ms. Edmo.

18     Q.   And what's the basis for that?

19     A.   The basis was three different factors.

20         One was the discrepancy between some of her self report of

21     her history and the records that demonstrated that she did not

22     appear to be presenting as female in the community prior to

23     being incarcerated.

24         Now, there can be a lot of different reasons for that

25     inconsistency, but that's an important part that needs to be

1     fleshed out further with her treating clinicians.

2          I also believe that her other medical -- her other mental

3     health comorbidities are not sufficiently well controlled.  She

4     is actively self-injuring.  At the time that I saw her, she said

5     she had cut herself as recently as one month prior.  She said

6     that she was doing that with feelings of dysphoria.

7          But as a mental health professional, self-injury in any

8     form is never considered a healthy or productive coping

9     mechanism.  So in my career as a mental health professional, we

10    try to work with people to develop better coping strategies so

11    that they don't engage in self-injury in any form.

12         So, in my opinion, that is not going to go away if she does

13    have gender confirmation surgery.  I would like to see her

14    develop further coping skills that she would be able to use

15    following the surgery so that she is not engaging in self-injury

16    after the surgery.

17         And then third reason that I cited was that WPATH still

18    includes the 12-month real-life experience, and they provide --

19    in the standards of care document, they provide a rationale for

20    continuing to include that.  And it lists the importance of the

21    person experiencing all of the things that they are going to

22    experience on the outside -- so family response to their social

23    transition or their physical transition, work response, family

24    parties, all sorts of things that you would encounter in your

25    life.

530

1        Ms. Edmo is not -- is not serving a life sentence.  She is

2    going to be getting out of prison, I believe, in July of 2021.

3    I think there is a lot of -- there is challenges to using her

4    time in a men's prison as this real-life experience because it

5    doesn't offer her the opportunity to actually experience all

6    those things she is going to go through on the outside.

7    Q.   And, in fact, does WPATH address that rationale for the

8    12-month experience?

9    A.   They do.  So --

10   Q.   And what does it say?

11   A.   It says that -- they included that and they didn't take it

12   out of the Standards of Care 7 because they felt that it was

13   important for people to experience all of those social issues

14   and settings that they are going to experience after they have

15   the surgery.

16        So to go through those first as a socially transitioned or

17   hormone-treated individual prior to undergoing gender

18   confirmation surgery.

19   Q.   So I just want to make sure I didn't skip over it, but you

20   utilized, in part, the WPATH criteria for sex reassignment

21   surgery?

22   A.   Right.

23        So the WPATH standards of care document has a section where

24   it talks about these as being flexible clinical guidelines.  So

25   I used the criteria that they have outlined and applied my

1   experience and clinical judgment to each of the criteria to come

2   up with a answer about her medical necessity.

3   Q.   Is the WPATH the end-all and be-all of resources that a

4   provider will consider for sex reassignment surgery?

5   A.   I think it's commonly cited.  I do use it.  I've read the

6   whole document several times.  I attended the training.   It

7   doesn't have the quality of evidence behind its recommendations

8   that I typically see with a treatment guideline.

9        So if I'm looking at a treatment guideline for depression,

10   generally researchers will grade the level of evidence behind

11   each recommendation.  So even if you look at the Endocrine

12   Society guidelines for hormone therapy, they use the grading

13   system -- that's what it's called -- to rank the levels of

14   recommendation as a suggestion or a recommendation based on the

15   quality of the evidence.  And they also give a number for the

16   quality of the evidence.

17        The WPATH standards of care document lists references, but

18   it doesn't have that evidence-based grading system.  So behind

19   each of their recommendations, I'm not sure how much data there

20   actually is to support that particular recommendation.

21        And for that reason, I think it's important that they are

22   interpreted flexibly and that we are allowed to use clinical

23   judgment and use them as a guideline.

24   Q.   And I know in your report, you go through some of the

25   poor-quality studies; correct?

532

1    A.   Yes.

2    Q.   Okay.  And can you briefly go through some of the CMS

3    study.

4    A.   Sure.  So I used the CMS reference because it was a very

5    thorough review of all of the evidence and studies that had been

6    done as of that point.

7         I am aware that CMS refers -- is usually dealing with the

8    elderly and people that have disabilities.  But prior to drawing

9    their conclusion about their population, they reviewed all of

10   the studies and made determinations about the quality of the

11   evidence.

12        They cited several issues with the quality of the evidence,

13   including sometimes small sample sizes, different methodology,

14   different outcomes that were studied, and significant loss of

15   follow-up where the loss to follow a population is not analyzed

16   in any way.

17        And they made recommendations about doing additional

18   research that would more carefully look at the population that

19   is lost, to follow up to determine what factors are unique to

20   them.

21   Q.   And was there a consideration by the CMS about whether

22   WPATH should be adopted?

23   A.   Yes.  I believe it was in response to a question.  There is

24   an open call for questions, and someone asked if they adopt

25   WPATH as a controlling guideline.

1          They made a decision that they would not adopt WPATH as the

2     controlling guideline because they did not feel like the

3     evidence was strong enough and that they wanted to allow other

4     providers to either use WPATH or use their own standards based

5     on their decision-making.

6     Q.   Okay.  And you mentioned the APA.

7          Why is that?

8     A.   The APA was another -- this was an academic now resource

9     that was looking at the data to determine whether there was

10    enough to develop a practice guideline.

11         They also concluded that there were issues with the quality

12    of the data and the quality of the evidence, including the

13    numbers on regret.  And they concluded that there was enough

14    information to make -- to draft recommendations but not to

15    formally develop a practice guideline because their threshold

16    for developing a practice guideline was not met with the quality

17    of the data.

18    Q.   So why would we bring up these deficiencies in the WPATH?

19    A.   Because I think it's important to recognize that it is a

20    valuable resource, but it's not -- it's not so definitive that

21    we can equate their recommendations with success.

22         So it doesn't have -- it doesn't consider the correctional

23    population specifically.  There is a section where they briefly

24    address institutional settings.

25         But there is no data -- as we have talked about before,

1    there is only one person we know in the system that has had

2    gender confirmation surgery while incarcerated.  So we don't

3    have any data.

4         Until we get that data, we just need to be cautious in

5    using the guidelines, using what we know about what makes

6    someone a good candidate, and be able to apply our clinical

7    judgment.

8    Q.   So you briefly went over -- is it criteria 1 of the WPATH

9    that is persistent, well-documented gender dysphoria is one of

10   the criteria for sex reassignment surgery?

11   A.   Yes.

12   Q.   Okay.  And so if you're assessed with gender dysphoria,

13   then, in your opinion, do you automatically satisfy those

14   criteria?

15   A.   In my opinion, no.

16   Q.   And why is that?

17   A.   When I'm making a diagnosis of gender dysphoria, often it's

18   an individual who has not sought any treatment for that prior.

19   Some people have never heard of it and maybe just learning about

20   it and kind of exploring it.

21        Giving the diagnosis often allows them to progress in their

22   treatment.  They might have opportunities to participate in

23   groups or get additional property items and be able to feminize

24   to the degree it's allowed in the system.  So it kind of gives

25   them the opportunity to explore it with very little harm.

535

1          However, as you get into more and more irreversible and

2     permanent treatments, my opinion is that the threshold for

3     conclusively making the diagnosis is higher.

4          So you can never be certain of a diagnosis, but when I'm

5     treating someone and doing an evaluation, I always request prior

6     treatment records.  We are not always able to get them, but when

7     I do, I always use them in making my determination.

8          When I reviewed Ms. Edmo's prior records, I saw the

9     inconsistencies in her report.  That didn't change my opinion

10    about her diagnosis.  But prior to recommending irreversible

11    surgeries, that needs to be explored further.  She needs to be

12    able to speak with her clinicians about why there is that

13    discrepancy.

14    Q.   So you mentioned the North Idaho Correctional Institution

15    records as page 31 of your report.

16         And why did you mention those records?

17    A.   So that was at a facility that she was at.  I believe it

18    was part of probation on a prior charge.  She was there for, I

19    believe, about six months.

20         And there was no mention that I saw in those records of her

21    presenting as female or entering the system as female.  And

22    there was no -- no mention of using any female pronouns or

23    describing her as appearing female.

24    Q.   You also mentioned the Portneuf Medical Center records.

25         Why is that?

GARVEY – Direct

536

1   A.   Those were the -- her two hospitalizations for her suicide

2   attempts; one was in 2010, and one was in 2011.

3         When I'm reviewing records --

4   Q.   Just for the record, that's prior to her incarceration;

5   correct?

6   A.   Correct.   Yeah, prior to her incarceration.

7         When I am reviewing records, I put a lot of value in what

8   the patient says at that time, because sometimes their

9   recollection of what they say or what they were experiencing is

10  not completely consistent with the records.

11        So when I reviewed those records, she reported the reasons

12  for her suicide attempts as related to relationship issues,

13  alcohol use, inability to find a job and some financial

14  problems, and kind of general life difficulties.

15        She didn't mention gender at that time, at either of those

16  times of admission, as being a contributing factor.   And also, I

17  have worked in inpatient units, and we -- when we are meeting

18  with people, we do a mental status exam, and you describe the

19  appearance of the person.

20        I didn't see any description of her presenting as female

21  during that time, which differs from her report to me that she

22  was presenting as female at that time period.

23  Q.   And you go through some other records on page 31 and 32.

24        Did any of those suggest that she was living as a female at

25  that time?

1    A.    No.   I reviewed the Sho-Ban Tribe Counseling and Family

2    Services records and then some other Indian Health Services

3    records, and I didn't see any mention of her presenting as

4    female or reporting any gender issues.

5    Q.    And why did you review the psychosexual evaluation, number

6    5 on page 32?

7    A.    That was a very comprehensive evaluation of her past sexual

8    activity that was ordered because of the nature of her offense.

9    So it was very comprehensive.

10        There was also a polygraph examination involved with a

11   prepolygraph interview.   But some of what she reported there did

12   differ from her report to me.

13        This is a quote.   It says:   "He denied ever

14   cross-dressing."   This is a quote from the report.   And also,

15   the report said that Ms. Edmo had reported that she had sexual

16   contact with two females in the past, which is different from

17   what she told me during my interview.

18   Q.    Okay.   I would like to move on to the next criteria.

19        Is there anything else significant you want to mention

20   there?

21   A.    Just the part about the photographs.   I saw a declaration

22   from, I believe, a parole officer or probation officer who

23   worked with Ms. Edmo prior to this incarceration and had

24   confirmed that Ms. Edmo didn't present with feminized appearance

25   during any of those contacts.

GARVEY - Direct

538

1    Q.   And I believe you indicated another criteria that is not

2    met in Ms. Edmo's case regarding sex reassignment surgery is

3    that her medical and mental health concerns are not well

4    controlled; is that right?

5    A.   Yes, that's correct.

6    Q.   Okay.  And you briefly mentioned self-injury.  Can you

7    elaborate on that a little bit.

8    A.   Sure.  So self-injurious behavior is done for a variety of

9    reasons, but it's almost always associated with a history of

10   trauma.  It can be a component of a personality disorder or

11   depression; but, again, it's often associated with trauma.

12        It's never seen by a mental health professional as being an

13   effective or healthy coping strategy.  And it's always -- for

14   anyone that engages in self-injurious behavior, if I am their

15   treating provider, that's going to be a main point of our

16   treatment plan.

17        It's especially important -- if Ms. Edmo does undergo

18   gender confirmation surgery, that's going to be a very stressful

19   undertaking, both physically and socially.  And she will need to

20   have strong, effective coping strategies to manage all of those

21   issues.

22        And she -- in my opinion, she hasn't demonstrated that she

23   has effective coping strategies that she would be able to use

24   after the surgery.

25   Q.   I'm going to move on to the next criteria.  Do you have any

1    other comments, though, as to criteria 4?

2    A.   I didn't include this, but I talked it about elsewhere in

3    my report, is her substance abuse history.  I diagnosed her with

4    alcohol use disorder, opoid use disorder, and stimulant use

5    disorder.

6         In my almost 10 years of experience in corrections, I saw a

7    lot of people who were sober during their incarceration but then

8    immediately relapsed.

9         So I didn't talk about it here because I know she -- I

10   don't see any evidence that she has been actively using

11   substances, and some people do even while they are incarcerated.

12   But I think it's an important thing to consider also, because I

13   haven't seen that she has spent a lot of time doing substance

14   abuse treatment.  I know she had at one point been discharged

15   from one of those treatment programs.

16        And that's also going to be something that she is going to

17   have to manage when she gets out, because she was -- she told me

18   that she was pretty much consumed in substance abuse prior to

19   her incarceration.

20   Q.   Okay.  And then I wanted to give you a brief chance to

21   elaborate on why she doesn't satisfy criteria No. 6, the 12

22   months living as a female.

23   A.   Sure.  So WPATH, in their section about the 12-month

24   criteria, they note that sometimes providers have to get

25   collateral information to verify that someone has lived through

1    the 12-month experience.

2         In my opinion, the time prior to incarceration has -- I

3    have a lot of questions about whether she was presenting as

4    female, because the records just don't support that.

5         But also, she was so active with her substance abuse, that

6    the true clinical meaning behind this recommendation to

7    experience life in her preferred gender could not be met while

8    someone is actively using substances to that degree.

9         And in a men's prison, I think it's very complicated.  I'm

10   sure it's been challenging for her, as well, but it doesn't

11   allow her to live through the social events and work and kind of

12   general life on the outside that she is going to live once she

13   gets out.

14   Q.   And then, briefly, you talk about alternative supplementary

15   approaches to treatment of gender dysphoria, and I believe you

16   referenced the Osborne and Lawrence article.

17        Can you briefly explain to the court why you referenced

18   that.

19   A.   Sure.  So this was -- there is not a lot of literature

20   that's written directly about the correctional environment when

21   it comes to gender confirmation surgery.

22        When I present on this, a lot of people have the same

23   questions about, you know, how to determine medical necessity.

24   And the general theme is that people want to do the right thing,

25   and they don't want to harm people.

1          This was one of the few articles I have seen that does

2     directly talk about the correctional population as being

3     different from the general population.  They do note that we

4     should never exclude gender confirmation surgery in a prison

5     setting.

6          Obviously, there are going to be cases before we have

7     really good data, and we're going to use those cases to develop

8     the data.  But until then, they made recommendations for having

9     additional criteria.

10         Now, I haven't seen these criteria specifically adopted

11    anywhere, but I think it was -- it's important because it

12    note -- they do talk about the limitations of the standards of

13    care document in the correctional setting.  And they think it's

14    an oversimplification to just say that we should do exactly the

15    same thing inside as we do outside.

16    Q.   And did you analyze any of those criteria under the Osborne

17    and Lawrence article as to Ms. Edmo?

18    A.   I did.  I'm just going to refer to my report here.

19         So should I list the criteria?  I know it's in my report,

20    but --

21    Q.   Why don't you say it briefly, and then just tell them,

22    quickly, what your opinions are.

23    A.   Okay.  There are some that she -- like, one of them is

24    willingness to live in a women's prison after.  If she did have

25    the surgery, that's where she would be housed.  So that's kind

1    of an easy one.  She said that she would be willing to live

2    there.

3        They also talked about a satisfactory disciplinary record

4    and the capacity to cooperate with providers.  That's something

5    that Ms. Edmo struggles with.  I won't get into the disciplinary

6    reports too much, but I'm more concerned about her ability to

7    work with her treatment providers because that's going to be an

8    essential component if she does have the surgery, that she is

9    going to need the support and need to discuss what she is

10    experiencing as she is making that transition.

11        At this point, she hasn't demonstrated that she is able to

12    do that and to process her experience with her treatment

13    providers.

14    Q.   Okay.  And did you come to a conclusion as to whether the

15    treatment and care provided by Corizon and its medical

16    providers, was it appropriate and within the applicable

17    standards of care?

18    A.   Yes, I believe that it was within standard of care.

19    Q.   Is attempted self-castration an automatic qualifier for

20    gender confirmation surgery?

21    A.   In my opinion, no, it's not.

22    Q.   Why is that?

23    A.   Again, mental health providers don't see any form of

24    self-harm as being productive or healthy regardless of what's

25    driving the self-harm.

543

1          Now, I have worked in prison for almost 10 years.  I have

2     seen very extreme forms of self-harm that were not driven by

3     suicidal ideation or by a desire to permanently alter themselves

4     but were driven by all sorts of factors that are unique to the

5     correctional system.

6          I think that it's -- demonstrates that Ms. Edmo had -- did

7     not -- has not developed coping strategies to deal with

8     distress.  If she has the surgery, she is still going to deal

9     with distress.  She had a lot of distress in her life prior to

10    entering the system, and I want to see her develop strategies

11    that don't involving harming herself in any capacity.

12    Q.   Do you have an opinion as to whether her mental health

13    issues are solely related to gender dysphoria?

14    A.   In my opinion, they are not solely related to gender

15    dysphoria.

16    Q.   And why is that?  What's that based on?

17    A.   I have reviewed her past records prior to incarceration.

18    Again, she did not report having gender issues at that point.

19    Despite her report to me that she was living as a female, I

20    haven't seen that in the records.

21         At the time of her suicide attempts -- and she had two very

22    serious attempts; one was by an overdose on a very lethal

23    medication and another was by cutting; it was a very serious

24    cut.  And at the time of those suicide attempts, she reported

25    issues with alcohol, relationships, kind of general life

1    dissatisfaction.

2        She also reported to me that she had a history of

3    depression going back to childhood.  She -- when I asked her

4    directly if she believes that she has major depression as well

5    as gender dysphoria, she said she believes that she has both.

6        Now, I recognize it's very difficult to sort those out,

7    sort out which dysphoric feelings are related to the gender

8    dysphoria and which ones are depression.  But I do believe there

9    is enough evidence there to say that she has gender dysphoria

10   and major depression.

11   Q.    Would that be part of your job as a mental health

12   professional and psychiatrist, to help sort that out?

13   A.    Yes, absolutely.

14   Q.    Okay.  Do you have opinions as to the risk of suicide after

15   SRS, for Ms. Edmo?

16   A.    There is limited data on that.  There is a Swedish study by

17   Cecilia Dhejne -- I'm probably saying that wrong.  It's

18   D-H-E-J-N-E.  That was a population-based cohort study, so they

19   didn't --

20        MS. RIFKIN:  Your Honor, I'm going to object.

21   Opposing counsel repeatedly objected to our experts speculating

22   about a risk of suicide or harm to Ms. Edmo after -- after

23   surgery.  And I believe that their answers were limited as a

24   result of those objections.  And now they are eliciting the same

25   opinion from their expert.

545

1          THE COURT:  Well, I don't recall they were precluded

2      from offering the opinion.

3          MR. EATON:  I don't believe -- I think that's right,

4      Your Honor.

5          MS. RIFKIN:  Withdrawn, Your Honor.

6          THE COURT:  All right.  Proceed.

7          THE WITNESS:  So that study looked at a sample of a

8      little over 300, I believe, patients who had had gender

9      confirmation surgery over a 30-year period.

10         It compared that sample to general population, so it did

11     not give us, like, before and after kind of comparison, which

12     would be really helpful.

13         But compared to the general population of people that don't

14     have gender dysphoria, postsurgery patients had a 19 times

15     higher risk of suicide.  They concluded that that means that we

16     need to continue to provide mental health and medical care

17     following surgery, but I have not seen the data to support that

18     gender confirmation surgery cures people of their suicidality.

19     Q.   BY MR. EATON:  Again, what are your opinions as to the

20     suicide risk after SRS for Ms. Edmo?

21     A.   Based on her current coping strategies, I would be

22     concerned about her suicide risk after surgery if she doesn't

23     work with mental health and begin to develop more effective

24     coping strategies for the stress that she is going to

25     experience.

1    Q.    Do you think her suicide risk will decrease with SRS?

2    A.    I don't think it will decrease at her current state.

3    Q.    And do you think her cutting will decrease at her current

4    state after SRS?

5    A.    I think it might temporarily, but I would be worried.

6    Because on the street, she was using alcohol and drugs as a

7    coping mechanism.  And then inside, now she is using cutting.  I

8    would be worried about that returning and/or the substance abuse

9    returning as a coping strategy.

10   Q.    Finally, what are the harms if Ms. Edmo were to get surgery

11   now?

12   A.    Well, I think that's what everyone is concerned about.

13   We'd all like to see her succeed.  If she has it now when we

14   haven't sorted out some of these questions and helped her to

15   develop better coping strategies, I'm worried that it would not

16   be a success and that she would be at risk of having

17   complications, both physically and psychiatrically.

18   Q.    Can you elaborate on that a little bit.

19   A.    I think, again, she doesn't have the proper coping

20   strategies.  This is going to -- gender confirmation surgery is

21   a significant life event.  For the right candidate, it can be

22   very effective and associated with very low regret.

23         I'm not convinced that she is the right candidate at this

24   point, and that's why I recommend that we need -- she needs --

25   we need to sort out -- I mean her treatment providers need to

1    sort out some of the discrepancies with her history provided,

2    also help her to develop better coping strategies that she will

3    use following the surgery, and then sort out the real-life

4    experience.  But this is something where WPATH doesn't give a

5    lot of guidance in terms of the correctional setting.

6           MR. EATON:  Your Honor, I would move to admit her

7    report into evidence for consideration of the court.

8           THE COURT:  Same objections?

9           MS. RIFKIN:  Same objections.

10          THE COURT:  I'll admit it.  But as I've indicated, I

11   think the witness has expertise.  It goes to the weight, not the

12   admissibility of the exhibit -- or of the opinion.

13       So I'll overrule the objection and admit the report.  It's

14   technically hearsay.  But since all the reports are coming in,

15   I'm going to admit this exhibit as well.

16       What's the number on that again?

17          MS. RIFKIN:  Your Honor, may I just -- we had a

18   stipulation with counsel that the expert reports would not

19   actually be offered as exhibits into evidence.

20          THE COURT:  Oh, then I stand corrected.  I thought

21   they were.

22          MS. RIFKIN:  That is why we did not offer our

23   exhibits.  They have been filed in the case --

24          THE COURT:  Okay.

25          MS. RIFKIN:  They have been filed in the case --

1          THE COURT:  Okay.

2          MS. RIFKIN:  -- but not as evidence at the hearing.

3          THE COURT:  All right.  I will not admit, then, the

4     exhibit.  Often counsel will stipulate the exhibits -- the

5     reports come in, but they are hearsay.  The opinions should be

6     offered in court under cross-examination, not by way of a

7     written document unless the parties agree for all parties that

8     they will come in.

9          So, assuming that's all correct, the report will not be

10    admitted.  All right?

11         MR. EATON:  That's fine, Your Honor, as long as it's

12    the same for all parties.

13         THE COURT:  It is.

14         MR. EATON:  I thought they had all been admitted.

15         THE COURT:  Well, I guess I thought they had as well,

16    but I'm going to trust Ms. Rifkin is not misleading me that

17    she's never really offered that.  I thought it was a joint --

18    that they were joint exhibits, but I didn't look that carefully

19    at all of them.

20         MR. HALL:  Right.  And I would like a point of

21    clarification as to whether Ms. Rifkin's position is limited

22    only to the retained experts.  We have filed nonretained expert

23    declarations, which was our understanding completely pursuant to

24    our stipulation, that those would be considered and admissible

25    pursuant to our stipulation in addition to or in lieu of live

1     testimony.

2           MS. RIFKIN:  Yes, Your Honor.  That is correct for the

3     nonexpert declarations.

4        And for the declarations, the stipulation was they were

5     already on file with the court in support of and opposition to

6     the briefs.  My distinction is that they are hearsay, and so

7     they cannot be considered as evidence by the court unless the

8     actual evidence was established at the hearing.

9        They are in the court's file.  We don't object to the court

10    considering them.

11          THE COURT:  Okay.  Does that clarify it, Mr. Hall?

12          MR. HALL:  Yes, as to the nonretained --

13          THE COURT:  Right.

14          MR. HALL:  -- as long as the limitations on

15    plaintiff's retained expert declarations are the same, that they

16    are not admitted into evidence.

17          MS. RIFKIN:  That's correct.

18          THE COURT:  All right.  Let's go ahead and proceed.

19    Cross.

20                CROSS-EXAMINATION

21    BY MS. RIFKIN:

22    Q.  Good morning, Dr. Garvey.

23    A.  Good morning.

24    Q.  In your -- just before counsel ended his direct, he asked

25    you about potential harms to Ms. Edmo.  And you said:  "We would

GARVEY - Cross

550

1   all like to have her succeed."

2       Do you remember that?

3   A.   Yes.

4   Q.   Who is the "we" that you were referring to when you said

5   "We'd all like to have her succeed" and went on to describe with

6   "we"?

7   A.   I guess I'm generally referring to mental health

8   professionals.  I mean, her treatment team, I'm sure her

9   plaintiff's experts.

10  Q.   You're not a treater of Ms. Edmo; correct?

11  A.   That's correct.

12  Q.   But you identify very closely with Ms. Edmo's treaters

13  employed by Corizon at IDOC; that's why you used the word "we";

14  correct?

15  A.   No.  I wouldn't say that.

16  Q.   Dr. Garvey, you have never previously been qualified as an

17  expert in any court regarding treatment of gender dysphoria;

18  correct?

19  A.   No.  This is the first case that I have been involved in

20  that's gone to court.

21  Q.   Until today, you have never testified in court as an expert

22  regarding treatment of gender dysphoria, any kind of treatment

23  of gender dysphoria; correct?

24  A.   That's correct.

25  Q.   In fact, prior to this case, you have never been retained

1     and provided an expert report regarding any aspect of treatment

2     of gender dysphoria; correct?

3     A.    I was retained but not disclosed, so I can't speak about

4     the details.

5     Q.    You didn't provide an expert report; correct?

6     A.    Correct.  It was dismissed prior to getting to that point.

7     Q.    You have never published any peer-review article relating

8     to treatment of gender dysphoria; correct?

9     A.    I was acknowledged in an article --

10    Q.    Please answer the question.

11    A.    No.  I -- I have not published in a peer-review journal on

12    gender dysphoria.

13    Q.    And the acknowledgement, you were talking about a

14    newsletter that someone wrote and, at the end, said thank you

15    with a number of individuals for talking to me; is that fair?

16    A.    No, that's not fair.

17          That individual had attended one of my talks and talked to

18    me after the talk and developed this article in collaboration.

19    So he sent it to us, a couple of us.  And I reviewed it and gave

20    him some feedback.

21    Q.    This article, you're talking about a newsletter; right?

22    It's not a peer-reviewed publication?  I want to be clear for

23    the court.

24    A.    It's in the American Academy of Psychiatry, in a

25    newsletter; that's correct.

1    Q.   Newsletter.

2         You have never completed any peer-review research relating

3    to treatment of gender dysphoria; correct?

4    A.   That's correct.  Most of my career has been --

5    Q.   Please just answer the question.

6    A.   That's correct.

7    Q.   You have never served on the board of any organization that

8    relates to treatment of gender dysphoria; correct?

9    A.   Outside of the Department of Correction in Massachusetts,

10   that would be correct.

11   Q.   And your only university or graduate-level teaching

12   experience regarding treatment of gender dysphoria was a single

13   lecture at Brown University; correct?

14   A.   I provided a lecture at Brown University.

15   Q.   One lecture; correct?

16   A.   It was to the forensic fellowship program.  There is only

17   one fellow at a time.  Yes, that's correct.

18   Q.   And that was your only university or graduate-level

19   teaching experience regarding treatment of gender dysphoria;

20   correct?

21   A.   Well, I presented at three conferences, including an

22   academic conference.

23   Q.   You're talking about correctional conferences.

24        Those aren't university or graduate-level teaching courses,

25   are they?

553

1    A.   They are typically sponsored by a university.  And the CME

2    that's given out is from the university.  So I'm not sure if

3    technically that counts as being university.

4    Q.   Okay.  We'll move on.

5         You said your training on treating gender dysphoria

6    consists of attending a WPATH conference.  And you can't

7    remember whether it was 2016 or 2017; correct?

8              MR. EATON:  Objection.  Misstates the testimony.

9    Q.   BY MS. RIFKIN:  That's one -- that was one part of your

10   training?

11             THE COURT:  State the question one more time and

12   then -- so counsel can object.  It kind of got garbled.  Go

13   ahead.

14             MS. RIFKIN:  Sure.

15             THE COURT:  Because of the objection.  Go ahead.

16   Restate the question.

17   Q.   BY MS. RIFKIN:  You stated that one of the bases of your

18   training for treating gender dysphoria was attending a WPATH

19   conference, and you can't remember whether it was 2016 or 2017;

20   correct?

21   A.   It was January of 2016.

22   Q.   And another bases of your training was attending a talk on

23   gender dysphoria at the July 2017 National Commission on

24   Correctional Health Care conference; is that correct?

25   A.   I attended a talk by Dr. Timothy Beach from California at

1    that conference, yes.  And then I also received two hours a

2    month of supervision with Dr. Stephen Levine as part of the

3    Gender Dysphoria Treatment Committee and supervision group.

4    Q.   And that plus reading literature, that's your training on

5    treating gender dysphoria; correct?  That's the universe?

6    A.   Well, and treating the patients that I had prior to

7    becoming involved in the committee.

8    Q.   In your report, you wrote that you received monthly formal

9    consultation from Dr. Stephen Levine plus additional extended

10   in-person training; correct?

11   A.   That's correct.

12   Q.   The monthly formal consultation was your participation on

13   the Massachusetts Department of Corrections Gender Dysphoria

14   Treatment Committee with three other members, including

15   Dr. Levine; correct?

16   A.   It was that, and it was also the supervision group, which

17   had a larger number of members.  He participated in that and the

18   treatment committee.  So both.

19   Q.   He was a consultant to each of these groups, so he would

20   call into each of these groups' meetings for one hour for each

21   meeting; correct?

22   A.   Yes.  And we would review cases with him and ask his

23   opinion.  He would provide --

24   Q.   And the extended in-person training that you refer to in

25   your report, you testified in your deposition that was actually

1    a one-day training you attended where the Massachusetts

2    Department of Corrections brought Dr. Levine in to provide a

3    training; correct?

4    A.   There is one that I can recall.  So I believe that that's

5    correct.

6    Q.   That was your extended in-person training; correct?

7    A.   Well, extended beyond the monthly, because it was longer,

8    and it was in person.

9    Q.   Your only experience directly treating any patient who has

10   received gender confirmation surgery was with a patient who was

11   in a hospital program for somewhere between three to seven days

12   when you were doing your residency; correct?

13   A.   That patient, yes.  I have other patients that had gender

14   dysphoria, but that was the only postsurgical one.  Other than I

15   think I mentioned in the deposition, too, there was a patient in

16   the Massachusetts system who had had a surgery that didn't go

17   well, and I believe it was done in another country.

18   Q.   You were not that person's direct clinical treater,

19   assigned clinical provider, as I think you mentioned earlier;

20   correct?

21   A.   I was the supervisor for the nurse practitioner that was

22   treating her.  So I did the supervision over her treatment.

23   Q.   So I'm going to ask my question again.

24        Your only experience directly treating any patient who has

25   received gender confirmation surgery was with a patient who was

1     in a hospital program for somewhere between three to seven days

2     when you were doing your residency; correct?

3     A.   To the best that I can recall, that's correct.

4     Q.   And you have never made any recommendation that a patient

5     with gender dysphoria receive gender confirmation surgery;

6     correct?

7     A.   At this point, I have not.  But, again, we discussed it on

8     several patients that --

9     Q.   I'm going to ask you --

10         THE COURT:  Let me -- I think that question is pretty

11    much yes or no.

12         Restate the question, if you would.

13         And try to answer counsel's questions very directly.  We

14    can move this much more quickly.  Mr. Eaton will have a chance

15    to allow you to clarify and elaborate on redirect.  But for our

16    purposes here on cross, answer the questions yes or no, if they

17    can be answered that way.

18         Would you restate the question, Ms. Rifkin.

19         MS. RIFKIN:  Sure.  Thank you.

20    Q.   BY MS. RIFKIN:  And you have never made any recommendation

21    that a patient with gender dysphoria receive gender confirmation

22    surgery; correct?

23    A.   Yes.

24    Q.   And you have never written a letter of referral for gender

25    confirmation surgery; correct?

1    A.   Correct.  That would be -- that wasn't part of my role in

2    prison because it would have been through the committee.  So I

3    have --

4    Q.   I'm going to ask you, once again, to answer my question

5    that I'm asking you.

6    A.   Yes, that's correct.

7    Q.   You have never done long-term follow-up care with a patient

8    who has had gender confirmation surgery; correct?

9    A.   Yes.

10   Q.   Prior to your work that defendants paid you for in this

11   case, you had never personally assessed any patient with gender

12   dysphoria as to the medical necessity of gender confirmation

13   surgery; correct?

14   A.   Again, the process in the system that I --

15   Q.   I'm going to ask you to answer my question, please.

16        THE COURT:  Just a moment.

17        Again, answer the question yes or no.  Again, Mr. Eaton

18   will have a chance to allow you to elaborate later.  But if the

19   question can be answered fairly yes or no, it should be.

20        Restate the question one more time, if you would,

21   Ms. Rifkin.

22   Q.   BY MS. RIFKIN:  Prior to your work defendants paid you for

23   in this case, you had never personally assessed any patient with

24   gender dysphoria as to the medical necessity of gender

25   confirmation surgery; correct?

1    A.   I mean, again, the process that -- I would say I didn't do

2    a formal evaluation specifically for that purpose, that's

3    correct.

4         MS. RIFKIN:  I'm going to move to strike that as

5    nonresponsive.

6         THE COURT:  I think it is responsive.  Let's go ahead

7    and put another question.

8         But, again, yes or no if you can.

9         Go ahead.

10   Q.   BY MS. RIFKIN:  You had never done an in-person evaluation,

11   including a clinical interview, to assess any patient with

12   gender dysphoria as to the medical necessity of gender

13   confirmation surgery; correct?

14   A.   Yes, that's correct.

15   Q.   And at the time of your deposition approximately three

16   weeks ago, you had billed defendants more than approximately

17   $60,000 for your work on this case; correct?

18   A.   I have an hourly rate, and I reviewed many records and

19   spent a long time on the report.  So that is the rate that I

20   charge; correct.

21   Q.   And your interview -- so you had billed defendants, as of

22   the time of your deposition three weeks ago, approximately

23   $60,000 for your work on this case; correct?

24   A.   I don't remember exactly how many hours I had.  I think

25   that sounds a little bit --

1          THE COURT:  The question is the dollar amount, not the

2     hours.

3          THE WITNESS:  Mm-hmm.  Right.

4     Q.   BY MS. RIFKIN:  At your deposition, you testified that you

5     had spent between 75 to 85 hours to be averaged at 80 -- at $600

6     an hour, so that's $48,000, plus $6,000 per day for your two-day

7     trip to Idaho to interview Ms. Edmo; correct?

8     A.   Yes, that sounds approximately correct.

9     Q.   And $48,000 and $12,000, that's $60,000; correct?

10    A.   That sounds correct.

11    Q.   And, in fact, for the record to be very clear, your

12    interview with Ms. Edmo was the first time you had ever done any

13    clinical interview of a patient as to the medical necessity of

14    gender confirmation surgery; correct?

15    A.   Specifically for that purpose, correct.

16         MS. RIFKIN:  Your Honor, I'll continue with my

17    questioning, but I would like to put on the record that we once

18    again move to strike and exclude the opinions by Dr. Garvey as

19    to the medical necessity of gender confirmation surgery for

20    Ms. Edmo.  She does not have any experience to support her

21    opinions in this case.

22         THE COURT:  As counsel pointed out, Rule 702 and 703

23    indicates that the expertise can be based upon training,

24    experience, and education.  And given her role as a psychiatrist

25    working within the prison setting, I think she can offer an

1    opinion.

2        But you have done a good job of pointing out some

3    weaknesses in the resume, and that's something the court

4    obviously will consider, but it does not preclude her from

5    testifying.

6        Go ahead and proceed.

7    Q.   BY MS. RIFKIN:  Dr. Garvey, your experience with gender

8    dysphoria comes almost exclusively, based on what you told us

9    during the direct, from your participation on the Massachusetts

10   Department of Corrections Gender Dysphoria Treatment Committee

11   and Supervision Group; correct?

12   A.   That's been most of my experience, yes.

13   Q.   And you were part of that group for two years; correct?

14   A.   Correct.  I had -- I believe it was around 2013, I did a

15   couple of preliminary evaluations that I presented to the group.

16   So --

17   Q.   I'm going to ask you, once again, to listen to my question

18   and please answer my question.

19       You were a part of that group for two years; correct?

20   A.   I was a part of the group for two years.  I had gone to

21   meetings prior to that.

22   Q.   For the time that you served in the capacity as a member of

23   the Massachusetts Department of Corrections Gender Dysphoria

24   Treatment Committee and Supervision Group, IDOC's expert in this

25   case, Dr. Andrade, was also part of that treatment committee;

1    correct?

2    A.   Yes, that's correct.

3    Q.   As well as Massachusetts Department of Corrections outside

4    consultant, Dr. Levine; correct?

5    A.   Correct.

6    Q.   And there were four members of the treatment committee;

7    correct?

8    A.   Or five.  There was a Department of Correction

9    representative who was a health service division director, so

10   sort of the person that oversaw our contract.  Sometimes she had

11   an additional health services representative there.  And then

12   also the general medical director for my company was also part

13   of that group.

14   Q.   The treatment committee?

15   A.   The treatment committee, yes.

16   Q.   You testified at deposition you couldn't quite remember; it

17   might be five.  Dr. Andrade testified that there were four.

18        Does four to five members of the treatment committee sound

19   correct to you?

20   A.   It does.  It was up to the Department of Correction who

21   else would be allowed.  So I know that a health services

22   division director was part of it.  Sometimes she sends someone

23   in her place, and sometimes she might have brought someone with

24   her.

25        So, yeah, that sounds correct.

1    Q.   So you, Dr. Andrade, IDOC's expert in this case, and

2    Dr. Levine, who has been referenced extensively in this case,

3    you were three of the four or five members of the Massachusetts

4    Department of Corrections Gender Dysphoria Treatment Committee;

5    correct?

6    A.   Yes, that's correct.

7    Q.   And that's where, as you testified a few moments ago,

8    besides attending one WPATH conference and another presentation

9    at a conference, you testified that the majority of your

10   training came from those group meetings and Dr. Levine's

11   supervision; correct?

12   A.   And from reading a lot of the literature, yes.

13   Q.   And you and Dr. Andrade in the Massachusetts Department of

14   Corrections, you worked close together; correct?

15   A.   I did.  At some point, he was promoted within the company

16   and was no longer in Massachusetts in a large capacity, but he

17   was still part of the Gender Dysphoria Committee.

18   Q.   And within the Gender Dysphoria Committee, you testified

19   that one of your roles was to go out and provide a second

20   interview as to a gender dysphoria diagnosis; correct?

21   A.   Correct.

22   Q.   And while Dr. Andrade was serving in the role on the Gender

23   Dysphoria Treatment Committee, you and he would go together to

24   conduct those assessments; correct?

25   A.   Correct.  Most of the time, we did, yes.

1    Q.   So you and Dr. Andrade worked very closely together in the

2    Massachusetts Department of Corrections; wouldn't you agree?

3    A.   In the gender dysphoria, yes.

4    Q.   And you have done at least three presentations together

5    relating to gender dysphoria at a corrections -- at corrections

6    conferences?

7    A.   Yes, that's correct.

8    Q.   And both of you, then, as part of your role on the Gender

9    Dysphoria Treatment Committee received your supervision from

10   Dr. Levine; correct?

11   A.   Yes.  He was a consultant, and he provided recommendations,

12   and we ran cases by him.  It wasn't really a supervisory role,

13   more of a consultant.

14   Q.   So when you described earlier in your testimony here today

15   that Dr. Levine was a supervisor of this group and provided

16   supervision regarding treatment of gender dysphoria, that's not

17   quite accurate; correct?

18   A.   Yeah.  I guess I might have misspoken there.

19        He was retained by, I believe, the Department of Correction

20   as a consultant, so we ran cases by him.  He offered -- he did

21   the one annual training, but he did a lot of training within

22   those meetings also.

23   Q.   So his was a training role, or it was a consulting role?

24   A.   A little of both.

25   Q.   All right.  If we can show Plaintiff's Exhibit 1030,

1          please.

2                  You and Dr. Andrade gave a conference presentation together

3          that you titled "Tax Dollars at Work, Treating Inmates With

4          Gender Dysphoria"; correct?

5          A.    Correct.  As I explained in the deposition --

6          Q.    I'm going to just --

7                      THE COURT:  Just answer counsel's question.

8                      THE WITNESS:  Correct, but the title is in quotes for

9          a reason.

10                     MS. RIFKIN:  Move to strike.

11                     THE COURT:  Well, I'll strike the response.

12                 I'll again caution the witness to listen to counsel's

13         question.  That's why you'll have redirect in a moment when

14         Mr. Eaton will have a chance to correct and clarify that, but

15         answer the questions directly as they are asked.

16                 Proceed.

17         Q.    BY MS. RIFKIN:  You were the one who came up the title of

18         this presentation; correct?

19         A.    Yes, that's correct.

20         Q.    And you testified in your deposition you wanted it to be

21         catchy; correct?

22         A.    For this conference, that was usually a necessity.

23         Q.    You testified in your deposition that you wanted the title

24         to be catchy; correct?

25         A.    That sounds correct, yes.

1    Q.   And you and Dr. Andrade wrote a summary of your

2    presentation for the conference program; correct?

3    A.   I think there was an abstract in the --

4    Q.   I would like --

5    A.   -- conference program.

6         MS. RIFKIN:  Before we move on, I would like to admit

7    Plaintiff's Exhibit 1030, Your Honor.

8         THE COURT:  Any objection?

9         MR. HALL:  No objection, Your Honor.

10        MR. EATON:  No objection.

11        THE COURT:  1030 will be admitted.

12      (Plaintiff's Exhibit 1030 admitted.)

13        MS. RIFKIN:  I would like to show Plaintiff's Exhibit

14   1029.

15   Q.   BY MS. RIFKIN:  This was the meeting at which you and

16   Dr. Andrade presented this presentation; correct?  The APA, the

17   American Academy of Psychiatry and the Law meeting in 2017?

18   A.   Yes, that's correct.

19   Q.   All right.  If we can go to the next page.  And can we

20   please zoom in on the bottom half of this page.

21        Under the summary you wrote with Dr. Andrade:

22             "For the correctional mental health professional who

23             treats gender dysphoria, however, this means

24             navigating a minefield of advocates on one side and

25             disapproving taxpayers on the other, while maintaining

1              focus on the psychosocial complexity and unique needs

2              of the individual inmate.  Careful exploration of

3              trauma and ambivalence, and consideration of the

4              irreversibility of highly desired forms of treatment,

5              are often represented by plaintiffs' experts as

6              negligence and discrimination.  Advocacy groups call

7              for gender dysphoric inmates to receive treatment that

8              mirrors the community.  These advocates emphasize

9              inmate patients' rights and deemphasize important

10              distinctions between community-dwelling gender

11              dysphoric individuals and those serving life sentences

12              for violent crimes."

13      This is what you and Dr. Andrade wrote as the summary of

14   your presentation, isn't it?

15   A.   Yes, that's correct.

16   Q.   In your deposition, you testified that in addition to the

17   WPATH standards of care, you rely on the NCCHC, the National

18   Commission on Correctional Health Care, guidelines for treatment

19   of dysphoria; correct?

20   A.   I considered those, yes.

21   Q.   You testified that the guidelines you use or rely upon when

22   treating gender dysphoria are the WPATH standards of care and

23   the NCCHC guidelines; correct?

24   A.   Yes, that's correct.

25   Q.   And you're aware -- you're familiar with the NCCHC

567

1    guidelines; correct?

2    A.   Yes.  I haven't read them recently.  But, yes, I'm

3    relatively familiar with them.

4    Q.   Why don't we -- can we bring those up for Dr. Garvey.  I

5    believe it's Plaintiff's Exhibit 1041.  Thank you.

6        Do these look like guidelines you have reviewed,

7    Dr. Garvey?

8    A.   Yes.  There is more to it, but let me just look at it

9    quickly.

10            THE COURT:  Do you wish to see the other pages or

11    just --

12            THE WITNESS:  Sure.  Do you have the other pages?

13    Right.  Okay.  Yeah.  There is usually -- there are a couple of

14    sections.

15            MS. RIFKIN:  Can you just flip through the pages so

16    Dr. Garvey can see.

17            THE WITNESS:  Okay.  Yeah.  I wasn't able to read all

18    of them, but that does look like the document that I have seen.

19    Q.   BY MS. RIFKIN:  You -- you testified that you rely on these

20    when you're treating patients with gender dysphoria; correct?

21    A.   Yes, that's correct.

22    Q.   And as an expert in treating patients with gender

23    dysphoria, then, you're pretty familiar with these guidelines,

24    aren't you?

25    A.   I am familiar with these, yes.

568

Q.   And these NCCHC guidelines specifically incorporate the WPATH standard of care as the standard of care for treating gender dysphoria in corrections settings; correct?

A.   Yes, they do refer to WPATH.  Yes.

Q.   Can we go to page 2 of this exhibit, please.  Can we zoom in on No. 5.

These NCCHC guidelines say that the management of medical or surgical transgender care should follow accepted standards developed by professionals with expertise in transgender health.

In the accepted standards, there is one reference, and that's to the WPATH standard of care, isn't it?

A.   It is.  The WPATH does talk about using them flexibly, so --

Q.   I'm going to ask you --

THE COURT:  Again, just answer the question.

THE WITNESS:  Yes, that's correct.

THE COURT:  All right.  Thank you.

Q.   BY MS. RIFKIN:  So because you've used these and you're familiar with these and you're presenting yourself as an expert on treating gender dysphoria, and you're certified by the National Commission on Correctional Health Care, you understand that this represents the statement from the National Commission on Correctional Health Care that WPATH standards are the accepted standards for treatment of patients in corrections; is that -- is that fair?

1    A.   That's correct.

2              MR. EATON:  Misstates testimony.

3              THE COURT:  I'm sorry?

4              MR. EATON:  Misstates the document.

5              THE COURT:  Well, there is a lot packed into that.

6              MR. EATON:  And compound.

7              MS. RIFKIN:  I can break it down, Your Honor.

8              THE COURT:  Go ahead.

9              MS. RIFKIN:  I'm happy to break it down.

10   Q.   BY MS. RIFKIN:  You testified earlier -- counsel asked you

11   whether you had a CCHP; is that correct?

12   A.   Yes, that's correct.

13   Q.   And that is a certification from the National Commission on

14   Correctional Health Care; correct?

15   A.   Yes, that's correct.

16   Q.   And you testified in deposition that you thought that was

17   important for you to get in order to be better suited to provide

18   correctional healthcare; is that right?

19   A.   Yes.  I think it's important.

20   Q.   And it's not a board-certified -- it's not a

21   board-recognized certification; right?

22   A.   No.  I'm board certified also, but it's an additional.

23   Q.   You are not board certified in correctional healthcare;

24   correct?

25   A.   There is not a board certification in correctional

1       healthcare.  For -- it's a component of forensic psychiatry,

2       which I am board certified in.

3       Q.    So as having to become a CCHP, you had to sit for an exam

4       and pay a fee to get that certification; is that accurate?

5       A.    Yes, that's correct.

6       Q.    And you had to be familiar with the NCCHC standards; is

7       that accurate?

8       A.    Yes, that's correct.

9       Q.    You had to understand what they mean; is that accurate?

10      A.    Yes.

11      Q.    Okay.  So based on your certification by NCCHC and your

12      testimony that you rely on these standards when treating

13      patients with gender dysphoria, is it fair that you understand

14      that this represents NCCHC's statement that the WPATH standards

15      of care should be followed as the accepted standards for

16      treating patients in a correctional setting?

17             MR. EATON:  Objection.  Compound, misstates the

18      document, and foundation.

19             THE COURT:  The witness can testify she either does or

20      does not understand it that way.

21             THE WITNESS:  So it has some of the same weaknesses as

22      the WPATH.  I mean, again, WPATH --

23             MS. RIFKIN:  That is not my question.

24             THE COURT:  All right.  I think the witness is saying,

25      no, she doesn't accept it unqualifiedly.  So I'm going to allow

1    her to explain that.  Because there's -- this is not the kind of

2    question that I think can fairly just be answered yes or no.

3    It's just too compound or complex.

4         So I'm going to give the witness a chance to explain why it

5    is that you think this does not constitute kind of the accepted

6    standard of care.

7              THE WITNESS:  So I'm familiar with this, and I am

8    aware that they cite WPATH as the reference.  When I use WPATH

9    and apply it to correctional systems, I use it as the flexible

10   document that it says that it is.

11        I think there are some weaknesses in the NCCHC guidelines,

12   as well, in that they also don't talk about the specific

13   components of applying the standards to the correctional

14   setting.

15        I think they are very strong in other areas in terms of

16   safety and other kinds of, you know, making sure that staff are

17   trained, but they also don't get into the specifics about

18   applying WPATH standards of care to the correctional

19   environment.

20        I think I also said previously that there isn't -- I'm not

21   aware of any kind of competing set of guidelines.  So I use

22   what's available, which is the NCCHC and WPATH, and I apply

23   clinical judgment to the WPATH standards.

24             THE COURT:  All right.  So what I hear you saying is

25   that you have -- you feel that there is some inadequacy to these

1      NCCHC standards.

2           But I think the question is:  Do you recognize that they

3      are kind of -- that they are the only developed standards for

4      treating patients with gender dysphoria?

5           And I think you acknowledged that when you said there is

6      nothing competing.  Do you acknowledge this is the only standard

7      that's been published or put out by any reputable organization?

8                THE WITNESS:  It's the only one that I'm aware of,

9      yes.

10               THE COURT:  All right.  Go ahead.

11               MS. RIFKIN:  Can we --

12               THE COURT:  Counsel, we are probably close to taking

13     another break, but I'll let you go for another five, maybe ten

14     minutes but not more than that before we take a break.

15     Q.   BY MS. RIFKIN:  All right.  In you -- in the direct

16     testimony, you talked about a CMS decision that talked about

17     WPATH standards.

18          Do you recall that discussion with Mr. Eaton?

19     A.   Yes.

20               THE COURT:  Okay.  I have not been very thoughtful of

21     Ms. Hohenleitner's almost impossible role in this courtroom.

22     Let's try to speak a little more slowly and not speak over each

23     other.  All right.

24               MS. RIFKIN:  Thank you, Your Honor.  And I apologize.

25     Q.   BY MS. RIFKIN:  So you recall that discussion; correct?

1    A.    Sorry.  Say that -- remind me which discussion.

2    Q.    You discussed with Mr. Eaton a CMS decision about

3    coverage -- about coverage of surgery for gender dysphoria.

4    A.    Yes.

5    Q.    Do you recall that?

6          The decision that you were talking about, that was actually

7    a decision by CMS about whether they would issue an affirmative

8    coverage decision saying that surgery would affirmatively be

9    covered for the Medicare population; correct?

10   A.    That's correct.

11   Q.    And you're aware that there -- two years prior to that,

12   there was a decision by the Department of Health and Human

13   Services also talking about surgery and coverage of surgery to

14   treat gender dysphoria; correct?

15   A.    Yes.  That was where they did away with the exclusion

16   against treating surgery.  And then this was to look at whether

17   it would automatically be covered, and they concluded it would

18   be on a case-by-case basis.

19   Q.    It was -- and I want to be really clear here.  It was a

20   conclusion about whether it would automatically be covered for

21   the Medicare population; correct?

22   A.    That's correct, based on their review of the literature in

23   general, not specific to the Medicare population.  Their

24   conclusions were drawn --

25         MS. RIFKIN:  I'd move to strike.

574

1           THE COURT:  Again, listen carefully to the question.

2   The question was:  Was there a conclusion about whether it would

3   be automatically covered for the Medicare population?

4           THE WITNESS:  That's correct.

5   Q.   BY MS. RIFKIN:  And Ms. Edmo is not part of the Medicare

6   population, as far as you know?  That's what you testified at

7   your deposition; correct?

8   A.   I am not aware of her being part of the Medicare

9   population.

10  Q.   All right.  If we can show Plaintiff's Exhibit 1026,

11  please.

12          This is the decision by the Department of Health and Human

13  Services on May 30, 2014.  And this is where the board

14  determined to end an exclusion.  They had a blanket exclusion on

15  covering surgery -- gender confirmation surgery; right?

16  A.   Yes, that's correct.

17  Q.   And they just --

18          MR. HALL:  Objection.  Hearsay.

19          MR. EATON:  Join.

20          THE COURT:  It's not being offered for the truth of

21  the matter asserted but just to cross-examine the witness about

22  her knowledge of the standard?  I'm not sure --

23          MS. RIFKIN:  And about her testimony about these CMS

24  decisions and what the Department of Health and Human Services

25  and CMS --

575

1          THE COURT:  I don't know how we cannot get in -- I

2     mean, we have talked all around about this decision.  I don't

3     know how we can't look at the original document -- not for the

4     truth of the matter asserted, but how it bears upon all of the

5     discussion we have already had.

6          I'll overrule --

7          MR. HALL:  I'll object on foundation as well.  I don't

8     think there is any testimony as to what this is or counsel's

9     representations.

10          MR. EATON:  Join.

11   Q.   BY MS. RIFKIN:  Dr. Garvey, you understand when I -- we

12   just talked about two different decisions.

13          You described a decision, right, about CMS not issuing an

14   affirmative coverage decision saying it would affirmatively

15   cover all surgeries for the Medicare population; correct?

16   A.   That's correct.

17   Q.   And I asked you if you were aware of a preceding decision

18   that eliminated the ban on covering surgery which they had

19   prior; right?

20   A.   Yes.  I'm aware of that.

21   Q.   And this is that document; correct?

22   A.   I haven't -- I can't --

23          THE COURT:  Let's take a break and give her a copy,

24   and she can review it and come back and tell us if it's that

25   document or not.

1          MS. RIFKIN:  Okay.

2          THE COURT:  I mean, if, in fact, it's something other

3     than what we have been talking about, then I think Mr. Hall or

4     Mr. Eaton is perfectly right to object.

5          If it's exactly what we have been talking about, then I

6     think we are wasting time over something that is really pretty

7     inconsequential, and we have already been all through it through

8     other witnesses, anyway.

9          One thing, Ms. Rifkin, Exhibit 1029, you didn't offer it.

10    Now, you don't need to offer an exhibit when you're using it

11    only for impeachment purposes.  But between now and when we come

12    back, if you want that admitted into evidence, you need to

13    formally move for its admission.  That's Exhibit 1029.

14         All right.  We'll be in recess for 15 minutes.

15         (Recess at 11:57 a.m. until 12:20 p.m.)

16         THE COURT:  For the record, we have reconvened.  I'll

17    remind you, Dr. Garvey, you are still under oath.

18         You may resume your cross-examination, Ms. Rifkin.

19         MS. RIFKIN:  Yes.  Before I resume, I would like to

20    move Plaintiff's Exhibit 1029 into evidence.

21         THE COURT:  Is there any objection?

22         MR. EATON:  I don't believe so, Your Honor.

23         MR. HALL:  No, Your Honor.

24         THE COURT:  1029 will be admitted.

25         (Plaintiff's Exhibit 1029 admitted.)

577

1    Q.    BY MS. RIFKIN:  Dr. Garvey, in your expert report in this

2    case, you discussed -- you specifically cited Dr. Ettner, the

3    plaintiff's expert's report and her discussion of the CMS

4    overturning Medicare's policy barring coverage for

5    transition-related surgeries in May 2014.

6          Do you recall discussing that?

7    A.    Yes, I do.

8    Q.    It's on page 27 of your report?

9    A.    Okay.

10   Q.    All right.  So if we can go back to Plaintiff's Exhibit

11   1026, please.

12         This is the decision, the Department of Health and Human

13   Services decision, you were referencing on page 27 of your

14   report, correct, about Dr. Ettner's discussion?  You talked

15   about this 2014 decision and then the subsequent decision?

16   A.    This is discussing that decision, yes.  I'm not sure if I

17   had seen -- I have seen a couple of different versions of it.

18   But, yes, I believe so.  This was to do away with the exclusion

19   of the treatment.

20   Q.    All right.  And if we can turn to page 15 of this exhibit.

21   Can we please zoom in on the paragraph that starts "We

22   conclude," down through the next heading.

23         This was the decision to overturn the surgery.  And the

24   Department of Health and Human Services concluded that:

25               "The APA has shown that the NCD statement that

1                    transsexual surgery is unsafe and has a high rate of

2                    complications is not reasonable in light of the

3                    evolution of surgical techniques and the studies of

4                    outcomes discussed in the new -- in the unchallenged

5                    new evidence presented here."

6           That was part of their decision in May 2014; correct?

7    A.   That's correct.  Again, this was to do away with the

8    exclusion.  So they disagreed that the research was not -- did

9    not support doing the surgery in general.

10   Q.   In fact, they concluded and it's summarized in the heading

11   that begins -- the very next heading:

12                   "The new evidence indicates that transsexual surgery

13                   is an effective treatment option in appropriate

14                   cases."

15          Correct?

16   A.   Correct.  And I agree it is an effective treatment option

17   in appropriate cases.

18   Q.   Okay.  And they cited -- there is a footnote to this

19   heading, footnote 22.

20          And CMS cited to the WPATH standards in that footnote;

21   correct?

22   A.   I'm just going to look at it quickly.

23          You're talking about the one that says, "We do not read the

24   new evidence as necessarily" --

25   Q.   You don't need to read it, Dr. Garvey.  I'm asking you

1     about the footnote 22.

2              THE COURT:  It's been blown up on the screen for you

3     there, too.

4              THE WITNESS:  Okay.  I'm reading it.  What was the

5     question?

6     Q.   BY MS. RIFKIN:  The question is whether footnote 22 that's

7     cited for new evidence indicates that transsexual surgery is an

8     effective treatment option in appropriate cases.

9          Then there is a footnote, whether that footnote refers to

10    WPATH standards of care.

11    A.   Yes.  The footnote discusses appropriate cases and refers

12    to WPATH.

13    Q.   If we can put up Joint Exhibit 15, please.

14             THE COURT:  Do you intend to offer Exhibit 1026?

15             MS. RIFKIN:  Yes, Your Honor.  Thank you for the

16    reminder.

17             THE COURT:  Any objection?

18             MR. EATON:  Yes, I would object.  We offered -- tried

19    to offer the CMS records previously, and the court said no, that

20    it's hearsay.

21             MS. RIFKIN:  Well, Your Honor, Dr. Garvey referenced

22    this, and they affirmatively brought it out on their direct.

23             THE COURT:  You have been able, through

24    cross-examination, to highlight what you need to from the

25    document.  So I don't think we need to admit the entire

1       document.

2            So I'll sustain the objection.

3       Q.   BY MS. RIFKIN:  All right.  So these are the WPATH

4       standards of care.  And there has been talk about the

5       applicability of these to people in prisons.

6            Let's go to page 73 of this exhibit, please.  Can we please

7       blow up the bottom half of the page.

8            You're familiar with this section of the WPATH standard of

9       care; right, Dr. Garvey?

10      A.   Yes, I'm familiar with it.

11      Q.   You said you have read the WPATH standards multiple times;

12      correct?

13      A.   Yes.

14      Q.   And these begin by saying:

15               "The standards of care in their entirety apply to all

16               transsexual, transgender, and gender nonconforming

17               people, irrespective of their housing situation."

18           Correct?

19      A.   That's what it says, yes.

20      Q.   It goes on to say that:

21               "People should not be discriminated against in their

22               access to appropriate health care based on where they

23               live, including institutional environments, such as

24               prisons, or long-/intermediate-term health care

25               facilities."

581

1           That's the next sentence; correct?

2      A.   Yes.

3                THE COURT:  Counsel, is that -- that's part of the

4      WPATH?

5                MS. RIFKIN:  Yes, Your Honor.

6                THE COURT:  All right.  Exhibit 15?

7                MS. RIFKIN:  Yes.  Page 73, Your Honor.

8      Q.   BY MS. RIFKIN:  And then it states:

9                "Health care for transsexual, transgender, and gender

10               nonconforming people living in an institutional

11               environment should mirror that which would be

12               available to them if they were living in a

13               noninstitutional setting within the same community."

14     Correct?

15     A.   That's what it says, yes.

16     Q.   And you agree with that statement, don't you?

17     A.   I would like to see more detail.  That's where I don't

18     agree with every statement in this section, because there

19     are --

20     Q.   Dr. Garvey, I'm asking you about this -- the sentence that

21     I just read, the last sentence of this paragraph.

22          Do you agree that healthcare for transsexual, transgender,

23     and gender nonconforming people living in an institutional

24     environment should mirror that which would be available to them

25     if they were living in a noninstitutional setting within the

1     same community?  Do you agree with that statement?

2     A.   I agree that all treatment options that are available in

3     the community should be available.

4          I wouldn't use the word "mirror" because that does not take

5     into account unique aspects of the correctional environment.

6     There are some things that we have to make treatment decisions

7     on that are not a treatment decision outside.  So, actually, to

8     say that it mirrors the community would leave out some important

9     pieces of the treatment.

10    Q.   So you disagree with this sentence; is that accurate?

11    A.   I agree that all the options should be available.  I do

12    disagree with the sentence as written, yes.

13    Q.   So it's your opinion that if a person inside a prison with

14    gender dysphoria, if surgery would be medically required to

15    treat that person if they were in the community, that doesn't

16    mean that they should get it if they are in prison?  Is

17    that -- is that your opinion?

18    A.   No, that's not my opinion.

19              MR. HALL:  Objection.  Vague.

20              THE COURT:  I'm sorry.  What?

21              MR. HALL:  Objection.  Compound, vague.  But she

22    answered.

23              THE COURT:  All right.

24              MR. HALL:  I'll withdraw.

25              THE COURT:  I'll take the objection as withdrawn.

1          Go ahead.

2               THE WITNESS:  That's not my opinion, no.

3     Q.   BY MS. RIFKIN:  The next sentence is:

4               "All elements of assessment and treatment as described

5               in the standard of care can be provided to people

6               living in institutions.  Access to these medically

7               necessary treatments should not be denied on the basis

8               of institutionalization or housing arrangements."

9               MR. EATON:  I'm going to object as vague.  Institution

10    is defined as prison or long-/intermediate-term --

11              MS. RIFKIN:  I didn't ask a question.

12              THE COURT:  Counsel, she is just reading from the

13    document.  You can say the document is vague, but there is no

14    question yet.  So if there is an objection, it's overruled.

15         Proceed.

16    Q.   BY MS. RIFKIN:  Do you agree that access to the medically

17    necessary treatments described in the standard of care should

18    not be denied on the basis that somebody is in prison?

19    A.   Yes.  I just want to make sure because of the double

20    negative.

21         I agree that they should not be denied based on being in

22    prison, yes.  I do agree with that sentence.

23    Q.   If we can turn to the -- can we zoom out, please.  Can we

24    turn to the next page, page 74.

25         This is the second part of this section of applicability of

584

1      the standards of care to people living in institutional

2      environments that you're familiar with; right, Dr. Garvey?

3      A.   Yes.

4      Q.   Can we zoom in on the paragraph "Reasonable

5      accommodations," please.

6           I would like to direct your attention to the last sentence

7      of this paragraph, Dr. Garvey.

8                "Denial of needed changes in gender role or access to

9                treatments, including sex reassignment surgery, on the

10               basis of residence in an institution are not

11               reasonable accommodations under the standard of care."

12          Is it your understanding that somebody housed in prison

13     cannot meet criteria No. 6 for surgery, 12 months of living in a

14     congruent role of their preferred gender identity?

15     A.   No, that's not my opinion.

16     Q.   So it's your opinion that somebody living in a prison can

17     satisfy that criteria of living for 12 months in a role

18     congruent with their preferred gender identity?

19     A.   Yes, on a case-by-case basis.

20          It's easier to do that in someone that is going to be

21     serving a life sentence, but I think on a case-by-case basis, it

22     could be met even for someone that's not serving a life

23     sentence.  It would probably have to incorporate elements of the

24     community, like family involvement and things like that, but I

25     do believe it's possible.

585

1    Q.   What about interacting with people at a job?  Would

2    that -- would that be part of what qualifies you for that 12

3    months of congruent living?

4    A.   Well, this is where I wish that there was more guidance on

5    how to apply that standard.  This section, I think, should talk

6    about that.

7    Q.   I'm asking for you -- I'm sorry.  I'm asking for your

8    opinion, Dr. Garvey, your opinion of how somebody in prison --

9    which you said they can do -- can meet that 12-month

10   requirement.  And you said on a case-by-case basis, in certain

11   situations, for example, family.

12        And I'm asking:  On a case-by-case basis, can having a job

13   count towards that 12 months of living in a congruent role?

14   A.   It's possible.  It won't give the same experience as having

15   a job in the community.  I think, again, it's all case by case.

16   Q.   In your opinion, if that job involves interacting with

17   nonincarcerated persons, does that make it more like the

18   community?

19   A.   It's possible.

20   Q.   When you say "it's possible," have you thought about that

21   before?

22   A.   Well, I have had patients -- in my experience in

23   Massachusetts, we had patients on a work release, so they did go

24   out into the community and work.  So it is something that I

25   thought about.  That particular -- those particular patients

GARVEY - Cross

586

1    were getting out soon and not seeking surgery.  So I wasn't

2    thinking about it then specifically regarding the real-life

3    experience.

4        But since then, since I know that people do go out into the

5    community and have jobs with people in the community, I think

6    it's possible.

7    Q.  Because you didn't evaluate it -- because for those

8    patients, you didn't evaluate whether surgery was medically

9    necessary for them; correct?

10   A.  For those patients, they were not looking for surgery.

11   Q.  For those patients, you didn't evaluate whether surgery was

12   medically necessary for them; correct?

13   A.  None of them requested surgery, or we did talk about

14   surgery, but they did not want surgery.

15   Q.  All right.  I would like to turn to page 67 of the WPATH,

16   this exhibit, the WPATH standards of care.

17       Do you see the section titled "Rationale for a

18   preoperative, 12-month experience of living in an

19   identity-congruent gender role"?

20   A.  Yes, I do.

21   Q.  Okay.  If we can please -- well, that works.

22       I would like to direct your attention to the second

23   paragraph that's up on the screen.

24           "The duration of 12 months allows for a range of

25           different life experiences and events that may occur

1          throughout the year..." and gives some examples.

2     Do you see that?

3     A.   Yes, I do.

4     Q.   This sentence doesn't say the duration of 12 months must

5     include every type of different life experience that somebody

6     can have in a year, does it?

7     A.   It doesn't.

8          I see this as a clinically relevant experience.  So, no, I

9     don't think you have to check a bunch of boxes and make sure

10    they have gone on a vacation and done all of those things.  But

11    this, to me, speaks to the rationale behind the clinical

12    experience of experiencing the identified gender prior to

13    undergoing surgery.

14         So I don't think all those boxes need to be checked, but it

15    has to be a clinically meaningful experience.

16    Q.   A clinically meaningful experience would be interacting

17    with people in a preferred gender role and understanding how

18    they interact back with you, understanding the both positive and

19    negative interactions you might have living like that.

20         Do you agree with that?

21    A.   I think that that can happen to a degree, but there is

22    going to be another social adjustment that happens in the

23    community.  So that's certainly part of it.  It's not going to

24    completely mimic what the adjustment will be in the community.

25    Q.   Is it your opinion that if somebody in the community

1    is -- wants sex reassignment surgery and it's medically

2    necessary, but they may transition to a new job at some point in

3    the future or move to a different state at some point in the

4    future -- let's say from California to North Dakota or Texas,

5    where they might interact with people with different sets of

6    ideas -- they should be denied sex reassignment surgery because

7    if they move to Texas or North Dakota, it might be a social

8    adjustment for them?

9    A.   You're asking if that's my opinion that they should be

10   denied?

11   Q.   That's right.  Because they may move to a different

12   community in the future where that -- there might be a social

13   adjustment for them as a post-op transsexual person.

14   A.   No, that's not my opinion.

15   Q.   You have never treated any people with gender dysphoria

16   outside of prison other than that single patient for that three-

17   to seven-day period during your residency; correct?

18   A.   No, that's not correct.

19        I had a patient more recently who had gender dysphoria and

20   was looking for -- she was in a rural part of the country and

21   was very young and didn't have access to resources.  So we

22   talked about what resources were available.

23   Q.   Was that in the last three weeks, between the time of your

24   deposition and today?

25   A.   No.  I think I mentioned this in my deposition.  This was a

GARVEY - Cross

589

1    patient in a community mental health setting.

2    Q.   How long did you treat that patient?

3    A.   I was only in that location for about six months.  So about

4    six months, maybe a little bit less.

5    Q.   Okay.  So besides those two patients that you've told us

6    about with gender dysphoria you have interacted with the

7    community, you haven't treated other people with gender

8    dysphoria in the community, have you?

9    A.   No.  I think I mentioned also that I had a therapy patient

10   who was sort of exploring gender but that hadn't -- hadn't

11   identified fully, but we were doing therapy and working

12   primarily on other things.

13        So other than that, no.

14   Q.   Are you making a determination or offering an expert

15   opinion about whether it's easier to be a transgender person

16   outside of prison or inside of prison?

17   A.   No, I'm not.

18   Q.   You would agree that you don't have a basis based on

19   experience to provide that opinion; correct?

20   A.   I'm not sure that -- I mean, I -- I haven't seen any

21   definitive comparative studies, so I wouldn't offer an opinion

22   on that, no.

23   Q.   You would agree that you don't have the basis to provide an

24   expert opinion as to whether it's easier to be a transgender

25   person inside a prison or outside a prison; correct?

1          MR. HALL:  Objection.  Relevance.  She hasn't offered

2     the opinion, so --

3          THE COURT:  Just a moment.  I'll allow it.  I'm not

4     going to let you to go much further than this.  But given the

5     testimony about -- by both Dr. Garvey and Dr. Eliason about the

6     need for 12 months outside of the prison setting, I think it's

7     fair cross.

8          Do you want to restate the question for the witness?

9          MS. RIFKIN:  Sure.

10    Q.   BY MS. RIFKIN:  You would agree that you don't have a basis

11    for providing an expert opinion as to whether it's easier to be

12    a transgender person inside a prison versus outside a prison;

13    correct?

14    A.   No.  I mean, in my 10 years of correctional experience, I

15    know a lot about the differences for individuals in general

16    inside prison and outside but not specific to the gender

17    dysphoria population.

18    Q.   In your report, you stated, quote:

19              "Gender confirmation surgery should not be outright

20              prohibited in a correctional environment.  But until

21              more data is available, it is appropriate for

22              correctional healthcare professionals to use caution

23              in making determinations regarding gender confirmation

24              surgery."

25         Correct?

591

1    A.   Yes.  What page are you on?  That sounds familiar, but I

2    just want to get to where you are.

3            THE COURT:  Is that from Dr. Garvey's written report?

4            MS. RIFKIN:  Yes, Your Honor.

5            THE COURT:  All right.

6            MS. RIFKIN:  We will come back to that.  I don't want

7    to waste time looking for it now.

8    Q.   BY MS. RIFKIN:  But, Dr. Garvey, you agree that sex

9    reassignment surgery is a safe, effective, and widely accepted

10   treatment for gender dysphoria; correct?

11   A.   Yes, I do -- for the correct candidate, yes.

12   Q.   You testified in your deposition that sex reassignment

13   surgery is a safe, effective, and widely accepted treatment for

14   gender dysphoria; correct?

15   A.   Yes, it is, in general.  Yes, I believe that.

16   Q.   And you agree that disputing the medical necessity of sex

17   reassignment surgery based on assertions to the contrary is

18   unsupportable; correct?

19   A.   Yes.

20   Q.   But you also opine that better and more data is needed for

21   the results of surgery for inmates in order to approve these

22   surgeries; correct?

23   A.   Yes.

24   Q.   And in your report, you cite to the American Psychiatric

25   Association Task Force's 2012 report on the treatment of gender

592

1      identity disorder; correct?

2      A.    Yes.  Let me find it.

3      Q.    You can just -- do you recall whether you --

4      A.    Yes.

5      Q.    -- cited to that article?

6      A.    I recall, yes.

7      Q.    You characterized this report as concluding that the

8      quality of evidence pertaining to sex reassignment surgery is

9      low; correct?

10     A.    Correct.  I remember saying that, yes.

11     Q.    Can we show Defendant's Exhibit 2033, please.

12           Is this the report you were referring to in your -- or the

13     paper you were referring to in your expert report, Dr. Garvey?

14     A.    I haven't read through the whole thing.  It looks to be the

15     one that I was referring to.

16     Q.    Do you need to review the entire article to know whether

17     it's the one you cited in your report?

18     A.    No.  The authors and the date and the journal are correct.

19     Q.    If we can zoom in on the second-column paragraph of the

20     page, please.

21           All right.

22                "The American Psychiatric Association Task Force

23                concluded that current evidence was judged sufficient

24                to support recommendations for adults in the form of

25                an evidence-based APA practice guideline with gaps in

593

1              the empirical data supplemented by clinical

2              consensus."

3         They wrote that, right.

4    A.   Further in the report, they explain that the evidence --

5    Q.   Dr. Garvey, is this --

6    A.   That's correct.  That's part of the report, yes.

7    Q.   If we can turn to page 2, please.  I'm not sure how

8    possible it will be to blow this up, but I'll try.  Can we sort

9    of move towards -- I'll circle it, so hopefully we can blow it

10   up.

11        All right.  You cited these -- this article in your expert

12   report to make a point that you do not believe the data and

13   evidence -- quality of evidence pertaining to sex reassignment

14   surgery is of high enough quality in your opinion; correct?

15   A.   Yes.  I believe there is some deficiencies in the data.

16   And I don't know if I can speak more to what this article

17   states, but they also talked about --

18   Q.   I'm just asking why you -- I'm asking if I'm right about

19   why you included it, if I'm fairly --

20   A.   Yes.  Yeah.  Having reviewed the literature myself, the

21   small sample sizes, the different methodologies with lack of

22   control groups and the very high number of people that are lost

23   to follow-up are concerns to me about the quality of the data.

24   Q.   In your expert report, you didn't discuss the APA's

25   observation in this paragraph that, given the very nature of

1    GID, such trials or even unblinded trials with random assignment

2    to treatment groups are not likely to be forthcoming due to a

3    lack of feasibility and/or ethical concerns.

4        You didn't cite that part of the article in your report;

5    correct?

6    A.   I didn't cite the whole -- I mean, I put a part of the

7    article that was relevant.  I read the further discussion.

8    Q.   All right.  Can we pull up page 24, please.

9        Later in this article, the American Psychiatric Association

10   Task Force stated that:

11            "For some important aspects of transgender care, it

12            would be impossible or unwise to engage in more robust

13            study designs."

14       Do you see that?

15   A.   I do.  I mean, you're only showing parts of the article.

16   There is other further discussion about this.

17   Q.   It's similar to quoting just one quote in a report, isn't

18   it?

19       All right.  If we can zoom out again, please.  I think

20   we're going to have to go piece by piece with the sentence.

21       Do you see that last sentence here that's blown up?

22            "Although few systematic studies of suicide among

23            gender-transitioning persons have" --

24       I think the word "not" is a typo there, but --

25            -- "have not been conducted" --

1          And I'll just read the rest:

2               -- "the case report literature suggests that this is a

3               relatively rare outcome."

4          Do you agree with that, that the case reports suggests that

5     suicide among gender-transitioning persons is a relatively rare

6     outcome?

7          MR. HALL:  Hold on.  Your Honor, we can't see the

8     portion that's being read.

9          MS. RIFKIN:  And this is a defendants' exhibit, 2033.

10         THE WITNESS:  I'm sorry.  What is your question?

11    Q.   BY MS. RIFKIN:  Whether you agree that the study -- that

12    the case report literature, which you said you reviewed,

13    suggests that suicide among gender-transitioning persons is a

14    relatively rare outcome.

15         MR. EATON:  Your Honor, I'm going to object.  I know

16    it's hard for counsel to have the sentence all together, but

17    there is also a comment by counsel where there was "not" in the

18    sentence, and then she said I think that's a mistake.  So it's

19    confusing --

20         MS. RIFKIN:  That's fine.

21         MR. EATON:  -- question in that regard.

22         MS. RIFKIN:  I'm not sure this is going to help,

23    but --

24         THE COURT:  Well, zoom in on the bottom left-hand

25    corner, read through it, and then just shift to the top

GARVEY - Cross

596

1   right-hand corner.  I think that will work.  Okay.

2   Q.   BY MS. RIFKIN:  All right.

3          "Although few systematic studies of suicide among

4          gender-transitioning persons have not been conducted,

5          the case report literature suggests that this is a

6          relatively rare outcome."

7   A.   I see that, yes.

8   Q.   Do you understand what that sentence means?

9          THE COURT:  Could you keep up the next part of that?

10         MS. RIFKIN:  I'm sorry.

11         THE COURT:  Counsel, just so I'm clear, then it goes

12  on to say that this other study found an increased risk of death

13  by suicide and of suicide attempts among subjects who had

14  received sex reassignment surgery relative to age-matched

15  population controls.  But that's, again, comparing the general

16  population with those who received sex reassignment surgery, not

17  those who received sex reassignment surgery compared to other

18  gender-dysphoric members of the population?

19         MS. RIFKIN:  Those were my next questions, Your Honor.

20         THE COURT:  All right.

21         MS. RIFKIN:  I'll just move straight to those.

22  Q.   BY MS. RIFKIN:  Dr. Garvey, in your -- in the direct, you

23  cited this study actually -- I believe the Dhejne article -- and

24  you said there was a -- that article found a 19 percent rate

25  that -- suicide rate for individuals who had undergone sex

1      reassignment surgery had a relatively increased suicide rate, 19

2      percent, compared to the general population; correct?

3      A.   It was death by suicide.  So the increased rate of suicide

4      attempts was not as significantly increased as the death by

5      suicide.  The death by suicide rate was 19 times higher than the

6      general population.

7           Sorry.  Go ahead.

8      Q.   Do you know the -- the suicide rate for transgender

9      individuals compared to the general population?

10               THE COURT:  Transgender without sex reassignment

11     surgery?

12               MS. RIFKIN:  All transgender individuals.

13               THE WITNESS:  No.  That's why, as I have talked

14     about --

15     Q.   BY MS. RIFKIN:  I'm just asking you to answer the question.

16          No?  You said, no, you don't know that?

17     A.   Of completed suicide, I haven't found a reference for that.

18     I'm talking about completed suicide, not the suicide attempts

19     part.

20     Q.   So you haven't heard the -- that it's approximately 44

21     times the rate of the general population?  You're unfamiliar

22     with that?

23     A.   For suicide attempts or completed suicide?

24     Q.   You believe that's suicide attempts?

25     A.   That sounds probably close for suicide attempts but not --

1    completed suicide is a much more rare event.  So I haven't heard

2    of 44-fold increase in completed suicide.  I don't think that

3    that's accurate.

4    Q.   You agree that the 19 times -- you agree that the

5    completed -- the rate of completed suicides for all transgender

6    individuals is significantly higher than the gender -- than the

7    general population; correct?

8    A.    Of completed suicides?  That's what -- I guess I don't have

9    a reference for that number.  Completed suicides is, again, a

10   very rare event compared to suicide attempts.  So I don't know

11   what the baseline rate of completed suicide for gender-dysphoric

12   individuals is.

13   Q.   So you agree, then, that this 19 times figure that you

14   cited, that doesn't tell us anything about -- anything

15   clinically significant about the effect of sex reassignment

16   surgery on the transgender population specifically as to

17   completed suicides; correct?

18   A.    It does not tell us the effects.  It tells us that of that

19   cohort, which was a representative sample with no one lost to

20   follow-up, there was a 19 times increased risk.  So it does not

21   tell us -- that could be lower.  It could be lower than the

22   risk might have been.

23            THE COURT:  But, again, it's 19 times when compared to

24   the general population, not the gender-dysphoric population;

25   correct?

1          THE WITNESS:  Correct.  So I use that sample because I

2     see people argue that gender confirmation surgery will cure

3     people of their suicidality.

4          To me, this doesn't tell us anything about the effect of

5     gender confirmation surgery on completed suicide.  It does tell

6     us that it doesn't do -- it doesn't eliminate completed suicide

7     because we know that a significant number complete suicide.

8     They might --

9          MS. RIFKIN:  You have answered my question.  Thank

10    you, Doctor.

11         THE WITNESS:  Okay.

12    Q.   BY MS. RIFKIN:  So in deposition, you agreed that

13    you -- you did not understand either of plaintiff's experts in

14    this case, Dr. Gorton or Dr. Ettner, to be positing that gender

15    confirmation surgery for Ms. Edmo would be treatment in order to

16    solve potential suicidality; correct?

17    A.   From what I recall -- I think I didn't remember this part

18    of Dr. Gorton's report.  But with Dr. Ettner, she had written

19    that Ms. Edmo was at increased risk of suicide if she didn't

20    have the surgery.  I think that's what we had talked about.

21    Q.   But you agreed that you understood both plaintiff's experts

22    to be determining that surgery is necessary to treat Ms. Edmo's

23    gender dysphoria; they were not suggesting this is prescribed to

24    treat her suicidality directly; correct?

25    A.   Right.  But Dr. Ettner had said that she was at increased

1    risk for suicide if she doesn't have the surgery.  So, to me,

2    those are kind of saying a similar thing.

3         If she -- if Dr. Ettner's report said that Ms. Edmo was at

4    high risk for suicide if she didn't have the surgery.

5         THE COURT:  Just to be clear, I think counsel's

6    original question was whether you understood that Dr. Ettner and

7    Dr. Gorton were not opining that this would cure any other

8    non-gender-dysphoria problems which may make her suicidal.  They

9    weren't suggesting it would cure her; you agree with that?

10        THE WITNESS:  I guess I think the suggestion that her

11   risk of suicide is higher if she doesn't have the surgery --

12        THE COURT:  That's not -- that wasn't the question.

13   It's whether they suggested it would cure her of any other

14   suicidal problems attributed to non-gender-dysphoric concerns.

15        THE WITNESS:  Right.  That, to me -- so they don't

16   state it, but saying that her -- that she is at high risk of

17   suicide if she doesn't have the surgery, to me, does suggest

18   that the surgery might do away with her suicidality.

19   Q.   BY MS. RIFKIN:  Is it possible that they were suggesting

20   that the surgery might alleviate rather than necessarily

21   eliminate her risk of suicide?  Do you think that's fair?

22        MR. EATON:  Objection.  Speculation.

23        THE WITNESS:  Yeah.  I'm not sure what --

24        THE COURT:  I'm going to overrule the objection.

25   Again, just so we're clear, I mean, we're not -- we're talking

601

1      about curing mental health concerns.

2           Did you think, explicitly or implicitly, Dr. Gorton or

3      Dr. Ettner were suggesting that the gender confirmation surgery

4      would cure her other mental health issues?

5           THE WITNESS:  I guess I wouldn't say it was suggesting

6      that it would cure, necessarily.

7           THE COURT:  That's what the question was.  So the

8      answer is, no, you did not understand that?

9           THE WITNESS:  No, not from what I recall.

10          THE COURT:  Proceed.

11     Q.   BY MS. RIFKIN:  You testified in your deposition that you,

12     when examining Ms. Edmo, found it difficult to separate

13     Ms. Edmo's depressive symptoms from her gender dysphoric

14     symptoms; correct?

15     A.   That sounds familiar.  I think that's true for a lot of

16     people with gender dysphoria.  And Ms. Edmo told me herself that

17     she thinks she has depression and gender dysphoria.

18     Q.   You testified in your deposition that you -- while

19     examining Ms. Edmo, you, yourself, found it difficult to

20     separate Ms. Edmo's depressive symptoms from her gender

21     dysphoric symptoms; correct?

22     A.   That sounds correct.

23     Q.   And you testified that that's common when people have

24     gender dysphoria and major depressive disorder; correct?

25     A.   That sounds correct.

1    Q.   And it's fair that you do not know how much of Ms. Edmo's

2    depression is related to her gender dysphoria; correct?

3    A.   I think that's correct, yes.

4    Q.   And would it also be fair to state that you don't know how

5    much of Ms. Edmo's suicidality -- that is, increased suicide

6    risk -- is related to her gender dysphoria; correct?

7    A.   That's correct.  I --

8    Q.   That's -- that's what I asked.

9         You assessed Ms. Edmo, you told us, as having gender

10   dysphoria; correct?

11   A.   Correct.

12   Q.   And you added to your diagnosis of Ms. Edmo for gender

13   dysphoria the phrase "posttransition"; correct?

14   A.   Correct.

15   Q.   And you explained in your deposition that that means that

16   she has made changes towards living in her preferred gender;

17   correct?

18   A.   Correct.

19   Q.   You believe Ms. Edmo has presented as female since 2012;

20   correct?

21   A.   Yes.  From the records that I reviewed, that seems to be

22   correct.

23   Q.   And that was six years ago; would you agree?

24   A.   Yes, that's correct.

25   Q.   And you agree that, given that Ms. Edmo has been on

1    feminizing hormones since 2012, you do not expect that she will

2    have many more physical changes associated with the hormones;

3    correct?

4    A.   Correct.

5    Q.   You agree that presently Ms. Edmo continues to experience

6    gender dysphoria; correct?

7    A.   Correct.

8    Q.   When you evaluated Ms. Edmo, you did not see any evidence

9    of psychosis or any kind of obsessional sort of thinking with

10   her; correct?

11   A.   That's correct.

12   Q.   In your review of Ms. Edmo's medical records, you didn't

13   see any evidence of psychosis in her records; correct?

14   A.   That's correct.

15   Q.   You concluded that her insight appeared fair and her

16   judgment appeared to be reasonably intact; correct?

17   A.   That's correct.

18   Q.   And at the time of your evaluation of Ms. Edmo, you didn't

19   see any evidence that she was making negative choices, such as

20   being uncooperative; correct?

21   A.   That's correct.

22   Q.   You did not attribute Ms. Edmo's gender dysphoria to

23   hysteria, psychosis, malingering, or exaggeration; correct?

24   A.   Correct.

25   Q.   You believe that Ms. Edmo's substance use disorders are in

GARVEY – Cross

604

1    full, sustained remission in a controlled environment; correct?

2    A.   Correct.

3    Q.   And you also assess Ms. Edmo as having major depressive

4    disorder at the moderate level; correct?

5    A.   Correct.

6    Q.   You explained in your deposition, there is a mild level, a

7    moderate level, and a severe level of major depressive disorder;

8    correct?

9    A.   That's correct.  And with the information that I had, that

10   was the --

11   Q.   I was just asking you --

12   A.   Sure.  Yes, that's correct.

13   Q.   And you assessed Ms. Edmo as not having severe major

14   depressive disorder but as having moderate major depressive

15   order [*sic*]; correct?

16   A.   Correct.  And that gets to where it's difficult to --

17   Q.   Thank you for the answer.

18        In your deposition, you testified that you don't know why

19   Ms. Edmo attempted to cut off her genitals; correct?

20   A.   Correct.

21   Q.   You don't believe Ms. Edmo is being manipulative by

22   attempting to castrate herself or cutting on her arm; correct?

23   A.   No.  I don't think that she is doing it intentionally to be

24   manipulative, no.

25   Q.   You also testified that you do not know whether providing

1    gender confirmation surgery would do anything to relieve

2    Ms. Edmo's experience of gender dysphoria; correct?

3    A.   I don't have the transcript of the deposition in front of

4    me.  I mean, I -- I think the concern is the outcome following

5    the surgery, not that it wouldn't necessarily -- I guess I

6    don't -- I don't know.  There are -- when I did Ms. Edmo's

7    interview, I didn't have her --

8    Q.   I'm going to stop you and ask you my question again.

9        You also testified at your deposition that you do not know

10   whether providing gender confirmation surgery would do anything

11   to relieve her experience of gender dysphoria; correct?

12   A.   Correct.

13   Q.   Ms. Edmo has been -- and although, as you just told us,

14   you're not able to understand why Ms. Edmo attempted to castrate

15   herself, you believe that this issue has to be addressed before

16   she can have gender confirmation surgery; correct?

17   A.   That and her other forms of self-injury, yes, because it is

18   a maladaptive coping strategy that would not do her well

19   following surgery.

20   Q.   So before Ms. Edmo can have gender confirmation surgery to

21   remove her genitals that give rise to gender dysphoria, she has

22   to stop wanting to cut them off?  Is that your testimony?

23   A.   The patients that I have reviewed and considered for gender

24   confirmation surgery were not --

25   Q.   I'm sorry.

GARVEY - Cross

606

1    A.    -- engaging in --

2    Q.    You haven't evaluated any patients for gender confirmation

3    surgery.  You told us that multiple times; correct?

4              MR. EATON:  Objection.  Misstates testimony.

5              THE COURT:  Is that correct?

6              THE WITNESS:  The distinction I was trying to make --

7    and I was cut off -- is that we discussed it at every monthly

8    meeting.  I didn't formally do an evaluation, but we were

9    discussing their treatment plans and reviewing the people that

10   looked like they were heading towards medical necessity for

11   gender confirmation surgery.  So that was discussed on a monthly

12   basis.

13        And the people that were close, in looking like it was

14   going to be approved at some point, were functioning relatively

15   well, were not engaging in active self-injury in any form.

16   Q.    BY MS. RIFKIN:  You agree, based on your experience with

17   gender dysphoria, that gender dysphoria can take different forms

18   for different people?  Not every person with acute gender

19   dysphoria wants to cut off their genitals themselves; correct?

20   A.    It seems to be relatively rare outside of prison.  So, yes,

21   I'm sure that that's true.  Not everyone wants to cut off their

22   genitals.

23   Q.    And you -- counsel asked you if attempting to self-castrate

24   automatically meant you get sex reassignment surgery, and you

25   said no; correct?

1    A.   Correct.  But --

2    Q.   But you seem to view -- I want to understand this.  In your

3    opinion, you view trying to cut off your testicles as

4    disqualifying for sex reassignment surgery; correct?

5    A.   I wouldn't say "disqualifying."

6    Q.   But you have to stop trying to do that in order to then get

7    the surgery you're trying to perform on yourself; correct?

8    A.   So the point I'm making is that she needs to be able to use

9    healthy coping strategies to deal with stress.  Doing that is

10   not a healthy coping strategy.

11   Q.   So you're a medical doctor; right?

12   A.   Yes.

13   Q.   And in medical school, you study cancer; is that fair?

14   A.   Yes.

15   Q.   Treatments for cancer, like chemotherapy and radiation?

16   A.   Yes.

17   Q.   Were you trained that in order for a patient with a tumor

18   to have a procedure that would remove the tumor, first they have

19   to think about themselves how to reduce the tumor and not be

20   anxious about the tumor in order to have chemotherapy or

21   radiation?

22             MR. EATON:  Object to the form.

23             THE WITNESS:  I haven't seen --

24             THE COURT:  Just a moment.  Just a moment.  Overruled.

25             THE WITNESS:  I haven't seen a patient attempt to

GARVEY - Cross

608

1    remove their own tumor, so I don't -- I guess I don't really see

2    that comparison.

3    Q.   BY MS. RIFKIN:  Have you ever seen a patient who was denied

4    any treatment for their tumor?

5    A.   I can't recall.

6    Q.   Do you think it's possible that if a patient was denied

7    treatment for a tumor that they knew was growing inside them and

8    would kill them, they might try to cut it out themselves?

9              MR. EATON:  Object to form.

10             THE COURT:  Just a moment.

11        I'll overrule the objection, but I think the point is made,

12   Counsel.  You might want to just move on.

13             MS. RIFKIN:  I'll move on.

14             THE COURT:  You can answer that question.

15             THE WITNESS:  I'm sorry.  Can you repeat the question?

16             MS. RIFKIN:  I'll move on.

17   Q.   BY MS. RIFKIN:  Ms. Edmo has been compliant with her

18   hormone therapy for the past six years; correct?

19   A.   Yes.  From the records I read, yes, that looks correct.

20   Q.   Ms. Edmo meets with the psychiatrist assigned to her when

21   she is given an appointment; correct?

22   A.   Yes.

23   Q.   And it's your understanding that Ms. Edmo doesn't attend

24   meetings with Clinician Stewart, that her primary assigned

25   clinician right now, because she feels that Clinician Stewart is

1    not qualified to treat gender dysphoria; correct?

2    A.   Yes, that's my understanding.

3    Q.   And in deposition, you were not able to identify any other

4    members of Ms. Edmo's treatment team who she refuses to meet

5    with; correct?

6    A.   I think I mentioned that there were some groups that she

7    was refusing to participate in.

8    Q.   But as far as members of her treatment team actually

9    assigned to her -- her psychiatrist, other doctors, Dr. Alviso

10   who she sees once a year -- you don't -- you're not aware of any

11   times she has refused to meet with them; correct?

12   A.   With those individuals, no.

13              THE COURT:  Counsel, I would just -- both sides have

14   about an hour, a little over an hour left of your total time.  I

15   just want to let both counsel know so you can think accordingly

16   as to how you plan the rest of the afternoon.

17        Go ahead, Ms. Rifkin.

18              MS. RIFKIN:  Okay.  Thank you, Your Honor.

19   Q.   BY MS. RIFKIN:  In your deposition, you could not identify

20   any studies that you are relying on for your opinion that there

21   is a risk that Ms. Edmo may regret gender confirmation surgery;

22   correct?

23   A.   Yes, that's correct.

24   Q.   You agreed that peer-review articles typically report

25   statistics of regret for gender confirmation surgery as being

1    very low; correct?

2    A.   Yes.  I think I already discussed my concern with the

3    quality of those numbers.

4    Q.   I would like you to turn to --

5         Do we have Dr. Garvey's report that we're able to show?

6    Okay.  I would like to show Dr. Garvey's report and turn to page

7    43.  If we can blow up sort of the top two paragraphs, please.

8         You opined in your report that you disagree with Ms. Edmo's

9    allegation that defendants failed to enact appropriate standards

10   and procedures that would have prevented the harm that she has

11   experienced; correct?

12   A.   Correct.

13   Q.   And even though you're not a lawyer, you opined that

14   Corizon has not been deliberately indifferent because it has not

15   disregarded an excessive risk to an inmate's health or safety;

16   correct?

17   A.   Correct.

18   Q.   You opined that despite Ms. Edmo's -- what you call

19   dissatisfaction with her treatment, defendants are not

20   disregarding risk to her health or safety; correct?

21   A.   Correct.

22   Q.   You believe that concerns that Ms. Edmo is at risk of grave

23   harm without sex reassignment surgery, including suicide, are

24   unfounded; correct?

25   A.   Are you reading this from my report?

GARVEY - Cross

611

1    Q.   No.  I'm asking you.

2    A.   So can you repeat that.

3    Q.   You believe that concerns that Ms. Edmo is at risk of grave

4    harm without sex reassignment surgery, including suicide -- you

5    believe those concerns are unfounded; correct?

6    A.   Yeah.  This gets to the discussion about suicide as a --

7    surgery as a treatment for suicide.

8    Q.   It gets to the treatment -- surgery as a treatment for

9    gender dysphoria, which may alleviate risk of suicide.

10        But you don't believe that; right?

11   A.   I haven't seen evidence that firmly supports that, so I

12   have concerns about making that conclusion.

13   Q.   You're aware that in 2016 and 2017, there were three

14   suicides at ISCI, the institution where Ms. Edmo was housed;

15   correct?

16             MR. HALL:  Objection.  Foundation --

17             MR. EATON:  Objection.

18             MR. HALL:  -- relevance.  Objection.  Foundation,

19   relevance.

20             THE COURT:  Sustained.

21   Q.   BY MS. RIFKIN:  You are opining that you do not believe

22   Ms. Edmo is at increased risk of suicide because defendants will

23   not provide her sex reassignment surgery; correct?

24   A.   I believe that Ms. Edmo's risk of suicide is critically

25   increased because of her history of suicide attempts and her

1        self-injury.  I do not believe that it is caused by the

2        treatment that she has or has not received.

3        Q.   Can we show Plaintiff's Exhibit 1042, please.

4             You testified that you are a certified correctional

5        healthcare provider under NCCHC; correct?

6        A.   Correct.

7        Q.   And NCCHC does an audit, a court-mandated audit, of ISCI,

8        the institution where Ms. Edmo is housed as a result of the

9        court lawsuit.

10            Can we turn to page 35 of this exhibit, please.

11                 MR. HALL:  Objection.  Foundation.

12                 MR. EATON:  Join.

13                 THE COURT:  Well --

14                 MS. RIFKIN:  Your Honor, this -- you will see this is

15       directly relevant.

16                 THE COURT:  I think it's premature to object yet.

17       Let's find out what we're getting at and what --

18                 MS. RIFKIN:  Can you please zoom in for the

19       recommendation.

20                 THE COURT:  Well, just a second.  If the objection is

21       to foundation -- I mean, I presided over the *Balla* case.  I

22       assume I can take judicial notice of anything that's been filed

23       in that proceeding.  I'm not sure -- I'm not sure how far I'm

24       going to let Ms. Rifkin go with it, but I'm not sure the

25       objection is that it's not truly what it purports to be.

1          MR. HALL:  Your Honor, I object on the grounds of

2     relevance and hearsay as well.

3          THE COURT:  Okay.  Well, that might be a good

4     objection, but --

5          MR. EATON:  Join.

6          THE COURT:  -- I'm assuming you are not objecting that

7     this isn't, in fact, the special master's report in *Balla*.

8          But let's see where we're going to go with it, and then

9     I'll sustain the objection or not depending upon -- if you were

10     offering it for the truth of the matter asserted, it's going to

11     be hearsay, and I won't allow it.

12          If you're using it to impeach the witness in some fashion,

13     that may be appropriate if this witness has ever seen it or is

14     aware of it.  Otherwise, I don't know how you can use it.

15          But go ahead and --

16          MR. HALL:  Your Honor, may I ask a question in lieu of

17     an objection?

18          THE COURT:  In aid of objection.  If you ask in lieu

19     of objection, that means you weren't going to make the

20     objection, so just to be clear.  But, yeah, you may.

21          MR. HALL:  Dr. Garvey, have you ever seen this

22     document?

23          THE WITNESS:  I have not.

24          MR. HALL:  Thank you.

25          MS. RIFKIN:  Your Honor --

614

1            THE COURT:  Ms. Rifkin, just give me a proffer as to

2     how you intend to use it.

3            MS. RIFKIN:  Sure.

4            THE COURT:  Because I'm not seeing how it's relevant

5     to the proceeding.

6            MS. RIFKIN:  Two reasons, Your Honor.  Dr. Garvey, in

7     her report -- I just went through the opinions that she

8     offered -- and she opined that defendants -- she disagrees with

9     the allegation that defendants failed to enact appropriate

10    standards and procedures that would have prevented the harm that

11    she has experienced.

12         She testified that she reviewed IDOC and Corizon's -- the

13    policies and procedures regarding inmates with gender dysphoria,

14    and she believes they are not deliberately indifferent and they

15    don't disregard an excessive risk to inmates' health or safety.

16         That's her opinion she is offering in this case.  And I

17    think information, especially if she didn't review it before

18    offering that opinion, is directly relevant about the harm to

19    inmates with gender dysphoria at the institution where Ms. Edmo

20    is housed.

21            THE COURT:  All right.  Well, she has acknowledged

22    that she, in fact, has not reviewed it.  So the fact that there

23    is --

24            MS. RIFKIN:  So I'll ask a question about the general

25    information.

**GARVEY – Cross**

615

1          THE COURT:  Yes, just as to what she has reviewed or

2    not reviewed.

3    Q.   BY MS. RIFKIN:  Did you review any information in order to

4    form your opinions about defendants' policies and procedures and

5    the risk they pose to gender-dysphoric inmates at ISCI -- did

6    you review any information about the three inmates who committed

7    suicide, two of whom had a gender dysphoria diagnosis and one of

8    whom was dealing with sexual identification issues?  Did you

9    review that when you offered this opinion?

10          MR. EATON:  Objection.

11          MR. HALL:  Objection.  Misstates facts -- assumes

12    facts not in evidence.

13          MS. RIFKIN:  So if they are going to object that this

14    misstates facts --

15          THE COURT:  Just a moment.  Just a moment.  Let's tie

16    ourselves to what the report actually says.

17          She has indicated she didn't review it.  So if you want to

18    ask if she was aware of those facts as reported in the report --

19    not your characterization, but as reported in the report -- then

20    let's move on.

21          MS. RIFKIN:  Okay.

22    Q.   BY MS. RIFKIN:  Are you aware that this report noted that

23    ISCI had had three suicides in the past year, in October 2016,

24    in February 2017, and in August 2017?

25    A.   No, I'm not -- I was not.

1        Q.   Are you aware that this report stated that one notable

2   aspect of these suicides is that two of the inmates had a

3   diagnosis of gender dysphoria and the third was associated with

4   the GD inmate community and was exploring sexual identification

5   issues?

6                MR. HALL:  Objection.  Hearsay.

7                MR. EATON:  Join.

8                THE COURT:  Well, it's -- I think for impeachment

9   purposes, it's not being offered to prove the truth, but whether

10  she was aware there was a report out there that said this.

11       This goes to the credibility of the opinions offered, not

12  the substance.  I'm obviously not going to rely upon the truth

13  of those statements but only on the extent to which they call

14  into question the thoroughness of the opinion offered or the

15  evaluation that went into the opinion that was offered.

16       So were you aware of those facts?

17                THE WITNESS:  I was not, no.

18                THE COURT:  All right.  Let's proceed.  Move on.

19                MS. RIFKIN:  No further questions at this time,

20  Your Honor.

21                THE COURT:  All right.  Mr. Eaton.

22       I have some questions, but I think they are not -- I'm not

23  going to take the time, given where we are and how thorough we

24  have covered all of this.

25       So go ahead, Mr. Eaton.

GARVEY – Redirect

617

1                    REDIRECT EXAMINATION

2    BY MR. EATON:

3    Q.   Dr. Garvey, are you the only expert psychiatrist in this

4    case?

5    A.   I believe so, yes.

6    Q.   And you're a board-certified psychiatrist; right?

7    A.   Correct.

8    Q.   And so you are able to opine about standards of care and

9    appropriate care of a psychiatrist; right?

10   A.   Yes, that's correct.

11   Q.   And that would be including Dr. Eliason?

12   A.   Yes, correct.

13   Q.   And unlike plaintiff's experts, you have experience working

14   and treating in a correctional setting; correct?

15   A.   Yes, in three different states.

16   Q.   And is the treatment of gender dysphoria treatment

17   committees that we have talked about, is that unique in a

18   correctional setting?

19   A.   I think some states haven't organized in that fashion, but

20   it's becoming more and more common.  So that's a pretty -- it's

21   becoming a more standard way of making treatment decisions.

22   Q.   And you had a treatment committee -- a Gender Dysphoria

23   Treatment Committee that you were on and presided over at times

24   in Massachusetts; right?

25   A.   Yes, that's correct.

1    Q.   And at issue in this case, in part, is a treatment -- a

2    management treatment care committee that oversaw gender

3    dysphoria; right?

4    A.   Correct.

5    Q.   And so you have expertise in the correctional setting

6    regarding that unique set of facts; right?

7    A.   Correct, yes.

8    Q.   All right.  Why do you believe you're qualified to render

9    opinions on SRS?

10   A.   Because of my experience in treating patients and also the

11   literature that I have reviewed and the WPATH training that I

12   attended and kind of ongoing attention to standards and my

13   experience on the gender dysphoria treatment committee where I

14   reviewed the treatment plans of every individual in the state

15   who had gender dysphoria and conducted the initial evaluation

16   for -- a confirmatory evaluation for every patient that entered

17   the system that reported gender issues.

18   Q.   And I believe you were asked about have you ever written a

19   recommendation for SRS and weren't allowed to explain your

20   answer at that time.

21        Would you like to do that now?

22   A.   Sure.  So in our -- in our system in Massachusetts, the

23   process would be that a clinician treating the patient made a

24   formal recommendation to the treatment committee, who would then

25   evaluate that recommendation and make a decision.

619

1          In the supervision group that also met monthly, we talked

2     about the total treatment plan for everyone that was being

3     treated for gender dysphoria.  And including in that -- included

4     in that was a discussion of gender confirmation surgery for

5     certain individuals.

6          We discussed it.  The clinicians would discuss what their

7     thought process was and what concerns they still had that had

8     led them to not yet recommend surgery.  But that was an ongoing

9     discussion for several patients, that we talked about the

10    readiness and the medical necessity of the surgery.

11    Q.   So I need to move on and give Mr. Hall time.

12         But you wanted to -- did you want to mention anything about

13    your "Tax Dollars at Work" title?

14    A.   Yes.

15              MS. RIFKIN:  Objection.  Leading.

16              THE COURT:  Overruled.

17              THE WITNESS:  Just to clarify, that title was taken

18    from a news article.  And the reason that I used it is because I

19    wanted to draw attention to the fact that this was still a

20    perception in the community that this is -- comes down to

21    nothing but money.

22         So it was in quotes.  They incorrectly eliminated the

23    quotes in the program, but that was definitely not my sentiment.

24    And the point of using that title was to draw attention to the

25    fact that some people still viewed it that way.

620

1           MR. EATON:  Your Honor, I would like to move to admit

2      Defendants' 2033 that was discussed with plaintiff's counsel.

3           THE COURT:  I had a note to inquire about that.

4      Is there any objection, since it was used in

5      cross-examination?

6           MS. RIFKIN:  No, Your Honor.

7           THE COURT:  Exhibit 2033 will be admitted.

8      (Defendants' Exhibit 2033 admitted.)

9      Q.   BY MR. EATON:  And I believe, lastly, you were asked by

10     plaintiff's counsel about suicide and related to gender

11     dysphoria and sex reassignment surgery.  I believe you were

12     trying to qualify your answer.

13          Did you want to do that now?

14     A.   Yes.  I don't remember the exact question.  But the article

15     that I cited in my report by Cynthia Osborne and Anne Lawrence

16     talked about the lack of data to support claims that gender

17     confirmation surgery will decrease suicidality.

18          And the study, the Cecilia Dhejne -- I'm probably saying

19     that wrong -- study does show that there is elevated, above

20     general population, risk of completed suicide following sex

21     reassignment surgery.

22          I am not comparing that to patients that have gender

23     dysphoria and have not had surgery.  I cited it to point out

24     that there is still a high risk of suicide following the

25     surgery.

1    Q.   And finally and very quickly, there was a discussion about

2    your diagnosis of moderate -- sorry.  I'm blanking on --

3              THE COURT:  Depressive disorder, I think.

4              MR. EATON:  Thank you, Your Honor.  Yes.

5    Q.   BY MR. EATON:  And I believe you wanted to clarify the

6    distinction between moderate and severe.

7    A.   Sure.  It's a matter of the severity of the symptoms.

8         As I have said, it is difficult to completely separate the

9    gender dysphoria from the depression.  So that was -- with the

10   available information that I had at that time, that was my best

11   estimate of the severity.

12             MR. EATON:  Thank you.  No further questions.

13             MR. HALL:  No questions, Your Honor.

14             MS. RIFKIN:  Just one, Your Honor.

15             THE COURT:  That's all I'll give you.  Go ahead.

16                      RECROSS-EXAMINATION

17   BY MS. RIFKIN:

18   Q.   Dr. Garvey, during the time that you served on the

19   Massachusetts Department of Corrections Gender Dysphoria

20   Treatment Committee and supervisory group, surgery -- that group

21   did not recommend surgery or did not -- I'm sorry -- did not

22   provide surgery to any gender dysphoric inmate in the

23   Massachusetts Department of Corrections; correct?

24   A.   Define "surgery."  It can be used to discuss a lot of

25   different things.

1    Q.   During the time that you served on the Massachusetts

2    Department of Corrections Gender Dysphoria Treatment Committee

3    and supervisory group, that committee did not provide genital

4    reconstruction surgery to any inmate with gender dysphoria in

5    the Massachusetts Department of Corrections; is that right?

6    A.   There has only been one that I'm aware of in the country.

7    And during that two-year period that I was on the committee,

8    no -- that is correct, there was not that surgery.

9              MS. RIFKIN:  No further questions, Your Honor.

10             THE COURT:  All right.  Doctor, you may step down.

11   Thank you.

12        Counsel, it troubles me that we don't have any data

13   comparing suicide rates -- we obviously have suicide rates of

14   the general population, and apparently somebody has done suicide

15   rates of people who have had gender confirmation surgery.

16        But there seems to be distinctions between suicide attempts

17   and successful suicide.  And I know, of course, you can't do a

18   double-blind study because of ethical concerns of a placebo

19   group.  But are there any statistics, any studies done to just

20   try to compare, as best we can, apples and apples rather than

21   apples and oranges about suicide rates among the general

22   incarcerated or nonincarcerated gender-dysphoric community

23   compared to those who have had -- I'm going to assume that if

24   there was, somebody would have offered it.

25        But it's frustrating that we seem to have all the studies

623

1    in the world except the one we need.

2         All right.  I'm just whining.  I apologize.

3         Defense may call their next witness.

4         MR. HALL:  Your Honor, may we have a three-minute

5    break to use the restroom and grab --

6         THE COURT:  Yes.  We'll take a ten-minute break.  Did

7    you say 20-minute break?

8         MR. HALL:  I said three-minute, in fact.  We'll make

9    it five.

10        THE COURT:  I'm not going to go there.  We'll take a

11   ten-minute break or until everybody is back.  We'll be in

12   recess.

13        (Recess at 1:29 p.m. until 1:42 p.m.)

14        THE COURT:  You may call your next witness.

15        MR. HALL:  Defendants call Dr. Joel Andrade.

16        THE COURT:  Dr. Andrade, would you step before the

17   clerk and be sworn.

18        JOEL ANDRADE, Ph.D., DEFENDANTS' WITNESS, SWORN

19        THE CLERK:  Please a take a seat in the witness stand.

20        MR. HALL:  Move a little faster, please.

21        (Laughter.)

22        THE CLERK:  Please state your complete name and spell

23   your name for the record.

24        THE WITNESS:  Joel Andrade, A-N-D-R-A-D-E.

25                    DIRECT EXAMINATION

624

1    BY MR. HALL:

2    Q.   Doctor, do you recognize the exhibit marked as Defendants'

3    Exhibit 2021?

4         That's not counted against my time, is it?

5         Do you see that there, Doctor?

6    A.   Yes.

7    Q.   Is that your resume?

8    A.   Yes.

9    Q.   Is that true and correct?

10            THE COURT:  Can we stipulate to the admission as we

11   have the others?

12            MS. RIFKIN:  Yes, Your Honor.

13            THE COURT:  The exhibit will be admitted.

14        (Defendants' Exhibit 2021 admitted.)

15   Q.   BY MR. HALL:  Doctor, do you recognize this document here

16   marked as Defendants' Exhibit 2021?

17   A.   Yes.

18   Q.   Is that a list of publications and journals that you

19   reviewed and relied upon in this case?

20   A.   Yes.

21            MR. HALL:  Move to admit, Your Honor.

22            THE COURT:  Any objection?

23            MS. RIFKIN:  Well, I think it's hearsay, the same as

24   the underlying report, Your Honor.

25            MR. HALL:  I can ask him if he has reviewed every

1          single one, Your Honor.

2                    THE COURT:  I'm going to allow it.  I -- you have got

3          to move on.  And I assume you had it in advance.  If there was

4          some misrepresentation, that could have been pointed out.

5                    MS. RIFKIN:  Your Honor, if we're moving to admit that

6          document which contains the Medicare decision, Plaintiff's

7          Exhibit 1026 that we talked about at length with Dr. Garvey, I

8          would just move to admit Plaintiff's Exhibit 1026, as well,

9          which is referenced by Dr. Andrade in that document.

10                    THE COURT:  I apologize.  1026 was the --

11                    MS. RIFKIN:  2014 decision eliminating --

12                    THE COURT:  From the Medicaid?

13                    MS. RIFKIN:  Yes.  And Dr. Andrade just testified he

14         relied upon it, and counsel moved to admit that list.

15                    MR. HALL:  I don't know why we need to admit it,

16         Your Honor.

17                    THE COURT:  Well, you need a reference or why do I

18         need to see all the studies that have been done?

19                    MR. HALL:  That's fine, Your Honor.  Withdrawn.

20                    THE COURT:  Let's just not admit that and move on.

21                    MR. HALL:  Okay.  Doctor --

22            Your Honor, I'm going to lead in the interest of time here

23         to lay some foundation.

24                    THE COURT:  I'll give you a lot of leeway.

25                    MR. HALL:  Thank you.

**ANDRADE - Direct**

1    Q.   BY MR. HALL:  Doctor, you have your doctorate of philosophy

2    in social work; correct?

3    A.   Yes.

4    Q.   And you have a master's in social work as well; correct?

5    A.   Yes.

6    Q.   And you are licensed -- you are a licensed independent

7    clinical social worker in the State of Massachusetts and

8    Florida; correct?

9    A.   Yes.

10   Q.   Okay.  And you are also a certified correctional healthcare

11   professional; correct?

12   A.   Yes.

13   Q.   You have an MH designation after that.  I don't think

14   that's been put on the record.

15        Would you briefly state what that MH designation is.

16   A.   Yes.  NCCHC, the National Commission on Correctional Health

17   Care, has two levels of accreditation, the CCHP and then the

18   higher level for different disciplines for physicians, for

19   administrators, and for mental health professionals,

20   psychologists, psychiatrists, psychologists.  And that's the

21   designation I have.

22   Q.   Okay.  Thank you, Doctor.

23        Your employment experience over the last 10 years has

24   consisted of working as a mental health professional in the

25   correctional industries in Massachusetts; correct?

ANDRADE – Direct

627

1    A.   Yes.

2    Q.   Okay.  Describe for me your roles and duties that you've

3    held over the last 10 years.

4    A.   Okay.  Really, two main roles.  The first was the clinical

5    director and program manager of the Massachusetts contract.  So

6    oversaw all mental health services in the State Department of

7    Correction in Massachusetts, including being the chair of the

8    Gender Dysphoria Supervision Group and member of the Gender

9    Dysphoria Treatment Committee.

10        My other role and my current role, I work for MHM Services

11   as the director of clinical operations.  So I'm based from home

12   out of the corporate office, actually, in Virginia, and I travel

13   to wherever the company has contracts.  We have about 17

14   different contracts, so I travel to all those contracts.

15   Q.   In your employment, have you had the opportunity to provide

16   treatment to gender-dysphoric inmates?

17   A.   Yes.

18   Q.   Okay.  And have you provided assessments in your employment

19   for the diagnosis of gender dysphoria?

20   A.   Yes.

21   Q.   Approximately how many?

22   A.   In my role in Massachusetts, I would evaluate individuals

23   and confirm diagnosis.  So well over 100, hundreds of patients.

24   Q.   And have you also been involved in assessments for the

25   appropriateness of certain treatment options for

ANDRADE – Direct

628

1    gender-dysphoric inmates?

2    A.   Yes.

3    Q.   And does that include hormone therapy?

4    A.   Yes.

5    Q.   Approximately how many times have you been involved in

6    that?

7    A.   In dozens of cases.

8    Q.   And have you made referrals for hormone therapy?

9    A.   Yes.

10        So the process was the treatment committee would approve

11   hormone therapy, and we would refer to an endocrinologist for

12   the specific medications to be given.  But we would evaluate and

13   approve based on the person's gender dysphoria to help alleviate

14   the dysphoria.

15   Q.   And would that require you to have familiarity with the

16   individual's treatment history and mental health records?

17   A.   Yes.

18   Q.   And have you had an opportunity in your employment to

19   provide -- excuse me -- assessments to gender-dysphoric patients

20   in a correctional institution for the appropriateness of sex

21   reassignment surgery or gender-confirming surgery?

22   A.   Yes.

23   Q.   Okay.  Approximately how many times?

24   A.   Approximately six individual assessments for gender

25   affirming surgery, and two were approved.  There are specifics

1    to each of those cases.

2    Q.   You said two approved; correct?

3    A.   Yes.

4    Q.   Okay.  Did you make recommendations, as part of that

5    process, that it was appropriate for those two individuals to

6    receive gender-confirming surgery?

7    A.   Yes.

8    Q.   Okay.  And in providing your opinions and your assessment

9    in that process, did you rely upon the WPATH standards of care?

10   A.   Yes.

11   Q.   Are you familiar with the WPATH standards of care?

12   A.   Yes.

13   Q.   Have you received training in the WPATH standards of care?

14   A.   I've attended WPATH conference and, as part of the

15   treatment committee, consistently reviewed the standards of

16   care, which were updated while I was on the treatment committee.

17   So the previous standards and now the seventh version, yes.

18   Q.   Have you attended other conferences besides WPATH where you

19   received training on treatment of gender-dysphoric inmates?

20   A.   Yes.  I regularly attend and present at NCCHC, National

21   Commission on Correctional Health Care; ACA, which is the

22   American Correctional Association.  I have also attended and

23   presented at the American Psychiatric Association conference,

24   and AAPL, which is the American Academy of Psychiatry and Law

25   conference.

ANDRADE - Direct

630

1    Q.   Thank you, Doctor.

2         I have marked here Joint Exhibit 15, page 28.

3         Do you recognize this document?

4    A.   Yes.

5    Q.   Is it your understanding that this is the WPATH standards

6    of care criteria for competency of mental health professionals?

7    A.   Yes.

8    Q.   And have you reviewed those criteria before?

9    A.   Yes.

10   Q.   And do you meet each of those criteria?

11   A.   Yes.

12   Q.   Now, Doctor, you have been retained in this case by the

13   defendants; correct?

14   A.   Yes.

15   Q.   And as part of your retention, have you been asked to

16   assess Mrs. Edmo's mental health?

17   A.   Yes.

18   Q.   And have you done so?

19   A.   Yes.

20   Q.   And in -- did you have an opportunity to meet Ms. Edmo?

21   A.   Yes.

22   Q.   And was that through a clinical interview?

23   A.   Yes.

24   Q.   And did that occur in approximately late July or early

25   August of this year?

ANDRADE - Direct

1    A.    Yes.  July 31st.

2    Q.    And did you have an opportunity to interview Ms. Edmo about

3    her prior preincarceration history?

4    A.    Yes.

5    Q.    Including mental health history?

6    A.    Yes.

7    Q.    And was part of your role to make an assessment as to

8    whether or not Ms. Edmo has any mental health concerns?

9    A.    Yes.  That was part of the evaluation.

10   Q.    And were you asked to diagnose Ms. -- well, see if Ms. Edmo

11   met the diagnosis for gender dysphoria?

12   A.    Yes.

13   Q.    And were you asked to assess her for the appropriateness of

14   gender-confirming surgery?

15   A.    Yes.

16   Q.    Okay.  And did you do that?

17   A.    Yes.

18   Q.    Prior to rendering your opinions, did you review documents?

19   A.    Yes.

20   Q.    Doctor, my office provided you with a whole list of

21   documents.  In the interest of time, I just want to read a few

22   and have you say yes or no as to whether or not you reviewed

23   them prior to you issuing your opinions in this case.  Okay?

24   A.    Yes.

25   Q.    Did you review the preincarceration mental health records

1          from the Sho-Ban Tribe?

2          A.   Yes.

3          Q.   From Portneuf Medical Center?

4          A.   Yes.

5          Q.   Bannock County Jail?

6          A.   Yes.

7          Q.   Did you review the presentence investigation report?

8          A.   Yes.

9                    MR. HALL:  And that's Exhibit 2010.  And, Your Honor,

10         to the extent it's not already on the record by stipulation, I

11         would like to confirm that that is admitted.

12                   THE COURT:  Exhibit 2010, did you say?

13                   MR. HALL:  2010, correct.

14                   THE COURT:  It is not.

15                   MR. HALL:  It was agreed to be admitted subject to our

16         joint stipulation and motion under seal.

17                   THE COURT:  Any objection?  That's the presentence

18         report.

19                   MS. RIFKIN:  Oh --

20                   THE COURT:  Or the confidential PSI documents.  I

21         assume it was the state presentence report.

22                   MR. HALL:  Correct, Your Honor.

23                   MS. RIFKIN:  Well, the agreement was that it would be

24         submitted to the court under seal.  The agreement was not that

25         it was admitted under seal.

ANDRADE – Direct

633

1      We object to the relevancy of any of this document based on

2      the -- based on the testimony that Ms. Edmo's preincarceration

3      history is not applicable.  But that objection is for the

4      record.

5              THE COURT:  And the objection is overruled.

6          Exhibit 2010 -- I think the -- I don't know how you can

7      exclude certain portions of Ms. Edmo's total medical and

8      psychological evaluation.  It just has to be considered.  Now,

9      some is more important than others, but the exhibit is admitted.

10     2010 is admitted.

11         (Defendants' Exhibit 2010 admitted.)

12     Q.   BY MR. HALL:  Doctor, do you believe that it's important in

13     your -- as part of your assessment to review all relevant

14     preincarceration mental health and medical records?

15     A.   Yes.

16     Q.   And does that also extend to presentence investigations

17     that are conducted and go into topics regarding mental health

18     and psychosexual evaluations?

19     A.   Yes.

20     Q.   Okay.  And you did review the PSI report; correct?

21     A.   Yes.

22     Q.   And you have reviewed the records of incarceration,

23     including the mental and medical health records, approximately

24     1500 pages that were provided to you; is that correct?

25     A.   Yes.

ANDRADE - Direct

634

1    Q.   And did you review the MTC meetings?

2    A.   Yes.

3    Q.   Did you review the incident reports?

4    A.   Yes.

5    Q.   The DORs?

6    A.   Yes.

7    Q.   The C notes and offender summaries?

8    A.   Yes.

9    Q.   Parole records?

10   A.   Yes.

11   Q.   Did you speak to anyone prior to issuing your report in

12   your opinions other than Ms. Edmo?

13   A.   I spoke to two clinicians that work at the facility, Krina

14   Stewart, and I'm forgetting the other person's name right now,

15   but two mental health professionals that worked with Ms. Edmo.

16        I also met briefly with the warden for about a half-hour

17   interview the day I was onsite.

18   Q.   Was the other mental health clinician -- excuse me --

19   interviewed Laura Watson?

20   A.   Yes.

21   Q.   And what was your understanding as to their role in

22   providing treatment or clinical contact to Ms. Edmo?

23   A.   Both had been involved in treating Ms. Edmo in the past and

24   were very familiar with policies, procedures of the facility.

25   Q.   I want to talk about your opinions in this case, Doctor.

**ANDRADE - Direct**

635

1        You're familiar with the DSM criteria for gender dysphoria?

2    A.   Yes.

3    Q.   And did you apply that during your review of Ms. Edmo and

4    the clinical interview?

5    A.   Yes.

6    Q.   And does Ms. Edmo, in your opinion, meet the diagnosis for

7    gender dysphoria?

8    A.   Yes, she does.

9    Q.   Did you determine as to whether or not Ms. Edmo meets the

10   diagnosis for any other mental health disorders under the DSM?

11   A.   Yes.

12   Q.   Okay.  And was one of those borderline personality

13   disorder?

14   A.   Yes.

15   Q.   Doctor, do you recognize the document marked as Plaintiff's

16   Exhibit 1036, page 1?

17   A.   Yes.

18        MS. RIFKIN:  Objection.  Foundation, hearsay.

19        THE COURT:  Just a moment.

20        Okay.  The question is whether he reviewed it.  It's not

21   been offered yet.  So let's see where it goes, and then you can

22   restate your objection.

23   Q.   BY MR. HALL:  Doctor, do you recognize the document here

24   marked as Plaintiff's Exhibit 1036?

25   A.   Yes.

1    Q.   Okay.  What are we looking at?  What is this?

2    A.   This is the diagnostic criteria in the DSM-5 for --

3              MS. RIFKIN:  Objection, Your Honor.

4              THE WITNESS:  -- borderline personality disorder.

5              MS. RIFKIN:  It is not just that.  It is one with the

6    circles on it.

7              THE COURT:  Counsel, if you want to offer a clean

8    copy, that may be different.  But if there is any emphasis given

9    to any portion of it, it shouldn't be admitted in that form.

10             MR. HALL:  Right.  This is a version that was provided

11   by plaintiff's counsel as an exhibit.

12             THE COURT:  Well --

13             MS. RIFKIN:  An exhibit for a witness who is not

14   testifying.

15             MR. HALL:  That's fine.

16   Q.   BY MR. HALL:  Dr. Andrade, are you familiar with the

17   criteria for diagnosis of borderline personality disorder?

18   A.   Yes.

19   Q.   Okay.  And do you believe that Ms. Edmo meets those

20   criteria?

21   A.   I do.

22   Q.   And which of those criteria do you believe that Ms. Edmo

23   meets?

24   A.   There were nine criteria for borderline personality

25   disorder.  And in my evaluation, I -- my opinion was that she

**ANDRADE – Direct**

637

1        met criteria for five, which is the diagnostic criteria for

2        borderline personality disorder.

3        Q.    Do you believe that she met the criteria for a pattern of

4        unstable and intense interpersonal relationships?

5        A.    Yes.

6                MS. RIFKIN:  Leading, Your Honor.

7                THE COURT:  Sustained.

8        Q.    BY MR. HALL:  What criteria do you believe that she met?

9        A.    I believe she met criteria -- I have listed it in my

10       report.  Am I able to --

11       Q.    Would it refresh your recollection to have a copy of the

12       DSM criteria for borderline personality disorder?

13       A.    Yes.

14               MR. HALL:  Your Honor, may I provide this to the

15       witness?

16               THE COURT:  Yes.

17           Mr. Severson.

18           I assume, Ms. Rifkin, you have a copy of that as well.

19               MR. HALL:  Plaintiff's exhibit.

20               MS. RIFKIN:  I'm sorry.  I thought he was providing

21       his report.

22               THE COURT:  That's what I thought it was, too.

23               MS. RIFKIN:  Not -- the exhibit we've been talking

24       about is hearsay.

25               MR. HALL:  That's fine.  Is there an objection, then,

ANDRADE - Direct

638

1    to that?

2                THE COURT:  There is.  I thought you were providing

3    him with his report.

4                MS. RIFKIN:  Yes.  It's not what you represented.

5                MR. HALL:  I'm sorry.  It was the criteria for

6    borderline personality disorder.

7                MS. RIFKIN:  I believe the witness stated it was in

8    his report, not in the document.

9                THE COURT:  That's what I was thinking it was, too.

10        Counsel, we have got to get through this.

11               MR. HALL:  I understand.

12               THE COURT:  I'm going to give you some more leeway to

13   proceed.  I don't think this -- you can get at it in

14   cross-examination.

15               MR. HALL:  Right.

16               THE COURT:  So just list the five -- you don't know

17   what the five are that you thought applied?

18               THE WITNESS:  Not off the top of my head.  I listed

19   all nine --

20               THE COURT:  In your report?

21               THE WITNESS:  -- in my report and identified which

22   five I thought she met the criteria for.

23               MS. RIFKIN:  And so we don't object to him refreshing

24   with his report.  But a document --

25               THE COURT:  That's what I thought we were doing.

639

1        Mr. Eaton, you need -- or, Mr. Hall, you need to proceed in

2    that fashion.  So let's move -- move along.

3    Q.   BY MR. HALL:  Okay.  Doctor, do you -- do you have concerns

4    with whether or not Ms. Edmo meets the criteria for SRS?

5    A.   Yes.

6    Q.   Okay.  And are you familiar with the criteria for sex

7    reassignment surgery under the WPATH?

8    A.   Yes.

9    Q.   Okay.  And do you recognize Joint Exhibit 15, page 66?

10   A.   Yes.

11   Q.   Okay.  And are these the criteria under the WPATH for sex

12   surgery?

13   A.   Yes.

14   Q.   Doctor, do you believe that Ms. Edmo has met all of the

15   criteria under the WPATH for surgery?

16   A.   Not all.

17   Q.   Do you believe that she has met criteria No. 1?

18   A.   I think there are -- I have questions about whether she

19   has.  And my concerns are that she -- her persistent,

20   well-documented history is while incarcerated but not prior to

21   her incarceration.

22        So that raises concerns for me because she has only

23   presented full time, as the WPATH standards recommend, for at

24   least 12 months in a correctional setting.

25        So my concern would be if she had surgery in a correctional

640

1    setting, you know, she has an understanding of how that would

2    play out because she has presented as female for several

3    years -- since 2012, at least -- but if she were then to

4    transition to the community where she has not presented full

5    time as female, that she wouldn't know what to expect.

6    Q.   Doctor, in your review of the records, did you see any

7    documentation that would corroborate Ms. Edmo's claim that she

8    lived full time as a woman prior to her incarceration?

9    A.   I did not see any.

10   Q.   And, Doctor, do you believe that Ms. Edmo's borderline

11   personality disorder traits are well controlled at this time?

12   A.   I have concern, other mental health concerns.  One is her

13   borderline personality disorder and also, in my opinion, her

14   unresolved trauma which we talked about during our interview,

15   which she attributes her early childhood trauma, potentially, to

16   either her gender dysphoria at the time resulted in the sexual

17   abuse; or, because she was sexually abused, she then became an

18   adult transgender woman.

19        And I think there are things she needs to work out in

20   therapy in the short and long term before she can make a really

21   well-informed decision about surgery.

22   Q.   What are those things that you believe Ms. Edmo should work

23   out in therapy before surgery is appropriate?

24   A.   I think resolving her understanding of her early-life

25   sexual abuse.

**ANDRADE – Direct**

641

1        Like I said, she attributes -- she goes back and forth

2    whether she caused the abuse herself because of her feminine

3    presentation, or the result of the abuse is growing up to be a

4    transgender woman.

5        I think that's something she needs to work on in therapy to

6    hopefully understand that she was a 9-year-old child that was

7    sexually victimized by a much older person; and her gender --

8    that's not her fault, you know, that that was someone that

9    sexually abused her.

10       I think the symptoms of her borderline personality

11   disorder, so her -- one is intense interpersonal relationships,

12   that she needs to work on that issue, too.  Because I think,

13   right now, she has the belief, based on her time living in

14   prison as a woman, that surgery will fulfill a lot of her hopes,

15   where I'm not confident that that would be true when she

16   completes her sentence and reintegrates into society.

17       My hope would be it does, but I'm not confident in that.

18   And I want her to be able to make that decision on her own when

19   she is able to feminize in the community for an extended period

20   of time.

21   Q.   So, Doctor, looking back at Joint Exhibit 15, page 66, do

22   you believe that Ms. Edmo meets the criteria for No. 4, if

23   significant medical or mental health concerns are present, they

24   must be well controlled?

25   A.   No.  I think that's a concern.

1    Q.   Do you believe that surgery will cure Ms. Edmo of her

2    coexisting mental health concerns?

3    A.   No.

4    Q.   Why not?

5    A.   Well, the cure for unresolved trauma and borderline

6    personality disorder is psychotherapy.  There are a lot

7    of -- there is a lot of research on outcomes for folks with

8    unresolved trauma and borderline personality disorder.

9        DBT, dialectical behavioral therapy, or CBT, cognitive

10   behavioral therapy, are interventions that have shown good

11   efficacy.  And I think those --

12           MS. RIFKIN:  Your Honor, this is beyond the scope of

13   any opinions in Dr. Andrade's report.

14           THE COURT:  Well, we're back to reports.

15       Mr. Hall, do you have --

16           MR. HALL:  I think these matters were addressed in the

17   deposition.

18           THE COURT:  Well, as I've said, if the opinions were

19   expressed in the deposition or in the report, they are fair

20   game.  If not, then I'm not going to allow it.

21       So I don't have access to either.  So, Mr. Hall, you need

22   to point out where that is in the expert report or the

23   deposition.

24           MR. HALL:  Why don't we move on from there,

25   Your Honor.

643

1          THE COURT:  You can come back to this, if need be.

2          MR. HALL:  Thank you.

3     Q.   BY MR. HALL:  Doctor, do you believe that if Ms. Edmo is

4     provided with surgery, that it could be potentially harmful to

5     her?

6     A.   Yes.

7     Q.   In what ways?

8     A.   My concern is that she has not feminized in the community;

9     she has expressed to various people that she has, which raises

10    concerns for me regarding her understanding of how she presented

11    in the community before.

12         So I would want her to continue along the path she is on,

13    continue with therapy while incarcerated, transition to the

14    community, hopefully have the supports, still, you know, present

15    as female, as the WPATH standards recommend, in all realms of

16    life.

17         To this point, she has only presented as female while

18    incarcerated.  So in the community, I think it would be very

19    different for her.  My hope is it would all work out, and then

20    she would decide surgery makes sense, and it would help her in

21    the long run.

22         MR. HALL:  Thank you, Doctor.  No further questions at

23    this time.

24         THE COURT:  I assume -- Mr. Eaton, you have no

25    questions?

644

```
 1                    MR. EATON:  No questions, Your Honor.

 2                    THE COURT:  Cross, Ms. Rifkin.

 3                    MS. RIFKIN:  Yes, Your Honor.

 4                         CROSS-EXAMINATION

 5      BY MS. RIFKIN:

 6      Q.   Dr. Andrade -- I am saying that right; correct?

 7      A.   Yes.

 8      Q.   Okay.

 9                    THE COURT:  Is it Dr. "An-drade" or "An-drad-ee"?

10                    THE WITNESS:  I respond either way.  I say "An-drade,"

11      but a lot of people say "An-drad-ee."

12                    THE COURT:  Okay.

13                    MS. RIFKIN:  I try hard to pronounce it the right way.

14                    THE WITNESS:  Right.  It's Portuguese, and it's gotten

15      very Americanized as "An-drade."

16      Q.   BY MS. RIFKIN:  All right.  Dr. Andrade, your experience

17      with gender dysphoria comes almost exclusively from your

18      participation on the Massachusetts Department of Corrections

19      Gender Dysphoria Treatment Committee and Supervision Group;

20      correct?

21      A.   Yes.

22      Q.   And for the time that you served in that capacity,

23      Corizon's expert in this case, Dr. Garvey, was also part of that

24      treatment committee; correct?

25      A.   For a portion of that time, yes.
```

ANDRADE — Cross

645

1   Q.   As well as Massachusetts Department of Corrections outside

2   consultant, Dr. Levine; correct?

3   A.   Yes.

4   Q.   You testified in your deposition there were four members of

5   the treatment committee; correct?

6   A.   Yes.

7   Q.   You, Dr. Garvey, and Dr. Levine were three of the four

8   members of that committee; correct?

9   A.   Dr. Garvey for a short period of time.

10  Q.   Two years; right?

11  A.   Yes.

12  Q.   How long were you on the committee?

13  A.   Eight.

14  Q.   So for two years, you, Dr. Garvey, and Dr. Levine were

15  three of the four members of the treatment committee where you

16  gained almost all of your experience with gender dysphoria;

17  correct?

18  A.   Yes.

19  Q.   As part of your role on the treatment committee, if a

20  prisoner was given a preliminary diagnosis of gender dysphoria,

21  you would interview them to confirm the diagnosis; correct?

22  A.   Yes.

23  Q.   The -- and you would often do these interviews with

24  Dr. Garvey or her predecessor on the committee; correct?

25  A.   Correct.

1    Q.   And the majority of the interviews that you and Dr. Garvey

2    conducted with the actual patient to confirm gender dysphoria

3    diagnosis were around 15 minutes; correct?

4    A.   The majority.  I mean, there was a wide range, but most

5    were very straightforward.  The person met criteria, so we

6    didn't need much more time than that.

7    Q.   And outside of confirming diagnoses of gender dysphoria,

8    you personally have never provided any treatment for gender

9    dysphoria directly as a clinician to patients; correct?

10   A.   Prior to my time on the committee and supervision group;

11   correct.

12   Q.   At present, outside of confirming diagnosis of gender

13   dysphoria, you have never provided any treatment for gender

14   dysphoria directly as a clinician to patients; correct?

15   A.   That's very difficult to answer.  I can explain.

16   Q.   Well, can you give me a "yes" or a "no" answer, please.

17   A.   Not based on that question, I don't think I can.

18   Q.   Do you recall giving me an answer in your deposition?

19   A.   Not specifically.  I mean, the way you are asking the

20   question, to provide treatment on the treatment committee, we

21   were the only folks that could approve treatment.  So

22   that's -- we approved all treatments.  So I never --

23           THE COURT:  The question was whether, outside of

24   confirming the diagnosis, have you ever provided any treatment

25   for gender dysphoria directly?

1              THE WITNESS:  And the treatment committee was the

2       group that provided all the treatment -- approved all treatment

3       into --

4              THE COURT:  They approved it.  But did they provide

5       the treatment?  That was the question.

6              THE WITNESS:  Okay.  Right.  I wasn't the primary care

7       clinician, no.

8       Q.   BY MS. RIFKIN:  So outside of confirming diagnoses of

9       gender dysphoria, you have never provided any treatment for

10      gender dysphoria directly as a clinician to patients; correct?

11      A.   Any -- right.  Psychotherapy, no.

12      Q.   Or any other treatment for gender dysphoria directly as a

13      clinician to patients; correct?

14      A.   Correct.

15      Q.   Within the Massachusetts Department of Corrections, you

16      have never been the primary care clinician treating any patient

17      with gender dysphoria; correct?

18      A.   Correct.

19      Q.   And earlier, on the direct testimony, you discussed two

20      patients within the Massachusetts Department of Corrections that

21      you said you approved surgery for; correct?

22      A.   Correct.

23      Q.   You actually -- you actually only recommended that surgery

24      with a requirement that prior to receiving that surgery, they

25      had to live in a women's facility, a women's prison, for

1      approximately 12 months before they could receive that surgery;

2      correct?

3      A.   Yes.

4      Q.   So you added that requirement in order -- as a precursor

5      for them receiving surgery; correct?

6      A.   I mean, it's much more complicated than that, so it's

7      more --

8      Q.   You added that requirement; right?  Before they could get

9      surgery, you and the treatment committee required that they live

10     in the women's prison for approximately 12 months before you

11     would actually provide surgery; correct?

12     A.   It's a very complicated -- I mean, each case was very

13     complicated.

14          Can I explain further?

15     Q.   No.  I would like a yes or a no.

16     A.   Can you repeat the question.

17     Q.   For these two inmates, before -- the treatment committee,

18     before they could actually be provided surgery, you required

19     that they live in a female prison for approximately 12 months

20     before they would actually be provided surgery; correct?

21               THE COURT:  You will have a chance to explain.

22     Mr. Hall will give you a chance to elaborate.

23               THE WITNESS:  Okay.  Yes.

24               THE COURT:  Was that a requirement you imposed?

25               THE WITNESS:  Yes.

1    Q.   BY MS. RIFKIN:  And you were aware at the time that you

2    imposed that requirement that the Massachusetts Department of

3    Corrections houses prisoners according to their genitals;

4    correct?

5              THE COURT:  If you know.

6              THE WITNESS:  For the majority, yes.  But there were

7    some patients that lived in both at different times during

8    incarceration.  So the majority, yes; like, 99.9 percent were

9    based on genitals.

10   Q.   BY MS. RIFKIN:  And, in fact, while you were still working

11   with the Massachusetts Department of Corrections, the

12   Massachusetts Department of Corrections did not allow either of

13   these prisoners to move to a women's prison facility; correct?

14   A.   Correct.

15   Q.   And so the effect of the requirement that you added that

16   they live in a female facility for 12 months prior to receiving

17   surgery was that they haven't gotten surgery; correct?

18   A.   At this point, I don't know.  I mean, this -- at the time I

19   left, we were in -- they asked us if there were any

20   alternatives; we said no.  And then I had not heard back from

21   the Department of Correction.

22   Q.   And when did you leave?

23   A.   July 1st.

24   Q.   Of this year?

25   A.   Yes.

ANDRADE − Cross

650

1    Q.   And when was the recommendation that these individuals be

2    provided surgery if, and only if, they had lived in a women's

3    facility for approximately 12 months?  When was that made?

4    A.   The initial was late 2017, November-ish -- October-November

5    2017.

6    Q.   So as far as you're aware, seven months after you made this

7    recommendation that they needed to live in a facility for an

8    additional 12 months before having surgery, they haven't been

9    moved, so that 12-month period couldn't even start ticking;

10   correct?

11   A.   Yes.

12   Q.   And that requirement that they move to a female facility,

13   that is not in the WPATH; correct -- the WPATH standards of

14   care?

15   A.   Well, the WPATH standards of care say you can be flexible

16   on a case by case.

17        So, yes, I think we were -- in requiring this, I think we

18   were consistent with WPATH.

19   Q.   The WPATH standards of care actually state that surgery

20   should never be denied based on a housing situation, such as

21   which prison you're housed at; correct?

22   A.   Correct.

23   Q.   Other than the two individuals we have been discussing, you

24   have never approved any other patients for surgery to treat

25   gender dysphoria; correct?

1     A.   Correct.

2     Q.   And you personally have only ever treated one patient who

3     has had gender confirmation surgery; correct?

4     A.   Treated or been involved with the treatment committee?

5     Q.   Treated, as a clinician.

6          You have never been the actual treating clinician for a

7     patient who has had gender confirmation surgery?  That's only

8     happened once; correct?

9     A.   I have never been the treating clinician, no.

10    Q.   So you have never been a treating clinician for a patient

11    who has had gender confirmation surgery?

12    A.   Correct.

13    Q.   You testified in your deposition that you define "medically

14    necessary" as it relates to gender dysphoria as, quote, "If any

15    intervention can alleviate the dysphoria, it would be deemed

16    medically necessary."

17         Do you recall that?

18    A.   Yes.

19    Q.   Is it your opinion that sex reassignment surgery cannot

20    alleviate Ms. Edmo's gender dysphoria?

21    A.   It's my opinion that there are other complicating factors

22    that need to be answered first.

23    Q.   Is it your opinion that sex reassignment surgery cannot

24    alleviate Ms. Edmo's gender dysphoria?

25              THE COURT:  The question is whether it cannot.  Is it

1      your opinion that it cannot alleviate Ms. Edmo's gender

2      dysphoria?

3                THE WITNESS:  No.

4      Q.   BY MS. RIFKIN:  So, to clarify the record, you're saying

5      it's not your opinion that sex reassignment surgery cannot

6      alleviate Ms. Edmo's gender dysphoria?  You're not offering the

7      opinion -- let me just state it again.

8                THE COURT:  Yeah.  So is it your opinion that it

9      could?

10               THE WITNESS:  I don't know.  I mean, based on all

11     available information, I think there are things that need to --

12     she needs to work through first before that decision could be

13     made.

14               THE COURT:  Well, no.  The question is whether the

15     gender-confirming surgery, whether in your opinion it could

16     solve her gender dysphoria.

17               THE WITNESS:  Right.  I don't think I can answer,

18     because it could exacerbate it.

19               THE COURT:  You're not ruling it out, though?

20               THE WITNESS:  Right.

21     Q.   MS. RIFKIN:  You're aware, aren't you, that Ms. Edmo has

22     never been diagnosed by anyone besides you as having borderline

23     personality disorder?

24     A.   Yes.

25     Q.   And you agree that IDOC and Corizon have not been treating

1    Ms. Edmo for borderline personality disorder for the last six

2    years; correct?

3    A.    No.

4                THE COURT:  You don't agree with that?

5                THE WITNESS:  I don't.

6                THE COURT:  Okay.  If they have not diagnosed her with

7    that, they have not been specifically treating her for that,

8    although some of the treatment -- I don't know if "modalities"

9    is the right word -- may, in fact, have been beneficial to

10   someone with that condition; is that what you're saying?

11               THE WITNESS:  I'm saying they didn't officially

12   diagnose her with that.  But in talking with clinicians, they

13   identified traits of borderline personality disorder and were

14   treating her for those.

15               THE COURT:  For those -- all right.  For those

16   elements but not --

17               THE WITNESS:  Yes.

18               THE COURT:  -- the condition itself?

19               THE WITNESS:  I mean, to identify the traits, I think

20   they didn't formally diagnose.

21               THE COURT:  Okay.

22               THE WITNESS:  Which, in my report, I talk about that

23   they --

24               THE COURT:  Okay.  Go ahead.

25   Q.    BY MS. RIFKIN:  It's your opinion, correct, that in the six

654

1    years that Ms. Edmo has been incarcerated and treated in IDOC,

2    her Corizon and IDOC mental health treaters missed a diagnosis

3    of borderline personality disorder for Ms. Edmo?

4    A.   It's my opinion they did not officially document the

5    diagnosis.

6    Q.   You testified -- in your deposition in response to the

7    question, "Is it your testimony that in the six years of

8    treating her, her mental health treaters within the Department

9    of Correction and Corizon missed the diagnosis of borderline

10   personality disorder?" you testified, "Right.  I did not see the

11   diagnosis in the record."

12        Do you remember that?

13   A.   Right.  I did not see it documented.

14   Q.   You agree that Ms. Edmo experiences distress over her

15   genitals; correct?

16   A.   Yes.

17   Q.   And you agree that this can be acute distress; correct?

18   A.   Yes.

19   Q.   And it's your opinion that at the time she tried to

20   castrate herself, she was experiencing so much distress, that

21   she thought that would alleviate the distress; correct?

22   A.   Yes.

23   Q.   But you're testifying that you're not able to opine that

24   gender-affirming surgery would lessen her gender dysphoria?

25   A.   Correct.

655

1    Q.   In your own experience, only individuals diagnosed with

2    gender dysphoria have attempted to cut off their genitals;

3    correct?

4    A.   No.

5    Q.   All right.  I would like to show the witness his

6    deposition.

7              THE COURT:  Mr. Severson -- well, can you show it on

8    the evidence presenter, or do you want --

9              MS. RIFKIN:  I think we don't have it on there,

10   Your Honor, but I do have multiple copies of it, a certified

11   copy -- actually, we have the original.

12             THE COURT:  If we have the original, let's publish

13   that, but let's not go through the formality of it.  I'll just

14   direct Ms. Bracke to publish it.

15             MR. HALL:  I don't think the witness has had an

16   opportunity to review and sign that, so the same stipulation.

17             THE COURT:  Then it's not -- oh, all right.  I thought

18   you said that it -- I thought it had been reviewed.  So it will

19   be under the same order that I indicated we follow yesterday or

20   the day before; if there is any areas where the witness

21   disagrees and would have corrected the deposition if he had had

22   a chance to review it, then we'll point that out as we go along.

23   Q.   BY MS. RIFKIN:  If you could please turn to page 146 of

24   your deposition.

25             We have another copy.  Does the court want a copy?

**ANDRADE - Cross**

656

```
 1              THE COURT:  No.  That's fine.

 2     Q.   BY MS. RIFKIN:  All right.  Are you on page 146, Doctor?

 3     A.   Yes.

 4     Q.   If I can direct your attention to line 10.

 5     A.   Yes.

 6     Q.   Question:  "Have you directly treated any patients who have

 7     attempted to cut off their genitals?

 8          "MS. CRECELIUS:  Object to form."

 9          Answer:  "As part of my work in Massachusetts, yes."

10          Question:  "How many?"

11          Answer:  "Less than ten, more than five."

12          Question:  "How many of those individuals were diagnosed

13     with gender dysphoria?"

14          Answer:  "Oh, all right.  So many.

15          "MS. CRECELIUS:  Answer her question."

16          Answer:  "Well, can we go back?"

17          Question:  "Yes."

18          Answer:  "The first question of attempting to cut off their

19     genitals, yes, less than ten, more than five.  And I believe all

20     were diagnosed with gender dysphoria."

21          That's what your deposition testimony states; correct?

22     A.   Yes.  But I -- yeah.  I remember talking about two other

23     groups of patients that have attempted.

24     Q.   To cut off their genitals?

25     A.   I would have to review, like, more than just the one page.
```

ANDRADE - Cross

657

1    Q.   All right.  We'll move on.

2         When you reviewed Ms. Edmo's prior medical records, did you

3    see -- you concluded that she did not present as a woman in the

4    community.

5         Is that what you responded on direct?

6    A.   Yes.

7    Q.   Did you see notes in one of the records when she was

8    brought after her suicide attempt that she was wearing nail

9    polish?

10   A.   I did not see that.

11   Q.   Did you -- you were provided with the photos of Ms. Edmo at

12   the time she was booked into the Idaho Department of

13   Corrections?

14   A.   I believe so.

15   Q.   Did you see that one of those photos noticed that -- noted

16   that both of her ears were pierced?

17   A.   No, I did not notice that.

18   Q.   Would you agree that it's more typical in our society, in

19   our culture here, that women wear nail polish versus men?

20   A.   Yes.

21   Q.   Would you agree that in our culture, it's more typical that

22   women have both ears pierced, versus men?

23   A.   Yes.

24   Q.   But you didn't note those signifiers of Ms. Edmo's

25   femininity in her prior medical records and her photo when she

1    was booked; correct?

2    A.   I reviewed a lot of records and did not see evidence of her

3    feminizing, no.

4    Q.   It's your opinion in this case, same as in Massachusetts,

5    that if Ms. Edmo was going to have surgery, she has to live for

6    12 months in a women's prison, isn't it?

7    A.   It's my opinion that if -- if the court did approve

8    surgery, that it would be in her best interest for her to

9    transition to a female facility first, to ensure that she

10   understands what the facility is like, whether she will be able

11   to acclimate, have a peer group.

12   Q.   You've answered the question, Doctor.

13        Are you aware of Idaho Department of Corrections policy as

14   far as housing of inmates?

15   A.   I have seen a policy.

16   Q.   Have you seen their newest policy issued last Friday?

17   A.   No.

18   Q.   Are you aware that that policy and the email distributing

19   it emphasize that inmates in IDOC will continue to be housed

20   primarily based on genitals?

21   A.   No.  I haven't seen it.

22   Q.   You have never published any research related to gender

23   dysphoria in a peer-reviewed journal; correct?

24   A.   Correct.

25   Q.   You have never published any peer-reviewed work related to

1    gender dysphoria; correct?

2    A.   Correct.

3    Q.   You taught a class at Bridgewater State University on human

4    behavior in a social environment, where you reviewed every

5    section of the DSM and all diagnostic criteria; correct?

6    A.   Yes.

7    Q.   And as part of that class reviewing all of the DSM, you

8    reviewed gender dysphoria or what was then called "gender

9    identity disorder"; correct?

10   A.   Yes.

11   Q.   Other than that, you have never taught any other university

12   or graduate classes related to gender dysphoria; correct?

13   A.   Correct.

14        MS. RIFKIN:  Your Honor, at this time, we would move

15   to strike and exclude Dr. Andrade's opinions related to

16   treatment of gender dysphoria and specifically his assessment of

17   whether Ms. Edmo is -- whether gender reassignment surgery is

18   medically necessary for Ms. Edmo, given that he has never

19   treated a patient who has had this the surgery.  He does not

20   have the requisite experience or training to offer these

21   opinions.

22        THE COURT:  Okay.  It's noted.  I'll overrule the

23   objection for the same reasons stated earlier with regard to

24   Dr. Garvey.

25        I think it goes to the weight, not the admissibility of the

660

1      opinion.  Dr. Andrade has the training and -- as a psychiatrist,

2      I think, to offer opinions, but I think you have made your point

3      about the lack of actual experience in treatment.

4           So the objection is noted and overruled, but I'll consider

5      your arguments concerning the weight of the testimony.

6                THE MS. RIFKIN:  Okay.

7                THE COURT:  Proceed.

8      Q.   BY MS. RIFKIN:  And just for clarification, Dr. Andrade,

9      you are not a psychiatrist; correct?

10     A.   Correct.

11     Q.   What is your licensure?

12     A.   Licensed independent clinical social worker, with a

13     doctorate in social work.

14     Q.   Dr. Andrade, under the IDOC policy that you've reviewed,

15     were you qualified as a gender identity disorder evaluator who

16     could assess somebody for surgery?

17     A.   The policy I saw said "psychologist."  So, no.

18                MS. RIFKIN:  No further questions, Your Honor.

19                THE COURT:  Redirect.

20                MR. HALL:  Yes, Your Honor.

21                         REDIRECT EXAMINATION

22     BY MR. HALL:

23     Q.   Dr. Andrade, in your profession, are you permitted within

24     your scope to recommend hormone treatment for a transgender

25     gender-dysphoric patient?

661

1    A.   Yes.

2    Q.   But do you actually administer those hormones?

3    A.   No.

4    Q.   And is it within the scope of your practice to provide an

5    assessment for gender-confirming surgery?

6    A.   Yes.

7    Q.   But do you actually perform that surgery?

8    A.   No.

9    Q.   So mental health providers like yourself make

10   recommendations for treatment but don't actually perform all

11   those treatments; is that correct?

12   A.   Correct.

13   Q.   Doctor, I want to talk to you about these two individuals

14   for whom you recommended surgery for in Massachusetts.

15        You were asked whether or not you had recommended that they

16   be housed first for a year in a female prison; correct?

17   A.   Yes.

18   Q.   Okay.  What was your rationale for making that

19   recommendation?

20   A.   For both, both were serving life sentences.  Massachusetts

21   only has one female prison, so they would have to acclimate to

22   that one female prison.

23        Both were well engaged in the male prisons they were housed

24   at, involved in programming, education, extracurricular

25   services, and were functioning well.  We worked with them over

662

1    the years and, over time, believed they met criteria for surgery

2    but wanted to be sure that when they had the surgery, they were

3    able to acclimate into that female facility and live a happy

4    life better than they had in the male facility.

5        In both -- at the time, talking with both, both agreed to

6    do that.  One said, "I don't need to.  I'm 100 percent confident

7    the surgery will be effective.  I don't need to, but I'll go

8    along."

9        The other said --

10            MS. RIFKIN:  Objection.  Hearsay.

11            THE COURT:  Sustained.

12   Q.   BY MR. HALL:  What was your understanding as to those two

13   inmates' feelings about your recommendations?

14            MS. RIFKIN:  Same objection.

15            MR. HALL:  It doesn't call for statements of these

16   other --

17            THE COURT:  Overruled.  You may go ahead.

18            MS. RIFKIN:  Lack of foundation.

19            THE COURT:  Sustained.  I'd need to know what the

20   basis is for the witness to have an understanding.

21   Q.   BY MR. HALL:  Did you have communications with these

22   individuals about your treatment recommendations, particularly

23   that they be housed in a female facility prior to surgery?

24   A.   Yes.  Both were based on extensive interviews.

25   Q.   Okay.  From your interviews, did you gain an understanding

**ANDRADE - Redirect**

663

1    as to what their feelings or thoughts were on that?

2    A.   Yes.  We processed this as a possibility with each.  And

3    one understood and had -- was ambivalent and thought it would be

4    a good decision to try living at the female facility first.

5        The other basically said, "I'll go along with that, but I

6    don't think it's necessary, but I will if it gets me a step

7    closer to surgery."

8    Q.   Did you believe, in your professional opinion, that that

9    recommendation that you made for those two individuals was in

10   their best interest?

11   A.   Yes.

12   Q.   Okay.  And why?

13   A.   Our concern for both -- again, both were serving life

14   sentences, well integrated at the male facility -- that if they

15   had genital surgery, gender-affirming surgery, and now living in

16   a male facility was no longer an option and they became

17   depressed and did not find the peer group, did not acclimate the

18   way they expected -- because neither, obviously, had ever been

19   inside a female facility -- that their risk for suicide would go

20   up; they would be ostracized, and we will have done harm.

21   Q.   Is it your opinion that wearing nail polish on one occasion

22   is consistent with living full time as a woman in the community?

23   A.   No.

24   Q.   Is it your opinion that piercing your ears is consistent

25   with living full time as a woman in the community?

1    A.    No.

2    Q.    You're not recommending right now, Doctor, that Ms. Edmo be

3    transferred to a female facility, are you?

4    A.    No.

5    Q.    Okay.  And why not?

6    A.    As I said before, I think there is a lot of work she needs

7    to do in therapy prior to mental health providers feeling

8    comfortable that she is ready for surgery.

9    Q.    And in your profession, Doctor, does a patient have to have

10   a diagnosis of borderline personality disorder in order for

11   treatment aimed at some of those traits to be appropriate?

12   A.    No.

13   Q.    Why not?

14   A.    In my experience, mental health professionals,

15   psychiatrists tend not to diagnosis personality disorders,

16   especially in corrections, as often as they should.

17        The base rate of personality disorders is very high in

18   corrections, and I think treatment providers, especially

19   psychiatrists --

20        MS. RIFKIN:  Objection.  Outside the scope of

21   expertise.  He is not a psychiatrist or a psychologist, and he

22   is testifying about why they do or do not diagnose these.

23        THE COURT:  Was that a foundation --

24        MR. HALL:  He has experience.

25        THE COURT:  I'm sorry?

665

1          MR. HALL:  He has experience working with

2     psychologists and psychiatrists.

3          THE COURT:  Well, I think we need to lay it more

4     clearly that there is a foundation that, in fact, he has had

5     experience and that that experience has caused him to be able to

6     observe what psychiatrists and psychologists would require.

7     Q.   BY MR. HALL:  Doctor, do you have experience with working

8     psychiatrists and psychologists regarding patients who are

9     diagnosed or not diagnosed with borderline personality disorder?

10    A.   With all mental health professionals -- and a licensed

11    mental health professional is also able to diagnose and treat.

12    In my experience with all mental health professionals in

13    corrections and outside -- so master's level, doctorate level,

14    psychologists, and psychiatrists -- underdiagnose --

15         MS. RIFKIN:  Move to strike.  I believe the witness

16    can opine within his licensure.  He is now generalizing about

17    all mental health professionals.

18         THE COURT:  Well, but he's only -- well -- I'll

19    overrule the objection, but I took it only as his testimony

20    concerning his own level of licensure.

21         So -- but don't -- we don't need to hear what your thoughts

22    are on what's appropriate in other areas.

23         Go ahead.

24    Q.   BY MR. HALL:  Doctor, in your license, do you believe that

25    it is -- it is necessary to have a patient diagnosed with

1    borderline personality disorder in order to treat their symptoms

2    that may be consistent with the criteria for that diagnosis?

3    A.   No.

4    Q.   Okay.  Why not?

5    A.   Because personality disorders are enduring patterns of

6    inner experience and behavior that clinical staff are trained to

7    treat the symptoms.  The symptoms together then meet the

8    criteria for the diagnosis.

9        So it's like trauma.  Just because someone has a trauma

10   history doesn't mean they meet criteria for PTSD.  That doesn't

11   mean we're not going to treat someone who has a trauma history

12   and relate it to the trauma they have experienced.

13       So we are treating symptoms.

14   Q.   Doctor, I believe that you were asked by counsel whether or

15   not it's your understanding if the defendants have been treating

16   Ms. Edmo's traits for borderline personality disorder; is that

17   correct?

18   A.   Can you repeat.  Sorry.

19   Q.   You were asked a question as to whether or not defendants

20   have been treating Ms. Edmo's traits for borderline personality

21   disorder.

22       Do you remember that?

23   A.   Yes.

24           MS. RIFKIN:  Objection.  Misstates the record.

25   Q.   BY MR. HALL:  Do you remember being asked that?  Is that

1    your recollection?

2    A.   Yes.

3    Q.   Okay.

4             THE COURT:  The objection is overruled.  Go ahead.

5    Q.   BY MR. HALL:  Is it your understanding that the defendants

6    have been attempting to treat Ms. Edmo's traits that are

7    consistent with borderline personality disorder?

8    A.   Yes.

9    Q.   And how have they been trying to do that?

10   A.   So the constellation of symptoms she has for borderline

11   personality disorder -- some are behavioral, some self-injury;

12   she has talked recently about cutting, that that's a behavior

13   she has engaged in -- clinical staff work with her on that.

14        Her intense interpersonal relationships, which is one of

15   the criteria for borderline personality disorder, is something

16   that I talked with clinical staff about that they have worked

17   with Ms. Edmo on.

18        So those are two of the main symptoms that she has met

19   criteria for.

20   Q.   Is it your understanding that clinicians at the Department

21   of Corrections have attempted to -- or have recommended that

22   Ms. Edmo undergo various therapy or groups?

23   A.   Yes.

24   Q.   Okay.  And is it your understanding that Ms. Edmo has

25   repeatedly refused to undergo those groups?

668

1      A.   Yes, that's my understanding.

2      Q.   Do you think that Ms. Edmo should engage in those groups?

3      A.   Yes.

4           MR. HALL:  No further questions.

5           THE COURT:  Recross.  Any recross?

6           MS. RIFKIN:  Yes, Your Honor.

7                       RECROSS-EXAMINATION

8      BY MS. RIFKIN:

9      Q.   You have offered the opinion, Dr. Andrade, that without

10     transferring to a women's prison first and without engaging in

11     these groups, you don't think Ms. Edmo has an appropriate

12     understanding of how gender reassignment surgery may or may not

13     affect her life; correct?

14     A.   In general, yes.

15     Q.   And in your report, you talked about -- you suggested that

16     she may have the idea that it's going to be a magic pill that

17     will solve all her problems; correct?

18     A.   I don't think I said "magic pill," did I?

19     Q.   In your report, you talked about your concern -- as you've

20     talked about here today, your concerns that Ms. Edmo doesn't

21     understand that she would continue to face challenges after

22     transitioning through sex reassignment surgery; correct?

23     A.   Correct.

24     Q.   Do you recall asking Ms. Edmo in your exam of her the

25     question:  "Without surgery, how would you rate dysphoria with

ANDRADE - Recross

669

1    regard to your genitals, on a 1-to-10 scale, not having it?"

2    A.   Yes.

3    Q.   Do you recall that she answered "10"?

4         And you asked:  "All the time?"

5         And she said:  "Yes."

6         And you asked her:  "If you had surgery, what do you think

7    it would be?"

8         And she answered:  "Lower than 10."

9         Do you remember that?

10   A.   Yes.

11   Q.   And you asked her:  "10 is highest.  Would it be, like, 8?"

12        And she responded:  "Lower than 10 -- 7, 6, 5, 4, can't say

13   exactly."

14        Do you recall that?

15   A.   Yes.

16   Q.   Do you recall that you asked her:  "You don't think it's

17   just going to make everything better?"

18        And she asked:  "Yes" -- she answered:  "Yes, I understand

19   it can't just make everything better.  But after surgery, I will

20   be in a better place to handle other things."

21        Do you recall that?

22   A.   Yes.

23   Q.   And do you recall that, in response, you said:  "In a

24   correctional setting, you often hear the answer -- people have

25   this magical idea that everything will be better.  Good to hear

1      that you know there isn't something that will fix everything."

2           And she responded:  "Right.  Wish there were, but there

3      isn't."

4           Do you recall that?

5      A.   Yes.

6                MS. RIFKIN:  No more questions.

7                THE COURT:  Anything else?

8                MR. HALL:  No further questions, Your Honor.

9                THE COURT:  All right.  You may step down.  Thank you,

10     Dr. Andrade.

11          Call your next witness.

12               MR. HALL:  Defendants do not have any more witnesses,

13     Your Honor.

14               THE COURT:  Mr. Eaton, do you confirm that?

15               MR. EATON:  No more witnesses, Your Honor.

16               THE COURT:  Any rebuttal witnesses?

17          We can take a short break and then come back.  I assume

18     each side might have half an hour, roughly.  So we can take a

19     short break, and you can consider whether you, A, have other

20     witnesses and, B, want to spend any time on closing argument.

21          My inclination -- I, frankly, find posthearing briefs to be

22     more helpful, but I don't want to foreclose you from making an

23     oral argument as well.

24          So take a short recess, and then you can advise us how you

25     want to proceed.

1          MS. RIFKIN:  Okay.  We do not have any rebuttal

2     witnesses, Your Honor.

3          THE COURT:  All right.  Then the evidence is closed.

4     Maybe we can just deal with it now.

5          Do you wish to make a closing argument.

6          MS. RIFKIN:  A short one.

7          THE COURT:  Defendants, you have time to do it as

8     well.  Again, let's take a short break, and then we'll come back

9     and hear closing argument.

10          MR. HALL:  Sounds good, Your Honor.

11          THE COURT:  All right.  We'll be in recess.

12          (Recess at 2:44 p.m. until 3:02 p.m.)

13          THE COURT:  Counsel, before we go any further, I had

14     here -- but I can't find it -- a list of the relief requested.

15     I would ask either today, or perhaps by stipulation next week,

16     or at some point, I need to have the lay of the land set a bit.

17     Because the requested relief includes sex reassignment surgery;

18     and on that issue, I don't know how we can hear that on a

19     preliminary injunction.

20          I mean, it's -- you can't -- if I order it, then it's done.

21     And obviously, that's not maintaining the status quo; it's a

22     mandatory injunction.  Therefore, it seems to me that can only

23     be resolved in a final hearing, and I have kind of treated this

24     hearing as the final hearing on that issue.

25          Now, if there is some disagreement on that, then that's a

1   bit of a problem because I really have a hard time seeing how I
2   could grant or deny that request under the preliminary
3   injunction standard.
4        The other items, reinstatement of the -- I don't --
5   spironolactone -- I don't know if that's the right
6   pronunciation -- which I assume is the testosterone-suppressing
7   drug, access to gender-appropriate underwear, clothing, and
8   commissary items, that may be moot given the change in policy
9   effective last -- a week ago today.  And then a catchall, for
10   any other treatment that a medical professional qualified to
11   assess and treat gender dysphoria determines to be medically
12   urgent, and then some other relief.
13        So that's one of the first issues I have got, is:  What
14   relief really does the court need to consider stemming from this
15   hearing?  And secondly:  What standard applies?  And can we even
16   really consider at least the sex reassignment surgery on
17   anything short of a final injunction hearing?
18        So whether you want to address that orally or work it out
19   next week early in the week before any briefs are filed is fine.
20        Then the second thing is:  One of the reasons we are late
21   getting back here is we're -- counsel in the case we have set
22   for trial in Pocatello next week just alerted that the client
23   may want to plead guilty straight up without a plea agreement,
24   which means my trial goes away, and perhaps Ms. Hohenleitner is
25   back on course to have the transcript ready by next Friday.  But

1    that, again, remains to be seen as well.

2        So we need to work out kind of a schedule.  I would assume

3    that we could do pretty much expedited briefing, in any event,

4    subject only to give you some time to wait for the transcript so

5    that you can correlate the draft that you've prepared to the

6    actual excerpts from the trial transcript.

7        So -- and then I have given you X amount of time to present

8    your case, so I am not going to preclude any party from making a

9    closing argument even if the other party would prefer to submit

10   theirs in writing.

11       I find the written submissions more helpful because, you

12   know, I try very hard to make these decisions very, very

13   objective.  And although oral argument and closing argument is

14   helpful, I generally want to objectify, and it's much easier to

15   do that just looking at the briefing.

16       So, your option.  But I understand the plaintiffs want to

17   give a brief closing argument.  I don't know what the defendants

18   want to do.  So maybe I ought to hear first.

19           MR. HALL:  Your Honor, I just want to clarify that

20   there will be an opportunity to provide a written closing;

21   correct?

22           THE COURT:  Absolutely.

23           MR. HALL:  Okay.  And then providing a statement today

24   orally will not preclude --

25           THE COURT:  No.

1          MR. HALL:  -- that opportunity?  Thank you.

2          MR. EATON:  That was my question as well.

3          THE COURT:  No.  It won't preclude it.  I'll expect

4     the briefs to be fairly short.  I really want to focus in on the

5     findings of fact and conclusions of law.

6          And I assume you understand I'm not just going to say,

7     well, I adopt one side or the other.  What I really want from

8     that findings of fact and conclusions of law is if you were

9     writing the decision, what would you want that decision to say

10    so as to preserve an issue on appeal.

11         Because that's what I'm trying to do, is really make sure

12    that every base is covered.  And we think we do a pretty good

13    job of that, but I think it's very helpful to see how you assess

14    that as well.  And we'll probably be in the process of at least

15    outlining a decision even before we see what you have submitted.

16         So with that, Ms. Rifkin, were you going to --

17         MS. RIFKIN:  Yes, Your Honor.

18         THE COURT:  Yes.

19         MS. RIFKIN:  Your Honor, I understand, and I will try

20    to keep it short and to the point.

21         The first thing I want to address is what you just raised

22    about the mandatory injunction.  We are happy to provide further

23    briefing on this.  But the answer is:  Yes, you can consider the

24    relief that Ms. Edmo has requested for sex reassignment surgery

25    as a preliminary injunction.  It is a mandatory injunction.

1          And under the Ninth Circuit standard, there is a higher

2     standard.  You have to prove a stronger likelihood of success.

3     And you also have to make sure that the showing of irreparable

4     harm is serious.  But this -- a mandatory injunction in the

5     Ninth Circuit can be issued as a preliminary injunction.

6          Judge Reinhardt specifically stated:  Mandatory injunctions

7     are most likely to be appropriate when the status quo is exactly

8     what will inflict the irreparable injury upon complainant.

9          And we are happy to provide further briefing, but the

10    answer is yes.  And we believe this is exactly such a situation.

11         What we have heard in the last three days is that there is

12    an undisputed serious medical condition here.  There is also

13    undisputed suffering.  The DSM definition of gender dysphoria --

14    by definition, this condition is associated with clinically

15    significant distress or impairment in social, occupational, or

16    other important areas of functioning.

17         Every single witness that has testified agrees that

18    Ms. Edmo has gender dysphoria and agrees that it's causing her

19    clinically significant distress.  Even defendants acknowledge

20    that it's causing her acute distress.  No witness was willing to

21    testify under oath that gender confirmation surgery will not

22    treat Ms. Edmo's gender dysphoria.

23         So the question, I think, for the court is -- in addition

24    to whether the court can issue such relief, the underlying

25    question is:  Does the standard of care require that she be

676

1    provided surgery?  Is surgery medically necessary?

2         And the Eighth Amendment -- regardless of what the WPATH

3    standards of care say, the Eighth Amendment provides the answer.

4    It is black-letter Eighth Amendment law that the standard of

5    care is the same in the community and in a prison.

6         The arguments defendants are making is nothing new.  It's

7    the same rationale departments of corrections used decades ago

8    to justify refusing to provide incarcerated persons with

9    chemotherapy, surgery, and mental health treatment.

10        The underlying idea -- and we saw this in the slides,

11   Dr. Levine's slides and the slides that defendants and their

12   experts embraced.  The underlying idea was that people in prison

13   have committed crimes; they have done bad things; and they

14   should not get the same medical care that good, honest people in

15   the community get.

16             THE COURT:  Okay.  Just so we're clear -- and I

17   totally agree with you that that should not be a reason for

18   denying someone medical care.

19        The Eighth Amendment standard requires a showing that the

20   failure to treat the condition -- apparently in accordance with

21   the standard of care prescribed in this case by the WPATH

22   standards -- could result in further significant injury or the

23   unnecessary and wanton infliction of pain.

24        So doesn't that become the focus of the case?

25        I mean -- you know, there have been two primary objections

677

1    to -- by the defendants' experts to the application of the WPATH

2    standards to Ms. Edmo.

3         One has to do with whether or not her mental health

4    concerns are well controlled.  And I think that turns upon a

5    very difficult question of whether or not those mental health

6    concerns really are a product of or substantially exacerbated by

7    her gender dysphoria.

8         But the other factor that -- the suggestion that the 12

9    months living in a chosen gender lifestyle should not be allowed

10   in a -- needs to be something other than in a prison setting.

11        What I'm struggling with here is that there are

12   distinguishing characteristics here, but it almost seems to me

13   it turns more on whether -- if she is denied this treatment,

14   whether that is going to result in further significant injury or

15   unnecessary and wanton infliction of pain.

16        The case law, I think, is pretty clear that it's not a

17   malpractice standard; it has to be something more than that.  It

18   has to be deliberate indifference coupled with an inmate

19   suffering from further significant injury.

20        If I'm wrong on that as far as the legal standard, how so?

21        But I am troubled when you say that the standard of care is

22   the same in prison as out of the prison.  If you're talking in

23   terms of what is the medically indicated standard of care,

24   that's -- I would agree.  But if you're saying the standard of

25   care in prison is the same for Eighth Amendment purposes as what

1      the standard of care for medical malpractice is outside a

2      prison, I think I part company with you unless you can show me

3      some case law from the Ninth Circuit or the Supreme Court to

4      indicate I'm wrong.

5                MS. RIFKIN:  No, Your Honor.  I completely agree with

6      that analysis.  I think I'm focusing on the standard of care

7      because I think the undisputed evidence in this case shows that

8      Ms. Edmo is suffering.

9                THE COURT:  Okay.

10               MS. RIFKIN:  And so I think the irreparable harm prong

11     for the injunction -- I don't think we have heard any

12     evidence -- because every single one of the defendants and their

13     experts testified that Ms. Edmo is not malingering, she is not

14     manipulating, she is not faking it, she is not exaggerating, and

15     she has tried to castrate herself twice.  That's very

16     life-threatening harm.

17          So I don't -- there is no evidence, none, that is before

18     the court to suggest that the irreparable harm prong isn't

19     satisfied here.

20          And so I think -- I'm focusing on the only part I think

21     defendants have contested here.  Because they don't actually --

22     they don't contest that if this were determined to be medically

23     necessary for Ms. Edmo, that they would provide it.

24          We heard defendants from both IDOC, Mr. Clark, and

25     Dr. Eliason get on the stand and say that their understanding is

679

1    that IDOC has no problem with providing the surgery to an inmate

2    for whom it is found to be medically necessary.

3        So, really, that's what it -- I think that's the only

4    evidence that it comes down to in this case.  And defendants are

5    picking around the edges.

6        The WPATH standards -- they presented two experts who have

7    almost zero experience treating anyone with gender dysphoria and

8    no experience with the surgery, no experience evaluating

9    patients for surgery.  And they say:  We don't believe the WPATH

10   standards should apply, hypothetically this and hypothetically

11   that.

12       And I think we have established that Dr. Levine, who is not

13   a witness in this case, trained and was very involved in every

14   single -- every single one of defendants' witnesses.

15       Mr. Clark was trained by Dr. Levine, got his slides from

16   Dr. Levine, embraced those slides.  Dr. Eliason brought

17   Dr. Levine in; that's who he trained with; he reproduced his

18   slides.

19       And defendants -- both of their experts, remarkably, are

20   from the same correctional system who were trained by

21   Dr. Levine.

22       And I think something very important is that in the

23   *Norsworthy* case, the district court found, after considering

24   Dr. Levine, who was there, and an actual expert in that case --

25              THE COURT:  What case is this?

680

1          MS. RIFKIN:  This is *Norsworthy v. Beard*, 87 F.Supp.3d

2     1164.

3          THE COURT:  What district?

4          MS. RIFKIN:  This is, I believe, the Northern District

5     of California, 2015.

6          THE COURT:  By the way, was the one case in California

7     where gender confirmation surgery was performed for an inmate --

8     was that ordered by the court, or was it just a decision made by

9     the department of -- California Department of Corrections?

10         MS. RIFKIN:  I believe, Your Honor, that that was a

11    settlement after the court ordered surgery for Michelle

12    Norsworthy that CDCR then paroled.  So they did not provide her

13    surgery.

14         But Shiloh Quine had another case.  And so the result of

15    the *Norsworthy* case was that CDCR adopted policies that it would

16    provide surgery, and that was the settlement, and it has

17    provided surgery.

18         I'm informed that, according to CDCR attorneys, two more

19    individuals in CDCR have since been provided surgery, but I

20    don't have that as evidence, Your Honor.

21         THE COURT:  Okay.  All right.

22         MS. RIFKIN:  So this court, who was directly

23    considering Levine, found that -- essentially concluded that

24    Levine's apparent opinion that no inmate should ever receive SRS

25    predetermined his conclusion with respect to *Norsworthy*, who was

681

1    the plaintiff.  Therefore, his conclusions are unhelpful in

2    assessing whether she has a serious medical need for surgery.

3         Now, Levine isn't here today.  But what you heard from

4    Dr. Eliason, and essentially what you heard from Dr. Andrade and

5    Dr. Garvey, is the same thing.  They say -- defendants' defense

6    in this case is:  We don't have a ban.  Our policy would allow

7    it.

8         But the standard, the criterion that they are suggesting

9    creates a de facto ban on surgery for anyone who isn't serving a

10   life sentence.  They say, on the one hand -- Dr. Garvey said

11   that Ms. Edmo wasn't presenting as feminine; there is no

12   evidence she was presenting as feminine prior to prison six

13   years ago.  On the other hand, she said, even if she were, the

14   substance abuse history would make that meaningless.

15        So on the one hand, they say that her six years of

16   consistent, persistent gender presentation in prison don't count

17   and can't count toward the standard.  On the other hand, they

18   say, and it never could, because nothing -- nothing counts

19   unless it's in the community.

20            THE COURT:  Well, I mean, hypothetically, someone

21   could have spent a year having dressed or acted -- having

22   adopted that gender identity and then been arrested.  That would

23   have satisfied it.  But, generally, you're right.  It's going to

24   a rare circumstance where anybody short of a very long prison

25   sentence would ever qualify.  That's the point.

1          MS. RIFKIN:  That's the point, Your Honor.

2      I mean, it's also important to consider that Ms. Edmo

3   wasn't given a diagnosis of gender dysphoria until after she

4   entered the prison.  She testified she didn't know what

5   the -- what the -- what the condition was.  And so she has

6   provided testimony that she considered herself effeminate from

7   the time she was small.

8      Whether Dr. Garvey thinks that her shirt was feminine

9   enough as recorded in the record, Dr. Ettner explained to us

10  clearly, that's not the measure of gender identity.  The measure

11  of gender identity is how somebody perceives their gender

12  identity.

13     And no one in this case suggested that Ms. Edmo has been

14  manipulative or is faking this or lying.  And so regardless of

15  whether she wore a skirt or a shirt or earrings before she

16  entered prison, it is undisputed that for six years, in the face

17  of discipline -- and this is important -- defendants have

18  disciplined her for, quote, "disobeying orders" that were

19  related to appearing feminine.  Some of that discipline involved

20  escorting Ms. Edmo to the segregation unit and forcing her to

21  spend time in segregation for this.

22     This is not something that she is doing lightly or has done

23  lightly.  And I think that matters.

24     Now, Your Honor asked a question at the end of Dr. Garvey's

25  presentation about whether there are statistics that actually

1    measure suicide rates.  There is that information.  It's in the

2    exhibit that we did not admit, but it specifically talks about

3    that.

4         We didn't present it with our experts because we didn't

5    anticipate that Dr. Garvey would testify that way.  In her

6    report, she specifically says that that 19-times rate number,

7    she acknowledges that the authors of that study say this is not

8    to be confused with saying that gender confirmation surgery

9    increase a risk.  This is not to be used to make this argument.

10   This is not what it's saying.

11        She said that in her report, so we did not be expect her to

12   opine that as if that somehow mattered in this case.

13        So there is evidence, Your Honor.  And I think you'll find

14   that Dr. Ettner actually explained this in her testimony when

15   the record is reviewed.  There is substantial evidence, it's

16   uncontroverted evidence that gender confirmation surgery has a

17   significant effect on increasing the mental health of people who

18   receive it.

19        Suicide is the result of decompensating mental health.

20   Dr. Garvey herself testified suicide -- the completed suicide is

21   extremely rare.

22        So, I mean, the information is there, and it's been

23   uncontroverted.  Even the experts in this case acknowledge that

24   surgery is a well-established treatment for this condition, and

25   to say otherwise is unethical.  I mean, that's what Dr. Garvey

684

1    stood up and agreed to.

2         So these -- these are red herrings.  These are

3    hypotheticals by people.  All four witnesses defendants put on,

4    not one of them has any experience with someone who has actually

5    had the surgery; and yet, they speculate that Ms. Edmo will

6    somehow be harmed.

7         Again, these are the kinds of arguments that used to be

8    used in Eighth Amendment cases for things we now consider

9    absolutely common sense.  But because this population of people

10   with gender dysphoria, of transgender people, there is still a

11   lot of prejudice, the idea that they are lying, they are

12   manipulating, they are somehow making this up, they have other

13   things going on.

14        Dr. Garvey in her report ruled out transvestic fetishism,

15   which isn't even a disease recognized by the World Health

16   Organization anymore.

17        These are -- these are ignorant.  These are ignorant, and

18   they are prejudiced.  And it's important that we have come to a

19   point, what Justice Kennedy called "evolving standards of

20   decency," that we understand the harm we are doing to people by

21   leaving them untreated.

22        Dr. Ettner said that in prison, we see the natural

23   progression.  Because it's only in prison at this point, because

24   the rest of society knows that you treat this now.  That's why

25   there is a CMS decision ending a blanket ban.  That's why this

1    is covered by insurance now.  Because there are evolving

2    standards and understanding of medical knowledge recognize this

3    as a medical treatment for a medical condition.  And that can't

4    be disputed.

5         And this -- I think this ends up being a simple Eighth

6    Amendment question.  I think irreparable harm is clear.  The

7    medical necessity is clear.  And it's a question of do we apply

8    the same standard of care in the community and in prison; and

9    the Eighth Amendment establishes that.

10        I think, in closing -- I know Your Honor knows this because

11   she has been in court for three days, but defendants' expert

12   Dr. Andrade described Ms. Edmo as a young, intelligent woman.

13        And defendants' arguments look at her as if she can't

14   comprehend what she is asking for, even though she has lived as

15   a woman for six years in a male prison.

16        She brought this case on her own, Your Honor.  She brought

17   this case pro se.  She has been seeking surgery since 2014.

18   This is the second case she has filed to seek it.  Ms. Edmo is

19   not confused about her gender identity.  This is her real life.

20        Defendants and their experts talk about the sixth

21   criterion, which used to be called "real-life experience."  This

22   is Ms. Edmo's real life.  But defendants' experts have literally

23   no real-life experience of their own treating this condition.

24   They have no real-life experience with surgery.

25        And I think it's really important that their theoretical

1        disagreements with what is the established standard of care by

2        people who have no experience with this not be allowed to cause

3        a human being to continue what is very real, very acute

4        suffering.

5                    THE COURT:  Thank you.

6                    MS. RIFKIN:  Thank you.

7                    THE COURT:  Counsel, do you wish to --

8                    MR. HALL:  Your Honor, to the extent there is time

9        after Mr. Eaton gives his closing, I would like to say a few

10       words.

11                   THE COURT:  All right.  Very good.

12                   MR. EATON:  Your Honor, I would first also -- like

13       Mr. Hall, I wanted to thank you for giving us the summer to

14       conduct discovery and provide a more complete picture of all of

15       this to the court and for the opportunity the last three days,

16       and to close today.  We will want to submit a short brief, as

17       well, in closing.

18           You know, it's interesting.  When I listened to plaintiff's

19       counsel talk, I didn't hear a whole lot of facts.  And what I

20       heard was trying to put Dr. Levine's PowerPoints and slides on

21       trial as a red herring.

22           And what I hear is saying:  Look, there has been a lot of

23       prejudice and lying and ignorance in the Department of

24       Corrections previously, but then they -- in kind of talking out

25       of both sides of her mouth, but then said she agreed that

1    we're -- all of our witnesses agreed that Ms. Edmo is not lying

2    and trying to put that on trial.

3         What's on trial is the facts of this case, and I know

4    that's what the court will look at.

5         At the outset, the court was very acute in recognizing two

6    key issues:  First, as you've mentioned, the standards for

7    granting a permanent and mandatory injunction; and, second,

8    whether, given Ms. Edmo's numerous mental health issues, SRS is

9    appropriate.

10        Now, as to the second issue, the day-to-day treatment

11   providers all speak with one voice:  SRS is not appropriate at

12   this time.  It's never been barred entirely.  They have been

13   trying to work with her and provide appropriate care and

14   treatment to the extent she will cooperate.

15        There are underlying mental health issues; there is no

16   dispute.  And there is no dispute she does have gender

17   dysphoria, but she also has anxiety, she has major depressive

18   disorder, she has depression, and all of that bubble that

19   Mr. Hall put up at the beginning in his opening, all of those

20   issues -- borderline personality disorder.  Those are all still

21   there.  And if the court ordered sex reassignment surgery, those

22   issues are still going to be there afterwards.

23        Now, this is a complex case and a complex issue.  There is

24   poor studies regarding outcomes of sex reassignment surgery.

25   There is a lack of clarity as to the applicability of standards

688

1        and how to apply them in the correctional setting.

2                THE COURT:  Wasn't the -- I couldn't quite pull up the

3        exhibit number, but is it NCCS -- I don't recall --

4                MR. EATON:  NCCHC I believe.

5                THE COURT:  Yeah, NCCHC.  That criteria adopted the

6        WPATH standards and two pages -- I want to say 73 and 74 -- of

7        the WPATH standards seems to clearly say you don't consider

8        housing arrangements, including institutionalization, in

9        applying these standards.

10           Doesn't that provide some clarity?

11               MR. EATON:  Well, I believe that that was the

12       recommendation, first of all.  I don't believe that was an

13       official adoption.  And I would want the court to look at that.

14       That's in evidence.

15               THE COURT:  I can do that.  I just glanced at it when

16       it was on the screen.

17               MR. EATON:  And it was a position -- I believe a

18       position statement, so a recommendation, not an official

19       adoption by the NCCHC.

20           And in any event, the reference to the WPATH still allows

21       for flexibility, and it doesn't provide a lot of helpful

22       guidance on medical necessity.  It doesn't provide a lot of

23       helpful guidance on, for instance, how to apply criteria 6 of

24       the sex reassignment surgery criteria as to --

25               THE COURT:  What was No. 6?

1          MR. EATON:   -- living as a female -- living as a

2     female for 12 months in a correctional setting.   So there

3     is -- I believe there is a lack of clarity.

4          But my point is that there is some of this lack of clarity.

5     And because of that, this is, at a minimum, a doubtful case

6     where I can't see how the court can grant a mandatory injunction

7     that is a permanent, irreversible surgery.

8          And, you know, this is just such a case where it was

9     appropriate for Dr. Eliason to exercise his clinical judgment in

10    assessing Ms. Edmo.

11         And I know the court doesn't want to spend a lot of time on

12    the facts, and I know you're aware of them.   But what did

13    Dr. Eliason do?   He assessed her with gender identity disorder

14    in 2012 to help her, and she said that helped her.   And why?   To

15    help her get hormones, and she got hormones.

16         What did Dr. Eliason do?   He then monitored and saw her

17    periodically over many, many years to help monitor and treat the

18    underlying mental health disorders -- giving her Zoloft,

19    adjusting the medications, and trying to deal with those other

20    issues.

21         And then the mental health providers provided appropriate

22    hormone therapy to her, and she got results that she wanted and

23    helped to decrease her dysphoria; such as developing breasts,

24    the fat distribution, and those kind of things.   She found that

25    helpful, and that was because of what Dr. Eliason started.

1           And then when he assessed sex reassignment surgery, what

2   did he do?  He talked with her, he staffed it, he documented it.

3   He made up -- he made objective observations.  He did an

4   assessment, noted that there was criteria indicated that WPATH

5   was important, and that's why he said he staffed it with a WPATH

6   clinician, and then made a determination.

7           And the determination was not an outright denial forever,

8   but he indicated at that time hormone therapy was appropriate to

9   continue, and should also continue with needed counseling.

10          And she continued to receive treatment and care for the

11  underlying mental health issues.  And the clinicians also have

12  been working tirelessly with Ms. Edmo to try to help her.  And,

13  unfortunately, she hasn't cooperated with some of the

14  recommendations that they think will help with her underlying

15  mental health conditions.

16          And you've heard our experts say that those need to be

17  resolved or at least much better well controlled before sex

18  reassignment surgery should be on the table.

19          THE COURT:  Well, Dr. Ettner and Dr. Gorton, who have

20  been quite involved in the WPATH process, have said what that

21  means is not that we -- that they need to be controlled where

22  they can cooperate and follow up, that sort of thing.  Now,

23  there is some concern about that given Ms. Edmo's behavior while

24  incarcerated.

25          But well controlled, I guess I'm struggling with how

1    that -- who is going to measure that?  Does it mean something

2    more than just simply controlled enough that we can make sure

3    that she, in fact, cooperates with the surgery and the follow-up

4    and whatnot?

5         Now, you may dispute that given the problems that she has

6    had while incarcerated.

7              MR. EATON:  Well, I think, in part, that's why there

8    needs to be a lot of deference to the clinical judgment of the

9    clinicians and the therapists and the medical providers in

10   trying to help work through those things before SRS may be

11   indicated at some other time.

12        Additionally, I think you do bring up a good point, which

13   is when you talk about the WPATH, there is the criteria for an

14   informed consent, and then there is a separate criteria for --

15   that the mental health conditions need to be well controlled.

16        And I think Your Honor picked up on it, but their experts

17   and plaintiffs want to lump those together.  And I think that's

18   telling.  They don't want to distinguish that you have to have

19   well-controlled mental health issues.  They want to say:  Well,

20   that's solely just so they can have informed consent, and they

21   just want to make it about psychosis only.

22        And that's not what the WPATH says.  It wants to have

23   things in order so that there can be good coping mechanisms

24   before and after surgery, and that there has been time spent in

25   an appropriate community in the outside community before that

692

1      sex reassignment surgery is performed, so that after, they know

2      what that experience is going to be like.  As you heard the

3      experts talk about, that's a clinical point.

4          I also wanted to mention that, you know, the Idaho

5      Department of Corrections and Corizon don't have a blanket

6      policy prohibiting SRS.  And, in fact, witnesses from both sides

7      testified that they allow all treatment options and even SRS if

8      it's medically necessary.

9          And so a lot of the cases that are being cited by

10     plaintiff's counsel are cases where there was a blanket

11     prohibition against one of these treatment options, hormones or

12     sex reassignment surgery.  That's not this case.

13         As to the other issue that Your Honor picked up on, this is

14     a mandatory injunction, and it's not to be taken lightly.  And

15     the Ninth Circuit, in *Garcia v. Google, Inc.*, summarized some of

16     the case law in this regard.

17                 "This relief is treated as a mandatory injunction

18                 because it orders the responsible party to take

19                 action.  As we have cautioned, a mandatory injunction

20                 goes well beyond simply maintaining the status quo and

21                 is particularly disfavored.  The district court should

22                 deny such relief unless the facts and law clearly

23                 favor the moving party.  In plain terms, mandatory

24                 injunction should not be issued in doubtful cases."

25         This is not a clear case by plaintiffs in any regard.  And

693

 1        we feel that defendants have defended this well and on the

 2        merits.  And in any event, at a minimum, this is simply a

 3        doubtful case where a mandatory injunction should not be issued

 4        and granted.

 5              It's an extraordinary step for a court to order a surgery.

 6        That's -- that's -- that's a big deal, and I know the court

 7        appreciates that.

 8              And, you know, there is case law out there that suggests

 9        that asking the court to exercise medical and mental health

10        decisions is not really the place of the court, and that's why

11        there needs to be deference to the medical providers and what

12        they have been -- what they are doing and their judgment.

13              Your Honor is very familiar and aware with the deliberate

14        indifference standard, and this just simply is not a deliberate

15        indifference case.  There is no deliberate indifference, and

16        there is no likelihood that they are going to prove that with

17        what they have put on before the court today.

18              As Mr. Hall indicated in his opening, what this really

19        boils down to is a difference of opinion by medical

20        professionals about the treatment.  And that is not deliberate

21        indifference.

22              And as Your Honor recognizes, even negligence or gross

23        negligence does not arise to a level of deliberate indifference.

24              You know, I -- the judge also -- the court also needs to

25        decide -- I'm finding my note here.  Excuse me.

694

1          The court also needs to decide that there is a substantial

2     risk of serious harm.  And I believe it was -- I think it was

3     telling, among other things, that Dr. Gorton indicated, I

4     believe, if I recall the testimony correctly, that it was absurd

5     that this needed to be an emergent surgery.

6          And even their own experts were suggesting that, you know,

7     it could be now or in six months or there is time.  So there is

8     nothing to suggest that there is anything emergent and urgent at

9     this point.

10         And there are concerns about what would happen after her

11    surgery.  There is concerns as to suicide.  There is concerns as

12    to cutting continuing.  Our experts have opined -- like

13    Dr. Garvey opined that the suicidal rate would not be decreased

14    after sex reassignment surgery.

15              THE COURT:  Well, did she actually say that it would

16    not be decreased, or she just said there is no information from

17    which she can draw a conclusion on that?

18              MR. EATON:  I thought that's what she said, but I

19    agree that there has been a lot of discussion about how

20    the -- it's difficult to tell, and the -- and the studies just

21    are poor out there as to what will happen, which, again, makes

22    this a case where it's a doubtful case, that mandatory judgment

23    should not be issued.

24              THE COURT:  Well, in terms of the likelihood of

25    her -- Ms. Edmo resorting again to efforts at self-castration or

1    even suicide --

2         I apologize, Ms. Edmo, for talking about you.  It's got to

3    be a little bit discomforting to have people -- I guess that's

4    what this whole trial is about or hearing is about.

5         But is it -- what significance should we draw from the fact

6    that two efforts were made -- I think one in 2015 and one in

7    2016; I don't know the exact date when the pro se filing was

8    made or when the case was picked up by defense counsel.  Is it

9    somewhat significant that after litigation was filed and there

10   was going to be light at the end of the tunnel, that the efforts

11   at self-castration stopped?  Is that of any significance, or is

12   there no connection between those dots?

13              MR. EATON:  Well, I believe that the defendants'

14   experts testified that the point is that -- with the

15   self-castrations, there is still self-harming behavior, and

16   there is also cutting behavior.  And that's very dangerous and

17   shows that there is not good coping mechanisms and that there

18   likely may not be a good result after the surgery.  And that's

19   the concern.

20              THE COURT:  So you are saying anyone who attempts

21   self-castration is categorically excluded, then, because they

22   don't qualify under that fourth element of the WPATH standards?

23              MR. EATON:  No.  I think they analyzed it for

24   Ms. Edmo's case specifically.  And there is lots of self-harming

25   behavior, and that may be one factor.  But she also had

696

 1      self-harming behavior preincarceration, and that there was no

 2      mention of gender dysphoria or those type of comments in those

 3      preincarceration records.  And now she is cutting herself again,

 4      and at least our experts indicated that that could be related to

 5      borderline personality disorder or other, you know, mental

 6      health issues as well.

 7            So unless Your Honor has any other comments --

 8                  THE COURT:  No, that's fine.

 9                  MR. EATON:  -- we'll reserve the rest of our -- rest

10      of our argument for briefing.

11            I would just close by saying that we do believe that the

12      motion for preliminary injunction should be denied in all

13      respects, and that there is no proof of likelihood of success on

14      deliberate indifference.  And there are concerns about harm

15      after SRS, and Your Honor needs to take that into consideration

16      when you hopefully deny it.

17            Thank you.

18                  THE COURT:  Thank you.

19            Mr. Hall.

20                  MR. HALL:  Is there any time remaining?

21                  LAW CLERK:  Nine and a half minutes.

22                  THE COURT:  I'll give you 10.

23                  MR. HALL:  Very generous, Your Honor.

24            I think I heard the words "ignorant" and "prejudiced."

25      That's a first because usually only my wife calls me ignorant.

1          I think that I would like to end where I began, Your Honor,

2     and just highlight that this case is about a difference in

3     medical opinion made by professionals, and that is not

4     deliberate indifference alone.

5          This is not a case where the defendants have denied or

6     refused to recognize the WPATH, which we have referred to as

7     standards.  But the WPATH, admittedly, agrees that they are

8     guidelines, that they are flexible guidelines to be provided and

9     to provide recommendations to professionals who have to apply

10     them on these highly complex mental health issues.

11          To say that or use the cancer analogy is not accurate here

12     because, as we know, not everyone who has cancer is eligible, or

13     is it appropriate for them to have chemotherapy.

14          The defendants, their experts, and plaintiff's experts

15     disagree about the appropriateness of the guidelines, about the

16     appropriateness of surgery at this time.  And that is not

17     deliberate indifference to have engaged in a thoughtful

18     analysis.

19          And are they the experts on this evolving area of the

20     world?  That's -- that's debatable, plaintiff's as well.

21     Plaintiff's experts come from one portion of this debate.

22          They have zero experience in correctional -- in the

23     correctional world; yet, both Dr. Gorton and Dr. Ettner sit on a

24     committee that appears to be prepared to dictate how they should

25     be applied in a correctional institution.

1          And no one with the defendants has said that they should

2     not be applied in a correctional institution.  They are just

3     saying:  We need to apply that flexibility so that we can do the

4     right thing and do no harm.  And they disagree that Ms. Edmo

5     actually meets all the criteria.

6          Your Honor, I fail to see how that is deliberate

7     indifference to any medical need -- to recognize the treatment

8     options, to provide treatment, but to decide that one potential

9     treatment option, one appropriate treatment option is not

10    appropriate at this time.

11         This case is, in essence, asking this court to step in,

12    exercise its own judgment, and determine whether or not it's

13    appropriate, whether she meets the criteria despite this dispute

14    over whether or not it is appropriate at this time.

15         Plaintiffs want to advance an argument that there is only

16    two experts in this world, two individuals in this world who

17    could have done the right thing for Ms. Edmo, that they have the

18    most experience; so, therefore, what they say is right.

19         Now, they never treated Ms. Edmo.  They never had that

20    patient-provider relationship.  Defendants' employees,

21    defendants' doctors, defendants' mental health clinicians, they

22    did, and they have taken that seriously.

23         I think it would be a dangerous precedent to have the court

24    step in whenever there is a debate as to whether or not a

25    patient in a correctional institution meets the criteria for

1       some standards or guidelines which are ever evolving, whether

2       it's in a cancer case or gender dysphoria case.

3           The Department and its employees need the discretion to be

4       able to do their job, to apply the data that is out there, to

5       apply their experience to the person that they know.

6           This is not a clear-cut, you know, broken tibia case where

7       it's really not in dispute how you treat that.  This is a highly

8       complex mental health case.  And it requires, even under the

9       WPATH, that flexibility be provided and that, ultimately, those

10      treating physicians or those treating providers be given the

11      discretion to exercise their sound clinical judgment.

12          Thank you, Your Honor.

13          THE COURT:  Thank you.

14          Counsel, Mr. Severson reminded me that I think we actually

15      did set out a briefing schedule.  If our trial next week goes

16      off and Ms. Hohenleitner can get the brief *[sic]* as we

17      discussed, then we will just keep those deadlines.  If there is

18      a delay -- and I'm not putting any pressure on her because we're

19      going into a trial the next week, as well, and I have got a

20      pretty full docket apart from the trial next week anyway.

21          So if -- I guess the same number of days it takes her

22      beyond that one week to prepare the transcript is the number of

23      days we'll move back on the briefing schedule, just so we don't

24      have to issue any new orders.

25          If you want to reach agreement on something different from

1    that, you can, but that's going to be the presumptive briefing

2    schedule unless you reach an agreement otherwise.

3          And I would, I guess, suggest that you submit your

4    posttrial briefs along with the proposed findings and

5    conclusions, the same schedule.

6          Is there anything else we need to take up at this point?

7          MS. RIFKIN:  No, Your Honor.  But we do very much

8    appreciate the efforts of the courtroom staff and know that

9    that's a lot of pressure.  Thank you.

10         THE COURT:  Yeah.  I have got the world's greatest

11   staff; I know that for sure.  They make me look a lot better

12   than I deserve to look.

13         Anything else from the defendants?

14         MR. HALL:  No, Your Honor.  Thank you.

15         MR. EATON:  No, Your Honor.  Thank you.

16         THE COURT:  We will -- now, the only thing I would add

17   is we're very much going to put this on the front of our list of

18   things that need to be done.  And so we will try to work very

19   hard to get a decision out very quickly once all the briefing

20   and proposed findings and conclusions have been submitted.

21         I don't intend to let this sit.  I would hope within a week

22   or two, maybe, after it's submitted, we will try to have

23   something out.  But things happen that may make that a little

24   difficult, but that will certainly be our objective.

25         All right.  We will be in recess.
           (Proceedings concluded at 3:52 p.m.)

```
1                  CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5

6            I, Tamara Hohenleitner, Federal Official Realtime

7    Court Reporter, in and for the United States District Court for

8    the District of Idaho, do hereby certify that pursuant to

9    Section 753, Title 28, United States Code, that the foregoing

10   is a true and correct transcript of the stenographically

11   reported proceedings held in the above-entitled matter and that

12   the transcript page format is in conformance with the

13   regulations of the Judicial Conference of the United States.

14

15                     Dated this 19th day of October, 2018.

16

17

18                     /S/ TAMARA I. HOHENLEITNER
                       _____
19                     TAMARA I. HOHENLEITNER, CSR NO. 619, CRR
                       FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25
```

## $

**$12,000** [1] - 559:9
**$48,000** [2] - 559:6,
559:9
**$6,000** [1] - 559:6
**$60,000** [3] - 558:17,
558:23, 559:9
**$600** [1] - 559:5

## '

**'Standards** [1] -
478:7

## 1

**1** [19] - 457:18,
462:1, 462:2, 463:23,
464:6, 464:15, 470:9,
478:1, 478:5, 484:19,
484:20, 526:19,
527:21, 528:1, 528:6,
528:9, 534:8, 635:16,
639:17
**1-347** [1] - 463:15
**1-538** [2] - 457:17,
464:15
**1-to-10** [1] - 669:1
**10** [12] - 463:16,
539:6, 543:1, 590:14,
626:23, 627:3, 656:4,
669:3, 669:8, 669:11,
669:12, 696:22
**10-minute** [2] -
501:13, 501:16
**100** [2] - 627:23,
662:6
**100-2** [1] - 515:24
**1026** [6] - 574:10,
577:11, 579:14,
625:7, 625:8, 625:10
**1029** [6] - 565:14,
576:9, 576:13,
576:20, 576:24,
576:25
**1030** [4] - 563:25,
565:7, 565:11, 565:12
**1036** [2] - 635:16,
635:24
**104** [1] - 460:4
**1041** [6] - 476:9,
476:17, 476:20,
476:21, 479:6, 567:5
**1042** [1] - 612:3
**10:02** [1] - 501:18
**10:20** [1] - 501:18
**11** [1] - 507:16
**113** [2] - 469:8,
469:14

**1164** [1] - 680:2
**11:57** [1] - 576:15
**12** [29] - 443:2,
460:6, 460:7, 463:1,
465:2, 466:2, 466:3,
466:4, 486:17,
496:10, 508:16,
539:21, 584:13,
584:17, 585:2,
585:13, 586:24,
587:4, 590:6, 639:24,
648:1, 648:10,
648:19, 649:16,
650:3, 650:8, 658:6,
677:8, 689:2
**12-month** [9] - 456:1,
496:16, 529:18,
530:8, 539:23, 540:1,
585:9, 586:18, 650:9
**12:20** [1] - 576:15
**14** [5] - 482:25,
483:23, 483:24,
483:25, 491:7
**146** [2] - 655:23,
656:2
**15** [9] - 508:17,
576:14, 577:20,
579:13, 581:6, 630:2,
639:9, 641:21, 646:3
**1500** [1] - 633:24
**1599** [1] - 516:3
**16** [5] - 478:24,
475:9, 479:9, 480:17,
507:16
**17** [2] - 472:25,
627:13
**17-151** [1] - 443:4
**18** [3] - 473:15,
473:17, 473:20
**19** [8] - 545:14,
596:24, 597:1, 597:5,
598:4, 598:13,
598:20, 598:23
**19-times** [1] - 683:6
**1:29** [1] - 623:13
**1:42** [1] - 623:13
**1st** [2] - 521:9,
649:23

## 2

**2** [10] - 476:22,
486:9, 517:7, 526:19,
527:21, 528:2, 528:6,
528:9, 568:5, 593:7
**20** [17] - 457:15,
457:20, 461:25,
462:11, 463:4,
464:14, 464:16,
466:14, 467:7,

467:20, 471:15,
473:12, 473:19,
473:23, 474:17,
475:9, 501:14
**20-minute** [1] - 623:7
**2009** [2] - 516:10,
522:13
**2010** [9] - 508:1,
508:2, 536:2, 632:9,
632:12, 632:13,
633:6, 633:10, 633:11
**2011** [4] - 508:2,
516:10, 516:12, 536:2
**2012** [10] - 463:13,
518:22, 521:10,
521:15, 522:9,
591:25, 602:19,
603:1, 640:3, 689:14
**2013** [2] - 463:16,
560:14
**2014** [7] - 463:25,
574:13, 577:5,
577:15, 578:6,
625:11, 685:17
**2015** [5] - 457:21,
464:7, 507:5, 680:5,
695:6
**2016** [27] - 450:20,
451:7, 452:2, 457:15,
457:20, 458:9,
459:12, 460:13,
461:25, 462:11,
463:4, 464:14, 467:7,
467:20, 471:15,
475:9, 493:5, 495:19,
497:1, 513:25,
523:16, 553:7,
553:19, 553:21,
611:13, 615:23, 695:7
**2017** [11] - 523:16,
523:17, 553:7,
553:19, 553:23,
565:17, 611:13,
615:24, 650:4, 650:5
**2018** [1] - 443:2
**2021** [4] - 530:2,
624:3, 624:14, 624:16
**2032** [3] - 503:12,
503:13, 503:14
**2033** [5] - 592:11,
595:9, 620:2, 620:7,
620:8
**22** [3] - 578:19,
579:1, 579:6
**24** [1] - 594:8
**25th** [1] - 521:12
**27** [3] - 459:12,
577:8, 577:13
**28** [2] - 464:7,
474:17, 630:2

**2:44** [1] - 671:12

## 3

**3** [3] - 478:23, 479:7,
479:8
**30** [5] - 458:18,
500:9, 508:20,
508:25, 574:13
**30-year** [1] - 545:9
**300** [1] - 545:8
**31** [2] - 535:15,
536:23
**31st** [1] - 631:1
**32** [2] - 536:23, 537:6
**35** [2] - 517:7, 612:10
**3:02** [1] - 671:12
**3:52** [1] - 701:1

## 4

**4** [4] - 478:4, 539:1,
641:22, 669:12
**40** [2] - 508:20,
508:25
**425** [1] - 463:24
**43** [2] - 473:4, 610:7
**44** [1] - 597:20
**44-fold** [1] - 598:2
**452** [1] - 464:6

## 5

**5** [5] - 477:18,
477:20, 537:6, 568:6,
669:12
**538** [4] - 457:18,
462:2, 470:9, 484:20

## 6

**6** [6] - 469:14,
539:21, 584:13,
669:12, 688:23,
688:25
**615** [1] - 448:7
**66** [2] - 639:9, 641:21
**67** [1] - 586:15

## 7

**7** [4] - 474:2, 478:9,
530:12, 669:12
**7,000** [1] - 500:20
**702** [2] - 515:3,
559:22
**703** [1] - 559:22
**73** [3] - 580:6, 581:7,
688:6
**74** [2] - 583:24, 688:6

**75** [1] - 559:5

## 8

**8** [6] - 460:15, 487:6,
498:7, 498:12,
498:15, 669:11
**80** [1] - 559:5
**85** [1] - 559:5
**87** [1] - 680:1

## 9

**9** [1] - 463:25
**9-year-old** [1] - 641:6
**99.9** [1] - 649:8

## A

**A-N-D-R-A-D-E** [1] -
623:24
**a.m** [3] - 501:18,
576:15
**AAPL** [1] - 629:24
**ability** [1] - 542:6
**able** [29] - 443:21,
444:5, 447:6, 465:7,
490:17, 528:7,
529:14, 534:6,
534:23, 535:6,
535:12, 538:23,
542:11, 567:17,
579:23, 605:14,
607:8, 609:3, 610:5,
617:8, 637:10,
641:18, 641:19,
654:23, 658:10,
662:3, 665:5, 665:11,
699:4
**absolutely** [4] -
453:11, 544:13,
673:22, 684:9
**abstract** [1] - 565:3
**absurd** [1] - 694:4
**abuse** [11] - 488:1,
539:3, 539:14,
539:18, 540:5, 546:8,
640:17, 640:25,
641:2, 641:3, 681:14
**abused** [2] - 640:17,
641:9
**ACA** [1] - 629:21
**academic** [2] -
533:8, 552:22
**Academy** [4] - 526:6,
551:24, 565:17,
629:24
**accept** [2] - 446:20,
570:25
**accepted** [9] -

477:22, 478:14,
568:8, 568:10,
568:24, 570:15,
571:5, 591:9, 591:13
**access** [8] - 483:11,
580:22, 583:6,
583:16, 584:8,
588:21, 642:21, 672:7
**accidentally** [1] -
448:15
**acclimate** [4] -
658:11, 661:21,
662:3, 663:17
**accommodations**
[2] - 584:5, 584:11
**accordance** [1] -
676:20
**according** [4] -
466:1, 524:5, 649:3,
680:18
**accordingly** [1] -
609:15
**account** [2] - 466:21,
582:5
**accreditation** [1] -
626:17
**accurate** [10] -
469:24, 469:25,
515:5, 563:17, 570:4,
570:7, 570:9, 582:10,
598:3, 697:11
**acknowledge** [4] -
466:1, 572:6, 675:19,
683:23
**acknowledged** [3] -
551:9, 572:5, 614:21
**acknowledgement**
[1] - 551:13
**acknowledges** [1] -
683:7
**acted** [1] - 681:21
**acting** [1] - 465:1
**action** [1] - 692:19
**active** [2] - 540:5,
606:15
**actively** [3] - 529:4,
539:10, 540:8
**activity** [1] - 537:8
**actual** [9] - 466:1,
511:11, 519:21,
549:8, 646:2, 651:6,
660:3, 673:6, 679:24
**acute** [5] - 606:18,
654:17, 675:20,
686:3, 687:5
**add** [1] - 700:16
**added** [4] - 602:12,
648:4, 648:8, 649:15
**addition** [4] - 444:17,
548:25, 566:16,

675:23
**additional** [1] -
446:23, 516:6,
516:24, 527:11,
532:17, 534:23,
541:9, 554:9, 561:11,
569:22, 650:8
**additionally** [1] -
691:12
**address** [10] - 452:5,
488:18, 492:18,
509:12, 515:2, 524:6,
530:7, 533:24,
672:18, 674:21
**addressed** [2] -
605:15, 642:16
**addressing** [1] -
477:6
**adjusting** [1] -
689:19
**adjustment** [4] -
587:22, 587:24,
588:8, 588:13
**adjustments** [1] -
524:10
**administer** [1] -
661:2
**administrative** [3] -
507:3, 507:6, 511:8
**administrators** [1] -
626:19
**admissibility** [2] -
547:12, 659:25
**admissible** [1] -
548:24
**admission** [3] -
536:16, 576:13,
624:10
**admit** [17] - 476:17,
503:5, 547:6, 547:10,
547:13, 547:15,
548:3, 565:6, 579:25,
620:1, 624:21, 625:5,
625:8, 625:14,
625:15, 625:20, 683:2
**admitted** [27] -
463:11, 473:19,
473:23, 476:20,
476:21, 503:9,
503:13, 503:14,
548:10, 548:14,
549:16, 565:11,
565:12, 576:12,
576:24, 576:25,
620:7, 620:8, 624:13,
624:14, 632:11,
632:15, 632:25,
633:9, 633:10,
633:11, 636:9
**admittedly** [1] -

697:7
**adopt** [3] - 532:24,
533:1, 674:7
**adopted** [10] - 480:2,
480:8, 480:12,
493:13, 493:14,
532:22, 541:10,
680:15, 681:22, 688:5
**adopting** [1] - 495:2
**adoption** [2] -
688:13, 688:19
**Adree** [1] - 443:4
**adult** [2] - 504:17,
640:18
**adults** [1] - 592:24
**advance** [2] - 625:3,
698:15
**adverse** [1] - 488:5
**advice** [1] - 455:13
**advise** [1] - 670:24
**advised** [1] - 443:8
**advocacy** [1] - 566:6
**advocate** [1] - 489:7
**advocated** [1] -
480:3
**advocates** [2] -
565:24, 566:8
**affect** [1] - 668:13
**affidavit** [3] - 446:9,
446:20
**affidavits** [1] -
443:21
**affirmatively** [3] -
573:8, 575:14, 579:22
**affirming** [4] -
485:20, 628:25,
654:24, 663:15
**afternoon** [1] -
609:16
**afterwards** [1] -
687:22
**age** [1] - 596:14
**age-matched** [1] -
596:14
**ago** [10] - 458:19,
462:15, 527:21,
558:16, 558:22,
562:7, 602:23, 672:9,
676:7, 681:13
**agree** [47] - 444:10,
448:22, 451:7, 471:3,
477:12, 483:10,
487:18, 497:13,
497:16, 548:7, 563:2,
578:16, 581:16,
581:18, 581:22,
582:1, 582:2, 582:11,
583:16, 583:21,
583:22, 587:20,
589:18, 589:23,

590:10, 591:8,
591:16, 595:4,
595:11, 598:4,
598:13, 600:9,
602:23, 602:25,
603:5, 606:16,
652:25, 653:4,
654:14, 654:17,
657:18, 657:21,
676:17, 677:24,
678:5, 694:19
**agreed** [10] - 444:16,
478:20, 599:12,
599:21, 609:24,
632:15, 662:5, 684:1,
686:25, 687:1
**agreement** [6] -
443:24, 632:23,
632:24, 672:23,
699:25, 700:2
**agrees** [3] - 675:17,
675:18, 697:7
**ahead** [28] - 449:19,
451:1, 461:17, 466:7,
467:3, 467:15, 482:5,
482:19, 506:8,
520:13, 549:18,
553:13, 553:15,
558:6, 558:9, 560:6,
569:8, 572:10, 583:1,
597:7, 609:17,
613:15, 616:25,
621:15, 653:24,
662:17, 665:23, 667:4
**aid** [1] - 613:18
**aimed** [1] - 664:11
**al** [1] - 443:4
**alcohol** [6] - 451:12,
519:5, 536:13, 539:4,
543:25, 546:6
**alerted** [1] - 672:22
**allegation** [2] -
610:9, 614:9
**alleviate** [9] - 600:20,
611:9, 628:13,
651:15, 651:20,
651:24, 652:1, 652:6,
654:21
**allow** [16] - 446:5,
448:1, 455:22, 456:9,
533:3, 540:11,
556:15, 557:18,
570:25, 590:3,
613:11, 625:2,
642:20, 649:12,
681:6, 692:7
**allowed** [8] - 446:10,
448:24, 531:22,
534:24, 561:21,
618:19, 677:9, 686:2

**allowing** [2] - 445:6,
445:18
**allows** [1] - 534:21,
586:24, 688:20
**almost** [11] - 452:24,
523:9, 538:9, 539:6,
543:1, 560:8, 572:21,
644:17, 645:16,
677:12, 679:7
**alone** [1] - 697:4
**alter** [1] - 543:3
**alternative** [1] -
540:14
**alternatives** [1] -
649:20
**Alviso** [7] - 451:15,
451:17, 451:18,
452:1, 516:13,
516:22, 609:9
**Alviso's** [1] - 495:8
**ambivalence** [1] -
566:3
**ambivalent** [1] -
663:3
**amended** [1] - 516:3
**Amendment** [8] -
676:2, 676:3, 676:4,
676:19, 677:25,
684:8, 685:6, 685:9
**American** [10] -
526:5, 526:6, 551:24,
565:17, 591:24,
592:22, 594:9,
629:22, 629:23,
629:24
**Americanized** [1] -
644:15
**amount** [3] - 490:24,
559:1, 673:7
**An-drad-ee** [2] -
644:9, 644:11
**An-drade** [3] - 644:9,
644:10, 644:11
**analogy** [1] - 697:11
**analysis** [2] - 678:6,
697:18
**analyze** [1] - 541:16
**analyzed** [2] -
532:15, 695:23
**ANDRADE** [1] -
623:18
**Andrade** [28] -
516:21, 560:25,
561:17, 562:1,
562:13, 562:22,
563:1, 564:2, 565:1,
565:16, 565:21,
566:13, 623:15,
623:16, 623:24,
625:9, 625:13,

636:16, 644:6,
644:16, 660:1, 660:8,
660:14, 660:23,
668:9, 670:10, 681:4,
685:12
   **Andrade's** [2] -
642:13, 659:15
   **aneurysm** [1] -
474:25
   **Anne** [1] - 620:15
   **annual** [3] - 514:7,
525:22, 563:21
   **answer** [43] - 454:12,
455:5, 460:14,
460:22, 465:6, 465:7,
469:21, 472:21,
475:19, 478:21,
492:22, 531:2,
551:10, 552:5,
556:13, 556:16,
557:4, 557:15,
557:17, 560:18,
564:7, 564:15,
568:15, 597:15,
601:8, 604:17,
608:14, 618:20,
620:12, 646:15,
646:16, 646:18,
652:17, 656:9,
656:11, 656:14,
656:15, 656:16,
656:18, 669:24,
674:23, 675:10, 676:3
   **answered** [10] -
556:17, 557:19,
571:2, 582:22, 599:9,
651:22, 658:12,
669:3, 669:8, 669:18
   **answers** [1] - 544:23
   **antiandrogen** [1] -
524:3
   **anticipate** [2] -
511:6, 683:5
   **anticipated** [1] -
443:16
   **antidepressant** [1] -
471:20
   **anxiety** [2] - 488:1,
687:17
   **anxious** [1] - 607:20
   **anytime** [1] - 485:20
   **anyway** [3] - 448:6,
576:8, 699:20
   **aortic** [1] - 474:25
   **APA** [4] - 533:6,
533:8, 565:16,
577:25, 592:25
   **APA's** [1] - 593:24
   **apart** [1] - 699:20
   **apologize** [4] -

572:24, 623:2,
625:10, 695:2
   **apparent** [1] - 680:24
   **appeal** [1] - 674:10
   **appear** [3] - 484:21,
524:5, 528:22
   **appearance** [2] -
536:19, 537:24
   **appeared** [6] -
451:14, 464:19,
521:8, 527:14,
603:15, 603:16
   **appearing** [3] -
465:1, 535:23, 682:19
   **apples** [3] - 622:20,
622:21
   **applicability** [3] -
580:5, 583:25, 687:25
   **applicable** [2] -
542:16, 633:3
   **application** [1] -
677:1
   **applied** [4] - 530:25,
638:17, 697:25, 698:2
   **applies** [2] - 445:24,
672:15
   **apply** [18] - 448:5,
455:23, 492:18,
527:6, 534:6, 571:9,
571:22, 580:15,
585:5, 635:3, 679:10,
685:7, 688:1, 688:23,
697:9, 698:3, 699:4,
699:5
   **applying** [3] -
571:13, 571:18, 688:9
   **appointment** [1] -
608:21
   **appreciate** [2] -
506:9, 700:8
   **appreciates** [1] -
693:7
   **approach** [3] -
447:14, 459:23, 461:8
   **approaches** [1] -
540:15
   **approaching** [1] -
513:15
   **appropriate** [38] -
466:18, 519:21,
521:24, 523:24,
524:1, 524:15,
526:25, 527:1,
542:16, 578:13,
578:17, 579:8,
579:11, 580:22,
590:21, 610:9,
613:13, 614:9, 617:9,
629:5, 640:23,
664:11, 665:22,

668:11, 672:7, 675:7,
687:9, 687:11,
687:13, 689:9,
689:21, 690:8,
691:25, 697:13,
698:9, 698:10,
698:13, 698:14
   **appropriateness** [5]
- 627:25, 628:20,
631:13, 697:15,
697:16
   **approve** [6] - 523:5,
591:21, 628:10,
628:13, 646:21, 658:7
   **approved** [8] -
606:14, 628:25,
629:2, 646:22, 647:2,
647:4, 647:21, 650:24
   **approving** [1] -
521:22
   **April** [17] - 451:7,
457:15, 457:20,
461:25, 462:11,
463:4, 463:16,
463:25, 464:14,
464:16, 467:7,
467:20, 471:15,
475:9, 493:5, 495:19,
497:1
   **area** [2] - 502:10,
697:19
   **areas** [5] - 517:16,
571:15, 655:20,
665:22, 675:16
   **argue** [2] - 448:24,
599:2
   **arguing** [1] - 443:13
   **argument** [11] -
670:20, 670:23,
671:5, 671:9, 673:9,
673:13, 673:17,
683:9, 696:10, 698:15
   **arguments** [4] -
660:5, 676:6, 684:7,
685:13
   **arise** [1] - 693:23
   **arising** [2] - 479:2,
479:10
   **Arizona** [1] - 504:25
   **arm** [1] - 604:22
   **arrangements** [2] -
583:8, 688:8
   **arrested** [1] - 681:22
   **article** [18] - 540:16,
541:17, 551:7, 551:9,
551:18, 551:21,
592:5, 592:16,
593:11, 593:16,
594:4, 594:7, 594:9,
594:15, 596:23,

596:24, 619:18,
620:14
   **articles** [3] - 517:10,
541:1, 609:24
   **aspect** [2] - 551:1,
616:2
   **aspects** [4] - 509:24,
512:12, 582:5, 594:11
   **asserted** [3] -
574:21, 575:4, 613:10
   **assertions** [2] -
445:13, 591:17
   **assess** [5] - 517:25,
519:24, 558:11,
604:3, 630:16,
631:13, 660:16,
672:11, 674:13
   **assessed** [12] -
450:20, 451:6,
464:17, 471:8, 493:5,
534:12, 557:11,
557:23, 602:9,
604:13, 689:13, 690:1
   **assessing** [4] -
519:21, 526:16,
681:2, 689:10
   **assessment** [17] -
450:5, 457:15,
470:13, 490:7,
495:20, 495:24,
497:1, 497:2, 517:23,
519:16, 583:4, 629:8,
631:7, 633:13,
659:16, 661:5, 690:4
   **assessments** [6] -
453:24, 562:24,
627:18, 627:24,
628:19, 628:24
   **assigned** [8] -
509:12, 510:2, 510:4,
555:19, 608:20,
608:24, 609:9
   **assignment** [1] -
594:1
   **associated** [8] -
516:4, 520:25, 538:9,
538:11, 546:22,
603:2, 616:3, 675:14
   **Association** [7] -
478:9, 526:6, 591:25,
592:22, 594:9,
629:22, 629:23
   **assume** [14] -
473:16, 474:11,
485:4, 505:24,
612:22, 622:23,
625:3, 632:21,
637:18, 643:24,
670:17, 672:6, 673:2,
674:6

   **assumes** [1] -
615:11
   **assuming** [4] -
469:11, 485:5, 548:9,
613:6
   **Atlanta** [1] - 513:24
   **attempt** [5] - 458:2,
479:13, 479:17,
607:25, 657:8
   **attempted** [14] -
457:20, 458:6, 471:3,
471:23, 495:10,
498:7, 498:13,
542:19, 604:19,
605:14, 655:2, 656:7,
656:23, 667:21
   **attempting** [5] -
466:3, 604:22,
606:23, 656:18, 667:6
   **attempts** [20] -
457:24, 485:10,
487:10, 498:5,
527:10, 536:2,
536:12, 543:21,
543:22, 543:24,
596:13, 597:4,
597:18, 597:23,
597:24, 597:25,
598:10, 611:25,
622:16, 695:20
   **attend** [5] - 480:6,
513:24, 525:22,
608:23, 629:20
   **attendance** [1] -
452:14
   **attended** [13] -
452:15, 452:25,
504:12, 504:14,
523:15, 531:6,
551:17, 553:25,
555:1, 618:12,
629:14, 629:18,
629:22
   **attending** [5] - 473:8,
553:6, 553:18,
553:22, 562:8
   **attention** [6] - 584:6,
586:22, 618:12,
619:19, 619:24, 656:4
   **attorneys** [1] -
680:18
   **attribute** [1] - 603:22
   **attributed** [2] -
474:9, 600:14
   **attributes** [2] -
640:15, 641:1
   **audience** [3] -
493:21, 495:1, 526:15
   **audio** [2] - 517:4,
517:5

**audio-recorded** [2] - 517:4, 517:5
**audit** [2] - 612:7
**augmentation** [1] - 475:1
**August** [6] - 444:24, 445:15, 507:5, 522:20, 615:24, 630:25
**author** [1] - 514:12
**authored** [1] - 516:9
**authors** [2] - 592:18, 683:7
**automatic** [1] - 542:19
**automatically** [5] - 534:13, 573:17, 573:20, 574:3, 606:24
**available** [18] - 453:12, 454:23, 478:9, 481:24, 481:25, 509:3, 509:22, 520:16, 571:22, 581:12, 581:24, 582:2, 582:3, 582:11, 588:22, 590:21, 621:10, 652:11
**averaged** [1] - 559:5
**avoid** [1] - 448:2
**aware** [30] - 464:22, 464:24, 480:2, 481:10, 514:11, 532:7, 566:25, 571:8, 571:21, 572:8, 573:11, 574:8, 575:17, 575:20, 609:10, 611:13, 613:14, 615:18, 615:22, 616:1, 616:10, 616:16, 622:6, 649:1, 650:6, 652:21, 658:13, 658:18, 689:12, 693:13

---

## B

**bachelor** [1] - 504:11
**bad** [3] - 456:16, 489:6, 676:13
**Balla** [2] - 612:21, 613:7
**ban** [4] - 575:18, 681:6, 681:9, 684:25
**Ban** [3] - 516:8, 537:1, 632:1
**Bannock** [1] - 632:5
**barred** [1] - 687:12
**barring** [1] - 577:4

**base** [3] - 468:12, 664:17, 674:12
**based** [35] - 455:2, 462:17, 468:2, 468:5, 468:9, 468:16, 522:8, 522:18, 531:14, 531:18, 533:4, 543:16, 544:18, 545:21, 559:23, 560:8, 570:11, 573:22, 580:22, 583:21, 589:18, 591:17, 592:25, 606:16, 627:11, 628:13, 633:1, 633:2, 641:13, 646:17, 649:9, 650:20, 652:10, 658:20, 662:24
**baseline** [1] - 598:11
**bases** [3] - 462:4, 553:17, 553:22
**basis** [24] - 462:8, 462:13, 462:24, 463:6, 509:22, 518:19, 518:20, 524:19, 525:22, 528:18, 528:19, 573:18, 583:7, 583:18, 584:10, 584:19, 584:21, 585:10, 585:12, 589:18, 589:23, 590:10, 606:12, 662:20
**be-all** [1] - 531:3
**Beach** [1] - 553:25
**Beard** [1] - 680:1
**bears** [1] - 575:4
**became** [7] - 507:5, 508:11, 510:14, 510:18, 511:15, 640:17, 663:16
**become** [2] - 570:3, 676:24
**becoming** [3] - 554:7, 617:20, 617:21
**began** [1] - 697:1
**begin** [3] - 457:15, 545:23, 580:14
**beginning** [1] - 687:19
**begins** [1] - 578:11
**behalf** [2] - 478:19, 479:20
**behavior** [11] - 486:23, 538:8, 538:14, 659:4, 666:6, 667:12, 690:23, 695:15, 695:16,

695:25, 696:1
**behavioral** [3] - 642:9, 642:10, 667:11
**behind** [5] - 531:7, 531:10, 531:18, 540:6, 587:11
**belief** [2] - 462:25, 641:13
**believes** [3] - 544:4, 544:5, 614:14
**below** [1] - 477:10
**beneficial** [1] - 653:9
**best** [7] - 447:14, 486:13, 556:3, 621:10, 622:20, 658:8, 663:10
**better** [17] - 447:15, 461:8, 489:5, 500:2, 515:1, 529:10, 546:15, 547:2, 559:17, 591:20, 662:4, 669:17, 669:19, 669:20, 669:25, 690:17, 700:11
**between** [11] - 493:22, 528:20, 555:11, 556:1, 559:5, 566:10, 576:11, 588:23, 621:6, 622:16, 695:12
**beyond** [4] - 555:7, 642:12, 692:20, 699:22
**big** [1] - 693:6
**bigger** [1] - 500:21
**billed** [2] - 558:16, 558:21
**bit** [13] - 471:14, 488:16, 506:18, 507:9, 513:21, 527:8, 538:7, 546:18, 558:25, 589:4, 671:16, 672:1, 695:3
**black** [2] - 464:18, 676:4
**black-letter** [1] - 676:4
**blanket** [4] - 574:14, 684:25, 692:5, 692:10
**blanking** [1] - 621:2
**blind** [1] - 622:18
**block** [1] - 524:3
**blow** [7] - 477:1, 477:19, 478:4, 580:7, 593:8, 593:9, 610:7
**blown** [2] - 579:2, 594:21
**board** [11] - 504:17, 504:19, 552:7,

569:20, 569:21, 569:22, 569:23, 569:25, 570:2, 574:13, 617:6
**board-certified** [2] - 569:20, 617:6
**board-recognized** [1] - 569:21
**boils** [1] - 693:19
**booked** [2] - 657:12, 658:1
**borderline** [32] - 470:4, 495:14, 495:15, 497:25, 498:1, 635:12, 636:4, 636:17, 636:24, 637:2, 637:12, 638:6, 640:10, 640:13, 641:10, 642:5, 642:8, 652:22, 653:1, 653:13, 654:3, 654:9, 664:10, 665:9, 666:1, 666:16, 666:20, 667:7, 667:10, 667:15, 687:20, 696:5
**Boston** [1] - 502:10
**bottom** [5] - 471:16, 474:20, 565:20, 580:7, 595:24
**boxes** [2] - 587:9, 587:14
**Bracke** [1] - 655:14
**brain** [1] - 449:7
**break** [13] - 501:14, 569:7, 569:9, 572:13, 572:14, 575:23, 623:5, 623:6, 623:7, 623:11, 670:17, 670:19, 671:8
**breast** [2] - 493:20, 494:18
**breasts** [2] - 475:2, 689:23
**Bridgewater** [1] - 659:3
**brief** [5] - 497:7, 539:20, 673:17, 686:16, 699:16
**briefing** [9] - 673:3, 673:15, 674:23, 675:9, 696:10, 699:15, 699:23, 700:1, 700:19
**briefly** [15] - 504:10, 506:2, 506:20, 510:19, 527:23, 527:24, 532:2, 533:23, 534:8, 538:6, 540:14, 540:17, 541:21, 626:15,

634:16
**briefs** [5] - 549:6, 670:21, 672:19, 674:4, 700:4
**bring** [5] - 450:8, 480:17, 533:18, 567:4, 691:12
**broken** [1] - 699:6
**brought** [7] - 555:2, 561:23, 579:22, 657:8, 679:16, 685:16
**Brown** [3] - 504:14, 552:13, 552:14
**bubble** [1] - 687:18
**bullet** [1] - 474:24
**bunch** [1] - 587:9
**BY** [111] - 450:1, 451:3, 455:17, 457:12, 459:7, 459:17, 460:1, 461:18, 462:3, 466:9, 467:5, 467:17, 469:14, 472:24, 473:24, 476:23, 477:3, 478:23, 479:9, 480:1, 480:19, 482:6, 482:23, 484:17, 486:5, 490:4, 491:6, 494:9, 494:24, 496:16, 497:9, 498:15, 498:22, 502:8, 502:25, 504:7, 506:15, 515:25, 520:15, 525:15, 545:19, 549:21, 553:9, 553:17, 556:20, 557:22, 558:10, 559:4, 560:7, 564:17, 565:15, 567:19, 568:18, 569:10, 572:15, 572:25, 574:5, 575:11, 577:1, 579:6, 580:3, 581:8, 583:3, 583:16, 590:10, 591:8, 595:11, 596:2, 596:22, 597:15, 599:12, 600:19, 601:11, 606:16, 608:3, 608:17, 609:19, 611:21, 615:3, 615:22, 617:2, 620:9, 621:5, 621:17, 624:1, 624:15, 626:1, 633:12, 635:23, 636:16, 637:8, 639:3, 643:3, 644:5, 644:16, 647:8, 649:1, 649:10, 652:4, 653:25, 655:23, 656:2, 660:8,

660:22, 662:12, 662:21, 665:7, 665:24, 666:25, 667:5, 668:8

## C

**calculation** [1] - 486:22
**California** [13] - 489:15, 489:17, 489:19, 504:16, 504:25, 505:15, 505:21, 506:21, 553:25, 588:4, 680:5, 680:6, 680:9
**cancer** [5] - 607:13, 607:15, 697:11, 697:12, 699:2
**candidate** [5] - 456:14, 534:6, 546:21, 546:23, 591:11
**candor** [1] - 444:13
**cannot** [8] - 549:7, 575:1, 584:13, 651:19, 651:23, 651:25, 652:1, 652:5
**capacity** [5] - 542:4, 543:11, 560:22, 562:16, 644:22
**capture** [1] - 497:2
**care** [69] - 453:7, 455:10, 477:22, 478:11, 478:14, 492:13, 495:5, 512:14, 522:10, 522:16, 529:19, 530:23, 531:17, 541:13, 542:15, 542:17, 542:18, 545:16, 557:7, 566:17, 566:22, 568:2, 568:8, 568:11, 570:15, 571:6, 571:18, 579:10, 580:4, 580:9, 580:15, 580:22, 580:24, 581:9, 583:5, 583:17, 584:1, 584:11, 586:16, 594:11, 617:8, 617:9, 618:2, 629:9, 629:11, 629:13, 629:16, 630:6, 647:6, 647:16, 650:14, 650:15, 650:19, 675:25, 676:3, 676:5, 676:14, 676:18, 676:21, 677:21, 677:23,

677:25, 678:1, 678:6, 685:8, 686:1, 687:13, 690:10
**Care** [14] - 476:2, 476:11, 477:4, 478:7, 525:18, 526:3, 530:12, 553:24, 566:18, 568:21, 568:23, 569:14, 626:17, 629:21
**career** [1] - 505:5, 507:11, 510:24, 529:9, 552:4
**careful** [1] - 566:2
**carefully** [3] - 532:18, 548:18, 574:1
**Case** [1] - 443:3
**case** [104] - 454:18, 457:1, 486:19, 487:1, 487:2, 489:10, 493:3, 509:22, 512:13, 514:12, 514:13, 514:17, 516:1, 516:21, 516:25, 517:9, 517:17, 538:2, 547:23, 547:25, 550:19, 550:25, 557:11, 557:23, 558:17, 558:23, 559:21, 560:25, 562:1, 562:2, 573:18, 577:2, 584:19, 584:21, 585:10, 585:12, 585:15, 595:2, 595:4, 595:12, 596:5, 599:14, 612:21, 614:16, 617:4, 618:1, 624:19, 630:12, 631:23, 634:25, 644:23, 648:12, 650:16, 658:4, 672:21, 673:8, 676:21, 676:24, 677:16, 678:3, 678:7, 679:4, 679:13, 679:23, 679:24, 679:25, 680:6, 680:14, 680:15, 681:6, 682:13, 683:12, 683:23, 685:16, 685:17, 685:18, 687:3, 687:23, 689:5, 689:8, 692:12, 692:16, 692:25, 693:3, 693:8, 693:15, 694:22, 695:8, 695:24, 697:2, 697:5, 698:11, 699:2, 699:6, 699:8
**case-by-case** [6] -

509:22, 573:18, 584:19, 584:21, 585:10, 585:12
**caseload** [3] - 506:24, 507:7, 511:10
**cases** [20] - 487:4, 507:18, 521:20, 524:10, 528:8, 541:6, 541:7, 554:22, 563:12, 563:20, 578:14, 578:17, 579:8, 579:11, 628:7, 629:1, 684:8, 692:9, 692:10, 692:24
**castrate** [7] - 458:6, 471:23, 604:22, 605:14, 606:23, 654:20, 678:15
**castrating** [1] - 460:20
**castration** [17] - 458:2, 458:13, 459:9, 461:20, 471:4, 485:10, 486:24, 487:3, 495:10, 498:4, 498:7, 498:13, 527:10, 542:19, 694:25, 695:11, 695:21
**castrations** [1] - 695:15
**catch-22** [3] - 488:13, 488:15, 500:4
**catchall** [1] - 672:9
**catchy** [2] - 564:21, 564:24
**categorically** [1] - 695:21
**caused** [5] - 488:12, 490:15, 612:1, 641:2, 665:5
**causing** [3] - 499:5, 675:18, 675:20
**caution** [2] - 564:12, 590:22
**cautioned** [1] - 692:19
**cautious** [1] - 534:4
**CBT** [1] - 642:9
**CCHP** [3] - 569:11, 570:3, 626:17
**CDCR** [4] - 680:12, 680:15, 680:18, 680:19
**Cecilia** [2] - 544:17, 620:18
**Center** [4] - 516:8, 523:20, 535:24, 632:3
**certain** [8] - 443:15, 444:4, 524:15, 535:4,

585:10, 619:5, 627:25, 633:7
**certainly** [4] - 499:15, 520:11, 587:23, 700:24
**certification** [6] - 525:20, 569:13, 569:21, 569:25, 570:4, 570:11
**certifications** [1] - 525:15
**certified** [16] - 458:17, 475:25, 477:14, 480:1, 504:17, 504:19, 525:17, 568:20, 569:20, 569:22, 569:23, 570:2, 612:4, 617:6, 626:10, 655:10
**chair** [3] - 508:8, 508:11, 627:7
**challenges** [3] - 487:22, 530:3, 668:21
**challenging** [3] - 488:19, 511:17, 540:10
**chance** [12] - 446:15, 447:10, 484:14, 503:17, 539:20, 556:14, 557:18, 564:14, 571:4, 648:21, 648:22, 655:22
**change** [10] - 454:17, 455:18, 471:11, 485:22, 486:21, 486:22, 499:17, 516:25, 535:9, 672:8
**changes** [5] - 512:17, 513:9, 584:8, 602:16, 603:2
**characteristics** [1] - 677:12
**characterization** [4] - 450:22, 450:24, 451:7, 615:19
**characterized** [1] - 592:7
**charge** [2] - 535:18, 558:20
**chase** [1] - 449:12
**check** [1] - 587:9
**checked** [1] - 587:14
**chemotherapy** [4] - 607:15, 607:20, 676:9, 697:13
**chicken** [1] - 499:3
**chief** [6] - 507:5, 508:7, 508:10, 510:14, 510:18, 525:4

**child** [1] - 641:6
**childhood** [3] - 518:24, 544:3, 640:15
**choice** [2] - 446:8, 446:19
**choices** [1] - 603:19
**choose** [1] - 447:7
**chose** [1] - 474:16
**chosen** [3] - 443:14, 456:1, 677:9
**circle** [1] - 593:9
**circles** [1] - 636:6
**Circuit** [4] - 675:1, 675:5, 678:3, 692:15
**circumstance** [1] - 681:24
**circumstances** [3] - 448:21, 484:21, 524:16
**cite** [6] - 462:12, 463:5, 571:8, 591:24, 594:4, 594:6
**cited** [15] - 529:17, 531:5, 532:12, 577:2, 578:18, 578:20, 579:7, 592:5, 592:17, 593:11, 596:23, 598:14, 620:15, 620:23, 692:9
**cites** [1] - 457:24
**Civil** [1] - 443:3
**claim** [1] - 640:7
**claims** [1] - 620:16
**clarification** [2] - 548:21, 660:8
**clarify** [7] - 549:11, 556:15, 564:14, 619:17, 621:5, 652:4, 673:19
**clarity** [4] - 687:25, 688:10, 689:3, 689:4
**Clark** [4] - 527:4, 527:12, 678:24, 679:15
**class** [2] - 659:3, 659:7
**classes** [1] - 659:12
**classic** [2] - 452:17, 488:13
**Claudia** [2] - 521:14, 522:2
**clean** [1] - 636:7
**clear** [17] - 466:24, 481:20, 482:2, 482:11, 551:22, 559:11, 573:19, 596:11, 600:5, 600:25, 613:20, 676:16, 677:16, 685:6, 685:7, 692:25,

699:6
**clear-cut** [1] - 699:6
**clearer** [1] - 473:14
**clearly** [6] - 487:22,
487:25, 665:4,
682:10, 688:7, 692:22
**clerk** [2] - 501:22,
623:17
**Clerk** [3] - 449:22,
457:9, 502:14
**CLERK** [5] - 443:3,
501:25, 623:19,
623:22, 696:21
**client** [1] - 672:22
**Clinic** [1] - 451:20
**clinic** [2] - 451:20,
471:20
**clinical** [40] - 453:25,
456:23, 481:15,
491:7, 492:16, 507:4,
507:13, 507:14,
512:4, 517:2, 517:6,
517:24, 527:5,
527:15, 530:24,
531:1, 531:22, 534:6,
540:6, 555:18,
555:19, 558:11,
559:13, 571:23,
587:11, 593:1, 626:7,
627:4, 627:11,
630:22, 634:22,
635:4, 660:12, 666:6,
667:13, 667:16,
689:9, 691:8, 692:3,
699:11
**clinically** [6] - 587:8,
587:15, 587:16,
598:15, 675:14,
675:19
**Clinician** [2] -
608:24, 608:25
**clinician** [19] -
488:17, 509:9,
509:12, 510:4, 513:3,
608:25, 618:23,
634:18, 646:9,
646:14, 647:7,
647:10, 647:13,
647:16, 651:5, 651:6,
651:9, 651:10, 690:6
**clinicians** [12] -
513:7, 513:11,
513:15, 529:1,
535:12, 619:6,
634:13, 653:12,
667:20, 690:11,
691:9, 698:21
**close** [8] - 474:20,
512:10, 562:14,
572:12, 597:25,

606:13, 686:16,
696:11
**closed** [1] - 671:3
**closely** [2] - 550:12,
563:1
**closer** [1] - 663:7
**closing** [10] - 670:20,
671:5, 671:9, 673:9,
673:13, 673:17,
673:20, 685:10,
686:9, 686:17
**clothing** [1] - 672:7
**CME** [1] - 553:1
**CMS** [14] - 532:2,
532:4, 532:7, 532:21,
572:16, 573:2, 573:7,
574:23, 574:25,
575:13, 577:3,
578:20, 579:19,
684:25
**coexisting** [1] -
642:2
**cognitive** [1] - 642:9
**cohort** [2] - 544:18,
598:19
**collaboration** [1] -
551:18
**collateral** [3] -
469:16, 469:19,
539:25
**colored** [1] - 464:18
**column** [1] - 592:19
**comfortable** [1] -
664:8
**coming** [2] - 512:6,
547:14
**comment** [1] -
595:17
**comments** [4] -
465:17, 539:1, 696:2,
696:7
**commissary** [1] -
672:8
**Commission** [12] -
476:2, 476:25, 477:4,
525:18, 526:2,
553:23, 566:18,
568:21, 568:22,
569:13, 626:16,
629:21
**committed** [2] -
615:6, 676:13
**committee** [49] -
452:4, 452:10,
452:11, 452:20,
453:4, 454:14,
454:15, 454:17,
475:12, 508:19,
510:7, 510:8, 510:17,
513:5, 513:7, 514:5,

514:6, 521:16, 554:7,
554:18, 557:2,
560:25, 561:6,
561:14, 561:15,
561:18, 617:22,
618:2, 618:13,
618:24, 622:3, 622:7,
628:10, 629:15,
629:16, 644:24,
645:5, 645:8, 645:12,
645:15, 645:19,
645:24, 646:10,
646:20, 647:1, 648:9,
648:17, 651:4, 697:24
**Committee** [23] -
452:25, 453:2, 454:5,
454:7, 475:15, 493:2,
508:9, 508:12,
521:17, 554:3,
554:14, 560:10,
560:24, 562:4,
562:17, 562:18,
562:23, 563:9,
617:23, 621:20,
622:2, 627:9, 644:19
**committees** [1] -
617:17
**common** [3] -
601:23, 617:20, 684:9
**commonly** [2] -
527:25, 531:5
**communications** [1]
- 662:21
**community** [41] -
511:25, 512:11,
528:22, 566:8,
566:10, 581:13,
582:1, 582:3, 582:8,
582:15, 584:24,
585:15, 585:18,
585:24, 586:5,
587:23, 587:24,
587:25, 588:12,
589:1, 589:7, 589:8,
616:4, 619:20,
622:22, 640:4,
641:19, 643:8,
643:11, 643:14,
643:18, 657:4,
663:22, 663:25,
676:5, 676:15,
681:19, 685:8, 691:25
**community-
dwelling** [1] - 566:10
**comorbid** [2] -
490:24, 490:25
**comorbidities** [2] -
519:9, 529:3
**company** [8] -
452:20, 506:12,

511:24, 511:25,
561:12, 562:15,
627:13, 678:2
**comparative** [1] -
589:21
**compare** [1] - 622:20
**compared** [8] -
545:10, 545:13,
596:17, 597:2, 597:9,
598:10, 598:23,
622:23
**comparing** [3] -
596:15, 620:22,
622:13
**comparison** [2] -
545:11, 608:2
**competency** [3] -
505:9, 510:25, 630:6
**competing** [2] -
571:21, 572:6
**complainant** [1] -
675:8
**complaint** [1] - 516:3
**complete** [6] -
446:25, 502:1,
502:25, 599:7,
623:22, 686:14
**completed** [16] -
552:2, 597:17,
597:18, 597:23,
598:1, 598:2, 598:5,
598:8, 598:9, 598:11,
598:17, 599:5, 599:6,
620:20, 683:20
**completely** [5] -
536:10, 548:23,
587:24, 621:8, 678:5
**completes** [1] -
641:16
**complex** [5] - 571:3,
687:23, 697:10, 699:8
**complexity** [1] -
566:1
**compliant** [1] -
608:17
**complicated** [4] -
540:9, 648:6, 648:12,
648:13
**complicating** [1] -
651:21
**complications** [4] -
479:1, 499:25,
546:17, 578:2
**component** [3] -
538:10, 542:8, 570:1
**components** [1] -
571:13
**compound** [4] -
569:6, 570:17, 571:3,
582:21

**comprehend** [1] -
685:14
**comprehensive** [3] -
514:1, 537:7, 537:9
**comprised** [1] -
474:6
**computer** [2] -
449:22, 502:14
**conceived** [1] -
474:24
**concern** [17] - 445:6,
445:18, 481:16,
485:7, 488:9, 493:4,
499:3, 605:4, 610:2,
639:25, 640:12,
641:25, 643:8,
663:13, 668:19,
690:23, 695:19
**concerned** [6] -
443:19, 481:15,
506:8, 542:6, 545:22,
546:12
**concerning** [3] -
515:3, 660:5, 665:20
**concerns** [33] -
462:9, 462:12,
462:22, 487:24,
488:11, 496:3,
499:10, 538:3,
593:23, 594:3,
600:14, 601:1,
610:22, 611:3, 611:5,
611:12, 619:7,
622:18, 631:8, 639:3,
639:19, 639:22,
640:12, 641:23,
642:2, 643:10,
668:20, 677:4, 677:6,
694:10, 694:11,
696:14
**concise** [1] - 455:21
**conclude** [1] -
577:22
**concluded** [12] -
470:14, 533:11,
533:13, 545:15,
573:17, 577:24,
578:10, 592:23,
603:15, 657:3,
680:23, 701:1
**concluding** [1] -
592:7
**conclusion** [8] -
462:4, 532:9, 542:14,
573:20, 574:2,
611:12, 680:25,
694:17
**conclusions** [6] -
573:24, 674:5, 674:8,
681:1, 700:5, 700:20

**conclusively** [1] - 535:3
**condition** [9] - 653:10, 653:18, 675:12, 675:14, 676:20, 682:5, 683:24, 685:3, 685:23
**conditions** [3] - 496:8, 690:15, 691:15
**conduct** [2] - 562:24, 686:14
**conducted** [5] - 594:25, 596:4, 618:15, 633:17, 646:2
**conference** [16] - 523:15, 526:6, 552:22, 553:6, 553:19, 553:24, 554:1, 562:8, 562:9, 564:2, 564:22, 565:2, 565:5, 629:14, 629:23, 629:25
**conferences** [8] - 513:23, 525:22, 525:25, 526:1, 552:21, 552:23, 563:6, 629:18
**confident** [4] - 489:23, 641:15, 641:17, 662:6
**confidential** [1] - 632:20
**confirm** [9] - 443:10, 443:25, 472:19, 515:5, 627:23, 632:11, 645:21, 646:2, 670:14
**confirmation** [68] - 472:2, 475:23, 480:20, 482:7, 483:5, 483:15, 484:4, 484:21, 485:24, 489:14, 489:21, 499:7, 509:21, 512:24, 513:2, 513:12, 514:3, 517:21, 524:18, 524:21, 528:16, 529:13, 530:18, 534:2, 538:18, 540:21, 541:4, 542:20, 545:9, 545:18, 546:20, 555:10, 555:25, 556:5, 556:21, 556:25, 557:8, 557:12, 557:25, 558:13, 559:14, 559:19, 574:15, 590:19, 590:23,

599:2, 599:5, 599:15, 601:3, 605:1, 605:10, 605:16, 605:20, 605:24, 606:2, 606:11, 609:21, 609:25, 619:4, 620:17, 622:15, 651:3, 651:7, 651:11, 675:21, 680:7, 683:8, 683:16
**confirmatory** [1] - 618:16
**confirmed** [1] - 537:24
**confirming** [9] - 628:21, 629:6, 631:14, 646:7, 646:12, 646:24, 647:8, 652:15, 661:5
**conforming** [2] - 486:7, 486:17
**confused** [2] - 683:8, 685:19
**confusing** [1] - 595:19
**congruent** [8] - 463:2, 463:5, 465:3, 584:14, 584:18, 585:3, 585:13, 586:19
**connected** [1] - 449:7
**connection** [1] - 695:12
**consensus** [1] - 593:2
**consent** [2] - 691:14, 691:20
**consider** [18] - 453:2, 504:8, 508:22, 521:2, 521:4, 527:10, 531:4, 533:22, 539:12, 560:4, 660:4, 670:19, 672:14, 672:16, 674:23, 682:2, 684:8, 688:7
**consideration** [6] - 453:3, 481:23, 532:21, 547:7, 566:3, 696:15
**considered** [7] - 529:8, 548:24, 549:7, 566:20, 605:23, 633:8, 682:6
**considering** [4] - 527:15, 549:10, 679:23, 680:23
**consisted** [1] - 626:24
**consistent** [8] - 524:10, 536:10,

650:18, 663:22, 663:24, 666:2, 667:7, 681:16
**consistently** [1] - 629:15
**consists** [1] - 553:6
**constantly** [1] - 485:13
**constellation** [1] - 667:10
**constitute** [1] - 571:5
**construed** [1] - 466:1
**consultant** [9] - 451:24, 514:5, 523:2, 554:19, 561:4, 563:11, 563:13, 563:20, 645:2
**consultation** [3] - 527:11, 554:9, 554:12
**consulted** [1] - 527:3
**consulting** [1] - 563:23
**consumed** [1] - 539:18
**contact** [2] - 537:16, 634:22
**contacting** [1] - 472:7
**contacts** [1] - 537:25
**contains** [1] - 625:6
**contemplated** [1] - 444:15
**contest** [1] - 678:22
**contested** [1] - 678:21
**context** [5] - 446:17, 446:23, 447:13, 481:3
**continue** [14] - 443:7, 471:19, 491:1, 492:25, 512:17, 545:16, 559:16, 643:12, 643:13, 658:19, 668:21, 686:3, 690:9
**continued** [5] - 490:8, 493:1, 524:9, 690:10
**CONTINUED** [1] - 449:25
**continues** [1] - 603:5
**continuing** [3] - 465:23, 529:20, 694:12
**continuous** [2] - 463:1, 465:2
**contract** [3] - 489:16, 561:10, 627:5
**contracts** [4] - 489:19, 627:13,

627:14
**contradictory** [2] - 445:17, 446:14
**contrary** [4] - 459:2, 461:6, 461:9, 591:17
**contributing** [2] - 499:4, 536:16
**control** [1] - 593:22
**controlled** [13] - 462:9, 529:3, 538:4, 604:1, 640:11, 641:24, 677:4, 690:17, 690:21, 690:25, 691:2, 691:15, 691:19
**controlling** [2] - 532:25, 533:2
**controls** [1] - 596:15
**convene** [1] - 475:12
**conversation** [2] - 455:3, 495:22
**convinced** [1] - 546:23
**cooperate** [3] - 542:4, 687:14, 690:22
**cooperated** [1] - 690:13
**cooperates** [1] - 691:3
**cooperating** [1] - 499:24
**cooperation** [2] - 456:10, 456:17
**cooperativeness** [1] - 456:19
**coordinated** [1] - 507:18
**copies** [1] - 655:10
**coping** [19] - 529:8, 529:10, 529:14, 538:13, 538:20, 538:23, 543:7, 545:21, 545:24, 546:7, 546:9, 546:15, 546:19, 547:2, 605:18, 607:9, 607:10, 691:23, 695:17
**copy** [13] - 458:18, 469:12, 473:21, 502:25, 515:19, 515:21, 575:23, 636:8, 637:11, 637:18, 655:11, 655:25
**Corizon** [35] - 443:4, 451:23, 451:24, 451:25, 453:5, 453:6, 453:10, 453:13, 453:20, 454:2, 472:8,

473:10, 481:8, 481:10, 483:3, 489:16, 489:18, 489:20, 491:7, 491:19, 491:22, 493:14, 495:4, 500:15, 516:2, 517:19, 517:20, 527:12, 542:15, 550:13, 610:14, 652:25, 654:2, 654:9, 692:5
**Corizon's** [3] - 500:21, 614:12, 644:23
**corner** [2] - 595:25, 596:1
**corporate** [1] - 627:12
**correct** [434] - 443:10, 444:2, 457:21, 458:3, 458:13, 460:2, 460:21, 461:21, 461:24, 462:9, 462:10, 462:13, 462:14, 462:22, 463:2, 463:6, 463:7, 463:9, 463:14, 463:18, 463:22, 463:25, 464:1, 464:4, 464:5, 464:8, 464:9, 464:13, 464:20, 464:21, 464:23, 466:11, 467:8, 467:9, 467:20, 467:21, 468:7, 468:10, 468:14, 468:17, 468:18, 468:22, 470:2, 470:6, 470:7, 470:11, 470:12, 470:19, 470:20, 470:23, 471:1, 471:5, 471:6, 471:9, 471:10, 471:12, 471:13, 471:18, 471:22, 471:25, 472:4, 472:8, 472:9, 472:12, 472:15, 472:23, 473:6, 473:7, 473:10, 473:11, 474:7, 474:10, 474:18, 474:21, 475:3, 475:4, 475:6, 475:7, 475:9, 475:10, 475:13, 475:17, 475:23, 475:24, 476:3, 477:25, 478:11, 478:12, 478:15, 478:22, 479:10, 479:14, 479:18,

479:25, 480:4,
480:21, 480:22,
481:6, 481:11, 482:8,
482:25, 483:1, 483:3,
483:6, 483:9, 483:12,
483:15, 483:16,
484:6, 490:5, 490:6,
490:9, 497:11,
497:12, 497:17,
497:20, 497:21,
497:23, 498:2, 498:3,
498:10, 502:11,
504:22, 506:17,
510:12, 516:16,
531:25, 536:5, 536:6,
538:5, 548:9, 549:2,
549:17, 550:10,
550:11, 550:14,
550:18, 550:23,
550:24, 551:2, 551:5,
551:8, 551:25, 552:3,
552:4, 552:6, 552:8,
552:10, 552:13,
552:15, 552:17,
552:20, 553:7,
553:20, 553:24,
554:5, 554:10,
554:11, 554:15,
554:21, 555:3, 555:5,
555:6, 555:12,
555:20, 556:2, 556:3,
556:6, 556:22,
556:25, 557:1, 557:6,
557:8, 557:13,
557:25, 558:3,
558:13, 558:14,
558:17, 558:20,
558:23, 559:7, 559:8,
559:9, 559:10,
559:14, 559:15,
560:11, 560:13,
560:14, 560:19,
561:1, 561:2, 561:4,
561:7, 561:19,
561:25, 562:5, 562:6,
562:11, 562:14,
562:20, 562:24,
562:25, 563:7,
563:10, 563:17,
564:4, 564:5, 564:8,
564:14, 564:18,
564:19, 564:21,
564:24, 564:25,
565:2, 565:16,
565:18, 566:15,
566:19, 566:23,
566:24, 567:1,
567:20, 567:21,
568:3, 568:16, 569:1,
569:11, 569:12,
569:14, 569:15,

569:24, 570:5, 570:8,
572:25, 573:9,
573:10, 573:14,
573:21, 573:22,
574:4, 574:7, 574:16,
575:15, 575:16,
575:21, 577:14,
578:6, 578:7, 578:15,
578:16, 578:21,
580:12, 580:18,
581:1, 581:14, 586:9,
586:12, 588:17,
588:18, 589:19,
589:25, 590:13,
590:25, 591:10,
591:11, 591:14,
591:18, 591:22,
592:1, 592:9, 592:10,
592:18, 593:6,
593:14, 594:5, 597:2,
598:7, 598:17,
598:25, 599:1,
599:16, 599:24,
601:14, 601:21,
601:22, 601:24,
601:25, 602:2, 602:3,
602:6, 602:7, 602:10,
602:11, 602:13,
602:14, 602:17,
602:20, 602:22,
602:24, 603:3, 603:6,
603:7, 603:10,
603:11, 603:13,
603:14, 603:16,
603:17, 603:20,
603:21, 603:23,
603:24, 604:1, 604:4,
604:8, 604:9, 604:12,
604:15, 604:16,
604:19, 604:22,
605:2, 605:11,
605:12, 605:16,
606:3, 606:5, 606:19,
606:25, 607:1, 607:4,
607:7, 608:18,
608:19, 608:21,
609:1, 609:5, 609:11,
609:22, 609:23,
610:1, 610:11,
610:12, 610:16,
610:17, 610:20,
610:24, 611:5,
611:15, 611:23,
612:5, 617:7, 617:10,
617:12, 617:14,
617:25, 618:4, 618:7,
621:23, 622:8, 624:9,
626:2, 626:4, 626:8,
626:11, 626:25,
629:2, 630:13,
632:13, 632:22,

633:20, 633:24,
644:6, 644:20,
644:24, 645:2, 645:5,
645:8, 645:17,
645:21, 645:24,
646:3, 646:9, 646:11,
646:14, 647:10,
647:13, 647:14,
647:17, 647:18,
647:21, 648:2, 648:5,
648:11, 648:20,
649:4, 649:13,
649:14, 649:17,
650:10, 650:13,
650:21, 650:25,
651:1, 651:3, 651:8,
653:2, 653:25,
654:15, 654:17,
654:21, 654:25,
655:3, 656:21, 658:1,
658:23, 658:24,
659:1, 659:5, 659:9,
659:12, 660:9,
660:10, 661:11,
661:16, 666:17,
668:13, 668:17,
668:22, 668:23,
673:21
   **Correct** [29] - 460:3,
466:12, 470:8, 471:2,
472:1, 472:5, 474:19,
477:9, 479:11,
479:15, 481:7,
497:24, 551:6, 561:5,
562:21, 602:18,
603:4, 604:2, 604:5,
604:20, 610:21,
612:6, 645:25,
647:22, 650:22,
651:12, 659:2,
659:13, 661:12
   **corrected** [2] -
547:20, 655:21
   **correction** [2] -
510:15, 512:22
   **Correction** [12] -
452:22, 472:11,
506:22, 508:22,
512:23, 552:9, 561:8,
561:20, 563:19,
627:7, 649:21, 654:9
   **Correctional** [16] -
476:2, 476:12,
476:25, 477:4,
525:18, 526:3, 526:5,
535:14, 553:24,
566:18, 568:21,
568:23, 569:14,
626:16, 629:21,
629:22

   **correctional** [66] -
452:17, 455:19,
476:1, 477:6, 477:14,
492:11, 492:15,
492:18, 505:2, 505:4,
505:6, 505:11,
505:16, 505:17,
505:18, 505:20,
505:22, 508:14,
510:19, 510:20,
511:21, 512:2, 512:4,
520:8, 525:16,
525:17, 525:21,
526:4, 526:7, 533:22,
540:20, 541:2,
541:13, 543:5, 547:5,
552:23, 565:22,
569:18, 569:23,
569:25, 570:16,
571:9, 571:13,
571:18, 582:5,
590:14, 590:20,
590:22, 612:4,
617:14, 617:18,
618:5, 626:10,
626:25, 628:20,
639:24, 639:25,
669:24, 679:20,
688:1, 689:2, 697:22,
697:23, 697:25,
698:2, 698:25
   **corrections** [13] -
455:8, 458:19, 511:2,
511:6, 539:6, 563:5,
568:3, 568:24,
664:16, 664:18,
665:13, 676:7
   **Corrections** [29] -
454:1, 454:6, 455:7,
500:10, 554:13,
555:2, 560:10,
560:23, 561:3, 562:4,
562:14, 563:2,
621:19, 621:23,
622:2, 622:5, 644:18,
645:1, 647:15,
647:20, 649:3,
649:11, 649:12,
657:13, 658:13,
667:21, 680:9,
686:24, 692:5
   **Corrections'** [1] -
454:24
   **correctly** [2] -
455:18, 694:4
   **correlate** [1] - 673:5
   **corroborate** [1] -
640:7
   **Counsel** [4] - 443:6,
466:7, 500:25, 608:12

   **counsel** [49] -
443:10, 444:24,
448:22, 449:11,
450:22, 466:23,
467:3, 469:9, 481:18,
481:19, 491:9,
491:24, 492:21,
495:20, 495:24,
514:16, 514:20,
514:23, 544:21,
547:18, 548:4,
549:24, 553:12,
559:22, 569:10,
572:12, 581:3,
583:12, 595:16,
595:17, 596:11,
606:23, 609:13,
609:15, 620:2,
620:10, 622:12,
625:14, 636:7,
636:11, 638:10,
666:14, 671:13,
672:21, 686:7,
686:19, 692:10,
695:8, 699:14
   **counsel's** [7] -
448:2, 465:16,
556:13, 564:7,
564:12, 575:8, 600:5
   **Counseling** [1] -
537:1
   **counseling** [1] -
690:9
   **count** [3] - 585:13,
681:16, 681:17
   **counted** [2] - 528:9,
624:4
   **country** [3] - 555:17,
588:20, 622:6
   **counts** [2] - 553:3,
681:18
   **County** [1] - 632:5
   **couple** [7] - 498:19,
508:2, 510:17,
551:19, 560:15,
567:13, 577:17
   **coupled** [1] - 677:18
   **course** [5] - 469:10,
486:21, 500:3,
622:17, 672:25
   **courses** [1] - 552:24
   **court** [56] - 443:3,
443:22, 444:9,
447:13, 449:1,
455:14, 458:18,
469:12, 498:4, 504:7,
506:20, 512:19,
515:15, 540:17,
547:7, 548:6, 549:5,
549:7, 549:9, 550:17,

550:20, 550:21, 551:23, 560:3, 579:19, 612:7, 612:9, 632:24, 655:25, 658:7, 672:14, 675:23, 675:24, 678:18, 679:23, 680:8, 680:11, 680:22, 685:11, 686:15, 687:4, 687:5, 687:21, 688:13, 689:6, 689:11, 692:21, 693:5, 693:6, 693:9, 693:10, 693:17, 693:24, 694:1, 698:11, 698:23

**Court** [1] - 678:3

**court's** [2] - 481:23, 549:9

**court-mandated** [1] - 612:7

**courtroom** [9] - 448:14, 448:18, 448:19, 449:4, 481:20, 482:2, 482:11, 572:21, 700:8

**criterion** [3] - 463:1, 681:8, 685:21

**cover** [3] - 460:1, 522:1, 575:15

**coverage** [6] - 573:3, 573:8, 573:13, 575:14, 577:4

**covered** [8] - 484:15, 573:9, 573:17, 573:20, 574:3, 616:24, 674:12, 685:1

**covering** [2] - 574:15, 575:18

**covers** [1] - 517:11

**cramped** [1] - 526:21

**created** [1] - 503:3

**creates** [2] - 488:13, 681:9

**CRECELIUS** [2] - 656:8, 656:15

**credibility** [1] - 616:11

**crimes** [2] - 566:12, 676:13

**criminal** [3] - 468:2, 468:5, 510:24

**criteria** [77] - 456:19, 465:2, 465:11, 466:10, 470:15, 470:19, 480:3, 480:7, 480:8, 480:12, 480:20, 480:23, 481:2, 486:10, 496:10, 522:11, 522:15, 522:17, 528:15, 530:20,

530:25, 531:1, 534:8, 534:10, 534:14, 537:18, 538:1, 538:25, 539:1, 539:21, 539:24, 541:9, 541:10, 541:16, 541:19, 584:13, 584:17, 630:6, 630:8, 630:10, 635:1, 636:2, 636:17, 636:20, 636:22, 636:24, 637:1, 637:3, 637:8, 637:9, 637:12, 638:5, 638:22, 639:4, 639:6, 639:11, 639:15, 639:17, 641:22, 646:5, 659:5, 662:1, 666:2, 666:8, 666:10, 667:15, 667:19, 688:5, 688:23, 688:24, 690:4, 691:13, 691:14, 698:5, 698:13, 698:25

**criterion** [3] - 463:1, 681:8, 685:21

**critically** [1] - 611:24

**cross** [21] - 446:15, 446:23, 447:12, 449:17, 484:10, 484:15, 509:14, 520:11, 520:23, 525:12, 537:14, 548:6, 549:19, 556:16, 574:21, 576:18, 579:24, 590:7, 620:5, 638:14, 644:2

**CROSS** [3] - 457:11, 549:20, 644:4

**cross-designate** [2] - 446:15, 447:12

**cross-designation** [1] - 446:23

**cross-dressing** [1] - 537:14

**cross-examination** [7] - 449:17, 525:12, 548:6, 576:18, 579:24, 620:5, 638:14

**CROSS-EXAMINATION** [3] - 457:11, 549:20, 644:4

**cross-examine** [1] - 574:21

**cross-gender** [2] - 509:14, 520:23

**crucial** [1] - 456:2

**culture** [2] - 657:19, 657:21

**cure** [8] - 599:2, 600:7, 600:9, 600:13, 601:4, 601:6, 642:1, 642:5

**cured** [4] - 491:1, 499:1, 499:7, 499:10

**cures** [1] - 545:18

**curing** [1] - 601:1

**current** [11] - 459:1, 459:5, 471:11, 511:23, 518:4, 527:15, 545:21, 546:2, 546:3, 592:23, 627:10

**custody** [3] - 454:24, 475:22, 500:10

**cut** [16] - 449:12, 457:20, 529:5, 543:24, 604:19, 605:22, 606:7, 606:19, 606:21, 607:3, 608:8, 655:2, 656:7, 656:18, 656:24, 699:6

**cutting** [9] - 487:10, 543:23, 546:3, 546:7, 604:22, 667:12, 694:12, 695:16, 696:3

**CV** [4] - 502:16, 502:20, 503:1, 504:7

**Cynthia** [1] - 620:15

## D

**D-H-E-J-N-E** [1] - 544:18

**Dakota** [2] - 588:4, 588:7

**dangerous** [3] - 486:23, 695:16, 698:23

**data** [22] - 528:3, 528:10, 531:19, 533:9, 533:12, 533:17, 533:25, 534:3, 534:4, 541:7, 541:8, 544:16, 545:17, 590:21, 591:20, 593:1, 593:12, 593:15, 593:23, 620:16, 622:12, 699:4

**date** [5] - 459:11, 464:16, 508:2, 592:18, 695:7

**dated** [4] - 462:11, 463:16, 463:25, 464:7

**Daubert** [1] - 515:2

**Davis** [3] - 504:16, 505:15, 505:21

**day-long** [1] - 472:7

**day-to-day** [1] - 687:10

**days** [11] - 444:22, 458:18, 505:22, 512:5, 555:11, 556:1, 675:11, 685:11, 686:15, 699:21, 699:23

**DBT** [1] - 642:9

**de** [1] - 681:9

**deadlines** [1] - 699:17

**deal** [8] - 487:11, 488:19, 543:7, 543:8, 607:9, 671:4, 689:19, 693:6

**dealing** [3] - 498:25, 532:7, 615:8

**death** [4] - 596:12, 597:3, 597:4, 597:5

**debatable** [1] - 697:20

**debate** [2] - 697:21, 698:24

**decades** [1] - 676:7

**decency** [1] - 684:20

**decide** [4] - 643:20, 693:25, 694:1, 698:8

**decided** [1] - 445:4

**decision** [40] - 462:16, 462:21, 468:12, 468:20, 527:6, 533:1, 533:5, 572:16, 573:2, 573:6, 573:7, 573:8, 573:12, 574:12, 575:2, 575:13, 575:14, 575:17, 577:12, 577:13, 577:15, 577:16, 577:23, 578:6, 582:7, 618:25, 625:6, 625:11, 640:21, 641:18, 652:12, 663:4, 674:9, 674:15, 680:8, 684:25, 700:19

**decision-making** [2] - 527:6, 533:5

**decisions** [8] - 510:9, 520:9, 574:24, 575:12, 582:6, 617:21, 673:12, 693:10

**declaration** [2] - 527:3, 537:21

**declarations** [13] - 443:17, 444:18, 444:21, 445:13, 445:17, 446:1, 447:9,

517:13, 548:23, 549:3, 549:4, 549:15

**decline** [1] - 515:11

**declined** [1] - 444:10

**decompensating** [1] - 683:19

**decrease** [5] - 546:1, 546:2, 546:3, 620:17, 689:23

**decreased** [2] - 694:13, 694:16

**decreases** [1] - 485:17

**deemed** [2] - 454:8, 651:15

**deemphasize** [1] - 566:9

**defendant** [4] - 443:19, 447:6, 447:11, 487:22

**Defendant's** [1] - 592:11

**defendants** [39] - 443:14, 443:16, 443:17, 444:3, 444:10, 446:7, 557:10, 557:22, 558:16, 558:21, 610:9, 610:19, 611:22, 614:8, 614:9, 623:15, 630:13, 666:15, 666:19, 667:5, 670:12, 671:7, 673:17, 675:19, 676:6, 676:11, 678:12, 678:21, 678:24, 679:4, 679:19, 682:17, 684:3, 685:20, 693:1, 697:5, 697:14, 698:1, 700:13

**defendants'** [12] - 595:9, 615:4, 677:1, 679:14, 681:5, 685:11, 685:13, 685:22, 695:13, 698:20, 698:21

**Defendants'** [7] - 503:14, 620:2, 620:8, 624:2, 624:14, 624:16, 633:11

**DEFENDANTS'** [3] - 449:24, 501:24, 623:18

**defended** [1] - 693:1

**defense** [5] - 472:11, 501:20, 623:3, 681:5, 695:8

**defer** [1] - 449:1

**deference** [2] -

691:8, 693:11
  **deficiencies** [2] -
533:18, 593:15
  **define** [2] - 621:24,
651:13
  **defined** [1] - 583:10
  **definitely** [1] -
619:23
  **definition** [2] -
675:13, 675:14
  **definitive** [2] -
533:20, 589:21
  **degree** [5] - 504:11,
504:13, 534:24,
540:8, 587:21
  **delay** [2] - 448:2,
699:18
  **deliberate** [10] -
677:18, 693:13,
693:14, 693:15,
693:20, 693:23,
696:14, 697:4,
697:17, 698:6
  **deliberately** [2] -
610:14, 614:14
  **demeanor** [6] -
463:12, 463:20,
464:3, 464:11,
464:19, 465:2
  **demonstrated** [3] -
528:21, 538:22,
542:11
  **demonstrates** [1] -
543:6
  **denial** [2] - 584:8,
690:7
  **denied** [16] - 454:20,
467:6, 467:14, 490:5,
537:13, 583:7,
583:18, 583:21,
588:6, 588:10, 608:3,
608:6, 650:20,
677:13, 696:12, 697:5
  **deny** [8] - 454:7,
462:16, 462:21,
467:11, 467:12,
672:2, 692:22, 696:16
  **denying** [4] - 462:13,
462:25, 463:6, 676:18
  **Department** [48] -
452:22, 454:1, 454:5,
454:23, 455:6,
472:11, 500:10,
506:22, 508:22,
512:23, 552:9,
554:13, 555:2,
560:10, 560:23,
561:3, 561:8, 561:20,
562:4, 562:13, 563:2,
563:19, 573:12,

574:12, 574:24,
577:12, 577:24,
621:19, 621:23,
622:2, 622:5, 627:6,
644:18, 645:1,
647:15, 647:20,
649:2, 649:11,
649:12, 649:21,
654:8, 657:12,
658:13, 667:20,
680:9, 686:23, 692:5,
699:3
  **department** [5] -
455:4, 455:7, 510:14,
512:22, 680:9
  **departments** [1] -
676:7
  **depose** [1] - 444:19
  **deposition** [71] -
444:6, 444:7, 445:6,
445:19, 446:11,
458:1, 458:4, 458:5,
458:15, 458:18,
459:2, 459:3, 459:19,
459:21, 460:1, 461:5,
461:7, 461:10,
462:15, 463:8, 466:9,
467:25, 468:11,
469:5, 469:11, 470:1,
470:24, 471:3,
475:16, 496:11,
516:20, 516:21,
516:22, 527:2,
527:14, 554:25,
555:15, 558:15,
558:22, 559:4,
561:16, 564:5,
564:20, 564:23,
566:16, 569:16,
574:7, 588:24,
588:25, 591:12,
599:12, 601:11,
601:18, 602:15,
604:6, 604:18, 605:3,
605:9, 609:3, 609:19,
642:17, 642:19,
642:23, 645:4,
646:18, 651:13,
654:6, 655:6, 655:21,
655:24, 656:21
  **depositions** [10] -
443:20, 445:1, 445:2,
445:4, 445:11,
445:12, 445:14,
446:16, 446:22,
516:19
  **depressed** [1] -
663:17
  **depression** [13] -
451:12, 470:2,

487:25, 531:9,
538:11, 544:3, 544:4,
544:8, 544:10,
601:17, 602:2, 621:9,
687:18
  **depressive** [12] -
496:8, 497:19, 519:4,
601:13, 601:20,
601:24, 604:3, 604:7,
604:14, 621:3, 687:17
  **depth** [2] - 511:5,
522:3
  **deputy** [6] - 507:1,
507:12, 510:10,
510:13, 520:8, 525:4
  **dermatologist** [1] -
509:18
  **describe** [3] -
536:18, 550:5, 627:2
  **described** [5] -
563:14, 575:13,
583:4, 583:17, 685:12
  **describing** [1] -
535:23
  **description** [2] -
486:7, 536:20
  **deserve** [1] - 700:12
  **designate** [4] -
446:12, 446:15,
447:10, 447:12
  **designated** [1] -
446:18
  **designation** [5] -
446:17, 446:23,
626:13, 626:15,
626:21
  **designations** [1] -
446:10
  **designs** [1] - 594:13
  **desire** [1] - 543:3
  **desired** [1] - 566:4
  **despite** [3] - 543:19,
610:18, 698:13
  **detail** [3] - 480:6,
481:16, 581:17
  **details** [3] - 486:11,
491:15, 551:4
  **detainees** [1] -
508:23
  **determination** [14] -
468:1, 468:4, 468:8,
468:15, 518:16,
519:2, 519:7, 521:19,
521:20, 527:16,
535:7, 589:14, 690:6,
690:7
  **determinations** [2] -
532:10, 590:23
  **determine** [7] -
452:12, 522:15,

532:19, 533:9,
540:23, 635:9, 698:12
  **determined** [3] -
471:24, 574:14,
678:22
  **determines** [1] -
672:11
  **determining** [3] -
469:17, 521:23,
599:22
  **devastating** [1] -
485:3
  **develop** [9] - 529:10,
529:14, 533:10,
533:15, 541:7,
543:10, 545:23,
546:15, 547:2
  **developed** [7] -
477:22, 478:14,
511:11, 543:7,
551:18, 568:9, 572:3
  **developing** [2] -
533:16, 689:23
  **Dhejne** [3] - 544:17,
596:23, 620:18
  **diagnose** [7] -
497:19, 518:17,
631:10, 653:12,
653:20, 664:22,
665:11
  **diagnosed** [17] -
470:4, 470:7, 472:3,
495:13, 500:11,
509:3, 519:4, 522:25,
539:3, 652:22, 653:6,
655:1, 656:12,
656:20, 665:9, 665:25
  **diagnoses** [4] -
497:17, 506:16,
646:7, 647:8
  **diagnosing** [2] -
497:25, 518:8
  **diagnosis** [36] -
497:22, 508:13,
509:8, 509:10,
519:16, 521:11,
534:17, 534:21,
535:3, 535:4, 535:10,
562:20, 602:12,
615:7, 616:3, 621:2,
627:19, 627:23,
631:11, 635:6,
635:10, 636:17,
645:20, 645:21,
646:3, 646:12,
646:24, 654:2, 654:5,
654:9, 654:11,
664:10, 664:15,
666:2, 666:8, 682:3
  **diagnostic** [4] -

521:23, 636:2, 637:1,
659:5
  **dialectical** [1] -
642:9
  **dicey** [1] - 498:25
  **dictate** [1] - 697:24
  **differ** [1] - 537:12
  **difference** [2] -
693:19, 697:2
  **differences** [2] -
493:22, 590:15
  **different** [36] -
445:14, 454:13,
455:23, 460:16,
466:19, 485:6,
487:10, 488:21,
492:14, 501:12,
510:21, 528:19,
528:24, 532:13,
532:14, 537:16,
541:3, 575:12,
577:17, 586:25,
587:5, 588:3, 588:5,
588:11, 593:21,
606:17, 606:18,
617:15, 621:25,
626:18, 627:14,
636:8, 643:19, 649:7,
699:25
  **differs** [1] - 536:21
  **difficult** [13] -
458:12, 459:8,
460:19, 461:19,
544:6, 601:12,
601:19, 604:16,
621:8, 646:15, 677:5,
694:20, 700:24
  **difficulties** [1] -
536:14
  **DIRECT** [3] - 449:25,
502:7, 623:25
  **direct** [17] - 449:16,
449:17, 460:6, 475:5,
477:18, 549:24,
555:18, 560:9,
572:15, 579:22,
584:6, 586:22,
596:22, 647:19,
655:14, 656:4, 657:5
  **direction** [1] - 499:23
  **directly** [19] - 482:21,
510:11, 540:20,
541:2, 544:4, 555:9,
555:24, 556:13,
564:15, 599:24,
612:15, 614:18,
646:9, 646:14,
646:25, 647:10,
647:12, 656:6, 680:22
  **director** [13] - 453:5,

491:20, 507:2, 507:12, 508:4, 510:10, 510:13, 512:3, 561:9, 561:12, 561:22, 627:5, 627:11
**disabilities** [1] - 532:8
**disagree** [7] - 465:11, 468:25, 582:10, 582:12, 610:8, 697:15, 698:4
**disagreed** [2] - 454:15, 578:8
**disagreement** [2] - 466:4, 671:25
**disagreements** [1] - 686:1
**disagrees** [2] - 614:8, 655:21
**disapproving** [1] - 565:25
**discharged** [1] - 539:14
**disciplinary** [6] - 456:13, 468:9, 468:13, 487:6, 542:3, 542:5
**discipline** [2] - 682:17, 682:19
**disciplined** [2] - 464:22, 682:18
**disciplines** [1] - 626:18
**disclosed** [1] - 551:3
**disclosure** [1] - 515:11
**discomforting** [1] - 695:3
**discovery** [4] - 445:12, 516:4, 516:6, 686:14
**discrepancies** [1] - 547:1
**discrepancy** [2] - 528:20, 535:13
**discretion** [2] - 699:3, 699:11
**discriminated** [1] - 580:21
**discrimination** [1] - 566:6
**discuss** [7] - 454:15, 510:7, 527:20, 542:9, 593:24, 619:6, 621:24
**discussed** [10] - 444:8, 458:9, 509:21, 513:14, 519:23, 556:7, 573:2, 577:2, 578:4, 606:7, 606:11, 610:2, 619:6, 620:2,

647:19, 699:17
**discusses** [2] - 479:9, 579:11
**discussing** [6] - 454:19, 481:16, 577:6, 577:16, 606:9, 650:23
**discussion** [21] - 454:4, 460:23, 494:18, 496:23, 513:18, 523:11, 526:15, 526:18, 572:18, 572:25, 573:1, 575:5, 577:3, 577:14, 594:7, 594:16, 611:6, 619:4, 619:9, 621:1, 694:19
**disease** [1] - 684:15
**disfavored** [1] - 692:21
**disingenuous** [1] - 488:6
**dismissed** [1] - 551:6
**disobeying** [1] - 682:18
**disorder** [54] - 450:6, 451:12, 470:5, 495:14, 495:16, 496:8, 497:20, 498:1, 498:2, 519:5, 519:6, 538:10, 539:4, 539:5, 592:1, 601:24, 604:4, 604:7, 604:14, 621:3, 635:13, 636:4, 636:17, 636:25, 637:2, 637:12, 638:6, 640:11, 640:13, 641:11, 642:6, 642:8, 652:23, 653:1, 653:13, 654:3, 654:10, 659:9, 660:15, 664:10, 665:9, 666:1, 666:16, 666:21, 667:7, 667:11, 667:15, 687:18, 687:20, 689:13, 696:5
**disorders** [10] - 451:10, 490:25, 519:3, 603:25, 635:10, 664:15, 664:17, 666:5, 689:18
**dispute** [6] - 447:22, 687:16, 691:5, 698:13, 699:7
**disputed** [1] - 685:4
**disputing** [2] - 487:23, 591:16
**disqualifying** [2] -

607:4, 607:5
**disregard** [1] - 614:15
**disregarded** [1] - 610:15
**disregarding** [1] - 610:20
**dissatisfaction** [2] - 544:1, 610:19
**dissemination** [1] - 481:24
**disservice** [1] - 489:12
**distinct** [1] - 519:16
**distinction** [3] - 549:6, 606:6, 621:6
**distinctions** [2] - 566:10, 622:16
**distinguish** [1] - 691:18
**distinguishing** [1] - 677:12
**distress** [10] - 543:8, 543:9, 654:14, 654:17, 654:20, 674:25, 675:15, 675:19, 675:20
**distressed** [1] - 475:2
**distributing** [1] - 658:18
**distribution** [1] - 689:24
**district** [3] - 679:23, 680:3, 692:21
**District** [1] - 680:4
**division** [2] - 561:9, 561:22
**Docket** [1] - 515:24
**docket** [1] - 699:20
**doctor** [5] - 451:18, 451:19, 607:11, 626:1, 665:24
**Doctor** [29] - 498:23, 599:10, 622:10, 624:2, 624:5, 624:15, 625:21, 626:22, 630:1, 630:12, 631:20, 633:12, 634:25, 635:15, 635:23, 639:3, 639:14, 640:6, 640:10, 641:21, 643:3, 643:22, 656:2, 658:12, 661:13, 664:2, 664:9, 665:7, 666:14
**doctorate** [4] - 504:13, 626:1, 660:13, 665:13

**doctors** [2] - 609:9, 698:21
**document** [49] - 458:24, 476:14, 479:12, 481:10, 481:14, 482:6, 482:11, 483:2, 483:3, 483:5, 484:2, 491:25, 496:7, 497:11, 497:14, 497:16, 502:17, 502:19, 503:3, 516:12, 522:17, 529:19, 530:23, 531:6, 531:17, 541:13, 548:7, 567:18, 569:4, 570:18, 571:10, 575:3, 575:21, 575:25, 579:25, 580:1, 583:13, 613:22, 624:15, 625:6, 625:9, 630:3, 633:1, 635:15, 635:23, 638:8, 638:24, 654:4
**documentation** [1] - 640:7
**documented** [7] - 464:17, 465:1, 497:25, 534:9, 639:20, 654:13, 690:2
**documents** [6] - 481:22, 516:14, 516:17, 631:18, 631:21, 632:20
**dollar** [1] - 559:1
**Dollars** [1] - 564:3, 619:13
**done** [26] - 484:10, 499:9, 499:12, 499:23, 516:12, 525:8, 526:14, 532:6, 538:8, 555:17, 557:7, 558:10, 559:12, 560:2, 563:4, 587:10, 622:14, 622:19, 625:18, 630:18, 663:20, 671:20, 676:13, 682:22, 698:17, 700:18
**DORs** [2] - 468:10, 634:5
**dots** [1] - 695:12
**double** [2] - 583:19, 622:18
**double-blind** [1] - 622:18
**doubtful** [4] - 689:5, 692:24, 693:3, 694:22
**down** [10] - 457:9,

501:7, 569:7, 569:9, 577:22, 619:20, 622:10, 670:9, 679:4, 693:19
**dozens** [1] - 628:7
**Dr** [193] - 443:7, 447:19, 447:23, 448:15, 448:17, 448:18, 448:19, 449:5, 449:8, 450:2, 451:15, 451:17, 451:18, 452:1, 452:14, 457:13, 469:5, 469:11, 470:1, 472:7, 472:10, 472:24, 473:1, 473:2, 473:5, 473:8, 474:9, 474:12, 474:15, 474:21, 475:5, 475:16, 478:5, 482:23, 487:21, 493:11, 493:17, 493:20, 494:4, 494:6, 495:8, 497:10, 501:20, 501:22, 502:3, 502:9, 502:16, 502:17, 514:17, 515:14, 516:5, 516:13, 516:20, 516:21, 516:22, 519:15, 521:12, 521:14, 522:1, 523:5, 524:18, 526:24, 549:22, 550:16, 553:25, 554:2, 554:9, 554:15, 555:2, 559:18, 560:7, 560:25, 561:4, 561:17, 562:1, 562:2, 562:10, 562:13, 562:22, 563:1, 563:10, 563:15, 564:2, 565:1, 565:16, 565:21, 566:13, 567:4, 567:7, 567:16, 575:11, 576:17, 577:1, 577:2, 577:14, 578:25, 579:21, 580:9, 581:20, 584:2, 584:7, 585:8, 590:5, 591:3, 591:8, 592:13, 593:5, 596:22, 599:14, 599:18, 599:25, 600:3, 600:6, 600:7, 601:2, 601:3, 609:9, 610:5, 610:6, 613:21, 614:6, 617:3, 617:11, 621:18, 623:15, 623:16, 625:7, 625:9, 625:13, 636:16, 642:13,

644:6, 644:9, 644:16,
644:23, 645:2, 645:7,
645:9, 645:14,
645:24, 646:1,
659:15, 659:24,
660:1, 660:8, 660:14,
660:23, 668:9,
670:10, 676:11,
678:25, 679:12,
679:15, 679:16,
679:17, 679:21,
679:24, 681:4, 681:5,
681:10, 682:8, 682:9,
682:24, 683:5,
683:14, 683:20,
683:25, 684:14,
684:22, 685:12,
686:20, 689:9,
689:13, 689:16,
689:25, 690:19,
694:3, 694:13, 697:23
**drad** [2] - 644:9,
644:11
**drade** [3] - 644:9,
644:10, 644:15
**draft** [2] - 533:14,
673:5
**drafted** [1] - 506:11
**draw** [4] - 619:19,
619:24, 694:17, 695:5
**drawing** [1] - 532:8
**drawn** [1] - 573:24
**dressed** [1] - 681:21
**dressing** [3] -
450:15, 485:15,
537:14
**driven** [2] - 543:2,
543:4
**driver's** [1] - 512:14
**driving** [1] - 542:25
**drug** [1] - 672:7
**drugs** [1] - 546:6
**DSM** [6] - 635:1,
635:10, 637:12,
659:5, 659:7, 675:13
**DSM-4** [2] - 506:4,
506:10
**DSM-5** [9] - 505:25,
506:4, 506:5, 506:6,
506:11, 506:12,
506:14, 506:16, 636:2
**due** [2] - 485:3,
594:2
**duration** [2] -
586:24, 587:4
**during** [25] - 447:23,
448:23, 448:24,
450:15, 458:11,
461:10, 466:9, 505:2,
505:6, 511:14, 514:8,

514:24, 521:18,
536:21, 537:17,
537:25, 539:7, 560:9,
588:17, 621:18,
622:1, 622:7, 635:3,
640:14, 649:7
**duties** [2] - 507:12,
627:2
**dwelling** [1] - 566:10
**dynamic** [1] - 486:22
**dysphoria** [196] -
450:19, 451:5,
453:10, 453:13,
454:5, 470:2, 471:8,
472:4, 473:9, 479:13,
479:16, 481:6, 481:9,
481:11, 482:7, 483:2,
483:10, 483:15,
485:3, 485:5, 485:14,
485:15, 485:17,
487:23, 488:5,
488:12, 490:16,
495:5, 499:4, 500:12,
506:15, 507:21,
508:3, 508:5, 509:4,
509:8, 509:11,
509:25, 510:6,
510:11, 513:21,
517:23, 517:25,
518:9, 518:13,
518:18, 519:8,
519:11, 519:12,
519:16, 519:17,
519:22, 520:7,
520:16, 521:5, 523:1,
525:1, 526:3, 526:7,
529:6, 534:9, 534:12,
534:17, 540:15,
543:13, 543:15,
544:5, 544:8, 544:9,
545:14, 550:17,
550:22, 550:23,
551:2, 551:8, 551:12,
552:3, 552:8, 552:12,
552:19, 553:5,
553:18, 553:23,
554:5, 555:14, 556:5,
556:21, 557:12,
557:24, 558:12,
560:8, 562:20, 563:3,
563:5, 563:16,
565:23, 566:19,
566:22, 567:20,
567:23, 568:3,
568:20, 570:13,
572:4, 573:3, 573:14,
582:14, 588:15,
588:19, 589:6, 589:8,
590:17, 591:10,
591:14, 599:23,
600:8, 601:16,

601:17, 601:24,
602:2, 602:6, 602:10,
602:13, 603:6,
603:22, 605:2,
605:11, 605:21,
606:17, 606:19,
609:1, 611:9, 614:13,
614:19, 615:7, 616:3,
617:16, 618:3,
618:13, 618:15,
619:3, 620:11,
620:23, 621:9, 622:4,
627:19, 628:13,
628:14, 631:11,
635:1, 635:7, 640:16,
644:17, 645:16,
645:20, 646:2, 646:7,
646:9, 646:13,
646:14, 646:25,
647:9, 647:10,
647:12, 647:17,
650:25, 651:14,
651:15, 651:20,
651:24, 652:2, 652:6,
652:16, 654:24,
655:2, 656:13,
656:20, 658:23,
659:1, 659:8, 659:12,
659:16, 668:25,
672:11, 675:13,
675:18, 675:22,
677:7, 679:7, 682:3,
684:10, 687:17,
689:23, 696:2, 699:2
**Dysphoria** [19] -
474:3, 508:8, 508:11,
554:3, 554:13,
560:10, 560:23,
562:4, 562:17,
562:18, 562:23,
563:9, 564:4, 617:22,
621:19, 622:2, 627:8,
627:9, 644:19
**dysphoric** [19] -
453:7, 509:15, 544:7,
566:7, 566:11,
596:18, 598:11,
598:24, 600:14,
601:13, 601:21,
615:5, 621:22,
622:22, 627:16,
628:1, 628:19,
629:19, 660:25

---

# E

**early** [6] - 449:13,
505:5, 630:24,
640:15, 640:24,
672:19
**early-life** [1] - 640:24

**earrings** [1] - 682:15
**ears** [3] - 657:16,
657:22, 663:24
**easier** [5] - 584:20,
589:15, 589:24,
590:11, 673:14
**easy** [1] - 542:1
**Eaton** [21] - 444:12,
445:22, 447:19,
448:22, 449:10,
481:8, 490:1, 501:3,
524:22, 556:14,
557:17, 564:14,
572:18, 573:2, 576:4,
616:21, 616:25,
639:1, 643:24,
670:14, 686:9
**EATON** [108] -
445:23, 446:1,
447:21, 449:1,
449:20, 450:1, 451:2,
451:3, 455:14,
455:17, 457:5, 457:9,
458:20, 458:24,
461:1, 465:7, 465:13,
465:19, 465:22,
465:24, 467:10,
468:23, 472:14,
472:17, 473:18,
476:19, 478:16,
478:18, 479:19,
481:13, 482:15,
490:2, 490:4, 491:6,
494:9, 494:24,
496:16, 497:4, 501:4,
501:20, 502:6, 502:8,
502:25, 503:5,
503:12, 503:19,
504:5, 504:7, 506:7,
506:9, 506:15, 515:4,
515:18, 515:24,
515:25, 520:2, 520:4,
520:14, 520:15,
524:23, 525:15,
545:3, 545:19, 547:6,
548:11, 548:14,
553:8, 565:10, 569:2,
569:4, 569:6, 570:17,
574:19, 575:10,
576:22, 579:18,
583:9, 595:15,
595:21, 600:22,
606:4, 607:22, 608:9,
611:17, 612:12,
613:5, 615:10, 616:7,
617:2, 620:1, 620:9,
621:4, 621:5, 621:12,
644:1, 670:15, 674:2,
686:12, 688:4,
688:11, 688:17,

689:1, 691:7, 694:18,
695:13, 695:23,
696:9, 700:15
**edges** [1] - 679:5
**Edmo** [165] - 443:4,
450:11, 450:20,
451:6, 451:10,
457:19, 458:2, 458:6,
459:7, 460:23, 462:4,
463:11, 463:20,
464:2, 464:10,
464:17, 464:22,
464:24, 465:1,
467:18, 467:22,
468:5, 470:4, 471:15,
471:23, 475:8,
475:17, 486:10,
486:13, 487:4,
489:10, 490:5,
492:24, 492:25,
493:4, 493:8, 495:13,
495:17, 496:12,
496:16, 497:19,
498:6, 498:12, 516:7,
516:20, 517:2,
517:18, 517:25,
518:3, 518:5, 518:16,
518:17, 518:24,
519:4, 519:8, 522:2,
523:24, 527:7,
528:14, 528:17,
530:1, 537:15,
537:23, 537:24,
538:17, 541:17,
542:5, 543:6, 544:15,
544:22, 545:20,
546:10, 549:25,
550:10, 559:7,
559:12, 559:20,
574:5, 599:15,
599:19, 600:3,
601:12, 601:16,
601:19, 602:9,
602:12, 602:19,
602:25, 603:5, 603:8,
603:18, 604:3,
604:13, 604:19,
604:21, 605:13,
605:14, 605:20,
608:17, 608:20,
608:23, 609:21,
610:22, 611:3,
611:14, 611:22,
612:8, 614:19,
630:20, 631:2, 631:8,
631:10, 634:12,
634:15, 634:22,
634:23, 635:3, 635:6,
635:9, 636:19,
636:22, 639:4,
639:14, 640:22,

641:22, 642:1, 643:3, 652:21, 653:1, 654:1, 654:3, 654:14, 657:11, 658:5, 659:17, 659:18, 664:2, 667:17, 667:22, 667:24, 668:2, 668:11, 668:20, 668:24, 674:24, 675:18, 677:2, 678:8, 678:13, 678:23, 681:11, 682:2, 682:13, 682:20, 684:5, 685:12, 685:18, 687:1, 689:10, 690:12, 694:25, 695:2, 698:4, 698:17, 698:19

**Edmo's** [60] - 457:16, 460:25, 461:18, 462:13, 462:17, 462:21, 462:25, 467:6, 467:18, 468:2, 468:12, 468:21, 471:7, 471:11, 486:19, 487:1, 487:4, 489:10, 498:4, 499:18, 518:20, 521:2, 521:9, 527:10, 535:8, 538:2, 550:12, 599:22, 601:13, 601:20, 602:1, 602:5, 603:12, 603:22, 603:25, 605:2, 605:6, 609:4, 610:8, 610:18, 611:24, 630:16, 633:2, 633:7, 640:7, 640:10, 651:20, 651:24, 652:1, 652:6, 657:2, 657:24, 666:16, 666:20, 667:6, 675:22, 685:22, 687:8, 690:23, 695:24

**education** [8] - 504:10, 505:25, 520:5, 523:12, 524:24, 524:25, 559:24, 661:24

**ee** [2] - 644:9, 644:11

**effect** [4] - 598:15, 599:4, 649:15, 683:17

**effective** [14] - 456:24, 457:4, 538:13, 538:20, 538:23, 545:23, 546:22, 578:13, 578:16, 579:8, 591:9,

591:13, 662:7, 672:9

**effects** [1] - 598:18

**effeminate** [1] - 682:6

**efficacy** [1] - 642:11

**efforts** [4] - 694:25, 695:6, 695:10, 700:8

**egg** [1] - 499:3

**eight** [2] - 504:22, 645:13

**Eighth** [8] - 676:2, 676:3, 676:4, 676:19, 677:25, 684:8, 685:5, 685:9

**either** [15] - 446:8, 454:16, 469:11, 472:19, 488:12, 500:11, 533:4, 536:15, 570:19, 599:13, 640:16, 642:21, 644:10, 649:12, 671:15

**elaborate** [8] - 492:22, 527:8, 538:7, 539:21, 546:18, 556:15, 557:18, 648:22

**elderly** [1] - 532:8

**elective** [2] - 505:7, 505:8

**electives** [1] - 505:6

**electrologist** [1] - 509:17

**element** [1] - 695:22

**elements** [3] - 583:4, 584:23, 653:16

**elevated** [1] - 620:19

**Eliason** [26] - 443:7, 447:19, 448:17, 449:8, 450:2, 457:13, 469:11, 470:1, 473:2, 475:16, 478:5, 482:23, 497:10, 516:22, 521:12, 522:1, 526:24, 590:5, 617:11, 678:25, 679:16, 681:4, 689:9, 689:13, 689:16, 689:25

**ELIASON** [1] - 449:24

**Eliason's** [1] - 469:5

**eliciting** [1] - 544:24

**eligibility** [1] - 522:16

**eligible** [5] - 466:17, 467:7, 467:19, 467:23, 697:12

**eliminate** [3] - 490:11, 599:6, 600:21

**eliminated** [2] - 575:18, 619:22

**eliminating** [1] - 625:11

**ell** [1] - 458:25

**elsewhere** [1] - 539:2

**email** [1] - 658:18

**embraced** [2] - 676:12, 679:16

**emergent** [2] - 694:5, 694:8

**emphasis** [1] - 636:8

**emphasize** [1] - 566:8, 658:19

**emphatic** [1] - 490:14

**emphatically** [1] - 490:17

**empirical** [1] - 593:1

**employed** [1] - 550:13

**employee** [1] - 451:23

**employees** [2] - 698:20, 699:3

**employment** [4] - 626:23, 627:15, 627:18, 628:18

**enact** [2] - 610:9, 614:9

**encounter** [2] - 508:5, 529:24

**end** [10] - 451:13, 460:20, 488:22, 511:3, 531:3, 551:14, 574:14, 682:24, 695:10, 697:1

**end-all** [1] - 531:3

**ended** [1] - 549:24

**ending** [1] - 684:25

**endocrine** [1] - 522:13

**Endocrine** [2] - 523:19, 531:11

**endocrinologist** [1] - 628:11

**endorsement** [1] - 478:13

**ends** [1] - 685:5

**enduring** [1] - 666:5

**enemy** [1] - 485:7

**engage** [5] - 479:17, 487:7, 529:11, 594:12, 668:2

**engaged** [3] - 661:23, 667:13, 697:17

**engages** [2] - 486:23, 538:14

**engaging** [5] - 456:12, 529:15, 606:1, 606:15, 668:10

**enhancement** [2] - 493:20, 494:19

**enhancing** [1] - 475:1

**enjoyed** [2] - 511:5, 511:16

**ensure** [2] - 447:12, 658:9

**entered** [3] - 618:16, 682:4, 682:16

**entering** [4] - 512:11, 518:13, 535:21, 543:10

**entire** [3] - 446:11, 579:25, 592:16

**entirely** [1] - 687:12

**entirety** [1] - 580:15

**environment** [10] - 487:13, 511:5, 540:20, 571:19, 581:11, 581:24, 582:5, 590:20, 604:1, 659:4

**environments** [3] - 492:15, 580:23, 584:2

**envisioned** [1] - 510:24

**episodes** [1] - 487:10

**equate** [2] - 494:18, 533:21

**equating** [1] - 493:19

**escorting** [1] - 682:20

**especially** [4] - 538:17, 614:17, 664:16, 664:18

**essence** [1] - 698:11

**essential** [1] - 542:8

**essentially** [2] - 680:23, 681:4

**established** [6] - 479:20, 508:9, 549:8, 679:12, 683:24, 686:1

**establishes** [1] - 685:9

**estimate** [1] - 621:11

**estrogen** [1] - 524:3

**et** [1] - 443:4

**ethical** [2] - 594:3, 622:18

**Ettner** [14] - 487:21, 516:5, 516:21, 577:2, 599:14, 599:18, 599:25, 600:6, 601:3, 682:9, 683:14, 684:22, 690:19,

697:23

**Ettner's** [2] - 577:14, 600:3

**evaluate** [9] - 513:1, 513:13, 521:4, 586:7, 586:8, 586:11, 618:25, 627:22, 628:12

**evaluated** [3] - 524:20, 603:8, 606:2

**evaluating** [4] - 480:20, 512:24, 518:12, 679:8

**evaluation** [25] - 505:10, 516:11, 521:9, 521:11, 521:14, 521:21, 522:2, 522:6, 524:12, 526:11, 526:24, 527:2, 535:5, 537:5, 537:7, 558:2, 558:10, 603:18, 606:8, 616:15, 618:15, 618:16, 631:9, 633:8, 636:25

**evaluations** [6] - 505:9, 511:1, 518:15, 521:18, 560:15, 633:18

**evaluator** [1] - 660:15

**evaporated** [1] - 452:20

**event** [6] - 546:21, 598:1, 598:10, 673:3, 688:20, 693:2

**events** [2] - 540:11, 586:25

**evidence** [53] - 456:23, 476:17, 499:14, 503:6, 503:10, 531:7, 531:10, 531:15, 531:16, 531:18, 532:5, 532:11, 532:12, 533:3, 533:12, 539:10, 544:9, 547:7, 547:19, 548:2, 549:7, 549:8, 549:16, 576:12, 576:20, 578:5, 578:12, 578:24, 579:7, 592:8, 592:23, 592:25, 593:4, 593:13, 603:8, 603:13, 603:19, 611:11, 615:12, 655:8, 658:2, 671:3, 678:7, 678:12, 678:17, 679:4,

680:20, 681:12, 683:13, 683:15, 683:16, 688:14
**evidence-based** [2] - 531:18, 592:25
**evolution** [1] - 578:3
**evolving** [4] - 684:19, 685:1, 697:19, 699:1
**exacerbate** [2] - 499:17, 652:18
**exacerbated** [2] - 488:12, 677:6
**exacerbating** [1] - 499:4
**exact** [5] - 473:21, 508:1, 508:15, 620:14, 695:7
**exactly** [10] - 466:6, 466:22, 492:10, 496:18, 541:14, 558:24, 576:5, 669:13, 675:7, 675:10
**exaggerating** [1] - 678:14
**exaggeration** [1] - 603:23
**exam** [3] - 536:18, 570:3, 668:24
**examination** [13] - 443:7, 447:20, 449:10, 449:17, 481:23, 514:24, 525:12, 537:10, 548:6, 576:18, 579:24, 620:5, 638:14
**EXAMINATION** [14] - 449:25, 457:11, 484:16, 490:3, 497:8, 498:21, 502:7, 549:20, 617:1, 621:16, 623:25, 644:4, 660:21, 668:7
**examine** [1] - 574:21
**examining** [3] - 481:19, 601:12, 601:19
**example** [5] - 466:14, 471:4, 486:7, 489:2, 585:11
**examples** [5] - 470:18, 470:25, 484:24, 484:25, 587:1
**Excellence** [1] - 523:20
**except** [1] - 623:1
**exception** [1] - 467:11
**excerpts** [5] - 444:9, 446:18, 446:24,

447:11, 673:6
**excessive** [2] - 610:15, 614:15
**exclude** [5] - 448:6, 541:4, 559:18, 633:7, 659:15
**excluded** [5] - 447:24, 447:25, 448:8, 448:12, 695:21
**exclusion** [5] - 573:15, 574:14, 577:18, 578:8
**exclusively** [2] - 560:8, 644:17
**excuse** [3] - 628:19, 634:18, 693:25
**exercise** [4] - 689:9, 693:9, 698:12, 699:11
**exhibiting** [1] - 498:1
**exhibits** [5] - 503:17, 547:19, 547:23, 548:4, 548:18
**expand** [1] - 512:1
**expect** [4] - 603:1, 640:5, 674:3, 683:11
**expected** [2] - 503:22, 663:18
**expedited** [1] - 673:3
**experience** [87] - 502:13, 505:2, 505:25, 506:4, 506:7, 506:18, 506:19, 512:19, 513:19, 518:4, 518:7, 518:21, 520:5, 520:6, 522:8, 522:18, 522:21, 523:12, 524:24, 525:4, 526:16, 529:18, 529:22, 530:4, 530:5, 530:8, 530:13, 530:14, 531:1, 539:6, 540:1, 540:7, 542:12, 545:25, 547:4, 552:12, 552:19, 555:9, 555:24, 559:20, 559:24, 560:7, 560:12, 585:14, 585:22, 586:3, 586:18, 587:5, 587:8, 587:12, 587:15, 587:16, 589:19, 590:14, 603:5, 605:2, 605:11, 606:16, 617:13, 618:10, 618:13, 626:23, 644:16, 645:16, 655:1, 659:20, 660:3, 664:14, 664:24,

665:1, 665:5, 665:7, 665:12, 666:6, 679:7, 679:8, 684:4, 685:21, 685:23, 685:24, 686:2, 692:2, 697:22, 698:18, 699:5
**experienced** [3] - 610:11, 614:11, 666:12
**experiences** [3] - 504:9, 586:25, 654:14
**experiencing** [5] - 529:21, 536:9, 542:10, 587:12, 654:20
**expert** [44] - 444:19, 444:20, 445:3, 446:2, 447:22, 448:2, 448:4, 448:14, 448:23, 448:25, 472:11, 514:12, 514:14, 514:15, 514:16, 516:1, 517:8, 519:25, 520:15, 544:25, 547:18, 548:22, 549:15, 550:17, 550:21, 551:1, 551:5, 560:24, 562:1, 567:22, 568:19, 577:1, 589:14, 589:24, 590:11, 592:13, 593:11, 593:24, 617:3, 642:22, 644:23, 679:24, 685:11
**expert's** [1] - 577:3
**expertise** [8] - 477:23, 478:15, 519:18, 547:11, 559:23, 568:9, 618:5, 664:21
**experts** [36] - 447:24, 448:13, 448:16, 448:22, 516:5, 516:20, 526:18, 527:21, 544:21, 548:22, 550:9, 566:5, 599:13, 599:21, 617:13, 676:12, 677:1, 678:13, 679:6, 679:19, 683:4, 683:23, 685:20, 685:22, 690:16, 691:16, 692:3, 694:6, 694:12, 695:14, 696:4, 697:14, 697:19, 697:21, 698:16
**explain** [12] - 465:14, 506:2, 506:4, 540:17,

571:1, 571:4, 593:4, 618:19, 646:15, 648:14, 648:21
**explained** [5] - 564:5, 602:15, 604:6, 682:9, 683:14
**explicitly** [1] - 601:2
**exploration** [1] - 566:2
**explore** [1] - 534:25
**explored** [1] - 535:11
**exploring** [3] - 534:20, 589:10, 616:4
**exposure** [1] - 505:20
**expressed** [2] - 642:19, 643:9
**extend** [1] - 633:16
**extended** [5] - 554:9, 554:24, 555:6, 555:7, 641:19
**extensive** [3] - 505:19, 521:14, 662:24
**extensively** [2] - 448:17, 562:2
**extent** [7] - 448:18, 481:14, 519:15, 616:13, 632:10, 686:8, 687:14
**extra** [1] - 480:2
**extracurricular** [1] - 661:24
**extraordinary** [1] - 693:5
**extreme** [2] - 485:19, 543:2
**extremely** [1] - 683:21
**eyebrows** [4] - 463:20, 464:3, 464:11, 464:17

---

# F

**F.Supp.3d** [1] - 680:1
**face** [2] - 668:21, 682:16
**facilities** [2] - 500:15, 580:25
**facility** [20] - 489:20, 535:17, 634:13, 634:24, 647:25, 649:13, 649:16, 650:3, 650:7, 650:12, 658:9, 658:10, 662:3, 662:4, 662:23, 663:4, 663:14, 663:16, 663:19, 664:3

---

**fact** [29] - 444:19, 445:3, 446:20, 449:18, 462:15, 463:11, 470:24, 498:6, 498:12, 498:15, 530:7, 550:25, 559:11, 576:2, 578:10, 613:7, 614:22, 619:19, 619:25, 623:8, 649:10, 653:9, 665:4, 674:5, 674:8, 691:3, 692:6, 695:5
**facto** [1] - 681:9
**factor** [4] - 469:17, 536:16, 677:8, 695:25
**factors** [4] - 528:19, 532:19, 543:4, 651:21
**facts** [10] - 615:11, 615:12, 615:14, 615:18, 616:16, 618:6, 686:19, 687:3, 689:12, 692:22
**fail** [1] - 698:6
**failed** [2] - 610:9, 614:9
**failure** [2] - 463:5, 676:20
**fair** [16] - 447:6, 448:7, 448:9, 454:21, 499:15, 551:15, 551:16, 568:25, 570:13, 590:7, 600:21, 602:1, 602:4, 603:15, 607:13, 642:19
**fairly** [10] - 489:23, 500:18, 508:19, 521:21, 522:8, 523:10, 557:19, 571:2, 593:19, 674:4
**faking** [2] - 678:14, 682:14
**fall** [2] - 452:2, 457:25
**falling** [1] - 486:6
**familiar** [22] - 453:6, 476:6, 476:14, 477:10, 566:25, 567:3, 567:23, 567:25, 568:19, 570:6, 571:7, 580:8, 580:10, 584:2, 591:1, 601:15, 629:11, 634:24, 635:1, 636:16, 639:6, 693:13
**familiarity** [2] - 518:8, 628:15
**family** [5] - 451:19, 529:22, 529:23,

584:24, 585:11
**Family** [3] - 451:19,
451:20, 537:1
**far** [8] - 449:22,
519:24, 574:6, 609:8,
612:23, 650:6,
658:14, 677:20
**fashion** [4] - 515:16,
613:12, 617:19, 639:2
**fast** [2] - 502:21,
502:23
**faster** [1] - 623:20
**fat** [1] - 689:24
**fault** [1] - 641:8
**favor** [1] - 692:23
**feasibility** [1] - 594:3
**February** [1] - 615:24
**fee** [1] - 570:4
**feedback** [1] -
551:20
**feelings** [4] - 529:6,
544:7, 662:13, 663:1
**fellow** [1] - 552:17
**fellowship** [4] -
504:15, 505:12,
506:21, 552:16
**fellowships** [1] -
505:23
**felt** [6] - 454:19,
455:4, 491:22,
513:15, 530:12
**female** [38] - 450:15,
485:15, 485:16,
496:10, 496:17,
518:21, 528:22,
535:21, 535:22,
535:23, 536:20,
536:22, 536:24,
537:4, 539:22, 540:4,
543:19, 602:19,
640:2, 640:5, 643:15,
643:17, 648:19,
649:16, 650:12,
658:9, 661:16,
661:21, 661:22,
662:3, 662:23, 663:4,
663:19, 664:3, 689:1,
689:2
**females** [1] - 537:16
**feminine** [12] -
463:12, 463:20,
464:3, 464:11,
464:19, 464:23,
465:1, 641:2, 681:11,
681:12, 682:8, 682:19
**femininity** [1] -
657:25
**feminize** [2] -
534:23, 641:19
**feminized** [2] -

537:24, 643:8
**feminizing** [2] -
603:1, 658:3
**fetishism** [1] -
684:14
**few** [11] - 449:14,
471:24, 484:12,
504:9, 511:7, 541:1,
562:7, 594:22, 596:3,
631:21, 686:9
**figure** [1] - 598:13
**file** [2] - 549:5, 549:9
**filed** [11] - 443:18,
444:21, 445:15,
445:16, 547:23,
547:25, 548:22,
612:22, 672:19,
685:18, 695:9
**filing** [1] - 695:7
**final** [5] - 445:5,
469:12, 671:23,
671:24, 672:17
**finally** [2] - 546:10,
621:1
**financial** [1] - 536:13
**findings** [4] - 674:5,
674:8, 700:4, 700:20
**fine** [10] - 447:17,
458:9, 548:11,
595:20, 625:19,
635:15, 637:25,
656:1, 672:19, 696:8
**firmly** [1] - 611:11
**first** [29] - 447:6,
449:14, 455:25,
462:8, 462:20,
463:12, 521:9,
521:11, 522:20,
526:23, 530:16,
550:19, 559:12,
607:18, 627:4,
651:22, 652:12,
656:18, 658:9,
661:16, 663:4,
668:10, 672:13,
673:18, 674:21,
686:12, 687:6,
688:24, 696:25
**fit** [1] - 495:17
**five** [13] - 456:8,
561:8, 561:17,
561:18, 562:3,
572:13, 623:9, 637:1,
638:16, 638:17,
638:22, 656:11,
656:19
**fix** [1] - 670:1
**fixed** [1] - 466:15
**fleshed** [1] - 529:1
**flew** [1] - 502:10

**flexibility** [7] -
455:22, 455:24,
480:7, 492:16,
688:21, 698:3, 699:9
**flexible** [5] - 492:9,
530:24, 571:9,
650:15, 697:8
**flexibly** [2] - 531:22,
568:12
**flip** [1] - 567:15
**Florida** [2] - 504:25,
626:8
**fluctuated** [1] -
508:21
**focus** [8] - 485:18,
485:19, 485:21,
486:11, 512:12,
566:1, 674:4, 676:24
**focusing** [2] - 678:6,
678:20
**folks** [3] - 452:22,
642:7, 646:21
**follow** [21] - 454:1,
455:13, 456:16,
477:15, 477:22,
484:14, 498:19,
500:24, 521:14,
528:5, 528:7, 532:15,
532:19, 557:7, 568:8,
593:23, 598:20,
655:19, 690:22, 691:3
**follow-up** [8] -
498:19, 500:24,
528:5, 532:15, 557:7,
593:23, 598:20, 691:3
**follow-ups** [1] -
456:16
**followed** [5] -
504:15, 506:24,
507:10, 528:10,
570:15
**following** [11] -
444:6, 477:5, 506:21,
522:3, 529:15,
545:17, 547:3, 605:4,
605:19, 620:20,
620:24
**footnote** [10] - 478:1,
478:5, 578:18,
578:19, 578:20,
579:1, 579:6, 579:9,
579:11
**Force** [2] - 592:22,
594:10
**Force's** [1] - 591:25
**forcing** [1] - 682:20
**foreclose** [1] -
670:22
**forensic** [9] - 504:15,
504:19, 505:12,

506:21, 510:23,
512:3, 512:6, 552:16,
570:1
**forever** [2] - 490:5,
690:7
**forgetting** [1] -
634:14
**form** [19] - 452:11,
461:16, 485:6, 488:1,
493:4, 498:9, 509:19,
513:3, 517:20, 529:8,
529:11, 542:23,
592:24, 606:15,
607:22, 608:9, 615:4,
636:9, 656:8
**formal** [6] - 504:10,
513:12, 554:8,
554:12, 558:2, 618:24
**formality** [2] - 447:2,
655:13
**formally** [6] - 513:1,
513:13, 533:15,
576:13, 606:8, 653:20
**forms** [6] - 485:6,
526:11, 543:2, 566:4,
605:17, 606:17
**forth** [1] - 641:1
**forthcoming** [1] -
594:2
**forward** [1] - 447:16
**foundation** [23] -
461:2, 464:18,
465:13, 465:20,
466:25, 478:16,
479:19, 486:1,
493:23, 493:25,
514:16, 514:24,
570:18, 575:7,
611:16, 611:18,
612:11, 612:21,
625:23, 635:18,
662:18, 664:23, 665:4
**four** [10] - 512:5,
513:25, 561:6,
561:17, 561:18,
562:3, 645:4, 645:7,
645:15, 684:3
**four-day** [1] - 513:25
**fourth** [2] - 488:10,
695:22
**frankly** [1] - 450:24,
670:21
**frequently** [1] -
456:12
**Friday** [3] - 485:23,
658:16, 672:25
**front** [4] - 502:17,
515:19, 605:3, 700:17
**frustrating** [1] -
622:25

**fulfill** [1] - 641:14
**full** [12] - 443:22,
444:7, 444:22,
447:13, 528:11,
604:1, 639:23, 640:4,
640:8, 663:22,
663:25, 699:20
**fully** [1] - 589:11
**function** [1] - 488:3
**functioning** [3] -
606:14, 661:25,
675:16
**FURTHER** [1] -
498:21
**future** [4] - 513:16,
588:3, 588:4, 588:12

## G

**gain** [1] - 662:25
**gained** [1] - 645:16
**game** [2] - 448:7,
642:20
**gaps** [1] - 592:25
**garbled** [1] - 553:12
**Garcia** [1] - 692:15
**GARVEY** [2] -
501:24, 502:4
**Garvey** [54] - 447:23,
448:18, 448:19,
501:21, 501:22,
502:3, 502:9, 502:16,
502:17, 514:17,
515:14, 519:15,
549:22, 550:16,
559:18, 560:7, 567:4,
567:7, 567:16,
575:11, 576:17,
577:1, 578:25,
579:21, 580:9,
581:20, 584:2, 584:7,
585:8, 590:5, 591:8,
592:13, 593:5,
596:22, 613:21,
614:6, 617:3, 621:18,
625:7, 644:23, 645:7,
645:9, 645:14,
645:24, 646:1,
659:24, 681:5,
681:10, 682:8, 683:5,
683:20, 683:25,
684:14, 694:13
**Garvey's** [5] -
524:18, 591:3, 610:5,
610:6, 682:24
**GD** [2] - 508:13,
616:4
**gender** [333] - 450:6,
450:19, 451:5, 453:7,
453:9, 453:12, 454:4,

456:2, 463:2, 463:5,
465:3, 470:2, 471:7,
472:2, 472:3, 473:9,
475:23, 479:12,
479:16, 480:20,
481:5, 481:8, 481:11,
482:7, 483:2, 483:5,
483:10, 483:14,
483:15, 484:4,
484:21, 485:3, 485:5,
485:14, 485:20,
485:24, 486:7,
486:17, 486:18,
487:23, 488:4,
488:12, 489:11,
489:14, 489:21,
490:15, 493:19,
495:5, 499:3, 499:6,
500:11, 506:15,
507:21, 508:3, 508:5,
509:4, 509:8, 509:11,
509:14, 509:15,
509:21, 509:24,
510:6, 510:11,
512:24, 513:2,
513:12, 513:21,
514:2, 517:21,
517:23, 517:25,
518:9, 518:13,
518:17, 519:8,
519:10, 519:12,
519:15, 519:17,
519:22, 520:7,
520:16, 520:23,
521:4, 522:25,
524:18, 524:20,
525:1, 526:3, 526:7,
528:16, 529:13,
530:17, 534:2, 534:9,
534:12, 534:17,
536:15, 537:4,
538:18, 540:7,
540:15, 540:21,
541:4, 542:20,
543:13, 543:14,
543:18, 544:5, 544:7,
544:9, 545:8, 545:14,
545:18, 546:20,
550:17, 550:22,
550:23, 551:2, 551:8,
551:12, 552:3, 552:8,
552:12, 552:19,
553:5, 553:18,
553:23, 554:5,
555:10, 555:13,
555:25, 556:5,
556:21, 556:24,
557:8, 557:11,
557:12, 557:24,
558:12, 559:14,
559:19, 560:7,

562:20, 563:3, 563:5,
563:16, 565:23,
566:7, 566:10,
566:22, 567:20,
567:22, 568:3,
568:20, 570:13,
572:4, 573:3, 573:14,
574:15, 580:16,
581:9, 581:23,
582:14, 584:8,
584:14, 584:18,
586:19, 587:12,
587:17, 588:15,
588:19, 589:6, 589:7,
589:10, 590:16,
590:19, 590:23,
591:10, 591:14,
591:25, 594:23,
595:5, 595:13, 596:4,
596:18, 598:6,
598:11, 598:24,
599:2, 599:5, 599:14,
599:23, 600:8,
600:14, 601:3,
601:13, 601:16,
601:17, 601:20,
601:24, 602:2, 602:6,
602:9, 602:12,
602:16, 603:6,
603:22, 605:1, 605:2,
605:10, 605:11,
605:16, 605:20,
605:21, 605:23,
606:2, 606:11,
606:17, 606:18,
609:1, 609:21,
609:25, 611:9,
614:13, 614:19,
615:5, 615:7, 616:3,
617:16, 618:2,
618:13, 618:15,
618:17, 619:3, 619:4,
620:10, 620:16,
620:22, 621:9,
621:22, 622:4,
622:15, 622:22,
627:16, 627:19,
628:1, 628:13,
628:19, 628:21,
628:24, 629:6,
629:19, 631:11,
631:14, 635:1, 635:7,
640:16, 641:7,
644:17, 645:16,
645:20, 646:2, 646:7,
646:8, 646:12,
646:13, 646:25,
647:9, 647:10,
647:12, 647:17,
650:25, 651:3, 651:7,
651:11, 651:14,

651:20, 651:24,
652:1, 652:6, 652:15,
652:16, 654:24,
655:2, 656:13,
656:20, 658:22,
659:1, 659:8, 659:12,
659:16, 659:17,
660:15, 660:25,
661:5, 663:15,
668:12, 672:7,
672:11, 675:13,
675:18, 675:21,
675:22, 677:7, 677:9,
679:7, 680:7, 681:16,
681:22, 682:3,
682:10, 682:11,
683:8, 683:16,
684:10, 685:19,
687:16, 689:13,
696:2, 699:2
    **Gender** [21] - 474:3,
476:11, 478:8, 508:8,
508:11, 554:3,
554:13, 560:10,
560:23, 562:4,
562:17, 562:18,
562:22, 563:8, 564:4,
617:22, 621:19,
622:2, 627:8, 644:19
    **gender-affirming** [3]
- 485:20, 654:24,
663:15
    **gender-appropriate**
[1] - 672:7
    **gender-confirming**
[5] - 628:21, 629:6,
631:14, 652:15, 661:5
    **gender-conforming**
[1] - 486:17
    **gender-dysphoric**
[11] - 509:15, 596:18,
598:11, 598:24,
615:5, 622:22,
627:16, 628:1,
628:19, 629:19,
660:25
    **gender-**
**transitioning** [4] -
594:23, 595:5,
595:13, 596:4
    **general** [33] - 449:14,
465:11, 481:24,
504:14, 504:17,
507:19, 517:16,
520:17, 524:2,
536:14, 540:12,
540:24, 541:3,
543:25, 545:10,
545:13, 561:12,
573:23, 578:9,

590:15, 591:15,
596:15, 597:2, 597:6,
597:9, 597:21, 598:7,
598:24, 614:24,
620:20, 622:14,
622:21, 668:14
    **generalizing** [1] -
665:16
    **generally** [6] - 448:1,
496:19, 531:10,
550:7, 673:14, 681:23
    **generous** [1] -
696:23
    **genital** [6] - 479:1,
479:9, 479:17,
485:21, 622:3, 663:15
    **genitalia** [2] - 485:7,
485:18
    **genitals** [16] -
457:25, 479:14,
485:3, 604:19,
605:21, 606:19,
606:22, 649:3, 649:9,
654:15, 655:2, 656:7,
656:19, 656:24,
658:20, 669:1
    **GID** [3] - 521:23,
522:6, 594:1
    **given** [21] - 444:3,
508:20, 514:17,
553:2, 559:24, 590:4,
593:25, 602:25,
608:21, 616:23,
628:12, 636:8,
645:20, 659:18,
672:8, 673:7, 682:3,
687:8, 690:23, 691:5,
699:10
    **glanced** [1] - 688:15
    **glaring** [1] - 456:22
    **Google** [1] - 692:15
    **Gorton** [9] - 448:15,
516:5, 516:20,
599:14, 600:7, 601:2,
690:19, 694:3, 697:23
    **Gorton's** [1] - 599:18
    **gosh** [1] - 500:17
    **gotcha** [1] - 494:8
    **governed** [2] -
512:21, 512:23
    **grab** [1] - 623:5
    **grade** [1] - 531:10
    **grading** [2] - 531:12,
531:18
    **graduate** [4] -
552:11, 552:18,
552:24, 659:12
    **graduate-level** [3] -
552:11, 552:18,
552:24

    **grant** [2] - 672:2,
689:6
    **granted** [1] - 693:4
    **granting** [1] - 687:7
    **grave** [2] - 610:22,
611:3
    **great** [1] - 493:17
    **greater** [1] - 511:9
    **greatest** [1] - 700:10
    **grew** [1] - 508:19
    **groomed** [3] -
463:20, 464:2, 464:10
    **gross** [1] - 693:22
    **grounds** [1] - 613:1
    **Group** [4] - 560:11,
560:24, 627:8, 644:19
    **group** [21] - 508:16,
513:6, 523:10, 554:3,
554:16, 560:13,
560:15, 560:19,
560:20, 561:13,
562:10, 563:15,
619:1, 621:20, 622:3,
622:19, 646:10,
647:2, 658:11, 663:17
    **groups** [11] - 534:23,
554:19, 566:6,
593:22, 594:2, 609:6,
656:23, 667:22,
667:25, 668:2, 668:11
    **groups'** [1] - 554:20
    **growing** [2] - 608:7,
641:3
    **guess** [22] - 447:2,
448:7, 448:11,
462:19, 473:20,
483:19, 488:9,
498:23, 499:22,
526:21, 548:15,
550:7, 563:18, 598:8,
600:10, 601:5, 605:5,
608:1, 690:25, 695:3,
699:21, 700:3
    **guidance** [4] - 547:5,
585:4, 688:22, 688:23
    **guide** [3] - 477:5,
491:14, 491:22
    **guideline** [12] -
481:10, 482:6, 483:3,
531:8, 531:9, 531:23,
532:25, 533:2,
533:10, 533:15,
533:16, 592:25
    **guidelines** [26] -
477:15, 491:11,
492:4, 492:9, 492:11,
492:17, 522:13,
523:19, 523:20,
530:24, 531:12,
534:5, 566:18,

566:21, 566:23,
567:1, 567:6, 567:23,
568:1, 568:7, 571:11,
571:21, 697:8,
697:15, 699:1
**guilty** [2] - 510:25,
672:23

# H

**hair** [4] - 509:16,
509:18, 509:20,
520:24
**haircut** [1] - 485:15
**half** [8] - 464:25,
505:22, 528:8,
565:20, 580:7,
634:16, 670:18,
696:21
**half-hour** [1] -
634:16
**Hall** [15] - 444:12,
446:15, 457:6, 501:5,
549:11, 576:3,
619:11, 639:1,
642:15, 642:21,
648:22, 686:13,
687:19, 693:18,
696:19
**HALL** [91] - 444:13,
447:17, 457:7,
478:17, 486:1, 491:3,
491:5, 498:9, 501:6,
501:9, 503:8, 548:20,
549:12, 549:14,
565:9, 574:18, 575:7,
576:23, 582:19,
582:21, 582:24,
590:1, 595:7, 611:16,
611:18, 612:11,
613:1, 613:16,
613:21, 613:24,
615:11, 616:6,
621:13, 623:4, 623:8,
623:15, 623:20,
624:1, 624:15,
624:21, 624:25,
625:15, 625:19,
625:21, 625:25,
626:1, 632:9, 632:13,
632:15, 632:22,
633:12, 635:23,
636:10, 636:15,
636:16, 637:8,
637:14, 637:19,
637:25, 638:5,
638:11, 638:15,
639:3, 642:16,
642:24, 643:2, 643:3,
643:22, 655:15,
660:20, 660:22,

662:12, 662:15,
662:21, 664:24,
665:1, 665:7, 665:24,
666:25, 667:5, 668:4,
670:8, 670:12,
671:10, 673:19,
673:23, 674:1, 686:8,
696:20, 696:23,
700:14
**hand** [6] - 595:24,
596:1, 681:10,
681:13, 681:15,
681:17
**handle** [1] - 669:20
**happy** [4] - 569:9,
662:3, 674:22, 675:9
**hard** [6] - 452:18,
595:16, 644:13,
672:1, 673:12, 700:19
**hardest** [1] - 488:24
**harm** [26] - 456:12,
479:1, 479:10,
479:17, 487:8,
534:25, 540:25,
542:24, 542:25,
543:2, 544:22,
610:10, 610:23,
611:4, 614:10,
614:18, 663:20,
675:4, 678:10,
678:16, 678:18,
684:20, 685:6, 694:2,
696:14, 698:4
**harmed** [1] - 684:6
**harmful** [2] - 488:23,
643:4
**harming** [4] - 543:11,
695:15, 695:24, 696:1
**harms** [2] - 546:10,
549:25
**head** [2] - 459:10,
638:18
**heading** [5] - 577:22,
578:10, 578:11,
578:19, 606:10
**health** [101] - 451:4,
451:10, 456:11,
462:8, 462:12,
462:17, 462:22,
473:10, 477:6,
477:23, 478:15,
487:24, 488:11,
488:20, 490:11,
490:25, 496:3, 496:8,
498:25, 499:1, 499:5,
499:9, 499:13,
499:18, 506:13,
509:9, 512:1, 516:2,
519:3, 521:7, 525:17,
529:3, 529:7, 529:9,

538:3, 538:12,
542:23, 543:12,
544:11, 545:16,
545:23, 550:7, 561:9,
561:11, 561:21,
565:22, 568:9,
580:22, 580:24,
581:9, 589:1, 601:1,
601:4, 610:15,
610:20, 614:15,
626:19, 626:24,
627:6, 628:16, 630:6,
630:16, 631:5, 631:8,
631:25, 633:14,
633:17, 633:23,
634:15, 634:18,
635:10, 640:12,
641:23, 642:2, 654:2,
654:8, 661:9, 664:7,
664:14, 665:10,
665:11, 665:12,
665:17, 676:9, 677:3,
677:5, 683:17,
683:19, 687:8,
687:15, 689:18,
689:21, 690:11,
690:15, 691:15,
691:19, 693:9, 696:6,
697:10, 698:21, 699:8
**Health** [22] - 476:2,
476:11, 477:4, 478:7,
478:10, 516:8,
525:18, 526:3, 537:2,
553:24, 566:18,
568:21, 568:23,
569:14, 573:12,
574:12, 574:24,
577:12, 577:24,
626:16, 629:21,
684:15
**healthcare** [14] -
476:1, 477:14,
489:21, 505:4, 505:6,
505:18, 505:20,
505:22, 505:24,
509:18, 569:23,
570:1, 581:22,
590:22, 612:5, 626:10
**healthy** [5] - 529:8,
538:13, 542:24,
607:9, 607:10
**hear** [13] - 443:3,
446:4, 515:12,
526:12, 571:24,
665:21, 669:24,
669:25, 671:9,
671:18, 673:18,
686:19, 686:22
**heard** [14] - 448:24,
534:19, 597:20,
598:1, 649:20,

675:11, 678:11,
678:24, 681:3, 681:4,
686:20, 690:16,
692:2, 696:24
**hearing** [14] - 444:7,
445:10, 447:4,
448:10, 449:13,
514:19, 548:2, 549:8,
671:23, 671:24,
672:15, 672:17, 695:4
**hearsay** [12] -
547:14, 548:5, 549:6,
574:18, 579:20,
613:2, 613:11, 616:6,
624:23, 635:18,
637:24, 662:10
**held** [1] - 627:3
**help** [21] - 456:21,
461:20, 467:3,
488:21, 489:4, 489:7,
491:14, 495:1,
512:13, 520:25,
544:12, 547:2,
595:22, 628:13,
643:20, 689:14,
689:15, 689:17,
690:12, 690:14,
691:10
**helped** [3] - 546:14,
689:14, 689:23
**helpful** [11] - 458:16,
491:14, 515:23,
545:12, 670:22,
673:11, 673:14,
674:13, 688:21,
688:23, 689:25
**herring** [1] - 686:21
**herrings** [1] - 684:2
**herself** [12] - 471:23,
529:5, 543:11,
601:16, 604:22,
605:15, 641:2,
654:20, 678:15,
682:6, 683:20, 696:3
**high** [7] - 578:1,
593:14, 593:22,
600:4, 600:16,
620:24, 664:17
**higher** [7] - 535:3,
545:15, 597:5, 598:6,
600:11, 626:18, 675:1
**highest** [1] - 669:11
**highlight** [3] - 504:9,
579:24, 697:2
**highly** [4] - 455:11,
566:4, 697:10, 699:7
**hired** [1] - 512:1
**history** [21] - 468:10,
468:13, 487:9, 518:3,
518:7, 521:18, 522:4,

528:21, 538:9, 539:3,
544:2, 547:1, 611:25,
628:16, 631:3, 631:5,
633:3, 639:20,
666:10, 666:11,
681:14
**hmm** [1] - 559:3
**Hohenleitner** [2] -
672:24, 699:16
**Hohenleitner's** [1] -
572:21
**hold** [3] - 494:12,
595:7
**home** [1] - 627:11
**honest** [1] - 676:14
**honestly** [2] -
480:24, 488:6
**hope** [3] - 641:17,
643:19, 700:21
**hoped** [1] - 475:11
**hopefully** [4] - 593:9,
641:6, 643:14, 696:16
**hopes** [1] - 641:14
**hormone** [24] -
453:18, 491:15,
509:14, 520:23,
521:22, 522:11,
523:2, 523:13,
523:22, 523:23,
523:25, 524:2, 524:8,
524:11, 530:17,
531:12, 608:18,
628:3, 628:8, 628:11,
660:24, 689:22, 690:8
**hormone-treated** [1]
- 530:17
**hormones** [15] -
451:22, 521:22,
522:6, 522:16,
522:20, 522:21,
522:22, 523:4,
523:19, 603:1, 603:2,
661:2, 689:15, 692:11
**hospital** [3] - 489:2,
555:11, 556:1
**hospitalizations** [1] -
536:1
**hour** [9] - 459:21,
514:5, 514:6, 554:20,
559:6, 609:14,
634:16, 670:18
**hourly** [1] - 558:18
**hours** [7] - 501:13,
514:8, 517:7, 554:1,
558:24, 559:2, 559:5
**house** [1] - 455:10
**housed** [10] -
541:25, 584:12,
611:14, 612:8,
614:20, 650:21,

658:19, 661:16,
661:23, 662:23
**houses** [2] - 508:22,
649:3
**housing** [8] - 455:23,
492:14, 512:14,
580:17, 583:8,
650:20, 658:14, 688:8
**Human** [5] - 573:12,
574:12, 574:24,
577:12, 577:24
**human** [2] - 659:3,
686:3
**hundreds** [2] -
500:22, 627:23
**hung** [2] - 443:13,
486:18
**hurriedly** [1] - 447:4
**hypothetically** [3] -
679:10, 681:20
**hypotheticals** [1] -
684:3
**hysteria** [1] - 603:23

**I**

**Idaho** [14] - 451:20,
452:22, 454:1, 454:5,
454:23, 455:6, 455:9,
500:10, 500:20,
535:14, 559:7,
657:12, 658:13, 692:4
**idea** [9] - 452:11,
489:1, 500:16,
500:17, 668:16,
669:25, 676:10,
676:12, 684:11
**ideally** [1] - 511:19
**ideas** [1] - 588:6
**ideation** [2] - 486:24,
543:3
**identification** [2] -
615:8, 616:4
**identified** [10] -
443:15, 445:3, 445:9,
452:13, 452:20,
503:11, 587:12,
589:11, 638:21,
653:13
**identify** [4] - 550:12,
609:3, 609:19, 653:19
**identity** [16] - 450:6,
456:2, 463:2, 465:4,
584:14, 584:18,
586:19, 592:1, 659:9,
660:15, 681:22,
682:10, 682:11,
682:12, 685:19,
689:13

**identity-congruent**

[1] - 586:19
**IDOC** [13] - 447:12,
472:8, 475:22, 486:2,
550:13, 614:12,
652:25, 654:1, 654:2,
658:19, 660:14,
678:24, 679:1
**IDOC's** [2] - 560:24,
562:1
**ignorance** [1] -
686:23
**ignorant** [4] -
684:17, 696:24,
696:25
**ill** [1] - 511:3
**illness** [1] - 450:19
**illnesses** [1] - 519:10
**imagine** [1] - 456:7
**immediate** [1] -
489:4
**immediately** [1] -
539:8
**impacting** [1] - 488:5
**impairment** [1] -
675:15
**impeach** [3] -
443:21, 461:11,
613:12
**impeaching** [3] -
446:13, 447:11, 461:4
**impeachment** [8] -
444:5, 444:9, 445:19,
446:21, 458:21,
461:16, 576:11, 616:8
**implicitly** [1] - 601:2
**importance** [2] -
496:24, 529:20
**important** [24] -
490:22, 497:11,
497:16, 528:25,
530:13, 531:21,
533:19, 538:17,
539:12, 541:11,
566:9, 569:17,
569:19, 582:8,
594:11, 633:9,
633:12, 675:16,
679:22, 682:2,
682:17, 684:18,
685:25, 690:5
**imposed** [2] -
648:24, 649:2
**impossible** [2] -
572:21, 594:12
**improve** [1] - 511:18
**improved** [2] -
499:10
**improvement** [1] -
499:12
**impulses** [1] -

488:21
**in-person** [4] -
554:10, 554:24,
555:6, 558:10
**inability** [1] - 536:13
**inadequacy** [1] -
571:25
**Inc** [1] - 692:15
**incarcerated** [19] -
466:11, 466:14,
483:12, 486:20,
486:23, 487:16,
511:19, 514:10,
528:23, 534:2,
539:11, 622:22,
639:20, 643:13,
643:18, 654:1, 676:8,
690:24, 691:6
**incarceration** [14] -
456:5, 486:21,
511:20, 536:4, 536:6,
537:23, 539:7,
539:19, 540:2,
543:17, 633:22,
639:21, 640:8, 649:8
**incidence** [1] - 454:9
**incidences** [1] -
487:3
**incident** [1] - 634:3
**inclination** [2] -
448:11, 670:21
**include** [11] - 453:16,
453:17, 453:18,
492:14, 518:23,
520:23, 526:9,
529:20, 539:2, 587:5,
628:3
**included** [7] - 445:5,
469:3, 473:14,
493:11, 530:11,
593:19, 619:3
**includes** [3] -
492:15, 529:18,
671:17
**including** [24] -
493:16, 496:8,
504:23, 510:5, 516:7,
516:10, 516:19,
522:5, 525:1, 532:13,
533:12, 552:21,
554:14, 558:11,
580:23, 584:9,
610:23, 611:4,
617:11, 619:3, 627:7,
631:5, 633:23, 688:8
**inconsequential** [1]
- 576:7
**inconsistencies** [1] -
535:9
**inconsistency** [1] -

528:25
**incorporate** [2] -
568:1, 584:23
**Incorporated** [1] -
443:4
**incorporated** [2] -
494:10, 494:15
**incorrect** [2] -
475:14, 480:5
**incorrectly** [1] -
619:22
**increase** [2] - 598:2,
683:9
**increased** [10] -
596:12, 597:1, 597:3,
597:4, 598:20,
599:19, 599:25,
602:5, 611:22, 611:25
**increasing** [1] -
683:17
**indeed** [1] - 488:11
**independent** [2] -
626:6, 660:12
**Indian** [2] - 516:8,
537:2
**indicate** [8] - 443:11,
446:10, 467:14,
469:1, 479:22, 499:6,
515:14, 678:4
**indicated** [22] -
479:23, 486:16,
490:8, 490:17,
495:20, 496:2, 499:5,
500:9, 524:24, 525:2,
525:3, 538:1, 547:10,
615:17, 655:19,
677:23, 690:4, 690:8,
691:11, 693:18,
694:3, 696:4
**indicates** [3] -
559:23, 578:12, 579:7
**indicating** [1] - 499:9
**indication** [1] -
499:11
**indifference** [10] -
677:18, 693:14,
693:15, 693:21,
693:23, 696:14,
697:4, 697:17, 698:7
**indifferent** [2] -
610:14, 614:14
**individual** [11] -
466:10, 487:12,
509:12, 510:15,
522:25, 530:17,
534:18, 551:17,
566:2, 618:14, 628:24
**individual's** [1] -
628:16
**individually** [1] -

510:3
**individuals** [30] -
443:20, 443:22,
445:1, 483:10,
483:14, 509:15,
512:10, 520:25,
523:21, 551:15,
566:11, 590:15,
596:25, 597:9,
597:12, 598:6,
598:12, 609:12,
619:5, 627:22, 629:5,
650:1, 650:23, 655:1,
656:12, 661:13,
662:22, 663:9,
680:19, 698:16
**industries** [1] -
626:25
**inflict** [1] - 675:8
**infliction** [2] -
676:23, 677:15
**information** [18] -
447:1, 468:19,
469:17, 469:19,
516:24, 518:23,
533:14, 539:25,
604:9, 614:17,
614:25, 615:3, 615:6,
621:10, 652:11,
683:1, 683:22, 694:16
**informed** [4] -
640:21, 680:18,
691:14, 691:20
**infraction** [1] - 487:6
**initial** [3] - 523:3,
618:15, 650:4
**initiating** [1] - 521:22
**initiation** [1] - 523:3
**injunction** [19] -
443:5, 671:19,
671:22, 672:3,
672:17, 674:22,
674:25, 675:4, 675:5,
678:11, 687:7, 689:6,
692:14, 692:17,
692:19, 692:24,
693:3, 696:12
**injunctions** [1] -
675:6
**injuring** [1] - 529:4
**injurious** [2] - 538:8,
538:14
**injury** [12] - 529:7,
529:11, 529:15,
538:6, 605:17,
606:15, 612:1,
667:11, 675:8,
676:22, 677:14,
677:19
**inmate** [15] - 456:24,

457:2, 460:15, 470:14, 486:16, 486:23, 566:2, 566:9, 616:4, 621:22, 622:4, 677:18, 679:1, 680:7, 680:24
**inmate's** [1] - 610:15
**Inmates** [1] - 564:3
**inmates** [24] - 453:7, 489:13, 489:20, 500:9, 500:20, 507:14, 508:13, 509:3, 511:12, 514:9, 524:15, 566:7, 591:21, 614:13, 614:19, 615:5, 615:6, 616:2, 627:16, 628:1, 629:19, 648:17, 658:14, 658:19
**inmates'** [2] - 614:15, 662:13
**inner** [1] - 666:6
**InnovaTel** [2] - 511:24, 512:4
**inpatient** [1] - 536:17
**input** [1] - 454:17
**inquire** [3] - 449:19, 502:5, 620:3
**inquiry** [1] - 461:9
**insanity** [1] - 510:25
**inside** [9] - 541:15, 546:7, 582:13, 589:16, 589:25, 590:12, 590:16, 608:7, 663:19
**insight** [1] - 603:15
**instance** [2] - 461:12, 688:23
**institution** [9] - 583:9, 584:10, 611:14, 612:8, 614:19, 628:20, 697:25, 698:2, 698:25
**Institution** [1] - 535:14
**institutional** [5] - 533:24, 580:23, 581:10, 581:23, 584:1
**institutionalization** [2] - 583:8, 688:8
**institutions** [1] - 583:6
**insurance** [1] - 685:1
**intact** [1] - 603:16
**integrated** [1] - 663:14
**intelligent** [1] - 685:12
**intend** [3] - 579:14, 614:2, 700:21

**intended** [3] - 444:5, 494:4, 494:7
**intense** [3] - 637:4, 641:11, 667:14
**intentionally** [1] - 604:23
**interact** [2] - 587:18, 588:5
**interacted** [1] - 589:6
**interacting** [3] - 585:1, 585:16, 587:16
**interaction** [6] - 459:11, 463:12, 463:21, 464:3, 464:11, 464:19
**interactions** [1] - 587:19
**interest** [6] - 511:11, 511:13, 625:22, 631:21, 658:8, 663:10
**interested** [3] - 505:4, 505:18, 511:2
**interesting** [1] - 686:18
**internist** [1] - 451:19
**interpersonal** [3] - 637:4, 641:11, 667:14
**interpreted** [1] - 531:22
**intervention** [1] - 651:15
**interventions** [2] - 485:14, 642:10
**interview** [20] - 517:2, 517:6, 517:24, 518:3, 518:5, 537:11, 537:17, 558:11, 558:21, 559:7, 559:12, 559:13, 562:20, 605:7, 630:22, 631:2, 634:17, 635:4, 640:14, 645:21
**interviewed** [1] - 634:19
**interviews** [4] - 645:23, 646:1, 662:24, 662:25
**investigation** [3] - 468:17, 516:10, 632:7
**investigations** [1] - 633:16
**involved** [18] - 505:8, 505:10, 505:17, 505:19, 509:7, 509:24, 520:9, 537:10, 550:19, 554:7, 627:24, 628:5, 634:23, 651:4, 661:24, 679:13,

682:19, 690:20
**involvement** [2] - 511:9, 584:24
**involves** [5] - 512:5, 524:2, 525:20, 526:14, 585:16
**involving** [2] - 528:4, 543:11
**irreparable** [5] - 675:3, 675:8, 678:10, 678:18, 685:6
**irrespective** [1] - 580:17
**irreversibility** [1] - 566:4
**irreversible** [3] - 535:1, 535:10, 689:7
**ISCI** [2] - 611:14, 612:7, 615:5, 615:23
**ish** [1] - 650:4
**Island** [2] - 504:24, 505:7
**issue** [17] - 443:8, 445:23, 491:21, 515:2, 515:3, 573:7, 605:15, 618:1, 641:12, 671:18, 671:24, 674:10, 675:24, 687:10, 687:23, 692:13, 699:24
**issued** [5] - 658:16, 675:5, 692:24, 693:3, 694:23
**issues** [29] - 450:19, 451:4, 490:11, 499:5, 509:13, 530:13, 532:12, 533:11, 536:12, 537:4, 538:21, 543:13, 543:18, 543:25, 601:4, 615:8, 616:5, 618:17, 672:13, 687:6, 687:8, 687:15, 687:20, 687:22, 689:20, 690:11, 691:19, 696:6, 697:10
**issuing** [3] - 575:13, 631:23, 634:11
**item** [2] - 479:5, 480:17
**items** [4] - 446:16, 534:23, 672:4, 672:8
**itself** [4] - 485:10, 495:10, 514:21, 653:18

---

**J**

**Jail** [1] - 632:5

**jail** [3] - 508:22, 512:7, 512:11
**January** [2] - 458:9, 459:12, 460:13, 464:7, 513:24, 523:15, 523:16, 553:21
**Jen** [1] - 502:16
**Jeremy** [1] - 527:12
**job** [12] - 488:24, 506:22, 536:13, 544:11, 560:2, 585:1, 585:12, 585:15, 585:16, 588:2, 674:13, 699:4
**jobs** [1] - 586:5
**Joel** [2] - 623:15, 623:24
**JOEL** [1] - 623:18
**join** [6] - 478:17, 574:19, 575:10, 612:12, 613:5, 616:7
**joined** [1] - 514:5
**joint** [3] - 548:17, 548:18, 632:16
**Joint** [14] - 457:17, 463:15, 464:6, 470:9, 472:25, 473:12, 473:23, 482:25, 483:25, 484:18, 579:13, 630:2, 639:9, 641:21
**Joshua** [1] - 523:5
**journal** [3] - 551:11, 592:18, 658:23
**journals** [1] - 624:18
**Judge** [1] - 675:6
**judge** [1] - 693:24
**judged** [1] - 592:23
**judgment** [14] - 453:25, 492:16, 527:6, 531:1, 531:23, 534:7, 571:23, 603:16, 689:9, 691:8, 693:12, 694:22, 698:12, 699:11
**judicial** [1] - 612:22
**July** [6] - 521:15, 530:2, 553:23, 630:24, 631:1, 649:23
**jump** [1] - 490:13
**June** [4] - 444:16, 463:13, 521:9, 521:12
**jury** [1] - 483:19
**Justice** [1] - 684:19
**justified** [1] - 484:22
**justify** [1] - 676:8

**K**

**Keelin** [2] - 501:20, 502:3
**KEELIN** [2] - 501:24, 502:4
**keep** [6] - 455:21, 467:10, 473:20, 596:9, 674:20, 699:17
**keeps** [1] - 486:6
**Kennedy** [1] - 684:19
**kept** [1] - 510:22
**key** [1] - 687:6
**kill** [1] - 608:8
**kind** [35] - 449:12, 457:2, 465:12, 485:7, 486:14, 488:4, 488:13, 493:21, 507:19, 509:9, 511:7, 511:13, 522:14, 524:6, 524:7, 534:20, 534:24, 536:14, 540:11, 541:25, 543:25, 545:11, 550:22, 553:12, 571:1, 571:5, 571:21, 572:3, 600:2, 603:9, 618:12, 671:23, 673:2, 686:24, 689:24
**kinds** [3] - 509:13, 571:16, 684:7
**knowledge** [2] - 574:22, 685:22
**knows** [2] - 684:24, 685:10
**Krina** [1] - 634:13

**L**

**lack** [8] - 593:21, 594:3, 620:16, 660:3, 662:18, 687:25, 689:3, 689:4
**lacks** [2] - 465:20, 493:23, 493:25
**laid** [2] - 514:16, 514:23
**Lake** [2] - 521:14, 522:2
**land** [1] - 671:16
**large** [1] - 562:16
**largely** [1] - 511:10
**larger** [1] - 554:17
**laser** [1] - 509:18
**last** [18] - 454:12, 476:23, 477:3, 478:3, 485:22, 487:20, 517:6, 581:1, 584:6, 588:23, 594:21, 626:23, 627:3, 653:1,

658:16, 672:9,
675:11, 686:15
**lastly** [2] - 456:22,
620:9
**late** [4] - 522:19,
630:24, 650:4, 672:20
**Laughter** [1] -
623:21
**Laura** [1] - 634:19
**LAW** [1] - 696:21
**Law** [3] - 526:7,
565:17, 629:24
**law** [8] - 674:5,
674:8, 676:4, 677:16,
678:3, 692:16,
692:22, 693:8
**Lawrence** [5] -
480:4, 480:13,
540:16, 541:17,
620:15
**lawsuit** [1] - 612:9
**lawyer** [1] - 610:13
**lay** [4] - 443:9,
625:23, 665:3, 671:16
**lead** [2] - 472:7,
625:22
**leadership** [1] -
491:19
**leading** [4] - 494:22,
496:14, 619:15, 637:6
**leads** [1] - 486:14
**leaking** [1] - 474:25
**leap** [1] - 499:23
**learning** [1] - 534:19
**least** [13] - 466:2,
466:3, 484:22, 485:6,
489:18, 510:17,
563:4, 639:24, 640:3,
672:16, 674:14,
690:17, 696:4
**leave** [3] - 489:24,
582:8, 649:22
**leaves** [2] - 492:15,
492:16
**leaving** [1] - 684:21
**lecture** [3] - 552:13,
552:14, 552:15
**lectures** [1] - 480:5
**led** [1] - 619:8
**leeway** [3] - 515:13,
625:24, 638:12
**left** [8] - 449:18,
451:14, 452:20,
453:25, 513:13,
595:24, 609:14,
649:19
**left-hand** [1] - 595:24
**legal** [1] - 677:20
**lends** [1] - 485:10
**length** [1] - 625:7

**less** [4] - 521:12,
589:4, 656:11, 656:19
**lessen** [1] - 654:24
**lethal** [1] - 543:22
**letter** [2] - 556:24,
676:4
**level** [17] - 456:9,
456:18, 471:8,
485:17, 531:10,
552:11, 552:18,
552:24, 604:4, 604:6,
604:7, 626:18,
665:13, 665:20,
693:23
**levels** [2] - 531:13,
626:17
**Levine** [29] - 452:14,
472:7, 472:10, 474:9,
493:13, 493:17,
493:20, 494:4, 494:6,
495:5, 554:2, 554:9,
554:15, 555:2, 561:4,
562:2, 563:10,
563:15, 645:2, 645:7,
645:14, 679:12,
679:15, 679:16,
679:17, 679:21,
679:24, 680:23, 681:3
**Levine's** [13] -
472:24, 473:1, 473:5,
473:8, 474:12,
474:15, 474:21,
475:5, 493:11,
562:10, 676:11,
680:24, 686:20
**license** [2] - 512:14,
665:24
**licensed** [6] -
504:21, 504:22,
626:6, 660:12, 665:10
**licensure** [4] -
512:13, 660:11,
665:16, 665:20
**lie** [1] - 445:1
**lieu** [5] - 444:16,
473:17, 548:25,
613:16, 613:18
**life** [37] - 456:1,
456:6, 466:15, 475:1,
486:20, 496:24,
529:18, 529:25,
530:1, 530:4, 536:14,
540:7, 540:12, 543:9,
543:25, 546:21,
547:3, 566:11,
584:21, 584:22,
586:2, 586:25, 587:5,
640:24, 643:16,
661:20, 662:4,
663:13, 668:13,

678:16, 681:10,
685:19, 685:21,
685:22, 685:23,
685:24
  **life-enhancing** [1] -
475:1
  **life-threatening** [1] -
678:16
  **lifesaving** [1] -
474:24
  **lifestyle** [1] - 677:9
  **light** [2] - 578:2,
695:10
  **lightly** [3] - 682:22,
682:23, 692:14
  **likelihood** [4] -
675:2, 693:16,
694:24, 696:13
  **likely** [3] - 594:2,
675:7, 695:18
  **limitations** [2] -
541:12, 549:14
  **limited** [4] - 453:17,
544:16, 544:23,
548:21
  **limits** [1] - 491:16
  **line** [6] - 450:9,
460:6, 460:7, 461:9,
469:14, 656:4
  **lined** [1] - 452:6
  **list** [14] - 443:16,
444:4, 445:5, 473:14,
484:20, 484:24,
504:23, 541:19,
624:18, 625:14,
631:10, 638:16,
671:14, 700:17
  **listed** [3] - 484:5,
637:9, 638:18
  **listen** [3] - 560:17,
564:12, 574:1
  **listened** [1] - 686:18
  **lists** [2] - 529:20,
531:17
  **literally** [1] - 685:22
  **literature** [14] -
514:2, 519:23,
523:18, 528:1, 528:2,
540:19, 554:4,
562:12, 573:22,
593:20, 595:2,
595:12, 596:5, 618:11
  **litigation** [1] - 695:9
  **live** [19] - 444:17,
446:8, 447:8, 463:5,
466:3, 466:19,
540:11, 540:12,
541:24, 542:1,
548:25, 580:23,
647:25, 648:9,

648:19, 649:16,
650:7, 658:5, 662:3
  **lived** [5] - 539:25,
640:8, 649:7, 650:2,
685:14
  **lives** [1] - 511:18
  **living** [34] - 456:1,
463:1, 465:3, 466:2,
486:17, 486:19,
496:10, 496:17,
518:21, 536:24,
539:22, 543:19,
581:10, 581:12,
581:23, 581:25,
583:6, 584:1, 584:13,
584:16, 584:17,
585:3, 585:13,
586:18, 587:19,
602:16, 641:13,
663:4, 663:15,
663:22, 663:25,
677:9, 689:1
  **local** [1] - 451:18
  **location** [1] - 589:3
  **lodge** [1] - 444:7
  **long-/intermediate-
term** [2] - 580:24,
583:10
  **long-term** [2] -
486:21, 557:7
  **look** [22] - 455:25,
483:20, 484:3,
486:11, 487:9,
493:18, 503:17,
531:11, 532:18,
548:18, 567:6, 567:8,
567:18, 573:16,
575:3, 578:22,
685:13, 686:22,
687:4, 688:13,
700:11, 700:12
  **looked** [5] - 505:19,
521:7, 523:22, 545:7,
606:10
  **looking** [14] -
462:11, 463:4,
464:23, 474:23,
482:25, 531:9, 533:9,
586:10, 588:20,
591:7, 606:13, 636:1,
641:21, 673:15
  **looks** [2] - 592:14,
608:19
  **loss** [3] - 526:18,
532:14, 532:15
  **lost** [5] - 528:4,
528:8, 532:19,
593:22, 598:19
  **low** [3] - 546:22,
592:9, 610:1

**lower** [1] - 598:21
**Lower** [2] - 669:8,
669:12
**lump** [1] - 691:17
**luxury** [1] - 511:13
**lying** [4] - 682:14,
684:11, 686:23, 687:1

## M

**M.D** [3] - 449:24,
501:24, 502:4
**madam** [1] - 502:14
**Madam** [2] - 449:22,
457:9
**magic** [2] - 668:16,
668:18
**magical** [1] - 669:25
**main** [3] - 538:15,
627:4, 667:18
**maintain** [1] - 525:22
**maintained** [2] -
507:3, 507:7
**maintaining** [4] -
507:6, 565:25,
671:21, 692:20
**major** [12] - 451:12,
496:8, 497:19, 519:4,
544:4, 544:10,
601:24, 604:3, 604:7,
604:13, 604:14,
687:17
**majority** [5] - 562:9,
646:1, 646:4, 649:6,
649:8
**maladaptive** [1] -
605:18
**male** [5] - 661:23,
662:4, 663:14,
663:16, 685:15
**malingering** [1] -
603:23, 678:13
**malpractice** [2] -
677:17, 678:1
**manage** [2] - 538:20,
539:17
**managed** [1] -
500:15
**Management** [7] -
452:24, 453:1, 454:5,
454:7, 475:15, 493:2,
521:17
**management** [3] -
477:21, 568:7, 618:2
**manager** [1] - 627:5
**managers** [1] -
512:13
**mandated** [1] - 612:7
**mandatory** [15] -
491:13, 492:4,

671:22, 674:22,
674:25, 675:4, 675:6,
687:7, 689:6, 692:14,
692:17, 692:19,
692:23, 693:3, 694:22
  **manifestations** [1] -
488:4
  **manipulating** [2] -
678:14, 684:12
  **manipulative** [3] -
604:21, 604:24,
682:14
  **manner** [1] - 444:8
  **manual** [1] - 491:25
  **marked** [5] - 624:2,
624:16, 630:2,
635:15, 635:24
  **Massachusetts** [51] -
472:11, 504:12,
504:24, 506:13,
506:22, 507:11,
508:7, 508:14,
508:21, 509:2,
509:23, 511:15,
512:23, 514:4,
518:11, 520:7,
523:21, 552:9,
554:13, 555:1,
555:16, 560:9,
560:23, 561:3, 562:3,
562:13, 562:16,
563:2, 585:23,
617:24, 618:22,
621:19, 621:23,
622:1, 622:5, 626:7,
626:25, 627:5, 627:7,
627:22, 644:18,
645:1, 647:15,
647:20, 649:2,
649:11, 649:12,
656:9, 658:4, 661:14,
661:20
  **master's** [3] - 613:7,
626:4, 665:13
  **matched** [1] - 596:14
  **matter** [5] - 515:10,
574:21, 575:4,
613:10, 621:7
  **mattered** [1] - 683:12
  **matters** [2] - 642:16,
682:23
  **mean** [47] - 444:13,
453:17, 454:14,
459:21, 472:18,
481:22, 482:13,
483:19, 488:6,
488:24, 506:4, 512:8,
515:10, 519:12,
520:4, 525:19,
546:25, 550:8, 558:1,

570:9, 570:22, 575:2,
576:2, 582:16,
589:20, 590:14,
594:6, 594:15,
600:25, 605:4,
612:21, 646:4,
646:19, 648:6,
648:12, 649:18,
652:10, 653:19,
666:10, 666:11,
671:20, 676:25,
681:20, 682:2,
683:22, 683:25, 691:1
  **meaning** [2] - 519:9,
540:6
  **meaningful** [2] -
587:15, 587:16
  **meaningless** [1] -
681:14
  **means** [9] - 476:6,
491:16, 545:15,
565:23, 596:8,
602:15, 613:19,
672:24, 690:21
  **meant** [5] - 491:14,
494:17, 499:11,
506:23, 606:24
  **measure** [4] -
682:10, 683:1, 691:1
  **mechanism** [2] -
529:9, 546:7
  **mechanisms** [2] -
691:23, 695:17
  **Medicaid** [1] -
625:12
  **Medical** [4] - 504:13,
516:7, 535:24, 632:3
  **medical** [76] -
452:17, 456:10,
456:15, 459:15,
459:14, 459:15,
462:4, 467:18,
468:20, 469:21,
470:11, 470:18,
470:25, 471:4,
477:21, 480:3, 480:9,
497:10, 497:17,
504:13, 507:2,
507:12, 510:10,
510:13, 512:14,
513:1, 513:16, 516:2,
517:19, 517:21,
521:7, 523:7, 524:6,
527:11, 529:2, 531:2,
538:3, 540:23,
542:15, 545:16,
557:12, 557:24,
558:12, 559:13,
559:19, 561:12,
568:7, 591:16,

603:12, 606:10,
607:11, 607:13,
619:10, 633:7,
633:14, 633:23,
641:23, 657:2,
657:25, 672:10,
675:12, 676:14,
676:18, 678:1, 681:2,
685:2, 685:3, 685:7,
688:22, 691:9, 693:9,
693:11, 693:19,
697:3, 698:7
  **medically** [30] -
453:14, 454:8,
454:20, 454:24,
455:4, 455:13, 468:1,
468:4, 468:9, 468:16,
471:25, 472:3, 479:3,
527:16, 528:17,
582:14, 583:6,
583:16, 586:8,
586:12, 588:1,
651:13, 651:16,
659:18, 672:11,
676:1, 677:23,
678:22, 679:2, 692:8
  **Medicare** [8] - 573:9,
573:21, 573:23,
574:3, 574:5, 574:8,
575:15, 625:6
  **Medicare's** [1] -
577:4
  **medication** [5] -
461:20, 488:2,
512:17, 523:8, 543:23
  **medications** [4] -
471:20, 489:3,
628:12, 689:19
  **Medicine** [2] -
451:20
  **meet** [17] - 462:4,
462:25, 466:10,
467:18, 470:11,
470:14, 471:4,
486:10, 584:13,
585:9, 609:4, 609:11,
630:10, 630:20,
635:6, 666:7, 666:10
  **meeting** [7] - 521:16,
523:9, 536:17,
554:21, 565:15,
565:17, 606:8
  **meetings** [9] -
491:20, 493:3, 514:8,
554:20, 560:21,
562:10, 563:22,
608:24, 634:1
  **meets** [9] - 608:20,
635:9, 636:19,
636:23, 639:4,

641:22, 698:5,
698:13, 698:25
  **member** [5] - 454:14,
479:21, 527:13,
560:22, 627:8
  **members** [12] -
510:8, 554:14,
554:17, 561:6,
561:18, 562:3,
596:18, 609:4, 609:8,
645:4, 645:8, 645:15
  **memory** [3] - 458:23,
459:5, 459:16
  **men** [3] - 508:23,
657:19, 657:22
  **men's** [2] - 530:4,
540:9
  **Menard** [1] - 516:22
  **mental** [89] - 450:18,
451:4, 451:10,
456:10, 456:11,
462:8, 462:12,
462:17, 462:22,
487:24, 488:11,
488:20, 490:11,
490:24, 496:3, 496:7,
498:25, 499:1, 499:5,
499:9, 499:13,
499:18, 506:13,
509:9, 512:1, 516:2,
519:3, 521:7, 529:2,
529:7, 529:9, 536:18,
538:3, 538:12,
542:23, 543:12,
544:11, 545:16,
545:23, 550:7,
565:22, 589:1, 601:1,
601:4, 626:19,
626:24, 627:6,
628:16, 630:6,
630:16, 631:5, 631:8,
631:25, 633:14,
633:17, 633:23,
634:15, 634:18,
635:10, 640:12,
641:23, 642:2, 654:2,
654:8, 661:9, 664:7,
664:14, 665:10,
665:11, 665:12,
665:17, 676:9, 677:3,
677:5, 683:17,
683:19, 687:8,
687:15, 689:18,
689:21, 690:11,
690:15, 691:15,
691:19, 693:9, 696:5,
697:10, 698:21, 699:8
  **mentally** [1] - 511:3
  **mention** [13] - 463:8,
482:7, 483:5, 496:2,

535:16, 535:20,
535:22, 536:15,
537:3, 537:19,
619:12, 692:4, 696:2
  **mentioned** [16] -
451:14, 452:4,
469:16, 481:8,
481:17, 505:1, 533:6,
535:14, 535:24,
538:6, 555:15,
555:19, 588:25,
589:9, 609:6, 687:6
  **mentioning** [1] -
527:20
  **merits** [1] - 693:2
  **met** [22] - 457:19,
463:12, 465:2, 513:6,
513:14, 533:16,
538:2, 540:7, 584:22,
619:1, 631:11,
634:16, 637:1, 637:3,
637:8, 637:9, 638:22,
639:14, 639:17,
646:5, 662:1, 667:18
  **method** [1] - 524:2
  **methodologies** [1] -
593:21
  **methodology** [1] -
532:13
  **methods** [1] - 526:16
  **MH** [2] - 626:13,
626:15
  **MHM** [2] - 506:12,
627:10
  **Michelle** [1] - 680:11
  **middle** [2] - 448:9,
457:23
  **might** [20] - 485:23,
515:1, 523:16,
534:22, 546:5,
561:17, 561:23,
563:18, 587:19,
588:5, 588:7, 588:12,
598:22, 599:8,
600:18, 600:20,
608:8, 608:12, 613:3,
670:18
  **mild** [1] - 604:6
  **mimic** [1] - 587:24
  **mind** [7] - 454:17,
458:12, 459:8,
460:10, 460:19,
481:17, 485:13
  **mindful** [1] - 449:17
  **minefield** [1] -
565:24
  **minimize** [1] -
499:17
  **minimum** [2] - 689:5,
693:2

**Minnesota** [1] - 504:24

**minute** [7] - 448:15, 483:21, 527:20, 623:4, 623:6, 623:8, 623:11

**minutes** [6] - 501:14, 517:7, 572:14, 576:14, 646:3, 696:21

**mirror** [3] - 581:11, 581:24, 582:4

**mirrors** [2] - 566:8, 582:8

**misleading** [1] - 548:16

**misreading** [1] - 490:20

**misrepresentation** [1] - 625:4

**missed** [2] - 654:2, 654:9

**misspoken** [1] - 563:18

**misstatements** [1] - 465:19

**misstates** [10] - 468:23, 472:17, 553:8, 569:2, 569:4, 570:17, 606:4, 615:11, 615:14, 666:24

**mistake** [1] - 595:18

**modalities** [1] - 653:8

**moderate** [5] - 604:4, 604:7, 604:14, 621:2, 621:6

**moment** [14] - 468:24, 483:20, 493:24, 494:2, 557:16, 564:13, 590:3, 607:24, 608:10, 615:15, 635:19

**moments** [1] - 562:7

**money** [1] - 619:21

**monitor** [1] - 689:17

**monitored** [2] - 490:8, 689:16

**monitoring** [1] - 526:22

**monitors** [2] - 503:24, 504:3

**month** [11] - 505:7, 505:8, 513:6, 514:6, 514:8, 521:13, 522:3, 522:25, 529:5, 554:2

**month's** [1] - 523:9

**monthly** [6] - 554:8, 554:12, 555:7, 606:7,

606:11, 619:1

**months** [34] - 462:15, 463:1, 465:3, 466:2, 466:3, 466:4, 471:21, 471:24, 486:17, 496:10, 499:20, 535:19, 539:22, 584:13, 584:17, 585:3, 585:13, 586:24, 587:4, 589:3, 589:4, 590:6, 639:24, 648:1, 648:10, 648:19, 649:16, 650:3, 650:6, 650:8, 658:6, 677:9, 689:2, 694:7

**moot** [1] - 672:8

**morning** [6] - 443:6, 449:7, 457:13, 457:14, 549:22, 549:23

**most** [8] - 507:13, 526:12, 552:4, 560:12, 562:25, 646:4, 675:7, 698:18

**mostly** [1] - 451:22

**motion** [4] - 443:5, 448:8, 632:16, 696:12

**motions** [1] - 445:16

**mouth** [1] - 686:25

**move** [46] - 450:21, 465:16, 474:2, 476:16, 476:22, 492:24, 503:5, 526:17, 537:18, 538:25, 547:6, 553:4, 556:14, 558:4, 559:18, 564:10, 565:6, 573:25, 576:13, 576:20, 588:3, 588:7, 588:11, 593:9, 596:21, 608:12, 608:13, 608:16, 615:20, 616:18, 619:11, 620:1, 623:20, 624:21, 625:3, 625:8, 625:20, 639:2, 642:24, 649:13, 650:12, 657:1, 659:14, 665:15, 699:23

**moved** [2] - 625:14, 650:9

**moves** [1] - 485:20

**moving** [2] - 625:5, 692:23

**MR** [200] - 444:13, 445:23, 446:1, 447:17, 447:21,

449:1, 449:20, 450:1, 451:2, 451:3, 455:14, 455:17, 457:5, 457:7, 457:9, 458:20, 458:24, 461:1, 465:7, 465:13, 465:19, 465:22, 465:24, 467:10, 468:23, 472:14, 472:17, 473:18, 476:19, 478:16, 478:17, 478:18, 478:20, 479:19, 481:13, 482:15, 486:1, 490:2, 490:4, 491:3, 491:5, 491:6, 494:9, 494:24, 496:16, 497:4, 498:9, 501:4, 501:6, 501:9, 501:20, 502:6, 502:8, 502:25, 503:5, 503:8, 503:12, 503:19, 504:5, 504:7, 506:7, 506:9, 506:15, 515:4, 515:18, 515:24, 515:25, 520:2, 520:4, 520:14, 520:15, 524:23, 525:15, 545:3, 545:19, 547:6, 548:11, 548:14, 548:20, 549:12, 549:14, 553:8, 565:9, 565:10, 569:2, 569:4, 569:6, 570:17, 574:18, 574:19, 575:7, 575:10, 576:22, 576:23, 579:18, 582:19, 582:21, 582:24, 583:9, 590:1, 595:7, 595:15, 595:21, 600:22, 606:4, 607:22, 608:9, 611:16, 611:17, 611:18, 612:11, 612:12, 613:1, 613:5, 613:16, 613:21, 613:24, 615:10, 615:11, 616:6, 616:7, 617:2, 620:1, 620:9, 621:4, 621:5, 621:12, 621:13, 623:4, 623:8, 623:15, 623:20, 624:1, 624:15, 624:21, 624:25, 625:15, 625:19, 625:21, 625:25, 626:1, 632:9, 632:13, 632:15, 632:22, 633:12, 635:23, 636:10, 636:15, 636:16, 637:8,

637:14, 637:19, 637:25, 638:5, 638:11, 638:15, 639:3, 642:16, 642:24, 643:2, 643:3, 643:22, 644:1, 655:15, 660:20, 660:22, 662:12, 662:15, 662:21, 664:24, 665:1, 665:7, 665:24, 666:25, 667:5, 668:4, 670:8, 670:12, 670:15, 671:10, 673:19, 673:23, 674:1, 674:2, 686:8, 686:12, 688:4, 688:11, 688:17, 689:1, 691:7, 694:18, 695:13, 695:23, 696:9, 696:20, 696:23, 700:14, 700:15

**MS** [226] - 444:2, 446:3, 447:18, 448:13, 450:21, 457:12, 458:17, 459:7, 459:12, 459:17, 459:23, 460:1, 461:18, 462:2, 462:3, 465:16, 466:9, 467:4, 467:5, 467:17, 469:4, 469:8, 469:13, 469:14, 472:24, 473:12, 473:22, 473:24, 476:16, 476:22, 476:23, 477:3, 478:23, 479:7, 479:9, 480:1, 480:19, 482:3, 482:6, 482:10, 482:20, 482:23, 483:17, 483:21, 483:25, 484:2, 484:6, 484:7, 484:11, 493:23, 493:25, 494:22, 496:14, 497:7, 497:9, 498:15, 498:18, 501:2, 503:15, 503:22, 504:1, 504:4, 504:6, 514:15, 514:22, 515:9, 519:14, 519:20, 524:17, 544:20, 545:5, 547:9, 547:17, 547:22, 547:25, 548:2, 549:2, 549:17, 549:21, 553:9, 553:14, 553:17, 556:19, 556:20, 557:22, 558:4, 558:10, 559:4, 559:16, 560:7,

564:10, 564:17, 565:6, 565:13, 565:15, 567:15, 567:19, 568:18, 569:7, 569:9, 569:10, 570:23, 572:11, 572:15, 572:24, 572:25, 573:25, 574:5, 574:23, 575:11, 576:1, 576:19, 577:1, 579:6, 579:15, 579:21, 580:3, 581:5, 581:7, 581:8, 583:3, 583:11, 583:16, 590:9, 590:10, 591:4, 591:6, 591:8, 595:9, 595:11, 595:20, 595:22, 596:2, 596:10, 596:19, 596:21, 596:22, 597:12, 597:15, 599:9, 599:12, 600:19, 601:11, 606:16, 608:3, 608:13, 608:16, 608:17, 609:18, 609:19, 611:21, 612:14, 612:18, 613:25, 614:3, 614:6, 614:24, 615:3, 615:13, 615:21, 615:22, 616:19, 619:15, 620:6, 621:14, 621:17, 622:19, 624:12, 624:23, 625:5, 625:11, 625:13, 632:19, 632:23, 635:18, 636:3, 636:5, 636:13, 637:6, 637:20, 637:23, 638:4, 638:7, 638:23, 642:12, 644:3, 644:5, 644:13, 644:16, 647:8, 649:1, 649:10, 652:4, 652:21, 653:25, 655:9, 655:23, 656:2, 656:8, 656:15, 659:14, 660:6, 660:8, 660:18, 662:10, 662:14, 662:18, 664:20, 665:15, 666:24, 668:6, 668:8, 670:6, 671:1, 671:6, 674:17, 674:19, 678:5, 678:10, 680:1, 680:4, 680:10, 680:22, 682:1, 686:6, 700:7

**MTC** [1] - 634:1

multiple [6] - 452:13, 464:23, 498:10, 580:11, 606:3, 655:10
must [2] - 587:4, 641:24
mutilate [1] - 457:24

**N**

nail [3] - 657:8, 657:19, 663:21
name [9] - 474:21, 485:16, 502:1, 502:3, 523:4, 623:22, 623:23, 634:14
national [1] - 506:14
National [12] - 476:1, 476:25, 477:4, 525:18, 526:2, 553:23, 566:17, 568:21, 568:22, 569:13, 626:16, 629:20
natural [1] - 684:22
nature [2] - 537:8, 593:25
navigating [1] - 565:24
NCCHC [31] - 476:4, 476:6, 476:10, 477:15, 478:19, 479:16, 479:20, 480:1, 480:2, 480:6, 480:12, 491:24, 492:8, 566:17, 566:23, 566:25, 568:1, 568:7, 570:6, 570:11, 571:11, 571:22, 572:1, 612:5, 612:7, 626:16, 629:20, 688:4, 688:5, 688:19
NCCHC's [2] - 478:13, 570:14
NCCS [1] - 688:3
NCD [1] - 577:25
near [1] - 513:16
necessarily [4] - 578:24, 600:20, 601:6, 605:5
necessary [33] - 446:16, 453:15, 454:8, 454:20, 454:25, 455:4, 455:13, 468:1, 468:5, 468:9, 468:16, 471:25, 472:3, 479:3, 483:11, 519:25, 527:16, 528:17, 583:7, 583:17, 586:9,

586:12, 588:2, 599:22, 651:14, 651:16, 659:18, 663:6, 665:25, 676:1, 678:23, 679:2, 692:8
necessity [24] - 462:5, 467:18, 470:11, 470:18, 471:1, 471:5, 480:3, 480:9, 513:2, 513:16, 517:21, 531:2, 540:23, 557:12, 557:24, 558:12, 559:13, 559:19, 564:22, 591:16, 606:10, 619:10, 685:7, 688:22
need [60] - 445:7, 446:4, 447:1, 449:2, 455:23, 456:4, 456:9, 456:16, 466:20, 466:25, 482:1, 486:16, 488:13, 488:14, 526:17, 534:4, 538:19, 542:9, 545:16, 546:24, 546:25, 576:10, 576:12, 578:25, 579:24, 579:25, 587:14, 590:6, 592:16, 619:11, 623:1, 625:15, 625:17, 625:18, 639:1, 642:21, 643:1, 646:6, 651:22, 652:11, 662:6, 662:7, 662:19, 665:3, 665:21, 671:16, 672:14, 673:2, 681:2, 690:16, 690:21, 691:15, 698:3, 698:7, 699:3, 700:6, 700:18
needed [6] - 513:9, 584:8, 591:20, 650:7, 690:9, 694:5
needs [20] - 457:3, 469:18, 477:7, 528:25, 535:11, 546:24, 566:1, 607:8, 640:19, 641:5, 641:12, 652:12, 664:6, 677:10, 691:8, 693:11, 693:24, 694:1, 696:15
night [4] - 458:12, 459:8, 460:19, 461:20
nine [4] - 459:21, 636:24, 638:19, 696:21
nine-hour [1] - 459:21
Ninth [4] - 675:1, 675:5, 678:3, 692:15
nobody [4] - 448:8, 448:12, 482:17, 502:23
never [57] - 448:24,

454:16, 454:19, 461:5, 467:14, 470:4, 470:7, 472:2, 475:8, 475:12, 475:14, 475:17, 475:18, 481:5, 490:5, 491:21, 497:25, 524:19, 529:8, 534:19, 535:4, 538:12, 541:4, 548:17, 550:16, 550:21, 550:25, 551:7, 552:2, 552:7, 556:4, 556:20, 556:24, 557:7, 557:11, 557:23, 558:10, 588:15, 646:8, 646:13, 646:22, 647:9, 647:16, 650:20, 650:24, 651:6, 651:9, 651:10, 652:22, 658:22, 658:25, 659:11, 659:18, 681:18, 687:12, 698:19
new [11] - 480:20, 481:2, 518:13, 578:4, 578:5, 578:12, 578:24, 579:7, 588:2, 676:6, 699:24
newest [1] - 658:16
newly [1] - 518:14
news [1] - 619:18
newsletter [4] - 551:14, 551:21, 551:25, 552:1
next [23] - 450:9, 501:8, 501:19, 537:18, 538:25, 565:19, 577:22, 578:11, 581:1, 583:3, 583:24, 596:9, 596:19, 623:3, 623:14, 670:11, 671:15, 672:19, 672:22, 672:25, 699:15, 699:19, 699:20
night [4] - 458:12, 459:8, 460:19, 461:20
nine [4] - 459:21, 636:24, 638:19, 696:21
nine-hour [1] - 459:21
Ninth [4] - 675:1, 675:5, 678:3, 692:15
nobody [4] - 448:8, 448:12, 482:17, 502:23

non [2] - 600:8, 600:14
non-gender-dysphoria [1] - 600:8
non-gender-dysphoric [1] - 600:14
nonconforming [3] - 580:16, 580:10, 581:23
Nonconforming [2] - 476:11, 478:8
none [2] - 586:13, 678:17
nonexpert [1] - 549:3
nonincarcerated [2] - 585:17, 622:22
noninstitutional [2] - 581:13, 581:25
nonresponsive [1] - 558:5
nonretained [4] - 444:19, 445:3, 548:22, 549:12
normal [1] - 469:10
Norsworthy [5] - 679:23, 680:1, 680:12, 680:15, 680:25
North [3] - 535:14, 588:4, 588:7
Northern [1] - 680:4
notable [1] - 616:1
note [37] - 450:2, 450:5, 457:23, 458:14, 459:13, 459:14, 459:15, 460:15, 461:25, 462:11, 462:12, 463:4, 463:5, 463:19, 463:23, 463:25, 464:2, 464:7, 464:10, 464:14, 470:13, 471:14, 495:19, 495:21, 495:24, 496:5, 496:7, 497:1, 497:14, 539:24, 541:3, 541:12, 620:3, 657:24, 693:25
noted [7] - 460:18, 467:6, 615:22, 657:15, 659:22, 660:4, 690:4
notes [8] - 461:13, 463:16, 468:21, 469:22, 478:4, 497:22, 634:7, 657:7
nothing [8] - 467:12, 501:2, 572:6, 619:21, 676:6, 681:18, 694:8

notice [2] - 612:22, 657:17
noticed [1] - 657:15
notified [1] - 514:20
November [2] - 650:4
November-ish [1] - 650:4
nowhere [2] - 462:12, 463:4
nuance [1] - 490:22
number [22] - 456:7, 466:17, 466:19, 484:18, 487:24, 503:10, 508:23, 508:25, 517:10, 528:4, 531:15, 537:5, 547:16, 551:15, 554:17, 593:22, 598:9, 599:7, 683:6, 688:3, 699:21, 699:22
numbers [8] - 500:16, 500:17, 508:15, 508:21, 527:25, 528:11, 533:13, 610:3
numerous [2] - 490:23, 687:8
nurse [2] - 507:17, 555:21

**O**

oath [4] - 443:18, 449:9, 576:17, 675:21
Object [1] - 498:9
object [24] - 458:20, 461:1, 465:13, 466:24, 503:18, 514:21, 519:14, 519:25, 544:20, 549:9, 553:12, 575:7, 576:4, 579:18, 583:9, 595:15, 607:22, 608:9, 612:16, 613:1, 615:13, 633:1, 638:23, 656:8
objected [1] - 544:21
objectify [1] - 673:14
objecting [4] - 465:21, 467:10, 501:16, 613:6
objection [80] - 450:21, 461:15, 465:18, 467:13, 468:23, 472:14, 473:16, 476:18, 476:19, 478:18, 479:19, 479:24, 481:13, 482:16,

486:1, 493:23,
494:22, 496:14,
503:7, 503:8, 503:21,
515:16, 520:10,
520:12, 524:17,
525:6, 525:14,
547:13, 553:8,
553:15, 565:8, 565:9,
565:10, 570:17,
574:18, 576:21,
579:17, 580:2,
582:19, 582:21,
582:25, 583:14,
590:1, 600:22,
600:24, 606:4,
608:11, 611:16,
611:17, 611:18,
612:11, 612:20,
612:25, 613:4, 613:9,
613:17, 613:18,
613:19, 613:20,
615:10, 615:11,
616:6, 619:15, 620:4,
624:22, 632:17,
633:3, 633:5, 635:18,
635:22, 636:3,
637:25, 659:23,
660:4, 662:10,
662:14, 664:20,
665:19, 666:24, 667:4
**objections** [4] -
544:24, 547:8, 547:9,
676:25
**objective** [3] -
673:13, 690:3, 700:24
**observation** [1] -
593:25
**observations** [3] -
468:21, 469:22, 690:3
**observe** [1] - 665:6
**obsessional** [1] -
603:9
**obtaining** [1] -
469:16
**obviously** [10] -
485:4, 494:5, 511:17,
525:8, 541:6, 560:4,
616:12, 622:13,
663:18, 671:21
**occasion** [1] -
663:21
**occasions** [1] -
450:16
**occupational** [1] -
675:15
**occur** [3] - 446:21,
586:25, 630:24
**occurring** [1] -
519:10
**October** [3] - 443:2,

615:23, 650:4
**October-November**
[1] - 650:4
**odds** [1] - 456:11
**offender** [1] - 634:7
**offense** [1] - 537:8
**offer** [13] - 515:15,
525:12, 530:5,
547:22, 559:25,
576:9, 576:10,
579:14, 579:19,
589:21, 636:7,
659:20, 660:2
**offered** [16] - 547:19,
548:6, 548:17,
563:20, 574:20,
579:18, 590:1, 614:8,
615:9, 616:9, 616:11,
616:14, 616:15,
622:24, 635:21, 668:9
**offering** [8] - 514:25,
519:25, 545:2,
547:24, 613:10,
614:16, 614:18, 652:6
**office** [2] - 627:12,
631:20
**officer** [2] - 537:22
**official** [2] - 688:13,
688:18
**officially** [2] -
653:11, 654:4
**often** [11] - 520:24,
526:10, 526:11,
534:17, 534:21,
538:11, 548:4, 566:5,
645:23, 664:16,
669:24
**oftentimes** [4] -
485:14, 488:8,
488:22, 488:25
**older** [2] - 522:15,
641:7
**once** [10] - 491:21,
513:6, 514:7, 540:12,
557:4, 559:17,
560:17, 609:10,
651:8, 700:19
**one** [114] - 448:6,
449:11, 450:8,
452:19, 456:22,
456:25, 457:1, 458:4,
462:23, 463:16,
470:21, 474:15,
480:10, 481:12,
482:20, 483:14,
483:21, 485:2, 485:6,
486:9, 487:22,
489:15, 493:18,
496:4, 499:7, 499:23,
501:14, 504:15,

506:15, 509:19,
510:3, 513:11,
514:11, 515:22,
528:20, 529:5, 534:1,
534:9, 536:2, 539:14,
539:15, 541:1,
541:23, 542:1,
543:22, 551:17,
552:15, 552:17,
553:9, 553:11,
553:17, 554:20,
555:1, 555:4, 555:14,
557:20, 562:8,
562:19, 563:21,
564:17, 565:24,
568:10, 572:8, 576:9,
578:23, 592:15,
592:17, 594:17,
598:19, 615:7, 616:1,
621:14, 622:6, 623:1,
625:1, 635:12, 636:5,
640:12, 641:11,
651:2, 656:25, 657:7,
657:15, 661:21,
661:22, 662:6, 663:3,
663:21, 667:14,
671:6, 672:13,
672:20, 674:7, 677:3,
678:12, 679:14,
680:6, 681:10,
681:15, 682:13,
684:4, 687:11,
692:11, 695:6,
695:25, 697:21,
698:1, 698:8, 698:9,
699:22
**one-day** [1] - 555:1
**one-year** [1] - 504:15
**ones** [2] - 487:25,
544:8
**ongoing** [3] - 513:18,
618:12, 619:8
**onsite** [1] - 634:17
**op** [1] - 588:13
**open** [1] - 532:24
**opening** [2] - 687:19,
693:18
**operating** [1] - 454:2
**operations** [1] -
627:11
**opine** [8] - 517:16,
517:18, 519:18,
591:20, 617:8,
654:23, 665:16,
683:12
**opined** [6] - 610:8,
610:13, 610:18,
614:8, 694:12, 694:13
**opining** [2] - 600:7,
611:21

**opinion** [81] -
464:25, 465:9,
499:16, 515:11,
517:21, 520:1,
520:15, 522:6,
523:23, 524:18,
525:7, 525:9, 525:12,
526:23, 528:14,
528:16, 529:12,
534:13, 534:15,
535:2, 535:9, 538:22,
540:2, 542:21,
543:12, 543:14,
544:25, 545:2,
547:12, 554:23,
560:1, 582:13,
582:17, 582:18,
583:2, 584:15,
584:16, 585:8,
585:16, 587:25,
588:9, 588:14,
589:15, 589:19,
589:21, 589:24,
590:2, 590:11,
593:14, 607:3,
609:20, 614:16,
614:18, 615:9,
616:14, 616:15,
635:6, 636:25,
640:13, 651:19,
651:21, 651:23,
652:1, 652:5, 652:7,
652:8, 652:15,
653:25, 654:4,
654:19, 658:4, 658:7,
660:1, 663:8, 663:21,
663:24, 668:9,
680:24, 693:19, 697:3
**opinions** [28] -
514:17, 514:22,
515:2, 515:3, 515:14,
516:25, 517:9,
527:24, 541:22,
544:14, 545:19,
548:5, 559:18,
559:21, 614:7, 615:4,
616:11, 618:9, 629:8,
631:18, 631:23,
634:12, 634:25,
642:13, 642:18,
659:15, 659:21, 660:2
**opioid** [1] - 519:5
**opoid** [1] - 539:4
**opportunities** [1] -
534:22
**opportunity** [18] -
445:7, 445:20,
446:22, 447:6,
447:12, 461:6,
466:15, 511:18,

530:5, 534:25,
627:15, 628:18,
630:20, 631:2,
655:16, 673:20,
674:1, 686:15
**opposing** [3] - 448:1,
448:23, 544:21
**opposition** [1] -
549:5
**optimal** [1] - 456:3
**option** [10] - 484:5,
489:22, 509:22,
578:13, 578:16,
579:8, 663:16,
673:16, 698:9
**options** [16] -
453:12, 453:14,
509:3, 519:19,
519:23, 520:16,
520:22, 520:23,
525:1, 525:5, 582:2,
582:11, 627:25,
692:7, 692:11, 698:8
**oral** [2] - 670:23,
673:13
**orally** [2] - 672:18,
673:24
**oranges** [1] - 622:21
**order** [15] - 569:17,
591:21, 599:15,
604:15, 607:6,
607:17, 607:20,
615:3, 648:4, 655:19,
664:10, 666:1,
671:20, 691:23, 693:5
**ordered** [5] - 522:20,
537:8, 680:8, 680:11,
687:21
**ordering** [1] - 523:8
**orders** [3] - 682:18,
692:18, 699:24
**organization** [2] -
552:7, 572:7
**Organization** [1] -
684:16
**organized** [2] -
473:2, 617:19
**organizing** [1] -
473:8
**original** [8] - 444:7,
450:5, 473:14, 500:4,
575:3, 600:6, 655:11,
655:12
**Osborne** [5] - 480:4,
480:12, 540:16,
541:16, 620:15
**ostracized** [1] -
663:20
**otherwise** [4] -
446:13, 613:14,

683:25, 700:2
**ought** [1] - 673:18
**ourselves** [2] -
488:8, 615:16
**outcome** [6] -
499:25, 595:3, 595:6,
595:14, 596:6, 605:4
**outcomes** [5] -
456:16, 532:14,
578:4, 642:7, 687:24
**outlined** [1] - 530:25
**outlining** [1] - 674:15
**outright** [2] - 590:19,
690:7
**outset** [2] - 524:14,
687:5
**outside** [26] - 449:4,
486:12, 523:2,
529:22, 530:6,
540:12, 541:15,
552:9, 561:3, 582:7,
588:16, 589:16,
589:25, 590:6,
590:12, 590:16,
606:20, 645:1, 646:7,
646:12, 646:23,
647:8, 664:20,
665:13, 678:1, 691:25
**overdose** [1] -
543:22
**overrule** [10] -
467:13, 520:10,
520:12, 525:6,
547:13, 575:6,
600:24, 608:11,
659:22, 665:19
**overruled** [14] -
450:23, 465:25,
472:18, 478:21,
479:24, 498:11,
525:14, 583:14,
607:24, 619:16,
633:5, 660:4, 662:17,
667:4
**oversaw** [5] -
507:14, 520:8,
561:10, 618:2, 627:6
**oversight** [1] -
507:20
**oversimplification**
[1] - 541:14
**overturn** [1] - 577:23
**overturning** [1] -
577:4
**own** [14] - 448:4,
448:25, 471:4,
503:24, 504:3, 533:4,
608:1, 641:18, 655:1,
665:20, 685:16,
685:23, 694:6, 698:12

## P

**p.m** [6] - 576:15,
623:13, 671:12, 701:1
**packed** [1] - 569:5
**page** [51] - 457:18,
460:4, 462:2, 463:24,
464:6, 464:15, 469:8,
469:14, 470:9, 473:4,
474:2, 474:17,
476:22, 477:18,
478:3, 478:4, 478:23,
479:7, 479:8, 480:18,
484:1, 484:2, 484:20,
535:15, 536:23,
537:6, 565:19,
565:20, 568:5, 577:8,
577:13, 577:20,
580:6, 580:7, 581:7,
583:24, 586:15,
591:1, 592:20, 593:7,
594:8, 610:6, 612:10,
630:2, 635:16, 639:9,
641:21, 655:23,
656:2, 656:25
**pages** [5] - 567:10,
567:12, 567:15,
633:24, 688:6
**paid** [2] - 557:10,
557:22
**pain** [5] - 485:21,
485:23, 489:4,
676:23, 677:15
**painful** [1] - 488:7
**paper** [1] - 592:13
**paragraph** [9] -
449:23, 457:24,
577:21, 581:21,
584:4, 584:7, 586:23,
592:19, 593:25
**paragraphs** [1] -
610:7
**parole** [7] - 466:15,
466:17, 467:7,
467:19, 467:23,
537:22, 634:9
**paroled** [1] - 680:12
**part** [5] - 462:1,
463:19, 467:6,
467:19, 473:20,
478:4, 488:24, 513:5,
514:4, 516:6, 517:24,
518:11, 522:1,
528:25, 530:20,
535:18, 537:21,
544:11, 553:9, 554:2,
557:1, 560:13,
560:19, 560:20,
560:25, 561:12,
561:22, 562:17,

563:8, 574:5, 574:8,
578:6, 581:3, 583:25,
585:2, 587:23,
588:20, 593:6, 594:4,
594:6, 596:9, 597:19,
599:17, 618:1, 629:4,
629:14, 630:15,
631:7, 631:9, 633:13,
644:23, 645:19,
656:9, 659:7, 678:2,
678:20, 691:7
**participate** [3] -
495:1, 534:22, 669:7
**participated** [1] -
554:17
**participation** [3] -
554:12, 560:9, 644:18
**particular** [4] -
507:18, 531:20,
585:25
**particularly** [4] -
449:17, 487:12,
662:22, 692:21
**parties** [9] - 444:17,
444:18, 446:25,
447:5, 529:24, 548:7,
548:12
**parties'** [1] - 473:14
**parts** [1] - 594:15
**party** [4] - 673:8,
673:9, 692:18, 692:23
**past** [9] - 457:25,
487:9, 516:6, 537:7,
537:16, 543:17,
608:18, 615:23,
634:23
**path** [1] - 643:12
**pathways** [2] -
481:15, 491:7
**patient** [55] - 453:13,
454:23, 456:11,
469:18, 472:3,
475:22, 489:7,
497:11, 497:14,
497:17, 509:7, 510:2,
510:3, 512:20,
520:16, 523:7,
524:19, 524:20,
536:8, 555:9, 555:10,
555:13, 555:15,
555:24, 555:25,
556:4, 556:21, 557:7,
557:11, 557:23,
558:11, 559:13,
588:16, 588:19,
589:1, 589:2, 589:9,
607:17, 607:25,
608:3, 608:6, 618:16,
618:23, 646:2,
647:16, 651:2, 651:7,

651:10, 659:19,
660:25, 664:9,
665:25, 698:20,
698:25
**patient-provider** [1]
- 698:20
**patients** [56] - 477:7,
477:15, 479:12,
479:16, 488:25,
506:24, 507:7,
507:10, 507:21,
508:3, 508:5, 509:25,
510:11, 510:16,
513:8, 513:14,
519:21, 519:25,
520:7, 522:18, 545:8,
545:14, 554:6,
555:13, 556:8,
567:20, 567:22,
568:24, 570:13,
570:16, 572:4,
585:22, 585:23,
585:25, 586:8,
586:10, 586:11,
589:5, 605:23, 606:2,
618:10, 619:9,
620:22, 627:23,
628:19, 646:9,
646:14, 647:10,
647:13, 647:20,
649:7, 650:24, 656:6,
656:23, 665:8, 679:9
**patients'** [1] - 566:9
**pattern** [1] - 637:3
**patterns** [1] - 666:5
**pay** [1] - 570:4
**peer** [11] - 481:2,
507:18, 551:7,
551:11, 551:22,
552:2, 609:24,
658:11, 658:23,
658:25, 663:17
**peer-review** [5] -
481:2, 551:7, 551:11,
552:2, 609:24
**peer-reviewed** [3] -
551:22, 658:23,
658:25
**pencil** [1] - 464:18
**Pennsylvania** [1] -
504:24
**people** [60] - 455:10,
480:3, 494:20, 511:3,
511:14, 511:18,
512:6, 513:18,
524:11, 526:11,
528:4, 528:7, 528:10,
529:10, 530:13,
532:8, 534:19,
536:18, 539:7,

539:11, 540:22,
540:24, 540:25,
545:13, 545:18,
580:5, 580:17,
581:10, 581:23,
583:5, 584:1, 585:1,
586:4, 586:5, 587:17,
588:5, 588:15, 589:7,
593:22, 599:2, 599:3,
601:16, 601:23,
606:9, 606:13,
606:18, 619:25,
622:15, 643:9,
644:11, 669:24,
676:12, 676:14,
683:17, 684:3, 684:9,
684:10, 684:20,
686:2, 695:3
**People** [2] - 478:8,
580:21
**per** [5] - 505:22,
523:4, 559:6
**perceives** [1] -
682:11
**percent** [9] - 526:20,
527:22, 528:2, 528:6,
528:9, 596:24, 597:2,
649:8, 662:6
**perception** [1] -
619:20
**perfect** [2] - 447:4,
447:5
**perfectly** [1] - 576:4
**perform** [3] - 607:7,
661:7, 661:10
**performed** [3] -
499:18, 680:7, 692:1
**perhaps** [4] - 485:24,
488:1, 671:15, 672:24
**period** [2] - 456:4,
512:10, 522:14,
536:22, 545:9,
588:17, 622:7,
641:19, 645:9, 650:9
**periodically** [1] -
689:17
**permanent** [3] -
535:2, 687:7, 689:7
**permanently** [1] -
543:3
**permitted** [1] -
660:23
**persistent** [3] -
534:9, 639:19, 681:16
**person** [25] - 457:1,
466:11, 475:14,
518:8, 518:12, 527:3,
529:21, 534:1,
536:19, 554:10,
554:24, 555:6, 555:8,

558:10, 561:10,
582:13, 582:15,
588:13, 589:15,
589:25, 590:12,
606:18, 641:7, 646:5,
699:5
**person's** [5] - 510:5,
513:3, 555:18,
628:13, 634:14
**personality** [36] -
470:5, 495:14,
495:16, 498:1,
538:10, 635:12,
636:4, 636:17,
636:24, 637:2,
637:12, 638:6,
640:11, 640:13,
641:10, 642:6, 642:8,
652:23, 653:1,
653:13, 654:3,
654:10, 664:10,
664:15, 664:17,
665:9, 666:1, 666:5,
666:16, 666:20,
667:7, 667:11,
667:15, 687:20, 696:5
**personally** [4] -
557:11, 557:23,
646:8, 651:2
**persons** [6] - 585:17,
594:23, 595:5,
595:13, 596:4, 676:8
**Perspective** [1] -
474:4
**pertaining** [2] -
592:8, 593:13
**pervasiveness** [1] -
485:12
**Ph.D** [1] - 623:18
**philosophy** [1] -
626:1
**phone** [1] - 451:14
**photo** [1] - 657:25
**photographs** [1] -
537:21
**photos** [2] - 657:11,
657:15
**phrase** [1] - 602:13
**phrased** [1] - 496:18
**physical** [2] -
529:23, 603:2
**physically** [2] -
538:19, 546:17
**physician** [1] -
497:16
**physician's** [1] -
497:13
**physicians** [6] -
452:12, 452:13,
452:15, 452:19,

626:18, 699:10
**picked** [3] - 691:16,
692:13, 695:8
**picking** [1] - 679:5
**picture** [2] - 528:12,
686:14
**piece** [2] - 594:20
**pieces** [2] - 518:23,
582:9
**pierced** [2] - 657:16,
657:22
**piercing** [1] - 663:24
**pill** [2] - 668:16,
668:18
**place** [4] - 456:3,
561:23, 669:20,
693:10
**placebo** [1] - 622:18
**placed** [1] - 498:5
**plain** [1] - 692:23
**plaintiff** [6] - 444:25,
486:6, 486:9, 492:21,
501:1, 681:1
**Plaintiff's** [18] -
476:9, 476:17,
476:21, 563:25,
565:7, 565:12,
565:13, 567:5,
574:10, 576:20,
576:25, 577:10,
612:3, 625:6, 625:8,
635:15, 635:24,
637:19
**plaintiff's** [23] -
444:24, 450:18,
451:4, 490:11,
491:24, 516:4,
516:20, 526:18,
527:21, 549:15,
550:9, 577:3, 599:13,
592:21, 617:13,
620:2, 620:10,
636:11, 686:18,
692:10, 697:14,
697:20, 697:21
**plaintiffs** [13] -
443:19, 445:12,
445:18, 446:7, 446:9,
446:18, 447:10,
450:19, 451:3,
673:16, 691:17,
692:25, 698:15
**plaintiffs'** [1] - 566:5
**plan** [8] - 449:20,
471:11, 471:15,
471:19, 519:13,
538:16, 609:16, 619:2
**planning** [1] - 447:24
**plans** [5] - 513:9,
522:24, 523:21,

006:9, 618:14
**play** [1] - 640:2
**played** [1] - 525:10
**plea** [1] - 672:23
**plead** [1] - 672:23
**plus** [3] - 554:4,
554:9, 559:6
**Pocatello** [1] -
672:22
**point** [62] - 447:3,
448:8, 448:12,
449:16, 458:21,
466:5, 466:16,
474:24, 482:17,
486:3, 493:18,
493:21, 494:18,
494:25, 507:9,
507:25, 508:10,
513:16, 515:1,
515:12, 515:15,
518:4, 518:5, 518:17,
518:25, 520:12,
532:6, 538:15,
539:14, 542:11,
543:18, 546:24,
548:20, 551:6, 556:7,
562:15, 588:2, 588:3,
593:12, 606:14,
607:8, 608:11,
619:24, 620:23,
642:22, 643:17,
649:18, 655:22,
660:2, 671:16,
674:20, 681:25,
682:1, 684:19,
684:23, 689:4,
691:12, 692:3, 694:9,
695:14, 700:6
**pointed** [4] - 499:8,
525:9, 559:22, 625:4
**pointing** [1] - 560:2
**points** [4] - 493:17,
494:16, 494:17, 495:2
**policies** [9] - 453:6,
453:20, 453:23,
476:6, 525:21,
614:13, 615:4,
634:24, 680:15
**policy** [17] - 481:8,
485:22, 486:2,
493:14, 508:9,
512:21, 512:22,
512:23, 658:13,
658:15, 658:16,
658:18, 660:14,
660:17, 672:8, 681:6,
692:6
**polish** [3] - 657:9,
657:19, 663:21
**polygraph** [1] -

537:10
**poor** [5] - 499:14,
499:25, 531:25,
687:24, 694:21
**poor-quality** [1] -
531:25
**population** [38] -
451:21, 456:24,
457:2, 490:24,
509:11, 511:16,
512:6, 532:9, 532:15,
532:18, 533:23,
541:2, 541:3, 544:18,
545:10, 545:13,
573:9, 573:21,
573:23, 574:3, 574:6,
574:9, 575:15,
590:17, 596:15,
596:16, 596:18,
597:2, 597:6, 597:9,
597:21, 598:7,
598:16, 598:24,
620:20, 622:14, 684:9
**population-based**
[1] - 544:18
**portion** [8] - 448:19,
470:13, 471:16,
474:3, 595:8, 636:9,
644:25, 697:21
**portions** [4] -
446:12, 446:13,
447:10, 633:7
**Portneuf** [3] - 516:7,
535:24, 632:3
**Portuguese** [1] -
644:14
**pose** [2] - 455:16,
615:5
**positing** [1] - 599:14
**position** [7] - 476:10,
476:23, 492:2, 492:4,
548:21, 688:17,
688:18
**positive** [1] - 587:18
**possibility** [1] -
663:2
**possible** [10] - 477:1,
490:15, 584:25,
585:14, 585:19,
585:20, 586:6, 593:8,
600:19, 608:6
**possibly** [1] - 444:23
**post** [1] - 588:13
**post-op** [1] - 588:13
**posthearing** [1] -
670:21
**postsurgery** [1] -
545:14
**postsurgical** [1] -
555:14

**posttransition** [1] -
602:13
**posttrial** [1] - 700:4
**potential** [3] -
549:25, 599:16, 698:8
**potentially** [3] -
474:25, 640:15, 643:4
**PowerPoint** [4] -
472:25, 473:1,
473:24, 516:12
**PowerPoints** [1] -
686:20
**practical** [1] - 512:12
**practice** [6] - 453:24,
533:10, 533:15,
533:16, 592:25, 661:4
**practices** [1] - 453:6
**practitioner** [1] -
555:21
**practitioners** [1] -
507:17
**pre** [1] - 518:6
**pre-prison** [1] -
518:6
**precedent** [1] -
698:23
**preceding** [1] -
575:17
**preclude** [7] -
481:18, 481:19,
491:17, 560:4, 673:8,
673:24, 674:3
**precluded** [2] -
481:23, 545:1
**precursor** [1] - 648:4
**predecessor** [1] -
645:24
**predetermined** [1] -
680:25
**predict** [1] - 499:22
**preempt** [1] - 455:14
**prefer** [1] - 673:9
**preferred** [5] - 540:7,
584:14, 584:18,
587:17, 602:16
**preincarceration** [6]
- 631:3, 631:25,
633:2, 633:14, 696:1,
696:3
**prejudice** [2] -
684:11, 686:23
**prejudiced** [2] -
684:18, 696:24
**preliminary** [8] -
443:5, 560:15,
645:20, 671:19,
672:2, 674:25, 675:5,
696:12
**premature** [1] -
612:16

preoperative [1] - 586:18

preparation [1] - 516:1

prepare [1] - 699:22

prepared [2] - 673:5, 697:24

preparing [1] - 516:1

prepolygraph [1] - 537:11

prescribed [3] - 461:20, 599:23, 676:21

prescribing [1] - 451:22

prescription [1] - 461:23

present [12] - 474:3, 494:20, 526:2, 537:24, 540:22, 629:20, 641:23, 643:14, 646:12, 657:3, 673:7, 683:4

presentation [16] - 451:15, 452:23, 473:5, 474:6, 475:5, 494:14, 495:8, 562:8, 564:2, 564:18, 565:2, 565:16, 566:14, 641:3, 681:16, 682:25

presentations [2] - 452:6, 563:4

presented [19] - 463:11, 465:12, 473:9, 473:25, 494:24, 526:1, 526:5, 552:21, 560:15, 565:16, 578:5, 602:19, 629:23, 639:23, 640:2, 640:4, 643:10, 643:17, 679:6

presentence [6] - 468:17, 516:10, 632:7, 632:17, 632:21, 633:16

presenter [1] - 655:8

presenters [1] - 493:10

presenting [9] - 528:22, 535:21, 536:20, 536:22, 537:3, 540:3, 568:19, 681:11, 681:12

presently [1] - 603:5

preserve [1] - 674:10

presided [2] - 612:21, 617:23

pressure [2] - 699:18, 700:9

presumably [1] -

525:9

presumptive [1] - 700:1

pretty [18] - 466:24, 487:25, 490:14, 498:25, 506:6, 508:9, 513:25, 522:19, 526:14, 539:18, 556:10, 567:23, 576:6, 617:20, 673:3, 674:12, 677:16, 699:20

prevented [2] - 610:10, 614:10

previous [2] - 469:21, 629:17

PREVIOUSLY [1] - 449:24

previously [7] - 443:15, 517:10, 522:11, 550:16, 571:20, 579:19, 686:24

primarily [9] - 485:3, 486:10, 487:3, 507:13, 511:25, 513:22, 528:4, 589:12, 658:20

primary [5] - 514:2, 608:24, 647:6, 647:16, 676:25

principles [2] - 477:5, 477:10

prison [67] - 456:3, 456:6, 476:7, 487:12, 489:18, 496:17, 496:25, 505:7, 509:2, 509:23, 512:11, 518:6, 518:21, 525:11, 530:2, 530:4, 540:9, 541:4, 541:24, 543:1, 557:2, 559:25, 582:13, 582:16, 583:10, 583:18, 583:22, 584:12, 584:16, 585:8, 588:16, 589:16, 589:25, 590:6, 590:12, 590:16, 606:20, 641:14, 647:25, 648:10, 648:19, 649:13, 650:21, 658:6, 661:16, 661:21, 661:22, 668:10, 676:5, 676:12, 677:10, 677:22, 677:25, 678:2, 681:12, 681:16, 681:24, 682:4,

682:16, 684:22, 684:23, 685:8, 685:15

prisoner [1] - 645:20

prisoners [2] - 649:3, 649:13

prisons [4] - 455:11, 580:5, 580:24, 661:23

pro [2] - 685:17, 695:7

probation [2] - 535:18, 537:22

problem [8] - 452:16, 452:17, 456:22, 465:12, 499:1, 499:24, 672:1, 679:1

problems [2] - 528:3, 536:14, 600:8, 600:14, 668:17, 691:5

procedure [6] - 454:2, 456:14, 456:15, 499:18, 508:10, 607:18

procedures [10] - 453:6, 453:19, 453:21, 453:23, 525:21, 610:10, 614:10, 614:13, 615:4, 634:24

proceed [17] - 451:1, 459:5, 461:14, 461:17, 515:16, 520:13, 545:6, 549:18, 560:6, 564:16, 583:15, 601:10, 616:18, 638:13, 639:1, 660:7, 670:25

proceeding [3] - 443:18, 612:23, 614:5

Proceedings [1] - 701:1

process [15] - 507:19, 512:24, 520:25, 521:23, 526:11, 542:12, 557:14, 558:1, 618:23, 619:7, 628:10, 629:5, 629:9, 674:14, 690:20

processed [1] - 663:2

product [1] - 677:6

productive [2] - 529:8, 542:24

profession [2] - 660:23, 664:9

Professional [1] - 478:9

professional [13] - 455:11, 476:1,

525:17, 529:7, 529:9, 538:12, 544:12, 565:22, 626:11, 626:24, 663:8, 665:11, 672:10

professionals [18] - 477:6, 477:23, 478:15, 488:20, 527:12, 550:8, 568:9, 590:22, 626:19, 630:6, 634:15, 664:14, 665:10, 665:12, 665:17, 693:20, 697:3, 697:9

proffer [1] - 614:1

program [10] - 512:8, 512:9, 513:25, 552:16, 555:11, 556:1, 565:2, 565:5, 619:23, 627:5

programming [1] - 661:24

programs [3] - 505:19, 512:1, 539:15

progress [8] - 462:11, 463:16, 463:23, 463:25, 464:7, 497:13, 497:22, 534:21

progression [1] - 684:23

prohibited [2] - 453:10, 590:20

prohibiting [1] - 692:6

prohibition [1] - 692:11

projector [2] - 482:13, 482:18

prolonged [1] - 456:4

promoted [2] - 507:1, 562:15

prong [2] - 678:10, 678:18

pronounce [1] - 644:13

pronouns [1] - 535:22

pronunciation [1] - 672:6

proof [1] - 696:13

proper [5] - 458:21, 461:11, 461:14, 461:16, 546:19

property [1] - 534:23

proposal [1] - 444:11

proposed [2] - 480:12, 480:19, 480:23, 481:2, 700:4,

700:20

prove [3] - 616:9, 675:2, 693:16

provide [40] - 446:17, 446:22, 455:10, 489:16, 514:7, 523:6, 529:18, 529:19, 545:16, 551:5, 554:23, 555:2, 562:19, 569:17, 589:19, 589:23, 611:23, 621:22, 622:3, 627:15, 628:19, 637:14, 646:20, 647:4, 648:11, 661:4, 673:20, 674:22, 675:9, 676:8, 678:23, 680:12, 680:16, 686:14, 687:13, 688:10, 688:21, 688:22, 697:9, 698:8

provided [37] - 444:24, 455:5, 461:10, 475:23, 479:2, 506:24, 516:13, 521:18, 523:24, 542:15, 547:1, 551:1, 552:14, 563:11, 563:15, 583:5, 627:18, 631:20, 633:24, 636:10, 643:4, 646:8, 646:13, 646:24, 647:2, 647:9, 648:18, 648:20, 650:2, 657:11, 676:1, 680:17, 680:19, 682:6, 689:21, 697:8, 699:9

provider [11] - 455:12, 460:16, 477:14, 480:1, 507:25, 523:7, 531:4, 538:15, 555:19, 612:5, 698:20

providers [23] - 453:25, 473:10, 474:23, 493:1, 507:15, 517:19, 517:20, 533:4, 539:24, 542:4, 542:7, 542:13, 542:16, 542:23, 546:25, 661:9, 664:7, 664:18, 687:11, 689:21, 691:9, 693:11, 699:10

provides [1] - 676:3

providing [14] - 475:1, 476:7, 489:21,

507:14, 524:2,
590:11, 604:25,
605:10, 629:8,
634:22, 637:20,
638:2, 673:23, 679:1
**PSI** [2] - 632:20,
633:20
**psychiatric** [7] -
453:5, 491:20,
506:24, 508:4,
512:17, 517:20, 521:2
**Psychiatric** [5] -
474:4, 591:24,
592:22, 594:9, 629:23
**psychiatrically** [1] -
546:17
**psychiatrist** [24] -
485:5, 504:21,
505:24, 506:23,
507:5, 508:8, 508:11,
510:2, 510:4, 510:14,
510:18, 512:16,
513:4, 525:4, 544:12,
559:24, 608:20,
609:9, 617:3, 617:6,
617:9, 660:1, 660:9,
664:21
**psychiatrists** [9] -
498:24, 507:16,
626:20, 664:15,
664:19, 665:2, 665:6,
665:8, 665:14
**Psychiatry** [4] -
526:6, 551:24,
565:17, 629:24
**psychiatry** [9] -
504:14, 504:15,
504:17, 504:19,
507:2, 510:24, 512:3,
512:4, 570:1
**psychological** [1] -
633:8
**psychologist** [3] -
485:4, 660:17, 664:21
**psychologists** [7] -
498:23, 626:20,
665:2, 665:6, 665:8,
665:14
**psychosexual** [3] -
516:11, 537:5, 633:18
**psychosis** [4] -
603:9, 603:13,
603:23, 691:21
**psychosocial** [1] -
566:1
**psychotherapy** [4] -
453:18, 520:24,
642:6, 647:11
**PTSD** [3] - 470:7,
495:13, 666:10

**public** [1] - 481:25
**publication** [2] -
480:23, 551:22
**publications** [1] -
624:18
**publish** [3] - 483:21,
655:12, 655:14
**published** [7] -
481:5, 503:16, 551:7,
551:11, 572:7,
658:22, 658:25
**publishing** [1] -
469:10
**pull** [9] - 449:22,
452:14, 457:17,
470:9, 502:14,
502:16, 514:14,
594:8, 688:2
**purports** [1] - 612:25
**purpose** [5] - 493:16,
497:13, 502:22,
558:2, 559:15
**purposes** [4] -
556:16, 576:11,
616:9, 677:25
**pursuant** [2] -
548:23, 548:25
**put** [23] - 444:15,
446:7, 447:3, 450:9,
482:19, 483:18,
484:7, 493:20, 494:5,
494:6, 536:7, 558:7,
559:17, 572:7,
579:13, 594:6,
626:14, 684:3,
686:20, 687:2,
687:19, 693:17,
700:17
**putting** [2] - 461:4,
699:18

## Q

**qualifications** [2] -
502:13, 520:5
**qualified** [8] -
524:23, 525:11,
527:19, 550:16,
609:1, 618:8, 660:15,
672:10
**qualifier** [1] - 542:19
**qualifies** [1] - 585:2
**qualify** [6] - 495:10,
496:4, 620:12,
681:25, 695:22
**quality** [15] - 528:3,
531:7, 531:15,
531:16, 531:25,
532:10, 532:12,
533:11, 533:12,

533:16, 592:8,
593:13, 593:14,
593:23, 610:3
**questioning** [1] -
559:17
**questions** [34] -
450:24, 457:5,
461:14, 466:25,
483:17, 484:12,
489:13, 497:5, 497:6,
498:18, 500:25,
507:18, 526:13,
532:24, 540:3,
540:23, 546:14,
556:13, 556:16,
564:15, 596:19,
616:19, 616:22,
621:12, 621:13,
622:9, 639:18,
643:22, 643:25,
644:1, 660:18, 668:4,
670:6, 670:8
**quick** [4] - 449:20,
501:9, 521:21, 522:19
**quickly** [8] - 450:8,
526:17, 541:22,
556:14, 567:9,
578:22, 621:1, 700:19
**Quine** [1] - 680:14
**quit** [1] - 452:16
**quite** [5] - 446:3,
561:16, 563:17,
688:2, 690:20
**quo** [3] - 671:21,
675:7, 692:20
**quote** [11] - 450:9,
450:10, 460:19,
460:21, 475:5,
537:13, 537:14,
590:18, 594:17,
651:14, 682:18
**quoted** [2] - 527:25,
528:6
**quotes** [3] - 564:8,
619:22, 619:23
**quoting** [1] - 594:17

## R

**radiation** [1] -
607:15, 607:21
**raised** [1] - 674:21
**raises** [2] - 639:22,
643:9
**ran** [2] - 563:12,
563:20
**random** [1] - 594:1
**range** [2] - 586:24,
646:4
**rank** [1] - 531:13

**rapid** [1] - 522:8
**rapidly** [1] - 508:19
**rare** [10] - 450:16,
595:3, 595:5, 595:14,
596:6, 598:1, 598:10,
606:20, 681:24,
683:21
**rate** [19] - 502:24,
527:22, 528:2,
558:18, 558:19,
578:1, 596:24,
596:25, 597:1, 597:3,
597:5, 597:8, 597:21,
598:5, 598:11,
664:17, 668:25,
683:6, 694:13
**rates** [5] - 622:13,
622:15, 622:21, 683:1
**rather** [4] - 459:4,
519:22, 600:20,
622:20
**Rationale** [1] -
586:17
**rationale** [5] -
529:19, 530:7,
587:11, 661:18, 676:7
**reach** [3] - 443:24,
699:25, 700:2
**reaching** [1] - 468:20
**read** [28] - 446:11,
446:12, 460:10,
478:5, 502:23, 504:8,
514:2, 517:10,
517:13, 517:14,
523:18, 523:19,
527:1, 528:1, 531:5,
567:2, 567:17,
578:23, 578:25,
580:11, 581:21,
592:14, 594:7, 595:1,
595:8, 595:25,
608:19, 631:21
**readiness** [1] -
619:10
**reading** [8] - 490:22,
517:12, 527:14,
554:4, 562:12, 579:4,
583:12, 610:25
**reads** [4] - 476:24,
477:3, 477:20, 478:25
**ready** [2] - 664:8,
672:25
**reaffirming** [1] -
489:11
**real** [22] - 445:7,
456:1, 456:6, 456:7,
466:4, 466:16, 486:5,
486:20, 496:24,
501:9, 502:21,
529:18, 530:4, 547:3,

586:2, 685:19,
685:21, 685:22,
685:23, 685:24, 686:3
**real-life** [12] - 456:1,
456:6, 486:20,
496:24, 529:18,
530:4, 547:3, 586:2,
685:21, 685:23,
685:24
**really** [39] - 443:12,
443:22, 452:18,
453:25, 456:2, 456:5,
456:21, 457:3, 461:4,
465:10, 488:24,
489:3, 489:10,
493:17, 511:5,
511:16, 511:18,
513:14, 541:7,
545:12, 548:17,
563:12, 573:19,
576:6, 608:1, 627:4,
640:20, 672:1,
672:14, 672:16,
674:4, 674:7, 674:11,
677:6, 679:3, 685:25,
693:10, 693:18, 699:7
**realms** [1] - 643:15
**reason** [8] - 460:12,
463:8, 510:25,
529:17, 531:21,
564:9, 619:18, 676:17
**reasonable** [2] -
578:2, 584:11
**Reasonable** [1] -
584:4
**reasonably** [1] -
603:16
**reasons** [11] -
462:23, 487:5, 496:4,
510:21, 510:22,
528:24, 536:11,
538:9, 614:6, 659:23,
672:20
**reassess** [1] - 475:12
**reassignment** [72] -
451:6, 452:5, 453:9,
453:21, 453:24,
454:11, 454:22,
456:23, 457:1,
469:18, 490:10,
493:19, 499:6,
499:16, 512:20,
513:20, 524:13,
524:14, 525:1, 525:3,
525:5, 525:24, 526:9,
526:19, 526:24,
527:19, 527:23,
528:15, 530:20,
531:4, 534:10, 538:2,
584:9, 588:1, 588:6,

591:9, 591:12, 591:17, 592:8, 593:13, 596:14, 596:16, 596:17, 597:1, 597:10, 598:15, 606:24, 607:4, 610:23, 611:4, 611:23, 620:11, 620:21, 628:21, 639:7, 651:19, 651:23, 652:5, 659:17, 668:12, 668:22, 671:17, 672:16, 674:24, 687:21, 687:24, 688:24, 690:1, 690:18, 692:1, 692:12, 694:14

**rebut** [2] - 445:12, 448:4

**rebuttal** [2] - 670:16, 671:1

**receive** [9] - 515:11, 556:5, 556:21, 566:7, 629:6, 648:1, 680:24, 683:18, 690:10

**received** [16] - 458:19, 504:11, 504:13, 514:9, 517:19, 554:1, 554:8, 555:10, 555:25, 563:9, 596:14, 596:16, 596:17, 612:2, 629:13, 629:19

**receiving** [4] - 445:15, 647:24, 648:5, 649:16

**recent** [1] - 485:22

**recently** [6] - 517:14, 529:5, 567:2, 588:19, 667:12

**recess** [7] - 501:17, 576:14, 623:12, 670:24, 671:11, 700:25

**Recess** [4] - 501:18, 576:15, 623:13, 671:12

**recognize** [12] - 533:19, 544:6, 572:2, 624:2, 624:15, 630:3, 635:15, 635:23, 639:9, 685:2, 697:6, 698:7

**recognized** [3] - 487:25, 569:21, 684:15

**recognizes** [3] - 479:12, 479:16, 693:22

**recognizing** [1] - 687:5

**recollection** [4] - 459:1, 536:9, 637:11, 667:1

**recommend** [7] - 513:17, 546:24, 619:8, 621:21, 639:23, 643:15, 660:24

**recommendation** [19] - 513:3, 513:12, 531:11, 531:14, 531:20, 540:6, 556:4, 556:20, 612:19, 618:19, 618:24, 618:25, 650:1, 650:7, 661:19, 663:9, 688:12, 688:18

**recommendations** [22] - 476:7, 509:19, 510:5, 510:6, 510:9, 523:3, 523:4, 523:6, 531:7, 531:19, 532:17, 533:14, 533:21, 541:8, 563:11, 592:24, 629:4, 661:10, 662:13, 662:22, 690:14, 697:9

**recommended** [8] - 454:24, 520:24, 522:1, 524:20, 647:23, 661:14, 661:15, 667:21

**recommending** [3] - 491:22, 535:10, 664:2

**recommends** [1] - 477:5

**reconstruction** [1] - 622:4

**reconvene** [1] - 475:12

**reconvened** [1] - 475:16

**record** [27] - 443:23, 444:24, 445:8, 446:25, 468:2, 468:6, 468:20, 469:9, 469:21, 473:20, 497:17, 502:2, 521:16, 536:4, 542:3, 559:11, 559:17, 576:16, 623:23, 626:14, 632:10, 633:4, 652:4, 654:11, 666:24, 682:9, 683:15

**recorded** [3] - 517:4, 517:5, 682:9

**records** [48] -

515:25, 516:2, 516:7, 516:8, 517:12, 518:6, 518:25, 521:7, 521:8, 524:6, 528:21, 535:6, 535:8, 535:15, 535:16, 535:20, 535:24, 536:3, 536:7, 536:10, 536:11, 536:23, 537:2, 537:3, 540:4, 543:17, 543:20, 558:18, 579:19, 602:21, 603:12, 603:13, 608:19, 628:16, 631:25, 633:14, 633:22, 633:23, 634:9, 640:6, 657:2, 657:7, 657:25, 658:2, 696:3

**recross** [3] - 484:14, 668:5

**RECROSS** [3] - 497:8, 621:16, 668:7

**RECROSS-EXAMINATION** [3] - 497:8, 621:16, 668:7

**red** [2] - 684:2, 686:21

**REDIRECT** [3] - 490:3, 617:1, 660:21

**redirect** [5] - 484:14, 490:1, 556:15, 564:13, 660:19

**reduce** [3] - 485:18, 485:23, 607:19

**reentry** [3] - 512:1, 512:8, 512:9

**reevaluate** [1] - 467:22

**reevaluated** [5] - 475:8, 475:13, 475:14, 475:17, 492:21

**reevaluation** [2] - 493:5, 493:8

**refer** [5] - 485:24, 541:18, 554:24, 568:4, 628:11

**reference** [10] - 492:2, 492:8, 515:20, 532:4, 568:10, 571:8, 597:17, 598:9, 625:17, 688:20

**referenced** [5] - 540:16, 540:17, 562:2, 579:21, 625:9

**references** [1] - 531:17

**referencing** [2] - 492:6, 577:13

**referral** [2] - 523:5, 556:24

**referrals** [1] - 628:8

**referred** [3] - 485:2, 509:18, 697:6

**referring** [8] - 469:14, 485:11, 512:9, 550:4, 550:7, 592:12, 592:13, 592:15

**refers** [3] - 532:7, 579:9, 579:11

**reflect** [1] - 528:1

**reflected** [2] - 471:16, 497:22

**reflects** [1] - 478:13

**refresh** [2] - 459:16, 637:11

**refreshed** [1] - 458:23

**refreshing** [1] - 638:23

**refused** [3] - 609:11, 667:25, 697:6

**refuses** [1] - 609:4

**refusing** [2] - 609:7, 676:8

**regard** [9] - 450:12, 452:9, 513:19, 522:21, 595:21, 659:23, 669:1, 692:16, 692:25

**regarding** [31] - 450:5, 453:21, 454:4, 463:1, 465:2, 481:5, 481:8, 481:10, 482:6, 483:2, 493:5, 495:19, 497:1, 497:2, 524:25, 525:2, 538:2, 550:17, 550:22, 551:1, 552:12, 552:19, 563:16, 586:2, 590:23, 614:13, 618:6, 633:17, 643:10, 665:8, 687:24

**regardless** [5] - 483:12, 509:8, 542:24, 676:2, 682:14

**regimen** [4] - 523:9, 523:10, 523:22, 524:9

**regional** [2] - 453:5, 491:20

**regret** [8] - 526:18, 526:19, 527:22, 528:2, 533:13, 546:22, 609:21, 609:25

**regularly** [2] - 518:15, 629:20

**rehabilitate** [2] -

445:8, 445:20

**Reinhardt** [1] - 675:6

**reinstatement** [1] - 672:4

**reintegrates** [1] - 641:16

**relapsed** [1] - 539:8

**relate** [1] - 666:12

**related** [19] - 453:7, 453:24, 470:2, 498:5, 517:8, 536:12, 543:13, 543:14, 544:7, 577:5, 602:2, 602:6, 620:10, 658:22, 658:25, 659:12, 659:15, 682:19, 696:4

**relates** [2] - 552:8, 651:14

**relating** [3] - 551:7, 552:2, 563:5

**relationship** [3] - 455:6, 536:12, 698:20

**relationships** [4] - 543:25, 637:4, 641:11, 667:14

**relative** [2] - 521:20, 596:14

**relatively** [8] - 567:3, 595:3, 595:5, 595:14, 596:6, 597:1, 606:14, 606:20

**release** [1] - 585:23

**relevance** [4] - 590:1, 611:18, 611:19, 613:2

**relevancy** [1] - 633:1

**relevant** [9] - 519:7, 519:11, 519:13, 587:8, 594:7, 612:15, 614:4, 614:18, 633:13

**relied** [4] - 468:19, 469:21, 624:19, 625:14

**relief** [8] - 671:14, 671:17, 672:12, 672:14, 674:24, 675:24, 692:17, 692:22

**relieve** [2] - 605:1, 605:11

**reluctance** [1] - 490:17

**rely** [13] - 443:17, 446:20, 447:8, 447:9, 469:19, 515:11, 518:25, 566:17, 566:21, 567:19, 570:12, 616:12, 629:9

**relying** [1] - 609:20

**remaining** [1] - 696:20

**remains** [1] - 673:1

**remarkable** [1] - 455:9

**remarkably** [1] - 679:19

**remember** [30] - 450:3, 452:7, 458:7, 458:13, 459:7, 459:10, 459:21, 460:23, 462:6, 462:16, 462:19, 463:10, 474:8, 495:22, 508:1, 508:15, 550:2, 553:7, 553:19, 558:24, 561:16, 592:10, 599:17, 620:14, 654:12, 656:22, 666:22, 666:25, 669:9

**Remeron** [1] - 461:23

**remind** [3] - 449:8, 573:1, 576:17

**reminded** [1] - 699:14

**reminder** [1] - 579:16

**remission** [1] - 604:1

**removal** [4] - 509:16, 509:18, 509:20, 520:24

**remove** [4] - 479:13, 605:21, 607:18, 608:1

**removed** [2] - 522:10, 522:17

**render** [1] - 618:8

**rendering** [1] - 631:18

**renew** [1] - 524:17

**repairing** [1] - 474:25

**repeat** [4] - 608:15, 611:2, 648:16, 666:18

**repeatedly** [2] - 544:21, 667:25

**rephrase** [2] - 480:10, 494:23

**report** [100] - 460:25, 514:12, 514:14, 514:15, 514:17, 514:21, 515:5, 515:13, 515:19, 515:24, 516:1, 516:10, 516:15, 516:18, 516:21, 517:15, 518:20, 518:23, 519:1, 524:5, 528:20, 531:24,

535:9, 535:15, 536:21, 537:12, 537:14, 537:15, 539:3, 541:18, 541:19, 543:18, 543:19, 547:7, 547:13, 548:9, 551:1, 551:5, 554:8, 554:25, 558:19, 577:1, 577:3, 577:8, 577:14, 590:18, 591:3, 591:24, 591:25, 592:7, 592:12, 592:13, 592:17, 593:4, 593:6, 593:12, 593:24, 594:4, 594:17, 595:2, 595:12, 596:5, 599:18, 600:3, 609:24, 610:5, 610:6, 610:8, 610:25, 613:7, 614:7, 615:16, 615:18, 615:19, 615:22, 616:1, 616:10, 620:15, 624:24, 632:7, 632:18, 632:21, 633:20, 634:11, 637:10, 637:21, 638:3, 638:8, 638:20, 638:21, 638:24, 642:13, 642:19, 642:22, 653:22, 668:15, 668:19, 683:6, 683:11, 684:14

**reported** [14] - 450:15, 458:11, 460:15, 518:7, 518:12, 518:14, 536:11, 537:11, 537:15, 543:24, 544:2, 615:18, 615:19, 618:17

**reporting** [2] - 459:7, 537:4

**reports** [12] - 461:18, 468:17, 516:4, 516:9, 517:9, 542:6, 547:14, 547:18, 548:5, 595:4, 634:3, 642:14

**represent** [1] - 528:11

**representations** [1] - 575:9

**representative** [4] - 500:19, 561:9, 561:11, 598:19

**represented** [2] - 566:5, 638:4

**represents** [2] -

568:22, 570:14

**reproduced** [1] - 679:17

**reputable** [1] - 572:7

**request** [6] - 444:25, 457:16, 467:6, 521:9, 535:5, 672:2

**requested** [4] - 586:13, 671:14, 671:17, 674:24

**requesting** [1] - 512:24

**requests** [1] - 512:20

**require** [3] - 628:15, 665:6, 675:25

**required** [4] - 522:11, 582:14, 648:9, 648:18

**requirement** [11] - 488:10, 496:17, 585:10, 647:24, 648:4, 648:8, 648:24, 649:2, 649:15, 650:12

**requires** [2] - 676:19, 699:8

**requiring** [1] - 650:17

**requisite** [2] - 519:17, 659:20

**research** [5] - 532:18, 552:2, 578:8, 642:7, 658:22

**researchers** [1] - 531:10

**reserve** [1] - 696:9

**residence** [1] - 584:10

**residencies** [1] - 505:1

**Residency** [1] - 451:20

**residency** [7] - 504:15, 505:3, 505:6, 513:22, 555:12, 556:2, 588:17

**resident** [1] - 506:3

**resolve** [4] - 443:12, 443:24, 446:6, 447:15

**resolved** [2] - 671:23, 690:17

**resolving** [1] - 640:24

**resorting** [1] - 694:25

**resource** [2] - 533:8, 533:20

**resources** [3] - 531:3, 588:21, 588:22

**respect** [3] - 495:4, 507:24, 680:25

**respects** [1] - 696:13

**respond** [1] - 644:10

**responded** [3] - 657:5, 669:12, 670:2

**response** [11] - 460:25, 461:10, 461:18, 465:23, 524:7, 529:22, 529:23, 532:23, 564:11, 654:6, 669:23

**responsibilities** [2] - 507:3, 511:9

**responsibility** [1] - 507:7

**responsible** [6] - 506:11, 508:18, 518:11, 523:7, 523:8, 692:18

**responsive** [1] - 558:6

**rest** [5] - 595:1, 609:16, 684:24, 696:9

**restate** [7] - 467:15, 553:16, 556:12, 556:18, 557:20, 590:8, 635:22

**restroom** [2] - 501:10, 623:5

**result** [8] - 544:24, 612:8, 641:3, 676:22, 677:14, 680:14, 683:19, 695:18

**resulted** [1] - 640:16

**results** [4] - 485:10, 528:9, 591:21, 689:22

**resume** [5] - 449:10, 560:3, 576:18, 576:19, 624:7

**retained** [7] - 444:20, 548:22, 549:15, 550:25, 551:3, 563:19, 630:12

**retaining** [1] - 452:18

**retention** [1] - 630:15

**return** [1] - 471:20

**returning** [2] - 546:8, 546:9

**review** [37] - 468:16, 481:2, 483:7, 483:8, 507:18, 507:19, 513:9, 515:25, 516:17, 532:5, 537:5, 551:7, 551:11, 552:2, 554:22, 573:22, 575:24, 592:16, 603:12, 609:24, 614:17, 615:3, 615:6, 615:9, 615:17, 631:18, 631:25,

632:7, 633:13, 633:20, 634:1, 634:3, 635:3, 640:6, 655:16, 655:22, 656:25

**reviewed** [54] - 493:3, 516:2, 516:3, 516:4, 516:6, 516:11, 516:12, 516:14, 516:19, 516:24, 517:8, 517:11, 519:24, 521:16, 521:17, 522:24, 523:8, 523:20, 532:9, 535:8, 536:11, 537:1, 543:17, 551:19, 551:22, 558:18, 567:6, 593:20, 595:12, 602:21, 605:23, 614:12, 614:22, 615:1, 615:2, 618:11, 618:14, 624:19, 624:25, 629:15, 630:8, 631:22, 633:22, 635:20, 655:18, 657:2, 658:2, 658:23, 658:25, 659:4, 659:8, 660:14, 683:15

**reviewing** [4] - 536:3, 536:7, 606:9, 659:7

**rewarding** [1] - 511:20

**Rhode** [2] - 504:24, 505:7

**Rifkin** [14] - 446:4, 515:16, 525:8, 548:16, 556:18, 557:21, 576:9, 576:18, 609:17, 612:24, 614:1, 637:18, 644:2, 674:16

**RIFKIN** [171] - 444:2, 446:3, 447:18, 448:13, 484:7, 503:15, 503:22, 504:1, 504:4, 504:6, 514:15, 514:22, 515:9, 519:14, 519:20, 524:17, 544:20, 545:5, 547:9, 547:17, 547:22, 547:25, 548:2, 549:2, 549:17, 549:21, 553:9, 553:14, 553:17, 556:19, 556:20, 557:22, 558:4, 558:10, 559:4, 559:16, 560:7, 564:10, 564:17,

565:6, 565:13,
565:15, 567:15,
567:19, 568:18,
569:7, 569:9, 569:10,
570:23, 572:11,
572:15, 572:24,
572:25, 573:25,
574:5, 574:23,
575:11, 576:1,
576:19, 577:1, 579:6,
579:15, 579:21,
580:3, 581:5, 581:7,
581:8, 583:3, 583:11,
583:16, 590:9,
590:10, 591:4, 591:6,
591:8, 595:9, 595:11,
595:20, 595:22,
596:2, 596:10,
596:19, 596:21,
596:22, 597:12,
597:15, 599:9,
599:12, 600:19,
601:11, 606:16,
608:3, 608:13,
608:16, 608:17,
609:18, 609:19,
611:21, 612:14,
612:18, 613:25,
614:3, 614:6, 614:24,
615:3, 615:13,
615:21, 615:22,
616:19, 619:15,
620:6, 621:14,
621:17, 622:9,
624:12, 624:23,
625:5, 625:11,
625:13, 632:19,
632:23, 635:18,
636:3, 636:5, 636:13,
637:6, 637:20,
637:23, 638:4, 638:7,
638:23, 642:12,
644:3, 644:5, 644:13,
644:16, 647:8, 649:1,
649:10, 652:4,
652:21, 653:25,
655:9, 655:23, 656:2,
659:14, 660:6, 660:8,
660:18, 662:10,
662:14, 662:18,
664:20, 665:15,
666:24, 668:6, 668:8,
670:6, 671:1, 671:6,
674:17, 674:19,
678:5, 678:10, 680:1,
680:4, 680:10,
680:22, 682:1, 686:6,
700:7
   **Rifkin's** [1] - 548:21
   **right-hand** [1] -
596:1

**rights** [1] - 566:9
**rise** [1] - 605:21
**risen** [1] - 471:8
**risk** [32] - 544:14,
544:22, 545:15,
545:20, 545:22,
546:1, 546:16,
596:12, 598:20,
598:22, 599:19,
600:1, 600:4, 600:11,
600:16, 600:21,
602:6, 609:21,
610:15, 610:20,
610:22, 611:3, 611:9,
611:22, 611:24,
614:15, 615:5,
620:20, 620:24,
663:19, 683:9, 694:2
**robust** [1] - 594:12
**role** [37] - 463:2,
463:5, 465:3, 486:17,
491:19, 505:10,
507:1, 507:22,
507:24, 508:10,
508:16, 509:2,
509:23, 510:16,
514:4, 518:11, 557:1,
559:24, 562:22,
563:8, 563:12,
563:23, 572:21,
584:8, 584:14,
584:17, 585:13,
586:19, 587:17,
627:10, 627:22,
631:7, 634:21, 645:19
**roles** [4] - 525:10,
562:19, 627:2, 627:4
**room** [3] - 448:2,
492:16
**roughly** [1] - 670:18
**rule** [2] - 448:5,
490:18
**Rule** [2] - 448:7,
559:22
**ruled** [1] - 684:14
**ruling** [2] - 490:18,
652:19
**run** [4] - 489:1,
489:5, 489:8, 643:21
**rural** [1] - 588:20

## S

**safe** [4] - 456:24,
457:4, 591:9, 591:13
**Safer** [2] - 523:5
**safety** [4] - 571:16,
610:15, 610:20,
614:15
**sample** [7] - 528:8,

532:13, 545:7,
545:10, 593:21,
598:19, 599:1
**satisfactory** [1] -
542:3
   **satisfied** [3] -
512:18, 678:19,
681:23
   **satisfies** [1] - 528:14
   **satisfy** [3] - 534:13,
539:21, 584:17
   **saw** [13] - 458:7,
518:5, 521:8, 522:2,
524:6, 529:4, 535:8,
535:20, 537:21,
536:9, 660:17,
676:10, 689:16
   **scale** [1] - 669:1
   **schedule** [5] - 673:2,
699:15, 699:23,
700:2, 700:5
   **scheduled** [2] -
445:2, 445:14
   **school** [2] - 497:10,
607:13
   **School** [1] - 504:13
   **scope** [4] - 642:12,
660:24, 661:4, 664:20
   **SCOTT** [1] - 449:24
   **screen** [7] - 483:18,
484:8, 484:9, 503:23,
579:2, 586:23, 688:16
   **scroll** [1] - 502:21
   **scrolling** [1] - 502:23
   **se** [2] - 685:17, 695:7
   **seal** [3] - 632:16,
632:24, 632:25
   **sealed** [3] - 469:12,
481:14, 481:19
   **sealing** [1] - 481:22
   **search** [1] - 447:2
   **seat** [2] - 501:25,
623:19
   **second** [16] - 462:24,
463:19, 474:23,
482:20, 485:2, 516:3,
527:18, 562:19,
583:25, 586:22,
592:19, 612:20,
672:20, 685:18,
687:7, 687:10
   **second-column** [1] -
592:19
   **secondly** [1] -
672:15
   **section** [9] - 530:23,
533:23, 539:23,
580:8, 581:18,
583:25, 585:5,
586:17, 659:5

**sections** [1] - 567:14
**sedative** [1] - 489:3
**see** [59] - 457:23,
460:12, 470:16,
474:20, 478:1,
482:17, 492:25,
493:1, 499:23,
499:24, 501:16,
502:17, 503:23,
511:18, 511:20,
529:13, 531:8,
536:20, 537:3,
539:10, 542:23,
543:10, 546:13,
567:10, 567:16,
581:17, 586:17,
587:2, 587:8, 594:14,
594:21, 595:7, 596:7,
599:2, 603:8, 603:13,
603:19, 608:1,
612:14, 613:8, 624:5,
625:18, 631:10,
635:21, 640:6, 640:9,
654:10, 654:13,
657:3, 657:7, 657:10,
657:15, 658:2,
674:13, 674:15,
684:22, 689:6, 698:6
**seeing** [3] - 494:11,
614:4, 672:1
**seek** [1] - 685:18
**seeking** [2] - 586:1,
685:17
**seem** [3] - 490:18,
607:2, 622:25
**sees** [1] - 609:10
**segregation** [5] -
498:5, 498:6, 498:12,
682:20, 682:21
**select** [1] - 474:12
**selected** [1] - 489:22
**self** [44] - 456:12,
458:2, 461:20, 471:4,
479:1, 479:2, 479:10,
479:13, 479:17,
485:10, 486:24,
487:3, 487:8, 488:2,
495:10, 498:7,
498:13, 527:10,
528:20, 529:4, 529:7,
529:11, 529:15,
538:6, 538:8, 538:14,
542:19, 542:24,
542:25, 543:2,
605:17, 606:15,
606:23, 612:1,
667:11, 694:25,
695:11, 695:15,
695:21, 695:24, 696:1
   **self-castrate** [1] -

606:23
   **self-castration** [14] -
458:2, 461:20, 471:4,
485:10, 486:24,
487:3, 495:10, 498:7,
498:13, 527:10,
542:19, 694:25,
695:11, 695:21
   **self-castrations** [1] -
695:15
   **self-harm** [8] -
456:12, 479:1,
479:10, 479:17,
487:8, 542:24,
542:25, 543:2
   **self-harming** [3] -
695:15, 695:24, 696:1
   **self-injuring** [1] -
529:4
   **self-injurious** [2] -
538:8, 538:14
   **self-injury** [8] -
529:7, 529:11,
529:15, 538:6,
605:17, 606:15,
612:1, 667:11
   **self-medication** [1] -
488:2
   **self-treat** [1] - 479:17
   **self-treatment** [3] -
479:2, 479:10, 479:13
   **send** [1] - 493:4
   **sends** [1] - 561:22
   **sense** [7] - 443:22,
449:15, 465:25,
466:24, 498:24,
643:20, 684:9
   **sent** [2] - 487:6,
551:19
   **sentence** [24] -
450:10, 466:15,
476:23, 477:3, 530:1,
581:1, 581:20,
581:21, 582:10,
582:12, 583:3,
583:22, 584:6,
584:21, 584:23,
587:4, 594:20,
594:21, 595:16,
595:18, 596:8,
641:16, 681:10,
681:25
   **sentences** [3] -
566:11, 661:20,
663:14
   **sentiment** [1] -
619:23
   **separate** [4] -
601:12, 601:20,
621:8, 691:14

**September** [2] - 457:21, 522:20

**serious** [6] - 543:22, 543:23, 675:4, 675:12, 681:2, 694:2

**seriously** [4] - 488:12, 491:21, 511:3, 698:22

**served** [5] - 552:7, 560:22, 621:18, 622:1, 644:22

**service** [1] - 561:9

**Service** [1] - 516:8

**Services** [8] - 537:2, 573:13, 574:13, 574:24, 577:13, 577:24, 627:10

**services** [14] - 561:11, 561:21, 627:6, 661:25

**serving** [8] - 530:1, 562:22, 566:11, 584:21, 584:22, 661:20, 663:13, 681:9

**set** [8] - 452:4, 452:12, 509:16, 571:21, 618:6, 671:16, 672:21, 699:15

**sets** [1] - 588:5

**setting** [32] - 455:19, 486:20, 492:12, 492:19, 496:17, 505:2, 505:16, 509:23, 510:20, 520:8, 525:16, 541:5, 541:13, 547:5, 559:25, 570:16, 571:14, 581:13, 581:25, 589:1, 590:6, 617:14, 617:18, 618:5, 639:24, 640:1, 669:24, 677:10, 688:1, 689:2

**Settings** [1] - 476:12

**settings** [6] - 525:11, 526:4, 526:8, 530:14, 533:24, 568:3

**settlement** [2] - 680:11, 680:16

**seven** [7] - 474:6, 507:10, 511:14, 555:11, 556:1, 588:17, 650:6

**seven-day** [1] - 588:17

**seventh** [1] - 629:17

**several** [13] - 452:15, 455:3, 505:5, 513:13, 513:18, 516:9, 516:19, 526:1, 531:6,

532:12, 556:8, 619:9, 640:2

**severe** [4] - 485:2, 604:7, 604:13, 621:6

**severity** [2] - 621:7, 621:11

**Severson** [5] - 443:8, 459:25, 637:17, 655:7, 699:14

**sex** [70] - 451:6, 452:5, 453:9, 453:21, 453:24, 454:10, 454:22, 456:23, 457:1, 469:18, 490:10, 499:6, 499:16, 512:20, 513:20, 524:12, 524:14, 525:1, 525:3, 525:5, 525:24, 526:9, 526:19, 526:24, 527:19, 527:23, 528:15, 530:20, 531:4, 534:10, 538:2, 584:9, 588:1, 588:6, 591:8, 591:12, 591:16, 592:8, 593:13, 596:14, 596:16, 596:17, 596:25, 597:10, 598:15, 606:24, 607:4, 610:23, 611:4, 611:23, 620:11, 620:20, 628:20, 639:6, 639:11, 651:19, 651:23, 652:5, 668:22, 671:17, 672:16, 674:24, 687:21, 687:24, 688:24, 690:1, 690:17, 692:1, 692:12, 694:14

**sexual** [6] - 537:7, 537:15, 615:8, 616:4, 640:16, 640:25

**sexually** [3] - 640:17, 641:7, 641:9

**Shanbhag** [3] - 457:8, 467:16, 497:6

**SHANBHAG** [54] - 450:21, 457:12, 458:17, 459:7, 459:12, 459:17, 459:23, 460:1, 461:18, 462:2, 462:3, 465:16, 466:9, 467:4, 467:5, 467:17, 469:4, 469:8, 469:13, 469:14, 472:24, 473:12, 473:22, 473:24, 476:16,

476:22, 476:23, 477:3, 478:20, 478:23, 479:7, 479:9, 480:1, 480:19, 482:3, 482:6, 482:10, 482:20, 482:23, 483:17, 483:21, 483:25, 484:2, 484:6, 484:11, 493:23, 493:25, 494:22, 496:14, 497:7, 497:9, 498:15, 498:18, 501:2

**shared** [1] - 518:24

**shares** [1] - 526:16

**sheet** [1] - 452:14

**shift** [1] - 595:25

**Shiloh** [1] - 680:14

**shirt** [2] - 682:8, 682:15

**Sho** [3] - 516:8, 537:1, 632:1

**Sho-Ban** [3] - 516:8, 537:1, 632:1

**short** [12] - 640:20, 645:9, 670:17, 670:19, 670:24, 671:6, 671:8, 672:17, 674:4, 674:20, 681:24, 686:16

**show** [27] - 458:15, 463:2, 463:15, 463:23, 464:6, 469:7, 472:24, 473:4, 473:12, 474:15, 474:17, 476:9, 482:10, 482:16, 490:23, 499:12, 563:25, 565:13, 574:10, 592:11, 610:5, 610:6, 612:3, 620:19, 655:5, 655:7, 678:2

**showing** [5] - 461:13, 482:12, 594:15, 675:3, 676:19

**shown** [3] - 503:16, 577:25, 642:10

**shows** [2] - 678:7, 695:17

**sic** [1] - 699:16

**side** [5] - 449:22, 508:23, 565:24, 670:18, 674:7

**side's** [1] - 448:23

**sides** [4] - 484:14, 609:13, 686:25, 692:6

**sign** [1] - 655:16

**signed** [1] - 515:6

**significance** [2] - 695:5, 695:11

**significant** [17] - 490:24, 526:15, 528:3, 528:4, 532:14, 537:19, 546:21, 598:15, 599:7, 641:23, 675:15, 675:19, 676:22, 677:14, 677:19, 683:17, 695:9

**significantly** [2] - 597:4, 598:6

**signifiers** [1] - 657:24

**similar** [3] - 470:21, 594:17, 600:2

**simple** [1] - 685:5

**simply** [7] - 461:12, 466:18, 473:14, 691:2, 692:20, 693:2, 693:14

**simultaneous** [1] - 519:10

**single** [9] - 452:19, 454:9, 552:12, 588:16, 625:1, 675:17, 678:12, 679:14

**sit** [1] - 447:23, 448:16, 570:3, 697:23, 700:21

**situation** [4] - 443:9, 580:17, 650:20, 675:10

**situations** [4] - 455:23, 470:10, 492:14, 585:11

**six** [15] - 499:20, 535:19, 589:3, 589:4, 602:23, 608:18, 628:24, 653:1, 653:25, 654:7, 681:12, 681:15, 682:16, 685:15, 694:7

**sixth** [1] - 685:20

**sizes** [2] - 532:13, 593:21

**skills** [1] - 529:14

**skip** [1] - 530:19

**skirt** [1] - 682:15

**sleep** [2] - 461:21, 471:19

**slide** [2] - 473:5, 474:18

**slides** [17] - 474:6, 474:9, 474:12, 474:15, 493:10, 493:11, 493:13, 493:16, 494:9, 494:14, 676:10, 676:11, 679:15,

679:16, 679:18, 686:20

**slowly** [1] - 572:22

**small** [4] - 475:2, 532:13, 593:21, 682:7

**smaller** [3] - 507:9, 508:16, 512:2

**smoothly** [1] - 500:2

**sneak** [1] - 501:9

**snuck** [1] - 449:5

**so..** [1] - 459:22

**sober** [1] - 539:7

**social** [3] - 529:22, 530:13, 540:11, 587:22, 588:7, 588:12, 626:2, 626:4, 626:7, 659:4, 660:12, 660:13, 675:15

**socially** [2] - 530:16, 538:19

**Society** [2] - 523:19, 531:12

**society** [3] - 641:16, 657:18, 684:24

**solely** [3] - 543:13, 543:14, 691:20

**solve** [3] - 599:16, 652:16, 668:17

**someone** [22] - 466:14, 466:17, 499:1, 500:9, 525:8, 532:24, 534:6, 535:5, 539:25, 540:8, 551:14, 561:22, 561:23, 584:20, 584:22, 641:8, 653:10, 666:9, 666:11, 676:18, 681:20, 684:4

**sometimes** [10] - 451:24, 484:13, 485:19, 485:20, 532:13, 536:8, 539:24, 561:10, 561:22, 561:23

**somewhat** [1] - 695:9

**somewhere** [5] - 507:25, 508:2, 508:16, 555:11, 556:1

**soon** [2] - 458:7, 586:1

**sorry** [28] - 449:5, 467:10, 470:23, 472:16, 489:25, 491:3, 493:24, 494:2, 494:13, 503:20, 504:6, 520:21, 526:21, 569:3, 573:1, 582:20, 585:7,

595:10, 596:10,
597:7, 605:25,
608:15, 621:2,
621:21, 637:20,
638:5, 664:25, 666:18
**sort** [18] - 454:15,
456:4, 490:15, 500:5,
511:9, 526:15, 544:6,
544:7, 544:12,
546:25, 547:1, 547:3,
561:10, 589:10,
593:8, 603:9, 610:7,
690:22
**sorted** [1] - 546:14
**sorts** [3] - 485:8,
529:24, 543:4
**sought** [2] - 527:11,
534:18
**sound** [2] - 561:18,
699:11
**sounds** [12] -
460:14, 558:25,
559:8, 559:10,
561:25, 564:25,
591:1, 597:25,
601:15, 601:22,
601:25, 671:10
**sources** [2] - 469:17,
469:19
**space** [1] - 448:15
**speaks** [2] - 479:20,
587:11
**special** [1] - 613:7
**specific** [12] - 455:3,
467:12, 470:10,
478:13, 480:8, 487:2,
492:11, 496:2,
571:12, 573:23,
590:16, 628:12
**specifically** [22] -
480:6, 488:7, 491:15,
492:18, 495:2,
505:19, 524:18,
533:23, 541:10,
558:2, 559:15, 568:1,
577:2, 586:2, 598:16,
646:19, 653:7,
659:16, 675:6, 683:2,
683:6, 695:24
**specifics** [4] - 482:4,
514:20, 571:17,
628:25
**speculate** [2] -
494:4, 684:5
**speculating** [1] -
544:21
**speculation** [1] -
600:22
**spell** [2] - 502:1,
623:22

**spend** [3] - 670:20,
682:21, 689:11
**spent** [6] - 507:13,
539:13, 558:19,
559:5, 681:21, 691:24
**spironolactone** [1] -
672:5
**sponsored** [1] -
553:1
**SRS** [28] - 450:20,
453:2, 474:18,
474:24, 490:5,
490:10, 491:17,
495:11, 495:20,
495:24, 496:4, 497:1,
514:9, 524:12,
544:15, 545:20,
546:1, 546:4, 618:9,
618:19, 639:4,
680:24, 687:8,
687:11, 691:10,
692:6, 692:7, 696:15
**stability** [1] - 462:17
**stable** [1] - 523:10
**staff** [15] - 452:18,
456:10, 456:11,
468:20, 469:21,
472:8, 499:24,
506:13, 506:23,
571:16, 666:6,
667:13, 667:16,
700:8, 700:11
**staffed** [2] - 690:2,
690:5
**stand** [8] - 446:2,
447:1, 447:20,
501:25, 505:9,
547:20, 623:19,
678:25
**standard** [35] -
454:2, 466:20,
542:18, 568:2,
568:11, 571:6, 572:6,
574:22, 580:8, 583:5,
583:17, 584:11,
585:5, 617:21, 672:3,
672:15, 675:1, 675:2,
675:25, 676:4,
676:19, 676:21,
677:17, 677:20,
677:21, 677:23,
677:24, 678:1, 678:6,
681:8, 681:17, 685:8,
686:1, 693:14
**standards** [71] -
455:24, 466:2,
466:20, 477:22,
478:1, 478:11,
478:14, 488:11,
492:13, 522:10,

522:16, 529:19,
530:23, 531:17,
533:4, 541:12,
542:17, 566:17,
566:22, 568:8,
568:10, 568:23,
568:24, 570:6,
570:12, 570:14,
570:15, 571:13,
571:18, 571:23,
572:1, 572:3, 572:17,
578:20, 579:10,
580:4, 580:11,
580:15, 584:1,
586:16, 610:9,
614:10, 617:8,
618:12, 629:9,
629:11, 629:13,
629:15, 629:17,
630:5, 639:23,
643:15, 650:13,
650:15, 650:19,
676:3, 676:24, 677:2,
679:6, 679:10,
684:19, 685:2, 687:6,
687:25, 688:6, 688:7,
688:9, 695:22, 697:7,
699:1
**Standards** [1] -
530:12
**start** [1] - 650:9
**started** [6] - 451:25,
508:1, 508:15, 524:4,
524:9, 689:25
**starts** [1] - 577:21
**state** [16] - 487:7,
489:15, 502:1, 509:2,
546:2, 546:4, 553:11,
588:3, 600:16, 602:4,
618:14, 623:22,
626:15, 632:21,
650:19, 652:7
**State** [4] - 489:16,
626:7, 627:6, 659:3
**statement** [12] -
476:10, 476:24,
492:2, 492:4, 568:22,
570:14, 577:25,
581:16, 581:18,
582:1, 673:23, 688:18
**statements** [2] -
616:13, 662:15
**States** [2] - 456:25,
514:10
**states** [8] - 455:8,
500:21, 504:22,
581:8, 593:17,
617:15, 617:19,
656:21
**statewide** [2] - 508:4

**statistics** [3] -
609:25, 622:19,
682:25
**status** [6] - 499:20,
527:15, 536:18,
671:21, 675:7, 692:20
**stay** [2] - 448:23,
449:4
**staying** [1] - 511:6
**stem** [2] - 450:19,
451:4
**stemming** [1] -
672:14
**step** [11] - 456:2,
456:3, 501:7, 501:22,
622:10, 623:16,
663:6, 670:9, 693:5,
698:11, 698:24
**Stephen** [4] - 472:7,
474:21, 554:2, 554:9
**Stewart** [2] - 608:24,
608:25, 634:14
**still** [23] - 449:9,
454:20, 465:5, 506:3,
507:6, 507:7, 507:13,
522:15, 529:17,
543:8, 562:17,
576:17, 619:7,
619:19, 619:25,
620:24, 643:14,
649:10, 684:10,
687:20, 687:22,
688:20, 695:15
**stimulant** [2] - 519:6,
539:4
**stipulate** [3] - 515:7,
548:4, 624:10
**stipulated** [1] - 515:9
**stipulation** [9] -
444:16, 547:18,
548:24, 548:25,
549:4, 632:10,
632:16, 655:16,
671:15
**stood** [1] - 684:1
**stop** [7] - 458:12,
459:8, 460:19,
461:19, 605:8,
605:22, 607:6
**stopped** [1] - 695:11
**straight** [2] - 596:21,
672:23
**straightforward** [1] -
646:5
**strategies** [11] -
529:10, 538:20,
538:23, 543:7,
543:10, 545:21,
545:24, 546:15,
546:20, 547:2, 607:9

**strategy** [4] - 538:13,
546:9, 605:18, 607:10
**street** [1] - 546:6
**stress** [7] - 487:5,
487:11, 520:25,
545:24, 607:9
**stressful** [3] -
456:14, 487:13,
538:18
**stressors** [1] -
509:12
**strike** [10] - 445:16,
450:21, 465:16,
558:4, 559:18,
564:10, 564:11,
573:25, 659:15,
665:15
**strong** [4] - 485:6,
533:3, 538:20, 571:15
**stronger** [1] - 675:2
**struggles** [1] - 542:5
**struggling** [2] -
677:11, 690:25
**studied** [2] - 457:3,
532:14
**studies** [18] - 490:23,
499:5, 499:9, 499:12,
528:6, 531:25, 532:5,
532:10, 578:3,
589:21, 594:22,
596:3, 609:20,
622:19, 622:25,
625:18, 687:24,
694:20
**study** [13] - 532:3,
544:16, 544:18,
545:7, 594:13,
595:11, 596:12,
596:23, 607:13,
620:18, 620:19,
622:18, 683:7
**studying** [1] - 525:20
**stuff** [1] - 512:15
**style** [5] - 463:12,
463:21, 464:3,
464:11, 464:19
**subject** [2] - 632:15,
673:4
**subjects** [1] - 596:13
**submissions** [1] -
673:11
**submit** [12] - 444:5,
444:9, 444:17,
444:18, 445:19,
446:8, 446:9, 446:11,
469:12, 673:9,
686:16, 700:3
**submitted** [5] -
444:23, 632:24,
674:15, 700:20,

700:22
**submitting** [1] - 444:6
**subsequent** [2] - 516:17, 577:15
**subsequently** [1] - 521:13
**substance** [9] - 488:1, 539:3, 539:13, 539:18, 540:5, 546:8, 603:25, 616:12, 681:14
**substances** [2] - 539:11, 540:8
**substantial** [2] - 683:15, 694:1
**substantially** [1] - 677:6
**succeed** [3] - 546:13, 550:1, 550:5
**success** [4] - 533:21, 546:16, 675:2, 696:13
**successful** [1] - 622:17
**suffering** [4] - 675:13, 677:19, 678:8, 686:4
**sufficient** [1] - 592:23
**sufficiently** [1] - 529:3
**suggest** [6] - 449:11, 536:24, 600:17, 678:18, 694:8, 700:3
**suggested** [6] - 444:3, 450:18, 451:3, 600:13, 668:15, 682:13
**suggesting** [7] - 599:23, 600:9, 600:19, 601:3, 601:5, 681:8, 694:6
**suggestion** [3] - 531:14, 600:10, 677:8
**suggests** [5] - 595:2, 595:4, 595:13, 596:5, 693:8
**suicidal** [5] - 486:24, 543:3, 600:8, 600:14, 694:13
**Suicidal** [1] - 474:14
**suicidality** [7] - 545:18, 599:3, 599:16, 599:24, 600:18, 602:5, 620:17
**suicide** [71] - 487:10, 536:1, 536:12, 543:21, 543:24, 544:14, 544:22, 545:15, 545:20,

545:22, 546:1, 594:22, 595:5, 595:13, 596:3, 596:13, 596:25, 597:1, 597:3, 597:5, 597:8, 597:17, 597:18, 597:23, 597:24, 597:25, 598:1, 598:2, 598:10, 598:11, 599:5, 599:6, 599:7, 599:19, 600:1, 600:4, 600:11, 600:17, 600:21, 602:5, 610:23, 611:4, 611:6, 611:7, 611:9, 611:22, 611:24, 611:25, 615:7, 620:10, 620:20, 620:24, 622:13, 622:14, 622:16, 622:17, 622:21, 657:8, 663:19, 683:1, 683:19, 683:20, 694:11, 695:1
**suicides** [7] - 598:5, 598:8, 598:9, 598:17, 611:14, 615:23, 616:2
**suit** [1] - 486:13
**suited** [1] - 569:17
**summaries** [1] - 634:7
**summarized** [2] - 578:10, 692:15
**summary** [3] - 565:1, 565:21, 566:13
**summer** [1] - 686:13
**supervision** [13] - 513:6, 514:5, 514:8, 523:10, 554:2, 554:3, 554:16, 555:22, 562:11, 563:9, 563:16, 619:1, 646:10
**Supervision** [4] - 560:11, 560:24, 627:8, 644:19
**supervisor** [2] - 555:21, 563:15
**supervisory** [4] - 507:19, 563:12, 621:20, 622:3
**supplementary** [1] - 540:14
**supplemented** [1] - 593:1
**support** [9] - 531:20, 540:4, 542:9, 545:17, 549:5, 559:20, 578:9, 592:24, 620:16
**supports** [2] - 611:11, 643:14

**suppressing** [1] - 672:6
**Supreme** [1] - 678:3
**surgeries** [6] - 452:5, 520:24, 535:11, 575:15, 577:5, 591:22
**surgery** [296] - 451:6, 453:9, 453:21, 454:11, 454:22, 456:23, 457:1, 457:16, 462:5, 462:13, 462:17, 462:21, 462:25, 463:6, 464:17, 467:6, 467:19, 467:22, 468:1, 468:4, 468:8, 468:15, 469:18, 470:19, 471:9, 471:24, 472:2, 475:8, 475:17, 475:23, 480:20, 482:7, 483:6, 483:15, 484:4, 484:21, 485:25, 486:8, 489:11, 489:14, 489:21, 490:10, 491:4, 491:17, 491:23, 493:19, 499:6, 499:7, 499:17, 509:21, 512:20, 512:25, 513:2, 513:12, 513:20, 514:3, 514:9, 517:22, 524:13, 524:14, 524:19, 524:21, 525:1, 525:3, 525:5, 525:24, 526:9, 526:19, 526:24, 527:19, 527:23, 528:15, 528:16, 529:13, 529:15, 529:16, 530:15, 530:18, 530:21, 531:4, 534:2, 534:10, 538:2, 538:18, 538:24, 540:21, 541:4, 541:25, 542:8, 542:20, 543:8, 544:23, 545:9, 545:17, 545:18, 545:22, 546:10, 546:20, 547:3, 555:10, 555:16, 555:25, 556:5, 556:22, 556:25, 557:8, 557:13, 557:25, 558:13, 559:14, 559:19, 573:3, 573:8, 573:13, 573:16, 574:15, 575:18, 577:23, 578:1, 578:9, 578:12,

579:7, 582:14, 584:9, 584:13, 586:1, 586:8, 586:10, 586:11, 586:13, 586:14, 587:13, 588:1, 588:6, 590:19, 590:24, 591:9, 591:13, 591:17, 591:21, 592:8, 593:14, 596:14, 596:16, 596:17, 597:1, 597:11, 598:16, 599:2, 599:5, 599:15, 599:20, 599:22, 600:1, 600:4, 600:11, 600:17, 600:18, 600:20, 601:3, 605:1, 605:5, 605:10, 605:16, 605:19, 605:20, 605:24, 606:3, 606:11, 606:24, 607:4, 607:7, 609:21, 609:25, 610:23, 611:4, 611:7, 611:8, 611:23, 619:4, 619:8, 619:10, 620:11, 620:17, 620:21, 620:23, 620:25, 621:20, 621:21, 621:22, 621:24, 622:4, 622:8, 622:15, 628:21, 628:25, 629:6, 631:14, 639:7, 639:12, 639:15, 639:25, 640:21, 640:23, 641:14, 642:1, 643:4, 643:20, 647:21, 647:23, 647:24, 648:1, 648:5, 648:9, 648:11, 648:18, 648:20, 649:17, 650:2, 650:8, 650:19, 650:24, 651:3, 651:7, 651:11, 651:19, 651:23, 652:5, 652:15, 654:24, 658:5, 658:8, 659:17, 659:19, 660:16, 661:5, 661:7, 661:14, 662:1, 662:2, 662:7, 662:23, 663:7, 663:15, 664:8, 668:12, 668:22, 668:25, 669:6, 669:19, 671:17, 672:16, 674:24, 675:21, 676:1, 676:9, 679:1, 679:8, 679:9, 680:7, 680:11, 680:13, 680:16,

680:17, 680:19, 681:2, 681:9, 683:8, 683:16, 683:24, 684:5, 685:17, 685:24, 687:21, 687:24, 688:24, 689:7, 690:1, 690:18, 691:3, 691:24, 692:1, 692:12, 693:5, 694:5, 694:11, 694:14, 695:18, 697:16
**surgical** [4] - 453:18, 477:21, 568:8, 578:3
**sustain** [3] - 461:15, 580:2, 613:9
**sustainable** [1] - 485:17
**sustained** [8] - 494:3, 494:23, 496:15, 604:1, 611:20, 637:7, 662:11, 662:19
**Swedish** [1] - 544:16
**SWORN** [3] - 449:24, 501:24, 623:18
**sworn** [2] - 501:23, 623:17
**symptoms** [17] - 488:7, 518:12, 518:14, 518:20, 524:7, 601:13, 601:14, 601:20, 601:21, 621:7, 641:10, 666:1, 666:7, 666:13, 667:10, 667:18
**system** [34] - 505:7, 505:11, 506:13, 507:6, 507:20, 508:7, 508:14, 508:21, 508:24, 509:2, 509:7, 509:16, 509:17, 511:4, 511:10, 511:21, 512:21, 513:1, 518:12, 518:13, 522:24, 523:21, 531:13, 531:18, 534:1, 534:24, 535:21, 543:5, 543:10, 555:16, 557:14, 618:17, 618:22, 679:20
**systematic** [2] - 594:22, 596:3
**systems** [3] - 512:2, 525:21, 571:9
**systemwide** [1] - 500:15

# T

**table** [2] - 502:14, 690:18

**talks** [4] - 493:18, 530:24, 551:17, 683:2

**Task** [3] - 591:25, 592:22, 594:10

**taught** [3] - 497:10, 659:3, 659:11

**Tax** [2] - 564:3, 619:13

**taxpayers** [1] - 565:25

**teaching** [3] - 552:11, 552:19, 552:24

**team** [2] - 550:8, 609:4, 609:8

**technically** [3] - 513:11, 547:14, 553:3

**techniques** [1] - 578:3

**telepsychiatry** [1] - 511:25

**temporarily** [1] - 546:5

**ten** [5] - 572:13, 623:6, 623:11, 656:11, 656:19

**ten-minute** [2] - 623:6, 623:11

**tend** [2] - 490:25, 664:15

**tended** [1] - 508:25

**term** [4] - 486:21, 508:24, 557:7, 640:20

**terminology** [1] - 486:19

**terms** [5] - 547:5, 571:15, 677:23, 692:23, 694:24

**test** [5] - 456:1, 456:6, 496:24, 525:12, 525:20

**testicles** [3] - 457:21, 458:6, 607:3

**testified** [65] - 448:17, 457:19, 458:1, 458:5, 459:4, 459:18, 462:3, 462:16, 462:24, 464:16, 467:2, 467:5, 467:17, 467:25, 468:8, 468:15, 470:1, 470:10, 470:24, 471:7, 472:10, 472:19, 475:11, 475:16, 475:25, 480:19, 496:11,

520:4, 520:6, 550:21, 554:25, 559:4, 561:16, 561:17, 562:7, 562:9, 562:18, 564:20, 564:23, 566:16, 566:21, 567:19, 569:10, 569:16, 574:6, 591:12, 601:11, 601:18, 601:23, 604:18, 604:25, 605:9, 612:4, 614:12, 625:13, 645:4, 651:13, 654:6, 654:10, 675:17, 678:13, 682:4, 683:20, 692:7, 695:14

**testify** [9] - 466:10, 468:11, 468:19, 468:25, 494:5, 519:22, 570:19, 675:21, 683:5

**testifying** [6] - 493:25, 519:15, 560:5, 636:14, 654:23, 664:22

**testimony** [44] - 444:6, 444:10, 444:17, 445:19, 447:23, 448:14, 448:16, 448:20, 448:23, 450:22, 452:7, 458:15, 461:5, 465:19, 466:13, 466:24, 468:23, 469:5, 472:6, 472:17, 478:18, 490:20, 524:25, 525:7, 549:1, 553:8, 563:14, 569:2, 570:12, 572:16, 574:23, 575:8, 590:5, 605:22, 606:4, 633:2, 647:19, 654:7, 656:21, 660:5, 665:19, 682:6, 683:14, 694:4

**testosterone** [2] - 524:3, 672:6

**testosterone-suppressing** [1] - 672:6

**Texas** [3] - 504:25, 588:4, 588:7

**THE** [367] - 443:3, 443:6, 444:12, 445:22, 445:25, 446:4, 447:19, 448:1, 448:21, 449:3, 450:23, 457:6, 457:8, 458:22, 458:25,

459:11, 459:13, 459:14, 459:15, 459:24, 461:3, 462:1, 465:9, 465:10, 465:14, 465:15, 465:18, 465:21, 465:23, 465:25, 466:6, 466:7, 466:8, 466:13, 466:22, 466:23, 467:13, 468:24, 469:2, 469:6, 469:9, 472:15, 472:16, 472:18, 472:21, 472:22, 472:23, 473:16, 473:19, 476:18, 476:20, 477:1, 478:21, 478:22, 479:5, 479:8, 479:21, 479:25, 480:17, 481:18, 482:5, 482:12, 482:18, 482:22, 483:18, 483:23, 484:1, 484:3, 484:9, 484:12, 484:17, 486:3, 486:5, 489:24, 490:13, 490:21, 491:2, 491:4, 493:24, 494:2, 494:8, 494:23, 496:15, 497:6, 498:11, 498:14, 498:19, 498:22, 500:24, 501:3, 501:5, 501:7, 501:11, 501:19, 501:22, 501:25, 502:3, 502:5, 502:22, 503:7, 503:9, 503:13, 503:20, 503:24, 504:2, 506:6, 506:8, 506:10, 514:18, 514:25, 515:7, 515:10, 515:21, 515:22, 519:19, 520:3, 520:10, 524:22, 525:6, 545:1, 545:6, 545:7, 547:8, 547:10, 547:20, 547:24, 548:1, 548:3, 548:13, 548:15, 549:11, 549:13, 549:18, 553:11, 553:15, 556:10, 557:16, 558:6, 559:1, 559:3, 559:22, 564:7, 564:8, 564:11, 565:8, 565:11, 567:10, 567:12, 567:17, 568:15, 568:16, 568:17, 569:3, 569:5, 569:8, 570:19,

570:21, 570:24, 571:7, 571:24, 572:8, 572:10, 572:12, 572:20, 574:1, 574:4, 574:20, 575:1, 575:23, 576:2, 576:16, 576:21, 576:24, 579:2, 579:4, 579:14, 579:17, 579:23, 581:3, 581:6, 582:20, 582:23, 582:25, 583:2, 583:12, 590:3, 591:3, 591:5, 595:10, 595:24, 596:9, 596:11, 596:20, 597:10, 597:13, 598:23, 599:1, 599:11, 600:5, 600:10, 600:12, 600:15, 600:23, 600:24, 601:5, 601:7, 601:9, 601:10, 606:5, 606:6, 607:23, 607:24, 607:25, 608:10, 608:14, 608:15, 609:13, 611:20, 612:13, 612:16, 612:20, 613:3, 613:6, 613:18, 613:23, 614:1, 614:4, 614:21, 615:1, 615:15, 616:8, 616:17, 616:18, 616:21, 619:16, 619:17, 620:3, 620:7, 621:3, 621:15, 622:10, 623:6, 623:10, 623:14, 623:16, 623:19, 623:22, 623:24, 624:10, 624:13, 624:22, 625:2, 625:10, 625:12, 625:17, 625:20, 625:24, 632:12, 632:14, 632:17, 632:20, 633:5, 635:19, 636:4, 636:7, 636:12, 637:7, 637:16, 637:22, 638:2, 638:9, 638:12, 638:16, 638:18, 638:20, 638:21, 638:25, 642:14, 642:18, 643:1, 643:24, 644:2, 644:9, 644:10, 644:12, 644:14, 646:23, 647:1, 647:4, 647:6, 648:21, 648:23,

648:24, 648:25, 649:5, 649:6, 651:25, 652:3, 652:8, 652:10, 652:14, 652:17, 652:19, 652:20, 653:4, 653:5, 653:6, 653:11, 653:15, 653:17, 653:18, 653:19, 653:21, 653:22, 653:24, 655:7, 655:12, 655:17, 656:1, 659:22, 660:7, 660:19, 662:11, 662:17, 662:19, 664:23, 664:25, 665:3, 665:18, 667:4, 668:5, 670:7, 670:9, 670:14, 670:16, 671:3, 671:7, 671:11, 671:13, 673:22, 673:25, 674:3, 674:18, 676:16, 678:9, 679:25, 680:3, 680:6, 680:21, 681:20, 686:5, 686:7, 686:11, 688:2, 688:5, 688:15, 688:25, 690:19, 694:15, 694:24, 695:20, 696:8, 696:18, 696:22, 699:13, 700:10, 700:16

**theirs** [1] - 673:10

**theme** [1] - 540:24

**themselves** [4] - 543:3, 606:19, 607:19, 608:8

**theoretical** [1] - 685:25

**therapeutically** [1] - 509:13

**therapist** [2] - 468:21, 469:22

**therapist's** [1] - 468:21

**therapists** [2] - 493:2, 691:9

**therapy** [24] - 509:14, 520:23, 521:22, 523:24, 523:25, 524:8, 524:11, 531:12, 589:9, 589:11, 608:18, 628:3, 628:8, 628:11, 640:20, 640:23, 641:5, 642:9, 642:10, 643:13, 664:7, 667:22, 689:22, 690:8

**therefore** [6] - 466:20, 485:24, 519:8, 671:22, 681:1, 698:18

**thinking** [9] - 458:12, 459:8, 460:19, 461:19, 493:21, 497:2, 586:2, 603:9, 638:9

**thinks** [2] - 601:17, 682:8

**third** [2] - 529:17, 616:3

**thorough** [2] - 532:5, 616:23

**thoroughness** [1] - 616:14

**thoughtful** [2] - 572:20, 697:17

**thoughts** [8] - 455:19, 455:21, 458:13, 459:9, 460:20, 495:15, 663:1, 665:21

**thousands** [1] - 500:22

**threatening** [1] - 678:16

**Threats** [1] - 474:18

**three** [32] - 443:5, 444:22, 445:2, 470:10, 470:18, 470:25, 471:21, 474:9, 484:20, 528:19, 552:21, 554:14, 555:11, 556:1, 558:15, 558:22, 562:3, 563:4, 588:16, 588:23, 611:13, 615:6, 615:23, 617:15, 623:4, 623:8, 645:7, 645:15, 675:11, 685:11, 686:15

**three-minute** [2] - 623:4, 623:8

**threshold** [2] - 533:15, 535:2

**throughout** [1] - 587:1

**tibia** [1] - 699:6

**ticking** [1] - 650:9

**tie** [1] - 615:15

**Timothy** [1] - 553:25

**tirelessly** [1] - 690:12

**title** [7] - 474:20, 564:8, 564:17, 564:23, 619:13, 619:17, 619:24

**titled** [4] - 474:3, 474:18, 564:3, 586:17

**titrated** [1] - 524:5

**today** [12] - 487:15, 501:11, 550:21, 563:14, 588:24, 668:20, 671:15, 672:9, 673:23, 681:3, 686:16, 693:17

**together** [10] - 444:15, 447:4, 562:14, 562:23, 563:1, 563:4, 564:2, 595:16, 666:7, 691:17

**tomorrow** [2] - 487:15, 499:19

**took** [6] - 506:22, 507:2, 508:10, 521:4, 522:5, 665:19

**top** [6] - 449:23, 457:23, 459:10, 595:25, 610:7, 638:18

**topics** [1] - 633:17

**total** [3] - 609:14, 619:2, 633:7

**totality** [1] - 528:1

**totally** [2] - 487:19, 598:5

**toward** [1] - 681:17

**towards** [4] - 585:13, 593:9, 602:16, 606:10

**town** [1] - 451:21

**trained** [10] - 474:23, 506:10, 506:13, 571:17, 607:17, 666:6, 679:13, 679:15, 679:17, 679:20

**training** [44] - 452:15, 452:25, 472:7, 472:25, 473:1, 473:8, 473:9, 473:25, 474:13, 505:5, 505:24, 506:12, 513:19, 513:21, 513:22, 513:24, 514:7, 520:6, 523:12, 524:24, 525:10, 526:13, 526:14, 531:6, 553:5, 553:10, 553:18, 553:22, 554:4, 554:10, 554:24, 555:1, 555:3, 555:6, 559:23, 562:10, 563:21, 563:23, 618:11, 629:13, 629:19, 659:20, 660:1

**trainings** [4] - 452:13, 495:4,

506:14, 525:2

**traits** [9] - 495:16, 498:2, 640:11, 653:13, 653:19, 664:11, 666:16, 666:20, 667:6

**trans** [1] - 508:23

**transcript** [7] - 445:7, 460:2, 605:3, 672:25, 673:4, 673:6, 699:22

**transcripts** [1] - 444:8

**transferred** [2] - 521:13, 664:3

**transferring** [1] - 668:10

**transgender** [25] - 451:21, 477:7, 477:21, 477:23, 478:15, 487:12, 490:23, 568:8, 568:9, 580:16, 581:9, 581:22, 589:15, 589:24, 590:12, 594:11, 597:8, 597:10, 597:12, 598:5, 598:16, 640:18, 641:4, 660:24, 684:10

**Transgender** [3] - 476:10, 478:8, 478:10

**transition** [10] - 521:1, 522:14, 529:23, 542:10, 577:5, 588:2, 640:4, 643:13, 658:9

**transition-related** [1] - 577:5

**transitioned** [1] - 530:16

**transitioning** [5] - 594:23, 595:5, 595:13, 596:4, 668:22

**Transsexual** [2] - 476:11, 478:7

**transsexual** [7] - 578:1, 578:12, 579:7, 580:16, 581:9, 581:22, 588:13

**transvestic** [1] - 684:14

**trauma** [11] - 538:10, 538:11, 566:3, 640:14, 640:15, 642:5, 642:8, 666:9, 666:11, 666:12

**travel** [2] - 627:12, 627:14

**treat** [20] - 479:17,

507:21, 573:14, 582:15, 589:2, 599:22, 599:24, 609:1, 650:24, 665:11, 666:1, 666:7, 666:11, 667:6, 672:11, 675:22, 676:20, 684:24, 689:17, 699:7

**treated** [18] - 489:14, 492:25, 500:11, 520:7, 524:19, 530:17, 588:15, 589:7, 619:3, 651:2, 651:4, 651:5, 654:1, 656:6, 659:19, 671:23, 692:17, 698:19

**treater** [3] - 510:16, 550:10, 555:18

**treaters** [3] - 550:12, 654:2, 654:8

**Treating** [1] - 564:3

**treating** [44] - 453:12, 477:15, 507:25, 509:9, 510:3, 512:16, 529:1, 535:5, 538:15, 553:5, 553:18, 554:5, 554:6, 555:9, 555:22, 555:24, 566:22, 567:20, 567:22, 568:2, 568:20, 570:12, 570:16, 572:4, 573:16, 617:14, 618:10, 618:23, 634:23, 647:16, 651:6, 651:9, 651:10, 652:25, 653:7, 653:14, 654:8, 666:13, 666:15, 666:20, 679:7, 685:23, 699:10

**Treatment** [22] - 452:25, 453:2, 454:5, 454:7, 475:15, 479:1, 493:2, 508:9, 508:12, 521:17, 554:3, 554:14, 560:10, 560:24, 562:4, 562:23, 563:9, 617:23, 621:20, 622:2, 627:9, 644:19

**treatment** [183] - 453:7, 453:9, 453:12, 453:14, 453:18, 456:24, 461:13, 471:11, 471:15, 471:19, 476:7, 479:2, 479:10, 479:13,

483:11, 483:14, 484:5, 489:22, 495:5, 497:11, 497:14, 505:9, 505:22, 506:25, 507:14, 508:3, 508:18, 509:3, 509:24, 510:5, 510:6, 510:8, 510:16, 511:11, 513:5, 513:7, 513:9, 514:6, 517:18, 519:8, 519:13, 519:15, 519:18, 519:19, 519:21, 519:23, 519:24, 520:9, 520:15, 520:19, 522:1, 522:5, 522:12, 522:22, 522:24, 523:9, 523:13, 523:21, 524:2, 524:15, 524:25, 526:3, 526:7, 526:10, 531:8, 531:9, 534:18, 534:22, 535:6, 538:16, 539:14, 539:15, 540:15, 542:7, 542:12, 542:15, 546:25, 550:8, 550:17, 550:22, 551:1, 551:8, 552:3, 552:8, 552:12, 552:19, 554:18, 555:22, 560:25, 561:6, 561:14, 561:15, 561:18, 563:16, 566:4, 566:7, 566:18, 568:24, 577:19, 578:13, 578:16, 579:8, 582:2, 582:6, 582:7, 582:9, 583:4, 591:10, 591:13, 591:25, 594:2, 599:15, 606:9, 608:4, 608:7, 609:4, 609:8, 610:19, 611:7, 611:8, 612:2, 617:16, 617:21, 617:22, 618:1, 618:2, 618:13, 618:14, 618:24, 619:2, 627:16, 627:25, 628:10, 628:16, 629:15, 629:16, 629:19, 634:22, 644:24, 645:5, 645:15, 645:19, 646:8, 646:13, 646:20, 646:21, 646:24, 647:1, 647:2, 647:5, 647:9, 647:12, 648:9, 648:17, 651:4, 653:8,

659:16, 660:3,
660:24, 661:10,
662:22, 664:11,
664:18, 672:10,
676:9, 677:13,
683:24, 685:3,
687:10, 687:14,
690:10, 692:7,
692:11, 693:20,
698:7, 698:8, 698:9
**treatments** [8] -
491:15, 535:2, 583:7,
583:17, 584:9,
607:15, 646:22,
661:11
**treats** [2] - 451:21,
565:23
**trial** [15] - 444:22,
445:9, 445:11,
449:13, 505:9,
672:22, 672:24,
673:6, 686:21, 687:2,
687:3, 695:4, 699:15,
699:19, 699:20
**trials** [2] - 594:1
**Tribe** [1] - 537:1,
632:1
**tried** [3] - 579:18,
654:19, 678:15
**trip** [1] - 559:7
**troubled** [1] - 677:21
**troubles** [1] - 622:12
**true** [10] - 446:3,
475:18, 475:20,
487:14, 487:15,
540:6, 601:15,
606:21, 624:9, 641:15
**truly** [1] - 612:25
**trust** [1] - 548:16
**truth** [6] - 447:2,
574:20, 575:4,
613:10, 616:9, 616:12
**try** [18] - 455:21,
484:12, 488:21,
489:7, 500:3, 529:10,
556:13, 572:22,
593:8, 608:8, 622:20,
644:13, 663:4,
673:12, 674:19,
690:12, 700:18,
700:22
**trying** [18] - 467:3,
479:13, 484:24,
491:22, 492:22,
494:15, 606:6, 607:3,
607:6, 607:7, 620:12,
667:9, 674:11,
686:20, 687:2,
687:13, 689:19,
691:10

**tumor** [7] - 607:17,
607:18, 607:19,
607:20, 608:1, 608:4,
608:7
**tunnel** [1] - 695:10
**turn** [13] - 478:3,
482:12, 504:2,
524:12, 577:20,
583:23, 583:24,
586:15, 593:7, 610:4,
610:6, 612:10, 655:23
**turnaround** [1] -
522:19
**turnover** [1] - 452:18
**turns** [2] - 677:4,
677:13
**twice** [2] - 498:10,
678:15
**two** [55] - 456:21,
462:4, 462:15,
462:23, 464:25,
484:2, 499:21, 505:7,
505:8, 505:21,
505:22, 508:18,
514:8, 536:1, 537:16,
543:21, 554:1, 559:6,
560:13, 560:19,
560:20, 573:11,
575:12, 589:5, 610:7,
614:6, 615:7, 616:2,
622:7, 626:17, 627:4,
628:25, 629:2, 629:5,
634:13, 634:15,
645:10, 645:14,
647:19, 648:17,
650:23, 656:22,
661:13, 662:12,
663:9, 667:18,
676:25, 679:6,
680:18, 687:5, 688:6,
695:6, 698:16, 700:22
**two-and-a-half** [2] -
464:25, 505:22
**two-day** [1] - 559:6
**two-month** [2] -
505:7, 505:8
**two-page** [1] - 484:2
**two-year** [1] - 622:7
**type** [3] - 483:14,
587:5, 696:2
**types** [3] - 483:11,
492:14, 510:25
**typical** [2] - 657:18,
657:21
**typically** [7] - 448:22,
512:5, 525:23, 526:1,
531:8, 553:1, 609:24
**typo** [1] - 594:24

## U

**UC** [1] - 504:16
**ultimately** [1] - 699:9
**unaware** [1] - 475:22
**unblinded** [1] - 594:1
**unchallenged** [1] -
578:4
**uncontrolled** [1] -
462:21
**uncontroverted** [2] -
683:16, 683:23
**uncooperative** [1] -
603:20
**under** [32] - 443:18,
447:20, 448:6,
448:21, 449:9,
476:23, 477:14,
488:10, 500:9,
506:10, 508:3,
524:15, 541:16,
548:6, 565:21,
576:17, 584:11,
612:5, 632:16,
632:24, 632:25,
635:10, 639:7,
639:11, 639:15,
655:19, 660:14,
672:2, 675:1, 675:21,
695:22, 699:8
**underdiagnose** [1] -
665:14
**undergo** [3] -
538:17, 667:22,
667:25
**undergoing** [2] -
530:17, 587:13
**undergone** [1] -
596:25
**undergraduate** [1] -
504:11
**underlying** [8] -
624:24, 675:24,
676:10, 676:12,
687:15, 689:18,
690:11, 690:14
**understood** [5] -
455:17, 494:17,
599:21, 600:6, 663:3
**undertaking** [1] -
538:19
**underwear** [1] -
672:7
**undisputed** [4] -
675:12, 675:13,
678:7, 682:16
**unethical** [1] -
683:25
**unfamiliar** [1] -
597:21

**unfortunately** [1] -
690:13
**unfounded** [2] -
610:24, 611:5
**unhelpful** [1] - 681:1
**unique** [7] - 457:2,
532:19, 543:4, 566:1,
582:5, 617:17, 618:6
**Unit** [5] - 460:15,
487:6, 498:7, 498:12,
498:15
**unit** [3] - 460:16,
492:24, 682:20
**United** [2] - 456:25,
514:10
**units** [1] - 536:17
**universe** [1] - 554:5
**University** [8] -
504:12, 504:14,
505:15, 505:20,
552:13, 552:14, 659:3
**university** [7] -
552:11, 552:18,
552:24, 553:1, 553:2,
553:3, 659:11
**unless** [7] - 548:7,
549:7, 678:2, 681:19,
692:22, 696:7, 700:2
**unlike** [1] - 617:13
**unnecessary** [3] -
485:25, 676:23,
677:15
**unqualifiedly** [1] -
570:25
**unresolved** [3] -
640:14, 642:5, 642:8
**unsafe** [1] - 578:1
**unstable** [1] - 637:4
**unsupportable** [1] -
591:18
**untested** [1] - 443:21
**untreated** [1] -
684:21
**unwise** [1] - 594:12
**up** [73] - 443:13,
448:8, 448:12, 449:6,
449:22, 450:8, 452:4,
452:6, 452:12,
452:14, 457:17,
470:9, 477:1, 477:19,
478:4, 480:17,
483:18, 484:7,
484:14, 486:18,
488:23, 498:19,
500:24, 502:14,
502:16, 503:19,
509:16, 510:17,
511:3, 514:14,
514:18, 521:14,
525:24, 528:5, 528:7,

528:8, 528:10, 531:2,
532:15, 532:19,
533:18, 557:7,
561:20, 564:17,
567:4, 579:2, 579:13,
580:7, 586:23, 593:8,
593:10, 593:23,
594:8, 594:21, 596:9,
598:20, 610:7, 641:3,
663:20, 672:23,
684:1, 684:12, 685:5,
687:19, 688:2, 690:3,
690:22, 691:3,
691:12, 691:16,
692:13, 695:8, 700:6
**updated** [3] - 522:10,
522:14, 629:16
**ups** [2] - 456:13,
456:16
**upset** [2] - 487:7,
488:8
**urgent** [2] - 672:12,
694:8
**utilized** [1] - 530:20

## V

**vacation** [1] - 587:10
**vaginoplasty** [1] -
492:17
**vague** [6] - 482:3,
498:9, 582:19,
582:21, 583:9, 583:13
**valuable** [1] - 533:20
**value** [1] - 536:7
**variety** [1] - 538:8
**various** [3] - 525:11,
643:9, 667:22
**vary** [1] - 508:25
**verify** [1] - 539:25
**Version** [1] - 478:8
**version** [3] - 473:15,
629:17, 636:10
**versions** [1] - 577:17
**versus** [3] - 590:12,
657:19, 657:22
**victimized** [1] -
641:7
**view** [3] - 447:3,
607:2, 607:3
**viewed** [1] - 619:25
**views** [1] - 485:7
**violent** [1] - 566:12
**Virginia** [4] - 458:9,
458:11, 471:12,
471:13
**voice** [1] - 687:11
**vs** [1] - 443:4

## W

**wait** [1] - 673:4
**wanton** [2] - 676:23, 677:15
**wants** [6] - 489:11, 515:15, 588:1, 606:19, 606:21, 691:22
**warden** [1] - 634:16
**waste** [2] - 443:12, 591:7
**wasting** [1] - 576:6
**Watson** [1] - 634:19
**ways** [3] - 487:11, 488:5, 643:7
**weaknesses** [3] - 560:3, 570:21, 571:11
**wear** [1] - 657:19
**wearing** [3] - 464:18, 657:8, 663:21
**week** [12] - 505:22, 512:5, 671:15, 672:9, 672:19, 672:22, 699:15, 699:19, 699:20, 699:22, 700:21
**weeks** [3] - 558:16, 558:22, 588:23
**weight** [5] - 525:7, 525:9, 547:11, 659:25, 660:5
**well-controlled** [1] - 691:19
**well-documented** [2] - 534:9, 639:20
**well-established** [1] - 683:24
**well-informed** [1] - 640:21
**whatnot** [1] - 691:4
**whining** [1] - 623:2
**whole** [10] - 449:6, 507:10, 511:9, 511:14, 531:6, 592:14, 594:6, 631:20, 686:19, 695:4
**wide** [1] - 646:4
**widely** [2] - 591:9, 591:13
**wife** [1] - 696:25
**willing** [2] - 542:1, 675:20
**willingness** [1] - 541:24
**wish** [5] - 567:10, 585:4, 670:2, 671:5, 686:7
**withdraw** [1] - 582:24

**withdrawn** [3] - 545:5, 582:25, 625:19
**WITNESS** [71] - 449:24, 459:13, 459:15, 465:10, 465:14, 466:6, 466:8, 466:22, 469:2, 472:15, 472:21, 472:23, 478:22, 479:25, 490:21, 491:4, 494:8, 498:14, 501:24, 502:3, 506:10, 515:22, 545:7, 559:3, 564:8, 567:12, 567:17, 568:16, 570:21, 571:7, 572:8, 574:4, 579:4, 583:2, 595:10, 597:13, 599:1, 599:11, 600:10, 600:15, 600:23, 601:5, 601:9, 606:6, 607:23, 607:25, 608:15, 613:23, 616:17, 619:17, 623:18, 623:24, 636:4, 638:18, 638:21, 644:10, 644:14, 647:1, 647:6, 648:23, 648:25, 649:6, 652:3, 652:10, 652:17, 652:20, 653:5, 653:11, 653:17, 653:19, 653:22
**witness** [45] - 443:16, 444:4, 445:5, 445:20, 446:8, 446:17, 449:21, 455:15, 455:16, 458:22, 461:5, 461:9, 467:1, 481:20, 482:16, 482:19, 482:21, 501:8, 501:19, 501:25, 515:19, 547:11, 564:12, 570:19, 570:24, 571:4, 574:21, 590:8, 613:12, 613:13, 623:3, 623:14, 623:19, 636:13, 637:15, 638:7, 655:5, 655:15, 655:20, 662:20, 665:15, 670:11, 675:17, 675:20, 679:13
**witness's** [1] - 525:7
**witnesses** [24] - 443:15, 443:18,

444:4, 444:19, 444:20, 445:2, 445:3, 445:8, 445:9, 448:6, 448:7, 449:14, 450:25, 576:8, 670:12, 670:15, 670:16, 670:20, 671:2, 679:14, 684:3, 687:1, 692:6
**woman** [13] - 450:10, 450:13, 466:3, 486:19, 640:8, 640:18, 641:4, 641:14, 657:3, 663:22, 663:25, 685:12, 685:15
**women** [3] - 475:1, 657:19, 657:22
**women's** [9] - 508:23, 541:24, 647:25, 648:10, 649:13, 650:2, 658:6, 668:10
**wondering** [1] - 450:11
**word** [8] - 467:11, 478:1, 488:4, 499:2, 550:13, 582:4, 594:24, 653:9
**worded** [1] - 457:22
**words** [3] - 499:20, 686:10, 696:24
**wore** [1] - 682:15
**worker** [2] - 626:7, 660:12
**works** [3] - 451:19, 451:24, 586:21
**World** [2] - 478:9, 684:15
**world** [8] - 466:5, 466:16, 466:19, 623:1, 697:20, 697:23, 698:16
**world's** [1] - 700:10
**worried** [3] - 546:5, 546:8, 546:15
**WPATH** [98] - 455:18, 455:22, 466:2, 466:10, 466:20, 470:19, 478:11, 478:14, 478:19, 488:11, 492:6, 492:8, 492:11, 492:19, 513:24, 522:1, 522:10, 522:16, 523:15, 525:2, 525:24, 527:13, 529:17, 530:7, 530:20, 530:23, 531:3,

531:17, 532:22, 532:25, 533:1, 533:4, 533:18, 534:8, 539:23, 547:4, 553:6, 553:18, 562:8, 566:17, 566:22, 568:2, 568:4, 568:11, 568:12, 568:23, 570:14, 570:22, 571:8, 571:18, 571:22, 571:23, 572:17, 578:20, 579:10, 579:12, 580:3, 580:8, 580:11, 581:4, 586:15, 586:16, 618:11, 629:9, 629:11, 629:13, 629:14, 629:18, 630:5, 639:7, 639:11, 639:15, 639:23, 643:15, 650:13, 650:15, 650:18, 650:19, 676:2, 676:21, 677:1, 679:6, 679:9, 688:6, 688:7, 688:20, 690:4, 690:5, 690:20, 691:13, 691:22, 695:22, 697:6, 697:7, 699:9
**write** [2] - 456:13, 464:2
**write-ups** [1] - 456:13
**writing** [3] - 519:1, 673:10, 674:9
**written** [13] - 444:5, 444:9, 453:20, 512:22, 540:20, 548:7, 556:24, 582:12, 591:3, 599:18, 618:18, 673:11, 673:20
**wrote** [9] - 460:18, 515:5, 517:14, 551:14, 554:8, 565:1, 565:21, 566:13, 593:3

## Y

**Yale** [1] - 504:12
**year** [13] - 444:16, 499:21, 504:15, 507:1, 514:7, 587:6, 609:10, 615:23, 622:7, 630:25, 649:24, 661:16, 681:21
**year..** [1] - 587:1
**years** [33] - 456:8,

464:25, 466:14, 466:18, 466:20, 499:21, 507:10, 508:18, 511:7, 511:14, 539:6, 543:1, 560:13, 560:19, 560:20, 573:11, 590:14, 602:23, 608:18, 626:23, 627:3, 640:3, 645:10, 645:14, 653:2, 654:1, 654:7, 662:1, 681:13, 681:15, 682:16, 685:15, 689:17
**yes-or-no** [2] - 465:6, 475:19
**yesterday** [17] - 444:8, 448:17, 450:2, 451:13, 457:19, 462:3, 462:20, 462:24, 463:11, 464:16, 467:5, 467:17, 470:10, 472:6, 475:25, 487:15, 655:19
**young** [2] - 588:21, 685:12
**yourself** [4] - 568:19, 601:19, 607:7, 661:9

## Z

**zero** [3] - 516:2, 679:7, 697:22
**Zoloft** [1] - 689:18
**zoom** [12] - 449:23, 471:14, 478:24, 565:20, 568:5, 577:21, 583:23, 584:4, 592:19, 594:19, 595:24, 612:18