UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ADREE EDMO,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>IDAHO DEPARTMENT OF<br>CORRECTION, *et al.*,<br><br>　　　　Defendants. | Case No. 1:17-cv-00151-BLW<br><br>**FINDINGS OF FACT,<br>CONCLUSIONS OF LAW, AND<br>ORDER** |

## INTRODUCTION

For more than forty years, the Supreme Court has consistently held that consciously ignoring a prisoner's serious medical needs amounts to cruel and unusual punishment in violation of the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976). After all, inmates have no choice but to rely on prison authorities to treat their medical needs, and "if the authorities fail to do so, those needs will not be met." *Id.* Prison authorities thus treat inmates with all manner of routine medical conditions – broken bones are set; diabetic inmates receive insulin; inmates with cancer receive chemotherapy; and so on. This constitutional duty also applies to far less routine, and even controversial, procedures – if necessary to address a serious medical need. And so it is here. Plaintiff Adree Edmo alleges that prison authorities violated her Eighth Amendment rights by refusing to provide her with gender confirmation surgery. For the

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 1**

reasons explained below, the Court agrees and will order defendants to provide her with this procedure, a surgery which is considered medically necessary under generally accepted standards of care.

The Court will explain its reasoning below but will first pause to place this decision in a broader context. The Rule of Law, which is the bedrock of our legal system, promises that all individuals will be afforded the full protection of our legal system and the rights guaranteed by our Constitution. This is so whether the individual seeking that protection is black, white, male, female, gay, straight, or, as in this case, transgender. This decision requires the Court to confront the full breadth and meaning of that promise.

Adree Edmo is a male-to-female transgender prisoner in the custody of the Idaho Department of Correction ("IDOC"). She has been incarcerated since April 2012. In June 2012, soon after being incarcerated, an IDOC psychiatrist diagnosed Ms. Edmo with gender dysphoria. An IDOC psychologist confirmed that diagnosis a month later.

Gender dysphoria is a medical condition experienced by transgender individuals in which the incongruity between their assigned gender and their actual gender identity is so severe that it impairs the individual's ability to function. The treatment for gender dysphoria depends upon the severity of the condition. Many transgender individuals are comfortable living with their gender identity, role, and expression without surgery. For others, however, gender confirmation surgery, also known as gender or sex reassignment surgery ("SRS"), is the only effective treatment.

To treat Ms. Edmo's gender dysphoria, medical staff at the prison appropriately

began by providing Ms. Edmo with hormone therapy. This continued until she was hormonally confirmed – meaning she had the same circulating sex hormones and secondary sex characteristics as a typical adult female. Ms. Edmo thus achieved the maximum physical changes associated with hormone treatment. But, Ms. Edmo continued to experience such extreme gender dysphoria that she twice attempted self-castration. For her second attempt, Ms. Edmo prepared for weeks by studying the anatomy of the scrotum and took steps to diminish the chance of infection by boiling a razor blade and scrubbing her hands with soap. She was successful in opening the scrotum and exposing a testicle. But because there was too much blood, Ms. Edmo abandoned her second self-castration attempt and sought medical assistance. She was transported to a hospital where her testicle was repaired.

As already noted, an inmate has no choice but to rely on prison authorities to treat their medical needs.  For this reason, the United States Supreme Court has held that deliberate indifference to a prisoner's serious medical needs constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.  *See, e.g., Estelle v. Gamble*, 429 U.S. 97, 103 (1976). To show such deliberate indifference, Ms. Edmo must establish two things.  First, she must show a "serious medical need" by demonstrating that failure to treat a medical condition could result in significant further injury or the "unnecessary and wanton infliction of pain."  Second, she must show that the prison officials were aware of and failed to respond to her pain and medical needs, and that she suffered some harm because of that failure.

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 3**

Ms. Edmo's case satisfies both elements of the deliberate indifference test. She has presented extensive evidence that, despite years of hormone therapy, she continues to experience gender dysphoria so significant that she cuts herself to relieve emotional pain. She also continues to experience thoughts of self-castration and is at serious risk of acting on that impulse. With full awareness of Ms. Edmo's circumstances, IDOC and its medical provider Corizon refuse to provide Ms. Edmo with gender confirmation surgery. In refusing to provide that surgery, IDOC and Corizon have ignored generally accepted medical standards for the treatment of gender dysphoria. This constitutes deliberate indifference to Ms. Edmo's serious medical needs and violates her rights under the Eighth Amendment to the United States Constitution. Accordingly, for the reasons explained in detail below, IDOC and Corizon will be ordered to provide Ms. Edmo with gender confirmation surgery. Thus, the Court will grant in part Plaintiff's Motion for Preliminary Injunction (Dkt. 62).

In so ruling, the Court notes that its decision is based upon, and limited to, the unique facts and circumstances presented by Ms. Edmo's case. This decision is not intended, and should not be construed, as a general finding that all inmates suffering from gender dysphoria are entitled to gender confirmation surgery.

## FINDINGS OF FACT

### I.    Transgender and Gender Dysphoria

1.    Transgender is an umbrella term for a person whose gender identity is not congruent with their assigned gender. Tr. 50:5-11.  A transgender person suffers

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 4**

from gender dysphoria when that incongruity is so severe that it impairs the individual's ability to function. Tr. 50:12-14.

2.   The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM-5") sets forth specific criteria which must exist before a diagnosis of gender dysphoria is appropriate. Specifically, two conditions are required:

   a.   First, there must be marked incongruence between one's experienced/expressed gender and assigned gender, of at least six month's duration, as manifested by at least two of the following:

      i.   A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics.

      ii.   A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender.

      iii.   A strong desire for the primary and/or secondary sex characteristics of the other gender.

      iv.   A strong desire to be of the other gender.

      v.   A strong desire to be treated as the other gender.

      vi.   A strong conviction that one has the typical feelings and reactions of the other gender.

   b.   Second, the individual's condition must be associated with clinically

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 5**

significant distress or impairment in social, occupational, or other important areas of functioning. Exh. 1001 at 3-4.

3.   "Clinically significant distress" means that the distress impairs or severely limits the person's ability to function in a meaningful way and has reached a threshold that requires either medical or surgical interventions, or both. Tr. 51:3-8.

4.   Not every person who identifies as transgender has gender dysphoria. Tr. 50:5-11.

## II.   WPATH

5.   The World Professional Association of Transgender Health ("WPATH") Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People were first promulgated in 1979 and are the internationally recognized guidelines for the treatment of individuals with gender dysphoria. Tr. 42:6-20; Exh. 15. WPATH Standards of Care are "flexible clinical guidelines." Tr. 118:16-24, 119:1-7, 8-25, 288:7-23, and "are intended to be flexible in order to meet the diverse health care needs of transsexual, transgender, and gender nonconforming people." Exh. 15 at 8.

6.   The WPATH Standards of Care have provided treatment guidelines for incarcerated individuals since 1998. Tr. 54:11-21; Exh. 15 at 73. The current WPATH Standards of Care apply equally to all individuals "irrespective of their housing situation" and explicitly state that health care for transgender people "living in an institutional environment should mirror that which would be available to them if they were living in a non-institutional setting within the same

community." Tr. 54:11-21; Exh. 15 at 73. The next update to the WPATH

Standards of Care will also apply to an individual regardless of where that person

is housed, including in a prison setting. Tr. 54:25-55:12.

