**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ADREE EDMO, AKA Mason Edmo, *Plaintiff-Appellee,* <br><br> v. <br><br> CORIZON, INC.; SCOTT ELIASON; MURRAY YOUNG; CATHERINE WHINNERY, *Defendants-Appellants,* <br><br> and <br><br> IDAHO DEPARTMENT OF CORRECTIONS; HENRY ATENCIO; JEFF ZUMDA; HOWARD KEITH YORDY; AL RAMIREZ, Warden; RICHARD CRAIG; RONA SIEGERT, *Defendants.* | No. 19-35017 <br><br> D.C. No. 1:17-cv-00151-BLW |

| | |
|---|---|
| ADREE EDMO, AKA Mason Edmo, *Plaintiff-Appellee*, | No. 19-35019 |
| | D.C. No. 1:17-cv-00151-BLW |
| v. | |
| IDAHO DEPARTMENT OF CORRECTIONS; HENRY ATENCIO; JEFF ZUMDA; HOWARD KEITH YORDY; AL RAMIREZ, Warden; RICHARD CRAIG; RONA SIEGERT, *Defendants-Appellants*, | ORDER |
| and | |
| CORIZON, INC.; SCOTT ELIASON; MURRAY YOUNG; CATHERINE WHINNERY, *Defendants*. | |

Filed February 10, 2020

Before: M. Margaret McKeown and Ronald M. Gould, Circuit Judges, and Robert S. Lasnik,[*] District Judge.

Order;
Statement by Judge O'Scannlain;
Dissent by Judge Collins;
Dissent by Judge Bumatay

---

[*] The Honorable Robert S. Lasnik, United States District Judge for the Western District of Washington, sitting by designation.

# SUMMARY[**]

### Prisoner Civil Rights

The panel denied a petition for panel rehearing and denied a petition for rehearing en banc on behalf of the court, in a case in which the panel affirmed the district court's entry of a permanent injunction in favor of an Idaho state prisoner, but vacated the injunction to the extent it applied to certain defendants in their individual capacities, in the prisoner's action seeking medical treatment for gender dysphoria.

Respecting the denial of rehearing en banc, Judge O'Scannlain, joined by Judges Callahan, Bea, Ikuta, R. Nelson, Bade, Bress, Bumatay and VanDyke, stated that with its decision not to rehear this case en banc, this court became the first federal court of appeals to mandate that a State pay for and provide sex-reassignment surgery to a prisoner under the Eighth Amendment. Judge O'Scannlain stated that the three-judge panel's conclusion—that any alternative course of treatment would be "cruel and unusual punishment"—is as unjustified as it is unprecedented. To reach such a conclusion, the court created a circuit split, substituted the medical conclusions of federal judges for the clinical judgments of prisoners' treating physicians, redefined the familiar "deliberate indifference" standard, and, in the end, constitutionally enshrined precise and partisan treatment criteria in what is a new, rapidly changing, and highly controversial area of medical practice.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Dissenting from the denial of rehearing en banc, Judge Collins stated that whether the defendant doctor was negligent or not (a question on which Judge Collins expressed no opinion), his treatment decisions did not amount to "cruel and unusual punishment," and the court thus strayed far from any proper understanding of the Eighth Amendment.

Dissenting from the denial of rehearing en banc, Judge Bumatay, joined by Judges Callahan, Ikuta, R. Nelson, Bade and VanDyke, and by Judge Collins as to Part II, stated that by judicially mandating an innovative and evolving standard of care, the panel effectively constitutionalized a set of guidelines subject to ongoing debate and inaugurated yet another circuit split. And by diluting the requisite state of mind from "deliberate indifference" to negligence, the panel effectively held that—contrary to Supreme Court precedent—medical malpractice does become a constitutional violation merely because the victim is a prisoner.

## ORDER

The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 35.

The petition for rehearing en banc is **DENIED**. An opinion respecting denial of rehearing en banc, prepared by Judge O'Scannlain, and dissents from denial of rehearing en banc prepared by Judge Collins and Judge Bumatay are filed concurrently with this order.

---

O'SCANNLAIN, Circuit Judge,[*] with whom CALLAHAN, BEA, IKUTA, R. NELSON, BADE, BRESS, BUMATAY, and VANDYKE, Circuit Judges, join, respecting the denial of rehearing en banc:

With its decision today, our court becomes the first federal court of appeals to mandate that a State pay for and provide sex-reassignment surgery to a prisoner under the Eighth Amendment. The three-judge panel's conclusion—that any alternative course of treatment would be "cruel and unusual punishment"—is as unjustified as it is unprecedented. To reach such a conclusion, the court creates a circuit split, substitutes the medical conclusions of federal

---

[*] As a judge of this court in senior status, I no longer have the power to vote on calls for rehearing cases en banc or formally to join a dissent from failure to rehear en banc. *See* 28 U.S.C. § 46(c); Fed. R. App. P. 35(a). Following our court's general orders, however, I may participate in discussions of en banc proceedings. *See* Ninth Circuit General Order 5.5(a).

judges for the clinical judgments of prisoners' treating physicians, redefines the familiar "deliberate indifference" standard, and, in the end, constitutionally enshrines precise and partisan treatment criteria in what is a new, rapidly changing, and highly controversial area of medical practice.

Respectfully, I believe our court's unprecedented decision deserved reconsideration en banc.

## I

## A

In 2012, Adree Edmo (then known as Mason Dean Edmo) was incarcerated for sexually assaulting a sleeping 15-year-old boy. By all accounts, Edmo is afflicted with profound and complex mental illness. She[1] suffers from major depressive disorder, anxiety, alcohol addiction, and drug addiction. At least two clinicians have concluded that she shares the traits of borderline personality disorder. She abused alcohol and methamphetamines every day for many years, stopping only upon her incarceration. A victim of sexual abuse at an early age, she attempted suicide three times before her arrest for sexual assault—twice by overdose and once by cutting.

A new diagnosis was added in 2012: gender dysphoria. Two months after being transferred to the Idaho State Correctional Institution (a men's prison), Edmo sought to speak about hormone therapy with Dr. Scott Eliason, the Board-certified director of psychiatry for Corizon, Inc. (the prison's medical care provider). In Dr. Eliason's view,

---

[1] Though Edmo was born a male, Edmo has legally changed the sex listed on her birth certificate to female. I therefore use feminine pronouns throughout, just as the panel does.

Edmo met the criteria for gender dysphoria.[2]  After the diagnosis was confirmed by another forensic psychiatrist and the prison's Management and Treatment Committee, Edmo was prescribed hormone therapy.  She soon changed her legal name and the sex listed on her birth certificate.  As a result of four years of hormone therapy, Edmo experienced physical changes, including breast development, redistribution of body fat, and a change in body odor.  She now has the same circulating hormones as a typical adult female.

In April 2016, at Edmo's request, Dr. Eliason evaluated her for sex-reassignment surgery.[3]  Ultimately, Dr. Eliason decided to maintain the current course of hormones and supportive counseling instead of prescribing surgery.  He staffed Edmo's case with Dr. Jeremy Stoddart (a psychiatrist) and Dr. Murray Young (a physician who served as the Regional Medical Director for Corizon), as well as Jeremy Clark, a clinical supervisor and member of the World Professional Association for Transgender Health ("WPATH").  He also presented the evaluation and vetted it

---

[2] Gender dysphoria is a diagnosis introduced in the latest, fifth edition of the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders*.  It replaces the now-obsolete "gender identity disorder" used in the previous edition.  The gender dysphoric patient experiences "clinically significant distress or impairment in social, occupational, or other important areas of functioning" that is associated with the feeling of incongruence between perceived gender identity and phenotypic sex.  *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 453 (5th ed. 2013).

[3] The panel adopts the question-begging term "gender confirmation surgery," which is preferred by Edmo and her lawyers.  I will continue to use the neutral "sex-reassignment surgery."

before the regular meeting of the multidisciplinary Management Treatment Committee.

Dr. Eliason, supported by Dr. Stoddart, Dr. Young, and Clark, opted not to recommend sex-reassignment surgery for several reasons, some of which are described in his chart notes and others of which were elaborated in their testimony. First, Dr. Eliason noted that Edmo reported that the hormone therapy had improved her dysphoria and Eliason "did not observe significant dysphoria." In the absence of more severe distress, Dr. Eliason could not justify the risks of pursuing the most aggressive—and permanent—treatment through surgery. Second, Dr. Eliason observed that Edmo's comorbid conditions—major depressive disorder and alcohol use disorder, among others—were not adequately controlled. Edmo had refused to attend therapy consistently in prison. She also engaged in self harm (including cutting and attempted castration) and exhibited co-dependency and persistently poor sexual boundaries with other prisoners. In Dr. Eliason's view, Edmo's other mental health disorders were not sufficiently stabilized to handle the stressful process of surgery and transition. Finally, Dr. Eliason observed that Edmo—who was parole-eligible and due to be released in 2021—had not lived among her out-of-prison social network as a woman. He noted the high suicide rates for postoperative patients and was concerned that Edmo might be at greater risk of suicide given the potential lack of support from family, friends, coworkers, and neighbors during her transition. Dr. Eliason did not rule out the possibility of Edmo receiving sex-reassignment surgery at some later point. As Dr. Eliason put it in his notes on his consultation with Edmo, "Medical Necessity for Sexual Reassignment Surgery is not very well defined and is constantly shifting." Citing the changing nature of the

science and the contingent nature of his evaluation of Edmo, his recommendations were merely "for the time being."