7.      The WPATH Standards of Care indicate that options for psychological and

medical treatment of gender dysphoria include:

    a.  changes in gender expression and role,

    b.  hormone therapy to feminize or masculinize the body,

    c.  surgical changes of primary or secondary sex characteristics, and

    d.  psychotherapy. Exh. 15 at 15-16.

8.      The WPATH Standards of Care suggest options for social support and changes in

gender expression, including:

    a.  offline and online peer support resources, groups, or community

       organizations that provide avenues for social support and advocacy;

    b.  offline and online support resources for families and friends;

    c.  voice and communication therapy to help individuals develop verbal and

       non-verbal communication skills that facilitate comfort with their gender

       identity;

    d.  hair removal through electrolysis, laser treatment, or waxing;

    e.  breast binding or padding, genital tucking or penile prostheses, padding of

       hips or buttocks; and

    f.  changes in name and gender marker on identity documents. Exh. 15 at 16.

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 7**

9.      The WPATH Standards of Care provide that the purposes of psychotherapy

include "exploring gender identity, role, and expression; addressing the negative

impact of gender dysphoria and stigma on mental health; alleviating internalized

transphobia; enhancing social and peer support; improving body image; or

promoting resilience." Exh. 15 at 16.

10.     Cross-sex hormone therapy results in development of secondary sex

characteristics of the other sex and provides an increase in the overall level of

well-being of a person with gender dysphoria. Tr. 60:8-22. For a transgender

woman, hormone treatment has physical effects such as breast growth, thinning of

facial hair, redistribution of fat and muscle, and shrinkage of the testicles. Tr.

246:7-20.  The maximum physical effects of hormone therapy will typically be

achieved within two to three years. Exh. 15 at 42; Tr. 60:23-61:5, 246:7-247:1.

11.     Surgery – particularly genital surgery – is often the last and the most considered

step in the treatment process for gender dysphoria. Exh. 15 at 60.

12.     Many transgender individuals find comfort with their gender identity, role, and

expression without surgery. Exh. 15 at 60. For many others, however, surgery is

essential and medically necessary to alleviate their gender dysphoria. Exh. 15 at

60. For the latter group, relief from gender dysphoria cannot be achieved without

modification of their primary or secondary sex characteristics to establish greater

congruence with their gender identity. Exh. 15 at 60.

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 8**

13.   For individuals with severe gender dysphoria, where hormone therapy is

insufficient, gender confirmation surgery is the only effective treatment and is

medically necessary. Tr. 168:23-169:15; *see also* Ettner Decl. ¶ 51.

14.   The WPATH criteria for genital reconstruction surgery in male-to-female patients

include the following:

    a.   Persistent, well documented gender dysphoria;

    b.   Capacity to make a fully informed decision and to consent for treatment;

    c.   Age of majority in a given country;

    d.   If significant medical or mental health concerns are present, they must be

       well controlled;

    e.   12 continuous months of hormone therapy as appropriate to the patient's

       gender goals; and

    f.   12 continuous months of living in a gender role that is congruent with their

       gender identity. Exh. 15 at 66.

15.   Regarding the first criterion, "persistent, well documented gender dysphoria" is

deemed to exist when the person has a well-established diagnosis of gender

dysphoria that has persisted beyond six months. Tr. 55:21-56:3.

16.   Regarding the fourth criterion, the WPATH Standards of Care make clear that the

presence of co-existing mental health concerns does not necessarily preclude

possible changes in gender role or access to feminizing/masculinizing hormones or

surgery. Exh. 15 at 31. But these concerns need to be optimally managed prior to,

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 9**

or concurrent with, treatment of gender dysphoria. Exh. 15 at 31.

    a.  It is often difficult to determine whether coexisting mental health concerns are a result of gender dysphoria or are unrelated to that medical condition. Tr. 171:1-14, 24-25, 172:1-5; 387:20-25, 388:1, 398:2-18, 601: 11- 602: 2; Campbell Decl., Dkt. 101-4, ¶¶ 30-33. Co-existing mental health issues directly tied to an individual's gender dysphoria should not be considered in assessing whether an individual meets the fourth WPATH criterion that significant medical or mental health concerns must be well controlled. Tr. 387:6 to 388:6.

17.  Regarding the sixth criterion – a twelve-month experience of living in an identity-congruent role – the WPATH Standards of Care provide that this is intended to ensure that the individual has had the opportunity to experience the full range of different life experiences and events that may occur throughout the year (e.g., family events, holidays, vacations, season-specific work or school experiences). During this time, patients should present consistently, on a day-to-day basis and across all settings of life, in their desired gender role. This includes coming out to partners, family, friends, and community members (e.g., at school, work, and in other settings). Exh. 15 at 67.

18.  An individual in prison can satisfy the criterion of living in a gender role congruent with their gender identity. Tr. 62:16-63:4, 584:16-25.

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 10**

## III.   Expert Testimony

### A. Plaintiff's Experts

19. Dr. Ettner is one of the authors of the WPATH Standards of Care, version 7. Tr. 42:21-24. Dr. Ettner has been a WPATH member since 1993 and chairs its Committee for Institutionalized Persons. Tr. 43:2-16; Exh. 1003.

   a. Dr. Ettner has treated approximately 3,000 individuals with gender dysphoria, including evaluating whether gender confirmation surgery is necessary for certain patients. She has referred approximately 300 patients for gender confirmation surgery and assessed approximately 30 incarcerated individuals with gender dysphoria. Tr. 43:17-44:1, 44:9-13.

   b. Dr. Ettner has extensive experience treating patients who have undergone gender confirmation surgery. Tr. 44:2-8.

   c. Dr. Ettner is an author or editor of numerous peer-reviewed publications on treatment of gender dysphoria and transgender healthcare. Dr. Ettner is an editor for the textbook, "Principles of Transgender Medicine and Surgery," which was revised in 2017 and is the textbook used in medical schools. Tr. 44:14-45:1; Exh. 1003.

   d. Dr. Ettner also trains medical and mental health providers on treating people with gender dysphoria, including assessing whether gender confirmation surgery is appropriate, through the global education initiative of WPATH and other presentations. Tr. 41:8-16, 45:17-46:18.

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 11**

e.  Dr. Ettner has been appointed by a federal court as an independent expert related to evaluation of an incarcerated patient for gender confirmation surgery. Tr. 46:19-22.

f.  However, Dr. Ettner is not a Certified Correctional Healthcare Professional, and she has not treated inmates with gender dysphoria. Tr. 106:21-24, 107:11-18.

20.  Dr. Gorton is an emergency medicine physician who practices at a federally qualified healthcare center that primarily services uninsured patients or those with Medicare or Medicaid. Exh. 1004; Tr. 234:24-235:2. Dr. Gorton also works with Project Health, which has provided training for numerous clinics regarding the provision of transgender health care in California. Tr. 233:5-21. Dr. Gorton is a member of WPATH and is on WPATH's Transgender Medicine and Research Committee and its Institutionalized Persons Committee. Tr. 238:4-6; Exh. 1004.

a.  Dr. Gorton has been the primary care physician for approximately 400 patients with gender dysphoria and is currently the primary care physician for approximately 100 patients with gender dysphoria. Exh. 1004; Tr. 237:4-12. Dr. Gorton currently provides follow-up care for about thirty patients who have had vaginoplasty. Exh. 1004; Tr. 249:20-250:3.

b.  Dr. Gorton has published peer-reviewed articles regarding treatment of gender dysphoria. Tr. 239:16-18, Exh. 1004.

    c.  Dr. Gorton has been qualified as an expert in multiple cases involving transgender healthcare. Tr. 239:19-240:19; Exh. 1004.

    d.  However, Dr. Gorton has no experience treating inmates with gender dysphoria. Tr. 269:17-23. Dr. Gorton is not a Certified Correctional Healthcare Professional. Tr. 270:9-16.