## B

About a year after her evaluation, Edmo filed this § 1983 lawsuit against Dr. Eliason, the Idaho Department of Corrections, Corizon, and several other individuals, alleging that the prison doctors' treatment choice violated her right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments. She then moved for a preliminary injunction to require the prison to provide her with sex-reassignment surgery.

The district court held an evidentiary hearing on the motion. At the outset of the hearing, the court commented that it was hard "to envision" how a request to mandate sex-reassignment surgery could be granted through anything other than a permanent injunction. Nonetheless, the district court evaluated Edmo's motion under the preliminary injunction standard and, only out of "an abundance of caution," provided a footnote evaluating whether an injunction was merited under the more demanding standard for a permanent injunction (which the court erroneously described as "no more rigorous than that applicable to a claim for preliminary mandatory relief"). *Edmo v. Idaho Dep't of Corr.*, 358 F. Supp. 3d 1103, 1122 n.1 (D. Idaho 2018); *see Edmo v. Corizon, Inc.*, 935 F.3d 757, 784 n.13 (9th Cir. 2019) ("[T]he standard for granting permanent injunctive relief is higher (in that it requires actual success on the merits) . . . .").

In addition to testimony from Edmo, Dr. Eliason, and Jeremy Clark, the evidentiary hearing featured testimony from four expert witnesses. Edmo presented Dr. Randi Ettner, a psychologist, and Dr. Ryan Gorton, an emergency

room physician. Dr. Ettner is one of the authors of the World Professional Association of Transgender Health's Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People and chairs WPATH's Committee for Institutionalized Persons. Dr. Gorton serves on that committee too. WPATH—formerly the Harry Benjamin International Gender Dysphoria Association— describes itself as a "professional association" devoted "to developing best practices and supportive policies worldwide that promote health, research, education, respect, dignity, and equality for transsexual, transgender, and gender nonconforming people in all cultural settings." World Prof'l Ass'n for Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People* 1 (7th ed. 2011) ("WPATH Standards"). One of WPATH's central functions is to promulgate Standards of Care, which offer minimalist treatment criteria for several possible approaches to gender dysphoria, from puberty-blocking hormones to sex-reassignment surgery.

In addition to Dr. Eliason and Mr. Clark, the State presented Dr. Keelin Garvey, the Chief Psychiatrist of the Massachusetts Department of Corrections and chair of its Gender Dysphoria Treatment Committee, and Dr. Joel Andrade, a clinical social worker who served as clinical director for the Massachusetts Department of Corrections and served on its Gender Dysphoria Treatment Committee. Each set of experts had gaps in their relevant experience. Edmo's experts had never treated *inmates* with gender dysphoria, while the State's experts had never conducted long-term follow-up care with a patient who had undergone sex-reassignment surgery.

Edmo's experts testified that, in their opinion, Edmo needs sex-reassignment surgery. They based their conclusion on the latest edition of WPATH Standards of Care, which contain six criteria for sex-reassignment surgery:

> (1) "persistent, well documented gender dysphoria,"

> (2) "capacity to make a fully informed decision and to consent for treatment,"

> (3) "age of majority,"

> (4) "if significant medical or mental health concerns are present, they must be well controlled,"

> (5) "12 continuous months of hormone therapy as appropriate to the patient's gender goals,"

> (6) "12 continuous months of living in a gender role that is congruent with their gender identity."

*Id.* at 60. In the opinion of Edmo's experts, Edmo met all six criteria and was unlikely to show further improvement in her gender dysphoria without such surgery.

The State's experts disagreed on three main grounds. First, they did not regard the WPATH Standards as definitive treatment criteria, let alone medical consensus. In their analysis, the evidence underlying the WPATH Standards is not sufficiently well developed, particularly when it comes to the treatment of gender dysphoric prisoners. Therefore, they opined that a prudent, competent doctor might rely on clinical judgment that differs from the (already ambiguous) WPATH Standards. Second, the State's experts testified that, even under WPATH, Edmo failed to meet the fourth

criterion for surgery, which requires that the patient's other mental health concerns be well controlled in order to reduce the risks associated with transitioning. In the view of the State's experts, her mental health raised the concern that she would have trouble transitioning. For their part, Edmo's experts argued that Edmo's depression and addiction were controlled enough for surgery and that some current symptoms (such as self-cutting) stem from her gender dysphoria and therefore can be alleviated with surgery. Finally, the State's experts testified that Edmo also failed to meet the WPATH Standards' sixth criterion for surgery, which requires that Edmo live as a woman for twelve months before surgery. In their view, it was essential that Edmo live those twelve months outside of prison—that is, within her social network—in order to be adequately sure that she and her social network are ready for the challenges posed by transitioning. Edmo's experts disagreed, noting that WPATH says treatment in prisons should "mirror" treatment outside of prisons.

## C

Although this appeal is from a grant of a preliminary injunction, at some point the evidentiary hearing on the motion for a preliminary injunction was consolidated into a final bench trial on the merits. It is hard to know when (or if) the parties were given the requisite "clear and unambiguous notice" of consolidation. *See Isaacson v. Horne*, 716 F.3d 1213, 1220 (9th Cir. 2013); *see also Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

The district court applied the Supreme Court's oft-cited rule that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v.*

*Georgia*, 428 U.S. 153, 173 (1976)). The State agreed that gender dysphoria is a serious medical need, so the only question on the merits is whether Dr. Eliason and his team were "deliberately indifferent" as a matter of law.

The district court concluded that the State's experts were "unconvincing" and gave their opinions "virtually no weight." *Edmo*, 358 F. Supp. 3d at 1125–26. Once such expert testimony was set aside, the district court held that any decision not to prescribe sex-reassignment surgery would be "medically unacceptable under the circumstances" and would therefore violate the Eighth Amendment. *Id.* at 1127. Accordingly, the district court entered an injunction ordering the State to "take all actions reasonably necessary to provide Ms. Edmo gender confirmation surgery as promptly as possible." *Id.* at 1129.

### D

The panel has now affirmed the injunction. *See Edmo*, 935 F.3d at 803. Concluding that sex-reassignment surgery was "medically necessary" and that the prison officials chose a different course of treatment "with full awareness of the prisoner's suffering," the panel holds that Dr. Eliason and the other prison officials "violate[d] the Eighth Amendment's prohibition on cruel and unusual punishment." *Id.*

To reach its conclusion that sex-reassignment surgery was medically necessary, the panel spends most of its lengthy opinion extolling and explaining the WPATH Standards of Care. Because Dr. Eliason failed to "follow" or "reasonably deviate from" the WPATH Standards, the panel concluded that his treatment choice was "medically unacceptable under the circumstances." *Id.* at 792. To reach the ultimate conclusion—that Dr. Eliason had a deliberately

indifferent state of mind and was consequently in violation of the Eighth Amendment—the panel posited that Dr. Eliason's awareness of the risks that Edmo would attempt to castrate herself or feel "clinically significant" distress "demonstrates that Dr. Eliason acted with deliberate indifference." *Id.* at 793. Each conclusion was legal error.

## II

"Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). It is, after all, under governing precedent one form of the "unnecessary and wanton infliction of pain" that is the sine qua non of an Eighth Amendment violation. *Estelle*, 429 U.S. at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). Simply put, Edmo must prove that Dr. Eliason's chosen course of treatment was the doing of a criminally reckless—or worse—state of mind. *Farmer v. Brennan*, 511 U.S. 825, 839 (1994).

We have stated that a deliberately indifferent state of mind may be inferred when "the course of treatment the doctors chose was medically unacceptable under the circumstances" and "they chose this course in conscious disregard of an excessive risk to plaintiff's health." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996). Yet even most objectively unreasonable medical care is not deliberately indifferent. "[M]ere 'indifference,' 'negligence,' or 'medical malpractice'" is not enough to constitute deliberate indifference. *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1082 (9th Cir. 2013) (quoting *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980)). "Even gross negligence is insufficient to establish deliberate indifference . . . ." *Id.* Likewise, "[a] difference of opinion between a physician and the prisoner— or between medical professionals—concerning what

medical care is appropriate does not amount to deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012) (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989)), *overruled on other grounds by Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014) (en banc). Although the panel organizes its opinion according to the dictum we first articulated in *Jackson*, it so contorts the standard as to render deliberate indifference exactly what we have said it is not: a constitutional prohibition on good-faith disagreement between medical professionals.