## B.  Defendants' Experts

21.    Dr. Garvey is a psychiatrist and Certified Correctional Healthcare Professional under the National Commission on Correctional Health Care. Tr. 525:15-23. As the Chief Psychiatrist in the Massachusetts Department of Corrections, Dr. Garvey served as the chair of the Gender Dysphoria Treatment Committee. Tr. 508:10-11. Dr. Garvey directly treated patients in the Massachusetts Department of Correction who had gender dysphoria. Tr. 508:13-509:1.

    a.  Prior to evaluating Ms. Edmo, Dr. Garvey had never conducted an in-person evaluation to determine whether a patient needed gender confirmation surgery. Tr. 558:10-14.

    b.  Dr. Garvey has never recommended that a patient with gender dysphoria receive gender confirmation surgery or done long-term follow-up care with a patient who has had gender confirmation surgery. Tr. 556:20-557:9.

22.    Dr. Andrade is a licensed independent clinical social worker and is a Certified Correctional Healthcare Professional with an emphasis in mental health. Tr. 626:1-21. Dr. Andrade has over a decade of experience providing and supervising the

provision of correctional mental health care, including directing and overseeing the treatment of all inmates diagnosed with gender dysphoria in the custody of the Massachusetts Department of Corrections in his role as clinical director, chair of the Gender Dysphoria Supervision Group, and member of the Gender Dysphoria Treatment Committee. Tr. 627:22-23.

   a. Over the last decade, Dr. Andrade has provided treatment to gender dysphoria inmates in his role on the treatment committee and has evaluated and confirmed diagnoses of gender dysphoria for over 100 inmates. Tr. 627:2-14. But Dr. Andrade has never provided direct treatment for patients with gender dysphoria and has never been a treating clinician for a patient who has had gender confirmation surgery. Tr. 647:8-14, 651:10-12.

   b. As part of a committee, Dr. Andrade has recommended gender confirming surgery for incarcerated inmates on two occasions. Tr. 627-629:1-10.  But the recommendation was contingent upon the requirement that the inmates first live in a women's prison for approximately twelve months. Tr. 647:19-648:25. The Massachusetts Department of Corrections houses prisoners according to their genitals, so the inmates were not allowed to move to a women's prison. Tr. 649:1-650:11. To Dr. Andrade's knowledge, the inmates had not been moved to a women's prison at least seven months after his recommendation. Tr. 649:1-650:11. Thus, the twelve-month period of living in a women's prison could not have started. Tr. 650:6-11.

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 14**

    c. As a licensed independent clinical social worker, Dr. Andrade does not qualify under IDOC's former gender dysphoria policy as a "gender identity disorder evaluator" who could assess someone for surgery. Tr. 660:11-17; Exh. 8 at 3.

23. Dr. Campbell is IDOC's Chief Psychologist. He has provided mental health services to incarcerated inmates since 2012. Campbell Decl., Dkt. 101-4, ¶¶ 2-7. Dr. Campbell is a member of WPATH and is familiar with the WPATH Standards of Care regarding gender dysphoria offenders and transgender inmates as provided by the National Commission on Correctional Healthcare ("NCCHC"), the National Institute of Corrections, and the Federal Bureau of Prisons. Campbell Decl., Dkt. 101-4, ¶¶ 8-10.

    a. Dr. Campbell serves as chair of the Management and Treatment Committee ("MTC"), a multidisciplinary committee that meets monthly to discuss and evaluate the needs of inmates who have been diagnosed with gender dysphoria. Campbell Decl., Dkt. 101-4, ¶¶ 13-14.

    b. Dr. Campbell has directly conducted six gender dysphoria assessments and has overseen the treatment and assessment of approximately fifty inmates who have requested gender dysphoria evaluations, through his role as chair of the Management and Treatment Committee and as the Chief Psychologist. Campbell Decl., Dkt. 101-4, ¶¶ 13-14.

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 15**

    c.  There is no evidence that Dr. Campbell has ever recommended gender confirmation surgery for an inmate.

## IV.   <u>NCCHC</u>

24.    The NCCHC endorses the WPATH Standards of Care as the accepted standards for the treatment of transgender prisoners. Exh. 1041 at 2, 4, n.1; Tr. 477:14-478:22.

## V.   <u>Defendants' Policies and Practices Regarding Gender Dysphoria</u>

### A. Corizon's Policies and Practices

25.    Corizon is a private corporation that contracts to provide health care to prisons and jails throughout the country. Corizon providers have never recommended gender confirmation surgery to a patient at any of the prisons where it provides medical services. Tr. 489:20-23.

26.    Corizon's only written policy regarding gender dysphoria treatment does not include gender confirmation surgery as a form of treatment. Tr. 482:25-483:9; Exh. 14.

### B. IDOC's Policies and Practices

27.    The IDOC MTC is a multiple-disciplinary team that addresses treatment, planning, and security issues associated with IDOC inmates who have gender dysphoria. Tr. 322:12-20. The Management and Treatment Committee reviews the treatment of all inmates with gender dysphoria but does not make medical decisions. Tr. 323:4-13, 324:9-14.

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 16**

28.     There are currently 30 prisoners with gender dysphoria in IDOC custody. Tr.
        322:21-323:3. No individual in IDOC custody has ever been recommended for, or
        received, gender confirmation surgery. Tr. 376:23-377:4.

29.     IDOC's operative gender dysphoria policy when Ms. Edmo was assessed for
        surgery defined a "qualified gender identity disorder (GID) evaluator as '[a]
        Doctor of philosophy (PhD) level practitioner licensed by an appropriate state
        licensing authority as a psychologist, or a physician licensed by a state Board of
        Medicine, who has demonstrated an indicia of basic competence related to the
        diagnosis and treatment of GID and related mental or emotional disorders through
        their licensure, training, continuing education, and clinical experience.'" Exh. 8 at
        3; Tr. 388:16-389:1.

30.     This policy stated that gender confirmation surgery "will not be considered for
        individuals within the Idaho Department of Correction (IDOC), unless determined
        medically necessary by the treating physician." Exh. 8 at 8.

31.     On October 5, 2018, shortly before the hearing in this matter, IDOC implemented
        a new gender dysphoria policy that would allow prisoners at Idaho State
        Correctional Institute ("ISCI") diagnosed with gender dysphoria to order and
        possess female commissary items and present in a manner consistent with their
        gender identity. Tr. 347:18-348:23; Exh. 9.

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 17**

a.  The new policy also states that "to avoid a sexually charged atmosphere in IDOC facilities . . .. [n]o provocative or sexually charged clothing or behavior will be permitted." Exh. 9 at 6.

b.  IDOC's new gender dysphoria policy continues to state that gender confirmation surgery "will not be considered for individuals within the Idaho Department of Correction (IDOC), unless determined medically necessary by the treating physician." Exh. 9 at 8-9.

c.  The policy further states that prisoners will be housed "based upon the inmate's primary physical sexual characteristics." Exh. 9 at 4.