## A

The panel first, and fundamentally, errs by misunderstanding what it means for a chosen treatment to be medically "unacceptable" for purposes of the Eighth Amendment. As did the district court, the panel concludes that the decision to continue hormone treatment and counseling instead of sex-reassignment surgery for Edmo was "medically unacceptable under the circumstances" because, in short, Dr. Eliason failed to "follow" or "reasonably deviate from" the WPATH Standards of Care. *Edmo*, 935 F.3d at 792. Yet such an approach to the Eighth Amendment suffers from three essential errors. First, contrary to the panel's suggestion, constitutionally acceptable medical care is not defined by the standards of one organization. Second, the panel relies on standards that were promulgated by a controversial self-described advocacy group that dresses ideological commitments as evidence-based conclusions. Third, once the WPATH Standards are put in proper perspective, we are left with a "case of dueling experts," compelling the conclusion that Dr. Eliason's treatment choice was indeed medically acceptable.

1

A mere professional association simply cannot define what qualifies as constitutionally acceptable treatment of prisoners with gender dysphoria. In *Bell v. Wolfish*, 441 U.S. 520 (1979), the Supreme Court rejected the argument that prison conditions must reflect those set forth in the American Public Health Association's Standards for Health Services in Correctional Institutions, the American Correctional Association's Manual of Standards for Adult Correctional Institutions, or the National Sheriffs' Association's Handbook on Jail Architecture. *Id.* at 543 n.27. According to the Court, "the recommendations of these various groups may be instructive in certain cases, [but] they simply do not establish the constitutional minima." *Id.* After all, even acclaimed, leading treatment criteria only represent the "goals recommended by the organization in question" and the views of the promulgating physicians,[4] and so, without more, a physician's disagreement with such criteria is simply the "'difference of medical opinion' . . . [that is] insufficient, as a matter of law, to establish deliberate indifference." *Id.*; *Jackson*, 90 F.3d at 332 (quoting *Sanchez*, 891 F.2d at 242); *accord Snow*, 681 F.3d at 987; *see also Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996) ("[N]othing in the Eighth Amendment prevents prison doctors from exercising their independent medical judgment.").

In its discussion of the role of treatment standards, the panel fails to cite a single case in which a professional organization's standards of care defined the line between medically acceptable and unacceptable treatment. Instead, the panel cites two cases, one from the Seventh Circuit and

---

[4] Although, as we will see, only half of the committee that promulgates the WPATH Standards are physicians.

one from the Eighth, for the proposition that professional organizations' standards of care are "highly *relevant* in determining what care is medically acceptable and unacceptable." *Edmo*, 935 F.3d at 786 (emphasis added). That may be. But as those two cases demonstrate, the range of medically acceptable care is defined by *qualities* of that care (or of its opposite) and not by professional associations. Medically unacceptable care is "*grossly incompetent* or inadequate care," *Allard v. Baldwin*, 779 F.3d 768, 772 (8th Cir. 2015), or care that constitutes "such a substantial departure from accepted professional judgment to demonstrate that the person responsible did not base the decision on . . . [accepted professional] judgment," *Henderson v. Ghosh*, 755 F.3d 559, 566 (7th Cir. 2014) (original parenthetical) (quoting *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013) (stipulating that "medical professionals . . . are 'entitled to deference in treatment decisions unless no minimally competent professional would have so responded'")). For its part, the First Circuit holds in its own sex-reassignment-surgery case that medical care does not violate the Eighth Amendment so long as it is "reasonably commensurate with the medical standards of prudent professionals." *Kosilek v. Spencer*, 774 F.3d 63, 90 (1st Cir. 2014) (en banc). The panel is alone in its insistence that a professional association's standards add up to the constitutional minima.[5]

---

[5] Far from countering such assertions, the panel's concession that "deviation from [WPATH] standards does not alone establish an Eighth Amendment claim" is just a truism that recognizes that the Eighth Amendment also contains a subjective element. *Edmo*, 935 F.3d at 789. Moreover, such a statement serves simply to repeat the panel's faulty premise that the WPATH Standards are the appropriate reference point in any analysis of medical acceptability.

2

In the words of the panel, speaking for our court, the WPATH Standards are "the gold standard," the "established standards" for evaluations of the necessity of sex-reassignment surgery, the "undisputed starting point in determining the appropriate treatment for gender dysphoric individuals." *Edmo*, 935 F.3d at 787–88, 788 n.16. But such overwrought acclaim is just the beginning of the panel's thorough enshrinement of the WPATH Standards. The district court chose which expert to rely on by looking at which expert hewed most closely to the WPATH Standards of Care. *See Edmo*, 358 F. Supp. 3d at 1124–26. And the panel uncritically approves such an approach, calling the WPATH Standards "a useful starting point for analyzing the credibility and weight to be given to each expert's opinion." *Edmo*, 935 F.3d at 788 n.16. By rejecting any expert not (in the court's view) appropriately deferential to WPATH, the district court and now the panel have effectively decided ab initio that only the WPATH Standards could constitute medically acceptable treatment.[6]

---

[6] In enshrining the WPATH Standards as the "gold standard" for determining when to provide surgery to a prisoner with gender dysphoria, the panel makes much of the State's comment in its opening statement before the evidentiary hearing that the WPATH Standards are the "best standards out there." *Edmo*, 935 F.3d at 769, 788 n.16. The panel even goes so far as to insist that "[b]oth sides . . . agree that the appropriate benchmark regarding treatment for gender dysphoria is the World Professional Association of Transgender Health Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People." *Id.* at 767. But, contrary to the panel's suggestion, the State's admission that the WPATH Standards are more refined than any alternative hardly means that the State agrees—or the Eighth Amendment requires—that a medical provider must base treatment decisions on WPATH's criteria. Indeed, before the district

One would be forgiven for inferring from the panel's opinion that its bold assertions about the WPATH Standards are uncontroverted truths. But, as the Fifth Circuit has recognized, "the WPATH Standards of Care reflect not consensus, but merely one side in a sharply contested medical debate over sex reassignment surgery." *Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019). For its part, the First Circuit, sitting en banc, has likewise held that "[p]rudent medical professionals . . . do reasonably differ in their opinions regarding [WPATH's] requirements." *Kosilek*, 774 F.3d at 88. Our court should have done the same.

The WPATH Standards are merely criteria promulgated by a controversial private organization with a declared point of view. According to Dr. Stephen Levine, author of the WPATH Standards' fifth version, former Chairman of WPATH's Standards of Care Committee, and the court-appointed expert in *Kosilek*, WPATH attempts to be "both a scientific organization and an advocacy group for the transgendered. These aspirations sometimes conflict." *Id.* at 78. Sometimes the pressure to be advocates wins the day. As Levine put it, "WPATH is supportive to those who want sex reassignment surgery. . . . Skepticism and strong alternate views are not well tolerated. Such views have been known to be greeted with antipathy from the large numbers of nonprofessional adults who attend each [of] the organization's biennial meetings . . . ." *Id.* (ellipses and

---

court and before our court, the State clearly rejected the notion that any particular treatment criteria defines what is medically acceptable, stating that Dr. Eliason's choice "should be ratified as long as it is a reasonable choice." The panel erroneously construes the State's refusal to concede that it violated the WPATH Standards as a concession that such standards are the "benchmark" of legally acceptable medical care.

brackets original). WPATH's own description of its drafting process makes this clear. Initially, the sections of the sixth version were each assigned to an individual member of WPATH who then published a literature review with suggested revisions. WPATH Standards, *supra*, at 109. The suggested revisions were then discussed and debated by a thirty-four-person Revision Committee, all before a subcommittee drafted the new document. *Id.* at 109–11. Only about half of the Revision Committee possesses a medical degree. The rest are sexologists, psychotherapists, or career activists, with a sociologist and a law professor rounding out the group. *Id.* at 111.

The pressure to be advocates appears to have won the day in the WPATH Standards' recommendations regarding institutionalized persons. Recall that one central point of contention between the State's witnesses and Edmo's was over whether Edmo's time undergoing hormone therapy in prison provides sufficient guarantee that she could live well outside of prison as a woman without having ever done so before. The district court resolved the debate by citing the WPATH Standards' section on institutionalized persons, *see Edmo*, 358 F. Supp. 3d at 1125, which tersely stipulates that institutionalized persons should not be "discriminated against" on the basis of their institutionalization, WPATH Standards, *supra*, at 67. Such a recommendation is not supported by any research about the similarity between prisoners' experiences with sex-reassignment surgery and that of the general public. Indeed, as Edmo's expert witness and WPATH author, Dr. Randi Ettner, admits, there is only one known instance of a person undergoing sex-reassignment surgery while incarcerated—leaving medical knowledge about how such surgery might differ totally undeveloped.