## V.    Adree Edmo's Gender Dysphoria

32.    Adree Edmo is a male-to-female transgender prisoner in the custody of IDOC. Ms. Edmo has been incarcerated at ISCI since April 2012. Tr. 192:19-20; *see also* Edmo Decl. ¶ 12.  She is 30 years of age.  Tr. 192:17-18.

33. From the age of 5 or 6, Ms. Edmo has viewed herself as female.  In her words, "my brain typically operates female, even though my body hasn't corresponded with my brain."  Tr. 193:7-8.

34. While others viewed her as being gay, that is not how she perceived herself.  Tr. 193:18-23.  While, she struggled with her gender identity as a child and teenager, she began living as a woman at age 20 or 21.  Tr. 211:1-11.  She views herself as a woman with a heterosexual attraction to men. Tr. 193:15-17.

35.    Prior to being incarcerated, and learning about gender identity and transgender, Ms. Edmo struggled with her own identity and sexual orientation.  On two occasions in 2010 and 2011, she attempted suicide.  Tr. 206:12-15.

36.    In June 2012, soon after being incarcerated, Ms. Edmo was diagnosed with gender identity disorder by Corizon psychiatrist Dr. Eliason. Exh. 1 at 321. In July 2012, Corizon psychologist Claudia Lake confirmed Ms. Edmo's diagnosis of gender identity disorder. Exh. 1 at 323-27. There is no dispute that Ms. Edmo suffers from gender dysphoria. Tr. 69:20-70:3, 251:23-252:3, 518:16-18, 635:1-7.

37.    Ms. Edmo legally changed her name to Adree Edmo in September 2013. Tr. 192:6-9. Ms. Edmo has also changed her sex to "female" on her birth certificate to further affirm her gender identity. Tr. 203:13-22; Exh. 1002.

38.    Ms. Edmo has consistently presented as feminine throughout her incarceration by wearing her hair in traditionally feminine hairstyles when able to do so, wearing makeup when able to do so, and acting in a feminine demeanor. Tr. 194:24-195:5, 411:1-7, 463:11-464:21. Ms. Edmo's feminine presentation has been documented by Defendants' medical providers since 2012. *See, e.g.*, Exh. 1 at 321, 347, 425, 452, 538. Ms. Edmo has also held two jobs while in prison and has presented as feminine at her places of employment. Tr. 201:24-202:10.

39.    Ms. Edmo has continually sought to present herself as feminine despite receiving multiple disciplinary offense reports related to wearing makeup, styling her hair in a feminine manner, and altering her male-issued undergarments into female

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 19**

panties. Tr. 195:11-20; Exh. 5 at 8, 9, 21-22, 25, 27-28, 33-34, 41-43, 48-57, 62-65; Yordy Dep. 47:4-49:15, 85:22-87:11; Edmo Decl. ¶ 19.

40.     Ms. Edmo testified that hormone therapy helped treat her gender dysphoria to some extent. Tr. 223:9-14. The hormones "cleared her mind," and resulted in breast growth, body fat redistribution, and changes in her skin consistency. Tr. 196:15-25. As a result of hormone therapy, Ms. Edmo is hormonally confirmed, which means she has the same circulating sex hormones and secondary sex characteristics as a typical adult female. Tr. 72:14-21; Ettner Decl. ¶ 59.

41.     Ms. Edmo has achieved the maximum physical changes associated with hormone treatment. Tr. 602:1-603:4. However, Ms. Edmo continues to experience distress related to gender incongruence, which is mostly focused on her male genitalia. She testified she feels "depressed, embarrassed, and disgusted" by her male genitalia and that this is an "everyday reoccurring thought." Tr. 197:7-24.

42.     Ms. Edmo first attempted self-castration to remove her testicles in September 2015 using a disposable razor blade. She wrote a note to let the officers know she was not trying to commit suicide and was only trying to help herself. She attempted to cut her testicle sac open but was unsuccessful. Edmo Decl. ¶ 31; Tr. 197:25-198:8.

43.     In January 2016, Ms. Edmo reported to Dr. Eliason that she was having difficulty sleeping due to thoughts of self-castration. In response, Dr. Eliason prescribed Ms. Edmo sleeping medication. Tr. 458:5-10, 461:18-24.

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 20**

44.   Ms. Edmo also reported her frequent thoughts of self-castration to her assigned clinician, Krina Stewart, in November 2016. Ms. Stewart testified that none of the interventions she identified for Ms. Edmo at that visit would alleviate her gender dysphoria or desire to self-castrate. Stewart Dep. 58:15-59:16; Exh. 1 at 584-85.

45.   Ms. Edmo attempted self-castration a second time in December 2016. She prepared for weeks by studying the anatomy of the scrotum and took steps to diminish the chance of infection by boiling the razor blade and scrubbing her hands with soap. Ms. Edmo made more surgical headway on this attempt and was able to cut open the testicle sac and remove the testicle. Gorton Decl. ¶ 74. Because there was too much blood, Ms. Edmo abandoned her attempt and sought medical assistance. Tr. 198:9-16. She was transported to a hospital where her testicle was repaired. Tr. 198:25-199:13.

46.   Ms. Edmo was receiving hormone therapy both times she attempted to self-castrate. Tr. 228:20-25.

47.   After the procedure, Ms. Edmo felt disappointed in herself because she felt she had come so close to removing her testicle but had not succeeded. Tr. 199:17-23. Ms. Edmo continues to actively experience thoughts of self-castration. Tr. 197: 21-24. In an effort to avoid acting on them, when she has experienced extreme episodes of gender dysphoria in the past year, Ms. Edmo "self-medicat[es]" by using a razor to cut her arm. The physical pain she feels from

cutting helps her release the emotional torment and mental anguish she feels at the time. Tr. 199:24-200:15.

48.     Ms. Edmo will likely be released from prison sometime in 2021. Tr. 201:14-15, 230:3-10.

### VI.     Defendants' Treatment of Ms. Edmo for Gender Dysphoria

49.     On April 20, 2016, Dr. Eliason evaluated Ms. Edmo for sex reassignment surgery. Jt. Exh. 1 at 538. Dr. Eliason noted that Ms. Edmo reported she was "doing alright," that she was eligible for parole, but it had not been granted because of multiple Disciplinary Offense Reports ("DORs"). Jt. Exh. 1 at 538. The DORS were related to her use of makeup and feminine appearance. Jt. Exh. 1 at 538.

50.     Dr. Eliason noted that Ms. Edmo had been on hormone replacement for the last year and a half, but that she felt she needed more. Jt. Exh. 1 at 538. Dr. Eliason specifically noted that Ms. Edmo stated an improvement in gender dysphoria on hormone replacement but had ongoing frustrations stemming from her current anatomy. Jt. Exh. 1 at 538. He also recognized Ms. Edmo's multiple attempts to "mutilate her genitalia" because of the severity of her distress. Jt. Exh. 1 at 538. He also noted that he spoke to prison staff about Ms. Edmo's behavior, "which is notable for animated affect and no observed distress." Jt. Exh. 1 at 538. Dr. Eliason then stated that he also personally observed Ms. Edmo in these settings and did not observe significant dysphoria. Jt. Exh. 1 at 538.