Instead, WPATH's recommendation for institutionalized persons merely expresses a policy preference. The article from which the recommendations are adapted stipulates upfront that, because WPATH's "mission" is "to advocate for nondiscriminatory" care, it presumes that treatment choices should be the same for all "demographic variables, unless there is a clinical indication to provide services in a different fashion." George R. Brown, *Recommended Revisions to the World Professional Association for Transgender Health's* Standards of Care *Section on Medical Care for Incarcerated Persons with Gender Identity Disorder*, 11 Int'l J. of Transgenderism 133, 134 (2009). Unable to make an evidentiary finding from a sample size of one, the article concludes that its presumption should set the standard of care and then proceeds to recommend revisions with the express purpose of influencing how courts review gender dysphoria treatments under the Eighth Amendment. *Id.* at 133, 135. As a later peer-reviewed study by Dr. Cynthia Osborne and Dr. Anne Lawrence put it, WPATH's institutionalized-persons recommendations follow from an "ethical principle," not "extensive clinical experience." Cynthia S. Osborne & Anne A. Lawrence, *Male Prison Inmates With Gender Dysphoria: When Is Sex Reassignment Surgery Appropriate?*, 45 Archives of Sexual Behav. 1649, 1651 (2016).

Even apart from the concerns over WPATH's ideological commitments, its evidentiary basis is not sufficient to justify the court's reliance on its strict terms. The WPATH Standards seem to suggest as much. In its own words, the WPATH Standards are simply "*flexible* clinical guidelines," which explicitly allow that "individual health professionals and programs may modify them." WPATH Standards, *supra*, at 2. Indeed, the most recent WPATH Standards "represents a significant departure from previous

versions" in part due to significant changes in researchers' conclusions over the preceding decade. *Id.* at 1 n.2. Moreover, the WPATH Standards lack the evidence-based grading system that characterizes archetypal treatment guidelines, such as the Endocrine Society's hormone therapy guidelines. Lacking evidence-based grading, the WPATH Standards leave practitioners in the dark about the strength of a given recommendation. *See* William Byne et al., *Report of the American Psychiatric Association Task Force on Treatment of Gender Identity Disorder*, 41 Archives of Sexual Behav. 759, 783 (2012) (concluding that "the level of evidence" supporting WPATH's Standards' criteria for sex-reassignment surgery "was generally low"). For these reasons, the Centers for Medicare & Medicaid Services, an agency of the United States Department of Health and Human Services, decided, "[b]ased on a thorough review of the clinical evidence," that providers may consult treatment criteria other than WPATH, including providers' own criteria. Ctrs. for Medicare & Medicaid Servs, *Proposed Decision Memo for Gender Dysphoria and Gender Reassignment Surgery* (June 2, 2016); Ctrs. for Medicare & Medicaid Servs, *Decision Memo for Gender Dysphoria and Gender Reassignment Surgery* (Aug. 30, 2016).

3

The panel's disposition results from its failure to put the WPATH Standards in proper perspective. Had the district court understood that Edmo's experts' role in WPATH marks them not with special insight into the legally acceptable care, but rather as mere participants in an ongoing medical debate, they would have acknowledged this case for what it is: a "case of dueling experts." *Edmo*, 935 F.3d at 787. Instead of giving Drs. Garvey and Andrade (to say nothing of Dr. Eliason) "no weight" due to their insufficient

fealty to WPATH, the district court should have recognized them as legitimate, experienced participants in that debate. And had the State's experts' criticisms of and interpretation of the WPATH Standards been given proper weight—any weight at all—the district court would have had to conclude that the State's disagreement with Edmo's experts was a mere "difference of medical opinion," not a constitutional violation. *Jackson*, 90 F.3d at 332.

So too with its assessment of Dr. Eliason's treatment choice. It is instructive that the worst the district court can say about Dr. Eliason is that he "did not apply the WPATH criteria." *Edmo*, 358 F. Supp. 3d at 1126. Focusing the analysis not on whether Dr. Eliason applied the standards of a professional association but rather on whether the treatment choice was within that of a prudent, competent practitioner, the cautious treatment selected by Dr. Eliason is plainly constitutionally acceptable.

As Drs. Garvey and Andrade explain, it is medically acceptable to offer Edmo a treatment of hormone therapy and psychotherapy but not sex-reassignment surgery. The practitioners' fear that sex-reassignment surgery would exacerbate Edmo's other mental illnesses and increase the risk of surgery was a genuine and sound fear. As Dr. Garvey put it, "[b]ased on her current coping strategies, I would be concerned about her suicide risk after surgery." Although the measured "regret rate," which refers to the proportion of postoperative patients who regret their surgery, is "low," *see Edmo*, 935 F.3d at 771, the district court and the panel failed to acknowledge detailed testimony that those studies neglected to follow up with such a high proportion of the observed sample that the stated figure does not "represent the full picture." In Dr. Andrade's opinion, "I think there are things she needs to work out in therapy in the short and long

term before she can make a really well-informed decision about surgery." He raised the concern that Edmo is particularly at risk because of "unresolved trauma" that may stem, not from gender dysphoria, but instead from past sexual abuse.

Dr. Eliason's view that Edmo needed to have lived as a woman outside of prison in order to ensure that she would be able to adapt well after the surgery was also legitimate. Indeed, under the peer-reviewed treatment criteria developed by Drs. Osborne and Lawrence, Edmo was not eligible for sex-reassignment surgery for these exact reasons. Acknowledging the lack of evidence concerning the effects of sex-reassignment surgery on inmates, the unique challenges imposed by the correctional setting, and the significant risk of patient regret, Drs. Osborne and Lawrence proposed criteria that require a prospective patient have "a satisfactory disciplinary record and demonstrated capacity to cooperate" and "a long period of expected incarceration after [surgery]," among others. Osborne & Lawrence, *supra*, at 1661. This latter criterion helps to ensure that male-to-female patients have "a longer period of time to consolidate one's feminine gender identity and gender role." *Id.* at 1660; *see also id.* at 1656 ("[I]nmates with [gender dysphoria] who attempt to live in female-typical gender roles within men's prisons . . . could not effectively prepare" for life after surgery.) The district court disregarded such additional, peer-reviewed treatment criteria because they "are not part of the WPATH criteria and are in opposition to the WPATH Standards of Care." *Edmo*, 358 F. Supp. 3d at 1126. Had the district court taken a step back and considered not whether Osborne and Lawrence were WPATH-compliant but rather whether a competent physician could rely on their reasoning, it would have had to conclude that Dr. Eliason's treatment choice was that of a competent, prudent physician.

Perhaps recognizing such problems with the district court's definition of medical unacceptability, the panel concludes its medical-unacceptability analysis by changing the subject. Instead of considering whether Dr. Eliason's choice of *treatment* was medically unacceptable, the panel fixates on Dr. Eliason's chart notes, which sets forth three general categories in which he believes sex-reassignment surgery may be required: (1) "Congenital malformation or ambiguous genitalia," (2) "Severe and devastating dysphoria that is primarily due to genitals," (3) or "Some type of medical problem in which endogenous sexual hormones were causing severe physiological damage." According to the panel, such categories "bear little resemblance" to the WPATH Standards and therefore "Dr. Eliason's evaluation was not an exercise of medically acceptable professional judgment." *Edmo*, 935 F.3d at 791–92. In the first place, Dr. Eliason's categories are not meant to substitute for treatment standards. Such categories describe three broad pools of eligible patients; whether a particular patient belongs in a certain pool—by having dysphoria sufficiently severe to require sex-reassignment surgery, for instance— would be resolved by more detailed evaluative criteria. In the second place, conformity to WPATH is not the test of constitutionally acceptable treatment of gender dysphoria. But more broadly, the panel simply asks the wrong question. Deliberate indifference may be inferred when "the *course of treatment* the doctors chose was medically unacceptable under the circumstances," not when the doctors' contemporaneous explanation of the choice is incomplete. *Jackson*, 90 F.3d at 332 (emphasis added); *see also Snow*, 681 F.3d at 988; *Toguchi*, 391 F.3d at 1058; *Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th Cir. 2016) (all referring to the "course of treatment," not the rationale). It does not matter that Dr. Eliason's testimony justifies his treatment choice in ways not explicit in his chart notes such that the

panel calls his testimony a "post hoc explanation." *Edmo*, 935 F.3d at 791. So long as the ultimate treatment *choice* was medically acceptable, our precedents tell us, we cannot infer "the unnecessary and wanton infliction of pain" that violates the Eighth Amendment.