51.    Nevertheless, Dr. Eliason noted that Ms. Edmo appeared feminine in demeanor and interaction style. Jt. Exh. 1 at 538. He concluded that Ms. Edmo had Gender Dysphoria, Alcohol Use disorder, and Depression, Jt. Exh. 1 at 538, but his ultimate conclusion was that Ms. Edmo "[d]oes not meet criteria for medical necessity for sex reassignment surgery." Jt. Exh. 1 at 538.

52.    In assessing Ms. Edmo's need for gender confirmation surgery, Dr. Eliason indicated that he staffed her case with Dr. Jeremy Stoddart, Dr. Murray Young, and Jeremy Clark LCPC (clinical supervisor and WPATH member). Each of these individuals agreed with his assessment. Jt. Exh. 1 at 538.

53.    Dr. Eliason indicated he would continue to monitor and assess Ms. Edmo for the medical necessity of gender confirmation surgery. Jt. Exh. 1 at 538. He further determined that the combination of hormonal treatment and supportive counseling is sufficient for Ms. Edmo's gender dysphoria for the time being.

54.    To justify his conclusion, Dr. Eliason noted that while medical necessity for gender confirmation surgery is not very well defined and is constantly shifting, the following situations could constitute medical necessity for the surgery:

   a.   Congenital malformations or ambiguous genitalia;

   b.   Severe and devastating dysphoria that is primarily due to genitals; and

   c.   Some type of medical problem in which endogenous sexual hormones were causing severe physiological damage. Jt. Exh. 1 at 538.

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 23**

55.     He also explained that there may also be other situations where gender confirmation surgery is medically necessary as more information becomes available. Jt. Exh. 1 at 538.

56.     Although not noted in his April 20, 2016 progress notes, Dr. Eliason testified that Ms. Edmo's mental health concerns were not "fully in adequate control." Tr. 430:22-431:2. He testified that not all of Ms. Edmo's mental health issues, such as her major depression and alcohol use disorders, stemmed from her gender dysphoria. His testimony, however, is contradicted by his April 20, 2016 clinician notes. Tr. 451:1-12.

57.     Ms. Edmo has received mental health treatment from a psychiatrist and mental health nurse practitioner since she began her incarceration in 2012.  Tr. 225:8-227:2. However, she has not consistently attended therapy to help her work through serious underlying mental health issues and a pre-incarceration history of trauma, abuse, and suicide attempts.  Tr. 134:8-25, 135:1-23, 218:21-25, 219:1-14, 220:17-20; 221:16-19; Campbell Decl. Dkt., 101-4, ¶¶24, 29; Stewart Decl., Dkt. 101-1, ¶12; Watson Decl., Dkt. 101-3, ¶18; Clark Decl., Dkt. 101-7, ¶14).

58.      Dr. Eliason testified that there were two primary reasons why sex reassignment surgery was not medically necessary at the time:

    a.  Ms. Edmo had not satisfied the 12-month period of living in her identified gender role under WPATH standards. Tr. 430: 25-431:2; and

b. "[I]t was not doing Ms. Edmo any service to rush through getting gender reassignment surgery in that current social situation." Tr. 431:3-6.

59. Dr. Eliason's evaluation was the only time IDOC and Corizon evaluated Ms. Edmo for gender confirmation surgery prior to this lawsuit. Exh. 1 at 538; Tr. 419:1-10.

60. In concluding that surgery was not medically necessary for Ms. Edmo, Dr. Eliason did not review her prior criminal record, disciplinary history, or her presentence investigation reports. Tr. 468:4-18. The only information Dr. Eliason relied upon was Ms. Edmo's medical record, staff observations, and her therapist's notes. Tr. 469:16-25. Dr. Eliason testified that when he assessed her for surgery, he was aware of Ms. Edmo's prior self-surgery attempt. He believed Ms. Edmo's gender dysphoria had risen to another level, but he made no change to her treatment plan. Tr. 471:7-22.

## VII.   Ms. Edmo's Medical Necessity for Gender Confirmation Surgery

61. Plaintiff's and Defendants' experts disagree on whether Ms. Edmo meets all the WPATH standards criteria for gender confirmation surgery. Specifically, Defendants' experts believe that Ms. Edmo does not meet the fourth and sixth criteria – that any significant mental health concerns be well controlled and that she live twelve months in a fully gender-congruent role. Tr. 75:9-78:3; 252:13-254:11; 607:2-10, 639:14-640:25.

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 25

62.   Notably, however, Dr. Eliason did not rely upon any finding that Ms. Edmo did not meet the WPATH criteria in concluding in his April 2016 assessment that she did not meet the criteria for gender confirmation surgery. Tr. 462:3-463:10.

63.   With regard to the fourth criterion, Ms. Edmo has been diagnosed with Major Depressive Disorder, Alcohol Use Disorder, and Gender Dysphoria. *See, e.g.*, Exh. 1 at 538. These diagnoses were generally confirmed by each of the experts, with observation that any substance use disorder has been in remission while Ms. Edmo has been incarcerated. Tr. 67:16-18, 253:3-9, 518:16-219:6, 603:22-604:5.

   a.   Plaintiff's experts testified that Ms. Edmo's depression and anxiety are as controlled as they can be and do not impair her ability to undergo surgery. Tr. 76:13-25, 123:14-124:11, 253:3-9; Exh. 15 at 30. In their view, the clinical significance of Ms. Edmo's self-surgery attempts and recent cutting of her arm is that she has severe genital-focused gender dysphoria and is not getting medically necessary treatment to alleviate it. Tr. 254:15-19, 98:11-22.  Ms. Edmo's self-surgery attempts are not acts of mutilation or self-harm, but are instead attempts to remove her target organ that produces testosterone, which is the cure for gender dysphoria. Tr. 80:3-13. Ms. Edmo's gender dysphoria, not her depression and anxiety, is the driving force behind her self-surgery attempts. Tr. 254:20-255:8.

   b.   Thus, Ms. Edmo's self-surgery attempts and cutting do not indicate she has mental health concerns that are not well controlled. Tr. 98:11-22. Rather,

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 26**

Ms. Edmo's recent cutting is attention-reduction behavior that she uses to prevent herself from cutting her genitals. Tr. 98:16-22.  Her self-surgery attempts indicate a need for treatment for gender dysphoria. Tr. 98:11-15.

c.  In the more than six years she has spent in IDOC custody, no Corizon or IDOC provider has ever diagnosed Ms. Edmo with borderline personality disorder. Tr. 361:18-362:3, 470:4-6. Defense expert Dr. Andrade is the first person to ever diagnose Ms. Edmo with borderline personality disorder, and he was unable to identify his criteria for this diagnosis of Ms. Edmo during his testimony. Tr. 652:21-24, 638:16-22. None of the other experts, including Defense expert Dr. Garvey, diagnosed Ms. Edmo with borderline personality disorder. Tr. 131:24-132:3, 139:19-24.

d.  One of the primary concerns underlying the fourth criterion is that the individual be able to properly participate in postsurgical care. Ms. Edmo has demonstrated the capacity to follow through with the postsurgical care she would require. Tr. 99:3-8, 169:23-170:25.

e.  Although it is troubling that Ms. Edmo has declined to fully participate in the mental health treatment and counseling sessions recommended by Dr. Eliason and others, Dr. Ettner made clear that, "Psychotherapy is neither a precondition for treatment or a condition -- a precondition for surgery." Tr. 98:23-99:2.

f. Dr. Ettner concludes that Ms. Edmo meets the fourth criterion, since she has no unresolved mental health issues that would prevent her from receiving gender confirmation surgery. Tr. 98:3-10.