## B

Even were the panel correct that the only medically acceptable way to approach a gender dysphoric patient's request for sex-reassignment surgery is to apply the WPATH Standards of Care, we still could not infer a constitutional violation from these facts. As the Supreme Court has explained, the Eighth Amendment simply proscribes categories of punishment, and punishment is "a deliberate act intended to chastise or deter." *Wilson v. Seiter*, 501 U.S. 294, 299–300 (1991). "[O]nly the 'unnecessary *and wanton* infliction of pain' implicates the Eighth Amendment." *Id.* at 297 (quoting *Estelle*, 429 U.S. at 104) (emphasis original). Hence the commonplace deliberate-indifference inquiry, which is a culpability standard equivalent to criminal recklessness. *Farmer*, 511 U.S. at 839–40. Simply put, unless the official "knows of and disregards an excessive risk to inmate health and safety," he does not violate the Eighth Amendment. *Id.* at 837.

### 1

With little explanation, the panel castigates Dr. Eliason for having "disregarded" risks that he directly and forthrightly addressed. *Edmo*, 935 F.3d at 793. Far from disregarding the risk that Edmo would attempt to castrate herself, Dr. Eliason investigated the causes of such a risk and took concrete steps to mitigate it. Edmo's self-harm (including her castration attempts) followed closely after her disciplinary infractions and other severe stressors.

Identifying this causal connection, Dr. Eliason prescribed and encouraged regular counseling to address Edmo's acting out and her ability to cope. Dr. Eliason also sought to further deter self-castration by explaining to Edmo that she will need to have intact genitals for any eventual surgery, something Edmo now understands and articulated in her testimony. Likewise, contrary to the panel's conclusion that he disregarded the risk of continued distress, Dr. Eliason opted for a treatment of continued hormone therapy and more regular supportive counseling precisely because hormone therapy had already substantially ameliorated the distress from the dysphoria.

Furthermore, the panel errs by fixating on such individual risks. Physicians ministrate to whole individuals with whole diseases. Thus, individual risks may—and frequently do—persist for the sake of the overall health of the person. Dr. Eliason and his staff clearly believed their treatment choice would mitigate *overall risk*, including grave risks the panel downplays. Given Edmo's long-term struggles with severe depression and addiction, coupled with the fact that she had not lived as a woman within her social network, Eliason and the other doctors with whom he staffed the evaluation were concerned that she would have trouble adjusting after surgery, which could lead to regret, relapse, or new mood disorders. Ultimately, they worried that she might attempt suicide again. Such risks are not trifling and, in light of them, Dr. Eliason's willingness to accept some risk that Edmo would try to castrate herself or would continue to feel the distress of gender dysphoria (while taking steps to mitigate such risks) is anything but deliberately indifferent.

2

None of this is to acquiesce in the straw-man argument set up by the panel: that, so long as officials provide some care, they are immunized from an Eighth Amendment claim. One may assume that some medical care is indeed so obviously inadequate that, without any direct evidence of the defendant's state of mind, we may infer that the defendant was deliberately indifferent. *See Farmer*, 511 U.S. at 842 (remarking that deliberate indifference is "subject to demonstration in the usual ways, including inference from circumstantial evidence" and may be inferred "from the very fact that the risk was obvious").**[7]** But that is not this case.

Even in a legal universe in which the WPATH Standards define adequate care, Dr. Eliason's deviations were not deliberately indifferent. He selected a course of treatment that, in light of the complex of diagnoses, the grave risks, and the rapidly evolving nature of the medical research, was

---

**[7]** It should, however, be noted that the panel fails to identify a precedent of ours in which we have inferred a physician's deliberate indifference solely from the inadequate nature of the treatment and the persistence of known risks. In the nearest cases, some other circumstantial evidence has suggested the obviousness of the inadequacy such that the physician must have been aware of the inadequacy. *E.g., Snow*, 681 F.3d at 988 (non-specialist refused the recommendation of a treating specialist); *Hamilton v. Endell*, 981 F.2d 1062, 1067 (9th Cir. 1992) (same); *Lopez v. Smith*, 203 F.3d 1122, 1132 (9th Cir. 2000) (same); *Hunt v. Dental Dep't*, 865 F.2d 198, 201 (9th Cir. 1989) (refusal to replace the dentures prisoner had been prescribed); *Jett v. Penner*, 439 F.3d 1091, 1098 (9th Cir. 2006) (prisoner not referred to specialist for reasons unrelated to the prisoner's medical needs and medical records were manipulated); *Colwell v. Bannister*, 763 F.3d 1060, 1070 (9th Cir. 2014) (reliance on arbitrary prison policy). I do not doubt that mere inadequacy may raise the inference of deliberate indifference, but we seem to leave such an inference for cases of genuine quackery.

not obviously inadequate. *Cf. Lemire*, 726 F.3d at 1075 ("A prison official's deliberately indifferent conduct will generally 'shock the conscience' so long as the prison official had time to deliberate before acting . . . ."). He subjected his assessment to a review process intended to surface any possibility he was not considering, a review process that included several doctors and a full committee. And far from being an "unjustifiable" or "gross" deviation from the WPATH Standards, he departed from WPATH by raising the Standards' own concerns for the presence of comorbid conditions and the patient's limited experience as a woman. *See Farmer*, 511 U.S. at 839 (incorporating the Model Penal Code's definition of criminal recklessness); Model Penal Code § 2.02(2)(c) (1985) (stating that the criminally reckless individual "disregards a substantial and unjustifiable risk" and that such disregard "involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation."). Indeed, the panel concludes that his deviations were simply not "reasonable"—the test for negligent malpractice, not deliberate indifference. *Edmo*, 935 F.3d at 792. "Eighth Amendment liability requires 'more than ordinary lack of due care . . . .'" *Farmer*, 511 U.S. at 835 (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).

## III

The panel's novel approach to Eighth Amendment claims for sex-reassignment surgery conflicts with every other circuit to consider the issue. The panel acknowledges such a circuit split with the Fifth Circuit's opinion in *Gibson v. Collier*, 920 F.3d 212 (5th Cir. 2019), but tries—and fails—to distinguish the First Circuit's en banc opinion in *Kosilek v. Spencer*, 774 F.3d 63 (1st Cir. 2014). *See Edmo*, 935 F.3d at 794–95. The panel does not even address a third

decision: the Tenth Circuit's opinion in *Lamb v. Norwood*, 899 F.3d 1159 (10th Cir. 2018).

Just as in this case, the First Circuit considered an appeal of an injunction mandating sex-reassignment surgery. But, unlike our court, the First Circuit reversed. Though the panel attempts to downplay the direct conflict between its opinion and *Kosilek* by pointing to minor differences between the factual circumstances in each case,[8] the decisive differences are matters of law. As to whether the care was medically unacceptable, the First Circuit held that medically acceptable treatment of gender dysphoric prisoners is not synonymous with the demands of WPATH. *Kosilek* first reversed the district court's finding that one of the State's experts was "illegitimate" because the district court "made a significantly flawed inferential leap: it relied on its own— non-medical—judgment" and put too much "weight" on the WPATH Standards. *Kosilek*, 774 F.3d at 87–88. With that expert now taken seriously, the First Circuit held that the denial of Kosilek's sex-reassignment surgery was medically

---

[8] The differences between the circumstances in *Kosilek* and those in this case are not substantial enough to distinguish the holdings. The clinical judgments in each case were motivated by concerns about coexisting mental health conditions and the risk of suicide. *Kosilek*, 774 F.3d at 72. Just as in this case, *Kosilek* surfaced expert opinions that the WPATH Standards are best applied flexibly, that in-prison experience in the newly assigned gender is not a sufficient guarantee of ability to transition, and that practitioners face a "dearth of empirical research" on sex-reassignment surgery. *Id.* at 72–73, 76. The "security concerns" over how to house a potential postoperative Kosilek, which the panel considers the foremost difference between the two cases, was not even essential to *Kosilek*'s holding. *See Edmo*, 935 F.3d at 794; *Kosilek*, 774 F.3d at 91–92 (concluding that the officials' "choice of a medical option . . . does not exhibit a level of inattention or callousness to a prisoner's needs rising to a constitutional violation" before even analyzing the security concerns).

acceptable because it was within the bounds of "the medical standards of prudent professionals." *Id.* at 90. On the question of deliberate indifference, the First Circuit applied a test, which, unlike the panel's inference from the practitioners' mere knowledge that a course of treatment carried risks, asked whether the practitioners "knew or should have known" that course of treatment was *medically unacceptable*. *Id.* at 91.