64. With respect to the sixth criterion, both Plaintiff's experts testified that Ms. Edmo meets and exceeds the condition of social role transition by living as a woman to the best of her ability in a male prison.

a. For the six-plus years she has lived in prison, Ms. Edmo has consistently sought to present as feminine, despite living in an environment hostile to her efforts, and despite the disciplinary consequences she faces. Tr. 77:9-78:3, 254:4-11.

65. Dr. Ettner testified that gender confirmation surgery would eliminate Ms. Edmo's gender dysphoria and significantly attenuate much of the attendant depression and symptoms she is experiencing. Tr. 104:24-105:9. She testified that gender confirmation surgery is the cure for gender dysphoria and will therefore result in therapeutic and beneficial effects for Ms. Edmo. Tr. 81:13-19.

66. Dr. Gorton testified that it is highly unlikely that Ms. Edmo's severe gender dysphoria will improve without gender confirmation surgery. Tr. 267:19-22.

67. The risks of not providing gender confirmation surgery to Ms. Edmo include surgical self-treatment, emotional decompensation, and risk of suicide given her high degree of suicide ideation. Tr. 80:24:81:8, 264:13-22. If she is not provided with surgery, Ms. Edmo has indicated that she will try self-surgery again to deal

with her extreme episodes of gender dysphoria. Tr. 199:24-200:5. Given that Ms. Edmo made increasing progress on her first two self-surgery attempts, it is likely that Ms. Edmo will be successful if she attempts self-surgery again. Tr. 264:13-22.

68. Scientific studies indicate that the regret rate for individuals who have had gender confirmation surgery is very low and generally in the range of one percent of patients. Tr. 103:25-12, 165:16-166:4. Ms. Edmo does not have any of the risk factors that make her likely to regret undergoing gender confirmation surgery. Tr. 266:1-267:1.

## CONCLUSIONS OF LAW

### I.   <u>Injunction Standard</u>

1. Ms. Edmo asks for a preliminary injunction. A preliminary injunction is only awarded upon a clear showing that the plaintiff is entitled to the requested relief. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008).

2. To make this showing, the plaintiff must establish: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that the balance of equities tips in favor of the moving party; and (4) that an injunction is in the public interest. *Id.*

3. The requirements are stated in the conjunctive so that all four elements must be established to justify injunctive relief. The court may apply a sliding scale test, under which "the elements of the preliminary injunction test are balanced, so that a

stronger showing of one element may offset a weaker showing of another."

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

4.   A more stringent standard is applied where mandatory, as opposed to prohibitory, injunctive relief is sought. Prohibitory injunctions restrain a party from taking action and effectively "freeze[ ] the positions of the parties until the court can hear the case on the merits." *Heckler v. Lopez*, 463 U.S. 1328, 1333 (1983). Mandatory injunctions go well beyond preserving the status quo, as they order a party to take some action. *See Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009).

5.   Although the same general principles inform the court's analysis in deciding whether to issue mandatory or prohibitory relief, courts should be "extremely cautious" about ordering mandatory relief. *Martin v. Intl Olympic Comm.*, 740 F.2d 670, 675 (9th Cir. 1984). Mandatory preliminary relief should not issue unless both the facts and the law clearly favor the moving party and extreme or very serious damage will result. *See Marlyn Nutraceuticals*, 571 F.3d at 879. Mandatory injunctions are not issued in doubtful cases, or where the party seeking an injunction could be made whole by an award of damages. *Id*.

6.     The Court agrees with defendants that Edmo seeks mandatory relief. Thus, the Court will apply the more stringent standard.[1]

7.     The Prison Litigation Reform Act ("PLRA") requires any preliminary injunction to be "narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct the harm. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system." 18 U.S.C. § 3626(a)(2).

## II.     Eighth Amendment Claim

### A.  Likelihood of Success on the Merits

8.     The Eighth Amendment to the United States Constitution protects prisoners against cruel and unusual punishment. To state a claim under the Eighth

---

[1] In discussions with counsel before the evidentiary hearing, the Court expressed the concern that the nature of the relief requested in this case, coupled with the extensive evidence presented by the parties over a 3-day evidentiary hearing, effectively converted these proceedings into a final trial on the merits of the plaintiff's request for permanent injunctive relief. Neither party addressed the Court's concern, and both parties appear to have treated the evidentiary hearing as a final trial of Ms. Edmo's claims.

In an abundance of caution, the Court has considered the standard for the issuance of a permanent injunction, which would have required the plaintiff to show (1) she has suffered an irreparable injury, (2) monetary damages would not compensate her for that injury, (3) after balancing the hardships between the parties, a remedy of equity is warranted, and (4) the public interest would not be disserved by a permanent injunction. See *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). That standard appears to be no more rigorous than that applicable to a claim for preliminary mandatory relief. The Court concludes that under either standard Ms. Edmo is entitled to relief.

Amendment, Ms. Edmo must show that she is "incarcerated under conditions posing a substantial risk of serious harm," or that she has been deprived of "the minimal civilized measure of life's necessities" as a result of Defendants' actions. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted).

9.    An Eighth Amendment claim requires a plaintiff to satisfy "both an objective standard – that the deprivation was serious enough to constitute cruel and unusual punishment – and a subjective standard – deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012).

10.    The Eighth Amendment includes the right to adequate medical care in prison, and prison officials or prison medical providers can be held liable if their "acts or omissions [were] sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

11.    Regarding the objective standard for prisoners' medical care claims, the Supreme Court of the United States has explained that "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Estelle v. Gamble*, 429 U.S., 97, 103 (1976)).

12.    The Ninth Circuit has defined a "serious medical need" in the following ways: failure to treat a prisoner's condition [that] could result in further significant injury or the unnecessary and wanton infliction of pain [;] ... [t]he existence of an injury

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 32**

that a reasonable doctor or patient would find important and worthy of comment

or treatment; the presence of a medical condition that significantly affects an

individual's daily activities; or the existence of chronic and substantial pain . . . ."

*McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992) (internal citations

omitted), overruled on other grounds, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133

(9th Cir. 1997) (en banc).

13.     As to the subjective standard, a prison official or prison medical provider acts with

"deliberate indifference . . . only if the [prison official] knows of and disregards an

excessive risk to inmate health and safety." *Gibson v. Cnty. of Washoe, Nev.*, 290

F.3d 1175, 1187 (9th Cir. 2002) (citation and internal quotation marks omitted).

"Under this standard, the prison official must not only 'be aware of facts from

which the inference could be drawn that a substantial risk of serious harm exists,'

but that person 'must also draw the inference.'" *Toguchi v. Chung*, 391 F.3d 1051,

1057 (9th Cir. 2004) (quoting *Farmer*, 511 U.S. at 837).

14.     "If a [prison official] should have been aware of the risk, but was not, then the

[official] has not violated the Eighth Amendment, no matter how severe the risk."

*Gibson*, 290 F.3d at 1188 (citation omitted). However, "whether a prison official

had the requisite knowledge of a substantial risk is a question of fact subject to

demonstration in the usual ways, including inference from circumstantial

evidence, . . . and a factfinder may conclude that a prison official knew of a

substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at

842; *see also Lolli v. County of Orange*, 351 F.3d 410, 421 (9th Cir. 2003) (deliberate indifference to medical needs may be shown by circumstantial evidence when the facts are sufficient to demonstrate that defendant actually knew of a risk of harm).