For its part, the Fifth Circuit has held that good faith denial of sex-reassignment surgery *never* violates the Eighth Amendment. Recognizing "large gaps" in medical knowledge and a "robust and substantial good faith disagreement dividing respected members of the expert medical community," the Fifth Circuit concluded that "there can be no claim [for sex-reassignment surgery] under the Eighth Amendment." *Gibson*, 920 F.3d at 220, 222. Indeed, Texas's refusal to even evaluate the inmate for sex-reassignment surgery is, in the words of the Fifth Circuit, not "so unconscionable as to fall below society's minimum standards of decency" and permit an Eighth Amendment claim. *Id.* at 216 (quoting *Kosilek*, 774 F.3d at 96).

Finally, the Tenth Circuit has upheld the entry of summary judgment against a prisoner's Eighth Amendment claim for sex-reassignment surgery. *See Lamb*, 899 F.3d at 1163. As in this case, the doctor who evaluated the prisoner in *Lamb* determined that "surgery is impractical and unnecessary in light of the availability and effectiveness of more conservative therapies." *Id.* Adopting *Kosilek*'s subjective standard—that an Eighth Amendment violation would take place "only if prison officials had known or should have known" that "sex reassignment surgery [was] the only medically adequate treatment"—the Tenth Circuit held that "prison officials could not have been deliberately

indifferent by implementing the course of treatment recommended by a licensed medical doctor." *Id.* at 1163 & n.11 (citing *Kosilek*, 774 F.3d at 91).

Although I am not aware of any other circuits to have directly addressed the questions posed in this case,[9] for its part, the Seventh Circuit has held that it is at least not "clearly established" that there is a constitutional right to gender-dysphoria treatment beyond hormone therapy. *Campbell v. Kallas*, 936 F.3d 536, 549 (7th Cir. 2019). Nor is it "clearly established" that a prison medical provider is prohibited from denying sex-reassignment surgery on the basis of the patient's status as an institutionalized person. *Id.* at 541, 549.

With this decision, our circuit sets itself apart.

## IV

I do not know whether sex-reassignment surgery will ameliorate or exacerbate Adree Edmo's suffering. Fortunately, the Constitution does not ask federal judges to put on white coats and decide vexed questions of psychiatric medicine. The Eighth Amendment forbids the "unnecessary and wanton infliction of pain," not the "difference of opinion between a physician and the prisoner—or between medical

---

[9] The Seventh and Fourth Circuits (along with our own circuit) have also held that arbitrary blanket bans on certain gender dysphoria treatments can violate the Eighth Amendment—an issue not presented here because Idaho evaluates prisoner requests for sex-reassignment surgery on a case-by-case basis. *See Rosati v. Igbinoso*, 791 F.3d 1037, 1040 (9th Cir. 2015); *De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013); *Fields v. Smith*, 653 F.3d 550, 556 (7th Cir. 2011).

professionals." *Snow*, 681 F.3d at 985, 987 (quoting *Estelle*, 429 U.S. at 104).

Yet today our court assumes the role of Clinical Advisory Committee. Far from rendering an opinion "individual to Edmo" that "rests on the record," *Edmo*, 935 F.3d at 767, the panel entrenches the district court's unfortunate legal errors as the law of this circuit. Instead of permitting prudent, competent patient care, our court enshrines the WPATH Standards as an enforceable "medical consensus," effectively putting an ideologically driven private organization in control of every relationship between a doctor and a gender dysphoric prisoner within our circuit. Instead of reserving the Eighth Amendment for the grossly, unjustifiably reckless, the panel infers a culpable state of mind from the supposed inadequacy of the treatment.

We have applied the traditional deliberate-indifference standard to requests for back surgery, kidney transplant, hip replacement, antipsychotic medication, and hernia surgery. Yet suddenly the request for sex-reassignment surgery—and the panel's closing appeal to what it calls the "increased social awareness" of the needs and wants of transgender citizens—effects a revolution in our law! *Id.* at 803. The temptation to stand at what we are told is society's next frontier and to invent a constitutional right to state-funded sex-reassignment surgery does not justify the revision of previously universal principles of Eighth Amendment jurisprudence.

Dr. Eliason and the State's other practitioners were not deliberately indifferent—far from it. And they certainly were not guilty of violating the Eighth Amendment. They confronted the serious risks to Edmo's health, especially the gravest one. They considered the knotty quandary posed by her overlapping illnesses and the vicissitudes of her life.

Mindful of the dictate "first do no harm," these doctors determined that the appropriate treatment would be more cautious and more reversible than the one the patient desired. And they did so in the shadow of the ongoing debate about when the surgical replacement of the genitals is curative and when it is not.

Surely this was not cruel and unusual punishment.

COLLINS, Circuit Judge, dissenting from the denial of rehearing en banc:

The Supreme Court has held that a prisoner claiming that his or her medical treatment is so inadequate that it constitutes "cruel and unusual punishment" in violation of the Eighth Amendment must make the demanding showing that prison officials acted with "deliberate indifference" to the prisoner's "serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). As judges of an "inferior Court[]," *see* U.S. Const. art. III, § 1, we are bound to apply that standard, but as Judge Bumatay explains, the panel here effectively waters it down into a "mere negligence" test. *See infra* at 47–48 (Bumatay, J., dissenting from denial of rehearing en banc). That is, by narrowly defining the range of "medically acceptable" options that the court believes a prison doctor may properly consider in a case such as this one, and by then inferring deliberate indifference from Dr. Eliason's failure to agree with that narrow range, the district court and the panel have applied standards that look much more like negligence than deliberate indifference. *Id.* at 45–48. Whether Dr. Eliason was negligent or not (a question on which I express no opinion), his treatment decisions do not amount to "cruel and unusual punishment," and we have thus strayed far from any proper understanding

of the Eighth Amendment.  I therefore join Part II of Judge Bumatay's dissent, and I respectfully dissent from our failure to rehear this case en banc.

---

BUMATAY, Circuit Judge, with whom CALLAHAN, IKUTA, R. NELSON, BADE, and VANDYKE, Circuit Judges, join, and with whom COLLINS, Circuit Judge, joins as to Part II, dissenting from the denial of rehearing en banc:

Like the panel and the district court, I hold great sympathy for Adree Edmo's medical situation.  And as with all citizens, her constitutional rights deserve the utmost respect and vigilant protection.  As the district court rightly stated,

> The Rule of Law, which is the bedrock of our legal system, promises that all individuals will be afforded the full protection of our legal system and the rights guaranteed by our Constitution.   This is so whether the individual seeking that protection is black, white, male, female, gay, straight, or, as in this case, transgender.[1]

Adree Edmo is a transgender woman suffering from gender dysphoria—a serious medical condition.  While incarcerated in Idaho's correctional facilities, she asked that her gender dysphoria be treated with sex-reassignment

---

[1] *Edmo v. Idaho Dep't of Corr.*, 358 F. Supp. 3d 1103, 1109 (D. Idaho 2018), *order clarified*, No. 1:17-CV-00151-BLW, 2019 WL 2319527 (D. Idaho May 31, 2019), *and aff'd in part, vacated in part, remanded sub nom. Edmo v. Corizon, Inc.*, 935 F.3d 757 (9th Cir. 2019).

surgery ("SRS"). After consultation with a prison doctor, her request was denied. She then sued under the Eighth Amendment.[2]

I respect Edmo's wishes and hope she is afforded the best treatment possible. But whether SRS is the optimal treatment for Edmo's gender dysphoria is not before us. As judges, our role is not to take sides in matters of conflicting medical care. Rather, our duty is to faithfully interpret the Constitution.

That duty commands that we apply the Eighth Amendment, not our sympathies. Here, in disregard of the text and history of the Constitution and precedent, the panel's decision elevates innovative and evolving medical standards to be the constitutional threshold for prison medical care. In doing so, the panel minimizes the standard for establishing a violation of the Eighth Amendment.

After today's denial of rehearing en banc, the Ninth Circuit stands alone in finding that a difference of medical opinion in this debated area of treatment amounts to "cruel and unusual" punishment under the Constitution. While this posture does not mean we are wrong, it should at least give us pause before embarking on a new constitutional trajectory. This is especially true given the original meaning of the Eighth Amendment.

Because the panel's opinion reads into the Eighth Amendment's Cruel and Unusual Clause a meaning in conflict with its text, original meaning, and controlling

---

[2] Because Judge O'Scannlain thoroughly recites the relevant facts in his opinion respecting the denial of the rehearing en banc, which I join in full, I do not reiterate them here.

precedent, I respectfully dissent from the denial of rehearing en banc.

## I.

In holding that Idaho[3] violated the Eighth Amendment, the panel opined that the Constitution's text and original meaning merited "little discussion." *See Edmo*, 935 F.3d at 797 n.21. I disagree.