15.     In the medical context, a conclusion that a defendant acted with deliberate indifference requires that the plaintiff show both "a purposeful act or failure to respond to a prisoner's pain or possible medical need and . . . harm caused by the indifference." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

16.     Deliberate indifference can be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104–05 (footnotes omitted).

17.     Non-medical prison personnel are generally entitled to rely on the opinions of medical professionals with respect to the medical treatment of an inmate. However, if "a reasonable person would likely determine [the medical treatment] to be inferior," the fact that an official is not medically trained will not shield that official from liability for deliberate indifference. *Snow*, 681 F.3d at 986; *see also McGee v. Adams*, 721 F.3d 474, 483 (7th Cir. 2013) (stating that non-medical personnel may rely on medical opinions of health care professionals unless "they have a reason to believe (or actual knowledge) that prison doctors or their

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 34**

assistants are mistreating (or not treating) a prisoner") (internal quotation marks omitted).

18.   Differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir.1989). "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk' to the prisoner's health." *Toguchi*, 391 F.3d at 1058, (alteration omitted) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

19.   Mere indifference, medical malpractice, or negligence will not support a cause of action under the Eighth Amendment. *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir.1980) (per curiam).  Likewise, a delay in treatment does not constitute a violation of the Eighth Amendment unless the delay causes further harm. *McGuckin*, 974 F.2d at 1060.

   **1.  Serious Medical Need**

20.   There is no dispute that Ms. Edmo suffers from gender dysphoria. And there is no dispute that gender dysphoria is a serious medical condition recognized by the DSM-5.

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 35**

21. WPATH Standards of Care are the accepted standards of care for treatment of transgender patients. These standards have been endorsed by the NCCHC as applying to incarcerated persons.

22. There are no other competing, evidence-based standards that are accepted by any nationally or internationally recognized medical professional groups.

23. The Court finds credible the testimony of Plaintiff's experts Drs. Ettner and Gorton, who have extensive personal experience treating individuals with gender dysphoria both before and after receiving gender confirmation surgery. Plaintiff's experts found that Ms. Edmo satisfied all six WPATH medical necessity criteria for surgery.

24. Defendants' experts, by contrast, have opined that surgery is not medically necessary for Ms. Edmo. However, neither Dr. Garvey nor Dr. Andrade has any direct experience with patients receiving gender confirmation surgery or assessing patients for the medical necessity of gender confirmation surgery. Defendants' experts also have very little experience treating patients with gender dysphoria other than assessing them for the existence of the condition.

25. Defendants' experts appear to misrepresent the WPATH Standards of Care by concluding that Ms. Edmo, despite presenting as female since her incarceration in 2012, cannot satisfy the WPATH criteria because she has not presented as female outside of the prison setting. But there is no requirement in the WPATH Standards of Care that a "patient live for twelve months in his or her gender role outside of

prison before becoming eligible for SRS." *Norsworthy v. Beard*, 87 F. Supp. 3d

1164 (N.D. Cal. 2015),

26.     Indeed, Plaintiff's experts opine that Ms. Edmo exceeds this criterion because she

has not only presented as female for far longer than twelve months, but has done

so in an environment arguably more hostile to these efforts than the non-custodial

community, and despite the disciplinary consequences of doing so. The WPATH

Standards of Care explicitly provide that they apply "in their entirety . . . to all

transsexual, transgender, and gender-nonconforming people, irrespective of their

housing situation," and "including institutional environments such as prisons."

Exh. 15 at 73. The Standards of Care make clear that "[d]enial of needed changes

in gender role or access to treatments, including sex reassignment surgery, on the

basis of residence in an institution are not reasonable accommodations." Exh. 15 at

74.

27.     Defendants' evidence to the contrary is unconvincing and suggests a decided bias

against approving gender confirmation surgery.

28.     In 2016, Dr. Eliason contacted Dr. Steven Levine to lead a training for IDOC and

Corizon providers on medical necessity for gender confirmation surgery. Tr.

433:23-434:24. Dr. Levine's training presentation was titled "Medical Necessity

of Transgender Inmates: In Search of Clarity When Paradox, Complexity, and

Uncertainty Abound." Exh. 17 at 1.  Dr. Levine trained Corizon and IDOC staff

that gender confirmation surgery is "not conceived as lifesaving as is repairing a

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 37**

potentially leaking aortic aneurysm but as life enhancing as is providing

augmentation for women distressed about their small breasts." Exh. 17 at 43; Exh.

16.

29.     Dr. Levine is considered an outlier in the field of gender dysphoria and does not

ascribe to the WPATH Standards of Care. Tr. 176:14-21. His training materials do

not reflect opinions that are generally accepted in the field of gender dysphoria.

Tr. 176:22-179:1.

30.     Dr. Levine's training includes additional criteria proposed by Cynthia Osborne

and Anne Lawrence that incarcerated individuals must meet in order to receive

gender confirmation surgery. Exh. 17 at 39-41, 51; Exh. 19. These requirements

are not part of the WPATH criteria and are in opposition to the WPATH Standards

of Care. Tr. 101:15-22, 103:14-20. There are no scientific studies that support

these additional requirements, and no professional associations or organizations

have endorsed Osborne and Lawrence's proposed requirements for prisoners. Tr.

103:4-13. The NCCHC has not adopted Osborne and Lawrence's additional

requirements. Tr. 480:12-16. Like Dr. Levine, Osborne and Lawrence are

considered outliers in the field of gender dysphoria treatment, are not WPATH

members, and do not ascribe to the WPATH Standards of Care. Tr. 101:2-14.

31.     A decision of the U.S. District Court in the Northern District of California,

*Norsworthy v. Beard*, 87 F. Supp. 3d 1164 (N.D. Cal. 2015), is noteworthy here.

Dr. Levine was retained as a defense expert by the California Department of

Corrections and Rehabilitation in a suit filed by a transgender plaintiff in that case. In ordering the prison to provide the plaintiff gender confirmation surgery, the *Norsworthy* court afforded Dr. Levine's opinions "very little weight," stating: "To the extent that Levine's apparent opinion that no inmate should ever receive SRS predetermined his conclusion with respect to Norsworthy, his conclusions are unhelpful in assessing whether she has established a serious medical need for SRS." *Norsworthy*, 87 F. Supp. 3d at 1188. The court also determined that Dr. Levine's opinion was not credible because of illogical inferences, inconsistencies, and inaccuracies," including misrepresentations of the WPATH Standards of Care, overwhelming "generalizations about gender dysphoric prisoners" and Dr. Levine's fabrication of a prisoner anecdote. *Id*.

32.    Under these circumstances, the Court gives virtually no weight to the opinions of Defendants' experts that Ms. Edmo does not meet the fourth and sixth WPATH criteria for gender confirmation surgery.

### 2.  Deliberate Indifference

33.    Defendants misapplied the recognized standards of care for treating Ms. Edmo's gender dysphoria.

34.    Defendants insufficiently trained their staff with materials that discourage referrals for surgery and represent the opinions of a single person who rejects the WPATH Standards of Care.