As inferior court judges, we are bound by Supreme Court precedent. Yet, in my view, judges also have a "duty to interpret the Constitution in light of its text, structure, and original understanding." *NLRB v. Noel Canning*, 573 U.S. 513, 573 (2014) (Scalia, J., concurring). While we must faithfully follow the Court's Eighth Amendment precedent as articulated in *Estelle v. Gamble*, 429 U.S. 97 (1976), and its progeny, "[w]e should resolve questions about the scope of those precedents in light of and in the direction of the constitutional text and constitutional history." *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 537 F.3d 667, 698 (D.C. Cir. 2008) (Kavanaugh, J., dissenting), *aff'd in part, rev'd in part and remanded*, 561 U.S. 477 (2010).

Accordingly, the Eighth Amendment's history and original understanding are of vital importance to this case.

## A.

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend.

---

[3] For simplicity, I collectively refer to Defendants below and Appellants here as "Idaho."

VIII. Even just a cursory review of the amendment's original meaning shows that Edmo's claims fall far below a constitutional violation as a matter of text and original understanding.

At the time of the Eighth Amendment's ratification, "cruel" meant "[p]leased with hurting others; inhuman; hard-hearted; void of pity; wanting compassion; savage; barbarous; unrelenting." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1123 (2019) (citing 1 Samuel Johnson, *A Dictionary of the English Language* (4th ed. 1773); 1 Noah Webster, *An American Dictionary of the English Language* (1828) ("Disposed to give pain to others, in body or mind; willing or pleased to torment, vex or afflict; inhuman; destitute of pity, compassion or kindness.")). Even today, "cruel" punishments have been described as "inhumane," *Farmer v. Brennan*, 511 U.S. 825, 838 (1994), involving the "unnecessary and *wanton* infliction of pain," *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (emphasis added) (citations omitted), or involving the "*superadd[ition]* of terror, pain, or disgrace." *Bucklew*, 139 S. Ct. at 1124 (emphasis added) (internal quotation marks and citations omitted).

In the 18th Century, a punishment was "unusual" if it ran contrary to longstanding usage or custom, or had long fallen out of use. *Bucklew*, 139 S. Ct. at 1123 (citing 4 William Blackstone, *Commentaries on the Laws of England* 370 (1769); Stuart Banner, *The Death Penalty: An American History* 76 (2002); *Baze v. Rees*, 553 U.S. 35, 97 (2008) (Thomas, J., concurring); John F. Stinneford, *The Original Meaning of "Unusual": The Eighth Amendment as a Bar to Cruel Innovation*, 102 Nw. U. L. Rev. 1739, 1770–71, 1814 (2008)). This early understanding comports with the plain meaning of "unusual," which has changed little from our

Nation's founding. *See Harmelin v. Michigan*, 501 U.S. 957, 976 (1991) (comparing Webster's American Dictionary (1828) definition of "unusual" as that which does not "occu[r] in ordinary practice" with Webster's Second International Dictionary 2807 (1954) as that which is not "in common use.").

Conversely, customs enjoying a long history of usage were described as "usual" practices. Stinneford, *supra*, at 1770. James Wilson, a key contributor to the Constitution, stated that "long customs, approved by the consent of those who use them, acquire the qualities of a law." 2 James Wilson, *Collected Works of James Wilson* 759 (Kermit L. Hall & Mark David Hall eds., Indianapolis, Liberty Fund 2007); *see also* Stinneford, *supra*, at 1769. Likewise, early American courts construing the term "cruel and unusual" (generally, as used in state constitutions) upheld punishments that were not "unusual" in light of common law usage. Stinneford, *supra*, at 1810–11 (citing *Barker v. People*, 20 Johns. 457, 459 (N.Y. Sup. Ct. 1823), *aff'd*, 3 Cow. 686 (N.Y. 1824); *Commonwealth v. Wyatt*, 27 Va. 694, 701 (Va. Gen. Ct. 1828); *People v. Potter*, 1 Edm. Sel. Cas. 235, 245 (N.Y. Sup. Ct. 1846)). Thus, "[u]nder the plain meaning of the term, a prison policy cannot be 'unusual' if it is widely practiced in prisons across the country." *Gibson v. Collier*, 920 F.3d 212, 226 (5th Cir. 2019).

Finally, various views have been proposed with respect to the original meaning of "punishment" in the Eighth Amendment. Some view the word as being inapplicable to conditions of confinement. *See, e.g.*, *Farmer*, 511 U.S. at 837 ("The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'") (Souter, J.). Some have even suggested

that "punishment" refers only to sentences imposed by a judge or jury. *See Hudson v. McMillian*, 503 U.S. 1, 18 (1992) (Thomas, J., dissenting); *but see Helling v. McKinney*, 509 U.S. 25, 40 (1993) (Thomas, J., dissenting) (recognizing that the "evidence is not overwhelming" on this question). Others believe the term was originally understood to encompass more than sentences called for by statute or meted out from the bench or jury box, but it required deliberate intent. *See, e.g.*, *Wilson v. Seiter*, 501 U.S. 294, 300 (1991) ("The infliction of punishment is a deliberate act intended to chastise or deter. This is what the word means today; it is what it meant in the eighteenth century.") (Scalia, J.) (quoting *Duckworth v. Franzen*, 780 F.2d 645, 652 (7th Cir. 1985)); *see also* Celia Rumann, *Tortured History: Finding Our Way Back to the Lost Origins of the Eighth Amendment*, 31 Pepp. L. Rev. 661, 675, 677 (2004) (presenting historical evidence that the word punishment was "understood at the time to include torturous interrogation") (citing 4 William Blackstone, *Commentaries on the Laws of England*; 3 Jonathan Elliot, The Debates in the Several State Conventions on the Adoption of the Federal Constitution 447–48).

## B.

While the foregoing overview does not provide the full contours of the original understanding of the Cruel and Unusual Clause, it demonstrates that Idaho's actions are far from a constitutional violation based on the clause's text and original meaning. Idaho's actions simply do not amount to the "barbarous" or "inhuman" treatment so out of line with longstanding practice as to be forbidden by the Eighth Amendment.

No longstanding practice exists of prison-funded SRS.[4] Indeed, the medical standards at the heart of Edmo's claim are innovative and evolving. The standards of care relied on by Edmo were promulgated by the World Professional Association for Transgender Health ("WPATH") in 2011— only about five years before Edmo's lawsuit. WPATH, *Standard of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People* (7th ed. 2011) ("WPATH standards"). As the standards themselves note, this "field of medicine is evolving." The WPATH standards also call for flexibility, individual tailoring, and wide latitude in treatment options.

Likewise, as recognized by numerous federal courts, the WPATH standards are not accepted as medical consensus. The first circuit court to address the issue ruled that the WPATH standards did not foreclose alternative treatment options, and that a doctor's decision to choose a non-WPATH treatment did not violate the Eighth Amendment. *Kosilek v. Spencer*, 774 F.3d 63, 90 (1st Cir. 2014). The Fifth Circuit also found that the WPATH standards remained controversial and did not reflect a consensus. *Gibson*, 920 F.3d at 223. Similarly, after reciting the WPATH standard's recommended treatment options for gender dysphoria, the Tenth Circuit rejected a claim that prison officials acted with deliberate indifference "by implementing [an alternative] course of treatment recommended by a licensed medical doctor," rather than

---

[4] *See, e.g.*, *Quine v. Beard*, No.14-cv-02726-JST, 2017 WL 1540758, at *1 (N.D. Cal. Apr. 28, 2017), *aff'd in part, vacated in part, rev'd in part sub nom. Quine v. Kernan*, 741 F. App'x 358 (9th Cir. 2018); Kristine Phillips, *A Convicted Killer Became the First U.S. Inmate to Get State-Funded Gender-Reassignment Surgery*, Wash. Post (Jan. 10, 2017), https://wapo.st/2S21zP3.

SRS. *Lamb v. Norwood*, 899 F.3d 1159, 1163 (10th Cir. 2018), *cert. denied*, 140 S. Ct. 252 (2019).[5]

The debate about the WPATH standards continues even outside prison walls. The Centers for Medicare and Medicaid Services ("CMS") declined to adopt the WPATH standards due to inadequate scientific backing, and instead gives providers discretion to apply either the WPATH standards or their own standards. CMS, Decision Memo for Gender Dysphoria and Gender Reassignment Surgery (August 30, 2016), available at https://go.cms.gov/36yMrx X. Similarly, the American Psychiatric Association expressed concern about the scientific evidence undergirding the WPATH standards. And as recently as 2017, WPATH requested that Johns Hopkins University conduct an evidence-based review of the standards, a review that, at the time of Edmo's lawsuit, was ongoing.