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 39**

35.   Defendants' sole evaluation of Ms. Edmo for surgery prior to this lawsuit failed to accurately apply the WPATH Standards of Care. Specifically, Dr. Eliason's assessment that Ms. Edmo did not meet medical necessity for surgery did not apply the WPATH criteria.

36.   Defendants have been deliberately indifferent to Ms. Edmo's medical needs by failing to provide her with available treatment that is generally accepted in the field as safe and effective, despite her actual harm and ongoing risk of future harm including self-castration attempts, cutting, and suicidal ideation.

37.   Evidence also suggests that Ms. Edmo has not been provided gender confirmation surgery because Corizon and IDOC have a *de facto* policy or practice of refusing this treatment for gender dysphoria to prisoners.

38.   In *Norsworthy*, the court found that the prison had a blanket policy barring surgery in light of evidence that the prison's "guidelines for treating transgender inmates, which do not mention SRS as a treatment option, and the 2012 training provided to CDCR staff by Levine, which indicated that SRS should never be provided to incarcerated patients." *Norsworthy*, 87 F. Supp. 3d at 1191.

39.   Here, the only guidelines Corizon issued to assist its providers in treating gender dysphoria likewise do not include surgery as a treatment option. Moreover, Dr. Levine's training provided to Corizon and IDOC staff, and incorporated into further Corizon and IDOC training, discourages providing surgery to incarcerated persons with gender dysphoria.

40.     Significantly, no Corizon or IDOC provider has ever recommended that gender confirmation surgery is medically necessary for a patient in IDOC custody. In fact, Corizon has never provided this surgery at any of its facilities in the United States.

41.     As was the case in *Norsworthy*, "[t]he weight of the evidence demonstrates that for [Ms. Edmo], the only adequate medical treatment for her gender dysphoria is [gender confirmation surgery], that the decision not to address her persistent symptoms was medically unacceptable under the circumstances, and that [Defendants] denied her the necessary treatment for reasons unrelated to her medical need." *Norsworthy*, 87 F. Supp. 3d at 1192.

42.     Accordingly, Ms. Edmo is likely to succeed on the merits of her Eighth Amendment claim.

**B.  Likelihood of Irreparable Harm**

43.     The Ninth Circuit has repeatedly held that serious psychological harm, in addition to physical harm and suffering, constitutes irreparable injury. *See, e.g.*, *Chalk v. U.S. Dist. Ct. Cent. Dist. of California*, 840 F. 2d 701, 709 (9th Cir. 1988) (plaintiff's "emotional stress, depression and reduced sense of well-being" constituted irreparable harm); *Thomas v. Cnty. of Los Angeles*, 978 F. 2d 504, 512 (9th Cir. 1992) ("Plaintiffs have also established irreparable harm, based on this Court's finding that the deputies' actions have resulted in irreparable physical and emotional injuries to plaintiffs and the violation of plaintiffs' civil rights.").

44.  Ms. Edmo's gender dysphoria results in clinically significant distress or impairment of functioning.

45.  Both Plaintiff's and Defendants' experts agree that Ms. Edmo is properly diagnosed with gender dysphoria and continues to experience serious distress from this condition.

46.  Ms. Edmo has received hormone treatment and achieved the maximum feminizing effects years ago.

47.  Other district courts have recognized that the significant emotional pain, suffering, anxiety, and depression caused by prison officials' failure to provide adequate treatment for gender dysphoria constitute irreparable harm warranting a preliminary injunction. *See, e.g.*, *Hicklin v. Precynthe*, 2018 WL 806764, at *9 (E.D. Missouri 2018); *Norsworthy*, 87 F. Supp. 3d at 1192.

48.  Ms. Edmo has twice attempted self-castration resulting in significant pain and suffering.

49.  The Court is persuaded by Plaintiff's experts that, without surgery, Ms. Edmo is at serious risk of life-threatening self-harm.

50.  Thus, Ms. Edmo has satisfied the irreparable harm prong by showing that she will suffer serious psychological harm and will be at high risk of self-castration and suicide in the absence of gender confirmation surgery.

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 42**

## C. Balance of Equities

51.  "Courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S. at 24 (quoting *Amoco Production Co.*, 480 U.S. 531, 542 (1987)).

52.  The balance of equities tips in a plaintiff's favor where the plaintiff has established irreparable harm in the form of unnecessary physical and emotional suffering and denial of her constitutional rights. *See, e. g.*, *Hicklin*, 2018 WL 806764, at *13; *Norsworthy*, 87 F. Supp. 3d at 1193.

53.  Ms. Edmo has established that Defendants' refusal to provide her with gender confirmation surgery causes her ongoing irreparable harm.

54.  Defendants have made no showing that an order requiring them to provide treatment that accords with the recognized WPATH Standard of Care causes them injury.

## D. The Public Interest

55.  The Court finds that a mandatory preliminary injunction is in the public interest. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *See Melendres v. Arpaio*, 695 F. 3d 990, 1002 (9th Cir. 2012).

56.  "In addition, 'the public has a strong interest in the provision of constitutionally adequate health care to prisoners.'" *McNearney v. Wash. Dep't of Corr.*, 2012 WL 3545267, at *16 (W.D. Wash. 2012).

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 43**

57.   Accordingly, a mandatory preliminary injunction should issue because both the facts and the law clearly favor Ms. Edmo and extreme or very serious damage will result if it is not issued. *See Marlyn Nutraceuticals*, 571 F.3d at 879.

### III.   FOURTEENTH AMENDMENT AND ACA CLAIMS

58.   Plaintiff has not met her burden for a preliminary injunction on her Fourteenth Amendment and Affordable Care Act claims at this time.

59.   As explained above, to make this showing for preliminary injunction, the plaintiff must establish: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that the balance of equities tips in favor of the moving party; and (4) that an injunction is in the public interest. *Winter*, 555 U.S. at  22.

60.   While Ms. Edmo may ultimately prevail on her Fourteenth Amendment and Affordable Care Act claims, she is unable to show that she is entitled to injunctive relief at this time. Given the Court's ruling on her Eighth Amendment claim, there is no likelihood of irreparable harm to Ms. Edmo in the absence of injunctive relief on these two claims.

61.   Moreover, the balance of equities tips in favor of Defendants because a more developed record on Defendants' treatment of transgender inmates is necessary before making a broader ruling based upon the Fourteenth Amendment or the Affordable Care Act.

62.     Likewise, a more developed record is necessary to assess the public's interest in

granting such injunctive relief. *Id*.

**ORDER**

**IT IS ORDERED:**

1.     Plaintiff's Motion for Preliminary Injunction (Dkt. 62) is **GRANTED IN

PART**. Defendants are ordered to provide Plaintiff with adequate medical care, including

gender confirmation surgery. Defendants shall take all actions reasonably necessary to

provide Ms. Edmo gender confirmation surgery as promptly as possible and no later than

six months from the date of this order. However, given IDOC's implementation of an

updated gender dysphoria policy on October 5, 2018 that appears to provide Plaintiff's

requested injunctive relief related to accessing gender-appropriate underwear, clothing,

and commissary items, the Court will not address that relief at this time. This is without

prejudice to the plaintiff's right to raise the issue in the future, should IDOC revoke the

new policy or if the implementation of the policy results in ongoing violations.

2.     The Court's Deputy, Jamie Bracke, is directed to set a telephonic status

conference in this case no later than two weeks after this decision issues.


DATED: December 13, 2018

_____

B. Lynn Winmill
Chief U.S. District Court Judge