Idaho's actions reflect the uncertainty regarding the WPATH standards throughout the medical field, and do not, under the record, reflect a want of compassion. *See supra* O'Scannlain, J., dissenting at 22–29. Given the lack of medical consensus, Dr. Eliason's decision to pursue an alternative treatment, rather than SRS, cannot constitute the "barbarous" or "inhuman" conduct prohibited by the Eighth Amendment. *See Bucklew*, 139 S. Ct. at 1123. Nothing in the record reflects that Dr. Eliason's diagnosis and treatment of Edmo was tainted by malice or animosity. Notably, Dr. Eliason concluded that Edmo had coexisting mental

---

[5] In the non-SRS context, the Tenth Circuit also found no Eighth Amendment violation where a doctor prescribed lower hormonal treatment levels for a gender dysphoric inmate than those suggested by the WPATH standards. *Druley v. Patton*, 601 F. App'x 632, 635 (10th Cir. 2015).

health issues that required treatment and counseling prior to considering SRS. The district court itself found Edmo's reluctance to address those issues "troubling." *Edmo*, 358 F. Supp. 3d at 1121. Additionally, Idaho had no blanket policy prohibiting SRS, and Dr. Eliason never definitively ruled it out. Dr. Eliason committed to monitoring Edmo's candidacy for SRS after deciding that Edmo did not meet the criteria for the procedure in 2016. In sum, Dr. Eliason's decision to pursue an alternative treatment to SRS suggests a tailored evaluation of potential risks and does not reflect the hard-hearted or barbarous treatment proscribed by the text of the Constitution.

Given the facts of this case, Dr. Eliason's treatment cannot rise to the infliction of cruel and unusual punishment—not in a sense that bears any resemblance to the original meaning of that phrase. This is not to say that the WPATH standards are not *a* medically acceptable standard. But the innovative, contested, and evolving nature of the WPATH standards, the lack of medical consensus, and the particular circumstances of this case make clear that no constitutional violation occurred under the Constitution's text and original understanding.

## II.

In addition to being inconsistent with the original understanding of the Eighth Amendment, I, like Judge O'Scannlain, believe that the panel decision departs from precedent.

### A.

Since *Estelle v. Gamble*, the Supreme Court has recognized claims for inadequate medical treatment under the Eighth Amendment when prison officials act with

"deliberate indifference to serious medical needs of prisoners." 429 U.S. at 104. The test for such a claim involves "both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), *overruled on other grounds by Peralta v. Dillard*, 774 F.3d 1076 (9th Cir. 2014). Under Ninth Circuit precedent, if a defendant's treatment decision was "medically acceptable," then the court need go no further: the plaintiff cannot show deliberate indifference as a matter of law. *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (citing *Estelle*, 429 U.S. at 107–08).

Deliberate indifference is a high bar, involving an "unnecessary and wanton infliction of pain" or conduct that is "repugnant to the conscience of mankind." *Estelle*, 429 U.S. at 104, 105–06 (citations omitted). An inadvertent failure to provide adequate medical care is neither, so it cannot support an Eighth Amendment claim. *Id*; *see also Farmer*, 511 U.S. at 835 (explaining that deliberate indifference requires "more than ordinary lack of due care for the prisoner's interests or safety") (citation omitted).

A prison official acts with deliberate indifference only where he "knows of and disregards an *excessive* risk to inmate health or safety." *Farmer*, 511 U.S. at 837 (emphasis added). As Justice Thomas describes it, this is the second-highest standard of subjective culpability under the Court's Eighth Amendment jurisprudence—short only of "malicious and sadistic action for the very purpose of causing harm." *Id*. at 861 (Thomas, J., concurring) (internal quotation marks and citations omitted). Such a stringent culpability requirement "follows from the principle that 'only the unnecessary and wanton infliction of pain implicates the

Eighth Amendment.'" *Id.* at 834 (quoting *Wilson*, 501 U.S. at 294).

Our precedent has consistently emphasized the challenging threshold for showing deliberate indifference.[6] Rightfully so, too. In the 44 years since *Estelle*, an unbroken line of Supreme Court cases reaffirmed that mere negligence, inadvertence, or good-faith error cannot establish an Eighth Amendment claim.[7]

## B.

The panel's decision here dilutes the otherwise stringent deliberate indifference standard. The panel begins by finding Edmo's gender dysphoria to be a "serious medical

---

[6] *See Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th Cir. 2016) (explaining that "[a] difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference," and reiterating the "high legal standard" for showing an Eighth Amendment violation) (citations omitted); *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004); *Hallett v. Morgan*, 296 F.3d 732, 745 (9th Cir. 2002); *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990).

[7] *See Minneci v. Pollard*, 565 U.S. 118, 130 (2012) (noting that "to show an Eighth Amendment violation a prisoner must typically show that a defendant acted, not just negligently, but with 'deliberate indifference'") (citing *Farmer*, 511 U.S. at 825, 834); *Ortiz v. Jordan*, 562 U.S. 180, 190 (2011) (restating *Farmer*'s articulation of the deliberate indifference standard); *Wilson*, 501 U.S. at 297 ("[A]llegations of 'inadvertent failure to provide adequate medical care,' or of a 'negligent . . . diagnosis,' simply fail to establish the requisite culpable state of mind.") (internal citations and alterations omitted); *Whitley*, 475 U.S. at 319 ("To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care . . . . It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause[.]").

need." *Edmo*, 935 F.3d at 785. It then determines, based solely on the WPATH standards, that Dr. Eliason's failure to recommend SRS was medically unacceptable. *Id.* at 786–92. From there, the panel leaps to conclude that Dr Eliason was "deliberately indifferent" precisely because it viewed his treatment as "ineffective" and "medically unacceptable" under the panel's reading of the WPATH standards. *Id.* at 793. Thus, under the panel's approach, compliance with the court-preferred medical standards (in this case, the WPATH standards) is the beginning and the end of the inquiry. This is not the deliberate indifference inquiry required by precedent.

As an initial matter, and as Judge O'Scannlain aptly points out, the panel errs in holding up *one* medically accepted standard, i.e., the WPATH guidelines, as the constitutional "gold standard," thereby precluding any further debate on the matter. *See supra* O'Scannlain, J., dissenting at 15–22. As discussed above, the WPATH standards do not establish a definitive medical consensus and judges applying Eighth Amendment standards should not and need not take sides in this debate.

More fundamentally though, the panel's analysis effectively erases the subjective deliberate indifference requirement with its circular reasoning. Nowhere does the panel consider any direct evidence of Dr. Eliason's subjective mental state. *Cf. Jett v. Penner*, 439 F.3d 1091, 1098 & n.2 (9th Cir. 2006) (concluding that a doctor's medical note stating "I reviewed xrays which showed no obvious fracture malalignment," written after reviewing a radiology report which specifically indicated a deformity, could evidence deliberate indifference) (alteration in original). Nor does the panel consider the many reasons underlying Dr. Eliason's decision to decline SRS treatment.

*See supra* O'Scannlain, J., dissenting at 15–22.  Once those reasons are swept aside, the panel circularly *infers* deliberate indifference based on its prior determination that Dr. Eliason's treatment plan was "ineffective" or "medically unacceptable" under the WPATH standards.  *See Edmo*, 935 F.3d at 793–94 (finding Dr. Eliason deliberately indifferent because his treatment "stopped short of what was medically necessary").

Such an approach is particularly troublesome because, if replicated, deliberate indifference could be inferred solely from a finding of a "medically unacceptable" treatment.  For Eighth Amendment claims like Edmo's, a plaintiff must first show the "medically unacceptable" treatment of a "serious medical need[]" and, second, that the doctor's treatment decision reflected "deliberate indifference" to the medical need.  *Jackson*, 90 F.3d at 332.  The panel's analysis collapses this two-part inquiry into one circular step.  If courts follow the panel's reasoning, in every case of medically unacceptable treatment, courts could automatically infer deliberate indifference.

Worse still, because "medical acceptability" is an objective negligence inquiry, the ultimate effect of the panel's analysis is to dilute the heightened, subjective culpability required for deliberate indifference, *see Farmer*, 511 U.S. at 839–40, into mere negligence, which the Supreme Court has repeatedly warned falls short of an Eighth Amendment violation.  *See, e.g.*, *Estelle*, 429 U.S. at 105–06.  By denying rehearing en banc in this case, we relegate federal judges to the role of referee in medical disputes.  This is not what the Constitution or precedent envisions.

\* \* \*

The Eighth Amendment's history and text entreat us to hold the line on the heightened standards for a constitutional deprivation found in our precedent. As Justice Thomas rightly observed, "[t]he Eighth Amendment is not, and should not be turned into, a National Code of Prison Regulation." *Hudson*, 503 U.S. at 28 (Thomas, J., dissenting). By judicially mandating an innovative and evolving standard of care, the panel effectively constitutionalizes a set of guidelines subject to ongoing debate and inaugurates yet another circuit split. And by diluting the requisite state of mind from "deliberate indifference" to negligence, the panel effectively holds that—contrary to Supreme Court precedent—"[m]edical malpractice [*does*] become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106 (altered). I respectfully dissent from the denial of rehearing en banc.